

**FILE COPY**

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL

DIVISION OF STATE COUNSEL
LITIGATION BUREAU

Writer Direct: 518-776-2583

July 7, 2015

Maxmillian Sloley
171 Eagle Street
Albany, New York  12202

Re:   *Sloley v. VanBramer*
Northern District of New York
14-CV-339 (GLS/CFH)

Dear Mr. Sloley:

Enclosed is a copy of the transcription from your deposition on May 18, 2015.  If you wish to make any changes, please list the changes and the reasons for making them on the errata sheet and return the signed and notarized errata sheet to me within 30 days.  Please also sign and have notarized the signature page (page 116) and return it to me.

Also enclosed are copies of the exhibits from your May 18 deposition.

Thank you,

Mark G. Mitchell
Assistant Attorney General

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

MAXMILLIAN SLOLEY,

<em>Plaintiff,</em>

-against-

ERIC VANBRAMER; BRIAN VANBRAMER; STATE OF
NEW YORK,

<em>Defendants.</em>

**DECLARATION OF
SERVICE**

14-CV-0339

GLS/CFH

---

I, SANDRA M. SCHNAPP, declare pursuant to 28 USC § 1746, that on July 7, 2015, I

served the annexed **deposition transcript from May 18, 2015** upon the following individual, by

depositing a true copy thereof, properly enclosed in a sealed, postpaid wrapper, in a post office

box in the City of Albany, a depository under the exclusive care and custody of the United States

Postal Service, directed to the individual at the address, designated for that purpose, as follows:

Maxmillian Sloley
171 Eagle Street
Albany, NY  12202

Dated: July 7, 2015
       Albany, New York

Sandra M. Schnapp

ORIGINAL

1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF NEW YORK

3            Civil Action No. 14-CV-339

4    ------------------------------------------------------------

5    MAXMILLIAN SLOLEY,

6                              Plaintiff,

7            -against-

8    ERIC VANBRAMER and BRIAN VANBRAMER,

9                              Defendants.

10   ------------------------------------------------------------

11          STENOGRAPHIC MINUTES OF EXAMINATION BEFORE TRIAL

12   conducted of the plaintiff, MAXMILLIAN SLOLEY, pursuant to

13   Notice, on the 18th day of May, 2015, at the offices of the

14   New York State Attorney General, Justice Building, fourth

15   floor conference room, Albany, New York, commencing at 10:15

16   a.m.; before SARAH B. DLUGOLECKI, a Shorthand Reporter and

17   Notary Public within and for the State of New York.

18

19

20

21

22

23

24

25

2

APPEARANCES:

      On behalf of Plaintiff:

         (The plaintiff appeared pro se.)


      On behalf of Defendants:

         STATE OF NEW YORK
         OFFICE OF THE ATTORNEY GENERAL
         ERIC T. SCHNEIDERMAN
         Justice Building
         Albany, New York  12224-0341

            BY:   MARK G. MITCHELL, ESQ.
                 Assistant Attorney General
                 Litigation Bureau
                 Mark.Mitchell@ag.ny.gov

S T I P U L A T I O N S

1 IT IS HEREBY STIPULATED AND AGREED by and
between the attorneys for the respective parties hereto,
that filing, sealing and certifications are hereby waived;
IT IS FURTHER STIPULATED AND AGREED that all objections,
except as to the form of the question, shall be reserved to
the time of the trial; IT IS FURTHER STIPULATED AND AGREED
that the within Deposition may be signed before any Notary
Public with the same force and effect as though subscribed
and sworn to before this Court.

```
1              (Defendant's Exhibits 1 through 3,
2         respectively, were pre-marked for identification.)
3              MAXMILLIAN SLOLEY,
4         (having been first duly sworn by the Notary
5    Public, was examined and testified as follows:)
6    EXAMINATION BY COUNSEL FOR THE DEFENDANTS
7    BY MR. MITCHELL:
8    Q.    Hello.  I am Mark Mitchell representing the
9    defendants, Eric and Brian VanBramer.  Are you represented
10   by an attorney on this case?
11   A.    No.
12   Q.    And I just wanted to talk to you a little bit about
13   depositions, how they work.  You should answer only based on
14   your personal knowledge.  You shouldn't guess what an answer
15   might be.  If you don't understand a question I ask, just
16   let me know and I will rephrase it.
17             Have you taken any medications or other substances
18   that would affect your ability to understand my questions?
19   A.    No.
20   Q.    Can you state your name?
21   A.    Maxmillian Sloley.
22   Q.    Do you have a middle name?
23   A.    Roxroy.
24   Q.    How do you spell that?
25   A.    R-O-X-R-O-Y.
```

```
1   Q.    What is your address?
2   A.    1                    , Albany, New York, 12202.
3   Q.    What's your date of birth?
4   A.         /1976.
5   Q.    What is your Social Security number?
6   A.
7   Q.    Do you currently live with anyone?
8   A.    Yes.
9   Q.    Who?
10  A.    Stacey Hines, my roommate.
11  Q.    Are you in an apartment?
12  A.    Yes.
13  Q.    Are you married?
14  A.    No.
15  Q.    Have you ever been married?
16  A.    No.
17  Q.    What is your educational background?
18  A.    I did a few semesters of college, never completed.
19  Q.    Where did you go to high school?
20  A.    Bronx.  Evander Childs High School in the Bronx.
21  Q.    And did you graduate?
22  A.    No.  I got my GED.
23  Q.    And then what education did you have after that?
24  A.    I had a few semesters of technical college in
25  Manhattan for majoring in automotive technology.
```

1    Q.    By the way, what year did you get your GED?

2    A.    1993.

3    Q.    And approximately what year or years were you in

4    technical college?

5    A.    2012.

6    Q.    Are you still doing that?

7    A.    No.

8    Q.    You said it was to be a mechanic?

9    A.    Yes.

10   Q.    Do you have any other education?

11   A.    No.

12   Q.    Are you currently employed?

13   A.    Yes.

14   Q.    Where?

15   A.    I do, like, the automotive work.

16   Q.    Where?

17   A.    It's not -- I don't work for a specific garage . I

18   just -- people I know, I fix their cars for them.

19   Q.    Do you do that in Albany?

20   A.    Mostly in Greene County and Columbia County.  I don't

21   really know anybody in Albany.

22   Q.    Do you have a shop?

23   A.    No.  We just have a lot of land.

24   Q.    Are you part of a business?

25   A.    No.  I guess I'm self-employed.

1    Q.    Before your current work, what was your job?

2    A.    I was working for Dunkin' Donuts.

3    Q.    When was that?

4    A.    2014.

5    Q.    In what city?

6    A.    Schodack.   Overnight truck delivery.   We delivered

7    the donuts to the stores.

8    Q.    When did that job end?

9    A.    About approximately in December.

10   Q.    December of 2014?

11   A.    Of 2014.

12   Q.    And where did you work before that?

13   A.    Before that, I was incarcerated.

14   Q.    Going back before the incarceration, did you have a

15   career?

16   A.    A career or a job?

17   Q.    A job.

18   A.    Yes, I did part-time when I was in school for like

19   temp agencies.

20   Q.    Are you talking in 2012?

21   A.    Yes.   When I was in school, I was, like, part-time

22   for a temp agency as long as it didn't conflict with my

23   school hours.

24   Q.    So we're talking 2012?

25   A.    Yes.

1   Q.      And what about before that, did you have a job?

2   A.      2009.

3   Q.      And what was that job?

4   A.      I worked for a security company when I was in a

5   work-release program, a security company in Queens.  I just

6   worked the phones, though.

7   Q.      Going back to the temp agency, where was that

8   located?

9   A.      Down by 44th Street or 45th Street in Manhattan.

10  That was their main office.  I think it's F-S-O or F-S-S

11  Staffing.

12  Q.      So the lawsuit that you have talks about an incident

13  on April 1st, 2013; is that correct?

14  A.      Yes.

15  Q.      Were you working at that time?

16  A.      No.

17  Q.      So you gave your address as                .  Where

18  did you live before that?

19  A.                         Yonkers, New York.

20  Q.      I'd like to start most recent and going back in time.

21  So I'm asking about what was your residence immediately

22  before the Eagle Street address?

23  A.

24  Q.      And what area?

25  A.      Yonkers, New York.

```
1    Q.      And what about before that?

2    A.                         , Brooklyn, New York.

3    Q.      What time period did you live at                    ?

4    A.      When I was released in 2014 until I moved to Albany.

5    Q.      And then you said the other one was

6    in Brooklyn?

7    A.      Yes.

8    Q.      And when did you live there?

9    A.      2011, '12, and '13.

10   Q.      And what about before    '              ?

11   A.      Before             t, I was at

12                                  , Elmsford, New York.

13   Q.      And what years were you there?

14   A.      2010.

15   Q.      Were you continuing to use the          address as a

16   mailing address for a while?

17   A.      Yes.  That's my sister's address.

18   Q.      And then before                    , where did you live?

19   A.      Before            , there's about a six-year stretch.

20   Q.      And where were you?

21   A.      I was in prison.

22   Q.      Which one?

23   A.      Numerous.  I was in federal institutions.

24   Q.      Can we go through some of them?

25   A.      Otisville.
```

1   Q.      And where is that?

2   A.      That's Upstate New York.

3   Q.      And that's a federal facility?

4   A.      Yes.

5   Q.      And what year were you there?

6   A.      2005 to 2007.

7   Q.      And what other facilities?

8   A.      From 2003 to 2005, I was in MCC, New York.

9   Q.      And where is that located?

10  A.      Manhattan.

11  Q.      And what other facilities?

12  A.      From 2007 to 2009, I was in USP Lee.  That's in

13  Virginia.

14  Q.      Any other facilities?

15  A.      2009, I was in Allenwood.  That's in Pennsylvania.

16  Q.      Any others?

17  A.      That's it.

18  Q.      Were you ever in Metropolitan Detention Center in

19  Brooklyn?

20  A.      Yes, just as a transit.

21  Q.      And when were you there?

22  A.      I was there numerous times because, like, you pass

23  through there through transit, so I was there numerous

24  times.

25  Q.      When was the most recent time you were there?

```
 1   A.      2014 I came home from there.  I was there for about a
 2   month or two.
 3   Q.      Were you ever in the Columbia County Jail?
 4   A.      Yes.
 5   Q.      When was that?
 6   A.      Most recent was 2011 -- '10 -- '10 to '11.
 7   Q.      And were you in that jail before that at some point?
 8   A.      Yes.  I have been there numerous times.
 9   Q.      What was the most recent one before the 2010 to 2011
10   period?
11   A.      2002.
12   Q.      So you weren't in the Columbia County Jail between
13   2002 and 2010; is that right?
14   A.      No.  That was the federal time.
15   Q.      Did you live in Hudson at any point?
16   A.      No.
17   Q.      Were you ever at                     in Hudson?
18   A.      Yes.
19   Q.      So you did live in Hudson?
20   A.      No.
21   Q.      So what was your arrangement?
22   A.      That was never my address.  The cops put that as my
23   address to cover up what they did in that situation, but I
24   never lived there.
25   Q.      Did you stay there for a while?
```

```
 1   A.      I slept there before.  Like, when I can't make it
 2   across the bridge to my girlfriend's house, I would sleep
 3   there if I had too much to drink.
 4   Q.      Were you friends with the people who lived there?
 5   A.      One.
 6   Q.      Who was your friend there?
 7   A.      Jamaican guy with dreads, an older guy.
 8   Q.      What's his name?
 9   A.      Jerry.
10   Q.      What's his last name?
11   A.      I don't know.
12   Q.      Were you ever in Downstate Correctional Facility?
13   A.      I think I passed through there back in '97 for like a
14   week or two, just a transit, just passing through.  That was
15   never like a permanent --
16   Q.      I think we talked a little bit about the
17   Street address.  And you said that you didn't live there,
18   but you slept there sometimes?
19   A.      Yes.
20   Q.      Where were you living at that time?
21   A.      I was back and forth from New York City and
22   Greenville, New York.  That's where my girlfriend was
23   living.  That's in Greene County.
24   Q.      Did you give me that address?
25   A.      No.
```

1  Q.      What was that one?

2  A.      I don't know.  It's off Route 32 in Greenville, New

3  York.  I don't know the specific address.

4  Q.      Who was the girlfriend?

5  A.      Cary Andersen.  S-E-N, not, S-O-N, Andersen.

6  Q.      So Greenville.  And what was the other place you were

7  living at that time?

8  A.      2010 I was

9  Q.      Are you currently on probation?

10 A.      Yes.

11 Q.      What conviction are you on probation for?

12 A.      Firearm.

13 Q.      And when was that?

14 A.      2003, I was arrested.

15 Q.      Was there a conviction for that?

16 A.      Yes.

17 Q.      What was the year of the conviction, if you remember?

18 A.      2005.

19 Q.      Do you have a probation officer that you correspond

20 with?

21 A.      Yes.

22 Q.      What are the terms of your probation?

23 A.      Just the usual, you know, no drug use, no criminal

24 activity.  And I got new terms right now, special conditions

25 to stay away from Cary Andersen and her sister.  Well, no,

1   it's not to stay away.  It's just if I have contact with

2   them or they have contact with me, I let my probation

3   officer know about it.

4   Q.     Does Cary Andersen have an Order of Protection

5   against you?

6   A.     No more, no.  There was at one time.

7   Q.     When was that in effect, if you know?

8   A.     2014.

9   Q.     When did it end?

10  A.     2014.  Stayed on for about a month or two.  Something

11  like that.

12  Q.     Are there any other conditions of your probation?

13  A.     Probation has numerous conditions.

14  Q.     Are you under GPS monitoring?

15  A.     Yes.

16  Q.     How does that work?

17  A.     They just keep track of my location at all times.

18  Q.     Do you wear some type of bracelet or --

19  A.     Yes.

20  Q.     Are there any restrictions on your travel?

21  A.     If I leave the district, I need permission.

22  Q.     Which district?

23  A.     Well, right now I'm in the Northern District.  So if

24  I leave the Northern District, I would have to get

25  permission, but that's standard.

