# United States v. Sloley

United States District Court for the Southern District of New York

July 18, 2013, Decided; July 18, 2013, Filed

03 Cr. 1190 (WHP)

**Reporter**
2013 U.S. Dist. LEXIS 105035; 2013 WL 5231462

UNITED STATES OF AMERICA, - against - MAXIMILLIAN SLOLEY, Defendant.

**Subsequent History:** Affirmed by United States v. Sloley, 2014 U.S. App. LEXIS 10693 (2d Cir. N.Y., June 10, 2014)

**Counsel:** [*1] For the Government: Amy Ruth Lester, U.S. Attorney's Office, SDNY, New York, NY.

For Maximillian Sloley: Justine Harris, Colson & Harris LLP, New York, NY.

**Judges:** WILLIAM H. PAULEY III, U.S.D.J.

**Opinion by:** WILLIAM H. PAULEY III

## Opinion

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

Maximillian Sloley seeks to vacate discretionary conditions of supervised release this Court imposed following two revocations of supervised release. For the following reasons, Sloley's motion is denied.

BACKGROUND

Sloley's serious criminal history spans two decades. At age 14, he was convicted of an armed robbery. Between the ages of 18 and 20, Sloley was convicted of providing a false name, possessing drugs, selling drugs, and possessing a firearm. He also violated parole twice. In 2004, Sloley plead guilty to being a felon in possession of a firearm. At that time, this Court sentenced him principally to eighty-eight months imprisonment and a three year term of supervised release.

Slolely's first term of supervised release began on April 21, 2010. On June 29, 2010, Sloley was arrested in the Northern District of New York for possessing drugs. On January 11, 2012, he admitted violating the terms of his supervised release. This [*2] Court sentenced him to time served and re-imposed a new thirty-four month term of supervised release. On April 1, 2013, Sloley was arrested in the Northern District of New York for harassment. This Court issued a summons directing Sloley to appear for a conference on April 19, 2013.

On that day, Sloley came to the courthouse, met with his lawyer, and then fled the courtroom before the conference began. Later that day this Court issued an arrest warrant. Five days later, Deputy United States Marshals arrested Sloley in the Northern District of New York.

On June 10, 2013, Sloley admitted three separate specifications relating to violations of his second supervisory term. On the same day, this Court sentenced Sloley principally to fourteen months imprisonment and a new twenty month term of supervised release that included two special conditions to which he now objects: (1) that his travel is restricted to the Southern and Eastern Districts of New York, except with the prior permission of Probation, and (2) that he is subject to 24-hour electronic monitoring that includes a Global Positioning System ("GPS").

DISCUSSION

The Court may impose discretionary conditions of supervised release when [*3] they "are reasonably related to the [§ 3553(a)] factors" and "involve only such deprivations of liberty . . . as are reasonably necessary[.]" 18 U.S.C. § 3563(b). This Court has "broad discretion to tailor conditions of supervised release" if the conditions are related to the goals and purposes of the Sentencing Guidelines. United States v. Myers, 426 F.3d 117, 124 (2d Cir. 2005). Among others, those goals include: (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) the need to afford adequate specific and general deterrence. U.S.S.G. § 5D1.3(b).

A. Travel Restriction

Sloley has a significant history of breaking the law and violating conditions of supervision. During his supervision,

Sloley informed his Probation Officer that he had a "stable residence" in Brooklyn, New York, but the U.S. Marshals investigation revealed that Sloley stayed in Brooklyn only "a few days a week." This Court is left to wonder where Sloley was and what he was doing. In addition, he not only fled the courthouse when he realized he might be incarcerated, but he also failed to surrender after learning that law enforcement was searching for him. Because [*4] he disregards the rules of the Court and Probation, enhanced verification is appropriate. While GPS monitoring will not prevent Sloley from fleeing, it will enable Probation to monitor Sloley's whereabouts and ascertain whether he is actually residing where he says he does or alert Probation if he disables it or travels to the Northern District.

More troubling, Sloley has repeatedly travelled to the Northern District without permission. Indeed, when he fled the courtroom in April, he did not go to his "stable residence" in Brooklyn. Instead, he travelled to a drug-infested trailer in the Northern District to be with his girlfriend. Even viewed in the best light, Sloley's physical proximity to drugs demonstrates extremely poor judgment. And each time that Sloley has travelled to the Northern District, his Probation Officer only learns about it because Sloley gets arrested. Thus, there is a significant need to restrict Sloley from traveling to the Northern District without the prior approval of Probation and GPS monitoring guarantees compliance with that condition.

Sloley contends that the travel restriction is unreasonable because it prevents him from maintaining relationships with family [*5] members, girlfriends past and present, and children that he is close to who reside in the Northern District of New York. Putting aside that an order of protection prohibits him from lawfully maintaining one of those relationships, Sloley's view of this term of supervised release does not comport with its plain terms: he is restricted to the Southern and Eastern Districts of New York, except with the prior permission of Probation. Sloley is free to request permission to travel to the Northern District for specific occasions. And they, of course, are free to visit him in the Southern and Eastern Districts.

B. GPS Condition

The Fourth Amendment protects against "unreasonable searches." But this protection "extend[s] only to 'unreasonable government intrusions into . . . legitimate expectations of privacy.'" United States v. Thomas, 729 F.2d 120, 122 (2d Cir. 1984) (quoting United States v. Chadwick, 433 U.S. 1, 7, 97 S. Ct. 2476, 53 L. Ed. 2d 538 (1977). A person on supervised release, however, has a "diminished expectation of privacy." United States v. Reyes, 283 F.3d 446, 460 (2d Cir. 2002). Indeed, because supervised release is "meted out in addition to, not in lieu of incarceration," on the continuum of supervised release, [*6] parole, and probation, restrictions imposed by supervised release are "[t]he most severe." United States v. Lifshitz, 369 F.3d 173, 181 n.4 (2d Cir. 2004).

The conditions of supervised release should be designed to deter the defendant, and protect the public from future criminal behavior. See U.S.S.G. § 5D1.3(b). Continual GPS monitoring will require Sloley to adhere to the travel restrictions placed on him. Given Sloley's propensity to violate his conditions of supervised release almost as soon as he is released from imprisonment, GPS monitoring is necessary to ensure that the goals of supervised release are met. Accord United States v. Miller, __Fed. App'x __, 2013 U.S. App. LEXIS 11837, 2013 WL 2631308, at *2 (5th Cir. June 12, 2013) (upholding GPS monitoring condition because it provides "effective verification of compliance with the other conditions of supervised release, deterrence of future crimes, and protection of the public"); see also United States v. Porter, 555 F. Supp. 2d 341, 345 (E.D.N.Y. 2008) (setting the GPS condition because it "addresses the special need for deterrence and the protection of the public").

CONCLUSION

For the foregoing reasons, Defendant Maximillian Sloley's motion to vacate [*7] two discretionary conditions of supervised release is denied.

Dated: July 18, 2013

New York, New York

SO ORDERED:

/s/ William H. Pauley III

WILLIAM H. PAULEY III

U.S.D.J.

# United States v. Sloley

United States Court of Appeals for the Second Circuit

June 10, 2014, Decided

No. 13-2898-cr

**Reporter**

568 Fed. Appx. 79; 2014 U.S. App. LEXIS 10693; 2014 WL 2579322

UNITED STATES OF AMERICA, Appellee, v. MAXMILLIAN SLOLEY, AKA RONNIE PERRY, AKA "MAXMILLIAN," AKA "JERRY EBANKS," AKA "KEVIN MADISON," AKA "MAXMILLIAN SLOLEY," Defendant-Appellant.

**Notice:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History:** **[**1]** Appeal from a July 18, 2013 Memorandum & Order of the United States District Court for the Southern District of New York (William H. Pauley III, Judge).

United States v. Sloley, 2013 U.S. Dist. LEXIS 105035 (S.D.N.Y., July 18, 2013)

**Counsel:** FOR APPELLEE: Amy Lester (Brent S. Wible, on the brief), Assistant United States Attorneys, for Preet Bharara, United States Attorney for the Southern District of New York, New York, NY.

FOR DEFENDANT-APPELLANT: Justine Aleta Harris, Kristen M. Santillo, Colson & Harris LLP, New York, NY.

**Judges:** PRESENT: RALPH K. WINTER, JOHN M. WALKER, JR., JOSE A. CABRANES, Circuit Judges.

## Opinion

**[*79] SUMMARY ORDER**

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the District Court be **AFFIRMED.**

Appellant Maxmillian Sloley ("Sloley") challenges two conditions of his supervised release ordered by the District Court. These conditions were ordered during a violation proceeding at which Sloley admitted having violated the terms of his original supervised release by, *inter alia,* committing the state crime of harassment and leaving the judicial district without permission on two occasions. At that proceeding, the District Court sentenced Sloley to 14 months' imprisonment and 20 months' supervised release, which included two special conditions **[**2]** that Sloley's attorney objected to in the District Court and now contests on appeal.

The first is a condition limiting Sloley's travel to the Southern and Eastern Districts of New York without permission from the District Court or probation. Sloley argues that this violates the requirement of 18 U.S.C. § 3583(d)(2) that special **[*80]** supervised release conditions involve no greater deprivation of liberty than is necessary to achieve the goals of sentencing, and that it is not "narrowly tailored" to meet a compelling government interest.

The second condition challenged by Sloley is the requirement that he be subject to 20 months of continuous GPS monitoring. Sloley argues that this also violates 18 U.S.C. § 3583(d)(2), as well as his Fourth Amendment right to be free from unjustified searches, and is not narrowly tailored to achieve the goals of sentencing.

We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

"The propriety of conditions of supervised release are judged by an abuse of discretion standard," and "[a]lthough the district court enjoys broad discretion in imposing these conditions, its discretion is not 'untrammeled' **[**3]** . . . our Court will carefully scrutinize unusual and severe conditions." *United States v. Dupes,* 513 F.3d 338, 343 (2d Cir. 2008). Conditions of supervised release must also "involve no greater deprivation of liberty than is reasonably necessary to implement the statutory purposes of sentencing." *United States v. Myers,* 426 F.3d 117, 124 (2d Cir. 2005) (internal quotation marks omitted). "A challenge to conditions of supervised release that presents an issue of law is generally reviewed *de novo.*" *Dupes,* 513 F.3d at 343.

The United States Sentencing Guidelines § 5D1.3(c)(1) states that a "standard" condition recommended for supervised release is that "the defendant shall not leave the judicial district or other specific geographic area without the

permission of the court." These "standard" conditions are "presumed suitable in all cases." *United States v. Asuncion-Pimental*, 290 F.3d 91, 94 (2d Cir. 2002). We conclude that it was well within the District Court's discretion to order Sloley to remain in a particular geographic area.

Second, Sloley argues that the District Court abused its discretion in imposing GPS monitoring because his history does not warrant such an imposition. He does [**4] not challenge the District Court's ability to impose such a condition, only its appropriateness to his case. We conclude that the District Court acted within its discretion in imposing GPS monitoring. Sloley concedes that he has a "history of violating conditions of supervised release" and has "twice violated for leaving the jurisdiction." Appellant Br. at 23. Thus, the Court could reasonably question whether Sloley would abide by the travel restrictions, and GPS monitoring provides an appropriate means of ensuring that he does.

## CONCLUSION

We have considered all of Sloley's arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the District Court.

# Sloley v. United States

United States District Court for the Southern District of New York

June 18, 2009, Decided; June 18, 2009, Filed

08 Civ. 111 (WHP)

**Reporter**

2009 U.S. Dist. LEXIS 53270; 2009 WL 1834349

MAXMILLIAN SLOLEY, Petitioner, -against- UNITED STATES OF AMERICA, Respondent.

**Prior History:** United States v. Sloley, 464 F.3d 355, 2006 U.S. App. LEXIS 23470 (2d Cir. N.Y., 2006)

**Counsel:** [*1] Maxmillian Sloley, Petitioner, Pro se, Jonesville, VA.

**Judges:** WILLIAM H. PAULEY III, United States District Judge.

**Opinion by:** WILLIAM H. PAULEY III

## Opinion

*MEMORANDUM & ORDER*

WILLIAM H. PAULEY III, District Judge:

Petitioner Maxmillian Sloley ("Sloley") brings this habeas corpus proceeding under 28 U.S.C. § 2255 to vacate his 88-month sentence for possession of a firearm after conviction of a felony. For the following reasons, Sloley's motion is denied.

*BACKGROUND*

I. *Suppression Hearing*

Before his scheduled trial, Sloley moved to suppress the principal evidence against him--the firearm. *United States v. Sloley*, 03 Cr. 1190 (WHP), Slip Op. at 1 (S.D.N.Y Mar. 10, 2004). At the suppression hearing, two officers testified that on September 17, 2003, they stopped a pick-up truck for driving recklessly. *Sloley*, Slip Op. at 3. Sloley, who was seated in the back seat leaned forward and grabbed the waistband of his pants while the officers were questioning him. *Sloley*, Slip Op. at 4-5. One officer testified that when he reached in to see what Sloley was doing, he felt a gun. *Sloley*, Slip Op. at 5. Sloley testified that he did not act suspiciously and that he only leaned forward after the officer tried to pull him from the vehicle. [*2] *Sloley*, Slip Op. at 7. This Court credited the officers' version of events, found that stop and the search were reasonable, and denied Sloley's motion to suppress. *See Sloley*, Slip Op. at 8-13.

II. *Sentencing*

On June 18, 2004, Sloley plead guilty pursuant to a plea agreement dated June 14, 2004. (Transcript dated June 14, 2004, at 16.) In the plea agreement, the Government calculated Sloley's base offense level as 24, because he committed his current offense after "sustaining at least two felony convictions of either a crime of violence or a controlled substance offense," U.S.S.G. § 2K2.1(a)(2), and his criminal history category as VI. Sloley stipulated to a two-level enhancement for obstruction of justice for committing perjury during his testimony on his motion to suppress. (Letter from Christine Meding dated Sept. 28, 2004 ("Meding Letter") Ex. A: Letter from Christina Bischoff to David Patton dated June 14, 2004 ("Bischoff Letter") at 2.) The Government stipulated to a three-level downward adjustment if Sloley clearly demonstrated his acceptance of responsibility to the Government's satisfaction. (Bischoff Letter at 2.) With these adjustments, Sloley's base offense level was 25, [*3] resulting in a sentencing range of 92-115 months. (Bischoff Letter at 3.)

The plea agreement was entered into six days before the Supreme Court issued its decision in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). In light of *Blakely*, Sloley argued that the Government was required to prove that his prior felony offenses were crimes of violence or involved a controlled substance to a jury beyond a reasonable doubt. (Letter of David Patton dated Sept. 13, 2004 ("Patton 9/13 Letter"), at 4-5.) He also argued that he should not be subject to the obstruction of justice enhancement in the plea agreement because the facts supporting such an enhancement should be found by a jury. (Patton 9/13 Letter, at 4-5.) Thus, he argued his base offense level should be 12 (including a two-point deduction for acceptance of responsibility), with a sentencing range of 30 to 37 months. (Patton 9/13 Letter, at 4-5.) The Government responded that there was no such requirement under *Blakely*

and that Sloley was trying to withdraw from the plea agreement. Thus, the Government asserted he was not entitled to a downward adjustment for acceptance of responsibility and a sentencing range of 120 to 150 months was appropriate. [*4] (Meding 9/28 Letter at 1, 13.)

After *Blakely*, this Court postponed sentencing until the Supreme Court ruled in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005). (Letter of David Patton dated Dec. 6, 2004; Letter of David Patton dated Jan. 14, 2005.) After the Supreme Court's decision in *Booker*, Sloley argued that *Booker* "substantially altered the federal sentencing scheme" and that this Court should consider the factors set forth in 18 U.S.C. § 3553(a), in addition to the Guidelines, in determining the appropriate sentence. (Letter of David Patton dated Jan. 31, 2005 ("Patton 1/31 Letter") at 2.) Sloley argued that even the lowest possible sentence under the Guidelines was excessive in light of § 3553(a). (Patton 1/31 Letter at 5.) The Government countered that a Guidelines sentence was reasonable and that the § 3553(a) factors did not warrant a lower sentence. (Letter from Christine Meding dated Feb. 14, 2005.)

On March 16, 2005, this Court sentenced Sloley to an 88-month term of imprisonment. This Court concluded that the issue of whether Sloley breached the plea agreement was immaterial because the agreement was not binding on the court. (Sentencing Transcript ("Sent. Tr.") at 9.) This [*5] Court calculated Sloley's base offense level as 24, and declined the Government's request for a two-point upward adjustment for obstruction of justice because there was not "sufficient evidence of Sloley's willful intent to provide false testimony" at the suppression hearing (Sent. Tr. at 10). While the Court granted a two-point downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), the Government did not move for an additional one-point downward adjustment under U.S.S.G. § 3E1.1(b), because Sloley repudiated the plea agreement. (Sent. Tr. at 11.) Thus, Sloley's total offense level was 22, and his criminal history category was VI. That yielded a recommended sentencing range of 84 to 105 months. (Sent. Tr. at 12.) If this Court had granted the additional one-point reduction (for acceptance of responsibility), Sloley's Guidelines sentencing range would be 77 to 96 months.

This Court concluded that a Guidelines sentence was "sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2)." (Sent. Tr. at 14.) Specifically, this Court found that the 84 to 105 months range prescribed in the Sentencing Guidelines was "a [*6] reasonable sentence in this particular case and will not lead to any disparity in sentencing with respect to similar offenses and, considering all of the other factors set forth in Section 3553, there's nothing in Mr. Sloley's background or in the circumstances of this case that warrants a nonguidelines sentence." (Sent. Tr. at 14.) This Court then determined that "[t]o serve the deterrent and rehabilitative purposes of the criminal justice system, [Sloley] must . . . serve a lengthy period of incarceration," and sentenced Sloley to 88 months of imprisonment, followed by three years of supervised release and a $ 100 special assessment. (Sent. Tr. at 15.)

III. *Post-Trial Proceedings*

Sloley filed an appeal on March 23, 2005, arguing that the Government breached its plea agreement by not moving for an additional one-point reduction under § 3E1.1(b) and this Court erred by not granting Sloley this additional one-point reduction. The Court of Appeals held that § 3E1.1(b) was clear--a district court cannot grant an additional one-point reduction for acceptance of responsibility unless the Government files a motion requesting it. *United States v. Sloley*, 464 F.3d 355, 359 (2d Cir. 2006). The [*7] Court of Appeals further held that while the Government cannot refuse to file the motion based on either an unconstitutional motive--e.g., the defendant's race or religion--or bad faith, neither of those circumstances were present. *Sloley*, 464 F.3d at 360-61. On March 26, 2007 the Supreme Court denied Sloley's petition for a writ of certiorari. *Sloley v. United States*, 549 U.S. 1316, 127 S. Ct. 1900, 167 L. Ed. 2d 383 (2007).

*DISCUSSION*

Sloley's present motion attempts to relitigate the claim that he was entitled to a an additional one-point reduction under § 3E1.1(b) by re-casting it as an ineffective assistance of counsel claim. Specifically, Sloley alleges that his counsel was ineffective for failing to: (1) ask for a sentencing "variance" as opposed to a "departure"; (2) investigate applicable case law relating to variances; and (3) advise Sloley of the risks of testifying at the evidentiary hearing, specifically, that the Government could deny the additional one-point reduction. These claims are without any basis in law or fact and are denied.

To prevail on an ineffective assistance of counsel claim, a petitioner must show that: (1) his counsel's representation fell below an objective standard of reasonableness; [*8] and (2) there is a reasonable probability that, but for the deficiency in representation, the result of the proceeding would have been different--i.e., that he was prejudiced by

his counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "[T]he prejudice component of the Strickland test . . . focuses on whether counsel's deficient performance renders the result of the [proceeding] unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). There is a strong presumption that counsel exercises reasonable judgment in all significant decisions. *Strickland*, 466 U.S. at 690. This deference is particularly warranted when considering matters of trial strategy, which reviewing courts are "ill-suited to second-guess." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998). Self-serving, conclusory allegations are insufficient to establish ineffective assistance of counsel. *See United States v. Torres*, 129 F.3d 710, 715-17 (2d Cir. 1997).

I. *Variance versus Departure*

"While the terms 'departure' and 'variance' are often used interchangeably to describe deviations from the recommended Guideline range," *United States v. Keller*, 539 F.3d 97, 99 n.2 (2d Cir. 2008) [*9] (citing *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 597, 169 L. Ed. 2d 445 (2007)), "'[d]eparture is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines," *Irizarry v. United States*, 128 S. Ct. 2198, 2201, 171 L. Ed. 2d 28 (2008). "A 'variance,' on the other hand, describes the District Court's power pursuant to 18 U.S.C. § 3553(a) to impose a sentence outside of the otherwise applicable Guidelines range. . . ." *Keller*, 539 F.3d at 99 n.2.

The record is clear that, although Sloley's attorney did not use the word "variance," he specifically sought to have this Court impose a non-Guidelines sentence under § 3553(a), which this Court declined to do. Indeed, this Court found that none of the § 3553(a) factors warranted a variance from the Guidelines. Even if this Court had awarded an additional point deduction, Sloley's 88-month sentence was within the 77 to 96 month range. Moreover, this Court found that 88 months was a reasonable sentence. Sloley points to nothing that would have changed that conclusion. Thus, Sloley fails to show that he suffered any prejudice or that his able counsel did anything unreasonable.

II. *Risks of Testifying*

Sloley also claims [*10] that his counsel failed to advise him that by testifying at the suppression hearing, he risked losing the additional one-point reduction. However, the Government's decision was based on Sloley's rescission of his plea agreement, not his decision to testify. Importantly, Sloley's decision to avoid his plea deal resulted in a lower sentence than the plea deal provided to him, even without the additional one-point reduction.

Finally, because the record clearly establishes that Sloley's claims are completely without merit, Sloley's request for a hearing is denied. *Dalli v. United States*, 491 F.2d 758, 760 (2d Cir. 1974); *see also Hayden v. United States*, 814 F.2d 888, 892 (2d Cir. 1987).

*CONCLUSION*

For the foregoing reasons, Petitioner Maxmillian Sloley's motion to vacate his sentence is denied. Because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). In addition, this Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. *See Coppedge v. United States*, 369 U.S. 438, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

The Clerk of the Court is directed to dismiss all [*11] pending motions and mark this case as closed.

Dated: June 18, 2009

New York, New York

SO ORDERED:

/s/ William H. Pauley

WILLIAM H. PAULEY III

U.S.D.J.

# Sloley v. O'Brien

United States District Court for the Western District of Virginia, Roanoke Division

July 22, 2008, Decided; July 22, 2008, Filed

Civil Action No. 7:07cv00507

**Reporter**
2008 U.S. Dist. LEXIS 63849

MAXIMILLIAN SLOLEY, Petitioner, v. TERRY O'BRIEN, Respondent.

**Subsequent History:** Writ of habeas corpus dismissed, Motion granted by Sloley v. O'Brien, 2008 U.S. Dist. LEXIS 63847 (W.D. Va., July 22, 2008)

**Counsel:** [*1] Maxmillian Sloley, Petitioner, Pro se, Jonesville, VA.

For Warden Terry O'Brien, Respondent: Rick A. Mountcastle, LEAD ATTORNEY, UNITED STATES ATTORNEYS OFFICE, Roanoke, VA.

**Judges:** Samuel G. Wilson, United States District Judge.

**Opinion by:** Samuel G. Wilson

# Opinion

*MEMORANDUM OPINION*

**By: Samuel G. Wilson**

**United States District Judge**

Petitioner, Maximillian Sloley, currently housed at United States Penitentiary at Lee County, Virginia ("USP Lee"), filed this 28 U.S.C. § 2241 motion challenging a disciplinary hearing which resulted in various sanctions, including loss of good conduct time. However, the Bureau of Prisons ("BOP") has expunged the disciplinary data regarding the challenged disciplinary action from Sloley's discipline record and re-credited his record to reflect no loss of good conduct time. Accordingly, the court finds that this action is moot and, therefore, grants respondent's motion to dismiss.

I.

On November 7, 2006, while at Federal Correctional Institution at Otisville, New York ("FCI Otisville"), Sloley was charged with institutional infractions for allegedly assaulting another inmate while wearing a disguise or mask. In January 2007, a Discipline Hearing Officer ("DHO") conducted a hearing concerning [*2] the alleged assault and disguise. The DHO found Sloley guilty and sanctioned him with 60 suspended days of segregation time, disallowance of 14 days good conduct time, forfeiture of 108 days of nonvested good conduct time, 1-year loss of visiting, commissary, and television privileges, and a recommended disciplinary transfer. Sloley's appeal of the DHO's decision to the Regional Director was denied. In his petition, Sloley indicates that he timely appealed the Regional Director's April 2007 decision but received no response as of the time he filed his federal habeas petition in October 2007. However, in his motion to dismiss, respondent indicates, and Sloley does not contest, that Sloley's last appeal was partially granted in October 2007 and a rehearing was ordered. Consequently, respondent indicated that the DHO's sanctions, including the loss of good conduct time, would not be given effect and Sloley's record would be updated to reflect no loss of good conduct time.

II.

Sloley claims he was denied due process and found guilty upon insufficient evidence at his disciplinary hearing, which resulted in the DHO sanctioning him with loss of good conduct time, loss of certain privileges, [*3] a recommended disciplinary transfer, and suspended segregation time. However, Sloley's disciplinary action has been remanded on appeal, the disciplinary action has been expunged from his inmate record, and he has been credited all good conduct time lost with regard to this disciplinary action. Therefore, the court finds that this claim is now moot. [1]

Article III of the Constitution limits the jurisdiction of federal courts to actual cases and controversies. A federal

[1] It is unclear whether the DHO's sanctions of loss of certain privileges, a recommended disciplinary transfer, and suspended segregation time were applied to Sloley during the time his appeals were pending; however, any claim Sloley might have regarding these sanctions would not be actionable in a federal habeas petition. A petition for writ of habeas corpus may be brought by a prisoner who seeks to challenge the fact or duration of the prisoner's confinement. *Preiser v. Rodriguez*, 411 U.S. 475, 500, 93 S. Ct. 1827, 36 L. Ed.

court has no authority to "give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of California v. United States*, 506 U.S. 9, 12, 113 S. Ct. 447, 121 L. Ed. 2d 313 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653, 16 S. Ct. 132, 40 L. Ed. 293 (1895)). A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969). Thus, when changes occur during the course of litigation that eliminate the petitioner's interest in the outcome of the case or the petitioner's need for the requested relief, the case must be dismissed as moot. *See Friedman's Inc. v. Dunlap*, 290 F.3d 191, 197 (4th Cir. 2002) ("[O]ne such circumstance mooting a claim arises when the claimant receives the relief he or she sought to obtain through the claim.").

In this case, Sloley's claims are moot because no viable issues remain to be resolved. All of Sloley's claims pertain to the sufficiency of the evidence and [*5] alleged due process violations at his DHO hearing held on January 24, 2007. However, on October 9, 2007, Sloley's disciplinary action was remanded for rehearing. Further, the BOP expunged the discipline data from Sloley's inmate discipline record and updated Sloley's Sentence Monitoring Good Time Data record to reflect no loss of good conduct time based on the challenged disciplinary action. Accordingly, Sloley's complaints regarding the initial hearing have been rendered moot. *See Hayes v. Evans*, 70 F.3d 85, 86 (10th Cir. 1995); *Rojas v. Driver*, No. 5:06cv88, 2007 U.S. Dist. LEXIS 71177 (N.D. W. Va. Sept. 24, 2007).

## III.

For the reasons stated herein, the court grants respondent's motion to dismiss

ENTER: This 22nd day of July, 2008.

/s/ Samuel G. Wilson

United States District Judge

---

2d 439 (1973). To the extent Sloley challenges the denial of his television, commissary, and visiting privileges, recommended disciplinary transfer, or the suspended segregation time, he is not challenging the duration or propriety of his sentence. Instead, Sloley is challenging the conditions of his confinement, which are actionable under 42 U.S.C. § 1983, [*4] not § 2241.

# United States v. Shefler

United States District Court for the Northern District of New York

January 13, 2009, Decided; January 13, 2009, Filed

5:06-CR-448-001

**Reporter**
2009 U.S. Dist. LEXIS 2108

UNITED STATES OF AMERICA, vs. AARON M. SHEFLER; VANCE HALL; and CARL CRUMP a/k/a/ "Bubba," Defendants.

**Counsel:** [*1] APPEARANCES: Andrew T. Baxter, Esq., Acting United States Attorney for the Northern District of New York, Syracuse, New York, Richard R. Southwick, Esq., Assistant U.S. Attorney.

Gary B. Zimmerman, Esq., Pittsburgh, PA, Attorney for Defendant Shefler.

**Judges:** Norman A. Mordue, Chief United States District Court Judge.

**Opinion by:** Norman A. Mordue

## Opinion

**Norman A. Mordue, Chief U.S. District Judge**

**MEMORANDUM-DECISION AND ODER**

**I. INTRODUCTION**

Defendant Aaron Shefler moves for suppression of evidence seized by law enforcement officers after a stop of a vehicle in which he and co-defendant Hall were traveling as passengers in Potsdam, New York. Defendant Shefler submits that the initial stop of the van for a speeding violation was unlawful since unindicted co-conspirator Craig Barber, the operator of the van, was not speeding and the law enforcement officer who initiated the stop had no scientific basis to believe otherwise. Defendant contends that the officer's determination that Barber had violated the traffic law was simply a "subterfuge" to justify stopping the vehicle to search for drugs based on information given to police by a confidential informant. Based upon the initial unlawful traffic stop, defendant Shefler [*2] argues that the subsequent sniff and search of the van by a K-9 unit was also illegal. Alternatively, Shefler contends that even if the K-9 sniff and search was legal, the dog was unreliable since he alerted to the presence of drugs when none were found.

**II. FACTUAL BACKGROUND**

The facts of the present motion as adduced at an evidentiary hearing in this matter are as follows: On April 6, 2006, the St. Lawrence County Narcotics Task Force received information from a confidential informant that Craig Barber was going to be delivering a load of marijuana from Snye, Quebec - located on the Akwesasne Reservation - to his residence in Nicholville, New York. Detective Sergeant William Carlisle of the Task Force contacted the Village of Potsdam Police Department and told Potsdam Police Officer Scott Thompson that the Task Force might need assistance with surveilling the van, a K9 unit or a traffic stop. The Task Force set up surveillance on Barber's residence and observed a white rented minivan parked in the driveway. At approximately 6:00 p.m., the van was observed heading west on State Route 11B toward Potsdam. Detective Carlisle testified that he called Officer Thompson and told him that the [*3] white minivan was headed his way. Carlisle then followed the vehicle to the Village of Potsdam and handed off surveillance to another Task Force officer. During the time he surveilled the vehicle, Carlisle did not observe the driver violate any traffic laws.

Mark LaBrake testified that he took over surveilling the white minivan where Carlisle left off. In April 2006, LaBrake was employed as an officer with the Village of Massena Police Department and was also assigned to the St. Lawrence County Drug Task Force. Officer LaBrake was 7 to 10 car lengths behind the white minivan when he observed the vehicle make a "right on red" at the intersection of Market and Maple Streets where "right on red" turns were prohibited expressly by a large black and white metal sign hanging next to the traffic light. When Officer LaBrake observed the traffic infraction, he broadcast the information over his police radio.

After talking to Detective Carlisle, Officer Thompson had set up a stationary surveillance point on Maple Street (Route 11) close to the Eben's Hearth Restaurant on the western edge of the Village of Potsdam. Carlisle had advised Thompson that if he saw the operator of the van violate the [*4] New York State Traffic Law, he should initiate a stop.

Officer Thompson was able to hear communications from Carlisle and LaBrake over his police radio. At one point, Thompson heard LaBrake say that the white minivan had passed through a red light. Officer Thompson then observed the minivan approaching him traveling south from Potsdam toward the Village of Canton. The posted speed limit in that area of the Village of Potsdam is 30 mph. Thompson estimated the white minivan was traveling at approximately 40 mph. Thompson's radar equipment confirmed the excessive speed of 41 mph.

Just past Thompson's surveillance point, the minivan approached a bridge over railroad tracks on Route 11 which demarcated the Village of Potsdam limits. As indicated by a posted traffic control sign, the speed zone changed at the bridge from 30 mph to 55 mph. After the white van passed Thompson, he initiated a traffic stop by activating his lights. Thompson stopped the vehicle on the other side of the aforementioned bridge and learned that the vehicle was being operated by Craig Barber. Barber advised Thompson that he had a learners permit but did not have it in his possession. Thompson also asked Barber for [*5] the vehicle registration, Barber said the van was rented but he did not know by whom. Barber said he was going to the Best Western in Canton, about 10 miles away. Thompson then asked Barber to step out of and to the rear of the vehicle. Thompson asked another officer who had pulled in to assist in the stop to observe Barber while Barber's license information was retrieved [1] and Thompson attempted to obtain further information about the vehicle from the two passengers.

Thompson then approached the front passenger side of the minivan and spoke to defendant Aaron Shefler. Thompson asked Shefler if he could retrieve documentation concerning rental of the vehicle from the glove box. Thompson observed Shefler reach into the vehicle glove box but he was unable to find the requested documents. When asked by Thompson where the group was headed, Shefler replied "home," to Pennsylvania. The backseat passenger, defendant Hall, also indicated that they had been heading to Pennsylvania at the time of the stop which Thompson found suspicious given Barber's statement that the group was staying at a motel in Canton. Thompson asked the [*6] two passengers to exit the vehicle so he could investigate further and they agreed.

Thompson knew the Task Force had requested his assistance in a narcotics investigation and that the services of his K9 might be needed. He then retrieved his dog, K9 Drake, from his patrol car. Thompson then ran the dog around the perimeter of the vehicle. The first time around the van, K9 Drake rose up and alerted to the open driver's side window and attempted to gain access to the vehicle. The second time around the vehicle, the K9 reacted the same way. Thompson then allowed the dog to go inside the van for a further investigation. Moments later, the dog began digging at a duffel bag or backpack in the rear of the vehicle. Thompson then retrieved K9 Drake and advised another officer on the scene of the bag upon which the dog had alerted. Upon inspection, law enforcement officers located $ 200,000.00 in U.S. currency inside the bag. No drugs were found inside the van.

Task Force officers then transported the three men for questioning and processing on New York State drug charges. During transport of defendant Hall to the St. Lawrence County Sheriff's Department, Hall told one officer that the van also [*7] contained firearms. Officers searched and located two 9 mm pistols in the other black backpack in the van. The guns were owned by Hall and Shefler who were licensed to carry them in Pennsylvania. Later, a fourth member of the group, Matthew Roszner, was taken into custody at a nearby hotel room where he was found with $ 100,000.00 in U.S. currency and a pistol. Thompson issued three tickets to Craig Barber on the date of the stop - "speed in zone, unlicensed driver and disobey[ing] the right on red." The "right on red" ticket was issued based on the observations of Officer LaBrake who saw Barber make an illegal turn at the intersection of Market and [Maple] Streets.

Defendant Shefler submits that the initial stop of the van was unlawful since the van was not speeding and Officer Thompson had no scientific basis to believe otherwise. Indeed, Shefler contends that the speed limit sign visible to motorists in the area of Eben's Hearth Restaurant is 55 mph. Moreover, Shefler contends that Thompson's determination that the vehicle was speeding was a mere guess. Shefler argues that it is apparent from review of police reports provided in the course of discovery that the police were going [*8] to stop the white van in question one way or another given the information received from a confidential informant and that the officer's determination that the van had violated the traffic law was simply a "subterfuge" to justify stopping the vehicle to search for drugs.

Defendant Shefler also argues that he was illegally detained and questioned by Officer Thompson out of the presence of the other occupants of the vehicle. Shefler avers that since

[1] Thompson later learned that Barber's license had been suspended.

the van was not stopped lawfully the sniff and search of the van by the K-9 unit was illegal. Moreover, Shefler contends that even if the K-9 sniff and search was legal, the dog was unreliable since he alerted to the presence of drugs when none were found. Finally, while Shefler averred in an affidavit in support of the suppression motion that K9 Drake dog **did not** alert to the presence of drugs while outside the van, he testified at the hearing in this case that the dog did alert, but that was likely due to the fact that he had Craig Barber's small white dog on his lap at the time of the stop. For his part, Thompson denied seeing a dog in defendants' vehicle and stated that if a dog had been present he would have seen it.

### III. DISCUSSION

Defendant [*9] Shefler argues that Officer Thompson had no grounds upon which to stop the vehicle since there was no traffic violation. Specifically he contends that there is a 55 mph speed limit sign visible to motorists in the area of the restaurant where the van was stopped and that therefore Barber was not speeding as alleged by Thompson. The government asserts that the speed limit change outside the Village of Potsdam from 30 mph to 55 mph did not authorize Barber to drive 55 mph until he reached the latter sign on Route 11. Shefler also contends that he has standing to contest both the stop and search of the vehicle. To wit, according to Shefler, since Thompson had no reasonable suspicion to stop the vehicle, he was not authorized to question its occupants or order his dog to sniff search the outside of the van.

It is clear from established case law that while a passenger in a vehicle has the right to make a Fourth Amendment challenge to a stop of the vehicle, he generally has no standing to challenge a search of the vehicle unless he can establish a specific expectation of privacy. *See, e.g., Rakas v. Illinois*, 439 U.S. 128, 148-49, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978); *United States v. Paulino*, 850 F.2d 93, 97 (2d Cir. 1988), [*10] *cert. denied*, 490 U.S. 1052, 109 S. Ct. 1967, 104 L. Ed. 2d 435 (1989). Making the required showing of an expectation of privacy in the vehicle would be especially difficult in this case given the rental status of the van. However, since an automobile stop may result in a Fourth Amendment "seizure" of a car and the passengers alike, a passenger may have standing to challenge the seizure of the vehicle even if he or she lacks standing to challenge a search. *See United States v. Eylicio-Montoya*, 70 F.3d 1158, 1164 (10th Cir. 1995); *United States v. Muyet*, 946 F.Supp. 302, 304-05 (S.D.N.Y. 1996); *United States v. Clark*, 822 F.Supp. 990, 1004 (W.D.N.Y. 1993). Indeed, if the initial stop of the vehicle was illegal - that is, not supported by probable cause or a reasonable suspicion of unlawful conduct - evidence seized in a subsequent search may well be excludable as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.), *cert. denied*, 513 U.S. 877, 115 S. Ct. 207, 130 L. Ed. 2d 136 (1994).

However, while defendant Shefler's contention concerning his standing to contest the initial stop of the vehicle may be correct, his argument that the Task Force's use of a traffic violation [*11] as a subterfuge for stopping the van thereby invalidates the ensuing narcotics search is misplaced. In *Scopo, supra*, the Second Circuit adopted the "authorization" test for determining the validity of a vehicle stop and the resultant seizure of evidence. Under this test, a court must focus on whether the particular law enforcement officer "'in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop."' *Scopo*, 19 F.3d at 784 (quoting *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993)). If there was probable cause, the stop is justified, "and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop." *Id.* A valid basis for a stop and search is not "rendered invalid by the fact that police resort[ed] to a pretext for one purpose or another to continue that [stop] and search." *United States v. Nersesian*, 824 F.2d 1294, 1316 (2d Cir.), *cert. denied*, 484 U.S. 957, 108 S. Ct. 355, 98 L. Ed. 2d 380 (1987).

"[A]n ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth and Fourteenth Amendments." *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979). Accordingly, [*12] such stops must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct. *See Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). Here, Thompson's stop was based upon a specific and articulable fact: the observed traffic violation of speeding. Though defendant Shefler denied that Barber was speeding prior to the stop, his testimony failed to raise a question concerning the credible evidence presented by Officer Thompson. Thompson averred that he believed the vehicle was speeding when he first observed it and that his observation was confirmed by his standard police radar equipment. The court finds no reason to doubt Officer Thompson's testimony concerning these facts.

As to defendant's argument that Barber was not speeding in the 30 mph zone because the 55 mph sign was visible as they approached the village limits, it is clear from legal

authority submitted by the government, including New York State Vehicle and Traffic Law and the Code of the Village of Potsdam, that speed zones under New York law begin *at* the posted sign, not when a motorist can *observe* the sign. Moreover, assuming arguendo that Barber was not speeding, Thompson was [*13] still authorized to stop the vehicle based on the observations of Officer LaBrake who saw Barber make an illegal right turn at a traffic control device. As in *Scopo*, though this traffic violation and the others committed by Barber on the date in question were "minor," Thompson acted within his authority in stopping the white minivan. *Scopo*, 19 F. 3d at 781, *see also* N.Y.VEH. & TRAF. LAW § 155 ("For purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense."); *United States v. Cruz*, 834 F.2d 47, 50 (2d Cir. 1987), *cert. denied*, 484 U.S. 1077, 108 S. Ct. 1056, 98 L. Ed. 2d 1018 (1988) (probable cause arises when the police reasonably believe that "an offense has been or is being committed."). In *Scopo*, the police observed the vehicle in which defendant was traveling change lanes without signaling as required by the New York Vehicle and Traffic Law. 19 F.3d at 780. Yet, federal task force officers chose to wait until the vehicle was stopped at an intersection 2.2 miles past the site of the traffic infraction to arrest him. *See id.* As a further matter, the organized crime agents who stopped defendant did not conduct traffic [*14] arrests as part of their usual duties. *See id.* None of these factors "negate[d] the fact that [the officers] directly observed Scopo violating the traffic laws and thus had probable cause to arrest him." *Id.*

It follows that, once Thompson had probable cause to stop the vehicle based on Barber's violation of the traffic law, police were entitled to search the vehicle, especially since there were inconsistencies in the stories offered by the three occupants of the vehicle and Thompson's K9 unit alerted to odor of narcotics in the vehicle. *See New York v. Belton*, 453 U.S. 454, 460, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981) ("when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile") (footnotes omitted). [2]

## IV. CONCLUSION

Based on the foregoing, defendant Shefler's motion for suppression of evidence (Dkt. No. 51) is hereby [*15] DENIED in its entirety.

IT IS SO ORDERED.

Date: January 13, 2009

/s/ Norman A. Mordue

Norman A. Mordue

Chief United States District Court Judge

---

[2] Thompson did not need probable cause to conduct the K9 "sniff search" of the vehicle's perimeter since it is well-settled that "canine sniffing is neither a serach or a seizure for purposes of the Fourth Amendment." United States v. Waltzer, 682 F. 2d 370, 373 (2d Cir. 1982).

# Miller v. Carney

United States District Court for the Northern District of New York

September 18, 2014, Decided; September 18, 2014, Filed

9:12-CV-0972 (LEK/RFT)

**Reporter**
2014 U.S. Dist. LEXIS 130796

PATRICK MILLER, Plaintiff, -against- EDWARD CARNEY, et al., Defendants.

**Prior History:** Miller v. Carney, 2014 U.S. Dist. LEXIS 132780 (N.D.N.Y, Aug. 7, 2014)

**Counsel:** [*1] Patrick Miller, Plaintiff, Pro se, Gowanda, NY.

For Edward Carney, Deputy, Justin Campeau, Deputy, Brian Willis, Deputy, James Prior, Deputy, Ella Brown, Deputy, Defendants: Frank W. Miller, LEAD ATTORNEY, Office of Frank W. Miller, East Syracuse, NY.

**Judges:** Lawrence E. Kahn, United States District Judge.

**Opinion by:** Lawrence E. Kahn

## Opinion

ORDER

This matter comes before the Court following a Report-Recommendation filed on August 7, 2014, by the Honorable Randolph F. Treece, U.S. Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3. Dkt. No. 68 ("Report-Recommendation").

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). "If no objections are filed . . . reviewing courts should review a report and recommendation for clear error ." Edwards v. Fischer, 414 F. Supp. 2d 342, 346-47 (S.D.N.Y. 2006); see also Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003) ("As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."); Farid v. Bouey, 554 F. Supp. 2d 301, 306 (N.D.N.Y. 2008).

Plaintiff filed a Letter Motion requesting appointment of counsel, but did not otherwise respond to the Report-Recommendation. Dkt. No. 71. Accordingly, the Court has reviewed [*2] the Report-Recommendation for clear error. Having found none, the Report-Recommendation is approved and adopted in its entirety.

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 68) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that Defendants' Motion (Dkt. No. 43) for summary judgment is **GRANTED**; and it is further

**ORDERED**, that Plaintiff's Letter Motion (Dkt. No. 71) is DENIED; and it is further

**ORDERED**, that the Clerk of the Court enter judgment for Defendants and close this case; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Order upon the parties to this action in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED: September 18, 2014

Albany, New York

/s/ Lawrence E. Kahn

Lawrence E. Kahn

U.S. District Judge

# Miller v. Carney

United States District Court for the Northern District of New York

August 7, 2014, Decided; August 7, 2014, Filed

Civ. No. 9:12-CV-972 (LEK/RFT)

**Reporter**
2014 U.S. Dist. LEXIS 132780

PATRICK MILLER, Plaintiff, - v - EDWARD CARNEY, Deputy, JUSTIN CAMPEAU, Deputy, BRIAN WILLIS,[1] Deputy, JAMES PRIOR, Deputy, ELLA BROWN, Deputy, Defendants.

**Subsequent History:** Adopted by, Summary judgment granted by, Dismissed by, Motion denied by Miller v. Carney, 2014 U.S. Dist. LEXIS 130796 (N.D.N.Y, Sept. 18, 2014)

**Counsel:** [*1] PATRICK MILLER, Plaintiff, Pro se, Moravia, NY.

For Defendants: FRANK W. MILLER, ESQ., BRYAN N. GEORGIADY, ESQ., Office of Frank W. Miller, East Syracuse, NY.

**Judges:** Randolph F. Treece, United States Magistrate Judge.

**Opinion by:** Randolph F. Treece

## Opinion

**REPORT-RECOMMENDATION and ORDER**

*Pro se* Plaintiff Patrick Miller brings this Complaint, pursuant to 42 U.S.C. § 1983, alleging that he was falsely arrested and maliciously prosecuted by Defendants. Dkt. Nos. 1, Compl.; & 11, Supp. Submission in Support of Compl. (hereinafter "Supp. Compl.").[2] Defendants now move for summary judgment, pursuant to Federal Rule of Civil Procedure 56. Dkt. No. 43. Plaintiff has not opposed the Motion.[3] For the reasons that follow, we recommend that Defendants' Motion be **GRANTED** and that this case be **DISMISSED**.

### I. STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion [*3] for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. Fed. R. Civ.

---

[1] Defendant Brian Wills's name is incorrectly listed on the Docket Report as "Willis." The Court will use the proper spelling when referring to this Defendant. See Dkt. No. 43-6, Brian Wills Aff., dated Sept. 26, 2013.

[2] Plaintiff's Complaint was initially dismissed with leave to re-plead for failure to state a claim. Dkt. No. 9, Dec. & Order, dated Dec. 7, 2012. Although Plaintiff submitted a document entitled "Amended Complaint," the two-page document failed to comply with even the most basic rules for such a pleading; nonetheless, given his *pro se* status, the Court deemed the document to be a Supplemental Submission in Support of his Complaint, and construing the two documents liberally, found [*2] that Plaintiff had alleged sufficient information to warrant a response from Defendants with respect to his malicious prosecution and false arrest claims. Dkt. No. 12, Dec. & Order, dated Feb. 13, 2013.

[3] Despite receiving Notice from the Clerk of the Court and the Defendants as to the consequences of failing to respond to a motion for summary judgment, Plaintiff failed to do so. *See* Dkt. Nos. 43-9 & 45.

P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where [*4] a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

In the instant matter, Plaintiff has failed to oppose Defendants' Motion.[4] However, "[t]he fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to a judgment as a matter of law. *Id.*; Fed. R. Civ. P. 56(c). Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on a court to conduct an independent review of the record to find proof of a factual dispute. *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002).

**II. DISCUSSION**

**A. Summary of Facts**

The following facts are undisputed.[5]

On May 14, 2010, at approximately 2:21 a.m., the Oswego County Sheriff's Office ("Sheriff's Office") began receiving reports that an assault with a weapon had occurred at building number 32 of the Birch Lane Apartments in the Town of Scriba, New York. Dkt. No. 43-1, Defs.' Statement of Material Facts Pursuant to Local Rule 7.1(a)(3) (hereinafter "Defs.' 7.1 Statement"), at ¶ 1. The dispatcher requested that vehicle units respond to an incident involving a stabbing and injuries at the scene. *Id.* at ¶ 2. The first officers to arrive at the scene were Defendant James Prior, a deputy with the Sheriff's Office, and Officers Finkle and Kedenburg of the New York State Police.[6] *Id.* at ¶ 4. Upon arriving at the scene, the officers encountered a crowd of people, members of which told the officers that there was a man in apartment 32B who had been throwing knives, and there was an injured woman with a knife in her arm in one of the adjacent buildings. *Id.* at ¶¶ 5-6.

A significant [*6] amount of blood was visible on the sidewalk area near the entrance to apartment 32B; the lights in the apartment were on and its door was ajar. *Id.* at ¶ 7. Deputy Prior and Officers Kedenburg and Finkle drew their weapons and made a tactical entry through the front door. *Id.* at ¶ 8. Moments later, Defendant Deputy Sheriff Justin Campeau, arrived on scene and entered apartment 32B. *Id.* at ¶ 9. Once inside, the officers fanned out and began to search the apartment for victims or suspects. *Id.* at ¶ 10. Defendant Deputy Sheriff Edward Carney, who arrived not long after Defendant Campeau, took up a position outside the rear door of apartment 32B. *Id.* at ¶ 11. Trooper Kedenburg located Plaintiff hiding inside a bedroom closet, handcuffed him for their safety, and led him to the living room where he was asked to sit down. *Id.* at ¶¶ 12-13 & 15.

[4] *See supra* Note 3.

[5] Although Plaintiff failed to respond to Defendants' Motion for Summary Judgment, a liberal reading of his Complaint and Supplemental Complaint reveal that the facts of the instant case are nonetheless undisputed. *Compare* [*5] Dkt. No. 43-1, Defs.' Statement of Material Facts Pursuant to Local Rule 7.1(a)(3), *with* Compl. & Supp. Compl. Accordingly, the following facts are construed from the submissions of both parties.

[6] Officers Finkle and Kedenburg are not Defendants in this action.

After the apartment had been cleared, Deputy Carney returned to the front of the building. Deputy Prior and Trooper Kedenburg then left apartment 32B in search of the injured victim. *Id.* at ¶¶ 14 & 16. Near the front door to apartment 32B, Deputy Prior noticed additional blood spatter on the outside wall of the building and a trail of blood drops on [*7] the ground leading from building number 32 to building number 33. *Id.* at ¶ 17. Trooper Kedenburg and Deputy Prior located the victim, Colbi Fantom, in the stairway of building number 33; Fantom had a foot-long knife embedded into her upper arm and was bleeding profusely. *Id.* at ¶ 18-19. Fantom, conscious and coherent despite her injuries, told Deputy Prior that Pat Miller threw the knife that was embedded in her arm. *Id.* at ¶ 19-20. Trooper Kedenburg and Deputy Prior returned to apartment 32B, and asked Plaintiff to identify himself; Plaintiff then admitted that his name was Patrick Miller. *Id.* at ¶ 21. Defendant Prior placed Plaintiff under arrest and Trooper Finkle read Plaintiff his Miranda rights. *Id.* at ¶¶ 22-23. Upon further investigation, Defendant Prior noticed that there were several knives similar to the one found in Fantom's arm in the kitchen of apartment 32B. *Id.* at ¶ 24. Thereafter, Deputy Prior transported Plaintiff to the Oswego County Public Safety Center ("PSC"). *Id.* at ¶ 25.

At approximately 2:42 a.m., Defendant Campeau took a statement from Shane Merrit, an eye witness. *Id.* at ¶ 27; Dkt. No. 43-3, James Prior Aff., dated Sept. 4, 2013, at ¶ 53 & Ex. E. At approximately [*8] 3:18 a.m., Trooper Kedenburg took a statement from Teresa M. Finch, the primary resident of apartment 32B and Plaintiff's girlfriend. Prior Aff. at ¶ 53 & Ex. D. At approximately 5:06 a.m., Defendant Carney took an eyewitness statement from Tyler Purchase. *Id.* at ¶ 53 & Ex. F; Defs.' 7.1 Statement at ¶ 29.

At approximately 3:30 a.m., Defendant Ella Brown, an Investigator with the Sheriff's Office, arrived to collect evidence and document the crime scene. Defs.' 7.1 Statement at ¶ 26. Defendant Sergeant Brian Wills, also with the Sheriff's Office, drove to University Hospital in Syracuse to get Fantom's statement and retrieve the knife from her arm for evidence. *Id.* at ¶ 30.

At PSC, and while processing Plaintiff, Defendant Prior emptied Plaintiff's pockets and discovered, *inter alia*, a substance which was later confirmed by a field regent test to be illicit psilocybin mushrooms, a controlled substance. Plaintiff admitted that the mushrooms belonged to him and that he had purchased them. *Id.* at ¶¶ 32-35. Plaintiff was re-Mirandized, and asked to give a statement about what happened that evening. At approximately 3:29 a.m., a written statement was prepared and reviewed by Plaintiff; after [*9] being given the opportunity to make edits, Plaintiff initialed all the legal releases and signed the statement under penalty of perjury. *Id.* at ¶ 36; Prior Aff. at ¶¶ 44-45 & 47 & Ex. B.

Later that same morning, Deputy Prior received and reviewed eyewitness statements from Teresa M. Finch, Tyler M. Purchase, and Shane M. Merritt. Defs.' 7.1 Statement at ¶ 37. After reviewing these statements, Defendant Prior prepared three charges against Plaintiff: (1) Felony Assault in the Second Degree, pursuant to N.Y. PENAL L. (hereinafter "PL") § 120.05; (2) misdemeanor Reckless Endangerment in the Second Degree, pursuant to PL § 120.20; and, (3) misdemeanor Criminal Possession of a Controlled Substance in the Seventh Degree, pursuant to PL § 220.03. *Id.* at ¶ 38; Prior Aff. at ¶ 54 & Ex. G.

Subsequently,[7] the Oswego County Grand Jury ("Grand Jury") indicted Plaintiff on six counts, including Assault in the Second Degree. Defs.' 7.1 Statement at ¶ 43. At a suppression hearing before the Oswego County Court, it was determined that Kedenburg, Finkle, and Prior unlawfully entered apartment 32B without a warrant and all of the evidence obtained from Plaintiff subsequent to the entry was deemed inadmissable. At trial, Plaintiff [*10] was convicted of Criminal Possession of a Weapon in the Third Degree. *Id.* at ¶¶ 44-45; Pl.'s Supp. Compl.

Plaintiff alleges that he threw the knives in self defense because a group of people were trying to burglarize his girlfriend's apartment. *See generally* Compl.; Supp. Compl.[8]

**B. Personal Involvement**

Plaintiff alleges that he was falsely arrested and maliciously prosecuted. *See generally* Compl. Defendants argue that Brown, Wills, Carney, and Campeau were not personally involved in either arresting or prosecuting Plaintiff. Dkt. No. 43-2, Defs.' Mem. of Law at pp. 2-5.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v.*

[7] The precise date is unclear.

[8] Defendants do not dispute that Plaintiff claimed to have acted in self defense. Dkt. No. 43-3, James Prior Aff., dated Sept. 4, 2013, at ¶ 46 & Exs. D & E.

*Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz*, 1997 U.S. Dist. LEXIS 13998, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995) & *Wright v. Smith*, 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's [*11] own individual actions, has violated the constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

It is undisputed that Defendant Brown did not arrive on the scene until after Plaintiff had already been arrested and transported to the PSC. Prior Aff. at ¶ 59; Dkt. No. 43-7, Ella Brown Aff., dated Aug. 17, 2013, at p. 2; Dkt. No. 43-5, Edward Carney Aff., dated, Sept. 4, 2013, at ¶ 12. Additionally, it is undisputed that Defendant Wills's involvement was limited to driving to the hospital to take a statement from Colbi Fantom, and that he was not present when Plaintiff was arrested. Prior Aff. at ¶ 58; Dkt. No. 43-6, Brian Wills Aff., dated Sept. 26, 2013, at ¶¶ 3-7 & 19-20. Moreover, although Defendant Carney was present at the scene, his involvement was limited to securing the back entrance, monitoring the crowd in front of the building, and taking an eyewitness's statement. Prior Aff. at ¶ 61; Carney Aff. at ¶¶ 1-18. Likewise, although Defendant Campeau participated in "sweeping" apartment 32B, he was outside when Plaintiff was found by Trooper Finkle hiding in the closet, and he did not interact with Plaintiff at any time nor was he present when Defendant Prior placed Plaintiff under arrest. Prior Aff. at ¶ 60; Dkt. No. [*12] 43-4, Justin Campeau Aff., dated Aug. 15, 2013, at ¶¶ 4-12 & 17-20. Thus, no rational juror could conclude that these Defendants were personally involved in Plaintiff's arrest. *See Munoz v. City of New York*, 2008 U.S. Dist. LEXIS 12305, 2008 WL 464236, at *5 (S.D.N.Y. Feb. 20, 2008) (finding that officer who was "waiting around the apartment" but did not physically contact plaintiff, was not personally involved in his alleged false arrest); *Minott v. Duffy*, 2014 U.S. Dist. LEXIS 49791, 2014 WL 1386583, at *11 (S.D.N.Y. Apr. 8, 2014) (finding that officers who were not present at the scene at the time of arrest, or when suspect was actually taken into custody, were entitled to summary judgment on grounds of lack of personal involvement in arrest); *Minter v. Cnty. of Westchester*, 2011 U.S. Dist. LEXIS 24519, 2011 WL 856269, at *7 (S.D.N.Y. Jan. 20, 2011) (officers' presence outside of home insufficient to establish personal involvement for purposes of false arrest claim).

Furthermore, it is also undisputed that Defendant Prior was the only law enforcement officer involved in prosecuting Plaintiff. Defendant Prior decided which crimes to charge Plaintiff with and personally filled out and signed the criminal charging instruments. Prior Aff. at ¶ 54 & Ex. G. In contrast, aside from collecting evidence, taking statements from eyewitnesses, and giving narrative accounts for the Sheriff's internal incident report, Defendants Wills, Brown, Campeau, and Carney had no involvement in the decision [*13] to bring charges nor the actual prosecution of Plaintiff. *Id.* at ¶¶ 57-61 & Ex. I; Wills Aff. at ¶¶ 3 &19-22; Brown Aff. at p. 2; Carney Aff. at ¶¶ 13 & 16-19; Campeau Aff. at ¶¶ 12-21; *see also Llerando-Phipps v. City of New York*, 390 F. Supp. 2d 372, 382-83 (S.D.N.Y. 2005) (citing cases for the proposition that law enforcement officers are personally involved in prosecuting suspects where they bring formal charges, or have the suspect arraigned, fill out complaining or corroborating affidavits, or swear or sign felony complaints) (citations omitted); *Alcantara v. City of New York*, 646 F. Supp. 2d 449, 458 (S.D.N.Y. 2009) ("None of the defendants participated in the plaintiff's arrest. None of the defendants brought formal charges against the plaintiff or had him arraigned. None of the defendants filled out complaining or corroborating affidavits, swore to any felony complaint, or forwarded any information to prosecutors in any way. On these grounds alone, the malicious prosecution claims against all of the defendants fail.").

Accordingly, given that Defendants Brown, Wills, Carney, and Campeau were not personally involved in Plaintiff's arrest or prosecution, we recommend that Defendants' Motion be **GRANTED** with respect to all of Plaintiff's claims against these Defendants.

### C. False Arrest

A § 1983 claim for false arrest is substantially [*14] the same as a claim for false arrest under New York law. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted).[9] Under New York law, to prevail on a false arrest claim, a plaintiff must show (1) the defendant intended to

[9] The terms false arrest and false imprisonment are always stated in tandem, yet they are not distinct causes of action but rather, false arrest is only a species of false imprisonment. *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). Because they are corollaries of each other, the nomenclature can be, and often are, employed interchangeably. Nonetheless this species of action is rather distinct from another common law cause of action, malicious prosecution, which is often concurrently invoked in these types of lawsuits. *Broughton v. State of New York*, 37 N.Y.2d 451, 456, 335 N.E.2d 310, 373 N.Y.S.2d 87 (N.Y. Ct. App. 1975).

confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. *Broughton v. State*, 37 N.Y.2d 451, 456, 335 N.E.2d 310, 373 N.Y.S.2d 87 (N.Y. Ct. App. 1975). The quintessential justification, or defense, to false arrest is the presence of probable cause. *Weyant v. Okst*, 101 F.3d at 852 (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (noting that the existence of probable cause "is a complete defense to an action for false arrest")). Essentially, the presence of probable cause proclaims that the arrest and confinement were privileged. In order for probable cause to exist for an arrest, the arresting officers must

> have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. [citations omitted] . . . [Therefore] [a] district court must look to the 'totality of the circumstances.' [citation omitted]. In looking to the totality of the circumstances, courts must be aware that 'probable [*15] cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not ready, or even usefully, reduced to a neat set of legal rules.'

*Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (citations omitted).

In essence, probable cause is determined by the facts available to the officers at the time of the arrest and immediately before. *Id.*; *see also Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003). Furthermore, "the probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004)); *Maliha v. Faluotico*, 286 F. App'x 742, 744 (2d Cir. 2008) (noting that probable cause is an objective test).

Defendants contend that Plaintiff's false arrest claim is subject to dismissal based on the fact that Defendant Prior had sufficient probable cause [*16] to arrest Plaintiff. Defs.' Mem. of Law at pp. 6-8. Because we agree, we need not analyze any of the other factors of Plaintiff's false arrest claim.

It is undisputed that prior to placing Plaintiff under arrest, Defendant Prior: (1) had received a dispatch alerting him to the fact that an assault/stabbing had occurred at the Birch Lane Apartments, Prior Aff. at ¶¶ 5-6; (2) was told by unidentified members of a crowd outside of the apartment building that "there was a man in Apartment #32B, . . . who had been throwing knives" and that "there was an injured woman in one of the adjacent buildings with a knife in her arm[,]" *id.* at ¶¶ 10-11; (3) noticed "a significant amount of blood on the sidewalk area near the entrance to Apartment #32B[,]" *id.* at ¶ 12; (4) had found Plaintiff hiding in a closet in apartment 32B; *id.* at ¶¶ 13-17; (5) noticed a blood splatter on the wall near apartment number 32B, as well as a noticeable trail of blood leading from building number 32 to building number 33; *id.* at ¶¶ 23-24; (6) located Colbi Fantom, in the stairwell of building number 33, sitting in a pool of her own blood with a foot-long knife embedded in her arm, *id.* at ¶¶ 25 & 28; (7) was told by [*17] Fantom that "Pat Miller" threw the knife at her, *id.* at ¶ 29; and, (8) had received confirmation from Plaintiff that he was Patrick Miller, *id.* at ¶ 31.

Therefore, we conclude as a matter of law, that based on the totality of the circumstances, Defendant Prior had sufficient information to believe that Plaintiff committed a crime. *See Weyant v. Okst*, 101 F.3d at 852 (citing cases for the proposition that "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers").[10]

Moreover, to the extent that Plaintiff alleges he acted in self defense, *see generally* Compl. *and* Supp. Compl, Defendant Prior "was not required to make a full investigation into plaintiff's state of mind prior to taking action. Once a police officer has a reasonable basis for believing there is probable cause, he is not required to [*18] explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 145-46, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979), *and Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989)); *see also Jaegly v. Couch*, 439 F.3d at 153 (citing *Caldarola v. Calabrese*, 298 F.3d at 167-68 (for the same proposition).

Likewise, our conclusion in this regard is not affected by the fact that Plaintiff's statements to police were ultimately suppressed, as fruits of the poisonous tree, as a result of

---

[10] Indeed, during a subsequent suppression hearing, the County Court agreed that at the time of his arrest, Defendant Prior had sufficient probable cause to believe that a crime had been committed. Dkt. No. 43-8, Bryan Georgiady, Esq. Decl., dated Sept. 27, 2013, at Ex. B, Dec. & Order, dated Oct. 12, 2010, at p. 9.

what was subsequently determined to be an unlawful warrantless entry of apartment 32B. Here, the Oswego County Court Judge found that there were no exigent circumstances that would have justified a warantless entry. *See* Dkt. No. 43-8, Bryan Georgiady, Esq. Decl., dated Sept. 27, 2013, at Ex. B. Yet, "[t]he fruit of the poisonous tree doctrine is inapplicable to civil actions arising under § 1983" and the fact that evidence which served the basis for an arrest is later suppressed does not, for purposes of a § 1983 claim, eviscerate the validity of the officer's decision based on his awareness of that evidence at the time of arrest. *Hinds v. City of New York*, 768 F. Supp. 2d 512, 514 n.1 (S.D.N.Y. 2010) (citing *Townes v. City of New York*, 176 F.3d 138, 145, 149 (2d Cir. 1999)).

Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's false arrest claim against Defendant Prior. *See Weyant v. Okst*, 101 F.3d at 852.

**D. Malicious Prosecution**

"In order to prevail on a § 1983 claim against a state actor for malicious [*19] prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment . . . and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) (citations omitted). "To establish a malicious prosecution claim under New York law, a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Id.* at 161. "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Id.* at 161-62 (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)).

Here, Defendants argue that Defendant Prior had probable cause to file charges against Plaintiff. Defs.' Mem. of Law at pp. 8-9 & 16. Because we agree, we do not analyze any of the other factors of Plaintiff's malicious prosecution claim.

In the context of malicious prosecution, probable cause exists where a police officer is aware of "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Lenhard v. Dinallo*, 2011 U.S. Dist. LEXIS 112519, 2011 WL 4592804, at *7 (N.D.N.Y. Sept. 30, 2011) (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003)). Furthermore, "'[t]he existence of probable cause must be determined as of the time the prosecution was initiated [*20] . . . on the basis of the facts then known to the defendant or which he reasonably believed from appearances to be true.'" *Id.* (quoting *Loeb v. Teitelbaum*, 77 A.D.2d 92, 432 N.Y.S.2d 487, 494-95 (N.Y. App. Div. 2d Dep't1980). And, finally, courts may determine whether probable cause existed as a matter of law where "'there is no dispute as to the pertinent events and the knowledge of the officers.'" *Id.* (quoting *Weyant v. Okst*, 101 F.3d at 852).

We agree that, as a matter of law, Defendant Prior had probable cause to initiate charges against Plaintiff. The undisputed facts establish that in addition to the evidence described above, *see supra* Part II.C, prior to filing charges against Plaintiff for Second Degree Assault, Reckless Endangerment in the Second Degree, and Criminal Possession of a Controlled Substance in the Seventh Degree, Defendant Prior had: (1) Fantom's statement claiming that Plaintiff had thrown the knife which struck her, Prior Aff. at ¶¶ 25-29; (2) his personal observation (made after placing Plaintiff under arrest) that in the kitchen of apartment 32B there were several other knives similar to the one found in Fantom's arm, *id.* at ¶ 35; and (3) what later proved to be psilocybin mushrooms, a Schedule I controlled substance, found in Plaintiff's pockets [*21] at the PSC, *id.* at ¶¶ 40-43.

Additionally, prior to charging Plaintiff, Defendant Prior received a total of four sworn statements, three from eyewitnesses and one from Plaintiff.[11] In his sworn statement, eyewitness Shane M. Merrit stated that:

> I was staying at 7 Birch Lane building 32F for the night with Colbi Fantom. At around midnight a guy named Pat had been drinking. Pat started fighting with his girlfriend and slamming the door. Pat lives at 32B. Me, Tyler, and Mike came down to see if he was hitting his girlfriend and he started getting violent and started running his mouth. We were trying to talk him down but he wouldn't. Pat then started picking up knives. We all started running out the door and Pat started throwing knives. [Colbi] came downstairs because she heard a lot of noise and yelling. Pat threw another knife and it hit [her] in the arm. We then called 911 and Pat took off.

Prior Aff. at Ex. E.

[11] Except for minor edits for clarity and brevity, the statements that follow are presented *verbatim*, without changes in grammar, punctuation, or spelling.

Additionally, in his sworn statement, eyewitness Tyler M. Purchase stated, in pertinent part:

> At around 1:30 Pat Miller came up to [*22] my apartment to get a smoke from me and was talking about his girlfriend being a bitch. He went down to his apartment starting arguing with Theresa. . . . We heard a bunch of banging so me Christina, Shane Merritt, Mike Reynolds and Colby Phantom went downstairs knocked on the door, Pat opened up the door and threatened us with a knife and said that he was going to kick the shit out of us and kill us. Then he went after Shane with a knife but missed him and Shane punched him. Pat had his arm out the door trying to get Shane and then Shane kicked the door we all went to try to calm him down but Pat whipped a knife at us which stuck in the carpet so we started to defend ourselves and he picked up a handful of knives and started running at me and Shane but we left and slammed the door closed on our way out. Pat then came out as we were trying to run upstairs, Pat then threw a knife at Colby first and that stuck right in her arm then he threw one at me and missed, that was the one you found outside.

*Id.* at Ex. F.

In her sworn statement, Plaintiff's girlfriend, Theresa M. Finch, stated, in pertinent part:

> AROUND 2:00 AM, PATRICK CAME INTO THE APARTMENT . . . WHILE HE WAS IN THE APARTMENT, [*23] SHANE, TYLER, AND MIKE BEGAN BANGING ON THE DOOR. . . . PAT AND I TOLD THEM TO LEAVE AND CLOSED THE DOOR. THEN PAT WAS YELLING AND TELLING THEM TO GET AWAY FROM THE DOOR EVEN THOUGH THE DOOR WAS SHUT. I WENT OUTSIDE AND TOLD TYLER, SHANE, MIKE, AND TWO GIRLS TO LEAVE. I JUST FOUND OUT THAT ONE GIRL WAS THE GIRL THAT GOT THE KNIFE THROUGH HER ARM, WHICH I BELIEVE IS SHANE'S GIRLFRIEND. HER NAME IS COLBY. . . . I WALKED BY MYSELF TO THE END OF THE SIDEWALK WHERE IT MEETS THE PARKING LOT. I HEARD SOMEONE KICKING MY APARTMENT DOOR SO I WALKED BACK TOWARD MY APARTMENT. I DID NOT SEE WHO WAS KICKING THE DOOR, BUT I KNOW TYLER, SHANE AND MIKE WERE IN FRONT OF MY DOOR. I HEARD SOMEONE SCREAM, "HE'S GOT A KNIFE!" I HEARD PAT SCREAMING, "GET AWAY FROM MY HOUSE!" I HEARD THEM CALLING PAT A PUSSY AND THEY WERE GOING TO BEAT HIS ASS. I TOLD THEM TO GET AWAY FROM THE DOOR AND GO UPSTAIRS. I TOLD THEM SOMEONE HAD CALLED THE COPS. THEN I CALLED 911 BECAUSE ALL OF A SUDDEN KNIVES WERE GETTING THROWN. I SAW MIKE RUN OUT OF MY APARTMENT AND RUN UPSTAIRS WITHOUT ANYTHING IN HIS HANDS. I SAW MIKE COME OUT OF TYLER'S APARTMENT WITH A KNIFE. TYLER AND SHANE WERE STANDING IN THE STAIR WELL WITH SOMETHING [*24] IN THEIR HANDS, BUT I DON'T KNOW WHAT THEY HAD IN THEIR HANDS. COLBY AND KRISTINA WERE SITTING ON THE STAIRS JUST UP FROM MY APARTMENT WHEN I SAW KNIVES GETTING THROWN FROM THE LOWER LEVEL NEAR MY APARTMENT. I BELIEVE PATRICK WAS STILL IN MY APARTMENT. I COULDN'T TELL WHO WAS THROWING THE KNIVES. . . . COLBY SCREAMED THAT SHE HAD A KNIFE IN HER ARM SO I RAN OVER TO HER. THEN I SCREAMED TO 911 BECAUSE SHE HAD A KNIFE IN HER ARM.

*Id.* at Ex. D.

In his sworn statement, Plaintiff stated, in pertinent part:

> On Friday May 14, 2010 at or around 2:15 am I was in my Apt at Birch Lane Apt 32B. . . . my door got kicked in by Tyler and Shane. Theresa [Plaintiff's girlfriend] ran out past them somehow. I then grabbed a knife from the wooden block on my kitchen counter and threw it towards the open door. Then they ran and I slammed the door shut. I hid in the closet until the police came, because I thought they were going to attack me.

Prior Aff. at Ex. B.

The fact that Plaintiff's statements to police and the drugs found on his person were later suppressed as the fruit of an unconstitutional entry does not undermine our conclusion that Defendant Prior had probable cause to charge Plaintiff. *See Hinds v. City of New York*, 768 F. Supp. 2d at 514 n.1 (exclusionary [*25] rule has no effect in § 1983 claims). Likewise, neither Plaintiff's protestations that he was acting in self defense, nor Theresa Finch's Affidavit, undermine our conclusion as to the fact that Defendant Prior had probable cause to charge Plaintiff. To begin with, "even where a plaintiff explains that he acted in self-defense, police officers are entitled to credit the allegations of a complaining victim in finding probable cause [to prosecute

plaintiff], especially where that victim bears injuries." *Wieder v. City of New York*, 2013 U.S. Dist. LEXIS 60890, 2013 WL 1810751, at *10 (E.D.N.Y. Apr. 29, 2013) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d at 128); *De Santis v. City of New York*, 2011 U.S. Dist. LEXIS 99126, 2011 WL 4005331, at *7 (S.D.N.Y. Aug. 29, 2011) (citing *Panetta v. Crowley*, 460 F.3d 388, 396 (2d Cir. 2006), for the proposition that in the context of a malicious prosecution claim, "[s]tatements by the putative victim of the crime to police are ordinarily sufficient in themselves to establish probable cause, unless there is reason to doubt the victim's veracity.").

Moreover, "'probable cause to arrest is a defense to a malicious prosecution claim unless, after the arrest, additional facts come to light that vitiate the probable cause.'" *De Santis v. City of New York*, 2011 U.S. Dist. LEXIS 99126, 2011 WL 400533, at * 8 (quoting *Smith v. City of New York*, 388 F. Supp. 2d 179, 186 (S.D.N.Y. 2005)). Setting aside Plaintiff's sworn statement for a moment, Plaintiff maintains that at the scene of the crime he asked officers to arrest a group of people who he claimed had attempted to burglarize his home. To the extent that Defendant Prior received [*26] a statement from Theresa Finch after the arrest but prior to filing charges, Prior Aff. at ¶¶ 53-54 & Ex. D, such statement cojoined with the Plaintiff's were not sufficiently exculpatory to eliminate probable cause. Indeed, in all of the sworn accounts, except Plaintiff's, witnesses claimed that Plaintiff continued to throw knives at the group after they had fled from apartment 32B; indeed, according to Finch, not only did Plaintiff continue to thrown knives after the alleged aggressors had fled Apartment 32B, Fantom was sitting on the stairs at the time she was struck by a knife. *Id.* at Ex. D. Thus, at the very least, Defendant Prior still had reasonable probable cause to believe that Plaintiff was not justified in throwing a knife at Colbi Fantom, who was neither in Plaintiff's apartment nor in a position to threaten him at the time she was struck.

Moreover, Plaintiff was ultimately indicted by a grand jury on six counts, including two counts of Second Degree Assault. Georgiady Decl. at Ex. A. And, "under New York law, indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression [*27] of evidence or other police conduct undertaken in bad faith." *Nickey v. City of New York*, 2013 U.S. Dist. LEXIS 141047, 2013 WL 5447510, at *7 (E.D.N.Y. Sept. 27, 2013) (internal quotation marks omitted) (quoting *Savino v. City of New York*, 331 F.3d 63, 72 & 73 (2d Cir. 2003)). It is the Plaintiff's burden to establish the existence of fraud, perjury, suppression of evidence, or bad faith police conduct. *Id.* However, Plaintiff has not responded to Defendants' Motion, and a review of his submissions to date does not reveal any indication of fraud, perjury, the suppression of evidence, or any other police conduct undertaken in bad faith.

Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's malicious prosecution claims against Defendant Prior.

**E. Qualified Immunity**

Defendants contend that, even if the arrest and subsequent prosecution of Plaintiff were not justified by adequate probable cause, Defendant Prior is entitled to qualified immunity. Defs.' Mem. of Law at pp. 9-13. We agree.

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); *Eng v. Coughlin*, 858 F.2d 889, 895 (2d Cir. 1988). Whether an official protected by qualified immunity may be held liable for an alleged [*28] unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987); *Lewis v. Cowen*, 165 F.3d 154, 166 (2d Cir. 1999). Until recently, courts faced with qualified immunity defenses have applied the procedure mandated in *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). That case set forth a two-pronged approach whereby the court must first decide whether the facts alleged, or shown, make out a violation of a constitutional right. If yes, the court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194 at 201-02, 121 S. Ct. 2151, 150 L. Ed. 2d 272. Recently, however, the Supreme Court softened the rigid approach enunciated in *Saucier. See Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). Now, the *Saucier* two-pronged test is not mandated in terms of the order in which the prongs may be addressed, though the sequence of review may remain appropriate or beneficial. *Id.* at 818.

To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "whether the right was defined with reasonable specificity;

whether decisional law of the Supreme Court and the [Second Circuit] supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood [*29] that his [or her] actions were unlawful." *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir. 1995); *see also Nicholas v. Miller*, 189 F.3d 191, 195 (2d Cir. 1999). The right to be free from false arrest and malicious prosecution are clearly established. *See Perez v. Duran*, 962 F. Supp. 2d 533, 544 (S.D.N.Y. 2013) (citing *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995)).

A party is entitled to summary judgment on qualified immunity grounds if the court finds that the rights asserted by the plaintiff were not clearly established, or that "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[], could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997) (citations omitted). In the context of police officers, a court should find that an officer has acted in an objectively unreasonable manner "when no officer of reasonable competence could have made the same choice in similar circumstances." *Id.* (citing *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995)). It follows then that "if a rational jury would find that reasonable officers would disagree about the legality of the defendant's conduct under the circumstances," than that officer is entitled to summary judgment on the basis of qualified immunity. *Id.* (citations omitted).

Crucially, given [*30] the facts and circumstances known to Defendant Prior, both at the time of Plaintiff's arrest, and prior to issuing charges against Plaintiff, it is clear that he is entitled to qualified immunity. *See supra* Parts II.C & D. Even considering Plaintiff's protestations that he was innocent, and Theresa Finch's sworn statement, no rational juror could conclude that "no officer of reasonable competence could have made the same choice in similar circumstances." *See Lee v. Sandberg*, 136 F.3d at 102.

Accordingly, to the extent that the facts and circumstances known to Defendant Prior at the time of arrest or prior to charging Plaintiff were insufficient to establish actual probable cause, we recommend that Defendant's Motion be **GRANTED** as to these claims on the grounds that Defendant Prior had arguable probable cause for his actions. *Id.* at 102-03 (citations omitted).

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 43) be **GRANTED** and that this case be **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which [*31] to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72 & 6(a).

Date: August 7, 2014

Albany, New York

/s/ Randolph F. Treece

Randolph F. Treece

U.S. Magistrate Judge

# Ellsworth v. Wachtel

United States District Court for the Northern District of New York

January 11, 2013, Decided; January 11, 2013, Filed

1:11-CV-0381(LEK/CFH)

**Reporter**
2013 U.S. Dist. LEXIS 4486; 2013 WL 140342

KRISTEN A. ELLSWORTH; and JEFFREY R. KIMBLE, Plaintiffs, -against- DONNA WACHTEL, Defendant.

**Counsel:** [*1] For Kristen A. Ellsworth, Plaintiff: John A. DeGasperis, Basch, Keegan Law Firm, Kingston, NY.

For Jeffrey R. Kimble, Plaintiff: Eli B. Basch, Basch, Keegan Law Firm, Kingston, NY; John A. DeGasperis, Basch, Keegan Law Firm, Kingston, NY.

For Donna Wachtel, Defendant: Robert D. Cook, LEAD ATTORNEY, Cook, Netter Law Firm, Kingston, NY.

**Judges:** Lawrence E. Kahn, U.S. District Judge.

**Opinion by:** Lawrence E. Kahn

## Opinion

MEMORANDUM-DECISION and ORDER

### I. INTRODUCTION

On April 6, 2011, Plaintiffs Kristen A. Ellsworth and Jeffrey R. Kimble (collectively, "Plaintiffs") filed a civil rights Complaint pursuant to 42 U.S.C. § 1983. Dkt. No. 1 ("Complaint"). Presently before the Court is a Motion for summary judgment filed by Defendant Donna Wachtel ("Defendant") on May 4, 2012. Dkt. No. 15 ("Motion"). Plaintiffs filed a Response in opposition to this Motion on June 3, 2012, and Defendant filed a Reply to the Response on July 3, 2012. Dkt. Nos. 19 ("Response"), 20 ("Reply").[1]

### II. BACKGROUND

The allegations that form the basis for this case arise from an encounter between Plaintiffs and Defendant just after midnight on August 14, 2010 in Kingston, New York. Compl. ¶ 9. On the night of August 13, 2010, Plaintiffs visited the apartment house of an acquaintance, Wayne Oates ("Oates"),[2] located at 607 Abeel Street in Kingston. Plaintiff's Statement of material facts (Dkt. No. 19-17) ("Pl.'s S.M.F.") ¶ 39. Plaintiffs and Oates spent between one and two hours at Oates's home, conversing over tea and coffee. See Dkt. No. 19-8 at 20-23. At some point, Oates [*3] made a telephone call and then asked if Plaintiffs would give him a ride to his girlfriend's house. Id. at 22; Pl.'s S.M.F. ¶ 39. Plaintiffs agreed, and Plaintiff Kimble drove Oates and Plaintiff Ellsworth to another house, returning to 607 Abeel Street around midnight. Pl.'s S.M.F. ¶¶ 40-42. When they returned, Plaintiff Kimble parked the car in the driveway, all three got out of the car, and they walked toward the rear entrance of the apartment. Id. ¶ 42. On the same August 2010 night, Defendant, a City of Kingston police officer, was on patrol with New York State

[1] In lieu of a memorandum of law, Defendant filed as her Reply a "Reply Affidavit." The Affidavit purports to "specifically address the arguments set forth by John A. DeGasperis, Esq. in his attorney's affirmation in opposition to defendant's motion for summary [*2] judgment." Id. ¶ 3. The Reply (and the argumentative portions of Mr. DeGasperis's affidavit) clearly violate Local Rule 7.1(a)(2), which provides that "[a]n affidavit must not contain legal arguments but must contain factual and procedural background that is relevant to the motion the affidavit supports." Therefore, the Court declines to consider any such improper argumentation contained in the Affidavits. See Oneida Indian Nation v. Cnty. of Oneida, 802 F. Supp. 2d 395, 425 n.24 (N.D.N.Y. 2011) (refusing, under Local Rule 7.1(a)(2), to consider the legal arguments contained in affidavits submitted to the court).

[2] Some uncertainty persists as to Oates's first name and his criminal history. Defendant identifies the house at 607 Abeel Street as belonging to a "Randolph Oates" and states that she was familiar with him because of prior calls to this address and because he "had been arrested for dealing in illegal narcotics during prior raids at the premises." Defendant's Statement of material facts (Dkt. No. 15-8) ("Def.'s S.M.F.") ¶¶ 13-14. Both Plaintiffs, however, claim to know Oates as "Wayne Oates." See, e.g., Dkt. Nos. 15-7 at 22-23, 15-8 at 19. Based on the various deposition transcripts offered in support of and in opposition to the Motion, it is not clear to the Court whether Wayne and Randolph Oates are one and the same. The question [*4] of Oates's identity does not appear to have any bearing on the substantive issues in this case and — as a result — is not the sort of "genuine issue of material fact" that might defeat this Motion. Nevertheless, the Court notes this discrepancy between the parties' accounts.

Trooper Joshua Taylor ("Taylor"). Defendant's Statement of material facts (Dkt. No. 15-8) ("Def.'s S.M.F.") ¶¶ 5-8. Defendant and Taylor were assigned to a special program called the "Blue and Gray Program" wherein uniformed patrol officers from the City of Kingston worked together with officers from the New York State Police Department in a joint police program known as "IMPACT." Id. ¶¶ 7-8.

When Defendant began her shift on August 13, 2010, she was aware that there was an outstanding arrest warrant for an individual named Jessica Wiand ("Wiand"). Id. ¶ 9. Further, during the course of her shift, Defendant received information from a confidential informant that Wiand was at 607 Abeel Street. Id. ¶ 10. Defendant had prior experiences with this address based on prior drug activity and drug arrests that had [*5] occurred there.[3] Id. ¶¶ 12-13.

Shortly after midnight on August 14, 2010, Defendant and Taylor arrived in front of 607 Abeel Street in their police vehicle. Id. ¶ 14. The two officers saw a car parked in the driveway and saw three individuals — two men and one woman — exit the vehicle. Id.

At this point in the night, the parties' accounts of what transpired begin to diverge. In order to tease out any potential issues of material fact that might make a grant of summary judgment inappropriate, therefore, the Court recounts both Plaintiffs' and Defendant's versions.

**A. Defendant's Account**

According to Defendant, Taylor exited the police car as soon as he saw Plaintiffs and Oates emerge from their car and yelled "Stop, police." Id. ¶ 15. "[I]mmediately after State Trooper Taylor yelled 'Stop, police', the three individuals ran towards the rear of the premises followed by" the officers. Id. ¶ 16. The three individuals stopped at the back door of the house, at which point it appeared to Taylor that they were trying to flee through a door that happened to [*6] be locked. Id. ¶ 19. After Plaintiffs and Oates saw Taylor, they had "a little deer in the headlight look, like, oh, gosh, cops." Id. ¶ 20.

When they confronted Plaintiffs and Oates, Defendant and Taylor saw heroin scattered on the ground "in close proximity to each of the individuals." Id. ¶¶ 17-18. At this point, the officers detained Plaintiffs and Oates. Id. ¶ 21. The drugs were field tested and positively identified as heroin, but none of the three individuals acknowledged ownership of the drugs. Id. ¶¶ 23-24. Plaintiffs and Oates were each placed under arrest for possession of a controlled substance. Id. ¶ 24. Defendant conducted a pat-down search of the Plaintiff Ellsworth, placed handcuffs on her, and transported her to the Kingston Police Station. Id. ¶ 25. Taylor, meanwhile, conducted a pat-down search of the two males, placed handcuffs on them, and arranged for their transportation to the Kingston Police Department. Id. ¶ 26.

Once at the station, Defendant obtained permission from her supervisor, Sergeant Scanlon, to conduct a strip search of Plaintiff Ellsworth. Id. ¶ 28. Defendant subsequently strip-searched Plaintiff Ellsworth. Id. ¶ 29. During the course of the search, [*7] Defendant never touched Plaintiff Ellsworth, but instead instructed her to remove her clothes. Id. ¶¶ 29-30. Taylor handled the arrest and processing of Plaintiff Kimble, in which Defendant took no part. Id. ¶¶ 31-32.

**B. Plaintiffs' Account**

According to Plaintiffs, when they arrived back at 607 Abeel Street, they parked the car in the driveway, got out of the car, and walked toward the rear entrance of the apartment. Pl.'s S.M.F. ¶ 42. At this point, Plaintiffs observed neither other vehicles in the driveway nor any other person in the driveway or on the street in front of the house. Id. ¶ 43.

As they approached the rear of the apartment, both Plaintiffs heard someone say "stop." Id. ¶ 44. Plaintiff Ellsworth looked over her right shoulder and then over her left shoulder to determine where the noise came from, but she did not see anyone. Id. ¶ 45. Plaintiffs continued to walk "only a short distance" before they heard a male voice say, "Stop, police," at which point they both stopped and turned around to see police officers walking up the driveway. Id. ¶ 46. Plaintiffs and Oates did not run after the command was issued, and at this point they had not reached the rear doorway or opened [*8] the door. Id. ¶¶ 47-48.

The two officers approached Plaintiffs and Oates, and Defendant stated that "[w]e have a warrant for Jessica Wiand." Id. ¶ 50. At this point, the officers instructed Plaintiffs and Oates to produce personal identification. Id. ¶ 51. Plaintiff Ellsworth handed her personal identification to Taylor, who took the ID back to the squad car. Id. ¶ 52. No narcotics had been found at the scene yet, and Plaintiff Kimble overheard Defendant tell another officer that Plaintiff Ellsworth did not fit the description of the individual

---

[3] As discussed *supra*, this prior experience stemmed from police activity relating to Randolph Oates. Def.'s S.M.F. ¶¶ 13-14; see *supra* note 2.

identified in the warrant. Id. ¶ 53. Nevertheless, Defendant conducted a pat-down search of Plaintiff Ellsworth. Id. ¶ 54. Over the course of her pat-down search and her search of Plaintiff Ellsworth's purse, Defendant did not discover any drugs or weapons. Id. ¶¶ 54-55. One of the officers then searched Plaintiffs' car and found no contraband. Id. ¶ 56. After the vehicle search, one of the officers opened the outer door to the rear apartment and said that he had discovered an illegal substance between the outer screen door and inner door. Id. ¶ 57. Oates and Plaintiffs denied ownership of the substance. Id. ¶ 58.

On the ride to the Kingston Police [*9] station, Defendant continued to question Plaintiff Ellsworth about the drugs and to inquire whether Plaintiff Ellsworth had any drugs on her person. Id. ¶ 60. Plaintiff Ellsworth continued to deny that she was in possession of any illegal substances, but Defendant stated that Plaintiff Ellsworth would be subjected to a strip search when they arrived at the station. Id. ¶¶ 61-63. Once inside the station, Defendant performed a strip search of Plaintiff Ellsworth. Id. ¶¶ 64-65.

Plaintiffs were arrested for and charged with the misdemeanor offense of "Criminal Possession of a Controlled Substance in the Seventh Degree" in violation of Penal Law § 220.02. Id. ¶ 66. The misdemeanor information for both Plaintiffs stated that "defendant did stand near the apartment doorway where three decks of a substance where [sic] located and field tested positive for heroin." Id. ¶¶ 68-69. The criminal charges against both Plaintiffs were eventually dismissed on the merits in January 2011. Id. ¶ 70.

Based on these allegations, Plaintiff Ellsworth alleges that she was subjected to: (1) false arrest; (2) malicious prosecution; and (3) an unreasonable search, all in violation of her constitutional rights. See [*10] generally Compl. Plaintiff Kimble asserts causes of action for (1) false arrest and (2) malicious prosecution in violation of his constitutional rights. See generally id.

### III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure instructs a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of a material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, if the moving party has shown that there is no genuine dispute as to any material fact, the burden shifts to the [*11] non-moving party to demonstrate "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. This requires the non-moving party to do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). A court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

### IV. DISCUSSION

In her Memorandum of law in support of her Motion to dismiss, Defendant raises five primary arguments why the Court should grant summary judgment in her favor. Defendant contends that: (1) the strip search of Plaintiff Ellsworth was lawful because there was reasonable suspicion that she was carrying contraband; (2) Defendant possessed [*12] probable cause to arrest Plaintiffs, therefore eliminating any basis for a false arrest claim; (3) Plaintiffs have failed to satisfy the elements of a malicious prosecution claim; (4) Defendant should be shielded by qualified immunity; and (5) Plaintiff Kimble has failed to allege any personal involvement on the part of Defendant, therefore barring his claims. See generally Defendant's Memorandum of law (Dkt. No. 15-9) ("Def.'s Mem."). The Court addresses each of these arguments in turn.

#### A. Strip Search

"To state a claim under Section 1983, a plaintiff must show: '(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation, [and]; (4) damages .'" Rahman v. Fisher, 607 F. Supp. 2d 580, 584 (S.D.N.Y. 2009) (quoting Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008)). Defendant has raised no

argument in her Motion regarding causation, damages, or the "under color of state law requirements," so the Court only addresses whether the strip search of Plaintiff Ellsworth constituted a deprivation of a constitutional right.

As a preliminary matter, the Court notes that the law regarding the constitutionality of strip searches is in a state of [*13] substantial flux. Until recently, Second Circuit case law on the rights of arrestees to be free from strip searches under the Fourth Amendment was well settled. Longstanding precedent dictated that "[t]he Fourth Amendment requires an individualized 'reasonable suspicion that [a misdemeanor] arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest' before she may be lawfully subjected to a strip search." Hartline v. Gallo, 546 F.3d 95, 100 (2d Cir. 2008) (quoting Weber v. Dell, 804 F.2d 796, 802 (2d Cir. 1986)); see also N.G. v. Connecticut, 382 F.3d 225, 232 (2d Cir. 2004) (noting that all circuits to consider issue have reached similar conclusion). "A reasonable suspicion of wrongdoing is something stronger than a mere hunch, but something weaker than probable cause." Varrone v. Bilotti, 123 F.3d 75, 79 (2d Cir. 1997) (internal quotation marks and citations omitted). "To establish reasonable suspicion, [an officer] must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience. The standard requires [*14] individualized suspicion, specifically directed to the person who is targeted for the strip search." Id. (internal quotation marks and citations omitted).

The determination of whether a given strip search is constitutional "turns on an objective assessment of the . . . facts and circumstances confronting [the searching officer] at the time, and not on the officer's actual state of mind at the time of the search." Hartline, 546 F.3d at 100 (quoting Maryland v. Macon, 472 U.S. 463, 470-71, 105 S. Ct. 2778, 86 L. Ed. 2d 370 (1985); citing Simms v. Village of Albion, N.Y., 115 F.3d 1098, 1108 (2d Cir. 1997)) (internal quotation marks and citations omitted). "Factors which may be taken into account in determining the issue of [the] reasonableness" of a search, include:

> (1) excessive nervousness; (2) unusual conduct; (3) an informant's tip; (4) computerized information showing pertinent criminal propensities; (5) loose-fitting or bulky clothing; (6) an itinerary suggestive of wrongdoing; (7) discovery of incriminating matter during routine searches; (8) lack of employment or a claim of self-employment; (9) needle marks or other indications of drug addiction; (10) information derived from the search or conduct of a traveling [*15] companion; (11) inadequate luggage; and (12) evasive or contradictory answers.

Id. (citing United States v. Asbury, 586 F.2d 973, 976-77 (2d Cir. 1978)).

The Second Circuit has also held that a "'special needs' standard applied to policies providing for routine strip searches in penal and other institutions housing large, dangerous, or vulnerable populations where introduction of secreted contraband from the outside raises a substantial risk of harm." Id. at 102 n.5 (citing N.G. v. Connecticut, 382 F.3d 225, 234-37 (2d Cir. 2004); Covino v. Patrissi, 967 F.2d 73, 76-80 (2d Cir.1992)). But "[n]o such special needs exist where . . . an arrestee is taken to an empty cell for purposes of an evidentiary search, subsequent booking, and release." Id.

However, the Supreme Court has recently weighed in on the Fourth Amendment implications of strip searches in Florence v. Board of Chosen Freeholders of County of Burlington, 132 S. Ct. 1510, 182 L. Ed. 2d 566 (2012). In Florence, the Supreme Court held that officials may strip search any arrestee before admitting her to jail, even absent any reasonable suspicion. See generally id. The Majority in Florence (along with both Concurrences and the Dissent) emphasized that [*16] this was a narrow holding and that the rule announced therein might not apply to arrestees who were not going to be introduced to the general jail or prison population. Id. at 1523, 1523 (Roberts, J., concurring), 1524-25 (Alito, J., concurring), 1531-32 (Breyer, J., dissenting).

It is not clear how much Florence alters the landscape of Second Circuit Fourth Amendment precedent, and the Second Circuit has yet to announce the impact (if any) Florence has on the individualized suspicion requirement. Absent any clear Second Circuit directive, however, the Court concludes that Florence is inapposite to the case at bar and does not govern the Court's analysis of Defendant's strip search of Plaintiff Ellsworth. Plaintiff Ellsworth was not searched prior to her introduction into a general jail population, and therefore falls under the exception to the rule in Florence.[4] Id. at 1523.

To determine if the strip search of Plaintiff Ellsworth [*17] were reasonable, then, the Court looks to the factors

[4] The Court also notes that — because the Second Circuit already recognizes a "special needs" standard in the prison context — the Florence rule should leave untouched the Second Circuit's individualized suspicion requirement in the case of non-custodial searches.

articulated by the Second Circuit in Asbury, 586 F.2d at 976-77. The only factors that the Court finds applicable here are: "discovery of incriminating matter during routine searches," as there is no question that Defendant found heroin near Plaintiff Ellsworth; and "itinerary suggestive of wrongdoing," based on the alleged history of drug activity at 607 Abeel Street.[5] The Court concludes that based on these facts alone it cannot find the strip search reasonable as a matter of law.

In reaching this decision, the Court finds the Second Circuit's decision in Hartline to weigh heavily against a finding that the search did not violate Plaintiff Ellsworth's rights. In Hartline, [*18] the plaintiff had been arrested after an officer found marijuana in her car during a traffic stop. 546 F.3d 95. The plaintiff was subsequently arrested and strip searched and brought a § 1983 claim against, *inter alia*, the arresting officer. The Hartline court found that the strip search was not reasonable because it was "hard to imagine how the facts of this case could have led a reasonable officer in Officer Gallo's position to suspect that Hartline was illicitly concealing drugs on her person." Id. at 101. The Hartline court emphasized that:

> Officer Gallo had no reason to believe that Hartline was under the influence of narcotics at the time of her arrest . . . nor did he see Hartline take any suspicious actions which might have suggested she was hiding something as he approached her vehicle. Officer Gallo did not notice anything about Hartline's physical appearance that suggested she was secreting drugs on her person . . . Hartline answered every question that Officer Gallo asked her about drugs truthfully, yet Gallo did not even ask Hartline if she had any drugs on her person. Furthermore, Hartline had been arrested for nothing more serious than a B-misdemeanor.

Id.; see also Foote v. Spiegel, 118 F.3d 1416, 1425 (10th Cir. 1997) [*19] ("[A] strip search of a person arrested for driving while under the influence of drugs . . . is not justified in the absence of reasonable suspicion that the arrestee has drugs . . . hidden on . . . her person. . . . [T]his court expressly rejected the proposition that it is reasonable to strip search every inmate booked on a drug related charge."); Way v. Cnty. of Ventura, 445 F.3d 1157, 1162 (9th Cir. 2006) (holding that an arrest for misdemeanor drug offense does not support reasonable suspicion necessary to justify strip search).

While certainly not identical, the facts of the instant case are highly analogous. Defendant never alleges that Plaintiff Ellsworth appeared to be under the influence of narcotics. There is no evidence before the Court of suspicious behavior by Plaintiff Ellsworth beyond perhaps refusing to initially stop walking when called. Further, Defendant has cited to nothing about Plaintiff Ellsworth's physical appearance that might suggest that she was secreting drugs on her person. Indeed, the facts of this case support a reasonableness finding even less than those in Hartline. There, (1) the plaintiff was clearly in possession of narcotics; and (2) she had admitted [*20] that the narcotics were hers. Whereas, here, Plaintiff Ellsworth was one of three people found in the vicinity of narcotics.

The Hartline court concluded that

> if the facts of this case amount to reasonable suspicion, then strip searches will become commonplace. Given the uniquely intrusive nature of strip searches, as well as the multitude of less invasive investigative techniques available to officers confronted by misdemeanor offenders, that result would be unacceptable in any society that takes privacy and bodily integrity seriously.

546 F.3d at 102. Based on the facts currently before it, the Court harbors similar concerns and cannot conclude as a matter of law that the strip search was reasonable.

**B. Probable Cause to Arrest**

"To establish a claim for false arrest under 42 U.S.C. § 1983, a plaintiff must show that 'the defendant intentionally confined him without his consent and without justification.'" Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)). "Because probable cause to arrest constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff." Id. [*21] (citing Weyant, 101 F.3d at 852). "Probable cause to arrest exists when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" Id. (quoting Weyant, 101 F.3d at

---

[5] While Taylor testified that Plaintiffs had "a little deer in the headlight look, like, oh, gosh, cops" when they saw him, Def.'s S.M.F. ¶ 20, the Court does not find this to constitute "excessive nervousness." To the extent the Court were to credit this testimony, the Court is skeptical that any law-abiding citizen would not be at least a little taken aback or unsettled if she were approached from behind by and shouted at by a police officer in the dark of night.

852). Further, "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." Weyant, 101 F.3d at 852 (citations omitted).

"In order for the presence of contraband to constitute probable cause, it must be sufficient to 'lead a person of reasonable caution to believe that [the arrestee] was complicit in . . . [the] possession of [the contraband].'" Minter v. Cnty. of Westchester, 08 Civ. 7726, 2011 U.S. Dist. LEXIS 24519, 2011 WL 856269, at *8 (S.D.N.Y. Jan. 20, 2011) (quoting United States v. Heath, 455 F.3d 52, 56 (2d Cir. 2006) (internal quotation and citation omitted; alterations in original)). "[A]n officer must have individualized probable cause to arrest an individual and that mere proximity to illegal conduct does not establish probable cause [*22] with respect to an individual." Dinler v. City of New York, 04 Civ. 7921, 2012 U.S. Dist. LEXIS 141851, 2012 WL 4513352, at *11 (S.D.N.Y. Sept. 30, 2012) (citing Ybarra v. Illinois, 444 U.S. 85, 91, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979); Rogers v. City of Amsterdam, 303 F.3d 155, 160 (2d Cir. 2002)).

Defendant's argument that probable cause existed and bars this claim is contained in two sentences in the Motion. Defendant contends that "plaintiffs do not contest the fact that contraband, i.e., heroin was found at the scene in close proximity to the plaintiffs. Clearly, this evidence supports probable cause for the arrest." Mot. at 11. Plaintiffs, however, argue that "[D]efendant has overlooked one critical detail in that the drugs were discovered as a part of an illegal search and seizure." Resp. at 15. "Specifically," Plaintiffs assert that "the arresting officers lacked the reasonable suspicion that was required prior to instructing the [P]laintiffs to stop and prior to pursuing the [P]laintiffs to the rear of the apartment building." Id.

Plaintiffs provide strong support for their contention that material issues of fact persist as to whether the officers had reasonable suspicion or probable cause to pursue Plaintiffs to the rear of the apartment [*23] house or even to open the door to locate the heroin.[6] Plaintiffs argument is, at its essence, that some version of the exclusionary rule or the "fruit of the poisonous tree doctrine" should vitiate any probable cause to arrest that Defendant might have had once she found the drugs because she should never have found the drugs. This logic is compelling and is resonant in the context of motions to suppress evidence for criminal trials. However, in the context of § 1983 suits for damages, the Second Circuit has roundly rejected this argument.

"Victims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy — including (where appropriate) damages for physical injury, property damage, injury to reputation, etc.; but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution." Townes v. City of New York, 176 F.3d 138, 148 (2d Cir. 1999), cert. [*24] denied, 528 U.S. 964, 120 S. Ct. 398, 145 L. Ed. 2d 311 (1999) (citing John C. Jeffries, Jr., *Damages for Constitutional Violations: The Relation of Risk to Injury in Constitutional Torts*, 75 Va. L. Rev. 1461, 1475 (1989)). Further, "[t]he lack of probable cause to stop and search does not vitiate the probable cause to arrest, because (among other reasons) the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant." Id.; see also Miller v. City of New York, 11 Civ. 6663, 2012 U.S. Dist. LEXIS 92229, 2012 WL 2524248, at *4-5 (S.D.N.Y. June 26, 2012); McDermott v. City of New York, 00 CIV 8311, 2002 U.S. Dist. LEXIS 2893, 2002 WL 265127, at *6-7 (S.D.N.Y. Feb. 25, 2002).

Therefore, while the Court harbors serious doubts about the existence of probable cause or reasonable suspicion to take all of the steps that ultimately led to Defendant's finding the heroin, these doubts are collateral to the existence of probable cause to arrest for § 1983 purposes.[7] Under the Second Circuit's holding in Townes, even if every action taken by Defendant up until the time at which she identified the heroin were unreasonable, Plaintiffs would have no cause of action for false arrest if Defendant had probable cause to arrest.

In this case, there is no question that heroin was found at the scene of the arrest. Even though there are factual disputes relating to the events leading up to the discovery of heroin, based on the undisputed facts and knowledge of the officers

[6] The Court notes that contrary to Defendant's characterization of the heroin sitting on the ground between Plaintiffs, Plaintiffs contend that the heroin was eventually located between the two doors of the apartment house.

[7] While Plaintiff devotes substantial space [*25] in her Response to arguing about the validity and existence of the arrest warrant for Jessica Wiand, the Court concludes that under Townes this issue is irrelevant to the question of probable cause to arrest and therefore does not address these arguments.

at the time of arrest[8] — *inter alia*, that the heroin was close to Plaintiffs; that the officers had been pursuing Plaintiffs; that Plaintiffs were preparing to enter a house that was known to the officers as being a locus for drug transactions — "a person of reasonable caution [would be led] to believe that [Plaintiffs were] complicit in . . . [the] possession of [the heroin]." Heath, 455 F.3d at 56 (internal quotations and citations omitted). Therefore, the Court grants Defendant's Motion for summary judgment on Plaintiffs' false arrest claims.

**C. Malicious Prosecution Claims**

Defendant contends that Plaintiffs' allegations and the undisputed facts fail to satisfy **[*26]** the elements of a cause of action for malicious prosecution. To state a claim for malicious prosecution under New York State law, a plaintiff must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Murphy v. Lynn, 118 F.3d 938 (2d Cir. 1997) (quoting Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995); citing Broughton v. State, 37 N.Y.2d 451, 458, 335 N.E.2d 310, 373 N.Y.S.2d 87 (1995), cert. denied, 423 U.S. 929, 96 S. Ct. 277, 46 L. Ed. 2d 257 (1975) (internal quotation marks omitted)).

In addition to the finding that there was probable cause to arrest, the Court concludes that there is no basis on the record to conclude that actual malice motivated Defendant's actions. Indeed, Plaintiffs paint Defendant's actions not as the product of personal ill will or animus, but rather the result of official overreach and lack of regard for civil liberties. "The global picture here," allege Plaintiffs, "is that Officer Wachtel and Trooper Taylor chased these people down a driveway simply because they were getting out of a car. The officers never had **[*27]** any right to be anywhere near plaintiffs." Resp. at 18. Similarly, Plaintiffs assert that the strip search was not some cruel attempt to humiliate a helpless woman, but rather that it was a part of Defendants (unconstitutional) "standard protocol in drug related arrests." Id. at 14.

Even if elements of Defendant's conduct relating to Plaintiffs' arrest were unconstitutional, there is no basis for the Court to conclude that Defendant acted with the requisite *mens rea*, and contrary to Plaintiffs' assertions, there is no genuine issue of material fact as to the presence of malice. Therefore, the Court grants Defendant's Motion for summary judgment on Plaintiffs' malicious prosecution claim.

**D. Qualified Immunity**

The doctrine of qualified immunity protects government officials acting in their capacity from liability for civil damages as long as their conduct does not "violate clearly-established rights of which an objectively reasonable official would have known." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999); see also Martinez v. Simonetti, 202 F.3d 625, 633-34 (2d Cir. 2000). However, a defendant may still be protected by qualified immunity if she violated an individual's constitutional **[*28]** rights, but "it was objectively reasonable [for her] to believe that their acts did not violate these clearly established rights." Amore v. Novarro, 624 F.3d 522, 530 (2d Cir. 2010) (quoting Cornejo v. Bell, 592 F.3d 121, 128 (2d Cir.2010)); see also Messerschmidt v. Millender, 132 S. Ct. 1235, 1245, 182 L. Ed. 2d 47 (2012). As a matter of law, an officer is entitled to qualified immunity if

> "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ]" to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987) (quoting Halperin v. Kissinger, 807 F.2d 180, 189, 257 U.S. App. D.C. 35 (D.C. Cir.1986)). The party invoking qualified immunity bears the burden of offering proof that it was objectively reasonable for her to believe that her actions did not violate clearly established rights and that she is entitled to qualified immunity. See Young v. Selsky, 41 F.3d 47, 54 (2d Cir. 1994).

"[F]or more than twenty years [the Second Circuit] has held that a misdemeanor arrestee may not **[*29]** be strip searched in the absence of individualized reasonable suspicion that she is secreting contraband." Hartline, 546 F.3d at 100 (citing, *inter alia*, Wachtler v. Cnty. of Herkimer, 35 F.3d 77, 81 (2d Cir. 1994); Walsh v. Franco, 849 F.2d 66, 68-69 (2d Cir. 1988)). Based on the similar facts in Hartline discussed *supra*, "a reasonable jury might determine that Defendants were acting in a fashion that clearly violated Hartline's Fourth Amendment rights." Id. at 103. Here, the Court similarly concludes that a reasonable jury might conclude that Defendant's strip search clearly violated Plaintiff Ellsworth's constitutional rights. Therefore, the Court concludes that Defendant is not entitled to summary judgment on the issue of qualified immunity for the strip search.

---

[8] See Weyant, 101 F.3d at 852.

Because the Court grants Defendant's Motion for summary judgment with respect to Plaintiffs' claims for false arrest and malicious prosecution, the Court need not address any potential immunity for those causes of action.

**E. Personal Involvement**

Defendant contends that the Court should grant summary judgment to her on all claims by Plaintiff Kimble because he has failed to show that she was personally involved in any of the [*30] constitutional violations that he alleges. Because the Court grants Defendant's Motion for summary judgment on the merits of both claims by Plaintiff Kimble, the Court need not address the issue of Defendant's personal involvement in the alleged violations of Plaintiff Kimble's constitutional rights.

**V. CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that Defendant's Motion (Dkt. No. 15) for summary judgment is **GRANTED in part and DENIED in part**, consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that Defendant's Motion (Dkt. No. 15) seeking summary judgment on the strip search claim by Plaintiff Ellsworth is **DENIED**; and it further

**ORDERED**, that Defendant's Motion (Dkt. No. 15) seeking summary judgment on Plaintiffs' false arrest claims is **GRANTED**; and it is further

**ORDERED**, that Defendant's Motion (Dkt. No. 15) seeking summary judgment on Plaintiffs' malicious prosecution claims is **GRANTED**; and it is further

**ORDERED**, that Defendant's Motion (Dkt. No. 15) seeking summary judgment on the issue of qualified immunity for the strip search of Plaintiff Ellsworth is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision [*31] and Order on all parties.

**IT IS SO ORDERED.**

DATED: January 11, 2013

Albany, New York

/s/ Lawrence E. Kahn

Lawrence E. Kahn

U.S. District Judge

# Smith v. Hulihan

United States District Court for the Southern District of New York

September 13, 2011, Decided; September 13, 2011, Filed

11 Civ. 2948 (HB) (AJP)

**Reporter**
2011 U.S. Dist. LEXIS 103542; 2011 WL 4058764

BRETT SMITH, Petitioner, -against- WILLIAM F. HULIHAN, Respondent.

**Subsequent History:** Approved by, Adopted by, Objection overruled by, Writ of habeas corpus denied, Certificate of appealability denied Smith v. Hulihan, 2012 U.S. Dist. LEXIS 149585 (S.D.N.Y., Oct. 17, 2012)

**Prior History:** People v. Smith, 52 A.D.3d 232, 859 N.Y.S.2d 75, 2008 N.Y. App. Div. LEXIS 4767 (N.Y. App. Div. 1st Dep't, 2008)

**Counsel:** [*1] Brett Smith, Petitioner, Pro se, Bronx, NY.

For William F. Hulihan, Respondent: Lisa E. Fleischmann, LEAD ATTORNEY, New York State Office of the Attorney General, New York, NY.

**Judges:** Andrew J. Peck, United States Magistrate Judge. Honorable Harold Baer Jr., United States District Judge.

**Opinion by:** Andrew J. Peck

## Opinion

**REPORT AND RECOMMENDATION**

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Harold Baer Jr., United States District Judge:**

Pro se petitioner Brett Smith seeks a writ of habeas corpus from his June 12, 2006 conviction in Supreme Court, New York County, for third degree criminal sale of a controlled substance and sentence of five years imprisonment. (Dkt. No. 1: Pet. ¶¶ 1-5.)

Smith's habeas petition asserts that: (1) Smith's Fourth Amendment rights were violated when the prosecutor failed to present evidence in the grand jury that the substance Smith sold was a narcotic (Pet. ¶ 13(1)); (2) the prosecutor committed misconduct by using perjured testimony to indict Smith (Pet. ¶ 13(2); Dkt. No. 21: Smith Traverse at 3-4); (3) Smith's speedy trial rights were violated because the prosecutor failed "to [*2] covert the misdemeanor accusatory instrument, from a misdemeanor into a misdemeanor information" within the required ninety days and because Smith's trial started fifty-two days after his speedy trial time expired (Pet. ¶¶ 13(3), 13(5); Smith Traverse at 1, 18, 21, 22); (4) Smith's double jeopardy rights were violated because the prosecutor used the accusatory instrument to convict Smith even though it should have been dismissed for a speedy trial violation (Pet. ¶ 13(3); Smith Traverse at 17); (5) the indictment was based on "material false information" (Pet. ¶ 13(4)); (6) Smith's trial counsel was ineffective for (a) failing to argue that the grand jury evidence was insufficient and (b) "committ[ing] 'malpractice'" by making typographical errors in a pre-trial motion (Pet. ¶ 13(6)); (7) Smith was "'wrongly confined' for 5 years on a 'misdemeanor'" and his sentence was excessive (Pet. ¶ 13(7); Smith Traverse at 21-22); (8) the motion court erred in finding the grand jury evidence sufficient (Pet. ¶ 13(8)); (9) the state habeas court erroneously dismissed Smith's petition for failure to serve the proper parties (Pet. ¶ 13(9); Smith Traverse at 11-16); (10) Smith's state habeas counsel [*3] was ineffective (Pet. ¶ 13(10)); (11) the undercover officer committed perjury in the grand jury and at trial when he testified that he field tested the drugs (Pet. Att.: Smith Pro Se 1st Dep't Br. Point I; Smith Traverse at 18, 22); (12) Smith's attorneys "precluded him from testifying before the grand jury" (Pet. Att.: Smith Pro Se 1st Dep't Br. Point II); and (13) Smith's "'due process rights' were violated" when the undercover officer did not testify at the scheduled pre-trial hearing (Pet. Att.: Smith Pro Se 1st Dep't Br. Point III).

For the reasons set forth below, Smith's habeas corpus petition should be DENIED.

**FACTS**

On the night of November 3-4, 2005, the NYPD conducted an undercover buy and bust drug operation in the vicinity of 147th Street and Amsterdam Avenue in Manhattan. (Dkt. No. 17: Fleischmann Aff. Ex. G: Smith 1st Dep't Br. at 3;

Fleischmann Aff. Ex. I: State 1st Dep't Br. at 1.) At approximately midnight, Undercover Detective 6385 ("UC 6385") approached Smith and asked him if anyone was "'out working.'" (Smith 1st Dep't Br. at 3; State 1st Dep't Br. at 1-2.) Smith asked what UC 6385 was looking for; UC 6385 responded that he wanted two "'dimes'" (i.e., two ten dollar [*4] bags of crack cocaine), but that he only had eighteen dollars. (Smith 1st Dep't Br. at 3; State 1st Dep't Br. at 2.) Smith told UC 6385 that his "'boy'" would sell a "'20'" for eighteen dollars and led UC 6385 to another man standing around the corner. (Smith 1st Dep't Br. at 3-4; State 1st Dep't Br. at 2.) Smith asked the man to sell UC 6385 a "'twenty bag'" for eighteen dollars and gave the man UC 6385's money. (Smith 1st Dep't Br. at 4; State 1st Dep't Br. at 2.) The man gave a bag of crack cocaine to Smith, who gave it to UC 6385. (Smith 1st Dep't Br. at 4; State 1st Dep't Br. at 2.) Minutes later, the police arrested Smith, but the other man got away. (Smith 1st Dep't Br. at 5-6; State 1st Dep't Br. at 2.)

**The Trial**[1]

On March 28, 2006, Smith proceeded to a jury trial before Justice Richard D. Carruthers. (Dkt. No. 19: Trial Transcript ("Tr.").)

**The Prosecution Case at Trial**

On the night of November 3-4, 2005, UC 6385, Detective Carl Summers, Detective Matthew Griffen and several other NYPD officers were conducting a buy and bust drug operation around 147th Street and Amsterdam Avenue in Manhattan. (UC 6385: Tr. 280-81, 287-90, 318, 332, 352-53; Summers: Tr. 381-82, 405; Griffin: Tr. 427-28.) At about midnight, UC 6385 walked by Smith on the street, made eye contact and nodded his head. (UC 6385: Tr. 287-88, 290, 292-93, 316-17, 324, 325; Griffen: Tr. 430-31.) As Smith stopped walking, UC 6385 asked Smith if anyone was "out working," meaning that UC 6385 was [*6] looking to buy drugs. (UC 6385: Tr. 290-91, 293, 294, 317, 327.) Smith asked what UC 6385 was looking for, and UC 6385 said he wanted "'two dimes,'" referring to two ten-dollar bags of crack cocaine, but that he only had eighteen dollars. (UC 6385: Tr. 291, 294-95, 319-20, 327.) Smith informed UC 6385 that Smith's "boy was working around the corner," had "20's," and he could "probably hook [UC 6385] up for eighteen dollars." (UC 6385: Tr. 291, 297, 320-22.)

UC 6385 gave Smith eighteen dollars of pre-recorded buy money and walked with Smith around the corner to West 148th Street where he saw a black male leaning against a stoop. (UC 6385: Tr. 287, 291, 297-300, 325, 327-28; Griffen: Tr. 431.) Smith told the man that UC 6385 was "'looking for a twenty bag, but he only has eighteen dollars,'" and asked if the man could "hook him up." (UC 6385: Tr. 291, 300, 323.) The man replied, "'Yes. No problem.'" (UC 6385: Tr. 291, 300.) After Smith handed the man UC 6385's money, the man took "a small plastic twist of crack cocaine" out of his pocket and gave it to Smith, who gave it to UC 6385. (UC 6385: Tr. 291-92, 301, 329, 346, 348-49.)

UC 6385 walked away from Smith, signaled Detective Griffin [*7] that he had purchased drugs and provided physical descriptions of Smith and the other man over his radio and Kel transmitter. (UC 6385: Tr. 303-05; Summers: Tr. 384-86, 394-95; Griffin: Tr. 432, 436, 437, 440, 442.) Minutes later, Detective Summers saw Smith, who fit UC 6385's description, in front of 500 West 148th Street. (Summers: Tr. 386-87, 396.) Det. Summers identifying himself as a police officer and arrested Smith. (Summers: Tr. 387, 394, 397, 405.) A few minutes later, UC 6385 drove past where Smith was being detained and identified Smith as the one of the people involved in the drug sale. (UC 6385: Tr. 305-07, 315.) In addition, Det. Griffin had kept Smith in his sight from the time UC 6385 walked away from Smith until Smith was detained by Det. Summers. (Griffin: Tr. 437-38, 443.) When arrested, Smith did not have any money or drugs on him. (Summers: Tr. 387-88, 397-99.) The police did not catch Smith's accomplice who had supplied the drugs. (UC 6385: Tr. 306, 348; Summers: Tr. 392.)

After getting back to his office, UC 6385 field tested the drugs he had received from Smith. (UC 6385: Tr. 308.) The contents of the small plastic twist were subsequently tested in the NYPD lab [*8] and found to be cocaine. (Gajendra: Tr. 368-76.)

---

[1] On December 19, 2005, Smith's trial counsel made a pre-trial motion to dismiss the indictment for an alleged violation of Smith's C.P.L. § 190.50 right to testify before the grand jury. (Dkt. No. 17: Fleischman Aff. Ex. LL: Konoski 12/19/05 Aff. ¶¶ 4-25.) On February 8, 2006, Justice Bonnie G. Wittner denied Smith's motion, finding that Smith "withdrew cross grand jury notice and waived [C.P.L. §] 180.80 release." (Fleischman Aff. Ex. MM: Justice Wittner 2/8/06 Decision.)

On [*5] March 20, 2006, the prosecutor and Smith's trial counsel appeared before Justice Wittner for a pre-trial Mapp/Dunaway hearing to determine the admissibility of a crack pipe that the police recovered from Smith when he was arrested. (Dkt. No. 19: 3/20/06 Transcript 2.) The hearing was canceled, however, after the prosecutor informed Justice Wittner that the prosecution did not intend to introduce the crack pipe at trial. (3/20/06 Transcript 2-3.)

Verdict and Sentencing

On March 30, 2006, the jury convicted Smith of third degree criminal sale of a controlled substance. (Tr. 562.)

At sentencing on June 12, 2006, Smith's trial counsel referred to a pro se motion that Smith had made to dismiss the indictment, arguing that "the indictment was based on inadmissible evidence, namely, that the field test was not certified, or signed to by the officer . . . who did the field test." (Dkt. No. 19: Sentencing Transcript ("S.") 3.) [2] The prosecutor responded that, at trial, the proof that the small plastic twist contained cocaine was laboratory analysis and not a field test. (S. 4.) As to the sufficiency of the grand jury evidence, the prosecutor argued that "the undercover officer[] testified in the Grand Jury as to the steps that he took and also his training and experience in field testing substances, which is sufficient for Grand Jury purposes." (S. 4-5.) Justice Carruthers denied Smith's motion, noting that the grand jury minutes were already reviewed by Justice Wittner and found to be sufficient. (S. 5.)

Trial counsel informed Justice Carruthers that Smith had "done research," and that, under C.P.L. § 190.30(2), a field test may only be admitted in the grand jury if it has been certified. (S. 6.) The prosecutor responded that the undercover testified in the grand jury that he had conducted the field test, but the field test report was never presented to the grand jury. (S. 6.) Justice Carruthers adhered to his prior ruling denying Smith's motion. (S. 6.)

After addressing Smith's motions, Justice Carruthers sentenced Smith, as a second felony drug offender, to five years imprisonment. (S. 9, 12.)

Smith's C.P.L. § 440 Motions

Smith filed a pro se C.P.L. § 440 motion arguing that he was denied the effective assistance of counsel when "the three Legal Aid attorneys who appeared on [Smith's] behalf following his arrest denied [Smith] his right to testify before the grand jury by withdrawing cross grand jury notice without [Smith's] consent." (See Dkt. No. 17: Fleischmann Aff. Ex. A: 8/18/06 Motion Clerk Letter to Smith Att.: Justice Carruthers 8/11/06 Decision at 2.) Justice Carruthers denied Smith's [*10] motion, noting that the motion was identical to a pre-trial motion filed by Smith's counsel and previously denied by Justice Wittner. (Justice Carruthers 8/11/06 Decision at 1-2; see page 3 n.1 above.)

On August 27, 2006, Smith filed a second C.P.L. § 440 motion, arguing that: (1) trial counsel was ineffective for failing to "exculpate" Smith by arguing that the field test report was "falsified" and not certified and therefore could not corroborate UC 6385's grand jury testimony that he had field tested the drugs; (2) the prosecutor used UC 6385's perjured testimony to convict Smith at trial; and (3) Justice Carruthers failed to dismiss the "defective Grand Jury Indictment." (Fleischmann Aff. Ex. B: Smith Notice of Motion at pp. 1-3 & Smith 8/27/06 Aff. ¶¶ 1, 4-5.)

On November 3, 2006, Justice Carruthers denied Smith's second C.P.L. § 440 motion, noting that the trial record demonstrated that trial counsel had explained to Smith that his claims relating to the field test report were "not legally viable" and that Justice Carruther's had "concurred in counsel's explanation." (Fleischmann Aff. Ex. C: 11/3/06 Motion Clerk Letter to Smith Att.: Justice Carruthers 11/3/06 Decision at 1.) Justice [*11] Carruthers also noted that Smith had raised this exact issue in two prior C.P.L. § 330 motions that were denied previously. (Justice Carruthers 11/3/06 Decision at 2.)

On February 1, 2007, the First Department denied Smith leave to appeal from Justice Carruther's November 3, 2006 denial of Smith's § 440 motion. (Fleischmann Aff. Ex. F: 2/1/07 1st Dep't Cert. Denying Leave.)

Smith's Direct Appeal

Represented by the Center for Appellate Litigation, Smith's appeal to the First Department argued that: (1) Justice Carruthers erred in failing to instruct the jury on the agency defense (Dkt. No. 17: Fleischmann Aff. Ex. G: Smith 1st Dep't Br. at 10-15); and (2) Smith's five-year sentence was excessive (Smith 1st Dep't Br. at 15-16).

In a supplemental pro se brief, Smith argued that his conviction should be reversed because: (1) UC 6385 perjured himself in the grand jury and at trial when he testified that he field tested the drugs (Fleischmann Aff. Ex. H: Smith Pro Se 1st Dep't Br. at 5-11); (2) Smith's right to testify before the grand jury was violated when his "three Legal Aid lawyers precluded him from testifying" (Smith Pro Se 1st Dep't Br. at 12); and (3) Smith's "'due process rights'" [*12] were violated when UC 6385 failed to testify at the pre-trial Mapp/Dunaway hearing (Smith Pro Se 1st Dep't Br. at 13).

On June 3, 2008, the First Department affirmed Smith's conviction, holding in full:

---

[2] Smith had raised this claim prior to sentencing in a pro se C.P.L. § 330.30 motion [*9] to set aside the verdict. (Dkt. No. 17: Fleischmann Aff. Ex. OO: Smith 4/21/06 Aff. Att. at 8-9.)

> The court properly denied [Smith's] request for an agency charge since there was no reasonable view of the evidence, viewed most favorably to [Smith], that he acted solely on behalf of the buyer. [Smith's] actions were those of a steerer and order taker who, among other things, offered a discounted price. There was no evidence he was doing a favor for a friend or of any conversation between [Smith] and the undercover purchaser as to why the latter needed or wanted to be represented by an agent instead of simply buying his own drugs.
>
> We perceive no basis for reducing the sentence.
>
> We have considered and rejected [Smith's] pro se claims.

People v. Smith, 52 A.D.3d 232, 233, 859 N.Y.S.2d 75, 75-76 (1st Dep't 2008) (citations & quotations omitted). On August 19, 2008, the New York Court of Appeals denied leave to appeal. People v. Smith, 11 N.Y.3d 741, 894 N.E.2d 664, 864 N.Y.S.2d 400 (2008).

**Smith's Coram Nobis Motion**

On January 30, 2009, Smith filed a pro se motion for a writ of error coram nobis in the First [*13] Department, claiming that his appellate counsel was ineffective for failing to argue on direct appeal, inter alia, that: (1) the verdict was against the weight of the evidence (Dkt. No. 17: Fleischmann Aff. Ex. M: Smith 1/20/09 Aff. Att. at 6-7); (2) the field test report was not certified (Smith 1/20/09 Aff. Att. at 6, 8); (3) the prosecutor committed misconduct by using perjured testimony to convict Smith (Smith 1/20/09 Aff. Att. at 8); (4) trial counsel was ineffective for (a) failing to alert either Justice Wittner or Justice Carruthers that the field test was not certified (Smith 1/20/09 Aff. Att. at 9); and (b) making typographical errors in his omnibus motion before Justice Wittner (Smith 1/20/09 Aff. Att. at 9); (5) Justice Carruthers erred in failing to dismiss the indictment because the field test report was not certified (Smith 1/20/09 Aff. Att. at 10); (6) UC 6385 perjured himself in the grand jury and at trial when he testified that he field tested the drugs (Smith 1/20/09 Aff. Att. at 11); (7) Smith's right to testify before the grand jury was violated when his three Legal Aid attorneys waived his right to testify without his permission (Smith 1/20/09 Aff. Att. at 12); [*14] (8) Smith's due process rights were violated when his pre-trial Mapp/ Dunaway hearing was "cancelled" (Smith 1/20/09 Aff. Att. at 13); and (9) Justice Carruthers erred in arbitrarily denying Smith's motions relating to the uncertified field test report and Justice Carruther's decisions were based on "'[f]alse [p]retenses'" (Smith 1/20/09 Aff. Att. at 14).

On April 30, 2009, the First Department denied Smith's coram nobis petition. (Fleischmann Aff. Ex. GG: 4/30/09 1st Dep't Order.)

**Smith's Motions to Inspect the Grand Jury Minutes**

On March 31, 2009, Smith filed a motion requesting that Justice Carruthers inspect the grand jury minutes because the lack of a certified field test report rendered the grand jury evidence insufficient. (Dkt. No. 17: Fleischmann Aff. Ex. P: Smith 3/31/09 Aff. ¶¶ 3-12.)

Construing Smith's motion as a C.P.L. § 440 motion, Justice Carruthers denied the motion on June 10, 2009 on procedural grounds. (Fleischmann Aff. Ex. T: Motion Clerk 6/11/09 Letter to Smith Att.: Justice Carruthers 6/10/09 Decision at 1-2.) Specifically, Justice Carruthers noted that Smith had previously filed two C.P.L § 330.30 motions to set aside the verdict, as well as two C.P.L. § 440 motions. [*15] (Justice Carruthers 6/10/09 Decision at 1.) Relying on C.P.L. § 440.10(3)(c), Justice Carruthers denied Smith's motion because Smith "'was in a position adequately to raise the ground or issue underlying the present motion but did not do so.'" (Justice Carruthers 6/10/09 Decision at 2, quoting C.P.L. § 440.10(3)(c).) Justice Carruthers also noted that Justice Wittner previously had reviewed the grand jury minutes in response to Smith's pre-trial motions and found the evidence sufficient. (Justice Carruthers 6/10/09 Decision at 2.)

On June 25, 2009, Smith filed a "motion to renew for inspection of the grand jury minutes," in which he again raised his claim that the grand jury evidence was insufficient to establish that the substance he sold was a narcotic. (Fleischmann Aff. Ex. U: Smith 6/25/09 Aff. ¶ 2.) Smith also claimed that trial counsel was ineffective for, inter alia, erroneously stating in a pre- trial omnibus motion that Smith was charged in this case with rape, robbery, menacing and assault. (Smith 6/25/09 Aff. ¶¶ 1-2.)

On July 29, 2009, Justice Carruthers summarily denied Smith's renewed motion. (Fleischmann Aff. Ex. V: Motion Clerk 7/30/09 Letter to Smith Att.: Justice Carruthers [*16] 7/29/09 Decision at 1.) On October 8, 2009, the First Department denied Smith's application for leave to appeal from Justice Carruther's July 29, 2009 decision. (Fleischmann Aff. Ex. Y: 10/8/09 1st Dep't Cert. Denying Leave.)

**Smith's State Habeas Petition**

On March 12, 2010, Smith filed a state habeas petition in Supreme Court, Sullivan County, arguing that his detention

was "unlawful and unconstitutional" because the prosecutor violated New York's speedy trial provisions. (Dkt. No. 17: Fleischmann Aff. Ex. AA: Smith State Pet. ¶ 4 & pp. 16, 19.) Smith claimed that, because he was charged with a misdemeanor, the prosecutor had only ninety days to start the trial against Smith. (Smith State Pet. at pp. 16, 19.) Smith claimed, however, that his trial started 142 days after he was arraigned. (Smith State Pet. at p. 16.) Smith also claimed that the prosecutor never "convert[ed] the misdemeanor accusatory instrument into an information." (Smith State Pet. at p. 16.)

On March 22, 2010, Justice Frank J. LaBuda assigned Glenn Knoll, Esq., to represent Smith in his state habeas proceedings. (Fleischmann Aff. Ex. BB: Justice Labuda 3/22/10 Order.) In an April 11, 2010 letter, however, Smith requested [*17] that Knoll be terminated as counsel because Knoll had not responded to Smith's letters or visited Smith to discuss the case. (Fleischmann Aff. Ex. CC: Smith 4/11/10 Letter to Clerk.) Smith also stated that he was proceeding pro se and no longer "need[ed] the services of an [a]ttorney." (Smith 4/11/10 Letter to Clerk.) [3]

By decision dated December 30, 2010, Justice LaBuda denied Smith's state habeas petition on procedural grounds, noting that "the Court lacks personal jurisdiction over the respondent and cannot proceed to determine the merits of the petition" because Smith had failed to serve his habeas petition on the appropriate parties. (Fleischmann Aff. Ex. FF: 2/7/11 Notice of Entry Att.: Justice LaBuda 12/30/10 Decision at 1-2.) On February 7, 2011, Assistant Attorney General J. Gardner Ryan mailed Smith Notice of Entry [*18] of Justice LaBuda's state habeas decision. (Fleischmann Aff. Ex. FF: 2/7/11 Notice of Entry.)

On March 3, 2011, Smith applied to the Third Department for an extension of time to appeal Justice LaBuda's state habeas decision. (Fleischmann Aff. Ex. HH: Smith 3/3/11 Motion.) On April 15, 2011, the Third Department denied Smith's request. (Fleischmann Aff. Ex. II: 3d Dep't 4/15/11 Decision.) Smith has not appealed Justice LaBuda's state habeas decision.

**Smith's Federal Habeas Petition**

On April 22, 2011, Smith filed a pro se federal habeas corpus petition arguing that: (1) Smith's Fourth Amendment rights were violated when the prosecutor failed to present evidence in the grand jury that the substance Smith sold was a narcotic (Pet. ¶ 13(1)); (2) the prosecutor committed misconduct by using perjured testimony to indict Smith (Pet. ¶ 13(2); Dkt. No. 21: Smith Traverse at 3-4); (3) Smith's speedy trial rights were violated because the prosecutor failed "to covert the misdemeanor accusatory instrument, from a misdemeanor into a misdemeanor information" within the required ninety days and because Smith's trial started fifty-two days after his speedy trial time expired (Pet. ¶¶ 13(3), 13(5); Smith Traverse at 1, 18, 21, 22); (4) [*19] Smith's double jeopardy rights were violated because the prosecutor used the accusatory instrument to convict Smith even though it should have been dismissed for a speedy trial violation (Pet. ¶ 13(5); Smith Traverse at 17); (5) the indictment was based on "material false information" (Pet. ¶ 13(4)); (6) Smith's trial counsel was ineffective for (a) failing to argue that the grand jury evidence was insufficient and (b) "committ[ing] 'malpractice'" by making typographical errors in a pre-trial motion (Pet. ¶ 13(6)); (7) Smith was "'wrongly confined' for 5 years on a 'misdemeanor'" and his sentence was excessive (Pet. ¶ 13(7); Smith Traverse at 21-22); (8) Justice Wittner erred in finding the grand jury evidence sufficient (Pet. ¶ 13(8)); (9) Justice LaBuda erroneously dismissed Smith's petition for failure to serve the proper parties (Pet. ¶ 13(9); Smith Traverse at 11-16); (10) Smith's state habeas counsel was ineffective (Pet. ¶ 13(10)); (11) UC 6385 committed perjury in the grand jury and at trial when he testified that he field tested the drugs (Pet. Att.: Smith Pro Se 1st Dep't Br. Point I; Smith Traverse at 18, 22); (12) Smith's attorneys "precluded him from testifying before [*20] the grand jury" (Pet. Att.: Smith Pro Se 1st Dep't Br. Point II); and (13) Smith's "'due process rights' were violated" when the undercover officer did not testify at the pre-trial hearing and the arresting officer "show[ed] up in his place" (Pet. Att.: Smith Pro Se 1st Dep't Br. Point III).

**ANALYSIS**[4]

**I. THE AEDPA REVIEW STANDARD**

Before the Court can determine whether petitioner is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

---

[3] Smith also filed another motion on May 30, 2010, requesting summary judgment on his state habeas petition. (Fleischmann Aff. Ex. DD: Smith 5/30/10 Aff. ¶¶ 3-4.) On September 15, 2010, Smith filed another motion, arguing that Justice LaBuda was in "'delay/default'" for not timely ruling on Smith's habeas petition. (Fleischmann Aff. Ex. EE: Smith 9/15/10 Aff. ¶¶ 2-9.)

[4] The State argues that Smith's habeas petition should be dismissed as untimely. (Dkt. No. 18: State Br. at 20-24.) Because Smith's claims are being denied as not cognizable on habeas review or meritless (see Sections II-VIII below), this Court need not address the timeliness issue.

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." Williams v. Taylor, 529 U.S. 362, 403, 120 S. Ct. 1495, 1518, 146 L. Ed. 2d 389 (2000). The AEDPA imposed a more stringent review standard, as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment [*21] of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim ?
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). [5]

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." Williams v. Taylor, 529 U.S. at 404-05, 120 S. Ct. at 1519. [6] Both, however, "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." Williams v. Taylor, 529 U.S. at 412, 120 S. Ct. at 1523. [7] "That federal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." Kennaugh v. Miller, 289 F.3d at 42; accord, e.g., Davis v. Grant, 532 F.3d 132, 140 (2d Cir. 2008), cert. denied, 555 U.S. 1176, 129 S. Ct. 1312, 173 L. Ed. 2d 595 (2009). "A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." Yung v. Walker, 341 F.3d at 110; accord, e.g., DelValle v. Armstrong, 306 F.3d at 1200.

As to the "contrary to" clause:

> A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases. . . . A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts [*25] that are materially indistinguishable

---

[5] See also, e.g., Cullen v. Pinholster, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011); Knowles v. Mirzayance, 556 U.S. 111, 129 S. Ct. 1411, 1418, 173 L. Ed. 2d 251 (2009); Portalatin v. Graham, 624 F.3d 69, 78-79 (2d Cir. 2010) (en banc), cert. denied, 131 S. Ct. 1693, 179 L. Ed. 2d 646 (2011); Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622, 164 L. Ed. 2d 334 (2006); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004); Dallio v. Spitzer, 343 F.3d 553, 559-60 (2d Cir. 2003), cert. denied, 541 U.S. 961, 124 S. Ct. 1713, 158 L. Ed. 2d 402 (2004); Eze v. Senkowski, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly [*22] curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'" (quoting Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001), cert. denied, 535 U.S. 1019, 122 S. Ct. 1611, 152 L. Ed. 2d 625 (2002))).

[6] Accord, e.g., Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir.), [*23] cert. denied, 540 U.S. 1091, 124 S. Ct. 962, 157 L. Ed. 2d 798 (2003); Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000); Lurie v. Wittner, 228 F.3d 113, 125 (2d Cir. 2000), cert. denied, 532 U.S. 943, 121 S. Ct. 1404, 149 L. Ed. 2d 347 (2001); Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000), cert. denied, 531 U.S. 1116, 121 S. Ct. 865, 148 L. Ed. 2d 778 (2001).

[7] Accord, e.g., Carey v. Musladin, 549 U.S. 70, 77, 127 S. Ct. 649, 654, 166 L. Ed. 2d 482 (2006) ("Given the lack of holdings from this Court regarding [this issue], it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"); Yarborough v. Alvarado, 541 U.S. 652, 661, 124 S. Ct. 2140, 2147, 158 L. Ed. 2d 938 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); Wiggins v. Smith, 539 U.S. 510, 519, 123 S. Ct. 2527, 2534, 156 L. Ed. 2d 471 (2003); Lockyer v. Andrade, 538 U.S. 63, 71, 123 S. Ct. 1166, 1172, 155 L. Ed. 2d 144 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"); Portalatin v. Graham, 624 F.3d at 79 ("To qualify as 'clearly established' for the purposes of federal [*24] habeas review, a rule of law must be embodied in the 'holdings, as opposed to the dicta,' of Supreme Court precedent."); Georgison v. Donelli, 588 F.3d 145, 153-54 (2d Cir. 2009); Dunlap v. Burge, 583 F.3d 160, 164 (2d Cir.), cert. denied, 130 S. Ct. 642, 175 L. Ed. 2d 502 (2009); Hargett v. Giambruno, 291 F. App'x 402, 403 (2d Cir. 2008); Howard v. Walker, 406 F.3d at 122; Tueros v. Greiner, 343 F.3d 587, 591 (2d Cir. 2003), cert. denied, 541 U.S. 1047, 124 S. Ct. 2171, 158 L. Ed. 2d 739 (2004); Yung v. Walker, 341 F.3d 104, 109-10 (2d Cir. 2003); Parsad v. Greiner, 337 F.3d at 181; DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002); Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir.), cert. denied, 537 U.S. 909, 123 S. Ct. 251, 154 L. Ed. 2d 187 (2002); Loliscio v. Goord, 263 F.3d 178, 184 (2d Cir. 2001); Sellan v. Kuhlman, 261 F.3d 303, 309 (2d Cir. 2001).

from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

Williams v. Taylor, 529 U.S. at 405-06, 120 S. Ct. at 1519-20. [8]

In Williams, the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams v. Taylor, 529 U.S. at 413, 120 S. Ct. at 1523. [9] However, "[t]he term 'unreasonable' is . . . difficult to define." Williams v. Taylor, 529 U.S. at 410, 120 S. Ct. at 1522. The Supreme Court made clear that "an unreasonable application of federal law is different from an incorrect application of federal law." Id. [10] Rather, the issue is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams v. Taylor, 529 U.S. at 409, 120 S. Ct. at 1521. **[*27]** [11] "Objectively unreasonable" is different from "clear error." Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."). This is a "'substantially higher threshold'" than incorrectness. Renico v. Lett, 130 S. Ct. at 1862; accord, e.g., Knowles v. Mirzayance, 129 S. Ct. at

[8] Accord, e.g., Knowles v. Mirzayance, 129 S. Ct. at 1419 (The Supreme "Court has held on numerous occasions that it is not 'an unreasonable application of clearly established federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this [Supreme] Court." (quotation omitted)); Brown v. Payton, 544 U.S. 133, 141, 125 S. Ct. 1432, 1438-39, 161 L. Ed. 2d 334 (2005); Bell v. Cone, 543 U.S. 447, 452-53, 125 S. Ct. 847, 851, 160 L. Ed. 2d 881 (2005); Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853, 155 L. Ed. 2d 877 (2003); Lockyer v. Andrade, 538 U.S. at 73-74, 123 S. Ct. at 1173-74; Portalatin v. Graham, 624 F.3d at 79; Bierenbaum v. Graham, 607 F.3d 36, 47-48 (2d Cir. 2010), cert. denied, 131 S. Ct. 1693, 179 L. Ed. 2d 645 (2011); Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d 149, 156 (2d Cir. 2009), cert. denied, 131 S. Ct. 320, 178 L. Ed. 2d 254 (2010); Dunlap v. Burge, 583 F.3d at 164; Davis v. Grant, 532 F.3d at 140; Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006), cert. denied, 549 U.S. 1215, 127 S. Ct. 1267, 167 L. Ed. 2d 92 (2007); **[*26]** Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d 210, 219 (2d Cir.), cert. denied, 546 U.S. 889, 126 S. Ct. 215, 163 L. Ed. 2d 201 (2005); Tueros v. Greiner, 343 F.3d at 591; Yung v. Walker, 341 F.3d at 109; DelValle v. Armstrong, 306 F.3d at 1200; Kennaugh v. Miller, 289 F.3d at 42; Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 127-28.

[9] Accord, e.g., Cullen v. Pinholster, 131 S. Ct. at 1399; Waddington v. Sarausad, 555 U.S. 179, 190, 129 S. Ct. 823, 831, 172 L. Ed. 2d 532 (2009); Brown v. Payton, 544 U.S. at 141, 125 S. Ct. at 1439; Wiggins v. Smith, 539 U.S. at 520, 123 S. Ct. at 2534-35; Bierenbaum v. Graham, 607 F.3d at 48; Brisco v. Ercole, 565 F.3d 80, 87 (2d Cir.), cert. denied, 130 S. Ct. 739, 175 L. Ed. 2d 542 (2009); Jones v. West, 555 F.3d 90, 96 (2d Cir. 2009); Davis v. Grant, 532 F.3d at 140; **[*28]** Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006), cert. denied, 549 U.S. 1257, 127 S. Ct. 1383, 167 L. Ed. 2d 168 (2007); Howard v. Walker, 406 F.3d at 122; Parsad v. Greiner, 337 F.3d at 181.

[10] See also, e.g., Renico v. Lett, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010); Waddington v. Sarausad, 555 U.S. at 190, 129 S. Ct. at 831; Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2150; Wiggins v. Smith, 539 U.S. at 520, 123 S. Ct. at 2535; Price v. Vincent, 538 U.S. at 641, 123 S. Ct. at 1853 ("As we have explained: '[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'" (quoting Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S. Ct. 357, 360, 154 L. Ed. 2d 279 (2002))); Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1175; Dunlap v. Burge, 583 F.3d at 165-66 (A "federal court might agree with a petitioner that the relevant federal law should have been interpreted differently than the way it was interpreted by the state court yet still conclude that the state court's application of the federal law was not unreasonable."); Brisco v. Ercole, 565 F.3d at 87-88; Jones v. West, 555 F.3d at 96; Davis v. Grant, 532 F.3d at 140; **[*29]** Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 219; Cox v. Donnelly, 387 F.3d at 197; Eze v. Senkowski, 321 F.3d at 124-25; DelValle v. Armstrong, 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

[11] Accord, e.g., Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2150; Wiggins v. Smith, 539 U.S. at 520-21, 123 S. Ct. at 2535; Price v. Vincent, 538 U.S. at 641, 123 S. Ct. at 1853; Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1174-75; Woodford v. Visciotti, 537 U.S. at 25-27, 123 S. Ct. at 360-61; Portalatin v. Graham, 624 F.3d at 79; Dunlap v. Burge, 583 F.3d at 165; Davis v. Grant, 532 F.3d at 140; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006), cert. denied, 552 U.S. 836, 128 S. Ct. 75, 169 L. Ed. 2d 56 (2007); Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; **[*30]** Cox v. Donnelly, 387 F.3d at 197; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d 231, 245 (2d Cir. 2002); Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 128-29.

1420. [12] Federal habeas relief is precluded "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011). "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings.'" Cullen v. Pinholster, 131 S. Ct. at 1398 (citations omitted).

"[T]he [*31] range of reasonable judgment can depend in part on the nature of the relevant rule." Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2149. [13] "Even if the state court issued a decision 'contrary to' clearly established Supreme Court law, a petitioner 'cannot obtain relief . . . unless application of a correct interpretation of that [Supreme Court] decision leads to the conclusion that his rights were violated.'" Cousin v. Bennett, 511 F.3d 334, 339 (2d Cir.), cert. denied, 553 U.S. 1096, 128 S. Ct. 2910, 171 L. Ed. 2d 847 (2008) (citation omitted).

Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." Kennaugh v. Miller, 289 F.3d at 45. [14]

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." Yung v. Walker, 341 F.3d at 109; accord, e.g., Cullen v. Pinholster, 131 S. Ct. at 1398; Felkner v. Jackson, 131 S. Ct. 1305, 1307, 179 L. Ed. 2d 374 (2011)(per curiam)("On federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" (citations omitted)); Renico v. Lett, 130 S. Ct. at 1862; Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Mosby v. Senkowski, 470 F.3d at 519. "[I]t is the petitioner's burden to demonstrate that the state court applied the relevant clearly established law to th[e] record in an unreasonable [*34] manner." Acosta v. Artuz, 575 F.3d 177, 184 (2d Cir. 2009); accord, e.g., Cullen v. Pinholster, 131 S. Ct. at 1398 ("The petitioner carries the burden of proof."); Georgison v. Donelli, 588 F.3d at 154. As the Supreme Court explained:

> If this standard is difficult to meet, that is because it was meant to be. . . . [§ 2254(d)] preserves authority to issue the writ in cases where there is no possibility fairminded

12 However, the Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" Jones v. Stinson, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)); accord, e.g., Brisco v. Ercole, 565 F.3d at 88; Jones v. West, 555 F.3d at 96; Brown v. Alexander, 543 F.3d 94, 100 (2d Cir. 2008) ("[W]e have observed that the 'unreasonable application' standard 'falls somewhere between merely erroneous and unreasonable to all reasonable jurists.'"); Davis v. Grant, 532 F.3d at 140; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 219; Cox v. Donnelly, 387 F.3d at 197, 200-01; Yung v. Walker, 341 F.3d at 110; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d at 245; Loliscio v. Goord, 263 F.3d at 184.

13 The Supreme Court explained:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2149; [*32] accord, e.g., Harrington v. Richter, 131 S. Ct. at 786; Renico v. Lett, 130 S. Ct. at 1864; Knowles v. Mirzayance, 129 S. Ct. at 1420 (Where the Supreme Court "standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."); Portalatin v. Graham, 624 F.3d at 79; Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d at 157; Dunlap v. Burge, 583 F.3d at 166; Hawkins v. Costello, 460 F.3d at 243.

14 Accord, e.g., Bierenbaum v. Graham, 607 F.3d at 47-48; Davis v. Grant, 532 F.3d at 140-41; Tueros v. Greiner, 343 F.3d at 591; Yung v. Walker, 341 F.3d at 109; see Yarborough v. Alvarado, 541 U.S. at 665-66, 124 S. Ct. at 2150-51 ("The petitioner contends that if a habeas court must extend a rationale before it can apply to the facts at hand then the rationale cannot be clearly established at the time of [*33] the state-court decision. There is force to this argument. Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law. At the same time, the difference between applying a rule and extending it is not always clear. Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." (citations omitted)).

> jurists could disagree that the state court's decisions conflict with [the Supreme] Court's precedents. It goes no further. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington v. Richter, 131 S. Ct. at 786-87.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies.

> Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require [*35] that there be an opinion from the state court explaining the state court's reasoning. And as this Court has observed, a state court need not cite or even be aware of [Supreme Court] cases under § 2254(d). Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.

Harrington v. Richter, 131 S. Ct. at 784 (citations to Sellan v. Kuhlman, 261 F.3d at 312, & other cases omitted); accord, e.g., Cullen v. Pinholster, 131 S. Ct. at 1402; Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (State court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them."); Wilson v. Mazzuca, 570 F.3d 490, 499 (2d Cir. 2009) ("Where, as here, 'a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an unreasonable [*36] application of clearly established Supreme Court precedent.'"). [15] "'[A] habeas court must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court.'" Cullen v. Pinholster, 131 S. Ct. at 1402.

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 131 S. Ct. at 784-85.

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 131 S. Ct. at 1398.

Finally, in appropriate circumstances, "[i]f [the] court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless." Howard v. Walker, 406 F.3d at 122.

In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations: "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); accord, e.g., Bierenbaum v. Graham, 607 F.3d at 48; Lynn v. Bliden, 443 F.3d at 246-47; Rosa v. McCray, 396 F.3d at 220. "The [*38] petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'" Parsad v. Greiner, 337 F.3d at 181 (quoting § 2254(e)(1)); accord, e.g., Bierenbaum v. Graham, 607 F.3d at 48 ("A state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence."); Brown v. Alexander, 543 F.3d at 100; Lynn v. Bliden, 443 F.3d at 246-47.

## II. SMITH'S GRAND JURY CLAIMS (HABEAS GROUNDS ONE, TWO, FIVE, EIGHT AND ELEVEN) ARE NOT COGNIZABLE ON HABEAS REVIEW

Smith claims that the evidence presented to the grand jury was insufficient to establish that he sold a narcotic drug

[15] See also, e.g., Wade v. Herbert, 391 F.3d 135, 140, 142 (2d Cir. 2004) (Appellate Division held claim was "'without merit.'" "Such a summary determination, even absent citation of federal case law, is a determination 'on the merits' and as such requires the deference specified by § 2254." Moreover, "[i]f any reasonable ground was available [for the state court's decision], we must assume the [state] court relied on it."); Francolino v. Kuhlman, 365 F.3d 137, 141 (2d Cir.) (Where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" AEDPA deference applies.), cert. denied, 543 U.S. 872, 125 S. Ct. 110, 160 L. Ed. 2d 120 (2004); Jenkins v. Artuz, 294 F.3d 284, 291 (2d Cir. 2002) ("In Sellan, we found that an even more concise [*37] Appellate Division disposition-the word 'denied'-triggered AEDPA deference.").

(habeas ground one), that the prosecutor committed misconduct by using perjured testimony to indict him (habeas ground two), that the indictment was based on "material false information" (habeas ground five), that Justice Wittner erred in finding the grand jury evidence sufficient (habeas ground eight) and that UC 6385 committed perjury in the grand jury (habeas ground eleven). (Dkt. No. 1: Pet. ¶¶ 13(1)-(2), 13(4), 13(8), 13(11); Dkt. No. 21: Smith Traverse at 3-4, 18, 22.) These claims are not cognizable on habeas review.

A jury [*39] conviction transforms any defect connected with the grand jury's charging decision into harmless error because the trial conviction establishes probable cause to indict and also proof of guilt beyond a reasonable doubt. See, e.g., United States v. Mechanik, 475 U.S. 66, 68, 106 S. Ct. 938, 940, 89 L. Ed. 2d 50 (1986) ("The petit jury's verdict of guilty beyond a reasonable doubt demonstrates a fortiori that there was probable cause to charge the defendants with the offenses for which they were convicted. Therefore, the convictions must stand despite the [grand jury] rule violation.").[16] In Lopez v. Riley, the Second Circuit relied on Mechanik in holding that "[i]f federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are a fortiori foreclosed in a collateral attack brought in a federal court." Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989); see also, e.g., Davis v. Mantello, 42 F. App'x 488, 490-91(2d Cir. 2002) ("[C]laims of deficiencies in state grand jury proceedings are not cognizable in a habeas corpus proceeding in federal court." (citing cases)), cert. denied, 538 U.S. 986, 123 S. Ct. 1803, 155 L. Ed. 2d 681 (2003); [*40] Batchilly v. Nance, 2010 U.S. Dist. LEXIS 33031, 2010 WL 1253921 at *30; Fabre v. Taylor, 08 Civ. 5883, 2009 U.S. Dist. LEXIS 7825, 2009 WL 162881 at *18 (S.D.N.Y. Jan. 20, 2009) (Peck, M.J.), report & rec. adopted, 2009 U.S. Dist. LEXIS 45343, 2009 WL 1457169 (S.D.N.Y. May 26, 2009); Bramble v. Smith, 96 Civ. 5905, 1998 U.S. Dist. LEXIS 10494, 1998 WL 395265 at *18 (S.D.N.Y. July 15, 1998) ("[C]laims of error relating to state grand jury proceedings are not cognizable on federal collateral review.").

Consequently, Smith's claims alleging insufficiencies in [*42] the grand jury evidence (habeas grounds one and eight) are not cognizible on habeas review. See, e.g., Lopez v. Riley, 865 F.2d at 31-33 (Petitioner's claim that the grand jury evidence was insufficient "may not be raised" on habeas review "where a properly instructed petit jury heard all relevant evidence and convicted."); Fabre v. Taylor, 2009 U.S. Dist. LEXIS 7825, 2009 WL 162881 at *18 (Petitioner's "claim that the evidence presented to the grand jury was insufficient to indict him for second degree weapon possession is not cognizable on habeas review.").[17]

Additionally, Smith's claims that the prosecutor used perjured testimony to indict Smith (habeas ground two), that

[16] See also, e.g., United States v. Lombardozzi, 491 F.3d 61, 80 (2d Cir. 2007) ("It is well settled that a guilty verdict at trial 'remedies any possible defects in the grand jury indictment.'"); Batchilly v. Nance, 08 Civ. 7150, 2010 U.S. Dist. LEXIS 33031, 2010 WL 1253921 at *30 (S.D.N.Y. Apr. 2, 2010) (Peck, M.J.), report & rec. adopted, 2011 U.S. Dist. LEXIS 34290, 2011 WL 1226260 (S.D.N.Y. Mar. 30, 2011); Fernandez v. People, 06 Civ. 7174, 2009 U.S. Dist. LEXIS 77243, 2009 WL 2744903 at *8 (S.D.N.Y. Aug. 28, 2009); Peterson v. New York, 06 Civ. 3369, 2009 WL 935669 at *13 (S.D.N.Y. Apr. 7, 2009) ("[B]ecause [petitioner] was convicted after a jury trial at which he testified," any error regarding a right to testify at grand jury proceedings was rendered harmless beyond a reasonable doubt.); Chacko v. United States, 96 Cr. 519, 04 Civ. 2258, 2005 U.S. Dist. LEXIS 11380, 2005 WL 1388723 at *6 (S.D.N.Y. June 8, 2005) [*41] (errors in grand jury proceedings are generally considered harmless once a defendant has been convicted at a jury trial); James v. United States, 00 Civ. 8818, 2002 U.S. Dist. LEXIS 8879, 2002 WL 1023146 at *12 (S.D.N.Y. May 20, 2002) (§ 2255 petition; "It is well established that a guilty verdict at trial remedies any defects or errors in the grand jury indictment."); Lemons v. Parrott, 01 Civ. 9366, 2002 U.S. Dist. LEXIS 7970, 2002 WL 850028 at *5-6 (S.D.N.Y. May 2, 2002); Barnes v. Giambruno, 01 Civ. 8965, 2002 U.S. Dist. LEXIS 7969, 2002 WL 850020 at *7 (S.D.N.Y. May 2, 2002); Burgess v. Bintz, 00 Civ. 8271, 2002 U.S. Dist. LEXIS 7168, 2002 WL 727011 at *4 (S.D.N.Y. Apr. 24, 2002); McMoore v. Miller, No. 98CV1915, 2002 U.S. Dist. LEXIS 8224, 2002 WL 975305 at *8 (N.D.N.Y. Apr. 19, 2002); Ballard v. Costello, No. 01-CV-1000, 2001 U.S. Dist. LEXIS 18596, 2001 WL 1388297 at *2 (E.D.N.Y. Nov. 2, 2001); Davis v. Portuondo, 00 Civ. 8928, 2001 U.S. Dist. LEXIS 17120, 2001 WL 1273801 at *6 (S.D.N.Y. Oct. 23, 2001) ("[A]n error in grand jury proceedings is necessarily rendered harmless by a trial jury's subsequent finding of guilt beyond a reasonable doubt."); Spulka v. Walker, 97 Civ. 1879, 1998 U.S. Dist. LEXIS 7801, 1998 WL 274287 at *2 (S.D.N.Y. May 27, 1998) ("[T]he guilty verdict of the petit jury cured any defect in the grand jury proceeding.").

[17] See also, e.g., Silva v. Miller, 04 Civ. 8013, 2009 U.S. Dist. LEXIS 109847, 2009 WL 4060946 at *5 (S.D.N.Y. Nov. 24, 2009) ("'[I]t is well-settled that claims based on the sufficiency of the evidence presented to a state Grand Jury are not cognizable under federal law and thus are not reviewable in a habeas corpus petition.'"); Fulton v. Greene, No. 05-CV-6314, 2009 U.S. Dist. LEXIS 102971, 2009 WL 3733046 at *5 (W.D.N.Y. Nov. 5, 2009) ("It is well-settled that any errors in state grand jury proceedings involving sufficiency of grand jury evidence . . . do not entitle a petitioner to habeas relief."); Walker v. Brown, No. 08-CV-1254, 2009 U.S. Dist. LEXIS 59384, 2009 WL 2030618 at *7 (E.D.N.Y. July 10, 2009) ("[I]t is well-settled that [*43] claims based on the sufficiency of the evidence

the indictment was based on "material false information" (habeas ground five), and that UC 6385 perjured himself in the grand jury (habeas ground eleven) are also not cognizable on habeas review. See, e.g., Haberer v. Napoli, No. 07-CV-799, 2010 U.S. Dist. LEXIS 74762, 2010 WL 2998665 at *7-8 (W.D.N.Y. July 26, 2010) (Petitioner's claim that "the indictment was obtained by the prosecution's use of perjured, fabricated, and/or hearsay evidence at the grand jury" was "not cognizable in a federal habeas petition."); May v. Warden, 07 Civ. 2176, 2010 U.S. Dist. LEXIS 45462, 2010 WL 1904327 at *3 (S.D.N.Y. May 10, 2010) [*44] ("There is no federal constitutional right to a grand jury in a state criminal prosecution, and thus a claim of deficiency in the proceeding is not cognizable in a habeas corpus proceeding. This rule applies to claims of perjury." (citations & quotation omitted)). [18]

Accordingly, Smith's grand jury claims (habeas grounds one, two, five, eight and eleven) should be DENIED.

## III. SMITH'S SPEEDY TRIAL AND DOUBLE JEOPARDY CLAIMS (HABEAS GROUNDS THREE AND FOUR) ARE MERITLESS

Smith claims [*45] that his speedy trial rights were violated because the prosecutor failed "to covert the misdemeanor accusatory instrument, from a misdemeanor into a misdemeanor information" within the required ninety days and because his trial started fifty-two days after his speedy trial time ended (habeas ground three). (Dkt. No.1: Pet. ¶¶ 13(3), 13(5); Dkt. No. 17: Fleischmann Aff. Ex. AA: Smith State Pet. at pp. 16, 19; Dkt. No. 21: Smith Traverse at 1, 18, 21, 22; see pages 11, 13 above.) Smith also claims that his double jeopardy rights were violated because the prosecutor used the accusatory instrument to convict Smith even though it should have been dismissed for a speedy trial violation (habeas ground four). (Pet. ¶ 13(3); Smith Traverse at 17; see page 13 above.)

In making these claims, Smith argues that the relevant statutory speedy trial period is ninety days because he was charged only with a misdemeanor. (Pet. ¶¶ 13(3) ("My case after exceeding 90 days for a Misdemeanor should have been dismissed."), 13(5) ("The 90 days prescribed for a misdemeanor has been exceeded."); see also Smith Traverse at 1, 21, 22.)

These claims are meritless because Smith was not charged with a misdemeanor; rather, [*46] on November 4, 2005, Smith was charged in a felony complaint with the class B felony of third degree criminal sale of a controlled substance, Penal Law § 220.39. (Fleischmann Aff. Ex. JJ: 11/4/05 Felony Complaint.) Smith's lack of conversion claim is baseless because the requirement that a misdemeanor complaint be replaced by or converted to an information before trial [19] does not apply to felony complaints, see C.P.L. § 170.65(1); instead the felony complaint is replaced by an indictment or superior court information. See C.P.L. § 210.05 ("The only methods of prosecuting an offense in a superior court are by an indictment filed therewith by a grand jury or by a superior court information filed therewith by a district attorney.").

Moreover, as Smith was charged with a felony, the statutory speedy trial time was six months, not ninety days. See C.P.L. § 30.30(1)(a). As Smith concedes, he was arraigned on November 4, 2005 and his trial started 142 days later on March 28, 2006. (Smith State Pet. at p. 16.) Consequently, because his trial started within six months of his arraignment, Smith's speedy trial claim is meritless.

---

presented to a state Grand Jury are not cognizable under federal law and thus are not reviewable in a habeas corpus petition."); Jackson v. Morgenthau, 07 Civ. 2757, 2009 WL 1514373 at *13 n.4 (S.D.N.Y. May 28, 2009) ("Any claims relating to the Grand Jury proceedings and the legal sufficiency of the evidence in support of Petitioner's indictment are not reviewable in a federal habeas proceeding because the constitutional right to a grand jury is not applicable to the states.").

[18] See also, e.g., Brazeau v. Zon, No. 04-CV-031, 2007 WL 2903617 at *7 (W.D.N.Y. Oct. 1, 2007) ("Not only is [petitioner's claim that the prosecutor knowingly suborned perjury in the grand jury] factually baseless and premised on a distorted reading of the grand jury and trial testimony of [the witnesses], it is also not cognizable on habeas review because it asserts only that errors allegedly occurred at the grand jury proceeding."); Harris v. Lacy, No. 91-CV-0421, 1993 U.S. Dist. LEXIS 11937, 1993 WL 335602 at *1 (W.D.N.Y. Aug. 25, 1993) (Petitioner's claim that the "indictment was based on perjured testimony by the victim" and that "the prosecutor had knowingly allowed such testimony to be presented" was not cognizable on habeas review.).

[19] Under New York law, in order to charge a defendant with a misdemeanor, the prosecutor must file an accusatory instrument such as an '"information'" or a '"misdemeanor complaint.'" C.P.L. § 100.10 (1), (4). Unlike a misdemeanor complaint, an information cannot contain hearsay. See C.P.L. § 100.40(1)(a)-(c), (4)(a)-(b). Thus, if the defendant is charged via a misdemeanor complaint, the complaint must be replaced by an information prior to trial. See C.P.L. § 170.65(1). [*47] As an alternative, the prosecutor may convert the misdemeanor complaint into an information by filing a supporting deposition to remove any hearsay allegations. See C.P.L. §§ 100.20, 170.65(1).

unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. [23]

The Supreme Court has counseled that these principles "do not establish mechanical rules." Strickland v. Washington, 466 U.S. at 696, 104 S. Ct. at 2069. The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process. Id.

Any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury.'" Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001) (quoting Strickland v. Washington, 466 U.S. at 695-96, 104 S. Ct. at 2069); accord, e.g., Rodriguez v. Hoke, 928 F.2d 534, 538 (2d Cir. 1991). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Harrington v. Richter 131 S. Ct. at 788; see also, e.g., Cullen v. Pinholster, 131 S. Ct. at 1403 ("The [Supreme] [*54] Court acknowledged that '[t]here are countless ways to provide effective assistance in any given case,' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'").

The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland v. Washington, 466 U.S. at 697, 104 S. Ct. at 2069. [24]

In addition, the Supreme Court has counseled that:

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. . . . In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland v. Washington, 466 U.S. at 690-91, 104 S. Ct. at 2066. [*55] [25]

"The Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective

---

[23] See also, e.g., Cullen v. Pinholster, 131 S. Ct. at 1403; Harrington v. Richter, 131 S. Ct. at 787; Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542; Bell v. Cone, 535 U.S. at 695, 122 S. Ct. at 1850; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006), cert. denied, 552 U.S. 836, 128 S. Ct. 75, 169 L. Ed. 2d 56 (2007); Henry v. Poole, 409 F.3d at 63-64; Aparicio v. Artuz, 269 F.3d at 95; Sellan v. Kuhlman, 261 F.3d at 315; DeLuca v. Lord, 77 F.3d 578, 584 (2d Cir.), cert. denied, 519 U.S. 824, 117 S. Ct. 83, 136 L. Ed. 2d 40 (1996).

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068; accord, e.g., Cullen v. Pinholster, 131 S. Ct. at 1403; [*52] Harrington v. Richter, 131 S. Ct. at 787; Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542; Bierenbaum v. Graham, 607 F.3d at 51. The phrase "reasonable probability," despite its language, should not be confused with "'more likely than not.'" Strickler v. Greene, 527 U.S. 263, 289-91, 119 S. Ct. 1936, 1952-53, 144 L. Ed. 2d 286 (1999); accord, e.g., Harrington v. Richter, 131 S. Ct. at 792; Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1565-66, 131 L. Ed. 2d 490 (1995); Nix v. Whiteside, 475 U.S. 157, 175, 106 S. Ct. 988, 998, 89 L. Ed. 2d 123 (1986) ("[A] defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under Strickland."); Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."). Rather, the phrase "reasonable probability" seems to describe a fairly low standard of probability, albeit somewhat more likely than a "reasonable possibility." Strickler v. Greene, 527 U.S. at 291, 119 S. Ct. at 1953; cf. id. at 297-301, 119 S. Ct. at 1955-58 [*53] (Souter, J., concurring & dissenting) (arguing that any difference between "reasonable probability" and "reasonable possibility" is "slight").

[24] Accord, e.g., Smith v. Robbins, 528 U.S. 259, 286 n.14, 120 S. Ct. 746, 764 n.14, 145 L. Ed. 2d 756 (2000).

[25] See also, e.g., Harrington v. Richter, 131 S. Ct. at 789-90 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." Moreover, an "attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense."); Yarborough v. Gentry, 540 U.S. 1, 5-6, 124 S. Ct. 1, 4, 157 L. Ed. 2d 1 (2003); Engle v. Isaac, 456 U.S. 107, 134, 102 S. Ct. 1558, 1575, 71 L. Ed. 2d 783 (1982) ("We have long recognized . . . that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998) ("In reviewing Strickland claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error but derived instead from trial strategy. We

counsel founder on that standard." Lindstadt v. Keane, 239 F.3d at 199; accord, e.g., Cullen v. Pinholster, 131 S. Ct. at 1403 ("We take a 'highly deferential' look at counsel's performance."); Bierenbaum v. Graham, 607 F.3d at 50-51; Bell v. Miller, 500 F.3d at 156-57. "'Surmounting Strickland's high bar is never an easy task.'" Harrington v. Richter, 131 S. Ct. at 788 ("[T]he Strickland standard must be applied with scrupulous care" and "the standard for judging counsel's representation is a most deferential one.").

## 1. Strickland and the AEDPA Review Standard

For purposes of this Court's AEDPA analysis, "the Strickland standard . . . is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Aparicio v. Artuz, 269 F.3d 78, 95 & n.8 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(d)(1)). [*57] [26] "For AEDPA purposes, a petitioner is not required to further demonstrate that his particular theory of ineffective assistance of counsel is also 'clearly established.'" Aparicio v. Artuz, 269 F.3d at 95 n.8.

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington v. Richter, 131 S. Ct. 770, 788, 178 L. Ed. 2d 624 (2011) (citations omitted); accord, e.g., Cullen v. Pinholster, 131 S. Ct. at 1403 ("Our review . . . is thus 'doubly deferential.'"); Premo v. Moore, 131 S. Ct. at 740-41; Bell v. Cone, 535 U.S. at 698-99, 122 S. Ct. at 1852 ("For [petitioner] to succeed, [*58] however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. Rather, he must show that the [state appellate court] applied Strickland to the facts of his case in an objectively unreasonable manner." (citation omitted)); see also, e.g., Yarborough v. Gentry, 540 U.S. 1, 5, 124 S. Ct. 1, 4, 157 L. Ed. 2d 1 (2003); Mosby v. Senkowski, 470 F.3d at 519.

## B. Application of the Strickland Standard to Smith's Claims

### 1. Trial Counsel Was Not Ineffective For Failing to Argue that the Grand Jury Evidence was Insufficient (Habeas Ground Six(a))

Smith claims that trial counsel [*59] was ineffective for failing to argue that the indictment should have been dismissed because there was no evidence before the grand jury that the substance he sold was a narcotic (habeas ground six (a)). (Dkt. No. 1: Pet. ¶ 13(6).) In making this claim, Smith alleges that "[t]here was no proof that a '[n]arcotic [s]ubstance' was present" because "[n]o field test was performed the night of my arrest; and no laboratory chemical analysis was performed or presented before the Grand Jury; and no chemist testified before the Grand Jury." (Pet. ¶¶ 13(1), 13(6).) While acknowledging that UC 6385 testified in the grand jury that he had field tested the drugs and it was "99.9 percent positive for crack cocaine," Smith claims that this testimony was inadmissible under C.P.L. § 190.30(2) because UC 6385 "failed to certify the field test report." (Pet. ¶ 13(1); Dkt. No. 17: Fleischmann Aff. Ex. B: Smith 8/27/06 Notice of Motion at p. 2.) [27]

Justice Carruthers denied Smith's ineffective assistance claim, [*60] noting that "[d]efense counsel explained to the defendant on the record the reason that this issue was not legally viable, and the Court concurred in counsel's

---

are also instructed, when reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and impose on . . . counsel [*56] a duty to raise every "colorable" claim' on appeal." (citations omitted)); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), cert. denied, 513 U.S. 820, 115 S. Ct. 81, 130 L. Ed. 2d 35 (1994).

[26] See also, e.g., Cullen v. Pinholster, 131 S. Ct. 1388, 1403, 179 L. Ed. 2d 557 (2011); Premo v. Moore, 131 S. Ct. 733, 743, 178 L. Ed. 2d 649 (2011); Wiggins v. Smith, 539 U.S. 510, 521-22, 123 S. Ct. 2527, 2535, 156 L. Ed. 2d 471 (2003); Bell v. Cone, 535 U.S. 685, 698, 122 S. Ct. 1843, 1852, 152 L. Ed. 2d 914 (2002); Mosby v. Senkowski, 470 F.3d 515, 518-19 (2d Cir. 2006), cert. denied, 552 U.S. 836, 128 S. Ct. 75, 169 L. Ed. 2d 56 (2007); Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001).

[27] To support his claim that the field test report was not certified, Smith attaches UC 6385's unsigned field test report to his habeas petition. (Dkt. No. 1: Pet. 2d Att. at 11: Field Test Report.)

explanation." (Dkt. No. 17: Fleischmann Aff. Ex. C: 11/3/06 Motion Clerk Letter to Smith Att.: Justice Carruthers 11/3/06 Decision at 1; see page 7 above.)

While this conversation between Smith, trial counsel and Justice Carruthers does not appear in the trial record, the prosecutor addressed the merits of Smith's insufficiency of the grand jury evidence claim at sentencing. (See pages 5-6 above.) At sentencing, Smith's trial counsel raised Smith's pro se motion to dismiss the indictment, arguing that "the indictment was based on inadmissible evidence, namely, that the field test was not certified, or signed to by the officer . . . who did the field test." (See pages 5-6 above.) Trial counsel also informed Justice Carruthers that Smith had "done research," and that, under C.P.L. § 190.30(2), a field test may only be admitted in the grand jury if it has been certified. (See page 6 above.) In response, the prosecutor argued that "the undercover officer[] testified in the Grand Jury as to the steps that he took and also his training [*61] and experience in field testing substances, which is sufficient for Grand Jury purposes." (See page 6 above.) Addressing C.P.L. § 190.30(2), the prosecutor noted that UC 6385 testified in the grand jury that he had conducted the field test, but the field test report was never presented to the grand jury. (See page 6 above.) After hearing the prosecutor's rationale, Justice Carruthers denied Smith's motion, noting that the grand jury minutes were reviewed by Justice Wittner and found to be sufficient. (See page 6 above.)

Smith's ineffective assistance claim is meritless. Under New York law, an officer's grand jury testimony that he field tested drugs and that it tested positive for a controlled substance is sufficient to support a grand jury indictment. E.g., People v. Swamp, 84 N.Y.2d 725, 730-31, 646 N.E.2d 774, 622 N.Y.S.2d 472, 474-75 (1995) (grand jury evidence sufficient where officer testified that he field tested the drugs and it was positive for cocaine even though field test report was not admitted into evidence); accord, e.g., In re Angel A., 92 N.Y.2d 430, 434, 704 N.E.2d 554, 681 N.Y.S.2d 787, 789 (1998). Consequently, in the present case, UC 6385's grand jury testimony that he field tested the drugs and [*62] that it was "99.9 percent positive for crack cocaine" (see page 35 above) was sufficient to support the indictment.

Smith's claim that UC 6385's grand jury testimony was inadmissible under C.P.L. § 190.30(2) is baseless. Under that statute:

> A report . . . made by a public servant . . . concerning the results of an examination, comparison or test performed by him in connection with a case which is the subject of a grand jury proceeding, may, when certified by such person as a report made by him or as a true copy thereof, be received in such grand jury proceeding as evidence of the facts stated therein.

C.P.L. § 190.30(2). In other words, C.P.L. § 190.30(2) "permits a limited exception to the prohibition against hearsay in the Grand Jury" by "authoriz[ing] submission to the Grand Jury of a certified laboratory report in place of live testimony of a technician who performed tests on a controlled substance." People v. Swamp, 84 N.Y.2d at 730-31, 622 N.Y.S.2d at 474-75. Because C.P.L. § 190.30(2) only addresses the admissibility of a test report in the grand jury, it has no effect on the admissibility of UC 6385's oral testimony that he personally field tested the drugs. [28]

Accordingly, because Smith's insufficiency of the grand jury evidence claim was baseless, trial counsel was not ineffective for failing to raise this meritless claim. See, e.g., United States v. Noble, 363 F. App'x 771, 773 (2d Cir. 2010) ("An attorney's '[f]ailure to make a meritless argument does not amount to ineffective assistance.'"); United States v. Regalado, 518 F.3d 143, 149 n.3 (2d Cir. 2008); Calderon v. Perez, 10 Civ. 2562, 2011 U.S. Dist. LEXIS 8467, 2011 WL 293709 at *38 (S.D.N.Y. Jan. 28, 2011) (Peck, M.J.) ("To the extent that both state courts found that the hearing evidence established probable cause, defense counsel cannot

[28] Smith also claims [*63] that UC 6385's grand jury testimony regarding the field test was inadmissible hearsay. (Fleischmann Aff. Ex. H: Smith Pro Se 1st Dep't Br. at 11.) This claim is meritless because "the officer who performed the field test actually testified before the Grand Jury as to his own observations. Testimony of the . . . officer as to his own observations was not hearsay, and was legally competent evidence." People v. Swamp, 84 N.Y.2d at 731, 622 N.Y.S.2d at 475.

To the extent Smith is arguing that the field test should not have been admitted in the grand jury because it was not certified, this claim is also meritless because the field test report was never presented to the grand jury. (Dkt. No. 19: S. 6 ("[The prosecutor]: Just to make a record . . . with regard to the Grand Jury minutes, the field test analysis report was not admitted into evidence, but rather, the testimony regarding that. [The field test report] was not admitted by a certified public document so [C.P.L. § 190.30(2)] does not relate to the Grand Jury minutes."); Fleischmann Aff. Ex. N: Wiseman Aff. ¶ 13 ("UC 6385 testified before the grand jury regarding his conduct of the field test and the results thereof, and the field [*64] test report itself was never introduced into evidence or used in any way in the grand jury.").)

be ineffective for failing to put forth the meritless argument that there was no basis to stop" petitioner.), report & rec. adopted, 2011 U.S. Dist. LEXIS 39141, 2011 WL 1405029 (S.D.N.Y. Apr. 5, 2011); Devison v. Cunningham, 09 Civ. 1031, 2010 U.S. Dist. LEXIS 130115, 2010 WL 5060789 at *23 (S.D.N.Y. Oct. 15, 2010), report & rec. adopted, 2010 U.S. Dist. LEXIS 130107, 2010 WL 5060728 (S.D.N.Y. Dec. 8, 2010); Nickens v. Moscicki, 09 Civ. 3097, 2010 WL 2899863 at *8 (S.D.N.Y. July 21, 2010); Fabre v. Taylor, 08 Civ. 5883, 2009 U.S. Dist. LEXIS 7825, 2009 WL 162881 at *11 (S.D.N.Y. Jan. 20, 2009) [*65] (Peck, M.J.) ("[C]ounsel cannot be found ineffective for 'not pursuing a strategy doomed to failure.'"), report & rec. adopted, 2009 U.S. Dist. LEXIS 45343, 2009 WL 1457169 (S.D.N.Y. May 26, 2009).

**2. Trial Counsel Was Not Ineffective For Making Typographical Errors in a Pre-Trial Motion (Habeas Ground Six(b))**

In a pre-trial motion, trial counsel mistakenly wrote that Smith was charged with rape, robbery, menacing and assault. (Dkt. No. 17: Fleischmann Aff. Ex. KK: Konoski 12/26/05 Aff. ¶ 4.) Smith claims that trial counsel's error was "'malpractice'" and ineffective assistance, and that counsel's error "was done to deliberately bias and prejudice Judge Bonnie Wittner's [r]uling on [Smith's] 190.50 motion, Omnibus motion, and also to blind Judge Wittner to the fact that the 'Field Test Report' wasn't certified." (Dkt. No. 1: Pet. ¶ 13( 6); Dkt. No. 17: Fleischmann Aff. Ex. M: Smith Coram Nobis Motion at 9.) This claim is meritless.

Prior to the start of the trial, Smith claimed that trial counsel was "not doing a great job," and informed Justice Carruthers that counsel had filed a pre-trial motion before Justice Wittner that erroneously stated that Smith had "raped, menaced and assaulted somebody." (Dkt. No. 19: [*66] Tr. 15-17.) Counsel explained his mistake, telling Justice Carruthers that he had accidently left in a "boilerplate paragraph" from another client's motion. (Tr. 15.) Smith conceded that Justice Wittner knew about counsel's error because "[s]he said it was a technigraphical (sic). Disregard it." (Tr. 17.)

Justice Carruthers explained that Smith was not prejudiced by trial counsel's error because Justice Wittner, who reviewed the grand jury minutes and decided the pre-trial motion, "knew what the case was about. She knows this is a narcotics case. She knows it's not a case of rape, mayhem, or whatever. . . . Mistakes happen. That's . . . not why the Judge denied your motion." (Tr. 18.)

Smith's claim is meritless because he has failed to establish Strickland's second prong (see page 30 above) that he was prejudiced by trial counsel's alleged deficiency. As Justice Carruthers correctly noted, Justice Wittner read the grand jury minutes and knew that Smith was charged with a drug sale and not rape, robbery, menacing or assault. Moreover, Smith cannot show prejudice because he admits that Justice Wittner said that she would "[d]isregard" counsel's typographical error. (See page 39 above.)

Additionally, [*67] to the extent Smith claims that trial counsel's typographical error "was done to deliberately bias and prejudice" Justice Wittner against Smith (see page 39 above), this claim is rejected because Smith provides no support for this conclusory, self-serving allegation. See, e.g., Calderon v. Perez, 10 Civ. 2562, 2011 U.S. Dist. LEXIS 8467, 2011 WL 293709 at *39 (S.D.N.Y. Jan. 28, 2011) (Peck, M.J.) (Petitioner "also claims that defense counsel was ineffective for failing to 'sufficiently communicat[e]' with appellate counsel about [petitioner's] speedy trial claim. This claim is rejected since [petitioner] provides no support for this conclusory, self-serving allegation." (record citation omitted)), report & rec. adopted, 2011 U.S. Dist. LEXIS 39141, 2011 WL 1405029 (S.D.N.Y. Apr. 5, 2011); Stewart v. Greene, 05 Civ. 0566, 2009 U.S. Dist. LEXIS 108685, 2009 WL 4030833 at *3 (S.D.N.Y. Nov. 19, 2009) ("Self-serving, conclusory allegations are insufficient to establish ineffective assistance of counsel.").

Because Smith cannot show that he was prejudiced by counsel's typographical error, his ineffective assistance claim (habeas ground six (b)) should be DENIED. [29]

**3. Smith's Claim that His Counsel Waived His Right to Testify Before the Grand Jury (Habeas Ground Twelve) is Not Cognizable on Habeas Review**

Smith claims his pre-trial attorneys "precluded him from testifying before the grand jury." (Dkt. No. 1: Pet. Att.:

---

[29] As Smith has failed to demonstrate prejudice under Strickland, this Court need not address whether counsel's [*68] performance was deficient. E.g., Strickland v. Washington, 466 U.S. 668, 697, 104 S. Ct. 2052, 2069, 80 L. Ed. 2d 674 (1984) ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); accord, e.g., Torres v. Donnelly, 554 F.3d 322, 327 (2d Cir. 2009) ("As [petitioner] fails to demonstrate prejudice under the second prong of the Strickland test, we need not determine whether defense counsel's conduct fell below an objective standard of reasonableness."); see also cases cited at page 32 above.

Smith Pro Se 1st Dep't Br. Point II.) This claim is meritless because there is no federally-cognizable ineffective assistance claim concerning advice regarding the state [*69] grand jury process. As the Second Circuit explained:

> We also reject the petitioner's argument that his claim should be interpreted as a claim for ineffective assistance of counsel based on his attorney's failure to secure his right to testify before the grand jury. . . . A defendant's right to testify before the grand jury is not a constitutional right; rather, it is a statutorily created right. N.Y. Crim. Proc. Law § 190.50(5). New York courts have consistently held that counsel's failure to ensure that the defendant testifies before the grand jury does not amount to ineffective assistance of counsel.

Davis v. Mantello, 42 F. App'x 488, 491 n.1 (2d Cir. 2002) (emphasis added; citing federal & N.Y. cases), cert. denied, 538 U.S. 986, 123 S. Ct. 1803, 155 L. Ed. 2d 681 (2003); accord, e.g., Batchilly v. Nance, 08 Civ. 7150, 2010 U.S. Dist. LEXIS 33031, 2010 WL 1253921 at *41 (S.D.N.Y. Apr. 2, 2010) (Peck, M.J.), report & rec. adopted, 2011 U.S. Dist. LEXIS 34290, 2011 WL 1226260 (S.D.N.Y. Mar. 30, 2011); King v. Greiner, 02 Civ. 5810, 2008 U.S. Dist. LEXIS 74493, 2008 WL 4410109 at *47 (S.D.N.Y. Sept. 26, 2008) (Peck, M.J.), report & rec. adopted, 2009 U.S. Dist. LEXIS 58771, 2009 WL 2001439 (S.D.N.Y. July 8, 2009).[30]

As noted on pages 23-26 above, any defect in the grand jury proceedings was cured by the petit jury conviction, and thus Smith cannot show any prejudice from counsel's alleged failure to preserve his right to testify before the grand jury. Consequently, Smith's ineffective assistance of pre-trial counsel claim, based on counsels' failure to preserve his right to testify before the grand jury (habeas ground twelve), should be DENIED.

---

[30] See also, e.g., Affser v. Murray, No. 04 CV 2715, 2008 U.S. Dist. LEXIS 57598, 2008 WL 2909367 at *7 (E.D.N.Y. July 28, 2008) ("[C]ounsel's [*70] alleged failure to secure petitioner's presence before the grand jury does not constitute ineffective assistance."); Montalvo v. Annetts, 02 Civ. 1056, 2003 U.S. Dist. LEXIS 22619, 2003 WL 22962504 at *24 (S.D.N.Y. Dec. 17, 2003) (Peck, M.J.) (& cases cited therein); Turner v. Fischer, Nos. 01-CV-3251, 03-MISC-0066, 2003 U.S. Dist. LEXIS 16945, 2003 WL 22284177 at *6 (E.D.N.Y. Aug. 20, 2003) (Weinstein, D.J.) (Even "[a]ssuming . . . counsel waived [petitioner's] right to appear before the grand jury without petitioner's permission, petitioner cannot demonstrate that he was prejudiced thereby. He was afforded a jury trial and was convicted by a petit jury after testifying before it. Any prejudice suffered by petitioner was rendered harmless by his conviction at trial by the petit jury, which assessed his guilt under a heightened standard of proof."); Keeling v. Varner, Nos. 99-CV-6565, 03-MISC-0066, 2003 U.S. Dist. LEXIS 14635, 2003 WL 21919433 at *7 (E.D.N.Y. June 17, 2003) (Weinstein, D.J.) ("Petitioner claims his counsel was ineffective because he did not inform him of his right to testify before the grand jury. . . . Claims regarding the conduct of the grand jury are not cognizable in a habeas proceeding where a petit jury has heard the evidence and convicted defendant. [*71] Counsel was not ineffective in this regard. Petitioner's fair trial and due process rights were not infringed." (citation omitted)), aff'd, 142 F. App'x 506 (2d Cir. 2005), cert. denied, 546 U.S. 1106, 126 S. Ct. 1055, 163 L. Ed. 2d 882 (2006); Wilson v. Breslin, 217 F.R.D. 119, 126 (E.D.N.Y. 2003) (Weinstein, D.J.) (Even if petitioner was denied his right to testify before the grand jury, trial counsel was "not ineffective for failing to raise this claim before the trial court" since "[h]abeas relief is not warranted on this ground. The evidence of guilt at trial made irrelevant whatever grand jury error existed."); Bingham v. Duncan, 01 Civ. 1371, 2002 U.S. Dist. LEXIS 26445, 2003 WL 21360084 at *4 (S.D.N.Y. June 12, 2003) (Rejecting petitioner's claim that counsel was ineffective for failing to secure petitioner's right to testify before the grand jury: "Given that any defect in the grand jury proceeding was cured by petitioner's subsequent conviction, . . . [i]t necessarily follows as a matter of law that petitioner cannot establish that any errors made by his trial counsel with respect to the grand jury proceeding prejudiced him, thereby foreclosing the possibility of a Sixth Amendment violation." (quotation omitted)); Hutchings v. Herbert, 260 F. Supp. 2d 571, 578 & n.2 (W.D.N.Y. 2003) [*72] (Petitioner's "guilty plea cured any defect in the grand jury proceeding caused by the State's alleged failure to give [petitioner] an opportunity to appear before that body. It necessarily follows as a matter of law that [petitioner] cannot establish that any errors made by his trial attorney with respect to the grand jury proceeding prejudiced him, thereby foreclosing the possibility of a Sixth Amendment violation." Also, by failing to show "what he would have told the grand jury that would have prevented his indictment," petitioner "failed to demonstrate any prejudice resulting from the alleged failure of his attorney to ensure an opportunity for him to testify before the grand jury." (& cases cited therein)); Cates v. Senkowski, 02 Civ. 5957, 2003 U.S. Dist. LEXIS 3882, 2003 WL 1563777 at *3 (S.D.N.Y. Mar. 17, 2003) (Rejecting petitioner's claim that counsel was ineffective for failing to ensure petitioner's ability to testify before the grand jury: "Even if petitioner could establish that his counsel's assistance fell below an objective standard, he definitely has not satisfied Strickland's requirement of prejudice. . . . [C]onviction by the petit jury cures any prejudice from such an error during the grand [*73] jury proceedings."); Acosta v. Couture, 99 Civ. 9727, 2002 U.S. Dist. LEXIS 11682, 2003 WL 272052 at *8 (S.D.N.Y. Jan. 23, 2003) ("'[C]ounsel's failure to secure [a defendant's] right to testify before the grand jury does not, by itself, establish ineffective assistance of counsel.' . . . Although [petitioner] had a state statutory right to testify before the grand jury, he did not have a constitutional right and counsel's decision not to have him testify does not render his performance deficient." (& cases cited therein) (quoting Boyd v. Hawk, 965 F. Supp. 443, 451 (S.D.N.Y. 1997) (Batts, D.J. & Peck, M.J.)).

**4. Smith's Claim that State Habeas Counsel was Ineffective (Habeas Ground Ten) is not Cognizable on Habeas Review**

Smith claims that his state habeas counsel was ineffective for [*74] failing to serve the appropriate parties with Smith's habeas petition. (Dkt. No. 1: Pet. ¶ 13(10).) This claim is not cognizable on habeas review because it is well settled that "a criminal defendant has no right to counsel beyond his first appeal in pursuing state discretionary or collateral review." Coleman v. Thompson, 501 U.S. 722, 756, 111 S. Ct. 2546, 2568, 115 L. Ed. 2d 640 (1991); see, e.g., Pennsylvania v. Finley, 481 U.S. 551, 555, 107 S. Ct. 1990, 1993, 95 L. Ed. 2d 539 (1987) ("We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions, and we decline to so hold today. Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further. Thus, we have rejected suggestions that we establish a right to counsel on discretionary appeals." (citation omitted)); Evitts v. Lucey, 469 U.S. 387, 394, 105 S. Ct. 830, 834-35, 83 L. Ed. 2d 821 (1985); Murden v. Artuz, 497 F.3d 178, 194 (2d Cir. 2007) ("There is no constitutional right, however, to an attorney 'in state post-conviction proceedings' where such proceedings are not the first appeal as of right." (quoting Coleman)), cert. denied, 552 U.S. 1150, 128 S. Ct. 1083, 169 L. Ed. 2d 823 (2008).

Consequently, [*75] because state habeas is a collateral review, see, e.g., Galarza v. Murphy, No. 09cv1453, 2010 U.S. Dist. LEXIS 52384, 2010 WL 2232627 at *1 (D. Conn. May 26, 2010) ("A state habeas corpus proceeding is a form of collateral, as opposed to direct, review."), Smith has no constitutional right to counsel, and his claim that state habeas counsel was ineffective is not cognizable on federal habeas review. See, e.g., White v. Dretke, 126 F. App'x 173, 179 (5th Cir.) ("[T]here is no underlying right to counsel in state post-conviction review and there is no cognizable constitutional claim based on the ineffectiveness of state habeas counsel."), cert. denied, 546 U.S. 940, 126 S. Ct. 431, 163 L. Ed. 2d 328 (2005); Argiros v. Torres, No. 09cv1088, 2010 U.S. Dist. LEXIS 44434, 2010 WL 1840239 at *2 (D. Conn. May 6, 2010) ("[B]ecause there is no constitutional right to counsel in a state habeas proceeding, the grounds for relief asserting claims of ineffective assistance of habeas counsel are not cognizable" on federal habeas review.); Sadler v. Conn. Supreme Court, No. 04-CV-1189, 2005 U.S. Dist. LEXIS 112, 2005 WL 39135 at *2 (D. Conn. Jan. 5, 2005) ("Because there is no constitutional right to counsel in a state habeas proceeding, [petitioner] has no federal right to effective assistance of counsel [*76] in that proceeding."), aff'd, 167 F. App'x 257 (2d Cir. 2006); Atkinson v. Armstrong, No. 03CV334, 2004 U.S. Dist. LEXIS 19645, 2004 WL 2211736 at *2 (D. Conn. Sept. 29, 2004) (denying petitioner's ineffective assistance of state habeas counsel claim because "'[t]here is no constitutional right to an attorney in state post-conviction proceedings,'" and, "in the absence of a constitutional right to the assistance of counsel, there can be no claim for a constitutional violation on the basis of ineffective assistance of counsel." (quoting Coleman)); Johnson v. Brooks, 294 F. Supp. 2d 223, 232-33 (D. Conn. 2003) (Petitioner's claim alleging ineffective assistance of state habeas counsel is not cognizable on federal habeas review "because there is no constitutional right to counsel in a state habeas proceeding."); 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). [31]

**V. SMITH'S EXCESSIVE SENTENCE CLAIM (HABEAS GROUND SEVEN) IS NOT COGNIZABLE ON HABEAS REVIEW**

---

[31] See generally, e.g., Coleman v. Thompson, 501 U.S. at 752, 111 S. Ct. at 2566 ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner [*77] cannot claim constitutionally ineffective assistance of counsel in such proceedings." (citations omitted)); Wainwright v. Torna, 455 U.S. 586, 587-88, 102 S. Ct. 1300, 1301, 71 L. Ed. 2d 475 (1982) ("Since respondent had no constitutional right to counsel [for discretionary state appeals], he could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the application timely."); Dickens v. Filion, 02 Civ. 3450, 2002 U.S. Dist. LEXIS 21429, 2002 WL 31477701 at *24 (S.D.N.Y. Nov. 6, 2002) (Peck, M.J.) ("[T]he law is clear that where, as here, there is no right to counsel for a discretionary appeal, there can be no federal constitutional habeas claim of ineffective assistance of counsel."), report & rec. adopted, 2003 U.S. Dist. LEXIS 4661, 2003 WL 1621702 (S.D.N.Y. Mar. 28, 2003); Veras v. Strack, 58 F. Supp. 2d 201, 208-09 (S.D.N.Y. 1999) (Baer, D.J. & Peck, M.J.) ("Since [petitioner] had no federal Constitutional right to counsel for his discretionary appeal to the New York Court of Appeals, counsel's alleged ineffectiveness on such an appeal does not violate any federal Constitutional right to counsel (i.e., only where the federal Constitution mandates appointment of counsel does counsel's ineffectiveness deprive [*78] a criminal defendant of Constitutional rights)." (& cases cited therein)), certificate of appealability denied, 2000 WL 8249 at *1 (S.D.N.Y. Jan. 4, 2000) (Baer, D.J.) ("The petitioner's allegation in the present case that his counsel was ineffective during the discretionary appeal [to the N.Y. Court of Appeals], and thus constitutionally deprived him of his right to counsel, is therefore simply not debatable, as petitioner had no constitutional right to counsel during that appeal.").

Smith's excessive sentence claim (Dkt. No. 1: Pet. ¶ 13(7); Dkt. No. 21: Smith Traverse at 21) should be denied because it is not cognizable on habeas review.

An excessive sentence claim does not provide a basis for habeas relief, because "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992). [32]

Justice Carruthers sentenced Smith to five years imprisonment for one count of third degree criminal sale of a controlled substance. (See page 6 above.) Third degree criminal sale of a controlled substance is a class B felony. Penal Law § 220.39. Because Smith was a second felony drug offender (see page 6 above), Justice Carruthers was authorized, under New York law, to impose a maximum term of twelve years imprisonment for third degree criminal sale of a controlled substance. See [*80] Penal Law § 70.70(1)(b), (3)(b)(i).

Because Smith's sentence is within the statutory range, it is not reviewable on federal habeas corpus as "excessive." Accordingly, Smith's excessive sentence habeas claim (habeas ground seven) should be DENIED.

## VI. SMITH'S CLAIM THAT JUSTICE LABUDA ERRONEOUSLY DISMISSED SMITH'S STATE HABEAS PETITION (HABEAS GROUND NINE) IS UNEXHAUSTED, BUT DEEMED EXHAUSTED AND PROCEDURALLY BARRED

### A. The Exhaustion Doctrine: Background

Section 2254 codifies the exhaustion requirement, providing that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that — (A) the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A). [33] As the Supreme Court has made clear, "[t]he exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." Rose v. Lundy, 455 U.S. at 518, 102 S. Ct. at 1203; accord, e.g., O'Sullivan v. Boerckel, 526 U.S. at 845, 119 S. Ct. at 1732.

The Second Circuit determines whether a claim has been exhausted by applying a two-step analysis:

> First, the petitioner must have fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts. . . . Second, having presented his federal constitutional claim to an appropriate state court, and having been denied relief, the petitioner must have utilized all available mechanisms to secure [state] appellate review of the denial of that claim.

Diaz v. Coombe, 97 Civ. 1621, 1997 U.S. Dist. LEXIS 21281, 1997 WL 529608 at *3 (S.D.N.Y. June 12, 1997) (Mukasey, D.J. & Peck, M.J.) (quoting Klein v. Harris, 667 F.2d 274, 282 (2d Cir. 1981)); accord, e.g., O'Sullivan v. Boerckel, 526 U.S. at 843-48, 119 S. Ct. at 1732-34.

"The [*82] exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state

---

[32] Accord, e.g., Black v. Conway, 11 Civ. 0480, 2011 U.S. Dist. LEXIS 70838, 2011 WL 2610530 at *12 (S.D.N.Y. June 30, 2011) (Peck, M.J.); Robinson v. Smith, 09 Civ. 8222, 2011 U.S. Dist. LEXIS 52382, 2011 WL 1849093 at *27 (S.D.N.Y. May 17, 2011) (Peck, M.J.), report [*79] & rec. adopted, 2011 U.S. Dist. LEXIS 81569, 2011 WL 3163466 (S.D.N.Y. July 26, 2011); Jackson v. Lee, 10 Civ. 3062, 2010 U.S. Dist. LEXIS 121055, 2010 WL 4628013 at *44 (S.D.N.Y. Nov. 16, 2010), report & rec. adopted, 2010 U.S. Dist. LEXIS 130997, 2010 WL 5094415 (S.D.N.Y. Dec. 10, 2010); Garcia v. Rivera, 07 Civ. 2535, 2007 U.S. Dist. LEXIS 59722, 2007 WL 2325928 at *17 & n.18 (S.D.N.Y. Aug. 16, 2007) (Peck, M.J.) (& cases cited therein); see, e.g., Thomas v. Senkowski, 968 F. Supp. 953, 956 (S.D.N.Y. 1997) ("It is well established that, when a sentence falls within the range prescribed by state law, the length of the sentence may not be raised as grounds for federal habeas relief."); see also, e.g., Townsend v. Burke, 334 U.S. 736, 741, 68 S. Ct. 1252, 1255, 92 L. Ed. 1690 (1948) (severity of sentence generally not reviewable on habeas).

[33] See, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 842, 119 S. Ct. 1728, 1731, 144 L. Ed. 2d 1 (1999); [*81] Rose v. Lundy, 455 U.S. 509, 515-16, 102 S. Ct. 1198, 1201, 71 L. Ed. 2d 379 (1982) ("The exhaustion doctrine existed long before its codification by Congress in 1948" in 28 U.S.C. § 2254.); Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 512, 30 L. Ed. 2d 438 (1971); Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994), cert. denied, 514 U.S. 1054, 115 S. Ct. 1436, 131 L. Ed. 2d 316 (1995); Pesina v. Johnson, 913 F.2d 53, 54 (2d Cir. 1990); Daye v. Attorney Gen., 696 F.2d 186, 190-94 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048, 104 S. Ct. 723, 79 L. Ed. 2d 184 (1984).

courts." Daye v. Attorney Gen., 696 F.2d at 191. [34] The Second Circuit has held that a federal habeas petitioner must have alerted the state appellate court that a federal constitutional claim is at issue. E.g., Cox v. Miller, 296 F.3d at 99; Jones v. Vacco, 126 F.3d at 413-14; Grady v. LeFevre, 846 F.2d 862, 864 (2d Cir. 1988); Petrucelli v. Coombe, 735 F.2d 684, 688-89 (2d Cir. 1984); Daye v. Attorney Gen., 696 F.2d at 191. In Daye, the Second Circuit en banc stated:

> [T]he ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution, include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

Daye v. Attorney Gen., 696 F.2d at 194. [35]

The Supreme Court has confirmed the long-held view of the Second Circuit that "a state prisoner must present his claims to a state supreme [i.e., highest] court in a [*84] petition for discretionary review in order to satisfy the exhaustion requirement." O'Sullivan v. Boerckel, 526 U.S. at 839-40, 119 S. Ct. at 1730. [36]

**B. Application to Smith's Claim**

Smith claims that Justice LaBuda erred in dismissing Smith's state habeas petition for failure to serve the appropriate parties (habeas ground nine). (Dkt. No. 1: Pet. ¶ 13(9); Dkt. No. 21: Smith Traverse at 11-16). Smith, however, failed to appeal Justice LaBuda's decision to the Third Department. (See page 12 above.)

Under New York law, a defendant has a right to appeal "a judgment refusing to grant a writ of habeas corpus," and this appeal must be taken within thirty days after the opposing party serves the defendant with the court's decision. See C.P.L.R §§ 5513(a), 7011. Here, Smith's thirty-day period to appeal Justice LaBuda's decision began on February 8, 2011, the day after the Attorney General's office served Smith with a copy of the decision. (See page 12 above.) On March 3, 2011, Smith requested an extension of time to appeal Justice LaBuda's decision. (See page 12 above.) On April 15, 2011, the Third Department denied Smith's request [*86] for an extension. (See page 12 above.) Because Smith has still not appealed Justice LaBuda's decision (see page 12 above) and the deadline to do so has long since passed, Smith would be barred from raising this claim to the Third Department. Cf., e.g, Santos v. Rock, 10 Civ. 2896, 2011 U.S. Dist. LEXIS 86370, 2011 WL 3449595 at *6-9 (S.D.N.Y. Aug. 5, 2011) (petitioner's claims were unexhausted, but deemed exhausted and procedurally barred because petitioner failed to timely appeal the denial of his C.P.L. § 440 motion to the First Department); Edmee v. Coxsackie Corr. Facility, Nos. 09-Civ-3940, 09-Civ-3939, 2009 U.S. Dist. LEXIS 95654, 2009 WL 3318790 at *2 (E.D.N.Y. Oct. 14, 2009) ("The failure to timely appeal the

---

[34] Accord, e.g., [*83] O'Sullivan v. Boerckel, 526 U.S. at 844, 119 S. Ct. at 1732; Picard v. Connor, 404 U.S. at 275-76, 92 S. Ct. at 512; Jones v. Keane, 329 F.3d 290, 294-95 (2d Cir.), cert. denied, 540 U.S. 1046, 124 S. Ct. 804, 157 L. Ed. 2d 693 (2003); Cox v. Miller, 296 F.3d 89, 99 (2d Cir. 2002), cert. denied, 537 U.S. 1192, 123 S. Ct. 1273, 154 L. Ed. 2d 1026 (2003); Jones v. Vacco, 126 F.3d 408, 413 (2d Cir. 1997).

[35] Accord, e.g., Smith v. Duncan, 411 F.3d 340, 348 (2d Cir. 2005); Jackson v. Edwards, 404 F.3d 612, 618 (2d Cir. 2005); Rosa v. McCray, 396 F.3d 210, 217-18 (2d Cir.), cert. denied, 546 U.S. 889, 126 S. Ct. 215, 163 L. Ed. 2d 201 (2005); St. Helen v. Senkowski, 374 F.3d 181, 182-83 (2d Cir. 2004), cert. denied, 543 U.S. 1058, 125 S. Ct. 871, 160 L. Ed. 2d 785 (2005); Cox v. Miller, 296 F.3d at 99; Ramirez v. Attorney Gen., 280 F.3d 87, 95 (2d Cir. 2001); Levine v. Comm'r of Corr. Servs., 44 F.3d 121, 124 (2d Cir. 1995), cert. denied, 520 U.S. 1106, 117 S. Ct. 1112, 137 L. Ed. 2d 313 (1997); Grady v. LeFevre, 846 F.2d at 864; Garofolo v. Coomb, 804 F.2d 201, 206 (2d Cir. 1986); Petrucelli v. Coombe, 735 F.2d at 688.

[36] Accord, e.g., Rosa v. McCray, 396 F.3d at 217; Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir.), cert. denied, 544 U.S. 1025, 125 S. Ct. 1996, 161 L. Ed. 2d 868 (2005); Calderon v. Keane, 115 F. App'x 455, 457 (2d Cir. 2004); Cotto v. Herbert, 331 F.3d 217, 237 (2d Cir. 2003); Ramirez v. Attorney Gen., 280 F.3d at 94; Jordan v. LeFevre, 206 F.3d 196, 198 (2d Cir. 2000); Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir.), cert. denied, 531 U.S. 819, 121 S. Ct. 59, 148 L. Ed. 2d 26 (2000); Bossett v. Walker, 41 F.3d at 828 ("To fulfill the exhaustion requirement, a petitioner must have presented the substance of his federal claims 'to the highest court of the pertinent state.'"); Grey v. Hoke, 933 F.2d 117, 119 (2d Cir. 1991) ("a petitioner must present his federal constitutional claims to the highest court of the state before a federal court may consider the merits of the petition"); Pesina v. Johnson, 913 F.2d at 54 ("We have held that the exhaustion requirement mandates that federal claims be presented to the highest court of the pertinent state before a federal court may consider [*85] the petition," citing Daye); Daye v. Attorney Gen., 696 F.2d at 191 n.3 ("Exhaustion of available state remedies requires presentation of the claim to the highest state court from which a decision can be had.").

denial of petitioner's § 440.10 motion means that the claim is not only unexhausted, but procedurally barred under state law because it is too late to take that appeal and a state court would dismiss it on that ground."); Rodriguez v. Ercole, 08 Civ. 2074, 2008 U.S. Dist. LEXIS 86145, 2008 WL 4701043 at *3 (S.D.N.Y. Oct. 24, 2008) ("Since the petitioner can no longer move timely for permission to appeal from the denial of his CPL § 440.10 motion, his ineffective assistance of trial counsel claim is procedurally barred, and is deemed exhausted.").

"'For exhaustion [*87] purposes, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred."'" Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997) (quoting Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991) (quoting Harris v. Reed, 489 U.S. 255, 263 n.9, 109 S. Ct. 1038, 1043 n.9, 103 L. Ed. 2d 308 (1989))). [37] "In such a case, a petitioner no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. § 2254(b)." Grey v. Hoke, 933 F.2d at 120. Consequently, such procedurally barred claims are "deemed exhausted" by the federal courts. E.g., St. Helen v. Senkowski, 374 F.3d at 183; DiGuglielmo v. Smith, 366 F.3d at 135; McKethan v. Mantello, 292 F.3d at 122-23; Ramirez v. Attorney Gen., 280 F.3d at 94; Reyes v. Keane, 118 F.3d at 139; Bossett v. Walker, 41 F.3d at 828; Washington v. James, 996 F.2d 1442, 1446-47 (2d Cir. 1993), cert. denied, 510 U.S. 1078, 114 S. Ct. 895, 127 L. Ed. 2d 87 (1994); Grey v. Hoke, 933 F.2d at 120-21.

Consequently, because Smith did not appeal Justice LaBuda's decision to [*89] the Third Department and may no longer do so, Smith's claim that Justice Labuda's decision was erroneous (habeas ground nine) is unexhausted, but deemed exhausted and procedurally barred.

## VII. SMITH'S CLAIM THAT HIS TRIAL CONVICTION WAS BASED ON UC 6385'S PERJURED TESTIMONY (HABEAS GROUND ELEVEN) IS MERITLESS

Smith claims that UC 6385 committed perjury at trial when he testified that he field tested the drugs he had obtained from Smith (habeas ground eleven). (Dkt. No. 1: Pet. Att.: Smith Pro Se 1st Dep't Br. Point I.) [38] This claim was raised in Smith's pro se First Department brief (see page 8 above), and denied by the First Department when it "considered and rejected [Smith's] pro se claims." People v. Smith, 52 A.D.3d 232, 233, 859 N.Y.S.2d 75, 76 (1st Dep't), appeal denied, 11 N.Y.3d 741, 894 N.E.2d 664, 864 N.Y.S.2d 400 (2008).

"A petitioner's claim that his conviction was based on perjured testimony is analyzed under the Due Process Clause of the Fourteenth Amendment." Duncan v. Fischer, 410 F. Supp. 2d 101, 116 (E.D.N.Y. 2006) (citing Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177, 3 L. Ed. 2d 1217 (1959)); [*90] accord, e.g., Drake v. Portuondo, 553 F.3d 230, 240 (2d Cir. 2009) ("Supreme Court holdings have long 'established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.'" (quoting Napue)). [39]

"Under this standard, the [Supreme] Court has said that the conviction must be set aside if (1) 'the prosecution knew, or

[37] Accord, e.g., Castille v. Peoples, 489 U.S. 346, 350, 109 S. Ct. 1056, 1059, 103 L. Ed. 2d 380 (1989) ("It would be inconsistent with [§ 2254(b)], as well as with underlying principles of comity, to mandate [*88] recourse to state collateral review whose results have effectively been predetermined . . . ."); St. Helen v. Senkowski, 374 F.3d 181, 183 (2d Cir. 2004) ("[E]ven if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it has become procedurally barred under state law."), cert. denied, 543 U.S. 1058, 125 S. Ct. 871, 160 L. Ed. 2d 785 (2005); DiGuglielmo v. Smith, 366 F.3d 130, 135 (2d Cir. 2004) (petitioner's procedurally defaulted claims deemed exhausted where he could no longer obtain state-court review because of his procedural default); McKethan v. Mantello, 292 F.3d 119, 122-23 (2d Cir. 2002) (claims deemed exhausted where they were "procedurally barred for not having been raised in a timely fashion"), cert. denied, 555 U.S. 903, 129 S. Ct. 233, 172 L. Ed. 2d 178 (2008); Ramirez v. Attorney Gen., 280 F.3d 87, 94 (2d Cir. 2001); Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994) ("[I]f the petitioner no longer has 'remedies available' in the state courts under 28 U.S.C. § 2254(b), we deem the claims exhausted."), cert. denied, 514 U.S. 1054, 115 S. Ct. 1436, 131 L. Ed. 2d 316 (1995).

[38] Smith's additional claim that UC 6385 committed perjury in the grand jury is not cognizable on habeas review, as discussed on pages 23-26 above.

[39] See also, e.g., Zahrey v. Coffey, 221 F.3d 342, 355 (2d Cir. 2000) ("It has also long been established that a prosecutor who knowingly uses false evidence at trial to obtain a conviction acts unconstitutionally."); Deberry v. Spitzer, No. 05 CV 5286, 2011 U.S. Dist. LEXIS 34217, 2011 WL 1239999 at *8 (E.D.N.Y. Feb. 17, 2011) ("It is well established that a defendant's due process rights are violated if the prosecutor knowingly uses perjured testimony to obtain a conviction."), report & rec. adopted, 2011 U.S. Dist. LEXIS 34215, 2011 WL 1211969 (E.D.N.Y. Mar. 30, 2011).

should have known, of the perjury,' and (2) 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Drake v. Portuondo, 321 F.3d 338, 345 (2d Cir. 2003) (fn. omitted) (quoting United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976)). [*91] [40]

"The petitioner has the burden of demonstrating, by a preponderance of evidence, that the witness committed perjury, and, in determining whether perjury occurred, a court must 'weigh all the evidence of perjury before it.'" Zimmerman v. Burge, 492 F. Supp. 2d at 196 (quoting Ortega v. Duncan, 333 F.3d 102, 106-07 (2d Cir. 2003)).

Here, Smith's perjury claim is based on his argument that because UC 6385 did not sign the field test report, he must have lied when he testified at trial that he field tested the drugs. (Dkt. No. 17: Fleischmann Aff. Ex. H: Smith Pro Se 1st Dep't Br. at 5.) This unjustified assumption is rejected, however, because the mere fact that UC 6385 did not sign the field test report does not indicate, or even imply, that he did not [*92] test the drugs. Because Smith provides no other support for his perjury claim beside his own speculation, his claim is rejected. See, e.g., Costanzo v. United States, 758 F. Supp. 869, 875 (S.D.N.Y. 1990) ("Since [petitioner] has failed to show that [the witness] committed perjury, that such perjured testimony was material, or that the Government knew or should have known that [the witness] committed perjury, [petitioner] is not entitled to habeas corpus relief. I find that [petitioner's] perjury claim is groundless and lacking in substance; he asserts no more than thinly veiled and baseless allegations on this ground of his petition. The perjury claim must summarily be dismissed . . . .").

Moreover, even assuming UC 6385 did not actually field test the drugs, Smith has failed to show "'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Drake v. Portuondo, 321 F.3d at 345; see cases cited on page 53 above. At trial, NYPD lab chemist Joshi Gajendra testified that he conducted a laboratory analysis and the material tested positive for cocaine. (Dkt. No. 19: Gajendra: Tr. 355-77; see page 5 above.) Therefore, even if UC 6385 had testified [*93] falsely, there is no reasonable likelihood that the jury verdict was affected because the other trial evidence established that the substance in fact contained cocaine. See, e.g., United States v. Nash, 338 F. App'x 96, 99 (2d Cir. 2009) ("[E]ven if he could demonstrate perjury, [defendant] cannot show that the 'jury probably would have acquitted in the absence of the false testimony,' given the overwhelming physical evidence of guilt."); Campbell v. Greene, 440 F. Supp. 2d 125, 148 (N.D.N.Y. 2006) ("[I]n light of the substantial evidence presented at trial that established [petitioner's] guilt of the charged crimes, there is no possibility that the jury would have acquitted [petitioner] as to either charge even in the absence of the testimony that petitioner now claims is perjurious."); Grant v. Ricks, Nos. 00-CV-6861, 03-MISC-0066, 2003 U.S. Dist. LEXIS 13641, 2003 WL 21847238 at *5 (E.D.N.Y. July 18, 2003) (Weinstein, D.J.) (Even if burglary victim testified falsely that petitioner and he were not friends, habeas relief was inappropriate because the "jury could find petitioner guilty based on the other evidence-his presence at [the victim's] apartment and the fact that he was later seen hurrying around the [*94] corner with a red cart full of items."), aff'd, 151 F. App'x 44 (2d Cir. 2005).

Accordingly, Smith's claim that his conviction was based on perjury (habeas ground eleven) should be DENIED.

## VIII. SMITH'S CLAIM THAT HIS DUE PROCESS AND CONFRONTATION RIGHTS WERE VIOLATED WHEN UC 6385 DID NOT TESTIFY AT THE PRE-TRIAL SUPPRESSION HEARING (HABEAS GROUND THIRTEEN) IS MERITLESS

Justice Wittner canceled the pre-trial Mapp/Dunaway hearing after the prosecutor stated that he would not seek to introduce at trial the crack pipe recovered during Smith's arrest. (See page 3 n.1 above.) Smith claims that his due process rights were violated when UC 6385 did not testify at the (canceled) pre-trial hearing and that Smith was "railroaded to trial without being confronted by his accuser" (habeas ground thirteen). (Dkt. No. 1: Pet. Att.: Smith Pro Se 1st Dep't Br. Point III; Dkt. No. 17: Fleischmann Aff. Ex. H: Smith Pro Se 1st Dep't Br. at 13.) This claim was raised in Smith's pro se First Department brief (see page 8 above), and denied by the First Department. People v. Smith, 52 A.D.3d 232, 233, 859 N.Y.S.2d 75, 76 (1st Dep't), appeal denied, 11 N.Y.3d 741, 894 N.E.2d 664, 864 N.Y.S.2d 400 (2008).

The First Department's [*95] decision rejecting Smith's confrontation clause claim was not contrary to or an

[40] Accord, e.g., Graham v. Greiner, 123 F. App'x 436, 437 (2d Cir. 2005); Thompson v. Artuz, No. 06-CV-0254, 2011 U.S. Dist. LEXIS 17796, 2011 WL 736060 at *9 (W.D.N.Y. Jan. 4, 2011) ("A conviction must be set aside if the prosecutor knew, or should have known, of the perjury and there is any reasonable likelihood that the false testimony affected the verdict."); Zimmerman v. Burge, 492 F. Supp. 2d 170, 196 (E.D.N.Y. 2007); Duncan v. Fischer, 410 F. Supp. 2d at 116.

unreasonable application of Supreme Court precedent because the Supreme Court has never applied the Confrontation Clause to a pre-trial suppression hearing. See, e.g., United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009) ("There is no binding precedent from the Supreme Court . . . concerning whether Crawford applies to pretrial suppression hearings."); Francischelli v. Potter, No. 03-CV-6091, 2007 U.S. Dist. LEXIS 19242, 2007 WL 776760 at *10 (E.D.N.Y. Mar. 12, 2007) ("[T]he Court can find no authority applying Crawford to a suppression hearing."). [41] The courts in this Circuit that have addressed this issue have found that the Confrontation Clause does not apply to pre-trial hearings. See, e.g., Jones v. Woods, No. 07 CV 1326, 2009 U.S. Dist. LEXIS 118045, 2009 WL 4906882 at *3 (E.D.N.Y. Dec. 18, 2009) (Confrontation Clause does not apply to pre-trial hearings); Howard v. Kelly, No. CIV-88-963, 1990 WL 139330 at *7 (W.D.N.Y. Sept. 18, 1990) ("Courts have declined to find a right to confront at pretrial hearings, during investigations, and during the sentencing stage of criminal proceedings.").

Moreover, given that Smith had the opportunity to cross-examine UC 6385 at trial and in fact did so (Dkt. No. 19: UC 6385: Tr. 315-54), his confrontation rights were not violated. See, e.g., Kentucky v. Stincer, 482 U.S. 730, 744, 107 S. Ct. 2658, 2667, 96 L. Ed. 2d 631 (1987) ("Because respondent had the opportunity for full and effective cross-examination of the two witnesses during trial, and because of the nature of the competency hearing at issue in this case, we conclude that respondent's rights under the Confrontation Clause were not violated by his exclusion from the competency hearing of the two girls."); Cameron v. Greiner, 119 F. App'x 340, 342-43 (2d Cir. 2005) ("With respect to the in camera hearings relating to the location of the undercover officer's gun, petitioner has not explained how his exclusion from the hearing precluded a meaningful opportunity for cross-examination of the undercover officer. It was never alleged that the undercover officer used her gun during the [*97] sting and defendant had a full opportunity to cross-examine her on the sting itself at trial."); Jones v. Woods, 2009 U.S. Dist. LEXIS 118045, 2009 WL 4906882 at *3 ("[B]ecause [petitioner] had the 'opportunity for full and effective cross-examinations' of the identifying witnesses at his trial, his rights under the Confrontation Clause were not violated by the hearsay accounts of the witness identification at the pretrial proceeding." (quoting Stincer)); Owens v. Portuondo, 98 Civ. 6559, 1999 U.S. Dist. LEXIS 8682, 1999 WL 378343 at *16 (S.D.N.Y. June 9, 1999) (Peck, M.J.) (Petitioner's confrontation rights were not violated when he was excluded from a material witness hearing because, inter alia, petitioner cross-examined the witness at trial.), aff'd, 205 F.3d 1324 (2d Cir. 2000).

Finally, Smith's claim that Justice Wittner violated his due process rights by canceling the pre-trial Mapp/Dunaway hearing is meritless. The purpose of the suppression hearing in this case was to address the admissibility of the crack pipe recovered from Smith when he was arrested, [42] but since the prosecutor represented that he did not intend to admit the crack pipe at trial (see page 3 n.1 above), there was no need to conduct the suppression hearing. See, e.g., [*98] Edwards v. Mazzuca, 00 Civ. 2290, 2007 U.S. Dist. LEXIS 18542, 2007 WL 2994449 at *17 (S.D.N.Y. Oct. 15, 2007) (Even though a pre-trial suppression hearing was ordered, it need not be conducted where "no physical evidence was obtained from the petitioner that the prosecution sought to use against him at his trial."). Consequently, because the prosecutor did not offer the crack pipe into evidence at trial, Smith's due process rights were not violated when Justice Wittner canceled the pre-trial suppression hearing.

Accordingly, Smith's claim that his confrontation and due process rights were violated when UC 6385 did not testify at the pre-trial suppression hearing (habeas ground thirteen) should be DENIED.

## CONCLUSION

For the reasons set forth above, Smith's habeas petition [*99] should be DENIED in its entirety and a certificate of appealability should not be issued.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have

[41] Cf., e.g., Pennsylvania v. Ritchie, 480 U.S. 39, 52, 107 S. Ct. 989, 999, 94 L. Ed. 2d 40 (1987) [*96] ("The opinions of [the Supreme] Court show that the right to confrontation is a trial right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination.").

[42] See, e.g., Timmons v. Lee, No. 10-CV-1155, 2010 U.S. Dist. LEXIS 99847, 2010 WL 3813963 at *1 n.1 (E.D.N.Y. Sept. 23, 2010) ("A Mapp hearing tests the constitutionality of the seizure of physical evidence."); Stapleton v. Graham, No. 09-CV-00382, 2010 U.S. Dist. LEXIS 143849, 2010 WL 6599472 at *2 n.4 (E.D.N.Y. Sept. 22, 2010) (Purpose of a Mapp hearing is "to determine whether evidence was obtained in violation of petitioner's Fourth Amendment right to be free from unreasonable search and seizure.").

fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. [43] Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Harold Baer, Jr., 500 Pearl Street, Room 2230, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Baer (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86, 130 L. Ed. 2d 38 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825, 121 L. Ed. 2d 696 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); [*100] Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: New York, New York

September 13, 2011

Respectfully submitted,

/s/ Andrew J. Peck

**Andrew J. Peck**

United States Magistrate Judge

---

[43] If the pro se petitioner requires copies of any of the cases reported only in Westlaw, petitioner should request copies from opposing counsel. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.2.

# Smith v. Hulihan

United States District Court for the Southern District of New York

October 17, 2012, Decided; October 17, 2012, Filed

11 CV 2948 (HB)

**Reporter**
2012 U.S. Dist. LEXIS 149585; 2012 WL 4928904

BRETT SMITH, Petitioner, - against - WILLIAM F. HULIHAN, Respondent.

**Prior History:** Smith v. Hulihan, 2011 U.S. Dist. LEXIS 103542 (S.D.N.Y., Sept. 13, 2011)

**Counsel:** [*1] Brett Smith, Petitioner, Pro se, Bronx, NY.

For William F. Hulihan, Respondent: Lisa E. Fleischmann, LEAD ATTORNEY, New York State Office of the Attorney General, New York, NY.

**Judges:** HAROLD BAER, JR., United States District Judge.

**Opinion by:** HAROLD BAER, JR.

## Opinion

### OPINION & ORDER

**Hon. Harold Baer, Jr., District Judge**[1]:

In this petition for a writ habeas corpus, brought pursuant to 28 U.S.C. § 2254, petitioner Brett Smith challenges his 2006 conviction in Supreme Court, New York County, for criminal sale of a controlled substance. I referred the case to Magistrate Judge Andrew Peck, who issued a Report and Recommendation ("R&R") that recommends denial of the petition in its entirety. *Smith v. Hulihan*, No. 11 Civ. 2948, 2011 U.S. Dist. LEXIS 103542, 2011 WL 4058764 (S.D.N.Y. Sept. 13, 2011). Through a series of submissions to the Court, *see infra* Part III, Smith has objected to the R&R. For the reasons set forth below, Magistrate Judge Peck's R&R is adopted in full and the petition is denied.

### I. STANDARD OF REVIEW

A district court "may accept, reject, or modify, in whole [*2] or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). After the parties are served with a copy of the magistrate judge's R&R, they may file objections with the court, and the court must then review de novo any part of the R&R that has been objected to. *Id.*; Fed. R. Civ. P. 72(b)(2)-(3). As to those portions that neither party objects to, the court may review for clear error.[2] *See Gomez v. Brown*, 655 F. Supp. 2d 332, 341 (S.D.N.Y. 2009); *see also United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997) ("[F]ailure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision . . . ."). In addition, to the extent that the objections filed are overly general, conclusory, or simply reiterations of a party's prior arguments, the court may review corresponding portions of the R&R under the clearly erroneous standard. *United States ex rel. Cas Redimix Concrete Corp. v. Luvin Constr. Corp.*, No. 00 Civ. 7552, 2002 U.S. Dist. LEXIS 24700, 2002 WL 31886040, at *1 (S.D.N.Y. Dec. 27, 2002). Similarly, new arguments and factual assertions cannot properly be raised for the first time in objections to the R&R, and indeed [*3] may not be deemed objections at all. *See Forman v. Artuz*, 211 F. Supp. 2d 415, 418 n.8 (S.D.N.Y. 2000); *see also Abu-Nassar v. Elders Futures, Inc.*, No. 88 Civ. 7906, 1994 U.S. Dist. LEXIS 11470, 1994 WL 445638, at *4 n.2 (S.D.N.Y. Aug. 17, 1994) (dismissing new arguments not raised before the Magistrate Judge as "untimely" because entertaining them would "undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Report is issued to advance additional arguments"). That said, when a litigant is proceeding pro se, his filings "must be construed liberally and interpreted 'to raise the strongest arguments that they *suggest*.'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)).

---

[1] Jeremy Amar-Dolan, a second-year student at Cornell Law School and a Summer 2012 intern in my Chambers, provided substantial assistance in researching and drafting this opinion.

[2] "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948).

## II. BACKGROUND

### A. Facts

Brett Smith was arrested on the night of November 3, 2005, during an undercover "buy-and-bust" operation conducted in Manhattan by the New [*4] York Police Department.[3] An undercover officer, identified as UC 6385, approached Smith on the street and requested two "dimes," or ten dollar bags of crack cocaine. Smith then asked another man, who was not apprehended, to give the officer a "twenty bag" and handed the man the officer's money. A few minutes later, NYPD officers arrested Smith. The drugs UC 6385 received during the operation were subsequently field-tested by him at his office and then confirmed to be cocaine in an NYPD laboratory test.

### B. Procedural History

Smith was tried in Supreme Court, New York County, and was convicted of one count of third-degree criminal sale of a controlled substance. *See* N.Y. Penal Law § 220.39(1) (McKinney 2012). He was sentenced to five years in prison.

Following his conviction, Smith filed a pro se motion to vacate [*5] the judgment. *See* N.Y. Crim. Proc. Law § 440.10 (McKinney 2012). This petition raised three issues, all stemming from the assertion that UC 6385 did not certify the field test report made following Smith's arrest.[4] This motion was denied by Justice Carruthers, who explained that these claims were not "legally viable," and that this had already been explained to Smith at trial. Leave to appeal the denial of this motion was denied by the Supreme Court Appellate Division, First Department. The First Department subsequently affirmed Smith's conviction. *People v. Smith*, 52 A.D.3d 232, 859 N.Y.S.2d 75 (1st Dep't 2008). The Court of Appeals denied leave to appeal. 11 N.Y.3d 741, 894 N.E.2d 664, 864 N.Y.S.2d 400 (N.Y. 2008).

Smith filed a state habeas petition in Supreme Court, Sullivan County, and asserted [*6] that the state had violated the ninety-day speedy trial provision for misdemeanors. *See* N.Y. Crim. Proc. Law § 30.30(1)(b) (McKinney 2006). The court denied the petition on December 30, 2010, for lack of personal jurisdiction over the respondent. The Third Department denied Smith's request for an extension of time to appeal, and Smith has not directly appealed the state habeas decision.

On April 22, 2011, Smith filed a pro se federal habeas petition in this Court and alleged thirteen grounds for relief. On September 13, 2011, Magistrate Judge Peck recommended that Smith's petition be denied in its entirety. R&R, 2011 U.S. Dist. LEXIS 103542, [WL] at *24.

## III. DISCUSSION

On September 19, 2011, Smith filed a motion (Reply I) requesting an extension of time to file objections to the R&R so that a "reconstruction hearing" could be held on the trial record. To this motion, he attached a lengthy memorandum (Reply I-A) dated August 1 but which had not been separately filed. I responded, by letter dated September 22, that Smith could have until October 14 to submit any additional materials to supplement the submitted memorandum, but that it would not be possible to hold a hearing on objections to the R&R. Smith subsequently made [*7] two additional filings, on September 22 and October 1 (Reply II and Reply III, respectively). All together, Smith's post-R&R filings fill thirty-seven handwritten pages, not including supporting materials and exhibits.

Virtually all of Smith's arguments stem from the fact that UC 6385's field test report was not signed and, according to Smith, was inadmissible in the Grand Jury indictment proceedings. *E.g.*, Reply III at 2 (citing N.Y. Crim. Proc. Law § 190.30(2) (McKinney 2008)). Furthermore, Smith believes that UC 6385 committed perjury when he testified before the Grand Jury. Reply I at 1-2.[5] Though much of the material is repetitive, it is possible to distill five distinct arguments from Smith's submissions.

---

[3] Unless otherwise noted, the facts and procedural history recited are taken from Magistrate Judge Peck's Report and Recommendation, 2011 U.S. Dist. LEXIS 103542, 2011 WL 4058764, at *1-6, familiarity with which is presumed. Only background relevant to the substance of Smith's filings in response to the R&R is included here. The R&R itself contains a far more exhaustive review of the history of Smith's case.

[4] New York Criminal Procedure Law § 190.30(2) provides that: "A report or a copy of a report made by a public servant . . . concerning the results of an examination, comparison or test performed by him in connection with a case which is the subject of a grand jury proceeding, may, when certified by such person as a report made by him or as a true copy thereof, be received in such grand jury proceeding as evidence of the facts stated therein."

[5] As evidence of this perjury, Smith points to UC 6385's testimony before the Grand Jury where he described what he did "after [he] received the drugs from the defendant," while he testified on the accusatory instrument that he received the drugs from the

**A. First Argument**

On November 3, 2006, Justice Carruthers denied Smith's second § 440.10 motion, which alleged ineffective assistance of counsel because Smith's attorney "failed to actively pursue an issue concerning [the unsigned] field test report . . . ." Reply I-A, Ex. 16 at 1. The court denied the motion because "the trial record reveals discussion concerning this very issue" and because "motions on identical grounds have already been made and denied." *Id.*, Ex. 16 at 1-2. Smith asserts that no such discussion appears on the trial record and that the motion should have been granted, which would have given him the opportunity to prove that UC 6385 committed perjury before the Grand Jury. Reply I at 1-2. Smith believes that he is the victim of a conspiracy involving Justice Carruthers, the Assistant District Attorney, and his own defense attorney to "mischaracterize the trial record." Reply I-A at 10; Reply II at 1. Accordingly, Smith is requesting that the Court conduct a "Reconstruction Hearing" on the trial record. [*9] *E.g.*, Reply I-A at 2. However, in his original habeas petition, Smith did not address Justice Carruthers's denial of any of his motions, nor did he make any allegations regarding a conspiracy to lie about a discussion on the trial record. Accordingly, these arguments are dismissed. *See Forman*, 211 F. Supp. 2d at 418 n.8.

**B. Second Argument**

Smith argues that, in the absence of UC 6385's credible testimony before the Grand Jury or a certified field test report, the accusatory instrument could not be corroborated, and his case remains a misdemeanor. *E.g.*, Reply I-A at 1-6; Reply II at 4. As a result, Smith argues (a) that the People's failure to try Smith within ninety days violates Smith's right to a speedy trial under New York Criminal Procedure Law § 30.30(2)(a) and the Sixth Amendment; (b) that Smith's Fifth Amendment right against double jeopardy has been violated since he was charged with the same crime once as a misdemeanor and again as a felony; and (c) that a five-year sentence for a misdemeanor violates the Eighth Amendment prohibition of cruel and unusual punishment. Reply I-A at 1, 17, 21-23. These arguments essentially revisit several grounds from Smith's original petition,[6] [*10] but fail to address the R&R's disposition of these grounds. *See* R&R, 2011 U.S. Dist. LEXIS 103542, [WL] at *11, 19. As a result, these arguments cannot be construed as objections to the R&R and do not trigger de novo review.

**C. Third Argument**

Smith reiterates his assertion that his indictment was supported only by the perjured testimony of UC 6385 and the unsigned field test report, meaning (a) that the prosecution is "in non-compliance with the rules of evidence before the Grand Jury,"[7] Reply I-A at 3; and (b) that Justice Carruthers wrongly denied his § 330.30 pretrial motion based on a lie perpetrated by the three "co-conspirators" in

---

unapprehended dealer. Reply I-A at 2. In addition, at trial UC 6385 responded to a question from the prosecutor asking him what he did "with the crack cocaine that the defendant handed [him]." Pet., Ex. 4 at 308:17-18. On cross [*8] examination, the arresting officer (Summers) testified that, according to UC 6385's affidavit, the unapprehended male handed UC 6385 the drugs. Reply I-A, Ex. 5 at 403:1-5.

6 On the speedy trial issue, *compare* Pet. ¶ 5 ("My Sixth Amendment right [and §] 30.30 rights to a speedy trial have been violated. . . . The 90 days prescribed for a misdemeanor ha[ve] been exceeded."), *with* Reply I-A at 1 ("My [§] 30.30(2)(a) rights to be tried within 90 [days] for a misdemeanor ha[ve] been violated.") *and* Reply I-A at 21 ("My Sixth Amendment right [to a speedy trial] has been violated."). On the double jeopardy issue, *compare* Pet. ¶ 3 ("My Fifth Amendment Right was violated. The People . . . committed 'Double Jeopardy' [by] charging the defendant for the same crime twice. My case after exceeding 90 days for a misdemeanor should have been dismissed. . . . The People . . . used the same case and indictment n[umber] to convict the defendant . . . ."), *with* Reply I-A at 17 ("The People . . . committed 'Double Jeopardy' for charging the defendant for the same crime twice" and "failed to convert the accusatory instrument 90 days from my arraignment."). On the cruel and unusual punishment [*11] issue, *compare* Pet. ¶ 7("My Eighth Amendment Right was violated. The defendant has been 'wrongfully confined' for 5 years, on a 'misdemeanor'" and the "People knowingly presented material false information, leading to "Cruel and Unusual Punishment."), *with* Reply I-A at 21-22 ("The defendant has been wrongfully confined for 5 years on a misdemeanor" and the "People know[ing]ly used inadmissible [evidence] to wrongfully convict the defendant . . . .").

7 Smith states that the People have violated New York Criminal Procedure Law §§ 190.30(2)(3) (*see supra*, note 4), 180.60(8) (only non-hearsay evidence admissible in grand jury proceeding), 100.40(1)(c) (requiring an information to contain non-hearsay allegations supporting every element of an offense charged), and 100.15(3) (same).

violation of the Fifth Amendment,[8] *id.* at 19-20. To the extent that these arguments address denial of the pretrial motion—an argument not made in the original petition—they are dismissed. Without these arguments, what remains reiterates grounds of the petition[9] that the R&R dismissed because a "conviction transforms any defect [*12] connected with the grand jury's charging decision into harmless error". R&R, 2011 U.S. Dist. LEXIS 103542, [WL] at *10 (citing *United States v. Mechanik*, 475 U.S. 66, 68, 106 S. Ct. 938, 89 L. Ed. 2d 50 (1986)). Smith fails to address the R&R's disposition of this issue. Accordingly, these arguments fail to elicit review other than for clear error.

**D. Fourth Argument**

Smith's state habeas petition was denied by Justice LaBuda for lack of personal jurisdiction because Smith failed to serve his petition on the opposing parties. *See* R&R, 2011 U.S. Dist. LEXIS 103542, [WL] at *6. However, Smith attaches a letter from his attorney, Glenn Kroll, dated April 9, 2010, stating that he would send the amended petition "to all of the interested parties." Reply I-A, Ex. 11. This, Smith argues, shows that Justice LaBuda made an "erroneous ruling." *Id.* at 14. Furthermore, Smith states that Kroll never sent the affidavits of service as Smith requested. *Id.* at 16. This argument is essentially the same as an argument raised in the petition,[10] but again fails to address the R&R's disposition of the claim, namely that Smith failed to appeal Justice LaBuda's denial of his state habeas petition and thus that this claim is "unexhausted, but deemed exhausted and procedurally barred." R&R, 2011 U.S. Dist. LEXIS 103542, [WL] at *21. Because it cannot be construed [*14] as an objection, this point will be reviewed for clear error.

**E. Fifth Argument**

Smith alleges in his replies that the Attorney General's office deliberately failed to list Smith's § 330.30 motion (denied by Justice Carruthers on June 12, 2006) in the declaration it filed with Magistrate Judge Peck, who "seems to be overlooking" this issue. Reply III at 4. This motion, according to Smith, "reveals that Officer 6385 committed perjury" before the Grand Jury "and violated the Grand Jury rules of evidence." Reply I at 1-2. While it is true that this motion is not listed among the exhibits attached to the Attorney Generals' Declaration in Opposition [*15] to the Petition, *see* ¶ 3, it is not true that the R&R overlooks the motion. To the contrary, Magistrate Judge Peck describes this motion and the court's reasons for denying it, namely that the "minutes were already reviewed ... and found to be sufficient." R&R, 2011 U.S. Dist. LEXIS 103542, [WL] at *3. Furthermore, Smith's argument on this point, to the extent that it raises the underlying issue of the Grand Jury proceedings, is adequately addressed by the R&R as discussed above. Accordingly, Smith's filings on this point fail to raise an objection that will trigger de novo review.

**IV. CONCLUSION**

After reviewing Magistrate Judge Peck's R&R this Court concludes that there is no clear error and approves, adopts, and ratifies the R&R in its entirety. Accordingly, the petition for writ of habeas corpus is DENIED. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith. As the petition makes no substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. 28 U.S.C. § 2253. The Clerk of Court is instructed to close this motion and the case.

**SO ORDERED.**

**Date**: 10/17/12

**New York, New York**

/s/ Harold Baer, Jr.

**HAROLD BAER, JR.** [*16]

---

[8] Because Smith states that his "Fifth Amendment right had been violated" following a discussion of alleged defects in his indictment, Reply I-A at 20, I will construe this statement to invoke the prohibition on holding any person "to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury," U.S. Const. amend. V, cl. 1.

[9] *Compare* Pet. ¶ 2 "[The] Prosecutor . . . committed 'Prosecutorial Misconduct'[by] using a 'lying witness.'"), *and* Pet. ¶ 4 ("The People indicted the defendant using material false information," violating the Fifth Amendment.), [*13] *with* Reply I-A at 3 ("The Prosecutor [k]new that the[re] was no sworn signed affidavit to corroborate the accusatory instrument, so he used the sworn perjured testimony of Office[r] 6385, to deceive and manipulate the Grand Jury into indicting the defendant . . . .").

[10] *Compare* Pet. ¶ 9 ("Justice [LaBuda] made an erroneous ruling; he[] dismissed my state writ of habeas corpus petition; even though he'd received verification from [my attorney] that he'd mailed packages to all the interested parties . . . ."), *with* Reply I-A at 15 ("Justice La[B]uda blames the defendant, for not serving the respondents, in his decision December 30, 2010. But the letter that Justice Frank J. La[B]uda received from [my attorney] dated April 9, 2010, serves as evidence and verified proof, that all respondents were properly served.").

**United States District Judge**

# Brown v. City of New York

United States District Court for the Southern District of New York

September 30, 2014, Decided; September 30, 2014, Filed

No. 12CV3146-LTS-GWG

**Reporter**
2014 U.S. Dist. LEXIS 139258

ROBERT K. BROWN, Plaintiffs, -v- THE CITY OF NEW YORK et al., Defendants.

**Counsel:** [*1] Robert K. Brown, Plaintiff, Pro se, Brooklyn, NY.

For The City of New York, Police Officer Marcus McCoy, #09259, Police Officer Stephen Janec, #06088, Defendants: Aimee Kara Lulich, LEAD ATTORNEY, Nyc Law Department, New York, NY.

**Judges:** LAURA TAYLOR SWAIN, United States District Judge.

**Opinion by:** LAURA TAYLOR SWAIN

## Opinion

MEMORANDUM OPINION AND ORDER

Plaintiff Robert K. Brown ("Plaintiff") brings this action against Defendants the City of New York ("City of New York") and New York City Police Department ("N.Y.P.D.") Officers Marcus McCoy ("McCoy") and Stephen Janec[1] ("Janec," collectively, "Defendants"), pursuant to 42 U.S.C. § 1983, asserting federal claims for false arrest, unlawful imprisonment and malicious prosecution, as well as state law claims for false arrest and intentional infliction of emotional distress, stemming from Plaintiff's December 13, 2010, arrest and subsequent imprisonment.[2] Defendants move for summary judgment, pursuant to Federal Rule of Civil Procedure 56, arguing that there was probable cause to arrest the Plaintiff; that any search and/or imprisonment of the Plaintiff was lawful; that Plaintiff fails to state a claim for malicious prosecution; and that, to the extent that Plaintiff intends to bring any state law claims, those claims are [*2] meritless. The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367. The Court has considered carefully the parties' submissions and arguments and, for the following reasons, the Defendants' motion is granted in its entirety.

BACKGROUND[3]

Plaintiff was arrested on December 13, 2010, shortly after 1:00 p.m., in the vicinity of 84th Street and Park Avenue in Manhattan, New York. (Def. 56.1 St. ¶ 8.) Earlier that day, two men, identified as E.K. and O.M., had called the authorities to report that the van that they were using, which belonged to Wynne Plumbing and Heating, had been [*3] broken into while it was parked on 85th Street. (Id. ¶ 6.) Defendants McCoy and Janec responded to the complaint, which they heard about over the police radio. (Id. ¶ 7.)[4]

The two complainants, E.K. and O.M., told Officer McCoy that they had seen Plaintiff in the driver's seat of the van, attempting to start the ignition in the van and that, when E.K. followed Plaintiff as he attempted to flee, the Plaintiff

---

[1] Plaintiff refers to Defendant Janec as "Janee" in his papers.

[2] In his Complaint and his opposition to Defendants' Motion for Summary Judgment, Plaintiff also appears to allege that he was subject to an unlawful search, although he does not assert this as a separate claim.

[3] Facts recited as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory contrary factual proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements ("Def. 56.1 St." or "Pl. 56.1 St.") incorporate by reference the parties' citations to underlying evidentiary submissions.

[4] Plaintiff argues that there was no 911 call made to the police officers. (Pl 56.1 St. ¶ 6; see also Pl. Mem. In Opp. (ECF docket entry no. 43) at ECF pp. 40, 55.) Although Plaintiff cites to a New York City Police Department "Stop, Question & Frisk Report," which indicates that the police officers were not on a radio run on the afternoon of Plaintiff's arrest (see id., Ex. F); the New York City Police Complaint Report from the same incident indicates that the victims' complaint was received by the police over the radio (see Declaration of Aimee K. Lulich ("Lulich Decl."), Ex. E). For the purposes of the instant motion, it does not matter how the police officers first heard about the complaint, as the victims identified the Plaintiff once the officers had arrived on the scene.

waved a hammer [*4] near E.K.'s face and said something to the effect of "wait a second." (Def. 56.1 St. ¶¶ 9-11.) Officer Janec's memo book indicates that he watched a surveillance video of the parked van at 1:25 p.m., after Plaintiff was arrested. (Lulich Decl., Ex. L.) In his opposition to Defendants' motion for summary judgment, Plaintiff repeatedly alleges that, because he cannot be seen in the video, it exonerates him, and that McCoy violated his rights and was complicit in a false arrest and malicious prosecution by suppressing or withholding the "exculpatory" video. The Court has reviewed the security video, a copy of which was provided to the Court by the Defendants. It shows only a partial view of the van and neither the passenger side door of the van, through which the Plaintiff is accused of having entered, nor pedestrian traffic approaching the door on that side of the vehicle is visible. (Lulich Decl., Ex. M.)

E.K. and O.M. identified Plaintiff as the person who had broken into their van and he was arrested near the scene of the crime, at 84th Street and Park Avenue. (Def. 56.1 St. ¶¶ 7-9.) When he was arrested, a backpack containing, among other things, a hammer, screwdrivers and a knife, [*5] was vouchered as evidence belonging to the Plaintiff. (Lulich Decl., Ex. H.) Plaintiff denies that the hammer, screwdrivers and knife were his, and asserts that they were actually plumbing tools belonging to E.K. and O.M. that were found on the ground. (Pl. 56.1 St. ¶ 7; Pl. Mem. in Opp. (ECF docket no. 43) at ECF p. 63.) Plaintiff also alleges that he had been "in a pizzaria[sic] having coffee-tea and pastries with a woman at 86th Street and the corner of Lexington Avenue," and then had walked up 84th Street to Park Avenue to pick up a car that he had borrowed, before he was arrested. (Pl. 56.1 St. ¶ 7; Pl. Mem. in Opp. at ECF p. 21.) Plaintiff contends that Defendants McCoy and Janec pulled up in the police car next to Plaintiff and jumped out of the car, that one of the police officers had a gun in his hand and that they handcuffed the Plaintiff and forcefully searched him before putting him in the back seat of the police car. (Pl. Mem. in Opp at ECF p. 21.)

Plaintiff alleges that he was then made to wait in the police car with the heater running full blast and that, as a diabetic with high blood pressure and asthma, he suffered from having his blood circulation restricted by the handcuffs with the heat running [*6] so high. (Id.) According to Plaintiff, when Defendants McCoy and Janec returned to the police car he told them that he was having breathing problems and heart palpitations and they arranged to have an ambulance meet them at the police station and take him to the hospital. (Id.)[5] Plaintiff states that he was returned to the police station six to eight hours later, after being treated at the hospital, and that Defendant McCoy, while processing Plaintiff's paperwork, made a comment to the effect of "what was being done to the plaintiff was not right and that this is not what he joined the police department for." (Id. at ECF p. 24.) Plaintiff further alleges that Detective Lisa Moran, who had been involved in an arrest of Plaintiff on November 3, 2010, told Plaintiff that "[y]ou will not be getting out of jail this time because I will be making sure of it." (Id.)

Plaintiff's arrest was processed at the 19th Precinct and his pants and shirt from the time of his arrest were vouchered as evidence. (Def. 56.1 St. ¶ 12.) Plaintiff alleges that he remained [*7] naked (or in his underwear) and handcuffed for approximately ten minutes, before he was given back his "Red, White and Blue Jacket, his underwear, undershirt, and tan boots along with hospital pajamas to wear." (Pl. 56.1 St. ¶ 12.) (Compare Pl. Mem. In Opp. at ECF p. 26 with Lulich Decl., Ex. B., Tr. 111:9-112:6.)

At the time of his arrest, Plaintiff was on parole and was in violation of the conditions of his parole.[6] (Def. 56.1 St. ¶¶ 4-5, 8.) On November 3, 2010, Plaintiff had been arrested for, among other crimes, criminal possession of stolen property and unlawful use of a motor vehicle. (Id. ¶ 4.) The November 3, 2010, charges were pending in New York County Supreme Court under case number 2010-05448 at the time of the arrest that forms the basis of Plaintiff's allegations in this case. Plaintiff had not reported the November 3, 2010, arrest to his parole officer and had missed at least four mandatory check-ins with that officer by December 13, 2010. (Id. ¶ 5.)[7]

On December 14, 2010, Plaintiff was arraigned for attempted grand larceny in the fourth degree, menacing in the third

[5] The claims relating to the handcuffs are mentioned for the first time in his opposition and Plaintiff has not pleaded claims for excessive force in this case.

[6] In 2007, Plaintiff had been convicted of unauthorized use of a motor vehicle in the second degree, and sentenced to two to four years in prison. Plaintiff was incarcerated from October 20, 2007, to August 31, 2010, when he was released [*8] subject to the conditions of parole. (Def. 56.1 St. ¶ 3.) As part of his parole conditions, plaintiff was required to report any arrest to his parole officer and to check-in with his parole officer once a week. (Id.)

[7] In his opposition submission, Plaintiff contends that he did report the November 3, 2010, arrest to his parole officer (Pl. 56.1 St. ¶ 5), and denies that his parole was revoked, but his deposition testimony was to the contrary. See Lulich Decl., Ex. B., Tr. 78:121-22.

degree, auto stripping in the third degree, criminal mischief in the fourth degree, and possession of burglar's tools under New York County Criminal Court number 2010NY091520. (Id. ¶ 13.) E.K. and O.M. identified the Plaintiff as the perpetrator of the break-in of their van and signed affidavits attesting to this. Plaintiff's bail was set at $1.00 because there was a parole hold on Plaintiff. (Def. 56.1 St. ¶ 13.)[8] Following his arraignment, Plaintiff was remanded into custody of the New York City Department of Correction ("DOC") for violating his parole — not because of the criminal charges arising out of the December [*9] 13, 2010, incident. (Id. ¶ 14.)

From December 13, 2010, until March 28, 2012, the charges under New York Supreme Court case no. 2010-05448 and New York Country Criminal Court docket no. 2010NY091520 were both pending against the Plaintiff as separate actions. (Id. ¶ 15.) During the criminal proceedings in New York County Supreme Court case no. 2010-0558, Plaintiff was evaluated by at least two mental health professionals and found to be unfit to proceed to trial. (Id. ¶ 16.) In July 2011, Plaintiff was transferred to the Mid-Hudson Psychiatric Center, upon an Order of Commitment, and was treated there until September 2011, when he was transferred back into custody at Riker's Island. (Id.; Pl. 56.1 St. ¶ 16.)

On March 14, 2012, following a bench trial, Plaintiff was convicted of criminal possession of stolen property in the fourth degree and unauthorized use of a vehicle in the second degree, under case number 2010-05448. (Pl. 56.1 St. ¶ 17; Def. 56.1 St. ¶ 17.)[9] On March 28, 2012, Plaintiff was sentenced to two to four years on each charge. (Def. 56.1 St. ¶ 17.) However, if Plaintiff [*10] had been tried and convicted of the charges brought under docket number 2010NY09150, any sentence would statutorily have been required to run concurrently with, and not have exceeded, the sentence already imposed under case 2010-05548. Therefore, on April 10, 2012, the charges relating to the instant arrest under case number 2010NY091520 were dismissed as covered by Plaintiff's conviction in case number 2010-05448. (Def. 56.1 St. ¶ 18.)[10] Neither Defendant McCoy nor Janec testified in any of Plaintiff's criminal proceedings. (Id. ¶ 19.) From December 14, 2010, to March 28, 2012, Plaintiff was incarcerated because he violated parole prior to the December 13, 2010, arrest and from March 28, 2012, he was incarcerated pursuant to his conviction in case number 2010-05448. (Id. ¶ 22.) The only period during which Plaintiff was held on account of the charges for which he was arrested on December 13, 2010, was from the time of the arrest until his December 14, 2010, arraignment on the charges.

## DISCUSSION

Under Federal Rule of Civil Procedure 56(a), a Court should grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that it is entitled to summary judgment, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), and a "material fact" is one that might affect the outcome of a suit under governing [*12] law. See Kinsella v. Rumsfeld, 320 F.3d 309, 311 (2d Cir. 2003). When reviewing the record, the Court must assess the evidence in "the light most favorable to the [non-moving party]" and resolve all ambiguities and draw all inferences in its favor. Tufariello v. Long Island R. Co., 458 F.3d 80, 85 (2d Cir. 2006). However, the party opposing summary judgment must put forth more than a "scintilla of evidence," Anderson, 477 U.S. at 252, and "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements." Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1986) (internal citation omitted). To defeat the motion, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248.

Where a plaintiff is proceeding pro se, the Court must read the plaintiff's papers liberally and interpret them "to raise

---

[8] Plaintiff disputes that the bail was set at $1.00 because there was a parole hold on Plaintiff, but admits that it was set at $1.00. (Pl. 56.1 St. ¶ 13.)

[9] Although the Certificate of Disposition proffered by Defendants refers to a conviction upon a plea, in the sentencing transcript proffered by Plaintiff in his opposition papers, the sentencing judge discusses a bench [*11] trial and the evidence presented therein. (See Pl. Mem. in Opp., Ex. A, at ECF pp. 90-97; ECF docket entry no. 43-1, at ECF pp. 1-3.)

[10] Plaintiff disputes that the charges were dismissed as being "covered by his felony conviction and sentence" and proffers his own assertion that there was a final determination in his favor. (Pl. 56.1 St. ¶ 18.) Defendants' version is, however, corroborated by the disposition documentation proffered by Plaintiff in his opposition and by Defendants in support of this motion — the Certificate of Disposition of the charges arising from the December 13, 2010, arrest notes "DISM-CONVICTION UNRELATED DKT 5448-2010" and a "Record of Court Action" reads in relevant part "Dismissed as covered by Ind. 5448/2010." (See Pl. Opp. Mem., Ex. R., ECF docket entry no. 44-10, at ECF pp. 14-15; Lulich Decl., Ex. J.)

the strongest arguments that they suggest." Triestman v. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (internal citation omitted). However, a "pro se party's bald assertions cannot overcome a motion for summary judgment" and the plaintiff must provide the court with "some basis to believe that his version of relevant events is not fanciful." Yearwood v.LoPiccolo, No. 95 CV 2544, 1998 U.S. Dist. LEXIS 12302, 1998 WL 474073, at *3 (S.D.N.Y. Aug. 10, 1998) (internal quotation marks and citations omitted); see also Saldana v. Local 32B-32J Serv. Emps. Int'l Union, No. 03 CV 1853, 2005 U.S. Dist. LEXIS 464, 2005 WL 66895, at *2 (S.D.N.Y. Jan. 12, 2005) ("[e]ven a pro se plaintiff [ ] cannot withstand a motion for summary judgment by relying merely on the allegations of a complaint").

Individual Defendants [*13] McCoy and Janee

False Arrest Claim

Defendants move for summary judgment on Plaintiff's false arrest claim, which is asserted as a Fourth Amendment violation claim pursuant to 42 U.S.C. § 1983, as well as under New York state law. Plaintiff opposes the motion, arguing that it should be denied because the evidence would support a finding that the arrest was illegal, for lack of probable cause. A section 1983 claim for false arrest is "substantially the same" in all relevant respects as a claim for false arrest under state law. See Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003). Thus, in order to state a claim for false arrest, a plaintiff must show that "(1) the defendant intended to confine plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)); see also Hart v. City of New York, No. 11 CV 4678 (RA), 2013 U.S. Dist. LEXIS 129990, 2013 WL 6139648, at *3 (S.D.N.Y. Nov. 18, 2013).

"[T]he existence of probable cause is an absolute defense to a false arrest claim." Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir. 2006). "'Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" Torraco v. Port Authority of New York and New Jersey, 615 F.3d 129, 139 (2d Cir. 2010) (quoting Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004)). "[T]he probable cause [*14] standard is far below that of reasonable doubt." Husbands v. City of New York, 335 F. App'x 124, 127 (2d Cir. 2009). "The inquiry is limited to whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013) (internal quotation marks and citation omitted). Courts must look to the totality of the circumstances, keeping in mind that "probable cause does not require absolute certainty." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citations omitted).

Police officers do not have an affirmative duty to investigate allegations made by a complaining witness prior to effectuating an arrest. See Jaegly, 439 F.3d at 153. Police have probable cause to arrest if they receive "information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth." Miloslavsky v. AES Eng'g Soc'y Inc., 808 F. Supp. 351, 355 (S.D.N.Y. 1992), aff'd, 993 F.2d 1534 (2d Cir. 1993). "The veracity of citizen complaints [sic] who are the very victims of the very crime they report to the police is assumed." Id. Finally, even "the fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." Waldron v. Milana, 541 Fed. Appx. 5, 2013 WL 4733215, at *3 (2d Cir. 2013) (internal quotation marks and citation omitted).

Here, it is undisputed that Defendants McCoy and Janee responded to a report made by the two complaining victims, O.M. [*15] and E.K., regarding a vehicle break-in the vicinity of 85th Street and Madison Avenue. (Def. 56.1 St. ¶¶ 6-7.) O.M. and E.K. told Defendant McCoy that they saw the Plaintiff attempting to break into the van and E.K. told the police that the Plaintiff held up a hammer and told him to "wait a second." (Id. ¶¶ 8-11.) Plaintiff was arrested in the vicinity of Park Avenue and 84th Street, within half an hour of the time of the break-in, after having been identified by the victims. (Id. ¶ 8.) These circumstances are sufficient as a matter of law to establish the absolute defense of probable cause. See, e.g., Bacci v. Fairway Mkt., No. 06 CV 2407 (DAB), 2008 U.S. Dist. LEXIS 40534, 2008 WL 2139132, at *6-7 (S.D.N.Y. May 19, 2008) (finding probable cause for petit larceny and possession of stolen property where police officers were informed by employee that the employee observed plaintiff attempting to leave with unpaid for items concealed on his person). Plaintiff's argument that probable cause was lacking turns principally on his contention that, having seen the surveillance video immediately after the arrest, Defendant McCoy should have understood that the complainants' accusations were baseless. As explained above, however, the surveillance video does not exonerate Plaintiff because, although he is not seen [*16] in it, the van door that he is alleged to have broken into and that side of the van are not visible. Plaintiffs' arguments thus have no

evidentiary basis and are insufficient to frame a genuine factual dispute as to the existence of probable cause.

Defendants' motion for summary judgment on Plaintiff's federal and state law false arrest claims as against Defendants McCoy and Janec is granted. To the extent that Plaintiff also asserts claims of false imprisonment, they are dismissed as well, because false arrest and false imprisonment are synonymous under New York law. See Posr v. Doherty, 944 F.2d 91, 96 (2d Cir. 1991).

Unlawful Search Claim

Plaintiff appears to allege that he was subject to an unlawful strip search following his arrest, but he does not assert this cause of action as a separate claim. (See, e.g., Compl. ¶ 4; Pl. Mem. in Opp. at ECF p. 25.) Reading Plaintiff's papers in the light most favorable to him, however, the Court assumes that Plaintiff intends to assert such a claim. According to Plaintiff, after his arrest, while he was being processed, members of the N.Y.P.D.'s Emergency Services Unit collected his clothing and then left him alone and naked or with underwear only for approximately ten minutes before bringing [*17] him some hospital pajamas and telling the Plaintiff to put back on his socks, boots and heavy jacket. (Pl. Mem. in Opp. at ECF p. 26.)[11]

Even drawing all inferences in Plaintiff's favor, the search of Plaintiff was justified as a matter of law, both as a search pursuant to a lawful arrest and as a reasonable penological measure to protect the safety of the other inmates. See Illinois v. Lafayette, 462 U.S. 640, 645-46, 103 S. Ct. 2605, 77 L. Ed. 2d 65 (1983) ("[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification"; "[a]t the stationhouse, it is entirely proper for the police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed."); see also Florence v. Board of Chosen Freeholders of County of Burlington, 132 S. Ct. 1510, 182 L. Ed. 2d 566 (2012) (holding that the practice of conducting a strip search on all arrestees, regardless of severity of the underlying offense or individualized suspicion of possession of contraband, does not violate the [*18] Fourth Amendment). "[I]f an arrestee is taken to the police station, that is no more than a continuation of the custody inherent in the arrest status. . . . The governmental interests underlying a stationhouse search of the arrestee's person and possessions may in some circumstances be even greater than those supporting a search immediately following arrest." Lafayette, 462 U.S. at 645. However, the Fourth Amendment requires that strip searches of inmates be reasonable, see Hodges v. Stanley, 712 F.2d 34, 35 (2d Cir. 1983) (per curiam) (citing Bell v. Wolfish, 441 U.S. 520, 559, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)) and that "the need for a particular search [ ] be balanced against the resulting invasion of personal rights," Florence, 132 S. Ct. at 1516 (2012) (citation omitted). In determining whether a particular strip search is reasonable, a court "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell, 441 U.S. at 559 (collecting cases).

Here, there was a reasonable suspicion that Plaintiff was engaged in criminal activity as he was found with burglar's tools and a knife at the time of his arrest near the vicinity of the crime, and was identified by two complaining witnesses. After his arrest, it was reasonable to search Plaintiff when processing him, both for evidence from the alleged crime and for [*19] safety reasons. Arnold v. Westchester County., No. 09 CV 3727, 2012 U.S. Dist. LEXIS 12992, 2012 WL 336129, at *11 (S.D.N.Y. Feb. 3, 2012) ("prison officials have an obligation to take reasonable measures to protect the safety of the prison's inmates."), report & rec. adopted by 2012 U.S. Dist. LEXIS 33868, 2012 WL 841484 (S.D.N.Y. Mar 13, 2012). The approximately ten-minute delay in which Plaintiff was naked or wearing underwear that Plaintiff contends occurred while he was waiting for his clothing to be returned, while likely unpleasant for the Plaintiff, does not make the search unreasonable or unlawful. Defendants' motion for summary judgment is granted as to Plaintiff's unlawful search claim as against Defendants McCoy and Janec.

Malicious Prosecution Claim

Plaintiff also asserts a section 1983 claim for malicious prosecution in violation of his Fourth Amendment rights. The law imposes "a heavy burden on malicious prosecution plaintiffs." Rothstein v. Carriere, 373 F.3d 275, 282 (2d Cir. 2004) (citation omitted). To prevail on a section 1983 claim for malicious prosecution, a plaintiff must first establish the elements of a malicious prosecution claim under state law. See, e.g., Janetka v. Dabe, 892 F.2d 187, 189 (2d Cir. 1989). "To recover on a claim of malicious prosecution under New York law, a plaintiff must establish four elements: that (1) the defendant either commenced or continued a criminal

---

[11] Defendants argue that neither of the named Defendant officers conducted the search, but this is a disputed issue of fact, as Plaintiff claims that the Defendants were personally involved or, at the very least, failed to intervene.

proceeding against him; (2) that the proceeding terminated in his favor; (3) that there was no probable cause [*20] for the criminal proceeding; and (4) that the criminal proceeding was instituted in actual malice." Russo v. State of N. Y., 672 F.2d 1014, 1018 (2d Cir. 1982) (internal citations omitted). In addition to satisfying the state law elements, for a section 1983 claim to succeed there must also be a showing of "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." See Rohman v. New York City Transit Authority (NYCTA), 215 F.3d 208, 215 (2d Cir. 2000). Defendants are entitled to summary judgment dismissing Plaintiff's malicious prosecution claim for three principal reasons: there is no evidence that Defendants "initiated" the prosecution within the meaning of the relevant legal standards; there was probable cause to support the prosecution; and the prosecution was not terminated in Plaintiff's favor.

"Initiation in [the context of malicious prosecution] is a term of art," involving more than merely reporting a crime and giving testimony. "It must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act . . . One who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding." Rohman, 215 F.3d at 217 (internal quotation marks and citations omitted). An arrest alone [*21] "cannot serve as the predicate deprivation of liberty required by the Fourth Amendment because it occurred prior to [a defendant's] arraignment and without a warrant." Singer v. Fulton County Sheriff, 63 F.3d 110, 116-17 (2d Cir. 1995). "Once a criminal defendant has been formally charged, the chain of causation between the officer's conduct and the claim of malicious prosecution is broken by the intervening acts of the prosecutor, thereby abolishing the officer's responsibility for the prosecution." Jouthe v. City of New York, No. 05 CV 1374 (NGG), 2009 U.S. Dist. LEXIS 18163, 2009 WL 701110, at *11 (E.D.N.Y. March 10, 2009) (internal quotation marks and citation omitted).

Plaintiff argues that Defendant McCoy initiated the prosecution against the Plaintiff by signing the criminal complaint and that Defendant Janec helped to initiate the prosecution by signing the supporting affidavit. However, although McCoy swore out the criminal court complaint, the information regarding Plaintiff's alleged activities was obtained from the two complaining victims. Merely signing the criminal complaint and/or reporting the material information known to the officer does not override the independent prosecutorial judgment of the assistant district attorney in deciding whether to bring charges. Plaintiff also seems to allege that Defendants McCoy and Janec initiated the prosecution by withholding the security [*22] video from the District Attorney's Office Office, when the video would have allegedly exonerated him. However, there is no evidence in the record to support this contention. In fact, the Voluntary Disclosure Form, signed by the assistant district attorney, indicates that the District Attorney's Office was in possession of the video. (See Lulich Decl., Ex. N. "Voluntary Disclosure Form.") There is also no evidence to support Plaintiff's contention that the video exonerates him.

Even if Defendants McCoy and Janec could be found to have "initiated" Plaintiff's prosecution, the "existence of probable cause is a complete defense to a claim of malicious prosecution in New York." Savino, 331 F.3d at 72 (2d Cir. 2003). "The determination of probable cause in the context of malicious prosecution is essentially the same as for false arrest, 'except that [a claim for malicious prosecution] must be evaluated in light of the facts known or believed at the time the prosecution is initiated, rather than at the time of arrest.'" Danielak v. City of New York, No. 02 CV 2349, 2005 U.S. Dist. LEXIS 40901 2005 WL 2347095 at *10 (E.D.N.Y. Sept. 26, 2005) (internal quotation marks and citation omitted), aff'd, 209 F. App'x 55 (2d Cir. 2006). "In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996). Here, [*23] no new facts came to light after Plaintiff's arrest, and both E.K. and O.M. remained consistent in their identification of plaintiff and their accusations against him. N.Y.P.D. records further show that Defendant McCoy vouchered evidence (e.g. screwdrivers, a hammer etc.) that supported the complaining victims' allegations following plaintiff's arrest, suggesting that the strength of the evidence against plaintiff increased after his arrest. Nor does the record support Plaintiff's allegation that the security video proves his innocence.

As Plaintiff has not established the first two elements of his malicious prosecution claim, the claim necessarily fails. However, there are also no facts from which the Court could infer that defendants were motived by actual malice, see, e.g., Fulton v. Robinson, 289 F.3d 188, 198 (2d Cir. 2002) (affirming grant of summary judgment for defendants after the plaintiff failed to present evidence of actual malice), or that the proceedings were terminated in Plaintiff's favor, which only occurs when the final disposition of the case: (1) involves the merits and (2) tends to indicate the accused's innocence as opposed to a dismissal of cumulative charges. See, e.g., Murphy v. Lynn, 118 F.3d 938, 948 (2d Cir. 1997). "Where a prosecution did not result in [*24] an acquittal, it is generally not deemed to have ended in favor of the

accused, for purposes of a malicious prosecution claim, unless its final disposition is such as to indicate the accused's innocence." Fulton, 289 F.3d at 196. As explained above, the record indicates that the charges were dismissed as duplicative for sentencing purposes of charges on which Plaintiff had already been convicted and sentenced. That outcome is not indicative of Plaintiff's innocence of the dismissed charges. Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's claim for malicious prosecution against Defendants McCoy and Janee and that claim is dismissed.

Municipal Liability

Plaintiff also asserts a claim under 42 U.S.C. § 1983 against the City of New York. In order to state a claim against a municipality under section 1983, a plaintiff must adequately allege that a deprivation of his constitutional rights was caused by an official policy or custom of that municipality. Monell v. Dep't of Social Servs., 436 U.S. 658, 692-94, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Because Plaintiff has failed to present evidence that demonstrates that his constitutional rights were violated, the city is entitled as a matter of law to summary judgment dismissing Plaintiff's section 1983 claims against it. See Askins v. Doe No. 1, 727 F.3d 248, 253 (2d Cir. 2013) ("[u]nless a plaintiff shows that he [*25] has been the victim of a federal law tort committed by persons for whose conduct the municipality can be responsible, there is no basis for holding the municipality liable[;] Monell does not create a stand-alone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered the infliction of a tort resulting from the policy"). If a plaintiff fails to plausibly allege that municipal employees violated his or her constitutional rights, the plaintiff's Monell claim "necessarily fails as well" as against the municipal entity. Kajoshaj v. New York City Dep't of Educ., 543 Fed. Appx. 11, 2013 WL 5614113, at *4 (2d Cir. 2013).[12] Plaintiff's state law claims against the city based on respondeat superior or agency theories, for false arrest, false imprisonment and malicious prosecution are also dismissed, for lack of evidence indicating commission of the underlying violations.

Remaining State Law Claim

Plaintiff's papers may be read [*26] liberally to assert a state law claim for intentional infliction of emotional distress. As the Court is granting summary judgment dismissing all of Plaintiff's federal causes of action, the Court declines to exercise jurisdiction of any remaining state law claims. See 28 U.S.C. § 1367(c)(3); see also, Marcus v. AT & T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("where the federal claims are dismissed before trial, the state claims should be dismissed as well").

CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted. Plaintiff's federal and state law claims for false arrest, false imprisonment, and malicious prosecution, and any federal claim for illegal search, are dismissed. The Court declines to exercise supplemental jurisdiction of any remaining state law claims, which are dismissed without prejudice to litigation in state court.

This Memorandum Order resolves docket entry number 30.

The Clerk of Court is hereby requested to enter judgment in Defendants' favor and close this case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

SO ORDERED.

Dated: New York, New York

September 30, 2014

/s/ Laura Taylor [*27] Swain

LAURA TAYLOR SWAIN

United States District Judge

[12] Furthermore, aside from naked boilerplate allegations against the City of New York in his opposition, the Plaintiff has also not sufficiently demonstrated that the City of New York had a custom, policy, or practice of conducting unlawful arrests, searches, or engaging in malicious prosecution so as to sustain a section 1983 claim.

# Pascual v. Fernandez

United States District Court for the Southern District of New York

January 28, 2013, Decided; January 29, 2013, Filed

11 Civ. 7075 (RWS)

**Reporter**
2013 U.S. Dist. LEXIS 12064; 2013 WL 474292

MINERVA PASCUAL, Plaintiff, - against - S.A. MICHAEL FERNANDEZ, ET AL., Defendants.

**Prior History:** United States v. Pascual, 502 Fed. Appx. 75, 2012 U.S. App. LEXIS 23272 (2d Cir. N.Y., 2012)

**Counsel:** [*1] Minerva Pascual, Plaintiff, Pro se, Danbury, CT.

For Defendants: Louis A. Pellegrino, Assistant U.S. Attorney, UNITED STATES ATTORNEY FOR THE SOUTHERN DISTRICT OF NEW YORK, New York, New York.

**Judges:** ROBERT W. SWEET, U.S.D.J.

**Opinion by:** ROBERT W. SWEET

## Opinion

**Sweet, D.J.**

The defendants Special Agent Michael Fernandez ("Agent Fernandez"), Special Agent John Lattuca ("Agent Lattuca"), Special Agent Freddy Gomez ("Agent Gomez"), Special Agent Joseph Jerla ("Agent Jerla"), Special Agent Patricia Pliva[1]("Agent Pliva"), Special Agent Joseph Magilton ("Agent Magilton"), Special Agent Kyle Bowdy ("Agent Bowdy") and Special Agent Gonzalez ("Agent Gonzalez") (collectively, "Defendants") have moved to dismiss plaintiff Minerva Pascual's ("Plaintiff" or "Pascual") amended complaint pursuant to Fed. R. Civ. P. 12(b)(1), (b)(5) and (b)(6) ("Rule 12(b)(1)", "Rule 12(b)(5)" and "Rule 12(b)(6)", respectively). For the reasons set forth below, Defendants' motion is granted, and the amended complaint is dismissed with prejudice.

**Prior Proceedings**

On September 14, 2011, Pascual filed a complaint [*2] in the Eastern District of New York alleging various constitutional violations arising from her interactions with federal agents during the course of, and in the hours following, her arrest on September 16, 2008, as part of a "controlled delivery" of narcotics that occurred in New York City. The complaint named as defendants several federal agencies, as well as a number of individual federal agents.

The case was transferred to this District on October 7, 2011, and on November 17, 2011, Chief Judge Preska issued an order in which she found that Pascual failed to state a viable claim against any of the defendants, and directed Pascual to file an amended complaint within 60 days. See Dkt. No. 8 ("Order to Amend").

On January 11, 2012, Pascual filed an amended complaint. As opposed to the initial complaint, the amended complaint did not name any federal agencies as defendants, but did name as defendants the same individual agents who were named in the initial complaint, as well as several additional agents. The amended complaint (hereinafter, "Complaint") alleged violations of Pascual's rights under the Fourth, Eighth and Fourteenth Amendments as well as under 42 U.S.C. § 1983.

The allegations [*3] of the Complaint are set forth below and are assumed to be true for the purposes of the instant motion to dismiss. See, e.g., Musah v. Houslanger, No. 12 Civ. 3207 (RWS), 2012 U.S. Dist. LEXIS 164292, 2012 WL 5835293, at *2 (S.D.N.Y. Nov. 16, 2012).

On September 16, 2008, plaintiff Minerva Pascual drove her cousin to a location in northern Manhattan to meet with a Peruvian drug dealer. See Compl. ¶¶ 3,7. When they arrived, Pascual waited in her car and her cousin went to meet the drug dealer. Pascual's cousin was subsequently arrested by federal agents (the "Agents") while he was participating in a "rooftop rendevous [sic] with [the] Peruvian [sic] drug courier." Id. at ¶ 7. Following the arrest of Pascual's cousin, the Agents approached Pascual's car and arrested Pascual. Id.

---

[1] Pascual's complaint misspells Agent Pliva's surname as "Pelva." To avoid confusion, the correct spelling of Agent Pliva's name will be used herein.

During the course of Pascual's arrest, a male agent, Agent Fernandez, dragged her out of the car by grabbing her neck and forced her face into the car, and then handcuffed her very tightly. Id. at ¶ 9. Pascual was then driven to an alley around the corner from the location of her arrest, whereupon Agent Fernandez conducted a pat-down search of Pascual which involved touching Pascual's "breast, buttocks, and inner thighs." Id.

Pascual requested [*4] to have an opportunity to relieve herself, but was told that she could not do so until she had been brought back to the Agents' headquarters. Id. at ¶ 11. Pascual was then driven to the Narcotics Smuggling Unit located in Queens, New York (the "NSU"), a trip that lasted 45 minutes. Id. at ¶ 12.

Upon arriving at the NSU, Pascual again asked to use the bathroom, and in response was "threatened and verbally abused" by Agent Fernandez, who told Pascual that she would not be allowed to use the bathroom until she signed a consent form permitting a search of her car. Id. at ¶ 13. Pascual then gave consent for her car to be searched, and immediately thereafter Agent Fernandez ordered Agent Bowdy to take Pascual to the bathroom. Id. at ¶ 14. Agents Bowdy and Gonzalez then drove Pascual to a building and brought her to a "holding cell/place" where there was a toilet. Id. Agent Bowdy removed Pascual's handcuffs and "allowed [Pascual] no privacy" while she used the toilet, while Agent Gonzalez remained outside of the room. Id.

After Pascual used the bathroom, she was handcuffed and escorted by Agents Bowdy and Gonzalez to the NSU office, where she was subjected to a "cavity search/strip search" [*5] by Agent Pliva. Id.

Pascual was subsequently indicted for her role in the drug transaction, and on January 23, 2009, moved to suppress property seized from her car (the "Car Evidence") on the grounds that her consent to search the car was involuntary and the result of coercion. Id. at ¶ 19. The Court held a hearing in April 2009, and ruled that the consent was voluntary and therefore denied suppression. Id. Pascual's ensuing trial resulted in a mistrial. Id.

On June 9, 2010, Pascual moved to have the Car Evidence suppressed at her second trial, but the Court denied the motion. Id. at ¶ 20. At the conclusion of the second trial on October 20, 2010, Pascual was convicted. Id. at 1 21. However, Pascual remained out of prison pending her motion to reconsider the Court's denial of her motion to suppress the Car Evidence. Id. On November 3, 2010, the Court granted Pascual's motion to reconsider, and stated that it could not conclude that Pascual voluntarily consented to the search of her car, and therefore withdrew that finding. Order to Amend at 2-3. However, the Court went on to state that it nonetheless "s[aw] no basis to suppress" the Car Evidence. Id. at 3. Following this ruling, Pascual [*6] was sentenced on July 7, 2011. Id.

The instant motion was taken on submission on October 1, 2012.

## Applicable Standard

On a motion to dismiss pursuant to Rule 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 235-36, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

To survive a motion to dismiss pursuant to Rule 12 (b) (6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). Plaintiffs must allege sufficient facts to "nudge [ ] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570. Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion [*7] couched as a factual allegation." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

When a litigant is proceeding pro se, "h[er] submissions will [ ] be liberally construed and read to raise the strongest argument they suggest." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996). In addition, the submissions of pro se litigants are held to "less stringent standards than formal pleadings drafted by lawyers," Hughes v. Rowe, 449 U.S. 5, 9, 101 S.Ct. 173, 176, 66 L. Ed. 2d 163 (1980), and courts "apply [] a more flexible standard to evaluate their sufficiency tha[n] when reviewing a complaint submitted by counsel," Lerman v. Bd. of Elections in City of N.Y., 232 F.3d 135, 139-40 (2d Cir. 2000).

That being said, "pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006) (internal citation and quotation marks omitted).

**The Claims Against the Defendants are Dismissed**

Pascual purports to assert Bivens claims[2] under the Fourth, Eighth and Fourteenth Amendments, as well as 42 U.S.C. § 1983. See Compl. ¶¶ 2, 5. However, Pascual's allegations are limited to events that occurred incident [*8] to her arrest, such as unreasonable seizure and the use of excessive force. See id. at ¶ 27. Such claims are exclusively analyzed under the Fourth Amendment, rather than the Fourteenth Amendment. See Graham v. Connor, 490 U.S. 386, 394-95, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Moreover, a Bivens claim for a Fourteenth Amendment violation does not exist, as the Supreme Court has, to this date, created Bivens remedies only for violations of the Fourth, Fifth and Eighth Amendments. Arar v. Ashcroft, 532 F.3d 157, 177 (2d Cir. 2008), overruled on other grounds, 585 F.3d 559 (2d Cir. 2009) (en banc), cert. denied, 130 S. Ct. 3409, 177 L. Ed. 2d 349 (2010).

In addition, an Eighth Amendment Bivens claim is inapposite because the Eighth Amendment only protects against conduct that occurs *after* a criminal conviction, see Ingraham v. Wright, 430 U.S. 651, 671 n. 40, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977), whereas Pascual's allegations concern events that occurred around [*9] the time of her arrest, which was several years prior to her conviction.

Finally, a claim under 42 U.S.C. § 1983 claim is inapposite because that statute applies only to claims of a deprivation of a constitutional right by a defendant acting under color of *state* law, see Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics, 409 F.2d 718, 720 n. 1 (2d Cir. 1969), rev'd on other grounds, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), whereas Pascual asserts claims against *federal* agents who were acting under color of *federal* law.

Viewing Pascual's claims liberally due to her pro se status, see Graham, 89 F.3d at 79, her allegations are therefore construed as asserting causes of action under the Fourth Amendment. However, as set forth below, the allegations in the Complaint fail to state a Fourth Amendment claim against any of the Defendants.[3]

A. Agent Gomez

Pascual alleges that Agent Gomez was present for a portion of her interrogation (during which Agent Fernandez allegedly acted in an abusive nature towards her). [*10] see Compl. ¶¶ 18 & 22, but does not allege that Agent Gomez acted in an inappropriate or abusive nature towards her. Even if Pascual's allegations are construed liberally as asserting a claim of bystander liability, see Graham, 89 F.3d at 79, the claim fails since an officer is subject to bystander liability only if he fails to intercede in the face of a constitutional violation. See, e.g., Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001). Since "[v]erbal harassment or profanity alone . . . no matter how inappropriate, unprofessional, or reprehensible it may seem, does not constitute the violation of any federally protected right" if, as is the case here, there was no accompanying injury, Liriano v. ICE/DHS, 827 F. Supp. 2d 264, 271 (S.D.N.Y. 2011), Pascual fails to state a claim against Agent Gomez.

B. Agent Lattuca

Pascual alleges that Agent Lattuca took part in the interrogation in which Agent Fernandez was verbally abusive, and also that Agent Lattuca "made his own comment about my sexual preference." Compl. ¶ 22. As explained above, mere verbal abuse by an officer—regardless of how reprehensible the content may be—does not constitute a constitutional violation. See [*11] supra § A. Accordingly, Pascual fails to state a claim against Agent Lattuca.

C. Agent Magilton

Pascual alleges that (i) Agent Magilton was one of the several agents who was present at her arrest (during which Agent Fernandez allegedly used excessive force), see Compl. ¶ 8, and (ii) that Agent Magilton denied her request to use the bathroom, instead telling her "that she would have to wait until she arrived at the office." Compl. ¶ 11.

With respect to the former allegation, even if is liberally construed as asserting bystander liability against Agent Magilton for failing to intercede while excessive force was used against Pascual by another agent, Pascual nonetheless fails to state a claim. As set forth below, Pascual's allegations regarding Agent Fernandez's use of excessive force do not rise to the level of a constitutional violation, see infra § H(i), so Pascual's bystander claim against Agent Magilton, which is derivative of her claim against Agent Fernandez, fails as well.

---

2 Pursuant to the Supreme Court's decision in Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), "a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights." Camreta v. Greene, 131 S.Ct. 2020, 2031, 179 L. Ed. 2d 1118 (2011).

3 Since Pascual's claims fail on the merits, Defendants' arguments regarding deficient service of process, untimeliness, and the applicability of Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994), are not addressed.

With respect to the latter allegation, even if it is liberally construed as a claim for unreasonable seizure, Pascual has failed to state a claim because "[t]he temporary deprivation of the right to use the toilet, [*12] in the absence of serious physical harm or risk of contamination, does not rise to the level of an objective constitutional violation." Mateo v. Alexander, No. 10. Civ. 8427 (LAP)(DCF), 2012 U.S. Dist. LEXIS 34511, 2012 WL 864805, *5 (S.D.N.Y. Mar. 14, 2012); see also Steele v. County of Los Angeles, 117 Fed. Appx. 507, 508-09 (9th Cir. 2004) (holding that detaining individuals for "two to three hours" and refusing them the right to use the bathroom was not unreasonable under the Fourth Amendment); Hunter v. Namanny, 219 F.3d 825, 831 (8th Cir. 2000) (holding that a detainee does not have a *per se* right to use the toilet upon request). Since Pascual does not allege that the delay in permitting her to use the toilet resulted in serious physical harm or contamination, she fails to allege a constitutional violation arising from the denial of her request to use the bathroom.

D. Agent Jerla

Pascual alleges Agent Jerla "witnessed the altercation(s) that occurred during her arrest" and therefore "[f]ail[ed] to protect a detainee from unreasonable warrantless arrest/ seizure and failure to remedy violations while on the scene." Compl. ¶¶ 8, 24. Liberally construed, these allegations assert a bystander liability claim against [*13] Agent Jerla with respect to the alleged excessive force used during Pascual's arrest and the allegedly unreasonable search of her vehicle. As explained below, Pascual fails to state an excessive force claim, see infra § H(i), and therefore a bystander liability claim is not viable. In addition, the Court in Pascual's criminal case held that both Pascual's arrest as well as the search of her car were constitutionally reasonable, see Pl. Opp. Ex. p. A-574.

E. Agent Gonzalez

Pascual asserts a bystander liability claim against Agent Gonzalez with respect to the excessive force used during her arrest, see Compl. ¶¶ 8-9, as well as a claim premised upon the refusal to permit her to use the bathroom, see Compl. ¶ 12. The bathroom usage claim fails for the reasons stated above, see supra § C, and the excessive force claim fails for the reasons stated below, see infra § H(i).

F. Agent Bowdy

With respect to Agent Bowdy, Pascual asserts (i) a bystander liability claim premised upon the alleged excessive force used during her arrest; (ii) a claim premised upon the refusal to permit her to use the bathroom; and (iii) an invasion of privacy claim premised upon her allegation that Agent Bowdy remained [*14] in the bathroom with her while she relieved herself.

The first two claims fail for the same reasons that the identical claims asserted against Agent Gonzalez fail. See supra §§ H(i) & C. The third claim fails because Agent Bowdy's accompaniment of Pascual to the bathroom was for a legitimate security purpose, see Compl. ¶ 15, and therefore is not a constitutional violation. See, e.g., Johnson v. Phelan, 69 F.3d 144, 146 (7th Cir. 1995) (holding that there was no constitutional violation when guards of the opposite sex observed pretrial inmates in the shower and toilets).

G. Agent Pliva

Pascual's claim against Agent Pliva is based upon her allegation that Agent Pliva (who is female) performed a strip search and body cavity search of Pascua. See Compl. ¶ 18. Although a strip search may rise to the level of a constitutional violation "in the absence of particularized reasonable suspicion" that the target of the search is "carrying drugs or contraband," Sarnicola v. County of Westchester, 229 F. Supp. 2d 259, 270 (S.D.N.Y. 2002), here there was ample cause for Agent Pliva to be suspicious that Pascual was carrying drugs, since Pascual had just been arrested for taking part in a drug deal. [*15] Furthermore, Pascual acknowledges that the search took place in a private area outside the view of any male agents, and does not allege that the search was conducted in an unreasonable or abusive manner. See Compl. ¶ 19. Accordingly, Pascual's claim against Agent Pliva fails.

H. Agent Fernandez

Pascual alleges Fourth Amendment violations against Agent Fernandez arising from (i) excessive use of force in connection with Pascual's arrest, see Compl. ¶ 9; (ii) and inappropriate pat-down search following her arrest; (iii) denial of bathroom access; and (iv) verbal abuse. For the reasons stated below, Pascual fails to state a claim for any of these alleged violations.

*(i) Excessive Force*

Fourth Amendment claims regarding excessive use of force are evaluated under a reasonableness standard. *Graham*, 490 U.S. at 394. Under this standard, the reasonableness of a particular use of force must be determined from the perspective of a reasonable officer at the scene of the

incident, rather than with "20/20 vision hindsight." Id. at 396. Relevant factors in this analysis are (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; [*16] and (3) whether the subject of the use of force is actively resisting arrest or attempting to evade arrest. Id. Additionally, in order to recover under an excessive force claim, a plaintiff must claim to have been injured to some degree. Landy v. Irizarry, 884 F. Supp. 788, 799 n. 14 (S.D.N.Y. 1995).

In Pascual's description of her arrest, she alleges that Agent Fernandez "used excessive restraint of movement by physically grabbing me by my neck and forcing my face to the car," and also "put very tight hand cuufs [sic] on me behind my back." Compl. ¶ 9. Since Pascual alleges no actual injury resulting from Agent Fernandez's actions, she fails to state a constitutional claim for use of excessive force.

*(ii) Pat-Down Search*

As a matter of course, an officer may subject an arrestee to a full search incident to the arrest, provided that there was probable cause for the arrest. U.S. v. Robinson, 414 U.S. 218, 235, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973). Since Pascual was arrested while taking part in a drug deal, there was probable cause for her arrest, and therefore Agent Fernandez's decision to conduct a pat-down search of Pascual incident to the arrest is reasonable *per se* under the Fourth Amendment.

Pascual complains that [*17] Agent Fernandez's search was inappropriate because during the course of the search, Agent Fernandez touched her "breast, buttocks and . . . inner thighs area," and that it was completely inappropriate for a male officer to touch her in those areas. Compl. ¶ 9. However, the mere fact that a pat-down search was conducted on a female detainee by a male officer is not sufficient to give rise to a constitutional violation, absent any allegation of otherwise improper conduct. See Golden v. County of Westchester, No. 10-CV-8 933 (ER), 2012 U.S. Dist. LEXIS 133297, 2012 WL 4327652, *6 (Sept. 18, 2012). Here, Pascual does not allege any improper conduct, as she merely asserts that Agent Fernandez searched the areas of her body that were covered by clothing, which are precisely the areas that it would be reasonable for an officer to touch in the course of a search.[4]

*(iii) Denial of Bathroom Access*

As explained above, Pascual's allegations regarding the denial of her requests to use the bathroom do not rise to the level of a constitutional violation. See supra § C.

*(iv) Verbal Abuse*

As explained above, mere words—no matter how hurtful, intimidating or reprehensible they may be—cannot serve as the basis for a constitutional claim against an arresting officer. See supra § A,

* * *

When a motion to dismiss is granted, " [i]t is the usual practice . . . to allow leave to replead." Schindler v. French, 232 Fed. Appx. 17, 19 (2d Cir. 2007) (quoting Cortec Indus., Inc. v. Sum Holding P.P., 949 F.2d 42, 48 (2d Cir. 1991)). However, Pascual was already given an opportunity to replead after filing her initial complaint, and was even instructed specifically on the nature of the allegations she needed to include in order to make her claims viable. See Order to Amend. The fact that Pascual's amended complaint still fails to state a claim against any of the Defendants indicates that an additional attempt at repleading would be futile. Accordingly, leave to replead is denied, and the [*19] amended complaint is dismissed with prejudice. See Rivera v. Salomon Smith Barney, No. 01 Civ. 9282 (RWS), 2003 U.S. Dist. LEXIS 1231, 2003 WL 222249, at *3 (S.D.N.Y. Jan. 30, 2003) (citing Mooney v. Vitolo, 435 F.2d 838, 839 (2d Cir. 1970)).

**Conclusion**

For the reasons set forth above, the Defendants' motion to dismiss is granted with prejudice.

It is so ordered.

**New York, NY**

**January 28, 2013**

/s/ Robert W. Sweet

---

[4] Pascual's contention that it was unreasonable for Agent Fernandez to search her because her clothing was so minimal that it could not have possibly been hiding contraband is unavailing, as items such as drugs, which are often carried in very small quantities, can be concealed even under the type of clothing that Pascual alleges she was wearing at the time of [*18] her arrest. Cf. Rodriquez v. Furtado, 771 F. Supp. 1245, 1256-57 (D. Mass. 1991).

**ROBERT W. SWEET**

**U.S.D.J.**

# Patterson v. Labella

United States District Court for the Northern District of New York

September 30, 2014, Decided; September 30, 2014, Filed

6:12-cv-01572 (MAD/TWD)

**Reporter**

2014 U.S. Dist. LEXIS 137616

STEPHEN PATTERSON, Plaintiff, vs. DANIEL LABELLA, individually and in his official capacity as Utica Police Chief; MARK WILLIAMS, individually and in his official capacity as Utica Police Chief; JOHN TOOMEY, individually and in his official capacity as Utica Police Captain; LOUIS CAPRI, individually and in his official capacity as Utica Police Lieutenant; EDWARD NOONAN, individually and in his official capacity as Utica Police Officer; HOWARD BRODT, individually and in his official capacity as Utica Police Officer; OFFICER JOSHUA GRANDE, individually and in his official capacity as Utica Police Officer; JAMES HOLT, individually and in his official capacity as Utica Police Officer; TODD DUVAL, individually and in his official capacity as Utica Police Officer; MICHAEL CURLEY, individually and in his capacity as Utica Police Officer; SAMUEL GEDDES, individually and in his official capacity as Utica Police Officer; STEVEN HAUCK, individually and in his official capacity as Utica Police Officer; BRIAN BANSNER, individually and in his official capacity as Utica Police Officer; LINDA FATATA, individually and in her official capacity as Utica Corporation Counsel; CITY OF UTICA; DANIEL COZZA, individually and in his official capacity as Codes Officer; GERALD FOSTER, individually and in his official capacity as Fire Fighter; JOHN DOE, unknown individually and in his official capacity as Utica city employee, Defendants.

**Counsel:** [*1] STEPHEN PATTERSON, Plaintiff, Pro se, Utica, New York.

For Defendants: JOHN P. ORILIO, ESQ., ZACHARY C. OREN, ESQ., OF COUNSEL, OFFICE OF CORPORATION COUNSEL, Utica, New York.

**Judges:** Mae A. D'Agostino, United States District Judge.

**Opinion by:** Mae A. D'Agostino

## Opinion

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**[1]

Plaintiff commenced this action on October 19, 2012, pursuant to 42 U.S.C. § 1983 alleging that Defendants violated various constitutional rights. *See* Dkt. No. 1. Specifically, Plaintiff claims that he was subjected to, among other things, false arrest, malicious prosecution, unlawful search and seizure, conspiracy to violate his civil rights, First Amendment retaliation, cruel and unusual punishment in violation of the Eighth Amendment, and that various Defendants failed to intervene when his constitutional rights were being violated. *See generally* Dkt. No. 13.

Currently before the Court are the parties cross motions for summary judgment. *See* Dkt. Nos. 38 & 43.

**II. BACKGROUND**[2]

At all times relevant to this action, Plaintiff was a resident of Utica, New York. *See* Dkt. No. 13 at ¶ 1. The named Defendants in this action are all employed by the City of Utica. Defendant Linda Fatata is the City of Utica's Corporation Counsel. *See id.* at ¶ 3. Defendants Daniel Labella and Mark Williams are the former and current Chiefs of Police, respectively. *See id.* at ¶¶ 4-5. The remaining named Defendants are all Utica Police Officers. *See id.* at ¶¶ 6-19.

On August 31, 2008, Plaintiff signed a lease for the property located at 315 Nichols Street, Utica, New York. *See id.* at ¶

[1] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

[2] In the background section of this Memorandum-Decision and Order, the Court has partially relied on Plaintiff's [*2] amended complaint to set forth the relevant facts, insofar as such facts are also supported by the evidence in the record. Both parties' statements of material fact provide the Court with somewhat disjointed and confusing recitations of the relevant background facts.

22. Plaintiff has "habitually referred to 315 Nichols Street, Utica, New York as 'Petes.'" Dkt. No. 54-36 at ¶ 62. Although Petes caught fire sometime in early January 2010, the premises were active until the fire. *See id.* at ¶ 63. Defendants contend that Plaintiff operated Petes as an "'after-hours night club which serves alcohol[.]'" *Id.* [*3] at ¶ 68.

According to the amended complaint, Plaintiff contends that "Defendant Fatata began retaliation against plaintiff's business by placing his business on the police 'Hot Spot" list on September 7, 2008. Plaintiff was harassed and illegally videotaped by the Utica police for a year." Dkt. No. 13 at ¶ 25; *see also* Dkt. No. 54-36 at ¶ 55. On September 30, 2009, Plaintiff filed a civil rights lawsuit in response to this alleged conduct. *See Patterson v. Utica*, No. 6:09-cv-1102 (N.D.N.Y.).[3] Plaintiff alleges that, "[t]en days after the civil action was filed by the plaintiff the retaliation against plaintiff's business activities commenced with defendants Capri and Brodt initiating a[n] unjustified and unwarranted investigation against plaintiff without probable cause. This [led] to these defendants filing a false charge of illegal sale of alcohol on October 10, 2009 at 315 Nichols Street against the plaintiff." Dkt. No. 13 at ¶ 26.

Regarding the October 10, 2009 incident, the record indicates that Defendants used a confidential informant, Jacqueline Rodgers, who purchased alcohol [*4] at Pete's. *See* Dkt. No. 54-36 at ¶ 68; Dkt. No. 44 at ¶ 1; Dkt. No. 38-3 at 4. According to Ms. Rodgers statement to Defendant Brodt, upon entering Pete's and speaking with another individual, she went to the bar on the second floor. *See* Dkt. No. 38-3 at 4. Ms. Rodgers asked the bar tender what they were selling, and she said "E&J and Hennessey which is Cognac, alcohol and gin[.]" *Id.* Ms. Rodgers then purchased "a shot of E&J and a girl poured it in a cup from a cranberry juice container into a plastic cup" for five (5) dollars. *Id.* Ms. Rodgers then left Pete's and brought the purchased alcohol to Defendants Capri and Brodt who were waiting for her in a car nearby. *See id.* Ms. Rodgers then accompanied Defendants Capri and Brodt to the police station where she gave her statement. *See id.*

According to Defendant Capri, he maintained possession of the plastic cup that Ms. Rodgers had in her possession when she left Pete's. *See id.* at 7. The cup and liquid it contained were turned over to an evidence technician who sealed the evidence and sent it to the New York State Forensic Laboratory. *See id.* The "'New York State Police Forensic Investigation toxicology report that identified the liquid that [*5] Jacqueline Rodgers purchased at 315 Nichols St on October 10th 2009 contain[ed] 35% Ethanol (alcohol) by volume.'" Dkt. No. 54-36 at ¶ 69.

On October 10, 2009, Defendant Nash was assigned to park his patrol car in front of 315 Nichols Street and was brief regarding the plan to have Ms. Rodgers enter the establishment and purchase alcohol. *See id.* at 7. At approximately 2:20 a.m., Defendant Nash observed Ms. Rodgers enter Pete's with nothing in her hands. *See id.* After approximately ten minutes, Defendant Nash claims to have observed Ms. Rodgers exit the building carrying a clear plastic cup with an unknown liquid in it. *See id.* at 7-8. Defendant Nash then watched as Ms. Rodgers proceeded to the vehicle containing Defendant Capri and Brodt. *See id.* at 8.

In an Information/Complaint filed on December 7, 2009, Defendants Brodt and Capri charged Plaintiff with intentionally and knowingly selling alcohol without a license. *See id.* at 10. Specifically, the complaint reads as follows:

> On Saturday October 10th, 2009 at approximately 2:20am while at Pistol Pete's, 315 Nichols Street in the City of Utica, County of Oneida, State of New York, 13501, Stephen Patterson, who is the owner/operator/ proprietor of the business enterprise Pistol Pete's, [*6] did knowingly and intentionally have for sale and sell a shot of E & J Brandy for a fee of $5.00. The defendant, Mr. Patterson, did this without first obtaining the appropriate license from the New York State Liquor Authority. This act was also completed with the assistance of an unknown black female bartender.

*Id.*

On January 8, 2010, Plaintiff was arraigned in Utica City Court. *See* Dkt. No. 38-3 at 143-44. In addition to the charges stemming from the events of October 10, 2009, Plaintiff also had the following charges pending against him as of the date of his arraignment:

---

[3] This prior lawsuit was dismissed after Plaintiff failed to respond to the defendants' motion for summary judgment.

| **Alleged Offense** | **Date of Alleged Offense** | **Date Arraigned** | **Bail Status** |
|---|---|---|---|
| -Operating a Cabaret without a License<br>-Excessive Noise | 3-21-09 | 4-20-09 | ROR[4] |
| -Operating a Cabaret without a License<br>-Excessive Noise | 3-22-09 | 4-20-09 | ROR |
| -Operating a Cabaret without a License<br>-Excessive Noise | 3-28-09 | 4-14-09 | ROR |
| -Operating a Cabaret without a License<br>-Excessive Noise | 3-29-09 | 5-12-09 | ROR |
| -Operating a Cabaret without a License<br>-Excessive Noise | 4-11-09 (AM) | 5-12-09 | ROR |
| -Operating a Cabaret without a License<br>-Excessive Noise | 4-11-09 (PM) | 5-12-09 | ROR |
| -Excessive Noise | 5-30-09 | 6-22-09 | ROR |
| -Operating a Cabaret without a License | 5-16-09 | 6-22-09 | ROR |
| -Excessive Noise | 9-20-09 | 11-4-09 | ROR |
| -Endangering [*7] the Welfare of a Child<br>-Unlawfully Dealing with a Child<br>-Obstructing Governmental Administration<br>-Unlawful Maintenance of Premises<br>-Harassment 2nd<br>-Consumption on Premises without a License<br>-Operating a Cabaret without a License<br>-Noise Prohibited<br>-Excessive Noise | 10-24-09 | 11-4-09 | ROR |
| -Noise Prohibited | 11-7-09 | 1-6-10 | $500 (Bond Posted) |
| -Noise Prohibited | 11-7-09 | 1-6-10 | $500 (Bond Posted) |
| -Excessive Noise<br>Posted) | 12-6-09 | 1-6-10 | $500 (Bond |
| -Sale of Alcoholic Beverage without a License | 10-10-09 | 1-6-10 | $2,500 (Bond Posted) |
| -Operating a Cabaret without a License | 11-22-09 | 1-6-10 | $1,000 (Bond Posted) |
| -Unlicensed Bottle Club<br>-Operating a Cabaret without a License | 1-01-10 | 1-6-10 | $3,000 (Bond Posted) |

Dkt. No. 38-3 at 145-47.

The remainder of Plaintiffs' allegations involve events occurring on October 24, 2009. Plaintiff contends that on October 24, 2009, Defendants Noonan, Holt, Geddes, Grande, Curley, and Duval of the Special Operations Unit under the command of Defendant Capri, "showed up at a charitable teen party hosted by a your lady at 315 Nichols Street[.]" Dkt. No. 13 at ¶ 29. Plaintiff contends that, according to the police narrative, Defendants "went [*8] to 315 Nichols Street for a premise check. There were no 911 calls, crimes in progress, or no police assistance required at the location." *Id.* at ¶ 30.

Plaintiff's trial on the charges stemming from the October 24, 2009 incident occurred on June 15, 2010 in Utica City Court in front of Judge Gerald J. Popeo. *See* Dkt. No. 54-10. At trial, Defendant Duval testified that he was patrolling the East Utica area shortly after midnight when he received a call for units to respond to Pistol Pete's to assist him. *See id.*

4 The abbreviation "ROR" indicates that Plaintiff was released on his own recognizance.

at 9. When Defendant Duval arrived, he observed Defendants Noonan and Holt in front of the establishment speaking with Plaintiff. *See id.* at 10. Defendant Duval testified that he could hear loud music upon arriving and issued Plaintiff an appearance ticket for general noise violation. *See id.* at 10-11. As he was approaching, Defendant Noonan observed Plaintiff's business partner, Willie Walker, exit and enter the premises several times. *See id.* at 11. Thereafter, the neon sign outside the establishment was turned off and Defendant Duval observed "a large crowd of juveniles . . . beginning [to] exit[ ] the establishment." *See id.* Defendant Duval testified that there were approximately 100 individuals exiting the establishment [*9] and that there were anywhere between the ages of fifteen to seventeen. *See id.* at 11-12. Defendant Duval further testified that he observed Defendant Grande exit the premises with J.B., who was sixteen years of age and intoxicated. *See id.* at 13. While inside Pete's, Defendant Duval testified that he observed a bar area, empty liquor bottles scattered throughout the establishment, including some on the floor, and evidence that marijuana had been used. *See id.* at 19-20.

Defendant Holt testified that he and Defendant Noonan went to Pete's on October 24, 2009 because the illegal activity that generally occurred there happened on Friday and Saturday nights — "when they would have the gatherings there, the parties. The illegal cabaret activity." Dkt. No. 54-9 at 5-6. When he first arrived at Pistol Pete's, Defendant Holt testified that he and Defendant Noonan observed "numerous — they appeared to be juveniles — younger teenage males and females going in and out of the Nichols Street side door of the establishment, which is the common door that people normally use to enter and exit the establishment." *Id.* at 8. Defendant Holt estimated that the juveniles were anywhere between thirteen and seventeen years of age. *See id.* at 9. Defendant [*10] Holt heard loud music coming from the establishment and interviewed several of the teenagers who were loitering outside. *See id.* at 10. These teenagers advised Defendant Holt that there was "a party going on inside and there was an entry fee of $5." *Id.* Further, Defendant Holt testified that Mr. Walker advised him that they were having a private birthday party in the club. *See id.* at 11.

Defendant Holt also performed a breathalyzer test on J.B., an individual who was at Pete's on the evening of October 24, 2009 and was sixteen years of age at the time. *See* Dkt. No. 54-36 at ¶¶ 105, 114-15. The test indicated that J.B. had a blood alcohol content of at least 0.08%. *See id.* at ¶ 105; *see also* Dkt. No. 54-9 at 22-27. J.B.'s mother later confirmed that J.B. was not intoxicated before he left for the party. *See id.* at ¶ 106; *see also* Dkt. No. 54-9 at 32-33.

Defendants' testimony was supported by the deposition of Maurice D. Titus — the DJ hired to perform at the birthday party. *See* Dkt. No. 54-12 at 2-4. Mr. Titus stated that he was hired by T.S., who was celebrating her birthday at Pete's. *See id.* Mr. Titus further stated that the individuals at the party ranged from approximately fourteen to twenty-one years [*11] of age, "but the majority were definitely under twenty-one (21)." *Id.* at 3. Mr. Titus observed many under-aged attendants drinking alcoholic beverages, often straight from the bottle. *See id.* Mr. Titus also recalled a specific incident from that evening:

> At one point some drunk girl came to my DJ table and told me that a girl was passed out on the floor near the wall. The girl came to me and pointed to the girl and said 'She dead, she dead,' referring to the passed out girl. Soon after that I saw two other young girls helping the passed out girl to her feet. The girl was hardly able to walk, and was moving around like jelly, meaning that she was limp and was unable to stand on her own. I turned on the light when they were picking her up to see what happened, and when I saw them moving her I turned off the light and went back to playing music.

*Id.*; *see also* Dkt. No. 54-13 at 2-3 (supporting deposition of T.S. corroborating Defendants' testimony at trial and also stating that she was at Pete's on the evening of October 10, 2009).

Although Plaintiff was acquitted after trial of most of the charges stemming from the October 24, 2009 incident, the court found him guilty of violating New York Penal Law § 240.26 and sentenced [*12] him to fifteen days in jail. *See* Dkt. No. 54-36 at ¶ 77. Plaintiff contends that Defendants lacked probable cause to enter and search the second floor of the premises. *See* Dkt. No. 13 at ¶ 34. Plaintiff further contends that Defendants "removed old liquor and beer bottles that were stored in the basement garbage from the prior owner and prior events that took place at the premise and placed these bottles on the second floor of the premise where the teen party took place. The defendants created a crime scene." *Id.* at ¶ 35. Further, Plaintiff alleges that the Utica Dispatch, WKTV, YNN, and Utica Daily news received a press release by Defendant LaBella accusing Plaintiff of serving alcohol to minors at the October 24, 2009 party. *See id.* at ¶ 40.

On January 1, 2010, Utica City Court Judge John Balzano issued a search warrant for the interior and exterior of Pete's, to be executed between 12:00 a.m. and 6:00 a.m. that same day. *See* Dkt. No. 54-21. The warrant indicated that it was to seek "[e]vidence of the operation of a 'cabaret'

and/or of the illegal sale or consumption of alcohol; evidence of the names and addresses of persons on or about the premises." *See id.* at 2. Investigator Laurey submitted the [*13] search warrant application. *See id.* at 3. The application detailed the various incidents that Defendants had responded to in October of 2009, as well as road checks that they had conducted involving individuals who had been at 315 Nichols Street. *See id.* at 4. Additionally, the application noted that "[o]n December 16, 2009 the Honorable Samuel D. Hester Supreme Court Justice ruled that the owner of 315 Nichols St. Utica NY, Stephen Patterson, [is] prohibit[ed] persons from using the property for uses not permitted under the zoning of the property without having gotten either a special permit or variance from the zoning board of appeals and that would include operation as a bar or restaurant or similar commercial use." *Id.* After receiving the injunction, Plaintiff drafted a letter to Defendant Williams requesting that he be permitted to operate the premises at 315 Nichols Street on New Years Eve of 2009. *See id.* Further, the application indicates that, "[o]n December 31, 2009 a concerned citizen presented a flyer stating that Petes will be holding a New Years Eve party. The flyer also states that VH1 Miss New York will be attending along with numerous DJ's. The flyer further states that free food and free drinks will [*14] be provided." *Id.* Further, the flyer states "GIVE ME $20 B4 12AM. PETE'S LAST PARTY. PETE'S LAST PARTY. 10PM UNTIL YOU QUIT." Dkt. No. 54-26 at 2.

In the early morning hours of January 1, 2010, Defendants executed the search warrant for 315 Nichols Street. *See* Dkt. No. 54-29. When they arrived, Plaintiff was at the front door and was served with the warrant. *See id.* at 17. The first floor of the bar was empty, but Defendants could hear loud music coming from the second floor. *See id.* When Defendants proceeded to the second floor, they observed people dancing and at the bar. There was a DJ playing music and alcohol was being consumed. *See id.* Defendants included a video of their execution of the warrant, which corroborates their account of what was found. *See* Dkt. No. 53.

On May 12, 2010, a Report and Recommendation was issued by the Nuisance Abatement Hearing Panel following an administrative hearing. *See* Dkt. No. 38 at Exhibit "7." The Report and Recommendation recommended that Plaintiff and Willie Walker "be prohibited and banned from operating any night club, cabaret, café, restaurant, banquet hall, after-hours club, dance hall, concert hall, meeting room, or any other place of public assembly [*15] or public accommodation at the premises located at 313-315 Nichols Street in Utica, New York." *Id.* On May 14, 2010, Defendant LaBella, as the Commissioner of Public Safety, adopted the Report and Recommendation and determined that the prohibition shall be for one year. *See id.* Further, Defendant LaBella revoked any Certificate of Occupancy issued by the City of Utica. *See id.*

Currently before the Court are the parties' cross-motions for summary judgment.

## III. DISCUSSION

### A. Applicable law

#### *1. Summary judgment standard*

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, [*16] the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652

(1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing [*17] *Showers v. Eastmond*, 00 CIV. 3725, 2001 U.S. Dist. LEXIS 6473, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

*2. False arrest*

"A § 1983 claim for false arrest, . . . including arrest without probable cause, . . . is substantially the same as a claim for false arrest under New York law[.]" *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted). Under both New York law and the Fourth Amendment to the United States Constitution, the elements of a false arrest action are as follows: "'(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) (quotation omitted).

"'Justification may be established by showing that the arrest was based on probable cause.'" *Savino v. City of N.Y.*, 331 F.3d 63, 76 (2d Cir. 2003) (quotation omitted). Probable cause exists "when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed a crime or is committing a crime.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quotation omitted). "The existence of probable cause must be determined [*18] on the basis of the totality of the circumstances, . . . and 'where law enforcement authorities are cooperating in an investigation . . . , the knowledge of one is presumed shared by all.'" *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir. 1989) (internal citation and quotation omitted). "An officer retains probable cause to arrest a plaintiff 'even if the probable cause was for a crime different from what the police officers believed to have been committed.'" *Davis v. City of New York*, 373 F. Supp. 2d 322, 330 (S.D.N.Y. 2005) (quotation and other citations omitted).[5]

*3. Malicious prosecution*

"The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person — *i.e.*, the right to be free of unreasonable or unwarranted restraints on personal liberty." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995). To assert a Fourth Amendment claim for malicious prosecution under section 1983, a plaintiff must show a deprivation of her liberty consistent with the concept of "seizure," so as to ensure that the harm suffered is of "constitutional proportions." [*19] *See id.*

The elements of malicious prosecution under section 1983 are virtually identical to the elements of the same claim under New York law. *See Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992) (citations omitted). To state a cause of action for malicious prosecution in New York, the plaintiff must prove "'(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) (quotation omitted). To sustain a malicious prosecution claim pursuant to section 1983, "the state law elements must be met, and there must also be a showing of a 'sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.'" *Rutigliano*, 326 Fed. Appx. at 8-9 (quoting *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)). "Unlike an arrest, which only requires probable cause that 'the suspect had committed . . . *an* offense[,]' a prosecution requires probable cause 'to charge [the suspect] with *each* of the crimes.'" *Kavazanjian v. Rice*, No. 03-CV-1923, 2005 U.S. Dist. LEXIS 13653, 2005 WL 1377946, *4 (E.D.N.Y. June 7, 2005) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569, 571 (2d Cir. 1996)) (emphasis added). As such, when considering Plaintiff's malicious prosecution claim, the Court must individually consider each count with which Plaintiff was charged. *See id.* (quotation omitted).

[5] Although probable cause is a defense to both false arrest and malicious prosecution claims, the probable cause analysis for each claim requires a slightly different analysis. Therefore, the Court will analyze Plaintiff's false arrest and malicious prosecution claims separately. *See Kavazanjian v. Rice*, No. 03-CV-1923, 2005 U.S. Dist. LEXIS 13653, 2005 WL 1377946, *4 (E.D.N.Y. June 7, 2005) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569, 571 (2d Cir. 1996)).

*a. Probable cause*

"In the context of a malicious [*20] prosecution claim, probable cause under New York law is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *Rounseville v. Zahl*, 13 F.3d 625, 629-30 (2d Cir. 1994) (internal quotations and citations omitted); *see also Colon v. New York*, 60 N.Y.2d 78, 82, 455 N.E.2d 1248, 468 N.Y.S.2d 453 (1983) (holding that probable cause to prosecute consists of "such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty"). "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino*, 331 F.3d at 72; *see also Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010).

"In order to survive a motion for summary judgment on the malicious prosecution claim, [the plaintiff] must have submitted evidence sufficient for a reasonable jury to find that his indictment was procured as a result of police conduct undertaken in bad faith." *Savino*, 331 F.3d at 73. The presumption of probable cause is not rebutted "with mere 'conjecture' and 'surmise.'" *Id.* (citing *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)); *see also Sclafani v. Spitzer*, 734 F. Supp. 2d 288, 299 (E.D.N.Y. 2010) (holding that "mere conjecture and surmise that an indictment was procured as a result of conduct undertaken in bad faith cannot overcome the presumption of probable cause created in an indictment" (quotations and citation omitted)); [*21] *Fernandez v. DeLeno*, 71 F. Supp. 2d 224, 229 (S.D.N.Y. 1999) ("To survive a motion for summary judgment [on a malicious prosecution claim], plaintiff must present admissible facts and may not rely on bare allegations of facts, ultimate or conclusory facts, or legal conclusions").

"[E]ven when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (quotations and citations omitted). However, "[i]n order for probable cause to dissipate, the groundless nature of the charge must be made apparent [to the defendants] by the discovery of some intervening fact." *Lowth*, 82 F.3d at 571; *see also Husbands ex rel. Forde v. City of New York*, 335 Fed. Appx. 124, 128 (2d Cir. 2009) (citation omitted). "[T]he question is whether either the evidence gathered after arrest undermined a finding of probable cause, or whether the . . .Defendants' inquiry into the alleged [crime] so far departed from what a reasonable person would have undertaken as to itself constitute evidence of lack of probable cause." *Rae v. County of Suffolk*, 693 F. Supp. 2d 217, 227 (E.D.N.Y. 2010). "[D]efendants are not obliged to exonerate [the] plaintiff or uncover exculpatory evidence, but the 'failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'" *Lawrence v. City Cadillac*, No. 10 Civ. 3324, 2010 U.S. Dist. LEXIS 132761, 2010 WL 5174209, *6 (S.D.N.Y. Dec. 9, 2010) (quoting *Lowth*, 82 F.3d at 571).

*b. Actual malice*

Actual malice "'does not require a plaintiff to prove that the defendant [*22] was motivated by spite or hatred[,]'" but instead that he initiated or continued the criminal proceeding "'due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994) (quotation omitted). Actual malice typically is shown by circumstantial evidence, including a lack of probable cause. *See Martin v. City of Albany*, 42 N.Y.2d 13, 17, 364 N.E.2d 1304, 396 N.Y.S.2d 612 (1977). Both the Second Circuit and New York courts have held that, although

> "lack of probable cause to institute a criminal proceeding and proof of actual malice are independent and indispensable elements of a malicious prosecution action, the absence of probable cause does bear on the malice issue." . . . A jury may infer the [existence] of actual malice from the absence of probable cause.

*Maxwell v. City of N.Y.*, 156 A.D.2d 28, 34, 554 N.Y.S.2d 502 (1st Dep't 1990) (quotation and other citation omitted); *see also Lowth*, 82 F.3d at 573 (holding that, "[i]n most cases, the lack of probable cause — while not dispositive — tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause" (internal quotation omitted)).

*4. First amendment retaliation*

"[T]he Second Circuit has 'described the elements of a First Amendment retaliation claim in several ways, depending on the factual context.'" *Sloup v. Loeffler*, No. 05-CV-1766, 2008 U.S. Dist. LEXIS 65545, 2008 WL 3978208, *22 (E.D.N.Y. Aug. 21, 2008) (quoting *Williams v. Town of Greenburgh*, [535 F.3d 71, 76 (2d Cir. 2008)]). Where a private citizen asserts a [*23] First Amendment claim against a public official, the plaintiff must demonstrate that (1) the plaintiff engaged in speech or conduct that the First Amendment protects; (2) the plaintiff's exercise of his First Amendment rights motivated the defendant's actions; and (3) the defendant's actions effectively chilled the plaintiff's

exercise of those rights. *See Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)); *Moran v. City of New Rochelle*, 346 F. Supp. 2d 507, 517 (S.D.N.Y. 2004) (citation omitted).

*5. Unlawful search*

The Fourth Amendment protects individuals in their homes "against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless search is 'per se unreasonable . . . subject to only a few specifically established and well-delineated exceptions.'" *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)).

It is firmly established that the Fourth Amendment only proscribes unreasonable searches and seizures. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989) (citations omitted). The permissibility of a search "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Id.* (quotation and other citation omitted).

In *Ruggiero v. Krzeminski*, the Second Circuit held that although a search conducted without a warrant is

> presumptively unreasonable . . . [t]he operation of this presumption . . . cannot serve to place on the defendant the burden of proving that the official action was reasonable. Rather, the [*24] presumption may cast upon the defendant the duty of producing evidence of consent or search incident to an arrest or other exceptions to the warrant requirement. However, the ultimate risk of nonpersuasion must remain squarely on the plaintiff in accordance with established principles governing civil trials.

*Ruggiero v. Krzeminski*, 928 F.2d 558, 563 (2d Cir. 1991) (internal and other citations omitted).

*6. Qualified immunity*

"The doctrine of qualified immunity shields public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

> For a constitutional right to be "clearly established" for purposes of determining whether an officer is entitled to qualified immunity, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that *in the light of pre-existing law the unlawfulness must be apparent.*"

*Mollica v. Volker*, 229 F.3d 366, 370-71 (2d Cir. 2000) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)) (emphasis in original). "Where the right at issue in the [*25] circumstances confronting police officers . . . was clearly established but was violated, the officers will nonetheless be entitled to qualified immunity 'if . . . it was objectively reasonable for them to believe their acts did not violate those rights.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quotation and other citation omitted).

"Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent." *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010) (citations omitted). "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness. . . . That is, '[e]ven if the right at issue was clearly established in certain respects . . . an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context.'" *Id.* (quotations omitted).

The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact. *See Zellner*, 494 F.3d at 367 (citing [*26] *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)) (other citations omitted). "The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.*, whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court. However, '[a] contention that . . . it was objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case."'" *Id.* (quotation and other citations omitted).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is

an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman*, 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

**B. Application**

*1. Defendant Bansner*

Defendants contend [*27] that Defendant Bansner must be dismissed because "nowhere in the admissible record does his name appear as having any involvement with this case." Dkt. No. 34-37 at 7. Plaintiff has not addressed this argument.

The Court agrees with Defendants that none of Plaintiff's claims allege any wrongdoing by Defendant Bansner. Accordingly, the Court grants this portion of Defendants' motion for summary judgment.

*2. Defendant Fatata*

The only allegations pertaining to Defendant Fatata contend that she was informed that Plaintiff was leasing the property at 315 Nichols Street in September of 2008. *See* Dkt. No. 13 at ¶ 22. Plaintiff claims that, in a sworn affidavit, a City of Utica employee Jennifer Randall stated that Defendant Fatata told her to keep her apprised about Plaintiff's activities and when he entered City Hall. *See id.* at ¶ 23. Plaintiff also claims that Ms. Randall claimed that Defendant Fatata stated that she would not allow Plaintiff to operate at 315 Nichols Street and that she began retaliating against Plaintiff on September 7, 2008 by placing his business on the police "hot spot." *Id.* at ¶¶ 24-25.

Despite claiming that he has a sworn affidavit from Ms. Randall regarding Defendant [*28] Fatata's statements and actions, Plaintiff has failed to produce the document. These conclusory assertions are insufficient to support his First Amendment retaliation claim against Defendant Fatata. Moreover, the only First Amendment protected speech Plaintiff alleges are the civil rights lawsuits filed on September 30, 2009 and October 19, 2012. Clearly, Defendant Fatata could not retaliate against Plaintiff for speech that had not yet occurred.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's First Amendment retaliation claims against Defendant Fatata.

*3. The October 10, 2009 incident*

Regarding Plaintiff's false arrest claim, the Court assumes that the complaint and summons issued to Plaintiff are sufficient to constitute "confinement" for purposes of this claim. Nevertheless, Plaintiff's false arrest claim stemming from the events of October 10, 2009 still fail. Without question, Defendants had probable cause to arrest Plaintiff based on the information they obtained. Defendants observed Plaintiff's business throughout the evening and all indicated that their observations indicated that Plaintiff was illegally selling alcohol at 315 Nichols Street. Moreover, Defendants used a [*29] confidential informant to enter Pete's, purchase alcohol, and then leave with the beverage. *See* Dkt. No. 38-3 at 4. Defendants then took possession of the plastic cup and had its contents analyzed by the New York State Forensic Laboratory, who confirmed that it contained alcohol. Defendants undoubtedly had probable cause to arrest Plaintiff for the illegal sale of alcohol regarding the events of October 10, 2009. *See Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (holding that "[p]robable cause exists 'when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed a crime or is committing a crime'") (quotation omitted). As such, the Court grants Defendants' motion for summary judgment as to Plaintiff's false arrest claim surrounding the events of October 10, 2009.

As to Plaintiff's malicious prosecution claim, the Court finds that Defendants had probable cause for commencing the proceeding and continuing it through trial. Plaintiff has not presented any evidence to suggest that new evidence was presented after the time the complaint and summons was issued that would have eliminated [*30] the finding of probable cause. Defendants reasonably relied on Ms. Rodgers' testimony and Plaintiff has provided only conclusory assertions that her testimony was false. *See Garraway v. Newcomb*, 154 Fed. Appx. 258, 260 (2d Cir. 2005) (holding that the defendant had probable cause to arrest and prosecute the plaintiff for dog fighting where he had a sworn statement from a witness implicating the plaintiff and personally observed dogs with scars on their bodies). Based on the totality of the circumstances, Defendants were entitled to rely on Ms. Rodgers statement, which was supported by their past and current observations and dealings with Plaintiff and the activities at 315 Nichols

Street. *See Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). Accordingly, the Court finds that Defendants had probable cause to prosecute Plaintiff for violating N.Y. Alcoholic Beverage Control Law § 100.1. Additionally, the Court finds that Plaintiff has failed to put forth evidence suggesting that Defendants acted with malice. Although Plaintiff was cited for various violations of City ordinances over an extended period of time, the evidence in the record firmly establishes that Plaintiff was engaged in most of the activities alleged. Plaintiff's conclusory assertions regarding Defendants wrong and improper motives are insufficient to survive Defendants' [*31] motion for summary judgment.

Alternatively, the Court finds that Defendants are entitled to qualified immunity as to all of Plaintiff's claims relating to the events of October 10, 2009. Qualified immunity in the context of malicious prosecution and false arrest gives rise to the concept of "arguable probable cause." "'An officer's determination is objectively reasonable if there was "arguable" probable cause at the time of arrest — that is, if officers of reasonable competence could disagree on whether the probable cause test was met.'" *Gonzalez v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. 2013) (quotations omitted). Defendants' observations, in addition to Ms. Rodgers' statement, clearly provided Defendants with arguable probable cause to believe that Plaintiff was selling alcohol without a license in violation of N.Y. Alcoholic Beverage Control Law § 100.1 and that he was illegally operating a "cabaret" in violation of the relevant Utica City Ordinance.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiffs' claims stemming from the events of October 10, 2009.

*4. The October 24, 2009 incident*

Viewing Plaintiff's submissions liberally, Plaintiff is asserting the following claims regarding the October 24, 2009 arrest and subsequent prosecution: [*32] (1) unlawful search; (2) false arrest; (3) malicious prosecution; and (4) defamation. *See* Dkt. No. 38-2 at 5-11; *see also* Dkt. No. 13 at ¶¶ 32-43.

As to Plaintiff's false arrest claim, the Court finds that Defendants are entitled to summary judgment because Plaintiff was convicted after trial of violating N.Y. Penal Law § 240.26. Plaintiff did not appeal his conviction and it is therefore still valid. "A conviction that survives appeal is conclusive evidence of probable cause and is therefore a complete defense to a false arrest claim brought under § 1983." *Gibson v. City of New York*, 182 F.3d 899, 899 (2d Cir. 1999) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)) (other citation omitted); *see also Heck v. Humphrey*, 512 U.S. 477, 486-87, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994). Since probable cause is only required as to a single offense and not every offense charged on a false arrest claim, Plaintiff's false arrest claim must fail. *See Marcavage v. City of New York*, 689 F.3d 98, 109-10 (2d Cir. 2012) (citation omitted).

As to Plaintiff's malicious prosecution claim, Defendants had probable cause supporting the charged crimes. Upon arriving at Pete's on October 24, 2009, Defendant Duval testified that he heard loud music coming from the premises. *See* Dkt. No. 54-10 at 10-11. Defendant Duval witnessed a large crowd of juveniles exiting the premises. *See id.* at 11-12. Upon entering Pete's, Defendants observed a bar area and empty liquor bottles scattered throughout [*33] the establishment. *See id.* at 19-20. Defendants also gave a Breathalyzer test to J.B., a sixteen year-old individual at Pete's. *See* Dkt. No. 54-36 at ¶¶ 105, 114-15. The test indicated that J.B. had a blood alcohol content in excess of 0.08%. *See id.* Further, T.S. testified that she paid Plaintiff $200 to rent out Pete's for her birthday party, a fact which Plaintiff does not contest. Further, Maurice Titus testified that he was hired to DJ the party and that he observed many under-aged individuals consuming alcohol at the party. *See* Dkt. No. 54-12 at 2-4.[6] In a conclusory fashion, Plaintiff contends that Defendants fabricated the crime scene by placing old beer and liquor bottles throughout the premises. This contention, however, is entirely conclusory and directly contradicted by the testimony of the non-party witnesses who were present at the party. Clearly, as discussed in more detail above, Defendants' observations, supported by the testimony of witnesses at the party, provided probable cause for the charges brought against Plaintiff on October 24, 2009. Alternatively, the Court finds that Defendants had arguable probable cause for the charges brought against Plaintiff and subsequent prosecution; [*34] and, therefore, Defendants are entitled to qualified immunity as to this claim.

---

[6] "It shall be unlawful for any person, partnership or corporation operating a place for profit or pecuniary gain, with a capacity for the assemblage of twenty or more persons to permit a person or persons to come to the place of assembly for the purpose of consuming alcoholic beverages on said premises, which alcoholic beverages are either provided by the operator of the place of assembly, his agents, servants or employees, or are brought onto said premises by the person or persons assembling at such place, unless an appropriate license has first been obtained from the state liquor authority by the operator of said place of assembly." N.Y. Alcoholic Beverage Control Law § 64-b.

As to Plaintiff's illegal search and seizure claim, the Court finds that Plaintiff's failure to challenge the search and seizure in his state criminal trial precludes him from re-litigating the issue in this forum. *See Spinks v. Orleans County*, No. 10-CV-745A, 2011 U.S. Dist. LEXIS 66444, 2011 WL 2491001, *8 (W.D.N.Y. June 22, 2011) (holding that the plaintiff's failure to challenge the search and seizure in state court and his eventual guilty plea preclude bringing an illegal search and seizure claim pursuant to 42 U.S.C. § 1983). Moreover, a finding that the search of Pete's was unconstitutional would [*35] necessarily require the Court to call into question, directly or indirectly, the validity of the search that led to his eventual conviction for Harassment in the Second Degree. Additionally, the Court finds that Defendants did not infringe on Plaintiff's rights because Pete's was open to the public and, therefore, Plaintiff had no reasonable expectation in such spaces. *See Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414, 104 S. Ct. 769, 78 L. Ed. 2d 567 (1984); *Stone v. Port Authority of N.Y. & N.J.*, No. 11-CV-3932, 2014 U.S. Dist. LEXIS 92950, 2014 WL 3110002, *11 (E.D.N.Y. July 8, 2014) (citation omitted); *Winkel v. Reserve Officer*, 773 F. Supp. 1487, 1490 (D. Kan. 1991). Alternatively, the Court finds that, Defendants are entitled to qualified immunity because it was objectively reasonable for the officers to believe that their conduct was lawful, especially in light of the past incidents at Pete's and the presence of a large number of underage individuals entering and exiting the establishment. *See Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (citations omitted).

Finally, the Court finds that Plaintiff's defamation claim is barred by the applicable statute of limitations. The amended complaint alleges that the defamatory statements occurred on October 24, 2009. *See* Dkt. No. 13 at ¶ 40. Plaintiff commenced this action on October 23, 2012. *See* Dkt. No. 1. Since that is more than one year and ninety days after the alleged defamation, the claim is untimely. *See Murphy v. City of Rochester*, 986 F. Supp. 2d 257, 260 (W.D.N.Y. 2013) (citation omitted).

*5. Defendant Duval's* [*36] *arrest of Plaintiff on December 31, 2009*

On December 31, 2009, Defendant Duval arrested Plaintiff "on a warrant for failing to appear in court." Dkt. No. 13 at ¶¶ 44, 55. Plaintiff attempts to assert a claim for false arrest regarding this incident.

As Defendants correctly contend, this claim must be dismissed because Plaintiff was arrested pursuant to a facially valid warrant. *See Southerland v. Garcia*, 483 Fed. Appx. 606, 608 (2d Cir. 2012) (citations omitted). Plaintiff has not contended that the arrest warrant was invalid and Plaintiff's claim that he did not receive the summons for his court appearance is irrelevant to Defendant Duval's culpability on this claim. *See Dirienzo v. United States*, 690 F. Supp. 1149, 1154 (D. Conn. 1988).

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's false arrest claim against Defendant Duval stemming from Plaintiff's arrest on December 31, 2009.

*6. Defendants' search of Pete's on January 1, 2010*

Plaintiff claims that Defendants illegally entered and searched Pete's on January 1, 2010.

"Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes [*37] put it, in 'objective good faith.'" *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245, 182 L. Ed. 2d 47 (2012) (citation omitted). "Nonetheless, under our precedents, the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness. Rather, we have recognized an exception allowing suit when 'it is obvious that no reasonably competent officer would have concluded that a warrant should issue.'" *Id.* (quotation omitted). "The 'shield of immunity' otherwise conferred by the warrant . . . will be lost, for example, where the warrant was 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* (internal and other quotations omitted).

In the present matter, the Court finds that Defendants acted in objective good faith in procuring and acting on the search warrant. Investigator Laurey submitted the search warrant application and detailed the various incidents that Defendants had responded to in October of 2009. *See* Dkt. No. 54-12 at 3-4. Further, the application noted that on December 16, 2009, Judge Hester ruled that the owner of 315 Nichols Street shall be prohibited from using [*38] the property for commercial uses without first obtaining a special permit or variance from the Zoning Board of Appeals. *See id.* at 4. Moreover, the application included a flyer that was brought to Defendants attention. The flyer indicated that Pete's would be holding a New Years Eve party, that there would be a DJ, free food and drinks, and that participants were to give Plaintiff "$20 B4 12AM." *Id.*; *see also* Dkt. No. 54-26

at 2. The flyer also states that it is "PETE's LAST PARTY. PETE'S LAST PARTY." *Id.*

Relying on this flyer and all relevant information regarding past events at Pete's, it was objectively reasonable for Defendants to rely on this valid arrest warrant issued by a neutral judge. When Defendants arrived at Pete's, Plaintiff was served with the warrant at the front door of the establishment. Loud music could be heard and clear signs that a party was taking place. Moreover, as discussed, the video presented by Defendants which recorded their arrival and search of the premises corroborate their claims and provides additional evidence that their actions were objectively reasonable and that probable cause existed that illegal activities were occurring in this public establishment. **[*39]**

Plaintiff's argument that Defendants improperly relied on the flyer that they received from an anonymous person or street source is without merit. Based on the totality of the circumstances, it was objectively reasonable for Investigator Laurey, who is not a Defendant in this matter, to rely on the flyer and knowledge of past incidents at Pete's in applying for the search warrant. *See Gates*, 462 U.S. at 238. Moreover, Plaintiff's argument that it was improper to rely on the charges leveled against him that were eventually dismissed is misplaced. At the time Investigator Laurey applied for the warrant, the charges were still pending against Plaintiff.

To the extent that Plaintiff argues that Defendants failed to include exculpatory information in the application for the search warrant, the argument is without merit. *See Rodriguez v. City of Bridgeport*, No. 3:03 CV 1597, 2005 U.S. Dist. LEXIS 33481, 2005 WL 3307274, *4 (D. Conn. Dec. 2, 2005) (holding that the defendants were not required to include information that would have discredited their witnesses in the search warrant application). Plaintiff contends that he had a conversation with Defendant Toomey at the Utica Police Station on December 31, 2009. Plaintiff testified that he explained to Defendant Toomey that the flyer was incorrect, **[*40]** in that the "free drinks" depicted in the flyer were non-alcoholic and that no Djs would be performing and that Miss New York was not coming. Even assuming that Defendants should have included this information in the search warrant application, Plaintiff's claim still fails. "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *United States v. Awadallah*, 349 F.3d 42, 65 (2d Cir. 2003). In order to survive a motion for summary judgment, the plaintiff must prove that there is a "genuine issue of fact about whether the magistrate would have issued the warrant on the basis of 'corrected affidavits.'" *Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir. 1994). Plaintiff has failed to accomplish this. Based on the totality of the circumstances, it was objectively reasonable for Defendants to disregard Plaintiff's explanation about the flyer and the planned event for that evening at Pete's.

Based on the foregoing, the Court grants Defendants' motion for summary judgment regarding the entry and search of Pete's on January 1, 2010.

***7. Plaintiffs arrest on January 1, 2010 and subsequent prosecution***

Plaintiff argues that Defendants falsely arrested him on January **[*41]** 1, 2010. Further, Plaintiff contends that he was subject to malicious prosecution for the charges that stemmed from the January 1, 2010 search of Pete's.

After the search of Pete's on January 1, 2010, Plaintiff was charged on January 6, 2010 with operating a cabaret without a license and operating an unlicensed "bottle club." As discussed above, the evidence that Plaintiff was, in fact, violating both of these provisions was overwhelming. When Defendants arrived at Pete's, loud music could be heard. When Defendants entered Pete's, full and empty alcohol containers were scattered throughout, there was a bartender at the bar, and a DJ was playing music (as advertised in the flyer). Again, all of this was captured on video. Although Plaintiff may be correct that the video does not actually depict anyone consuming alcohol, it is immaterial to the finding of probable cause. Defendants' testimony and the video provide overwhelming evidence that Defendants had probable cause to arrest and prosecute Plaintiff for the violating N.Y. Alcoholic Bev. Control Law § 64-b and Utica City Code § 2-14-296. The video taken inside Pete's clearly depicts "musical entertainment, singing, dancing" and Plaintiff admits that there was music and a DJ, as **[*42]** required to find Plaintiff had been operating an illegal cabaret. *See* Utica City Code §§ 2-14-290, 2-14-296. As to operating an unlicensed bottle club, Plaintiff admits that there were maybe "twenty people" at Pete's that evening. The video clearly depicts more than twenty individuals, that alcohol had been consumed, and that alcohol was scattered throughout the premises, including behind the bar.

Finally, the Court finds that, in the alternative, Defendants are entitled to qualified immunity as to these claims because they had arguable probable cause to arrest and prosecute Plaintiff for the crimes alleged.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's false arrest

and malicious prosecution claims stemming from the incident on January 1, 2010.

*8. Plaintiff's claims regarding his suicide attempt on January 5-6, 2010*

In his amended complaint, Plaintiff alleges that, "[w]hile in city lockup the plaintiff informed the booking officer that he was not mentally stable and plaintiff needed medication that was prescribed to plaintiff. . . . The booking officer searched the plaintiff thoroughly; placed plaintiff in a cell on suicide watch status and monitored plaintiff [*43] until his shift was over." Dkt. No. 13 at ¶ 55. Thereafter, Plaintiff claims that "[t]he second officer defendant who guarded the plaintiff began to taunt and harass plaintiff. Defendant Duval came to plaintiff's cell after midnight and began harassing plaintiff. Later on that evening the defendant fell asleep and plaintiff fell asleep shortly after. When plaintiff woke up a belt was in plaintiff's cell." **Id.** at ¶ 56. Thereafter, Plaintiff claims that "had a nervous breakdown due to the cruel treatment," that he "broke up pressure and attempted suicide." **Id.** at ¶ 57. When the unnamed Defendant officer awoke, he found Plaintiff with the belt around his neck and called for assistance to help remove the belt from Plaintiff's neck. *See id.* At this point, Plaintiff was taken to Saint Lukes Hospital for an evaluation and he was "handcuff[ed] to the bed for twelve hours." *See id.* at ¶ 58.

In his deposition, Plaintiff provided the following testimony regarding the suicide attempt:

> Q. Can you describe the belt?
>
> A. I can't describe it. I can't describe it.
>
> Q. Where was it in your cell?
>
> A. Around my neck.
>
> Q. So you woke up with the belt around your neck?
>
> A. No, I did not. That's the only time I — it wasn't — I just [*44] know it was in my cell and I know I placed it around my neck. I know I just put it around my neck. I don't know if it was on the floor, I don't know if it was on the bed. I just know when I got to the cell, there was no belt.
>
> * * * * *
>
> Q. And what did you attach the belt to?
>
> A. Well, I walked around the cell a couple of times contemplating, I was up, I was in tears. I know that I was just broken up and I was looking for a pipe or a radiator or something and I just know their cells wasn't like that. But I do know that they have some bars going across here and he was — and I remember him laying in the chair and I walked past him a couple of times in the cell just looking at him laying there sleeping while he was guarding me and I had this belt around my neck. And I stood on the edge of the cot, and on the edge of the cot there was some bars to the door, and I tried to grab, put it through there, put it by there, and I — after that I heard he moved or something and I just laid back down quickly and I turned to the side like that and the belt was still around my neck.

Dkt. No. 54-5 at 127-29. Thereafter, Plaintiff testified that Officer Cimpi woke up, "rushed in" and called for some officers [*45] to assist him. *See id.* at 130. Plaintiff further testified that, when the officers came into his cell, he thought that they were going to attack him, so he "threw a kick at one of them." *Id.* The officers told him told him that "we're not going to hurt your, just calm down, give me the belt." *Id.*

"The Eighth Amendment's prohibition against cruel and unusual punishment requires prison conditions to be 'humane,' though not necessarily 'comfortable.'" *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (citing *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)) (other citations omitted); *see also* U.S. Const. amend. VIII. To establish an Eighth Amendment violation, an inmate must show: "'(1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities[;] and (2) a sufficiently culpable state of mind on the part of the defendant official, such as deliberate indifference to inmate health or safety.'" *Id.* (quoting *Gaston*, 249 F.3d at 164) (other citation omitted).

"As to the objective element, there is no 'static test' to determine whether a deprivation is sufficiently serious; '[t]he conditions themselves must be evaluated in light of contemporary standards of decency.'" *Jabbar*, 683 F.3d at 57 (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)) (other citation omitted). The Second Circuit has held that "prisoners may not be deprived of their 'basic human needs — e.g., food, clothing, [*46] shelter, medical care, and reasonable safety' — and they may not be exposed 'to conditions that pose an unreasonable risk of serious damage to [their] future health.'" *Id.* (quotations omitted).

As for the subjective requirement, deliberate indifference requires "'more than mere negligence.'" *Id.* (quoting *Farmer*, 511 U.S. at 835, 114 S. Ct. 1970). The prison official must know of, and disregard, an excessive risk to inmate health or safety. *See id.* (citation omitted). "'[A]n official's failure to

alleviate a significant risk that he should have perceived but did not . . . [cannot] be condemned as the infliction of punishment.'" *Id.* (quotation omitted).

To establish a due process violation of the Fourteenth Amendment, an inmate must show that a government official made a deliberate decision to deprive him of his life, liberty, or property. *See Jabbar*, 683 F.3d at 57 (citing *Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)) (other citation omitted). Merely negligent conduct does not give rise to claims under the Fourteenth Amendment. *See id.* (citing *Daniels*, 474 U.S. at 331, 333, 106 S. Ct. 662).

In the present matter, the Court finds that Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim. First, nothing in the record suggests that a named Defendant placed a belt in Plaintiff's cell. Moreover, Officer Cimpi is not named as a Defendant. The fact that Officer Cimpi may **[*47]** have fallen asleep during his shift constitutes, at best, negligence and does not evince the sufficiently culpable state of mind required. Rather, Plaintiff's own testimony demonstrates that, immediately upon becoming aware of the situation, Officer Cimpi rushed into Plaintiff's cell and called other officers for assistance. Once Plaintiff was relieved of the belt, the officers took him to the hospital pursuant to section 9.41 of the Mental Hygiene Law. Based on the officers actions upon perceiving the threat, no rational jury could conclude that any named Defendant was deliberately indifferent to the risk that Plaintiff could commit suicide. *See Kelsey v. City of New York*, 306 Fed. Appx. 700, 702-03 (2d Cir. 2009).

Moreover, Plaintiff's claim is belied by the actions Defendants took upon Plaintiff's arrival at City lockup. Plaintiff was placed on suicide watch after he made statements that concerned the booking officer. Officer Golden escorted Plaintiff to his cell and gave him food from McDonald's. *See* Dkt. No. 54-5 at 121. At that point, Officer Golden and Plaintiff discussed their religious beliefs at length in a conversation that Plaintiff described as pleasant. *See id.* at 121-22. Officer Golden was then relieved by Officer Cimpi. Plaintiff then had a slightly more combative **[*48]** conversation with Officer Cimpi. *See id.* at 122-25. After about fifteen minutes, Officer Cimpi left his position in front of Plaintiff's cell, but he "never left the hallway area because he was on 24-hour watch[.]" *Id.* at 126. Officer Cimpi repeatedly came back to check on Plaintiff and then eventually returned to his chair and fell asleep. *See id.* at 125-28.

Although Officer Cimpi may have been negligent in falling asleep, nothing in the record establishes the requisite state of mind to support Plaintiff's claim. Moreover, Plaintiff has not identified any named Defendant personally involved in the alleged deliberate indifference. As such, alternatively, the Court finds that Plaintiff has failed to establish the requisite personal involvement required by section 1983. *See Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

To the extent Plaintiff is attempting to bring this claim against Defendant LaBella and the City of Utica, the Court finds that he has failed to put forth any facts supporting supervisor or municipal liability. As to Defendant LaBella, Plaintiff has failed to set forth any facts regarding a policy or custom put in place by Defendant LaBella that caused this allege injury or that he was grossly negligent in supervising his officers.[7] Additionally, **[*49]** Plaintiff has not identified any municipal policy that caused this alleged deprivation. *See Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). As such, no rational jury could find that Plaintiff has established a claim for supervisory or municipal liability.

Finally, regarding Plaintiff's motion for spoliation sanctions for the loss of video footage of the incident at issue, the Court finds that he has not met his burden. The video at issue involved an incident that occurred on January 5-6, 2010. Plaintiff filed his complaint in this matter on October 19, 2012, nearly three-years later. Nothing in the record **[*50]** demonstrates that Defendants were on notice that they had an obligation to preserve the video during this period or that they knew Plaintiff was going to file suit. *See Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-12 (2d Cir. 2001); *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001).

Moreover, after Plaintiff learned that the video had been destroyed, he was given an opportunity to depose the officer

---

[7] Traditionally, supervisory personnel may be considered "personally involved" if a plaintiff demonstrates that the defendant: (1) participated directly in the alleged constitutional violation; (2) failed to remedy the wrong after being informed of it; (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or, (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating there were ongoing unconstitutional acts. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).

who compiled the video footage and any other officer who handled the videos. After several conversations with Defendants' counsel, the depositions of Lt. Brucker and Investigator Selimovic were scheduled for March 21, 2014. *See* Dkt. No. 47 at 4; Dkt. No. 55-4. Plaintiff, however, unilaterally cancelled the depositions and they were never rescheduled. *See* Dkt. No. 55-5. Prior to filing his motion, Plaintiff had failed to depose any member of the Utica Police Department regarding the missing video. Plaintiff's conclusory assertion that Lt. Brucker purposely omitted the video in question is insufficient to meet his burden.[8] Rather, the uncontested evidence establishes that, due to the limited storage capacity of the Department's DVR system, video is typically automatically written over after approximately two months. *See* Dkt. No. 55-6 at ¶¶ 6-7. As such, the evidence demonstrates that no member of the [*51] Utica Police Department acted with a sufficiently culpable state of mind to warrant spoliation sanctions. *See Byrnie*, 243 F.3d at 107-08; *see also Reilly v. Natwest Mkts. Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999).

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's deliberate indifference claims and denies Plaintiff's motion for spoliation sanctions.

*9. Due process claim concerning the administrative hearing and determination*

In his amended complaint, Plaintiff alleges that his procedural due process rights were violated as a result of the nuisance abatement proceeding. *See* Dkt. No. 13 at ¶¶ 61-66. Plaintiff alleges that Defendant Noonan lied during the proceeding regarding the charges that had been brought against Plaintiff. Plaintiff further attempts to [*52] argue that because the charges were subsequently dismissed, it "nullifies the evidence presented." Dkt. No. 38-2 at 18. Plaintiff argues that on May 13, 2010, Defendant LaBella determined that there were six violations committed by Plaintiff at 315 Nichols Street. *See id.* Plaintiff contends that "[t]he property was then closed down for a year **denying the plaintiff the right to earn a living.**" *Id.* (emphasis added).[9]

Defendants are entitled to summary judgment on this claim for several reasons. First, Plaintiff did not file an Article 78 proceeding to challenge the administrative hearing determination, which is fatal to his procedural due process claim. *See Rankel v. Town of Somers*, 999 F. Supp. 2d 527, 546 (S.D.N.Y. 2014) (citing *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 881-82 (2d Cir. 1996)); *Hafez v. City of Schenectady*, 894 F. Supp. 2d 207, 215 n.9 (N.D.N.Y. 2012) (citations omitted). Similarly, Plaintiff failed to appeal Judge Hester's injunction order. Finally, Plaintiff was afforded due process because he was given due notice of the proceeding and failed to appear. *See* Dkt. No. 54-25 [*53] at 2-3.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's due process claim.

*10. Video surveillance of Pete's from March 21, 2009 through April 12, 2009*

In his amended complaint, Plaintiff alleges that Defendant Grande "placed plaintiff and plaintiff's building located at 315 Nichols Street under video surveillance without a warrant from March 21, 2009 through April 12, 2009 intruding on Plaintiff's right to privacy." Dkt. No.13 at ¶ 67. Further, Plaintiff claims that Defendant Grande reviewed these surveillance videos and charged him with twelve City of Utica violations, which were dismissed by the corporation counsel's office on March 17, 2011. *See id.* at ¶ 68.

Defendants assert that they are entitled to summary judgment on this claim because it is barred by the applicable statute of limitations. *See* Dkt. No. 54-37 at 49-50. Plaintiff has not responded to this part of Defendants' motion.

Defendants are correct that Plaintiff's illegal surveillance claim is untimely. The surveillance occurred through April 12, 2009 and Plaintiff did not file this action until October 19, 2012. *See* Dkt. No. 1. Since this claim is subject to a three-year statute [*54] of limitations, it is untimely.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's unlawful surveillance claim.

*11. Due process claim regarding the 666 Bleeker Street property*

---

[8] Captain Mickle conducted an internal investigation into this incident, which concluded in April of 2010. *See* Dkt. No. 47-4. In his report of the investigation, Captain Mickle noted that his investigation revealed that Plaintiff was "wearing a belt when arrested and that belt remained on his person until he removed it in his cell and placed it around his neck." *Id.* at 2. Further, Captain Mickle concluded that Officer Golden missed the belt during the intake search he performed. *See id.*

[9] Throughout this litigation and Plaintiff's dealing with Defendants, Plaintiff has denied that he was operating a business at 315 Nichols Street after April of 2009. It is unclear how Plaintiff could have been earning a living through 315 Nichols Street if he was not operating a business out of the location.

In his amended complaint, Plaintiff appears to allege that his procedural due process rights were violated when Defendants denied him a certificate of occupancy. *See* Dkt. No. 13 at ¶¶ 73-93. Plaintiff leased the property on January 1, 2012 and named his new business the African American Heritage Lodge. *See id.* at ¶ 75. The purpose of the lodge "was to allow African American residents to have a facility with a bar and restaurant to host repasts, parties, religious and other social charity events." *See id.* Plaintiff applied for a certificate of occupancy on May 31, 2012 and Defendant Cozza was assigned to inspect the building. *See id.* at ¶ 76. Plaintiff received plumbing and electrical certifications that the property was in compliance with the relevant codes. *See id.* at ¶ 77. Plaintiff claims that Defendant Cozza inspected the building several times and found new violations each time so that Plaintiff would not pass inspection. *See id.* at ¶ 78. Plaintiff claims that, [*55] after all violations were corrected, Defendant Cozza performed the final inspection and informed Plaintiff that "he could not issue[ ] a certificate of occupancy because the chief of police did not want the building open." *Id.* at ¶ 81. Thereafter, Plaintiff alleges that Defendant Foster, the fire marshal, posted on the back and front door of the building that the premises were unsafe, despite having never inspected the building. *See id.* at ¶ 83.

Further, Plaintiff alleges that on August 3, 2012, Plaintiff applied for a cabaret license but Defendant Williams did not respond to Plaintiff's application in two weeks in violation of City of Utica Ordinance. *See id.* at ¶ 85. Rather, on October 10, 2012, Defendant Williams denied the application. *See id.* at ¶ 86. Defendant Williams allegedly denied the license because he claimed that Plaintiff was "involved in illegal serving of alcohol, narcotics activity and criminal activity." *Id.* at ¶ 87.

In order to bring a claim for violation of the procedural due process rights guaranteed by the Fourteenth Amendment, a plaintiff must show "(1) that he possessed a protected liberty or property interest; and (2) that he was deprived of that interest without due process." [*56] *Rehman v. State Univ. of N.Y. at Stony Brook*, 596 F. Supp. 2d 643, 656 (E.D.N.Y. 2009); *accord Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011). Within the Second Circuit, "a constitutionally protected property interest in land use regulation arises only if there is an entitlement to the relief sought by the property owner." *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 192 (2d Cir. 1994).

In the present matter, the Court finds that Defendants are entitled to summary judgment on Plaintiff's claim relating to the 666 Bleeker Street property. Although Plaintiff could have challenged the alleged denials through an Article 78 proceeding, he did not avail himself of that right. As the Second Circuit has emphasized, "[t]his court has held on numerous occasions that where, as here, a party sues the state and its officials and employees for the arbitrary and random deprivation of a property or liberty interest, an Article 78 proceeding is a perfectly adequate postdeprivation remedy." *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002) (internal quotations and citation omitted). Had Plaintiff commenced an Article 78 proceeding, the state court could have granted Plaintiff the relief he seeks. *See Ahmed v. Town of Oyster Bay*, __F. Supp. 2d __, 7 F. Supp. 3d 245, 2014 U.S. Dist. LEXIS 36178, 2014 WL 1092363, *6 (E.D.N.Y. 2014) (dismissing the plaintiff's procedural due process claim "because the Article 78 proceeding precludes the claim as a matter of law") (citation omitted); *see also Jackson v. Roslyn Bd. of Educ.*, 652 F. Supp. 2d 332, 345 (E.D.N.Y. 2009) ("An Article 78 proceeding provides the opportunity to review whether a body or officer 'failed [*57] to perform a duty enjoined upon it by law' or whether a specific act was 'made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion,' and permits the state court to remedy the violation by ordering a hearing or a return of the unlawfully seized property") (quotations omitted).

Moreover, the Court finds that Plaintiff's conclusory assertion that he did not believe that "an Article 78 proceeding would . . . remedy the multiple violations of [his] constitution[al] rights" is insufficient to find that the remedy was insufficient. Plaintiff fails to provide any explanation why an Article 78 proceeding would be insufficient.

Finally, to the extent that Plaintiff may be attempting to allege a substantive due process claim, the Court finds that Defendants are entitled to summary judgment. None of the alleged conduct was "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Pena*, 432 F.3d at 112 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)).

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to this claim.

*12. Plaintiff's conspiracy claim*

To maintain a conspiracy claim under either section 1983 or section 1985, the plaintiff must establish that [*58] the defendants violated one of his constitutional rights. *See Friends of Falun Gong v. Pacific Cultural Enterprise, Inc.*,

288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003) (citations omitted); *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) (citation omitted). Moreover, the intra-corporate conspiracy doctrine, which applies to conspiracy claims pursuant to both 42 U.S.C. § 1983, *see Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 2012 WL 4017789, *30 (S.D.N.Y. 2012); *Anemone v. Metropolitan Transportation Authority*, 419 F. Supp. 2d 602, 603-04 (S.D.N.Y. 2006), and 42 U.S.C. § 1985, *see Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978), "posits that officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other." *Jefferson v. Rose*, 869 F. Supp. 2d 312, 2012 WL 1398743, *4 (E.D.N.Y. 2012) (quotations and citations omitted); *see also Smith v. Town of Hempstead Department of Sanitation Sanitary District No. 2*, 798 F. Supp. 2d 443, 461 (E.D.N.Y. 2011) (citation omitted). The intra-corporate conspiracy doctrine "extends to public corporate bodies, including municipalities." *Nimkoff v. Dollhausen*, 751 F. Supp. 2d 455, 466 (E.D.N.Y. 2011) (citation omitted); *see also Michael v. County of Nassau*, No. 09-cv-5200, 2010 U.S. Dist. LEXIS 82764, 2010 WL 3237143, *5 (E.D.N.Y. Aug. 11, 2010) (holding that the intra-corporate conspiracy doctrine applies to municipalities).

Since Plaintiff failed to establish that Defendants violated any of his constitutional rights, the Court grants Defendants' motion for summary judgment as to Plaintiff's conspiracy claims. Moreover, the intra-corporate conspiracy doctrine precludes Plaintiff's conspiracy claims because all alleged conspirators were employed by the same municipal entity. *See Baines v. Masiello*, 288 F. Supp. 2d 376, 394-95 (W.D.N.Y. 2003) (holding that a conspiracy claim brought against "the Common Council, the Mayor, and [*59] the City Clerk" was barred by the intra-corporate conspiracy doctrine); *Broich v. Incorporated Vill. of Southampton*, 650 F. Supp. 2d 234, 247 (E.D.N.Y. 2009) (holding that conspiracy claim against the Village Board trustees, mayor, and former and current chief of police are barred by the intra-corporate conspiracy doctrine) (citations omitted).

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's conspiracy claims.

*13. State-law claims*

Application of supplemental jurisdiction is discretionary, and "it requires a balancing of the considerations of comity, fairness to the litigants, judicial economy, and the avoidance of needless decisions of state law." *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 809 (2d Cir. 1979) (citation omitted). The Second Circuit has held that "'if [all] federal claims are dismissed before trial . . . the state claims should be dismissed as well.'" *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S. Ct. 614, 98 L. Ed. 2d 720 & n.7 (1988) (enumerating several factors that courts should weigh in considering whether to exercise supplemental jurisdiction — "the values of judicial economy, convenience, fairness, and comity" — and suggesting that, "in the usual case in which all federal-law claims are eliminated before trial, the balance of [those] factors . . . will point toward declining to exercise jurisdiction over the remaining state-law [*60] claims").

It is unclear from the parties submissions whether Plaintiff is attempting to bring any state-law claim s not already addressed in this Memorandum-Decision and Order. Since the Court has dismissed all of Plaintiffs' federal claims, it declines to exercise supplemental jurisdiction over any state-law claims Plaintiff may have attempted to assert and dismisses them without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

*IV. CONCLUSION*

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 43) is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's motion for summary judgment (Dkt. No. 38) is **DENIED**; and the Court further

**ORDERS** that Plaintiff's motion for spoliation sanctions (Dkt. No. 47) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that all other pending motions are **DENIED** as moot; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with [*61] the Local Rules.

**IT IS SO ORDERED.**

Dated: September 30, 2014

Albany, New York

/s/ Mae A. D'Agostino

Mae A. D'Agostino

U.S. District Judge.

# Easton v. City of New York

United States District Court for the Eastern District of New York

June 23, 2009, Decided

Case No. 05-CV-1873 (FB) (JMA)

**Reporter**

2009 U.S. Dist. LEXIS 53519; 2009 WL 1767725

JERJUAN EASTON, Plaintiff, -against- THE CITY OF NEW YORK, THE NEW YORK CITY POLICE DEPARTMENT, SERGEANT JOHN DOE and P.O. POLANCO (the name of the sergeant being fictitious and presently unknown), Defendants.

**Counsel:** [*1] JERJUAN EASTON, Plaintiff, Pro se, New York, NY.

For Defendants: SUSAN P. SCHARFSTEIN, ESQ., New York City Law Department, New York, NY.

**Judges:** FREDERIC BLOCK, Senior United States District Judge.

**Opinion by:** FREDERIC BLOCK

## Opinion

**MEMORANDUM AND ORDER**

**BLOCK, Senior District Judge:**

Defendants City of New York ("the City") and New York City Police Officer Oscar Polanco ("Polanco") [1] (collectively, "defendants") move jointly for summary judgment pursuant to Federal Rule of Civil Procedure 56. [2] Plaintiff Jerjuan Easton ("Easton") has not opposed defendants' motion. For the reasons below, the motion is granted.

**BACKGROUND**

[3]

**I. Underlying Events**

On August 24, 2004, shortly before 5:00 p.m., Polanco observed Easton smoking marijuana on a public sidewalk in Brooklyn, New York. Polanco arrested Easton on charges of criminal possession of marijuana and searched Easton's pockets, where Polanco found a small plastic bag of marijuana. Easton was transported to the police station and processed, whereupon it was discovered that he had $ 1,000 in cash on his person.

Easton alleges that Polanco then took him into a bathroom at the precinct, where no other persons were present, and told Easton to disrobe, lift his testicles, turn around, squat, expose his private parts and cough. During this time,

---

[1] Polanco is sued in his individual capacity only.

[2] Easton's complaint also names as defendants the New York City Police Department ("the NYPD") and "Sergeant John Doe." The claims against the NYPD must be dismissed because "the NYPD is [merely] a non-suable agency of the City." *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007). The claims against "Sergeant John Doe" must be dismissed as well: Easton has not identified or served process on this defendant, and because over four years have transpired since the events of which Easton complains, the applicable statutes of limitations have run. *See Tapia-Ortiz v. Doe*, 171 F.3d 150, 151 (2d Cir. 1999) [*2] ("[*Pro se* plaintiff's] failure until two years after the expiration of the statute of limitations period to name specifically in his complaint the officers who allegedly violated his rights is . . . fatal to his . . . claim.").

[3] The following facts are taken from the defendants' Statement of Material Facts submitted pursuant to Local Rule 56.1, which adopts, for purposes of this motion, certain allegations in Easton's complaint. Easton did not submit a counter-statement under Rule 56.1. Accordingly, the Court is permitted to take as true the assertions in defendants' Rule 56.1 statement. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]e have affirmed the grant of summary judgment on the basis of uncontested assertions in the moving party's Local Rule 56.1 statement."). In its discretion, however, the Court may also "opt to conduct an assiduous review of the record even [though Easton] has failed to file [a Rule 56.1] statement." *Id.* (internal quotation marks omitted). In light of Easton's current pro se status, the Court has conducted such a review, *see Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) ("[S]pecial solicitude should be afforded [*3] pro se litigants generally, when confronted with motions for summary judgment."), but has found nothing to contradict the defendants' presentation of the facts.

according to Easton, Polanco looked at him with sexual interest, which made him feel uncomfortable. Afterwards, according to Easton, Polanco gave him his clothes; Easton acknowledges that he was not injured, or even touched, during the alleged strip-search. Polanco, for his part, does not recall whether this incident occurred at all.

Easton was prosecuted by the Brooklyn [*4] District Attorney's office on the possession charge, later accepting an adjournment in contemplation of dismissal pursuant to New York Criminal Procedure Law § 170.56. The charges against Easton were dismissed in August 2005.

**II. Procedural History**

On September 3, 2004, Easton timely served a written notice of claim upon the City and the NYPD in accordance with Section 50-e of the General Municipal Law. After the City refused to pay Easton's claim, he timely filed his complaint on April 15, 2005. The complaint asserts claims for constitutional violations pursuant to 42 U.S.C. § 1983 as well as claims under the common law of New York. Under § 1983, Easton alleges false arrest and imprisonment, illegal strip search and excessive force against Polanco; he also asserts municipal liability against the City. Under state law, Easton asserts causes of action against Polanco for assault, prima facie tort and intentional infliction of emotional distress. At the time Easton filed suit, he was represented by counsel.

Discovery came to a close on March 12, 2007. On June 4, 2007, defendants' counsel wrote a letter to the Court expressing defendants' intent to move for summary judgment. Two days later, [*5] Easton's counsel moved to withdraw, stating that he and Easton "[could not] agree on how best to respond to the motion currently pending before [the] [C]ourt," June 6, 2008 Letter of Gary N. Rawlins (Docket Entry # 41) at 1, and that Easton "ha[d] indicated that he would like the opportunity to obtain new counsel," *id.* On July 1, 2008, Easton's counsel again wrote to the Court, stating that he and Easton "ha[d] discussed [Easton's] case at length and [its] respective strengths and weaknesses" and that "[d]espite [his] counsel, [Easton desired] to pursue a course of action that [was] very different from the course of action [he] recommend[ed]." July 1, 2008 letter of Gary N. Rawlins (Docket Entry # 43) at 1. Easton's counsel again stated that "[i]t [was his] understanding that [Easton was] currently seeking the advice of other attorneys with regard to his case and with regard to the pending summary judgment motion." *Id.*

On July 7, 2008, Magistrate Judge Joan M. Azrack granted counsel's motion to withdraw and ordered him to "notify [Easton] of this order and of any outstanding motions that would require [Easton's] response." Order (Docket Entry # 44). On July 28, 2008, the Court ordered [*6] Easton to "notify the Court by August 8, 2008 . . . whether [he] will be proceeding *pro se* or obtaining new counsel." Electronic Order (Unnumbered Docket Entry dated July 28, 2008). This order was served on Easton by mail. *See* Declaration of Service (Docket Entry # 45). Easton did not respond to the Court's order.

On September 26, 2008, defendants filed their motion for summary judgment as to all claims against them. Three days later, defendants served their motion papers on Easton by first-class mail, including the Notice of Motion to *Pro Se* Litigants required by Local Civil Rule 56.2. *See* Declaration of Service (Docket Entry # 52). On September 30, 2008, the Court ordered Easton to "file and serve his opposition to defendants' motion by October 31, 2008" and warned that "[f]ailure to do so may result in the Court deciding [the] motion as unopposed . . . or dismissing [Easton's] action for failure to prosecute." *See* Order (Docket Entry # 53). This Order was mailed to Easton. *See id.* Although over seven months have elapsed since the Court's October 31, 2008 deadline, the Court has not received Easton's opposition papers § or, indeed, any further communication from Easton.

**DISCUSSION**

A [*7] district court must grant summary judgment "whenever it determines that there is no genuine issue of material fact to be tried." *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003) (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). In considering a summary judgment motion, the Court must "resolve all ambiguities and draw all factual inferences in favor of the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 255).

**I. Constitutional Claims Against Polanco**

**A. *False Arrest/Imprisonment***

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d

Cir. 1996) (internal citation omitted). "The existence of probable cause to arrest . . . is a complete defense to an action for false arrest, whether that action is brought under state [*8] law or under § 1983." *Id.* (internal quotation marks and citation omitted). The same is true for an action for false imprisonment. *See Rutigliano v. City of New York*, No. 08-cv-0531, 326 Fed. Appx. 5, 2009 U.S. App. LEXIS 9559, 2009 WL 1174657, at *2 (2d Cir. May 1, 2009) ("[A] finding of probable cause will defeat [New York] state tort claims for . . . false imprisonment, and hence § 1983 false imprisonment claims premised on New York law." (internal quotation marks and citation omitted)).

"Probable cause exists where the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008) (internal quotation marks omitted). Here, it is undisputed that Polanco observed Easton smoking marijuana in a public place, which is a criminal offense under New York law. *See* N.Y. Penal Law § 221.10. Therefore, Polanco had probable cause to arrest Easton, and Easton's § 1983 false arrest and imprisonment claims must fail.

B. *Unlawful Strip Search*

"The Fourth Amendment requires an individualized reasonable suspicion [*9] that [a misdeameanor] arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest before she may be lawfully subjected to a strip search." *Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008) (internal quotation marks omitted) (alteration in original). "A reasonable suspicion of wrongdoing is something stronger than a mere hunch, but something weaker than probable cause." *Id.* "To establish reasonable suspicion, [officers] must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience. The standard requires individualized suspicion, specifically directed to the person who is targeted for the strip search." *Id.*

Here, the Court finds, based on the undisputed facts, that there was reasonable suspicion Easton was concealing contraband. It is highly relevant that Easton was smoking marijuana at the time he was arrested and that a bag of marijuana was found on his person when he was searched incident to his arrest. *See Elk v. Townson*, 839 F. Supp. 1047, 1052 ("[Arrestee's] presence in a vehicle which smelled strongly [*10] of marijuana and in which marijuana was found both on another occupant and in a container located near him gave the Sheriff's Office reasonable grounds to suspect that [he] might be hiding drugs on his person."); *cf. Hartline*, 546 F.3d at 101 (finding no reasonable suspicion for strip search where, *inter alia*, arresting officer "had no reason to believe that [arrestee] was under the influence of narcotics at the time of her arrest . . . [and] found no useable narcotics in [arrestee's] vehicle").

And while this alone may not have been enough to justify the alleged strip search, *see id.* ("[I]t is [not] reasonable to strip search every inmate booked on a drug related charge." (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1425 (10th Cir. 1997))), the Court relies on the fact that Easton was carrying $ 1,000 in cash. In light of the circumstances, this allows the "rational inference" that Easton had been engaged in the sale or distribution of marijuana at the time of his arrest and that he would therefore be concealing additional quantities of the drug on his person. *See Wachtler v. County of Herkimer*, 35 F.3d 77, 80 (2d Cir. 1994) ("[Arrestee's] possession of $ 1,000 in cash might have seemed [*11] a ground for suspecting drug trafficking and the possible presence of contraband."); *Lee v. Perez*, 175 F. Supp. 2d 673, 680 (stating that, *inter alia*, "the presence on [an arrestee's] person of a substantial amount of cash" may "raise [] the suspicion that [the arrestee] was involved in the drug trade, and thus might be carrying contraband on his person.").

In any event, even if reasonable suspicion did *not* exist for the alleged strip search, the Court would find Polanco shielded by the doctrine of qualified immunity. "A police officer is entitled to qualified immunity if (1) his conduct does not violate a clearly established constitutional right, or (2) it was objectively reasonable for the officer to believe his conduct did not violate a clearly established constitutional right." *Hartline*, 546 F.3d at 102 (internal quotation marks omitted). While the constitutional right to be free from strip searches without individualized reasonable suspicion has long been clearly established, *see id.*, qualified immunity is still available under the "objectively reasonable" prong "if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual [*12] context." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (internal quotation marks omitted). Because this particular factual context includes at least two "indicia that this Court has found to support individualized reasonable suspicion in the past," *Hartline*, 546 F.3d at 103, the Court concludes that an officer of reasonable competence could have believed a strip search was legal here. *Accord Wachtler*, 35 F.3d at 79 (finding arresting officer qualifiedly immune

where, *inter alia*, he "discover[ed] incriminating matter during a routine search of the arrestee," who was "found to be carrying $ 1000 on his person . . .").

### C. *Excessive Force*

"An official's use of force violates the [constitution] when two requirements are met: the use of force must be, objectively, sufficiently serious,' and 'the prison official involved must have a sufficiently culpable state of mind.'" *Bellotto v. County of Orange*, 248 F. App'x 232, 235 (2d Cir. 2007) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997)). "[S]ome degree of injury is ordinarily required" to satisfy the objective prong, although the injury need not be "serious" or "significant" "as long as the amount of force used is not *de* [*13] *minimis*." *United States v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999). [4]

Easton fails to satisfy the objective prong, as he does not allege a "use of force [that is] . . . sufficiently serious," *Bellotto*, 248 F. App'x at 235; in fact, he has not adduced evidence that Polanco used "force" on him *at all* - merely that Polanco verbally ordered him to disrobe and ogled him. [5] Neither has Easton alleged physical injuries of *any* degree. *See Walsh*, 194 F.3d at 50. Thus, Easton cannot sustain an excessive-force claim.

## II. Municipal Liability

Easton alleges that the City (1) "failed to intervene to prevent or end [Polanco's] unlawful conduct"; (2) "displayed a deliberate indifference to [Easton's] rights to be free from unreasonable searches and seizures"; and (3) "acted intentionally, willfully, maliciously, with reckless [*15] disregard for and deliberate indifference to [Easton's] rights and physical well being." Compl. PP 24-26. The Court construes these as municipal-liability claims under *Monell v. Dep't of Social Services*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

Where a municipal liability claim is based solely on the actions of a municipality's officers, as it is here, the claim must fail if the individual defendants have not violated the plaintiff's constitutional rights. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986) ("[N]either *Monell* . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm."). Since Polanco did not violate Easton's constitutional rights, *Heller* bars his *Monell* claims against the City.

Furthermore, to succeed under *Monell*, a plaintiff must establish that the violation of his rights resulted from an official municipal policy, custom or practice. *Monell*, 436 U.S. at at 690-91; *see also Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995). "Though this does not mean that the plaintiff must show that the municipality had an explicitly [*16] stated rule or regulation, a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (citations omitted). Here, Easton alleges only a single incident involving an actor below the policy-making level and has adduced no evidence of any official City policy, custom or practice. For this reason as well, Easton's municipal liability claims must fail.

## III. State Law Claims

Pursuant to 28 U.S.C. § 1367(c)(3), a district court may, "in its discretion, . . . decline to exercise supplemental jurisdiction over state law claims if it has dismissed all federal claims." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 103 (2d Cir. 1998). The Supreme Court has counseled that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine -

---

[4] Because Easton was a pretrial detainee, his excessive-force claim arises under the Fourteenth Amendment instead of the Eighth Amendment, which applies to excessive-force claims of convicted prisoners. *Walsh*, 194 F.3d at 47. However, under the law of this circuit, "the same standard of law" applies to both types of claims. Bellotto, 248 F. App'x at 235 (citing *Walsh*, 194 F.3d at 47-48).

[5] The Court acknowledges that other circuits have occasionally recognized excessive-force claims even where no physical contact occurred, such as where officers pointed guns at an arrestee. *See, e.g., Cortez v. McCauley*, 478 F.3d 1108, 1131 (10th Cir. 2007) ("Physical contact is not required for an excessive [*14] force claim - patently unreasonable conduct is."). The Second Circuit has never before recognized such a claim. *See Snoussi v. Bivona*, No. 05 CV 3133(RJD)(LB), 2008 U.S. Dist. LEXIS 70682, 2008 WL 3992157 at *6 (E.D.N.Y. Aug. 22, 2008) (stating that "[i]t is not immediately clear whether or not [the] threat [of force, without more] . . . can constitute excessive force," and collecting conflicting out-of-circuit decisions). However, even if allegations of "patently unreasonable conduct" without actual physical contact could state an excessive-force claim in this circuit, Polanco's alleged conduct was reasonable under the specific Fourth Amendment standard for strip searches, as the Court has explained above. *Cf. Gerstein v. Pugh*, 420 U.S. 103, 125 n.27, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975) (noting that satisfaction of the Fourth Amendment's specific standard for reasonableness of a search precludes assertion of a free-standing due process claim).

judicial economy, convenience, fairness, and comity - will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988). [*17] This is such a case; accordingly, the Court declines to exercise jurisdiction over Easton's state-law claims.

**CONCLUSION**

For the reasons described, defendants' motion for summary judgment is granted.

**SO ORDERED.**

FREDERIC BLOCK

Senior United States District Judge

Brooklyn, New York

June 23, 2009

# Gonzalez v. City of Schenectady

United States District Court for the Northern District of New York

September 17, 2001, Decided

00-CV-0824

**Reporter**

2001 U.S. Dist. LEXIS 14406; 2001 WL 1217224

ELIZABETH GONZALEZ, MICHAEL FYVIE and CHARLES FRISBEE, Plaintiffs, -against- THE CITY OF SCHENECTADY, RICHARD BARNETT, MICHAEL SILER, THOMAS MATTICE, MICHAEL GLASSER, MARISELA MOSHER, WILLIAM LACHANSKI, and ERIC HESCH, Individually and as Agents, Servants and/or Employees and Police Officers of the City of Schenectady and the City of Schenectady Police Department, and "JOHN DOE" and "JANE DOE," Individually and being Unnamed Agents, Servants and/or Employees and Police Officers of the City of Schenectady and the City of Schenectady Police Department, Defendants.

**Disposition:** [*1] Defendants City of Schenectady and Mr. Barnett's motions for summary judgment GRANTED IN PART and DENIED IN PART. Fourth Amendment claims and state law false arrest claims seeking damages from these defendants for Mr. Frisbee's detention DISMISSED. Defendant Barnett's motion for summary judgment on the grounds of qualified immunity GRANTED IN PART AND DENIED IN PART. Plaintiff's claim DISMISSED. Defendant Barnett's motion to dismiss the state law claims against him GRANTED, and all state law claims brought against Mr. Barnett DISMISSED. Defendant Barnett's motion to sever the claims of Mr. Frisbee from the other plaintiffs' claims GRANTED pursuant to Rule 21 of the Federal Rules of Civil Procedure. Defendant Barnett's motion to bifurcate the trial of the claim between the individual officers and the municipal claims GRANTED.

**Counsel:** Kevin A. Luibrand, Esq., Adrienne Kerwin, Esq., Of Counsel, Tobin and Dempf, Albany, NY, For Plaintiffs.

Daniel J. Stewart, Esq., Of Counsel, Dreyer Boyajian LLP, Albany, NY, For Barnett, Defendant.

Michael Murphy, Esq., Of Counsel, Carter Conboy Law Firm, Albany, NY, For City of Schenectady, Defendant.

**Judges:** Hon. Thomas J. McAvoy, U.S. District Judge. [*2]

**Opinion by:** Thomas J. McAvoy

## Opinion

**DECISION & ORDER**

**McAvoy, D.J.**

**I. BACKGROUND**

Plaintiffs commenced the instant action pursuant to 42 U.S.C. § 1983 alleging violations of their Fourth and Fourteenth Amendment rights arising out of their alleged arrests, detainments, and strip searches by Defendants. Plaintiffs also assert various pendent state law causes of action.

Previously, the Court granted partial summary judgment in favor of Plaintiff Michael Fyvie as to his claim against the City of Schenectady that he was strip searched in violation of his Fourth Amendment rights pursuant to an unconstitutional strip search policy. The Court denied Plaintiff Gonzales' motion and Defendants City of Schenectady, Thomas Mattice, Michael Glasser, Marisela Mosher, William Lachanski, and Eric Hesch's cross-motion for summary judgment pursuant to Rule 56 on that same issue.

Now before the Court is the motion of the Defendant City of Schenectady seeking partial summary judgment on all claims brought against the City by Plaintiff Charles Frisbee; and the motions of Defendant Richard Barnett seeking dismissal of all claims against Mr. Barnett on the grounds that the [*3] Complaint fails to state a cause of action against Mr. Barnett, or, in the alternative, granting him summary judgment on the grounds of qualified immunity. Mr. Barnett also seeks to dismiss the state law claims against him because of the Plaintiff's failure to file a timely Notice of Claim and because the Plaintiff did not interpose the state law claims within the applicable statute of limitations. In addition, Mr. Barnett moves pursuant to Rule 21 of the Federal Rules of Civil Procedure to sever the claims of the three plaintiffs and, further, pursuant to Rule 42(b), to bifurcate Mr. Frisbee's claims against Mr. Barnett from the claims against the City of Schenectady.

**A. Plaintiff Frisbee's Version of the April 1, 1998 Arrest**

Pursuant to Rule 56, the following facts are taken in the light most favorable to the non-movant, Plaintiff Charles Frisbee. Cruden v. Bank of New York, 957 F.2d 961, 975 (2d Cir. 1992).

On April 1, 1998, at about 5:55 p.m., Mr. Frisbee was walking on a public street in the City of Schenectady with his then-six year old daughter and her nine year old friend to go to a convenience store to buy ice cream. When they were in front of [*4] the store, Frisbee was called over to a City of Schenectady police vehicle by Defendant-Officers Barnett and Siler who were seated in the vehicle. Siler asked Frisbee what he was doing in the area. Frisbee responded that he was going to the store. Frisbee's daughter and her friend entered the store, and Siler and Barnett exited the police vehicle. Siler and Barnett then approached Frisbee on the sidewalk and, according to Frisbee's deposition, Siler said: "Where is the fucking crack, where is the fucking crack?" [1] Plaintiff then responded: "I don't use crack. I don't know nothing about crack." Plaintiff asserts that he said he was with his daughter and her friend, that Siler & Barnett were aware of that fact, that he told the Officers that he just lived one block away. He also asserts that at about that point his daughter came running out of the store yelling: "Don't take my daddy to jail."

[*5] Plaintiff asserts that Barnett escorted his daughter away at which time Plaintiff said to Siler: "Why are you stopping me. Why are you harassing me." Plaintiff claims that Siler responded: "Because you won't fucking tell us where the fucking crackheads are you fucking asshole." Barnett then supposedly asked: "Got anything in your pockets?" to which Plaintiff responded in the negative. Siler then said: "Spread 'em." Plaintiff claims that Siler kicked him in the ankle, threw him up against the car, and started to frisk him. Plaintiff claims that "they was checking through my pockets, - keys, whatever I had in my pockets, looking, looking, looking. And they found a little marijuana." Frisbee Dep. p. 69. Plaintiff asserts Defendants found a small bag of marijuana in the Plaintiff's front pocket which Plaintiff claims was worth approximately $ 5.00.

Frisbee was then handcuffed, transported to the City of Schenectady Police Station, and stripped searched by Siler and Barnett. He was kept in a holding cell for a couple of hours and then was issued an Appearance Ticket and released without having to post bail. He was charged with the violation of possession of marijuana, contrary to New [*6] York Penal Law Section 221.05. He asserts that when he received back his belongings, one hundred ($ 100.00) dollars in cash was missing. He also asserts that at no time did he consent to be searched.

Mr. Frisbee eventually pled guilty to possession of marijuana and paid the resulting fine.

**II DISCUSSION**

The Court will first address the motions directed to Mr. Frisbee's arrest. The Court notes that the City's arguments are addressed only to the circumstances surrounding Mr. Frisbee's April 1, 1998 arrest, therefore, the Court treats the motion as limited to that much of those causes of action premised in whole or in part on the April 1, 1998 incident. [2]

[*7] In addition, Mr. Barnett's motion, which is similarly directed to the April 1, 1998 events, relies on documents beyond the pleadings. The non-movant responds in kind. Therefore, the Court treats his motion as a Rule 56 motion.

**A. Post-Marijuana discovery detention claim**

Plaintiff acknowledges that under Townes v. City of New York, 176 F.3d 138 (2d Cir. 1999), cert. denied, 528 U.S. 964, 120 S. Ct. 398, 145 L. Ed. 2d 311 (1999), he may not recover for damages arising from any detention suffered as a consequence of the discovery of marijuana on him on April 1, 1998. Therefore, that much of Defendant Barnett and the City of Schenectady's motions seeking to dismiss Plaintiff Frisbee's claims for damages for his detention occurring after the discovery of marijuana on April 1, 1998 is **GRANTED** and that portion of Mr. Frisbee's claims premised on his detention after the marijuana was discovered on April 1, 1998 are **DISMISSED.**

**B. Pre-Marijuana discovery detention claim**

Plaintiff argues, however, that he has a legally viable claim for damages under a false arrest theory based upon the

---

[1] At his deposition, Frisbee was asked who made this statement. He responded: "Siler and Barnett, pretty much Siler though." Plf. Dep. p. 66.

[2] The Amended Complaint asserts claims by Mr. Frisbee for false arrest and unlawful search arising from conduct by the City's police officers on April 1, 1998, April 8, 1998, and July 6, 1998. The Notice of Motion seeks dismissal of all claims by Frisbee whereas the attorney affirmation in support of the pending motion explicitly limits the motion to the causes of action arising from the April 1, 1998 arrest.

defendants' conduct on April 1, 1998 which [*8] occurred before the marijuana was discovered. The threshold issue now before the Court is whether the facts of this case, when viewed in the light most favorable to Mr. Frisbee, could lead a reasonable finder of fact to conclude that the Plaintiff was seized, arrested or searched in violation of his Fourth Amendment rights before the marijuana was discovered.

**1. The Fourth Amendment**

The Fourth Amendment safeguards "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend IV; Atwater v. City of Lago Vista, 532 U.S. 318, 121 S. Ct. 1536, 1543, 149 L. Ed. 2d 549 (2001). Whenever an individual is physically or constructively detained by a police officer in such a manner that a reasonable person would not feel he is free to leave, that individual has been "seized" or "arrested" within the meaning of the Fourth and Fourteenth Amendment. See Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); Tennessee v. Garner, 471 U.S. 1, 85 L. Ed. 2d 1, 105 S. Ct. 1694 (1985)("Whenever an officer restrains the freedom of a person to walk away, [*9] he has seized the person.").

A seizure does not occur every time a police officer approaches a citizen on the street to engage in consensual discourse. See United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995). A police officer may stop and detain an individual to conduct a reasonable inquiry into whether crime is afoot without violating the Fourth Amendment if the officer possesses a reasonable suspicion that criminal activity has occurred or is about to occur. Terry v. Ohio, 392 U.S. at 20. This is known as a Terry Stop. However, when an officer detains an individual for questioning yet lacks this reasonable suspicion, a seizure under the Fourth Amendment occurs. See United States v. Glover, 957 F.2d 1004, 1008 (2d Cir. 1992).

Further, Terry Stops, because they are investigative in nature, must be brief and "reasonably related in scope to the circumstances which justified the intervention in the first place." See Terry, 392 U.S. at 20. If such a stop last "longer than is necessary to effectuate the purposes of the stop" or employs tactics more invasive than necessary under the circumstances, then the stop becomes [*10] a *de facto* arrest for which the officer must have probable cause to believe that a crime has occurred. See Tehrani, 49 F.3d at 58; Oliveira v. Mayer, 23 F.3d 642, 645-46 (2d Cir. 1994), cert. denied, 513 U.S. 1076, 130 L. Ed. 2d 627, 115 S. Ct. 721, 115 S. Ct. 722 (1995).

Probable cause exists when officers "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Posr v. Court Officer Shield No. 207, 180 F.3d 409, 414 (2d Cir. 1999). The inquiry into the existence of probable cause is an objective one; the subjective beliefs of the arresting officer are irrelevant. Martinez v. Simonetti, 202 F.3d 625, 633 (2d Cir. 2000).

During a Terry Stop, officers may conduct a "pat-down frisk" if the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." Terry, 392 U.S. at 30. [*11] Further, "where nothing in the initial stages of the encounter serves to dispel his *reasonable fear* for his own or others' safety, he is entitled... to conduct" this pat down frisk, which is intended be "a carefully limited search of outer clothing of such persons in an attempt to discover weapons...." Terry, 392 U.S. at 30.

**2. Plaintiff's claims**

In order for the Plaintiff to maintain his Fourth Amendment or false arrest claims [3] for April 1, 1998, he must establish:

[*12] (1) that the defendants detained him without a reasonable suspicion before they found the marijuana; or

(2) that the defendants used measures more intrusive then necessary to conduct a Terry Stop without probable cause before the marijuana was discovered; or

(3) that the defendants engaged in a *de facto* arrest of the Plaintiff without probable cause before the marijuana was discovered.

To succeed on the first and third theories, Plaintiff must establish that he was seized within the meaning of the

[3] The elements of a cause of action for state common law false arrest are (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. See Kirk v. Metropolitan Transp. Auth., 2001 U.S. Dist. LEXIS 2786, *27-28, 2001 WL 258605, *9 (S.D.N.Y.2001) (citing Weyant v. Okst, 101 F.3d 845, 853 (2d Cir. 1996); Broughton v. State, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)). Because false arrest is a type of false imprisonment, the two claims have identical elements. See Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995), cert. denied, 517 U.S. 1189, 134 L. Ed. 2d 779, 116 S. Ct. 1676 (1996).

Fourth Amendment, to succeed on the second theory he must establish that the level of intrusion used by the officers was unreasonable under the totality of the circumstances. The Courts have held that these determinations are generally questions of fact for a jury to determine. See Oliveira, at 645; Posr v. Doherty, 944 F.2d 91, 99 (2d Cir. 1991)("The issue of precisely when an arrest takes place is a question of fact."). Further, each theory requires proof that the officers acted without the requisite "reasonable suspicion" or "probable cause."

Here, when viewing the facts in the light most favorable to Mr. Frisbee, a reasonable trier of fact could conclude that [*13] the officers detained Mr. Frisbee for questioning without a reasonable suspicion that a crime had occurred or was about to occur; that at least Defendant Siler engaged in procedures more intrusive then necessary under the circumstances; and that the officers seized and search Mr. Frisbee without probable cause.

According to Mr. Frisbee's version of the events, on April 1, 1998 he was engaged in wholly innocuous activity when he was approached by the defendants. A finder of fact could conclude that the police lacked any suspicion that crime was afoot when they approached Mr. Frisbee. Further, a reasonable finder of fact could conclude that during the questioning, a reasonable person would not feel free to leave and that the police gained no further heightened suspicion or probable cause to continue detaining or to search Mr. Frisbee during their questioning. None of the responses given by the Plaintiff to Defendants' questions, at least as he recounts them, would lead a reasonable trier of fact to conclude that the defendants obtained a reasonable suspicion or probable cause to believe that a crime had been committed or that plaintiff was armed.

Still further, based upon Mr. Frisbee's [*14] account, a reasonable finder of fact could conclude that the police lacked a reasonable basis to frisk Mr. Frisbee or, if they did have such reasonable suspicion, that the frisk went far beyond a justifiable pat down of his outer clothing. In addition, a reasonable trier of fact could conclude that there existed no reasonable suspicion or probable cause to believe, at that time, that Plaintiff presented a risk of harm to himself or to others. See Kerman v. City of New York, 2001 U.S. App. LEXIS 16808, 2001 WL 845442, at *6 (2d Cir. July 26, 2001)(A police officer's decision to detain or handcuff a person is not unreasonable if the officer has probable cause to believe that the person presents a risk of harm to himself or to others.). In fact, Defendants have not advanced a position on this motion that either Siler or Barnett believed the Plaintiff was armed at the time, and it is a reasonable inference that the small bag of marijuana discovered by the police would not have been discovered in a simple pat down frisk intended only to discover weapons.

Even assuming, *arguendo*, that the area in which this encounter took place was known by the police as having high drug sales, this fact still [*15] does not prevent a reasonable finder of fact from concluding that the police lacked an articulable suspicion or probable cause that Plaintiff committed or was about to commit a crime when they approached and detained him. To hold to the contrary would eviscerate the protections of the Fourth Amendment for every person who lives, works, or travels in an area known for high drug sales.

While Mr. Barnett asserts in his Memorandum of Law that a reasonable suspicion arose, in part, from the fact that Mr. Frisbee had a prior marijuana possession conviction, Mr. Barnett's affidavit is void of any contention that he possessed this information at the time of the stop. Further, while Frisbee admits that when the police approached, a number of "kids" who had gathered in front of the store ran away, he denies he had any involvement with these individuals. Frisbee Dep., p. 173-174.

Based upon Plaintiff's version of the events, a reasonable finder of fact could conclude that the facts leading up the discovery of marijuana constitute an unjustified intrusion which offends Mr. Frisbee's Fourth Amendment rights and constitutes a legally cognizable false arrest claim.

**3. Interplay with Townes [*16] v. City of New York**

Townes v. City of New York does not prevent the Plaintiff from pursuing claims for damages arising from conduct that occurred before the discovery of the marijuana. The holding of Townes is specifically limited to the fact that Mr. Townes had not sought damages for conduct occurring before the discovery of the weapons in the taxi-cab in which he was riding. Townes does not hold that a Fourth Amendment claim for that period of time is a legally nullity. In fact, the *dicta* in Townes supports the contrary conclusion. In this regard, the Townes decision states:

> The only actionable violations of [the Fourth Amendment] are the stop of the taxicab and the associated seizure and search of Townes's person, which alone might at most support slight or nominal damages. Townes, however, seeks damages not for those injuries, but only for the ultimate harm he suffered by his conviction and incarceration.

Townes, 176 F.3d at 145 (emphasis added).

The Townes decision goes on to hold that "because Townes does not seek the only relief to which he may have been entitled, his complaint should have been dismissed [*17] pursuant to Fed.R.Civ.P. 12(b)(6)." Townes, 176 F.3d at 149 (emphasis added). Accordingly, had Mr. Townes properly pled and sought damages for a constitutional violation for the period up to the discovery of weapons and drugs, his claim would have been actionable *albeit* of minimal value.

Here, the threshold issue is whether the Plaintiff's claim is cognizable at law. The Court finds that Plaintiff does assert cognizable false arrest claims for the period of time between initial contact with the police and the point where the marijuana was discovered.

**4. Barnett's personal involvement - April 1, 1998**

Mr. Barnett argues in his Reply Memorandum of Law that he did not participate in the search of Mr. Frisbee and therefore he cannot be held accountable for this conduct. At first blush, the Amended Complaint appears not to allege any patently unlawful conduct by Mr. Barnett on April 1, 1998 until after the marijuana was discovered. See Amend. Compl. PP 46, 47, & 48. The Amended Complaint asserts that on April 1, 1998, without probable cause, Barnett and Siler approached Plaintiff, Amend. Compl. P 46; that Officer Siler forced Plaintiff against the car and [*18] searched Plaintiff, Amend. Compl. P 47; and that Officer Siler unlawfully detained and handcuffed Mr. Frisbee, Amend. Compl. P 48. Officer Barnett is alleged to have participated in the transfer of Frisbee to the station which, according to the Plaintiff's facts, occurred after the discovery of marijuana. Amend. Compl. P 48. The mere allegation that Barnett approached Frisbee without probable cause is legally insufficient to state a claim under the Fourth Amendment or for state law false arrest.

However, one sentence in the Amended Complaint gives the Court pause before dismissing the claim against Mr. Barnett. At paragraph 55, the Amended Complaint uses a plural noun and asserts that:

> The defendant police officers, at the above times and places, ... without cause of legal right, did, under color of Law of the State of New York and/or the City of Schenectady, stop and frisk Charles Frisbee without reasonable suspicion and without consent of Charles Frisbee ... .

Amend. Compl. P 55.

While the earlier paragraphs of the Amended Complaint assert that Defendant Siler conducted the frisk, Plaintiff testified at his deposition that Mr. Barnett asked Plaintiff if he had anything [*19] in his pockets and then claims, using a plural pronoun, that: "they was checking through my pockets, - keys, whatever I had in my pockets, looking, looking, looking. And they found a little marijuana." Frisbee Dep. p. 69.

A reasonable finder of fact could conclude that Barnett participated in both the investigatory detention of Plaintiff and in the search after Siler started the frisk. Further, based upon the totality of circumstances, a reasonable finder of fact could conclude that Barnett's presence and actions when approaching Plaintiff, participating in the questioning, and ushering his daughter way from the scene contributed to a reasonable belief that Mr. Frisbee felt detained and therefore seized within the meaning of the Fourth Amendment and state common law.

This creates a sufficient question of material fact which requires the Court to **DENY** summary judgment on this ground.

**C. Qualified Immunity**

Next, Defendant Barnett moves for summary judgment asserting that under the holding of Cerrone v. Brown, 246 F.3d 194 (2d Cir. 2001), he is entitled to qualified immunity because the officers had "arguable probable cause" for the Terry Stop and [*20] pat down frisk of Plaintiff. Neither party contests that in 1998, it was clearly established that a "Terry Stop and Frisk" required an articulable suspicion, and that an arrest and search required probable cause. Thus, the issue is whether Officer Barnett's conduct was objectively reasonable under the second element of the qualified immunity analysis.

In Cerrone, the Second Circuit held that:

> the second element of qualified immunity analysis permits a court to grant summary judgment if a reasonable officer could have believed his or her actions were lawful. A court must evaluate the objective reasonableness of the appellants' conduct in light of clearly established law and the information the officers possessed. Because the test is an objective one, the officer's subjective beliefs about the seizure are irrelevant. A defendant is therefore entitled to summary judgment on qualified immunity grounds if a jury, viewing all facts in the light most favorable to the plaintiff, could conclude that officers of reasonable competence could disagree on the legality of the defendant's actions.

Cerrone, 246 F.3d at 202 (internal citations and quotations omitted). [*21] "Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law." Cerrone, 246 F.3d at 202-203.

While the holding of Cerrone combined with Mr. Barnett's version of the facts of April 1, 1998 [4] *might* entitle him to qualified immunity, one must not lose sight of the fact that this defense is raised in the context of a Rule 56 motion during which the Court must view the facts in the light most favorable to Mr. Frisbee. However, as also instructed by the Second Circuit in Cerrone:

> Even on summary judgment, where all facts must be viewed in the light most favorable to the non-moving party, for the purpose of qualified immunity and arguable probable cause, police officers are entitled to draw reasonable inferences from the facts they possess at the time of a seizure based upon their own experiences.

Cerrone, 246 F.3d at 203.

[*22] Here, when performing the mental exercise of viewing the facts in the light most favorable to Mr. Frisbee while still drawing reasonable inferences from the facts Defendant Barnett possessed at the time of the stop based upon his own experiences, the Court cannot conclude that reasonable officers would disagree on whether Defendants Siler and Barnett had either a reasonable suspicion to detain or frisk Frisbee or probable cause to arrest or search him - at least until they found the marijuana on him. Under Mr. Frisbee's version of events, he was doing nothing suspicious nor involved in any apparent criminal activity. He was simply walking down a City street with his daughter and her young friend. Even drawing the reasonable inference based upon Mr. Barnett's experience that Plaintiff was in a high drug trade zone and that he had previously been convicted of marijuana possession, nothing in Plaintiff's conduct, appearance, or his answers to the Defendants' questions could form the basis for an objectively reasonable suspicion that he was involved in drug activity or any other crime on April 1, 1998.

The 20/20 vision gained through hindsight cannot be used to alter the events which [*23] lead up the marijuana discovery, at least as recounted by Mr. Frisbee. The divergent version of the two scenarios creates a material question of fact which prevents the application of qualified immunity at this time. Kerman, 2001 WL 845442, at *8 ("However, the parties' versions of the facts differ markedly and 'summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.'")(quoting Thomas v. Roach, 165 F.3d 137, 143 (2d Cir. 1999); Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993)(summary judgment available on immunity issues only if undisputed facts).

**5. April 1, 1998 Strip Search**

Next, Plaintiff argues that despite the discovery of marijuana on his person, the strip search conducted of Mr. Frisbee on April 1, 1998 could still form the basis of a constitutional tort. He argues that the amount of marijuana was so small that he was only charged with a violation level offense, and, therefore, under the circumstances the strip search conducted by Siler and Barnett violated his Constitutional rights. Officer Barnett [*24] argues that the initial finding of marijuana supplied reasonable suspicion that the Plaintiff might have been secreting other contraband on his person which therefore justified the strip search.

In the May 31, 2001 Memorandum, Decision & Order issued in this case, the Court held that the blanket policy of

---

4 Barnett asserts that on the date in question, he and Siler were on routine patrol in an area of the City "known to [him] to be a popular location for drug dealings." As he approached the corner where the store is located, he observed Frisbee "huddled with several younger black males. Based upon [his] experience, it looked [to him] as if they were engaged in a drug deal. As [the officers] approached, a black gentleman ran into the adjacent store, and Mr. Frisbee began to walk away. Mr. Frisbee's daughter was not present at the time." Barnett Aff. P 3.

At his deposition, Frisbee said that there were "one or two [known drug houses] on every block" in the area in question; that there were "a lot of [drug] users" in the area where the store is located; but denied that it was known to him as an area where drugs were sold. Frisbee Dep., p. 154-155. Frisbee also states in his deposition that when he approached the store with his daughter and her friend, there were four (4) or five (5) kids within a "half block radius" in front of the store who "scurried... Took off when they seen [the police] pull up." Frisbee Dep., p. 173-174. He asserts further, however, that he had no involvement with these individuals.

Barnett asserts that Siler approached Frisbee and began asking him questions. When Plaintiff was asked about drugs, "he denied that he had any and said to go ahead and search him." That is when the police found the marijuana inside a cigarette package. Barnett denies taking any money after the strip search. He asserts that the stip search occurred pursuant to the policy of the City.

the City of Schenectady in strip searching all non-felony detainees was unconstitutional. The Court also held that each asserted constitutional violation must be addressed independently to determine whether or not there existed a reasonable suspicion in each case that the detainee possessed weapons or contraband. Circumstances which are considered in reaching this conclusion are the "the crime charged, the particular circumstances of the arrestee, and/or the circumstances of the arrest." Weber v. Dell, 804 F.2d 796 (2d Cir. 1986), cert. denied sub. nom., County of Monroe v. Weber, 483 U.S. 1020, 97 L. Ed. 2d 762, 107 S. Ct. 3263 (1987).

Once it is conceded that the detention was constitutionally justified, the issue then is whether the strip search incident to that detention was justified under the circumstances. Here, even drawing all facts and [*25] inferences in Mr. Frisbee's favor, given the discovery of marijuana before the detention a reasonable fact-finder could only conclude that reasonable officers could disagree whether a reasonable suspicion existed that Mr. Frisbee possessed more contraband which the defendants, for obvious institutional reasons, did not want in their holding cells.

There is no allegation the strip-search was punitive in nature or that questions of fact exist as to whether Plaintiff did possess marijuana. There is an allegation that after the strip search, $ 100.00 in cash was missing from Mr. Frisbee's personal belongings. While the Fourth Amendment's notion of a reasonable and non-excessive intrusion would probably be offended by an otherwise-valid strip search that converted $ 100.00 of personal belongings, the allegations of the Amended Complaint assert that it was Officer Siler who took the $ 100.00. Amend. Compl. P 50. There is no similar allegation with regard to Officer Barnett. Nor is there any allegation that Officer Barnett participated in nor was deliberately indifferent to Mr. Siler's alleged conduct in this regard.

Therefore, Mr. Barnett is entitled to qualified immunity on this portion [*26] of Plaintiff's claim. See Saucier v. Katz, 531 U.S. 991, 148 L. Ed. 2d 454, 121 S. Ct. 480 (2001); Cerrone, 246 F.3d 194.

**6. Damages**

In the Reply papers, Defendant Barnett argues that under Townes v. City of New York, any surviving claim under the Fourth Amendment should be limited to nominal damages as a matter of law.

In Townes, the Second Circuit stated that in a § 1983 suit, the plaintiff must demonstrate proximate causation between the asserted invasion of privacy and actual damages. Townes at 146-48. The discovery of criminality prevents recovery of damages for post-discovery incarceration caused by the criminality, not the pre-discovery false arrest. Id. However, Plaintiff concedes this point and instead seeks damages for the asserted invasion of privacy which occurred before the marijuana was discovered.

"Damages in an illegal search suit under § 1983 ... must ordinarily be determined by a jury, not a judge." Dasher v. Hughes, 2000 U.S. Dist. LEXIS 7688, *23, 2000 WL 726865, at *8 (S.D.N.Y. June 6, 2000). A plaintiff is entitled to develop his case tending to prove actual injury. Only if, after presenting evidence, he remains [*27] "unable to prove" actual damages does a nominal award become appropriate. See, e.g., Atkins v. New York City, 143 F.3d 100, 103 (2d Cir. 1998)(citing Carey v. Piphus 435 U.S. 247, 248, 55 L. Ed. 2d 252, 98 S. Ct. 1042 (1978)). "A judge cannot summarily award merely nominal damages, thereby usurping the jury's function, unless plaintiff cannot present any reasonable evidence of injury." Dasher, 2000 WL 726865, at *9.

Whether a jury would award compensatory damages for the brief detention suffered by the Plaintiff is, therefore, a question of fact. Because the issue was raised in a Reply Memorandum of Law, Plaintiff has not responded directly to the damage argument. However, Defendant Barnett has not demonstrated the lack of a genuine question of material fact on this issue and, therefore, he has not satisfied his burden under Rule 56. See FED. R. Civ. P. 56(e); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir.2000)(moving party bears the initial burden of establishing that there are no genuine issues of material fact, and, once such a showing is made, burden shifts to non-movant tp set forth specific facts [*28] showing that there is a genuine issue for trial). For this reason, the motion is denied in this respect.

**7. Conclusion**

Therefore, that much of Fourth Amendment and state law false arrest claims seeking damages for Mr. Frisbee's detention after the point in time that the marijuana was discovered are **DISMISSED.** These same claims, however, remain viable inasmuch as they seek damages for the detention up to the time of the discovery of marijuana. Further, Officer Barnett is **GRANTED** qualified immunity for his role in Mr. Frisbee's strip search on April 1, 1998.

**8. State Law Claims - Statute of Limitations**

Next, Officer Barnett moves to dismiss the state law claims asserted against him on the grounds that the Plaintiff failed

to file a Notice of Claim against Officer Barnett pursuant to General Municipal Law § 50(e), or, in the alternative, to dismiss on the grounds that the state law claims were not interposed within the applicable statute of limitations period. The Plaintiff has not opposed that portion of Defendant Barnett's motion addressed to the statute of limitations issue. Because it does not appear that the state law claims were interposed within [*29] one year of the date of accrual, these claims against Mr. Barnett are **DISMISSED**. See NY C.P.L.R. § 215(3); Greiner v. County of Greene, 811 F. Supp. 796, 800 (N.D.N.Y. 1993).

**9. Severance/Bifurcation**

Defendant Barnett also moves pursuant to FED. R. Civ. P. 21 seeking to sever Mr. Frisbee's claims from the plaintiffs' claims and, pursuant to FED. R. Civ. P. 42(b), seeking to bifurcate Mr. Frisbee's claims against Mr. Barnett from Mr. Frisbee's claims against the City of Schenectady. The Plaintiff does not oppose the severance of his claims from the other plaintiffs but does oppose the bifurcation of the claim between the City and the individual defendants.

**A. Severance/Separate Trial (bifurcation) - Standard**

Rule 21 of the Federal Rules of Civil Procedure allows for the severance of "any claims," [5] and Rule 42(b) provides that a court may order a separate trial of any claim "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy," FED. R. Civ. P. 42(b). The distinction between these two rules is that "separate trials usually will result in one judgment, but severed claims [*30] become entirely independent actions to be tried, and judgment entered thereon, independently." 9 Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2387.

Trial courts have broad discretion to employ either of these rules, which are generally determined using the same standard. Wausau Bus. Ins. Co. v. Turner Const. Co., 2001 U.S. Dist. LEXIS 5493, 2001 WL 460928, at *2 (S.D.N.Y. May 2, 2001)(citing New York v. Hendrickson Bros., Inc., 840 F.2d 1065 (2d Cir.), cert. denied, 488 U.S. 848, 102 L. Ed. 2d 101, 109 S. Ct. 128 (1988)); see also Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 370 (2d Cir. 1988). [*31]

In exercising this discretion, courts must consider "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." Morris v. Northrop Grumman Corp., 37 F. Supp. 2d 556, 580 (E.D.N.Y. 1999). [6] To grant severance or separate trials requires the presence of only one of these conditions. Lewis v. Triborough Bridge & Tunnel Authority, 2000 U.S. Dist. LEXIS 4982, 2000 WL 423517, at *2 (S.D.N.Y. April 19, 2000)(severance); Carson v. City of Syracuse, 1993 U.S. Dist. LEXIS 9508, 1993 WL 260676, at *2 (N.D.N.Y. July 7, 1993)(bifurcation).

**[*32] B. Severance**

In support of his position to sever the Frisbee claims from the other two plaintiffs' claims, Mr. Barnett argues that each plaintiff has a separate claim involving separate arrests by

---

[5] Rule 21 provides:

> Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

[6] Other Courts have held that the test is:

> "(1) whether the issues sought to be tried separately are significantly different from one another; (2) whether the severable issues require the testimony of different witnesses and different documentary proof; (3) whether the party opposing the severance will be prejudiced if it is granted; and (4) whether the party requesting the severance will be prejudiced if it is not granted."

BD ex rel. Jean Doe v. DeBuono, 193 F.R.D. 117, 125, 2000 WL 249115, at *5 (S.D.N.Y. 2000).

different officers. [7] He asserts that he stands to suffer substantial prejudice if severance is not granted because of the possibility of a taint by evidence of an impermissible stop or search of another plaintiff by another officer in another circumstance. As indicated, the Plaintiff consents to the severance. The City, Mr. Siler, and the other defendants have not presented a position one way or the other. Based upon the fact that they were served with the pending motions, their silence will be deemed acquiescence in the relief sought.

[*33] The Court finds that severance is appropriate in this case. Each individual plaintiff's claims arise from separate occurrences and involve separate individual defendants. The individual claims do not arise from a common nucleus of operative facts nor does it appear that there will be much overlap in witnesses or documentary proof, at least as the individual claims are concerned. There is the potential for some prejudice which can be avoided if severance is granted, and this potential is not outweighed by the judicial economy which will be served by one trial.

Therefore, Defendant Barnett's motion to sever Mr. Frisbee's claims from the main action is **GRANTED.**

**C. Bifurcation (Separate trials)**

Bifurcation, or the granting of separate trials, "may be appropriate where, for example, the litigation of the first issue might eliminate the need to litigate the second issue, or where one party will be prejudiced by evidence presented against another party." Amato v. City of Saratoga Springs, 170 F.3d 311, 316 (2d Cir. 1999). "The party moving for a separate trial has the burden of showing that [separate trials are] necessary to prevent prejudice or confusion, and [*34] to serve the ends of justice." Buscemi v. Pepsico, Inc., 736 F. Supp. 1267, 1271 (S.D.N.Y. 1990).

In support of bifurcation, Defendant Barnett makes two arguments. First, he argues that if the Plaintiff fails on his claims against the individual officers, the "failure to train" and "failure to supervise" claims will not need to be litigated. Thus, Defendants argues, there is the potential for judicial economy by trying the individual claims first. On this point, Defendant asserts that the trial of the individual claims will take merely a few days whereas the trial of the municipal claims will take substantially longer.

Plaintiff responds that if the claims are bifurcated, he would be forced to present the same proof twice unless the second trial is in front of the same jury. Plaintiff's counsel does not specifically address the quantum of proof that will be presented on the municipal claims as compared to the individual claims.

Second, Defendant argues that the potential for prejudice exists because the Plaintiff may attempt to prove his failure to train or failure to supervise theories by evidence of prior misconduct by the officers which would not be admissible [*35] on the individual claims under the Federal Rules of Evidence. Plaintiff responds that such a safeguard is not required in this case because specific evidence of past misconduct of the individual defendants involved in this case will not be offered to prove claims against the municipality.

Given Defense counsel's representation that the second set of claims will take considerable time to try in comparison to the individual claims, Plaintiff's counsel's silence on the issue, and the potential that the second trial may not be necessary if Mr. Frisbee does not succeed on his individual claims, [8] judicial economy is best served by bifurcation. However, the ends of justice are also best served by trying both portions of Mr. Frisbee's case "back to back to the same jury." Carson, 1993 WL 260676, at * 7. This obviates the need, for all parties, to try the same issues twice.

[*36] Therefore, Defendant's motion to bifurcate the claims is **GRANTED.** The case will be tried back to back to one jury.

**III. CONCLUSION**

In conclusion the Court determines as follows:

Defendants City of Schenectady and Mr. Barnett's motions for summary judgment are **GRANTED IN PART and DENIED IN PART.** That much of Fourth Amendment claims and state law false arrest claims seeking damages from these defendants for Mr. Frisbee's detention after the

[7] He argues that the only basis to join the three in the first place is because they all involved a single issue of whether the City's strip search policy was unconstitutional. Now that the this issue has been decided against the City, Defendant Barnett argues that the only issue left to be tried on the strip search issue is whether each plaintiff has made out a constitutional claim.

[8] *See* City of Los Angeles v. Heller, 475 U.S. 796, 799, 89 L. Ed. 2d 806, 106 S. Ct. 1571 (1986) and Pitchell v. Callan, 13 F.3d 545, 549 (2d Cir.1994), both standing for the proposition that it is well-settled that a claim of negligent training or supervision under Monell lies against a municipality only where there is a finding of a constitutional violation by one of its officers.

point in time that the marijuana was discovered are **DISMISSED.** These same claims, however, remain viable against these defendants inasmuch as they seek damages for the detention up to the time of the discovery of marijuana.

Defendant Barnett's motion for summary judgment on the grounds of qualified immunity is **GRANTED IN PART AND DENIED IN PART**. Mr. Barnett is granted qualified immunity for his role in the strip search of Mr. Frisbee occurring on April 1, 1998 and this much of Plaintiff's claim is **DISMISSED**. His motion for summary judgment on the grounds of qualified immunity is denied in all other respects.

Defendant Barnett's motion to dismiss the state law claims against him is **GRANTED**, and all [*37] state law claims brought against Mr. Barnett are **DISMISSED.**

Defendant Barnett's motion to sever the claims of Mr. Frisbee from the other plaintiffs' claims is **GRANTED** pursuant to Rule 21 of the Federal Rules of Civil Procedure. The Clerk of the Court is hereby **ORDERED** to assign the severed action a separate trial date as close in time as possible to the trial date set in the Rule 16 Scheduling Order in the main action, taking into account the Court's schedule and the overlap of counsel in the now-separate actions.

Defendant Barnett's motion to bifurcate the trial of the claim between the individual officers and the municipal claims is **GRANTED**, however, the claims shall be tried back to back to the same jury.

**IT IS SO ORDERED**

September 17, 2001

Hon. Thomas J. McAvoy

U.S. District Judge