# Alzawahra v. Albany Med. Ctr.

United States Court of Appeals for the Second Circuit

December 5, 2013, Decided

No. 12-4517

**Reporter**

546 Fed. Appx. 53; 2013 U.S. App. LEXIS 24168; 2013 WL 6284286

WAEL F. ALZAWAHRA, Plaintiff-Appellant, v. ALBANY MEDICAL CENTER, DAVID JOURD'HEUIL, HAROLD A. SINGER, Defendants-Appellees.

**Notice:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Subsequent History:** Motion denied by Alzawahra v. Albany Med. Ctr., 2014 U.S. LEXIS 5841 (U.S., Oct. 6, 2014)

**Prior History:** [**1] Appeal from a November 1, 2012 judgment of the United States District Court for the Northern District of New York (Thomas J. McAvoy, Judge). Alzawahra v. Albany Med. Ctr., 2012 U.S. Dist. LEXIS 156517 (N.D.N.Y, Oct. 31, 2012)

**Counsel:** FOR APPELLANT: Wael F. Alzawahra, Pro se, Albany, NY.

FOR APPELLEES: Nicholas John D'Ambrosio, Jr., Bond, Schoeneck & King, PLLC, Albany, NY.

**Judges:** PRESENT: JOHN M. WALKER, JR., JOSE A. CABRANES, RAYMOND J. LOHIER, JR., Circuit Judges.

## Opinion

[*53] **SUMMARY ORDER**

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the District Court is **AFFIRMED.**

Wael F. Alzawahra, proceeding *pro se*, appeals from an entry of summary judgment [*54] in favor of appellees Albany Medical Center, David Jourd'heuil, and Harold A. Singer, dismissing Alzawahra's claims for employment discrimination, hostile work environment, and retaliation, brought pursuant to Title VII of the Civil Rights Act ("Title VII") and New York Executive Law §290. The claims stemmed from Alzawahra's employment as a researcher in defendants' cardiovascular labs. We assume the parties' familiarity with the underlying facts, procedural history of the case, and issues on appeal.

We review orders granting summary judgment *de novo* and focus on whether the district court properly concluded that [**2] there was no genuine dispute as to any material fact and the moving party was entitled to judgment as a matter of law. *See Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir. 2003). In determining whether there are genuine disputes of material fact, we are "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003) (internal quotation marks omitted). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotation marks omitted). Once the movant has satisfied this burden, the burden of production shifts to the non-movant to bring forth evidence showing [**3] that a genuine factual dispute exists. *See Matsushita,* 475 U.S. at 587. There must be more than "a scintilla of evidence" in support of the non-movant's position; there must be sufficient evidence from which a reasonable finder of fact could find in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Northern District of New York Local Rule 7.1(a)(3) requires that a non-movant "file a response to the [movant's] Statement of Material Facts" that admits or denies each of the assertions; if denying the facts, the response must "set forth a specific citation to the record where the factual issue

arises." *Id.* The Rule also provides that any properly-supported fact set forth in the Statement of Material Facts that is not "specifically controvert[ed]," is "deem[ed] admitted." *Id.*

We have previously affirmed district court orders granting summary judgment where the opposing party failed to adhere to the requirements of this Rule. *See, e.g., N.Y. State Teamsters Conf. Pen. & Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 648 (2d Cir. 2005) (deeming the assertions in the Statement of Material Facts to be admitted where the non-movant supplied only conclusory denials [**4] in its response); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion."). Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America,* 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules, *see Edwards v. INS,* 59 F.3d 5, 8 (2d Cir. 1995).

[*55] Summary judgment may not be granted, however, solely because a non-movant failed to oppose the motion. *See Fabrikant v. French,* 691 F.3d 193, 215 n.18 (2d Cir. 2012); *Vt. Teddy Bear Co. v. 1-800Beargram Co.,* 373 F.3d 241, 244 (2d Cir. 2004). The district court must still determine whether the movant satisfied its burden of production: it must ensure that the evidence upon which the movant relies supports the facts asserted; confirm that the facts entitle the moving party to judgment as a matter of law; and set forth its reasoning for granting summary judgment. *See Vt. Teddy Bear,* 373 F.3d at 244; *see also Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n.5 (2d Cir.

2003) [**5] (noting that granting summary judgment without verifying the supporting facts "would derogate the truth-finding functions of the judicial process by substituting convenience for facts"); Fed. R. Civ. P. 56(a), (e)(3).

We have examined the record evidence and considered the factual allegations in Alzawahra's verified amended complaint, insofar as they are in the form of admissible evidence. *See Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995) (holding that a verified complaint is treated as an affidavit for summary judgment purposes and "considered in determining whether material issues of fact exist"). Even drawing all permissible inferences in Alzawahra's favor, and recognizing that there may exist circumstances where a single racially harassing comment would rise to the level of a hostile work environment, we affirm, substantially for the reasons set forth in the District Court's comprehensive Decision & Order of November 1, 2012.

Insofar as Alzawahra invites us to rule on discovery disputes he raised for the first time in his opposition to summary judgment, we decline to do so. Pursuant to Federal Rule of Civil Procedure 56(f), the opponent of a summary judgment motion who seeks [**6] additional discovery must file an affidavit explaining (1) the information sought and how it is to be obtained; (2) how a genuine issue of material fact will be raised by that information; (3) what efforts the affiant has made to obtain the information; and (4) why those efforts were unsuccessful. *See Hudson River Sloop Clearwater, Inc. v. Dep't of Navy,* 891 F.2d 414, 422 (2d Cir. 1989); *see also* Fed. R. Civ. P. 56(f). Alzawahra has not met these requirements.

For the foregoing reasons, the judgment of the District Court is hereby **AFFIRMED.**

# Alzawahra v. Albany Med. Ctr.

United States District Court for the Northern District of New York

October 31, 2012, Decided; November 1, 2012, Filed

11-CV-227

**Reporter**
2012 U.S. Dist. LEXIS 156517

WAEL F. ALZAWAHRA, Plaintiff, v. ALBANY MEDICAL CENTER, DAVID JOURD'HEUIL and HAROLD A. SINGER, Defendants.

**Subsequent History:** Affirmed by Alzawahra v. Albany Med. Ctr., 2013 U.S. App. LEXIS 24168 (2d Cir. N.Y., Dec. 5, 2013)

**Counsel:** [*1] Wael F. Alzawahra, Plaintiff, Pro se, Albany, NY.

For Albany Medical Center, David Jourd'Heuil, Harold A. Singer, Defendants: Nicholas J. D'Ambrosio, Jr., LEAD ATTORNEY, Bond, Schoeneck Law Firm - Albany, Albany, NY.

**Judges:** THOMAS J. MCAVOY, Senior United States District Judge.

**Opinion by:** THOMAS J. MCAVOY

## Opinion

### DECISION & ORDER

### I. INTRODUCTION

Plaintiff Wael F. Alzawahra commenced this action *pro se* asserting that he was subjected to a hostile work environment, treated in a disparate fashion regarding terms and conditions of employment, and terminated from his employment based on consideration of his national origin, in violation of Title VII of the Civil Rights Act ("Title VII") and New York Executive Law § 290, *et seq.* ("NY Human Rights Law"). See Am. Comp. ¶ 2. Defendants Albany Medical Center, David Jourd'heuil, and Harold A. Singer ("Defendants") now move for summary judgment seeking to dismiss Plaintiff's claims in their entirety. Dkt. # 23. Plaintiff filed a late response to the motion, dkt. # 41, but the response fails to comply with the Local Rules in that it fails to provide any legal argument in opposition to the motion; fails to constitute a proper response to Defendants' Statement of Material Facts; [*2] and fails to provide any admissible evidence in opposition to the motion. Id.[1] For the reasons that follow, the motion is granted.

### II. STANDARD OF REVIEW

The Court may grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual [*3] dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The nonmoving party must show, by affidavits or other evidence, admissible in form, that there are specific factual issues that can only be resolved at trial. Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). "[P]roceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment." Viscusi v. Proctor & Gamble, 2007 U.S. Dist. LEXIS 51307, 2007 WL 2071546, at * 9 (E.D.N.Y. July 16, 2007).

In determining whether to grant summary judgment, the Court must view all facts in the light most favorable to the

---

[1] The document is a unsigned and unverified, fails to contain any legal citations or arguments, and appears to be a series of factual assertions by Plaintiff.

nonmoving party, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," Matsushita., 475 U.S. at 586, or by a factual argument based on "conjecture or surmise." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). In this regard, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in the [*4] pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

The Local Rules of the Northern District require a party moving for summary judgment to submit a "Statement of Material Facts" which sets forth, with citations to the record, each material fact about which the moving party contends there exists no genuine issue. N.D.N.Y.L.R. 7.1(a)(3). Once a properly supported Local Rule 7.1(a)(3) Statement is submitted, the party opposing the motion must

> file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing [*5] party.

Id. (underscoring in original).

The responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly. See N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc., 426 F.3d 640, 648-49 (2d Cir. 2005)(upholding grant of summary judgment where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed

[movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1(a)(3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations."); Gubitosi v. Kapica, 154 F.3d 30, 31 n. 1 (2d Cir. 1998)(*per curiam*)(accepting as true material facts contained in unopposed local rule statement of material facts); Meaney v. CHS Acquisition Corp., 103 F. Supp.2d 104, 108 (N.D.N.Y. 2000)(deeming movant's Rule 7.1(a)(3) Statement admitted where non-movant's response "set forth *no* citations — specific or otherwise — to the record")(emphasis in original); McKnight v. Dormitory Auth. of State of N.Y., 189 F.R.D. 225, 227 (N.D.N.Y. 1999)(McAvoy, J.)("deem[ing] the portions of Defendants' 7.1(a)(3) statement that are not specifically controverted [*6] by Plaintiff to be admitted"); Osier v. Broome County, 47 F. Supp.2d 311, 317 (N.D.N.Y. 1999) (McAvoy, J.)(deeming admitted all facts in defendants' Rule 7.1(a)(3) statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record").

While the Court must construe a *pro se* litigant's pleadings and papers liberally and interpret them to raise the strongest arguments that they suggest, Govan v. Campbell, 289 F. Supp.2d 289, 295 (N.D.N.Y. 2003);[2] Veloz v. New York, 339 F. Supp.2d 505, 513 (S.D.N.Y. 2004), the application of this lenient standard does not relieve a *pro se* litigant of the requirement to follow the procedural formalities of Local Rule 7.1(a)(3). Govan, 289 F. Supp.2d at 295; see also Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525, 2541 n. 46, 45 L. Ed. 2d 562 (1975)("The right of self-representation is not a license . . . not to comply with relevant rules of procedural and substantive law."); Edwards v. INS, 59 F.3d 5, 8 (2nd Cir. 1995)("While a *pro se* litigant's pleadings must be construed liberally, . . . *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them.").

## III. BACKGROUND

Plaintiff has not submitted an opposing Statement of Material Facts despite being advised of this obligation.[3] Accordingly, the properly supported facts set forth in Defendant's Statement of Material Facts are deemed admitted for

---

[2]  To construe [*7] pleadings liberally means the Court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." Govan, 289 F. Supp.2d at 295.

[3]  Plaintiff was served with the Northern District's standard summary judgment notification for *pro se* litigants, see dkt. # 28. This notification provided, *inter alia,*

> The defendants have moved for **summary judgment** under Federal Rule of Civil Procedure 56. A motion for summary judgment asks the Court to make a final judgment dismissing some or all of your claims. If you do not file a proper response

purposes of this motion. N.D.N.Y.L.R. 7.1(a)(3). The following facts are taken from Defendant's Statement of Facts Not In Dispute ("SOF").

Defendant Albany Medical Center ("AMC") is a non-profit corporation consisting of a teaching hospital and medical college with biomedical research facilities. AMC has approximately 7,000 employees. Dr. Jourd'heuil is employed by AMC as an Associate Professor for Cardiovascular Sciences. Dr. Harold A. Singer is employed by AMC as a Professor and Director of the Center for Cardiovascular Services (the "Center"). Both Dr. Jourd'heuil and Dr. Singer run research laboratories ("labs") in the Center. SOF ¶¶ 1-3. Plaintiff was employed at AMC as a full-time post-doctoral fellow for a one-year term in the Center for Cardiovascular Sciences beginning on June 18, 2008 and ending on July 17, 2009. SOF ¶¶ 10-13. In that position, Plaintiff worked in support of the research being undertaken by Dr. Singer and Dr. Jourd'heuil's research laboratories ("labs"). SOF ¶ 5. Plaintiff accepted the one-year post doctoral position with knowledge of the nature and limitations of the Center's commitment. SOF ¶ 14. There was no written agreement or contract to employ Plaintiff for longer than one year or to condition renewal [*10] of Plaintiff's one-year term solely on the basis of satisfactory performance. SOF ¶ 15.

Plaintiff was hired to work primarily in Dr. Jourd'heuil's lab in collaboration with Dr. Jourd'heuil, his wife, Fran Jourd'heuil, and pre-doctoral research assistant Katherine Halligan. During this time, Plaintiff was treated as a typical post-doctoral fellow. He was consistently assigned work appropriate for his level of experience and expertise related to Dr. Jourd'heuil's ongoing research projects, including work on the cytoglobin project. SOF ¶¶ 17, 19. Part of Plaintiff's duties included generating tissue samples by performing animal surgeries for use in Dr. Jourd'heuil's lab as well as other labs in the Center. SOF ¶ 20. Plaintiff was made aware that the samples he generated would be used by other labs at the Center, and that he would be credited for his work by being listed as a co-author if the samples he harvested were used in connection with any publications submitted by other labs. In fact, when his samples were used in a paper published by another lab, Plaintiff was named as a co-author. SOF ¶¶ 20-21.

