**MANDATE**

# UNITED STATES COURT OF APPEALS
## FOR THE
### SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 12th day of December, two thousand nineteen.

Before:     Jon O. Newman,
            Dennis Jacobs,
            Rosemary S. Pooler,
                _Circuit Judges._

_____

| | |
|---|---|
| Maxmillian Sloley, | **JUDGMENT** |
| Plaintiff - Appellant, | Docket No. 16-4213 |
| v. | |
| Eric VanBramer, in his individual and official capacity, | |
| Brian VanBramer, in his individual and official capacity, | |
| Defendants - Appellees. | |

_____

The appeal in the above captioned case from a judgment of the United States District Court for the Northern District of New York was argued on the district court's record and the parties' briefs.  Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the district court's dismissal of Appellant Maxmillian Sloley's ("Sloley") claims against Bryan VanBramer are AFFIRMED, the dismissal of Sloley's visual body cavity search claim against Eric VanBramer is VACATED, and the case REMANDED for trial on the merits of Sloley's claim and the issue of Eric VanBramer's qualified immunity.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

**MANDATE ISSUED ON 01/30/2020**

16-4213-cv
Sloley v. VanBramer

| | |
|---|---|
| 1 | UNITED STATES COURT OF APPEALS |
| 2 | FOR THE SECOND CIRCUIT |
| 3 | ———————————— |
| 4 | |
| 5 | August Term, 2018 |
| 6 | |
| 7 | (Argued: September 12, 2018          Decided:  December 12, 2019) |
| 8 | |
| 9 | Docket No. 16-4213 |
| 10 | |
| 11 | ———————————— |
| 12 | |
| 13 | MAXMILLIAN SLOLEY, |
| 14 | |
| 15 | *Plaintiff-Appellant,* |
| 16 | |
| 17 | v. |
| 18 | |
| 19 | ERIC VANBRAMER, in his individual and official capacity, |
| 20 | BRYAN VANBRAMER, in his individual and official capacity, |
| 21 | |
| 22 | *Defendants-Appellees.*[1] |
| 23 | |
| 24 | ———————————— |
| 25 | |
| 26 | Before: NEWMAN, JACOBS, and POOLER, *Circuit Judges.* |
| 27 | |
| 28 | Appeal from the United States District Court for the Northern District of |
| 29 | New York (Gary L. Sharpe, *J.*) granting summary judgment for Defendants- |

———————————

[1] The Clerk of the Court is direct to amend the caption as above.

1    Appellees Bryan and Eric VanBramer on Plaintiff-Appellant Maxmillian Sloley's

2    claims, brought under 42 U.S.C. § 1983, alleging, inter alia, that a visual body

3    cavity search to which he was subjected incident to a felony arrest violated his

4    Fourth Amendment right to be free from unreasonable searches. We hold that

5    such searches must be justified by specific, articulable facts supporting

6    reasonable suspicion that an arrestee is secreting contraband inside a body

7    cavity. Because this requirement was established by sufficiently persuasive

8    authority, it was "clearly established" for purposes of a qualified immunity

9    defense by New York state police officers at the time of the search at issue in this

10    case. Moreover, we hold that disputed facts preclude a finding of reasonable

11    suspicion on a motion for summary judgment and remand for trial on the merits

12    of Sloley's claim and the issue of Eric VanBramer's entitlement to qualified

13    immunity. Finally, because Sloley has presented no evidence that Bryan

14    VanBramer was aware that Eric VanBramer was conducting, or was going to

15    conduct, the visual body cavity search, the district court properly dismissed

16    Sloley's claims against him.

17        Affirmed in part, vacated in part, and remanded.

2

1    Judge Newman concurs in the judgment and in the opinion of the Court

2    and files a separate concurring opinion.

3    Judge Jacobs dissents in a separate opinion.

4    _____

5    JONATHAN K. YOUNGWOOD, Simpson Thacher &
6    Bartlett LLP (Janet A. Gochman, *on the brief*), New York,
7    NY, *for Plaintiff-Appellant Maxmillian Sloley*.
8
9    JONATHAN D. HITSOUS, Assistant Solicitor General
10   (Barbara D. Underwood, Solicitor General, Victor
11   Paladino, Assistant Solicitor General, *on the brief*), *for*
12   Letitia James, Attorney General of the State of New
13   York, Albany, NY, *for Defendants-Appellees Eric*
14   *VanBramer and Bryan VanBramer*.
15
16   POOLER, *Circuit Judge*:

17   Plaintiff-Appellant Maxmillian Sloley brought this action pursuant to 42

18   U.S.C. § 1983 to vindicate the violation of his constitutional rights occasioned by,

19   inter alia, a visual body cavity search to which he was subjected incident to

20   arrest. The district court (Gary L. Sharpe, *J.*) granted summary judgment in favor

21   of Defendants-Appellees Eric and Bryan VanBramer, reasoning that Bryan was

22   not personally involved in the search, the search was supported by a reasonable

23   suspicion, and Eric was entitled to qualified immunity in any event because

3

1   reasonable officers in his position could conclude that he had the requisite

2   reasonable suspicion. *See Sloley v. VanBramer*, No. 1:14-cv-339 (GLS/CFH), 2016

3   WL 6603211, at *2-4 (N.D.N.Y. Nov. 8, 2016). On appeal, the VanBramers

4   additionally argue that they are also entitled to qualified immunity because it

5   was not clearly established at the time of the search that visual body cavity

6   searches incident to felony arrests must be supported by reasonable suspicion.

7       We vacate in part and hold that visual body cavity searches must be

8   justified by specific, articulable facts supporting reasonable suspicion that an

9   arrestee is secreting contraband inside the body cavity to be searched. Moreover,

10  because this requirement was established by sufficiently persuasive authority, it

11  was "clearly established" for purposes of a qualified immunity defense by New

12  York state police officers at the time Eric searched Sloley. We further hold that

13  disputed facts preclude a finding of reasonable suspicion on a motion for

14  summary judgment and remand for trial on the merits of Sloley's claim and the

15  issue of Eric's entitlement to qualified immunity. Finally, we affirm in part

16  because Sloley has not presented any evidence indicating that Bryan was aware

17  that Eric was conducting, or was going to conduct, the visual body cavity search.

4

# BACKGROUND

## I.   Factual Background[2]

In the pre-dawn hours of Monday, April 1, 2013, Sloley and Daphne Rollins got into an argument at Rollins's house in Athens, New York. According to Sloley, Rollins was somewhere between being his "girlfriend or ex-girlfriend" at the time. Sloley Dep. Tr. at 37:4-6, ECF No. 41-2.[3] The argument stemmed from rumors Rollins had heard that Sloley was romantically involved with another woman.

The argument escalated. At some point during the confrontation, Sloley grabbed the intoxicated Rollins's cellphone and ran out of the house with it. Rollins gave chase, falling down the house's front steps in the process. Rollins then went back inside, reemerging with a baseball bat in hand. At that point,

---

[2] We gather the following factual background from the summary judgment record, viewed in the light most favorable to Sloley. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); *Mitchell v. City of New York*, 841 F.3d 72, 75 (2d Cir. 2016).

[3] All such record citations refer to documents filed in the district court, *Sloley v. VanBramer*, No. 1:14-cv-339 (N.D.N.Y.).

5

Sloley retreated into his car, tossing Rollins's phone to the ground as he ran.

Rollins then struck the windshield of Sloley's car with the baseball bat.

After Rollins struck Sloley's car with the bat, they both returned inside. At

some point while they were inside, Sloley grabbed the bat from Rollins, went

back outside, and hit Rollins's car with it. Sloley then tossed the bat to the

ground before driving off. Rollins called 9-1-1, though Sloley was not aware at

that time that Rollins had called the police.

New York State Trooper Bryan VanBramer responded to Rollins's 9-1-1

call. According to Bryan, Rollins told him that Sloley may be involved with

illegal drug activity and possibly was in possession of illegal drugs. Rollins

denies having made any mention of Sloley being involved in, or possibly

involved in, drug activity and denies having suggested that Sloley might have

been possession of any illegal drugs.

A deputy from the Greene County Sheriff's Office pulled Sloley over about

five minutes after he left Rollins's house. Sloley told the deputy about his dispute

with Rollins. Upon consultation with the New York State Police, the deputy then

placed Sloley in handcuffs and brought him back to Rollins's house.

1    Once there, the deputy who had apprehended Sloley transferred Sloley

2 into Bryan's police car. After some discussion with Sloley, Bryan and another

3 state trooper present at the scene brought Sloley to a nearby state police station.

4 The troopers did not ask him if he was involved in any illegal drug activity.

5    At the police station, the troopers brought Sloley to an office, where they

6 handcuffed him to the wall. At that point, the troopers informed Sloley that he

7 was going to be charged with harassment and criminal mischief.

