**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────────

MAXMILLIAN SLOLEY,

                            Plaintiff,

            v.

ERIC VANBRAMER,                              No. 1:14-CV-339
                                             (CFH)
                            Defendant.


─────────────────────────────────


**APPEARANCES:**                         **OF COUNSEL:**

Maxmillian Sloley
17-A-0421
Eastern New York Correctional Facility
Box 338
Napanoch, New York 12458
Plaintiff <u>pro se</u>

Attorney General for the                 MARK G. MITCHELL, ESQ.
State of New York                        RACHAEL OUIMET, ESQ.
The Capitol                              Assistant Attorneys General
Albany, New York 12224
Attorneys for defendant(s)

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### MEMORANDUM-DECISION AND ORDER[1]

        <u>Pro se</u> plaintiff Maxmillian Sloley ("plaintiff"), presently an inmate at Eastern New

York Correctional Facility, commenced this action pursuant to 42 U.S.C. § 1983

claiming that his Fourth Amendment rights were violated.  <u>See</u> Dkt. No. 1.  The case

proceeded to a jury trial on August 29, 2022, against defendant Eric VanBramer

───────────────────

[1] The parties consented to Magistrate Judge Hummel's jurisdiction.  <u>See</u> Dkt. No. 85.

("defendant" or "Eric").  See Text Minute Entry 08/29/22.  The trial concluded on August 30, 2022, and the jury returned a no cause verdict.  See Text Minute Entry 08/30/22; see also Dkt. No. 124.  Presently before the Court is plaintiff's pro se post-trial motion "to reverse the erroneous verdict by the jury[]" and for a new trial.  Dkt. No. 134; see also Dkt. No. 140.  Defendant responded in opposition.  See Dkt. No. 143.  Defendant also filed a bill of costs.  See Dkt. No. 135.  For the following reasons, plaintiff's motion is denied, and defendant's bill of costs is granted to the extent set forth in this Memorandum-Decision and Order.

## I. Background

In his complaint, plaintiff alleged that New York State Police Officers and brothers, Eric, and Bryan VanBramer ("Bryan"), violated his Fourth Amendment rights by conducting a visual body cavity search subsequent to an arrest without proper justification.  See generally Dkt. No. 1.  The VanBramers moved for summary judgment, see Dkt. No. 41, which Senior District Judge Gary L. Sharpe granted.  See Sloley v. VanBramer, No. 1:14-CV-339 (GLS/CFH), 2016 WL 6603211, at *4 (N.D.N.Y. Nov. 8, 2016),[2] aff'd in part, vacated in part, remanded, 945 F.3d 30 (2d Cir. 2019); see also Dkt. No. 49.  The Court granted summary judgment as to Bryan for lack of personal involvement, and as to Eric because the search was constitutional and "even if Sloley's Fourth Amendment rights were violated, [Eric was] entitled to qualified immunity." Sloley, 2016 WL 6603211, at *4.  Plaintiff appealed, and the Second Circuit affirmed this

---

[2] All unpublished decisions cited in this Memorandum-Decision and Order, unless otherwise noted, have been provided to plaintiff.

Court's dismissal of the complaint against Bryan but vacated and remanded the case as to Eric. See Dkt. No. 64; see also Sloley v. VanBramer, 945 F.3d 30, 47 (2d Cir. 2019). The Second Circuit concluded that Eric was not entitled to qualified immunity because

> every reasonable officer in the VanBramers' position as New York State Troopers would have known that visual body cavity searches conducted incident to any arrest must additionally be supported by "a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity" and must be conducted in a reasonable manner.

Sloley, 945 F.3d at 40 (quoting People v. Hall, 10 N.Y.3d 303, 311 (Ct. App. 2008); People v. Mothersell, 14 N.Y.3d 358, 366-67 (Ct. App. 2010)). The Court stated that "once the disputed fact that Eric recovered crack cocaine from Sloley's car is disregarded, the evidence available to Eric supports no more than a mere hunch that Sloley was secreting drugs inside his anal cavity. Such a 'hunch of criminal activity is insufficient' to establish reasonable suspicion." Id. at 46 (quoting United States v. Muhammad, 463 F.3d 115, 121 (2d Cir. 2006)). Thus, the Second Circuit ordered the case to proceed to trial against Eric. See id. at 47.

The case proceeded to a two-day jury trial where plaintiff was represented by pro bono counsel, Remy Green, Esq. See Dkt. Nos. 80, 144, 145; see also Text Minute Entry 08/29/22; Text Minute Entry 08/30/22. During trial, the jury heard testimony from plaintiff, Eric, Bryan, and Senior Investigator Theodore LaRuffa. See generally Dkt. Nos. 144, 145. In sum, following a domestic dispute phone call to 9-1-1, Bryan arrived at the home of Daphne Rollins. See Dkt. No. 144 at 221.[3] Ms. Rollins advised Bryan that she and plaintiff, her boyfriend at the time, had gotten into an argument and plaintiff had driven away. See id. at 221-22. Bryan testified that Ms. Rollins told him that

---

[3] Citations to the record are to the pagination generated by CM/ECF in the header of each page.

plaintiff "may potentially be in possession of drugs and that he had been drinking . . . ." Id. at 223. Ms. Rollins' affidavit, which was read to the jury, stated that she became "fully aware of false accusations and false statements that were made by Eric VanBramer and Bryan VanBramer" and that she "ha[d] no knowledge of Mr. Sloley being involved with drugs[.]" Dkt. No. 145 at 16. Bryan was later informed that plaintiff had been pulled over by another officer. See Dkt. No. 144 at 223. Bryan contacted Eric, who was working at a different location, and who was a canine handler of a drug dog. See id.

Eric went to the location where plaintiff had been pulled over and had his drug dog "conduct a[n] open air sniff" of the vehicle. Dkt. No. 144 at 148. The canine alerted to the presence of narcotics on "the driver's side, the passenger's side, the hood, and inside the vehicle, the center console area around where the driver and passenger's seat is." Id. at 150. Eric then observed "a white chunky substance that resembled, [from his] training and experience, cocaine[]" on the driver's seat. Id. at 151. The canine did not alert to the driver's seat. See id. Eric explained that this was "[b]ecause if [he] introduce[d] [his] dog to the driver's seat, part of detection is biting and, you know, K9 handlers, we are fully aware that, the hazards that comes with search a vehicle[.]" Id. He "saw the narcotics and [he] decided at that point if [his] dog were to go into that area, she would consume it and die." Id. The canine did alert to the driver's console, and Eric explained that when he introduced the canine to the vehicle, "it's not really up to [him] kind of where the dog goes." Id. at 152. When he "saw the cocaine on the seat[,]" he "backed [the canine] out[.]" Id. Eric field tested the substance which revealed a positive result for cocaine. See id. at 153.

4

While Eric was testing the substance, he "formulate[d] an idea in [his] head of how it got there." Dkt. No. 144 at 156. Eric believed "[t]hat while Mr. Sloley was fleeing, he was potentially using, had the cocaine in plain sight, saw the emergency lights behind him as he was getting pulled over and was in a hurry to conceal them." Id. He thought that plaintiff "stuffed [the drugs] down his pants[,]" "between the butt cheeks." Id. at 157-58. He affirmed that he thought plaintiff was actively using cocaine while driving. See id. at 161-62. Eric did not find drugs anywhere else in the car. See id. at 163.

Plaintiff was taken to the trooper barracks where Eric conducted a search of plaintiff, requiring plaintiff to take one article of clothing off at a time and hand it to Eric. See Dkt. No. 144 at 159, 164. Eric did not find any drugs or drug residue in plaintiff's clothing. See id. at 164. After Eric instructed plaintiff to slide his underwear down to his ankles, Eric instructed plaintiff to bend over and separate his butt cheeks so that Eric could look into the "void[.]" Id. at 165-66. Eric did not find any drugs. See id. at 166. Plaintiff was instructed to get dressed and was arrested. See id.

Investigator LaRuffa was given the field test kit that was used to test the substance found in the driver's seat. See Dkt. No. 145 at 78. The narrative on an incident report stated that "[l]ess than 1 gram of cocaine was seized from the crease of the driver's seat and secured as evidence[.]" Id. The only drugs Investigator LaRuffa was given were those contained inside the test kit. See id. at 95. The test kit was not produced at trial because it had been destroyed after being kept in an evidence vault for six months. See id. at 79-80.

## II. Legal Standards

Plaintiff does not identify the Federal Rule of Civil Procedure ("Fed. R. Civ. P.") under which he seeks to bring his motion to "reverse the erroneous verdict by the jury[]" and for "a new trial[.]" Dkt. No. 134 at 1; Dkt. No. 140 at 1. Post-trial motions can be brought under Rules 50, 59, and/or 60. See FED. R. CIV. P. 50 (Judgement as a Matter of Law; Related Motion for New Trial; Conditional Ruling); FED. R. CIV. P. 59 (New Trial; Altering or Amending a Judgment); FED. R. CIV. P. 60 (Relief from a Judgment or Order). As plaintiff did not make a Rule 50(a) motion during trial, his present motion cannot be construed as a Rule 50(b) motion. See Holmes v. United States, 85 F.3d 956, 962 (2d Cir. 1996) ("A Rule 50(b) motion can be made after the jury verdict, but only if a Rule 50(a) motion was made prior to the close of the evidence."). As plaintiff cannot bring a Rule 50(b) motion, and out of deference to his pro se status and because Eric addresses both Rules 59 and 60 in his response, the Court will review plaintiff's motion under Rules 59 and 60. See generally Dkt. No. 143; see also Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010) (citations omitted) ("It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants. The rationale underlying this rule is that a *pro se* litigant generally lacks both legal training and experience and, accordingly, is likely to forfeit important rights through inadvertence if he is not afforded some degree of protection.").