1    Q.    Don't you need to get permission just to go to the

2    Northern District?

3    A.    No.   Right now I'm stationed in the Northern

4    District.   This is my district now.   I transferred from

5    Southern to Northern.   By probation officer's in Albany.

6    Q.    When did you transfer?

7    A.    September.

8    Q.    Of 2014?

9    A.    2014.   Yep.

10   Q.    What probation office do you deal with here?

11   A.    Federal.

12   Q.    What's the name of your probation officer?

13   A.    Ron LcCoy.   L-C-C-O-Y.

14   Q.    Who is Judge Pauley?

15   A.    That's my federal judge.

16   Q.    Is he in the Southern District of New York?

17   A.    Yes, Douthern.

18   Q.    Do you have any appearances with him scheduled?

19   A.    No.

20   Q.    When do you expect your term or probation will end?

21   A.    Sometime within the end of this year.

22   Q.    When was the last time you went to Judge Pauley's

23   courtroom?

24   A.    I think June of 2014 or July.   I'm not exactly sure.

25   Sometime last year.

1    Q.    Is there a lawyer representing you on that matter?

2    A.    Yes.

3    Q.    Who is it?

4    A.    Justine Harris.

5    Q.    Does she work for some organization?

6    A.    No.  She's private.

7    Q.    Have you ever been convicted of a crime?

8    A.    Yes.

9    Q.    Why don't we go through it, I guess, starting the

10   furthest back in time.  What was the first crime you were

11   convicted of?

12   A.    Robbery in 1992.

13   Q.    In what court?

14   A.    Bronx County.

15   Q.    How old were you at that point?

16   A.    Fifteen.

17   Q.    Did you receive a sentence?

18   A.    Yes.  One and a half to four and a half years.

19   Q.    In state prison?

20   A.    Juvenile, detention for youth.

21   Q.    And when did that sentence end?

22   A.    The prison sentence or in its entirety?

23   Q.    In its entirety.

24   A.    Ninety-six.

25   Q.    And when was your next conviction?

1   A.      1997 I was convicted for a drug charge and a firearm

2   possession charge.

3   Q.      In what court?

4   A.      The firearm was Bronx County, and the drug charge was

5   Columbia County.

6   Q.      Do you remember more specifically what the drug

7   charge was that you were convicted of?

8   A.      Sale of a controlled substance.

9   Q.      What was the substance?

10  A.      Crack/cocaine.

11  Q.      What were the sentences for those two?

12  A.      Three to nine.

13  Q.      For which?

14  A.      The drug charge.  They just -- it just ran

15  altogether.

16  Q.      Were you convicted in the Bronx or Columbia?

17  A.      Both.

18  Q.      What was your next conviction?

19  A.      2005, the firearm that I'm currently under now, the

20  federal situation.

21  Q.      Can you be more specific in terms of what the charge

22  was that you were convicted of?

23  A.      Possession of a firearm.

24  Q.      Was that conviction as a result of a trial?

25  A.      No.

1    Q.    You did a plea?

2    A.    Yes.

3    Q.    And what was the sentence?

4    A.    Eighty-eight months.

5    Q.    And was there a period of supervised release after?

6    A.    Yes.

7    Q.    And how long was that?

8    A.    Three years.

9    Q.    Any other convictions?

10   A.    I don't think so.  I probably have some miscellaneous

11   misdemeanors, probably one or two minors.

12   Q.    How about in 1995 in Hudson, were you convicted of

13   criminal possession of a controlled substance?

14   A.    Felony or misdemeanor?

15   Q.    That would be a misdemeanor.

16   A.    2005?

17   Q.    No.  1995.

18   A.    It couldn't have been that year.  It would have been

19   '96 because '95 I was in Rikers Island.  So it probably

20   would be '96.

21   Q.    Do you recall that conviction or not?  If you don't

22   remember, it's fine to tell me that.

23         Have you ever been conviction of criminal

24   impersonation in the second degree?

25   A.    I think they ran that with the -- they ran the

1  criminal impersonation with that same misdemeanor drug

2  charge.  They put it altogether in '96, and I did like 60

3  days or something like that.

4  Q.    So you recall being convicted of criminal

5  impersonation; is that correct?

6  A.    Yes.

7  Q.    Was that in Hudson or a different court?

8  A.    It's Hudson.

9  Q.    Was there an incident in 2010 in Hudson where you

10 were arrested for drugs?

11 A.    Yes.

12 Q.    Were you charged?

13 A.    Yes.

14 Q.    What were the charges?

15 A.    Possession of marijuana and heroin.

16 Q.    What was the result of those charges?

17 A.    It was dismissed.

18 Q.    In terms of the charges in 2010 in Hudson, were you

19 on probation at that time?

20 A.    Yes.

21 Q.    And your arrest in Hudson, did that have some impact

22 on your probation terms?

23 A.    Yes.

24 Q.    What happened?

25 A.    I was out of the jurisdiction without permission.

1    Q.      And was your probation revoked?

2    A.      Yes.

3    Q.      Were you sent to prison?

4    A.      No.

5    Q.      What were the consequences for leaving the

6    jurisdiction?

7    A.      He started me over.

8    Q.      Is this Judge Pauley?

9    A.      Yes.   Judge Pauley restarted my supervision time.

10   Q.      So in terms of the April 1st, 2013, incident that we

11   will get into more, did that arrest have any impact on your

12   probation terms?

13   A.      Yes.

14   Q.      What were the results?

15   A.      It was revoked.

16   Q.      Why was it revoked?

17   A.      The main thing was the same; leaving this

18   jurisdiction without permission.

19   Q.      So were you sent back to prison?

20   A.      Yes.

21   Q.      When were you released from prison?

22   A.      I think April of 2014.

23   Q.      And did you have an arrest after that?

24   A.      Yes.

25   Q.      And what were the circumstances of that?

1   A.      That was the Order of Protection situation with Cary

2   Andersen.   That was dismissed and everything deleted.   The

3   Order of Protection and everything went away.

4   Q.      Were you charged?

5   A.      Yes.

6   Q.      What was the charge?

7   A.      Harassment.

8   Q.      Of who?

9   A.      Cary Andersen.

10  Q.      Was there some allegation that you had sent

11  threatening e-mails while you were in prison?

12  A.      Yes.

13  Q.      Was the accusation that you sent threatening e-mails

14  to Cary Andersen?

15  A.      Yes.   That was the harassment.

16  Q.      Have you had any arrests since that time?

17  A.      No.

18  Q.      Approximately how many times have you been arrested

19  for your whole life?

20  A.      I couldn't count.

21  Q.      Was it more than ten?

22  A.      Yes, I think so.

23  Q.      Was it more than 20?

24  A.      I don't think so, no.

25  Q.      How many times have you been arrested in the Northern

1    District of New York?

2    A.      About five or six, roughly around there, give or

3    take.

4    Q.      So prior to April of 2013, had you ever been

5    strip-searched?

6    A.      Yes.

7    Q.      When were you strip-searched?

8    A.      Usually when I'm in certain facilities, institutional

9    facilities.  Like, if you are being transferred or

10   something, you will be stripped and change clothing and put

11   you on a bus or plane, wherever they are transporting you.

12   Q.      Before April of 2013, approximately how many times

13   had you been strip-searched?

14   A.      I'm not sure.

15   Q.      Was it more than ten times?

16   A.      Possibly.

17   Q.      Was it more than five times?

18   A.      Yes.

19   Q.      When you were strip-searched in the past, how was it

20   done?

21   A.      What do you mean?  I don't understand.

22   Q.      Did they have you take your clothes off?

23   A.      Yes.

24   Q.      Was it done in a private area?

25   A.      Usually, yes.  Cubical.

1    Q.    And had you ever been strip-searched by a police

2    officer?

3    A.    No.

4    Q.    So who did the searches?

5    A.    I mean, if you want to call a corrections officer a

6    police officer, yes, it's a corrections officer.

7    Q.    So aside from taking off your clothes, did they have

8    you do anything else?  And this is before April of 2013.

9    A.    Yes, they look at the bottom of your feet, make you

10   open your mouth, look under your tongue, underarms, squat,

11   cough.

12   Q.    Did the corrections officers ever have you bend over?

13   A.    No.  They usually tell you to squat and cough.

14   Q.    And do they look at you as you squat?

15   A.    Yes.

16   Q.    Prior to April of 2013, had you ever undergone a body

17   cavity search?

18   A.    No.

19   Q.    Before April of 2013, had you ever been

20   strip-searched in connection with an arrest?

21   A.    No.

22   Q.    So, for example, we talked about how you had a prior

23   conviction for possession of a controlled substance.  So on

24   that occasion when you were arrested, you weren't

25   strip-searched?

1    A.      No.

2    Q.      After your involvement with the VanBramers on April

3    1st, have you been strip-searched by anyone?

4    A.      Yes.   When I was in federal prison for my recent

5    violation, they strip you, change the clothes and all that

6    when they move you from one facility to the next.   That's

7    just procedure.

8    Q.      So there was only one search after your incident with

9    the VanBramers?

10   A.      Give or take, yes, because I was only at one or two

11   facilities.

12   Q.      For the strip-search that you had after April 1st of

13   2013, what facility was that?

14   A.      I was transported from MVC Brooklyn to Fairton, New

15   Jersey.

16   Q.      And was the strip-search done at Fairton?

17   A.      I think it's Brooklyn when they are leaving the

18   facility.

19   Q.      I'd like to show you some documents that are marked

20   as exhibits.

21           I am showing you what's marked as Defendant's

22   Exhibit 1 with today's date.   Did you receive this document?

23   A.      No.   But I'm having a little situation with my

24   mailing address because a lot of mail that comes to me it

25   says first floor and I'm the basement apartment, so it's

1  going upstairs.  Some of my mail is going upstairs.  So I

2  don't know what's going on with that.

3  Q.    Then how did you know to come here today for a

4  deposition?

5  A.    I had a phone conference.

6  Q.    Was that with the court?

7  A.    Yes.  Last week.  I think Tuesday.

8  Q.    Now, I'd like to show you a document that's marked

9  Defendant's Exhibit 2 with today's date.  Did you receive a

10  copy of this document in the mail?

11  A.    No.

12  Q.    Were you aware that I had scheduled a deposition?

13  A.    Yes.  You had told me.

14  Q.    Can I see that?  And the other deposition, was it

15  supposed to take place on April 29th of 2015?

16  A.    I'm not sure.  I think it was last week.  No, I had

17  -- the conference was supposed to be last week.

18  Q.    But I called you --

19  A.    That was April 29th when you called me.  I remember

20  that day.

21  Q.    Did you appear here at that time for that deposition?

22  And why did you not come to that deposition?

23  A.    I was running late that day.  Like I said, on the

24  phone.  And I was calling back the number that called me and

25  I wasn't getting through.  So by the time I got to Albany --

1   because I wasn't in Albany at the time.  That morning, when

2   I got to Albany and pulled up one of your letters and called

3   your number off that letter, that's when I got ahold of you

4   and explained what was going on.

5   Q.      By the way, have you ever been strip-searched by a

6   probation officer?

7   A.      Probation?  No.

8   Q.      Have you ever been the plaintiff or the defendant in

9   a lawsuit, aside from the current one?

10  A.      Yes.

11  Q.      And what were they?

12  A.      I had a lawsuit when I was a kid.  I got bit by a

13  dog.  And there was another lawsuit against -- I was a

14  plaintiff and the defendant was Hudson Police Department.

15  Q.      Approximately what year was the lawsuit involving the

16  dog bite?

17  A.      The docket date was 2012.  For the dog bite?

18  Q.      Yes.

19  A.      Thirty something years ago.

20  Q.      What was the result of the dog bite lawsuit?

21  A.      There was a cash settlement, a small cash settlement.

22  Q.      What court was it in?

23  A.      Bronx County.

24  Q.      And then moving on to the other lawsuit, which I

25  think you said involved the City of Hudson; is that correct?

1    A.    2012 it was docketed.

2    Q.    I'd like to take you to the date of June 29th, 2010.

3    Do you remember that day?

4    A.    Yep.

5    Q.    What happened that day?

6    A.    Depends on what time.

7    Q.    Was there an incident between you and the City of

8    Hudson Police?

9    A.    Yes, there was.

10   Q.    Could you describe what happened involving the

11   police?

12   A.    I was arrested, and that was the marijuana and heroin

13   charge that was dismissed.

14   Q.    Approximately, what time of day were you arrested?

15   A.    About 9:45 p.m., approximately, I think.

16   Q.    And what address was that at?

17   A.    That was

18   Q.    Why were you there at that time?

19   A.    I was there with Jerry.

20   Q.    So I think you said that you were arrested.   What

21   happened after you were arrested?

22   A.    They brought me to the county jail.

23   Q.    Did you go to the police precinct?

24   A.    Yes.

25   Q.    Were you strip-searched by the police?

1   A.    No.

2   Q.    Were you strip-searched by any other authorities in

3   connection with that arrest?

4   A.    Not that I can recall, no.

5   Q.    Who did you sue?

6   A.    Hudson Police Department.  I can't recall the

7   specific --

8   Q.    Did you have a lawyer?

9   A.    Yes.

10   Q.    Who was it?

11   A.    James LeBow (phonetic).

12               MR. MITCHELL:  Can you mark this?

13           (Directed to the court reporter.)

14           (Defendant's Exhibit 4 was marked for

15       identification.)

16   BY MR. MITCHELL:

17   Q.    I'm going out of order, but this is marked

18   Defendant's Exhibit 4.  Can you identify this document?

19   A.    Yes.

20   Q.    What is it?

21   A.    It's a civil complaint against the police officers in

22   Hudson.

23   Q.    And is this the lawsuit that you brought against the

24   Hudson Police?

25   A.    Yes.

1   Q.     What was the result of that lawsuit?

2   A.     It was dismissed.

3   Q.     Was there a settlement?

4   A.     No.

5   Q.     So you didn't receive any payment?

6   A.     Nope.

7   Q.     Have you ever been known by any other names?

8   A.     Kevin.

9   Q.     And when did you use that name?

10   A.     Twenty something years at least.

11   Q.     And what was your purpose in using the name Kevin?

12   A.     It's just a nickname.  I guess I looked like somebody

13 and like an older cousin, and the name just stuck.  Little

14 Kevin.

15   Q.     Are you familiar with a person named Ronny Parry

16 (phonetic)?

17   A.     Yes.  That's one of my -- that's what I was booked

18 under for that federal conviction.  I was booked under that

19 name.

20   Q.     Which conviction?

21   A.     2005.

22   Q.     That's the firearm one?

23   A.     Yes.

24   Q.     How did it come about that you were named Ronny

25 Parry?

1   A.   I just gave them that name in the precinct.

2   Q.   Had you been using that name for other purposes?

3   A.   No.   That was it.

4   Q.   Who is Ronny Parry?

5   A.   I don't know.   I mean, it might be me.

6   Q.   Are you familiar with a person names Jerry Ebanks?

7   A.   Yes.

8   Q.   Who is that?

9   A.   Yes, I used that when I was arrested for the firearm.

10  Q.   Which firearm?

11  A.   Ninety-seven.   But that's it.   I never used it for no

12  other purpose.