During the course of his employment at AMC, Plaintiff never made any complaints of discrimination [*11] or harassment on the basis of his national origin, even though he received AMC's policy prohibiting such conduct and which sets forth the proper avenues of complaint. SOF ¶ 22. Plaintiff made only informal reports about incidents he experienced with broken and missing equipment in Dr. Jourd'heuil's lab, but never gave any indication he believed the incidents resulted from harassment or discrimination. SOF ¶¶ 55-56. The frequency of the mishaps occurring to Plaintiff's experiments was no more than occurred for others and typical for the types of experiments being performed. SOF ¶ 56. All broken or missing lab equipment was promptly replaced or repaired and Plaintiff was able to timely complete his assignments. SOF ¶ 57. Plaintiff never identified what caused the incidents or who was responsible and acknowledged the incidents could have been merely accidental. SOF ¶¶ 58-61. Plaintiff also now makes harassment allegations concerning a flat tire in the AMC

to this motion, the Court may grant the motion **and dismiss some or all of your claims**. Under Local Rule 7.1 (a), to file a proper response to this motion, you must submit the following papers:

(1) A **response to the defendants' statement of [*8] material facts** that admits and/or denies each of the defendants' assertions in matching numbered paragraphs, and that supports each denial with citations to record evidence;

(2) Copies of all **record evidence** that you cite in your response to the defendants' statement of material facts; **AND**

(3) A response memorandum of law (no more than 25 pages long and formatted in compliance with Local Rule 10.1) that responds to each of the legal arguments contained in the defendants' memorandum of law, and that contains any additional legal arguments you may have in response to the defendants' motion for summary judgment.

**WARNING:** If you do not submit a proper response to the defendants' statement of material facts, **the Court may deem you to have admitted the defendants' factual statements**. If you do not submit copies of record evidence in support of your denials, **the Court may deem defendants' factual statements to be true**. If you do not submit a proper response memorandum of law, **the Court may deem you to have conceded the defendants' arguments**. If you do not respond to this motion properly (or at all), summary judgment may be entered against you, meaning that **SOME OR [*9] ALL OF YOUR CLAIMS MAY BE DISMISSED**.

Dkt. # 28 (emphasis in original, footnotes omitted).

parking garage, a piece of raw meat at the front door of his home, and several hang-up phone calls from unknown callers (Am. Comp. ¶ 23), but he admitted at his deposition that he does not know who is responsible for these incidents [*12] and does not have any basis to believe someone from AMC is responsible. SOF ¶ 62.

Dr. Jourd'heuil intended for Plaintiff to publish a manuscript based upon the data Plaintiff generated in Dr. Jourd'heuil's lab and gave him permission to write it. SOF ¶ 23. Dr. Jourd'heuil supported Plaintiff's efforts and willingly assisted him with this endeavor. SOF ¶ 24. Plaintiff prepared a manuscript and Dr. Jourd'heuil reviewed it on more than one occasion. Dr. Jourd'heuil also provided Plaintiff with extensive written feedback identifying what he perceived to be significant shortcomings with the supporting scientific data and quality of the writing. SOF ¶ 25. Despite Dr. Jourd'heuil's efforts, Plaintiff admits that he did not revise the manuscript to address the comments made by Dr. Jourd'heuil. SOF ¶ 26. Ultimately, Dr. Jourd'heuil did not approve Plaintiff's manuscript for submission because, in his professional opinion, the quality of the manuscript was not good enough to be competitive. SOF ¶¶ 27-30. Specifically, Dr. Jourd'heuil opined that there were significant grammatical deficiencies with the writing in his presentation that would require the paper to be entirely rewritten to be submitted. [*13] SOF ¶ 27. Further, the incomplete scientific data resulted in inconsistent conclusions, some of which repeated results that had already been published. SOF ¶ 28. Moreover, the results of the experiments ultimately disproved Plaintiff's primary hypothesis, making it a "negative study." With no published literature to justify the negative results, it would be extremely difficult to publish. SOF ¶ 29-30.

In or around September 2008, Dr. Jourd'heuil told Plaintiff to consider writing an American Heart Association ("AHA") grant. SOF ¶ 32. When Plaintiff gave Dr. Jourd'heuil the supporting data for the grant application, however, it was incomplete. SOF ¶ 33. Plaintiff never completed the supporting research and never submitted a completed application. SOF ¶ 35.

Upon expiration of his one-year term, Plaintiff's employment was terminated effective July 17, 2009. SOF ¶ 37. Dr.

Singer and Dr. Jourd'heuil could not renew his position because the labs lacked sufficient funding to continue his position or the research related to his specialized skill set. SOF ¶ 67.[4] There was no written contract to renew Plaintiff's position beyond the initial one-year term. SOF ¶¶ 15, 68. Plaintiff is not the only [*14] post-doctoral fellow to be employed for only one year, nor is Plaintiff the only employee to be terminated from the Center due to lack of funding. SOF ¶ 16.

At the time the motion was submitted, no one had been hired to replace Plaintiff [*15] in either Dr. Jourd'heuil or Dr. Singer's labs. The projects Plaintiff was working on in Dr. Jourd'heuil's lab remained unfinished due to the lack of grant funding for that specific research, and no one is performing the animal surgeries Plaintiff was doing in Dr. Singer's lab. SOF ¶¶ 39-40. At or near the time of Plaintiff's termination from AMC, there were no open positions for senior post-doctoral fellows. SOF ¶ 41. The Center did employ four junior post-doctoral fellows in the month following Plaintiff's non-renewal, but Plaintiff did not apply for these positions, nor did he have the requisite experience or skills for such positions. SOF ¶ 72. Since August 2009, the Center continues to employ post-doctoral fellows of varying national origins. Defendants have no knowledge that Plaintiff has applied for any of these positions or whether he was qualified for them. SOF ¶ 73. Plaintiff offered to stay on at AMC as a volunteer, but AMC declined his offer because of its policy prohibiting an employee to volunteer to do the same work for which the employee had previously been paid to ensure compliance with New York Labor Laws. SOF ¶ 43. Defendants have not been contacted by any of Plaintiff's [*16] prospective employers seeking references, nor provided references to anyone concerning his employment at the Center. SOF ¶ 44.

On February 25, 2010, Plaintiff filed a Complaint with the New York State Division of Human Rights ("NYSDHR"), alleging that Defendants had discriminated against him on the basis of his national origin. The Complaint was dual-filed with the Equal Employment Opportunity Commission ("EEOC"). SOF ¶ 45. Following its investigation, the NYSDHR determined there was no probable cause to

---

[4]    Defendants assert that nearly all post-doctoral positions in the Center are largely funded through grant awards, and that continued employment depends upon continued receipt of grant funding for the specific project the researcher was hired to perform. Singer Aff. ¶ 16; see Alzawahra Dep. at 79-80. Further, the undisputed evidence indicates that the funding for Plaintiff's position and research was set to expire at some point during, or immediately following, the expiration of his one-year term, and the sources of funding that had previously been supporting his salary were no longer available. Def. ex. "L"; Singer Aff. ¶¶ 23, 61-68; Jourd'heuil Aff. ¶¶ 17, 93. This evidence also indicates that the terms of the grants that were funding Dr. Jourd'heuil and Dr. Singer's labs at the time of Plaintiff's departure did not support the project Plaintiff was working on, or did not have enough unobligated funding to continue his position. Singer Aff. ¶¶ 63-68.

believe that Defendants had engaged in the unlawful discriminatory practice complained of, stating in part that Defendants had "articulated legitimate, nondiscriminatory reasons for the actions taken" and, therefore, ordered a dismissal of the Complaint. SOF ¶ 46.

On October 1, 2010, Plaintiff filed a second Complaint with the NYSDHR, alleging national origin discrimination and retaliation. This Complaint was also dual-filed with the EEOC. SOF ¶ 47. Following its investigation into Plaintiff's second Complaint, the NYSDHR determined there was no probable cause to believe that Defendants had engaged in the unlawful discriminatory practice complained of, and ordered a dismissal of the [*17] Complaint. SOF ¶ 48. The EEOC adopted the findings of the SDHR with respect to both Complaints and issued a Dismissal and Notice of Rights for each, on December 7, 2010 and August 4, 2011, respectively. SOF ¶ 49. This action followed.

## IV. DISCUSSION

### a. NY Human Rights Law Claims - Election of Remedies

New York Executive Law § 297(9) provides that "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction . . . unless such person had filed a complaint hereunder." N.Y. Exec. Law § 297(9)(emphasis added). "[New York Executive Law § 297(9)] deprives federal courts of subject matter jurisdiction where a plaintiff previously elected to proceed in an administrative forum." Chudnovsky v. Prudential Sec., Inc., 2000 U.S. Dist. LEXIS 15401, 2000 WL 1576876, at *4 (S.D.N.Y. Oct. 23, 2000). Thus, "[o]nce a complainant elects the administrative forum by filing a complaint with the Commission on Human Rights, that becomes the sole avenue of relief, and subsequent judicial action on the same complaint is generally barred . . . ." Moodie v. Fed. Reserve Bank of N.Y., 58 F.3d 879, 884 (2d Cir.1995).[5] "Furthermore, once a plaintiff brings a case [*18] before the NYSDHR, he or she may appeal only to the Supreme Court of the State of New York." York v. Ass'n of Bar of City of New York, 286 F.3d 122, 127 (2d Cir. 2002) (citing N.Y. Exec. Law § 298).

Because Plaintiff's NYSDHR Complaints were dismissed based on findings of "no probable cause," this Court lacks subject matter jurisdiction to consider Plaintiff's New York Human Rights Law claims based on the same acts raised

with the NYSDHR. Jones v. Onondaga County Res. Recovery Agency, 2011 U.S. Dist. LEXIS 35292, 2011 WL 1298774, *6 (N.D.N.Y. Mar. 31, 2011); DeWald v. Amsterdam Housing Authority, 823 F. Supp. 94, 99 (N.D.N.Y. 1993). Accordingly, all NYSHRL claims asserted in this matter are dismissed.

### b. Title VII Claims Against Jourd'heuil and Singer

In the Second Circuit, "individuals are not subject to liability under Title VII." Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam); see Tomka v. Seiler Corp., 66 F.3d 1295, 1314 (2d Cir. 1995) abrogated on other grounds, Burlington Indus. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). [*19] Consequently, individuals may not be sued under Title VII even in their capacities as supervisors. See Mandall v. Cnty. of Suffolk,316 F.3d 368, 371 (2d Cir. 2003) ("[T]he district court's dismissal of plaintiff's Title VII claims against Gallagher in his personal capacity must be affirmed because under Title VII individual supervisors are not subject to liability."); Hawkins v. Cnty. of Oneida, N.Y., 497 F. Supp. 2d 362, 371 (N.D.N.Y. 2007) (holding in Title VII action that plaintiff was prohibited from naming individual defendants in their official capacities); Bottge v. Suburban Propane, 77 F. Supp.2d 310, 313 (N.D.N.Y. 1999) (dismissing Title VII claim as against individuals in their official capacities). Thus, all remaining claims against David Jourd'heuil and Harold A. Singer, brought under Title VII, are dismissed.

### c. Discriminatory Discharge Claim

Plaintiff alleges that he was discharged because of his national origin. Defendants assert that Plaintiff's position was not renewed at the end of his one year contract because of budgetary constraints and lack of funding for Plaintiff's position.

Claims alleging discriminatory discharge under Title VII based upon circumstantial evidence [*20] of discrimination, such as is the case here, are analyzed using the burden-shifting paradigm articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under this analysis, Plaintiff first bears the burden of setting out a prima facie case of discrimination. See McDonnell Douglas, 411 U.S. at 802. Plaintiff's burden of establishing a prima facie case is de minimis. Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). If Plaintiff demonstrates a prima facie case, this gives rise to

---

[5] The exception to this rule is a dismissal for administrative convenience made before the administrative agency renders a decision on the complaint. This exception does not apply in this case.

a presumption of unlawful discrimination and the burden of production shifts to Defendant to offer a legitimate, nondiscriminatory rationale for its actions. See McDonnell Douglas, 411 U.S. at 802-03. Defendant's burden of production at this stage "is not a demanding one," Bickerstaff v. Vassar College, 196 F.3d 435, 446 (2d Cir. 1999), it need only offer a basis for the employment decision in issue which, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

If Defendant proffers a legitimate, nondiscriminatory reason for the challenged action, "the presumption raised by the [*21] prima facie case is rebutted, and drops from the case." St. Mary's Honor Ctr., 509 U.S. at 507. The burden shifts back to Plaintiff who "then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, and that [unlawful retaliation] was." Fisher v. Vassar College, 114 F.3d 1332, 1336 (2d Cir. 1997)(en banc)(internal citation and quotation marks omitted), cert. denied, 522 U.S. 1075, 118 S. Ct. 851, 139 L. Ed. 2d 752 (1998). "In order to defeat summary judgment . . ., the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trustees of Columbia Univ. in the City of N.Y., 131 F. 3d 305, 312 (2d Cir.1997). Thus, the ultimate burden of persuasion remains always with Plaintiff. St. Mary's Honor Ctr., 509 U.S. at 507, 511. In determining whether Plaintiff can satisfy this ultimate burden, the Court must examine the entire record and apply "a case-by-case approach." Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000).

Assuming, arguendo, that Plaintiff is able to establish a prima [*22] facie case,[6] the undisputed evidence shows that Defendants terminated Plaintiff due to a lack of funding for his position and specialized research. See Def. Ex. "C"; Singer Aff. ¶¶ 60-68, 79; Jourd'heuil Aff. ¶ 93. This constitutes a legitimate, nondiscriminatory justifications for the adverse action in issue in this case. See Turner v. NYU Hosp. Ctr., 2012 U.S. App. LEXIS 6552, *3-4 (2d Cir.

2012)(attached to Defendants' motion) (finding employer's reason for terminating plaintiff as part of a hospital-wide effort to reduce all departments' personnel budgets was a legitimate justification); Escribano v. Greater Hartford Acad. Arts, 449 Fed. Appx. 39, 2011 U.S. App. LEXIS 18754, **7-9 (2d Cir. 2011) (attached to Defendants' motion) (finding defendants presented sufficient evidence that plaintiff's position was cut due to budgetary constraints at the school, and thus had proffered a legitimate, nondiscriminatory reason for the employment action); Lalanne v. Begin Managed Programs, 346 Fed. Appx. 666, 2009 U.S. App. LEXIS 20853, *3 (2d Cir. 2009) [*23] (attached to Defendants' motion) (finding defendant's proffered reason for terminating plaintiff due to a cut in funding for his position was a legitimate nondiscriminatory reason).