8    Unbeknownst to Sloley at the time, Bryan had at some point told his

9 brother, New York State Trooper Eric VanBramer, to go to Sloley's car with Eric's

10 drug-sniffing dog, Ryder. According to Eric, he recognized Sloley's name "as

11 referring to an individual who was well known in the area for being wrapped up

12 in illegal drugs." Eric VanBramer Aff. ¶ 4, ECF No. 41-5. Moreover, before April

13 1, 2013, "several people" had told Eric that "Sloley was a drug dealer." *Id.*

14    Eric brought Ryder near Sloley's car. Ryder alerted—i.e., indicated the

15 presence of drugs—on each side of the car, in the area around the car's hood, and

16 in the center console area inside the car. According to Eric, he saw "a small

17 amount of a loose, chunky substance that appeared to be crack cocaine in the

18 crease in the driver's seat." *Id.* ¶ 5. Eric claims he field tested the substance,

1    which tested positive for cocaine. Sloley does not contest the fact that Eric

2    brought Ryder to the car. However, he does dispute that Eric found any drugs in

3    the car. He asserts that neither he nor his mother, who owned the car, use crack

4    cocaine.

5        In any event, at some point after searching Sloley's car, Eric and Ryder

6    arrived at the state police station where Sloley was being held. Ryder walked

7    right by Sloley but paid no attention to him. Eric then asked Sloley if he "had any

8    drugs stashed in [his] anal area." Sloley Dep. Tr. at 64:9-10, ECF No. 41-2. Sloley

9    said that he did not. Eric told Sloley that he had found a small quantity of drugs

10   in his car, which provided grounds to strip search Sloley. Sloley denied that Eric

11   found drugs in the car, possibly saying something along the lines of, "There's no

12   way you found drugs in my car. I don't do drugs." *Id.* at 64:18-20. As Sloley

13   elaborated at his deposition, "There's no way you are going to find drugs in my

14   car, especially in the driver's seat. That's impossible." *Id.* at 67:19-21.

15       When the incredulous Sloley asked to see the drugs, Eric told him he could

16   not, because the "crumbs" of crack cocaine were "too small" to see. *Id.* at 85:3-6.

17   Nevertheless, according to Eric, he "documented on a General 2 Evidence

18   Record" that he had obtained from Sloley's car a substance that "tested positive

8

for cocaine" and gave the evidence to Bryan. Eric VanBramer Aff. ¶ 9, ECF No.

41-5. According to Bryan, he "executed [the] General 2 Evidence Record" and

placed the evidence in an evidence locker. Bryan VanBramer Aff. ¶ 9, ECF No.

41-4.

Sloley's denial notwithstanding, Eric unhooked Sloley from the wall to

which he was handcuffed and brought him to a private back room of the police

station. Eric instructed Sloley to remove his clothing, and Sloley did so, piece by

piece. Eric searched each article of clothing as Sloley handed them to him. Once

Sloley was completely naked, Eric instructed him to lift his genitals, bend over,

spread his buttocks, and allow Eric to examine the now-exposed areas of Sloley's

body. The search revealed no drugs secreted on or in Sloley's body.

After the search, Sloley got dressed and was brought to Athens Town

Court to be arraigned. Sloley was arraigned on the harassment and criminal

mischief charges, as well as a drug possession charge for the cocaine Eric had

purportedly found in his car. Sloley was held without bail in Greene County Jail.

Three days after his arraignment, Sloley was brought back to Athens Town Court

where he pled guilty to the harassment charge—a violation—and was sentenced

to time served. The other charges were dropped.

1    **II.    Procedural History**

2        On March 27, 2014, Sloley filed a pro se complaint, pursuant to 42 U.S.C.

3    § 1983, against New York State and the VanBramers alleging, inter alia, that the

4    search Eric conducted violated his Fourth Amendment right to be free from

5    unreasonable searches. The district court dismissed his claims against New York

6    State and the VanBramers in their official capacity sua sponte pursuant to 28

7    U.S.C. § 1915(e).

8        The VanBramers moved for summary judgment on September 18, 2015.

9    The district court granted the motion on November 8, 2016. *See Sloley*, 2016 WL

10   6603211, at *1. The district court first concluded that Sloley had failed to establish

11   that Bryan was either present for, or personally involved in, the search and thus

12   could not be held liable. *Id.* at *2. The court then concluded that Eric had the

13   reasonable suspicion required before officers can conduct strip and visual body

14   cavity searches incident to arrest and that Eric conducted the search in a

15   reasonable manner. *Id.* at *3-4. The district court further concluded that Eric was

16   entitled to qualified immunity in any event because no clearly established law

17   stated that the facts before Eric were insufficient to support the reasonable

18   suspicion necessary to justify such searches incident to arrest. *Id.* at *4.

10

1    The district court entered judgment dismissing the case on November 8,

2    2016. After fixing some problems with his notice of appeal, Sloley timely

3    appealed. On January 26, 2018, we entered an order granting Sloley's motion for

4    appointment of counsel.

5                                **DISCUSSION**

6    We review de novo the district court's grant of summary judgment. *Doe ex*

7    *rel. Doe v. Whelan*, 732 F.3d 151, 155 (2d Cir. 2013). Summary judgment is

8    appropriate only "if the movant shows that there is no genuine dispute as to any

9    material fact and the movant is entitled to judgment as a matter of law." Fed. R.

10   Civ. P. 56(a). We "resolv[e] all ambiguities and draw[] all permissible factual

11   inferences in favor of the party against whom summary judgment is sought."

12   *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010) (internal quotation marks omitted).

13   Moreover, the familiar standards that govern resolution of motions for

14   summary judgment apply equally to such motions based on an assertion of

15   qualified immunity. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). We evaluate

16   claims of qualified immunity at summary judgment using a two-part inquiry: (1)

17   "whether the facts, taken in the light most favorable to the party asserting the

18   injury, show the officer's conduct violated a federal right" and (2) "whether the

11

1    right in question was clearly established at the time of the violation." *Id.* at

2    1865-66 (alterations omitted) (internal quotation marks omitted). Courts have

3    discretion in deciding the order in which to analyze the two prongs, *Pearson v.*

4    *Callahan*, 555 U.S. 223, 236 (2009), but under either, they "may not resolve

5    genuine disputes of" material fact, *Tolan*, 134 S. Ct. at 1866.

6    **I.      The Visual Body Cavity Search**

7         It is necessary at the threshold to define several terms essential to our

8    analysis:

9              (1) a 'strip search' occurs when a suspect is required to
10             remove his clothes; (2) a 'visual body cavity search' is
11             one in which the police observe the suspect's body
12             cavities without touching them (as by having the
13             suspect to bend over, or squat and cough, while naked);
14             (3) a 'manual body cavity search' occurs when the
15             police put anything into a suspect's body cavity, or take
16             anything out.

17   *Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013); *see also People v.*

18   *Hall*, 10 N.Y.3d 303, 306-07 (2008). Here, Sloley was subjected to a strip search

19   and visual body cavity search. However, on appeal, he challenges only the

20   constitutionality of the visual body cavity search.[4] We therefore limit our analysis

---

[4] Sloley has forfeited any claim regarding the unconstitutionality of the strip
search. *See Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d Cir. 1999) (describing

1    to that search. Thus, the questions to which we first turn are what the Fourth

2    Amendment requires when police officers conduct visual body cavity searches

3    incident to felony arrests and whether those requirements were clearly

4    established at the time Eric conducted the search at issue here.[5]

5    **A.**    **Visual Body Cavity Search Incident to Arrest Must Be Justified by**
6          **Reasonable Suspicion**

7    Since at least 1914, it has been accepted that a search incident to an arrest

8    "constitutes an exception to the warrant requirement" the Fourth Amendment

9    otherwise imposes. *Riley v. California*, 573 U.S. 373, 382 (2014). However, the

10    scope of a search incident to arrest is limited. "As the text of the Fourth

---

forfeiture as when "a litigant's action or inaction is deemed to incur the consequence of a loss of a right" and collecting cases). On that score, none of the stated "Issues Presented" in his brief mention the strip search. Moreover, Sloley's brief contains several statements indicating that he is raising issues concerning only the visual body cavity search, including, inter alia, the point heading, "The Visual Body Cavity Search of Appellant Violated the Fourth Amendment Because It Was Conducted Without Individualized Reasonable Suspicion." Appellant's Br. at 16. Finally, after the VanBramers distinguished between strip searches and visual body cavity searches in their brief, Sloley again focused only on the visual body cavity search in his reply brief.

[5] There is no indication here that the search was conducted pursuant to a jailhouse policy that would bring it within the ambit of *Florence v. Board of Chosen Freeholders of Burlington*, 566 U.S. 318, 328-30 (2012). Rather, Defendants assert that the search was conducted as a search incident to arrest.