### A. Rule 59

Under Rule 59(a), "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" FED. R. CIV. P. 59(a)(1)(a). "[F]or a district

court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence." Manley v. AmBase Corp., 337 F.3d 237, 245 (2d Cir. 2003) (internal quotation marks omitted) (quoting DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1998)). A new trial may be warranted "when: '(1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury; or (4) damages are excessive.'" Utica Mut. Ins. Co. v. Clearwater Ins. Co., No. 6:13-CV-1178 (GLS/TWD), 2022 WL 823932, at *2 (N.D.N.Y. Mar. 18, 2022) (citation omitted). Additionally, "[u]nder Rule 59(e), 'district courts may alter or amend judgment to correct a clear error of law or prevent manifest injustice.'" 4 Pillar Dynasty LLC v. N.Y. & Co., Inc., 933 F.3d 202, 216 (2d Cir. 2019) (citation omitted). "A Rule 59(e) motion 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" Id. (citation omitted).

### B. Rule 60

Rule 60(b) states,

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

7

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

FED. R. CIV. P. 60(b).  "In deciding a Rule 60(b) motion, a court must balance the policy in favor of hearing a litigant's claims on the merits against the policy in favor of finality." Kotlicky v. United States Fid. & Guar. Co., 817 F.2d 6, 9 (2d Cir. 1987) (citation omitted).  "Rule 60(b) motions are left to the sound discretion of the district judge." Stewart Park & Rsrv. Coal. Inc. (SPARC) v. Slater, 374 F. Supp. 2d 243, 253 (N.D.N.Y. 2005) (citing Nat'l Petrochemical Co. of Iran v. The M/T Stolt Sheaf, 930 F.2d 240, 244 (2d Cir. 1991)).  "[C]ourts require the party seeking to avail itself of [] Rule [60(b)(6)] to demonstrate that 'extraordinary circumstances' warrant relief."  Stevens v. Miller, 676 F.3d 62, 67 (2d Cir. 2012) (citation omitted).

### III.  Analysis

### A.  Credibility of Witnesses

Plaintiff argues that Eric and Bryan "committed intentional perjury under oath." Dkt. No. 134 at 2.  Plaintiff contends that their testimony that drugs were found in the driver's seat of the car is "outrageous," "unbelievable," and "suspicious" because no one else saw the drugs and "[a] test kit alone without any drugs shows that the credibility of these officers and their story is fabricated."  Id.  Plaintiff asserts that the VanBramers' testimony and an incident report are insufficient to prove that plaintiff possessed drugs,

and that a visual body cavity search was warranted.  See id. at 3-4.  Eric argues that plaintiff is challenging the jury's credibility determination, and that there is no persuasive evidence to second guess that determination.  See Dkt. No. 143 at 4-5.

"On new trial motions, the trial judge may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner."  Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012) (citation omitted).  "However, . . . trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge 'should rarely disturb a jury's evaluation of a witness's credibility[.]'"  Id. (quoting DLC Mgmt. Corp., 163 F.3d at 134).  The Court also "may not 'freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury[.]'"  Id. (quoting United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998)).  "[W]here the jury resolved conflicting versions of events in favor of one party, a new trial is appropriate only where one conflicting account is so inherently implausible as to tax credulity, or there is independent evidence in the trial record" which indicates "that finding for one party, instead of another, would lead to a miscarriage of justice."  Edwards v. Schrader-Bridgeport Int'l, Inc., 205 F. Supp. 2d 3, 8 (N.D.N.Y. 2002) (quotation marks omitted) (quoting Finn-Verburg v. N.Y. State Dep't of Labor, 165 F. Supp. 2d 223, 228 (N.D.N.Y. 2001)).  "A court should grant a new trial only where the court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  Id. (citation and quotation marks omitted).

Plaintiff's argument that the VanBramers lied under oath because their testimony is implausible is insufficient to warrant a new trial.  See Dkt. No. 134 at 3-5.  As plaintiff

points out, there was extremely minimal physical evidence presented at trial—only an incident report which mentioned the positive drug test kit.  See id. at 3-4.  The trial turned on plaintiff's credibility versus the VanBramers' credibility.  The decision of whose testimony to credit was for the jury to decide, and plaintiff has not presented independent evidence that calls the VanBramers' testimony into question.  See Hampton v. McDonough, No. 17-CV-5711 (JMW), 2023 WL 3159571, at *3 (E.D.N.Y. Apr. 28, 2023) ("[T]he jury was presented with the parties' desired evidence and witnesses, and it was their province to make credibility determinations accordingly. . . . [The p]laintiff had every opportunity to present his evidence, cross-examine the witnesses, and make his credibility contentions to the jury."); United States v. Bimbow, No. 21-CR-48 (JPO), 2022 WL 1617490, at *5 (S.D.N.Y. May 23, 2022) ("[T]here is no basis to conclude that any of the three witnesses' testimony was so incredible that the jury's credibility determination must be disturbed.  To the contrary, the testimony of [agents who assisted in the investigation] was corroborated by one another's testimony, the recovery of a large quantity of narcotics, several firearms, U.S. currency, and drug paraphernalia, as well as by the testimony of [the defendant] himself, who admitted that the drugs, firearms, and residences belonged to him.").

Eric's testimony was corroborated by Bryan's testimony, Investigator LaRuffa's testimony, and the incident report.  Although no drugs, aside from those inside the test kit, were recovered from the vehicle or plaintiff, that does not establish that Eric and Bryan's testimony was perjured.  As plaintiff has not presented evidence to contradict the VanBramers' testimony, the Court cannot disturb the jury's credibility determination. See Encarnacion v. Spinner, No. 9:15-CV-1411 (BKS/ML), 2023 WL 2785745, at *4

(N.D.N.Y. Apr. 5, 2023) (citation omitted) (denying motion for new trial where the "[p]laintiff's request that the Court now find that [certain] testimony was false amounts to a request that the Court 'ignore the jury's role in resolving factual disputes and assessing witness credibility.'"); <u>Daniel v. T&M Prot. Res., LLC</u>, 844 F. App'x 433, 436 (2d Cir. 2021) (summary order) (affirming district court's denial of Rule 60(b) motion because the plaintiff "did not offer any evidence that [the defendant's] witnesses or attorneys perjured themselves. [The plaintiff] asserts that various [defense] witnesses lied. But the fact that their testimony contradicted [the plaintiff's] personal account is not sufficient to show perjury."). Thus, a new trial is not warranted on this ground.

### B. Evidentiary Rulings

"A new trial may be warranted 'if substantial errors were made in admitting or excluding evidence.'" <u>Stampf v. Long Island R. Co.</u>, 761 F.3d 192, 202 (2d Cir. 2014) (quoting <u>Sharkey v. Lasmo (AUL Ltd.)</u>, 55 F. Supp. 2d 279, 289 (S.D.N.Y. 1999)). "A trial court has considerable discretion in determining whether or not evidence is admissible." <u>Hansen v. Warren County</u>, No. 1:17-CV-1134 (TWD), 2020 WL 4877186, at *2 (N.D.N.Y. Aug. 20, 2020) (citing <u>Barrett v. Orange Cnty. Human Rights Comm'n</u>, 194 F.3d 341, 346 (2d Cir. 1999)). "A new trial on the basis of improper evidentiary rulings will be granted only where the improper rulings 'affect[ ] a substantial right of the moving party.'" <u>Id.</u> (alteration in original) (citation omitted). "Whether an evidentiary error implicates a substantial right depends on 'the likelihood that the error affected the outcome of the case.'" <u>Id.</u> (quoting <u>Malek v. Fed. Ins. Co.</u>, 994 F.2d 49, 55 (2d Cir. 1993)); <u>see</u> <u>also</u> Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence . . . is ground for granting a new trial.").

Plaintiff argues that the trial was unfair because Eric discussed information that was irrelevant and prejudicial, including that plaintiff "tried to br[eak] Ms. Rollins' back during a dispute[,]" had several felony convictions, filed other civil lawsuits, had a restraining order against him from a different female; and that Eric found two missing children with the help of his canine and was awarded Trooper of the Year. Dkt. No. 134 at 1-2, 4. Plaintiff states that "[t]here were issues that the Magistrate forbid [defense counsel] from presenting that the [attorney] chose to present anyway just to cause prejudice and bias and deny [p]laintiff a fair trial." Id. at 2. Eric argues that "the Court properly permitted defense counsel to cross-examine [p]laintiff about other instances in which he alleged injuries nearly identical to those he alleges in the present action, and he claimed a cause of those injuries that is unrelated to [d]efendant." Dkt. No. 143 at 5. Eric also contends that questions about plaintiff's prior convictions were appropriate. See id. at 6.

Plaintiff's arguments have previously been considered by the Court and do not warrant a new trial as the Court's evidentiary rulings did not affect a substantial right. See Dkt. No. 144 at 210; see also Dkt. No. 146 at 9-23, 27, 38, 44-45. Insofar as plaintiff challenges defense counsel's reference to a restraining order, at trial, Eric's counsel, Mark Mitchell, Esq., asked, "Am I correct that subsequently your other girlfriend Carrie Anderson also obtained an order of protection against you?" Dkt. No. 144 at 210; see also Dkt. No. 134 at 2. Plaintiff's counsel, Mx.[4] Green, objected, and the Court sustained the objection and instructed the jury "to disregard that question and any potential answer." Dkt. No. 144 at 210.

---

[4] Attorney Green's honorific is "Mx." Dkt. No. 104-1 at 31.

Courts often deny a motion for a new trial when the court sustained an objection to improper questioning and instructed the jury to disregard the inappropriate question and/or answer. See Graham v. City of New York, 128 F. Supp. 3d 681, 703 (E.D.N.Y. 2015) (citing Lovejoy v. Gure-Perez, No. 10-CV-5748, 2014 WL 2459656, at *3 (E.D.N.Y. May 21, 2014); Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 370 (2d Cir. 1988)) (concluding that "[t]here is no suggestion that these two questions, asked in the course of a three-day trial, had any impact on the jury's verdict, and the [c]ourt does not find that this single, isolated incident of improper questioning warrants a new trial."); see also Warr v. Liberatore, 437 F. Supp. 3d 259, 278 (W.D.N.Y. 2020) (concluding that there was no undue prejudice requiring a new trial because "[t]he Court promptly provided a curative instruction after the footage was displayed, directing the jury to disregard it, and in its instructions to the jury, the Court advised the jury that counsel's statements were not evidence."), as amended (Mar. 30, 2020), aff'd, 853 F. App'x 694 (2d Cir. 2021) (summary order). Here, too, as Mx. Green immediately objected and the Court instructed the jury to disregard Mr. Mitchell's question concerning a restraining order, there was no undue prejudice.[5] A new trial is not warranted on this ground.