13  Q.   So you gave that as your name when you were booked;

14  is that correct?

15  A.   Yes.

16  Q.   And who is Jerry Ebanks?

17  A.   I don't know.

18  Q.   Are you familiar with a person named Kevin Madison?

19  A.   Yes.   I don't know about the Madison, but I'm Kevin.

20  Q.   Have you used the name Kevin Madison at some point?

21  A.   That's -- the Kevin Madison, that brought about the

22  criminal impersonation charge back in '95 or '96.

23  Q.   Who did you give that name to?

24  A.   One of the officers that arrested me.

25  Q.   Who is Kevin Madison?   Is it a person?

1   A.      I don't know.

2   Q.      Do you ever go by the name Darrel?

3   A.      No.

4   Q.      Do you recall hearing that there with a person named

5   Darrel that was supposedly involved in that Hudson case in

6   2010?

7   A.      Yep.

8   Q.      Who is Darrel?

9   A.      I don't know.  The only person I can say who Darrel

10  is is some lady that lived there who was saying somebody

11  named Darrel.

12  Q.      Did you ever see Darrel?

13  A.      It depends.  What's the guy's name that used to come

14  to see her?

15  Q.      The guy that used to see her, was it your impression

16  that that was Darrel?

17  A.      I don't know.  I mean, it's usually -- it's not the

18  same person.  Like, a couple different guys would come see

19  her, drop off her drugs and then leave.

20  Q.      Prior to this deposition, did you review any

21  documents about this case?

22  A.      About the VanBramer case?

23  Q.      Yes.  The current lawsuit.

24  A.      I have seen, I mean, the stuff that was sent to me

25  that came from your office.  That's about it.

1    Q.      Anything else?

2    A.      No, I don't think so.

3    Q.      Did you review any photographs?

4    A.      No.  I don't think any photographs came in the file

5    that was sent from your office.

6    Q.      Did you keep any records about your April 1st, 2013,

7    arrest?

8    A.      I'm not sure.  I got a bunch of papers.  They don't

9    tell me what's in there.

10   Q.      What are the papers?

11   A.      A bunch of old legal stuff from going back years and

12   years.

13   Q.      I am talking just about the April 1st, 2013,

14   incident.

15   A.      You mean as far as the arrest report?

16   Q.      I'm just asking what records you may have kept about

17   it.

18   A.      Just the basic police report that you sent in the

19   file.

20   Q.      Do you have any other records in terms of things like

21   court documents or charges?

22   A.      No.  That 2013 arrest, like, in a few days, the case

23   was done with and over, the harassment, the domestic

24   situation between me and my ex-girlfriend.

25   Q.      Did you keep a diary about the April, 2013, incident?

1    A.      No.

2    Q.      Have you spoken to anyone about the April 1st, 2013,

3    incident?

4    A.      Yes.   I speak to a lot of people.   Anybody specific?

5    Q.      Yes.

6    A.      I need to know -- I mean, I talked to a lot of people

7    about that situation.

8    Q.      Who did you speak to about that?

9    A.      Friends, family, everybody.

10   Q.      And what did you say about it?

11   A.      I just told them what happened.   If something

12   happens, they want to know, like, "Hey, what happened?   I

13   heard you got arrested."

14           I say, "Yeah.   Blah, blah, blah."   Basic stuff.

15   Q.      Do you have a Facebook page?

16   A.      Yes.

17   Q.      Have you put anything on Facebook about the April

18   1st, 2013, incident?

19   A.      Absolutely not.

20   Q.      Have you put anything on Facebook about this lawsuit?

21   A.      Absolutely not.

22   Q.      I'd like to show you what's marked Defendant's

23   Exhibit 3.   Do you recognize this document?

24   A.      Yes.

25   Q.      And what is it?

1    A.      It's the civil complaint against the state and

2    VanBramer.

3    Q.      And this is the complaint that you filed for this

4    case?

5    A.      Yes.  Handwritten by me.

6    Q.      As of April 1st, 2013, where were you living?

7    A.      April 1st, I was                    , Brooklyn, New

8    York.

9    Q.      Was April 1st, 2013, a Monday?

10   A.      Yes because Easter Sunday carried over.  That was

11   Easter Sunday.  I still had on my Easter clothes when I went

12   to church with my family.

13   Q.      In terms of the weekend right before April 1st, 2013,

14   where were you?

15   A.      I was in the city.  I was in New York with my kids

16   and my family.

17   Q.      So how about the Saturday before of April 1st, 2013,

18   where were you?

19   A.      I think I was down there.

20   Q.      You were in New York City?

21   A.      Yes.

22   Q.      And who were you with?

23   A.      My family, kids, my mom, sister, spending Easter

24   holiday with them.

25   Q.      And then how about Sunday?

1   A.      We went to church that Sunday.

2   Q.      In what city?

3   A.      The Bronx.

4   Q.      Tell me what you remember in terms of the event of

5   Sunday before April 1st, 2013.

6   A.      Starting from when?

7   Q.      The morning.

8   A.      The morning is when the incident happened.   It

9   happened about --

10  Q.      I am talking about the Sunday before.

11  A.      Sunday I was in the city with my family.   Went to

12  church that day that Sunday.

13  Q.      What did you do in that afternoon?

14  A.      We was in church that afternoon.

15  Q.      What about the night of Sunday before?

16  A.      That night, I came up state.

17  Q.      Did you come with your family?

18  A.      Yes.   I had my kids with me.

19  Q.      And where did you go?

20  A.      I dropped them off at their mother's aunt's house in

21  Catskill, New York.

22  Q.      What address did you drop them off at?

23  A.      I think it's                    :.   I could be off

24  with the numbers, but she's on

25  Q.      What kind of transportation were you using?

1   A.      I was driving my mom's car.

2   Q.      What kind of car?

3   A.      White Nissan Maxima.

4   Q.      Who's the owner of that?

5   A.      My mother.

6   Q.      What's her name?

7   A.      Janet McDermott (phonetic).

8   Q.      When did you drop off your kids?

9   A.      Probably around 11:00, 12:00.

10  Q.      At night?

11  A.      Yes.

12  Q.      And then where did you go?

13  A.      About an hour after that, I went to see Daphne

14  Rollins at her house.  That was my girlfriend or

15  ex-girlfriend at the time.  Somewhere in between those two.

16  Q.      What did you do in the hour before that?

17  A.      I was at the same address with my kids and their aunt

18  or great aunt.

19  Q.      What's the great aunt's name?

20  A.      Felecia.

21  Q.      Where does Daphne Rollins live?

22  A.      Athens, New York.

23  Q.      What's her address?  Or I should say, what was her

24  address at that time?

25  A.      I think it's                        .  Probably

1                             ı, I think.

2    Q.      Is that a house?

3    A.      Yes.

4    Q.      What was your relationship with Daphne Rollins as of

5    April 1st, 2013?

6    A.      Somewhere between girlfriend and ex-girlfriend.

7    Q.      When did you first meet her?

8    A.      I think November or December.  I think November of

9    2012.

10   Q.      Whose idea was it for you to go to her house?

11   A.      Both of ours.

12   Q.      So you spoke about it beforehand?

13   A.      Yep.

14   Q.      When did you arrive at Daphne Rollins' house?

15   A.      Probably between 1:00 and 2:00.  Probably close to

16   2:00 o'clock.

17   Q.      That's a.m.; is that correct?

18   A.      Yes.  This would be Monday morning.

19   Q.      So what happened when you got there?

20   A.      She was drinking, and there was an issue about me

21   messing with my ex-girlfriend while I was messing with her.

22   A lot of rumors was going on.

23   Q.      Who is the ex-girlfriend?

24   A.      Cary Andersen.

25   Q.      So Daphne Rollins accused you of being unfaithful?

1   A.      Yes.

2   Q.      You said she was drinking.  Did she appear to be

3   intoxicated?

4   A.      Yes.

5   Q.      And did you also drink with her?

6   A.      No.

7   Q.      Did you have a discussion with her?

8   A.      Yes.

9   Q.      And what else happened?

10  A.      I grabbed her phone.  I was going through her phone

11  trying to get the phone back.  She was chasing me.  I ran

12  out the house.  She ran out behind me, fell down the stairs.

13  She went back inside and grabbed the bat.  And when I jumped

14  in my car to pull off, she hit my windshield with the bat.

15  Q.      So she hit the windshield of the Maxima?

16  A.      Yes.

17  Q.      Let me break this down.  So you grabbed her phone and

18  went outside?

19  A.      Yes.  I ran out.  She was chasing me.

20  Q.      And then --

21  A.      She fell.  So I guess she got pissed.  She went

22  inside and grabbed the bat, and I jumped in the car.  I

23  started to pull off, at least I tried.  She hit the

24  windshield with the bat.

25  Q.      What happened to the phone?

1   A.      I dropped it before I even got to the car.

2   Q.      Did Daphne Rollins have a car?

3   A.      Yep.

4   Q.      What was it?

5   A.      Ford Focus.

6   Q.      Did the windshield of the Ford Focus get damaged that

7   day?

8   A.      Yes.  I damaged it.

9   Q.      You did?

10  A.      Yeah.

11  Q.      I think you left that part out.  When did that

12  happen?

13  A.      After she hit the windshield of the Maxima, I got

14  out.  She was coming in with the bat in her hand.  I

15  snatched the bat out of her hand, moved it to the side, and

16  I went outside and I hit her windshield.  I threw the bat

17  away, I jumped in the car and I left.  That's when she

18  called 911.

19  Q.      Did you do anything to the phone in terms of damming

20  it?

21  A.      No, at least not that I know of.  I just threw it to

22  the ground when I was running to the car.

23  Q.      So she hit your windshield with the bat and then she

24  went inside?

25  A.      We both went inside, yes.

1    Q.    Were you in the car when she hit the windshield?

2    A.    Yes, I was.

3    Q.    And then you went together inside?

4    A.    No.  I got out the car.  I went inside, and then she

5    came in behind me.

6    Q.    Did you drag her in?

7    A.    No.

8    Q.    At any point, did you drag her on the stairs?

9    A.    No.  I never dragged her.  I never punched her.  I

10   never kicked her.

11   Q.    When she hit the windshield of your Maxima, was there

12   any damage?

13   A.    Yes.

14   Q.    Whereabouts?

15   A.    There's a big spider web on the passenger side.

16   Q.    I think you said you used the bat on her car?

17   A.    Yes.

18   Q.    Was there any damage?

19   A.    Windshield damage, yes.

20   Q.    Any other?

21   A.    We both had windshield damage.  That's it.

22   Q.    So you both were inside again at some point?

23   A.    Yes.

24   Q.    And that was before you hit her car?

25   A.    Yes.

1 Q.     And what happened when you were inside together

2 before the damage to her windshield?

3 A.     It was brief.  I just snatched the bat out of her

4 hand, I went outside, hit her windshield, threw the bat, and

5 jumped in the car and left.

6 Q.     I think you said something about her calling 911?

7 A.     Yes.

8 Q.     Were you present when she was calling?

9 A.     No.

10 Q.     Did she say anything?

11 A.     No.

12 Q.     Did she say she was going to call the police?

13 A.     If she did, I didn't hear her.

14 Q.     Did she -- strike that.

15        Did Daphne Rollins break up with you that day?

16 A.     No.

17 Q.     Did she say that she wanted your relationship to be

18 over?

19 A.     No.

20 Q.     Did she say something to the effect, "I can't be with

21 you"?

22 A.     No.  Absolutely not.

23 Q.     Did you push her onto the floor?

24 A.     Nope.

25 Q.     Did she say that she would call the police if you

1   didn't give her her phone back?

2   A.      Nope.

3   Q.      Did you throw her into the radiator?

4   A.      No.

5   Q.      Do you remember anything else of your conversation

6   with Daphne Rollins in that early morning period?

7   A.      It was just basically about the situation with Cary

8   Andersen.

9   Q.      Did you tell Daphne Rollins where you were going?

10  A.      No.

11  Q.      Why did you drive away?

12  A.      It was a bad situation going on.  Getting violent.

13  Best thing to do.

14  Q.      Did you kick her?

15  A.      Nope.  Absolutely not.

16  Q.      Did you threaten to call the police?

17  A.      No.

18  Q.      So I think you said you drove away.  Where were you

19  headed?

20  A.      To the bridge, the Rip Van Winkle Bridge that goes

21  over to Columbia County, Hudson, New York.

22  Q.      Where did you intend to go?

23  A.      I don't know.  Just far away from her.

24  Q.      You weren't going to someone's place?

25  A.      I wasn't really thinking about my destination.  I was

1   just thinking about getting away from that little situation.

2   Q.     You said you were heading towards Hudson?

3   A.     Yes.  As soon as you cross the bridge, you are in

4   Hudson, New York.  It's like Rensselaer and Albany County.

5   It's the same as Catskill and Hudson.  The water just

6   separates them.

7   Q.     How long did it take you to get from Daphne Rollins'

8   house to the bridge?

9   A.     I didn't even make it to the bridge.

10  Q.     How long were you driving before you were stopped?

11  A.     Five minutes.

12  Q.     And what happened?

13  A.     I was pulled over.

14  Q.     By who?

15  A.     I think it was a sheriff.  A sheriff pulled me over.

16  Q.     From which office?

17  A.     Greene County sheriff.

18  Q.     And what happened?

19  A.     He said, "Were you in a situation back there?  You

20  damage somebody's car with a baseball bat?"

21         And I said to him, "Look at my windshield.  My

22  car's been damaged with a baseball bat."