This shifts the burden back to Plaintiff to present sufficient evidence from which a reasonable fact finder could conclude that consideration of Plaintiff's race was a motivating factor in the employer's decision. Plaintiff has not met this burden. Plaintiff points to inadmissible hearsay in support of his belief that AMC had sufficient funds to continue his position, but hearsay is insufficient to create a question of fact on a summary judgment motion. See Fed. R. Civ. P. 56(c)(4). Further, the undisputed evidence shows the research Plaintiff was performing in Dr. Jourd'heuil's lab remains unfinished [*24] and no one has been hired to replace him due to the lack of funding for the research, nor has anyone been hired in Dr. Singer's lab to perform the animal surgeries Plaintiff was performing. SOF ¶¶ 39-40. Plaintiff has also failed to present admissible evidence demonstrating that he applied for and was rejected for other position for which he was qualified to perform, or that similarly situated senior post-doctoral fellows had their contracts extended.

Moreover, the fact that the same actors made the decision to hire and fire Plaintiff strongly undermines any claim that Defendants' proffered reason for discharging Plaintiff was a pretext for discrimination. See, e.g., Jetter v. Knothe Corp., 324 F.3d 73, 76 (2d Cir. 2003);[7] Carlton v. Mystic Transp.,

---

[6]  To establish a prima facie case of discrimination, Plaintiff must show: "(1) [he] is a member of a protected class; (2) [he] is qualified for [his] position; (3) [he] suffered an adverse employment action; and (4) circumstances give rise to an inference of discrimination." Lore v. City of Syracuse, 583 F. Supp.2d 345, 361 (N.D.N.Y. 2008) (quoting Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)).

[7]  ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, especially when the firing occurred only a short time after the hiring, it is difficult to impute [to the decisionmaker] an invidious firing motivation that would be inconsistent with [the] decision to hire.")

Inc.., 202 F.3d 129, 137 (2d Cir. 2000),[8] cert. denied, 530 U.S. 1261, 120 S.Ct. 2718, 147 L.Ed.2d 983 (2000). Here, the undisputed evidence shows that Drs. Singer and Jourd'heuil collectively made the decisions to both hire and terminate Plaintiff within one year after his employment at AMC began. SOF ¶¶ 5-6, 37. Both Dr. Singer and Dr. Jourd'heuil were aware of Plaintiff's Syrian national origin at the time he was hired, which did not change [*25] at the time he was terminated. SOF ¶¶ 7-8. Thus, because Plaintiff was already in the protected class when he was hired, and because the hiring and firing took place within a relatively short time, there is a strong inference that discrimination was not a motivating factor in the employment determination.

As indicated above, a party opposing a properly supported motion for summary judgment may not rest [*26] upon "mere allegations or denials" asserted in the pleadings, Rexnord Holdings, 21 F.3d at 525-26, or on conclusory allegations or unsubstantiated speculation. Scotto, 143 F.3d at 114. Yet, this is what Plaintiff's case seemingly relies upon. Plaintiff has failed to present sufficient evidence from which a reasonable fact finder could conclude that his contract was not renewed because of his national origin, and his own conclusions that he was discriminated in this regard are insufficient to withstand summary judgment. See Bickerstaff v. Vassar College, 196 F.3d 435, 456 (2d Cir. 1999);[9] id. at 448;[10] Richardson v. N.Y. Dep't. of Correctional Serv., 180 F.3d 426, 447 (2d Cir. 1999).[11] Therefore, Plaintiff's claim of wrongful termination is dismissed.

### d. Plaintiff's Other Claims of National Origin Discrimination

Plaintiff further alleges that Defendants discriminated against him by failing to publish his manuscript, failing to submit his grant application, failing to assign him work from ongoing projects in the lab, stealing tissue samples he generated, and assigning him work that was beneath him. Am. Compl. ¶¶ 18-20, 23, 28, 31, 39. These Title VII national origin discrimination claims are also analyzed under the three-step McDonnell Douglas burden-shifting framework outlined above. See, e.g., Zhou v. SUNY Inst. of Tech., 2011 U.S. Dist. LEXIS 104025, *20 (N.D.N.Y. 2011) [*28] (attached to Defendants' motion) (citing Farias v. Instructional Sys.; Inc., 259 F.3d 91, 98 (2d Cir. 2001)).

Assuming, arguendo, that Plaintiff can establish a prima facie case of discrimination based upon these allegations, which Defendants argue he has not, Defendants have offered legitimate, nondiscriminatory reasons for the actions and Plaintiff has failed to present admissible evidence from which a reasonable fact finder could conclude that these reasons were pretexts for unlawful discrimination, or that considerations of Plaintiff's national origin motivated the decisions.

Regarding the manuscript, the undisputed evidence shows that Defendants aided Plaintiff in this endeavor but decided not to submit his manuscript for publication because of its poor written quality and deficient scientific data. SOF ¶¶ 27-30. Courts ordinarily defer to a defendant's professional judgment on decisions regarding the substance and quality of a professional work product, see Byrne v. Telesector Res. Group, 339 Fed. Appx. 13, 2009 U.S. App. LEXIS 15493, **7 (2d Cir. 2009) (citations and quotations omitted) (attached to Defendants' motion) (if defendants' proffered reason is non-discriminatory, the court should not

---

[8] ("When the same actor hires a person already within the protected class, and then later fires that same person, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire. . . . Case law teaches that where the termination occurs within a relatively short time after the hiring there is a strong inference that discrimination was not a motivating factor in the employment decision.") (internal quotation marks and citations omitted).

[9] (Plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination.")

[10] As indicated in Bickerstaff, on a motion for summary judgment the Court:

must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. This undertaking is not one of guesswork or theorization. After all, an inference is not [*27] a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist. Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances.

Bickerstaff, 196 F.3d at 448 (internal quotation marks and citations omitted).

[11] (affirming summary judgment for employer where employee offered only her own general claim of discrimination to show that the employer's legitimate reason for terminating her was pretextual).

"second-guess" [*29] the employer's business judgment) (citations omitted); see also Tori v. Marist College, 344 Fed. Appx. 697, 2009 U.S. App. LEXIS 19755, **7 (2d Cir. 2009) (attached to Defendants' motion) (citations and quotations omitted) ("triers of fact cannot hope to master the academic field sufficiently to review the . . . differences of scholarly opinion"), and Plaintiff offers nothing more than his own conjecture that the decision not to publish the manuscript was motivated by consideration of his national origin. As discussed above, this is insufficient to withstand summary judgment. The claim in this regard is dismissed.

Regarding Plaintiff's claim that the Defendants discriminated against him by failing to submit his grant, Plaintiff admitted at his deposition that he never submitted a completed grant application. Alzawahra Dep. at 307. Plaintiff cannot maintain a claim against Defendants based on Plaintiff's own conduct. Thus, the claim is dismissed.

Plaintiff also claims that he was not assigned work from ongoing projects in the lab because of his national origin. However, the undisputed evidence establishes that Plaintiff was treated like any other post-doctoral fellow and was consistently assigned work appropriate [*30] for his level of experience and unique area of expertise. Jourd'heuil Aff. ¶¶ 26-34, 37, 41; Alzawahra Dep. at 140-41, 220, 224-25; Def. Ex. "R;" Def. Ex. "Q." Despite Plaintiff's claims that he was denied an opportunity to work on Dr. Jourd'heuil's cytoglobin project, Plaintiff expressly admitted at his deposition that he did in fact work on this project. Alzawahra Dep. at 220, 224-25; Def. Ex. "R." Further, the evidence demonstrates that Plaintiff was not assigned to be a "technician" for Ms. Halligan (Am. Compl. 19, 23), but was simply expected to work collaboratively with her as well as other researchers in the Center. Jourd'heuil Aff. ¶¶ 10, 22, 43; Def. Ex. "N." As Defendants explain, Plaintiff was a post-doctoral fellow, not a Principal Investigator ("PI"). He had to work under the PIs in support of the PI's research aims and was therefore not free to research independently. Singer Aff. ¶¶ 45-46; Alzawahra Dep. at 144. Plaintiff's perception that this structure was discriminatory is alone insufficient to raise a genuine issue of fact.

Moreover, the undisputed evidence establishes that when Plaintiff was not assigned to work on a project, it was because Dr. Jourd'heuil determined [*31] that another researcher was more qualified based upon their experience and expertise. Jourd'heuil Aff. ¶¶ 26, 34-39. This constitutes a legitimate, nondiscriminatory basis to allocate work.

Because Plaintiff has offered no specific facts or evidence that would establish that he had the requisite qualifications, educational background, or experience to lead projects that were not assigned to him,[12] he fails to raise a genuine issue of fact as to whether Defendants' legitimate nondiscriminatory reasons for work allocation were actually pretexts for unlawful discrimination. Thus, Plaintiff's claim in this regard is dismissed.

Regarding Plaintiff's claims that Defendants discriminated against him because of his national origin by stealing tissue samples he generated, Plaintiff admitted at his deposition that when the samples were used by another lab in connection with a publication, he was named as a co-author (Alzawahra Dep. at 238-39) and that he does not "have any complaints" about this (Alzawahra Dep. at 236). Plaintiff provides no [*32] other proof that the tissue samples were "stolen," or any basis upon which a fact finder could conclude that any misappropriation of the tissue samples occurred because of consideration of Plaintiff's national origin. The claim is dismissed.

## c. Hostile Work Environment Claim

Plaintiff also alleges claims of hostile work environment under Title VII, contending that he was harassed because of his national origin. To establish a claim of hostile work environment, a plaintiff must prove that the workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Clark County School District v. Breeden, 532 U.S. 268, 270, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001); Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993); Quinn v. Green Tree Credit Corp., 159 F .3d 759 (2d Cir.1998). A "hostile work environment claim will succeed only where the conduct at issue is so 'severe and pervasive' as to create an 'objectively hostile or abusive work environment,' and where the victim 'subjectively perceive[s] the environment to be abusive.'" Richardson v. N.Y. State Dep't. of Correctional Serv., 180 F.3d 426, 436 (2d Cir. 1999), [*33] abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed.2d 345 (2006)(quoting Harris, 510 U.S. at 21-22). The objective aspect of this test is judged by a reasonable person standard. Id. To analyze a hostile work environment claim, the Court "must look to the record as a whole and assess the totality of the circumstances, considering a variety of factors including 'the frequency of

[12]  To the contrary, Plaintiff admitted at his deposition, he was "not that sophisticated" in basic cellular and molecular biology. Alzawahra Dep. at 365-66.

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 102 (2d Cir. 2010)(quoting Harris, 510 U.S. at 23).

The Second Circuit has repeatedly held that "[i]solated, minor acts or occasional episodes do not warrant relief" under a hostile environment theory. Brennan v. Metropolitan Opera Assn., Inc., 192 F.3d 310, 318 (2d Cir. 1999)(citing Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992)). "Generally, unless an incident of harassment is sufficiently severe, 'incidents must be more than episodic; they must be sufficiently continuous [*34] and concerted in order to be deemed pervasive.'" Gorzynski, 596 F.3d at 102 (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)); see also Kaytor v. Elec. Boat Corp., 609 F.3d 537, 547 (2d Cir. 2010)("Isolated incidents ... will not suffice to establish a hostile work environment unless they are extraordinarily severe." ); Alfano, 294 F.3d at 376 ("the twelve incidents cited by [plaintiff], taken together, [we]re insufficient as a matter of law to meet the threshold of severity or pervasiveness required for a hostile work environment"); Williams v. Cnty. of Westchester, 171 F.3d 98, 100 (2d Cir. 1999) (plaintiff must show "more than a few isolated incidents" and that "evidence solely of sporadic" discrimination does not suffice) (quotation marks and citation omitted).

Plaintiff's hostile work environment claim rests primarily upon allegations of a few isolated incidents where his laboratory equipment was discovered to be broken or missing. These incidents were neither severe nor pervasive, and the undisputed evidence demonstrates that the frequency of the mishaps occurring to Plaintiff's experiments was no more than occurred for others and typical for the types of experiments [*35] being performed. SOF ¶ 56. Moreover, all broken or missing lab equipment was promptly replaced or repaired and Plaintiff was able to timely complete his assignments. SOF ¶ 57. Plaintiff never identified what caused the incidents or who was responsible and acknowledged the incidents could have been merely accidental. SOF ¶¶ 58-61.

Plaintiff also alleges that he was harassed when Dr. Jourd'heuil purportedly advised him "not to go to an Arabic church" (Am. Compl. ¶ 49), which Dr. Jourd'heuil denies. Jourd'heuil Aff. ¶¶ 63-64. Even assuming this statement was made, courts have consistently found that a racially harassing comment is only sufficient to demonstrate a hostile work environment when it is part of a "stream of

racially offensive comments," including a "veritable barrage of racial epithets." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000), cert. denied, 537 U.S. 1089, 123 S. Ct. 702 (2002), rehearing denied, 537 U.S. 1228, 123 S. Ct. 1345 (2003); see also Fleming v. Maxmara USA, Inc., 371 Fed. Appx. 115, 2010 U.S. App. LEXIS 6134, **6-7 (2d Cir. 2010) (attached to Defendants' moving papers) (holding that plaintiff failed to state a hostile work environment claim based [*36] upon a single racial comment); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (finding racist comments, slurs, and jokes constitute a hostile work environment only where there are "more than a few isolated incidents of racial enmity"). Plaintiff has offered nothing more than a single comment that is only arguably and loosely connected to his national origin, which alone falls far short of the "veritable barrage of racial epithets" necessary to establish a hostile work environment, and is not severe enough to be actionable.

Similarly, Plaintiff's allegations concerning a flat tire in the AMC parking garage, a piece of raw meat found at the front door of his home, and several hang-up phone calls from unknown callers fail to establish an actionable claim. These events did not occur within the workplace, and Plaintiff admitted at his deposition that he does not know who is responsible for these incidents and does not have any basis to believe someone from AMC is responsible. SOF ¶ 62. For these reasons alone, the hostile work environment claim is subject to dismissal.