Amendment indicates, the ultimate measure of the constitutionality of a

governmental search is 'reasonableness.'" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S.

646, 652 (1995). The reasonableness of "[t]he search incident to arrest exception

rests not only on the heightened government interests at stake in a volatile arrest

situation, but also on an arrestee's reduced privacy interests upon being taken

into police custody." *Riley*, 573 U.S. at 382. To determine whether a particular

search incident to arrest falls within this exception, "we examine the degree to

which [it] intrud[es] upon an individual's privacy and the degree to which [it is]

needed for the promotion of legitimate governmental interests." *Birchfield v.*

*North Dakota*, 136 S. Ct. 2160, 2176 (2016) (alterations omitted) (internal quotation

marks omitted).

Applying this framework, this Court has held that the "uniquely intrusive

nature of strip searches, as well as the multitude of less invasive investigative

techniques available to officers" make it such that a strip search cannot be treated

as a routine search of an arrestee's person. *Hartline v. Gallo*, 546 F.3d 95, 102 (2d

Cir. 2008). Thus, we have held that the Fourth Amendment "requires an

individualized 'reasonable suspicion that a misdemeanor arrestee is concealing

weapons or other contraband based on the crime charged, the particular

14

1    characteristics of the arrestee, and/or the circumstances of the arrest' before she

2    may be lawfully subjected to a strip search." *Id.* at 100 (alterations omitted)

3    (quoting *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986)).

4         The VanBramers are correct that neither we nor the Supreme Court have

5    ever squarely held that a similar reasonable suspicion requirement applies to

6    visual body cavity searches of persons arrested for felony offenses. Balancing the

7    degree to which visual body cavity searches "intrude[] upon an individual's

8    privacy" against "the degree to which [they are] needed for the promotion of

9    legitimate governmental interests," *Birchfield*, 136 S. Ct. at 2176 (internal

10   quotation marks omitted), we now hold that such searches do require reasonable

11   suspicion. In other words, a visual body cavity search conducted as an incident

12   to a lawful arrest for any offense must be supported by "a specific, articulable

13   factual basis supporting a reasonable suspicion to believe the arrestee secreted

14   evidence inside a body cavity." *Hall*, 10 N.Y.3d at 311.

15        Visual body cavity searches are invasive and degrading, occasioning a

16   serious invasion of privacy and working a significant harm to a person's bodily

17   integrity. To begin with, strip searches, as opposed to other types of searches of a

18   person incident to arrest, are themselves "uniquely intrusive." *Hartline*, 546 F.3d

15

at 102. And yet visual body cavity searches are even more intrusive. They

"require an arrestee not only to strip naked in front of a stranger, but also to

expose the most private areas of her body to others. This is often, as here, done

while the person arrested is required to assume degrading and humiliating

positions." *Swain v. Spinney*, 117 F.3d 1, 6 (1st Cir. 1997). The freedom from such

"degrading body inspections is . . . basic to the concept of privacy." *Canedy v.*

*Boardman*, 16 F.3d 183, 185 (7th Cir. 1994) (internal quotation marks omitted).

In contrast to that strong privacy interest, the government's interest in

conducting suspicionless visual body cavity searches incident to arrest is slight.

The government's legitimate interest in searching an arrestee flows from the

need "to protect officer safety or to preserve evidence." *Riley*, 573 U.S. at 383.

Those interests would be, at most, minimally advanced by a rule that allowed

suspicionless visual body cavity searches of all arrestees. Regarding the

protection of officer safety, we are unaware of any case in which an arrestee

concealed inside a body cavity a weapon that he or she "might seek to use in

order to resist arrest or effect his [or her] escape." *See Chimel v. California*, 395 U.S.

752, 763 (1969). If such cases exist, they are certainly not commonplace.

16

1      It is far more likely that an arrestee may conceal "destructible evidence,"

2  *see id.*, such as illegal drugs, in a body cavity. But a reasonable suspicion

3  requirement readily accommodates the government's interest in preventing the

4  destruction of evidence without impairing that interest. If an arresting officer has

5  reason to believe, based on "specific and articulable facts . . . , taken together with

6  rational inferences from those facts," *Terry v. Ohio*, 392 U.S. 1, 21 (1968), that an

7  arrestee is secreting contraband inside a body cavity, then the officer is permitted

8  to conduct a visual body cavity search. If such suspicion is lacking, then the

9  government's interest in preserving evidence must yield to the individual's

10  strong privacy interest.

11      This holds true regardless of the level of crime for which a person is

12  arrested. Indeed, as the Supreme Court has repeatedly observed, it makes little

13  sense in this context to draw Fourth Amendment lines that rest on the felony–

14  misdemeanor distinction. Whether a person is arrested for a felony or a

15  misdemeanor says nothing about the likelihood that that person is secreting

16  contraband on or in his or her person. Indeed, "[e]xperience shows that people

17  arrested for minor offenses have tried to smuggle prohibited items into jail,

18  sometimes by using their rectal cavities or genitals for their concealment. They

17

1   may have some of the same incentives as a serious criminal to hide contraband."

2   *Florence v. Bd. of Chosen Freeholders of Burlington*, 566 U.S. 318, 335 (2012). And

3   while "[p]eople detained for minor offenses can turn out to be the most devious

4   and dangerous criminals," *id.* at 334, people arrested for felonies are not

5   necessarily more dangerous or more likely to conceal contraband, *see Tennessee v.*

6   *Garner*, 471 U.S. 1, 14 (1985) ("[T]he assumption that a 'felon' is more dangerous

7   than a misdemeanant [is] untenable. Indeed, numerous misdemeanors involve

8   conduct more dangerous than many felonies.").

9        To be sure, the type of crime for which someone is arrested may play some

10  role in the analysis of whether a visual body cavity search incident to that arrest

11  is supported by reasonable suspicion. But that role has nothing to do with a

12  categorical distinction between felonies and misdemeanors. Rather, the question

13  is whether the criminal conduct for which a person was arrested speaks to the

14  likelihood that he or she secreted contraband inside a body cavity. On that score,

15  one may well more reasonably expect someone arrested for a misdemeanor drug

16  offense to be secreting contraband than someone arrested for felony tax fraud.

17  While the crime of arrest is not a determinative factor, it is one officers may take

18

1   into account in their consideration of the totality of the circumstances

2   surrounding the search.

3       Finally, this rule is consistent with the Supreme Court's preference for

4   "readily administrable" Fourth Amendment rules, rather than ones "qualified by

5   all sorts of ifs, ands, and buts." *Atwater v. City of Lago Vista*, 532 U.S. 318, 347

6   (2001) (internal quotation marks omitted) (quoting *New York v. Belton*, 453 U.S.

7   454, 458 (1981), *abrogated on other grounds by Arizona v. Gant*, 556 U.S. 332, 350-51

8   (2009)). Indeed, we were sensitive to this very concern in *Gonzalez*—a case that

9   also involved a visual body cavity search, 728 F.3d at 152—albeit in the context of

10   our discussion of whether the officers in that case were entitled to qualified

11   immunity. There, we recognized that "[t]here are so many permutations of fact

12   that bear upon the constitutional issues of a search," including that "the arrest

13   can be for a misdemeanor or a felony." *Id.* at 162. We add clarity by removing

14   one of those permutations of fact and create a readily administrable bright-line

15   rule that applies to all arrests.

16       In short, we have previously held that strip searches conducted incident to

17   a misdemeanor arrest must be supported by reasonable suspicion. *Hartline*, 546

18   F.3d at 100. We clarify today that that rule applies equally to visual body cavity

1   searches incident to all arrests and hold that such searches must be based on

2   reasonable suspicion to believe that the arrestee is secreting evidence inside the

3   body cavity to be searched.

**B.    Qualified Immunity**

5       We now turn to the VanBramers' contention that they are entitled to

6   qualified immunity because the Fourth Amendment rules applicable to visual

7   body cavity searches conducted incident to arrest were unsettled at the time Eric

8   searched Sloley. Their primary contention is that, at the time of the search, the

9   law was only sufficiently clear that reasonable suspicion was required to conduct

10  visual cavity searches incident to arrests for misdemeanors and other minor

11  offenses. The law was unclear, they argue, whether the same requirement

12  applied to searches incident to felony arrests.

13      For purposes of deciding whether a defendant is entitled to qualified

14  immunity, we do "not require a case directly on point for a right to be clearly

15  established;" nevertheless, "existing precedent must have placed the statutory or

16  constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017)

17  (internal quotation marks omitted). That is because "qualified immunity protects

18  all but the plainly incompetent or those who knowingly violate the law."

20

1    *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).