Next, prior to trial, plaintiff moved to have his prior convictions excluded from evidence. See Dkt. No. 104-1 at 10-15; see also Dkt. No. 117 at 11. During the Court's

---

[5] The Court is cognizant of the difficulty that arises when considering whether a jury actually disregarded information it had already heard. See David Alan Sklansky, Evidentiary Instructions and the Jury As Other, 65 STAN. L. REV. 407, 412 (2013) (footnotes omitted) ("[I]t has long seemed obvious that jurors cannot forget or ignore evidence once they have been exposed to it. There is no end to the metaphors judges have used to express this concept: 'one cannot unring a bell'; '[a] drop of ink cannot be removed from a glass of milk'; 'after the thrust of the saber it is difficult to say forget the wound'; 'if you throw a skunk into the jury box, you can't instruct the jury not to smell it.' The idea is always the same: jurors cannot forget evidence they have seen or heard, and neither can they 'fractionate evidence into competent and incompetent segments, using only the former in [their] decision making process.'"). However, because the standard for a new trial is so high and plaintiff has not established that he was unduly prejudiced by Mr. Mitchell's one question, the Court must deny the motion on this issue.

hearing on the parties' motions in limine, the Court concluded that defense counsel could ask plaintiff about the date and charge of his 1996 criminal impersonation conviction and a 2017 criminal possession of a weapon conviction and fleeing the police charge. <u>See</u> Dkt. No. 146 at 9-23. During trial, Mr. Mitchell asked plaintiff about only those crimes. <u>See</u> Dkt. No. 144 at 195.

The Court did not err in permitting defense counsel to question plaintiff about a limited portion of his criminal history. Plaintiff's present arguments are an attempt to relitigate the issue. First, plaintiff's convictions were admissible under Federal Rules of Evidence ("Fed. R. Evid.") 608 and 609. <u>See</u> FED. R. EVID. 608(b); FED. R. EVID. 609(a)(1)-(2); <u>see</u> <u>also</u> <u>United States v. Estrada</u>, 430 F.3d 606, 615, 617 (2d Cir. 2005) ("[E]vidence of convictions for crimes involving 'dishonesty or false statement,' whether felonies or misdemeanors, *must* be admitted under Rule 609(a)(2) as being *per se* probative of credibility[.] . . . In conformity with Rule 403, unless the risk of unfair prejudice, confusion, or delay substantially outweighs the probative value of a felony conviction, it is the jury's function to assess the probative value of a witness's specific conviction or convictions as part of its overall evaluation of the witness's credibility. . . . [F]elonies not involving dishonesty or false statement such as to fall within the scope of Rule 609(a)(2) nonetheless bear on credibility to varying degrees.").

Second, plaintiff has not shown that the Court's evidentiary ruling was so clearly prejudicial that it impacted the outcome of the trial. Insofar as plaintiff argues that the testimony concerning his convictions painted him in a bad light to the jury, the Court previously weighed this argument concerning the probative and prejudicial values of his convictions and ruled that certain convictions could be discussed to a limited extent.

14

See Dkt. No. 146 at 9-23. To be sure, the trial turned almost exclusively on credibility and a criminal conviction could negatively impact one's credibility. Yet that does not alone warrant exclusion of plaintiff's convictions. Plaintiff's attempt to rehash this argument without showing substantial prejudice or an error in the Court's ruling does not warrant a new trial. See Encarnacion, 2023 WL 2785745, at *5 (citations and quotation marks omitted) (denying motion for new trial because the "[p]laintiff's disputes of the Court's disposition of the evidentiary issues are attempts at relitigating old issues . . . or otherwise taking a 'second bite at the apple[]" and the "[p]laintiff has not shown that these rulings were clearly prejudicial to the outcome of the trial, taking into account 'the record as a whole.'").

As to the testimony concerning plaintiff's other civil lawsuits, Eric argues that "the Court properly permitted" the testimony because it was "relevant to the issues of causation and damages." Dkt. No. 143 at 5. Plaintiff asserts that Eric used plaintiff's prior lawsuits "to paint a picture to the jury that [he] has a tendency to file frivolous lawsuits looking for a financial handout." Dkt. No. 134 at 1.

Prior to trial, plaintiff sought to have evidence of his other lawsuits excluded, arguing that they were irrelevant and had no impact on plaintiff's request for garden variety damages. See Dkt. No. 104-1 at 15-17; see also 117 at 6-9. During the pre-trial conference, the Court ruled that defense counsel could ask plaintiff about two of his three other civil lawsuits. See Dkt. No. 146 at 27. The Court instructed defense counsel that, with respect to the two lawsuits, defense counsel could only "inquire whether or not [plaintiff] had filed a claim, and in the course of that claim[,] [whether plaintiff] allege[d] he suffered emotional damages[.]" Id.

15

During trial, Mr. Mitchell asked plaintiff whether he had filed claims in 2012 against the City of Hudson and various Hudson police officers and in 2018 against the Greene County Sheriff and individuals working at Greene County jail. See Dkt. No. 144 at 197. Mr. Mitchell inquired whether, in relation to both claims, plaintiff alleged mental and emotional injuries. See id. Plaintiff answered affirmatively to all questions. See id. Mx. Green objected to the questioning, asserting that "the court's in limine rulings on that require that to be linked up to the damages in this case if it was going to come in. There was no linkage and so I'd ask to strike all of that testimony." Id. at 198. The Court responded that defense counsel was still questioning the witness. See id. Mr. Mitchell then asked plaintiff whether he was claiming that Eric caused him mental and emotional injuries in the present case, to which plaintiff answered affirmatively. See id.

Courts often allow evidence of other injuries or claims into evidence when the cause of damages is at issue. See Brewer v. Jones, 222 F. App'x 69, 70 (2d Cir. 2007) (summary order) (determining that evidence of a previous lawsuit was admissible "because the evidence was relevant to show a possible cause of [the plaintiff's] injury unrelated to the acts of the defendant[.]"); Jean-Laurent v. Hennessy, 840 F. Supp. 2d 529, 543 (E.D.N.Y. 2011) ("To the extent that plaintiff testifies at trial that he suffered emotional damages as a result of the June 11, 2002 strip search, defendants may introduce limited deposition testimony given by plaintiff in [another] Action as a prior inconsistent statement as to causation . . . ."); Williams v. Geraci, No. 14-CV-5742 (SIL), 2020 WL 5848738, at *12 (E.D.N.Y. Sept. 30, 2020) ("[T]he lawsuit [in which the plaintiff sought emotional damages] is not being introduced to show that he is a chronic litigant, rather, it is being introduced for another purpose, to impeach Williams's credibility and

show inconsistency in his statements."); Hogan v. Rose, No. 7:16-CV-1325 (BKS/ATB), 2022 WL 675703, at *10 (N.D.N.Y. Mar. 7, 2022) ("[E]vidence of [the p]laintiff's other lawsuits may be admissible for purposes other than to prove his litigiousness."); cf. Picciano v. McLoughlin, No. 5:07-CV-0781 (GTS/GJD), 2010 WL 4366999, at *2 (N.D.N.Y. Oct. 28, 2010) ("[I]n the event that [the p]laintiff testifies at trial that he suffered a 'fear' of police officers . . . as a result of the incident of August 4, 2014, which is the subject of this litigation, the Court will permit [the d]efendant to ask [the p]laintiff whether he has been arrested on more than one occasion since August 4, 2004. This is because his subsequent arrests are probative of [the p]laintiff's claim for emotional damages . . . .").

Here, plaintiff was claiming emotional damages from Eric's visual body cavity search, and the Court allowed defense counsel to cross examine plaintiff about his other claims for emotional damages stemming from unrelated incidents. See Dkt. No. 146 at 23-28. As the Court did not permit defense counsel to probe the underlying facts of plaintiff's other lawsuits or present them to show that plaintiff was litigious, the Court sees no error in its prior ruling. See Hogan, 2022 WL 675703, at *10. As plaintiff has not shown that the testimony caused substantial prejudice, a new trial is not warranted on this ground.

Plaintiff next argues that the jury was prejudiced by Eric's testimony "about him and his K-9 finding two children in a snow bank." Dkt. No. 134 at 4. Eric does not respond to this argument. See generally Dkt. No. 143. In his motion in limine, plaintiff sought to have Eric precluded from testifying about any awards or commendations that Eric received as a police officer. See Dkt. No. 104-1 at 26-27. Eric argued that such

testimony should be admitted "for other appropriate purposes, including to show [d]efendant's experience working with police canines." Dkt. No. 116 at 15. The Court determined that any testimony concerning Eric receiving an award for working with a canine would not be "allow[ed] [] in the first instance," but if plaintiff's counsel attacked Eric's "credibility regarding his competence with respect to use of canine dogs," the evidence would be permitted. Dkt. No. 146 at 38.

During trial, plaintiff's counsel, Mx. Green, asked Eric, "[s]o in your mind what happened here, and this is what gave rise to your decision to search him, is he opens a bag of drugs, uses some of it, spills some of it on the driver's seat and then puts the rest in his anus?" Dkt. No. 144 at 162. Eric responded,

> [s]o that's the difficult part when it comes to being a police officer. The bad guy is never going to tell us, hey, Trooper, this is what I was doing. It's based on us, our training, experience, to determine what was going on at that point. I've been involved in numerous of these cases, you know, trooper of the year, so I was -- I was pretty effective and pretty good at what I was doing so you asked me, you know, why I thought that.