23         He didn't know nothing about it.  So he looks at

24  it and he said, "We are going to take you down to the house

25  where the situation took place."  He said, "We are going to

1    take you down there and see what's going on."  He said, "We
2    are going to cuff you in the front because right now --"
3    like, I wasn't being arrested.
4              But right when he's putting the cuffs on the front
5    to put me in the sheriff's vehicle, I guess between that
6    time, VanBramer got to Daphne's house.  I don't know which
7    one of the brothers, but they got to Daphne's house.  And
8    once they found out that I was the one that she called 911
9    on, one of the VanBramers brothers told the sheriffs to cuff
10   him in the back and arrest him.  So that's how that
11   happened.
12   Q.    Who was the sheriff person?
13   A.    I don't know his name.
14   Q.    Was there one person or more than one?
15   A.    More than one.
16   Q.    What did they look like?
17   A.    Male, white males.  I don't know.
18   Q.    Did you recognize them?
19   A.    No.
20   Q.    So did you say they said you weren't under arrest?
21   A.    I wasn't.  They was going to cuff me in the front and
22   put me in the sheriff vehicle and bring me down to Daphne
23   Rollins' house to see what was going on, clarify what was
24   being said or whatever.
25   Q.    But they were going to put you in a police car?

```
 1   A.      Yes.

 2   Q.      And did you say, "Okay"?

 3   A.      Yes.

 4   Q.      You consented to being handcuffed?

 5   A.      They told me procedure is if you are getting in a

 6   police vehicle, we have to cuff you, but we can cuff you in

 7   the front because you're not being arrested at this time.

 8   Q.      How long were you talking to the sheriff employees at

 9   the stop?

10   A.      Five to ten minutes.

11   Q.      And then did you end up sitting in the sheriff's car?

12   A.      Yes.  We still went to her residence.  But whatever

13   phone call they got, they was told to cuff me in the back.

14   Q.      So the sheriff's guys put you in the car cuffed and

15   then they dove you somewhere?

16   A.      Back to Daphne Rollins' house.

17   Q.      And what happened when you got there?

18   A.      They took me out the sheriff's car.  They asked me

19   questions, what happened, this and that, blah, blah, blah,

20   and I explaining it to them.  Then they took me out the

21   sheriff's car and put me in the state trooper's car, which

22   is VanBramer.  It was Brian VanBramer and another sheriff --

23   I mean, excuse me.  Another state trooper.  He's the one I

24   think that filled out the report, handwrote the report and

25   signed it.
```

1   Q.      So when the sheriff's vehicle arrived back at Daphne

2   Rollins' house, what did you see there?

3   A.      Trooper vehicle was there, and I guess Eric VanBramer

4   was inside.

5   Q.      Please describe the trooper vehicle.

6   A.      It was an SUV.

7   Q.      There was just one trooper vehicle?

8   A.      I think so.

9   Q.      Did you see Daphne Rollins?

10  A.      No.  She was inside.  I was outside.

11  Q.      So when you arrived back at Daphne Rollins' house,

12  did you see any individuals there?

13  A.      No.  Just the law enforcement.

14  Q.      Please describe the law enforcement people that you

15  saw back at the house.

16  A.      Brian VanBramer, and I don't know the other trooper's

17  name.

18  Q.      What did he look like?

19  A.      Tall.  He was tall.  White male.

20  Q.      Anyone else?

21  A.      No.

22  Q.      I thought you said that Eric VanBramer was there?

23  A.      No.  Brian.

24  Q.      What were the state troopers doing?

25  A.      I don't know.

1   Q.      Were they standing outside?

2   A.      I seen them come out, go in.  Like, Brian came out,

3   asked me a few questions --

4   Q.      Came out of the house?

5   A.      Yes.  (Continuing) -- went back in.

6   Q.      Tell me everything you remember about that

7   conversation with Brian VanBramer.

8   A.      He was just basically asking me what happened as far

9   as the situation with her vehicle, her phone, between me and

10  her.  And I was explaining to him because he knows Cary

11  Andersen and her family.  It's a small town.  Everybody

12  knows everybody.

13          So I was talking to him about the situation where

14  she was drinking, she was upset from what she heard, blah,

15  blah, blah.  She smashed my windshield, this and that.

16  Nobody got beat up.  The only damage that was done was to

17  the vehicle and that was it.

18  Q.      Did you say anything to him about Daphne Rollins

19  damaging your car?

20  A.      Yes.

21  Q.      Was Daphne Rollins present when you were speaking to

22  Brian VanBramer?

23  A.      No.

24  Q.      How long was your conversation with Brian VanBramer

25  at that point?

1   A.   Probably five minutes.  It wasn't long.

2   Q.   Were you still handcuffed at that point?

3   A.   Yes.

4   Q.   In the front?

5   A.   No.  It was always in the back seat.

6   Q.   Sorry.  I mean, were your hands handcuffed in the

7   front?

8   A.   I was never cuffed in the front.

9   Q.   Well, I thought you said when the sheriff --

10  A.   That was their plan, but they got a call from Brian

11  VanBramer, from that police officer.  Once he found out I

12  was the one she called 911 on, he told them to cuff me in

13  the back.

14  Q.   When did that call come through?

15  A.   While I was talking to the sheriff's right before --

16  he was putting cuffs on me.  One of them said, "Hold on.

17  No.  Cuff him in the back."

18  Q.   This was when you were over near the bridge?

19  A.   Yes.

20  Q.   How did you find out that Brian VanBramer was the one

21  who was talking to the sheriff?

22  A.   They told me.  On the way back to Daphne's house, I

23  said, "Why am I being cuffed in the back now?"  They said,

24  "The state police told us to cuff you."

25  Q.   Did they tell you anything more?

1    A.    No.  At that point, everything was, like -- everybody

2    was still trying to find out what was going on.

3    Q.    How did you find out that the officer was named Brian

4    VanBramer?

5    A.    That night?

6    Q.    Yes.

7    A.    I found out his name because he signed the arrest

8    reports.

9    Q.    And you received those at some point?

10   A.    Yes.

11   Q.    When did you receive them?

12   A.    Between being arraigned and going to court, I guess,

13   or being booked into the county jail.

14   Q.    In terms of the person that you talked to or you

15   think it Brian VanBramer, what does he look like?

16   A.    Medium height, not too heavy, just normal build.

17   Q.    Did you ever find out the name of the other trooper

18   who you mentioned?

19   A.    The one that stripped me?

20   Q.    I think you said there was another one with Brian

21   VanBramer.

22   A.    Yes.  He's the one that filled out Daphne Rollins'

23   statement.  I don't know his name or I can't remember it at

24   this time.

25   Q.    Did you talk to that other trooper at any point?

1   A.      Yes, but we was all doing the whole situation.  We

2   was all in the same room.

3   Q.      I want to still finish off talking about the

4   situation where you were back at Daphne's house.  That's

5   what I'm talking about right now.

6   A.      The other trooper was inside.  He stayed inside.

7   VanBramer came out to talk to me in the vehicle.

8   Q.      Did Brian VanBramer ask you any other questions aside

9   from what you already said?

10  A.      No.

11  Q.      Did you give him any other information?

12  A.      Nope.

13  Q.      And I think you said the conversation was about five

14  minutes; is that right?

15  A.      Yes.  He came out, asked me what was going on.  I

16  explained to him.  Then he went back inside and was in there

17  for a while.  Then they both came out --

18  Q.      Let me stop you there.  Were any of the law

19  enforcement people nearby listening to the conversation?

20  A.      Probably a sheriff.  They was still right there.

21  Q.      This conversation, were you standing outside at that

22  point or still in the car?

23  A.      No.  I always remained in the vehicle.

24  Q.      Was Brian VanBramer in the vehicle with you?

25  A.      Yes, when me and him spoke, yes.

1  Q.    So he came into the back seat?

2  A.    No.  The front passenger seat and I'm in the back.

3  Q.    All right.  And there was another person sitting in

4  the car?

5  A.    Nope.

6  Q.    So where were the sheriffs at that point?

7  A.    They was standing right there, like, just keeping an

8  eye on me because both troopers was in the apartment with

9  Daphne Rollins.  So the sheriff's that brought me from the

10  bridge, they stayed until everybody left and it was over and

11  done with.

12  Q.    Did anyone else live at Daphne Rollins' house?

13  A.    Her stepfather.

14  Q.    What's his name?

15  A.    I can't remember at this time.  I forgot.

16  Q.    Was he there that day?

17  A.    No, he wasn't there.

18  Q.    Did you notice any members of the community or other

19  people standing around watching?

20  A.    No.

21  Q.    Are you familiar with the address

22      Athens, New York?

23  A.    That's Cary Andersen's address.

24  Q.    Is that in a complex of some sort?

25  A.    It's a trailer.

1  Q.    Does the trailer park have a name?

2  A.    It's not even a trailer park.  It's like two trailers

3  on that property.

4  Q.    Were you living part of the time at that address?

5  A.    No, I never lived there.  I would be there with her a

6  lot of times when me and her was together.

7  Q.    So we went through the discussion you had with Brian

8  VanBramer.  And what happened after that?

9  A.    He went inside.  And after that, both troopers came

10 in the car, and we drove to the police barracks.

11 Q.    Well, how long was Brian VanBramer inside?

12 A.    I can't say.

13 Q.    More than five minutes?

14 A.    I'm not sure.

15 Q.    More than an hour?

16 A.    No, not at all.  Not even close to an hour.

17 Q.    Was it more than half an hour?

18 A.    When I got there, I don't think he stood a half hour.

19 But he was there before I was there, so he could have been

20 there for a length of time.

21 Q.    While Brian VanBramer was in the house, what were you

22 doing?

23 A.    I was handcuffed in the backseat.

24 Q.    Did you talk to anybody during that period?

25 A.    Probably the sheriff.

1   Q.     What did you talk to the sheriff about?

2   A.     Just the same situation.  She's drunk, she's lying,

3   she's lying about -- because VanBramer came out and said,

4   "She says she doesn't know nothing about the windshield."

5         And I said, "Well, you know she's lying; right?"

6         So basically, we was just talking about the

7   situation that she's lying about smashing my windshield and

8   she doesn't know what happened to it, she's been drinking.

9   Just stuff about that.

10  Q.     So you were in the car?

11  A.     Yes.

12  Q.     And Brian VanBramer came out again?

13  A.     He came out -- I don't know if he came out twice, but

14  he came out one time to ask me what happened and went back

15  in.

16  Q.     That was the first time you were talking to him or

17  another time?

18  A.     That was the first time.

19  Q.     Sorry.  What did he say at that point?

20  A.     He was just talking about she's saying that she

21  doesn't know nothing about your windshield.

22  Q.     But I thought you were the one who told Brian

23  VanBramer about your windshield?

24  A.     No.  It was a sheriff that stopped me.

25  Q.     So did the sheriff give information to Brian

1   VanBramer about it?

2   A.    I'm not sure.  I don't remember.

3   Q.    So let's get back to where you are waiting.  And then

4   what happens after?

5   A.    Both troopers come in, and we leave and go to the

6   barracks where I got booked.

7   Q.    So the troopers came out of the house?

8   A.    Yes.

9   Q.    And was it Brian VanBramer and that other gentleman?

10  A.    Yes.

11  Q.    And then what happened?

12  A.    We left.

13  Q.    Did they move you to a different car?

14  A.    No.  I stayed in the trooper SUV.

15  Q.    I thought you were in the sheriff's car?

16  A.    No.  They transferred me from the sheriff's vehicle

17  to --

18  Q.    When did that happen?

19  A.    Either when I first got there or right before we

20  left.  Within that time frame.

21  Q.    When you were talking to Brian VanBramer in a car,

22  was that in a trooper vehicle or a sheriff vehicle?

23  A.    I'm not sure if the first time I was still in the

24  sheriff vehicle.

25  Q.    And the trooper vehicle was an SUV?

1  A.     Yes.

2  Q.     When the troopers came out of Daphne Rollins' house,

3  did they say anything more to you?

4  A.     No.  We just talked about what took place between me

5  and her and why, the allegations about Andersen and blah,

6  blah, blah.

7  Q.     What did you say about Andersen?

8  A.     I was telling them that she was accusing me with

9  messing with Andersen while I was messing with her.  Just

10 going into the whole story.

11 Q.     Did the troopers tell you anything about what Daphne

12 Rollins said?

13 A.     Not really.

14 Q.     At any point before you were taken away, did you see

15 Daphne Rollins again?

16 A.     No.

17 Q.     Did any of the troopers talk to you about a damaged

18 cell phone?

19 A.     Yes.

20 Q.     What did they say about that?

21 A.     He found a cell phone.

22 Q.     Who?

23 A.     I don't know if it was VanBramer or the other trooper

24 or which one specifically, but he had it.  He showed it to

25 me.  It was broken.  He found it in the street.

1    Q.    And was that Daphne Rollins' cell phone?

2    A.    Yes.

3    Q.    How was it damaged?

4    A.    The screen was cracked.

5    Q.    Are you the one who cracked the screen?

6    A.    I'm not sure.

7    Q.    Did the trooper say anything to you about a damaged

8    windshield?

9    A.    Yes.

10   Q.    What did they say about it?

11   A.    Whose?  Mine or hers?

12   Q.    About either one.

13   A.    Yeah, we was talking about it, and that's when he was

14   saying, like -- he knows she's lying.  He knows that she

15   knows something about your windshield being broken, but --

16   Q.    Sorry.  That's what you said?

17   A.    That's what he said.

18   Q.    Who?

19   A.    VanBramer.

20   Q.    Brian?

21   A.    He said, "I know she's lying about the windshield.

22   If anything, we might pull her up on false statement, but we

23   got to do what we got to do.  We got to go by whatever she's

24   saying.  She says she doesn't know nothing about your

25   windshield."

1  Q.      So you are saying he agreed with your version of

2  events?

3  A.      Yes.  He knows that common sense, I'm not going to

4  smash my own windshield.  He knew it was a jealous situation

5  going on.

6  Q.      But how about the damage to Daphne's windshield?  Did

7  you talk to Brian VanBramer about that?

8  A.      Yes.

9  Q.      And what did you say?

10 A.      I said I didn't do it.

11 Q.      You said you didn't do it?  But you did smash it;

12 didn't you?

13 A.      I did.

14 Q.      Did you discuss a bat?

15 A.      What do you mean?

16 Q.      Was there an aluminum bat at the scene?

17 A.      The bat was used to smash both windshields.

18 Q.      Did the trooper show you the bat?

19 A.      Yes.  He took it to the barracks with him.

20 Q.      Well --

21 A.      Supposedly held it as evidence.  I don't know.

22 Q.      So did you see the bat again at the scene when you

23 were brought there by the sheriff?

24 A.      Yes.  He brought the bat in the car with him.

25 Q.      Wait.  Who?

1    A.    The state police.  We went back to the barracks.  The

2    bat was in the car.

3    Q.    I mean, what did you say about the damage to Daphne

4    Rollins' car?

5    A.    I told them she did it.

6    Q.    Why did you say that?

7    A.    I mean, she wasn't going to own up to smashing mine,

8    so I wasn't going to own up to smashing hers.

9    Q.    She said that she smashed her own car?

10   A.    No.  I said she smashed her own car.

11   Q.    Was there any discussion about physical violence

12   against Daphne Rollins, against her person?