Further, to establish an actionable hostile work environment claim, Plaintiff must demonstrate the conduct occurred [*37] because of his race and/or national origin. See, e.g., Das v. Consol. Sch. Dist. of New Britain, 369 Fed. Appx. 186, 2010 U.S. App. LEXIS 5071, **8 (2d Cir. 2010) (attached to Defendants' moving papers)(citations omitted); Alfano, 294 F.3d at 374. He has not done this. Facially-neutral incidents may only be considered among the "totality of circumstances" in evaluating a hostile work environment claim if there is "some circumstantial or other basis for inferring that [these] incidents . . . were, in fact, discriminatory." Alfano, 294 F.3d at 378. While Plaintiff points to Dr. Jourd'heuil's purported advice "not to go to an Arabic church," Plaintiff offers no other evidence from which a reasonable act finder could conclude that the alleged harassing conduct occurred because of his national origin. Indeed, Plaintiff admitted at his deposition that he cannot identify who is responsible for the issues with the equipment in the laboratories, or what caused them. Alzawahra Dep. at 245-48, 258-63, 268-69, 271-72, 275, 280-82. Plaintiff admitted that the lab equipment that had broken was fragile and could easily be broken accidentally

and the equipment that was lost was very lightweight and could be easily misplaced. [*38] Alzawahra Dep. at 265, 268, 270-73. As for the flat tire and other strange occurrences at his home, Plaintiff admitted that he has no basis to believe that anyone from AMC had any connection to or responsibility for these incidents. Alzawahra Dep. at 359-62. Without some evidence tying the alleged course of harassment to Dr. Jourd'heuil, the only person who made any statement arguably exhibiting animosity toward Plaintiff's Syrian national origin, a reasonable fact finder could not conclude that the alleged harassment was motivated by consideration of Plaintiff's national origin. Thus, the claim is subject to dismissal on this basis.

Finally, Plaintiff admitted at his deposition that he never made any complaints of discrimination or harassment based upon his national origin, despite receipt and knowledge of this policy and reporting procedure. SOF ¶ 22; Alzawahra Dep. at 110-13. Therefore, even assuming the harassment was perpetrated by a supervisor, liability cannot be imputed to AMC. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257, 2270, 141 L. Ed. 2d 633 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 2293, 141 L. Ed. 2d 662 (1998).

Based upon these reasons, Plaintiff's [*39] hostile work environment claim is dismissed.

### f. Retaliation by Negative Employment Reference

Reading Plaintiff's Amended Complaint liberally and to raise the strongest legal claims it suggests, Plaintiff may be asserting a claim of retaliation by way of negative employment references. See Am. Comp. ¶ 61. To establish a retaliation claim based on a negative employment reference, a plaintiff must first prove that a *"false"* statement negatively affected [the plaintiff's] chances of securing employment." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 178-79 (2d Cir. 2005) (emphasis in original); see Abreu v. New York City Police Dept., 329 Fed. Appx. 296, 298, 2009 WL 835072, at * 1 (2d Cir. March 31, 2009).[13] Here, the undisputed evidence is that Defendants did not provide any employment references for Plaintiff. Consequently, he cannot establish the essential element of such a claim. Any such retaliation claim contained in the Amended Complaint is dismissed.

### V. CONCLUSION

For the reasons discussed [*40] above, Defendants' motion for summary judgment [dkt. # 23] is **GRANTED** and the Amended Complaint is **DISMISSED** in its entirety. The Clerk of the Court is instructed to mark this case as closed.

### IT IS SO ORDERED

**Dated:** October 31, 2012

/s/ Thomas J. McAvoy

Thomas J. McAvoy

Senior, U.S. District Judge

---

[13] ("First, [plaintiff] cannot show that he suffered an adverse employment action, as he failed to prove that any of [his Lieutenant's] statements impacted his ability to secure subsequent work.")

# Patterson v. Labella

United States District Court for the Northern District of New York

September 30, 2014, Decided; September 30, 2014, Filed

6:12-cv-01572 (MAD/TWD)

**Reporter**
2014 U.S. Dist. LEXIS 137616

STEPHEN PATTERSON, Plaintiff, vs. DANIEL LABELLA, individually and in his official capacity as Utica Police Chief; MARK WILLIAMS, individually and in his official capacity as Utica Police Chief; JOHN TOOMEY, individually and in his official capacity as Utica Police Captain; LOUIS CAPRI, individually and in his official capacity as Utica Police Lieutenant; EDWARD NOONAN, individually and in his official capacity as Utica Police Officer; HOWARD BRODT, individually and in his official capacity as Utica Police Officer; OFFICER JOSHUA GRANDE, individually and in his official capacity as Utica Police Officer; JAMES HOLT, individually and in his official capacity as Utica Police Officer; TODD DUVAL, individually and in his official capacity as Utica Police Officer; MICHAEL CURLEY, individually and in his capacity as Utica Police Officer; SAMUEL GEDDES, individually and in his official capacity as Utica Police Officer; STEVEN HAUCK, individually and in his official capacity as Utica Police Officer; BRIAN BANSNER, individually and in his official capacity as Utica Police Officer; LINDA FATATA, individually and in her official capacity as Utica Corporation Counsel; CITY OF UTICA; DANIEL COZZA, individually and in his official capacity as Codes Officer; GERALD FOSTER, individually and in his official capacity as Fire Fighter; JOHN DOE, unknown individually and in his official capacity as Utica city employee, Defendants.

**Counsel:** [*1] STEPHEN PATTERSON, Plaintiff, Pro se, Utica, New York.

For Defendants: JOHN P. ORILIO, ESQ., ZACHARY C. OREN, ESQ., OF COUNSEL, OFFICE OF CORPORATION COUNSEL, Utica, New York.

**Judges:** Mae A. D'Agostino, United States District Judge.

**Opinion by:** Mae A. D'Agostino

## Opinion

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION[1]

Plaintiff commenced this action on October 19, 2012, pursuant to 42 U.S.C. § 1983 alleging that Defendants violated various constitutional rights. *See* Dkt. No. 1. Specifically, Plaintiff claims that he was subjected to, among other things, false arrest, malicious prosecution, unlawful search and seizure, conspiracy to violate his civil rights, First Amendment retaliation, cruel and unusual punishment in violation of the Eighth Amendment, and that various Defendants failed to intervene when his constitutional rights were being violated. *See generally* Dkt. No. 13.

Currently before the Court are the parties cross motions for summary judgment. *See* Dkt. Nos. 38 & 43.

### II. BACKGROUND[2]

At all times relevant to this action, Plaintiff was a resident of Utica, New York. *See* Dkt. No. 13 at ¶ 1. The named Defendants in this action are all employed by the City of Utica. Defendant Linda Fatata is the City of Utica's Corporation Counsel. *See id.* at ¶ 3. Defendants Daniel Labella and Mark Williams are the former and current Chiefs of Police, respectively. *See id.* at ¶¶ 4-5. The remaining named Defendants are all Utica Police Officers. *See id.* at ¶¶ 6-19.

On August 31, 2008, Plaintiff signed a lease for the property located at 315 Nichols Street, Utica, New York. *See id.* at ¶

---

[1] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

[2] In the background section of this Memorandum-Decision and Order, the Court has partially relied on Plaintiff's [*2] amended complaint to set forth the relevant facts, insofar as such facts are also supported by the evidence in the record. Both parties' statements of material fact provide the Court with somewhat disjointed and confusing recitations of the relevant background facts.

22. Plaintiff has "habitually referred to 315 Nichols Street, Utica, New York as 'Petes.'" Dkt. No. 54-36 at ¶ 62. Although Petes caught fire sometime in early January 2010, the premises were active until the fire. *See id.* at ¶ 63. Defendants contend that Plaintiff operated Petes as an "'after-hours night club which serves alcohol[.]'" *Id.* [*3] at ¶ 68.

According to the amended complaint, Plaintiff contends that "Defendant Fatata began retaliation against plaintiff's business by placing his business on the police 'Hot Spot" list on September 7, 2008. Plaintiff was harassed and illegally videotaped by the Utica police for a year." Dkt. No. 13 at ¶ 25; *see also* Dkt. No. 54-36 at ¶ 55. On September 30, 2009, Plaintiff filed a civil rights lawsuit in response to this alleged conduct. *See Patterson v. Utica,* No. 6:09-cv-1102 (N.D.N.Y.).[3] Plaintiff alleges that, "[t]en days after the civil action was filed by the plaintiff the retaliation against plaintiff's business activities commenced with defendants Capri and Brodt initiating a[n] unjustified and unwarranted investigation against plaintiff without probable cause. This [led] to these defendants filing a false charge of illegal sale of alcohol on October 10, 2009 at 315 Nichols Street against the plaintiff." Dkt. No. 13 at ¶ 26.

Regarding the October 10, 2009 incident, the record indicates that Defendants used a confidential informant, Jacqueline Rodgers, who purchased alcohol [*4] at Pete's. *See* Dkt. No. 54-36 at ¶ 68; Dkt. No. 44 at ¶ 1; Dkt. No. 38-3 at 4. According to Ms. Rodgers statement to Defendant Brodt, upon entering Pete's and speaking with another individual, she went to the bar on the second floor. *See* Dkt. No. 38-3 at 4. Ms. Rodgers asked the bar tender what they were selling, and she said "E&J and Hennessey which is Cognac, alcohol and gin[.]" *Id.* Ms. Rodgers then purchased "a shot of E&J and a girl poured it in a cup from a cranberry juice container into a plastic cup" for five (5) dollars. *Id.* Ms. Rodgers then left Pete's and brought the purchased alcohol to Defendants Capri and Brodt who were waiting for her in a car nearby. *See id.* Ms. Rodgers then accompanied Defendants Capri and Brodt to the police station where she gave her statement. *See id.*

According to Defendant Capri, he maintained possession of the plastic cup that Ms. Rodgers had in her possession when she left Pete's. *See id.* at 7. The cup and liquid it contained

were turned over to an evidence technician who sealed the evidence and sent it to the New York State Forensic Laboratory. *See id.* The "'New York State Police Forensic Investigation toxicology report that identified the liquid that [*5] Jacqueline Rodgers purchased at 315 Nichols St on October 10th 2009 contain[ed] 35% Ethanol (alcohol) by volume.'" Dkt. No. 54-36 at ¶ 69.

On October 10, 2009, Defendant Nash was assigned to park his patrol car in front of 315 Nichols Street and was brief regarding the plan to have Ms. Rodgers enter the establishment and purchase alcohol. *See id.* at 7. At approximately 2:20 a.m., Defendant Nash observed Ms. Rodgers enter Pete's with nothing in her hands. *See id.* After approximately ten minutes, Defendant Nash claims to have observed Ms. Rodgers exit the building carrying a clear plastic cup with an unknown liquid in it. *See id.* at 7-8. Defendant Nash then watched as Ms. Rodgers proceeded to the vehicle containing Defendant Capri and Brodt. *See id.* at 8.

In an Information/Complaint filed on December 7, 2009, Defendants Brodt and Capri charged Plaintiff with intentionally and knowingly selling alcohol without a license. *See id.* at 10. Specifically, the complaint reads as follows:

> On Saturday October 10th, 2009 at approximately 2:20am while at Pistol Pete's, 315 Nichols Street in the City of Utica, County of Oneida, State of New York, 13501, Stephen Patterson, who is the owner/operator/proprietor of the business enterprise Pistol Pete's, [*6] did knowingly and intentionally have for sale and sell a shot of E & J Brandy for a fee of $5.00. The defendant, Mr. Patterson, did this without first obtaining the appropriate license from the New York State Liquor Authority. This act was also completed with the assistance of an unknown black female bartender.

*Id.*

On January 8, 2010, Plaintiff was arraigned in Utica City Court. *See* Dkt. No. 38-3 at 143-44. In addition to the charges stemming from the events of October 10, 2009, Plaintiff also had the following charges pending against him as of the date of his arraignment:

---

[3] This prior lawsuit was dismissed after Plaintiff failed to respond to the defendants' motion for summary judgment.

| Alleged Offense | Date of Alleged Offense | Date Arraigned | Bail Status |
|---|---|---|---|
| -Operating a Cabaret without a License<br>-Excessive Noise | 3-21-09 | 4-20-09 | ROR[4] |
| -Operating a Cabaret without a License<br>-Excessive Noise | 3-22-09 | 4-20-09 | ROR |
| -Operating a Cabaret without a License<br>-Excessive Noise | 3-28-09 | 4-14-09 | ROR |
| -Operating a Cabaret without a License<br>-Excessive Noise | 3-29-09 | 5-12-09 | ROR |
| -Operating a Cabaret without a License<br>-Excessive Noise | 4-11-09 (AM) | 5-12-09 | ROR |
| -Operating a Cabaret without a License<br>-Excessive Noise | 4-11-09 (PM) | 5-12-09 | ROR |
| -Excessive Noise | 5-30-09 | 6-22-09 | ROR |
| -Operating a Cabaret without a License | 5-16-09 | 6-22-09 | ROR |
| -Excessive Noise | 9-20-09 | 11-4-09 | ROR |
| -Endangering [*7] the Welfare of a Child<br>-Unlawfully Dealing with a Child<br>-Obstructing Governmental Administration<br>-Unlawful Maintenance of Premises<br>-Harassment 2nd<br>-Consumption on Premises without a License<br>-Operating a Cabaret without a License<br>-Noise Prohibited<br>-Excessive Noise | 10-24-09 | 11-4-09 | ROR |
| -Noise Prohibited | 11-7-09 | 1-6-10 | $500 (Bond Posted) |
| -Noise Prohibited | 11-7-09 | 1-6-10 | $500 (Bond Posted) |
| -Excessive Noise | 12-6-09 | 1-6-10 | $500 (Bond Posted) |
| -Sale of Alcoholic Beverage without a License | 10-10-09 | 1-6-10 | $2,500 (Bond Posted) |
| -Operating a Cabaret without a License<br><br>-Unlicensed Bottle Club | 11-22-09 | 1-6-10 | $1,000 (Bond Posted) |
| -Operating a Cabaret without a License | 1-01-10 | 1-6-10 | $3,000 (Bond Posted) |

Dkt. No. 38-3 at 145-47.