2    Moreover, the law must be clearly established with a high degree of "specificity"

3    because "[i]t is sometimes difficult for an officer to determine how the relevant

4    legal doctrine . . . will apply to the factual situation the officer confronts." *Id.*

5    (first alteration in original) (internal quotation marks omitted); *see also District of*

6    *Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018).

7         At the time of the search at issue here, this Court had not yet held that

8    visual body cavity searches incident to a felony arrest must be supported by

9    reasonable suspicion. Nevertheless, we have little trouble concluding that that

10   requirement would have been sufficiently clear to a reasonable New York state

11   police officer in the VanBramers' position. We have, at times, suggested that the

12   proper inquiry is whether "the Supreme Court or the Second Circuit [has]

13   affirmed the rule." *Gonzalez*, 728 F.3d at 161. However, that is not the only way in

14   which a right may be "clearly established" for qualified immunity purposes. In

15   addition to being "dictated by controlling authority," a right may be "clearly

16   established" if it is supported by "a robust consensus of cases of persuasive

17   authority." *Wesby*, 138 S. Ct. at 589-90 (internal quotation marks omitted); *see also*

18   *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *Wilson v. Layne*, 526 U.S. 603, 617

1    (1999). The rule must be more than merely "suggested by then-existing

2    precedent." *Wesby*, 138 S. Ct. at 590. Rather, the "decisions by this or other

3    courts" must "clearly foreshow a particular ruling." *Scott v. Fischer*, 616 F.3d 100,

4    105 (2d Cir. 2010) (internal quotation marks omitted). "The precedent must be

5    clear enough that every reasonable official would interpret it to establish the

6    particular rule the plaintiff seeks to apply." *Wesby*, 138 S. Ct. at 590; *see also*

7    *Reichle v. Howards*, 566 U.S. 658, 666 (2012).

8         Here, every reasonable officer in the VanBramers' position as New York

9    State Troopers would have known that visual body cavity searches conducted

10   incident to any arrest must additionally be supported by "a specific, articulable

11   factual basis supporting a reasonable suspicion to believe the arrestee secreted

12   evidence inside a body cavity" and must be conducted in a reasonable manner.

13   *Hall*, 10 N.Y.3d at 310-11; *see also People v. Mothersell*, 14 N.Y.3d 358, 366-67 (2010).

14   As numerous district courts in this Circuit have recognized, Supreme Court and

15   Second Circuit precedent clearly foreshadowed the rule we clarify today. *See, e.g.*,

16   *Sims v. Farrelly*, No. 10 Civ. 4765 (ER), 2013 WL 3972460, at *8 (S.D.N.Y. Aug. 2,

17   2013); *Sorrell v. Incorporated Village of Lynbrook*, No. 10 CV 49 (DRH) (GRB), 2012

18   WL 1999642, at *6 (E.D.N.Y. June 4, 2012); *Harriston v. Mead*, No. 05 CV 2058

22

1  (RJD) (LB), 2008 WL 4507608, at *3 (E.D.N.Y. Sept. 30, 2008); *Sarnicola v. County of*

2  *Westchester*, 229 F. Supp. 2d 259, 270 (S.D.N.Y. 2002); *Murcia v. County of Orange*,

3  226 F. Supp. 2d 489, 497 (S.D.N.Y. 2002); *see also Gonzalez*, 728 F.3d at 166-68

4  (Pooler, *J.*, dissenting). [6]

5  This Court has been previously unpersuaded that existing Supreme Court

6  precedent, Second Circuit precedent, and the above-cited body of district court

7  decisions are sufficient to have made it "clearly established" for qualified

8  immunity purposes that visual body cavity searches incident to felony arrests

9  require reasonable suspicion. *Gonzalez*, 728 F.3d at 161. What tips the balance in

10  this case, however, is the decision of the New York Court of Appeals, five years

---

[6] The dissent incorrectly characterizes *Scott v. Fischer*, 616 F.3d 100 (2d Cir. 2010), to stand for the proposition that we look only to the decisions of our or other federal courts of appeals to determine if a federal right was "clearly foreshadowed." This characterization is flatly contradicted by *Scott*, which explained in relevant part that "the unconstitutionality of [a] law or course of conduct will nonetheless be treated as clearly established if decisions by this *or other courts* clearly foreshadow a particular ruling on the issue, even if those decisions come from courts in other circuits." *Scott*, 616 F.3d at 105 (internal quotation marks and citations omitted) (emphasis added). This does not restrict us to look only to federal circuit courts of appeals in assessing foreshadowing, just as we are not forced to look only to ourselves or our sibling circuit courts to assess if a right has been clearly established generally.

23

1    before the search at issue in this case took place, holding that the Fourth

2    Amendment requires visual body cavity searches conducted incident to any

3    lawful arrest[7] to be supported by "a specific, articulable factual basis supporting

4    a reasonable suspicion to believe the arrestee secreted evidence inside a body

5    cavity"—the very rule we adopt today.[8] *Hall*, 10 N.Y.3d at 311. *Hall* has been

6    consistently applied by New York state courts. *See, e.g.*, *People v. Harry*, 884

---

[7] That court's Fourth Amendment holding did not turn on the level of crime for which a person was arrested. To the contrary, the New York Court of Appeals drew no distinctions between felonies and misdemeanors. Hall himself was indicted on felony drug possession charges, *id.* at 306 ("Defendant was indicted for criminal possession of a controlled substance in the third and fifth degrees."); *see also* N.Y. Penal Law § 220.06 ("Criminal possession of a controlled substance in the fifth degree is a class D felony."); *id.* § 220.16 ("Criminal possession of a controlled substance in the third degree is a class B felony."), and was initially arrested on felony drug sale charges, *People v. Hall*, 829 N.Y.S.2d 85, 86 (1st Dep't 2007) (noting that Hall was arrested "for criminal sale of a controlled substance in the third degree"), *rev'd*, 10 N.Y.3d 303; *see also* N.Y. Penal Law § 220.39 ("Criminal sale of a controlled substance in the third degree is a class B felony.").

[8] When the New York Court of Appeals decided *Hall*, it did so by interpreting the Fourth Amendment, not the New York state constitution. *See* 10 N.Y.3d at 307-10 (discussing Fourth Amendment cases); *see also id.* at 312-13 (holding that, by removing a "string-like object suspiciously hanging from defendant's rectum . . . without first obtaining a warrant, [the officers in that case] conducted an unreasonable manual body cavity search in violation of the Fourth Amendment").

1    N.Y.S.2d 712, 712 (1st Dep't 2009); *People v. Gonzalez*, 870 N.Y.S.2d 529, 530 (3d

2    Dep't 2008).

3        The VanBramers' ask our decision in *Gonzalez* to carry more weight than it

4    can bear. There, we held that it was not clearly established that an officer must

5    have reasonable suspicion before conducting a visual cavity search incident to a

6    felony arrest. *Gonzalez*, 728 F.3d at 162. However, that holding was based, at least

7    in part, on the observation that "*Hall* was decided *after* the search at issue in

8    [that] case," *id.* at 161 (emphasis added), and for that reason *Gonzalez* is not a

9    basis for upholding a qualified immunity defense for a search conducted after

10   *Hall*. *Gonzalez* also noted that "not one case cited in *Hall* said that an officer needs

11   particular, individualized facts to conduct a visual body cavity search." *Id*. Even

12   if true, that circumstance is not a basis for disregarding the authoritative effect of

13   a decision of New York's highest court on the availability of a qualified

14   immunity defense for a New York state police officer. The VanBramers cannot

15   draw the conclusive support they seek from a case regarding the state of the law

16   in 2006 when the search at issue in *Gonzalez* took place, *id*. at 153, because the

17   legal landscape was different in 2013 when the search here took place.

1    To be clear, we need not and do not decide whether a decision of a state

2    court, standing alone, would necessarily suffice to defeat a Section 1983

3    defendant's claim to qualified immunity in every case. Nevertheless, "[s]tate

4    court decisions, like the decisions of other federal lower courts, are relevant and

5    often persuasive" authority on the "clearly established" issue. *Charles W. v. Maul*,

6    214 F.3d 350, 357 (2d Cir. 2000); *see also Buckley v. Rogerson*, 133 F.3d 1125, 1129

7    (8th Cir. 1998) ("In the absence of binding precedent, a court should look to all

8    available decisional law, including decisions of state courts, other circuits and

9    district courts." (internal quotation marks omitted)); *Tribble v. Gardner*, 860 F.2d

10   321, 324 (9th Cir. 1988) (similar).