Id. (emphasis added). Later, Mr. Mitchell asked Eric, "[a]nd one of the things, since there's been quite a lot of questioning about your proficiency with K9s . . . have you received any awards related to your work with police K9s?" Dkt. No. 144 at 176. Mx. Green objected, and the Court stated, "[w]e addressed this during the motions in limine so we're not going to go down that road." Id. Mr. Mitchell moved on to other questions. See id. Eric was asked to provide an example of a time he worked with a canine, and he explained that several years earlier, he worked with a canine to search for two missing children. See Dkt. No. 145 at 25. Mx. Green objected on relevance grounds, and the Court gave Mr. Mitchell "a little leeway" but instructed him to "then move on to

something else[.]" Id. Eric explained that his canine alerted to a snowbank under which he located two missing children. See id. at 25-26.

"The Second Circuit has stated that it is 'well established . . . that absent an attack on the veracity of a witness, no evidence to bolster his credibility is admissible.'" Reeder v. Bishop, No. 9:15-CV-1078 (MAD/TWD), 2019 WL 3732050, at *7 (N.D.N.Y. Aug. 8, 2019) (quoting United States v. Arroyo-Angulo, 580 F.2d 1137, 1146 (2d Cir. 1978)). "Character evidence encompasses evidence of a defendant's prior commendations and awards . . . because the only purpose for offering such information would be to portray a defendant in a positive light by demonstrating recognition of certain character traits or actions that demonstrate such character traits." Id. (quoting United States v. Brown, 503 F. Supp. 2d 239, 242 (D.D.C. 2007)).

The Court did not permit Eric to speak about the award he achieved for handling his canine. See Dkt. No. 146 at 38. Additionally, plaintiff's counsel did not object to Eric's testimony that he had won Trooper of the Year. See Dkt. No. 144 at 162. Plaintiff's counsel did object to the relevance of Eric's testimony concerning his use of a canine to track two missing children, but relevance is a low bar. See Dkt. No. 145 at 25; see also United States v. White, 692 F.3d 235, 246 (2d Cir. 2012) (quoting FED. R. EVID. 401) (explaining that "[e]vidence is relevant when 'it has any tendency to make a fact more or less probable than it would be without the evidence,' and that this is a "very low standard"), as amended (Sept. 28, 2012). The Court permitted the testimony as an example of Eric's use and success working with a canine in conducting a search. See Dkt. No. 145 at 25. Although searching for two children is not the same as searching for drugs, Eric's prior success working with a canine makes it more probable that Eric was

19

successful in working with a canine in the case at hand. As the relevance bar is so low, the Court sees no error in its prior rulings. Further, plaintiff has not established that the testimony caused any prejudice. A new trial is not warranted on this ground.

Finally, plaintiff states that "[t]here was a document that presented evidence that Bryan and Eric Vanbramer illegally strip searched an elderly black man . . . ." Dkt. No. 134 at 4. Plaintiff contends that if the evidence had been presented, the jury would have been informed about the "propensity of both brothers to be dishonest and conduct unconstitutional strip searches." Id. at 5. Eric does not respond to this argument. See generally Dkt. No. 143.

In his motion in limine, Eric sought to exclude evidence concerning other individuals that the VanBramers strip searched. See Dkt. No. 107-1 at 9-11. During the pretrial conference, plaintiff's counsel stated that they[6] intended to ask questions about whether Eric had conducted other visual body cavity searches but not about who was searched or what plaintiff may have heard about other strip searches. See Dkt. No. 146 at 44-45. The Court permitted counsel for both sides to ask Eric about "any prior anal cavity searches which he conducted and whether or not drugs were found, but no one is going to inquire regarding any hearsay testimony about what was done or not done by either of the VanBramers." Id. at 46.

The Court did not err in excluding evidence of other individuals who had been stripped searched by the VanBramers. Plaintiff has not explained what the document is that he wanted to offer, plaintiff's counsel never tried to enter any such document into evidence, and plaintiff has not explained how the document would have been

---

[6] Attorney Green's pronouns are "they" and "them." Dkt. No. 104-1 at 31-32.

admissible.  <u>See</u> <u>generally</u> Dkt. Nos. 134, 140.  To the extent plaintiff states that the document would have shown a propensity for conducting unconstitutional strip searches, in general, evidence of prior conduct is not admissible to show that because an individual acted one way in the past, they must have acted that same way in the current circumstances.  <u>See</u> F<small>ED</small>. R. E<small>VID</small>. 404(b)(1) ("Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").  Plaintiff did not raise the issue of the document during the pretrial conference or at trial.  Plaintiff also does not argue that trial counsel was ineffective for failing to try to enter this document into evidence.  <u>See</u> <u>generally</u> Dkt. Nos. 134, 140.  The Court sees no error in its prior ruling on this issue and plaintiff has not established that he was substantially prejudiced as a result.  Thus, his motion is denied on this ground.

In sum, the Court's evidentiary rulings do not warrant reversal of the jury's verdict or a new trial.

### C. Make Up of The Jury

Plaintiff argues that his trial was unfair because the jury was comprised of all white individuals.  <u>See</u> Dkt. No. 134 at 2-3, 5.  Plaintiff states that during <u>voir</u> <u>dire</u>, the Court asked about potential bias concerning members of the LGBTQ community but did not ask any questions concerning racial bias.  <u>See</u> <u>id.</u> at 5.  He also states that one female juror "was added" after <u>voir</u> <u>dire</u> but was never questioned.  <u>Id.</u>  Plaintiff argues that "one of the (male) jurors stated that he would not credit the testimony of someone with numerous/multiple convictions," and "the opposition capitalized off of this and made a prejudicial comment that [p]laintiff has several felonies for drugs."  <u>Id.</u>  Defendant

contends that "[p]laintiff's allegation of racial bias in the jury pool and trial jury is without merit[]" because plaintiff has not provided evidence to prove that minority jurors were impermissibly excluded.  Dkt. No. 143 at 6.

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." Berghuis v. Smith, 559 U.S. 314, 319 (2010).  This right has been codified for all federal litigants in the Jury Selection and Service Act ("JSSA") which provides that "all litigants in Federal courts entitled to trial by jury shall have the right to . . . juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."  28 U.S.C. § 1861.   "Under the JSSA, a district court's jury selection plan must ensure jurors are selected 'from a *fair cross section of the community* in the district or division wherein the court convenes.'"  Askew v. Lindsay, No. 21-799, 2022 WL 17748623, at *4 (2d Cir. Aug. 1, 2022) (summary order) (quoting 28 U.S.C. §§ 1861, 1863(a)).  The JSSA contains procedural requirements: "a civil litigant must 'move to stay the proceedings on the ground of substantial failure to comply with the [JSSA]' and file it 'before the voir dire examination begins, or within seven days after the [litigant] discovered or could have discovered, by the exercise of diligence, the grounds . . . .'"  Id. (quoting 28 U.S.C. § 1867(c)).  Additionally, "[t]he motion must contain a 'sworn statement of facts which, if true, would constitute [such] a substantial failure.'" Id. (quoting 28 U.S.C. § 1867(d)).

During a side bar conversation in which counsel for both parties and the Court were discussing challenges to the jury venire, Mx. Green stated, "[w]hile we are here, one issue I don't know when to raise, it does concern me that the entire pool we just

looked at was white." Dkt. No. 144 at 105.  The Court noted that "there is one juror of color in the pool[.]"  Id.  Mx. Green explained,

> I'm not sure exactly what the remedy would be, but it does concern me that it appears that the jury pool that we pulled in for these first 16 jurors is not representative of the community, it appears to be all white.  There is not a single juror of color in the group that we just looked at, and the amount of peremptory strikes we have does not necessarily let us get to the point where there's even a single juror of color in the group.  It appears to me, and this is just based on how people present, that they're, in this entire group there is a single juror of color, and I don't think that's representative of the community.  And I am – I'd have to do some research to find out what the appropriate remedy is but I'd ask the court let me brief that I suppose on what the appropriate remedy is.

Id. at 105-106.  The Court responded, "I'm not sure what you'd like me to do, Counsel, we brought in jurors in accordance with the policies here in the Northern District of New York but I've noted your position."  Id. at 106.  Mr. Mitchell stated, "I think the jury selection has been handled here the way it has in all the other trials I've had, I don't think the court can control who shows up and happens to be in the jury pool."  Id.  Mx. Green said, "[o]kay."  Id.

Plaintiff did not meet the procedural requirement of the JSSA, and his motion on this issue must fail.  See Askew, 2022 WL 17748623, at *4; see also Barclay v. New York, 602 F. App'x 7, 12-13 (2d Cir. 2015) (summary order) ("Because [the appellant] failed to comply with these procedures, his challenge to the jury pool must fail."). Further, plaintiff has not presented any evidence that the jury selection process impermissibly excluded minorities.  As he has not pointed to anything about the jury selection process that caused the alleged unfairness, plaintiff's motion on this ground must be denied.  See Dedjoe v. Esper, No. 1:15-CV-1170, 2019 WL 697821, at *5 (N.D.N.Y. Feb. 19, 2019) ("[The [p]laintiff fails to provide sufficient evidence indicating

23

that the jury venire impermissibly excluded African-Americans, or did not represent a fair cross section of the community. Without this evidence, the motion for a new trial on the ground that the trial was unfair because of the racial composition of the jury pool or trial jury must be denied."); Dolberry v. Jakob, No. 9:11-CV-1018 (DNH/DEP), 2019 WL 1396975, at *2 (N.D.N.Y. Mar. 28, 2019) (quoting Williams v. City of Newburgh, 830 F. Supp. 770, 772 (S.D.N.Y. 1990)) ("[The p]laintiff is 'obligated to point to something - i.e. the manner in which the jury panel was assembled or the peremptory challenges were exercised - suggesting racial bias in the jury selection process.'"); Encarnacion, 2023 WL 2785745, at *2 (citations omitted) ("Merely pointing to the composition of the jury as proof of its unfairness is insufficient to warrant a new trial. Similarly, a plaintiff must 'make some kind of basic, threshold showing of impropriety beyond mere generalized speculation' to demonstrate unfairness of the trial arising from the behavior of the jury.").