13   A.    I'm not sure.

14   Q.    Was there any discussion with the troopers about

15   injuries to Daphne Rollins?

16   A.    I don't know if we spoke about her having any

17   injuries or -- I don't know.  I don't think so.

18   Q.    Did you ask how Daphne Rollins was doing?

19   A.    When?

20   Q.    When you were talking to the troopers.

21   A.    I can't remember.

22   Q.    Did the troopers say anything at that point about you

23   being involved with drugs?

24   A.    No.

25   Q.    Did the troopers ask you if you were involved with

```
1    drugs?

2    A.      In the car?

3    Q.      Right.  When you were still at the scene before you

4    were brought away.

5    A.      No.

6    Q.      Did the troopers ask you if you had been drinking?

7    A.      Yes.

8    Q.      What did you say?

9    A.      I said no.

10   Q.      Did you do any kind of field sobriety test?

11   A.      No.

12   Q.      By the way, where was your Maxima during all this?

13   A.      Well, when they took me in the -- the sheriffs put me

14   in their vehicle, that's the last place I seen it.

15   Q.      Did the sheriff tell you anything about what would

16   happen to your car?

17   A.      No.

18   Q.      When you were at Daphne Rollins' house, did you see

19   Eric VanBramer?

20   A.      No.

21   Q.      Did you see a police dog at her house?

22   A.      No.

23   Q.      So I think you talked about how you, at some point,

24   ended up in the trooper SUV.  And then what happened?

25   A.      Eventually, we left and went to the barracks where
```

1    they booked me and processed me.

2    Q.    Which barracks?

3    A.    Cairo, New York.

4    Q.    How long a drive was it?

5    A.    That's about ten minutes.

6    Q.    Was there any conversation between you and the

7    troopers during that dive?

8    A.    Yes, we was talking -- still talking about the

9    situation.

10   Q.    Tell me what you remember about the conversation.

11   A.    It was always a basic, "What happened?"

12         "She hit my windshield.  She was drinking.  She's

13   jealous because of the Cary Andersen situation."

14   Q.    Did the troopers ask you any questions?

15   A.    Nope.  Basically, just about the situation.

16   Q.    Did the troopers say anything about where you were

17   going?

18   A.    I don't think so.  I'm not sure.

19   Q.    So you arrived at the barracks, and then what

20   happened?

21   A.    That's when they booked me, cuffed me to the bench

22   cuffed to the wall, and --

23   Q.    Let me break this down.  So you went in the entrance;

24   is that right?

25   A.    Yes.

61

```
1   Q.    And then what happened immediately after that?

2   A.    They brought me in the office, their little office.

3   There's a little bench.  They cuffed me to the wall.

4   Q.    Did you do something in the lobby or --

5   A.    No.

6   Q.    So you went in the entrance and then you went into an

7   office; is that right?

8   A.    Yes.

9   Q.    Whose office was it?

10  A.    It's just an office with about two or three desks in

11  it where they sit at.

12  Q.    Is that where the troopers sit?

13  A.    Yes.

14  Q.    Were other people there?

15  A.    Yes.  A supervisor was there.  I think a supervisor

16  trooper was there, the one that was with VanBramer, and

17  VanBramer.

18  Q.    And that's Brian?

19  A.    Yes, I believe so, yes.

20  Q.    Who was the supervisor?

21  A.    I have no idea.  I don't know his name.

22  Q.    So that's three troopers.  Were there other people in

23  the office?

24  A.    In that specific room, no.

25  Q.    Did you say you were handcuffed?
```

1   A.      Yes.  I was cuffed to the wall.

2   Q.      And did you say you were sitting on a bench?

3   A.      Yes.

4   Q.      And then what happened?

5   A.      Basically, we was still talking about the situation,

6   about this situation, the case.

7   Q.      Tell me what you remember about the discussion.

8   A.      Just about the charges being B-S.

9   Q.      What charges?

10  A.      The harassment and -- what was he giving me?  Was it

11  destruction of property?  Something like -- criminal

12  mischief?  Something like that.

13  Q.      Were you presented with some kind of document that

14  had charges on it?

15  A.      Not until after.  They filled out the report in the

16  computer and gave me my copy.

17  Q.      The troopers said that you would be charged?

18  A.      Yes.

19  Q.      And what did they say you were being charged with as

20  far as you can remember?

21  A.      Harassment and criminal mischief.

22  Q.      Anything else?

23  A.      At that point, no.

24  Q.      So how long were you talking to the troopers?

25  A.      I don't know.  It was like 5:00, 6:00 in the morning.

1    I can't recall.  I was tired.  But, at some point, the other

2    VanBramer walks in with a K-9.  So the K-9 walks right past

3    me like I'm not even there.  He doesn't even acknowledge me.

4    Q.      Now, when you say the other VanBramer, do you mean

5    Eric?

6    A.      Yes.  He's taller and more muscular.

7    Q.      Had you ever seen him before?

8    A.      No.

9    Q.      Did you talk to Eric VanBramer when he walked in?

10   A.      I think he walked out.  I'm not sure if he walked

11   back out or if he stayed in, but at some time, he said -- he

12   asked me if I had drugs stashed in my anal area.

13   Q.      So the dog was hanging out in the office?

14   A.      The dog walked in with him.  Like, he knew I was in

15   there.  He came in there with the K-9.

16   Q.      Where did the dog go?

17   A.      Walked right past me.

18   Q.      This is the office with three or four desks?

19   A.      Yes.

20   Q.      So the dog was just hanging out there?

21   A.      He was with VanBramer and brought the dog in there.

22   Q.      And did it go in a cage?

23   A.      No.  He brought the dog in there to see if the dog

24   would react to me as if I had drugs on me or something.

25   Q.      And then where did the dog go?

1 A.      Walked right past me and walked around and was just

2 loitering, I guess, I don't know, waiting for a command.

3 Q.      Were the other troopers there in the office when the

4 dog entered?

5 A.      Yes.

6 Q.      So I think we already started talking about this,

7 but, at some point, did you have a conversation with Eric

8 VanBramer?

9 A.      Like I said, he asked me if I had any drugs stashed

10 in my anal area.  I said no.

11          And he said, "Oh, well.  We found drugs in the

12 seat of your car, but it's a real small amount, but it's

13 enough for us to strip-search you."

14 Q.      What else did he say?

15 A.      That was it.  That's what Eric said.  That was it.

16 He took me in the back room and strip-searched me.

17 Q.      And what did you say?

18 A.      I didn't say anything.  I probably said something

19 like, "There's no way you found drugs in my car.  I don't do

20 drugs."

21 Q.      It wasn't actually your car, though, right?  You

22 borrowed it?

23 A.      Yes.  It was just the car I was driving at the time.

24 Q.      What else did Eric VanBramer say?

25 A.      That was it.  He took me in the back and

1    strip-searched me.

2    Q.    Were there other troopers who were present?

3    A.    Yes.

4    Q.    And did they say anything?

5    A.    At some point, the other brother, Brian VanBramer,

6    said, "This is all bullshit, but don't worry about it."

7    Q.    In what context did he say that?

8    A.    I don't know if he was pertaining to the overall

9    situation between me and Daphne or the overall situation

10   between everything, including them supposedly finding drugs

11   in my car.

12   Q.    Could you explain more in terms of what Brian

13   VanBramer said?

14   A.    Once he told me everything that I was being charged

15   with, the misdemeanor drug possession, the harassment, the

16   criminal mischief, he said it's bullshit, like, this is all

17   bullshit, like, letting me know that there was nothing to

18   worry about, like it was a game or something.

19   Q.    Did you ask him about the charges?

20   A.    Yes.

21   Q.    What did you ask?

22   A.    I just asked, like, what I am being charged with and

23   why.  That's all.  And I asked, am I being charged with

24   misdemeanors, felonies.  Stuff like that.

25   Q.    When you were talking to Brian VanBramer about what

1   you were being charged with, was this before or after Eric

2   VanBramer came in?

3   A.      After.

4   Q.      So, according to you, Brian VanBramer said you had

5   nothing to worry about in terms of changes?

6   A.      No, he didn't say that.  He just said it's just a

7   bunch of bullshit.  Like, it's just minor bullshit.

8   Q.      So after you were talking to Eric VanBramer, then

9   what happened?

10   A.      Talked to who, Brian or Eric?

11   Q.      Eric.

12   A.      I mean, eventually, they brought me to Athens Town

13   Court.  I was arraigned, and they brought me to the county

14   jail.

15   Q.      So after Eric came in and you talked to him, they

16   brought you immediately to town court?

17   A.      Eric didn't just come in and talk to me.  He took me

18   down and strip-searched me.

19   Q.      That's why I'm asking what happened after you talked

20   with him.

21   A.      We didn't really talk.

22   Q.      Well, I thought you had a conversation where he

23   talked --

24   A.      Brian.  That's Brian.

25   Q.      I'm talking about Eric.

1   A.     Me and Eric didn't do too much talking.  Most of the
2   conversation was with Brian.
3   Q.     I thought that you testified that Eric said something
4   about finding drugs in your car?
5   A.     Yes.
6   Q.     That's the conversation I'm talking about.
7   A.     Yes.  He said he found drugs in my car and do I have
8   drugs hidden in my anal area, and, basically, that was it.
9   Q.     And I think you said something about Eric said it was
10  a small amount of drugs?
11  A.     Yes.  He was saying, like, "We found a little bit."
12  Like, a real -- like, he said, "We found a couple crumbs,"
13  or something to that nature.
14  Q.     What else did he say about the drugs?
15  A.     That was it.  We just said, "We found some crumbs in
16  the seat, so I have the right to strip-search you," and that
17  was it.
18  Q.     And what did you say?
19  A.     I was like -- I was denying it.  There's no way you
20  are going to find drugs in my car, especially in the
21  driver's seat.  That's impossible.
22  Q.     Did anyone say anything about testing for drugs?
23  A.     What do you mean?  Like testing me?
24  Q.     Performing some kind of test on a substance to
25  determine if it was drugs.

```
1    A.    Oh, a field test?

2    Q.    Right.

3    A.    I don't know.

4    Q.    Did Eric say anything about his dog?

5    A.    No.

6    Q.    And then where did you go at that point?

7    A.    Athens Town Court.

8    Q.    Well, after you had this conversation with Eric

9    VanBramer, then what happened?

10   A.    He strip-searched me.

11   Q.    Where did you go in the barracks?

12   A.    Down the hallway there was another room.  He took me

13   in there.

14   Q.    Who took you?

15   A.    Eric.

16   Q.    By himself?

17   A.    Yep.

18   Q.    Did you overhear any conversation between Eric

19   VanBramer and the other troopers before he brought you to

20   that room?

21   A.    No.

22   Q.    Were you handcuffed at that point?

23   A.    No.

24   Q.    So they unhooked you from the wall?

25   A.    Yes.
```

1    Q.      And you went down a hallway.  Where did you go?

2    A.      In a room.

3    Q.      What kind of room?

4    A.      Just a desk in there.

5    Q.      I mean, was there a door?

6    A.      Yes.

7    Q.      So it was a private room?

8    A.      Yes.

9    Q.      Was it someone's office as far as you can tell?

10   A.      No, it wasn't nobody's office.

11   Q.      What was in the room?

12   A.      A desk, and I'm not quite sure, possibly a

13   computerized fingerprint machine.

14   Q.      So was it you and Eric in the room together?

15   A.      Yes.

16   Q.      Did he shut the door?

17   A.      I'm not sure.

18   Q.      As far as you can tell, was anyone else looking in

19   while you were in there?

20   A.      I wouldn't know.  I mean, I can only speak for the

21   times I was facing him and facing the door.  Between the

22   time he told me to turn around, I wouldn't be able to tell

23   if anybody else was looking.

24   Q.      Did you hear anyone else in the area?

25   A.      Yes, you hear noises in the hallway.  There's cops

1   out there.

2   Q.    I thought you said there were only three troopers in

3   there?

4   A.    In that room, in the room that I was handcuffed to

5   the wall.

6   Q.    At any point did you see any other individuals

7   watching what was going on in the room where you were being

8   searched?

9   A.    No, I don't think so.

10  Q.    And so you went into this private room, and then what

11  happened?

12  A.    Performed the strip-search.  And I was clean.  I

13  didn't have nothing on me.  Searched my clothes.  I handed

14  him every piece of clothing one by one, went through it,

15  searched it.

16  Q.    Did Eric VanBramer give you any kind of direction

17  about what to do?

18  A.    Yeah.

19  Q.    What did he say?

20  A.    Turn around, squat, spread them.  The usual, lift up

21  your --

22  Q.    Did he tell you to take your clothes off?

23  A.    Absolutely.

24  Q.    Well, I'm trying to find out point by point what

25  happened.

1          So you go in this room and then what happened?

2   A.    Start stripping down.

3   Q.    So that's what he said?

4   A.    I start stripping down and handing him every

5   individual piece of clothing one by one.

6   Q.    And then what happened?

7   A.    Once I'm completely naked, you know, lift up the

8   genitals, let me see, turn around, bend over, spread them.

9   Q.    And what was Eric VanBramer doing?

10  A.    He was giving me these directions to do this stuff.

11  Q.    So he said lift up your genitals, bend over, spread

12  what, your legs?

13  A.    No.  My ass cheeks.

14  Q.    What else?

15  A.    That was it.

16  Q.    Did anyone touch you while you were being

17  strip-searched?

18  A.    No.

19  Q.    Did anyone reach into your body cavity?

20  A.    No.

21  Q.    Did anyone put an object into your body cavity?

22  A.    No.

23  Q.    How long did the strip-search last?

24  A.    I don't know.  Approximately ten minutes.

25  Q.    Were you crying?

1   A.      No.

2   Q.      Were you in fear?

3   A.      Kind of.  Sort of.

4   Q.      Of what?

5   A.      Just being violated.  Being told to strip.

6   Q.      Were you shaking or having a panic attack or anything

7   like that?

8   A.      No.

9   Q.      Were there any drugs on your body?

10  A.      Nope.

11  Q.      Do you remember anything else that you said to Eric

12  VanBramer in the room?

13  A.      No, we didn't really do any speaking.

14  Q.      Did he search your clothes?

15  A.      Yes.

16  Q.      Did he find anything, as far as you can tell?

17  A.      No.

18  Q.      And then what happened?

19  A.      I was brought back to the original room I was in.

20  Q.      Did you put your clothes on first?

21  A.      Absolutely, yes.  I got dressed, and I was brought

22  back to the room and cuffed back to the wall on the bench.