The remainder of Plaintiffs' allegations involve events occurring on October 24, 2009. Plaintiff contends that on October 24, 2009, Defendants Noonan, Holt, Geddes, Grande, Curley, and Duval of the Special Operations Unit under the command of Defendant Capri, "showed up at a charitable teen party hosted by a your lady at 315 Nichols Street[.]" Dkt. No. 13 at ¶ 29. Plaintiff contends that, according to the police narrative, Defendants "went [*8] to 315 Nichols Street for a premise check. There were no 911 calls, crimes in progress, or no police assistance required at the location." Id. at ¶ 30.

Plaintiff's trial on the charges stemming from the October 24, 2009 incident occurred on June 15, 2010 in Utica City Court in front of Judge Gerald J. Popeo. See Dkt. No. 54-10. At trial, Defendant Duval testified that he was patrolling the East Utica area shortly after midnight when he received a call for units to respond to Pistol Pete's to assist him. See id.

---

[4]  The abbreviation "ROR" indicates that Plaintiff was released on his own recognizance.

at 9. When Defendant Duval arrived, he observed Defendants Noonan and Holt in front of the establishment speaking with Plaintiff. *See id.* at 10. Defendant Duval testified that he could hear loud music upon arriving and issued Plaintiff an appearance ticket for general noise violation. *See id.* at 10-11. As he was approaching, Defendant Noonan observed Plaintiff's business partner, Willie Walker, exit and enter the premises several times. *See id.* at 11. Thereafter, the neon sign outside the establishment was turned off and Defendant Duval observed "a large crowd of juveniles . . . beginning [to] exit[ ] the establishment." *See id.* Defendant Duval testified that there were approximately 100 individuals exiting the establishment [*9] and that there were anywhere between the ages of fifteen to seventeen. *See id.* at 11-12. Defendant Duval further testified that he observed Defendant Grande exit the premises with J.B., who was sixteen years of age and intoxicated. *See id.* at 13. While inside Pete's, Defendant Duval testified that he observed a bar area, empty liquor bottles scattered throughout the establishment, including some on the floor, and evidence that marijuana had been used. *See id.* at 19-20.

Defendant Holt testified that he and Defendant Noonan went to Pete's on October 24, 2009 because the illegal activity that generally occurred there happened on Friday and Saturday nights — "when they would have the gatherings there, the parties. The illegal cabaret activity." Dkt. No. 54-9 at 5-6. When he first arrived at Pistol Pete's, Defendant Holt testified that he and Defendant Noonan observed "numerous — they appeared to be juveniles — younger teenage males and females going in and out of the Nichols Street side door of the establishment, which is the common door that people normally use to enter and exit the establishment." *Id.* at 8. Defendant Holt estimated that the juveniles were anywhere between thirteen and seventeen years of age. *See id.* at 9. Defendant [*10] Holt heard loud music coming from the establishment and interviewed several of the teenagers who were loitering outside. *See id.* at 10. These teenagers advised Defendant Holt that there was "a party going on inside and there was an entry fee of $5." *Id.* Further, Defendant Holt testified that Mr. Walker advised him that they were having a private birthday party in the club. *See id.* at 11.

Defendant Holt also performed a breathalyzer test on J.B., an individual who was at Pete's on the evening of October 24, 2009 and was sixteen years of age at the time. *See* Dkt. No. 54-36 at ¶¶ 105, 114-15. The test indicated that J.B. had a blood alcohol content of at least 0.08%. *See id.* at ¶ 105; *see also* Dkt. No. 54-9 at 22-27. J.B.'s mother later confirmed that J.B. was not intoxicated before he left for the party. *See id.* at ¶ 106; *see also* Dkt. No. 54-9 at 32-33.

Defendants' testimony was supported by the deposition of Maurice D. Titus — the DJ hired to perform at the birthday party. *See* Dkt. No. 54-12 at 2-4. Mr. Titus stated that he was hired by T.S., who was celebrating her birthday at Pete's. *See id.* Mr. Titus further stated that the individuals at the party ranged from approximately fourteen to twenty-one years [*11] of age, "but the majority were definitely under twenty-one (21)." *Id.* at 3. Mr. Titus observed many under-aged attendants drinking alcoholic beverages, often straight from the bottle. *See id.* Mr. Titus also recalled a specific incident from that evening:

> At one point some drunk girl came to my DJ table and told me that a girl was passed out on the floor near the wall. The girl came to me and pointed to the girl and said 'She dead, she dead,' referring to the passed out girl. Soon after that I saw two other young girls helping the passed out girl to her feet. The girl was hardly able to walk, and was moving around like jelly, meaning that she was limp and was unable to stand on her own. I turned on the light when they were picking her up to see what happened, and when I saw them moving her I turned off the light and went back to playing music.

*Id.; see also* Dkt. No. 54-13 at 2-3 (supporting deposition of T.S. corroborating Defendants' testimony at trial and also stating that she was at Pete's on the evening of October 10, 2009).

Although Plaintiff was acquitted after trial of most of the charges stemming from the October 24, 2009 incident, the court found him guilty of violating New York Penal Law § 240.26 and sentenced [*12] him to fifteen days in jail. *See* Dkt. No. 54-36 at ¶ 77. Plaintiff contends that Defendants lacked probable cause to enter and search the second floor of the premises. *See* Dkt. No. 13 at ¶ 34. Plaintiff further contends that Defendants "removed old liquor and beer bottles that were stored in the basement garbage from the prior owner and prior events that took place at the premise and placed these bottles on the second floor of the premise where the teen party took place. The defendants created a crime scene." *Id.* at ¶ 35. Further, Plaintiff alleges that the Utica Dispatch, WKTV, YNN, and Utica Daily news received a press release by Defendant LaBella accusing Plaintiff of serving alcohol to minors at the October 24, 2009 party. *See id.* at ¶ 40.

On January 1, 2010, Utica City Court Judge John Balzano issued a search warrant for the interior and exterior of Pete's, to be executed between 12:00 a.m. and 6:00 a.m. that same day. *See* Dkt. No. 54-21. The warrant indicated that it was to seek "[e]vidence of the operation of a 'cabaret'

and/or of the illegal sale or consumption of alcohol; evidence of the names and addresses of persons on or about the premises." *See id.* at 2. Investigator Laurey submitted the [*13] search warrant application. *See id.* at 3. The application detailed the various incidents that Defendants had responded to in October of 2009, as well as road checks that they had conducted involving individuals who had been at 315 Nichols Street. *See id.* at 4. Additionally, the application noted that "[o]n December 16, 2009 the Honorable Samuel D. Hester Supreme Court Justice ruled that the owner of 315 Nichols St. Utica NY, Stephen Patterson, [is] prohibit[ed] persons from using the property for uses not permitted under the zoning of the property without having gotten either a special permit or variance from the zoning board of appeals and that would include operation as a bar or restaurant or similar commercial use." *Id.* After receiving the injunction, Plaintiff drafted a letter to Defendant Williams requesting that he be permitted to operate the premises at 315 Nichols Street on New Years Eve of 2009. *See id.* Further, the application indicates that, "[o]n December 31, 2009 a concerned citizen presented a flyer stating that Petes will be holding a New Years Eve party. The flyer also states that VH1 Miss New York will be attending along with numerous DJ's. The flyer further states that free food and free drinks will [*14] be provided." *Id.* Further, the flyer states "GIVE ME $20 B4 12AM. PETE'S LAST PARTY. PETE'S LAST PARTY. 10PM UNTIL YOU QUIT." Dkt. No. 54-26 at 2.

In the early morning hours of January 1, 2010, Defendants executed the search warrant for 315 Nichols Street. *See* Dkt. No. 54-29. When they arrived, Plaintiff was at the front door and was served with the warrant. *See id.* at 17. The first floor of the bar was empty, but Defendants could hear loud music coming from the second floor. *See id.* When Defendants proceeded to the second floor, they observed people dancing and at the bar. There was a DJ playing music and alcohol was being consumed. *See id.* Defendants included a video of their execution of the warrant, which corroborates their account of what was found. *See* Dkt. No. 53.

On May 12, 2010, a Report and Recommendation was issued by the Nuisance Abatement Hearing Panel following an administrative hearing. *See* Dkt. No. 38 at Exhibit "7." The Report and Recommendation recommended that Plaintiff and Willie Walker "be prohibited and banned from operating any night club, cabaret, café, restaurant, banquet hall, after-hours club, dance hall, concert hall, meeting room, or any other place of public assembly [*15] or public accommodation at the premises located at 313-315 Nichols Street in Utica, New York." *Id.* On May 14, 2010, Defendant

LaBella, as the Commissioner of Public Safety, adopted the Report and Recommendation and determined that the prohibition shall be for one year. *See id.* Further, Defendant LaBella revoked any Certificate of Occupancy issued by the City of Utica. *See id.*

Currently before the Court are the parties' cross-motions for summary judgment.

## III. DISCUSSION

### A. Applicable law

#### 1. Summary judgment standard

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, [*16] the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652

(1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing [*17] *Showers v. Eastmond*, 00 CIV. 3725, 2001 U.S. Dist. LEXIS 6473, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## 2. False arrest

"A § 1983 claim for false arrest, . . . including arrest without probable cause, . . . is substantially the same as a claim for false arrest under New York law[.]" *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted). Under both New York law and the Fourth Amendment to the United States Constitution, the elements of a false arrest action are as follows: "'(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) (quotation omitted).

"'Justification may be established by showing that the arrest was based on probable cause.'" *Savino v. City of N.Y.*, 331 F.3d 63, 76 (2d Cir. 2003) (quotation omitted). Probable cause exists "when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed a crime or is committing a crime.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quotation omitted). "The existence of probable cause must be determined [*18] on the basis of the totality of the circumstances, . . . and 'where law enforcement authorities are cooperating in an investigation . . . , the knowledge of one is presumed shared by all.'" *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir. 1989) (internal citation

and quotation omitted). "An officer retains probable cause to arrest a plaintiff 'even if the probable cause was for a crime different from what the police officers believed to have been committed.'" *Davis v. City of New York*, 373 F. Supp. 2d 322, 330 (S.D.N.Y. 2005) (quotation and other citations omitted).[5]

## 3. Malicious prosecution

"The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person — *i.e.,* the right to be free of unreasonable or unwarranted restraints on personal liberty." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995). To assert a Fourth Amendment claim for malicious prosecution under section 1983, a plaintiff must show a deprivation of her liberty consistent with the concept of "seizure," so as to ensure that the harm suffered is of "constitutional proportions." [*19] *See id.*

The elements of malicious prosecution under section 1983 are virtually identical to the elements of the same claim under New York law. *See Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992) (citations omitted). To state a cause of action for malicious prosecution in New York, the plaintiff must prove "'(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) (quotation omitted). To sustain a malicious prosecution claim pursuant to section 1983, "the state law elements must be met, and there must also be a showing of a 'sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.'" *Rutigliano*, 326 Fed. Appx. at 8-9 (quoting *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)). "Unlike an arrest, which only requires probable cause that 'the suspect had committed . . . *an* offense[,]' a prosecution requires probable cause 'to charge [the suspect] with *each* of the crimes.'" *Kavazanjian v. Rice*, No. 03-CV-1923, 2005 U.S. Dist. LEXIS 13653, 2005 WL 1377946, *4 (E.D.N.Y. June 7, 2005) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569, 571 (2d Cir. 1996)) (emphasis added). As such, when considering Plaintiff's malicious prosecution claim, the Court must individually consider each count with which Plaintiff was charged. *See id.* (quotation omitted).

---

5    Although probable cause is a defense to both false arrest and malicious prosecution claims, the probable cause analysis for each claim requires a slightly different analysis. Therefore, the Court will analyze Plaintiff's false arrest and malicious prosecution claims separately. *See Kavazanjian v. Rice*, No. 03-CV-1923, 2005 U.S. Dist. LEXIS 13653, 2005 WL 1377946, *4 (E.D.N.Y. June 7, 2005) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569, 571 (2d Cir. 1996)).

### a. Probable cause

"In the context of a malicious [*20] prosecution claim, probable cause under New York law is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *Rounseville v. Zahl*, 13 F.3d 625, 629-30 (2d Cir. 1994) (internal quotations and citations omitted); *see also Colon v. New York*, 60 N.Y.2d 78, 82, 455 N.E.2d 1248, 468 N.Y.S.2d 453 (1983) (holding that probable cause to prosecute consists of "such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty"). "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino*, 331 F.3d at 72; *see also Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010).

"In order to survive a motion for summary judgment on the malicious prosecution claim, [the plaintiff] must have submitted evidence sufficient for a reasonable jury to find that his indictment was procured as a result of police conduct undertaken in bad faith." *Savino*, 331 F.3d at 73. The presumption of probable cause is not rebutted "with mere 'conjecture' and 'surmise.'" *Id.* (citing *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)); *see also Sclafani v. Spitzer*, 734 F. Supp. 2d 288, 299 (E.D.N.Y. 2010) (holding that "mere conjecture and surmise that an indictment was procured as a result of conduct undertaken in bad faith cannot overcome the presumption of probable cause created in an indictment" (quotations and citation omitted)); [*21] *Fernandez v. DeLeno*, 71 F. Supp. 2d 224, 229 (S.D.N.Y. 1999) ("To survive a motion for summary judgment [on a malicious prosecution claim], plaintiff must present admissible facts and may not rely on bare allegations of facts, ultimate or conclusory facts, or legal conclusions").

"[E]ven when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (quotations and citations omitted). However, "[i]n order for probable cause to dissipate, the groundless nature of the charge must be made apparent [to the defendants] by the discovery of some intervening fact." *Lowth*, 82 F.3d at 571; *see also Husbands ex rel. Forde v. City of New York*, 335 Fed. Appx. 124, 128 (2d Cir. 2009) (citation omitted). "[T]he question is whether either the evidence gathered after arrest undermined a finding of probable cause, or whether the . . .Defendants' inquiry into the alleged [crime] so far departed from what a reasonable person would have undertaken as to itself constitute evidence of lack of probable cause." *Rae v. County of Suffolk*, 693 F.