11   Nor do we hold that *Hall* would necessarily tip the balance against finding

12   qualified immunity if this case involved officers from different states in our

13   Circuit.[9] In this case, however, *Hall* is not just persuasive authority in this Court;

---

[9] To the extent this result seems strange, it is simply a quirk of our federal
system, which charges state and federal courts alike to interpret and faithfully
apply the U.S. Constitution. Of course, if we disagreed with *Hall*, we would not
be bound to follow it, *Charles W.*, 214 F.3d at 357, just as the New York Court of
Appeals is not bound to follow our interpretation of the U.S. Constitution, *see,
e.g.*, *People v. Kin Kan*, 78 N.Y.2d 54, 60 (1991). The dissent contends that, by
relying on *Hall*, we impliedly hold that though states within the same circuit
actively disagree about federal constitutional law, such law can nevertheless be

1    it has been binding authority for the VanBramers since 2008. At the time Eric

2    conducted the visual body cavity search of Sloley in 2013, the VanBramers—New

3    York State Troopers—were already forbidden as a matter of federal

4    constitutional law as interpreted by the New York Court of Appeals—the highest

5    court in their state—from conducting suspicionless visual body cavity searches

6    incident to felony arrests. Thus, had they discovered evidence during the course

7    of a suspicionless visual body cavity search incident to arrest, that evidence

8    would have been subject to suppression on Fourth Amendment grounds in any

9    corresponding state criminal proceeding. *See, e.g.*, *People v. Colon*, 913 N.Y.S.2d

10   658, 659 (1st Dep't 2011). We therefore do not hesitate to conclude that they were

11   "on notice their conduct [was] unlawful." *See Hope v. Pelzer*, 536 U.S. 730, 739

12   (2002) (internal quotation marks omitted); *see also id.* ("[Q]ualified immunity

---

clearly established for purposes of qualified immunity. But neither the dissent
nor the litigants point to a state case that holds visual body cavity searches can be
conducted incident to arrest without reasonable suspicion that the arrestee
secreted evidence inside their body. And insofar as we recognize that the cases of
state supreme courts can be persuasive authority in determining whether a
federal constitutional right is clearly established, we find no support for the idea
that litigants must point also to cases of the highest courts of Vermont and
Connecticut to bolster what was already clearly established in New York.

1    operates to ensure that before they are subjected to suit, officers are on notice

2    their conduct is unlawful." (internal quotation marks omitted)).

3         We pause to address the dissent's misplaced concern that our reliance on

4    the caselaw of the highest court of New York will inhibit police activity by

5    forcing police officers to be attentive to the federal law of constitutional rights as

6    developed in both state and federal courts. It is beyond doubt that police officers

7    frequently have difficult jobs. But if the dissent were right, then state police

8    officers could disregard the decisions of state supreme courts without any fear of

9    being held accountable through a § 1983 action. This is inconsistent with our

10   cases, which hold that courts can look to state court decisions to determine if a

11   federal right has been clearly established. *See, e.g., Maul*, 214 F.3d at 357

12   (explaining that "[s]tate court decisions, like the decisions of other federal lower

13   courts, are relevant and often persuasive."). And in conjuring up a fictitious

14   world where police proceed as unlicensed attorneys, the dissent overlooks that it

15   is already the job of state police officers to follow the federal constitutional rules

16   articulated by the supreme court of their state.

**II.    Reasonable Suspicion for the Visual Body Cavity Search**

Our analysis does not stop there, however. The VanBramers' primary

argument on appeal is that Eric had the requisite reasonable suspicion to justify

the visual body cavity search. They alternatively contend that a reasonable

officer in Eric's position could conclude that there was reasonable suspicion and

they are thus entitled to qualified immunity.

To determine whether an officer had reasonable suspicion to justify the

intrusion complained of, we "must look at the totality of the circumstances" to

see if the "officer ha[d] a particularized and objective basis for suspecting legal

wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation

marks omitted). "Although a mere hunch does not create reasonable suspicion,

the level of suspicion the standard requires is considerably less than proof of

wrongdoing by a preponderance of the evidence, and obviously less than is

necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014)

(citation omitted) (internal quotation marks omitted).

Moreover, when the Fourth Amendment requires an officer to have

reasonable suspicion before undertaking a search, an officer is entitled to

qualified immunity unless we can "say on the somewhat unique facts before us

29

1    that it is clearly established that no 'reasonable suspicion' justified" a visual body

2    cavity search. *Wachtler v. County of Herkimer*, 35 F.3d 77, 81 (2d Cir. 1994). Stated

3    differently, qualified immunity is unavailable if "no reasonable officer could

4    have believed that there was reasonable suspicion." *Dancy v. McGinley*, 843 F.3d

5    93, 108 (2d Cir. 2016).

6        The district court below held that Eric had the requisite reasonable

7    suspicion to conduct the search Sloley contends was unlawful and that Eric was

8    entitled to qualified immunity in any event because "the court [could not] say

9    that the facts of this case demonstrate that it is clearly established that no

10    reasonable suspicion justified a strip-search." *Sloley*, 2016 WL 6603211, at *3-4

11    (internal quotation marks omitted). On appeal, the VanBramers urge us to affirm,

12    arguing that Eric had reasonable suspicion that Sloley was secreting drugs inside

13    his anal cavity because Eric was aware of Sloley's criminal history, which

14    included a drug-crime conviction, he had heard that Sloley was involved with

15    drug dealing, he knew that Sloley was fleeing a crime scene, and Sloley stated

16    that it was not possible that Eric had recovered drugs from his car. More

17    significantly, the VanBramers also point to the facts that Ryder alerted to several

18    areas of Sloley's car, including places from which Eric did not recover any drugs,

30

leading him to conclude that Sloley had recently removed whatever had caused

Ryder to alert, and that Eric recovered crack cocaine from the driver's seat of

Sloley's car, which Eric regarded as consistent with Sloley spilling cocaine as he

secreted it.

We hold that Sloley has successfully raised a genuine dispute about

whether Eric actually recovered any crack cocaine from his car, which is a

material fact that precludes summary judgment. *See* Fed. R. Civ. P. 56(a). Because

that fact is central to the existence of the requisite reasonable suspicion and the

availability of qualified immunity, we remand for a trial on the merits of Sloley's

visual body cavity search claim, which shall include the issue of qualified

immunity. In so holding, we are particularly mindful of our obligation to

"resolve all ambiguities, and credit all factual inferences that could rationally be

drawn, in favor of the party opposing summary judgment." *Cifra v. Gen. Elec. Co.*,

252 F.3d 205, 216 (2d Cir. 2001).

The VanBramers' principal argument regarding the crack cocaine Eric

claims to have recovered is that Sloley lacks personal knowledge of the

circumstances of Eric's search of his car and thus cannot raise a triable issue of

fact sufficient to resist summary judgment. We disagree. Sloley testified during

31

1    his deposition that neither he nor his mother, who owned the car, use drugs, thus

2    making it impossible for Eric to have found crack cocaine in the car. Sloley also

3    testified that it would have been impossible for Eric to find drugs in the driver's

4    seat of his car because he would have known if there were drugs on the seat.

5    While that contention might not ultimately hold up in light of the trivial amount

6    of cocaine Eric purportedly recovered from the car, we draw the inference in

7    Sloley's favor that, if there were drugs on the driver's seat of the car, he would

8    have seen them. *See, e.g.*, *id*. Of course, a reasonable jury may well conclude that

9    Sloley would not have noticed the small amount of drugs Eric purportedly

10   recovered. That would certainly be one permissible inference. But the

11   VanBramers are not entitled to the benefit of that inference on their motion for

12   summary judgment in light of Sloley's competing plausible inference.

13       The VanBramers argue that Sloley's claim to personal knowledge fails

14   because he did not testify that he conducted a thorough inspection of the car

15   before driving it and because Sloley's mother also had access to it—although the

16   record appears to indicate that Sloley was the only one driving it in the days

17   preceding April 1, 2013. The VanBramers' first argument is fodder for cross-

18   examination and argument to the jury; it is not a foundational question that goes

32

1   to the basis of Sloley's personal knowledge. On that score, Sloley directly

2   testified during his deposition that he "didn't see any" drugs[10] and that he would

3   have known if there were drugs on the seat of the car on which he had been

4   sitting. Sloley Dep. Tr. at 84:4-8, 86:2-4, ECF No. 41-2.