Plaintiff also argues that a juror remained on the panel, and should not have, after the juror "stated that he would not credit the testimony of someone with multiple and/or numerous convictions." Dkt. No. 134 at 5. During voir dire, juror 139 was asked whether they had "opinions about people who have prior criminal histories[.]" Dkt. No. 144 at 79. The juror responded that "[i]t would depend on what the criminal history is, I mean what -- what the offense is, so I mean that's to me kind of a broad – there's a variance of the offense." Id. Mx. Green asked whether people with criminal histories are more or less trustworthy than other people and juror 139 said, "[n]o, they can be just as trustworthy as other people, just because they have, you know, done things in the past, it's not necessarily their character." Id. at 80. When asked whether knowing that plaintiff had at least one prior conviction would affect her neutrality, the juror explained,

24

"I would have to know what that conviction was. I mean, I think that that's -- that would be really important, depends on the severity of it." Id. Juror 139 stated that "[i]f it was a serious crime, I believe so. I . . . I mean, I consider a serious crime murder, arson, being a pedophiler [sic], you know, those are pretty serious crimes." Id. Mx. Green then asked whether a conviction for something like tax fraud or theft would impact neutrality and juror 139 said, "it would not." Id. at 80-81. Neither counsel for the parties challenged juror 139 and she was added to the jury. See id. at 100-104.

After the jury had been selected and counsel for both sides presented their opening statements, juror 139 approached the Court and asked whether there would be evidence concerning domestic violence presented during the trial. See Dkt. No. 144 at 135. Mr. Mitchell explained that the defense would likely be presenting evidence of a dispute between plaintiff and Ms. Rollins that included pushing, dragging, and breaking property. See id. at 136. The Court explained, "[w]e may have a problem then with one of the jurors because the juror indicated to me that they do not feel comfortable if that in fact is going to be the testimony." Id. The Court asked if the parties were agreeable to proceeding with a seven-person jury. See id. The attorneys for both sides, plaintiff, and defendant consented to continuing with a seven-person jury. See id. at 136-38. The Court then excused juror 139. See id. at 140-41.

During voir dire, other potential jurors expressed that they would find it difficult to be impartial because of interactions or relations to police officers, or because they believed that people with criminal histories are less trustworthy. See Dkt. No. 144 at 64, 66-67, 81-82, 84-85. Each of those jurors were excused for cause or through a peremptory challenge and were not added to the jury. See id. at 67-68, 98-105. Based

on the Court's review of the record, there was no juror who remained on the jury that stated they could not perform their duties fairly and impartially. Rather, the Court promptly informed the parties when a juror expressed discomfort about her ability to be impartial and all other jurors who stated a bias were excused. See United States v. Greer, 285 F.3d 158, 169 (2d Cir. 2002) (citations and quotation marks omitted) ("The process of empaneling a jury is firmly entrusted to the sound discretion of the trial judge . . . . To be sure, a judge who receives important information from a juror should promptly convey that information to the parties and counsel."). Therefore, plaintiff has not established that his trial was unfair in this regard and a new trial is not warranted on this ground.

Next, insofar as plaintiff states that a juror was added at the end of the voir dire but never questioned, see Dkt. No. 134 at 5, that is plainly inaccurate. After the attorneys challenged the jury venire and the Court ruled on their challenges, there was one spot that needed to be filled. See Dkt. No. 144 at 105. A new potential juror was added, and the Court stated, "I know you were present this morning when I asked the jurors a series of questions, the attorneys asked them a series of questions. Based upon those questions, anything you'd like to tell me in the first instance?" Id. at 108. The juror gestured negatively, and the Court asked whether there was any reason they could not be fair in the case. See id. The juror said, "[n]o." Id. The Court then proceeded to ask the juror about their job, spouse, children, home, connection to police officers, where they get their news, what they like to do in their spare time, and their ability to be impartial in the case—all questions that the Court asked of every other potential juror. See id. at 108-113. Counsel for both parties questioned the potential

juror.  See id. at 113-15.  As the Court and counsel for both sides asked the juror a series of questions concerning their ability to be a juror, just as the Court and attorneys asked every other juror, the Court finds no error on this issue and denies plaintiff's motion.

Plaintiff argues that the Court erred by failing to ask the potential jurors "about any possible biases towards [plaintiff] being Black."  Dkt. No. 134 at 5.  During voir dire, the Court asked each prospective juror whether they agreed that someone being a member of the LGBTQ community had no bearing on the outcome of the trial.  See Dkt. No. 144 at 14-15, 19, 24, 28, 30, 36, 40-41, 44, 49-50, 52-53, 58, 62, 72, 75, 112.  The Court did not ask a similar question related to race.

The Second Circuit has "never reversed a conviction for the failure to ask a particular question of prospective jurors."  United States v. Nieves, 58 F.4th 623, 626 (2d Cir. 2023) (citation omitted).  "[D]istrict judges are afforded broad discretion in conducting voir dire[,]" but the "discretion [] is not boundless."  Id.  "The standard set by the [Supreme] Court, which remains the standard today, is that the trial court's discretion must be exercised consistent with 'the essential demands of fairness.'"  Id. at 632 (alteration in original) (quoting United States v. Barnes, 604 F.2d 121, 137-38 (2d Cir. 1979)).  It is a "basic principle that '[t]here must be sufficient information elicited on voir dire to permit a defendant to intelligently exercise' both for-cause and peremptory challenges."  Id. at 633 (alteration in original) (quoting United States v. Colombo, 869 F.2d 149, 151 (2d Cir. 1989)).  "In other words, there must be sufficient factfinding at voir dire to allow for facts probative of any of these forms of bias to reveal themselves.

Otherwise, [f]undamental unfairness arises if voir dire is not adequate . . . to identify unqualified jurors." Id. (citations and quotation marks omitted) (alteration in original).

The Second Circuit has outlined three general ways in which voir dire could "fall short":

> (i) a voir dire so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about a potential juror's general outlook, experience, communication skills, intelligence, or life-style;

> (ii) a failure to inquire about, or warn against, a systematic or pervasive bias, including one that may be short-lived but existent at the time of trial, in the community that would have been cured by asking a question posed by a party; or

> (iii) a record viewed in its entirety suggesting a substantial possibility that a jury misunderstood its duty to weigh certain evidence fairly that would have been clarified by asking a requested voir dire question.

Nieves, 58 F.4th at 633 (quoting United States v. Lawes, 292 F.3d 123, 129 (2d Cir. 2002)).  In Nieves, the Court reiterated "the unremarkable but critical proposition that the district court must provide some opportunity for prospective jurors to be meaningfully screened for biases relevant to a particular defendant or the charges against that defendant."  Id. at 638.  Put another way, "a district court's decision not to ask certain questions probative of bias will not be grounds for reversal so long as *voir dire* otherwise covers the subjects that may arise in the case to ensure that jurors will be impartial."  Id. (quotation marks omitted) (quoting United States v. Rahman, 189 F.3d 88, 121 (2d Cir. 1999) (per curiam)).  The Court explained that a trial court could, "inquire directly about relevant biases.  But we have never reversed for failure to take that specific path, and again refrain from doing so today."  Id. (citation omitted).

The <u>Nieves</u> Court overturned a conviction because the trial court "did not ask – overtly or otherwise – about gang-related bias, notwithstanding that the government's central theory of the case was that the assault was motivated by gang rules, and its evidence in support of that theory consisted of gang-member testimony and gang-related expert testimony." 58 F.4th at 640. "Nor, as a last resort, did the district court attempt to counterbalance any of this by asking additional biographical or attitudinal questions that might have circumstantially unearthed inferable bias among potential jurors . . . ." <u>Id.</u> This was the case despite both parties asking for such questions in their proposed jury instructions. <u>See</u> <u>id.</u> at 635.

"*Nieves* concerned the rare case in which a district court failed to take *any* steps to identify a potential bias that was implicated by the government's case." <u>United States v. Mendlowitz</u>, No. 21-2049, 2023 WL 2317172, at *3 (2d Cir. Mar. 2, 2023) (summary order). Here, the Court did not err by failing to ask whether the prospective jurors had any racial biases. <u>See</u> <u>United States v. Joseph</u>, No. 20-CR-603 (PKC), 2022 WL 336975, at *6 (S.D.N.Y. Feb. 4, 2022) (citation omitted) ("There is no <u>per</u> <u>se</u> constitutional rule that requires an inquiry about racial prejudice during voir dire, although a court must inquire if there are 'substantial indications' of likely racial or ethnic prejudice affecting jurors in a particular case."). First, neither party requested such a question in their proposed <u>voir</u> <u>dire</u>. <u>See</u> Dkt. Nos. 92, 98. Second, the Court inquired where each prospective juror received their news—the answer to which may have revealed potential political and racial biases. <u>See, e.g.</u>, Dkt. No. 144 at 13, 18, 39, 58.[7]

---

[7] "Liberals mainly continue to rely on, and to place greatest trust in, legacy media outlets such as CNN, NPR, and the New York Times[.] . . . Survey data show that a large plurality of conservatives, to an extent that has no parallel on the left, orient themselves around a single news source: Fox News."

The Court and the attorneys also questioned prospective jurors about potential biases for, or against, police officers and individuals with criminal histories.  See, e.g., Dkt. No. 144 at 18, 74, 76, 81-82, 87, 90, 93, 96.  These questions are sufficient to ensure that the prospective jurors were "meaningfully screened" for potential racial biases without directly asking them whether they were biased.  Nieves, 58 F.4th at 638.  Accordingly, the Court finds no error, and plaintiff's motion is denied on this ground.

### D.  Jury Instructions

Plaintiff argues that the Court gave erroneous jury instructions that warrant a new trial.  See Dkt. No. 140 at 1.  Specifically, plaintiff asserts that the Court erred in instructing the jury on negligence and misstated the law concerning reasonable suspicion to conduct a visual body cavity search.  See id. at 1-2.  Eric argues that the Court did not err as to the negligence instruction because "[i]t is well settled that negligence is not cognizable under § 1983."  Dkt. No. 143 at 6 (citation and quotation marks omitted).  As to the visual body cavity search instruction, Eric restates a different portion of the Court's instructions than what plaintiff relies on, and argues that "[p]laintiff fails to identify an error in the Court's instruction[.]"  Id. at 7.