23  Q.      Did Eric VanBramer say anything about the search in

24  terms of what he found or didn't find?

25  A.      No.

1    Q.      As far as you know, was Brian VanBramer present for

2    the search?

3    A.      I don't think so.

4    Q.      Were there any other troopers that were present for

5    the search, strip-search?

6    A.      Not to my knowledge, no.

7    Q.      Then what happened?

8    A.      Eventually, I was brought to court for arraignment.

9    Then I was brought to jail.

10   Q.      How long in total were you at the barracks?

11   A.      At least an hour.

12   Q.      Did the troopers say anything else to you while you

13   were there?

14   A.      No.

15   Q.      After you were strip-searched and then brought back

16   to the area and handcuffed, did you have any conversation

17   with anyone?

18   A.      Yes.

19   Q.      And what was said?

20   A.      That's when we was talking about the charges.

21   Q.      Who talked to you about the charges?

22   A.      Brian.

23   Q.      What did he say?

24   A.      He was telling me what I'm being charged with and the

25   status, misdemeanor, felony, stuff like that.

1   Q.      And what were the charges?

2   A.      Harassment, criminal mischief, and drug possession.

3   Q.      Did he show you any documents?

4   A.      Yeah.  I got my police report eventually.

5   Q.      Did you see any kind of written statement about the

6   charges?

7   A.      No.  It was all technical, printout.

8   Q.      Did someone print out something for you while you

9   were at the barracks?

10  A.      I'm not sure if I got my papers at the barracks or at

11  the courtroom or the jail.  I can't recall specifically when

12  I got it.

13  Q.      So before you left the barracks, did you talk to any

14  other individuals at the barracks?

15  A.      No.

16  Q.      So Brian VanBramer told you the charges.  Did he say

17  anything else?

18  A.      The other trooper that was with him, he was calling

19  the prosecutor's office to set up the arraignment in court

20  and let him know my stats, my criminal history.

21  Q.      What did you overhear about your criminal history?

22  A.      They was telling the DA my criminal history, so they

23  already knew what they going to do before I get there.  So,

24  "Due to your priors, you are not going to get any bail being

25  that you are being charged with a felony right now."

1   Q.    This is the conversation you had with the other

2   trooper but not with the VanBramers?

3   A.    Yes.

4   Q.    Did that trooper have any kind of paper that had a

5   list of your criminal history?

6   A.    No.  I mean, I don't know.  He's at the desk at his

7   computer.  I'm over here at the bench on the wall.  I don't

8   know specifically what he's looking at.  I'm sure he had

9   something on the computer.

10  Q.    Did you overhear any discussion amongst the troopers

11  about your criminal history before the strip-search

12  happened?

13  A.    No.

14  Q.    And you said the troopers said you would not get bail

15  because of your criminal history?

16  A.    Yes.

17  Q.    So, at some point, did you leave the barracks?

18  A.    Yes.  We left the barracks and went to Athens Town

19  Court for arraignment.

20  Q.    Who brought you?

21  A.    I think the sheriffs picked me up.  Either the

22  sheriffs picked me up from the barracks or they picked me up

23  from the court.  I can't recall.

24  Q.    As far as you know, did the troopers take you to

25  Athens Town Court?

1    A.    I think so.

2    Q.    Which one?

3    A.    I don't know.  It wasn't none of the VanBramers

4    brought me to court.

5    Q.    So it was some other person?

6    A.    Somebody else, yes.

7    Q.    What happened when you got to Athens Town Court?

8    A.    I was arraigned, and they told me I have an Order of

9    Protection.  And that was it.  I was brought to the jail.

10   Q.    Did you go in front of a judge?

11   A.    Yes.

12   Q.    Did the judge say anything about the charges?

13   A.    Yes.  They read the charges out.

14   Q.    And what charges were read?

15   A.    The harassment, the criminal mischief, if I'm not

16   mistaken, and the drug possession.

17   Q.    Were any law enforcement officers there at the court?

18   A.    Yes.

19   Q.    Who?

20   A.    I can't remember.

21   Q.    Were there any state troopers there?

22   A.    I can't remember if it was state or sheriff.

23   Q.    Did any law enforcement speak to the judge about what

24   happened?

25   A.    I don't know.  I can't recall if that conversation

1    took place in front of me.

2    Q.      Was there a prosecutor there?

3    A.      I don't remember.

4    Q.      Did you give a plea of guilty or not guilty?

5    A.      I don't think they asked.  I don't think they asked

6    me at that point.

7    Q.      So how long were you at Athens Town Court?

8    A.      How long I was there?

9    Q.      Right.

10   A.      I don't know.  I can't recall.  Not long because I

11   was the only one.  Like, the judge actually just came in to

12   arraign me.

13   Q.      Approximately what time did you get to Athens Town

14   Court?

15   A.      About 6:00.  It had to be between 6:00 and 7:00.

16   Q.      And was that on April 1st, 2013?

17   A.      Yes.

18   Q.      By the way, going back, approximately what time did

19   you get to the troopers' barracks?

20   A.      Between 4:00 and 5:00.

21   Q.      So after the arraignment at town court, where did you

22   go?

23   A.      Columbia County Jail.

24   Q.      Who brought you there?

25   A.      Excuse me.  Greene County Jail.

1   Q.      Who brought you there?

2   A.      Sheriffs.

3   Q.      By the way, were you given bail?

4   A.      No.

5   Q.      Did the judge say anything about why you weren't

6   getting it?

7   A.      Yes.  Up there in those parts, if you are being

8   charged with a felony and you have at least two felony

9   priors, that first arraignment, they have the opportunity to

10  deny you bail.

11  Q.      And is that what happened in this case?

12  A.      Yes.

13  Q.      Going back, we talked about the charges that the

14  judge discussed with you.  Did he say what they were in

15  terms of felony or misdemeanor or anything else?

16  A.      The criminal mischief was a felony, an E-level

17  felony, the lowest felony there is.

18  Q.      What about the others?

19  A.      Misdemeanors.  No.  The harassment wasn't even a

20  misdemeanor.  That was a violation.

21  Q.      What about the drug possession charge?

22  A.      Misdemeanor.

23  Q.      Approximately what time did you arrive at Greene

24  County Jail?

25  A.      Probably between 7:00 and 8:00.

1  Q.      What happened when you got to the jail?

2  A.      Had me sit down for a while, they booked me, made me

3  fill out forms, asked questions, gave me a phone call, made

4  me take off my street clothes and put on jail clothes.

5  Q.      Were you strip-searched?

6  A.      No.

7  Q.      So when you changed clothes, it was just in private?

8  A.      Yes.

9  Q.      By the way, in terms of this date, April 1st, 2013,

10  what were you wearing that day?

11  A.      A white button-down dress shirt, a tan vest, blue

12  jeans and tan suede shoes.  I think I had a hat on.  That

13  was it.

14  Q.      In terms of your dealings with law enforcement on

15  April 1st, 2013, was there any discussion about your

16  employment status?

17  A.      No.

18  Q.      On April 1st, 2013, did you overhear anything about

19  drug testing being done on the substance in your car?

20  A.      No.

21  Q.      Did you ever hear any discussion about a dog

22  searching your car?

23  A.      Yes.

24  Q.      When did you hear that?

25  A.      When I got out.

1   Q.      Out of what?

2   A.      Jail.

3   Q.      And when was that?

4   A.      At least before I got out of jail, I found out what

5   happened.

6   Q.      What did you find out?

7   A.      That there was muddy dog prints all over the inside

8   of the car.

9   Q.      How did you find that out?

10  A.      Cary Andersen told me.  She went to pick the car up

11  from impound or wherever they had it.

12  Q.      What else did you find out?

13  A.      That's it.

14  Q.      So there were dog prints inside the car?

15  A.      Yes.

16  Q.      In what part?

17  A.      The front and back seats.

18  Q.      By the way, how long were you at the Greene County

19  Jail?

20  A.      About three days.

21  Q.      And where did you go at that point?

22  A.      I was released.

23  Q.      What was the result of the three charges against you

24  that we discussed?

25  A.      It was four.  They gave me criminal mischief twice,

1  once for the phone, once for the car.  They gave me criminal

2  mischief two times, and there was a harassment and the drug

3  possession.

4  Q.    Did you have follow-up court appearances about the

5  charges?

6  A.    No.  Everything was done right on the spot.  The case

7  was over with.

8  Q.    The day that you were arraigned?

9  A.    Three days after.

10 Q.    What happened three days later?

11 A.    I went to court.

12 Q.    Is that Athens Town Court?

13 A.    Athens Town Court.  I pled guilty to the harassment.

14 Q.    So would that be April 4th?

15 A.    I think it was a Thursday.  I'm not sure.

16 Q.    So approximately three days after your arrest, you

17 went back to town court?

18 A.    Yes.

19 Q.    Did you have a lawyer?

20 A.    Yes.

21 Q.    Who was it?

22 A.    I think it was Robinson or Johnson.  I can't

23 remember.

24 Q.    Is that someone at a firm?

25 A.    That's the Greene County public defender.  That was

1  like the first and last time I ever seen him.

2  Q.    Did you fill out some kind of paperwork to get that

3  defender?

4  A.    Yes.

5  Q.    So what happened when you went back to Athens Town

6  Court?

7  A.    I pled guilty to the harassment charge, and I was

8  released.

9  Q.    So you made a plea bargain basically; is that right?

10  A.    Yes.

11  Q.    And then what happened to the other charges besides

12  harassment?

13  A.    I have no idea.  They just disappeared.

14            MR. MITCHELL:  I'd like to mark this as

15  Defendant's Exhibit 5.

16            (Defendant's Exhibit 5 was marked for

17            identification.)

18  BY MR. MITCHELL:

19  Q.    Mr. Sloley, I'd like to show you Defendant's Exhibit

20  5 with today's date.  Have you seen this document?

21  A.    I think so, yes.

22  Q.    Does this document reflect the outcome of the charges

23  against you for the April 1st, 2013, incident?

24  A.    The outcome as far as --

25  Q.    As far as the disposition or result of the charges

83

1   that were against you.

2   A.      Yeah.

3   Q.      And in terms of -- I think you said you pled guilty

4   to one charge.  Was there some kind of sentence or

5   punishment for it?

6   A.      Just gave me time served and had an Order of

7   Protection.  I think the Order of Protection was actually

8   put on at my arraignment when I was initially charged.

9   Q.      And was that to protect Daphne Rollins?

10  A.      Yes.

11  Q.      Did you go back to Athens Town Court for anything on

12  these charges or was that the end of it?

13  A.      That was the end of it.

14  Q.      So basically you went to town court twice for this

15  whole situation?

16  A.      Yes.

17  Q.      In this lawsuit that you have that you are pursuing,

18  are you alleging that Eric VanBramer violated your rights?

19  A.      Yes.

20  Q.      In what way did he violate your rights?

21  A.      Strip-searching me.

22  Q.      Anything else?

23  A.      Fabricating that he found narcotics when he never did

24  to justify his strip-search.

25  Q.      And what's your basis for alleging that Eric

1    VanBramer fabricated evidence?

2    A.      There was no narcotics in the vehicle, nor was there

3    any narcotics in evidence.

4    Q.      What's your basis for saying that there were no

5    narcotics in evidence?

6    A.      I didn't see any, and I don't think the DA did

7    either, that's why he swept that charge number under the rug

8    immediately.

9    Q.      Who swiped it?

10   A.      The distinct attorney.

11   Q.      Is that what the distinct attorney said?

12   A.      Well, me and my lawyer had a conversation before --

13   Q.      Well, you shouldn't tell me your conversation with

14   your lawyer, but I would like to know your basis for saying

15   the thing was swept under the rug.

16   A.      They didn't want to pursue it.  They had no intention

17   of pursuing a drug possession charge.  They basically jumped

18   on me pleading guilty to the harassment charge and

19   dismissing the drug charge, or whatever.

20   Q.      Did you ever ask to see the narcotics?

21   A.      Yes.

22   Q.      You did?

23   A.      Yes.

24   Q.      Who did you ask?

25   A.      The cops, the troopers.

1  Q.     When did you do that?

2  A.     In the barracks.

3  Q.     So you said, "Show me the drugs"?

4  A.     I said, "What drugs?  Where is it?"

5         He said, "It's too small to see.  It's crumbs.

6  It's too small."

7  Q.     And what did you say?

8  A.     I didn't say nothing.  I already knew what was going

9  on.

10  Q.     Do you have any other basis for saying that Eric

11  VanBramer fabricated evidence?

12  A.     No.

13  Q.     In this lawsuit, are you alleging that Eric VanBramer

14  did anything else wrong?

15  A.     No.

16  Q.     So it's just the strip-search and fabricating

17  evidence; is that it?

18  A.     Yes.

19  Q.     Are you alleging that Brian VanBramer violated your

20  rights?

21  A.     Yes.

22  Q.     In what way?

23  A.     He falsified a police report with the alleged drugs

24  that they found.

25  Q.     What's your basis for saying that Brian VanBramer

1  falsified the police report?

2  A.     Because there's no drugs.  Like, you're not going to

3  tell me that you found drugs in the seat where I'm sitting

4  and I don't know it's there and it's there.  Like, you're

5  not going to tell me that you found crumbs in the seat where

6  I'm sitting at in my mother's car.  That's a lie.  My mother

7  doesn't smoke crack and neither do I.

8  Q.     Did someone say that there was crack in the car?

9  A.     He said he found crumbs of crack.

10  Q.     This was Eric VanBramer said?

11  A.     Yes, but he said it's not enough to show.

12  Q.     So I think we talked about that you are alleging that

13  Brian VanBramer falsified the police report about drugs?

14  A.     Yes.  He filled out -- all the police reports are

15  filled out by Brian.

16  Q.     Is it just the drugs or are you saying --

17  A.     Just the drugs.

18  Q.     Aside from the police report, are you alleging that

19  Brian VanBramer violated your rights in any other way?

20  A.     No.

21  Q.     Is there anything else improper that Brian VanBramer

22  did to you?

23  A.     No.

24  Q.     Did Brian VanBramer strip-search you?

25  A.     No.

1    Q.    Are you arguing that Brian ordered a strip-search?

2    A.    I'm saying he conspired with the whole unlawful

3    strip-search thing knowing that his brother didn't find any

4    drugs but still filling out a police report saying that

5    there was.

6    Q.    In what way do you mean conspiring?

7    A.    He knew there was no drugs found.

8    Q.    But you think somehow Brian was involved in the

9    strip-search?