Supp. 2d 217, 227 (E.D.N.Y. 2010). "[D]efendants are not obliged to exonerate [the] plaintiff or uncover exculpatory evidence, but the 'failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'" *Lawrence v. City Cadillac*, No. 10 Civ. 3324, 2010 U.S. Dist. LEXIS 132761, 2010 WL 5174209, *6 (S.D.N.Y. Dec. 9, 2010) (quoting *Lowth*, 82 F.3d at 571).

### b. Actual malice

Actual malice "'does not require a plaintiff to prove that the defendant [*22] was motivated by spite or hatred[,]'" but instead that he initiated or continued the criminal proceeding "'due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994) (quotation omitted). Actual malice typically is shown by circumstantial evidence, including a lack of probable cause. *See Martin v. City of Albany*, 42 N.Y.2d 13, 17, 364 N.E.2d 1304, 396 N.Y.S.2d 612 (1977). Both the Second Circuit and New York courts have held that, although

> "lack of probable cause to institute a criminal proceeding and proof of actual malice are independent and indispensable elements of a malicious prosecution action, the absence of probable cause does bear on the malice issue." . . . A jury may infer the [existence] of actual malice from the absence of probable cause.

*Maxwell v. City of N.Y.*, 156 A.D.2d 28, 34, 554 N.Y.S.2d 502 (1st Dep't 1990) (quotation and other citation omitted); *see also Lowth*, 82 F.3d at 573 (holding that, "[i]n most cases, the lack of probable cause — while not dispositive — tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause" (internal quotation omitted)).

### 4. First amendment retaliation

"[T]he Second Circuit has 'described the elements of a First Amendment retaliation claim in several ways, depending on the factual context.'" *Sloup v. Loeffler*, No. 05-CV-1766, 2008 U.S. Dist. LEXIS 65545, 2008 WL 3978208, *22 (E.D.N.Y. Aug. 21, 2008) (quoting *Williams v. Town of Greenburgh*, [535 F.3d 71, 76 (2d Cir. 2008)]). Where a private citizen asserts a [*23] First Amendment claim against a public official, the plaintiff must demonstrate that (1) the plaintiff engaged in speech or conduct that the First Amendment protects; (2) the plaintiff's exercise of his First Amendment rights motivated the defendant's actions; and (3) the defendant's actions effectively chilled the plaintiff's

exercise of those rights. *See Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)); *Moran v. City of New Rochelle*, 346 F. Supp. 2d 507, 517 (S.D.N.Y. 2004) (citation omitted).

### 5. Unlawful search

The Fourth Amendment protects individuals in their homes "against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless search is 'per se unreasonable . . . subject to only a few specifically established and well-delineated exceptions.'" *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)).

It is firmly established that the Fourth Amendment only proscribes unreasonable searches and seizures. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989) (citations omitted). The permissibility of a search "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Id.* (quotation and other citation omitted).

In *Ruggiero v. Krzeminski*, the Second Circuit held that although a search conducted without a warrant is

> presumptively unreasonable . . . [t]he operation of this presumption . . . cannot serve to place on the defendant the burden of proving that the official action was reasonable. Rather, the [*24] presumption may cast upon the defendant the duty of producing evidence of consent or search incident to an arrest or other exceptions to the warrant requirement. However, the ultimate risk of nonpersuasion must remain squarely on the plaintiff in accordance with established principles governing civil trials.

*Ruggiero v. Krzeminski*, 928 F.2d 558, 563 (2d Cir. 1991) (internal and other citations omitted).

### 6. Qualified immunity

"The doctrine of qualified immunity shields public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

For a constitutional right to be "clearly established" for purposes of determining whether an officer is entitled to qualified immunity, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that *in the light of pre-existing law the unlawfulness must be apparent*."

*Mollica v. Volker*, 229 F.3d 366, 370-71 (2d Cir. 2000) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)) (emphasis in original). "Where the right at issue in the [*25] circumstances confronting police officers . . . was clearly established but was violated, the officers will nonetheless be entitled to qualified immunity 'if . . . it was objectively reasonable for them to believe their acts did not violate those rights.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quotation and other citation omitted).

"Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent." *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010) (citations omitted). "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness. . . . That is, '[e]ven if the right at issue was clearly established in certain respects . . . an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context.'" *Id.* (quotations omitted).

The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact. *See Zellner*, 494 F.3d at 367 (citing [*26] *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)) (other citations omitted). "The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.*, whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court. However, '[a] contention that . . . it was objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case."'" *Id.* (quotation and other citations omitted).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is

an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman*, 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

## B. Application

### 1. Defendant Bansner

Defendants contend [*27] that Defendant Bansner must be dismissed because "nowhere in the admissible record does his name appear as having any involvement with this case." Dkt. No. 34-37 at 7. Plaintiff has not addressed this argument.

The Court agrees with Defendants that none of Plaintiff's claims allege any wrongdoing by Defendant Bansner. Accordingly, the Court grants this portion of Defendants' motion for summary judgment.

### 2. Defendant Fatata

The only allegations pertaining to Defendant Fatata contend that she was informed that Plaintiff was leasing the property at 315 Nichols Street in September of 2008. *See* Dkt. No. 13 at ¶ 22. Plaintiff claims that, in a sworn affidavit, a City of Utica employee Jennifer Randall stated that Defendant Fatata told her to keep her apprised about Plaintiff's activities and when he entered City Hall. *See id.* at ¶ 23. Plaintiff also claims that Ms. Randall claimed that Defendant Fatata stated that she would not allow Plaintiff to operate at 315 Nichols Street and that she began retaliating against Plaintiff on September 7, 2008 by placing his business on the police "hot spot." *Id.* at ¶¶ 24-25.

Despite claiming that he has a sworn affidavit from Ms. Randall regarding Defendant [*28] Fatata's statements and actions, Plaintiff has failed to produce the document. These conclusory assertions are insufficient to support his First Amendment retaliation claim against Defendant Fatata. Moreover, the only First Amendment protected speech Plaintiff alleges are the civil rights lawsuits filed on September 30, 2009 and October 19, 2012. Clearly, Defendant Fatata could not retaliate against Plaintiff for speech that had not yet occurred.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's First Amendment retaliation claims against Defendant Fatata.

### 3. The October 10, 2009 incident

Regarding Plaintiff's false arrest claim, the Court assumes that the complaint and summons issued to Plaintiff are sufficient to constitute "confinement" for purposes of this claim. Nevertheless, Plaintiff's false arrest claim stemming from the events of October 10, 2009 still fail. Without question, Defendants had probable cause to arrest Plaintiff based on the information they obtained. Defendants observed Plaintiff's business throughout the evening and all indicated that their observations indicated that Plaintiff was illegally selling alcohol at 315 Nichols Street. Moreover, Defendants used a [*29] confidential informant to enter Pete's, purchase alcohol, and then leave with the beverage. *See* Dkt. No. 38-3 at 4. Defendants then took possession of the plastic cup and had its contents analyzed by the New York State Forensic Laboratory, who confirmed that it contained alcohol. Defendants undoubtedly had probable cause to arrest Plaintiff for the illegal sale of alcohol regarding the events of October 10, 2009. *See Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (holding that "[p]robable cause exists 'when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed a crime or is committing a crime'") (quotation omitted). As such, the Court grants Defendants' motion for summary judgment as to Plaintiff's false arrest claim surrounding the events of October 10, 2009.

As to Plaintiff's malicious prosecution claim, the Court finds that Defendants had probable cause for commencing the proceeding and continuing it through trial. Plaintiff has not presented any evidence to suggest that new evidence was presented after the time the complaint and summons was issued that would have eliminated [*30] the finding of probable cause. Defendants reasonably relied on Ms. Rodgers' testimony and Plaintiff has provided only conclusory assertions that her testimony was false. *See Garraway v. Newcomb*, 154 Fed. Appx. 258, 260 (2d Cir. 2005) (holding that the defendant had probable cause to arrest and prosecute the plaintiff for dog fighting where he had a sworn statement from a witness implicating the plaintiff and personally observed dogs with scars on their bodies). Based on the totality of the circumstances, Defendants were entitled to rely on Ms. Rodgers statement, which was supported by their past and current observations and dealings with Plaintiff and the activities at 315 Nichols

Street. *See Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). Accordingly, the Court finds that Defendants had probable cause to prosecute Plaintiff for violating N.Y. Alcoholic Beverage Control Law § 100.1. Additionally, the Court finds that Plaintiff has failed to put forth evidence suggesting that Defendants acted with malice. Although Plaintiff was cited for various violations of City ordinances over an extended period of time, the evidence in the record firmly establishes that Plaintiff was engaged in most of the activities alleged. Plaintiff's conclusory assertions regarding Defendants wrong and improper motives are insufficient to survive Defendants' [*31] motion for summary judgment.

Alternatively, the Court finds that Defendants are entitled to qualified immunity as to all of Plaintiff's claims relating to the events of October 10, 2009. Qualified immunity in the context of malicious prosecution and false arrest gives rise to the concept of "arguable probable cause." "'An officer's determination is objectively reasonable if there was "arguable" probable cause at the time of arrest — that is, if officers of reasonable competence could disagree on whether the probable cause test was met.'" *Gonzalez v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. 2013) (quotations omitted). Defendants' observations, in addition to Ms. Rodgers' statement, clearly provided Defendants with arguable probable cause to believe that Plaintiff was selling alcohol without a license in violation of N.Y. Alcoholic Beverage Control Law § 100.1 and that he was illegally operating a "cabaret" in violation of the relevant Utica City Ordinance.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiffs' claims stemming from the events of October 10, 2009.

### 4. The October 24, 2009 incident

Viewing Plaintiff's submissions liberally, Plaintiff is asserting the following claims regarding the October 24, 2009 arrest and subsequent prosecution: [*32] (1) unlawful search; (2) false arrest; (3) malicious prosecution; and (4) defamation. *See* Dkt. No. 38-2 at 5-11; *see also* Dkt. No. 13 at ¶¶ 32-43.

As to Plaintiff's false arrest claim, the Court finds that Defendants are entitled to summary judgment because

Plaintiff was convicted after trial of violating N.Y. Penal Law § 240.26. Plaintiff did not appeal his conviction and it is therefore still valid. "A conviction that survives appeal is conclusive evidence of probable cause and is therefore a complete defense to a false arrest claim brought under § 1983." *Gibson v. City of New York*, 182 F.3d 899, 899 (2d Cir. 1999) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)) (other citation omitted); *see also Heck v. Humphrey*, 512 U.S. 477, 486-87, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994). Since probable cause is only required as to a single offense and not every offense charged on a false arrest claim, Plaintiff's false arrest claim must fail. *See Marcavage v. City of New York*, 689 F.3d 98, 109-10 (2d Cir. 2012) (citation omitted).

As to Plaintiff's malicious prosecution claim, Defendants had probable cause supporting the charged crimes. Upon arriving at Pete's on October 24, 2009, Defendant Duval testified that he heard loud music coming from the premises. *See* Dkt. No. 54-10 at 10-11. Defendant Duval witnessed a large crowd of juveniles exiting the premises. *See id.* at 11-12. Upon entering Pete's, Defendants observed a bar area and empty liquor bottles scattered throughout [*33] the establishment. *See id.* at 19-20. Defendants also gave a Breathalyzer test to J.B., a sixteen year-old individual at Pete's. *See* Dkt. No. 54-36 at ¶¶ 105, 114-15. The test indicated that J.B. had a blood alcohol content in excess of 0.08%. *See id.* Further, T.S. testified that she paid Plaintiff $200 to rent out Pete's for her birthday party, a fact which Plaintiff does not contest. Further, Maurice Titus testified that he was hired to DJ the party and that he observed many under-aged individuals consuming alcohol at the party. *See* Dkt. No. 54-12 at 2-4.[6] In a conclusory fashion, Plaintiff contends that Defendants fabricated the crime scene by placing old beer and liquor bottles throughout the premises. This contention, however, is entirely conclusory and directly contradicted by the testimony of the non-party witnesses who were present at the party. Clearly, as discussed in more detail above, Defendants' observations, supported by the testimony of witnesses at the party, provided probable cause for the charges brought against Plaintiff on October 24, 2009. Alternatively, the Court finds that Defendants had arguable probable cause for the charges brought against Plaintiff and subsequent prosecution; [*34] and, therefore, Defendants are entitled to qualified immunity as to this claim.

---

[6] "It shall be unlawful for any person, partnership or corporation operating a place for profit or pecuniary gain, with a capacity for the assemblage of twenty or more persons to permit a person or persons to come to the place of assembly for the purpose of consuming alcoholic beverages on said premises, which alcoholic beverages are either provided by the operator of the place of assembly, his agents, servants or employees, or are brought onto said premises by the person or persons assembling at such place, unless an appropriate license has first been obtained from the state liquor authority by the operator of said place of assembly." N.Y. Alcoholic Beverage Control Law § 64-b.

As to Plaintiff's illegal search and seizure claim, the Court finds that Plaintiff's failure to challenge the search and seizure in his state criminal trial precludes him from re-litigating the issue in this forum. *See Spinks v. Orleans County*, No. 10-CV-745A, 2011 U.S. Dist. LEXIS 66444, 2011 WL 2491001, *8 (W.D.N.Y. June 22, 2011) (holding that the plaintiff's failure to challenge the search and seizure in state court and his eventual guilty plea preclude bringing an illegal search and seizure claim pursuant to 42 U.S.C. § 1983). Moreover, a finding that the search of Pete's was unconstitutional would [*35] necessarily require the Court to call into question, directly or indirectly, the validity of the search that led to his eventual conviction for Harassment in the Second Degree. Additionally, the Court finds that Defendants did not infringe on Plaintiff's rights because Pete's was open to the public and, therefore, Plaintiff had no reasonable expectation in such spaces. *See Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414, 104 S. Ct. 769, 78 L. Ed. 2d 567 (1984); *Stone v. Port Authority of N.Y. & N.J.*, No. 11-CV-3932, 2014 U.S. Dist. LEXIS 92950, 2014 WL 3110002, *11 (E.D.N.Y. July 8, 2014) (citation omitted); *Winkel v. Reserve Officer*, 773 F. Supp. 1487, 1490 (D. Kan. 1991). Alternatively, the Court finds that, Defendants are entitled to qualified immunity because it was objectively reasonable for the officers to believe that their conduct was lawful, especially in light of the past incidents at Pete's and the presence of a large number of underage individuals entering and exiting the establishment. *See Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (citations omitted).