5          Their second argument is also an inadequate reason for disregarding

6   Sloley's testimony. It is true that the car Sloley was driving belonged to his

7   mother, but Sloley plainly testified, "My mother doesn't smoke crack and neither

8   do I." *Id.* at 86:6-7. The VanBramers' invocation of the fact that Sloley's mother

9   owned the car impliedly contests the truthfulness of that testimony—suggesting

10  that Sloley would not know if someone else, including Sloley's mother, was

11  responsible for the crack cocaine Eric purportedly discovered on the driver's seat

12  of the car. This argument fails, in part, for the reason discussed above regarding

13  Sloley's personal knowledge of what was or was not on the driver's seat, and, in

---

[10] Sloley's testimony on this issue is ambiguous. He may have been referring to the fact that he did not see the drugs Eric claims to have recovered *after* Eric claims to have recovered them (i.e., while Sloley was in custody in the police station), or he may have been asserting that he did not see the drugs Eric claims to have recovered *before* Eric claims to have recovered them (i.e., while Sloley was in the car). We resolve this ambiguity in the record in Sloley's favor. *E.g.*, *Cifra*, 252 F.3d at 216.

1    part, because suggesting that Sloley's testimony was inaccurate or untruthful

2    does not properly establish an undisputed fact on which the VanBramers may

3    rely on their motion for summary judgment. *See, e.g.*, *Cifra*, 252 F.3d at 216.

4         Moreover, there is an apparent inconsistency between Sloley's testimony

5    and the VanBramers' affidavits, which, combined with the reasons stated above,

6    creates a triable issue of fact as to whether Eric actually recovered any cocaine

7    from Sloley's car. According to the VanBramers, Eric documented the crack

8    cocaine in an evidence record and gave the evidence to Bryan. Bryan then

9    executed the evidence record, which established a chain of custody for the

10   evidence, and put the crack cocaine in an evidence locker. However, according to

11   Sloley, Eric told him that the crack cocaine was too small to see. That

12   contention—that the quantity of crack cocaine was nearly invisible—seems at

13   least somewhat inconsistent with the notion that Eric recovered enough crack

14   cocaine to field test, catalog, and store in evidence.

15        We acknowledge that Sloley's assertion that Eric told him the crack cocaine

16   was too trivial to be visible is in tension with Sloley's assertion that he would

17   have seen drugs that were on the driver's seat. But both possible resolutions of

18   this tension inure to Sloley's benefit: either the quantity of crack cocaine was

34

nearly invisible, calling into question whether Eric actually recovered enough crack cocaine (or any) to field test, catalog, and store as evidence, or it was substantial enough to field test, catalog, and store, from which a jury could reasonably infer that Sloley would have noticed it on the driver's seat.

Furthermore, if the trier of fact were to disbelieve Eric's account of finding drugs in Sloley's car, it would be entitled to disbelieve Eric's claim that Ryder alerted to Sloley's car. To be sure, Sloley was in no position to dispute that particular allegation because he was in custody when Eric took Ryder to Sloley's car. But a trier of fact may simply disbelieve Eric if he lied on another material matter—namely, that he recovered crack cocaine from Sloley's car. While the factual dispute about Eric's alleged discovery of crack cocaine suffices to preclude summary judgment, if the jury were to also disbelieve Eric's testimony regarding Ryder's alert, the entire foundation for the VanBramers' reasonable suspicion argument would collapse. They would be left with, at most, some suspicion that Sloley might have been involved in drug activity generally with no factual basis to reasonably conclude he was secreting drugs inside his anal cavity.

35

1    Finally, although Sloley does not point us to any case presenting identical

2    facts to his, and we have found none, that alone does not doom his claim by

3    granting Eric qualified immunity at the summary judgment stage. That the right

4    at issue must be stated with specificity is not to say that "an official action is

5    protected by qualified immunity unless the very action in question has

6    previously been held unlawful; but it is to say that in the light of pre-existing law

7    the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640

8    (1987) (citation omitted); *see also Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d

9    Cir. 2018).

10    On that score, none of the undisputed facts remotely suggest that Sloley

11    was secreting drugs inside his anal cavity. *Cf. Hartline*, 546 F.3d at 101 ("Officer

12    Gallo did not notice anything about Hartline's physical appearance that

13    suggested she was secreting drugs on her person, nor did he engage in a less

14    invasive pat down search that suggested the presence of contraband."). For

15    example, there is no evidence that Sloley was fidgeting or moved about

16    suspiciously, *e.g.*, *People v. Hunter*, 902 N.Y.S.2d 678, 680 (3d Dep't 2010); *Harry*,

17    884 N.Y.S.2d at 712-13; *People v. Walker*, 810 N.Y.S.2d 592, 595 (3d Dep't 2006);

18    *People v. Taylor*, 741 N.Y.S.2d 822, 824 (4th Dep't 2002), that he reached or

36

1    attempted to reach his hands down his pants, *Hunter*, 902 N.Y.S.2d at 680; *People*

2    *v. Banks*, 830 N.Y.S.2d 839, 841 (3d Dep't 2007), that anyone observed Sloley

3    putting drugs down his pants or retrieving drugs (or anything else) from inside

4    his pants, *e.g.*, *Harry*, 884 N.Y.S.2d at 712-13, *People v. Barnville*, 819 N.Y.S.2d 234,

5    235 (1st Dep't 2006), or that Sloley himself was previously known to secrete

6    drugs inside his anal cavity, *see People v. Clayton*, 868 N.Y.S.2d 303, 305-06 (2d

7    Dep't 2008) ("[T]he defendant had a history of secreting contraband in his rectum

8    . . . ."). Without some indicia that would suggest to a reasonable officer that

9    Sloley was secreting drugs in his anal cavity, Eric has not met his burden to

10   prove that he is entitled to qualified immunity in connection with the visual

11   body cavity search. *See Outlaw*, 884 F.3d at 367 ("Qualified immunity is an

12   affirmative defense on which the defendant has the burden of proof.").

13        In sum, once the disputed fact that Eric recovered crack cocaine from

14   Sloley's car is disregarded, the evidence available to Eric supports no more than

15   a mere hunch that Sloley was secreting drugs inside his anal cavity. Such a

16   "hunch of criminal activity is insufficient" to establish reasonable suspicion. *See*

17   *United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006) (internal quotation

18   marks omitted). Moreover, "we are comfortable concluding that in the absence of

1  indicia that this Court [or New York State courts] ha[ve] found to support

2  individualized reasonable suspicion" that Sloley was secreting drugs inside his

3  anal cavity, *Hartline*, 546 F.3d at 103, based on the undisputed evidence alone,

4  "no reasonable officer could have believed that there was reasonable suspicion"

5  to conduct a visual body cavity search, *see Dancy*, 843 F.3d at 108. Eric is thus not

6  entitled to qualified immunity at the summary judgment stage in connection

7  with the visual body cavity search.

8  **III.    Bryan's Failure to Intervene**

9       The final question we must answer is whether Bryan was sufficiently

10  involved in or aware of the searches such that he may be held liable for failing to

11  intervene. "It is widely recognized that all law enforcement officials have an

12  affirmative duty to intervene to protect the constitutional rights of citizens from

13  infringement by other law enforcement officers in their presence." *Anderson v.*

14  *Branen*, 17 F.3d 552, 557 (2d Cir. 1994). "Whether the officer had a 'realistic

15  opportunity' to intervene is normally a question for the jury, unless, 'considering

16  all the evidence, a reasonable jury could not possibly conclude otherwise.'"

17  *Terebesi v. Torreso*, 764 F.3d 217, 244 (2d Cir. 2014) (quoting *Anderson*, 17 F.3d at

18  557).

1    Here, the VanBramers argue, inter alia, that the record lacks any evidence

2  indicating that Bryan was aware that Eric was going to conduct a visual body

3  cavity search. We agree. While the record is ambiguous as to whether Bryan was

4  in the room where Sloley was detained when Eric entered and told Sloley that

5  Eric was going to strip search him, Sloley provided no evidence that Eric

6  communicated to Bryan he was conducting, or was going to conduct, a visual

7  body cavity search. In light of this dearth of evidence, no reasonable jury could

8  conclude that Bryan had "a realistic opportunity" to prevent this potentially

9  unconstitutional search. *See id.* (internal quotation marks omitted). Thus, the

10  district court properly dismissed Sloley's claims against Bryan.

**CONCLUSION**

12    For the foregoing reasons, we AFFIRM the district court's dismissal of

13  Sloley's claims against Bryan VanBramer, VACATE the dismissal of Sloley's

14  visual body cavity search claim against Eric VanBramer, and REMAND the case

15  for trial on the merits of Sloley's claim and the issue of Eric VanBramer's

16  qualified immunity.

39

1    Jon O. Newman, Circuit Judge, concurring:

2        In dissent, Judge Jacobs contends that the majority opinion permits a

3    decision of New York's highest court, *People v. Hall*, 10 N.Y.3d 303 (2008), to

4    establish federal law for purposes of a New York state police officer's qualified

5    immunity defense. Judge Jacobs also apprehends that the majority's ruling will

6    oblige police officers to "keep ahead of trends in federal constitutional law . . . ."