The Court's jury instructions, in relevant part, read as follows:

#### B. Visual Body Cavity Search

Here, Plaintiff claims that Defendant Eric VanBramer violated his Fourth Amendment rights on April 1, 2013, while plaintiff was being booked at a New York State Police Barracks in Greene County, New York. Specifically, Plaintiff alleges that defendant Eric VanBramer violated his Fourth Amendment rights when he conducted a strip search and a visual body cavity search of plaintiff at the police barracks.  A strip search occurs when a suspect is asked to remove his clothes.  A visual cavity search is

---

Joseph Fishkin & David E. Pozen, Asymmetric Constitutional Hardball, 118 COLUM. L. REV. 915, 957 (2018) (footnotes omitted).

one in which the police observe the suspect's body cavities without touching them.

The Fourth Amendment protects persons from being subjected to an unreasonable search while being arrested or while being detained after an arrest.

A visual cavity search occurring in connection with an arrest must be based on a reasonable suspicion that the arrestee is hiding evidence inside the body cavity to be searched. Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than is necessary for probable cause.

The officer's reasonable suspicion must be based on specific and articulable facts, along with rational inference taken from those facts.

To assess whether a search is reasonable or unreasonable under the Fourth Amendment, you are to assess the "totality of the circumstances." In other words, you are to consider all of the factors surrounding the arrest and the search to assess whether the officer had a particularized and objective basis for suspecting legal wrongdoing. In short, the relevant question is do the circumstances of the plaintiff's arrest support a reasonable suspicion that he was hiding contraband in or on his person?

### C. Negligence is not a Basis for Liability

If you determine that the Defendant was merely negligent or, in other words, acted in a way that reflected a lack of due care for the Plaintiff, but that he did not in a way that violated the Plaintiff's Fourth Amendment rights, as described above, then you must find in favor of the defendant."

Dkt. No. 125 at 8-9.

During the jury charge conference, Mx. Green objected to both instructions. See Dkt. No. 145 at 111-12, 116-17, 120-21. They first argued that the last line of the visual body cavity search instruction "undermines some of the rest of the instruction." Id. at 111. They argued that "the relevant question is not whether it supports a reasonable suspicion that they were secreting contraband on their person, it's in the specific cavity searched." Id. at 111-12. Mx. Green stated, "I think the problem is that it is, and I think what we're going to argue in closing is, he may have had a suspicion that he had drugs on his person, but that's not the same as a suspicion that it was in the relevant cavity."

31

Id. at 116.  Mr. Mitchell responded, "I think I would keep this quote from the case because this is what the law actually is[.]"  Id. at 117.  The Court asked, "[s]o if I were to say, do the circumstances of the plaintiff's arrest support a reasonable suspicion that he was secreting -- excuse me, that he was hiding contraband in or on his person, in or on his person, would that address your concern?"  Id.  Mx. Green responded, "[n]o, because it still invites them to say, if there was a reasonable suspicion that something was on his person, we lose.  That's -- that is, I mean I feel like that's specifically what the Second Circuit modified in this case."  Id.  Over plaintiff's objection, the Court kept the instruction as it was written.  See id.

As to the negligence instruction, Mx. Green objected, stating,

I don't think that there's a negligence question in this case. There's no question that the testimony was that the act was intentional.  I think the authority the court is referring to is that police can't be liable under 1983 for negligent acts but that's not negligence as to the law which is the only question here.  It's negligence as to the acts, you can't sue under 1983 for a car accident.  But the testimony from the defendant specifically was that he intended to conduct a search.  The act was intentional, I think this is, this -- the only purpose this instruction could be used for by the jury is to commit error.

Dkt. No. 145 at 120.  Mr. Mitchell responded, "I think this instruction's correct just because that's the nature of 1983, and that otherwise a jury might think negligence is good enough to support 1983 but it's not."  Id.  The Court stated, "I agree with [defense counsel,] I'm going to charge this over your objection, Attorney Green.  It's just a mere statement of the law, negligence is not a basis for liability under 1983, but again, I'll note your objection."  Id. at 120-21.

Plaintiff's counsel further inquired, stating, "I don't understand what would be negligent in this case that would be not good enough, right, what would, what -- what, I

32

guess what act was committed, would the jury even be able to find was committed negligently?" Dkt. No. 145 at 121. The Court said, "I don't know, but it's a pretty clear statement of the law. You'd agree that negligence is not a basis for liability under 1983?" Id. Plaintiff's counsel answered, "[n]o, of course not, but I mean, we don't read the entire law to the jury, period, and there was no testimony here that anything was negligent." Id. The Court then concluded that the jury would be instructed as written over plaintiff's objection. See id. The Court delivered the jury instructions as written to the jury. See id. at 157-60. The Court provided the jury with a copy of the instructions. See id. at 167-68. The jury deliberated for approximately thirty minutes and did not ask any questions. See id. at 169. The jury returned a verdict in Eric's favor. See id. at 169-70.

"When evaluating the effect of an allegedly erroneous jury instruction, the jury charge must be read as a whole." United States v. Botti, 711 F.3d 299, 310-11 (2d Cir. 2013). "[A] jury instruction [is] erroneous 'if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law.'" United States v. Silver, 864 F.3d 102, 118 (2d Cir. 2017) (quoting United States v. Finazzo, 850 F.3d 94, 105 (2d Cir. 2017)). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Lore v. City of Syracuse, 670 F.3d 127, 156 (2d Cir. 2012) (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)). "An erroneous instruction requires a new trial unless the error is harmless and an error is harmless only if the court is convinced that the error did not influence the jury's verdict." Murray v. UBS Sec., LLC, 43 F.4th 254, 262 (2d Cir. 2022) (quoting Warren v. Pataki, 823 F.3d 125, 137 (2d Cir. 2016)).

33

## 1. Visual Body Cavity Search Instruction

The Second Circuit, in reviewing this Court's 2016 grant of summary judgment, set forth the appropriate standard for reasonable suspicion in the context of a visual body cavity search: "visual body cavity searches incident to all arrests . . . must be based on reasonable suspicion to believe that the arrestee is secreting evidence <u>inside</u> the body cavity to be searched." <u>Sloley</u>, 945 F.3d at 39 (emphasis added). Thus, the Court's jury instruction, asking whether the circumstances supported a reasonable suspicion that plaintiff was hiding contraband "in <u>or on</u> his person" is a misstatement of the law. Dkt. No. 125 at 8 (emphasis added).[8] The question is whether the error is harmless.

A few lines above the Court's misstatement, the Court correctly stated the law: "[a] visual cavity search occurring in connection with an arrest must be based on a reasonable suspicion that the arrestee is hiding evidence <u>inside</u> the body cavity to be searched." Dkt. No. 125 at 8 (emphasis added). Similarly, in the Court's jury verdict form, the correct standard was stated, asking, "Has plaintiff, Maxmillian Sloley, proven by a preponderance of the credible evidence that on April 1, 2013, defendant Eric

---

[8] The parties noted that the Court's instruction was derived from <u>Hartline v. Gallo</u>, 546 F.3d 95, 102 (2d Cir. 2008). <u>See</u> Dkt. No. 145 at 111, 117. In <u>Hartline</u>, the Second Circuit concluded "that Hartline's Fourth Amendment rights were violated, because she was subjected to a <u>strip</u> <u>search</u> by the Southampton Police in the absence of reasonable suspicion that she was secreting contraband <u>on</u> her person." <u>Hartline</u>, 546 F.3d at 102 (emphasis added). Eleven years later, in <u>Sloley v. VanBramer</u>, the Second Circuit made the "necessary" decision to "define several terms essential" to the case, including "strip search" and "visual body cavity search." 945 F.3d at 36. The Second Circuit explained the difference between the different types of searches and stated that visual body cavity searches are "even more intrusive" than a strip search. <u>Id.</u> at 38. Thus, the Court held that a visual body cavity search subsequent to an arrest must be supported by a "reasonable suspicion reasonable suspicion to believe that the arrestee is secreting evidence <u>inside</u> the body cavity to be searched." <u>Id.</u> at 39 (emphasis added). At issue in this trial was not plaintiff's strip search, but solely the visual body cavity search. <u>See</u> <u>id.</u> at 37, 45. Thus, although <u>Hartline</u> remains the standard for strip searches, <u>Sloley</u> set forth a heightened standard for reasonable suspicion concerning the "more intrusive" visual body cavity search. <u>Id.</u> at 38.

VanBramer subjected him to a visual body cavity search without reasonable suspicion to believe that Mr. Sloley had hidden evidence <u>inside</u> of his body cavity, in violation of the Fourth Amendment?"  Dkt. No. 124 at 1 (emphasis added).

The Court's one misstatement could have permitted the jury to make an impermissible conclusion—that if Eric had reasonable suspicion to believe that plaintiff was hiding contraband <u>on</u> his body, he could conduct the visual body cavity search. Dkt. No. 125 at 8.  However, the Court is convinced "that the error did not influence the jury's verdict."  <u>Murray</u>, 43 F.4th at 262.

First, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  <u>Lore</u>, 670 F.3d at 156.  The Court did not omit an instruction but misstated the law in one of its three references to a visual body cavity search.  Second, when determining whether an error in jury instructions is harmless, courts often look to whether there was "ample evidence" presented during trial that supports the jury's conclusion.  See <u>United States v. Sheehan</u>, 838 F.3d 109, 127 (2d Cir. 2016) (citing <u>United States v. Tomkins</u>, 782 F.3d 338, 347 (7th Cir. 2015) ("[A]ny error with the jury instructions' definition of 'destructive device' was harmless because there was ample evidence to prove beyond a reasonable doubt that the devices were destructive devices.")); <u>United States v. Post</u>, 950 F. Supp. 2d 519, 535 (S.D.N.Y. 2013) (citing <u>United States v. Wright</u>, 665 F.3d 560, 570-72 (3d Cir. 2012) (honest services counts of conviction vacated where there was "ample evidence" that allowed the jury to convict on the basis of an honest services theory that "required nondisclosure of a financial interest that could conflict with a public official's duty to provide honest services" instead of a "bribery theory")); <u>United States v. Gatto</u>, 986 F.3d 104, 122 (2d

Cir.) ("[T]he jury heard ample evidence demonstrating" that the government met its burden.), cert. denied, 142 S. Ct. 710 (2021); United States v. Kozeny, 667 F.3d 122, 133 (2d Cir. 2011) ("While the government's primary theory at trial was that he had actual knowledge of the bribery scheme, there is ample evidence to support a conviction based on the alternate theory of conscious avoidance."); United States v. Diaz, 176 F.3d 52, 98 (2d Cir. 1999) ("[T]he government presented ample evidence" that supported the conviction); United States v. Eldridge, 860 F. App'x 773, 782 (2d Cir. 2021) (summary order) ("There was ample evidence that [the defendant] himself possessed a firearm in connection with the charged drug trafficking.").[9]

Here, there was not "ample evidence" that plaintiff was hiding contraband inside of his body. The undersigned is not aware of a case in which a defendant has been successful on reasonable suspicion grounds supporting a visual body cavity search on such minimal evidence as was presented here. See Sepulveda v. City of New York, No. 15-CV-5187 (RRM/CLP), 2020 WL 2836952, at *8 (E.D.N.Y. May 29, 2020) ("Because the Court finds that [the plaintiff] inserted drugs, or something that appeared to be drugs, into his rectum during the traffic stop, the arresting officers had "reason to believe, based on specific and articulable facts, taken together with rational inferences from those facts, that [the plaintiff was] secreting contraband inside a body cavity," and were thus "permitted to conduct a visual body cavity search.""); Taylor v. City of New York, No. 19-CV-6754 (KPF), 2022 WL 744037, at *18 (S.D.N.Y. Mar. 11, 2022) ("[T]he

---

[9] The cases discussing "ample evidence" concern criminal convictions which require a jury to reach a verdict beyond a reasonable doubt. See Gatto, 986 F.3d at 122; Kozeny, 667 F.3d at 133; Diaz, 176 F.3d at 98-99; see also Jackson v. Virginia, 443 U.S. 307, 309 (1979) ("The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt."). That standard is higher than the preponderance of the evidence standard which was applied in this case. See Dkt. No. 125 at 4.

Court is unable to discern any evidence in the record that could establish, as a matter of

law, that [the p]laintiff's strip search and cavity inspection were justified by reasonable

suspicion. [The defendant] testified in the abstract during his deposition that based on

his training and experience, [the p]laintiff's arrest was the type that would warrant a strip

search because it occurred in 'a drug prone location' and because the Officers 'were not

able to recover any additional narcotics on the prisoner's person' despite 'the fact that

[the defendant] said he saw the hand to hand [transaction].'"); Johnson v. City of New

York, No. 21-CV-5268 (PKC), 2022 WL 4133284, at *4 (S.D.N.Y. Sept. 12, 2022)

("[T]hat it was not constitutionally unreasonable for the Individual Defendants to perform

the visual body cavity search" in part because the defendants "discovered a controlled

substance, marijuana, and a knife during the arrest [and the defendants] found ecstasy

pills concealed in [the plaintiff's] underwear and Viagra pills in his pants pocket");

Wheeler v. Artola, No. 16-CV-7440 (LMS), 2019 WL 4593651, at *2, *14-15 (S.D.N.Y.

Sept. 23, 2019) (concluding that a search was supported by reasonable suspicion

where the plaintiff had a clear plastic bag with a white substance in his front passenger

seat, he delayed in stopping his vehicle, he was a known drug dealer, and he had been

observed selling cocaine), aff'd, 852 F. App'x 589 (2d Cir. 2021) (summary order).

Here, plaintiff cooperated with the police at every stage; he was not acting

suspicious or in any way that made him seem uncomfortable while in his vehicle; the

canine did not alert to the driver's seat; no drugs or contraband were found on plaintiff

during the strip search; and the only evidence supporting a search was the testimony

about a white substance that was field tested positive for cocaine, and the incident

report because the test kit had been destroyed before trial. See Dkt. No. Dkt. No. 144

at 150-51; see also Dkt. No. 145 at 78, 88.  No court has concluded that such minimal evidence amounts to reasonable suspicion to warrant a visual body cavity search. See Falls v. (Police Officer) Detective Michael Pitt, No. 16-CV-8863 (KMK), 2021 WL 1164185, at *27-28 (S.D.N.Y. Mar. 26, 2021) (granting the plaintiff's motion for summary judgment on the body cavity search claim because "without some particular indicator that [the p]laintiff was secreting drugs inside his body, the fact that he was arrested for reportedly dealing drugs is insufficient to establish reasonable suspicion. . . .  In the absence of any evidence that has been held to support reasonable suspicion in this context—such as fidgeting or moving suspiciously, reaching into one's pants, or having an individual reputation for concealing drugs inside one's body cavity—this Court must conclude, as did the Second Circuit in *Sloley*, that 'no reasonable officer could have believed . . . there was reasonable suspicion to conduct a visual body cavity search.'").

Nevertheless, the relevant inquiry here is not whether there was enough evidence to support the search as a matter of law, or whether the Court would have decided the case differently than the jury.  Whether a jury instruction is harmless turns on whether "the court is convinced that the error did not influence the jury's verdict." Murray, 43 F.4th at 262.  The Court is so convinced.  During plaintiff's closing argument, Mx. Green repeatedly emphasized the lack of physical evidence presented at trial and reiterated that the relevant question for the jury was whether there was reasonable suspicion to believe that plaintiff was hiding contraband inside of his body cavity.  See Dkt. No. 145 at 141-45.  During Eric's testimony, Mr. Mitchell questioned him about why he believed plaintiff was hiding drugs "in the area between [plaintiff's] buttocks[.]"  See Dkt. No. 145 at 43-46.  Mx. Green asked similar questions, and Eric affirmed that he

believed plaintiff might have been doing drugs while driving and frantically put the drugs down his pants while being pulled over.  See Dkt. No. 144 at 157-161.  This was despite plaintiff acting entirely normal, the canine not alerting to the driver's seat, and no drugs being found anywhere else in the car or in plaintiff's clothes—all information that was presented to the jury.  See id. at 156, 162-65.

This trial, because of a lack of physical evidence, came down to who the jury believed: plaintiff or defendant.  The jury chose to credit defendant Eric's testimony.  The Court is not convinced that had the one line of the jury instruction been correct, the jury would have come to a different conclusion.  See Dkt. No. 125 at 8.  The proper standard was stated earlier in the instructions and in the jury verdict form which the jury answered in favor of Eric.  See id.; see also Dkt. No. 124 at 1.  The correct standard being the ultimate question that the jury had to answer leaves the Court unconvinced that its one misstatement was harmful.  See Dkt. No. 125 at 8; see also Dkt. No. 124 at 1; cf. Jones v. United States, 527 U.S. 373, 393 (1999) (citation omitted) ("[W]e agree . . . that '[a]lthough the verdict forms standing alone could have persuaded a jury to conclude that unanimity was not required for the lesser sentence option, any confusion created by the verdict forms was clarified when considered in light of the entire jury instruction.'"); Tardif v. City of New York, 991 F.3d 394, 415 (2d Cir. 2021) (concluding that an error was harmful, in part, because "the jury was *never* provided with the correct instruction on those claims.").  Accordingly, the Court denies plaintiff's motion on this ground.

## 2. Negligence Instruction

It is well settled that negligence does not give rise to a constitutional violation pursuant to § 1983. See Hendricks v. Coughlin, 942 F.2d 109, 113 (2d Cir. 1991) ("Proof of mere negligence will not give rise to a constitutional violation."). "What mental state a § 1983 plaintiff is required to prove depends on the right at issue. Section 1983 'does not itself import an intent standard into an underlying constitutional deprivation that lacks such a requirement.'" Dancy v. McGinley, 843 F.3d 93, 117 (2d Cir. 2016) (quoting Hudson v. New York City, 271 F.3d 62, 68 (2d Cir. 2001)). "Plaintiffs 'need only demonstrate intent where the underlying constitutional deprivation, such as an equal protection violation under the Fourteenth Amendment, calls for it.'" Id. (citation omitted). "[U]nlike § 1983 claims under the Due Process Clause or Eighth Amendment, Fourth Amendment claims are tied to reasonableness, which is considerably less demanding." Id. at 117-18 (citing Graham v. Connor, 490 U.S. 386, 398 (1989) ("Differing standards under the Fourth and Eighth Amendments are hardly surprising: the terms 'cruel' and 'punishments' clearly suggest some inquiry into subjective state of mind, whereas the term 'unreasonable' does not.")). In Hudson, the Second Circuit "readily assum[ed] that all Fourth Amendment violations require intentional actions by officers, rather than the accidental effects of otherwise lawful government conduct." Id. (quoting Hudson, 271 F.3d at 68)); see also Brower v. Cnty. of Inyo, 489 U.S. 593, 596 (1989) ("Violation of the Fourth Amendment requires an intentional acquisition of physical control."). Moreover, the reasonable suspicion inquiry turns on an objective analysis. See United States v. Weaver, 9 F.4th 129, 140, 145 (2d Cir. 2021) (footnotes omitted) ("The Supreme Court has 'consistently recognized that reasonable suspicion

'need not rule out the possibility of innocent conduct.'. . .  The Supreme Court has long

rejected any attempt to inject subjectivity into the Fourth Amendment context.  '[T]he

Fourth Amendment's concern with "reasonableness" allows certain actions to be taken

in certain circumstances, whatever the subjective intent [of the officer].'").