10   A.    Of course, because he's telling me, "We found drugs,

11   so we have the right to strip-search you."  And his brother

12   filled out a police report for drugs, but there's no drugs,

13   so how is there a police report saying you found drugs?

14   Q.    Okay.  But as far as you're concerned, was Brian

15   VanBramer involved at all in performing or ordering the

16   strip-search?

17   A.    I don't know.

18   Q.    Aside from what we just talked about, do you have any

19   other allegations -- strike that.

20         Aside from what we just went over, do you have any

21   other allegations against Brian VanBramer or Eric VanBramer

22   that is a part of this lawsuit?

23   A.    No.

24   Q.    At some point after you were released from Greene

25   County Jail, did you receive correspondence from Judge

1    Pauley?

2    A.      Yes.

3    Q.      About how long after you were released was that?

4    A.      About two to three weeks.

5    Q.      And was it a letter?

6    A.      Actually, I dealt directly with my probation officer

7    at that time, not with Judge Pauley.

8    Q.      So did your probation officer contact you or did you

9    contact him?

10   A.      I was still reporting, but I think he got a hold of

11   me at one point and said we have court.

12   Q.      Did you tell your probation officer about your

13   arrest?

14   A.      Absolutely, yes.

15   Q.      When did you tell the probation officer?

16   A.      As soon as I was released, I went to go see him.

17   Q.      And what did he say about it?

18   A.      He just let me know -- he was asking me why did I

19   leave the jurisdiction without permission and I got to

20   submit the paperwork to the judge, I might get a court date

21   for this, and that was it.  I kept reporting.  He put me on

22   a weekly status to report.

23   Q.      Is this the probation officer that's in New York

24   City?

25   A.      Yes.

```
 1   Q.      So did you go back to New York City?

 2   A.      Yes.

 3   Q.      At some point, did you go to Judge Pauley's

 4   courtroom?

 5   A.      Yes.

 6   Q.      What date?

 7   A.      It was in April.  I think sometime in April.

 8   Q.      How about April 19th, 2013?

 9   A.      Yes, 18th and 19th.

10   Q.      And what happened that day?

11   A.      I left.

12   Q.      Please discuss the circumstances under which you

13   left.

14   A.      They was talking about probation and the district

15   attorney was asking Judge Pauley to detain me, lock me up,

16   and I panicked and I left.

17           I didn't leave out of court.  Like, we didn't even

18   start court yet.  This took place, like, in the hallways in

19   the building outside the courtroom.

20   Q.      So the prosecutor spoke to you?

21   A.      It was me, my lawyer, probation officer and the

22   prosecutor.  We were having a little conversation.

23   Q.      And they indicated to you that you might be sent to

24   prison?

25   A.      Yes.  They said, "We are going to tell Judge Pauley
```

1    we want to detain him."

2              And my lawyer said, "You know, your judge, it's

3    not looking good.  I don't think you are leaving here

4    today."

5    Q.    And what did you do?

6    A.    I panicked.  The lawyer went in the courtroom.  I was

7    in the hallway by myself.  I just left.

8    Q.    And then what happened after that?

9    A.    The marshals caught me about a week later.

10   Q.    Where?

11   A.    Columbia County.

12   Q.    Were you at a particular residence at that time?

13   A.    Yes.

14   Q.    Where?

15   A.    Trailer park.

16   Q.    And was that Cary Andersen's tailer?

17   A.    Judy Devenski.  Cary Andersen -- she was with me at

18   the time, though.

19   Q.    Can you spell her last name?

20   A.    D-E-V-E-N-S-K-I.

21   Q.    Where was this trailer?

22   A.    Claverack, New York.  I don't know if that's

23   officially Claverack.  That's in Columbia County.

24   Q.    So you were at the trailer of Judy Devenski with Cary

25   Andersen and Judy?

1   A.      Yes.

2   Q.      And then what happened?

3   A.      Marshals came in and got me.

4   Q.      Did you have any warning they were going to show up?

5   A.      No.

6   Q.      And then what did they do?

7   A.      They brought me down to Judge Pauley, to go see Judge

8   Pauley.

9   Q.      Did you have any awareness that the marshals were

10  looking for you during that period for about a week?

11  A.      Yeah.

12  Q.      How did you know that?

13  A.      I got a phone call.

14  Q.      From the marshall?

15  A.      No.

16  Q.      And once you found out the marshal was looking for

17  you, how did you respond to that?

18  A.      I didn't know -- I was contemplating about how I'm

19  going to fix the situation, to go into custody and just deal

20  with the situation.

21  Q.      Is it fair to say you did not turn yourself in?

22  A.      I did not.

23  Q.      And what was the result after you were brought back

24  to Judge Pauley's courtroom?

25  A.      We had an initial hearing that we were supposed to

1   have about the harassment charge and leaving the

2   jurisdiction without permission, and I got 14 months for

3   that violation.

4   Q.      Fourteen months imprisonment?

5   A.      Yes.

6   Q.      Was there also a term of supervised release tacked

7   onto that?

8   A.      Yes.

9   Q.      Is it fair to say that period of supervised released

10  hasn't ended yet?

11  A.      It hasn't.

12  Q.      Was Judge Pauley upset about you leaving?

13  A.      Absolutely.   Very upset.

14  Q.      Who was defending you on that proceeding?

15  A.      Justine Harris.

16  Q.      Since April 1st, 2013, have you spoken at all to

17  Daphne Rollins?

18  A.      Yes.

19  Q.      When?

20  A.      For most of that incarceration.   For most of that

21  time I did the 14 months.

22  Q.      Did she come to visit you?

23  A.      She came one time when I was in Jersey.

24  Q.      So did you get back together?

25  A.      Right now, no.   She's with somebody else.   So am I.

1  But I don't know.  We stay in contact.  She sent me money,

2  phone calls, e-mails, visit.  Seen her when I came home.

3  Q.    Are you still friendly?

4  A.    I don't know.  We haven't contacted each other

5  recently because she lives with her boyfriend, so, you know.

6  Q.    As far as you know, is she still living in the same

7  house, the one that you had the incident with her?

8  A.    No.  She told me her and her boyfriend live in

9  Cohoes.

10  Q.    Do you know what address she's at now?

11  A.    No.

12  Q.    She sold her house?

13  A.    No.  That house is still there in Athens.  It's her

14  stepfather's house.

15  Q.    As far as you know, is the stepfather the one who

16  owns it?

17  A.    Yes.

18  Q.    And does she have some kind of ownership interest in

19  the house?

20  A.    I don't think so.

21  Q.    But as of April 2013, she was living in that house;

22  right?

23  A.    Yes.

24  Q.    When was the last time you spoke to Daphne Rollins?

25  A.    Probably October of last year.

1   Q.      Have you ever talked to her about this lawsuit?

2   A.      Yeah.

3   Q.      What was the conversation?

4   A.      Not much really because I -- by the time I started

5   getting into the lawsuit, we haven't been really socializing

6   that much.   But she knows that I filed it.

7   Q.      Did she ever talk to you about what she said to the

8   police?

9   A.      Absolutely.

10  Q.      What did she say?

11  A.      She said the stuff they put on the paper's a lie.

12  Q.      What stuff?

13  A.      As far as me punching and kicking her and beating her

14  up, she said she never said that, it never happened, so I

15  believe her.   But she said VanBramer was asking her

16  questions talking about --

17  Q.      Which VanBramer?

18  A.      Brian.

19  Q.      Go on.

20  A.      Asking her questions about me, where I know him from

21  and where she knows me from and this and that.   So I asked

22  her, like, "Did you say anything about drugs?"

23          She said, "I didn't tell them nothing about drugs

24  because I knew you didn't have any drugs on you because you

25  told me you didn't," which is true.

1    Q.      When did you say that?

2    A.      When I was there with her, before the little fiasco

3    went down with the bat and everything.

4    Q.      So on April 1st, 2013, you talked to Daphne Rollins

5    about whether or not you had drugs?

6    A.      Yeah.

7    Q.      How did that come up?

8    A.      Once in a while, I take a Percocet or two.

9    Q.      And Daphne knew that?

10   A.      Yeah.

11   Q.      So somehow that came up in conversation?

12   A.      Yes.  I think she wanted a painkiller.

13   Q.      All right.  If you can tell me more about what you

14   can remember.  So this is April 1st, 2013, you are at Daphne

15   Rollins' house, but before the incident heated up, you were

16   talking about Percocet?

17   A.      Either I asked her for one or she asked me for one,

18   because I didn't have any and she didn't either.

19   Q.      Was there any other discussion about drugs?

20   A.      No.

21   Q.      Do you take Percocet for some kind of medical

22   condition?

23   A.      No.  Just for reactional.  Once in a blue.

24   Q.      Is that prescription?

25   A.      No.

1    Q.    I'd like to just get into your conversation with

2    Daphne Rollins a little bit more in terms of what she was

3    telling you what she said to the police.   Do you remember

4    anything else about that conversation?

5    A.    Yeah.   I was asking her, like, "Why does the

6    paperwork say that I was beating you up and punching you and

7    kicking you?"

8          She's like, "I didn't say that.   Obviously, you

9    see that's not even my handwriting.   The officer did that."

10         And that isn't her handwriting.   The officer

11   filled out that report and signed it on his own.

12   Q.    Are you talking about the statement of Daphne

13   Rollins?

14   A.    Yeah.

15                    MR. MITCHELL:   Can we have this marked?

16                    (Directed to the court reporter.)

17                    (Defendant's Exhibit 6 was marked for

18              identification.)

19   BY MR. MITCHELL:

20   Q.    Sir, I'd like to show you Defendant's Exhibit 6 of

21   today's date.   Is this the statement of Daphne Rollins that

22   you were just discussing?

23   A.    Yes.

24   Q.    What did Daphne Rollins tell you about this

25   statement?

1  A.    She said the paragraph wasn't filled out by her.

2  Q.    You are talking about the written part in the box?

3  A.    Yes.

4  Q.    So she said none of that was written by her?

5  A.    Yes.

6  Q.    Do you see a signature area with Daphne Rollins'

7  name?

8  A.    Yep.

9  Q.    Did she tell you that she didn't sign it?

10  A.    No.  She said she signed it, but she said she didn't

11  write what was up there.

12  Q.    Did she say whether she reviewed the written part

13  before she signed it?

14  A.    No, she didn't.

15  Q.    Did she say that this narrative is false?

16  A.    Yes.

17  Q.    But she still signed it anyway?

18  A.    Yes.  She was also intoxicated, and they knew this,

19  but they still took her statement and went with it with the

20  charges.

21  Q.    So, according to you, she's now saying you didn't hit

22  her?

23  A.    She's always saying I didn't hit her because I never

24  struck her, kicked her, punched her, none of that.

25  Q.    So basically, she -- strike that.

1          Is she saying she never told the police that you

2    damaged her phone?

3    A.      No.  I think she told them that I stole her phone.

4    She thought I had her phone in my possession because she was

5    asking, where's her phone.

6          I said I don't have her phone.  But eventually

7    they found it outside.

8    Q.      Did Daphne Rollins tell you that she did not tell the

9    police that you had damaged her car?

10   A.      She told me that she said that I damaged her car,

11   yeah.

12   Q.      As far as you know, Daphne Rollins is saying that she

13   never reported having any kind of injuries caused by you on

14   her person?

15   A.      I'm not sure.

16   Q.      Did she tell you anything else about her conversation

17   with Brian VanBramer or the other troopers?

18   A.      I can't really recall specifically.

19   Q.      Did you talk to Daphne Rollins about participating in

20   this lawsuit?

21   A.      She said she wasn't.  I asked her to, but she said

22   she wasn't going to get involved.

23   Q.      What did you ask her to do?

24   A.      To come testify or give a statement or something.

25   Q.      And what did she say about that?

1   A.      She said she doesn't want to get involved in the

2   court stuff.

3   Q.      In terms of your discussion with Daphne Rollins about

4   what she remembers saying to the troopers, did she say

5   anything about mentioning drugs or you being involved with

6   drug?

7   A.      I asked her.  She said she never said anything like

8   that.

9   Q.      Did she say anything about Percocet to the troopers?

10  A.      No, not that I know of.

11  Q.      On April 1st, 2013, when you spoke to various law

12  enforcement people, did they say anything about you being

13  arrested for drugs previously in the community?

14  A.      In the community, no.  That's my first time ever

15  being in trouble in Greene County.

16                      MR. MITCHELL:  Can I have another thing

17  marked?

18                           (Directed to the court reporter.)

19                           (Defendant's Exhibit Number 7 was

20                        marked for identification.)

21  BY MR. MITCHELL:

22  Q.      I'm showing you Defendant's Exhibit 7 with today's

23  date.  Do you recognize this document?

24  A.      Yes.

25  Q.      Is this something you prepared in this case?

1    A.    Yes.

2    Q.    I'd like to show you paragraph four -- sorry.  I'd

3    like to direct your attention to paragraph four.  When did

4    Daphne Rollins say that she would not testify on behalf of

5    the defendants due to the fact that they made false

6    admissions regarding her statements?

7    A.    Every time I spoke to her about it, between the time

8    the incident happened and the last time I spoke with her or

9    near the last time I spoke to her.

10   Q.    So is it fair to say you were not merely asking her

11   to testify on your behalf, but you were also trying to

12   determine if she would testify against you?

13   A.    No.  I asked her to testify on behalf of me and tell

14   them -- to straighten out what's on paper and what really

15   happened.

16   Q.    And could you go over, just in terms of your

17   discussion with her, what are the false admissions that she

18   was referring to that you have here in paragraph four?

19   A.    Whatever's on the -- this statement right here.  Most

20   of this paragraph is false, most of it. (Indicating)

21   Q.    Is there anything in there that, as far as you know,

22   she would say is true?

23   A.    I hit the car with the bat.  She would definitely say

24   that.

25   Q.    What else?

1   A.    "I told him I was calling the cops.  At that point,

2   he left."  I don't recall that at all.  If she did, I don't

3   recall that.  But as far as "I can't be with him.  I told

4   him I can't be with him," that never happened.

5          As far as where it says, "He grabbed my arm and

6   dragged me up the stairs through the front door and then

7   into the radiator, then he punched me several times on my

8   back and shoulders."  Never happened.  Never punched her,

9   kicked her, slapped her, nothing.

10   Q.    I understand that that's your testimony, but I'm

11   trying to get at your discussion with her about what part of

12   the statement she said that she never made.

13   A.    Most of it.

14   Q.    Moving on.  Did you suffer any kind of injury as a

15   result of a strip-search on April 1st, 2013?

16   A.    Injury?

17   Q.    Right.

18   A.    As far as?

19   Q.    Were you harmed in any way as a result of the

20   strip-search on April 1st, 2013?

21   A.    If I was harmed?  I believe so.

22   Q.    In what way?

23   A.    Mental and emotional.

24   Q.    Could you explain more the ways in which you were

25   harmed?

1   A.      Just the fact that I was forced to do something that

2   they had no right making me do just because law enforcement

3   feels they can.  It doesn't sit well with me or it shouldn't

4   sit well with anybody.

5   Q.      Do you feel that your arrest was unconstitutional?

6   A.      In some ways, yes.

7   Q.      Even though you pleaded guilty to a charge?

8   A.      Yes.

9   Q.      In what way was the arrest unconstitutional?

10  A.      False statements, false charge referring to the drug

11  charge.

12  Q.      Were you present when the sheriff searched your

13  Maxima?

14  A.      I'm not sure who searched it, if it was a sheriff or

15  if it was Eric or the troopers.  I'm not specifically sure

16  who searched the vehicle.

17  Q.      In terms of that vehicle, how long had it been in

18  your possession, you know, as of the date you were stopped

19  near the bridge?

20  A.      I drove up that same night.

21  Q.      But were you using the car before that night?

22  A.      Yes.  I was driving it all day.

23  Q.      Had you been using it the days prior?

24  A.      Yes.

25  Q.      Was that sort of your regular vehicle at that point?

1    A.      I have access to it to any point in time.

2    Q.      Were other people using the Maxima during those few

3    days?

4    A.      I was the only one driving.

5    Q.      So is it fair to say in terms of the search of your

6    car, you don't have any personal knowledge about it?  You

7    are going based on what other people told you about the

8    search?

9    A.      Yes.

10   Q.      When you were strip-searched, were you afraid?  And

11   I'm speaking about the April 1st, 2013 strip-search.

12   A.      If I was afraid?  Kind of.

13   Q.      What were you afraid of?

14   A.      Just being forced to do something I didn't feel

15   comfortable.

16   Q.      Did you experience paranoia during the strip-search?

17   A.      I had an uncomfortable feeling.  I'm not exactly sure

18   what it was.

19   Q.      Could you describe the feeling?

20   A.      Probably anxiety.

21   Q.      Have you ever had anxiety before April 1st, 2013?

22   A.      Yes.

23   Q.      In what kinds of situations?

24   A.      It depends on the situation, I guess.  I don't know.

25   I can't recall offhand.

1    Q.      Is it fair to say before April 1st, 2013, you had

2    other incidents where you were arrested or accused by law

3    enforcement?

4    A.      Yes.

5    Q.      And did you feel anxiety during those incidents?

6    A.      Sometimes.  It depends on the situation and what was

7    going on.

8    Q.      In terms of the April 1st, 2013, strip-search, did

9    you experience humiliation?

10   A.      Yes.

11   Q.      Based on what?

12   A.      Based on being stripped and having to bend over and

13   expose myself.

14   Q.      As a result of the April 1st, 2013, strip-search, did

15   you lose trust in law enforcement?

16   A.      Yes.

17   Q.      In what way?

18   A.      In a way that they are not honest and sometimes they

19   do what they want because they feel they can get away with

20   it.

21   Q.      And so this strip-search on April 1st, 2013 -- strike

22   that.

23           Prior to the strip-search on April 1st, 2013, did

24   you have trust in law enforcement?

25   A.      I have never experienced a reason not to trust them,

1    besides the usual abuse that happens from NYPD, but other

2    than that, no.

3    Q.      And you have experienced abuse from the NYPD before?

4    A.      Yes.

5    Q.      Can you give examples?

6    A.      They are very aggressive down there, or they was at

7    one time.  This is like a long time ago.  They would just

8    usually jump out and put their guns out, point it at you,

9    don't move, searching you or pushing you, putting their

10   hands on you.

11   Q.      And so did you feel that some of those incidents were

12   unjustified?

13   A.      Yes, of course.

14   Q.      What about June, 2010, in Hudson when you were

15   arrested?  Did that incident have any affect on your level

16   of trust of law enforcement?

17   A.      Yes.

18   Q.      What was the effect?

19   A.      It's basically the same thing, officers saying

20   certain things that doesn't really go that way.

21   Q.      So isn't it fair to say you really didn't have much

22   trust at all in law enforcement before April 1st, 2013?

23   A.      In those specific situations, it usually goes to the

24   individual officers, not really the whole law enforcement.

25   It's just some bad apples out of the bunch.  There's always

1    good and there's always bad.

2    Q.      So following the strip-search on April 1st, 2013,

3    have you sought medical attention for any of these symptoms

4    that you relate to that strip-search?

5    A.      Well, I spoke to -- I was taking some anger sessions

6    with a psych, so, I mean, I basically covered issues like

7    that with them, but that's not the reason I went there.  But

8    being that I was there, I kind of brought up a lot of stuff.

9    Q.      And who is that?

10   A.      Robert Kessler or David Kessler.  I still have his

11   number.  Last name is K-E-S-S-L-E-R.

12   Q.      Does that person have a practice?

13   A.      Yes.

14   Q.      What's it called?

15   A.      Dr. Richard Kessler.  I don't remember.  I don't have

16   his card, but his office is in New Rochelle, New York.

17   That's when I was still stationed down there in the Southern

18   District.

19   Q.      Do you have the person's number?

20   A.      Yes.

21   Q.      Could you put it on the record?

22   A.      347-203-4317.

23   Q.      And you said that had to do with anger?

24   A.      Yes, I was -- due to the harassment charge with

25   Daphne Rollins, Judge Pauley told me to take anger

1    management sessions, so I was going to see Dr. Kessler.

2    Q.       And are you still treating with that person?

3    A.       No.

4    Q.       Any other medical or professional attention related

5    to the strip-search?

6    A.       No.

7    Q.       Do you feel that you have lost any income as a result

8    of the April 1st, 2013, strip-search?

9    A.       No.  I was only gone for a few days.

10   Q.       Are there any activities that you did before April

11   1st, 2013, that you no longer do which you attribute to the

12   strip-search?

13   A.       No.

14   Q.       Is it your belief that Eric VanBramer has improperly

15   strip-searched other individuals?

16   A.       Yes.

17   Q.       Who?

18   A.       Aaron King.

19   Q.       Can you spell that name?

20   A.       A-A-R-O-N.  Last name is King, K-I-N-G.

21   Q.       And how did you find out about him?

22   A.       I know him personally.

23   Q.       And what did he say about Eric VanBramer?

24   A.       Strip-searched him in the middle of the street in

25   public.

1  Q.      What else did Aaron King say?

2  A.      That was it.

3  Q.      And that was in Hudson?

4  A.      9-W in I think Athens, New York.

5  Q.      Did Aaron King say anything about Brian VanBramer?

6  A.      I'm not sure if both of them was there or if it was

7  just one or if it was Eric by himself.  I can't recall.

8  Q.      Has anyone else told you they were improperly

9  strip-searched by Eric VanBramer?

10  A.      Yeah.

11  Q.      Who?

12  A.      Strip-searched, no.  Just Aaron King.  That's it.

13  Q.      And what's his address?

14  A.      I don't know.  He's in Athens.  I don't know his

15  address specifically.  But he filed a complaint with the

16  state police.  They have it on file.

17  Q.      Did he say when roughly he filed it?

18  A.      I think 2013.

19  Q.      Is it your impression that this happened after your

20  situation or before?

21  A.      After.  I think it was after.

22  Q.      Any other individuals that you believe were

23  improperly strip-searched by Eric VanBramer?

24  A.      No.

25  Q.      In terms of your allegations about fabricating

1  evidence, has anyone told you that Eric VanBramer or Brian

2  VanBramer did that to them?

3  A.      No.

4  Q.      Aside from what we have already talked about, is

5  there any other way that you feel you were harmed by the

6  actions of the VanBramers?

7  A.      No.

8  Q.      After April 1st, 2013, have you ever spoken to any

9  state troopers?

10  A.      Only as far as getting a speeding ticket or a traffic

11  ticket, that's it.

12  Q.      Have you had any communications with the state police

13  about this lawsuit?

14  A.      No, not in detail, no.

15  Q.      What do you mean "not in detail"?

16  A.      One time I said to a trooper that I hope there's not

17  going to be a situation due to the fact that I got a lawsuit

18  between some of your co-workers.  That's as far as it went.

19  Q.      How did that come up?

20  A.      I called for a tow one night and -- no.  I called 911

21  because I needed a tow.  So they came and asked me all these

22  questions, where I'm going, blah, blah, blah.  So I just

23  brought up the situation like, this is where I'm going.  My

24  girlfriend is right here.  Can you tow my car?  It needs to

25  get out of the ravine.  I can't move it.  And that was it.

1   Q.      How did your car end up in a ravine?

2   A.      I don't know if that's a ravine, but this road that

3   my girlfriend lives on, it's like back roads in Cairo,

4   straight back roads.  If you go off the edge of the road, it

5   just drops into a ditch.  And I'm making a U-turn, like a

6   three-way U-turn.  And once it goes over that side, it's

7   like you are in a little ditch.  And it was raining that

8   night and my car's not picking up traction because it's

9   raining, so I called for a tow to pull me out.

10  Q.      And what did the troopers say?

11  A.      They thought I had a DWI situation, like, "Why did

12  you get in here?"

13          I said, "I made a U-turn and my car won't move.

14  I'm trying to get it out.  It's just stuck."

15  Q.      Were you arrested?

16  A.      No.

17  Q.      When did this incident happen?

18  A.      This was last year, like November I think.

19  Q.      November of 2014?

20  A.      Yeah.

21  Q.      And who was the girlfriend you were referring to?

22  A.      Hidea Moore.  She's not one of the old girls.  It's a

23  different person.  H-I-D-E-A is her first name.  Moore,

24  M-O-O-R-E.

25  Q.      Are you familiar with a place called Griffin's

1  Apartments?

2  A.    Yes.   That's in Hudson.   Either Greenport or Hudson.

3  That's in Columbia County.

4  Q.    Do you know someone who lives there?

5  A.    Used to.

6  Q.    Who?

7  A.    Christopher.   Chris.   We call him Chris.

8  Q.    Did you sometimes stay there?

9  A.    Yes.

10  Q.    Do you remember the address?

11  A.    No.   It's like one of them back roads situations.

12  Q.    Is that the name of it, Griffin's Apartments, or does

13  it have another name?

14  A.    That's it.

15  Q.    As far as you know, did Daphne Rollins think that you

16  lived there?

17  A.    If I lived there, I'm not sure.   She probably thought

18  I did.

19  Q.    Did you tell her that's where you lived?

20  A.    No.   She's been there with me.   We have been to that

21  apartment plenty of times.

22  Q.    What's Christopher's last name?

23  A.    Johnson.

24  Q.    Is he still a friend of yours?

25  A.    Yeah.

1   Q.      In terms of the drugs that were allegedly found in

2   your car, have you heard anything about what happened to

3   them?

4   A.      Nope.

5   Q.      There was never any discussion?

6   A.      No.

7   Q.      Is it your belief that Eric VanBramer did not have

8   reasonable suspicion to do a strip-search of you?

9   A.      Yes.

10  Q.      And what's your basis for thinking he did not have

11  reasonable suspicion?

12  A.      Because he had no factual basis to believe that I had

13  anything hidden on my person, anything illegal hidden on me.

14  Q.      Did the officers ever say anything to you about

15  Daphne Rollins saying that you were involved with drugs?

16  A.      No.

17  Q.      In this case, are you demanding money damages?

18  A.      Yes.

19  Q.      I'm looking at it and I can show you page four of

20  your complaint, which is Defendant's Exhibit 3.  Do you see

21  where it says that you're demanding $25,000 of compensatory

22  damages?

23  A.      Yeah.

24  Q.      How did you come up with that figure?

25  A.      Well, it's probably a misprint or a misunderstanding

1    in my little filing of the complaint.

2    Q.      You think it should be lower?

3    A.      No.   I think everything should be punitive.

4    Q.      So you are saying you don't have any compensatory

5    damages in this case?

6    A.      I'm not sure at this time because, you know, I'm not

7    really legal savvy to really differentiate at this point

8    whether it falls under compensatory, punitive, or both.

9    Q.      And then did you also say in that complaint that you

10   want punitive damages?

11   A.      Absolutely.

12   Q.      And how much are you demanding in there?

13   A.      It says $30,000.

14   Q.      And how did come up with that figure?

15   A.      I was just going through -- over looking at some

16   other cases and I came up with an estimate depending on

17   similar cases.

18   Q.      And why do you think punitive damages are appropriate

19   in this case?

20   A.      Because punitive falls under penalizing the officer

21   for wrongdoing, or penalizing anyone for that matter.

22   Q.      And then apart from what we've discussed today, are

23   there any other allegations that you have against Eric

24   VanBramer or Brian VanBramer that are a part of this

25   lawsuit?

1    A.    No, I don't think so.

2              MR. MITCHELL:   That's all I have.

3              (WHEREUPON, at 1:13 p.m., the

4    examination of MAXMILLIAN SLOLEY in the

5    above-entitled matter was concluded.)

6                    *  *  *  *  *

INDEX TO WITNESS

EXAMINATION BY MR. MITCHELL...................PAGE 4


INDEX TO EXHIBITS

DEFENDANT'S

EXHIBIT NOS.                                        PAGE

1            Document                          24

2            Document                          25

3            Civil Complaint                   33

4            Civil Complaint                   28

5            Document                          82

6            Statement                         96

7            Document                          99


REQUESTS FOR DOCUMENTATION/INFORMATION

(None.)

```
 1   STATE OF NEW YORK

 2

 3   I have read the foregoing record of my testimony taken at

 4   the time and place noted in the heading hereof and I do

 5   hereby acknowledge it to be a true and correct transcript of

 6   the same.

 7

 8

 9                                   _____

10                                   MAXMILLIAN SLOLEY

11

12   Sworn to before me this

13               day of                    , 2015.

14

15

16   _____

17   Notary Public

18

19

20

21

22

23

24

25
```

C E R T I F I C A T I O N

I, **SARAH B. DLUGOLECKI,** Shorthand Reporter and Notary Public within and for the State of New York, do hereby CERTIFY that the foregoing record taken by me at the time and place noted in the heading hereof is a true and accurate transcript of same, to the best of my ability and belief.

SARAH B. DLUGOLECKI

Dated: June 15th, 2015.