Finally, the Court finds that Plaintiff's defamation claim is barred by the applicable statute of limitations. The amended complaint alleges that the defamatory statements occurred on October 24, 2009. *See* Dkt. No. 13 at ¶ 40. Plaintiff commenced this action on October 23, 2012. *See* Dkt. No. 1. Since that is more than one year and ninety days after the alleged defamation, the claim is untimely. *See Murphy v. City of Rochester*, 986 F. Supp. 2d 257, 260 (W.D.N.Y. 2013) (citation omitted).

## 5. Defendant Duval's [*36] arrest of Plaintiff on December 31, 2009

On December 31, 2009, Defendant Duval arrested Plaintiff "on a warrant for failing to appear in court." Dkt. No. 13 at ¶¶ 44, 55. Plaintiff attempts to assert a claim for false arrest regarding this incident.

As Defendants correctly contend, this claim must be dismissed because Plaintiff was arrested pursuant to a facially valid warrant. *See Southerland v. Garcia*, 483 Fed.

Appx. 606, 608 (2d Cir. 2012) (citations omitted). Plaintiff has not contended that the arrest warrant was invalid and Plaintiff's claim that he did not receive the summons for his court appearance is irrelevant to Defendant Duval's culpability on this claim. *See Dirienzo v. United States*, 690 F. Supp. 1149, 1154 (D. Conn. 1988).

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's false arrest claim against Defendant Duval stemming from Plaintiff's arrest on December 31, 2009.

## 6. Defendants' search of Pete's on January 1, 2010

Plaintiff claims that Defendants illegally entered and searched Pete's on January 1, 2010.

"Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes [*37] put it, in 'objective good faith.'" *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245, 182 L. Ed. 2d 47 (2012) (citation omitted). "Nonetheless, under our precedents, the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness. Rather, we have recognized an exception allowing suit when 'it is obvious that no reasonably competent officer would have concluded that a warrant should issue.'" *Id.* (quotation omitted). "The 'shield of immunity' otherwise conferred by the warrant . . . will be lost, for example, where the warrant was 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* (internal and other quotations omitted).

In the present matter, the Court finds that Defendants acted in objective good faith in procuring and acting on the search warrant. Investigator Laurey submitted the search warrant application and detailed the various incidents that Defendants had responded to in October of 2009. *See* Dkt. No. 54-12 at 3-4. Further, the application noted that on December 16, 2009, Judge Hester ruled that the owner of 315 Nichols Street shall be prohibited from using [*38] the property for commercial uses without first obtaining a special permit or variance from the Zoning Board of Appeals. *See id.* at 4. Moreover, the application included a flyer that was brought to Defendants attention. The flyer indicated that Pete's would be holding a New Years Eve party, that there would be a DJ, free food and drinks, and that participants were to give Plaintiff "$20 B4 12AM." *Id.*; *see also* Dkt. No. 54-26

at 2. The flyer also states that it is "PETE's LAST PARTY. PETE'S LAST PARTY." *Id.*

Relying on this flyer and all relevant information regarding past events at Pete's, it was objectively reasonable for Defendants to rely on this valid arrest warrant issued by a neutral judge. When Defendants arrived at Pete's, Plaintiff was served with the warrant at the front door of the establishment. Loud music could be heard and clear signs that a party was taking place. Moreover, as discussed, the video presented by Defendants which recorded their arrival and search of the premises corroborate their claims and provides additional evidence that their actions were objectively reasonable and that probable cause existed that illegal activities were occurring in this public establishment. [*39]

Plaintiff's argument that Defendants improperly relied on the flyer that they received from an anonymous person or street source is without merit. Based on the totality of the circumstances, it was objectively reasonable for Investigator Laurey, who is not a Defendant in this matter, to rely on the flyer and knowledge of past incidents at Pete's in applying for the search warrant. *See Gates*, 462 U.S. at 238. Moreover, Plaintiff's argument that it was improper to rely on the charges leveled against him that were eventually dismissed is misplaced. At the time Investigator Laurey applied for the warrant, the charges were still pending against Plaintiff.

To the extent that Plaintiff argues that Defendants failed to include exculpatory information in the application for the search warrant, the argument is without merit. *See Rodriguez v. City of Bridgeport*, No. 3:03 CV 1597, 2005 U.S. Dist. LEXIS 33481, 2005 WL 3307274, *4 (D. Conn. Dec. 2, 2005) (holding that the defendants were not required to include information that would have discredited their witnesses in the search warrant application). Plaintiff contends that he had a conversation with Defendant Toomey at the Utica Police Station on December 31, 2009. Plaintiff testified that he explained to Defendant Toomey that the flyer was incorrect, [*40] in that the "free drinks" depicted in the flyer were non-alcoholic and that no Djs would be performing and that Miss New York was not coming. Even assuming that Defendants should have included this information in the search warrant application, Plaintiff's claim still fails. "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *United States v. Awadallah*, 349 F.3d 42, 65 (2d Cir. 2003). In order to survive a motion for summary judgment, the plaintiff must prove that there is a "genuine issue of fact about

whether the magistrate would have issued the warrant on the basis of 'corrected affidavits.'" *Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir. 1994). Plaintiff has failed to accomplish this. Based on the totality of the circumstances, it was objectively reasonable for Defendants to disregard Plaintiff's explanation about the flyer and the planned event for that evening at Pete's.

Based on the foregoing, the Court grants Defendants' motion for summary judgment regarding the entry and search of Pete's on January 1, 2010.

## 7. Plaintiffs arrest on January 1, 2010 and subsequent prosecution

Plaintiff argues that Defendants falsely arrested him on January [*41] 1, 2010. Further, Plaintiff contends that he was subject to malicious prosecution for the charges that stemmed from the January 1, 2010 search of Pete's.

After the search of Pete's on January 1, 2010, Plaintiff was charged on January 6, 2010 with operating a cabaret without a license and operating an unlicensed "bottle club." As discussed above, the evidence that Plaintiff was, in fact, violating both of these provisions was overwhelming. When Defendants arrived at Pete's, loud music could be heard. When Defendants entered Pete's, full and empty alcohol containers were scattered throughout, there was a bartender at the bar, and a DJ was playing music (as advertised in the flyer). Again, all of this was captured on video. Although Plaintiff may be correct that the video does not actually depict anyone consuming alcohol, it is immaterial to the finding of probable cause. Defendants' testimony and the video provide overwhelming evidence that Defendants had probable cause to arrest and prosecute Plaintiff for the violating N.Y. Alcoholic Bev. Control Law § 64-b and Utica City Code § 2-14-296. The video taken inside Pete's clearly depicts "musical entertainment, singing, dancing" and Plaintiff admits that there was music and a DJ, as [*42] required to find Plaintiff had been operating an illegal cabaret. *See* Utica City Code §§ 2-14-290, 2-14-296. As to operating an unlicensed bottle club, Plaintiff admits that there were maybe "twenty people" at Pete's that evening. The video clearly depicts more than twenty individuals, that alcohol had been consumed, and that alcohol was scattered throughout the premises, including behind the bar.

Finally, the Court finds that, in the alternative, Defendants are entitled to qualified immunity as to these claims because they had arguable probable cause to arrest and prosecute Plaintiff for the crimes alleged.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's false arrest

and malicious prosecution claims stemming from the incident on January 1, 2010.

### 8. Plaintiff's claims regarding his suicide attempt on January 5-6, 2010

In his amended complaint, Plaintiff alleges that, "[w]hile in city lockup the plaintiff informed the booking officer that he was not mentally stable and plaintiff needed medication that was prescribed to plaintiff. . . . The booking officer searched the plaintiff thoroughly; placed plaintiff in a cell on suicide watch status and monitored plaintiff [*43] until his shift was over." Dkt. No. 13 at ¶ 55. Thereafter, Plaintiff claims that "[t]he second officer defendant who guarded the plaintiff began to taunt and harass plaintiff. Defendant Duval came to plaintiff's cell after midnight and began harassing plaintiff. Later on that evening the defendant fell asleep and plaintiff fell asleep shortly after. When plaintiff woke up a belt was in plaintiff's cell." Id. at ¶ 56. Thereafter, Plaintiff claims that "had a nervous breakdown due to the cruel treatment," that he "broke up pressure and attempted suicide." Id. at ¶ 57. When the unnamed Defendant officer awoke, he found Plaintiff with the belt around his neck and called for assistance to help remove the belt from Plaintiff's neck. See id. At this point, Plaintiff was taken to Saint Lukes Hospital for an evaluation and he was "handcuff[ed] to the bed for twelve hours." See id. at ¶ 58.

In his deposition, Plaintiff provided the following testimony regarding the suicide attempt:

Q. Can you describe the belt?

A. I can't describe it. I can't describe it.

Q. Where was it in your cell?

A. Around my neck.

Q. So you woke up with the belt around your neck?

A. No, I did not. That's the only time I — it wasn't — I just [*44] know it was in my cell and I know I placed it around my neck. I know I just put it around my neck. I don't know if it was on the floor, I don't know if it was on the bed. I just know when I got to the cell, there was no belt.

* * * * *

Q. And what did you attach the belt to?

A. Well, I walked around the cell a couple of times contemplating. I was up, I was in tears, I know that I was just broken up and I was looking for a pipe or a radiator or something and I just know their cells wasn't

like that. But I do know that they have some bars going across here and he was — and I remember him laying in the chair and I walked past him a couple of times in the cell just looking at him laying there sleeping while he was guarding me and I had this belt around my neck. And I stood on the edge of the cot, and on the edge of the cot there was some bars to the door, and I tried to grab, put it through there, put it by there, and I — after that I heard he moved or something and I just laid back down quickly and I turned to the side like that and the belt was still around my neck.

Dkt. No. 54-5 at 127-29. Thereafter, Plaintiff testified that Officer Cimpi woke up, "rushed in" and called for some officers [*45] to assist him. See id. at 130. Plaintiff further testified that, when the officers came into his cell, he thought that they were going to attack him, so he "threw a kick at one of them." Id. The officers told him told him that "we're not going to hurt your, just calm down, give me the belt." Id.

"The Eighth Amendment's prohibition against cruel and unusual punishment requires prison conditions to be 'humane,' though not necessarily 'comfortable.'" Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012) (citing Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001)) (other citations omitted); see also U.S. Const. amend. VIII. To establish an Eighth Amendment violation, an inmate must show: "'(1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities[;] and (2) a sufficiently culpable state of mind on the part of the defendant official, such as deliberate indifference to inmate health or safety.'" Id. (quoting Gaston, 249 F.3d at 164) (other citation omitted).

"As to the objective element, there is no 'static test' to determine whether a deprivation is sufficiently serious; '[t]he conditions themselves must be evaluated in light of contemporary standards of decency.'" Jabbar, 683 F.3d at 57 (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)) (other citation omitted). The Second Circuit has held that "prisoners may not be deprived of their 'basic human needs — e.g., food, clothing, [*46] shelter, medical care, and reasonable safety' — and they may not be exposed 'to conditions that pose an unreasonable risk of serious damage to [their] future health.'" Id. (quotations omitted).

As for the subjective requirement, deliberate indifference requires "'more than mere negligence.'" Id. (quoting Farmer, 511 U.S. at 835, 114 S. Ct. 1970). The prison official must know of, and disregard, an excessive risk to inmate health or safety. See id. (citation omitted). "'[A]n official's failure to

alleviate a significant risk that he should have perceived but did not . . . [cannot] be condemned as the infliction of punishment.'" *Id.* (quotation omitted).

To establish a due process violation of the Fourteenth Amendment, an inmate must show that a government official made a deliberate decision to deprive him of his life, liberty, or property. *See Jabbar*, 683 F.3d at 57 (citing *Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)) (other citation omitted). Merely negligent conduct does not give rise to claims under the Fourteenth Amendment. *See id.* (citing *Daniels*, 474 U.S. at 331, 333, 106 S. Ct. 662).

In the present matter, the Court finds that Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim. First, nothing in the record suggests that a named Defendant placed a belt in Plaintiff's cell. Moreover, Officer Cimpi is not named as a Defendant. The fact that Officer Cimpi may [*47] have fallen asleep during his shift constitutes, at best, negligence and does not evince the sufficiently culpable state of mind required. Rather, Plaintiff's own testimony demonstrates that, immediately upon becoming aware of the situation, Officer Cimpi rushed into Plaintiff's cell and called other officers for assistance. Once Plaintiff was relieved of the belt, the officers took him to the hospital pursuant to section 9.41 of the Mental Hygiene Law. Based on the officers actions upon perceiving the threat, no rational jury could conclude that any named Defendant was deliberately indifferent to the risk that Plaintiff could commit suicide. *See Kelsey v. City of New York*, 306 Fed. Appx. 700, 702-03 (2d Cir. 2009).

Moreover, Plaintiff's claim is belied by the actions Defendants took upon Plaintiff's arrival at City lockup. Plaintiff was placed on suicide watch after he made statements that concerned the booking officer. Officer Golden escorted Plaintiff to his cell and gave him food from McDonald's. *See* Dkt. No. 54-5 at 121. At that point, Officer Golden and Plaintiff discussed their religious beliefs at length in a conversation that Plaintiff described as pleasant. *See id.* at 121-22. Officer Golden was then relieved by Officer Cimpi. Plaintiff then had a slightly more combative [*48] conversation with Officer Cimpi. *See id.* at 122-25. After about fifteen minutes, Officer Cimpi left his position

in front of Plaintiff's cell, but he "never left the hallway area because he was on 24-hour watch[.]" *Id.* at 126. Officer Cimpi repeatedly came back to check on Plaintiff and then eventually returned to his chair and fell asleep. *See id.* at 125-28.

Although Officer Cimpi may have been negligent in falling asleep, nothing in the record establishes the requisite state of mind to support Plaintiff's claim. Moreover, Plaintiff has not identified any named Defendant personally involved in the alleged deliberate indifference. As such, alternatively, the Court finds that Plaintiff has failed to establish the requisite personal involvement required by section 1983. *See Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

To the extent Plaintiff is attempting to bring this claim against Defendant LaBella and the City of Utica, the Court finds that he has failed to put forth any facts supporting supervisor or municipal liability. As to Defendant LaBella, Plaintiff has failed to set forth any facts regarding a policy or custom put in place by Defendant LaBella that caused this allege injury or that he was grossly negligent in supervising his officers.[7] Additionally, [*49] Plaintiff has not identified any municipal policy that caused this alleged deprivation. *See Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). As such, no rational jury could find that Plaintiff has established a claim for supervisory or municipal liability.

Finally, regarding Plaintiff's motion for spoliation sanctions for the loss of video footage of the incident at issue, the Court finds that he has not met his burden. The video at issue involved an incident that occurred on January 5-6, 2010. Plaintiff filed his complaint in this matter on October 19, 2012, nearly three-years later. Nothing in the record [*50] demonstrates that Defendants were on notice that they had an obligation to preserve the video during this period or that they knew Plaintiff was going to file suit. *See Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-12 (2d Cir. 2001); *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001).

Moreover, after Plaintiff learned that the video had been destroyed, he was given an opportunity to depose the officer

---

[7] Traditionally, supervisory personnel may be considered "personally involved" if a plaintiff demonstrates that the defendant: (1) participated directly in the alleged constitutional violation; (2) failed to remedy the wrong after being informed of it; (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or, (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating there were ongoing unconstitutional acts. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).

who compiled the video footage and any other officer who handled the videos. After several conversations with Defendants' counsel, the depositions of Lt. Brucker and Investigator Selimovic were scheduled for March 21, 2014. *See* Dkt. No. 47 at 4; Dkt. No. 55-4. Plaintiff, however, unilaterally cancelled the depositions and they were never rescheduled. *See* Dkt. No. 55-5. Prior to filing his motion, Plaintiff had failed to depose any member of the Utica Police Department regarding the missing video. Plaintiff's conclusory assertion that Lt. Brucker purposely omitted the video in question is insufficient to meet his burden.[8] Rather, the uncontested evidence establishes that, due to the limited storage capacity of the Department's DVR system, video is typically automatically written over after approximately two months. *See* Dkt. No. 55-6 at ¶¶ 6-7. As such, the evidence demonstrates that no member of the [*51] Utica Police Department acted with a sufficiently culpable state of mind to warrant spoliation sanctions. *See Byrnie*, 243 F.3d at 107-08; *see also Reilly v. Natwest Mkts. Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999).

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's deliberate indifference claims and denies Plaintiff's motion for spoliation sanctions.

### 9. Due process claim concerning the administrative hearing and determination

In his amended complaint, Plaintiff alleges that his procedural due process rights were violated as a result of the nuisance abatement proceeding. *See* Dkt. No. 13 at ¶¶ 61-66. Plaintiff alleges that Defendant Noonan lied during the proceeding regarding the charges that had been brought against Plaintiff. Plaintiff further attempts to [*52] argue that because the charges were subsequently dismissed, it "nullifies the evidence presented." Dkt. No. 38-2 at 18. Plaintiff argues that on May 13, 2010, Defendant LaBella determined that there were six violations committed by Plaintiff at 315 Nichols Street. *See id.* Plaintiff contends that "[t]he property was then closed down for a year denying the plaintiff the right to earn a living." *Id.* (emphasis added).[9]

Defendants are entitled to summary judgment on this claim for several reasons. First, Plaintiff did not file an Article 78

proceeding to challenge the administrative hearing determination, which is fatal to his procedural due process claim. *See Rankel v. Town of Somers*, 999 F. Supp. 2d 527, 546 (S.D.N.Y. 2014) (citing *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 881-82 (2d Cir. 1996)); *Hafez v. City of Schenectady*, 894 F. Supp. 2d 207, 215 n.9 (N.D.N.Y. 2012) (citations omitted). Similarly, Plaintiff failed to appeal Judge Hester's injunction order. Finally, Plaintiff was afforded due process because he was given due notice of the proceeding and failed to appear. *See* Dkt. No. 54-25 [*53] at 2-3.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's due process claim.

### 10. Video surveillance of Pete's from March 21, 2009 through April 12, 2009

In his amended complaint, Plaintiff alleges that Defendant Grande "placed plaintiff and plaintiff's building located at 315 Nichols Street under video surveillance without a warrant from March 21, 2009 through April 12, 2009 intruding on Plaintiff's right to privacy." Dkt. No.13 at ¶ 67. Further, Plaintiff claims that Defendant Grande reviewed these surveillance videos and charged him with twelve City of Utica violations, which were dismissed by the corporation counsel's office on March 17, 2011. *See id.* at ¶ 68.

Defendants assert that they are entitled to summary judgment on this claim because it is barred by the applicable statute of limitations. *See* Dkt. No. 54-37 at 49-50. Plaintiff has not responded to this part of Defendants' motion.

Defendants are correct that Plaintiff's illegal surveillance claim is untimely. The surveillance occurred through April 12, 2009 and Plaintiff did not file this action until October 19, 2012. *See* Dkt. No. 1. Since this claim is subject to a three-year statute [*54] of limitations, it is untimely.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's unlawful surveillance claim.

### 11. Due process claim regarding the 666 Bleeker Street property

---

[8]  Captain Mickle conducted an internal investigation into this incident, which concluded in April of 2010. *See* Dkt. No. 47-4. In his report of the investigation, Captain Mickle noted that his investigation revealed that Plaintiff was "wearing a belt when arrested and that belt remained on his person until he removed it in his cell and placed it around his neck." *Id.* at 2. Further, Captain Mickle concluded that Officer Golden missed the belt during the intake search he performed. *See id.*

[9]  Throughout this litigation and Plaintiff's dealing with Defendants, Plaintiff has denied that he was operating a business at 315 Nichols Street after April of 2009. It is unclear how Plaintiff could have been earning a living through 315 Nichols Street if he was not operating a business out of the location.

In his amended complaint, Plaintiff appears to allege that his procedural due process rights were violated when Defendants denied him a certificate of occupancy. *See* Dkt. No. 13 at ¶¶ 73-93. Plaintiff leased the property on January 1, 2012 and named his new business the African American Heritage Lodge. *See id.* at ¶ 75. The purpose of the lodge "was to allow African American residents to have a facility with a bar and restaurant to host repasts, parties, religious and other social charity events." *See id.* Plaintiff applied for a certificate of occupancy on May 31, 2012 and Defendant Cozza was assigned to inspect the building. *See id.* at ¶ 76. Plaintiff received plumbing and electrical certifications that the property was in compliance with the relevant codes. *See id.* at ¶ 77. Plaintiff claims that Defendant Cozza inspected the building several times and found new violations each time so that Plaintiff would not pass inspection. *See id.* at ¶ 78. Plaintiff claims that, [*55] after all violations were corrected, Defendant Cozza performed the final inspection and informed Plaintiff that "he could not issue[ ] a certificate of occupancy because the chief of police did not want the building open." *Id.* at ¶ 81. Thereafter, Plaintiff alleges that Defendant Foster, the fire marshal, posted on the back and front door of the building that the premises were unsafe, despite having never inspected the building. *See id.* at ¶ 83.

Further, Plaintiff alleges that on August 3, 2012, Plaintiff applied for a cabaret license but Defendant Williams did not respond to Plaintiff's application in two weeks in violation of City of Utica Ordinance. *See id.* at ¶ 85. Rather, on October 10, 2012, Defendant Williams denied the application. *See id.* at ¶ 86. Defendant Williams allegedly denied the license because he claimed that Plaintiff was "involved in illegal serving of alcohol, narcotics activity and criminal activity." *Id.* at ¶ 87.

In order to bring a claim for violation of the procedural due process rights guaranteed by the Fourteenth Amendment, a plaintiff must show "(1) that he possessed a protected liberty or property interest; and (2) that he was deprived of that interest without due process." [*56] *Rehman v. State Univ. of N.Y. at Stony Brook*, 596 F. Supp. 2d 643, 656 (E.D.N.Y. 2009); *accord Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011). Within the Second Circuit, "a constitutionally protected property interest in land use regulation arises only if there is an entitlement to the relief sought by the property owner." *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 192 (2d Cir. 1994).

In the present matter, the Court finds that Defendants are entitled to summary judgment on Plaintiff's claim relating to the 666 Bleeker Street property. Although Plaintiff could have challenged the alleged denials through an Article 78

proceeding, he did not avail himself of that right. As the Second Circuit has emphasized, "[t]his court has held on numerous occasions that where, as here, a party sues the state and its officials and employees for the arbitrary and random deprivation of a property or liberty interest, an Article 78 proceeding is a perfectly adequate postdeprivation remedy." *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002) (internal quotations and citation omitted). Had Plaintiff commenced an Article 78 proceeding, the state court could have granted Plaintiff the relief he seeks. *See Ahmed v. Town of Oyster Bay*, __F. Supp. 2d __, 7 F. Supp. 3d 245, 2014 U.S. Dist. LEXIS 36178, 2014 WL 1092363, *6 (E.D.N.Y. 2014) (dismissing the plaintiff's procedural due process claim "because the Article 78 proceeding precludes the claim as a matter of law") (citation omitted); *see also Jackson v. Roslyn Bd. of Educ.*, 652 F. Supp. 2d 332, 345 (E.D.N.Y. 2009) ("An Article 78 proceeding provides the opportunity to review whether a body or officer 'failed [*57] to perform a duty enjoined upon it by law' or whether a specific act was 'made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion,' and permits the state court to remedy the violation by ordering a hearing or a return of the unlawfully seized property") (quotations omitted).

Moreover, the Court finds that Plaintiff's conclusory assertion that he did not believe that "an Article 78 proceeding would . . . remedy the multiple violations of [his] constitution[al] rights" is insufficient to find that the remedy was insufficient. Plaintiff fails to provide any explanation why an Article 78 proceeding would be insufficient.

Finally, to the extent that Plaintiff may be attempting to allege a substantive due process claim, the Court finds that Defendants are entitled to summary judgment. None of the alleged conduct was "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Pena*, 432 F.3d at 112 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)).

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to this claim.

## 12. Plaintiff's conspiracy claim

To maintain a conspiracy claim under either section 1983 or section 1985, the plaintiff must establish that [*58] the defendants violated one of his constitutional rights. *See Friends of Falun Gong v. Pacific Cultural Enterprise, Inc.*,

288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003) (citations omitted); *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) (citation omitted). Moreover, the intra-corporate conspiracy doctrine, which applies to conspiracy claims pursuant to both 42 U.S.C. § 1983, *see Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 2012 WL 4017789, *30 (S.D.N.Y. 2012); *Anemone v. Metropolitan Transportation Authority*, 419 F. Supp. 2d 602, 603-04 (S.D.N.Y. 2006), and 42 U.S.C. § 1985, *see Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978), "posits that officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other." *Jefferson v. Rose*, 869 F. Supp. 2d 312, 2012 WL 1398743, *4 (E.D.N.Y. 2012) (quotations and citations omitted); *see also Smith v. Town of Hempstead Department of Sanitation Sanitary District No. 2*, 798 F. Supp. 2d 443, 461 (E.D.N.Y. 2011) (citation omitted). The intra-corporate conspiracy doctrine "extends to public corporate bodies, including municipalities." *Nimkoff v. Dollhausen*, 751 F. Supp. 2d 455, 466 (E.D.N.Y. 2011) (citation omitted); *see also Michael v. County of Nassau*, No. 09-cv-5200, 2010 U.S. Dist. LEXIS 82764, 2010 WL 3237143, *5 (E.D.N.Y. Aug. 11, 2010) (holding that the intra-corporate conspiracy doctrine applies to municipalities).

Since Plaintiff failed to establish that Defendants violated any of his constitutional rights, the Court grants Defendants' motion for summary judgment as to Plaintiff's conspiracy claims. Moreover, the intra-corporate conspiracy doctrine precludes Plaintiff's conspiracy claims because all alleged conspirators were employed by the same municipal entity. *See Baines v. Masiello*, 288 F. Supp. 2d 376, 394-95 (W.D.N.Y. 2003) (holding that a conspiracy claim brought against "the Common Council, the Mayor, and [*59] the City Clerk" was barred by the intra-corporate conspiracy doctrine); *Broich v. Incorporated Vill. of Southampton*, 650 F. Supp. 2d 234, 247 (E.D.N.Y. 2009) (holding that conspiracy claim against the Village Board trustees, mayor, and former and current chief of police are barred by the intra-corporate conspiracy doctrine) (citations omitted).

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's conspiracy claims.

### 13. State-law claims

Application of supplemental jurisdiction is discretionary, and "it requires a balancing of the considerations of comity, fairness to the litigants, judicial economy, and the avoidance of needless decisions of state law." *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 809 (2d Cir. 1979)

(citation omitted). The Second Circuit has held that "'if [all] federal claims are dismissed before trial . . . the state claims should be dismissed as well.'" *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S. Ct. 614, 98 L. Ed. 2d 720 & n.7 (1988) (enumerating several factors that courts should weigh in considering whether to exercise supplemental jurisdiction — "the values of judicial economy, convenience, fairness, and comity" — and suggesting that, "in the usual case in which all federal-law claims are eliminated before trial, the balance of [those] factors . . . will point toward declining to exercise jurisdiction over the remaining state-law [*60] claims").

It is unclear from the parties submissions whether Plaintiff is attempting to bring any state-law claim s not already addressed in this Memorandum-Decision and Order. Since the Court has dismissed all of Plaintiffs' federal claims, it declines to exercise supplemental jurisdiction over any state-law claims Plaintiff may have attempted to assert and dismisses them without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 43) is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's motion for summary judgment (Dkt. No. 38) is **DENIED**; and the Court further

**ORDERS** that Plaintiff's motion for spoliation sanctions (Dkt. No. 47) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that all other pending motions are **DENIED** as moot; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with [*61] the Local Rules.

### IT IS SO ORDERED.

Dated: September 30, 2014

Albany, New York

U.S. District Judge.

/s/ Mae A. D'Agostino

Mae A. D'Agostino