7    Diss. Op. at 6.

8        I concur in Judge Pooler's opinion and add these words to point out that the

9    majority considers *Hall* important to our ruling but by no means the sole basis for

10   deciding that the New York officer, arresting a person for a felony, should have

11   known that he must have reasonable suspicion to conduct a visual body cavity

12   search. I also seek to allay the unwarranted concern about police officers' difficulty

13   in understanding the constitutional limits on their conduct.

14       The majority announces no general rule that the requirements of federal

15   law, for purposes of a qualified immunity defense to a claim of unconstitutional

16   police misconduct, can be established by a state court decision. The decision of the

17   New York Court of Appeals in *Hall* is enlisted as part of the guidance available to

18   the New York state police officer in this case because of the following unusual

1

combination of circumstances that existed prior to the visual body cavity search

he conducted:

(1) The Supreme Court acknowledged 34 years before the search in this case

that visual body cavity searches "instinctively give us the most pause." *Bell v.*

*Wolfish*, 441 U.S. 520, 558 (1979). Although the Court permitted such searches in

*Wolfish*, it did so only in a limited circumstance: immediately after a contact visit

by a person from outside a prison with a pretrial detainee. *See id*. And such

searches were deemed reasonable even in that limited circumstance on a record

that documents "inmate attempts to secrete [drugs and other contraband] into the

facility by concealing them in body cavities." *Id*. at 559.

(2) The unconstitutionality of a visual body cavity search without

reasonable suspicion had been firmly established in this Circuit for those arrested

for misdemeanors, *see Weber v. Dell,* 804 F.2d 796, 802 (2d Cir. 1986).

(3) The distinction between misdemeanors and felonies was highly unlikely

to be considered by a police officer hurriedly deciding to make a visual body cavity

search of a person arrested for a misdemeanor. *See Tennessee v. Garner*, 471 U.S. 1,

14 (1985) (In the context of Fourth Amendment searches and seizures, the distinction between felonies and misdemeanors "is minor and often arbitrary.").

(4) The seriousness of the assault that a visual body cavity search inflicts on personal dignity had been repeatedly recognized in federal law, *see, e.g., Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983) (Visual body-cavity searches are "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation[,] and submission.") (quotation marks and citation omitted); *Arruda v. Fair*, 710 F.2d 886, 887 (1st Cir. 1983) (recognizing "the severe if not gross interference with a person's privacy that occurs when guards conduct a visual inspection of body cavities).

(5) New York's highest court had instructed New York state police officers that a visual body cavity search of all persons arrested requires reasonable

1    suspicion "supported by a specific, articulable factual basis." *Hall*, 10 N.Y. 3d at

2    311.

3         (6) Decisions of New York's Appellate Division had reinforced the ruling in

4    *Hall*. *See People v. Colon*, 913 N.Y.S. 2d 658, 659 (1st Dep't 2011); *People v. Bamisile*,

5    887 N.Y.S.2d 53, 54 (1st Dep't 2009).

6         (7) District courts in this Circuit had understood that a visual body cavity

7    search requires reasonable suspicion. *See, e.g., Sims v. Farrelly*, No. 10 Civ. 4765,

8    2013 WL 3972460, at *7-8 (S.D.N.Y. Aug. 2, 2013); *Sarnicola v. County of Westchester*,

9    229 F. Supp. 2d 259, 264, 273 (S.D.N.Y. 2002); *Murcia v. County of Orange*, 226 F.

10   Supp. 2d 489, 491, 497 (S.D.N.Y. 2002). Although these courts do not establish

11   federal law for purposes of qualified immunity, their consistency contributes to

12   the conclusion that the requirement of reasonable suspicion for visual body cavity

13   searches was established prior to VanBramer's search.

14        The combination of these circumstances, not the *Hall* decision alone, clearly

15   establishes that reasonable suspicion is required for a visual body cavity search of

16   a person arrested for a felony. At a minimum, these circumstances clearly

17   foreshadow the requirement, and we have ruled that a constitutional limitation on

18   police conduct can be clearly established for purposes of a qualified immunity

4

defense if "decisions by this or other courts 'clearly foreshadow a particular ruling on the issue.'" *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010) (quoting *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997)).

Judge Jacobs suggests that New York police officers will have to "anticipate new law." Not so. Once the highest court of New York ruled that a police officer may conduct a visual body cavity search only if the officer has reasonable suspicion "that the arrestee has evidence concealed inside a body cavity," *People v. Hall*, 10 N.Y.3d 303, 305 (2008), all New York police officers were on notice of their legal obligations concerning visual body cavity searches.

Whether or not VanBramer could anticipate that this Court would rule, under the particular circumstances outlined in Judge Pooler's opinion, that reasonable suspicion as a requirement for visual body searches of those arrested for felonies was sufficiently established, or at least foreshadowed, to defeat a qualified immunity defense under 42 U.S.C. § 1983, he was on notice that reasonable suspicion was required. It would be fanciful to think that he said to himself, "I know that New York's highest court has ruled that I need reasonable suspicion, but I will go ahead without such suspicion because I am not sure that a federal court will rule that the federal right not to be subjected to a body cavity

1  search without reasonable suspicion has been clearly established." The majority's

2  decision to keep open on remand the possibility that he might not be entitled to

3  qualified immunity risks no unfairness to VanBramer.[1]

4      Judge Jacobs expresses concern that under the majority's ruling police

5  officers "would need to keep ahead of trends in federal constitutional law as

6  developed in state courts as well as in federal courts." Diss. Op. at 6. But the only

7  state court decisions the majority opinion charges VanBrmer or any reasonable

8  New York State police officer with an obligation to follow are decisions of New

9  York courts, which he is obliged to follow no matter how we rule. And though it

10  is concededly unusual to rule that reasonable police officers in Connecticut and

11  Vermont are not subject to the same federal requirement as reasonable New York

---

[1] Judge Jacobs' concern that VanBramer might be subject to damages and attorney's fees "personally," Diss. Op. at 2, discounts Article 24 of the contract between New York and the Police Benevolent Association of the New York State Troopers, Inc., which provides for state indemnification against losses arising out of claims for acts committed in the course of state police officers' employment. *See* https://goer.ny.gov/system/files/documents/ 2018/06/contract-agreementpba-troopers-final.pdf. Judge Jacobs suggests that if this contract matters, federal constitutional law "would vary from locality to locality." Diss. Op. at 6-7. But the contract is not claimed to have anything to do with establishing constitutional law. It simply shows that VanBramer will not be subject to damages "personally." Furthermore, the insulation provided by the contract will not vary from locality to locality; it provides for state indemnification of all New York state police officers.

1 police officers, I see no reason to impose on them a requirement influenced in

2 significant part, but not exclusively, by a decision of New York's highest court.

3      Finally, the majority does not "splice[] together: a federal circuit court

4 decision that goes the other way" among other sources, as Judge Jacobs

5 apprehends. Diss. Op. at 5. The decision he cites, *Gonzalez v. City of Schenectady*,

6 728 F.3d 149 (2d Cir. 2013), denied qualified immunity to an officer who conducted

7 a visual body cavity search *before* the decision in *Hall*. *Gonzalez* made that

8 circumstance critical when it first noted that the visual body cavity search in *Hall*

9 did not violate a clearly established federal constitutional rule and then, in the very

10 next sentence, said, "*Hall* was decided *after* the search at issue in this case." [2] 728

11 F.3d at 161 (emphasis added).

12      For all of these reasons, I concur in Judge Pooler's opinion, ruling that a

13 remand to resolve a factual dispute is required in order to determine whether

14 VanBramer is shielded by qualified immunity from liability for conducting a

---

[2] I acknowledge that the next sentence in *Gonzalez*, after the sentence stating the sequence that *Hall* was decided after the search in that case, said, "It [*Hall*] is not a ruling of the Supreme Court or this Court." 728 F.3d at 161. Nevertheless, now that the issue decided in *Gonzalez* has returned to this Court with respect to a visual body cavity search conducted *after Hall*, it is no disrespect to the *Gonzalez* holding for the majority opinion on this appeal to rely on this critically distinguishing fact and include *Hall* along with all of the circumstances outlined above, which *Gonzalez* had no need to consider when adjudicating the availability of qualified immunity as to a search conducted *before Hall*.

1    visual body cavity search of Maximillian Sloley without reasonable suspicion that

2    narcotics were concealed within his body.

1    DENNIS JACOBS, <u>Circuit Judge</u>, dissenting:

2        I respectfully dissent. I would affirm the grant of qualified immunity to

3    New York State Trooper Eric VanBramer, who conducted a body-cavity search

4    when the plaintiff was arrested for a felony offense.

5        Federal constitutional law recognizes that a body-cavity search requires

6    reasonable suspicion if a person is arrested for a *misdemeanor*: "the Fourth

7    Amendment precludes prison officials from performing strip/body cavity

8    searches of arrestees charged with misdemeanors or other minor offenses unless

9    the officials have a reasonable suspicion that the arrestee is concealing weapons

10   or other contraband . . . ." <u>Weber v. Dell</u>, 804 F.2d 796, 802 (2d Cir. 1986). There is

11   thus an express distinction between misdemeanors (and other minor offenses)

12   and felonies.

13       When in 2013 this Court considered this search question in the felony

14   context, the distinction was acknowledged, and qualified immunity was granted

15   to an officer who had executed a felony arrest: "[R]easonable officers could

16   disagree as to whether [the misdemeanor reasonable suspicion] rule applied to

17   those arrested for felony drug crimes, given the propensity of drug dealers to

1

conceal contraband in their body cavities." Gonzalez v. City of Schenectady, 728

F.3d 149, 161 (2d Cir. 2013). The corollary is that it is not clearly established in

federal law that an officer must have reasonable suspicion to justify a body-

cavity search of a person arrested for a felony.

On this appeal, qualified immunity is denied in the same circumstances.

The question is, what has changed? And the answer given in the majority

opinion is: People v. Hall, 10 N.Y.3d 303 (2008), a ruling of the New York State

Court of Appeals. Judge Newman's concurrence also admits the point (in a

roundabout way). But if Hall can make the difference to clearly establish the

Fourth Amendment right that Sloley contends was violated, then federal

constitutional law can be made clearly established by state courts. Moreover, it

would follow that clearly established federal constitutional law can differ state-

by-state within the same circuit. That is not contested by the majority. Maj. Op.

28-29 & n.9. Thus it happens that a New York police officer is now made subject

to personally paying damages and attorneys' fees for doing what in Connecticut

would be protected by immunity. Splits could thus be opened state-by-state

within this Circuit on issues of federal constitutional law. I don't see how that

can be; and I see no explanation in the majority opinion beyond the shrug that

1    such a "strange" result is "simply a quirk of our federal system," Maj. Op. 29 n.9.

2    (Judge Newman's concurrence calls it "concededly unusual," Concurring Op. 6—

3    an understatement on the order of: "Some assembly required.")

4         The majority elides the distinction between what Trooper VanBremer

5    should have known generally and what is clearly established federal

6    constitutional law. But only the latter governs qualified immunity. Judge

7    Newman's concurrence offers a digest of the longish majority opinion (a judicial

8    CliffsNotes®). But look as you may, you will see no supporting opinion of this

9    Circuit or the Supreme Court. I will likewise proceed in summary form. Judge

10   Newman and I have read the majority opinion so that others don't have to.

11        First, the majority opinion teases the wording of Gonzalez in order to

12   make it conditional.[1] This is a perfunctory bow to binding and recent precedent,

13   and (as such) breaches our traditional respect for panel holdings. Second, the

14   majority relies on Hall. But Hall—which of course is not a decision of the

15   Supreme Court or the Second Circuit—cannot plausibly make federal

16   constitutional law, let alone clearly establish it. See, e.g., Scott v. Fischer, 616 F.3d

---

[1] Judge Newman's concurrence acknowledges (footnote 2) that the majority opinion quotes Gonzalez selectively.

3

1   100, 105 (2d Cir. 2010). The majority also leans on a truncated quote from Charles

2   W. v. Maul, 214 F.3d 350 (2d Cir. 2000): "[s]tate court decisions, like the decisions

3   of other federal lower courts, are relevant and often persuasive." 214 F.3d 350 (2d

4   Cir. 2000). But the very next sentence of that opinion recognized that "we are in

5   no way obliged to enforce [state court decisions]," id. at 357; and qualified

6   immunity was granted in that case on the ground that the state court decision

7   cited by the plaintiff could not clearly establish the asserted federal constitutional

8   right, id. at 361. In short, Maul subverts the majority opinion.

9       The majority falls back on statements in this Court's caselaw that, even if a

10  federal constitutional right has not been explicitly recognized by the Supreme

11  Court or this Court, we will nonetheless treat the right as "clearly established" if

12  it was "clearly foreshadowed" by existing caselaw. See Scott, 616 F.3d at 105. But

13  in determining whether a right has been "clearly foreshadowed," we look to

14  decisions of this Court and the other federal courts of appeals—and nowhere

15  else. See id.; but cf. Garcia v. Does, 779 F.3d 84, 95 n.12 (2d Cir. 2015) (observing

16  that this Court's decisions are equivocal as to the relevance even of out-of-circuit

17  federal cases). The majority here blandly asserts that "Supreme Court and

18  Second Circuit precedent clearly foreshadowed" its result; but the omission of

4

1    any supporting citations to actual decisions of the Supreme Court or this Court is

2    telling. As set forth above, <u>Gonzalez</u> examined that very question and held that

3    the defendants were entitled to qualified immunity.

4          The majority invokes district court decisions to foreshadow the majority's

5    result; but all of them predate <u>Gonzalez</u>, which went the other way. In any event,

6    we are of course not bound by district court rulings, and perforce not bound by

7    district courts' predictions as to our future constitutional rulings. <u>See</u> <u>McGowan</u>

8    <u>v. United States</u>, 825 F.3d 118, 125 (2d Cir. 2016) (a right was not clearly

9    established if "the only authority that [the plaintiff] has identified . . . is a district

10   court opinion, which, of course, is not binding"). <u>Gonzalez</u> remains precedent

11   that requires the grant of qualified immunity in this case.

12                                         * * *

13          To maintain qualified immunity, officers need to know only the settled

14   precepts of federal constitutional law. In order to decide what every police officer

15   should know, the majority opinion splices together: a federal circuit court

16   opinion that goes the other way, a state court opinion, several trial court

17   opinions, and whatnot. If the majority opinion were the law, officers would need

                                             5

1    to keep ahead of trends in federal constitutional law as developed in the state

2    courts as well as in the federal courts, <u>see</u> Maj. Op. 28; and because the majority

3    opinion shores up its argument with trial court opinions, officers would need to

4    follow developments in the trial courts as well as in the appellate courts: I don't

5    know what my colleagues think police do all day.

6        The majority has it backwards. The better an officer understands federal

7    constitutional law, the less plausible it would seem to her that settled federal

8    constitutional law could vary in the several states of a single circuit. Certainly, it

9    is news to me. It is hard enough for police to ascertain settled federal

10   constitutional law; it is surely harder to anticipate new law; but it is simply

11   impossible to anticipate error. So a police officer who understood the concept of

12   clearly established federal constitutional law would have no notice that it could

13   be one thing in New York and something else in Connecticut and Vermont. Even

14   among persons trained in the law, few would think that. So far, I count two.

15   Judge Newman's concurrence (footnote 1) goes further, and relies on a union

16   contract that indemnifies Trooper VanBremer from paying damages and

17   attorney's fees out of his own pocket (a fact not in the record). But if that could

18   matter, qualified immunity would vary from locality to locality—from Saugerties

1    to Hoosick Falls (or DUMBO)—depending on whether there is a municipal union

2    contract and on what it might say.  (Judge Newman is discounting to nothing

3    VanBremer's interest in his professional reputation.)

4          If the majority's error prospers, police will have to follow federal

5    constitutional developments in the state courts as well as the federal courts, and

6    apply a learned distinction between state court rulings that are based on the

7    federal Constitution and those that are based on state law. It may be thought that

8    any confusion will be a benign limitation on the police; but it is by no means

9    always good to inhibit police conduct, and it is an error for federal courts to

10   restrict police conduct by imposing liability on individual officers unless the

11   federal Constitution is unambiguously violated. That is not my opinion; that is

12   Supreme Court law. See, e.g., Ashcroft v. Al-Kidd, 563 U.S. 731, 741 (2011).

13         The majority's idea that federal law can be clearly established state-by-

14   state, or even circuit-by-circuit, is conceptually flawed because federal

15   constitutional law is national and uniform. A circuit court ruling that a principle

16   is clearly established is not pronouncing on local or regional constitutional law; it

17   reflects the understanding of that circuit as to the clear establishment of that law

18   nationwide. That is why a circuit split on what is clearly established becomes a

7

1   problem for the Supreme Court to resolve. <u>See</u> <u>Wilson v. Layne</u>, 526 U.S. 603, 618

2   (1999) (reasoning that, in view of a circuit split, "[i]f judges thus disagree on a

3   constitutional question, it is unfair to subject police to money damages for

4   picking the losing side of the controversy"). If federal constitutional law is

5   deemed to be made or settled in the courts of each state, the federal constitution

6   will mean different things in different places within each jurisdiction of a single

7   circuit: a kind of circuit splinter.[2]

---

[2] This is one reason <u>in banc</u> procedure exists: to maintain the consistency of circuit law, as is done in other circuits.