In Dancy v. McGinley, in relation to a Fourth Amendment excessive force claim,

the district court instructed the jury that "[t]o establish a claim under Section 1983, a

plaintiff must . . . show that a defendant acted intentionally or recklessly.  If you have

found that the defendant committed the act in question, you must then determine

whether the defendant acted intentionally or recklessly.  If so, you will go on to consider

the third element of the plaintiff's second 1983 claim."  Dancy, 843 F.3d at 118. The

court proceeded, "[i]f, however, you find that the defendant's acts were merely

negligent, then even if you find that the plaintiff was harmed as a result of those

particular acts or omissions, you must find that the plaintiff has not established his claim

under Section 1983. . . ."  Id.  The Second Circuit explained that "as long as an officer

deliberately performed acts that constitute a seizure, the Fourth Amendment has been

triggered, regardless of whether it was accomplished by the exact method intended."

Id. at 116.  The Court continued, "[i]ntent is not relevant, however, as to the officer's

underlying motivation for his actions during the course of a seizure.  In *Graham*, the

Supreme Court made clear that the standard is one of objective reasonableness,

meaning the officer's 'underlying intent or motivation' is not a factor."  Id. (quoting

Graham, 490 U.S. at 397).  "Objectively unreasonable actions during the course of a

seizure, even if based on a mistake, are unconstitutional."  Id. at 117 (citations omitted).

Thus, the Second Circuit concluded that the district court's negligence instruction was

41

confusing in the context of excessive force liability. Instructing that a plaintiff must show that "the defendant acted intentionally or recklessly" and that if "the defendant's acts were merely negligent . . . [the jury] must find that the plaintiff has not established his claim" could be understood to suggest incorrectly that an officer must have intended the results of his actions or consciously disregarded their consequences. The district court's instruction thus may have led the jury to erroneously believe that it was required to find that [the defendant] intended to hit [the plaintiff's] face against the car and/or to injure him.

Id.

The same reasonableness and objective standards that the Dancy Court set forth for a Fourth Amendment seizure apply to a Fourth Amendment search. See United States v. Weaver, 9 F.4th 129, 145 (2d Cir. 2021) (en banc) (footnotes omitted) ("[A] police officer's subjective intentions bear no weight in determining whether a search has occurred. The Supreme Court has long rejected any attempt to inject subjectivity into the Fourth Amendment context."); Hartline v. Gallo, 546 F.3d 95, 100 (2d Cir. 2008) (citation omitted) ("Whether a particular strip search is constitutional 'turns on an objective assessment of the . . . facts and circumstances confronting [the searching officer] at the time, and not on the officer's actual state of mind at the time' of the search."); Taylor, 2022 WL 744037, at *18 (discussing relevant objective standard in the context of a visual body cavity search).

Although this Court's instruction is similar to the instruction in Dancy, they are not identical, and the differences warrant different outcomes. See Dkt. No. 125 at 9; see also Dancy, 843 F.3d at 118. First, in Dancy, the district court instructed the jury that the plaintiff had to prove that the defendant's conduct was intentional or reckless—an incorrect statement and one that this Court did not make. See Dancy, 843 F.3d at 118; cf. Fisher v. City of Memphis, 234 F.3d 312, 317 (6th Cir. 2000) ("[T]he intent in

42

question is the intent to commit the act, not the intent that a certain result be achieved. [The defendant's] act of firing the gun was intentional, even if the result was not one he sought to achieve. Instructing the jury that more than negligence was required would likely confuse the jury as to the intent question. The district court thus did not err in failing to instruct the jury that mere negligence is not actionable under § 1983.").

Second, in <u>Dancy</u>, the district court's instruction was contradictory with "the instruction that force is excessive if it is objectively unreasonable, i.e., beyond that which a reasonable and prudent officer would have applied." 843 F.3d at 119. Here, the Court's instruction did not contradict any other portion of its instructions. The Court did not, anywhere in the jury instructions, state that Eric had to have intended his actions in order to find him liable. <u>See</u> <u>generally</u> Dkt. No. 125. The Court did not include any state of mind instructions other than the negligence instruction. <u>See id.</u> at 9. Rather, the instructions stated that "the plaintiff must establish that the defendant's conduct deprived him of a right or rights secured by the Constitution or federal law[]" and that the defendant could not be held liable if "he did not [act] in a way that violated the Plaintiff's Fourth Amendment rights[.]" <u>Id.</u> at 8-9.

Although its presence might have been confusing to the jury, the Court cannot say that the negligence instruction was so confusing that it "undermine[d] 'the very integrity of the trial.'" <u>Dancy</u>, 843 F.3d at 116 (quoting <u>SCS Commc'ns Inc. v. Herrick Co.</u>, 360 F.3d 329, 343 (2d Cir. 2004)). As the jury was not told that plaintiff had to prove that Eric's actions were intentional and intent to conduct the search was not an issue at trial, the Court did not err in giving the negligence instruction. However, even if the Court did err, any error is harmless. <u>See</u> <u>Hill v. Quigley</u>, 784 F. App'x 16, 19-20 (2d

43

Cir. 2019) (summary order) (citing <u>Dancy</u>, 843 F.3d at 116) ("[I]ntent was not at issue

. . . . The defense theory was that the use of lethal force was justified—not that the

shooting was accidental. [The defendant] described the shooting as an intentional act.

Thus, to the extent the District Court failed clearly to convey that [the defendant] could

be held liable even if he unintentionally caused [the plaintiff's] death, that error is

harmless."). Thus, plaintiff's motion is denied on this ground.


## IV. Bill of Costs

As a result of the favorable verdict, defendant seeks $589.10 in transcript costs,

$126.20 for witness fees and mileage, and $9.00 for copies, for a total of $724.30. <u>See</u>

Dkt. No. 135 at 1, 3-4. Plaintiff does not oppose the motion for costs.

Federal Rule of Civil Procedure 54(d)(1) states, "[u]nless a federal statute, these

rules, or a court order provides otherwise, costs . . . should be allowed to the prevailing

party." Fed. R. Civ. P. 54(d)(1). "[T]he Supreme Court has held that the term 'costs'

includes only the specific items enumerated in 28 U.S.C. § 1920." <u>Whitfield v. Scully</u>,

241 F.3d 264, 269 (2d Cir. 2001) (citations omitted), <u>abrogated on other grounds by</u>

<u>Bruce v. Samuels</u>, 577 U.S. 82 (2016). As outlined in section 1920,

> "[a] judge or clerk of any court of the United States may tax as costs the following:
>
> (1) Fees of the clerk and marshal;
>
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
>
> (3) Fees and disbursements for printing and witnesses;

> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
>
> (5) Docket fees under section 1923 of this title; [and]
>
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title."

28 U.S.C. § 1920. "A prevailing party is 'ordinarily . . . permitted to recover costs for the original and one copy of [a] transcript[ ].'" Oliver v. N.Y.S. Police, No. 1:15-CV-00444 (BKS/DJS), 2023 WL 246698, at *7 (N.D.N.Y. Jan. 18, 2023) (citation omitted). "Furthermore, '[c]ourts interpret [28 U.S.C. § 1920(4)] to include photocopying charges for discovery.'" Encarnacion, 2023 WL 2785745, at *7 (quoting Green v. Venettozzi, No. 14-CV-1215, 2019 WL 4508927, at *2 (N.D.N.Y. Sept. 19, 2019)). Finally, 28 U.S.C. § 1821 allows $40.00 per for witness fees, plus mileage. See, e.g., id. at *6. The United States General Services Administration Privately Owned Vehicle Mileage Rates sets mileage at $0.625 for automobiles and $0.22 for government-furnished automobiles. See POV Mileage Rates, U.S. Gen. Serv. Admin., https://www.gsa.gov/travel/plan-book/transportation-airfare-pov-etc/privately-owned-vehicle-mileage-rates/pov-mileage-rates-archived (last visited May 9, 2023).

Defendant has provided sufficient information indicating that he seeks costs for an original and one copy of plaintiff's deposition, $40.00 for two witnesses and mileage at a rate of $0.22, and copies of defendant's mandatory disclosures. See Dkt. No. 135 at 4-12. These costs are appropriate, and defendant's motion is granted as to these requests. See Encarnacion, 2023 WL 2785745, at *7 (citation and quotation marks omitted) ("[T]he Court finds that the copies were necessary [as they] relate to the 'initial disclosure requirements.").

Insofar as defendant seeks $86.00 for an appearance fee for the court reporter from a deposition at which plaintiff failed to appear, such a fee is not listed as taxable under section 1920.  See 28 U.S.C. § 1920; see also PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC, No. 5:11-CV-761 (GLS/DEP), 2017 WL 473910, at *2 (N.D.N.Y. Feb. 3, 2017) (quoting Farberware Licensing Co. LLC v. Meyer Mktg. Co., Ltd., No. 09-CV-2570, 2009 WL 5173787, at *5 (S.D.N.Y. Dec. 30, 2009)) ("District courts in this circuit have disallowed 'certain associated fees' from deposition costs including 'expedited service, delivery costs, appearance fees, and rough diskettes and/or ASC II disks.'"); C.C. by & through Camarata v. Polaris Indus., Inc., No. 6:14-CV-0975 (GTS/TWD), 2018 WL 3031848, at *5 (N.D.N.Y. June 19, 2018) (disallowing additional fees associated with depositions that were not received into evidence or used with motion for summary judgment), aff'd, 774 F. App'x 45 (2d Cir. 2019) (summary order); Yin v. Japan Soc., Inc., No. 99-CV-4806 (HB), 2000 WL 827671, at *2 (S.D.N.Y. June 27, 2000) ("[T]he 'Appearance Fee' of $85.00, and the 'Delivery Fee' of $15.00 must be subtracted from the costs of the deposition transcript.").  Thus, the Court grants defendant's bill of costs, minus the $86.00 appearance fee, totaling $638.30.

## V.  Conclusion

**WHEREFORE**, for the reasons set forth above, it is hereby:

**ORDERED**, that plaintiff's motion to reverse the jury's verdict and for a new trial (Dkt. Nos. 134, 140) is **DENIED;** and it is further

**ORDERED**, that defendant's motion for bill of costs (Dkt. No. 135) is **GRANTED to the extent outlined in this Memorandum-Decision and Order**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Dated: May 25, 2023
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge