Askew v. Lindsay, Not Reported in Fed. Rptr. (2022)

2022 WL 17748623

2022 WL 17748623
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Timothy A. ASKEW, Plaintiff-Appellant,

v.

Police Officer LINDSAY, Police Officer Mota,

Police Officer Youmans, Defendants-Appellees. [*]

No. 21-799-pr
|
August 1, 2022

Appeal from a judgment of the United States District Court for the Southern District of New York (Paul E. Davison, *M.J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the February 25, 2021 judgment of the district court is **AFFIRMED.**

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Adam R. Mandelsberg, (William J. McCabe, Matthew Moffa, on the brief) Perkins Coie LLP, New York, NY.

FOR DEFENDANTS-APPELLEES: Ralph L. Puglielle, Jr., Drake Loeb PLLC, New Windsor, NY.

PRESENT: Rosemary S. Pooler, Myrna Pérez, Circuit Judges, Jed S. Rakoff, District Judge. [**]

### SUMMARY ORDER

**\*1** This case arises out of Plaintiff-Appellant Timothy Askew's suit against three Village of Monticello police officers ("Defendants") under 42 U.S.C. § 1983 for false arrest and use of excessive force at his home on September 4, 2014. Following a jury verdict in favor of the Defendants, the district court entered a judgment dismissing Askew's complaint on February 25, 2021. On appeal, Askew raises three issues: whether (1) the district court erred in excluding former testimony from an eyewitness in Askew's home under the Federal Rules of Evidence ("the Rules"); (2) the district court erred in responding to a readback request from the jurors; and (3) the Southern District of New York's jury selection process denied Askew a jury from a fair cross-

section of the community in violation of the Jury Selection and Service Act, 28 U.S.C. § 1861, *et seq.* We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal, to which we refer only as necessary to explain our decision to affirm.

### I. Exclusion of Former Testimony

On September 4, 2014, Defendants dispatched to Askew's home to respond to a physical domestic incident involving a man and a woman reported through 911. Thereafter, Defendants arrested Askew in an incident witnessed by Sandra Benjamin, Askew's then-girlfriend and the sole non-party eyewitness to the events that form the basis of this civil action. Eight days after Askew's arrest, Benjamin testified about the incident under oath at a preliminary hearing in the Village of Monticello Justice Court.

In the district court, Askew moved to introduce the transcript of Benjamin's preliminary hearing testimony under Federal Rule of Evidence 804(b)(1) ("Rule 804(b)(1)"), the former testimony exception to the rule against hearsay or, in the alternative, under Federal Rule of Evidence 807 ("Rule 807"), the "residual exception" to the rule against hearsay. The district court declined to admit the testimony under both rules. We review the district court's evidentiary ruling for abuse of discretion, *Warren v. Pataki*, 823 F.3d 125, 137 (2d Cir. 2016), and, accordingly, "give district court judges wide latitude in determining whether evidence is admissible at trial," *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 148 (2d Cir. 2001) (internal quotation marks omitted). "To find such an abuse, we must be persuaded that the trial judge acted in an arbitrary and irrational fashion." *Tesser v. Bd. of Educ.*, 370 F.3d 314, 318 (2d Cir. 2004). For the reasons stated below, we find no abuse of discretion.

#### A. Rule 804(b)(1)

Ordinarily, "[t]estimony of a nonparty witness that was given at a prior hearing is, when offered for its truth, hearsay." *Patterson v. County of Oneida*, 375 F.3d 206, 219–20 (2d Cir. 2004). However, Rule 804(b)(1) exempts from the hearsay rule certain former testimony given by an unavailable witness:

Askew v. Lindsay, Not Reported in Fed. Rptr. (2022)

2022 WL 17748623

(b) The Exceptions. The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:

**\*2** (1) Former Testimony. Testimony that:

(A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and

(B) is now offered against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

Fed. R. Evid. 804(b)(1).

The district court excluded Benjamin's preliminary hearing testimony under Rule 804(b)(1) after concluding that there was no legal "authority for the proposition that a District Attorney conducting a criminal prosecution [can] serve[ ] as a predecessor-in-interest to police officers who are subsequently sued in a matter like this." App'x 48–49. As the district court recognized, this Court has not yet defined who qualifies as a "predecessor in interest" under Rule 804(b)(1)(B). We need not do so today, however, because the district court properly excluded Benjamin's prior testimony under Rule 804(b)(1) for a more basic reason: Askew did not demonstrate Benjamin's unavailability to testify in the civil case. *See* ⚑ *Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 49 (2d Cir. 2010) ("We may affirm the district court's decision on any ground appearing in the record.").

The former testimony exception applies only if "the declarant is unavailable as a witness." Fed. R. Evid. 804(b). "A declarant is considered to be unavailable as a witness if," as relevant here, she "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure [her] attendance." Fed. R. Evid. 804(a)(5). The combined efforts of Askew and his counsel to procure Benjamin's attendance amounted to sending two unanswered messages to Facebook accounts with the name "Sandra Benjamin," calling a disconnected phone number that had been associated with Benjamin's daughter years earlier, and calling six telephone numbers—five of which were disconnected and one of which was a wrong number—found using the White Pages. These efforts, none of which succeeded in reaching Benjamin, are insufficient to establish Benjamin's unavailability. Askew did not call

Benjamin at the phone number she had used during their relationship. He did not hire a process server to serve a trial subpoena on Benjamin at her last known address. Nor did he take the basic step of seeking court intervention to procure Benjamin's attendance. There is no reason to believe any of these standard methods of producing a witness would have been ineffective. *Cf.* ⚑ *United States v. Losada*, 674 F.2d 167, 172 (2d Cir. 1982) (holding that the burden of showing unavailability met where witness, a "Colombian citizen living in Colombia," was "not subject to compulsory process," and the government was unable to obtain his attendance by voluntary request). Accordingly, because Askew did not demonstrate his inability, "by process or other reasonable means, to procure [Benjamin's] attendance," Fed. R. Evid. 804(a)(5), he cannot invoke Rule 804(b)(1) to introduce her former testimony, and the district court did not abuse its discretion in excluding it on this basis.

## B. **Rule 807**

**\*3** A hearsay statement may be admissible under Rule 807 if: "(i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party." ⚑ *United States v. Morgan*, 385 F.3d 196, 208 (2d Cir. 2004). The district court declined to admit Benjamin's testimony under the first prong finding it not "reliable" principally because it was made by a "domestic partner" or "temporary co-habitant of the criminal defendant." App'x 41–42, 48–49. This was not an abuse of discretion.

Courts have considered a romantic relationship between a declarant and a party a relevant factor in assessing the declarant's trustworthiness. *See, e.g., United States v. Zapata*, 356 F. Supp. 2d 323, 326 (S.D.N.Y. 2005) (finding statement not trustworthy because declarant was motivated "to protect" person "he was romantically involved with"); *cf.* ⚑ *Morgan*, 385 F.3d at 209 (admitting romantic partner's testimony under Rule 807, in part, because "[declarant] had no reason to expect that [statement] would ever find its way into the hands of the police; she did not write it to curry favor with them or with anyone else"). Moreover, at the time of her testimony, Benjamin had a pending misdemeanor charge related to Askew's arrest incident, which suggests she had a self-interest in offering testimony unfavorable to

Askew v. Lindsay, Not Reported in Fed. Rptr. (2022)

2022 WL 17748623

the arresting officers and consistent with Askew's testimony. *Cf.* ⚠️ⓘ *United States v. Matthews*, 20 F.3d 538, 546 (2d Cir. 1994) (finding a statement trustworthy, in part, because it "d[id] not reflect any attempt by [declarant] to minimize his own culpability"). Finally, Benjamin's testimony was not corroborated by the 911 call. While the call reported a "male beating a female" outside Askew's apartment on the day of the incident, Appellees' App'x 2, Benjamin testified that there was no "argument," "physical altercation," or "fight" between herself and Askew, App'x 22.51–22.52. *See* Fed. R. Evid. 807(a)(1) (providing that courts are to consider "the totality of circumstances under which [the statement] was made and *evidence, if any, corroborating the statement*" (emphasis added)). [1]

## II. **The Readback Request**

Because Askew failed to raise any objection to the district court's response to the jurors' readback request at trial, plain error review applies. *See, e.g., United States v. Grant*, 52 F.3d 448, 449 (2d Cir. 1995). This Court has expressed a "preference for honoring a jury's request for readbacks when made by a deliberating jury." *See* 📁 *United States v. Young*, 140 F.3d 453, 456 (2d Cir. 1998) (citing 📁 *United States v. Criollo*, 962 F.2d 241, 243–44 (2d Cir. 1992)). We have held that "trial judges should bear several considerations in mind" when responding to a jury's readback request, including: "[1] the jurors' need to review the material before reaching a verdict, assessed against the difficulty in locating the specific material requested, [2] the possibility of undue emphasis on any portion of the record, and [3] the possibility of undue delay in the trial." *Id.* (citing 📁 *United States v. Escotto*, 121 F.3d 81, 84 (2d Cir. 1997); 📁 *Criollo*, 962 F.2d at 243).

**\*4** During their deliberations, the jurors requested a readback of Askew's trial testimony "starting when [the officers] arrived." App'x 645–46. The parties disagreed about how to interpret this request. This led the district court to ask the jurors for clarification so that the court could locate relevant testimony and avoid undue delay. When addressing the jurors, the district court made clear their request would be honored in any form: "[t]o be clear, we can read the entire transcript to you, if that's what you want, but if you want testimony that can be associated with some narrower period or time or something like that, that would help us in finding what it is that you want." *Id.* at 646. Thereafter, the jurors informed the court that they no longer "want[ed] the readback

of Mr. Askew's testimony." *Id.* at 648–49. It is not error for a court, as here, to consider the "jurors' need to review the evidence," "the difficulty in locating the testimony to be read back," and "the possibility of undue delay," when responding to a readback request. 📁 *Escotto*, 121 F.3d at 84.

Therefore, the district court did not err—much less plainly err —when it responded to the jurors' readback request.

## III. **Jury Selection**

Askew's fair cross-section claim fails because he did not comply with the procedural requirements of the Jury Selection and Service Act ("JSSA"). Under the JSSA, a district court's jury selection plan must ensure jurors are selected "from *a fair cross section of the community* in the district or division wherein the court convenes." *See* 28 U.S.C. §§ 1861, 1863(a) (emphasis added). To challenge a district court's compliance with these provisions, a civil litigant must "move to stay the proceedings on the ground of substantial failure to comply with the [JSSA]" and file it "before the voir dire examination begins, or within seven days after the [litigant] discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier." *Id.* § 1867(c). The motion must contain a "sworn statement of facts which, if true, would constitute [such] a substantial failure." *Id.* § 1867(d). This procedure is the "exclusive means" by which a civil litigant may challenge a jury for failing to conform with the JSSA. *Id.* § 1867(e). Askew made no such motion at any stage in the trial proceedings and raises this issue for the first time on appeal. Because Askew failed to comply with these procedures, his JSSA claim is barred. *See* 📁 *United States v. Young*, 822 F.2d 1234, 1239 (2d Cir. 1987) (concluding that defendants' failure to timely object under JSSA "bar[red] them from statutory relief"); *see also United States v. Jones*, 480 F.2d 1135, 1139 (2d Cir. 1973) (concluding that compliance with section 1867(e) "is necessary to question the validity of a plan adopted and approved pursuant to the [JSSA]").

We have considered the remainder of Askew's arguments and conclude they are without merit. Accordingly, we **AFFIRM** the judgment of the district court.

## **All Citations**

Not Reported in Fed. Rptr., 2022 WL 17748623

**Askew v. Lindsay, Not Reported in Fed. Rptr. (2022)**

2022 WL 17748623

## Footnotes

\*      The Clerk of the Court is respectfully directed to amend the caption as set forth above.

\*\*     Judge Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

1      Askew argues that the 911 call cannot justify the district court's exclusion of Benjamin's testimony under Rule 807 because it is inadmissible hearsay. However, a trial court conducting an in limine hearing is not bound by the Rules and may consider inadmissible evidence in making its determinations. Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, *or evidence is admissible.* In so deciding, *the court is not bound by evidence rules*, except those on privilege." (emphasis added)); *see, e.g.,* ⚑⚠ *United States v. Yousef*, 327 F.3d 56, 145 (2d Cir. 2003).

---

                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

602 Fed.Appx. 7
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

H. Patrick BARCLAY, Plaintiff–Appellant,

v.

State of NEW YORK, Superintendent Thomas Ricks,
Captain Racette, Sergeant Zodiac, Director Donald
Selsky, Correction Counselor T. Hutchins, Correction
Officer A. La Clair, Correction Officer Jane Doe,
Correction Officer John Roe, Lieutenant Dubray,
Correction Officer R. Richard, Hearing Officer Cho
Drown, Sergeant Marlow, Correction Officer Ashlaw,
Correction Officer Ghostlaw, Correction Officer
Kissane, Steward J. Kelly, Correction Officer John
Doe, Correction Officer John Moe, Hearing Officer
M. Smith, Estate of Curtis Drown, Substituted for
Defendant Cho Drown, Defendants–Appellees.

No. 12–1593
|
Feb. 20, 2015.

**Synopsis**
**Background:** Former state inmate brought action against
State and prison officials, asserting claims relating to, inter
alia, the denial of his request to attend his mother's funeral
and alleged retaliation based on exercise of his protected
religious rights. The United States District Court for the
Northern District of New York, Lyle E. Strom, District
Judge for the District of Nebraska, sitting by designation,
granted summary judgment in defendants' favor on funeral
and retaliation claims and, following jury verdict, entered
judgment on remaining claims in defendants' favor. Inmate
appealed.

**Holdings:** The Court of Appeals held that:

[1] inmate failed to exhaust administrative remedies on claim
relating to denial of funeral request;

[2] defendants were not liable for First Amendment
retaliation;

[3] district court did not abuse its discretion by denying
inmate's motion to re-open discovery;

[4] district court did not abuse its discretion in denying
inmate's request for substitute pro bono counsel;

[5] inmate was not denied his right to self-representation;

[6] inmate could not challenge jury pool; and

[7] Sixth Amendment right to confrontation did not apply.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (9)

[1]     **Prisons**    Particular cases

State inmate failed to exhaust administrative
remedies, as required by the Prison Litigation
Reform Act (PLRA), before bringing his claim
against State and prison officials based on the
denial of his request to attend his mother's
funeral; inmate's letter to Commissioner of
New York State Department of Corrections
and Community Services (DOCCS) concerned
a separate, unrelated grievance, and single
sentence in letter regarding the funeral did
not satisfy the exhaustion requirement. Prison

Litigation Reform Act of 1995, § 101(a), 42
U.S.C.A. § 1997e(a).

1 Case that cites this headnote

**[2]** **Prisons** 🔑 Particular cases

Alleged confiscation of legal materials from state inmate, which purportedly showed prisoner properly exhausted his claim regarding prison's denial of his request to attend funeral, as required by the Prison Litigation Reform Act (PLRA), did not prevent prisoner from presenting relevant materials bearing on issue of exhaustion in his action against State and prison officials, where alleged confiscation occurred five months after district court granted summary judgment against inmate, based on in part on inmate's failure to exhaust claim. Prison Litigation Reform Act of 1995, § 101(a), 🚩 42 U.S.C.A. § 1997e(a).

1 Case that cites this headnote

**[3]** **Constitutional Law** 🔑 Prisons and Pretrial Detention

**Prisons** 🔑 Hair, grooming, and clothing

State and prison officials were not liable for First Amendment retaliation, based on alleged treatment of state inmate's kufi, absent evidence suggesting causal connection between inmate's protected religious activity and alleged treatment of his kufi. U.S.C.A. Const.Amend. 1.

**[4]** **Prisons** 🔑 Law books, law libraries, and legal materials

Prison officials did not improperly confiscate state inmate's legal papers, and thus district court properly denied inmate's motion seeking return of such materials, where inmate confirmed he had been offered, but refused to accept, a bag of legal materials, that the bag was securely stored at correctional facility, and that after inmate was released from custody, he was free to retrieve the bag.

**[5]** **Federal Civil Procedure** 🔑 Motion and Proceedings Thereon

District court did not abuse its discretion in denying state inmate's motion to re-open discovery four years after close of discovery and two months before trial to obtain medical records, given that medical records, which were 10 years old, were unlikely to be relevant to inmate's claims against State and prison officials.

1 Case that cites this headnote

**[6]** **Civil Rights** 🔑 Criminal law enforcement; prisons

District court did not abuse its discretion in denying state inmate's request for substitute pro bono counsel, in inmate's action against State and prison officials alleging retaliation based on exercise of his protected religious rights, on grounds that counsel was insufficiently zealous; counsel protected inmate's interests by conducting cross-examination at a prison official's video deposition, and district court's denial of inmate's meritless motions did not reflect a lack of zealousness on part of counsel.

2 Cases that cite this headnote

**[7]** **Attorneys and Legal Services** 🔑 Pro Se Litigants; Self-Representation

State inmate was not denied his right to self-representation, in his action against State and prison officials, where he did not ask to be allowed to proceed pro se.

1 Case that cites this headnote

**[8]** **Jury** 🔑 Affidavits and other evidence

State inmate could not challenge jury pool, in his action against State and prison officials, where he failed to file motion with sworn statement of facts, which if true, would constitute substantial failure to comply with provisions of the Jury Selection and Service Act, as required by statute. 🚩 28 U.S.C.A. § 1867(c, d).

**[9]** **Criminal Law** 🔑 Nature or stage of proceeding

Sixth Amendment right to confrontation did not apply in state inmate's civil action against State and prison officials. U.S.C.A. Const.Amend. 6.

5 Cases that cite this headnote

**\*9** Appeal from a judgment of the United States District Court for the Northern District of New York (Strom, J. [1] ).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED.**

**Attorneys and Law Firms**

H. Patrick Barclay, pro se, New York, N.Y., for Plaintiff–Appellant.

Barbara D. Underwood, Solicitor General; Andrea Oser, Deputy Solicitor General; Martin A. Hotvet, Assistant Solicitor General, for Eric T. Schneiderman, Attorney General of the State of New York, Albany, N.Y., for Defendants–Appellees.

PRESENT: AMALYA L. KEARSE, DEBRA ANN LIVINGSTON and SUSAN L. CARNEY, Circuit Judges.

**\*10** *SUMMARY ORDER*

Appellant H. Patrick Barclay, formerly an inmate in the custody of the New York State Department of Corrections and Community Services ("DOCCS"), proceeding pro se, appeals the district court's partial grant of summary judgment dismissing his claim related to the denial of his request to attend his mother's funeral, and his claim that he was retaliated against for exercising his protected religious rights. He also appeals the jury verdict, which found for the defendants on the remainder of his claims, arguing that various errors deprived him of a fair trial. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

We review a district court's grant of summary judgment de novo. *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004). Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-moving party, *Nabisco, Inc. v.*

*Warner–Lambert Co.,* 220 F.3d 43, 45 (2d Cir.2000), "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Nabisco,* 220 F.3d at 45 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

"We review a district court's evidentiary rulings for abuse of discretion, and will reverse only for manifest error." *Cameron v. City of New York,* 598 F.3d 50, 61 (2d Cir.2010) (quoting *Manley v. AmBase Corp.,* 337 F.3d 237, 247 (2d Cir.2003)) (internal quotation marks omitted). We also review for abuse of discretion rulings that resolve objections to assigned pro bono counsel. *See Carpenter v. Republic of Chile,* 610 F.3d 776, 780 (2d Cir.2010).

**I. Partial Summary Judgment**

**[1]** The Prison Litigation Reform Act of 1995 ("PLRA") mandates that inmates exhaust the administrative remedies available to them before they seek relief in federal court for any suit concerning prison life. *See Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The PLRA requires "proper exhaustion," which means "using all steps that the agency holds out, and doing so properly." *Woodford v. Ngo,* 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) (quoting *Pozo v. McCaughtry,* 286 F.3d 1022, 1024 (7th Cir.2002)) (emphasis omitted). This entails completing the administrative review process in accordance with the procedural rules prescribed by the relevant state prison grievance process, and providing "[t]he level of detail necessary in a grievance to comply with the grievance procedures." *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

The district court correctly ruled that Barclay had failed to exhaust his administrative remedies with respect to the denial of his funeral request. Although the court did not expressly address the issue, Barclay's assertion that a November 2000 letter to the DOCCS Commissioner constituted "proper" exhaustion lacks merit. This letter, which was not part of the summary judgment record and was admitted at trial for other purposes, was entirely concerned with a separate, unrelated grievance, and contained only a single sentence referencing the denial of his funeral request. Even if the

letter's lone reference to the denial of Barclay's funeral request was enough to notify prison officials of the nature of his grievance, such an informal complaint is insufficient to satisfy the PLRA's exhaustion requirement. *See* 🔖 *Macias v. Zenk,* 495 F.3d 37, 43–44 (2d Cir.2007) (holding that informal complaints alerting prison officials to nature of grievance were not "proper exhaustion").

**\*11** **[2]** Barclay's argument on appeal, that the legal materials allegedly confiscated from him contained additional evidence of his proper exhaustion, is similarly unavailing. By his own admission, the alleged confiscation of these materials took place in August 2009. The district court granted summary judgment, in part based on Barclay's failure to exhaust, in March 2009. Thus, the alleged confiscation some five months after the court's ruling did not prevent Barclay from presenting to the court any relevant legal materials bearing on the issue of exhaustion prior to its ruling.

**[3]** The district court also correctly ruled that Barclay's First Amendment retaliation claim was entirely conclusory, as he had not pleaded any facts that suggested a retaliatory motive for the treatment of his kufi. To succeed on a First Amendment retaliation claim under § 1983, a prisoner must establish "(1) that the [activity] at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [activity] and the adverse action." 🔖 *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (quoting 🔖 *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004)) (internal quotation marks omitted). There was no evidence in the record to suggest a causal connection between Barclay's protected religious activity and the alleged treatment of his kufi. In opposing defendants' properly supported motion for summary judgment, Barclay was not entitled to rely on his own conclusory allegations. *See, e.g.,* 🔖 *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996); 🔖 *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996).

## II. Pre-trial Motions

**[4]** With respect to Barclay's motion for the return of allegedly confiscated legal materials, as well as the related requests for a spoliation inference and to be allowed to argue to the jury that such a confiscation occurred, the district court reasonably rejected the requests, given the undisputed evidence that the defendants had not improperly confiscated Barclay's legal papers. Barclay confirmed that he had been offered a bag of legal materials bearing his name that he refused to accept, and that the bag was thereafter securely stored at Elmira Correctional Facility. And he admitted at trial that the bag remained securely stored there. At that point, Barclay was no longer incarcerated, having been released in February 2011, and was free to retrieve the bag from Elmira. His failure to do so belies his assertion that the bag's contents were necessary for him to adequately prosecute his claims.

**[5]** The district court also reasonably denied Barclay's motion to re-open discovery on the eve of trial so that he could obtain records for his recent medical treatment and a court-appointed expert to evaluate the integrity of the videotape purporting to show the June 2001 pat frisk that Barclay claimed injured him. Barclay initiated this action in 2002, and discovery closed in February 2008. In opposing the defendants' summary judgment motion in March 2008, Barclay did not argue that he required additional discovery. However, nearly four years later, he moved to re-open discovery less than two months before the scheduled trial date. As the district court noted, the medical records that Barclay sought to obtain were unlikely to be relevant to his claims, which were by then ten years old. And Barclay had never been denied access to the videotape; he had ample opportunity to seek an expert to review its integrity before discovery was closed. The court was thus well within its discretion in denying the motion. *See* 🔖 **\*12** *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 925–28 (2d Cir.1985).

On appeal, Barclay for the first time challenges the medical records that were filed under seal in connection with the defendants' summary judgment motion, arguing that he was prejudiced by the denial of his motion to re-open discovery because he was thereby prevented from rebutting those records with his own medical evidence regarding the injuries he allegedly sustained in the June 2001 pat frisk. This argument is meritless. The records Barclay challenges pertain to his continued need for a cane on or before February 2000, and are thus irrelevant to any injuries allegedly sustained thereafter.

Barclay also argues that discovery was not in fact closed when he made his motion, but that the discovery deadline had been stayed for purposes of mediation, that he received no notice of the deadline's reinstatement, and that the court allowed the deposition of defendant Selsky to proceed after the supposed closing of discovery in February 2008. This

argument is similarly without merit. The record reflects that Barclay was advised that discovery had closed in February 2008, and that his opposition to the defendant's summary judgment motion would be due in March. The case was indeed referred for mediation in July 2009, but nothing in the referral order suggested that discovery had been re-opened or stayed. Selsky's video deposition, which took place in April 2012, was not conducted for traditional discovery purposes, but was taken in anticipation of Selsky's unavailability for trial.

### III. Trial Rulings

[6] The district court did not abuse its discretion in denying Barclay's request for substitute pro bono counsel. Barclay claimed that his appointed counsel was insufficiently zealous, as evidenced by counsel's involvement in the Selsky deposition and failure to obtain favorable rulings on Barclay's pre-trial motions. However, counsel protected Barclay's interests by conducting a cross-examination of Selsky at his video deposition, and the court's denial of Barclay's meritless motions does not reflect a lack of zealousness on the part of his attorney.

[7] On appeal, Barclay argues that he should have been permitted to proceed pro se. However, to exercise his right to self-representation, Barclay had to assert the right in a timely manner, "preferably before trial," and he had to "clearly and unequivocally discharge any lawyer previously retained." *Iannaccone v. Law,* 142 F.3d 553, 558 (2d Cir.1998). Barclay did neither; he waited until trial had already commenced to make his request for new counsel, and, when the court, in its discretion, denied his request, he proceeded with the lawyer he had. Barclay did not ask to be allowed to proceed pro se. Thus, Barclay was not denied his right to self-representation.

[8] Barclay's argument that the court should have struck the jury pool is also without merit. Juries in the Northern District are selected at random from voter registration lists, pursuant to 28 U.S.C. § 1863. *See* Northern District General Order 24, approved by the Circuit Council of the Second Circuit on January 16, 2009, *reprinted in* McKinney's New York Rules of Court, Vol. II—Federal District Courts 903–11 (2012 ed.). The use of voter registration lists as the sole source of names for jury selection was approved by this Court in *United States v. Guzman,* 468 F.2d 1245, 1247–49 (2d Cir.1972). Barclay nevertheless argues that the jury pool in his case was unrepresentative. To raise such a challenge, he was

required to follow the procedures set forth in 28 U.S.C. § 1867(c) and (d), requiring the filing of a motion with "a sworn statement of facts which, if true, would constitute a substantial failure **\*13** to comply with the provisions" of the Jury Selection and Service Act. 28 U.S.C. § 1867(d). Under § 1867(e), that procedure is the exclusive method by which a party in a civil case may challenge a jury as unrepresentative. Because Barclay failed to comply with these procedures, his challenge to the jury pool must fail. *See United States v. Jones,* 480 F.2d 1135, 1139 (2d Cir.1973).

Finally, Barclay cannot show manifest error in any of the district court's evidentiary decisions. *See Cameron,* 598 F.3d at 61. With respect to the admission of the videotape depicting the June 2001 pat frisk, and contrary to Barclay's argument on appeal, the defendants laid a proper foundation for the tape, which the court correctly found to be adequate.

The court also reasonably allowed the admission of the photographs depicting Barclay in his cell. The photos themselves refute Barclay's argument on appeal that they were "inflammatory." One photo showed Barclay sitting on his bed, and the other showed him with his hand pressed against the window pane of his cell. Nothing about these photos is unfairly prejudicial.

[9] The court's admission of the Selsky video deposition under Fed. R. Civ. P. 32 was similarly not an abuse of discretion. Rule 32(a)(4) provides for the use of deposition testimony when a witness is unavailable. And, when a witness's unavailability for trial is anticipated in advance, "depositions, including video depositions, provide a superior means" of securing the witness's testimony for trial. Fed. R. Civ. P. 43, Advisory Committee Notes. Barclay does not challenge Selsky's unavailability for trial. Instead, he argues that the court's refusal to allow him to be present for the video deposition denied him his Sixth Amendment right of confrontation, and that, since discovery had already closed, it was unfair to allow the deposition to proceed while denying his own requests to re-open discovery. However, the Sixth Amendment right of confrontation does not apply in this civil action. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."). And, as discussed above, the Selsky deposition was not conducted for discovery purposes, but rather, was convened due to Selsky's anticipated unavailability for trial.

We have considered all of Barclay's arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

**All Citations**

602 Fed.Appx. 7

## Footnotes

1  The Honorable Lyle E. Strom, of the United States District Court for the District of Nebraska, sitting by designation.

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by   Altman v. New Rochelle Public School District,
S.D.N.Y.,   January 6, 2017

222 Fed.Appx. 69
This case was not selected for
publication in West's Federal Reporter.
United States Court of Appeals,
Second Circuit.

Jesse BREWER, Plaintiff–Appellant,

v.

Andrew D. JONES, Jr., Defendant–Appellee.

No. 05–4442–pr.
|
March 28, 2007.

**Synopsis**

**Background:** Pro se plaintiff brought § 1983 action. The
United States District Court for the Southern District of New
York, P. Kevin Castel, J., entered judgment on jury verdict in
defendant's favor. Plaintiff appealed.

**Holdings:** The Court of Appeals held that:

[1] probative value of evidence of prior lawsuit filed by
plaintiff outweighed any possibility of prejudice, and

[2] risk of prejudice from admission of evidence of prior
lawsuit did not warrant limiting instruction.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (2)

[1]   **Evidence**   Constitutional law, civil rights,
and discrimination in general
Probative value of evidence of prior lawsuit
filed by civil rights plaintiff, which showed
possible cause of plaintiff's injury unrelated to
acts of defendant, outweighed any possibility

of prejudice.   42 U.S.C.A. § 1983; Fed.Rules
Evid.Rules 403, 404, 28 U.S.C.A.

12 Cases that cite this headnote

[2]   **Federal Civil Procedure**   Necessity and
subject matter
Risk of prejudice to civil rights plaintiff
arising from admission of evidence of plaintiff's
prior lawsuit, which showed possible cause of
plaintiff's injury unrelated to acts of defendant,
did not warrant limiting instruction.   42
U.S.C.A. § 1983.

12 Cases that cite this headnote

*70   Appeal from a judgment of the United States District
Court for the Southern District of New York (P. Kevin Castel,
Judge).
UPON DUE CONSIDERATION IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED that the
judgment of the district court be **AFFIRMED.**

**Attorneys and Law Firms**

Jesse Brewer, pro se, Attica, NY, for Appellant.

Daniel J. Chepaitis, Assistant Solicitor General (Michael S.
Belohlavek, on the brief), for Eliot Spitzer, Attorney General
of the State of New York, for Appellee.

PRESENT: Hon. ROBERT D. SACK, Hon. B.D. PARKER
and Hon. PETER W. HALL, Circuit Judges.

*SUMMARY ORDER*

**1   Plaintiff-appellant Jesse Brewer, *pro se,* appeals from a
judgment entered after a jury verdict in favor of defendant-
appellee Andrew Jones in this suit brought under 42 U.S.C.
§ 1983. We assume the parties' familiarity with the underlying
facts and procedural history of the case and the issues on
appeal.

[1]   Brewer argues on appeal that the district court erred
under Federal Rules of Evidence 403 and 404 in admitting
evidence of a previous lawsuit filed by Brewer. Specifically,

Brewer argues that the challenged evidence improperly suggested that Brewer had litigious tendencies. We review a district court's evidentiary rulings for an abuse of discretion.

*See* 🚩 *Arlio v. Lively,* 474 F.3d 46, 51 (2d Cir.2007). A trial judge's Rule 403 rulings are entitled to "considerable deference." 🚩 *Costantino v. Herzog,* 203 F.3d 164, 173 (2d Cir.2000). "Moreover, the improper admission of evidence is grounds for reversal only where it affects 'a substantial right' of one of the parties." 🚩 *Id.* at 174 (quoting Fed.R.Evid. 103(a)).

We see nothing in the record to suggest that the challenged evidence was admitted for an improper purpose or was unduly prejudicial. On the contrary, because the evidence was relevant to show a possible cause of Brewer's injury unrelated to the acts of the defendant, the district court **\*71** correctly concluded that the probative value of the evidence outweighed any possibility of prejudice. Furthermore, the record reflects that the defense scrupulously confined its use of the challenged evidence to the purpose for which it was admitted. Evidence admissible for one purpose is not rendered inadmissible by a separate rule which might preclude it. 🚩 *United States v. Abel,* 469 U.S. 45, 56, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984).

 **[2]**   We also reject Brewer's argument that the district court should have issued a limiting instruction. The omission of such an instruction was not an abuse of discretion because the risk of prejudice to Brewer was not sufficient to require mitigation. *Cf.* 🚩 *Outley v. City of New York,* 837 F.2d 587, 595 & n. 6 (2d Cir.1988).

We have considered all of Brewer's arguments on appeal and find them to be without merit. Accordingly, the judgment of the district court is hereby **AFFIRMED.**

### All Citations

222 Fed.Appx. 69, 2007 WL 926850

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

774 Fed.Appx. 45 (Mem)
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

C.C., an infant, BY AND THROUGH her natural
mother, Cynthia CAMARATA, Plaintiff-Appellant,

v.

POLARIS INDUSTRIES, INC., Defendant-Appellee.

18-2066-cv
|
August 7, 2019

Appeal from an order of the United States District Court for
the Northern District of New York (Suddaby, *C.J.*).

**ON CONSIDERATION WHEREOF, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the order
of said District Court be and it hereby is **AFFIRMED**.

**Attorneys and Law Firms**

Appearing for Appellant: Anthony R. Friedman, The Simon
Law Firm, P.C (Anthony G. Simon, on the brief), St. Louis,
MO

Appearing for Appellee: Bruce Jones, Faegre Baker Daniels
LLP (Nicholas J. Nelson, on the brief), Minneapolis, MN

Present: JON O. NEWMAN, ROSEMARY S. POOLER,
BARRINGTON D. PARKER, Circuit Judges.

**SUMMARY ORDER**

Plaintiff-Appellant C.C., by and through her natural mother,
Cynthia Camarata, appeals from an order entered on June 19,
2018, in the United States District Court for the Northern
District of New York (Suddaby, *C.J.*), denying C.C.'s motion
for a new trial under Federal Rule of Civil Procedure 59(a).
We assume the parties' familiarity with the underlying facts,
procedural history, and specification of issues for review.

"We review a district court's denial of a Rule 59 motion
for a new trial for abuse of discretion. It is a deferential
standard, which reflects district courts' significant—although
not limitless—latitude to exercise their inherent discretionary
authority." Ali v. Kipp, 891 F.3d 59, 64 (2d Cir. 2018)
(footnote omitted). "We view the evidence in the light most
favorable to the nonmoving party, and we will reverse a
judgment only if the district court (1) based its decision on
an error of law, (2) made a clearly erroneous factual finding,
or (3) otherwise rendered a decision that cannot be located
within the range of permissible decisions." *Id.* (footnote
omitted) (internal quotation marks omitted).

C.C. primarily argues that the district court erred in:
(1) admitting evidence of and instructing the jury on
comparative negligence, which she argues is inapposite
to a crashworthiness case; (2) admitting evidence of and
instructing the jury on intervening causation; (3) precluding
evidence of other similar incidents; and (4) precluding
evidence of wrist restraints. We address each argument in
turn.

First, C.C. argues that because her injury was caused by the
alleged defect, not **\*46** the rollover of the Ranger, it is an
"enhanced" injury under the crashworthiness doctrine; thus,
the district court abused its discretion in admitting evidence
of her negligence because comparative fault is irrelevant in
"pure" crashworthiness cases like this one. Appellant's Br. at
12-13. The crashworthiness doctrine is a theory of liability in
tort law in which "the claimant does not allege that any defect
in the [vehicle] caused the accident; rather, the allegation is
that the claimant's injuries were more severe than what they
would have been had the [vehicle] been properly designed."
Caiazzo v. Volkswagenwerk A.G., 647 F.2d 241, 243 (2d
Cir. 1981). C.C. argues this is a pure crashworthiness case
because she sustained no injuries other than the enhanced
injury caused by the defective Ranger utility vehicle.

The district court disagreed. In ruling on C.C.'s motions in
limine, the district court explained that it "cannot conclude
that the facts in this case present a pure 'crashworthiness'

case, or that the proof related to the cause of the rollover is fairly divisible from the proof related to C.C.'s injury." App'x at 32. In her motion for a new trial, C.C. argued "that, after having seen the evidence presented at trial, it should be clear that this is a crashworthiness case and that the injuries caused by the overturn (none) are plainly divisible from the injuries caused by the alleged design defects (amputation)." App'x at 323 n.2. Nevertheless, evidence at trial supported Polaris's argument that it was the B pillar, not an alleged defective part of the Ranger, that caused the injury to C.C.'s hand. The district court did not err in determining that the proof related to the cause of the rollover was not fairly divisible from the proof related to C.C.'s injury, and thus it did not err in admitting evidence of and instructing the jury on comparative negligence.

Even if we were to assume this is a crashworthiness case, moreover, the district court did not err in allowing evidence of and instructing the jury on comparative fault because the jury did not reach the point in its analysis where it was instructed to consider it. "Juries are presumed to follow their instructions." 🔖 *United States v. Snype*, 441 F.3d 119, 130 (2d Cir. 2006) (internal quotation marks and alteration omitted). With respect to Polaris's defense of comparative fault, the district court instructed the jury: "*If* you find that plaintiff has established one or more of her claims ... *then* you will proceed to consider whether plaintiff was negligent in her actions and whether her negligence was a substantial factor in causing her injuries." App'x at 1913-14 (emphasis added). The jury indicated on the verdict form that C.C. had not proven the elements of any of her claims by a preponderance of the evidence, and it left the subsequent section regarding comparative fault blank. App'x at 313-14. There is no indication that the jury failed to follow the district court's instructions regarding comparative fault. The district court did not err in admitting evidence of and instructing the jury on comparative negligence for the above reasons. Accordingly, we need not reach C.C.'s argument regarding the import of comparative fault principles in crashworthiness cases.

Second, C.C. argues that the district court should not have instructed the jury on intervening causation because Nicholas Camarata's actions were foreseeable, as Polaris had actual knowledge that minors sometimes operate Polaris vehicles. Under New York law, "[w]here a litigant's claim or defense is supported by evidence of probative value, the litigant is entitled to have the district judge inform the jury of that claim or defense. Failure to give such an instruction is error."

🔖 *Boyle v. Revici*, 961 F.2d 1060, 1062-63 (2d Cir. 1992) (citation **\*47** omitted). Here, Polaris distinguished minors' occasional use of utility vehicles from parents' permission for such use. In particular, Polaris presented evidence and argued that it was not foreseeable that a parent would allow his 11-year-old child to drive a utility vehicle unsupervised, without the knowledge of how to shift gears, with a possible loose seat belt and unfastened net, with a 12-year-old and a 5-year-old passenger, on public roads. Thus, the district court did not err in giving an intervening cause instruction to the jury.

Third, C.C. argues that the district court erred in precluding evidence of other similar incidents. "District courts have broad discretion to determine the relevancy of evidence and that determination will not be overturned unless it is arbitrary or irrational." 🔖 *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994). "It is well settled that proof of a prior accident, whether offered as proof of the existence of a dangerous condition or as proof of notice thereof, is admissible only upon a showing that the relevant conditions of the subject accident and the previous one were substantially the same." *Hyde v. County of Rensselaer*, 51 N.Y.2d 927, 929, 434 N.Y.S.2d 984, 415 N.E.2d 972 (1980). In considering substantial similarity, courts conduct a fact-specific inquiry to determine whether there are sufficiently similar circumstances. *See, e.g.*, *Lidle v. Cirrus Design Corp.*, 278 F.R.D. 325, 330 (S.D.N.Y. 2011).

Here, there is only one exhibit at issue that C.C. sought to introduce at trial: a one-page customer service report of a Polaris dealer transcribing a phone call about an accident of a different model of Polaris Ranger. The district court granted Polaris's motion in limine to exclude this document. The district court reasoned that the incident was not "substantially similar" to C.C.'s incident because the report involved a "different model [of the Ranger], different net design, [and a] drunk driver." App'x at 357. The district court did not err in its observation that these three factors were different, and its conclusion that these differences resulted in an absence of substantially similar circumstances was not arbitrary or irrational.

Finally, C.C. argues that the district court erred in not allowing her to present evidence about wrist restraints, which she argues would have undermined Polaris's argument that she intentionally, rather than reflexively, put her arm outside of the Ranger. Initially, C.C. argued that wrist restraints are "available existing feasible alternative" designs. App'x at

457. Polaris objected, when the issue arose during trial, that "there's no competitor vehicle with wrist restraints" and "it's not an alternative design." App'x at 711. C.C. then explained that "[i]t's not being offered as an alternative design," but counsel did not explain its new purpose. App'x at 712. The district court responded, "But counsel, you do agree that it's not offered by any of the manufacturers in the industry as part of standard equipment that's provided with these vehicles," counsel conceded "I have no evidence otherwise," and the district court sustained the objection and struck from the record the question regarding wrist restraints. App'x at 712.

To the extent C.C. sought to introduce evidence of wrist restraints as bearing upon voluntariness versus involuntariness of hand movement, any limited relevance was substantially outweighed by a danger of confusing the issues. Fed. R. Evid. 403. C.C. argued to the jury that extending her arm out was "not voluntary, that's reaction." App'x at 1880.

The district court noted, "as far as whether they can help [putting their arms out] or not ... that's a decision for this jury to make." App'x at 459. Wrist restraint evidence was not necessary **\*48** for the jury to understand that a person in a tipping vehicle may reflexively try to brace themselves before hitting the ground. And admission of such evidence may well have confused the issues regarding alternative design. The district court did not err in precluding evidence of wrist restraints.

We have considered the remainder of C.C.'s arguments and find them to be without merit. The order of the district court hereby is AFFIRMED.

**All Citations**

774 Fed.Appx. 45 (Mem)

---

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

C.C. by and through Camarata v. Polaris Industries, Inc., Not Reported in Fed. Supp....

2018 WL 3031848

**2018 WL 3031848**
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

C.C., an infant, BY AND THROUGH her legal guardian
and natural mother, Cynthia CAMARATA, Plaintiff,

v.

POLARIS INDUSTRIES, INC., Defendant.

6:14-CV-0975 (GTS/TWD)
|
Signed 06/19/2018

**Attorneys and Law Firms**

THE SIMON LAW FIRM, P.C., OF COUNSEL: JOHN G.
SIMON, ESQ., RYAN A. KEANE, ESQ., AMY C. GUNN,
ESQ., ANTHONY R. FRIEDMAN, ESQ., ANTHONY G.
SIMON, ESQ., 800 Market Street, Suite 1700, St. Louis, MO
63101, Counsel for Plaintiff.

GETNICK LIVINGSTON ATKINSON & PRIORE, LLP, OF
COUNSEL: THOMAS L. ATKINSON, ESQ., 258 Genesee
Street, Suite 401, Utica, NY 13502, Co-counsel for Plaintiff.

BARCLAY DAMON LLP, OF COUNSEL: ROBERT A.
BARRER, ESQ., MICHELLE K. DeKAY, ESQ., 125 East
Jefferson Street, Syracuse, NY 13202, Counsel for Defendant.

BOWMAN & BROOKE LLP, OF COUNSEL: JEFFREY C.
WARREN, ESQ., PAUL G. CEREGHINI, ESQ., 2901 North
Central Avenue, Suite 1600, Phoenix, AZ 85012, Co-counsel
for Defendant.

BOWMAN & BROOKE LLP, OF COUNSEL: JENNIFER
L. BULLARD, ESQ., 150 South Fifth Street, Suite 3000,
Minneapolis, MN 55402, Co-counsel for Defendant.

## DECISION and ORDER

HON. GLENN T. SUDDABY, Chief United States District
Judge

**\*1** Currently before the Court, in this products liability
action filed by C.C., an infant ("Plaintiff" or "C.C."), by
and through her legal guardian and natural mother, Cynthia
Camarata, against Polaris Industries, Inc. ("Defendant" or
"Polaris"), is Plaintiff's motion for a new trial pursuant to
Fed. R. Civ. P. 59(a) and Defendant's motion for a bill of

costs. (Dkt. Nos. 217, 218.) For the reasons set forth below,
Plaintiff's motion is denied and Defendant's motion is granted
in part and denied in part.

## I. RELEVANT BACKGROUND

### A. Relevant Procedural History

Because this Decision and Order is intended primarily for the
review of the parties, who are familiar with the proceedings of
this case (including the pre-trial motions and the jury trial that
took place between August 15, 2017, and August 25, 2017),
the Court will not include a summation of that history here.
Rather, the Court will proceed directly to a description of the
parties' briefing on the motions.

### B. Parties' Briefing on Plaintiff's Motion for a New
Trial

#### 1. Plaintiff's Memorandum of Law

Generally, liberally construed, Plaintiff's motion for a new
trial asserts the following four arguments: (1) the Court
erred in allowing into evidence exhibits and testimony
concerning the cause of the vehicle overturn and C.C.'s
alleged negligence in operating the vehicle because this was
more properly a "crashworthiness" case where the injuries
caused by the defect in the vehicle's design were clearly
distinguishable from the injuries caused by the crash itself,
and such evidence was therefore unfairly prejudicial and
confusing to the jury; (2) the Court erred in instructing
the jury that Defendant might not be liable if C.C.'s father's act
of allowing her to operate the vehicle was an intervening or
superceding act because, under New York law, such act does
not qualify as an intervening or superceding act due to the fact
that it was not "abnormal" or "unforeseeable"; (3) the Court
erred in disallowing evidence of similar incidents by virtue
of applying an improperly high standard for determining
what constitutes "substantial similarity," namely requiring
that the similar incidents involve the same make/model of
vehicle, the same injury, or a minor operator; and (4) the
Court erred in disallowing evidence related to wrist restraints
because "the very existence of wrist restraints, and their use
among experienced drivers of off-road vehicles, shows the
unreasonableness of Defendant's position that its warning to
drivers to just 'keep hands and arms inside the vehicle' was
adequate." (Dkt. No. 217, Attach. 1, at 5-11 [Pl.'s Mem. of
Law].) [1]

C.C. by and through Camarata v. Polaris Industries, Inc., Not Reported in Fed. Supp....

2018 WL 3031848

### 2. Defendant's Opposition Memorandum of Law

Generally, in opposition to Plaintiff's motion, Defendant asserts the following five arguments: (1) overall, Plaintiff's arguments for a new trial are merely a repetition of arguments made previously in pre-trial motions, in pre-trial conferences, or at trial, and therefore are not proper subjects for a motion for a new trial; (2) the Court properly admitted evidence concerning the facts and circumstances leading to the crash and Plaintiff's injuries because (a) this is not a "crashworthiness" case were the injuries are divisible, (b) Plaintiff failed to submit any evidence at the trial that changed the landscape since the Court's ruling on Plaintiff's motion *in limine* as to the issue of "crashworthiness," (c) allowing evidence of contributory conduct is proper pursuant to N.Y. C.P.L.R. § 1411, and (d) Plaintiff has not offered any evidence to show that presenting this evidence confused or misled the jury particularly because there were jury instructions about the purpose for which such evidence could be used; (3) the jury instruction related to intervening and superceding causes was properly submitted to the jury because C.C.'s father's conduct was abnormal, the extensive warnings on the vehicle rendered it unforeseeable to Polaris that a user would flagrantly disregard those warnings, and the jury instruction on this issue was not prejudicial to Plaintiff because it is unlikely that this is the only element of the cause of action that caused the unfavorable jury verdict; (4) the Court properly excluded evidence of alleged similar incidents because (a) these incidents were significantly different from the incident that caused Plaintiff's injuries, (b) Plaintiff never sought to admit these incidents again at trial as allowed by the Court's previous order on a motion *in limine*, (c) these incidents were inadmissible hearsay, and (d) any probative value of these incidents is outweighed by the danger of unfair prejudice; and (5) the Court properly excluded evidence related to wrist restraints because (a) such evidence is not relevant, (b) it would have imposed a serious risk of use for the improper purpose of showing an alternative design (particularly because Plaintiff had previously attempted to admit this evidence for that purpose), and (c) the potential for unfair prejudice outweighed any possible probative value. (Dkt. No. 230, at 1-19 [Def.'s Opp'n Mem. of Law].)

### C. Parties' Briefing on Defendant's Motion for a Bill of Costs

### 1. Defendant's Memorandum of Law

**\*2** Generally, in its motion, Defendant requests the costs claimed in its Bill of Costs, arguing that the items claimed are correct, were necessarily incurred in the case, and were actually and necessarily performed. (Dkt. No. 218, Attach. 2, at 1 [Bullard Aff.].) Specifically, Defendant requests the following costs: (1) a total of $420 for service of summons and subpoenas; (2) a total of $18,069.95 for printed or electronically recorded transcripts; (3) a total of $488.48 for witness fees; (4) a total of $11,230.64 for exemplification; and (5) $20 for docket fees. (Dkt. No. 220, at 1-5 [Bullard Suppl. Aff.].)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendant's motion, Plaintiff argues that Defendant's motion should be denied for the following four reasons: (1) granting Defendant's motion would be inequitable because C.C. is a minor and a full-time 9th grade student with no income, savings, or other means to satisfy Defendant's Bill of Costs, while Defendant is a multi-billion dollar corporation, and because she brought this action in good faith; (2) Defendant has not shown that the depositions for which it seeks costs were used at trial or were reasonably necessary for trial; (3) Defendant seeks a significant amount of non-taxable fees, including recorded transcripts, stenographer appearance fees, transcript shipping fees, fees for e-mailed transcripts, and copying fees not necessarily obtained for use in this case; and (4) the fact that Defendant obtained benefit from the use of a *guardian ad litem* without being assessed any of the costs associated with the *guardian ad litem* should be taken into account when determining the amount of costs to shift to Plaintiff. (Dkt. No. 232, at 1-16 [Pl.'s Opp'n Mem. of Law].)

## II. GOVERNING LEGAL STANDARDS

### A. Legal Standard Governing a Motion for a New Trial

Rule 59(a) of the Federal Rules of Civil Procedure provides, in pertinent part, that "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party —... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court...." Fed. R. Civ. P. 59(a)(1)(A). The Second Circuit has

interpreted this standard to permit the granting of new trials when "in the opinion of the district court, the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." 🚩 *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 133 (2d Cir. 1998) (internal quotation marks omitted); 🚩⚠️ *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 911 (2d Cir. 1997). Examples of such a serious error or a miscarriage of justice include when "the verdict is against the weight of the evidence," or when "for the reasons stated the trial was not fair to the moving party." 🚩 *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 691 (2d Cir. 1983). However, "the court should only grant a motion for a new trial when the jury's verdict is 'egregious.' " *DLC Mgmt. Corp.,* 163 F.3d at 134 (internal quotation marks omitted); *Dunlap-McCuller v. Riese Org.,* 980 F.2d 153, 158 (2d Cir. 1992), *cert. denied,* 510 U.S. 908, 114 S. Ct. 290 (1993). "[I]n addressing a Rule 59 motion, the court may 'independently weigh the evidence presented at trial to determine whether the jury's verdict is 'seriously erroneous' or resulted in a 'miscarriage of justice.' " *Edwards v. Schrader-Bridgeport Int'l., Inc.,* 205 F. Supp. 2d 3, 8 (N.D.N.Y. 2002) (Scullin, C.J.). "In doing so, the court 'is afforded considerable discretion.' " *Edwards,* 205 F. Supp. 2d at 8. Additionally, "[i]t is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.' " *Sequa Corp. v. GBJ Corp.,* 156 F.3d 136, 144 (2d Cir. 1998).

### B. Legal Standards Governing a Motion for a Bill of Costs

**\*3** Rule 54(d)(1) of the Federal Rules of Civil Procedure states in relevant part that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs ... should be allowed to the prevailing party." The costs a prevailing party may recover include clerk's fees, fees for transcripts necessarily obtained for use in the case, fees for printing and witnesses, fees for copies necessarily obtained for use in the case, and a $20 dollar docket fee. *See* 28 U.S.C. §§ 1920, 1923.

Where a bill of costs is challenged, "[a] district court reviews the clerk's taxation of costs by exercising its own discretion to decide the cost question itself." 🚩 *Whitfield v. Scully,* 241 F.3d 264, 269 (2d Cir. 2001) (citation and internal quotation marks omitted). In exercising this discretion however, it must be recognized that a cost "award against the losing party is

the normal rule obtaining in civil litigation, not an exception." 🚩 *Whitfield,* 241 F.3d at 270 (citation omitted). Thus, "the losing party has the burden to show that costs should not be imposed; for example, costs may be denied because of misconduct by the prevailing party, the public importance of the case, the difficulty of the issues, or the losing party's limited financial resources." *Id.* (citations omitted). "[W]hen a prevailing party is denied costs, a district court must articulate its reasons for doing so." *Id.* (citation omitted).

### III. ANALYSIS

#### A. Whether Plaintiff Should Be Granted a New Trial
After carefully considering the matter, the Court denies Plaintiff's motion for each of the reasons stated in Defendant's opposition memorandum of law. *See, supra,* Part I.B.2. of this Decision and Order. (Dkt. No. 230, at 1-19 [Def.'s Opp'n Mem. of Law].) To those reasons, the Court adds the following four points.

First, as Defendant argues, the objections that Plaintiff raises in her motion for a new trial were all previously the subject of pre-trial motions or other discussions before and during the course of the trial. The Court finds no error in its previous rulings on these issues, and certainly not an error that resulted in the jury reaching a seriously erroneous result or in a serious miscarriage of justice. Given that Plaintiff's arguments consist of disagreements with the Court's rulings and instructions rather than an egregious unfairness in the verdict, Plaintiff's objections are more appropriate for an appeal than a motion for a new trial. *See Geshwind v. Garrick,* 738 F. Supp. 792, 794 (S.D.N.Y. 1990) ("Plaintiff simply disagrees with the Court's findings rather than pointing to 'manifest errors of fact.' There is therefore no basis for granting a new trial. Rather than relitigate matters already considered by this Court, plaintiff should address his arguments to the Court of Appeals for the Second Circuit.").

Second, as to Plaintiff's argument regarding the admission of evidence related to Plaintiff's fault-causing conduct, in addition to relying on the reasons outlined in Defendant's opposition memorandum of law, the Court notes that the jury instructions adequately accounted for Plaintiff's concerns that admission of this evidence confused or misled the jury. In particular, when instructing the jury on Defendant's defense of comparative fault, the Court stated that, "*[i]f you find that the Plaintiff has established one or more of her claims ... then you will proceed to consider whether Plaintiff was*

negligent in her actions and whether her negligence was a substantial factor in causing her injuries." (Dkt. No. 208, at 21 [Jury Instructions] [emphasis added].) This instruction indicated to the jury that it should consider whether Plaintiff was negligent (and whether that negligence was a substantial factor in causing her injuries) only after it had considered whether she established one or more of her claims; the instruction therefore limited the risk that the jury would consider the evidence of Plaintiff's negligent conduct in relation to proving her claims. A jury is presumed to follow the instructions given by the Court and Plaintiff has not shown any evidence to suggest that the jury failed to properly follow these instructions when considering Plaintiff's claims.

*See* ⚑ *United States v. Becker*, 502 F.3d 122, 130 (2d Cir. 2007) ("Generally, we presume that juries follow limiting instructions."); ⚑ *Britt v. Garcia*, 457 F.3d 264, 272 (2d Cir. 2006) ("It is a fundamental proposition that [a] jury is presumed to follow the instructions of the trial judge."); *LNC Invs., Inc. v. Nat'l Westminster Bank, N.J.*, 308 F.3d 169, 117 n.10 (2d Cir. 2002) ("The district court's instructions were quite clear on this point and we must presume the jury to follow its instructions."). It therefore must be presumed that the jury would have considered the evidence of Plaintiff's negligent conduct only after determining whether Plaintiff had meet the elements of one or more of her claims.[2] Given this instruction, the relevance of Plaintiff's negligent conduct to Defendant's defense, and the absence of any evidence indicating that Plaintiff was unfairly prejudiced, the Court declines to grant a new trial based on the admission of evidence related to C.C.'s negligent conduct.

**\*4** Third, the Court finds that instructing the jury as to an intervening and superceding cause based on the actions of C.C.'s father was not error meriting a new trial. Plaintiff's objection to the inclusion of this instruction is primarily an argument that C.C.'s father's actions were not extraordinary or unforeseeable. (Dkt. No. 217, Attach. 1, at 7-8 [Pl.'s Mem. of Law].) The evidence, discussed in detail in Defendant's opposition memorandum of law, sufficiently indicates that a reasonable fact finder could conclude that the conduct of C.C.'s father in allowing his eleven-year-old daughter to drive a vehicle intended for adults outside of his supervision with two other young children as passengers, among other things, was an abnormal or unforeseeable action that could be found to be a superceding or intervening cause. (Dkt. No. 230, at 10-13 [Def.'s Opp'n Mem. of Law].) The Court therefore cannot agree that the inclusion of the jury instruction on an

intervening and superceding cause was erroneous or resulted in a miscarriage of justice.

Fourth, and last, Plaintiff's argument that the Court applied an improperly heightened standard for what constitutes a "substantially similar" incident is not persuasive. Although evidence of similar incidents may be admitted to prove " 'negligence, a design defect, notice of a defect, or causation,' " "the proponent must establish ... relevance by showing that they occurred under the same or substantially similar circumstances as the accident at issue.' " *In re Gen. Motors LLC Ignition Switch Litig.*, 14-CV-2543, 2016 WL 796846, at \*2 (S.D.N.Y. Feb. 25, 2016). Evidence offered for the purpose of showing the existence of a dangerous condition requires " 'a high degree of similarity because it weighs directly on the ultimate issue to be decided by the jury.' " *In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 796846, at \*2. Evidence offered for the purpose of proving causation is often considered in light of multiple factors, including whether (a) "the products are similar," (b) "the alleged defect is similar," (c) "causation related to the defect in other incidents," and (d) "exclusion of all reasonable secondary explanations for the cause of the other incidents." *Id.* (quoting *Watson v. Ford Motor Co.*, 389 S. Ct. 434, 453 [2010] ). Evidence offered to show notice is subject to a more relaxed standard. *In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 796846, at \*2. Notably, "a 'district court is owed considerable deference in its determination of substantial similarity.' " *Id.* Given the above standards and a consideration of the various purposes for which Plaintiff intended to offer such similar incidents, the Court declines to find error in its previous rulings on this evidence for the reasons in Defendant's opposition memorandum of law and previous pre-trial memoranda (to the extent they are consistent with the Court's previous rulings on these evidentiary issues). (Dkt. No. 132, at 17-25; Dkt. No. 157, at 2-14; Dkt. No. 230, at 14-17 [Def.'s Opp'n Mem. of Law].)

For all of these reasons, Plaintiff's motion is denied.

### B. Whether the Court Should Grant Defendant's Motion for a Bill of Costs

After carefully considering the matter, the Court finds it appropriate to grant Defendant's motion in part and deny its motion in part for the following reasons.

The Court first addresses Plaintiff's argument that granting Defendant's Bill of Costs would be inequitable. Plaintiff argues that Defendant's Bill of Costs should be denied based

on a consideration of her age, disabling injury and lack of employment, the financial circumstances of her mother, the good faith nature of her actions in bringing her claims, and the fact that Defendant was not responsible for paying any of the fees for her *guardian ad litem*. (Dkt. No. 232, at 2-4, 16 [Pl.'s Opp'n Mem. of Law].) As Plaintiff notes, the Second Circuit has recognized that a district court is permitted to exercise "equitable discretion in awarding or denying costs pursuant to Fed. R. Civ. P. 54." *Moore v. Cnty of Delaware*, 586 F.3d 219, 221 (2d Cir. 2009). In exercising this discretion, courts consider factors including "misconduct by the prevailing party, the public importance of the case, the difficulty of the issues, ... the losing party's limited financial resources," and whether the claims were brought in good faith. *Williams v. Arctic Cat, Inc.*, 11-CV-0445, 2014 WL 4105286, at *2 (N.D.N.Y. Aug. 20, 2014) (McAvoy, J.). "The Court is permitted to 'deny costs on account of a losing party's indigency, but indigency *per se* does not automatically preclude an award of costs.' " *Williams*, 2014 WL 4105286, at *2 (quoting *Whitfield v. Scully*, 241 F.3d 264, 269 [2d Cir. 2001] ).

**\*5** The Court finds that the equitable considerations in this case merit reducing the amount of costs that Defendant is entitled to recover. Plaintiff is a minor child who, at the time the motions at issue were filed, was a student in the ninth grade who was unemployed (and presumably not even legally employable except in a very limited capacity) and who is learning to function without use of her left hand, which was amputated as a result of the incident at issue in this case. (Dkt. No. 232, Attach. 1, at ¶¶ 5-7 [Camarata Aff.].) The only income that Plaintiff allegedly receives is $217 per month as a result of her father's disability benefits and she does not have a savings or retirement account or own any property or equity in property. (*Id.* at ¶ 7-8.) Plaintiff's mother and legal guardian states that her own annual income from full-time employment as a cashier at a grocery store is "less than what Polaris is requesting in its Bill of Costs." (*Id.* at ¶ 4.) Although this statement is hardly specific, it is sufficient, along with Plaintiff's own age and resources and the lack of any indication that Plaintiff's lawsuit was not brought in good faith, to support a finding that requiring Plaintiff to pay the full cost of $30,229.07 to Defendant would offend common notions of equity.

With these equitable considerations in mind, the Court turns to Plaintiff's specific objections to Defendant's Bill of Costs. First, Plaintiff argues that Defendant is not entitled to

recover costs for printed or electronically recorded deposition transcripts because Defendant has not shown that these depositions were entered into evidence or otherwise used at trial; because they were not used at trial, Plaintiff reasons, they were not "necessarily obtained for use in the case." (Dkt. No. 232, at 5 [Pl.'s Opp'n Mem. of Law].) "Generally speaking, transcripts are necessarily obtained for use in the case if used or received in evidence at trial, or submitted for consideration on a dispositive motion." *New Skete Farms, Inc. v. Murray*, 06-CV-0486, 2009 WL 10680320, at *3 (N.D.N.Y. Apr. 3, 2009) (Sharpe, J.) (citing cases). "However, even where the transcripts are not so used, transcript costs are properly awarded if the court is convinced that they were otherwise necessary in the case." *New Skete Farms, Inc.*, 2009 WL 10680320, at *3 (citing *In re Air Crash Disaster at John F. Kennedy Int'l Airport*, 687 F.2d 626, 631 [2d Cir. 1982] ). Here, at least eight deposition transcripts were used at trial (e.g., the transcripts of the depositions of Susanna Rose, Brent Erspamer, C.C., Stephen Batzer, Jeffrey Eyres, M.H., Nicholas Camarata, and Michael Muise). Moreover, even if these depositions were not used or received into evidence at trial, approximately two-thirds of the depositions were submitted (at least in part) for consideration with the motions for summary judgment that occurred during the course of this litigation.[3] Consequently, Defendant would ordinarily be permitted to recover costs for the original and one copy of those transcripts. *Cutie v. Sheehan*, 11-CV-0066, 2016 WL 3661395, at *5 (N.D.N.Y. July 5, 2016) (D'Agostino, J.). The only deposition transcripts that the Court cannot readily identify as having been used are the transcripts of the depositions of Joseph Camarata, Raymond Camarata, Brian Coleman, Jennifer Draper, and Christopher Moser. From the invoices adduced by Defendant, the Court estimates the cost of these five depositions as approximately $960.

Also as to these transcripts, Plaintiff argues that fees for delivery, postage and handling, and stenographer fees are not taxable or recoverable costs. (Dkt. No. 232, at 6 [Pl.'s Opp'n Mem. of Law].) Delivery charges and postage and handling are not considered taxable costs under 28 U.S.C. § 1920 in the absence of a specific fee-shifting statute. *Cutie*, 2016 WL 3661395, at *5; *Glory Days, Inc. v. Glory Days, LLC*, 06-CV-0036, 2007 WL 1160406, at *9 (N.D.N.Y. Apr. 17, 2007) (Peebles, M.J., Mordue, C.J.); *Disney Enters. Inc. v. Merchant*, 05-CV-1489, 2007 WL 1101110, at *9 (N.D.N.Y. Apr. 10, 2007) (Mordue, C.J.). Defendant therefore cannot recover such expenses. From the invoices adduced by Defendant, the Court estimates those non-recoverable expenses as amounting to approximately $130.00. However,

stenographer fees are generally recoverable. *See* Hines v. City of Albany, 862 F.3d 215, 219 n.2 (2d Cir. 2017) (noting that 28 U.S.C. § 1920 includes court reporter charges as part of taxable costs); *Document Sec. Servs., Inc. v. Coupons.com, Inc.*, 11-CV-6528, 2015 WL 1189551, at *4 (W.D.N.Y. Mar. 16, 2015) (allowing recovery of court reporter attendance fees related to depositions taken for the case, noting that "the 'Guidelines for Bills of Costs" indicate that 'court reporter fees for attendance' are generally taxed as costs"); *Manson v. City of Chicago*, 825 F. Supp. 2d 952, 956 (N.D. Ill. 2011) (noting that "the Seventh Circuit has consistently held that [deposition attendance fees charged by the court reporter] may be taxed as costs"). To the extent that some of these fees were associated with depositions that the Court finds were not used (and therefore not recoverable), those fees (totaling approximately $205) will be disallowed.

**\*6** Second, Plaintiff argues that Defendant's requested fees for exemplification and copying should be reduced because such costs were beyond what was necessarily obtained for use in the case. (Dkt. No. 232, at 15 [Pl.'s Opp'n Mem. of Law].) Section 1920 of Title 28 of the United States Code permits recovery of the cost of making copies that are necessarily obtained for use in the case, including where the underlying document was not admitted at trial. 28 U.S.C. § 1920(4); U.S. for Use and Benefit of Evergreen Pipeline Constr. Co., Inc. v. Merritt Meridian Constr. Corp., 95 F.3d 153, 173 (2d Cir. 1996). However, "the burden of establishing the reasonableness of each charge rests with the prevailing party." *Cutie*, 2016 WL 3661395, at *5. In this case, Defendant submitted 62 pages of entries showing copying and printing

costs, including the number of pages, whether it was a copying or printing task, whether it was in color or black-and-white, and the cost. (Dkt. No. 220, Attach. 1, at 38-100.) Because Defendant has shown that these costs were incurred for the purpose of preparing two sets of trial binders required by the Court, the Court rejects Plaintiff's argument.

Considering the Plaintiff's specific objections and the equitable considerations discussed above, the Court finds that the costs sought in Defendant's Bill of Costs should be reduced to $14,467.04. The Court arrives at this amount by starting with Defendant's requested amount of $30,229.07, subtracting from it $1,295 (i.e., $1,165 in "unused" deposition transcripts [including associated stenographer fees] plus $130 in non-recoverable expenses), and then dividing the remaining amount of $28,934.07 in half so that each party shares equally in the burden.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for a new trial pursuant to Fed. R. Civ. P. 59 (Dkt. No. 217) is **DENIED**; and it is further;

**ORDERED** that Defendant's motion for a Bill of Costs pursuant to Fed. R. Civ. P. 54 (Dkt. No. 218) is **GRANTED** in part and **DENIED** in part. The amount of costs owed to Defendant by Plaintiff is reduced from $30,229.07 to $14,467.04.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3031848

---

### Footnotes

1    Page citations refer to the page numbers used on CM/ECF rather than the actual page numbers contained in the parties' respective motion papers.

2    Of note, the jury found that Plaintiff had not proven, by a preponderance of the evidence, all of the elements of any of her claims. (Dkt. No. 209, at 1 [Verdict Form].) There is therefore no indication that the jury ever needed to consider Defendant's defense of comparative negligence or the evidence of Plaintiff's negligent conduct.

3    *See, e.g.*, Dkt. No. 74, Attach. 1, at 7-22 [attaching transcripts of depositions of C.C. and Nicholas Camarata]; Dkt. No. 75, Attach. 1, at 1-79 [attaching transcripts of deposition of Walter Short]; Dkt. No. 82, Attach. 4, 5, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 19, 20 [attaching transcripts of depositions of Nicholas Camarata,

C.C., M.H., Graeme Fowler, William Newberry, Kevin Breen, Kenneth d'Entremont, Robert Nibilini, Brent Erspamer, Jeffrey Eyres, Robert Cunitz, Nathan Dorris, and Stephen Batzer].

---

**End of Document**                                       © 2023 Thomson Reuters. No claim to original U.S. Government Works.

844 Fed.Appx. 433
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Otis A. DANIEL, Plaintiff-Appellant,
v.
T&M PROTECTION RESOURCES,
LLC, Defendant-Appellee,
Edward J. Minkoff Equities, Inc.,
Universal Protection Services, Defendants.

20-2283
|
February 23, 2021

**Synopsis**
**Background:** Former employee brought action against
employer under Title VII alleging hostile work environment.
After entry of judgment in employer's favor, the United States
District Court for the Southern District of New York, Paul
A. Engelmayer, J., denied employee's motions for relief from
judgment, and employee appealed.

**Holdings:** The Court of Appeals held that:

[1] employee's motions for relief from judgment were
untimely;

[2] employee was not entitled to relief from judgment based
on alleged misconduct by employer and its attorneys; and

[3] employee's dissatisfaction with performance of his pro
bono attorneys did not warrant relief from judgment.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Relief from
Order or Judgment.

West Headnotes (3)

[1] **Federal Civil Procedure** ⚷ Time for
instituting proceedings

Former employee's motions for relief from
judgment in employer's favor in employee's
employment discrimination action were
untimely, despite employee's claim that his pro
bono attorneys ignored his evidence and failed to
adequately represent him; employee was aware
of attorneys' purported misconduct, but waited
nearly two years to file motions, by which time
Court of Appeals had affirmed judgment and
denied motions for reconsideration and to recall
mandate, and Supreme Court had denied writ of
certiorari. Fed. R. Civ. P. 60(b).

2 Cases that cite this headnote

[2] **Federal Civil Procedure** ⚷ Fraud;
misconduct

Former employee was not entitled to relief
from judgment in employer's favor in his
employment discrimination action against it,
despite employee's contention that employer
and its attorneys had committed fraud and
misconduct by offering perjured testimony,
making false opening statements during trial, and
falsely portraying him as emotionally unstable;
employee provided no evidence that employer's
witnesses or attorneys perjured themselves, and
employer's opening statements were based on
testimony that was later offered at trial. Fed.
R. Civ. P. 60(b).

[3] **Federal Civil Procedure** ⚷ Grounds and
Factors

Former employee's dissatisfaction with
performance of his pro bono attorneys did not

warrant relief from judgment in his employment discrimination action against employer, absent showing that attorneys abandoned case and prevented him from being heard. 🔖 Fed. R. Civ. P. 60(b).

**\*434** Appeal from two orders of the United States District Court for the Southern District of New York (Engelmayer, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the orders of the district court are **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Otis A. Daniel, pro se, New York, NY.

FOR DEFENDANT-APPELLEE: Leonard Weintraub, Paduano & Weintraub LLP, New York, NY.

PRESENT: SUSAN L. CARNEY, WILLIAM J. NARDINI, Circuit Judges, LEWIS J. LIMAN, District Judge. *

## SUMMARY ORDER

Appellant Otis Daniel, proceeding pro se, sued his former employer, T&M Protections Resources, LLC ("T&M") under Title VII for hostile work environment. After a bench trial, the district court found for T&M in July 2018 and entered judgment. We affirmed the judgment in June 2019. *Daniel v. T&M Protection Res. LLC*, 771 Fed. App'x 123 (2d Cir. 2019) (summary order). In June and July 2020, Daniel filed motions pursuant to 🔖 Federal Rule of Civil Procedure 60(b) seeking relief from the July 2018 judgment. [1] The district court denied the 🔖 Rule 60(b) motions as untimely and without merit. We assume **\*435** the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal, and refer to them only as needed to explain our decision to affirm.

We review a district court's decision granting or denying a 🔖 Rule 60(b) motion for abuse of discretion. *Boule v. Hutton*, 328 F.3d 84, 95 (2d Cir. 2003). "A district court abuses its discretion if it bases 'its ruling on an erroneous

view of the law or on a clearly erroneous assessment of the evidence.' " *Ins. Co. of N. Am. v. Pub. Serv. Mut. Ins. Co.*, 609 F.3d 122, 127 (2d Cir. 2010) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 162 F.3d 724, 729 (2d Cir. 1998)).

The district court did not abuse its discretion by denying Daniel's motions. 🔖 Rule 60(b) sets out six different grounds for relief, including "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party" and "any other reason that justifies relief." 🔖 Fed. R. Civ. P. 60(b)(3), (6). A litigant must file a 🔖 Rule 60(b) motion premised on fraud or misconduct of the opposing party within a year of entry of the judgment or order. 🔖 Fed. R. Civ. P. 60(c)(1). Neither of Daniel's 2020 motions was filed by the one-year deadline.

To the extent Daniel premised his motions on other grounds, the motions were also untimely. A 🔖 Rule 60(b) motion premised on the catch-all provision of subsection (b)(6) must be filed within a "reasonable time" after the entry of the judgment or order. 🔖 Fed. R. Civ. P. 60(c)(1). "What qualifies as a reasonable time, however, will ordinarily depend largely on the facts of a given case, including the length and circumstances of the delay and the possibility of prejudice to the opposing party." *Montco, Inc. v. Barr* (*In re Emergency Beacon Corp.*), 666 F.2d 754, 760 (2d Cir. 1981) (citation omitted). We have concluded that delays of over a year are untimely absent "mitigating circumstances." *Kellogg v. Strack*, 269 F.3d 100, 104 (2d Cir. 2001) (per curiam) (motion untimely when submitted 26 months after entry of final judgment); *see also* *Truskoski v. ESPN, Inc.*, 60 F.3d 74, 77 (2d Cir. 1995) (motion untimely when filed over one year after judgment entered); *cf.* *In re Emergency Beacon Corp.*, 666 F.2d at 760 (motion not untimely despite a 26-month period between order and motion in view of reasonable explanation for delay and lack of prejudice to opposing party).

**[1]** Daniel's June and July 2020 motions were not filed within a reasonable time of the July 2018 entry of judgment. He filed them respectively 23 and 24 months after judgment was entered. Under our precedent, this delay is presumptively unreasonable, and there were no mitigating circumstances to justify Daniel's untimeliness. Daniel also could have moved

for relief at an earlier time. For example, he cites his pro bono attorneys' misconduct as a reason for that the district court should have granted reconsideration, but he was aware of the alleged misconduct in 2018, when the related issues first occurred, and so it does not excuse Daniel's delay. Further, T&M would have been prejudiced by the district court's reconsideration at this late stage. When Daniel filed his motions in 2020, we had already affirmed the judgment and denied motions for reconsideration and to recall the mandate. The Supreme Court had also denied a writ of certiorari. If the district court granted reconsideration, it would have undermined those decisions.

 **[2]**  Even if Daniel's delay could have been excused, his 2020 motions lacked merit. Daniel argued that T&M and its attorneys committed fraud and misconduct by offering perjured testimony, making false opening statements during trial, and by falsely portraying him as emotionally unstable. But in his district court submissions **\*436** he did not offer any evidence that T&M's witnesses or attorneys perjured themselves. Daniel asserts that various T&M witnesses lied. But the fact that their testimony contradicted Daniel's personal account is not sufficient to show perjury. *See United States v. Sanchez, 969 F.2d 1409, 1415 (2d Cir. 1992)* ("Differences in recollection alone do not add up to perjury." (citation omitted)). Further, T&M's opening statements were based on testimony that was later offered at trial. Finally, Daniel cannot show any fraud or misconduct by T&M based on the fact it defended itself in the district court proceedings. T&M had the right to defend itself against Daniel's allegations.

 **[3]**  Daniel argues that his pro bono attorneys ignored his evidence and failed to adequately represent him. But general dissatisfaction with one's counsel is not sufficient to warrant Rule 60(b) relief. In a civil proceeding, a litigant does not have a right to counsel. *See Turner v. Rogers, 564*

U.S. 431, 441–43, 131 S.Ct. 2507, 180 L.Ed.2d 452 (2011) (holding that "the Sixth Amendment does not govern civil cases" and individuals will only have a right to counsel in civil cases when facing the possibility of incarceration). To show entitlement to Rule 60(b) relief based on the inadequate performance of a litigant's counsel, the litigant "must show that his lawyer abandoned the case and prevented [him] from being heard, either through counsel or *pro se*." *Harris v. United States, 367 F.3d 74, 77 (2d Cir. 2004)* (discussing Rule 60(b)(6) relief being sought by habeas petitioner). Daniel did not show this level of abandonment. By Daniel's own admission, his attorneys worked diligently on the case and met with him regularly to prepare discovery and for trial. Although Daniel may be dissatisfied with how his case was handled and with the judgment that was obtained, he has not shown that his lawyers physically or constructively abandoned him. *Cf. id. at 81.*

Insofar as Daniel appears to be relitigating his earlier appeal of the judgment, we need not consider those arguments. Daniel has not presented any compelling reason to revisit our prior decision. *See Johnson v. Holder, 564 F.3d 95, 99 (2d Cir. 2009)* ("[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." (internal quotation marks and citation omitted)).

We have considered all of Daniel's remaining arguments and find in them no basis for reversal. Accordingly, we **AFFIRM** the judgment of the district court.

### All Citations

844 Fed.Appx. 433

### Footnotes

\*      Judge Lewis J. Liman, of the United States District Court for the Southern District of New York, sitting by designation.

1      The district court construed Daniel's motion for an extension of time to file a notice of appeal as a timely notice
       of appeal of various motions dating back to 2018. So construed, Daniel's appeal is timely only as to the district
       court's June 22, 2020, and July 9, 2020 orders, however. Thus, we consider only those orders in this appeal.

**End of Document**                                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Dedjoe v. Esper, Not Reported in Fed. Supp. (2019)

2019 WL 697821, 2019 Fair Empl.Prac.Cas. (BNA) 54,950

2019 WL 697821
United States District Court, N.D. New York.

Benjamin DEDJOE, Plaintiff,

v.

Dr. Mark T. ESPER, in His Official Capacity
as the Secretary of the Army, [1] Defendant.

1:15-CV-1170
|
Signed 02/19/2019

**Attorneys and Law Firms**

D. Jen Brown, The Law Office of D. Jen Brown, PLLC,
Poughkeepsie, NY, for Plaintiff.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

 **\*1** Following a jury verdict in favor of Defendant
Department of the Army on Plaintiff Benjamin Dedjoe's sole
remaining claim, Plaintiff moves for judgment as a matter of
law or, in the alternative, a new trial. Dkt. Nos. 104 & 117.
Also, Defendant moves to confirm its Bill of Costs (Dkt. No.
105), and to redact portions of the trial transcript (Dkt. No.
114). The Court addresses these motions *seriatim*.

**II. BACKGROUND**

The Court presumes familiarity with the procedural and
factual background of this case, and recites portions of this
background only where necessary to decide the pending
motions.

**III. DISCUSSION**

**a. Plaintiff's Motion for Judgment as a Matter of Law
or New Trial**

**1. Rule 50 Standard of Review**

Plaintiff moves for a judgment as a matter of law pursuant
to Fed. R. Civ. P. 50(b). In reviewing the motion, "[t]he
court must consider the evidence in the light most favorable

to the non-movant and 'give that party the benefit of all
reasonable inferences that the jury might have drawn in his
favor from the evidence" bearing in mind that a jury is free
to believe or disbelieve any part of a witness' testimony.

*Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012)

(quoting *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir.
2007) ). The Court may "disregard all evidence favorable to
the moving party that the jury is not required to believe,"

*Zellner*, 494 F.3d at 371 (quoting *Reeves v. Sanderson
Plumbing Prods., Inc.*, 530 U.S. 133, 135, 120 S.Ct. 2097,
147 L.Ed.2d 105 (2000) ), and is required "to give [the non-
moving] party the benefit of all reasonable inferences that the
jury might have drawn in his favor from the evidence. The
court cannot assess the weight of conflicting evidence, pass
on the credibility of the witnesses, or substitute its judgment

for that of the jury." *Tolbert v. Queens College*, 242 F.3d
58, 70 (2d Cir. 2001) (citation omitted).

The moving party thus bears a heavy burden, especially
where, as here, "the jury has deliberated in the case
and actually returned its verdict in favor of the non-

movant." *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d
Cir. 2011)(internal quotation marks omitted). "A judgment
notwithstanding the verdict may only be granted if there exists
such a complete absence of evidence supporting the verdict
that the jury's findings could only have been the result of sheer
surmise and conjecture, or the evidence in favor of the movant
is so overwhelming that reasonable and fair minded persons
could not arrive at a verdict against it." *Wiercinski v. Mangia
57, Inc.*, 787 F.3d 106, 112 (2d Cir. 2015) (internal quotation
marks omitted).

**2. Rule 59 Standard of Review**

In the alternative, Plaintiff moves for a new trial pursuant
to Fed. R. Civ. P. 59. The Court may "grant a new trial on
all or some of the issues ... for any reason for which a new
trial has heretofore been granted in an action at law in federal
court[.]" Fed. R. Civ. P. 59(a)(1)(A). "The general grounds for
a new trial are that (1) the verdict is against the clear weight
of the evidence; (2) the trial court was not fair; (3) substantial
errors occurred in the admission or rejection of evidence or
the giving or refusal of instructions to the jury; or (4) damages
are excessive." *Lawson v. Cty. of Suffolk*, 920 F.Supp.2d 332,
339 (E.D.N.Y. 2013)(citing 12 *Moore's Federal Practice*, §
59.13[1] at 59–43 (3d Ed. 2005) ).

Dedjoe v. Esper, Not Reported in Fed. Supp. (2019)

2019 WL 697821, 2019 Fair Empl.Prac.Cas. (BNA) 54,950

**\*2** "A district court should grant a new trial motion if it 'is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.' "

*United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998) (quoting *Smith v. Lighting Bolt Productions, Inc.*, 835 F.2d 966, 970 (2d Cir. 1987) ); *see Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417-18 (2d Cir. 2012) (" '[A] decision is against the weight of the evidence ... if and only if the verdict is (1) seriously erroneous or (2) a miscarriage of justice.' ")(quoting *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002) ). Such a motion may be granted "even if there is substantial evidence to support the jury's verdict." *Landau*, 155 F.3d at 104. Though a trial judge "is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner," *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998), a jury's verdict should "rarely be disturbed." *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002) (*per curiam* ); *see also Carroll v. Cty. of Monroe*, 712 F.3d 649, 653 (2d Cir. 2013); *Raedle*, 670 F.3d at 417–18. Evaluations of the evidence should be made with a "high degree of deference ... to the jury's evaluation of witness credibility ...," *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97–98 (2d Cir. 2014) (internal quotation marks and citation omitted), and "a trial judge's disagreement with the jury's verdict is not a sufficient reason to grant a new trial.' " *Lawson*, 920 F.Supp.2d at 344 (internal quotation marks and citation omitted).

### 3. Analysis - Sufficiency of the Trial Evidence

The only claim before the jury was whether Plaintiff was ordered to leave the U.S. Army Watervliet Arsenal on November 7, 2012 in retaliation for his prior informal complaints of race-based discrimination. The jury was instructed that to prevail on this claim, Plaintiff must prove by a preponderance of the evidence that: (1) he engaged in "protected activity" under Title VII by making prior informal complaints of race-based discrimination; (2) Defendant was aware of this protected activity; (3) Plaintiff was then subjected to a material adverse action, and (4) Plaintiff's protected activity was the determinative factor in the material adverse action. *See* Trial Trans. ("TT") at 714. The dispute on the instant motion concerns whether Plaintiff satisfied the fourth element. On this element, the Court instructed the jury:

> Plaintiff must prove that the adverse action would not have been taken, or would have been substantially less adverse, were it not for Plaintiff's protected activity. This does not require proof that retaliation was the only cause of the adverse action, but Plaintiff must prove that the adverse action would not have occurred in the absence of a retaliatory motive. Put another way, Plaintiff must prove that but for his prior complaints, he would not have been subjected to the alleged adverse action on November 7, 2012.

*Id.* at 715.

The Court also instructed the jury that "[a]n employer may take adverse decisions against an employee for any reason, good or bad, as long as it is not retaliatory," *id.* at 716, and that whether Arsenal security officers' interactions with Plaintiff were motivated by racial animus was not an issue before the jury. *Id.* at 718. Rather, the Court instructed the jury: "The issues for you to decide are whether Arsenal security officers retaliated against Plaintiff for having made complaints of unlawful employment practices when they instructed him to leave the Arsenal property on November 7, 2012, and whether the Defendant is liable for such conduct." *Id.*

Here, when viewing the trial evidence in the light most favorable to Defendant, it cannot be said that there was such a complete absence of evidence that the jury's verdict could only have been the result of sheer surmise and conjecture. The jury heard testimony that at midday on November 7, 2012, Arsenal Security Officer Brad Frasco was dispatched to the Arsenal Visitor Center to provide assistance to other security officers dealing with a dispute with Plaintiff. *Id.* at 544-45, 636-38. Before entering, Frasco heard loud yelling coming from inside, *id.* at 546, 553, and once inside the Visitor Center saw that Plaintiff was very upset, was "pounding" on the counter, and yelling that the two security officers behind the counter were "messing" with him. *Id.* at 555, 559. Frasco learned that Plaintiff was upset because he was told he had to provide his full Social Security number on an Arsenal parking form. *Id.* at 557. Frasco told Plaintiff to go about his business filling out the parking form, *id.* at 558, 559, but

Dedjoe v. Esper, Not Reported in Fed. Supp. (2019)

2019 WL 697821, 2019 Fair Empl.Prac.Cas. (BNA) 54,950

Plaintiff accused Frasco and members of the security force of being "gangsters" and singling Plaintiff out for harassment. *Id.* at 559. Plaintiff said he was "a hot commodity," that the federal government needed him more than he needed it, and that he could work anywhere. *Id.* Frasco told Plaintiff "that's fine," but if he planned on staying he needed to fill out the paperwork properly and then go about his day. *Id.* Plaintiff responded by asking Frasco if he wanted to assault him. *Id.* Plaintiff then stated that the security officers were harassing him because he is black. *Id.* Frasco believed Plaintiff was trying to incite an altercation and bait the officers into acting unprofessionally. *Id.* at 561. He responded by saying to Plaintiff: "[N]ow it's time for you to go, you're not gonna sit here and call us racists," telling Plaintiff that he would have to leave the Arsenal for the rest of the day. *Id.* at 560. Plaintiff said he was not going anywhere. *Id.* at 561. Frasco yelled at Plaintiff to "get the f--k outta the Visitor Center," *id.* at 561, at which point Plaintiff walked into the parking lot followed by Frasco. *Id.* at 562.

**\*3** Frasco called his supervisor, Captain Osgood, to effectuate removing Plaintiff from the Arsenal. *Id.* at 562-63. When Osgood arrived at the Visitor Center, Frasco and Dedjoe were standing in the parking lot. *Id.* at 638. Frasco informed Osgood that Dedjoe became belligerent and aggressive inside the Visitor Center, accused the officers of singling him out because of his race, called the officers racists and gangsters, and was yelling and banging on the counter. *Id.* at 565-66, 641. Frasco advised that he told Dedjoe several times to leave as a result of his actions, but Dedjoe refused to leave. *Id.* at 641. Osgood asked Dedjoe if he was told to leave, which he conceded had occurred. *Id.* at 642. Osgood then told Plaintiff the he needed to follow the officer's instructions and leave, and that he could either get in his car and leave voluntarily, or he would be escorted off post in handcuffs and his car would be towed. *Id.; see id.* at 660. Mark Boomhower, a contractor who was signing into the Arsenal at the Visitor Center during this incident, observed Dedjoe in the parking lot loudly yelling and arguing with security officers about the documents he needed to enter the Arsenal, *id.*, at 598, 602, and also observed that the security officers remained calm, patient and professional. *Id.* at 603.

Frasco testified that it was "absolutely" upsetting that Dedjoe accused him of singling him out because of his race and called him a racist, *id.* at 574, but that was not why he told Dedjoe to leave. *Id.* at 575. Rather, Frasco testified that he told Plaintiff to leave the Arsenal because it was Frasco's job "to protect property, personnel and maintain order," and Dedjoe was

"acting very disruptively, very aggressively, he was making the other visitors in the Visitor Center uncomfortable." *Id.* at 573, *see id.* at 591. Frasco testified that another reason he told Dedjoe to leave was "[b]ecause he refused to comply with filling out the proper form to get his registration sticker." *Id.* at 575. Frasco also testified that knowledge of Plaintiff's prior informal race-based complaints did not enter his mind when he made the decision to tell Plaintiff to leave the Arsenal. *Id.* at 590.

Osgood testified that he instructed Dedjoe to leave the Arsenal to back up his officer and ensure compliance with Frasco's directive. *See id.* at 666-67. Osgood also indicted that, although Dedjoe was calm by the time Osgood arrived, he believed that if he excused Dedjoe from compliance with Frasco's order simply because he had calmed down, that would have stripped Frasco and other officers of their authority. *See id.* at 669.

Under these circumstances, there was more than sufficient evidence to permit a reasonable juror to find that Plaintiff failed to satisfy his ultimate burden - that is, to prove that Frasco and Osgood's "desire to retaliate was the but-for cause of the challenged employment action." 🔖 *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013). While evidence exists that Frasco became upset, raised his voice, and was aware of Plaintiff's prior protected conduct, the jury was entitled to credit Frasco's testimony that knowledge of Plaintiff's prior protected activity did not enter his mind when he instructed Plaintiff to leave the Arsenal. The jury was also entitled to credit Osgood's non-retaliatory reasons for supporting Frasco's directive.

It also cannot be concluded that the evidence in Plaintiff's favor was so overwhelming that reasonable and fair minded persons could not have arrived at a verdict against him. Plaintiff offers his own interpretations of the conclusions that should have been drawn from the evidence, but the evidence he points to does not overwhelmingly support his ultimate burden of establishing that but for his prior protected activity he would not have been expelled on November 7. "The Court recognizes the depth of [Plaintiff's] belief that he was the victim of [unlawful retaliation] but his sincerity does not affect the lack of evidence." *Bailey v. NYC Dep't of Transportation*, No. 93 CIV. 1121 (LBS), 1998 WL 472010, at \*1 (S.D.N.Y. Aug. 3, 1998), *aff'd sub nom. Bailey v. New York City Dep't of Transp.*, 173 F.3d 843 (2d Cir. 1999). Having reviewed Plaintiff's arguments and the totality of the evidence, the Court finds that the trial evidence, viewed

Dedjoe v. Esper, Not Reported in Fed. Supp. (2019)

2019 WL 697821, 2019 Fair Empl.Prac.Cas. (BNA) 54,950

in the light most favorable to Defendant, was sufficient to permit a reasonable juror to find for Defendant. Accordingly, Plaintiff's Rule 50 motion addressed to the sufficiency of the evidence is denied.

**\*4** To the extent Plaintiff offers this challenge to the sufficiency of the trial evidence under Rule 59, the Court is of the opinion the jury did not reach a seriously erroneous result, and that the verdict is not a miscarriage of justice. Accordingly, Defendant's Rule 59 motion on this ground is denied.

## 4. Analysis - Evidentiary Ruling

Plaintiff also contends he is entitled to a new trial because the Court allowed the defense to question him regarding his response to a discovery interrogatory. This interrogatory asked Plaintiff to identify complaints of racial discrimination and/or retaliation he previously filed with any court or administrative agency, to which he answered "none". Defendant sought to impeach Plaintiff's credibility based on what it deemed a false response. *See* TT 3-11, 14. The Court permitted inquiry only so far as necessary to establish that Plaintiff's response to the specified interrogatory was false, but prohibited inquiry into the substance of the underlying claims so as to avoid portraying Plaintiff as a serial Title VII or civil rights litigant. *See id.* at 185-92. However, after initially denying that he was untruthful in answering the interrogatory because he thought it pertained only to court cases, *see id.* at 349:2-5, Plaintiff then said that the response was incorrect because the *instant case* was pending at the time he answered the interrogatory and blamed his attorney for submitting an inaccurate response. *Id.* at 346:8 - 350:25. The Court found that Plaintiff's attempt to avoid directly answering the question posed by Defense Counsel opened the door to further inquiry into whether Plaintiff previously filed specific complaints of racial discrimination and/or retaliation. *Id.* at 351-354. In allowing this line of questioning, the Court limited the inquiry to whether such complaints were filed, and did not allow inquiry into the substance of the underlying claims. *Id.* at 352, 354, 355.

Contrary to Plaintiff's contention, this case is distinguishable from 🚩*Outley v. City of New York*, 837 F.2d 587 (2d Cir. 1988), and 🚩*Arlio v. Lively*, 474 F.3d 46 (2d Cir. 2007). Here, unlike in 🚩*Outley*, the defense did not overtly portray

Plaintiff as a chronic or perpetual litigant, *see* 🚩*id.,* at 591 ("An important part of the City's overall defense was to undermine Outley's credibility by, *inter alia,* portraying him as a chronic litigant."); 592 (referring to plaintiff as a "perpetual litigant" in the defense opening statement). Also unlike in 🚩*Outley*, the Court limited inquiry to evidence probative of whether Plaintiff was truthful when responding to the interrogatory, and did not allow inquiry into the substance of the underlying claims. *See e.g.* 🚩*id.* at 593 ("The total impact of the evidence was to show that Outley is 'claim-minded,' and that the claims before the court were just two more in a long line of lawsuits. Excepting this type of evidence from the general rule of 404(b) would permit an exception to swallow the rule."). Although Plaintiff opened the door to further inquiry by essentially denying that he was untruthful in his interrogatory response, the Court allowed this further inquiry only to the extent it showed that Plaintiff had previously filed complaints of racial discrimination and/ or retaliation and thus probative of his credibility. In the Court's opinion, this limited line of questioning did not result in unfair prejudice to Plaintiff, and did not amount to a substantial evidentiary error warranting a new trial. *See e.g.* 🚩*Outley,* 837 F.2d at 593 ("[T]he defense was properly permitted to impeach [plaintiff] with inconsistent statements on his August 1982 application to proceed *in forma pauperis* in connection with the lawsuit as to the 1981 incident."). Moreover, because this further inquiry did not directly delve into the merits of the underlying claims,[2] it did not deprive Plaintiff of a fair determination of the claim before the jury, as occurred in 🚩*Outley. See e.g.* 🚩*id.,* at 595 ("We feel that in this context it was likely that the jury regarded Outley first and foremost as a bringer of nuisance lawsuits, and that as a result his claims did not receive a fair hearing.").

**\*5** In 🚩*Arlio,* the Second Circuit found that the district court abused its discretion by allowing irrelevant evidence of a prior arbitration decision, resulting in substantial prejudice to the defendant. *See* 🚩*Arlio,* 474 F.3d at 53. Here, by contrast, the Court did not allow evidence of prior adjudications, and, as indicated above, limited evidence to whether prior complaints were filed in order to assess Plaintiff's veracity in answering the identified interrogatory. Viewing this line of questioning in the context of the totality of the trial evidence, Plaintiff has not established that the jury's judgment was swayed in a material fashion by these questions, or that he suffered an impairment of a substantial

Dedjoe v. Esper, Not Reported in Fed. Supp. (2019)

2019 WL 697821, 2019 Fair Empl.Prac.Cas. (BNA) 54,950

right justifying a new trial. *See* 📁 *id.* at 51 ("[A] new trial should be granted only if a substantial right of a party is affected - as when a jury's judgment could be swayed in a material fashion by [a district court's evidentiary error]."). Accordingly, Plaintiff's motion for a new trial on this ground is denied.

### 5. Analysis - Principles of Fairness and Substantial Justice

Plaintiff also contends that he is entitled to a new trial before the Court rather than a jury due to what he asserts is inherent racial bias in the jury pool for the Northern District of New York. The argument is without merit.

This case was heard by a jury consisting of eight white individuals.[3] Plaintiff did not challenge the composition of the jury pool or the empaneled jury, but rather consented to the empaneled jury without objection. *See* TT at 63 (indicating through counsel that the jury was satisfactory to Plaintiff). By failing to challenge the racial composition of the jury pool or the empaneled jury before the completion of jury selection, Plaintiff waived his challenge to the jury verdict on this ground. *See Bailey v. New York City Dep't of Transp.*, 173 F.3d 843 (2d Cir. 1999)("Bailey's challenge to the jury verdict on the ground that the all-white jury was biased against him is deemed waived because he did not challenge the racial make-up of the jury prior to the completion of jury selection.")

(citing 📁 *McCrory v. Henderson*, 82 F.3d 1243, 1249 (2d Cir. 1996) ); *see also Joiner v. Chartwells*, 486 Fed. Appx 196, 198 (2d Cir. 2015).[4]

Moreover, Plaintiff fails to provide sufficient evidence indicating that the jury venire impermissibly excluded African-Americans,[5] or did not represent a fair cross section of the community. Without this evidence, the motion for a new trial on the ground that the trial was unfair because of the racial composition of the jury pool or trial jury must be denied. *See Espaillat v. Cont'l Express, Inc.*, 33 F. App'x 567, 569 (2d Cir. 2002)("Espaillat's arguments that the jury selection excluded Hispanic jurors are neither supported by the evidence nor sufficiently particularized or proven to require a new trial."); *Williams v. City of Newburgh*, 830 F.Supp. 770, 773–74 (S.D.N.Y. 1993).[6]

**\*6** Finally, the Court is not convinced that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice. Accordingly, Plaintiff's motion for a new trial based upon considerations of fairness and substantial justice is denied.

### b. Defendant's Bill of Costs

Defendant filed a Bill of Costs (Dkt. No. 105) in the total amount $3,902.86, consisting of $1,912.55 for transcript fees, $1,910.31 for witness fees, $20 for docket fees, and $60.00 for other costs. Plaintiff challenges (1) those costs associated with witnesses David Roe, Paul Edwards, and Lauren Smith; (2) mileage fees claimed for Smith to travel from her half-year residence in Alburgh, Vermont; and (3) all costs associated with Brad Frasco. Plaintiff also contends that Defendant should not be allowed any costs because the issues in the case were "close and difficult." After Plaintiff submitted his opposition, Defendant conceded that $67.45 in costs for Frasco's pre-trial interview are not taxable, but also seeks an additional $690.30 for the trial transcript fees necessitated by Plaintiff's Rule 50 and Rule 59 motions.

### 1. Standard of Review - Bill of Costs

Federal Rule of Civil Procedure 54(d)(1) allows the Court to award the prevailing party its costs. Fed. R. Civ. R. 54(d)(1);

📁 *Kohus v. Toys R Us, Inc.*, 282 F.3d 1355, 1357 (Fed. Cir. 2002). Defendant is the prevailing party in this action and, therefore, entitled to costs under Rule 54.

The term "costs" as used in Rule 54 includes the specific items enumerated in 28 U.S.C. § 1920. 🚩 *Whitfield v. Scully*, 241 F.3d 264, 269 (2d Cir. 2001) (citations omitted). As a threshold matter, the prevailing party must establish to the court's satisfaction that the taxation of costs is justified. *John and Kathryn G. v. Board of Ed. of Mt. Vernon Public Schools*, 891 F.Supp. 122, 123 (S.D.N.Y. 1995); *see* 28 U.S.C. § 1924. "After the prevailing party demonstrates the amount of its costs and that they fall within an allowable category of taxable costs, that party enjoys a presumption that its costs will be awarded." 📁 *Natural Organics, Inc. v. Nutraceutical Corp.*, 2009 WL 2424188, at \*2 (S.D.N.Y. Aug. 6, 2009) (quotation marks and citations omitted). "[B]ecause Rule 54(d) allows costs 'as of course,' such an award against the losing party is the normal rule obtaining in civil litigation, not an exception. For this reason, the losing party has the burden to show that

Dedjoe v. Esper, Not Reported in Fed. Supp. (2019)

2019 WL 697821, 2019 Fair Empl.Prac.Cas. (BNA) 54,950

costs should not be imposed." 🚩 *Whitfield*, 241 F.3d at 270 (citations omitted).

A district court has authority to review, adjust, or deny an award of costs, and that decision "is committed to the sound discretion of the district court." 🚩 *Cosgrove v. Sears, Roebuck, & Co.*, 191 F.3d 98, 102 (2d Cir. 1999) (quotation marks and citation omitted). A court's decision to deny costs depends on a number of equitable factors, including "misconduct by the prevailing party, the public importance of the case, the difficulty of the issues, or the losing party's limited financial resources." 🚩 *Whitfield*, 241 F.3d at 269.

### 2. Analysis - Witnesses David Roe, Paul Edwards, and Lauren Smith

Plaintiff challenges the costs associated with witnesses Roe, Edwards, and Smith, arguing: (a) these witnesses, as employees or former employees of Defendant, are not entitled to witness fees because they each testified as party representatives; (b) Defendant did not include supporting documentation for the witness fees associated with these witnesses, and (c) Smith is not entitled to travel expenses.

### A. Party Representatives

**\*7** The only named defendant and the only real party in interest in this case was the United States Department of the Army. While Roe, Edwards, and Smith testified to specific involvement with Plaintiff and/or with members of the Arsenal security staff, none testified in a representational capacity on behalf of the Department of the Army. Plaintiff's objection on this ground is overruled.

### B. Supporting Documentation

As to supporting documentation, Plaintiff subpoenaed each of these witnesses. *See* Dkt. No. 116-1 at ¶ 2 & Ex. A; Dkt. No. 129-1. Statutory witness fees are set forth in 28 U.S.C. § 1821 and include a $40 per day attendance fee, *id.* at § 1821(b), a mileage allowance if the witness uses a private automobile, *id.* at § 1821(c)(2), and parking fees, *id.* at § 1821(c)(3). Roe, Edwards, and Smith's statutory witness fees were Plaintiff's responsibility, and because Plaintiff failed to provide the fees

with the subpoenas, he may be taxed these statutory expenses through a Bill of Costs without the need for documentation of the expense. [7]

### C. Smith's Witness Costs

Regarding Smith's witness costs, the record is clear that Defense Counsel explained to Plaintiff's Counsel that upon retirement from the Arsenal in 2014, Smith began living in Alburgh, Vermont from May through October each year, and in Clifton Park, New York from November through April. Dkt. No. 116-1, ¶¶ 3-7; Dkt. No. 122, ¶¶ 1-2; Dkt. No. 129-1. Because both parties wanted to call Smith to testify at the trial in May 2018, counsel agreed to split Smith's statutory witness fees, including the milage expense for the trip to and from Alburgh, Vermont. Dkt. No. 116-1, ¶ 8 & Ex. F; Dkt. No. 129-1, at 17.

Plaintiff's counsel indicated that she expected to call Smith on May 8, 2018, Dkt. No. 116-1, ¶ 8 & Ex. F; Dkt. No. 129-1, at 17, so Smith appeared and remained at the Courthouse the entire day but was not called to testify. Dkt. No. 116-1, ¶ 9; Dkt. No. 122, ¶ 6. Smith spent the night at her Clifton Park, New York residence, returned the next day, testified, and then returned to her Alburgh, Vermont residence. Dkt. No. 116-1, ¶ 9-10; Dkt. No. 122, ¶¶ 6-9. Even assuming that Smith was served with a subpoena *ad testificandum* in March requiring her testimony in May, the subpoena did not require her to alter her plans to move into her Alburgh, Vermont residence in the beginning of May. Because Plaintiff was aware of Smith's half-year residence in Vermont and agreed to pay one-half of Smith's witness costs, one-half of those costs is a statutory obligation Plaintiff assumed. The other half is an expense born by Defendant that is taxable pursuant to § 1920(3). Plaintiff fails to satisfy his burden of demonstrating that the sought-after costs for Smith's testimony are improper or should be denied. Consequently, his objection to Smith's witness costs is overruled.

### 3. Analysis - Frasco's Witness Costs

Plaintiff argues that expenses for Frasco's testimony should be excluded because Defendant failed to produce Frasco for a deposition or disclose his whereabouts in a timely fashion. The issue of Defendant's knowledge of Frasco's whereabouts, and whether Frasco should be allowed to testify, was the subject of an *in limine* motion brought by Plaintiff. The Court

Dedjoe v. Esper, Not Reported in Fed. Supp. (2019)

2019 WL 697821, 2019 Fair Empl.Prac.Cas. (BNA) 54,950

resolved the issue in Defendant's favor, *see e.g.*, Dkt. No. 94; TT at 28-29, and Frasco was allowed to testify. Objection to the Bill of Costs is not the proper vehicle to re-litigate this issue. Because Frasco did testify, and because Plaintiff offers no other valid reason to prohibit taxing Frasco's witness costs, the objection on this ground is overruled.

### 4. Analysis - Close and Difficult Case

**\*8** The retaliation claim that was tried to the jury was not, in the Court's opinion, such a close or difficult case that expenses should not be taxed under Rule 54(d)(1). While Plaintiff evidently believes that the factual issues were close and the jury reached the wrong conclusion, that position is based on a view of the evidence though Plaintiff's eyes. But a party's resolute stance in his position, even after a contrary jury conclusion, does not make the case so close that costs should not be taxed. Otherwise, every case brought in good faith would avoid taxation of costs, making Rule 54 meaningless. Similarly, the claim tried to the jury was not legally difficult, and it certainly was not so legally difficult or so close that costs should not be taxed. Plaintiff's objection to the taxing of costs on this ground is overruled.

### 5. Analysis - Trial Transcripts

The cost for trial transcripts purchased by Defendant to defend against Plaintiff's Rule 50 and Rule 59 motions is a taxable expense. 28 U.S.C. § 1920(2). Because the need for these transcripts arose after Defendant submitted its Bill of Costs, this cost can be added. Thus, $690.30 for the trial transcript fees is added to the Bill of Costs.

### 6. Conclusion - Bill of Costs

For the reasons set forth above, the Court approves a Bill of Costs in the total amount of $4,525.71. This amount is reached by taking the $3,902.86 total in the original Bill of Costs (Dkt. No. 105), subtracting $67.45 for Frasco's pre-trial interview, and adding $690.30 for the trial transcript fees.

### c. Defendant's Motion to Redact Trial Transcript

Defendant moves to redact portions of the trial transcript, essentially requesting these portions be sealed. All of the transcript lines Defendant wants redacted center around

Lauren Smith's testimony that, as the former Arsenal Chief of Staff, she imposed a 5-day suspension upon Security Officer Michael Valle. Defendant asserts that information concerning Valle's suspension is covered by the Privacy Act, 5 U.S.C. § 552a, was disclosed to Plaintiff only under a stipulated protective order signed by Magistrate Judge Hummel, and should be not be made publically available. Plaintiff does not oppose the motion. Dkt. No. 125.

Defendant's motion implicates First Amendment and common law presumptions in favor of public access to court proceedings and transcripts. [8] *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597-98, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *Newsday LLC v. Cnty. of Nassau*, 730 F.3d 156, 163 (2d Cir. 2013); *In re N.Y. Times Co. to Unseal Wiretap & Search Warrant Materials*, 577 F.3d 401, 409 (2d Cir. 2009); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 (2d Cir. 2006).

> [T]he right of access afforded by the common law and First Amendment is not absolute, and the need for disclosure may be overcome where there are "countervailing factors" (in the common law framework), *see United States v. Amodeo*, 71 F.23d at 1050, or where sealing is necessary to preserve "higher values" (in the First Amendment context), *see* [ *United States v. Erie Cty, N.Y.*, 763 F.3d 235, 239 (2d Cir. 2014) ]. Under certain circumstances the privacy interests of the person resisting disclosure can be sufficient to overcome the public right of access. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d at 120.

*USA v. Reynolds*, 3:18-CR-0321 (N.D.N.Y.), 01/09/19 Dec. & Ord. (Dkt. No. 54) at 3-4 (Stewart, MJ)(addressing requested redaction of portions of a detention hearing transcript).

Dedjoe v. Esper, Not Reported in Fed. Supp. (2019)

2019 WL 697821, 2019 Fair Empl.Prac.Cas. (BNA) 54,950

**\*9** The party moving to redact a transcript of a public court proceeding "ultimately bears the burden of establishing that sealing is warranted." *Id.* at 4 (citation omitted). In this regard, the moving party must demonstrate "that higher values overcome the presumption of public access." *Giuffre v. Maxwell*, 325 F.Supp.3d 428, 441–42 (S.D.N.Y. 2018)(citing *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997) ).

While the Court recognizes the importance of protective orders for discovery purposes, Defendant's interest in maintaining the privacy of Valle's disciplinary history did not override Plaintiff's right to present relevant evidence to the jury. Thus, the Court ruled that Plaintiff's counsel could question Smith regarding Valle's 5-day suspension. This ruling is the functional equivalent of a Court Order allowing disclosure of material covered by the Privacy Act. *See* 5 U.S.C. § 552a(b)(11). Moreover, Smith testified in open court regarding her decision to uphold a 5-day suspension for Valle. The facts surrounding Valle's 5-day suspension "became public the moment [they were] uttered." *Miller v. City of Ithaca*, No. 3:10-CV-597, 2013 WL 12310675, at \*1 (N.D.N.Y. Feb. 15, 2013). Once uttered, the subject of Smith's testimony became part of the public domain, *see Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947)("What transpires in the court room is public property."), and as such, "cannot be redacted after-the-fact." *Miller*, 2013 WL 12310675, at \*1 (citing *United States v. Strevell*, No. 05-CR-477(GLS), 2009 WL 577910, 2009 U.S. Dist. LEXIS 19020 (N.D.N.Y. Mar. 3, 2009) (in turn citing *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir. 2004) ("[O]nce the genie is out of the bottle because an otherwise protected document is in the public domain, the court has no power to remove it from that domain.") ) ). Since the "genie is out of the bottle," this Court has "no power to remove it from that domain" by way of redaction. *Strevell*, 2009 WL 577910, at \*5, 2009 U.S. Dist. LEXIS 19020, \*14–

15. Defendant's motion is denied as to any statements about Valle's suspension made in open court.

Defendant also seeks to redact related discussions that occurred during the pre-trial conference and at side bars. These discussions, although not in open court, provide context to the Court's decision to allow Smith's testimony and thereby fall within the scope of the First Amendment and common law presumptions in favor of public access. *See United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)("The presumption of access is based on the need for federal courts, although independent–indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice."). Defendant has not demonstrated that the need to redact chambers and side bar discussions about evidence disclosed in open court overcomes the First Amendment and common law presumptions in favor of public access to the transcripts. Accordingly, Defendant's motion to redact these portions of the trial transcript is also denied.

## IV. CONCLUSION

For the reasons discussed above,

- Plaintiff's motion for judgment as a matter of law or, in the alternative, a new trial, Dkt. Nos. 104 & 117, is **DENIED**.

- Defendant's motion to confirm its Bill of Costs, Dkt. No. 105, is **GRANTED as amended**, with the Court approving Defendant's Bill of Costs in the total amount of $4,525.71.

 **\*10** - Defendant's motion to redact portions of the trial transcript, Dkt. No. 114, is **DENIED**.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 697821, 2019 Fair Empl.Prac.Cas. (BNA) 54,950

## Footnotes

1      As of the date of this Decision and Order, Ryan D. McCarthy, the Defendant named by Plaintiff in this matter, is no longer the Acting Secretary of the Army, having been succeeded by Dr. Mark T. Esper. The Clerk of

Dedjoe v. Esper, Not Reported in Fed. Supp. (2019)

2019 WL 697821, 2019 Fair Empl.Prac.Cas. (BNA) 54,950

Court is therefore instructed to substitute "Dr. Mark T. Esper, in his official capacity as the Secretary of the Army" as the Defendant, in accordance with Federal Rule of Civil Procedure 25(d).

2    In answering Defense Counsel's questions whether he previously filed specific claims of racial discrimination or retaliation, Plaintiff voluntarily divulged specifics of one of the previously-filed claims. *See* TT 355.

3    Plaintiff asserts that his case was "before a six person jury that was exclusively Caucasian and exclusively male." Ptf. Mem. L. (Dkt. No. 117-9) at 24. Defendant asserts that the jury consisted of "two white females and six white males." Def. Mem. L. (Dkt. No. 126) at 14. The record is clear that the jury consisted of 8 persons, *see* 05/07/18 Minute Entry ("Jury trial commences on 5/7/2018.... Jury selection held. Jury sworn w/8 jurors empaneled."), and the Court accepts the parties' representations that all trial jurors were white.

4    ("Joiner, who was represented by counsel at trial, failed to raise any challenge to the racial composition of the jury. As a consequence, the record contains little or no evidence regarding the racial composition of the jury pool or the reasons for defense counsel's challenge to the juror Joiner now alleges was the only African-American in the jury pool. Because Joiner failed to raise the issue below, and because the record is therefore inadequate to address it here, we will not now consider the issue.")(citing *Bogle-Assegai v. Connecticut,* 470 F.3d 498, 504 (2d Cir. 2006) ).

5    Based on prior cases examining the Northern District of New York's jury selection process, it is doubtful that Plaintiff could demonstrate systematic exclusion of African-American's from the jury selection process. *See e.g.* *United States v. Bullock,* 550 F.3d 247, 251–52 (2d Cir. 2008)("Judge McAvoy explained at trial that in constructing the jury pool, the court drew potential jurors from the rolls of voters and drivers. The motor vehicle roll was included specifically 'to make sure that [the] jury pool [wa]s balanced.' That the district court failed in its attempt to achieve such balance does not detract from the court's demonstrably race-neutral approach to juror selection.").

6    In *Williams*, the Southern District wrote:

In addition, nothing in the record indicates that the jury which heard the case did not reflect "a fair cross section of the community." *Holland v. Illinois,* 493 U.S. 474, 479, 110 S.Ct. 803, 807, 107 L.Ed.2d 905 (1990) (citing *Taylor v. Louisiana,* 419 U.S. 522, 526, 95 S.Ct. 692, 696, 42 L.Ed.2d 690 (1975) ). Although Williams is now proceeding *pro se*, he is obligated to point to something—i.e. the manner in which the jury panel was assembled or the peremptory challenges were exercised—suggesting racial bias in the jury selection process. The mere fact that Williams is black and only one black juror was selected does not, without more, support a finding of such bias or warrant a new trial.

830 F.Supp. at 773–74.

7    Defendant argues in the alternative that its response to Plaintiff's challenge to the Bill of Costs should be treated a motion to compel Plaintiff to pay his statutory witness fees.

8    Given the importance of these presumptions inuring to the benefit of entities not before the court, the Court *sua sponte* considers their application. *See e.g.* *Prescient Acquisition Group, Inc. v. MJ Publ'g Trust,* 487 F.Supp.2d 374, 375 (S.D.N.Y. 2007) (court *sua sponte* required party seeking to maintain court filings under seal to "identif[y] with particularity (*i.e.* page and line) the precise information ... which the party maintains should be kept under seal [and] demonstrat[e] the particular need for sealing the information").

**Dedjoe v. Esper, Not Reported in Fed. Supp. (2019)**

2019 WL 697821, 2019 Fair Empl.Prac.Cas. (BNA) 54,950

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Dolberry v. Jakob, Not Reported in Fed. Supp. (2019)

2019 WL 1396975

2019 WL 1396975
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Andre DOLBERRY, Plaintiff,

v.

Correction Officer JAKOB, Correction
Officer Saltsman, Defendants.

9:11-CV-1018 (DNH/DEP)
|
Signed 03/28/2019

**Attorneys and Law Firms**

OF COUNSEL: KYLE N. KORDICH, ESQ., THORN,
GERSHON LAW FIRM – ALBANY OFFICE, 5 Wembley
Court, New Karner Road, P.O. Box 15054, Albany, New York
12212, Attorney for Plaintiff.

ANDRE DOLBERRY, Pro se plaintiff, 325 Washington
Avenue, Albany, New York 12202.

HON. LETITIA JAMES, Attorney General for the State
of New York, OF COUNSEL: DENISE P. BUCKLEY,
ESQ., MICHAEL G. MCCARTIN, ESQ., Ass't Attorney
General., The Capitol, Albany, New York 12224, Attorneys
for Defendants.

**DECISION and ORDER**

DAVID N. HURD, United States District Judge

**I. INTRODUCTION**

**\*1** Plaintiff Andre Dolberry ("Dolberry") brought this action
against defendants, each a corrections officer at Coxsackie
Correctional Facility at the relevant times, pursuant to 42
U.S.C. § 1983, alleging each defendant took retaliatory
actions against him for exercising his rights pursuant to the
First Amendment. After a two day trial, the jury rendered a
verdict in favor of defendants on March 14, 2018. Judgment
was entered in favor of defendants on March 15, 2018.
Presently under consideration are numerous motions filed
by plaintiff after trial, including a motion for a new trial
pursuant to Federal Rule of Civil Procedure 59 and a motion
for judgment as a matter of law pursuant to Federal Rule of
Civil Procedure 50. See ECF Nos. 194 & 195. Additionally,

defendants have filed a motion for a bill of costs. See ECF
No. 201.

**II. BACKGROUND**.
The Court presumes familiarity with the procedural and
factual background of this case, and recites portions of the
background only where necessary to decide the pending
motions.

**III. LEGAL STANDARDS**.

  (i) *New Trial Motion*.
Pursuant to Rule 59(a) of the Federal Rules of Civil
Procedure, a district court may grant a new trial "after a jury
trial, for any reason for which a new trial has heretofore been
granted in an action at law in federal court." In this Circuit,
in order to grant a motion for a new trial under Rule 59(a),
a court "must conclude that the jury has reached a seriously
erroneous result or ... the verdict is a miscarriage of justice,
i.e., it must view the jury's verdict as against the weight of
the evidence." Manley v. AmBase Corp., 337 F.3d 237,
245 (2d Cir. 2003). "[A] new trial under Rule 59(a) may be
granted even if there is substantial evidence supporting the
jury's verdict, and ... a trial judge is free to weigh the
evidence himself, and need not view it in the light most favorable to the
verdict winner." Id. at 244–45. The task before the court is
to balance "respect [for] the jury's findings ... with avoidance
of miscarriage of justice and" the court may only grant a
new trial if, after viewing all the evidence, it has "a definite
and firm conviction that a mistake has been committed."
Cunningham v. Town of Ellicott, 2007 WL 1756502, at \*4
(W.D.N.Y. June 18, 2007).

  (ii) *Motion for Judgment as a Matter of Law*.
"A Rule 50 motion may be granted only when, considering
the evidence in the light most favorable to the non-moving
party and drawing all reasonable evidentiary inferences in
that party's favor, there was no legally sufficient evidentiary
basis for a reasonable jury to find in favor of the non-moving
party." Nimely v. City of New York, 414 F.3d 381, 390
(2d Cir. 2005). The moving party thus bears a heavy burden,
especially where, as here, "the jury has deliberated in the case
and actually returned its verdict in favor of the non-movant."
Cash v. City of Erie, 654 F.3d 324, 333 (2d Cir. 2011).
A jury verdict should not be set aside lightly, and only where
there is "such a complete absence of evidence supporting

Dolberry v. Jakob, Not Reported in Fed. Supp. (2019)

2019 WL 1396975

the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." AMW Materials Testing, Inc. v. Town of Babylon, 584 F.3d 436, 456 (2d Cir. 2009).

**\*2** As plaintiff did not make the prerequisite pre-verdict motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), this post-trial motion may still be "granted by a district court where doing so is necessary to prevent manifest injustice." Henry v. Dinelle, 929 F. Supp. 2d 107, 113-114 (N.D.N.Y. 2013) (D.J. Suddaby).

## IV. DISCUSSION.

### (i) Motion for a New Trial.

Dolberry seeks a new trial based upon alleged deficiencies in the trial conducted in March 2018.

### (a) Bias in Jury Selection.

Dolberry argues that the jury selection process was biased in that the jury did not include any African Americans or individuals of Latino or Asian decent. See ECF No. 194 at 3.

Nothing in the record indicates that the jury which heard the case did not reflect a "a fair cross section of the community." Holland v. Illinois, 493 U.S. 474, 479 (1990) (citing Taylor v. Louisiana, 419 U.S. 522, 526 (1975) ). Plaintiff is "obligated to point to something - i.e. the manner in which the jury panel was assembled or the peremptory challenges were exercised - suggesting racial bias in the jury selection process." Williams v. City of Newburgh, 830 F. Supp. 770, 772 (S.D.N.Y. 1990). "Without this evidence, the motion for a new trial on the ground that the trial was unfair because of racial composition of the jury pool or trial jury must be denied." Dedjoe v. Esper, 2019 WL 697821, at \*5 (N.D.N.Y. Feb. 19, 2019) (S.J. McAvoy) (citing Espaillat v. Cont'l Express, Inc., 33 F.App'x 567, 569 (2d Cir. 2002) ) ("[Plaintiff's] arguments that the jury selection excluded Hispanic jurors are neither supported by the evidence nor sufficiently particularized or proven to require a new trial.").

Dolberry's assertion that there must be something nefarious occurring since Syracuse and Utica have large minority population, yet the jury did not have any minority members,

is insufficient to demonstrate bias in jury selection or warrant a new trial.

### (b) Observations of Juror.

Dolberry further asserts that a juror observed him being transported into the courthouse in shackles.

There is no evidence that either counsel was made aware that a juror had allegedly seen Dolberry in restraints during the trial. Even if a juror briefly saw Dolberry in restraints as he was being transported in the courthouse, which is the most that plaintiff's motion suggests happened, any such glimpse would have been harmless. "Where an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror." United States v. Greer, 285 F.3d 158, 173 (2d Cir. 2002). Courts have "distinguished the inherent prejudice to a [prisoner] who is shackled while in the courtroom from a [prisoner] who has been observed in shackles for a brief period elsewhere in the courtroom." United States v. Moreno, 933 F.2d 362, 368 (6th Cir. 1991). "In the absence of a showing of prejudice ... a fleeting glance by jurors of a [prisoner] outside the courtroom in handcuffs does not justify a new trial." United States v. Ayres, 725 F.2d 806, 813 (1st Cir. 1984).

A typical juror would not have been influenced by glimpsing Dolberry in restraints. The jurors were aware that plaintiff was incarcerated at the time of the alleged retaliation by defendants and at the time of trial. Further, plaintiff was not shackled while in the courtroom and appeared in court in business attire. Lastly, the jurors were instructed in both the preliminary and final instructions that the fact that plaintiff "was a prisoner has absolutely no bearing on his constitutional right to be free from retaliation of his right to recover damages if [the jurors] find, based on the evidence in this trial, that his constitutional rights have been violated." See Jury Instructions, at 10.

### (c) Missing Belongings.

**\*3** Dolberry next asserts that his legal documents and clothing were lost or stolen on the eve of trial, depriving him of his ability to be properly prepare for trial.

While Dolberry is not raising the alleged theft of his belongings as a cause of action but rather that it affected this case and warrants a new trial, it is helpful to look at

Dolberry v. Jakob, Not Reported in Fed. Supp. (2019)

2019 WL 1396975

existing case law concerning deprivation of legal documents and court access. To state a claim for denial-of-access to the courts, a prisoner must demonstrate actual prejudice to pending or contemplated litigation. See Lewis v. Casey, 518 U.S. 343, 351 (1996). "[A] claim that prison practices kept a prisoner from raising an argument or asserting a claim in his pleadings in response to a dispositive motion, or at trial would likely suffice to show harm; however, a claim that the prisoner could have made a more compelling or sophisticated argument would not." Arce v. Walker, 58 F. Supp. 2d 39, 43 (W.D.N.Y. 1999).

Court security provided Dolberry business attire to wear during the trial. Further, plaintiff's counsel had available all relevant legal documents pertaining to this case and defendant could have, and presumably did, review such documents during the duration of the trial. Plaintiff does not identify any particular legal documents that he did not have access to or demonstrate that the failure to have access to his copies prejudiced or harmed his case in any way. As a result, he is not entitled to a new trial on this ground.

### (d) *Plaintiff's Prior Convictions.*

Dolberry further objects to the fact that defendants' counsel gave "suggestive instructions" during their closing argument. It appears that this objection relates to the fact that defendants' counsel raised plaintiff's criminal history during closing arguments.

Pursuant to Federal Rule of Evidence 609(a)(1), "for the purposes of attacking the character for truthfulness of a witness, evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year ..." See FED. R. EVID. 609(a)(1). Prior to trial, the parties stipulated that the specifics of Dolberry's criminal background, including the specifics of his arrests and convictions and the length of his incarceration, were inadmissible. See Stipulation, ECF No. 192 at ¶ 4. Consistent with the Federal Rules of Evidence, the Court instructed the jury that plaintiff's "criminal history was allowed into evidence only for [the jury] to consider in evaluating his credibility" and that the jury "may consider the fact that [plaintiff] is a convicted felon in deciding how much of his testimony to accept and what weight, if any, it should be given." See Jury Instructions, at 10. The fact that defendants' counsel referred to plaintiff's status as a convicted felon in closing arguments did not run afoul of the Federal Rules of

Evidence or the parties' stipulation and does not warrant a new trial.

Lastly, no other arguments or grounds raised by Dolberry in his motion are adequate to warrant a new trial pursuant to Federal Rule of Civil Procedure 59. As such, his motion for a new trial will be denied in its entirety.

### (ii) *Motion for Judgment as a Matter of Law.*

**\*4** Dolberry further argues that he is entitled to judgment as a matter of law. In his motion, he alleges that there were numerous inconsistencies and deficiencies in the case presented by the defendants and in the testimony of defendants Jakob and Saltsman. Therefore, plaintiff argues that no reasonable jury could have found for the defendants.

However, there was sufficient evidence for the jury to conclude that defendants issued misbehavior reports to Dolberry for justified reasons and not in retaliation for any complaints or grievances filed by plaintiff. Contrary to plaintiff's assertion, the verdict in this case turned principally on witness credibility, an evaluation of which is properly left to the jury. Plaintiff testified with regards to his version of the events of July to October 2009, including the circumstances precipitating the issuance of the misbehavior reports written by defendants Jakob and Saltsman. Further, the jury heard testimony of both of the defendants and plaintiff had the opportunity to cross examine them both with regards to the alleged inconsistencies and deficiencies in their testimony, in hopes of impugning their credibility. As the testimony of Dolberry and the defendants was materially different with regards to the motives behind the issuance of the misbehavior reports to plaintiff, clear issues of fact were created for the jury's consideration. The jury was free to make credibility determinations and accept or reject the testimony of both plaintiff and defendants' witnesses. The jury did just that and their verdict is supported by sufficient evidence. As a result, the jury's verdict was neither erroneous nor a miscarriage of justice. Therefore, plaintiff's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) will be denied.

### (iii) *Motion for Discrimination in Selection of Jury Array.*

Dolberry also filed a "motion for discrimination in selection of jury array", which reiterates the same bias in jury selection argument he raised in his motion for a new trial. See ECF No. 196. For the same reasons previously discussed, this motion will also be denied.

Dolberry v. Jakob, Not Reported in Fed. Supp. (2019)

2019 WL 1396975

*(iv) Motion for Bill of Costs.*

Defendants have moved for a bill of costs in the amount of $1,767.94.

Under the Prison Litigation Reform Act, courts have the authority to assess costs against an indigent prisoner. See 28 U.S.C. § 1915(f)(2)(A) & (B). This authority lies at the discretion of the trial. See 28 U.S.C. § 1915(f)(2)(A) ("If the judgment against a prisoner includes the payment of costs under this subsection, the prisoner shall be required to pay the full amount of the costs ordered."); see also Keesh v. Smith, 2008 WL 2242622, at *3 (N.D.N.Y. May 29, 2008) (C.J. Mordue) ("[D]istrict courts retain discretion to limit or deny costs based on indigency."). "[T]he discretionary imposition of costs should be informed by any factor the court deems relevant, including the purpose of the *in forma pauperis* statute, the history of the party as litigator, good faith and the actual dollars involved." Feliciano v. Selsky, 205 F.3d 568, 572 (2d Cir. 2000) (internal quotation omitted). "Unless there is a specific direction by the court for the payment of costs by a prisoner proceeding *in forma pauperis*, no costs may be taxed by the prevailing party." Id.

The Judgment entered in favor of the defendants did not direct Dolberry to provide for the payment of costs and the substantive and procedural history of this case does not support the imposition of costs against plaintiff. Therefore, defendants' motion for bill of costs will be denied.

**V. CONCLUSION.**

**\*5** Dolberry has not demonstrated entitlement to relief concerning any of his post-trial motions. Additionally, defendants have not demonstrated entitlement to a bill of costs.

Therefore, it is

ORDERED that

1. Plaintiff's motion for new trial (ECF No. 194) is **DENIED**;

2. Plaintiff's motion for judgment as a matter of law (ECF No. 195) is **DENIED**;

3. Plaintiff's motion for discrimination in selection of jury array (ECF No. 196) is **DENIED**;

4. Defendants' motion for bill of costs (ECF No. 201) is **DENIED**; and

5. The Clerk serve a copy of this Decision and Order upon plaintiff in accordance with the Local Rules and close the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1396975

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2785745
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bernabe ENCARNACION, Plaintiff,

v.

James SPINNER, Defendant.

9:15-cv-1411 (BKS/ML)
|
Signed April 5, 2023

**Attorneys and Law Firms**

Plaintiff pro se: Bernabe Encarnacion, 91-B-0943, Attica Correctional Facility, Box 149, Attica, New York 14011.

For Defendant: Letitia James, Attorney General of the State of New York, Kostas D. Leris, Assistant Attorney General, The Capitol, Albany, New York 12224.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

**I. INTRODUCTION**

**\*1** Plaintiff pro se Bernabe Encarnacion brought this action under 42 U.S.C. § 1983 against Defendant James Spinner alleging that Defendant violated Plaintiff's Fourteenth Amendment procedural due process rights. (Dkt. No. 1, at 1.) Following a three-day trial, at which Plaintiff was represented by pro bono counsel, the jury returned a verdict finding that Plaintiff had failed to prove his claim by a preponderance of the evidence. (Dkt. No. 215.) The Court entered judgment in accordance with that verdict. (Dkt. No. 217.) Presently before the Court are: (1) Plaintiff's motion for a new trial under Federal Rule of Civil Procedure 59(a),[1] (Dkt. No. 221), which is fully briefed, (Dkt. Nos. 222, 227), and (2) Defendant's motion for a bill of costs, (Dkt. No. 220), which Plaintiff opposes, (Dkt. No. 228.) For the following reasons, the Court denies Plaintiff's motion for a new trial and grants in part Defendant's motion for a bill of costs.

**II. PLAINTIFF'S MOTION FOR A NEW TRIAL**

**A. Standard of Review**

Pursuant to Federal Rule of Civil Procedure 59, a court may, "on motion, grant a new trial on all or some of the issues ... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The decision to grant a new trial is left to the discretion of the trial judge, and a "motion for a new trial should be granted when, in the opinion of the district court, 'the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice.' " *Song v. Ives Lab'ys, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988)). "The general grounds for a new trial are that (1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence o[r] the giving or refusal of instructions to the jury; or (4) damages are excessive." *Utica Mut. Ins. Co. v. Century Indem. Co.*, 419 F. Supp. 3d 449, 466–67 (N.D.N.Y. 2019) (quoting *Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 174 (E.D.N.Y. 2012)). But it is "well-settled ... that the constitutional guarantee of effective assistance of counsel does not extend to civil cases," and accordingly, ineffective assistance of counsel is not grounds for a new trial under Rule 59. *See Booker v. Graham*, No. 13-cv-1342, 2018 WL 895587, at \*4, 2018 U.S. Dist. LEXIS 23995, at \*10–11 (N.D.N.Y. Feb. 14, 2018) (quoting *Guardado v. Nassau Cnty. Corr. Facility*, 160 F. App'x 66, 68 (2d Cir. 2005) (summary order)), *aff'd*, 974 F.3d 101 (2d Cir. 2020). Nor is Rule 59 "a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.' " *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998). Rather, "the granting of a new trial is [ ] extraordinary relief ... [and] 'is properly granted only upon a showing of exceptional circumstances.' " *Rosello v. Long Island Rail Rd. Co.*, 50 F. Supp. 3d 242, 249 (E.D.N.Y. 2014) (quoting *United States v. Int'l Brotherhood of Teamsters*, 247 F.3d 370, 391 (2nd Cir. 2001)).

**\*2** In evaluating a motion for a new trial pursuant to Rule 59, "a trial judge hearing a motion for a new trial 'is free to weigh the evidence ... and need not view it in the light most favorable to the verdict winner.' " *Song*, 957 F.2d at 1047 (quoting *Bevilaque v. Saydjari*, 574 F.2d 676, 684–85 (2d Cir. 1978)). A "court may 'independently weigh the evidence presented at trial to determine whether the jury's verdict is "seriously erroneous" or resulted in a "miscarriage of justice.'

" " *Edwards v. Schrader-Bridgeport Int'l., Inc.*, 205 F. Supp. 2d 3, 8 (N.D.N.Y. 2002) (quoting *Finn-Verburg v. N.Y. State Dep't of Lab.*, 165 F. Supp. 2d 223, 228 (N.D.N.Y. 2001)). In so doing, "the court 'is afforded considerable discretion.' " *Id.* (quoting *Finn-Verburg*, 165 F. Supp. 2d at 228). But the decision whether to credit a witness's testimony is within the discretion of the jury. *See Toliver v. N.Y.C. Dep't of Corr.*, 202 F. Supp. 3d 328, 335–36 (S.D.N.Y. 2016); *see also Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012) (noting that "a judge 'should rarely disturb a jury's evaluation of a witness's credibility' " (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998))). And a court's prerogative to weigh the evidence presented at trial "is not a permission slip to 'ignore the jury's role in resolving factual disputes and assessing witness credibility.' " *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 490 F. Supp. 3d 593, 616–17 (E.D.N.Y. 2020) (quoting *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 558–59 (S.D.N.Y. 2010)).

When challenging the fairness of a trial on the basis of the composition of the jury, a Rule 59 movant "is obligated to point to something ... suggesting racial bias in the jury selection process." *Williams v. City of Newburgh*, 830 F. Supp. 770, 773 (S.D.N.Y. 1993); *see also Espaillat v. Cont'l Express, Inc.*, 33 F. App'x 567, 569 (2d Cir. 2002) (holding that unparticularized arguments that jurors of a certain ethnicity were excluded were insufficient to grant a new trial). Merely pointing to the composition of the jury as proof of its unfairness is insufficient to warrant a new trial. *See Williams*, 830 F. Supp. at 773. Similarly, a plaintiff must "make some kind of basic, threshold showing of impropriety beyond mere generalized speculation" to demonstrate unfairness of the trial arising from the behavior of the jury. *See Utica Mut. Ins. Co.*, 419 F. Supp. 3d at 471.

A trial court has considerable discretion in determining whether evidence is admissible. *See Barrett v. Orange Cnty. Hum. Rts. Comm'n*, 194 F.3d 341, 346 (2d Cir. 1999). Thus, a new trial will be granted on the basis of improper evidentiary rulings only where improper rulings "affect[ ] a substantial right of the moving party." *Mem'l Drive Consultants, Inc. v. ONY, Inc.*, 29 F. App'x 56, 61 (2d Cir. 2002) (summary order) (citing *Malek v. Fed. Ins. Co.*, 994 F.2d 49, 55 (2d Cir. 1993)). Whether an evidentiary error implicates a substantial right depends on "the likelihood that

the error affected the outcome of the case." *Malek*, 994 F.2d at 55. "Where there has been an objection, a new trial is warranted if the [c]ourt's evidentiary ruling was 'clearly prejudicial to the outcome of the trial,' taking into account 'the record as a whole.' " *Graham v. City of N.Y.*, 128 F. Supp. 3d 681, 705 (E.D.N.Y. 2015) (quoting *Johnson v. Strive E. Harlem Emp Grp.*, 990 F. Supp. 2d 435, 450 (S.D.N.Y. 2014)). "But where [the moving party] did not object, a new trial is warranted only for plain error 'so serious and flagrant that it goes to the very integrity of the trial.' " *Johnson*, 990 F. Supp. 2d at 450 (quoting *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005)).

**B. Analysis**

Plaintiff's arguments in support of his motion for a new trial pursuant to Rule 59 are generally divisible into two categories: (1) the trial was not fair and (2) substantial errors occurred in the admission or rejection of evidence. (Dkt. No. 221, at 2–7.) Interwoven into his arguments is Plaintiff's contention that he received ineffective assistance of counsel. (*Id.* at 2, 4–6.) But it is "well-settled ... that the constitutional guarantee of effective assistance of counsel does not extend to civil cases," and accordingly, ineffective assistance of counsel cannot be a basis for a new trial under Rule 59. *See Booker*, 2018 WL 895587, at *4, 2018 U.S. Dist. LEXIS 23995, at *10–11 (quoting *Guardado*, 160 F. App'x at 68). Thus, the Court denies Plaintiff's motion for a new trial to the extent that it is premised on a claim of ineffective assistance of counsel and turns to address Plaintiff's specific arguments that (1) the trial was not fair and (2) substantial errors occurred in the admission or rejection of evidence.

**1. Fairness of the Trial**

**\*3** Plaintiff argues that the trial was not fair because "all Black and Spanish jurors w[ere] excluded from [the] trial and [Plaintiff was] tried ... [by a] white jury"; "Plaintiff ... was forced to stand in trial in his prisoner's green uniform"; "a correction officer [sat] next to the jury and [went] ... to the jury room with the jury"; and trial witness Ernesto Perez lied under oath. (Dkt. No. 221, at 2–3.) Defendant argues that there were no Black or Hispanic jurors in the jury pool, the Court explained to Plaintiff that the jury represented a fair cross section of the community, and Plaintiff has failed to provide any evidence to the contrary; that Plaintiff consented to wearing his prison uniform at trial; and that Plaintiff has

not asserted wrongdoing on the part of any correction officer. (Dkt. No. 222, at 2–3.)

Plaintiff raised his concern about the composition of the jury—that it included no Black or Hispanic jurors—at the conclusion of the first day of trial. The Court explained to Plaintiff how the jury pool was formed and that it included people from a wide area, not just the City of Syracuse. In reply to Defendant's opposition to his motion for a new trial, Plaintiff suggests that "the [majority] of [the] Black and Hispanic community[,] up to 30 [to] 40% of Syracuse['s] population[,] [live] in the West and South side [ ] area of the Federal Building [and] Courthouse are[a]." (Dkt. No. 227, at 2.) Whether or not this contention is true, it is irrelevant. As the Court explained, the area from which jury pools are drawn is much larger than the area surrounding the courthouse. *See* Juror FAQ, https://www.nynd.uscourts.gov/juror-faq (last visited Mar. 15, 2023). And Plaintiff has not "point[ed] to something ... suggesting racial bias in the jury selection process," *Williams*, 830 F. Supp. at 773, but instead has merely pointed to the composition of the jury as proof of its unfairness. This is insufficient to warrant a new trial. *See id.*; *see also Dedjoe v. Esper*, No. 15-cv-1170, 2019 WL 697821, at *5, 2019 U.S. Dist. LEXIS 26341, at *16 (N.D.N.Y. Feb. 19, 2019) ("Without [evidence that the jury venire impermissibly excluded African-Americans or did not represent a fair cross section of the community], the motion for a new trial on the ground that the trial was unfair because of the racial composition of the jury pool or trial jury must be denied."), *aff'd*, 804 F. App'x 1 (2d Cir. 2020).

Plaintiff's claim that he was forced to wear his prison uniform is also insufficient to warrant a new trial because Plaintiff consented to wearing it. The right not to be compelled to appear before a jury in a prison uniform generally applies to defendants in criminal trials. *See Campbell v. Greene*, 440 F. Supp. 2d 125, 145 (N.D.N.Y. 2006) ("In order to ensure a criminal defendant's right to a fair trial, the Supreme Court has determined that an accused cannot be forced "to go to trial in prison or jail clothing because of the possible impairment of the presumption [of innocence]." (quoting 🚩 *Estelle v. Williams*, 425 U.S. 501, 504 (1976))). But whether presiding over a civil or criminal trial, a court has a duty to exercise its discretion to ensure a fair trial, free, to the extent feasible, from the prejudicial effects the hallmarks of imprisonment may have. *See* 🚩 *Davidson v. Riley*, 44 F.3d 1118, 1122 (2d Cir. 1995) ("In either [criminal or civil case[s], the court must be alert to avoid practices that may undermine the fairness

of the factfinding process. Forcing a party to appear at a jury trial in manacles and other shackles may well deprive him of due process unless the restraints are necessary."). The Court did so. Indeed, at the outset of trial, the Court noted that Plaintiff was permitted to wear clothes other than his prison uniform, and both Plaintiff's pro bono counsel and Plaintiff himself, after translation, indicated Plaintiff's consent to wearing his prison uniform. Thus, the Court will not grant a new trial on this basis. *See Jones v. Lantry*, No. 04-3967, 2011 WL 5402463, at *2, 2011 U.S. Dist. LEXIS 128567, at *6 (E.D.N.Y. Nov. 4, 2011) (finding that a plaintiff wearing "full prison garb" during trial—despite the court issuing a pre-trial order permitting the plaintiff to wear civilian clothing—did not provide sufficient grounds for the court to grant a new trial where the plaintiff did not timely object).

**\*4** Plaintiff's claim that a "correction officer" sat next to the jury and accompanied the jury to the jury room is meritless. The individual situated next to the jury throughout the trial who escorted the jury into and out of the jury room was not a correction officer, but a Court Security Officer employed by the United States Marshals Service. Furthermore, Plaintiff has not suggested the presence of the Court Security Officer was associated with misconduct of or impact on the jury. *See, e.g.*, *Utica Mut. Ins. Co.*, 419 F. Supp. 3d at 471 (indicating the need "to make some kind of basic, threshold showing of impropriety beyond mere generalized speculation" to demonstrate juror misconduct).

Finally, Plaintiff's argument that a witness lied under oath is insufficient warrant a new trial. Plaintiff suggests that "Mr. Perez lied under oath to the jury" during Perez's testimony regarding translation and interpretation at Plaintiff's May 28, 2013, hearing. (Dkt. No. 221, at 3.) But Plaintiff has not provided any support for this contention, and the Court is unable to identify what specific testimony Plaintiff suggests is false. In any case, the decision whether to credit a witness's testimony is within the discretion of the jury. *See Toliver*, 202 F. Supp. 3d at 335–36; *see also Raedle*, 670 F.3d at 418. In essence, Plaintiff's request that the Court now find that Perez's testimony was false amounts to a request that the Court "ignore the jury's role in resolving factual disputes and assessing witness credibility." 🚩 *Am. Tech. Ceramics Corp.*, 490 F. Supp. 3d at 616–17 (quoting 🚩 *Mugavero*, 680 F. Supp. 2d at 558–59 (S.D.N.Y. 2010)). The Court declines to do so.

Thus, Plaintiff's claims suggesting that the trial was not fair, individually or in sum, are insufficient to provide a basis for the Court to grant Plaintiff's motion for a new trial.

### 2. Admitted and Excluded Evidence

Plaintiff also argues that substantial errors occurred in the admission or rejection of evidence. (Dkt. No. 221, at 2–7.) Namely, Plaintiff argues that the Court should not have admitted the recording and transcript of the May 28, 2013, hearing; the testimony of Ernesto Perez, Albert Gravlin, and Catherine Schrader; cell photographs; and an appeal letter and petition from an Article 78 petition. (*Id.*) Plaintiff also argues that the Court should have admitted evidence of the reversal and expungement of the May 28, 2013, hearing determination; a document showing a refund of $52 paid in restitution for the May 28, 2013, hearing determination; a letter to the Inspector General's Office, and evidence calling into question Plaintiff's prior convictions. (*Id.*) Defendant argues that "Plaintiff's claims related to the evidence that was either admitted or precluded from the trial are nothing more than an attempt to relitigate old issues, which is improper." (Dkt. No. 222, at 2.) The Court agrees with Defendant.

Defendant, pursuant to the Court's trial order, (Dkt. No. 156), submitted a motion in limine seeking pretrial rulings on the admissibility of certain evidence. (Dkt. No. 199.) As is relevant here, Defendant's motion specifically sought the exclusion of evidence of the reversal and expungement of the May 28, 2013, hearing determination. (*Id.* at 7–8.) Plaintiff did not submit a motion in limine in which pretrial evidentiary issues could have been raised but did respond in opposition to Defendant's motion. (Dkt. No. 208.) The Court ruled on that motion during the October 3, 2022, final pretrial conference and excluded evidence of the reversal and expungement of the May 28, 2013, hearing determination. (Text Minute Entry dated Oct. 3, 2022.) The Court based its ruling on *Federal Rule of Evidence 403*, citing the dangers of confusion of issues and unfair prejudice and the concern that the jury would give the expungement undue weight in their analysis of whether there was a due process violation. The Court exercised its discretion in ruling on that issue, and Plaintiff has not advanced any theory as to why the Court's ruling was erroneous.

**\*5** Plaintiff also asserts that he was precluded from introducing "documentary evidence" corroborating his testimony that he has been incarcerated for over thirty years "as the result of ... two wrongful convictions for crimes that have never happen[ed]," referring to his conviction for selling cocaine in 1990 and his conviction for murder in 1996. (Dkt. No. 221, at 6.)[2] But Plaintiff did not seek to admit any such documentary evidence at trial. At the end of the first day of trial, after Plaintiff had rested his case, he told the Court that he thought he should have an opportunity to explain that he is innocent of the charges for which he is incarcerated. The Court informed Plaintiff that he could speak to his attorneys about his concerns, and no such documentary evidence was ever proffered.

Ultimately, Plaintiff's disputes of the Court's disposition of the evidentiary issues are attempts at "relitigating old issues ... or otherwise taking a 'second bite at the apple.' " *Sequa Corp*, 156 F.3d at 144. And Plaintiff has not shown that these rulings were 'clearly prejudicial to the outcome of the trial,' taking into account 'the record as a whole.' " *Graham*, 128 F. Supp. 3d at 705 (quoting *Johnson*, 990 F. Supp. 2d at 450).

As for the remaining evidence with which Plaintiff takes issue, Plaintiff failed to object to the admission or exclusion of such evidence at trial.[3] And Plaintiff has not suggested that the admission or exclusion of this evidence amounted to "plain error 'so serious and flagrant that it goes to the very integrity of the trial.' " *Johnson*, 990 F. Supp. 2d at 450 (quoting *Marcic*, 397 F.3d at 124). Nor has Plaintiff suggested that the admission or exclusion of any of the evidence at issue "affect[ed] a substantial right," *Mem'l Drive Consultants, 29 F. App'x at 61*, or otherwise "affected the outcome of the case," *Malek*, 994 F.2d at 55. In fact, upon "independently weigh[ing] the evidence presented at trial," *Song*, 957 F.2d at 1047 (quoting *Benevivo*, 574 F.2d at 684–85), the Court cannot conclude that the admission or exclusion of any evidence discussed by Plaintiff affected the outcome of the case or that the jury's verdict was " 'seriously erroneous' or resulted in a 'miscarriage of justice.' " *Edwards*, 205 F. Supp. 2d at 8 (quoting *Finn-Verburg*, 165 F. Supp. 2d at 228). Accordingly, Plaintiff's claims that the Court erred in the admission or rejection of evidence are insufficient to provide a basis for the Court to grant Plaintiff's motion for a new trial.

In sum, Plaintiff has failed to demonstrate that the trial was not fair or that substantial errors occurred in the admission or rejection of evidence. And the Court is not otherwise persuaded that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice. Accordingly, Plaintiff's motion for a new trial is denied.

## III. DEFENDANT'S MOTION FOR A BILL OF COSTS

Federal Rule of Civil Procedure 54(d)(1) states in relevant part that, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs ... should be allowed to the prevailing party." "[T]he Supreme Court has held that the term 'costs' includes only the specific items enumerated in 28 U.S.C. § 1920." Whitfield v. Scully, 241 F.3d 264, 269 (2d Cir. 2001), *abrogated on other grounds by* Bruce v. Samuels, 577 U.S. 82 (2016). Section 1920 provides that the following costs are taxable: (1) fees of the clerk and marshal; (2) fees for transcripts "necessarily obtained for use in the case"; (3) fees and disbursements for printing and witnesses; (4) fees for exemplification and copying costs "where the copies are necessarily obtained for use in the case"; (5) docketing fees under 28 U.S.C. § 1923; and (6) fees for court-appointed experts and interpreters. 28 U.S.C. § 1920. "The burden is on the prevailing party to establish to the court's satisfaction that the taxation of costs is justified." Cohen v. Bank of N.Y. Mellon Corp., No. 11-cv-456, 2014 WL 1652229, at *1, 2014 U.S. Dist. LEXIS 57829, at *2 (S.D.N.Y. Apr. 24, 2014) (quoting John G. v. Bd. of Educ., 891 F. Supp. 122, 123 (S.D.N.Y. 1995)). "[B]ecause Rule 54(d) allows costs 'as of course,' such an award against the losing party is the normal rule obtaining in civil litigation, not an exception." Whitfield, 241 F.3d at 270.

**\*6** Defendant seeks a total of $1,812.82 in costs associated with defending this action. (Dkt. No. 220.) Plaintiff opposes Defendant's motion. (Dkt. No. 228.)

### A. Witness Fees
Defendant seeks a total of $1,168.12 in costs for witnesses, including $160 for the attendance of four witnesses at trial, $678.12 for mileage, and $330 for subsistence. (Dkt. No. 220, at 3.) Plaintiff argues that the testimony of three non-party witnesses was "false, fabricated, [irrelevant,] and unnecessary" and that, therefore, fees associated with those witnesses are not taxable. (Dkt. No. 228, at 1–2.)

Plaintiff's arguments are without merit. The decision whether to credit a witness's testimony is within the discretion of the jury, *see* Toliver, 202 F. Supp. 3d at 335–36; Raedle, 670 F.3d at 418, and the testimony of each witness "was relevant and material to ... issue[s] in the case and reasonably necessary to [their] disposition," Zulu v. Barnhart, No. 16-cv-1408, 2019 WL 4544420, at *2, 2019 U.S. Dist. LEXIS 159344, at *4 (N.D.N.Y. Sept. 19, 2019) (quoting Fed. Sav. & Loan Ins. Corp. v. Szarabajka, 330 F. Supp. 1202, 1208–09 (N.D. Ill. 1971)).[4] Thus, Defendant is entitled to "fees and disbursements for ... [these] witnesses." *See* 18 U.S.C. § 1920(3).

Accordingly, because the statutory witness attendance fee is $40.00 per witness, 18 U.S.C. § 1821(b), because Defendant has correctly calculated mileage for each witnesses at the rate of $0.625, as prescribed under 28 U.S.C. § 1821(c)(2) and the United States General Services Administration Privately Owned Vehicle Mileage Rates, effective July 1, 2022, https://www.gsa.gov/travel/plan-book/transportation-airfare-pov-etc/privately-owned-vehicle-mileage-rates/pov-mileage-rates-archived (last visited Mar. 15, 2023), and because Defendant's subsistence calculations comply with the requirements of 18 U.S.C. § 1821(d) and the United States General Services Administration FY 2023 Per Diem Rates for New York, https://www.gsa.gov/travel/plan-book/per-diem-rates (last visited Mar. 15, 2023), Defendant's request for costs in the amount of $1,168.12 for witness fees is granted. *See* N.D.N.Y. Guidelines for Bills of Costs §§ II(F)(1)(a)–(c), (e).

### B. Transcript Fees
Defendant seeks $488.95 in costs for the transcript of Plaintiff's November 2, 2016, deposition. (Dkt. No. 220, at 5.) A prevailing party is "permitted to recover costs for [an] original ... transcript[ ]." C.C. ex rel. Camarata v. Polaris Indus., Inc., No. 14-cv-975, 2018 WL 3031848, at *5, 2018 U.S. Dist. LEXIS 101785, at *18 (N.D.N.Y. June 19, 2018); *see also* N.D.N.Y. Guidelines for Bills of Costs § II(D)(1)(c). Thus, Defendant is entitled to an award of costs in the amount of $488.95 for transcript fees.

### C. Exemplification and Copy Fees
Defendant seeks costs for one copy of Plaintiff's 127-page deposition transcript at the rate of $0.25 per page—a rate that the Court finds reasonable—for a total of $31.75. (Dkt. No. 220, at 5.) Defendant also seeks to recover the cost of "[o]ne (1) copy of discovery produced to [P]laintiff (325 pages)" at

the rate of $0.25 per page for a total of $81.25. (*Id.*) Defendant specifically identifies the documents that were included. (Dkt. No. 220-2, at 2–4.)

**\*7** A prevailing party is "permitted to recover costs for ... one copy of [a] transcript[ ]." *Camarata*, 2018 WL 3031848, at \*5, 2018 U.S. Dist. LEXIS 101785, at \*18. Furthermore, "[c]ourts interpret [28 U.S.C. § 1920(4)] to include photocopying charges for discovery." *Green v. Venettozzi*, No. 14-cv-1215, 2019 WL 4508927, at \*2, 2019 U.S. Dist. LEXIS 159343, at \*4 (N.D.N.Y. Sept. 19, 2019) (quoting *Phillips v. Allen*, No. 07-c-666, 2011 WL 1884558, at \*2, 2011 U.S. Dist. LEXIS 49065, at \*7 (N.D. Ill. May 6, 2011)). Defendant "provided sufficient information regarding the purpose of the copies" and the Court finds that the copies were "necessary [as they] relate to the 'initial disclosure requirements.' " *Green*, 2019 WL 4508927, at \*2, 2019 U.S. Dist. LEXIS 159343, at \*4 (quoting *U.S. ex rel. Cullins v. Astra, Inc.*, No. 09-60696-civ, 2010 WL 3008833, at \*5, 2010 U.S. Dist. LEXIS 87669, at \*16 (S.D. Fla. July 28, 2010)).

Finally, Defendant seeks costs associated with fifty-seven pages of trial exhibits. (Dkt. No. 220, at 5). Specifically, Defendant seeks the cost of preparing three copies of the trial exhibits at $0.25 per page, totaling $42.75. Defendant's supporting documentation does not indicate the content, purpose, or recipient of each copy of the trial exhibits for which reimbursement is sought. Because copies made solely for the convenience of counsel are not taxable costs, *see* N.D.N.Y. Guidelines for Bills of Costs § II(H)(2)(a), the Court reduces the amount Defendant seeks for trial exhibits by one-third, yielding $28.50 in taxable costs for trial exhibits. *See Gyllenhammer v. Am. Nat'l Red Cross*, No. 15-cv-1143, 2019 WL 175122, at \*3, 2019 U.S. Dist. LEXIS 5132, at \*7 (N.D.N.Y. Jan. 11, 2019). Accordingly, Defendant is entitled to an award of costs in the amount of $141.50 for exemplification and copy fees. When combined with the award of costs in the amount of $1,168.12 for witness fees and $488.95 for transcript fees, the total award of costs to which Defendant is entitled is $1,798.57.

### D. Stay Pending Appeal

Plaintiff notes in his opposition to Defendant's motion for a bill of costs that his "[§] 1983 action [is] still active[,] open[,] and pending on appeal in the U.S. Court of Appeals for the Second Circuit." (Dkt. No. 228, at 2.) The Court construes this as a request for a stay pending appeal.

Under this Court's Guidelines for Bills of Costs, "[u]less otherwise ordered by the District Court, or the Circuit Court of Appeals pursuant to Fed. R. App. P. 8, the filing of an appeal shall not stay the taxation of costs." N.D.N.Y. Guidelines for Bills of Costs § I(F)(2). Federal Rule of Civil Procedure 62, which governs stays of proceedings to enforce a judgment and "outlines the mechanism for how a stay may be obtained while an appeal is pending," does not "expressly permit a stay" pending appeal without bond to a party that is not the United States. *Miller v. City of Ithaca*, No. 10-cv-597, 2017 WL 61947, at \*4, 2017 U.S. Dist. LEXIS 1310, at \*12 (N.D.N.Y. Jan. 5, 2017). However, because "[Rule 62] does not limit the district court's inherent power to issue a stay in a manner that does not fall within the scope of the Rule," *id.*, the Court utilizes its framework in evaluating Plaintiff's request.

"The party requesting a stay bears the burden of showing that the circumstances justify an exercise of th[e court's] discretion." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). In deciding whether to stay proceedings, courts consider four factors, the first two of which "are the most critical": "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

**\*8** Here, Plaintiff has not made any showing of a likelihood of success on the merits or irreparable injury absent a stay. Having considered the applicable factors, the Court finds that Plaintiff has failed to meet his burden of showing that the circumstances here warrant a stay, and his motion for a stay of taxation of costs pending appeal is therefore denied.

### IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for a new trial, (Dkt. No. 221), is **DENIED**; and it is further

**ORDERED** that Defendant's motion for a bill of costs, (Dkt. No. 220), is **GRANTED** in part to the extent that Defendant is awarded $1,798.57, but it is otherwise denied; and it is further

**ORDERED** that Plaintiff's request for a stay pending appeal, (Dkt. No. 228), is **DENIED**.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 2785745

## Footnotes

1   Plaintiff inappositely moves for " 'a mistrial' and for 'a new trial' pursuant to Federal Rule[ ] of Civil Procedure[ ] Rule 5.2(c)." (Dkt. No. 221, at 2.) Defendant construes this as a motion for a new trial under Rule 59, (Dkt. No. 222, at 2), and in reply, Plaintiff correctly refers to Rule 59, (Dkt. No. 227, at 1). The Court construes Plaintiff's motion as a motion for a new trial pursuant to Rule 59.

2   The Court excluded evidence of Plaintiff's murder conviction at trial at Plaintiff's request, (Dkt. No. 208, at 2–5), and Plaintiff's convictions for selling drugs were admissible only for impeachment under Federal Rule of Evidence 609(a)(1). (Text Minute Entry dated Oct. 3, 2022.)

3   The Court notes that Plaintiff stipulated to the admission of the recording and transcript of the May 28, 2013, hearing and the cell photographs, (Dkt. No. 213, at 1–2); Plaintiff did not object to Perez, Gravlin, or Schrader testifying at trial; and Plaintiff does not appear to have proffered any evidence of a refund of $52 paid in restitution or the letter to the Inspector General's Office, (Dkt. No. 204).

4   As Plaintiff alludes to in his opposition to Defendant's motion for a bill of costs, (Dkt. No. 228), Gravlin testified about conditions of confinement in the Special Housing Unit, Perez testified about his role translating Plaintiff's May 28, 2013, hearing, and Schrader testified about her inspection of Plaintiff's Special Housing Unit cell and subsequently issued misbehavior report.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Pettiford v. City of Yonkers, S.D.N.Y., September 28, 2022

2021 WL 1164185
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Raiquan K. FALLS, Plaintiff,

v.

(POLICE OFFICER) DETECTIVE MICHAEL PITT;
(Police Officer) Carlos Canario; (Police Officer)
Andres Arestin; (Police Officer) Jonathan Saintiche;
(Police Officer) Sergeant William Anderson; (Police
Officer) John Perez; (Police Officer) Carlos Mendez;
(Nurse) Blanca Lemos; (Nurse Practitioner) Hillary
Durbin-french; (Physician) Alan Madell, Defendants.

16-CV-8863 (KMK)
|
Signed 03/26/2021

**Attorneys and Law Firms**

Raiquan K. Falls, Brocton, NY, Pro Se Plaintiff.

David L. Posner, Esq., Kimberly H. Lee, Esq., McCabe
& Mack LLP, Poughkeepsie, NY, Counsel for Defendants
Michael Pitt, Carlos Canario, Andres Arestin, Jonathan
Saintiche, John Perez, Carlos Mendez, and William
Anderson.

Milan P. Spisek, Esq., Sean B. Maraynes, Esq., Wilson
Elser Moskowitz Edelman & Dicker LLP, White Plains, NY,
Counsel for Defendants Alan Madell, M.D., Hillary Durbin-
French, N.P., and Blanca Lemos, R.N..

OPINION & ORDER

KENNETH M. KARAS, United States District Judge

**\*1** Plaintiff Raiquan K. Falls ("Plaintiff") brought this
Action against seven members of the Newburgh Police
Department ("Police Defendants") and three members of
the hospital staff at Saint Luke's Cornwall Hospital ("St.
Luke's") in Newburgh, New York ("Medical Defendants"). [1]
Plaintiff alleges various civil rights violations stemming from
his arrest and subsequent treatment while in police custody.

(See generally Second Am. Compl. ("SAC") (Dkt. No. 111).)
Before the Court are Police Defendants' Motion for Summary
Judgment, (Dkt. No. 159), Medical Defendants' Motion for
Summary Judgment, (Dkt. No. 173), and Plaintiff's Partial
Motion for Summary Judgment, (Dkt. No. 183). For the
following reasons, Police Defendants' Motion is granted
in part and denied in part, Medical Defendants' Motion is
granted in part and denied in part, and Plaintiff's Motion is
granted in part and denied in part.

I. Background

A. Factual History
The Court has described the allegations and procedural
history of this case in two prior Opinions. See Falls v. Pitt,
No. 16-CV-8863, 2020 WL 2097626 (S.D.N.Y. May 1, 2020);
Falls v. Pitt, No. 16-CV-8863, 2018 WL 3768036 (S.D.N.Y.
Aug. 8, 2018). The Court therefore assumes familiarity
with the dispute and will provide factual and procedural
background only as relevant to the instant Motions.

Unless otherwise noted, the following facts are taken from
Plaintiff's Second Amended Complaint, (see generally SAC),
Defendants' statement pursuant to Local Civil Rule 56.1,
(see Defs.' Local Civil Rule 56.1 Statement in Supp. of
Mot. ("Defs.' 56.1") (Dkt. No. 168)), Plaintiff's Counter
56.1 Statement in Opposition to Defendants' 56.1, (see Pl.'s
Counter 56.1 Statement in Opp'n to Defs.' 56.1 ("Pl.'s
Counter 56.1") (Dkt. No. 204)), and Plaintiff's own statement
pursuant to Local Civil Rule 56.1, (see Pl.'s Local Civil Rule
56.1 Statement in Supp. of Mot. ("Pl.'s 56.1") (Dkt. No.
183)). [2] [3] Defendants have sent the required Local Civil Rule
56.2 Notice to Plaintiff. (See Police Defs.' Local Civil Rule
56.2 Not. (Dkt. No. 169); Med. Defs.' Local Civil Rule 56.2
Not. (Dkt. No. 176).)

**\*2** This case stems from a series of events that unfolded
on the evening of May 8, 2015. For conceptual clarity in
resolving the instant Motions, the Court will group these
events into roughly four distinct episodes: (1) Plaintiff's
apprehension and arrest; (2) Plaintiff's body cavity search at
the Newburgh police station; (3) Plaintiff's attempt to swallow
recovered narcotics; and (4) Plaintiff's subsequent treatment
and examination at St. Luke's.

1. Plaintiff's Apprehension and Arrest

On May 8, 2015 at approximately 5:00 P.M., Plaintiff was arrested following a pursuit on foot near 15 Lutheran Street in the City of Newburgh, New York. (SAC ¶¶ 20, 28; Pl.'s 56.1 ¶¶ 1, 6, 9.) [4] City of Newburgh Police Department Officers Canario, Perez, and Mendez were dispatched to the area in response to a 911 call from a nearby resident who reported ongoing drug sales. (SAC ¶ 20; Pl.'s Counter 56.1 ¶ 11.) [5] By Plaintiff's own admission, the 911 caller "fully describ[ed] [him] as the suspect selling narcotics[,]" (SAC ¶ 20; *see also* Pl.'s Counter 56.1 ¶ 11), and accurately described what he was wearing, (Pl.'s Counter 56.1 ¶ 13). [6] Plaintiff testified that he was holding marijuana, which he was "just about to smoke," when officers arrived on the scene. (Aff. of David L. Posner, Esq., in Supp. of Police Defs.' Mot. ("Posner Aff.") Ex. K ("Pl.'s Dep."), at 19:7–9 (Dkt. Nos. 160, 160-10).)

At some point after exiting the patrol car, Officer Canario began walking toward Plaintiff. (*See* SAC ¶ 25; Pl.'s Counter 56.1 ¶ 15.) [7] According to Plaintiff's account, Canario approached him with his hand on his service weapon, yelling, "Falls, I'll shoot you right in your back if you make me run!" (SAC ¶¶ 25–26.) Both sides agree that Plaintiff began to flee as soon as Canario approached him. (*Id.* ¶ 27; Pl.'s Counter 56.1 ¶ 15.) Plaintiff avers that the chase "lasted for about 20 seconds" before he was apprehended. (SAC ¶ 28.)

What happened next is in dispute. According to Police Defendants, Plaintiff "was captured by Officer Mendez a few blocks away and arrested without incident." (Defs.' 56.1 ¶ 16.) They maintain that "[n]o force was used by the arresting officers beyond restraining him in handcuffs." (*Id.* ¶ 17.) Plaintiff, by contrast, alleges that he was "slammed ... to the ground" and handcuffed by Perez and Mendez, who held him there for several seconds until Canario, Pitt, Salche, Arestin, and Anderson arrived. (SAC ¶¶ 28–30.) [8] Plaintiff alleges that the officers then "dragged [him] into a nearby backyard" behind 12 Dubois Street. (*Id.* ¶ 31.) There, he alleges, the officers "overtightened [his] handcuffs to the point where the metal was press[ing] against and squeezing [his] wrist bones[,] causing substantial pain and bruising." (*Id.* ¶ 32.) He claims the officers then took turns pummeling him with their "closed fists," striking Plaintiff in his stomach, ribs, chest, and thighs. (*Id.* ¶ 33.) He also claims that the officers "reach[ed] down inside of [his] pants from the front ... all the way from [his] underwear to [his] socks." (*Id.*)

**\*3** Plaintiff was eventually placed in a patrol car and driven to the Newburgh police station. (*See* Defs.' 56.1 ¶¶ 29–30;

SAC ¶ 35.) Although Plaintiff claims he was seated in the back seat between two detectives who interrogated him on the ride to the police station, (*see* SAC ¶¶ 35–36), video evidence shows there was no one else in the car besides Perez, the driver, and Plaintiff, (Defs.' 56.1 ¶¶ 30–31; Posner Aff. Ex. C ("Secure Bay Video"), at 5:26:35–5:27:39). [9]

### 2. Police Defendants' Cavity Search at the Newburgh Police Station

Video footage shows that after arriving at the police station, Plaintiff spent approximately half an hour waiting in the booking room. (Defs.' 56.1 ¶ 34; Booking 1 Video at 5:28:02–6:00:40.) During this time, Plaintiff can be seen sitting, lying down, and occasionally interacting with Canario and other officers. (Defs.' 56.1 ¶ 34; Booking 1 Video at 5:28:02–6:00:40.) Eventually, Sergeant Anderson authorized a "visual body cavity search" of Plaintiff. (Defs.' 56.1 ¶ 36.) [10] He allegedly did so for two reasons: first, Plaintiff had been arrested in a part of Newburgh "known to be rife with drug activity"; and second, "[s]treet dealers such as [Plaintiff] are known to 'cheek' drugs," placing them "between the cheeks of their buttocks to avoid detection." (*Id.* ¶¶ 38–39; Anderson Aff. ¶¶ 3–4.) Police Defendants maintain that "drugs are often recovered at the police station during visual body cavity searches." (Defs.' 56.1 ¶ 40.) The search authorized by Anderson was not without limit, however. According to Police Defendants, "there is no touching or digital penetration of a body orifice[ ]" during a "visual body cavity search." (*Id.* ¶ 41; Pl.'s Counter 56.1 ¶ 41.) The Newburgh Police Department's internal strip-search policy "requires a search warrant for digital penetration of a body orifice," and such an examination must be performed by medical staff. (Defs.' 56.1 ¶ 42; Pl.'s Counter 56.1 ¶ 42.)

**\*4** At approximately 6:00 P.M., Officers Canario and Saintiche escorted Plaintiff into a separate room—without video cameras—to perform the search. (Defs.' 56.1 ¶ 43; *see also* SAC ¶¶ 44–45.) In affidavits submitted in support of Police Defendants' Motion, Canario and Saintiche state that Plaintiff initially went along with the strip search protocol, removing one article of clothing at a time until he was completely naked. (Canario Aff. ¶ 13; *see also* Aff. of Jonathan Saintiche in Supp. of Mot. ("Saintiche Aff.") ¶ 6 (Dkt. No. 167) (stating that Plaintiff was initially "cooperative with the process").) But although Plaintiff agreed to "lift his genitals for visual inspection[,]" he "refused to turn around, bend over[,] and spread his buttocks." (Canario Aff. ¶ 13;

*see also* Saintiche Aff. ¶ 6 (stating that Plaintiff "balked at turning around, squatting[,] and spreading the cheeks of his buttocks").) In response, Canario and Saintiche gave Plaintiff "several loud verbal commands to comply[.]" (Canario Aff. ¶ 13; *see also* Saintiche Aff. ¶ 6 ("[N]o amount of verbal instruction from us could gain [Plaintiff's] cooperation.").) Around this time, Pitt and Arestin entered the room "because they heard indications that [Plaintiff] was being uncooperative." (Defs.' 56.1 ¶¶ 45–46.)

Each of the four officers in the room provides essentially the same account of what happened next. In their telling, Pitt and Saintiche each took one of Plaintiff's arms and "held him facing the wall." (Canario Aff. ¶ 15; Saintiche Aff. ¶ 7; *see also* Aff. of Michael Pitt in Supp. of Mot. ("Pitt Aff.") ¶ 7 (Dkt. No. 164); Aff. of Andres Arestin in Supp. of Mot. ("Arestin Aff.") ¶ 4 (Dkt. No. 166).) At that point, according to the officers, Plaintiff voluntarily squatted, and "a small plastic bag drop[ped] from his rectal area." (Canario Aff. ¶ 15; *see also* Saintiche Aff. ¶ 7; Pitt Aff. ¶ 7; Arestin Aff. ¶ 4; Defs.' 56.1 ¶ 47 ("While naked and squatting a small plastic bag later determined to [be] cocaine, fell from [Plaintiff's] rectal area, observed by both Arestin and Canario.").) They maintain that "[n]one of the four [D]efendants with [Plaintiff] in the strip search room digitally penetrated his rectum." (Defs.' 56.1 ¶ 48.) Accordingly, "[t]he only physical contact between [Plaintiff] and any of the four officers in the room was the contact [o]fficers Pitt and Saintiche had with [Plaintiff's] arms." (Canario Aff. ¶ 16; *see also* Saintiche Aff. ¶ 8; Arestin Aff. ¶ 5.) In this version of events, "there was no physical struggle." (Arestin Aff. ¶ 5; *see also* Saintiche Aff. ¶ 8 ("[Plaintiff] was not thrown to the ground or into the wall or punched by Detective Pitt.").)

Plaintiff has given a different account of what happened. He alleges that Pitt and Saintiche "slammed [him] onto the floor face first," whereupon Pitt "punched [him] directly on the right side of [his] face between [his] right ear and right eye," that is, "on [his] temple." (SAC ¶¶ 59–60.) Plaintiff alleges that his "head bounced off the floor[,] and Pitt then immediately pinned [Plaintiff's] face against the floor with force." (*Id.* ¶ 61.) "While [his] head was pinned against the floor by Pitt," Plaintiff explains, "Saintiche, Canario[,] and Arestin then began punching and kneeing [him] in [his] ribs in a rapid motion." (*Id.* ¶ 62.) Plaintiff "[t]hen ... felt one of these officers forcefully penetrate [his] anal cavity and snatch the plastic sandwich baggie containing the white-rock like substance [he] had hidden there." (*Id.* ¶ 63.) After the officers

had recovered the contraband, they allegedly threw Plaintiff's clothes at him and left the strip search room. (*Id.* ¶ 64.)

### 3. Plaintiff's Attempt to Swallow Contraband and the Ensuing Scuffle

Security camera footage from the booking room shows what happened next. A few moments after being brought back into the booking room and having one ankle shackled to a bench, Plaintiff leapt toward Officer Canario and snatched from his hands the contraband that had been recovered in the strip search room. (*See* Pl.'s Counter 56.1 ¶¶ 54, 57; Booking 1 Video at 6:17:35.) The ensuing scuffle is described in detail in Section II.B.2.c *infra*. In brief, Plaintiff stuffed the contraband in his mouth in an attempt to "eat" the drugs and thereby destroy the evidence. (*See* Pl.'s Counter 56.1 ¶ 57; Pl.'s Dep. 70:16–17 ("[M]y intent was to eat it, yes."); *id.* 70:18–20 (Q: "You thought by doing that you would destroy that evidence? A: "Yes."); SAC ¶ 66 (stating that he placed the drugs in his mouth "intending to chew and destroy it").) Officer Canario tackled Plaintiff, and Pitt, Saintiche, and Arestin rushed to restrain Plaintiff on the ground and pry the contraband from his mouth. (*See* Pl.'s Counter 56.1 ¶¶ 58–60; Booking 1 Video at 6:17:37–49.) About 12 seconds later, as the officers continue struggling to subdue Plaintiff and recover the drugs, Canario uses pepper spray on Plaintiff. (*See* Booking 1 Video at 6:17:49.) The struggle continues for approximately 20 more seconds until Arestin uses his taser on Plaintiff, (*see id.* at 6:18:11), and the officers are finally able to restrain Plaintiff's hands in handcuffs and retrieve the contraband from his mouth, (*see id.* at 6:18:16).

**\*5** The video footage of this episode substantially undermines Plaintiff's version of events outlined in the Second Amended Complaint. Plaintiff, for example, alleges that he was pepper sprayed "[a]s soon as [he] hit the floor," (SAC ¶ 69), and was "punched and kneed in [his] ribs," (*id.* ¶ 71), both of which are belied by the footage. He also alleges that he spit out the contraband within 20 seconds from when he first snatched it from Canario's hands. (*Id.* ¶ 70.) Again, the video proves otherwise. And finally, he alleges that Arestin used the taser on him when he was lying face-down on the floor with "[his] hands on [his] head, not resisting at all." (*Id.* ¶ 72.) As with his other allegations from this incident, this statement is not true.

Finally, Canario avers that at some point before he and Saintiche took Plaintiff to St. Luke's, *see* Part I.A.4 *infra*,

Plaintiff told him that "he had more drugs inside his rectum but they were too far in and [the police] would not be able to get them." (Canario Aff. ¶ 25.) Canario advised Pitt and Sergeant Anderson about these remarks. (*Id.*) Plaintiff denies that he made such a comment. (*See* Pl.'s Decl. in Supp. of Mot. for Partial Summ. J. ("Pl.'s Decl.") ¶¶ 23, 25 (Dkt. No. 183).) [11]

#### 4. Medical Treatment and Examination at St. Luke's

Shortly after the events just described, Canario and Saintiche drove Plaintiff to St. Luke's. (SAC ¶ 75; Pl.'s Counter 56.1 ¶ 74.) The Parties agree that at the hospital, Plaintiff received medical care to have the residual pepper spray washed from his eyes and to have the taser barbs removed from his lower back. (*See* SAC ¶ 83; Posner Aff. Ex. D ("ER Records"), at 8 (Dkt. No. 160-3); Posner Aff. Ex. L ("Madell Aff'n") ¶¶ 15, 20 (Dkt. No. 160-11).) [12] But at this point in the narrative, the Parties' respective accounts of the evening diverge significantly. As discussed below, Defendants maintain there were two separate visits to the hospital—an initial visit in which medical staff rinsed Plaintiff's eyes and removed the taser barbs from his lower back, and a subsequent visit later in the evening in which medical staff performed a manual body cavity search and x-ray examination pursuant to a search warrant. But according to Plaintiff, only the initial visit took place, and the cavity search and x-ray were performed without the search warrant, which was not obtained until later in the evening.

#### a. Defendants' Version of Events at St. Luke's

According to Defendants, Dr. Alan Madell treated Plaintiff during his first visit to St. Luke's, which took place between approximately 6:50 P.M. and 7:40 P.M. (*See* Defs.' 56.1 ¶¶ 108, 113.) During this visit, medical staff rinsed Plaintiff's eyes with water to remove any residual pepper spray, (*see* Madell Aff'n ¶¶ 11–12), and Dr. Madell removed the taser barbs, cleansed the area with antiseptic, and applied antibacterial ointment and a bandage, (*see id.* ¶ 20). Dr. Madell also conducted a "head to toe" examination of Plaintiff and observed no signs "of trauma, such as bruising, contusions[,] or reflexes of pain." (*Id.* ¶ 24.) According to Dr. Madell, Plaintiff "denied any neck pain, back pain[,] or any other complaints except for eye pain." (*Id.* ¶ 13.) The first visit

ended sometime between around 7:25 P.M. and 7:40 P.M. (*See* Defs.' 56.1 ¶¶ 81, 113.)

Meanwhile, Pitt prepared a search warrant application based on Plaintiff's alleged statement that he was secreting more drugs inside his body cavity or stomach. (*See* Pitt. Aff. ¶ 14; Anderson Aff. ¶¶ 9–10.) Obtaining a search warrant would allow the police to have Plaintiff's anal cavity manually examined by hospital personnel. (*See* Pitt Aff. ¶ 14; Anderson Aff. ¶ 8.) Pitt prepared an affidavit in support of the search warrant, noting in part that police had already recovered contraband from Plaintiff's "rectum area" during a "strip search," and that Plaintiff had "made a statement that he does have more narcotics in his rectum." (Posner Aff. Ex. I ("Search Warrant & Supporting Aff."), at 4 (Dkt. No. 160-8).) [13] Pitt's affidavit was presented to the Honorable Judge E.L. Williams of the Newburgh City Court ("Judge Williams"), who issued the requested search warrant. (*See* Pitt Aff. ¶ 14; Search Warrant & Supporting Aff. 2.) Pitt delivered the search warrant to St. Luke's and "gave it to its medical personnel." (Pitt Aff. ¶ 14; Canario Aff. ¶ 27.)

**\*6** Having obtained a search warrant, Canario and Saintiche took Plaintiff to St. Luke's once again, arriving around 11:00 P.M. (Defs.' 56.1 ¶ 84.) After a triage nurse took Plaintiff's vital signs, Nurse Blanca Lemos received Plaintiff in "Bay 5." (Posner Aff. Ex. M ("Lemos Aff.") ¶¶ 7–8 (Dkt. No. 160-12).) However, it was Nurse Practitioner Hillary Durbin-French who actually examined Plaintiff. (*See* Defs.' 56.1 ¶¶ 119, 136–39.) Durbin-French is "trained to do rectal exams" and has performed "countless" such searches over the course of her career. (Posner Aff. Ex. N ("Durbin-French Aff.") ¶ 18 (Dkt. No. 160-13).) Having been shown the search warrant, Durbin-French asked Plaintiff to cooperate with the rectal examination. (*Id.* ¶¶ 20, 23.) Although he initially refused to consent to the search, Plaintiff eventually turned over on his side and voluntarily "pulled down his pants and agreed to the examination." (*Id.* ¶ 23.) Donning examination gloves and a "liberal amount of lubricant," Durbin-French quickly inserted her forefinger into Plaintiff's rectum and "palpate[d] for abnormalities." (*Id.* ¶ 19.) She identified no foreign body. (*Id.* ¶ 21.)

After performing this search, Durbin-French ordered a "KUB" (kidney, ureter, and bladder) x-ray examination to ensure that there were no foreign objects "further in the rectal cavity." (*Id.* ¶ 24.) Durbin-French states that an x-ray was performed because "good medical practice requires" it, and "not because a police officer requested it." (*Id.* ¶¶ 24–25.)

At 1:30 A.M., Durbin-French reviewed the x-rays, which indicated there was no foreign body inside Plaintiff. (*Id.* ¶ 28.) Plaintiff was discharged back into police custody at approximately 1:40 A.M. on May 9, 2015. (Defs.' 56.1 ¶ 118.)

#### b. Plaintiff's Version of Events at St. Luke's

Plaintiff agrees that he initially arrived at St. Luke's at around 6:50 P.M. (*See* SAC ¶ 75.) Plaintiff states that his "emergency room doctors" were Dr. Madell *and* Nurse Practitioner Durbin-French. (*Id.* ¶ 76.) He alleges that he did complain about additional injuries he had sustained—including injuries to his wrists, (*see* Pl.'s Dep. 50:20–52:4), and face, (*id.* at 104:18–105:15)—but that Dr. Madell and Durbin-French "caused [his] complaints to go ignored," (SAC ¶ 77.) After Plaintiff changed into a hospital gown and was handcuffed to a gurney, Officers Canario and Saintiche left the room "to go find medical personnel." (SAC ¶ 80.) Plaintiff then "overheard Canario and Saintiche saying to someone out in the hallway" that they had a "search warrant for [Plaintiff's] rectum," that they had observed Plaintiff "swallowing drugs," and that Plaintiff had told them he had more drugs hidden in his rectum. (*Id.* ¶ 81.) Plaintiff alleges that "[a]t about 6:52 P.M.," Nurse Lemos informed him that "she was given authorization to search [his] body cavity." (*Id.* ¶ 84.) [14] Plaintiff allegedly tried to show Lemos the "vis[i]ble bruises on [his] face and [his] wrists," told her that it felt as though his neck and back were broken, and explained that he was experiencing "sharp pains in [his] rectum" from having the police manually extract the contraband. (*Id.* ¶ 86.) But Lemos "ignored [him]" and told him that the police "ha[d] a search warrant and ... [could] use deadly force" to ensure his compliance with the search. (*Id.* ¶¶ 86, 88.) Officers Canario and Saintiche reportedly told Plaintiff that the taser barbs and pepper spray were not be removed unless he complied with the search. (*Id.* ¶ 90.) Then, the officers allegedly forced him onto one side and pinned him to the hospital bed as Nurse Lemos "pulled [his] pants down and penetrated [his] rectum without any lubrication for about [five] seconds." (*Id.* ¶¶ 92–93.)

**\*7** After Lemos announced that there were no drugs in Plaintiff's cavity, Canario and Saintiche allegedly "suggested" that Lemos should perform an x-ray examination. (*Id.* ¶¶ 96–97.) Plaintiff allegedly had his "stomach/abdomen" x-rayed at 7:00 P.M., after which Lemos removed the taser barbs from his back and washed the pepper spray from his eyes. (*Id.* ¶¶ 98–100.) At around 7:35 P.M., Lemos returned with the results of the x-ray and reported that there were no "unknown substances" inside Plaintiff's stomach, and said that Plaintiff was ready to be discharged. (*Id.* ¶ 101.)

Although there is a discharge release form in Plaintiff's medical records indicating that he was discharged at 1:35 A.M. on May 9 following the rectal examination and x-ray, (*see* ER Records 36), Plaintiff maintains that this form has been forged, (*see* SAC ¶ 102). Indeed, Plaintiff alleges that to the extent his medical records clearly indicate there were two visits to St. Luke's, thereby corroborating Defendants' version of events, these records have been forged or falsified. (*See id.* ¶¶ 112, 137.) Likewise, Plaintiff alleges that Pitt fabricated his statement that he was concealing additional drugs, and then used this fabricated evidence not only to obtain a search warrant, but also to "build[ ] a stronger case for the prosecution." (*Id.* ¶¶ 108–09.) According to Plaintiff's theory, the search warrant obtained from Judge Williams was "brought back to the hospital by Canario and Saintiche so that they could conspire with ... Lemos and Durbin-French to ... cover-up the fact that [Plaintiff] was illegally" subjected to a manual body cavity search and x-ray before the warrant was obtained. (*Id.* ¶ 111.) These Defendants allegedly conspired "to record[ ] these events as if they [had] happened" during a non-existent second visit later in the evening, around 11:00 P.M., and to doctor the records such that the first visit only documented treatment of Plaintiff's back and eyes. (*See id.*)

Based on the foregoing events, Plaintiff has brought claims against Police Defendants for false arrest (Count One), excessive force (Counts Two, Five, and Eight), sexual harassment and sexual abuse (Counts Three and Four), an unreasonable search (Count Six), deliberate indifference (Count Seven), and malicious abuse of process (Count 10). [15] Against Police Defendants *and* Medical Defendants, Plaintiff has brought claims for sexual harassment and sexual abuse (Counts 12 and 13), unreasonable searches (Counts 15 and 16), and conspiracy (Counts 14 and 20). Against Medical Defendants alone, Plaintiff has brought claims for violation of his right to privacy (Count 17) and deliberate indifference (Counts 18 and 19).

#### B. Procedural History
Plaintiff filed his initial Complaint on November 15, 2016 against Arestin, Pitt, Canario, Saintiche, and "Registered Nurse Jane Doe." (Compl. (Dkt. No. 2).) On November 17, 2016, Plaintiff's application to proceed in forma pauperis was granted. (*See* Dkt. No. 4.) On November 18, 2016,

the Court directed the County Attorney for the County of Orange to ascertain the identity of the Jane Doe nurse at St. Luke's involved in the events on May 8, 2015. (*See* Dkt. No. 6.) On February 7, 2017, Plaintiff submitted the Amended Complaint, (*see* Am. Compl. (Dkt. No. 22)), along with a list of parties in the Amended Complaint, (*see* Dkt. No. 19). The Amended Complaint added Dr. Madell, Nurse Practitioner Durbin-French, Nurse Lemos, Sergeant Anderson, Officer Perez, and Officer Mendez as Defendants. (*See* Am. Compl.) On April 27, 2017, Plaintiff submitted an application asking the Court to appoint pro bono counsel to represent him. (*See* Dkt. No. 26.) On May 2, 2017, the Court denied the request without prejudice. (*See* Dkt. No. 27.)

**\*8** On October 6, 2017, Madell and Durbin-French moved to dismiss all claims filed against them (the "Motion To Dismiss"). (*See* Dkt. Nos. 64–66.) Plaintiff failed to file an opposition or otherwise respond, (*see* Dkt. No. 80), and on January 22, 2018, the Court deemed the Motion To Dismiss fully submitted, (*see* Dkt. No. 81).

Meanwhile, discovery proceeded as to the other Defendants. Following the completion of discovery, on July 9, 2018, Police Defendants sought leave to file a summary judgment motion. (*See* Dkt. No. 101.) The same day, Medical Defendants sought leave to file a summary judgment motion, but noted that the decision on Madell and Durbin-French's Motion To Dismiss was still pending. (*See* Dkt. No. 102.) On July 18, 2018, the Court set a briefing schedule for all Defendants to file summary judgment motions. (*See* Dkt. No. 104.)

On August 8, 2018, the Court issued an Opinion & Order granting Madell and Durbin-French's Motion To Dismiss. (*See* Op. & Order ("Aug. 2018 Op.") (Dkt. No. 109).) However, the Court granted Plaintiff 30 days to amend his complaint and correct the deficiencies with respect to the dismissed claims. (*See* Aug. 2018 Op. 15.) On September 6, 2018, Plaintiff signed his Proposed Second Amended Complaint ("PSAC"), which was docketed on September 11, 2018. (*See* Dkt. No. 111.) On September 14, 2018, Police Defendants filed a letter objecting to the PSAC on the grounds that it "purports to assert new matters and claims with regard to them ... without leave of the Court on the eve of summary judgment practice." (*See* Dkt. No. 113.) On November 7, 2018, the Court issued an Order construing Plaintiff's PSAC as a Motion To Amend, and setting a schedule for Police Defendants' Response and Plaintiff's Reply. (*See* Order ("Nov. 2018 Order") (Dkt. No. 125).) The Court

simultaneously stayed the briefing of Defendants' expected summary judgment motions pending resolution of Plaintiff's Motion To Amend. (*See id.* at 5.) On December 4, 2018, Police Defendants filed their Response and accompanying papers. (*See* Dkt. Nos. 126–27.) On February 26, 2019, Plaintiff filed his Reply. (*See* Dkt. No. 133.) On April 23, 2020, Plaintiff filed a "Declaration in Support of the Plaintiff's Motion for Appointment of Counsel," (Dkt. No. 146), thereby renewing his earlier (previously rejected) Application for appointment of pro bono counsel, (*see* Dkt. No. 26).

On May 1, 2020, the Court issued an Order granting in part and denying in part the Motion To Amend and denying Plaintiff's renewed Application for appointment of pro bono counsel. (*See* Order ("May 2020 Order") (Dkt. No. 147).) The Court found that two of the claims raised in the PSAC—a First Amendment retaliation claim and a malicious prosecution claim—were never raised in the Amended Complaint. (*See id.* at 9 & n.2.) The Court also concluded that neither claim satisfied the standard that governs motions to amend under Fed. R. Civ. P. 15(a). (*See id.* at 10–14.) Finally, the Court denied Plaintiff's renewed Application for appointment of pro bono counsel, observing in part that "Plaintiff has demonstrated his ability to present the case himself through his submissions in this Action that adequately express his arguments and desired forms of relief." (*Id.* at 16–17.) Having deemed the PSAC the new operative complaint (henceforth the Second Amended Complaint), the Court lifted the stay on Defendants' Motions for Summary Judgment and set a briefing schedule. (*See id.* at 17.)

**\*9** After the Court granted Defendants a 30-day adjournment in light of the Covid-19 pandemic, (*see* Dkt. No. 150), and granted their request for a page extension on their Memorandum of Law, (*see* Dkt. No. 155), Police Defendants and Medical Defendants filed their Motions for Summary Judgment and supporting papers on July 1, 2020, (*see* Police Defs.' Not. of Mot. (Dkt. No. 159); Med. Defs.' Not. of Mot. (Dkt. No. 173)). Plaintiff filed a cross-Motion for Partial Summary Judgment on July 7, 2020. (*See* Dkt. No. 183.) Police Defendants filed their Opposition to Plaintiff's Motion on August 10, 2020. (*See* Dkt. No. 193.) After receiving multiple extensions from the Court, (*see* Dkt. Nos. 191, 200), Plaintiff filed his Opposition to Defendants' Motions on October 23, 2020, (*see* Dkt. No. 204). Police Defendants submitted their Reply on November 19, 2020, (*see* Dkt. No. 207), and, after receiving an extension from the Court, (*see* Dkt. No. 210), Medical Defendants submitted their Reply on December 11, 2020, (*see* Dkt. No. 212). Plaintiff failed to

submit a Reply in further support of his Partial Motion for Summary Judgment.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and ... resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted); *see also Borough of Upper Saddle River v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (citation, alteration, and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion ..., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,' " *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir.

2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading ...."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (citation and quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (citation omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits ... to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant ... is competent to testify on the matters stated.' " *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

**\*10** As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)). Where the evidence presents "a question of 'he said, she said,' " the court "cannot ... take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d

712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side ... tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court"). And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment."

*Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact").

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant ... liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and citation omitted). Moreover, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should ... be[ ] made in light of the opposing party's pro se status" (italics omitted)). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence[ ] are insufficient to overcome a motion for summary judgment."

*Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Benefit Fund*, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014) (alterations, italics, citation, and quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

### B. Analysis

For reasons discussed in the May 2020 Order, the Court will not consider Plaintiff's First Amendment retaliation claim

(Count Nine) or his malicious prosecution claim (Count 11). Of the remaining claims, Police Defendants have moved for summary judgment on Counts 1–5, 7–8, 10, 12–16, and 20. (*See generally* Police Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Police Defs.' Mem.") (Dkt. No. 170).) Medical Defendants have moved for summary judgment on Counts 12–20. (*See generally* Med. Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Med. Defs.' Mem.") (Dkt. No. 177).) Plaintiff has moved for summary judgment on Count Six and cross-moved for summary judgment on Counts One, Seven, and 10. (*See* Pl.'s Mem. of Law in Supp. of Mot. for Partial Summ. J. ("Pl.'s Mem.") 8 (Dkt. No. 183).) [16]

### 1. False Arrest Claim (Count One)

**\*11** In Count One, Plaintiff asserts a claim for false arrest against Police Defendants Canario, Perez, and Mendez based on the incidents leading to his arrest. (SAC ¶¶ 20–29, 118.) Both Plaintiff and Police Defendants have moved for summary judgment on this claim. (*See* Pl.'s Mem. 8, 11–13; Police Defs.' Mem. 20–21, 32.)

A "§ 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006); *see also Widget v. Town of Poughkeepsie*, No. 12-CV-3459, 2013 WL 1104273, at *4 (S.D.N.Y. Mar. 18, 2013) (same). "In analyzing § 1983 claims for unconstitutional false arrest, [courts] have generally looked to the law of the state in which the arrest occurred." *Jaegly*, 439 F.3d at 151 (citation omitted); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) ("A § 1983 claim for false arrest ... is substantially the same as a claim for false arrest under New York law." (ellipsis in original) (citation omitted)). Under New York law, which is applicable here, "an action for false arrest requires that the plaintiff show that '(1) the defendant intended to confine him [or her], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged.' " *Ackerson*, 702 F.3d at 19 (quoting *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975)).

"Probable cause 'is a complete defense to an action for false arrest' brought under New York law or § 1983." *Ackerson*, 702 F.3d at 19 (quoting *Weyant v. Okst*, 101 F.3d 845,

852 (2d Cir. 1996)); *see also Deanda v. Hicks*, 137 F. Supp. 3d 543, 568 (S.D.N.Y. 2015) (same); *Conte v. County of Nassau*, No. 06-CV-4746, 2010 WL 3924677, at *12 (E.D.N.Y. Sept. 30, 2010) (same). "Probable cause to arrest exists when the officers have ... reasonably trustworthy information as to[ ] facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been ... committed by the person to be arrested."

*Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007); *see also Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (same). To determine whether probable cause existed for an arrest, a court "assess[es] whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Ackerson*, 702 F.3d at 19 (citation and quotation marks omitted). Moreover, "probable cause does not require an awareness of a particular crime, but only that some crime may have been committed." *Id.* at 20 (citation and quotation marks omitted). In other words, "[Police] Defendants prevail if there was probable cause to arrest Plaintiff for any single offense." *Id.* (alteration, citation, and quotation marks omitted). "Whether probable cause is established depends on the totality of the circumstances, ... including the information possessed by the officer prior to making the arrest and [his or] her experience." *Daniels v. City of New York*, No. 15-CV-2251, 2016 WL 4368378, at *3 (S.D.N.Y. Aug. 14, 2016) (citation omitted). "The burden of establishing the absence of probable cause rests on the plaintiff," and "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Sethi v. Nassau County*, No. 11-CV-6380, 2014 WL 2526620, at *4 (E.D.N.Y. June 3, 2014) (citations omitted); *see also Nickey v. City of New York*, No. 11-CV-3207, 2013 WL 5447510, at *5 (E.D.N.Y. Sept. 27, 2013) ("[W]hen the facts material to a probable cause determination are undisputed, the matter is a question of law properly decided by the [c]ourt.").

 **\*12** "Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest."

*Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."

*Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007) (citation and quotation marks omitted); *see also Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (same). Accordingly, "the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; arguable probable cause will suffice to confer qualified immunity for the arrest." *Escalera*, 361 F.3d at 742 (quotation marks omitted). "This forgiving standard protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To deny a motion for summary judgment on qualified immunity grounds, a court must find that the officer's judgment was "so flawed that no reasonable officer would have made a similar choice." *Provost*, 262 F.3d at 160 (citation omitted).

As relevant here, "[w]hen information is received from a putative victim or an eyewitness, probable cause exists unless the circumstances raise doubts as to the person's veracity." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citations omitted); *see also Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (observing that "information gleaned from informants can be sufficient to justify the existence of probable cause," and recognizing the "well-established" principle "that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity" (citations and quotation marks omitted)). Moreover, the information furnished by "an identified bystander with no apparent motive to falsify has a peculiar likelihood of accuracy," and the Second Circuit has "endorsed the proposition that an identified citizen informant is presumed to be reliable." *Panetta*, 460 F.3d at 395 (citation and quotation marks omitted).

Here, it is undisputed that the officers in question were responding to a 911 call in which the caller "fully describ[ed] [Plaintiff] as the suspect selling narcotics." (SAC ¶ 20; *see also* Defs.' 56.1 ¶ 11.) The officers had no reason to question this informant's credibility; indeed, Plaintiff himself acknowledges that the information provided to the officers was accurate. (*See* SAC ¶ 20.) Officer Canario, who first approached Plaintiff, recognized him as the individual who

"matched the description given by the caller." (Canario Aff. ¶ 4.) Joining the pursuit moments later, Officer Mendez also recognized that Plaintiff's clothing "matched" the "description [that had] come over the radio." (Mendez Aff. ¶ 4.)[17] All of this occurred in an area where illegal drug activity was common, (*see* Anderson Aff. ¶ 3), and in which Plaintiff admits to having sold drugs shortly before the officers arrived, (Pl.'s Dep. 23:4–17).

Relying on credible, contemporaneous information from an eyewitness, the responding officers here undoubtedly had arguable probable cause to arrest Plaintiff. Courts have found the existence of probable cause and arguable probable cause in similar circumstances where police officers make an arrest based on information from a 911 call. *See, e.g.,* 🚩 *Gatling v. West*, No. 18-CV-275, 2020 WL 564604, at *8 (N.D.N.Y. Feb. 5, 2020) (finding that a police officer had probable cause to arrest an erratic driver based in part on a "near-contemporaneous citizen complaint" that was "communicated to [the officer] through the 911 operator," and therefore dismissing the plaintiff's false arrest claim on summary judgment), *appeal docketed*, No. 20-827 (2d Cir. Mar. 6, 2020); *Pagan v. City of New York*, No. 15-CV-5825, 2019 WL 8128482, at *6–7 (E.D.N.Y. Mar. 28, 2019) (granting summary judgment based on conclusion that police officers had "arguable probable cause" where the officers were acting in response to a 911 caller who described the suspect as "disturbed, uncontrollable, and potentially carrying a weapon").[18] Likewise, courts have found the existence of arguable probable cause where, as here, officers make an arrest based on a contemporaneous, eyewitness description of the suspect's clothing. In *Steinbergin v. City of New York*, No. 19-CV-1314, 2021 WL 396690 (S.D.N.Y. Feb. 4, 2021), for example, the officer "arrived at the scene" of a reported drug deal "only a few minutes" after the sale and "saw [the plaintiff] ... wearing distinctive clothing matching [the undercover officer's] description of the suspect's clothing." *Id.* at *4. "Given the proximity in time and location to the crime and the fact that [the plaintiff's] distinctive attire matched the suspect's," the court concluded that "a reasonable officer in [the defendant's] position could have concluded that [the plaintiff] had sold cocaine to [the undercover officer] as soon as he saw him." *Id.* The court therefore found that the defendant officer was entitled to qualified immunity and dismissed the plaintiff's false arrest claim on a motion for summary judgment. *See id.* at *4–5. In *Falls v. Rude*, No. 17-CV-1339, 2019 WL 3715087 (S.D.N.Y. Aug. 7, 2019), another case involving Plaintiff, the

court found that the defendant officers had arguable probable cause to arrest Plaintiff based on "a particularly distinctive feature of [his] clothing[,]" a description of which had been provided to the officers by a victim who called the police to report that Plaintiff had threatened her with a gun, *see id.* at *8. Accordingly, the court held that defendants were entitled to qualified immunity with respect to Plaintiff's false arrest claim on a motion for summary judgment. *See id.*

**\*13** Finally, Plaintiff's decision to run from the responding officers is another factor that supports the existence of arguable probable cause. *See Greene v. Bryan*, No. 15-CV-249, 2018 WL 3539811, at *12 (E.D.N.Y. July 23, 2018) ("Unprovoked flight from the police is certainly suggestive of wrongdoing and can be treated as suspicious behavior that factors into the totality of the circumstances." (citation and quotation marks omitted)); *McClellan v. City of New York*, No. 15-CV-6759, 2017 WL 4217144, at *3 (S.D.N.Y. Sept. 20, 2017) (observing that courts may consider a suspect's "flight from the police, presence at the scene, and similarity ... to witness descriptions" when deciding whether there was probable cause).

Based on the totality of circumstances, the Court concludes that "it was objectively reasonable for the [responding] officer[s] to believe that probable cause existed," or, at the very least, "officers of reasonable competence could disagree on whether the probable cause test was met." *See* 🚩 *Walczyk*, 496 F.3d at 163. These officers therefore had "arguable probable cause" to arrest Plaintiff, and they are entitled to qualified immunity with respect to Plaintiff's false arrest claim. For these reasons, Police Defendants' Motion is granted, and Plaintiff's Motion is denied, with respect to Count One. Count One is therefore dismissed.

## 2. Excessive Force Claims (Counts Two, Five, and Eight)

Plaintiff has brought three excessive force claims, each based on a different episode on the night of May 8. In Count Two, Plaintiff brings an excessive force claim against each of the seven Police Defendants based on their alleged treatment of Plaintiff in the yard behind 12 Dubois Street shortly after he was apprehended. (*See* SAC ¶¶ 31–33, 119.) In Count Five, Plaintiff brings an excessive force claim against Canario, Pitt, Saintiche, and Arestin based on their alleged treatment of Plaintiff during the cavity search at the Newburgh police station. (*See id.* ¶¶ 59–63, 122.) In Count Eight, Plaintiff brings an excessive force claim against these same four Police

Defendants based on their efforts to restrain him after he tried to swallow the drugs that were recovered during the search. (*See id.* ¶¶ 67–73, 125.) Police Defendants have moved for summary judgment on each count. (*See* Police Defs.' Mem. 13–19.)

"Claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen [are] analyzed under the Fourth Amendment and its reasonableness standard." *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 591 (S.D.N.Y. 2013) (citation, alteration, and quotation marks omitted). Thus, as noted in the Court's May 2020 Order, although Plaintiff labels his excessive force claims as arising under the Fourteenth Amendment, (*see* SAC ¶¶ 119, 122, 125), the Court will "construe[ ] these claims as arising under the Fourth Amendment as incorporated by the Fourteenth Amendment," (*see* May 2020 Order 7 n.1). *See also Graham v. Connor*, 490 U.S. 386, 394–95 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against ... physically intrusive governmental conduct [during an arrest or investigatory stop of a free citizen], that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.").

"When determining whether police officers have employed excessive force in the arrest context, the Supreme Court has instructed that courts should examine whether the use of force is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation.' " *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (alteration in original) (quoting *Graham*, 490 U.S. at 397). To evaluate the reasonableness of an officer's conduct, a court should "consider the facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999). "Additionally, on an excessive force claim a plaintiff must present sufficient evidence to establish that the alleged use of force is objectively sufficiently serious or harmful enough to be actionable." *Washpon v. Parr*, 561 F. Supp. 2d 394, 406 (S.D.N.Y. 2008) (citation and quotation marks omitted). "Generally, the force used by the [d]efendant must be more than de minimis in order for an excessive force claim to be actionable." *Musso v. City of New York*, No. 05-CV-2511, 2008 WL 3200208, at *4 (E.D.N.Y. July 24, 2008) (citation, alterations, and italics omitted).

#### a. Use of Force During Plaintiff's Arrest (Count Two)

**\*14** Within Count Two itself, Plaintiff alleges three distinct acts that could arguably constitute excessive force. As discussed in Section I.A.1 *supra*, Plaintiff alleges that Police Defendants (1) overtightened his handcuffs (the "Handcuff Claim"), (2) repeatedly punched him in the stomach, ribs, chest, and thighs (the "Assault Claim"), and (3) "reach[ed] down inside of [his] pants from the front ... all the way from [his] underwear to [his] socks" (the "Search Claim"). (SAC ¶¶ 31–33.) The Court will address each of these specific claims in turn. *See Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *14–17 (S.D.N.Y. Sept. 30, 2015) (addressing separately the plaintiff's allegations of tight handcuffing, threats of arrest and property destruction, brandishing weapons, and physical force); *Keeney v. City of New London*, 196 F. Supp. 2d 190, 198 (D. Conn. 2002) (addressing separately alleged force used before an individual was handcuffed and restrained and after an individual was handcuffed and restrained).

#### i. Count Two: The Handcuff Claim

"Courts apply a separate standard to claims for excessive force in the use of handcuffs." *Sachs v. Cantwell*, No. 10-CV-1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012). "While handcuffs must be reasonably tight to be effective, handcuffs that are overly tight may constitute an excessive use of force on the part of the officer using them." *Id.* (citing *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008)). When evaluating a claim of excessive force based on the defendants' use of handcuffs, courts are to consider three factors: (1) whether the handcuffs were "unreasonably tight"; (2) whether the "defendants ignored the plaintiff's pleas that the handcuffs were too tight"; and (3) the "degree of injury to the [plaintiff's] wrists." *Id.* (citation, alteration, and emphasis omitted). Of these three factors, the third is "particularly important," for a plaintiff "must suffer some form of injury from the tight handcuffs in order for such a claim to be

actionable." *Id.* (quoting ⚠️ *Vogeler v. Colbath*, No. 04-CV-6071, 2005 WL 2482549, at \*9 (S.D.N.Y. Oct. 6, 2005)). Indeed, there is agreement throughout the Second Circuit that "tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Id.* (quoting *Lynch*, 567 F. Supp. 2d at 468–69) (gathering authorities).

Here, Plaintiff alleges that after Police Defendants handcuffed him, they "overtightened [his] handcuffs to the point where the metal was pressed against and squeezing [his] wrist bones[,] causing substantial pain and bruising." (SAC ¶ 32.) Describing this injury in more detail during his deposition, Plaintiff said his wrists had "dents," "bruises," and broken skin. (Pl.'s Dep. 51:4–21.) Plaintiff has provided a similar description of his injury in other submissions as well. (*See* Pl.'s Decl. in Opp'n to Defs.' Mot. ("Pl.'s Opp'n Decl.") ¶ 14 (Dkt. No. 204) (stating that he "sustained intensive bruising on his wrists caused by the assaults while in overtightened handcuffs"); Pl.'s Mem. of Law in Opp'n to Defs.' Mot. ("Pl.'s Opp'n") 3 (Dkt. No. 204) (explaining that the "only injuries he claims to have sustained as a result of the assault were intensive pain, bruising, scrapes[,] and redness in/on his wrists").) [19]

Even if the Court accepted Plaintiff's allegations and supporting testimony as true, the alleged injury he has described—temporary pain, bruising, scrapes, and redness—"does not rise to the level of injury necessary to sustain an excessive use of force claim for tight handcuffs." *Sachs*, 2012 WL 3822220, at \*15 (concluding on summary judgment that a plaintiff's swelling in her wrists, which lasted 24 hours, did not constitute a sufficient injury to support an excessive force claim based on tight handcuffs); *see also Selvaggio v. Patterson*, 93 F. Supp. 3d 54, 74–75 (E.D.N.Y. 2015) (granting summary judgment for the defendants where the plaintiff's injuries consisted of scabbing and abrasions); *Richardson v. N.Y.C. Health & Hosps. Corp.*, No. 05-CV-6278, 2009 WL 804096, at \*13–14 (S.D.N.Y. Mar. 25, 2009) (granting the defendants' summary judgment motion on an excessive force claim where Plaintiff suffered pain, bruises, swelling, and red marks, and was given an over-the-counter pain reliever at the hospital); *Bratton v. N.Y. State Div. of Parole*, No. 05-CV-950, 2008 WL 1766744, at \*9–10 (N.D.N.Y. Apr. 14, 2008) (concluding on summary judgment that the plaintiff did not satisfy the injury requirement despite medical records showing that his wrists were swollen and

bruised for three weeks as a result of handcuffs); *Hamlett v. Town of Greenburgh*, No. 05-CV-3215, 2007 WL 119291, at \*3 (S.D.N.Y. Jan. 17, 2007) (concluding on summary judgment that the plaintiff's "brief numbness as a result of the handcuffs being too tight" did not "rise to the level of force required to sustain an excessive force claim"); ⚠️ *Vogeler*, 2005 WL 2482549, at \*10 (granting the defendant's motion for summary judgment where the plaintiffs had failed to show "any measurable harm" from the handcuffing); *Wilder v. Village of Amityville*, 288 F. Supp. 2d 341, 344 (E.D.N.Y. 2003) ("Plaintiff's allegation of sore, yet uninjured, wrists simply does not rise to the level of ... unlawful conduct in an arrest situation."), *aff'd*, 111 F. App'x 635 (2d Cir. 2004). By contrast, "[t]he most common injuries found to satisfy the injury requirement in handcuff cases are scarring and nerve damage." *Usavage*, 932 F. Supp. 2d at 592, 598 (gathering cases and denying summary judgment where there was evidence that the plaintiff suffered from nerve damage after handcuffing); *see also Golio v. City of White Plains*, 459 F. Supp. 2d 259, 265 (S.D.N.Y. 2006) (denying defendants' motion for summary judgment where plaintiff had alleged swelling and lasting nerve damage due to the handcuffing. No such injuries are present here. (*See* Pl.'s Dep. 51:9–15 (Q: "Are there any marks on your wrists now?" A: "No, not right now." Q: "How long did those marks on your wrists last?" A: "Probably a couple of days, like that.").) Here, "the fact that the tight handcuffing did not cause [Plaintiff] any continuing injury is fatal to the excessive force claim[,]" *Lynch*, 567 F. Supp. 2d at 468, and thus, the Court will dismiss the Handcuff Claim on this basis.

### ii. Count Two: The Assault Claim

**\*15** Insofar as Plaintiff's excessive force claim is predicated on the alleged assault by Police Defendants, Plaintiff has not produced evidence "that the alleged use of force was serious or harmful enough to be actionable." *Ferebee v. City of New York*, No. 15-CV-1868, 2017 WL 2930587, at \*8 (S.D.N.Y. July 6, 2017), *reconsideration denied*, 2017 WL 3208602 (S.D.N.Y. July 27, 2017). Although the "focus of inquiry in an excessive-force claim is on the force used rather than the injuries sustained, '[t]he extent of injury may also provide some indication of the amount of force applied.' " *Sullivan v. City of New York*, No. 17-CV-3779, 2018 WL 3368706, at \*11 (S.D.N.Y. July 10, 2018) (alteration in original) (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam)); *see*

*also* 🚩 *Marlin v. City of New York*, No. 15-CV-2235, 2016 WL 4939371, at *12 (S.D.N.Y. Sept. 7, 2016) (observing that "[a]lthough the severity of [a] plaintiff's alleged injuries is not dispositive, it is nonetheless highly relevant to the inquiry about whether the force applied was reasonable" (citation and quotation marks omitted)). "A de minimis use of force will rarely suffice to state a constitutional claim," and "de minimis injury can serve as conclusive evidence that de minimis force was used." *Ferebee*, 2017 WL 2930587, at *8 (citations and italics omitted); *see also* 🚩 *Cunninham v. New York City*, No. 04-CV-10232, 2007 WL 2743580, at *6 (S.D.N.Y. Sept. 18, 2007) (same).

Although Plaintiff's account of his arrest includes a violent beating in which Police Defendants repeatedly pummeled his thighs and parts of his torso, (*see* SAC ¶ 33), his own subsequent testimony belies this account. At his deposition, for example, Plaintiff testified that despite being punched with closed fists "[e]ight to ten times," (Pl.'s Dep. 47:13–17), he suffered no injuries, (*see id.* 47:3–8 (explaining that the officers kept "hitting [him] in the body area," but that he "really didn't get injured off of that" and "didn't pay it [any] mind"); *id.* 48:2–9 (Q: "What part of your body did they punch? ... A: "Ribs, chest, stomach." Q: "You said you were not injured?" A: "I was not injured. Yeah, I wasn't injured.")). The alleged assault caused neither bleeding nor bruising. (*See id.* 48:10–14 (Q: "Were you bleeding from any part of your body?" A: "No." Q: "So, did you have any bruising?" A: "Not that I recall, no.").) After being taken to the hospital later in the evening, Plaintiff did not raise this alleged assault because he "didn't pay [it] [any] mind," and "[it] didn't [faze] [him]." (*Id.* 50:4–5.) Similarly, in his Memorandum of Law in Opposition to Summary Judgment, Plaintiff describes his pain from the alleged assault as "minor" and "momentar[y]." (*See* Pl.'s Opp'n 3.)

Thus, by Plaintiff's own admission, he suffered minor, momentary pain and no injuries from the officers' alleged beating. Under these circumstances, Plaintiff's "de minimis injury ... serve[s] as conclusive evidence that de minimis force was used." *Ferebee*, 2017 WL 2930587, at *8 (citation and italics omitted). Accordingly, "no reasonable trier of fact could determine that [Police Defendants] used excessive force when arresting Plaintiff." *Id.* (granting summary judgment and dismissing the plaintiff's excessive force claim where the "[p]laintiff himself testified that he suffered no physical injuries as a result of the arrest"); 🚩 *Cunninham*, 2007 WL 2743580, at *7 (granting summary judgment for defendants

where the only injuries plaintiffs alleged from being sprayed with mace were temporary discomfort and disorientation, which were held to be de minimis). Although this Court and others have allowed excessive force claims to survive summary judgment where a plaintiff has suffered only minor injuries, *see, e.g., Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, No. 12-CV-974, 2017 WL 4326540, at *13 (S.D.N.Y. Sept. 28, 2017) (gathering cases), the Court has not located a case in which a court allowed such a claim to survive in the absence of *any* injury. And while the force allegedly used by Police Defendants when arresting Plaintiff may *not* have been de minimis, Plaintiff's testimony renders this particular aspect of his account "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." 🚩 *Jeffreys*, 426 F.3d at 555 (citation and quotation marks omitted). Accordingly, the Assault Claim is dismissed.

### iii. Count Two: The Search Claim

**\*16** The third component of Plaintiff's excessive force claim is based on the allegation that during the arrest, certain Police Defendants "empt[ied] out [Plaintiff's] pockets, check[ed] [his] waistline, [and] reach[ed] down inside of [Plaintiff's] pants from the front side all the way from [his] underwear to [his] socks." (SAC ¶ 33.) Accordingly, this component of Count Two is more properly analyzed as an unreasonable search claim, rather than as a claim based on alleged excessive force. Police Defendants have not addressed this aspect of Plaintiff's claim. (*See generally* Police Defs.' Mem.)

The search of a person incident to an arrest is presumptively reasonable under the Fourth Amendment. *See* 🚩 *United States v. Robinson*, 414 U.S. 218, 235 (1973). "Nevertheless, a search incident to a lawfully executed arrest may still violate the Fourth Amendment, if conducted in an otherwise unreasonable manner." 🚩 *Wang v. Vahldieck*, No. 09-CV-3783, 2012 WL 119591, at *10 (E.D.N.Y. Jan. 9, 2012); *see also Bolden v. Village of Monticello*, 344 F. Supp. 2d 407, 417 (S.D.N.Y. 2004) (noting "[a] lawful arrest ... creates a presumption of reasonableness regarding an attendant search" that "can be rebutted by a showing that the search was conducted in an otherwise unreasonable manner"). "[U]nreasonable, non-consensual, inappropriate touching," for example, "can constitute unreasonable intrusions into a plaintiff's bodily integrity in violation of the Fourth

Amendment." *Golden v. County of Westchester*, No. 10-CV-8933, 2012 WL 4327652, at *5 (S.D.N.Y. Sept. 18, 2012)

(brackets and quotation marks omitted) (quoting *Fontana v. Haskin*, 262 F.3d 871, 880–81 (9th Cir. 2001)); *see also Anderson v. Waterbury Police Dep't*, No. 14-CV-829, 2017 WL 1157843, at *11 (D. Conn. Mar. 28, 2017) ("[C]ourts in [the Second] Circuit have found that claims that a police officer's actions during and following the arrest of a suspect rise to the level of a sexual assault are properly analyzed under the Fourth Amendment and could give rise to at least one genuine issue of material fact that precludes summary judgment on the Fourth Amendment claim." (citation and quotation marks omitted)). However, "not every truthful allegation of sexual bodily intrusion during an arrest is actionable as a violation of the Fourth Amendment." *Fontana*, 262 F.3d at 880. "Some bodily intrusions may be provably accidental or de minimis and thus constitutionally reasonable." *Id.* (italics omitted); *see also Wright v. City of Waterbury*, No. 07-CV-306, 2011 WL 1106217, at *6 (D. Conn. Mar. 23, 2011) (same).

Plaintiff has raised a triable issue of fact regarding the reasonableness of the search incident to his arrest. Although courts have found that an officer's brief contact with an arrestee's breasts or genital area, without more, does not violate the Fourth Amendment, those cases have involved pat-downs *on top of* an arrestee's clothing. *See Pascual v. Fernandez*, No. 11-CV-7075, 2013 WL 474292, at *6 (S.D.N.Y. Jan. 29, 2013) (finding that a pat-down of a female arrestee's breasts, buttocks, and inner thigh area *over her clothing* by a male officer was not constitutionally unreasonable); *Golden*, 2012 WL 4327652, at *6 (granting summary judgment on Fourth Amendment claim where the officer's search "was a minimally intrusive, *above the clothing*-pat down," even though it "included incidental contact with [the plaintiff's] breasts and genital area" (emphasis added)); *Wright*, 2011 WL 1106217, at *7 (finding that the police officer who "cupped [the plaintiff's] groin area, while she was frisking him, on two occasions," did "not rise to the level of unreasonableness required for a Fourth Amendment violation" because the officer "did not grab [the plaintiff's] groin area *or touch underneath his clothing*, and the search of [the] groin area was extremely quick" (emphasis added)); *Garcia v. N.Y. State Police Investigator Aguiar*, 138 F. Supp. 2d 298, 304 (N.D.N.Y. 2001) (dismissing Fourth Amendment claim where the plaintiff alleged that the officer "cupped her crotch or breasts" in part because the defendant "*did not touch underneath her clothing*" (emphasis

added)). The search Plaintiff has described—in which the arresting officer(s) reached "down inside of [his] pants from the front side all the way from [his] underwear to [his] socks," (SAC ¶ 33)—goes beyond an over-the-clothing pat-down. This allegation raises a genuine dispute regarding the reasonableness of Police Defendants' search incident to arrest. *See Anderson*, 2017 WL 1157843, at *11 (denying defendants summary judgment on unreasonable search claim where the plaintiff testified that an officer "put one hand into [the plaintiff's] pants, ... inside [the plaintiff's] underwear[,] ... [and] moved [his hand] directly between [the plaintiff's] butt cheeks in a swiping motion from front to back"); *Thomas v. O'Brien*, No. 08-CV-318, 2010 WL 3155817, at *9 (N.D.N.Y. Aug. 9, 2010) (denying summary judgment on unreasonable search claim where the plaintiff alleged that the defendant officer "shoved his hand into [his] pants and groped and painfully squeezed [his] scrotum"); *cf. Martinez v. Belcourt*, No. 20-CV-286, 2020 WL 5118016, at *6 (D. Conn. Aug. 31, 2020) (concluding that the plaintiff had adequately stated an unreasonable search claim where the officer allegedly had "put his hands down [the plaintiff's] pants and fondled and squeezed his genitals").

**\*17** Accordingly, Police Defendants' Motion is granted in part and denied in part with respect to Count Two. The Handcuff Claim and Assault Claim are dismissed, but the Search Claim survives.

### b. Use of Force During Cavity Search at Police Station (Count Five)

The excessive force claim in Count Five is predicated on Plaintiff's allegation that Canario, Pitt, Saintiche, and Arestin violently beat him in the strip search room at the Newburgh police station. (*See* SAC ¶ 122.) Insofar as Plaintiff's excessive force claim encompasses the cavity search itself, (*see id.* ¶¶ 63, 122), the Court treats that allegation as part of Plaintiff's unreasonable search claim in Count Six, discussed in Section II.B.3 *infra*.

As an initial matter, the Court notes that the Fourth Amendment's objective reasonableness standard continues to govern any excessive force claims based on events at the Newburgh police station. The Second Circuit "decided long ago that the objective reasonableness standard established in *Graham* applies to actions taken with respect to a person who asserts, as does the plaintiff here, a claim for excessive force after [he] has been arrested and detained, but 'prior

to the time when [he] is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer.' " *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019) (quoting *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989)); *see also Franks v New Rochelle Police Dep't*, No. 13-CV-636, 2015 WL 4922906, at *9 (S.D.N.Y. Aug. 18, 2015) (recognizing that, under *Powell*, the Fourth Amendment standard applies until the person is arraigned or formally charged, and remains in the custody of the arresting officer). Accordingly, the Court will analyze the excessive force claim in Count Five—as well as the excessive force claim in Count Eight—under the Fourth Amendment standard.

As recounted in Part I.A.2 *supra*, Plaintiff and Police Defendants give strikingly divergent accounts of what occurred in the strip search room. In Plaintiff's version, he is slammed to the ground, beaten, and digitally penetrated by one of the officers. (*See* SAC ¶¶ 59–63.) In the officers' version, Plaintiff voluntarily squats after having his arms held against a wall, and the small bag of drugs falls from his body cavity without any further intervention by the officers. (*See, e.g.*, Canario Aff. ¶ 15; Defs.' 56.1 ¶ 47.) In the latter version, there is no "physical struggle," (Arestin Aff. ¶ 5), and none of the officers places his hands on or inside Plaintiff's buttocks, (*see* Defs.' 56.1 ¶ 48).

The Parties therefore present two conflicting versions of the relevant events. There is no camera in the strip search room, and thus, no video footage to review. Because the Court "may not weigh evidence or assess the credibility of witnesses at the summary judgment stage[,]" *Jeffreys*, 426 F.3d at 551, it may not resolve the "he said, she said" factual conflict presented by Count Five at this point in time, *see* *Fincher*, 604 F.3d at 726.

Police Defendants maintain that summary judgment is warranted in light of two considerations. First, they argue that Plaintiff gave inconsistent testimony regarding which side of his face Pitt allegedly punched. (*See* Police Defs.' Mem. 6–7, 14–15.) In the Second Amended Complaint, Plaintiff alleges that Pitt punched him on the right side of his face. (SAC ¶ 60.) But Police Defendants argue that at his deposition, when Plaintiff "pointed to a picture taken of him at the hospital and his intake photo at the [Orange County Jail] ... to identify swelling ... from Pitt's alleged punch[,] ... he pointed to marks on the left side of his face, not the right [side] where he says Pitt punched him." (Police Defs.' Mem. 6–7;

*see also id.* at 14–15 (arguing that Plaintiff "pointed to the left side of his face to identify the area struck and noted a mark under his left eye and pointed to a photo showing an unrelated injury").) Police Defendants cite to three parts of the deposition transcript—pages 64, 77, and 148—in support of this claim. (*See id.* at 6–7.) Page 64 contains the following exchange:

**\*18** Q: Where did [Pitt] punch you in the face?

A: He punched me on this side of my face.

Q: The right side?

A: Yes.

Q: Between your eye and your ear?

A: Yes, like right here. Like in my head.

(Pl.'s Dep. 64:13–21.) Although the Court has not seen video footage of the deposition, the only reasonable inference to be drawn from this excerpt is that Plaintiff pointed to the right side of his face. After Plaintiff indicates where he was punched, the examiner's follow-up question—"[t]he right side?"—indicates that Plaintiff had pointed to the right side of his face. (*See id.*) Plaintiff responds in the affirmative, leaving no doubt as to his testimony. (*See id.*) On page 77, Plaintiff testifies that in the photo taken of him "when [he] was first admitted to the hospital[,]" his "whole face was bruised from that punch where Detective Pitt punched [him] in the eye." (Pl.'s Dep. 77:15–20; *see also* Posner Aff. Ex. E ("Hospital Photo") (Dkt. No. 160-4).) This statement does not conflict with Plaintiff's original allegation or his testimony from earlier in the deposition that Pitt punched him on the right side of his face. And without video footage of the deposition, the Court has no way of verifying whether Plaintiff pointed to the left side of his face in the photo, as Police Defendants claim. Finally, on pages 148 through 149 of the transcript, the examiner shows Plaintiff the hospital photo, at which point the following exchange occurs:

Q: I think earlier you pointed to that photograph before we had marked it when I was examining you initially and pointed [sic] to underneath your left eye to show what happened as a result of being punched by Detective Pitt; is that correct?

A: Yes. Just to note I did have lumps on my forehead, too. I think you could see that lump, too.

(Pl.'s Dep. 148:25–149:9.) In responding "[y]es" to the examiner's question, Plaintiff appears to indicate that he had previously pointed to the left side of his face in the hospital photo. But even assuming this answer constitutes an inconsistency in Plaintiff's testimony, the Court cannot say that his testimony was so "contradictory or rife with inconsistencies such that it was facially implausible[,]" *Fincher*, 604 F.3d at 726, particularly in light of his earlier testimony—in the same deposition—that *did* comport with his initial allegations. The Court therefore declines to grant summary judgment based on Police Defendants' first argument.

Police Defendants also argue summary judgment is warranted because "there are no hospital records corroborating any facial injury, which records also reflect he had no complaint of any." (*See* Police Defs.' Mem. 15; *see also* ER Records 13 (stating "no gross deformity" to head and face); *id.* (stating that Plaintiff "denies any neck pain, back pain[,] or any other complaints"); Madell Aff'n ¶¶ 16, 24 (stating that "there was no gross deformity of the head and face," that his "objective physical examination of the plaintiff did not exhibit any evidence of trauma, such as bruising, contusions[,] or reflexes of pain," and that, if Plaintiff had "made any complaints resulting from a physical altercation, [he] would have documented the same"); Durbin-French Aff. ¶¶ 15–17 (same)). But although Madell, Durbin-French, and the St. Luke's medical records suggest Plaintiff did not complain about any facial injury, Plaintiff maintains that he *did* complain to hospital staff about a facial injury resulting from the alleged assault in the strip search room. (*See* SAC ¶ 86; Pl.'s Dep. 49:18–21 (explaining that when he arrived at the hospital, the "injuries [he] was stressing to [hospital staff] [were] [his] body cavity injuries and the bruise on [his] face [arising from the officers' alleged] excessive force on [him] just before the hospital"); *id.* 104:15–21 (Q: "Did you make any complaint about any injury to your face to the hospital?" A: "I was like, look at my face, look at my face. They beat me up, all that. That's when I was explaining the body cavity search.... My neck was strained because I was like – I had so much tension on me. I told them my neck. I told them about everything.... But the bruises clearly seen right there in the face, they didn't treat me for that.").) Thus, Plaintiff has provided an account that is flatly at odds with the evidence and testimony produced by Police Defendants.

**\*19** In considering these conflicting accounts, the Court is mindful that "it is undoubtedly the duty of district courts

*not* to weigh the credibility of the parties at the summary judgment stage." *Jeffreys*, 426 F.3d at 554 (emphasis added). Even where, as here, a plaintiff has relied exclusively on his own testimony, courts have denied summary judgment to defendants, as long as the plaintiff's "testimony was not contradictory or rife with inconsistencies such that it was facially implausible." *Fincher*, 604 F.3d at 726; *see also Bridgewater v. Taylor*, No. 08-CV-3593, 2011 WL 6762931, at *5 (S.D.N.Y. Dec. 21, 2011) (denying summary judgment where the plaintiff's evidence consisted "solely of his own testimony," but this testimony offered "a plausible alternate version of events"); *Butler v. Gonzalez*, No. 09-CV-1916, 2010 WL 3398156, at *8 (S.D.N.Y. May 18, 2010) (denying summary judgment where, although the plaintiff's evidence was "minimal," and his allegations "suffer[ed] from a lack of corroboration," there were no "material inconsistencies" in his account), *adopted by* 2010 WL 3398150 (S.D.N.Y. Aug. 26, 2010); *Sash v. United States*, 674 F. Supp. 2d 531, 541–42 (S.D.N.Y. 2009) (denying summary judgment because the court did not find the plaintiff's "version of events to be so incredible, or in such discord with other evidence, as to find his allegations 'wholly fanciful,' " where the plaintiff's claim relied "almost entirely" on his own consistent testimony (citation omitted)).

Indeed, courts have even denied summary judgment to defendants where, as here, a plaintiff's version of the events is contradicted by substantial evidence. *See, e.g.,* *Scott*, 344 F.3d at 289–91 (holding that "[a]lthough [the plaintiff's] evidence may be thin, his own sworn statement is adequate to counter summary judgment," and that "[b]y finding against [the plaintiff] on the basis of the disparity between some of [the plaintiff's] medical records and statements in his affidavit, the district court made an impermissible credibility determination and weighed contradictory proof ... [which] may only be evaluated by a finder of fact"); *Vital*, 168 F.3d at 622 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)); *Archer v. Dutcher*, 733 F.2d 14, 16 (2d Cir. 1984) (reversing grant of summary judgment and noting that although "[i]t appears from the affidavits filed by appellees that [the plaintiff's] case may well be without merit[,]" the plaintiff's "affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution"); *cf.*

🚩 *DeBlasio v. Rock*, No. 09-CV-1077, 2011 WL 4478515, at *13 (N.D.N.Y. Sept. 26, 2011) (partially denying summary judgment where the plaintiff relied exclusively on his own testimony, which was contradicted by evidence produced by the defendants, because the plaintiff's complaint and deposition testimony were "moderately contradictory," but "far less contradictory" than the testimony at issue in decisions granting summary judgment; *Bennett v. Falcone*, No. 05-CV-1358, 2009 WL 816830, at *5 (S.D.N.Y. Mar. 25, 2009) (partially denying summary judgment where the plaintiff's story was "certainly inconsistent with other evidence and [was] subject to serious question," but was "not so blatantly false that the [c]ourt may simply reject it as a matter of law" (citation omitted)); *Rossi v. Stevens*, No. 04-CV-01836, 2008 WL 4452383, at *5–6 (S.D.N.Y. Sept. 30, 2008) (partially denying summary judgment where the defendants' testimony, third-party eyewitness testimony, and other evidence contradicted the plaintiff's uncorroborated version of events, because the plaintiff's story did not have any "fatal internal inconsistencies").

Here, although Plaintiff's account of his facial injury relies exclusively on his own testimony and is contradicted by other testimony and medical evidence in the record, his account still provides "a plausible alternate version of events," *Bridgewater*, 2011 WL 6762931, at *5, that is neither "wholly fanciful," 🚩 *Sash*, 674 F. Supp. 2d at 541 (citation omitted), nor "rife with inconsistencies," 🚩 *Fincher*, 604 F.3d at 726. It is true that some district courts in the Second Circuit have granted summary judgment on the basis of medical records where there is "direct[ ] and irrefutabl[e] contradict[ion]" of a plaintiff's descriptions of his injuries, such that "no reasonable jury could credit [the] plaintiff's account of the happening." *Henry v. Brown*, 406 F. Supp. 3d 211, 214–15 (E.D.N.Y. 2016) (citation and emphasis omitted) (granting summary judgment for the defendant where, although the plaintiff alleged that he nearly lost his left leg and had a head injury so severe that he was "unconscious [and] lying in a pool of blood" for over an hour, the medical records reflected only a scab on his leg and no head injury whatsoever); *see also Allah v. Wilson*, No. 13-CV-4269, 2017 WL 4350611, at *4 (S.D.N.Y. July 31, 2017) (granting summary judgment where the plaintiff's medical records six days after an alleged beating revealed only a possible foot fungus); *Musaid v. Manka*, No. 13-CV-7880, 2016 WL 540806, at *5 (S.D.N.Y. Feb. 9, 2016) (granting the defendant's summary judgment motion where, although the plaintiff alleged that he had suffered broken bones, the x-ray images showed no broken bones at all). But Plaintiff's

excessive force claim in Count Five does not present such a case. Although his alleged facial injury does not appear in his medical records, neither is his allegation "directly and irrefutably contradicted" by these records as was true in *Henry*, *Allah*, or *Musaid*. *Cf. Morehouse v. Vasquez*, No. 17-CV-4836, 2020 WL 1049943, at *14 (S.D.N.Y. Mar. 4, 2020) (citation omitted) (denying summary judgment on excessive force claim where, although "a number of [the] [p]laintiff's alleged injuries [did] not appear in the medical records, or [were] seemingly more serious than those that [did], not all of [the] [p]laintiff's allegations [were] 'directly and irrefutably contradicted' by the record" (citation omitted)). Because Plaintiff has offered an alternative version of events that is not "facially implausible," 🚩 *Fincher*, 604 F.3d at 726, it is for the jury to determine whose account is more credible.

**\*20** Finally, unlike the Handcuff Claim, which did not "rise to the level of injury necessary to sustain an excessive force claim for tight handcuffs," *see* 🚩 *Sachs*, 2012 WL 3822220, at *15, Plaintiff's alleged facial injury does constitute a cognizable injury in the excessive force context, *see* 🚩 *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) ("[W]e have permitted a plaintiff's claim to survive summary judgment on allegations that, during the course of an arrest, a police officer twisted her arm, 'yanked' her, and threw her up against a car, causing only bruising."); *Ong*, 2017 WL 4326540, at *13 (concluding that defendant was not entitled to summary judgment on excessive force claim where the plaintiff's only injuries were a "very small" bruise on his abdomen and a second bruise on his chest); 🚩 *Hamilton v. City of New York*, Nos. 07-CV-3633, 07-CV-3825, 2009 WL 2226105, at *3, *11 (E.D.N.Y. July 23, 2009) (holding that defendants were not entitled to summary judgment on plaintiff's excessive force claim where the alleged injury was a one-centimeter cut to plaintiff's right temple); 🚩 *Sforza v. City of New York*, No. 07-CV-6122, 2009 WL 857496, at *15 (S.D.N.Y. Mar. 31, 2009) (denying summary judgment where the plaintiff had suffered bruises to her head, because "[a] plaintiff need not demonstrate serious injury to prevail in an excessive force claim; bruising and other nonpermanent injuries are sufficient").

For these reasons, Police Defendants' Motion is denied with respect to Count Five.

### c. Use of Force During Plaintiff's
### Attempt to Swallow Drugs (Count Eight)

Police Defendants argue that the Booking Room Video demonstrates beyond dispute that excessive force was not used by Canario, Pitt, Saintiche, and Arestin when they tried to prevent Plaintiff from swallowing the recovered contraband. (*See* Police Defs.' Mem. 13, 15.) The Court agrees.

The Court has reviewed the relevant video footage in detail. At 6:17:35 P.M., Plaintiff—whose ankle was shackled to a bench—leaps to his left and swipes the recovered contraband from the hands of Officer Canario. As Plaintiff quickly spins 180 degrees to his right, he can be seen drawing his hands toward his mouth. (*See* Booking 1 Video at 6:17.37.163–.390.) Canario immediately pivots to his right, grabs the right side of Plaintiff's upper body with his right arm, pulls his left arm over the left side of Plaintiff's upper body, and drags Plaintiff to the ground. Although this initial sequence unfolds in a flash, Plaintiff can be seen drawing his left arm toward his mouth as Canario pins him to the ground. (*See id.* at 6:17:37.924; *see also* Pl.'s Dep. 71:14–16 (Q: "So, you stuffed it in your mouth, correct?" A: "Yes.").) Canario wraps his right arm around Plaintiff's head, and the two begin to tussle on the ground as Officers Saintiche, Arestin, Pitt, and a fourth police official swarm the scene. (*See* Booking 1 Video at 6:17:38.179–.711.) A fifth, unidentified officer runs toward the scene from the left side of the frame and stands near the edge of the commotion. (*See id.* at 6:17:41.147.) Canario, Saintiche, Arestin, and Pitt can be seen kneeling around Plaintiff and struggling to subdue him as several seconds pass. (*See id.* at 6:17:45–49.) Canario suddenly pulls his head from the scuffle, wincing and wiping his eyes, and begins to walk away, apparently having just deployed pepper spray. (*See id.* at 6:17:49.920.) Plaintiff was not in handcuffs and still had the drugs in his mouth when Canario used pepper spray. (*See* Canario Aff. ¶ 23; Saintiche Aff. ¶ 13; Arestin Aff. ¶ 7.) Pitt, Saintiche, and Arestin continue trying to subdue Plaintiff and remove the drugs from his mouth. (*See* Pl.'s Dep. 72:2–4 (stating that Pitt was "all in [his] mouth" attempting to "get the drugs out of [his] mouth"); *id.* 72:24–25 (officers were yelling, "he's trying to swallow it; he's trying to swallow it"); *id.* 74:2–3 (officers were yelling "he's resisting, he's resisting").) Saintiche can be seen kneeling over Plaintiff's left side, Arestin is crouched near Plaintiff's head, and Pitt straddles Plaintiff's lower body. A female officer, identified as Myra Rude ("Officer Rude"), (*see* Arestin Aff. ¶ 7), runs

toward the fray, (*see* Booking 1 Video at 6:17:55), and another unidentified officer approaches several seconds later, (*see id.* at 6:18:03). At 6:18:06, Pitt, Saintiche, Arestin, and the female officer are kneeling and crouching around Plaintiff, continuing to try to subdue him and remove the drugs from his mouth. Five seconds later, with the drugs still in Plaintiff's mouth, Arestin deploys his taser on Plaintiff. (*See id.* at 6:18:11; *see also* Arestin Aff. ¶ 7; Saintiche Aff. ¶ 13.) As he does this, Pitt holds Plaintiff's legs while Saintiche backs away. After Arestin uses the taser, Plaintiff rolls over onto his left side several seconds later. (*See id.* at 6:18:16.) The officers lean back in and begin to restrain Plaintiff, with Officer Rude helping to secure his hands in handcuffs. As Plaintiff's hands are being secured, an unidentified officer appears to remain crouched over Plaintiff, with his right knee securing Plaintiff's upper legs. Meanwhile, Pitt restrains Plaintiff's lower legs with his left knee and left hand. By 6:19:09, there is only one officer leaning over Plaintiff, with his left hand near Plaintiff's right shoulder. Plaintiff is lying on his left side. Plaintiff rolls over onto his stomach at 6:19:17, and from roughly 6:19:32 until 6:21:01, Plaintiff is only restrained by a single officer, who has his right hand near Plaintiff's right shoulder blade. From then until 6:21:58, Plaintiff remains handcuffed on the floor, with no officer restraining him. At that point, one of the officers secures his legs using a pair of leg restraints. Plaintiff is lifted to his feet at 6:23:52.

**\*21** When courts are confronted with an excessive force claim, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Estate of Jaquez v. City of New York*, 104 F. Supp. 3d 414, 433 (S.D.N.Y. 2015) (quoting *Graham*, 490 U.S. at 396–97). Such was the case here. By attempting to swallow the contraband that had been recovered moments earlier, Plaintiff not only threatened to destroy evidence, but also placed his own safety in peril. Plaintiff easily could have choked on the drugs, or, if he had managed to swallow them, there was a risk that the small bag holding the drugs could break inside Plaintiff's system, particularly given that it had been chewed moments earlier. (*See, e.g.*, Canario Aff. ¶ 22; Durbin-French Aff. ¶ 24.) Confronted with these threats, the officers responded swiftly and professionally. There were no kicks, punches, or other signs of gratuitous force. Moreover, it is clear that until Arestin deployed his taser, Plaintiff continued to resist the officers' attempts to subdue him and remove the

contraband from his mouth. Under these circumstances, it was reasonable for the officers to respond with some amount of force. *See* *Graham*, 490 U.S. at 396 (noting that two factors courts may consider in evaluating the reasonableness of force are (1) "whether the suspect poses an immediate threat to the safety of the officers *or others*, and whether he is *actively resisting arrest*" (emphasis added)); *Mobley v. Matayeva*, No. 15-CV-3418, 2020 WL 5577711, at *4 (E.D.N.Y. Sept. 17, 2020) (recognizing that force may be used to prevent "an immediate threat to [the] [p]laintiff's health and safety," particularly where, "[h]ad the bag [of drugs inserted in plaintiff's rectum] perforated, the drugs contained therein would have made their way into [p]laintiff's system, putting his health at grave risk"). Moreover, the nature of the force used—holding Plaintiff against the ground, securing his arms and legs, and attempting to pry the contraband from his mouth—was entirely reasonable under the circumstances. *See* *Casiano v. Ashley*, — F. Supp. 3d —, 2021 WL 281460, at *4 (W.D.N.Y. Jan. 28, 2021) (dismissing excessive force claim on summary judgment where video evidence showed that the defendants "did not strike [the pretrial detainee]," but "grappled with her and wrestled her to the ground");

*Frost v. City of New York*, No. 15-CV-4843, 2019 WL 1382323, at *5, *11 (S.D.N.Y. Mar. 27, 2019) (dismissing excessive force claim on summary judgment where video evidence "establishe[d] that defendants used only force [against a pretrial detainee] that was objectively reasonable"), *aff'd in relevant part, rev'd and vacated in part on other grounds*, 980 F.3d 231, 256 (2d Cir. 2020) (observing that "although perhaps the struggle between [plaintiff] and the [defendants] could have been gentler," the defendants "were justified in using nontrivial amounts of force" in light of the "security problem at issue; the threat reasonably perceived by the [defendants]; and the fact that [plaintiff] was actively resisting" (brackets and citation omitted)); *Boomer v. Lanigan*, No. 00-CV-5540, 2002 WL 31413804, at *2, *6 (S.D.N.Y. Oct. 25, 2002) (granting summary judgment where video evidence showed a "scuffle" in which the defendants pushed the plaintiff into a cell and held him in place for several minutes, none of which showed "wantonness" on the part of defendants).

Canario's use of pepper spray was also reasonable under the circumstances. "The use of pepper spray is not an actionable constitutional violation where there is no lasting injury, and where the subject was not cooperating with law enforcement." *Walton v. Lee*, No. 15-CV-3080, 2019 WL 1437912, at *6

(S.D.N.Y. Mar. 29, 2019); *see also* *Williams v. City of New York*, No. 05-CV-10230, 2007 WL 2214390, at *12 (S.D.N.Y. July 26, 2007) (holding that an excessive force claim based on an officer's use of mace was "not actionable" where the plaintiff had not alleged any injuries apart from "the expected side-effects: temporary discomfort and disorientation"). As was true of another Newburgh police officer in *Singleton v. City of Newburgh*, 1 F. Supp. 2d 306 (S.D.N.Y. 1998), "it was not unreasonable for [Canario] to direct a stream of pepper spray at [Plaintiff]," particularly "[g]iven the undisputed evidence that he believed [Plaintiff] was about to swallow contraband," *id.* at 315; *see also* *Casiano*, 2021 WL 281460, at *4 (granting summary judgment where video evidence showed that the pretrial detainee "received one burst of pepper spray," without "any lasting or serious effects," and "was subdued relatively quickly and without resort to punches, kicks, or other forceful blows that might have inflicted greater injury").

Arestin's use of the taser was likewise reasonable. The Court is mindful that use of a taser constitutes a "serious intrusion." *Read v. Town of Suffern Police Dep't*, No. 10-CV-9042, 2013 WL 3193413, at *8 (S.D.N.Y. June 25, 2013) (citation omitted) (finding that issues of fact precluded summary judgment where the defendant had allegedly tased the plaintiff a second time after he was already immobilized). Here, however, the circumstances justified this technique. The video shows that even after Canario deployed the pepper spray, (*see* Booking 1 Video at 6:17:49.920), the officers continued struggling to subdue Plaintiff and remove the contraband for approximately 22 additional seconds until Arestin used the taser, (*see id.* at 6:18:11). Where, as here, an arrestee is unrestrained and actively non-compliant with officers' directives, it is reasonable for officers to use a taser. *See* *Scoma v. City of New York*, No. 16-CV-6693, 2021 WL 230295, at *9 (E.D.N.Y. Jan. 22, 2021) (granting summary judgment because defendant's first taser deployment was reasonable to subdue an "unrestrained, uncooperative" arrestee who had engaged in a serious offense); *Gomez v. Village of Sleepy Hollow*, No. 07-CV-9310, 2011 WL 2652450, at *11 (S.D.N.Y. July 6, 2011) (holding that an officer's use of a taser was reasonable in light of an "uncertain[ ] and volatil[e]" situation in which the plaintiff resisted arrest and refused to comply with the officer's orders not to move); *Towsley v. Frank*, No. 09-CV-23, 2010 WL 5394837, at *7–8 (D. Vt. Dec. 28, 2010) (concluding on summary judgment that a defendant's first

taser deployment was reasonable in an "increasingly tense and uncertain" situation where the officers used the taser to subdue an arrestee "who was under the influence of drugs," was "verbally combative" with officers, and was threatening to jump out of a window).[20] For the reasons above, Police Defendants' Motion is granted with respect to Count Eight.

### 3. Unreasonable Search Claim (Count Six)

**\*22** In Count Six, Plaintiff asserts that Police Defendants Canario, Pitt, Saintiche, and Arestin conducted an unreasonable search in violation of his Fourth Amendment rights. (SAC ¶ 123.) As opposed to the unreasonable search claims in Counts 15 and 16, which are based on events that unfolded later in the evening at St. Luke's, (*see id.* ¶¶ 92–98, 132–33), Count Six is based on the search that took place in the strip search room at the Newburgh police station, (*see id.* ¶¶ 46–65, 123).[21] Although Police Defendants have not moved for summary judgment on Count Six, (*see* Police Defs.' Mem. 35), Plaintiff has, (*see* Pl.'s Mem. 8).

In evaluating Plaintiff's claim, the Court will adopt the same terminology some courts in the Second Circuit have used when evaluating similar actions in the law-enforcement context. Thus,

> (1) a "strip search" occurs when a suspect is required to remove his clothes; (2) a "visual body cavity search" is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); and (3) a "manual body cavity search" occurs when the police put anything into a suspect's body cavity, or take anything out.

*Gonzalez v. City of Schenectady,* 728 F.3d 149, 158 (2d Cir. 2013) (citing *People v. Hall,* 886 N.E.2d 162, 165 (N.Y. 2008)); *see also Sloley v. VanBramer,* 945 F.3d 30, 36–37 (2d Cir. 2019) (relying on the categorical definitions adopted in *Gonzalez*); *Bobbit v. Marzan,* Nos. 18-CV-2465, 16-CV-2042, 2020 WL 5633000, at \*9 (S.D.N.Y. Sept. 21,

2020) (same). Thus, a "strip search" enables officers to examine a subject when "he stands naked in their presence."

*Monroe v. Gould,* 372 F. Supp. 3d 197, 204 (S.D.N.Y. 2019) (quoting *United States v. Gonzalez,* 111 F. Supp. 3d 416, 431 (S.D.N.Y. 2015)). A "visual body cavity search" is more invasive, and may require, for example, that the subject squat, bend over, or even "hold his buttocks open to allow officers to visually inspect his anus." *Monroe,* 372 F. Supp 3d at 204 (citation omitted). However, this type of search involves no touching by the officers. *Id.* The "most invasive type of search" is the "manual body cavity search," which "crosses from a visual to a manual inspection of the subject's body cavity," *id.* (citation omitted), and includes "some degree of touching or probing of body cavities," *id.* (quoting *Harris v. Miller,* 818 F.3d 49, 58 (2d Cir. 2016)). Framing the relevant events within this terminology, all Parties agree that a "strip search" and "visual body cavity search" occurred at the Newburgh police station. (*See* SAC ¶¶ 48–50; Saintiche Aff. ¶¶ 6–7; Anderson Aff. ¶ 7.) But while Police Defendants maintain that their search of Plaintiff ended there, (*see* Defs.' 56.1 ¶ 48), Plaintiff alleges that Canario, Pitt, Saintiche, and Arestin took it one step further, performing a "manual body cavity search" by "forcefully penetrat[ing] [his] anal cavity and snatch[ing]" the small bag of drugs hidden within, (SAC ¶ 63).

**\*23** As an initial matter, Police Defendants make a procedural objection based on Plaintiff's main argument in support of his Motion. In the Second Amended Complaint, Plaintiff's unreasonable search claim appears to be predicated on his allegation that Police Defendants unlawfully conducted a manual body cavity search. (*See id.* ¶¶ 46–65, 123.) But in the Memorandum of Law Plaintiff has submitted in support of his Motion, he argues that the visual body cavity search *itself* constituted an unreasonable search. (*See* Pl.'s Mem. 13–15.) Police Defendants argue that "no such claim is raised in the Second Amended Complaint[,]" which "only asserts [that] the manual spreading of his buttocks and [the] digital exam were unlawful." (Police Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. ("Police Defs.' Opp'n") 1, 2 (Dkt. No. 193).) They contend that Plaintiff should not be permitted to "amend his [Second Amended] [C]omplaint via a motion for summary judgment[,]" and that "[i]t is equally inappropriate to affirmatively seek summary judgment on a claim that is not pled in [this document]." (*Id.* at 2.)

Although there is some merit to Police Defendants' complaint of whipsawing, the Court will nevertheless consider Plaintiff's

argument regarding the visual body cavity search, for two reasons. First, the factual allegations underpinning this argument were all pled in detail in the Second Amended Complaint, a critical feature that distinguishes this case from each of those relied upon by Police Defendants. *Cf.* 🚩 *Wilson v. City of New York*, 480 F. App'x 592, 594 (2d Cir. 2012) (summary order) (concluding that a plaintiff had waived any argument based on his excessive pre-*arraignment* detention where his complaint "contain[ed] no factual allegation regarding the length of his detention before being arraigned, or the times at which he was arrested or presented in court[,]" but had instead "focuse[d] on [his] ... prolonged pre-*trial* detention, [without] ma[king] [any] reference to an excessive delay in arraignment" (emphasis added)); 🚩 *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (concluding that the plaintiffs could not raise an argument based on the defendant's alleged failure to issue a timely disclaimer where the complaint "[did] not make any reference to [the defendant's] alleged failure to disclaim coverage"); 🚩 *Froio v. Monroe-Woodbury Cent. Sch. Dist.*, No. 17-CV-604, 2020 WL 2731970, at *7 n.6 (S.D.N.Y. May 26, 2020) (declining to consider a failure-to-accommodate claim where the plaintiff had entirely failed to allege such a claim in her second amended complaint, and had "not describe[d] a reasonable accommodation to which she was entitled but ... [had] not receive[d]"). Second, because Plaintiff is proceeding pro se—another feature that distinguishes this case from each of those cited by Police Defendants—the Court has an obligation to construe his submissions "liberally" and interpret them "to raise the strongest arguments that they suggest," 🚩 *Triestman*, 470 F.3d at 474. Accordingly, the Court will consider Plaintiff's argument that the visual body cavity search itself was unreasonable.

### a. Whether Visual Body Cavity Search Violated Fourth Amendment

In *Sloley v. VanBramer*, the Second Circuit held that law enforcement must have "reasonable suspicion" to conduct a lawful visual body cavity search. *See* 945 F.3d at 38. Although the Second Circuit had previously applied the "reasonable suspicion" standard to strip searches, *Sloley* recognized that "visual body cavity searches are even more intrusive[,]" requiring a person not only to "strip naked in front of a stranger, but also to expose the most private areas of [his] body to others[,]" often while "assum[ing] degrading and

humiliating positions." *Id.* (citation omitted). Accordingly, *Sloley* formally extended the "reasonable suspicion" standard to visual body cavity searches, *see id.* at 38, notwithstanding the fact that some district courts in the Second Circuit had been applying this standard to such searches already, *see id.* at 40–41 (gathering cases and observing that, "[a]s numerous district courts in this Circuit have recognized, Supreme Court and Second Circuit precedent clearly foreshadowed the rule we clarify today"); *see also, e.g.,* *Sims v. Farrelly*, No. 10-CV-4765, 2013 WL 3972460, at *8 (S.D.N.Y. Aug. 2, 2013); *Sarnicola v. County of Westchester*, 229 F. Supp. 2d 259, 274 (S.D.N.Y. 2002). After *Sloley*, there is no doubt that "a visual body cavity search conducted as an incident to a lawful arrest for any offense must be supported by a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity." *Sloley*, 945 F.3d at 38 (citation and quotation marks omitted).

### i. Whether Police Defendants Had Reasonable Suspicion

**\*24** Reasonable suspicion requires more than a "mere hunch," but "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Sloley*, 945 F.3d at 43 (quoting 🚩 *Navarette v. California*, 572 U.S. 393, 397 (2014)). To decide whether an officer had reasonable suspicion that would warrant a visual body cavity search, courts "must look at the totality of the circumstances." *Id.* at 43 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)); *see also Bobbit*, 2020 WL 5633000, at *11 ("Reasonable suspicion must be assessed 'in light of the totality of the circumstances known to the officers at the time the search was begun." (quoting 🚩 *United States v. Chirino*, 483 F.3d 141, 148 (2d Cir. 2007))). An officer must be able to "point to specific objective facts and rational inferences that [he] [is] entitled to draw from those facts in light of [his] experience." *Bobbit*, 2020 WL 5633000, at *9 (quoting 🚩 *Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008)). Finally, courts in the Second Circuit have repeatedly emphasized that the reasonable suspicion standard requires an *individualized* inquiry. That is, "[t]he standard requires individualized suspicion, specifically directed to the person who is targeted for the strip [or visual body cavity] search." 🚩 *Hartline*, 546 F.3d at 100; *see also Sloley*, 945 F.3d at 46 (concluding that, "in the absence of indicia" which the Second Circuit and New York State courts have "found to

support *individualized* reasonable suspicion" that an arrestee is "secreting drugs inside his anal cavity," the defendant officer was not entitled to qualified immunity in connection with his visual body cavity search of the plaintiff (emphasis added) (citation omitted)); *Cannon v. Port Auth. of N.Y. & N.J.*, No. 15-CV-4579, 2020 WL 6290665, at *4 (S.D.N.Y. Oct. 27, 2020) (recognizing that "visual body cavity searches at a police station 'are still subject to the *Hartline* standard requiring individualized reasonable suspicion' " (quoting *Blue v. City of New York*, No. 14-CV-7836, 2018 WL 1136613, at *15 (S.D.N.Y. Mar. 1, 2018))); *Bobbit*, 2020 WL 5633000, at *9 (recognizing the "individualized suspicion" requirement in considering whether officers had reasonable suspicion to perform visual body cavity search).

Gathering relevant authority from New York State courts, *Sloley* identified various factors that can support a reasonable suspicion that an arrestee is secreting narcotics inside his person. *See* 945 F.3d at 46.[22] For example, officers may have reasonable suspicion where the arrestee is seen placing his hands down his pants or making similarly suspicious movements. *People v. Hunter*, 902 N.Y.S.2d 678, 679–80 (App. Div. 2010) (finding reasonable suspicion based in part on the officers' observation of the arrestee "fidgeting with his hands down the back of his pants"); *People v. Harry*, 884 N.Y.S.2d 712, 712–13 (App. Div. 2009) (finding reasonable suspicion where an arrestee was placed in a patrol car and observed "moving around a lot, like sliding up and down in his seat and making movements with his hands" as though he were attempting to place or remove something from his pants); *People v. Clayton*, 868 N.Y.S.2d 303, 305–06 (App. Div. 2008) (finding reasonable suspicion where the arrestee was observed "wiggling around" in the patrol car and placing his hands in an area where the officer had felt a hard object during a pat-and-frisk). An officer may also have reasonable suspicion based on information that a particular arrestee is secreting objects in his person, or that he has a custom of doing so. *See Hunter*, 902 N.Y.S.2d at 680 (finding reasonable suspicion based in part on information the officers had received from a confidential informant that the arrestee "had a habit of carrying narcotics in his rectum"); *Clayton*, 868 N.Y.S.2d at 306 (finding reasonable suspicion based in part on the defendant's "history of secreting contraband in his rectum"). Finally, an officer clearly has reasonable suspicion where he has watched a suspect "retriev[e] an item from his buttocks area and exchang[e] it for money from a person found in possession of drugs minutes later." *People v. Barnville*, 819 N.Y.S.2d 234, 236 (App. Div. 2006).

**\*25** None of these factors is present in this case. Instead, Police Defendants have invoked two separate considerations which they maintain give rise to reasonable suspicion. First, they argue that "Plaintiff was observed selling drugs in an area of Newburgh known for a great deal of drug activity." (Police Defs.' Opp'n 5.) And second, they argue that "it was well known to police, prescient in this case, that drug dealers 'cheek' their drugs to conceal them from police." (*Id.*) The Court will address each in order.

That Plaintiff was observed selling drugs shortly before his arrest must of course bear some weight in the Court's analysis. *See Sloley*, 945 F.3d at 39 ("To be sure, the type of crime for which someone is arrested may play some role in the analysis of whether a visual body cavity search incident to that arrest is supported by reasonable suspicion."). As the court observed in *Sloley*, "one may well more reasonably expect someone arrested for a misdemeanor drug offense to be secreting contraband than someone arrested for felony tax fraud." *Id.*

But although the "crime of arrest" is "one [factor] officers may take into account in their consideration of the totality of the circumstances surrounding [a] search[,]" it "is not a determinative factor[.]" *Id.* Indeed, courts in the Second Circuit have repeatedly recognized the rule that "being arrested for a narcotics offense does not *automatically* give rise to a reasonable suspicion to justify a strip search and visual cavity inspection." *Quiles v. City of New York*, No. 15-CV-1055, 2016 WL 6084078, at *11 (S.D.N.Y. Oct. 12, 2016) (emphasis in original); *see also Nelson v. City of New York*, No. 18-CV-4636, 2019 WL 3779420, at *8 (S.D.N.Y. Aug. 9, 2019) (stating same rule); *Monroe*, 372 F. Supp. 3d at 204 (same); *Cordero v. City of New York*, 282 F. Supp. 3d 549, 562 (E.D.N.Y. 2017) (same); *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 292 (S.D.N.Y. 2015) (same); *Sims*, 2013 WL 3972460, at *8 (same); *Sarnicola*, 229 F. Supp. 2d at 273–74 (same, and noting that "[a]n automatic justification for strip searches based on an arrest for a drug-related crime would be inconsistent with the legal concept of reasonable suspicion based on the *totality* of the circumstances"). In *Sims v. Farrelly*, for example, the plaintiff was arrested at the scene of a drug bust, taken to the police station, and subjected to a visual body cavity search.

*See* 2013 WL 3972460, at *2–3. The stated basis for this search was "the narcotics nature of the incident, the easy concealability ... of crack cocaine, and the criminal history of many of the subjects." *Id.* at *8 (record citation omitted). Denying the defendant's motion for summary judgment on the plaintiff's unreasonable search claim, Judge Ramos concluded that this "general[ ]" rationale was insufficient to sustain an "individualized reasonable suspicion ... that [the] [p]laintiff was secreting narcotics on his person." *Id.* Similarly, in *Sarnicola v. County of Westchester*, the defendant officer had "ordered a strip search [of the plaintiff] simply and solely because [the plaintiff] was arrested for suspected involvement in a drug-related felony." 229 F. Supp. 2d at 274. Granting the plaintiff's motion for summary judgment on her unreasonable search claim, then- (now Chief) Judge McMahon concluded that because the defendant "had no particularized reason to suspect that [the plaintiff] was secreting drugs on her person[,]" his search failed to "pass constitutional muster." *Id.* Thus, Plaintiff's arrest for a narcotics offense does not, without more, establish reasonable suspicion for the visual body cavity search that was performed.

**\*26** Here, of course, Police Defendants argue they had reasonable suspicion for the search not merely because Plaintiff was arrested for a narcotics offense, but because he was actually *observed* dealing drugs. (*See* Police Defs.' Opp'n 5 (noting that "Plaintiff was *observed* selling drugs" (emphasis added)).) But in the absence of specific signs that Plaintiff was actually secreting drugs inside a body cavity, there is still no individualized reasonable suspicion to justify the search. The Second Circuit applied this principle in *Hartline v. Gallo*. There, the plaintiff was arrested following a traffic stop in which the officer observed the stem of a marijuana plant on the floor of her car and subsequently found the butt of a marijuana cigarette, a pipe, and a container with a few seeds. 546 F.3d at 97–98. The plaintiff was subjected to a visual body cavity search when she arrived at the police station. *See* *id.* at 98. Reversing the district court's decision granting summary judgment for the defendants, the Second Circuit held that the officer's search had violated the Fourth Amendment. *See* *id.* at 101. In the court's analysis, the absence of any indication that the plaintiff was concealing drugs in her body proved decisive. The officer, for example, "had no reason to believe that [the plaintiff] was under the influence of narcotics at the time of her arrest." *Id.* He "found no useable narcotics in [her] vehicle, nor did he see [her] take any suspicious actions which might have suggested she was hiding something as he approached her vehicle." *Id.* He

noticed nothing in her "physical appearance that suggested she was secreting drugs on her person, nor did he engage in a less invasive pat down search that suggested the presence of contraband." *Id.* [23] Under these facts, the officer's visual body cavity search was not supported by individualized reasonable suspicion, and the plaintiff's "Fourth Amendment rights were violated," *id.* at 102.

Similarly, in *Sloley*, an officer had performed a visual body cavity search on an arrestee whom the officer suspected was involved in illegal drug activity. *See* 945 F.3d at 35 ("According to [the officer], he recognized [the plaintiff's] name 'as referring to an individual who was well known in the area for being wrapped up in illegal drugs.' " (record citation omitted)). Although there was a factual dispute over whether the officer had recovered crack cocaine from the plaintiff's vehicle prior to the visual body cavity search, the Second Circuit concluded that "once th[at] disputed fact ... [was] disregarded, the evidence available to [the officer] support[ed] no more than a mere hunch that [the plaintiff] was secreting drugs inside his anal cavity." *Id.* at 46. There was "no evidence," for example,

> that [the plaintiff] was fidgeting or moved about suspiciously, that he reached or attempted to reach his hands down his pants, that anyone observed [him] putting drugs down his pants or retrieving drugs (or anything else) from inside his pants, or that [he] himself was previously known to secrete drugs inside his anal cavity.

*Id.* (citations omitted). Reversing the district court's grant of summary judgment for the defense, the Second Circuit concluded that the officer's " 'hunch of criminal activity [was] insufficient' to establish reasonable suspicion." *Id.* (citation omitted).

Lower courts in the Second Circuit have reached the same conclusion under similar facts. In *Bobbit v. Marzan*, for example, the police performed a visual body cavity search after the plaintiff tried to enter Green Haven Correctional Facility "with pills, vials of an unknown liquid substance, and bread, together in plastic wrap," that were discovered in her sock during a security scan. 2020 WL 5633000, at

*11. The court concluded that these facts did not "give rise to reasonable suspicion that would justify the intrusive search performed on [the] [p]laintiff," *id.* The court observed that "[i]t [was] not reasonable to infer from the discovery of contraband in [the] [p]laintiff's sock that she was also concealing contraband on her body in locations where it could only be accessed by requiring her to fully disrobe, squat to expose her private parts, and use the bathroom, all in view of an officer." *Id.* "If anything," the court explained, "the natural inference is the reverse: a smuggler would not risk concealing a bulky package in her sock if she also was willing to secrete contraband in more sensitive parts of her body." *Id.* Moreover, there was "no evidence" the plaintiff had shown any signs of concealing contraband in a body cavity, such as fidgeting suspiciously or reaching down her pants, nor was there evidence to suggest she had a reputation for such concealment. *Id.* Accordingly, the court granted the plaintiff's motion for summary judgment on her Fourth Amendment claim. *See id.* at *12.

 *27  In *Monroe v. Gould*, an officer had performed a manual body cavity search on the plaintiff after the latter was arrested for possessing marijuana and a gravity knife. *See* 🚩 372 F. Supp. 3d at 204. But although the police had "found [the] plaintiff walking away from a vehicle containing cocaine, and a subsequent search of [the] plaintiff [had] revealed marijuana and a gravity knife on his person," the police could "not point to [the] plaintiff's physical appearance, apparent discomfort, or any suspicious actions or other articulable facts which might have suggested he was hiding something inside his body." 🚩 *Id.* at 204–05 (emphasis omitted). Having found that the officer lacked reasonable suspicion for the search, the court denied the defendants' motion for summary judgment based on this search. *See* 🚩 *id.* at 205.

As the foregoing cases suggest, without some particular indicator that Plaintiff was secreting drugs inside his body, the fact that he was arrested for reportedly dealing drugs is insufficient to establish reasonable suspicion. Although Police Defendants muddy the waters by invoking Plaintiff's subsequent testimony that it was his practice to conceal drugs in his anal cavity, (*see* Police Defs.' Opp'n 5; Pl.'s Dep. 25:19–26:7), there is no evidence the officers knew this fact at the time of the search, and thus, it is irrelevant, *see Bobbit*, 2020 WL 5633000, at *11 ("Reasonable suspicion must be assessed 'in light of the totality of the circumstances known to the officers at the time the search was begun.' " (citation omitted)). In sum, Police Defendants' first asserted

basis for reasonable suspicion—the fact that Plaintiff was observed dealing drugs, (*see* Police Defs.' Opp'n 5)—does not, without more, support such a suspicion. Insofar as Police Defendants also rely on the fact that Plaintiff was observed dealing drugs "in an area of Newburgh known for a great deal of drug activity," (*id.*), this argument fails for the obvious reason that it does not describe an "individualized suspicion, specifically directed to the person who is targeted for the [visual body cavity] search." *Bobbit*, 2020 WL 5633000, at *9 (quoting 🚩 *Hartline*, 546 F.3d at 100). Unsurprisingly, Police Defendants provide no authority for the proposition that police have reasonable suspicion to invade a suspect's privacy when they arrest him in a neighborhood afflicted by crime. Such a notion runs contrary to well-established law and offends the protections enshrined in the Fourth Amendment.

Police Defendants' second asserted basis for reasonable suspicion—that "it was well known to police ... that drug dealers 'cheek' their drugs to conceal them from police," (Police Defs.' Opp'n 5)—fails for the same reason. This statement describes a generalized suspicion, rather than one individualized to Plaintiff specifically. Without a particular reason to believe that Plaintiff himself had a custom of secreting drugs inside his body cavity, the officers' knowledge regarding drug dealers *generally* does not establish reasonable suspicion. *See Sloley*, 945 F.3d at 46 (finding no reasonable suspicion where the plaintiff "himself was [not] previously known to secrete drugs inside his anal cavity"). Indeed, another court in this District has rejected an argument similar to the one advanced by Police Defendants. *See Bobbit*, 2020 WL 5633000, at *11–12 (finding no reasonable suspicion for visual body cavity search notwithstanding the assertion, proffered by the officer who ordered the search, "that in his experience, behavior like [the] [p]laintiff's [was] consistent with an effort to hide drugs"). In view of the basic principle that reasonable suspicion must be "specifically directed to the person who is targeted" for a visual body cavity search, *id.* at *9, Police Defendants did not have such suspicion based on the alleged custom of other drug dealers. For this and the reasons stated above, Police Defendants Canario, Pitt, Saintiche, and Arestin did not have reasonable suspicion to perform a visual body cavity search on Plaintiff.

ii. Whether Police Defendants Are Qualifiedly Immune

 *28  Of course, "[c]oncluding that a constitutional violation has been established is only the first step in a two-step

inquiry." *Murcia v. County of Orange*, 226 F. Supp. 2d 489, 496 (S.D.N.Y. 2002). The Court must also consider the possibility that Canario, Pitt, Saintiche, and Arestin are entitled to qualified immunity. *See id.* "To be entitled to qualified immunity at the summary judgment stage of a case, a defendant must show that, even viewing the evidence in the light most favorable to the plaintiff, the defendant's actions did not violate clearly established law." *Bobbit*, 2020 WL 5633000, at \*4 (quoting *Husain v. Springer*, 494 F.3d 108, 131 (2d Cir. 2007)). Where, as here, an officer must "have reasonable suspicion before undertaking a search, [he] is entitled to qualified immunity unless [a court] can say on the somewhat unique facts before [it] that it is clearly established that no reasonable suspicion justified a visual body cavity search." *Sloley*, 945 F.3d at 43 (citation and quotation marks omitted). "Stated differently, qualified immunity is unavailable if 'no reasonable officer could have believed that there was reasonable suspicion.' " *Id.* (quoting *Dancy v. McGinley*, 843 F.3d 93, 108 (2d Cir. 2016)).

*Sloley* precludes qualified immunity in this case. *Sloley* held that as of 2013,

> every reasonable officer in the [defendants'] position as New York State Troopers would have known [the rule] that visual body cavity searches conducted incident to any arrest must additionally be supported by a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity.

*Sloley*, 945 F.3d at 40 (citation and quotation marks omitted); *Sanchez v. Bonacchi*, 799 F. App'x 60, 62 (2d Cir. 2020) (summary order) (recognizing that "[u]nder *Sloley*, as of 2013, ... [this rule] was clearly established"); *Bobbit*, 2020 WL 5633000, at \*12 (recognizing same). Thus, after finding that the defendant lacked reasonable suspicion to perform a visual body cavity search, the Second Circuit concluded as follows:

> [I]n the absence of indicia that this [c]ourt or New York State courts

have found to support individualized reasonable suspicion that [a suspect] was secreting drugs inside his anal cavity, ... no reasonable officer could have believed that there was reasonable suspicion to conduct a visual body cavity search.

*Sloley*, 945 F.3d at 46 (citations, brackets, and quotation marks omitted). Because the events in this case occurred on May 8, 2015, well after the reasonable-suspicion rule with respect to visual body cavity searches was "clearly established," the Police Defendants who performed such a search on Plaintiff are not entitled to qualified immunity. In the absence of any evidence that has been held to support reasonable suspicion in this context—such as fidgeting or moving suspiciously, reaching into one's pants, or having an *individual* reputation for concealing drugs inside one's body cavity—this Court must conclude, as did the Second Circuit in *Sloley*, that "no reasonable officer could have believed ... there was reasonable suspicion to conduct a visual body cavity search." *Id.* (quotation marks omitted).

Accordingly, Plaintiff's Motion for Summary Judgment with respect to the visual body cavity search alleged in Count Six is granted.

#### b. Alleged Manual Body Cavity Search

Insofar as Plaintiff moves for summary judgment with respect to the alleged manual body cavity search, the Motion is denied. Whereas Plaintiff maintains that "one of the[ ] officers "forcefully penetrate[d] [his] anal cavity and snatch[ed]" the bag of drugs secreted there, (SAC ¶ 63), the officers deny that any such manual inspection occurred, (*see* Canario Aff. ¶ 16; Arestin Aff. ¶ 5). The Court is therefore presented with a "factual clash" it may not resolve on summary judgment. *See Kassel*, 272 F. Supp. 3d at 535. Accordingly, Plaintiff's Motion is denied with respect to that portion of Count Six that involves the alleged manual body cavity search.

#### 4. Sexual Harassment and Sexual Abuse Claims Based on Events at Police Station (Counts Three and Four)

**\*29** Plaintiff styles Count Three as a claim for "sexual harassment" against Canario, Pitt, Saintiche, and Arestin

based on "repeated orders to strip search a second time, using physical force, touching and grabbing [his] buttocks[,] and penetrating [his] body cavity." (SAC ¶ 120.) This claim is based on the allegations in paragraphs 48–57 of the Second Amended Complaint, which recount Plaintiff's version of what occurred in the strip search room at the Newburgh police station. (*See id.* ¶¶ 48–57, 120.) Similarly, Plaintiff styles Count Four as a claim for "sexual abuse" against Canario, Pitt, Saintiche, and Arestin for "using physical force, touching and grabbing [his] buttocks[,] and penetrating [his] body cavity." (*Id.* ¶ 121.) This claim is based on paragraphs 63–64 of the Second Amended Complaint, which describe the specific moment at which Plaintiff allegedly felt an unidentified officer "forcefully penetrate [his] anal cavity and snatch the plastic sandwich baggie containing the white-rock like substance [Plaintiff] had hidden there." (*Id.* ¶ 63.) The crux of Plaintiff's theory is that "the officers['] actions in conducting the strip search rise to the level of sexual assault," and thus, he argues, "there is a genuine issue of material fact regarding whether their actions were unreasonable under the Fourth Amendment." (Pl.'s Opp'n 9.)

Police Defendants have moved for summary judgment on both claims, arguing that, "[w]ithout some evidence the officers did the exam with a sexualized motive such as their own gratification or [Plaintiff's] sexual humiliation[,] there is nothing to support a claim of sexual harassment or abuse." (Police Defs.' Mem. 28.) They also note that "[d]ismissal of these [two] causes of action will not prevent [Plaintiff] from offering evidence in support of his [s]ixth [c]ause of [a]ction" alleging an unreasonable search in violation of the Fourth Amendment, (*id.* at 29), which the Court has already discussed *supra*. But "[t]he record," Police Defendants argue, "does not support separate claims of sexual abuse and harassment." (*Id.*)

In opposition to Police Defendants' Motion, Plaintiff invokes *Boddie v. Schnieder*, 105 F.3d 857 (2d Cir. 1997). (*See* Pl.'s Opp'n 10.) In *Boddie*, the Second Circuit considered whether "the sexual abuse of an inmate by a corrections officer may reach constitutional dimension and give rise to an Eighth Amendment claim under [§] 1983." *See* 105 F.3d at 859. As the Court explained, the Eighth Amendment "sets constitutional boundaries on the conditions of imprisonment[,]" proscribing the "unnecessary and wanton infliction of pain" that constitutes "cruel and unusual punishment." *Id.* at 861. An Eighth Amendment violation has two components: "First, the alleged 'punishment' must

be, 'objectively, sufficiently serious[ ]' "; and second, "the prison official involved must have a 'sufficiently culpable state of mind.' " *Id.* (citations omitted). In *Boddie*, the court concluded that allegations of sexual abuse *may* satisfy both elements of the constitutional test, "thereby stating an Eighth Amendment claim under [§] 1983." *Id.*

*Boddie*, however, does not govern this case. Plaintiff was not incarcerated when the alleged violations occurred, and thus, his claims do not arise under the Eighth Amendment. As discussed in Section II.B.2.b *supra*, because Plaintiff was still in the custody of the police and had not yet been formally arraigned when the alleged abuses occurred, his claims are properly examined under the Fourth Amendment.

It is well-established, moreover, that "sexual misconduct by a police officer during a 'seizure' is analyzed under the Fourth Amendment." *Spencer v. Sullivan County*, No. 18-CV-365, 2019 WL 4514011, at *6 (S.D.N.Y. Sept. 19, 2019) (citation and alteration omitted); *see also Jackson v. Mastrangelo*, 405 F. Supp. 3d 488, 491 (W.D.N.Y. 2019) (same); *Santiago v. City of Yonkers*, No. 13-CV-1077, 2015 WL 6914799, at *6 (S.D.N.Y. Oct. 30, 2015) (same); *Wright*, 2011 WL 1106217, at *6 (same). As a number of cases illustrate, however, claims for "sexual harassment" and "sexual abuse" are not independently cognizable causes of action under the Fourth Amendment. Instead, courts evaluate an officer's alleged sexual conduct as part of the inquiry into whether a search was unreasonable and invasive. For example, in *Wright*, the plaintiff alleged that two police officers had "sexually assaulted him" when they searched the plaintiff in connection with his arrest. *See* 2011 WL 1106217, at *6. The sexual assault claim was based on the fact that one of the two officers had allegedly "cupped [the plaintiff's] groin area, while she was frisking him, on two occasions[,]" while the other officer "failed to intervene." *Id.* at *7. The court's analysis focused on whether the officers' conduct constituted an unreasonable search under the Fourth Amendment. *See id.* at *6–7. Similarly, in *Love v. Town of Granby*, No. 03-CV-1960, 2004 WL 1683159 (D. Conn. July 12, 2004) (recommended ruling), the plaintiff alleged that two police officers had committed sexual assault and battery in connection with his arrest and confinement, *id.* at *4. According to the plaintiff, one of the officers grabbed [the plaintiff's] scrotum, used profanity, and referred to him using a homophobic slur. *Id.* at *5. Although the defendants argued that sexual assault and battery were state law claims over which the court should decline to exercise pendent jurisdiction, the court concluded that the plaintiff's "claims [were] properly

analyzed under the Fourth Amendment." *Id.* at *4–5. "Beyond the specific proscription of excessive force," explained the court, "the Fourth Amendment generally proscribes unreasonable intrusions on one's bodily integrity, and other harassing and abusive behavior that rises to the level of unreasonable seizure." *Id.* at *5 (quoting 🚩*Fontana, 262 F.3d at 878–79* (evaluating a plaintiff's allegations of sexually harassing behavior by a police officer following an arrest under the Fourth Amendment's "unreasonable seizure" standard)).

**\*30** Plaintiff's constitutional claims for "sexual harassment" and "sexual abuse" are therefore duplicative of his unreasonable search claim in Count Six. Indeed, Count Six is based on the same allegations underpinning Counts Three and Four. (*See* SAC ¶ 123.) Because the alleged sexually harassing behavior is properly analyzed with respect to the unreasonable search alleged in Count Six, Counts Three and Four do not give rise to separately cognizable constitutional claims, and should therefore be dismissed. *Cf., e.g., Lopes v. Westchester County*, No. 18-CV-8205, 2020 WL 7029002, at *10 (S.D.N.Y. Nov. 30, 2020) (dismissing substantive due process claim as duplicative of equal protection claim); *Matthews v. City of New York*, No. 15-CV-2311, 2016 WL 5793414, at *5–6 (S.D.N.Y. Sept. 30, 2016) (dismissing substantive due process claims that were duplicative of Fourth Amendment claims). Police Defendants' Motion is therefore granted with respect to Counts Three and Four.

### 5. Deliberate Indifference Based on Failure to Supervise (Count Seven)

In Count Seven, Plaintiff asserts a deliberate indifference claim against Sergeant Anderson based on his "failure to supervise Canario, Pitt, Saintiche[,] and Arestin in conducting [the] strip search which resulted in injuries that [were] serious and [which constituted a] deprivation of the Fourteenth Amendment." (SAC ¶ 124.) This claim is predicated on paragraph 45 of the Second Amended Complaint, in which Plaintiff explains that "[t]here [were] no cameras in th[e] strip searching room[,] nor was there anyone ... to supervise/monitor the search." (*Id.* ¶ 45; *see also id.* ¶ 124 (incorporating ¶ 45).) Plaintiff alleges that "Sergeant Anderson held the responsibility to supervise his subor[d]inates during this search but failed to do so, and as a result [Plaintiff] was seriously injured and deprived of [his] Fourth and Fourteenth Amendment[ ] [rights]." (*Id.* ¶ 45.)

In his Memorandum of Law, Plaintiff elaborates on this failure-to-supervise allegation. (*See* Pl.'s Mem. 15.) Anderson, he argues, "had a direct responsibility in monitoring the strip search in order to [e]nsure that the strip search was conducted in a manner that best [preserved] the Plaintiff's dignity and minimize[d] the potential abuse and humiliation[.]" (*Id.*) He argues that Anderson's "gross negligence in failing to supervise his subordinates in conducting the strip search, thus[ ] giving them the right to conduct the search in any manner they pleased[,] was the proximate cause of the constitutional violations that ... occurred during the strip/visual body cavity search." (*Id.*) Plaintiff also argues that Anderson "had constructive notice of such unconstitutional practices ... through prior disciplinary violations of his subordinates [such] that[,] as a supervisory official, he had a direct responsibility [to] monitor[ ] the strip search ... to [e]nsure that [no constitutional violations occurred]." (*Id.* at 16.) In view of these arguments and the allegations in the Second Amended Complaint, the Court understands Plaintiff to raise a deliberate indifference claim based on Anderson's alleged failure to supervise his subordinates.

### a. Plaintiff's Newly Added Unreasonable Search Claim Against Anderson

In addition to this deliberate indifference claim, Plaintiff's Memorandum of Law suggests a separate theory of liability based on Anderson's *order* to have the search performed. (*See id.* at 15 ("Sgt. Anderson ... had ordered Pitt, Canario, Arestin[,] and Saintiche to conduct a strip search on the Plaintiff ...."); *id.* at 16 (arguing that Anderson "directly participated in the[ ] [unconstitutional search] by ordering Pitt, Canario, Arestin, and Saintiche to conduct a 'strip search' and [then] failing to supervise [them]").) Indeed, Plaintiff explicitly raises this theory of liability in a single sentence, arguing that "Anderson should also be held liable for the unreasonable search claim [in Count Six]." (*Id.* at 15.)

**\*31** As noted, this Court is obligated to construe liberally the pleadings of pro se litigants and interpret them to raise the strongest arguments they suggest. *See* 🚩*Triestman, 470 F.3d at 474*. Indeed, that is why the Court has considered Plaintiff's new legal theory under Count Six over Police Defendants' procedural objection, *see supra* Section II.B.3, and has liberally construed Plaintiff's malicious abuse of process claim in Count 10 as a claim for denial of the right to a fair trial, *see infra* Section II.B.6.

Here, however, the Court would be overextending its discretion by allowing Plaintiff to pursue his second theory of liability with respect to Anderson. Whereas Plaintiff's legal theory in Count Six and the fair trial claim in Count 10 are both grounded in facts alleged in the Second Amended Complaint, that submission contained no allegations—and asserted no claims—with respect to Anderson's role in *ordering* the search. (*See generally* SAC.) The Second Amended Complaint—filed after the close of discovery—is quite clear in specifying the relevant facts and legal theory Plaintiff would use to establish Anderson's liability. Anderson, Plaintiff alleged, was "deliberate[ly] indifferen[t]" in "fail[ing] to supervise" his subordinates while they "conduct[ed] [the] strip search." (*Id.* ¶ 124.) Plaintiff may not now, on a motion for summary judgment, constructively amend his pleadings to incorporate a new claim against Anderson (unreasonable search) based on facts (Anderson's ordering of the search) that were never alleged in the Second Amended Complaint. *See Richardson v. City of New York*, No. 17-CV-8622, 2020 WL 5801476, at \*7 (S.D.N.Y. Sept. 29, 2020) (concluding that a pro se plaintiff "may not belatedly assert [new] claims at the summary judgment stage"), *appeal docketed*, No. 20-3560 (2d Cir. Oct. 16, 2020); *Mediavilla v. City of New York*, 259 F. Supp. 3d 82, 106 (S.D.N.Y. 2016) ("It is well settled that a litigant may not raise new claims not contained in the complaint in opposition to a motion for summary judgment."); *Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 223 (S.D.N.Y. 2013) ("It is well settled that a party may not amend its pleadings in its briefing papers."); *Cross v. State Farm Ins. Co.*, 926 F. Supp. 2d 436, 450 (N.D.N.Y. 2013) ("It is well settled that papers on a motion for summary judgment is not the proper vehicle to add a new claim."); *cf. AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726–27 (2d Cir. 2010) (affirming district court's denial of plaintiffs' attempt to amend complaint "several months after cross-summary judgment motions had been filed"). Thus, the Court need not consider Plaintiff's putative unreasonable search claim against Anderson.

### b. Deliberate Indifference Based on Failure to Supervise

As noted, Plaintiff seeks to hold Anderson liable for the alleged unconstitutional acts of his subordinates. (*See* SAC ¶¶ 45, 124.) The gravamen of Plaintiff's claim seems to be that Anderson was not present in the strip search room to supervise the visual body cavity search, thereby giving Pitt, Canario, Saintiche, and Arestin "the right to conduct the search in any manner they pleased." (Pl.'s Mem. 15.) Although Plaintiff does not specify which particular acts occurred as a result of Anderson's absence, the Court understands Plaintiff to refer to (1) the alleged excessive force and (2) the alleged digital penetration. (*See* SAC ¶¶ 53–63, 122–23.)

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Davila v. Johnson*, No. 15-CV-2665, 2015 WL 8968357, at \*4 (S.D.N.Y. Dec. 15, 2015) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (citation and quotation marks omitted)). Until recently, plaintiffs could establish the liability of a supervisory official for a subordinate's conduct under § 1983 by showing that:

> **\*32** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of the plaintiffs by failing to act on information indicating that unconstitutional acts were occurring.

*Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (brackets omitted) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). But in *Tangreti*, the Second Circuit held that "there is no special rule for supervisory liability[,]" thereby doing away with "the special standards for supervisory liability set forth in *Colon*." *Tangreti*, 983

F.3d at 617–18. As the court explained, the Supreme Court's 2009 decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), had "cast doubt on the continued viability" of these special standards. *Tangreti*, 983 F.3d at 617. In *Iqbal*, the Supreme Court stated that in § 1983 suits against state officials, such officials "may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." *Id.* at 616 (italics omitted) (quoting *Iqbal*, 556 U.S. at 676). In the years since *Iqbal* was decided, district courts in this Circuit tried, "with inconsistent results, to determine [its effect] on supervisory liability." *Id.* at 617 & n.3. *Tangreti* put the matter to rest by rejecting a special standard for supervisory liability and clarifying that "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676). Accordingly, when a plaintiff brings a § 1983 suit against a supervisory official, " '[t]he factors necessary to establish a [constitutional] violation will vary with the constitutional provision at issue[,]' because the elements of different constitutional violations vary." *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676). Whatever the alleged constitutional violation, after *Tangreti*, "[t]he violation must be established against the supervisory official directly." *Id.* at 618.

The Second Circuit's analysis in *Tangreti* illustrates how the Court may resolve the instant claim without reference to the supervisory liability factors in *Colon*. In *Tangreti*, an inmate at York Correctional Institute had been sexually abused by three correctional officers "on numerous occasions" over a span of more than a year from 2013 to 2014. *See id.* at 612. The inmate brought a § 1983 suit against eight prison supervisors alleging that they had shown deliberate indifference to the substantial risk of sexual abuse in violation of the Eighth Amendment. *Id.* The district court granted summary judgment to all but one of these defendants. *Id.* With respect to this last defendant, the district court found that she "was conceivably personally involved" in the alleged constitutional violations based on *Colon* factors four (gross negligence in supervising the subordinates who committed the violations) and five (deliberate indifference based on failure to act on information that unconstitutional acts were occurring). *See Tangreti v. Semple*, No. 17-CV-1420, 2019 WL 4958053, at *19–21 (Oct. 8, 2019), *reversed and remanded*, 983 F.3d 609 (2d Cir. 2020). Reversing the district court, the Second Circuit explained that the plaintiff "must ... establish that [the defendant] violated the Eighth Amendment by [the defendant's] own conduct, not by reason of [the defendant's] supervision of others who committed the violation." *Tangreti*, 983 F.3d at 619. In other words, "[s]he must show that [the defendant] herself acted with 'deliberate indifference,' " which in the Eighth Amendment context means "that [the defendant] personally knew of and disregarded an excessive risk to [the plaintiff's] health or safety." *Id.* (citation and some quotation marks omitted). The plaintiff could not, however, "rely on a separate test of liability specific to supervisors." *Id.*

**\*33** Here, in light of *Tangreti*, Plaintiff must establish that Anderson committed a constitutional violation through his own conduct, rather than through his supervision of Pitt, Canario, Saintiche, and Arestin. That is, Plaintiff must establish that Anderson himself showed deliberate indifference. Because Plaintiff was a pretrial detainee at the time of the alleged violations, his deliberate indifference claim is analyzed under the Due Process Clause of the Fourteenth Amendment. *See Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) ("[Because Plaintiff] was in pre-trial detention at the time of the alleged incidents ... [t]he district court correctly concluded that [his] claims ar[o]se under the Due Process Clause ...."). [24] Deliberate indifference claims under the Fourteenth Amendment are analyzed somewhat differently than the same claims under the Eighth Amendment, which applies to inmates who have been convicted and sentenced. *See Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (explaining the different mens rea requirements for Eighth Amendment and Fourteenth Amendment deliberate indifference claims). To be sure, the overarching framework remains the same. Under both the Eighth and Fourteenth Amendments, to prevail on a deliberate indifference claim a plaintiff must establish (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that the defendant "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017).

The first element "is evaluated the same way under both the Eighth Amendment and Fourteenth Amendment." *Ackridge v. Aramark Corr. Food Servs.*, No. 16-CV-6301, 2018 WL 1626175, at *19 n.19 (S.D.N.Y. Mar. 30, 2018)

(citing *Darnell, 849 F.3d at 30*). This requirement is "objective"; the detainee must show that "the alleged deprivation" is "sufficiently serious." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (citation and quotation marks omitted). In other words, the plaintiff must show that he was "[detained] under conditions posing a substantial risk of serious harm." *Blandon v. Capra*, No. 17-CV-65, 2017 WL 5624276, at *7 (S.D.N.Y. Nov. 20, 2017) (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996)).

The second element "applies differently to claims under the Eighth Amendment and the Fourteenth Amendment." *Howard v. Brown*, No. 15-CV-9930, 2018 WL 3611986, at *4 (S.D.N.Y. July 26, 2018) (citing *Darnell, 849 F.3d at 34–35*). While the Eighth Amendment imposes a subjective standard—that the defendant-official "knows of and disregards an excessive risk to inmate health or safety," *Darnell, 849 F.3d at 32* (citation omitted)—the Fourteenth Amendment, applicable here, imposes an objective standard. That is, the defendant-official need only "recklessly fail[ ] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id. at 35*. However, "[d]espite the slightly lower standard" applicable to pretrial detainees, "which is akin to objective recklessness, any § 1983 claim or a violation of due process requires proof of a mens rea greater than mere negligence." *Miller v. County of Nassau*, No. 16-CV-5843, 2018 WL 1597401, at *3 (E.D.N.Y. Mar. 31, 2018) (quotation marks and italics omitted) (ultimately quoting *Darnell, 849 F.3d at 36*).

Assuming Plaintiff satisfies the first element of his deliberate-indifference claim, he still has produced no evidence that Anderson recklessly failed to mitigate a risk that he either knew or should have known about. *See Darnell, 849 F.3d at 35*. Although Plaintiff asserts that Anderson "had constructive notice of ... unconstitutional practices ... through prior disciplinary violations of his subordinates," (Pl.'s Mem. 16), he has not pointed the Court to a single such violation. There is no evidence in the record, for example, regarding prior complaints or legal actions against Pitt, Canario, Saintiche, or Arestin. Nor is there evidence in the record regarding prior unreasonable search or excessive force claims

against other members of the Newburgh Police Department more generally.

**\*34** Though it preceded *Tangreti* and involved a motion to dismiss, this Court's decision in *Gantt v. Ferrara*, No. 15-CV-7661, 2018 WL 4636991 (S.D.N.Y. Sept. 27, 2018), is nevertheless instructive here. In *Gantt*, the plaintiff alleged that Newburgh's police chief had failed to properly train and supervise one of his subordinate officers who allegedly had used excessive force against the plaintiff. *See id.* at *6, *8. To determine whether the plaintiff had adequately alleged the police chief's personal involvement in the putative violation, this Court looked to the fourth *Colon* factor— whether "the defendant was grossly negligent in supervising subordinates who committed the wrongful acts." *Id.* at *6 (quoting *Grullon*, 720 F.3d at 139). Although after *Tangreti* courts must now resolve claims against supervisor-defendants without reference to *Colon*'s special standards for supervisory liability, the legal standard under the fourth *Colon* factor is virtually identical to the Fourteenth Amendment deliberate-indifference standard applicable here. To establish personal involvement based on this factor, a plaintiff formerly had to show that a defendant:

> knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to [the] [p]laintiff.

*Id.* (quoting *Frederick v. Sheahan*, No. 10-CV-6527, 2014 WL 3748587, at *8 (W.D.N.Y. July 29, 2014)); *see also Kucera v. Tkac*, No. 12-CV-264, 2013 WL 1414441, at *6 (D. Vt. Apr. 8, 2013) (noting that an "alleged failure [to supervise or train] [would] satisfy the fourth *Colon* factor if [the officers] 'knew or should have known that there was a high degree of risk that subordinates would behave inappropriately but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable officer would find necessary to prevent such a risk' " (alterations and citation omitted)). Much like Plaintiff has done here, the

plaintiff in *Gantt* alleged that the defendant "had knowledge of [his subordinate's] prior use of excessive force" by virtue of numerous prior "civil complaints and lawsuits alleging excessive force and police misconduct." *Gantt*, 2018 WL 4636991, at \*7 (record citation omitted). But because the plaintiff had "provide[d] no detail of these other complaints, such as when they were filed and whether the alleged misconduct was similar," this Court concluded that his allegations were "insufficient to make out a claim" that the defendant had been deliberately indifferent. *See id.* (citing *Guillory v. Cuomo*, No. 14-CV-971, 2014 WL 11173632, at \*4 (N.D.N.Y. Dec. 2, 2014) (dismissing claim for lack of personal involvement where "[the] [p]laintiff cite[d] to his four prior lawsuits but d[id] not allege how any defendant [named] ... had any involvement or any knowledge of any of the incidents described in any of those lawsuits")).

Here too, Plaintiff has alleged in conclusory fashion that Anderson "was aware of ... [his subordinates'] prior disciplinary violations," (Pl.'s Mem. 16), but has offered no evidence in support of that claim. Without record evidence that Anderson knew about or should have known about an excessive risk to Plaintiff's safety, *see* 🔖*Darnell*, 849 F.3d at 35, the Court must deny Plaintiff's Motion in this respect and grant summary judgment in favor of Police Defendants, *see Rodriguez v. Goins*, No. 18-CV-1380, 2020 WL 6150984, at \*4 (N.D.N.Y. Aug. 17, 2020) (granting summary judgment where there was no evidence that the defendant knew or should have known about the threat allegedly posed by the pretrial detainee's fellow inmate), *adopted by* 2020 WL 6146597 (N.D.N.Y. Oct. 20, 2020); *Charles v. Rockland Cnty. Off. of Sheriff*, No. 16-CV-166, 2019 WL 1299804, at \*4 (S.D.N.Y. Mar. 21, 2019) (same).

Accordingly, Police Defendants' Motion is granted with respect to Count Seven.

### 6. Abuse of Process and Denial of Right to Fair Trial Claims (Count 10)

**\*35** In Count 10, Plaintiff asserts what is styled as a claim for malicious abuse of process against Police Defendants Canario and Pitt. (SAC ¶ 127.) In the Second Amended Complaint, this claim is predicated on the allegations that Canario and Pitt "falsified incriminating statements to obtain, secure[,] and execute [a] search warrant [in order] to carry out body cavity / x-ray examinations," and that they "provided statements to [the] prosecution and falsely charg[ed] / fil[ed]

[a] felony and misdemeanor complaint." (*Id.*) Plaintiff and Police Defendants have both moved for summary judgment on this claim. (*See* Police Defs.' Mem. 23–25; Pl.'s Mem. 16–17.)

As his Memorandum of Law makes clear, however, Plaintiff is actually asserting a cause of action for denial of the right to a fair trial. (*See* Pl.'s Mem. 16–17.) Such a claim is distinct from a claim for malicious abuse of process. *See* 🔖*Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 244–51 (2d Cir. 2020) (discussing the cause of action for denial of one's right to a fair trial); *Thagard v. Lauber*, 317 F. Supp. 3d 669, 684 (W.D.N.Y. 2018) (explaining that a claim for the denial of the right to a fair trial "is a separate legal theory from a claim for abuse of process under § 1983"); 🔖*Hoyos v. City of New York*, 999 F. Supp. 2d 375, 391–95 (E.D.N.Y. 2013) (analyzing malicious abuse of process claim and fair trial claim as distinct causes of action); *Douglas v. City of New York*, 595 F. Supp. 2d 333, 343–44, 346–47 (S.D.N.Y. 2009) (same).

Although ordinarily the Court would decline to consider a claim that was not explicitly pled in the Second Amended Complaint, the Court is ever mindful of its obligation to construe "the submissions of a pro se litigant ... liberally" and interpret them "to raise the strongest arguments that they suggest," 🔖*Triestman*, 470 F.3d at 474 (italics omitted). Count 10 is predicated in part on the allegation that Pitt "provided false statements to the ... D[istrict] A[ttorney]," that "[t]he substance of these false statements violated [Plaintiff's] rights to a fair trial," and that "Pitt was maliciously building a stronger case for the prosecution when providing such false statements to the prosecution." (SAC ¶¶ 108–09; *id.* ¶ 127 (incorporating these allegations).) As discussed *infra*, these allegations clearly sound in a Fourteenth Amendment fair trial claim, rather than a Fourth Amendment abuse of process claim. Moreover, while Police Defendants have objected to what they characterize as Plaintiff's constructive amendment with respect to Count Six, *see* discussion *supra*, they raise no such objection with respect to Count 10. Indeed, they have responded to Plaintiff's arguments regarding his fair trial claim. (*See* Police Defs.' Opp'n 8–9.) Accordingly, the Court will consider this claim on its merits.

### a. Plaintiff's Fair Trial Claim

A criminal defendant's "right to a fair trial" is enshrined in the Due Process Clause of the Fourteenth Amendment.

*Frost*, 980 F.3d at 244 (quoting *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010)). "This right is violated 'when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors.' " *Frost*, 980 F.3d at 244 (brackets omitted) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). "[T]he harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti*, 124 F.3d at 130. Despite the "nomenclature, a criminal defendant's right to a fair trial protects more than the fairness of the trial itself," and, as relevant here, "a criminal defendant can bring a fair trial claim even when no trial occurs at all." *Frost*, 980 F.3d at 249; *see also Ricciuti*, 124 F.3d at 130 (reversing dismissal of fair trial claim despite the fact that all criminal charges were dismissed before trial); *Polanco v. City of New York*, No. 14-CV-7986, 2018 WL 1804702, at *11 (S.D.N.Y. Mar. 28, 2018) ("Somewhat counterintuitively, a claim for denial of the right to a fair trial does not require that the underlying action actually proceeded to a trial on the merits."); *Soomro v. City of New York*, 174 F. Supp. 3d 806, 815 (S.D.N.Y. 2016) (fair trial claim does not require "an actual trial").

**\*36** To prevail on his fair trial claim, Plaintiff "must show that 'an (1) investigating official (2) fabricate[d] evidence (3) that [was] likely to influence a jury's decision, (4) forward[ed] that information to prosecutors, and (5) [Plaintiff] suffer[ed] a deprivation of liberty as a result." *Soomro*, 174 F. Supp. 3d at 815 (quoting *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order); *Ricciuti*, 124 F.3d at 130). Thus, Plaintiff is required to establish not only that the police fabricated evidence, but also that this evidence *caused* his deprivation of liberty. *See Moroughan v. County of Suffolk*, — F. Supp. 3d —, 2021 WL 298714, at *34 (E.D.N.Y. Jan. 20, 2021) ("The Second Circuit has held that the fabricated evidence must *cause* the deprivation of liberty." (citing *Zahrey v. Coffey*, 221 F.3d 342, 350–51 (2d Cir. 2000))). In this respect, the relevant inquiry is "whether the liberty deprivations that occurred are legally traceable back even further to the earlier investigatory act of fabrication ...." *Zahrey*, 221 F.3d at 352.

As a threshold matter, the Parties dispute whether the information allegedly forwarded to prosecutors—i.e.,

Plaintiff's putative statement that he was secreting more drugs inside his body—was fabricated to begin with. [25] If this were the only factual dispute with respect to Plaintiff's fair trial claim, the Court could still grant summary judgment for Police Defendants based on the lack of causal connection between the alleged fabrication and Plaintiff's deprivation of liberty. *See Zahrey*, 221 F.3d at 348 ("[I]f the plaintiff] had claimed only that [the defendant] fabricated evidence and did nothing to precipitate the sequence of events that resulted in a deprivation of [the plaintiff's] liberty, no constitutional violation would have been alleged."). Here, however, there is also a genuine dispute as to whether Police Defendants' alleged fabrication could have caused Plaintiff's deprivation.

Police Defendants appear to argue there was no causation in part because "no false information was turned over to the prosecutor." (Police Defs.' Mem. 24.) But Plaintiff has provided two documents, evidently filed in connection with his prosecution, that complicate that assessment. (*See* Pl.'s Mem. Ex. J (Dkt. No. 183).) [26] Dated October 13, 2015 and submitted by Orange County District Attorney David M. Hoovler ("Hoovler"), both documents are labeled "Notice to Defendant of Intention to Offer Confessions or Admissions." (*See id.*) In the first document, Hoovler informs Plaintiff that he "intend[ed] to offer into evidence certain voluntary statements made by [Plaintiff] to Detective Michael Pitt of the City of Newburgh Police Department on May 8, 2015 at the City of Newburgh Police Department[,]" the substance of which was "that the police did not get it all and he has more up his buttocks." (*Id.*) In the second document, Hoovler informs Plaintiff of an additional statement he intended to offer into evidence. (*Id.*) In that statement, Plaintiff purportedly told Canario, Arestin, Saintiche, and/or Pitt: "[Y]ou guys are gay; you just want to see my ass; is this what you want[?]; that's not mine; you won't find the rest; it's either up too far or I ate it[.]" (*Id.*) Plaintiff also purportedly suggested "that it was his knife from the ground; [and] that the object that was recovered was just a lighter." (*Id.*) [27] Without question, these documents at least raise the possibility that the investigating officers "forward[ed] th[e] [allegedly fabricated] information to prosecutors." *Soomro*, 174 F. Supp. 3d at 815. Thus, Police Defendants' argument that "no false information was turned over to the prosecutor," (Police Defs.' Mem. 24), simply ignores the genuine dispute of fact regarding the alleged fabrication. [28]

**\*37** Police Defendants also appear to argue there was no causation because "no charges alleging [Plaintiff] had additional drugs were [ever] filed," and Plaintiff "was solely prosecuted on the evidence tampering charge to which he pled guilty[,] and does not even know the disposition of the sole drug possession charge which only related to what was found at the police station." (Police Defs.' Mem. 24 (record citations omitted).) The problem with this argument is that it frames the potential harm from the allegedly fabricated evidence too narrowly. In other words, Plaintiff may still establish the causation element of his fair trial claim even if the prosecutor did not *use* the fabricated evidence. The recent decisions in *Frost* and *Moroughan* are instructive on this point.

In *Frost*, the plaintiff alleged that detectives had coerced a witness into identifying him as the shooter in connection with a murder investigation, and then provided that evidence to prosecutors, who used it to seek the plaintiff's detention and prosecution. 980 F.3d at 244–45. Although the allegedly coerced identification was never used at trial, *see id.* at 249, the court held that the plaintiff's fair trial claim survived summary judgment because there were triable questions as to whether (1) the witness's identification was coerced in the first instance, and (2) whether such evidence "would likely have influenced the jury" had such evidence been presented at trial, *see id.* at 250. As the court observed, a "prosecutor's decision to pursue charges rather than to dismiss a complaint without further action may depend on the prosecutor's assessment of the strength of the case, which in turn may be critically influenced by fabricated evidence." *Id.* at 248 (brackets and ellipsis omitted) (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277–78 (2d Cir. 2016)). Taken together, the two triable questions identified by the court "create[d] a genuine dispute as to whether [the witness's] identification "critically influenced" the decision to prosecute [the plaintiff], thereby resulting in a deprivation of his liberty." *Id.* at 250.

In *Moroughan*, the plaintiff alleged that police officers fabricated his confession and provided this fabricated evidence to the prosecution. *See* 2021 WL 298714, at \*3, \*34. Ultimately, however, the charges against the plaintiff were dismissed before trial. *See id.* at \*13. The defendants argued—much as Police Defendants have argued here—that because "the plaintiff's statement was never used, or even considered during his brief pending criminal prosecution,"

his fair trial claim had to be dismissed, *id.* at \*36 (record citation omitted). The court disagreed, observing that "the Second Circuit recently rejected [that] precise argument [in *Frost*]." *Id.* (noting that "the fair trial claim survived summary judgment in *Frost* even though the allegedly fabricated evidence was presented to the prosecutor, but never used at any trial"). In *Moroughan*, moreover, there was evidence in the record that the district attorney, while investigating the charges, had considered the allegedly fabricated confession, which he found "corroborated [the defendants'] accounts as evidence against [the] plaintiff." *Id.* In light of this evidence, as well as the Second Circuit's holding in *Frost*, the court concluded there were genuinely disputed issues of material fact precluding summary judgment. *Id.* at \*37. Here, as in *Frost* and *Moroughan*, disputed issues of material fact preclude summary judgment on Plaintiff's fair trial claim. The documents filed by District Attorney Hoovler raise the distinct possibility that Plaintiff's allegedly fabricated statements "critically influenced" Hoovler's "assessment of the strength of the case." *See Frost*, 980 F.3d at 248. Although Police Defendants rely on the fact that Plaintiff "was solely prosecuted on the evidence tampering charge to which he pled guilty," (Police Defs.' Mem. 24), they cannot get around the fact that Hoovler evidently thought Plaintiff's alleged statements had *some* potential relevance to his prosecution. Indeed, even if the disclaimer on Hoovler's second document were interpreted to suggest that he had no intention of introducing Plaintiff's alleged statement at trial, (*see* Police Defs.' Opp'n 9), that is not the relevant inquiry, as the discussion above illustrates. The Court's concern is whether the statement "would be likely to influence a jury's decision, *were that evidence presented to the jury*." *Frost*, 980 F.3d at 250. Because there is a genuine dispute of material fact regarding the causation element of Plaintiff's fair trial claim, the Court may not grant summary judgment. Thus, Plaintiff's Motion and Police Defendants' Motion are both denied with respect to this claim.

**\*38** Finally, the Court notes that to the extent Plaintiff has framed his fair trial claim around Police Defendants' acquisition of a search warrant, (*see* Pl.'s Mem. 16–17), he seems to misconceive the nature of his own claim. In a fair trial claim such as the one he has raised, the relevant injury is a plaintiff's deprivation of liberty. *See, e.g.*, *Frost*, 980 F.3d at 250 (explaining that the fair trial right "protects against deprivation of liberty"); *Zahrey*, 221 F.3d at 349 (explaining that "the right at issue" in a fair trial claim

"is appropriately identified as the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity");

*Soomro*, 174 F. Supp. at 815 (stating that the plaintiff must suffer a deprivation of liberty to prevail on a fair trial claim); *Moroughan*, 2021 WL 298714, at *34 (noting that "the fabricated evidence must cause the deprivation of liberty"). Whereas "the claim of denial of the right to a fair trial finds its roots in the Sixth Amendment, as well as the due process clauses of the Fifth and the Fourteenth Amendments," *Aguirre v. City of New York*, No. 15-CV-6043, 2017 WL 4236552, at *10 n.13 (E.D.N.Y. Sept. 22, 2017); *see also Gogol v. City of New York*, No. 15-CV-5703, 2017 WL 3449352, at *11 (S.D.N.Y. Aug. 10, 2017) (same); *but cf. Garnett*, 838 F.3d at 276 n.6 (stating that "[w]hether this right is rooted in the Sixth Amendment or Fifth and Fourteenth Amendments, or both, is an issue we need not decide"), the right to be free from an unreasonable search by law enforcement arises under the Fourth Amendment, *see Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 392 (S.D.N.Y. 2020). Although a deprivation of liberty may arise "from an allegedly fabricated statement in a search warrant," *see Polanco*, 2018 WL 1804702, at *12 & n.13, the relevant injury in such a scenario would still be the deprivation of liberty, rather than the resultant search itself. Thus, insofar as Plaintiff alleges that the search warrant was procured through fabricated evidence, (*see* Pl.'s Mem. 16–17), he appears to be challenging the legality of the search that was subsequently undertaken pursuant to that warrant. Such a challenge is appropriately framed as an unreasonable search claim, rather than a fair trial claim.

### b. Malicious Abuse of Process Claim

Although Count 10, as discussed, is appropriately treated as a fair trial claim, the Court will briefly address Plaintiff's putative abuse of process claim to avoid any doubt.

"The elements of a § 1983 cause of action for malicious abuse of process are provided by state law." *Sorrell v. County of Nassau*, 162 F. Supp. 3d 156, 171 (E.D.N.Y. 2016) (citing *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)). In New York,

a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.

*Deanda*, 137 F. Supp. 3d at 576 (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)). The third element—a collateral objective—is "[t]he crux of a malicious abuse of process claim." *Marshall v. Port Auth. of N.Y. & N.J.*, No. 19-CV-2168, 2020 WL 5633155, at *8 (S.D.N.Y. Sept. 21, 2020) (quoting *Douglas v. City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009)). Thus, to prevail on such a claim, "a plaintiff must establish that the defendants had an improper <u>purpose</u> in instigating the action," and must establish that the defendants "aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Marshall*, 2020 WL 5633155, at *8 (brackets omitted) (quoting *Savino*, 331 F.3d at 77). "A collateral objective is usually characterized by personal animus, and may include infliction of economic harm, extortion, blackmail[,] or retribution." *Dash v. Montas*, —F. Supp. 3d—, 2020 WL 1550708, at *10 (E.D.N.Y. Mar. 31, 2020) (citations, brackets, and quotation marks omitted).

Here, Plaintiff has not come forward with *any* evidence to suggest that Pitt or Canario sought to investigate or facilitate the prosecution of Plaintiff with any collateral objective. Without evidence that these Defendants maintained some personal animus toward Plaintiff, or "aimed to achieve a collateral purpose beyond or in addition to his prosecution," *Marshall*, 2020 WL 5633155, at *8, his claim for malicious abuse of process fails. Thus, insofar as Count 10 purports to raise a malicious abuse of process claim, that claim is denied. *See id.* at *9 (granting summary judgment for defendants where the plaintiff "ha[d] not offered any evidence that the officers had an 'improper motive or pursued a collateral purpose outside the legitimate ends of process' " (citation omitted)); *Dash*, 2020 WL 1550708, at *11 (granting summary judgment for defendants where plaintiff provided no evidence that the defendant "harbored any

personal animus toward [him] or acted with some other collateral objective ... not related to law enforcement").

**\*39**  For the reason above, Police Defendants' Motion and Plaintiff's Motion are both denied with respect to Count 10.

### 7. Unreasonable Search and Right to Privacy Claims Based on Events at St. Luke's (Counts 15, 16, and 17)

To resolve Defendants' Motions with respect to the claims arising from the events at St. Luke's, the Court must address two threshold issues. First, the Court must address Plaintiff's contention that the manual body cavity search and x-ray examination at St. Luke's occurred during the first—and, according to Plaintiff, the *only*—visit to the hospital, before the police had secured a search warrant. (*See* SAC ¶¶ 75–102; Pl.'s Opp'n 18–20; Pl.'s Dep. 102:8–13.) Second, the Court must consider the validity of the warrant itself, and whether Police Defendants had a good-faith basis to rely on the warrant.

### a. Timing and Sequence of the Manual Body Cavity Search and X-Ray Examination at St. Luke's

As noted in Section I.A.4.b *supra*, Plaintiff maintains that a manual body cavity search and x-ray examination were performed during his first visit to St. Luke's, and that, contrary to Defendants' version of events, there was no second visit to the hospital later in the evening. According to Plaintiff's account, therefore, the manual body cavity search and x-ray were performed without a search warrant, (*see* Pl.'s Opp'n 19; Pl.'s Dep. 103:10–104:8), which the police did not obtain until later in the evening, (*see* Defs.' 56.1 ¶¶ 81–83).

Plaintiff's medical records from St. Luke's, however, corroborate Defendants' version of events. According to the digital timestamps from these records, Plaintiff was first admitted to St. Luke's at "1847" (6:47 P.M.) on May 8, 2015. (*See* ER Records 4; Posner Aff. Ex. O ("Berberich Aff.") ¶ 10 (Dkt. No. 160-14).) These records indicate that he left the hospital "in police custody" either at "1939" (7:39 P.M.), (*see* ER Records 4), or at "1927" (7:27 P.M.), (*see id.* at 16).[29]  The Court has thoroughly reviewed the first 20 pages of Police Defendants' Exhibit D, which contains the medical records pertaining to Plaintiff's initial visit to St. Luke's. (*See* ER Records 2–21.) These records indicate that between "1905" (7:05 P.M.) and "1935" (7:35 P.M.), medical staff

flushed Plaintiff's eyes (to remove residual pepper spray), performed an "EKG" (an electrocardiogram), and performed "wound care [on] [a] small abrasion to [the] patient['s] back," which included "cleans[ing] [the abrasion] with [a] normal saline antibiotic" and covering the wound with a bandage, after which Plaintiff was "discharged back into [the] custody of [the] police department." (*See id.* at 8.) But although these records contain information regarding Plaintiff's vital signs, (*see id.* at 5, 10, 13–14), medical history, (*see id.* at 12), and discharge instructions, (*see id.* at 14, 16–19), there is no mention of either a manual body cavity search or x-ray examination having been performed.

**\*40**  Exhibit D also contains a second set of records pertaining to a subsequent emergency room visit later in the evening. According to the digital timestamps in these records, Plaintiff was admitted a second time at "2300" (11:00 P.M.) on May 8, 2015, and discharged at "0137" (1:37 A.M.) on May 9, 2015. (*See id.* at 23; *see also id.* at 36–37 (indicating discharge time of "0135"); Berberich Aff. ¶ 10 (stating that discharge time was "01:39").) The "Emergency Room Note" for this second visit indicates that Plaintiff was "seen earlier today" at the hospital and was now there "for [a] search warrant rectal exam." (*Id.* at 29; *see also id.* at 24 (stating that "police [were] present ... with search warrant to search the rectal area"); *id.* at 31 (listing "secondary impression" as "search warrant rectal exam").) The same note states: "Per Sergeant, [x-ray] if needed may be completed as well." (*Id.* at 29.) According to the records, Plaintiff was "seen" and an "eval[uation]" was performed by Nurse Practitioner Durbin-French at "00:30" (12:30 A.M.). (*See id.* at 25; *cf.* Durbin-French Aff. ¶¶ 13, 21 (indicating that she saw Plaintiff at 12:25 A.M. and performed a rectal examination).) An x-ray examination was performed at approximately "00:37" (12:37 A.M.). (*See* ER Records 25; Durbin-French Aff. ¶¶ 24–27 (discussing the x-ray examination performed on Plaintiff).) And at "01:30" (1:30 A.M.), the x-rays were "reviewed by [Durbin-French]," Plaintiff was "cleared for [discharge]," and discharge instructions were provided to Plaintiff and the police. (*See* ER Records 25–26; Durbin-French Aff. ¶¶ 28–31.) The records reflect that no "foreign body" was found in Plaintiff's rectum. (ER Records 28, 31, 34, 37; *see also* Durbin-French Aff. ¶ 28.)

Further undermining Plaintiff's version of events is the testimony and timesheet of Nurse Lemos. As discussed in Part I.A.4.b *supra*, Plaintiff maintains that the manual body cavity search and x-ray were performed by Nurse Lemos during his first and only visit to St. Luke's between approximately 6:50

P.M. and 7:40 P.M. But Nurse Lemos's time records for that evening show that she did not clock in until 10:45 P.M., a fact to which she has testified. (*See* Lemos Aff. ¶ 5 & attached timesheet.) Thus, there is no way she could have examined Plaintiff as he claims.

In the Court's view, these records "directly and irrefutably contradict" Plaintiff's version of events. *See Henry,* 406 F. Supp. 3d at 214 (citation and italics omitted). As discussed in Section II.B.2.b *supra,* the Court may not grant summary judgment merely because a Plaintiff's alleged injuries do "not appear in the medical records," provided his allegations are not "directly and irrefutably contradicted" by those records. *See Morehouse,* 2020 WL 1049943, at *14 (quoting *Henry,* 406 F. Supp. 3d at 214). But although the Court declined to dismiss Count Five notwithstanding the tension between Plaintiff's allegations and the evidence in his medical records, the conflict here is of a different character and magnitude. For example, with respect to Count Five, the Court relied on Plaintiff's allegations that he complained to hospital staff about his supposed injuries. In that context, the Court observed that although Plaintiff's account relies exclusively on his own testimony and is contradicted by his medical records, his account still provides a "plausible alternative version of events" that could preclude summary judgment. *See Bridgewater,* 2011 WL 6762931, at *5. That is not the case here. The digital timestamps in the medical records conclusively establish that there were two visits—one between approximately 6:45 P.M. and 7:40 P.M., and another between approximately 11:00 P.M. and 1:40 P.M. Likewise, the Director of Health Information Management at St. Luke's, Laura Berberich, has reviewed the "audit trail" of Plaintiff's electronic medical records and affirmed that "there were two visits to St. Luke's Emergency Department on 5/8/2015"— the first of which lasted from "18:47" to "19[:]38," and the second of which lasted from "23:00" to "01:39." (Berberich Aff. ¶¶ 9–10.) [30] As noted, the records for the first hospital visit contain no mention of a manual body cavity search or an x-ray. Given the other detail in these records, it is implausible that hospital staff would perform these two procedures without including them in the records. Although Plaintiff may create a triable issue of fact by alleging that he complained about a bruise or contusion which do not appear in his records, he may not do the same by alleging in conclusory fashion—without a shred of supporting evidence —that hospital staff performed two significant procedures and then simply omitted them from the records. Nor has he plausibly challenged the timesheet produced by Nurse Lemos.

**\*41** Plaintiff's response is to argue that the police and medical staff must have conspired to falsify the medical records, fabricating evidence of a second hospital visit that took place after police had obtained a search warrant. (*See, e.g.,* Pl.'s Opp'n 17 (referring to the "falsified hospital medical records"); *id.* at 20 (stating that evidence of a second hospitalization was "forged and falsified"); SAC ¶¶ 102, 112, 137.) But as courts have routinely held, a plaintiff may not survive summary judgment through a conclusory assertion that relevant records were forged or falsified. *See, e.g., Goonewardena v. Spinelli,* No. 15-CV-5239, 2020 WL 1557745, at *11 (E.D.N.Y. Mar. 5, 2020) (granting summary judgment for the defendants where the plaintiff "ha[d] not adduced any evidence [to support his theory] that the certified court documents and transcripts [relied upon by the defendants] may have been fabricated, [and] ha[d] [not] ... uncovered any reason to believe that the documents [were] inaccurate"), *report and recommendation adopted in relevant part,* 2020 WL 1550724 (E.D.N.Y. Mar. 31, 2020); *Engles v. Dougherty,* No. 14-CV-1185, 2017 WL 6466309, at *11 (N.D.N.Y. Aug. 22, 2017) (holding, for purposes of summary judgment, that the "[p]laintiff's conclusory allegation that the medical professionals and other officers 'covered up,' and fabricated [the] plaintiff's medical records and logbooks to suppress evidence of his alleged injuries is highly suspect and would, in this court's view, ... be insufficient to sway any rational fact finder" (record citation omitted)), *report and recommendation adopted sub nom. Engles v. Souza,* 2017 WL 6463074 (N.D.N.Y. Dec. 18, 2017); *Hilton v. Maltese,* No. 09-CV-1373, 2012 WL 6965105, at *6 & n.10 (N.D.N.Y. Dec. 14, 2012) ("Plaintiff's conclusory assertion that the transcript and other records of his disciplinary hearing were completely fabricated is not sufficient to establish a material issue of fact ...."), *report and recommendation adopted,* 2013 WL 375489 (N.D.N.Y. Jan. 30, 2013); *Lewis v. Johnson,* No. 08-CV-482, 2010 WL 3785771, at *20 (N.D.N.Y. Aug. 5, 2010) (concluding that the "[p]laintiff's conclusory allegation that multiple medical professionals in two different prisons fabricated [the] plaintiff's medical records to suppress evidence of his alleged injuries ... would ... be insufficient to sway any rational fact finder"), *report and recommendation adopted,* 2010 WL 3762016 (N.D.N.Y. Sept. 20, 2010); *Farid v. Ellen,* No. 01-CV-8292, 2006 WL 59517, at *11 (S.D.N.Y. Jan. 11, 2006) (dismissing the plaintiff's Eighth Amendment deliberate-indifference claim on summary judgment in part because "[t]he most that plaintiff ha[d] provided [to establish the defendant's conscious disregard] [was] his speculation that [the] defendant ... had somehow doctored plaintiff's

medical records to fabricate details of his medical history"), *aff'd*, 593 F.3d 233 (2d Cir. 2010). Accordingly, there are no genuine disputes of material fact regarding the basic timing and sequence of the manual body cavity search and x-ray examination at St. Luke's. The evidence establishes that both procedures took place during Plaintiff's second visit to the hospital, after the police had obtained a search warrant.

### b. Whether Police Defendants Are Entitled to Qualified Immunity Based On Good-Faith Reliance On Search Warrant

Because the manual body cavity search and x-ray examination at St. Luke's were conducted pursuant to a search warrant, they are presumed reasonable. *See Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012) ("Ordinarily, an arrest or search pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause."); *see also Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) ("Normally, the issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause ...."); *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 426 (S.D.N.Y. 2013) ("A search is presumptively reasonable when executed pursuant to a warrant."). Although Plaintiff's theory is that the manual body cavity search and x-ray examination were performed without a search warrant, he has also challenged the validity of the warrant itself, arguing Police Defendants "wrongfully procur[ed]" the warrant by relying on the fruits of a "prior illegal search" and fabricating Plaintiff's statement that he had more drugs inside of him. (Pl.'s Mem. 16–17; *see also* SAC ¶ 108.) Because the Court has concluded that Defendants did rely on the search warrant during the second visit to St. Luke's, Plaintiff's challenge to the warrant merits consideration.

"To be valid under the Fourth Amendment, a search warrant must (1) be based on probable cause, (2) be supported by oath or affirmation, (3) describe with particularity the place to be searched, and (4) describe with particularity the things to be seized." *Green*, 96 F. Supp. 3d at 286 (citing *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)). It is well-established, however, that a "police officer who relies in good faith on a warrant issued by a neutral and detached magistrate

upon a finding of probable cause is presumptively shielded by qualified immunity." *Id.* at 286 (quoting *Simms v. Village of Albion*, 115 F.3d 1098, 1106 (2d Cir. 1997)). Thus, courts confronted with a suppression motion "have recognized that evidence obtained by government agents 'in objectively reasonable reliance' on a warrant subsequently invalidated by a reviewing court is not generally subject to exclusion." *United States v. Scully*, 108 F. Supp. 3d 59, 103 (E.D.N.Y. 2015) (quoting *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008)). "When a government agent genuinely believes that he has obtained a valid warrant from a magistrate and executes that warrant in good faith, there is no conscious violation of the Fourth Amendment, 'and thus nothing to deter.' " *Scully*, 108 F. Supp. 3d at 103 (quoting *United States v. Leon*, 468 U.S. 897, 920–21 (1984)); *see also United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015) (same). These same principles "appl[y] in civil cases, like this one, brought pursuant to § 1983, in which a plaintiff seeks to challenge a warranted search as unlawful." *Calderon v. City of New York*, No. 14-CV-1082, 2015 WL 2079405, at *5 (S.D.N.Y. May 4, 2015) (gathering cases); *see also Conroy v. Caron*, 275 F. Supp. 3d 328, 346–47 (D. Conn. 2017) (stating same principle). Accordingly, if the Court finds that Police Defendants reasonably relied on the search warrant in good faith, it need not determine whether the search was, in fact, supported by probable cause. *See Scully*, 108 F. Supp. 3d at 103 (gathering cases and observing that "the Second Circuit and district courts in this Circuit have, at times, declined to evaluate a probable cause showing altogether and instead decided Fourth Amendment claims based on the good faith exception").

**\*42** To invoke the good faith exception, however, an officer's reliance on a duly issued warrant "must be objectively reasonable." *Id.* at 103 (quoting *Leon*, 468 U.S. at 922); *see also Raymonda*, 780 F.3d at 118 (same). Courts have recognized four circumstances in which the good faith exception "cannot shield even an officer who relie[d] on a duly issued warrant":

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the

application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*Raymonda*, 780 F.3d at 118 (quoting *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011)).

The second and fourth factors do not apply here. With respect to the second factor, although the judge issuing a search warrant "must 'perform his neutral and detached function' as a judicial officer 'and not serve merely as a rubber stamp for the police," courts will not "hastily assume a magistrate's surrender of his judicial independence to the police or prosecution." *Clark*, 638 F.3d at 100, 101 (quoting *Leon*, 468 U.S. at 914). Here, there is no evidence that Judge Williams "allowed himself to become a member, if not the leader, of the search party," as was the case, for example, in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979). There, the Supreme Court invalidated a warrant where the issuing judge had accompanied police and prosecutors to an adult bookstore and, over the course of six hours, determined for himself which obscene materials could be seized. *See id.* at 322. Moreover, even if the reviewing court determines that the issuing judge "committed legal error in his assessment of probable cause," it may not infer "abandonment of judicial neutrality and detachment" on that basis alone. *Clark*, 638 F.3d at 101. Here, there is no evidence to suggest that Judge Williams abandoned his judicial role, and thus, "this factor did not preclude the officers' good faith reliance on the challenged warrant." *Id.*

With respect to the fourth factor, "a warrant is facially defective when it omits or misstates information specifically required to be contained therein," such as "the place to be searched, and the persons or things to be seized." *Id.* at 102 (quoting U.S. Const. amend. IV). This factor is also inapposite here. The search warrant issued by Judge Williams authorized law enforcement personnel and medical staff to search for and seize "cocaine[,] marihuana[,] or other controlled substances and/or packaging material consistent with the sale of such items." (Search Warrant & Supporting Aff. 2.) The warrant authorized them "to search and inspect, and photograph and/ or record in any way the person of [Plaintiff,] including

an inspection of the rectal area[,]" for these products. (*Id.*) Because the warrant identified with particularity both the items to be seized and the place to be searched, it was not facially defective so as to preclude good faith reliance. *Cf.* *Groh*, 540 U.S. at 564 (concluding that a search warrant's failure to identify the items to be seized prevented reasonable reliance); *Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5 (1984) (upholding a lower court's conclusion that a "warrant was constitutionally defective [where] the description [of items to be seized] in the warrant was completely inaccurate and the warrant did not incorporate the description contained in the affidavit").

**\*43** Here, rather, Plaintiff's challenge to the warrant implicates the first and third factors that may vitiate good faith reliance. He argues that Pitt "provided false statements to [Judge Williams] ... in order to secure a search warrant," (SAC ¶ 108), thereby suggesting that "the issuing magistrate [was] knowingly misled[,]" *Raymonda*, 780 F.3d at 118. He also argues that the search warrant was obtained by using the fruits of a prior unconstitutional search, (*see* Pl.'s Mem. 16), thereby suggesting that the warrant "application [was] so lacking in indicia of probable cause as to render reliance upon it unreasonable[,]" *Raymonda*, 780 F.3d at 118. The Court will consider each challenge in turn.

### i. Whether Judge Williams Was Misled

"Where an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, ... the shield of qualified immunity is lost." *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994) (ellipsis in original) (quoting *Golino*, 950 F.2d at 871)). "A [§] 1983 plaintiff challenging a warrant on this basis must make the same showing that is required at a suppression hearing under *Franks v. Delaware*, 438 U.S. 154, 155–56 [(1978).]" *Id.* In such cases, "the plaintiff must show that the affiant knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in his application for a warrant, and that such statements or omissions were necessary to the finding of probable cause." *Id.*; *see also United States v. Lahey*, 967 F. Supp. 2d 698, 709 (S.D.N.Y. 2013) ("To require suppression, a movant must demonstrate, by a preponderance of the evidence, both the affiant's *intent* to mislead the issuing judge and the *materiality*

of the affiant's falsehoods or omissions." (citing 🚩 *United States v. Rajaratnam*, 719 F.3d 139, 145–46 (2d Cir. 2013))). It is not enough for a plaintiff to set forth "[u]nsupported conclusory allegations of falsehood or material omission"; rather, he "must make specific allegations accompanied by an offer of proof." 🚩 *Velardi*, 40 F.3d at 573; *see also Calderon*, 2015 WL 2079405, at *5 (same). With respect to the materiality requirement, "a false statement is material when 'the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding.' " *Calderon*, 2015 WL 2079405, at *6 (quoting 🚩 *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005)); *see also Lahey*, 967 F. Supp. 2d at 711. "To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause." *Lahey*, 967 F. Supp. 2d at 711; *Conroy*, 275 F. Supp. 3d at 347 (same); *see also Calderon*, 2015 WL 2079405 (same). Thus, "to survive the defendants' motion for summary judgment on this issue," plaintiffs must meet three criteria:

> [T]hey must have made an offer of proof supporting specific allegations of deliberate or reckless misrepresentation, as required by *Franks*; the alleged misrepresentations must be legally relevant to the probable cause determination; and there must be a genuine issue of fact about whether the magistrate would have issued the warrant on the basis of 'corrected affidavits.'

🚩 *Velardi*, 40 F.3d at 574. The *Franks* standard is therefore considered "a high one." 🚩 *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991); *Calderon*, 2015 WL 2079405, at *5 (same).

Here, Plaintiff alleges that Pitt "intentionally, knowingly[,] and with reckless disregard for the truth" fabricated Plaintiff's statement that he had more drugs inside his anal cavity, and that he did so to support the application for a search warrant. (Pl.'s Mem. 16; *see also* SAC ¶ 108; Search Warrant & Supporting Aff. 4 ("[Plaintiff] then made a statement that he does have more narcotics in his rectum.").) The Court

assumes there is a genuine issue of fact about whether Judge Williams would have issued the warrant on the basis of an affidavit omitting this statement, just as it assumes that Pitt's alleged fabrication is legally relevant to the probable cause determination.[31] But even with these assumptions in place, Plaintiff has not provided a sufficient "offer of proof" in support of his allegations as required by *Franks*. *Velardi* and its progeny have made clear that even in a 🚩 § 1983 action, and even in the context of a summary judgment motion, a plaintiff challenging the validity of a warrant must still satisfy the rigorous standards in *Franks*. *See* 🚩 *Velardi*, 40 F.3d at 573; *Calderon*, 2015 WL 2079405, at *5; *Conroy*, 275 F. Supp. 3d at 347; *Spafford v. Romanowsky*, 348 F. Supp. 2d 40, 46 (S.D.N.Y. 2004). Under *Franks*, "a challenge to the veracity of the affidavit [on which a warrant was based] merits a [suppression] hearing only if the challenger makes a 'substantial preliminary showing' that the affiant knowingly and intentionally made a false statement that was 'necessary to the finding of probable cause.' " 🚩 *Simms*, 115 F.3d at 1107 (brackets and ellipsis omitted) (quoting 🚩 *Rivera*, 928 F.2d at 604). As noted, this "substantial preliminary showing" requires that the plaintiff's allegations be "supported by an offer of proof." *Calderon*, 2015 WL 2079405, at *5 (citing 🚩 *Velardi*, 40 F.3d at 573). Courts have made clear that a plaintiff's own, uncorroborated statements do not constitute a sufficient offer of proof under *Franks*. *See United States v. Nix*, No. 15-CR-6126, 2016 WL 11268960, at *5 (W.D.N.Y. Apr. 25, 2016) (challenge to search warrants did not warrant a *Franks* hearing where the defendant "provide[d] no basis for his claim and no sworn, corroborating statements other than his own"); *Bourguignon v. Guinta*, 247 F. Supp. 2d 189, 194 (D. Conn. 2003) (granting summary judgment for defendants on a pro se plaintiff's 🚩 § 1983 false arrest claim where the plaintiff "presented no evidence to support his claims" that the arrest warrant affidavit contained material misrepresentations and omissions); *United States v. Rollack*, 90 F. Supp. 2d 263, 270 (S.D.N.Y. 1999) (concluding that a defendant's own affidavit submitted in support of his challenge to the veracity of a search warrant affidavit "[was] insufficient to establish the substantial preliminary showing required to warrant a *Franks* hearing").

**\*44** Although Plaintiff denies having said there were more drugs in his anal cavity, he has provided no "offer of proof" besides his own conclusory allegation that this statement was fabricated. (*See* Pl.'s Mem. 16–17.) Under the "stringent"

standard in *Franks*, such "unadorned conclusory charges" do not make out a "substantial preliminary showing," *Nix, 2016 WL 11268960, at \*5*, and are therefore insufficient to defeat a summary judgment motion, *see* 🚩 *Velardi, 40 F.3d at 574*. Plaintiff's only other challenge to the search warrant affidavit is based on perceived inconsistencies between Pitt's testimony and other statements by the officers. (*See* Pl.'s Mem. 17.) Although Plaintiff's argument is a confusing swirl of theories and allegations, his principle contention seems to be that one of Pitt's statements in an incident report is inconsistent with an account offered by Arestin. (*See id.*) In an incident report summarizing his involvement in the events of May 8, Pitt stated that after he and the other officers retrieved the drugs Plaintiff had tried to swallow, and after Plaintiff had been transported to the hospital, Pitt was "advised by [Sergeant] Weaver and [Officer] Canario that [Plaintiff] had stated to officers that he had more 'drugs' up his ass that [they] didn't find." (*See* Pl.'s Opp'n Ex. K (Dkt. No. 204).) [32] In a separate incident report, Arestin states that Plaintiff made this alleged statement after he had tried to swallow the recovered contraband. (*Id.* Ex. J.) [33] Plaintiff appears to argue that Arestin's account is inconsistent with Pitt's account, because "Pitt's police report indicates that [he] was advised by Canario and Sgt. Weaver that the Plaintiff had made such admissions during the strip search." (Pl.'s Mem. 17.) In fact, that is not what Pitt's incident report says. His report does not specify *when* Plaintiff had reportedly made the remark about having additional drugs. (*See* Pl.'s Opp'n Ex. K.) Thus, Plaintiff has attacked an inconsistency that does not exist. Although Plaintiff complains of other perceived inconsistencies among the officers' incident reports, they are not significant. (*See* Pl.'s Mem. 17.) At most, these perceived inconsistencies might be read to suggest some ambiguity as to *when* Plaintiff made the alleged remark, but not *whether* he made the remark in the first place.

Because Plaintiff has offered no more than "[u]nsupported conclusory allegations of falsehood or material omission," which are insufficient to "support a *Franks* challenge," 🚩 *Velardi, 40 F.3d at 573*, he has failed to establish that Judge Williams "was knowingly or recklessly misled by any statements or omissions in [Pitt's] affidavit," 🚩 *Falso, 544 F.3d at 128*. Thus, on this basis at least, Plaintiff has failed to establish that Defendants' good faith reliance on the warrant was not objectively reasonable.

### ii. Whether Warrant Application Was So Lacking in Indicia of Probable Cause As To Render Reliance Upon it Unreasonable

Plaintiff also argues that Pitt used the fruits of a prior unconstitutional search to obtain the search warrant. (*See* Pl.'s Mem. 16.) In paragraph 8 of the affidavit submitted in support of the search warrant, Pitt wrote the following:

> [Plaintiff] was transported to the City of Newburgh Police Department. While at the station he [sic] was advised by his supervisor Sgt. Anderson that he wanted Strip Search conducted. While conducting a strip search for any possible narcotics, officers located a small clear plastic bag containing an off white rock like substance, which later field tested possible for the presence of cocaine, in the rectum area of [Plaintiff].

(Search Warrant & Supporting Aff. 4.) Relying on a 1975 case from Maryland's Court of Appeals, Plaintiff argues that "[e]vidence derived as a result of a prior illegal search or seizure[ ] cannot be used as a valid basis to justify the existence of probable cause in a subsequent application for a search warrant." (Pl.'s Mem. 16 (citing 🚩⚠ *Everhart v. State, 274 Md. 459, 481 (1975)*.) The Court interprets Plaintiff's argument to implicate the third circumstance in which officers may not claim the good faith exception— that is, "where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable ...." 🚩 *Raymonda, 780 F.3d at 118*.

Liberally construed to raise the strongest possible argument in the context of the instant analysis regarding qualified immunity and the good faith exception, Plaintiff's position is "that agents who have engaged in a predicate Fourth Amendment violation may not rely on a subsequently issued warrant to establish good faith." 🚩 *United States v. Ganias, 824 F.3d 199, 222 (2d Cir. 2016)*. The Second Circuit, though, has declined to adopt such a rule on at least three occasions, beginning with 🚩 *United States v. Thomas, 757 F.2d 1359 (2d*

Cir. 1985), and continuing with 🚩 *United States v. Reilly*, 76 F.3d 1271 (2d Cir. 1996), and 🚩 *United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016). *See also United States v. Calhoun*, No. 16-CR-92, 2017 WL 1078634, at *14 (D. Conn. Mar. 21, 2017) (observing that the Second Circuit has applied the "good faith exception to circumstances where the warrant affidavit included information arguably tainted by a Fourth Amendment violation, if it would nevertheless be objectively reasonable for the officers to believe that the resulting warrant had validly issued").

**\*45** In *Thomas*, an agent for the Drug Enforcement Agency ("DEA"), acting without a search warrant, used a drug-sniffing dog to perform a "canine sniff" at an apartment. 🚩 757 F.2d at 1366. The canine sniff indicated there were narcotics inside the apartment, and the agent submitted this evidence to a magistrate in support of a search warrant application. *Id.* Relying on this and other evidence, the judge determined there was probable cause and issued a warrant. *Id.* The defendant moved to suppress the evidence uncovered during execution of the search warrant, arguing that the canine sniff was a predicate constitutional violation, and that the fruits of this unlawful search were material to the judge's finding of probable cause. 🚩 *Id.* at 1366. The Second Circuit decided as a matter of first impression that the canine sniff constituted a search, 🚩 *id.* at 1367, and further concluded that without the evidence obtained from that search, there would have been no probable cause, 🚩 *id.* at 1368. The court nevertheless concluded that suppression was not warranted because the agent's reliance on the warrant was objectively reasonable. *See id.* As the court explained:

> The DEA agent brought his evidence, including the positive "alert" from the canine, to a neutral and detached magistrate. That magistrate determined that probable cause to search existed, and issued a search warrant. There is nothing more the officer could have or should have done under these circumstances to be sure his search would be legal. The magistrate, whose duty it is to interpret the law, determined that the canine sniff could form the basis for probable

cause; it was reasonable for the officer to rely on this determination.

*Id.* Accordingly, the court found that the agent was entitled to the good faith exception. *Id.*

The Second Circuit distinguished *Thomas* when deciding *Reilly*. In *Reilly*, two police officers unlawfully went onto the defendant's curtilage and observed "a clearing with about 20 marijuana plants." 🚩 76 F.3d at 1274. To obtain a search warrant, the officers submitted to the county court judge a "bare-bones" description of the defendant's land," and "failed to give [the judge] information as to their behavior." 🚩 *Id.* at 1280. The omitted information "was crucial," the court explained, and "[w]ithout it, the issuing judge could not possibly make a valid assessment of the legality of the warrant that he was asked to issue." *Id.* In short, the affidavit submitted to the judge "was almost calculated to mislead." *Id.* The court held that in such a situation, "[t]he good faith exception ... does not protect searches by officers who fail to provide all potentially adverse information to the issuing judge." *Id.* In dicta, the *Reilly* court suggested that the good faith exception also did not apply for a second reason: "The issuance of the warrant was itself premised on material obtained in a prior [illegal] search." *Id.* The court was quick to clarify, however, that

> [i]n deciding that the good faith exception does not apply when officers do not provide an issuing judge with details about their conduct during a pre-warrant search, *we do not hold that the fruit of illegal searches can never be the basis for a search warrant that the police can subsequently use in good faith.*

*Id.* at 1280–81 (emphasis added). There is a clear tension between the court's first and second statements that was never fully resolved in *Reilly*. But despite this ambiguity, the court still clarified that the good faith inquiry is focused not on whether there was a predicate unconstitutional search, but on whether the officers fully disclosed their actions to the issuing magistrate in good faith. As it observed:

> The facts surrounding th[e] prior search ... raise[d] serious doubts about the officers' good faith at that earlier time. The officers went to [the judge] with the fruits of this prior search in hand, and it was on the basis of that evidence that they asked him to issue a warrant. Yet the officers never gave [the judge] a full account of what they did. And without such an account, [the judge] could not possibly decide whether their conduct was sufficiently illegal and in bad faith as to preclude a valid warrant. This fact, *by itself*, makes [the good faith exception] inapplicable.

**\*46** *Id.* at 1280 (emphasis added). Thus, the court made clear that its holding was based solely on the officers' bad faith when failing to describe their actions to the issuing magistrate.

Whatever ambiguity lingered after *Reilly* was laid to rest in *Ganias*. There, agents for the U.S. Army's Criminal Investigation Division executed a search warrant and obtained several mirrored hard drives belonging to an accountant as part of an investigation into two of the accountant's clients (but not the accountant himself). 824 F.3d at 202–03. But even after the government had finished "identifying and segregating" the files that fell within the scope of the warrant, it continued to retain all the data that had been seized in the raid. *Id.* at 205–06. Roughly three years after the raid, government investigators began to suspect that the accountant himself may have been involved in tax-related crimes. *Id.* at 206. Accordingly, the investigating agent sought a search warrant to search files which she knew to be on the mirrored hard drives, but which had not previously been accessed. *Id.* at 207. The magistrate issued the warrant, and the government ultimately indicted the accountant for tax evasion. *Id.* On appeal, the defendant argued that the government could not rely in good faith on the search warrant because the issuance of the warrant was based on an alleged constitutional violation—unlawful retention of the mirrored hard drives. *Id.* at 222. [34] Invoking *Reilly*, he made the same argument Plaintiff essentially raises here: "that

agents who have engaged in a predicate Fourth Amendment violation may not rely on a subsequently issued warrant to establish good faith." *Id.* But *Reilly*, the Second Circuit said, "stands for no such thing." *Id.* The basis of the holding in *Reilly*, the court explained, was the officers' failure to provide the magistrate "with an account of what they did," such that the magistrate "was unable to ascertain whether the evidence on which the officers relied in seeking the warrant was 'itself obtained illegally and in bad faith.' " *Id.* (quoting *Reilly*, 76 F.3d at 1281). Contrasting the facts in *Reilly* to those in *Thomas*, the *Ganias* court said that the distinction between those cases "did not turn on whether the violation found was *predicate*, or prior to, the subsequent search warrant on which the officers eventually relied, but on whether the officers' reliance on the warrant was reasonable." *Ganias*, 824 F.3d at 223. Thus, "it is not the case that good faith reliance on a warrant is never possible in circumstances in which a predicate constitutional violation has occurred." *Id.* In *Ganias*, the court found that the agent had "provided sufficient information in her affidavit to apprise the magistrate judge of the pertinent facts regarding the retention of the mirrored copies of [the defendant's] hard drives—the alleged constitutional violation on which [the defendant] relie[d]." *Id.* at 224. As in *Thomas*, then, the magistrate had enough information to determine whether the alleged unconstitutional act precluded issuance of the warrant, and the government agents were entitled to rely in good faith on the warrant that followed. *See id.* at 224–25.

**\*47** The Court concludes that here, as in *Thomas* and *Ganias*, the search warrant affidavit contained sufficient information to apprise the issuing judge of the officers' prior conduct. Although the Court has found that Police Defendants' visual body cavity search violated the Fourth Amendment, *see supra* Section II.B.3.a, the search warrant affidavit submitted to Judge Williams clearly states that the officers had performed a "strip search" of Plaintiff and had uncovered a small bag of drugs inside Plaintiff's "rectum area," (*see* Search Warrant & Supporting Aff. 4). Even if Judge Williams, applying strict definitional categories, interpreted "strip search" to connote something less invasive than what took place, Pitt's statement that drugs were found in Plaintiff's "rectum area" likely would have disabused him of that notion. Thus, in contrast to the affidavit in *Reilly*, the affidavit submitted to Judge Williams was not a "bare-bones" document "calculated to mislead." 76 F.3d at 1280. Like the agents in *Thomas* and *Ganias*, Pitt

apprised Judge Williams "of the relevant conduct, so that [Judge Williams] was able to determine whether any predicate illegality precluded issuance of the warrant." *Ganias,* 824 F.3d at 223. Whether this Court would have reached the same probable cause determination as Judge Williams is not the relevant inquiry, for "a court reviewing a challenged warrant —whether at the district or appellate level—'must accord considerable deference to the probable cause determination of the issuing magistrate.' " *Clark,* 638 F.3d at 93 (quoting *Walczyk,* 496 F.3d at 157). What matters is whether Pitt "disclosed all crucial facts for the legal determination in question to the [issuing] judge." *Ganias,* 824 F.3d at 223. The Court concludes that he did.

There is one final point that merits comment. In *Reilly,* the Second Circuit distinguished *Thomas* not only based on the agent's full disclosure to the issuing magistrate, but also based on the novelty of the predicate constitutional violation in question: Whereas no court in the Second Circuit had held a canine sniff unconstitutional before *Thomas* was decided, it was well-established before *Reilly* that an invasion of curtilage was unconstitutional. *See Reilly,* 76 F.3d at 1281. Thus, in contrast to the officers in *Reilly,* the DEA agent in *Thomas* "did not have any significant reason to believe that what he had done was unconstitutional." *Id.* The Second Circuit invoked this distinction once again in *Ganias,* where it observed that, at the time of the alleged constitutional violation there—retention of mirrored hard drives—"no court in this Circuit had held that [such] retention ... could violate the Fourth Amendment," and thus, the government agent had no particular reason to suspect that her conduct was unconstitutional. 824 F.3d at 225; *see also Calhoun,* 2017 WL 1078634, at *16 (observing that "[i]n *Thomas* and *Ganias,* the Second Circuit was deciding novel questions at the very edge of Fourth Amendment law"). In this sense, the instant case falls more in line with *Reilly* than with *Thomas* or *Ganias.* As noted *supra* Section II.B.3.a.ii, reasonable police officers in New York state would have known as of 2013 that visual body cavity searches require reasonable suspicion. *See Sloley,* 945 F.3d at 40. Thus, in contrast to the canine sniff in *Thomas* or the retention of mirrored hard drives in *Ganias,* the visual body cavity search here does not sit at the vanguard of Fourth Amendment violations. But while the novelty of the predicate conduct may provide an *additional* basis for distinguishing the facts in *Thomas* and *Ganias* from those in *Reilly,* that was not the *primary* distinction on which the Second Circuit relied in either *Reilly*

or *Ganias.* In both cases, the court focused mainly on whether the law enforcement officers had sufficiently disclosed their underlying conduct to the issuing magistrate. *See Ganias,* 824 F.3d at 222–24; *Reilly,* 76 F.3d at 1280–81. Nothing in either opinion suggests that where, as here, a predicate constitutional violation has occurred, the novelty of that violation is a *sine qua non* for an officer's subsequent good faith reliance on a warrant, particularly when the officer has sufficiently disclosed the circumstances of that violation to the issuing magistrate. Thus, although the visual body cavity search at the police station was not a novel constitutional violation, this fact does not foreclose Police Defendants' good faith reliance on the subsequently issued warrant.

If Pitt and his fellow officers believed they had committed a constitutional offense, Pitt might well have omitted certain details from his affidavit to Judge Williams. But instead, his affidavit acknowledged the "strip search," as well as the fact that drugs had been located in Plaintiff's "rectum area." (Search Warrant & Supporting Aff. 4.)[35] His transparency in the matter suggests his good faith in seeking the warrant. Most important, Judge Williams was sufficiently apprised of the underlying facts to reach a determination not only whether there was probable cause, but also "whether any predicate illegality precluded issuance of the warrant." *Ganias,* 824 F.3d at 223. Having "disclose[d] all potentially adverse information to the issuing judge," Police Defendants were entitled to rely on the subsequently issued warrant. *Id.* at 221.

**\*48** Based on the foregoing analysis, the Court cannot say that Pitt's application was "so lacking in indicia of probable cause as to render reliance upon it unreasonable." *Raymonda,* 780 F.3d at 118. Because none of the four circumstances that might preclude good faith reliance apply to the facts of this case, the Court finds that Police Defendants' good faith reliance on the warrant was "objectively reasonable," *see id.,* and they are therefore shielded by qualified immunity with respect to the searches that occurred pursuant to the search warrant, *see Simms,* 115 F.3d at 1106; *Green,* 96 F. Supp. 3d at 286.

Having determined that the Police Defendants who reasonably relied on the search warrant in good faith are entitled to qualified immunity, the Court turns to consider the relevant claims themselves.

#### c. Manual Body Cavity Search at St. Luke's (Count 15)

In Count 15, Plaintiff brings an unreasonable search claim against Police Defendants Canario and Saintiche and Medical Defendant Lemos. (SAC ¶ 132.) The gravamen of the claim is that these Defendants performed a manual body cavity search "without [a] warrant, consent[,] or trained medical doctors." (*Id.*) Plaintiff alleges in relevant part that Canario and Saintiche "forcefully turned [him] over onto [his] side and pinned [him] down on the hospital bed." (*Id.* ¶ 92; *see also* Pl.'s Opp'n 29 (arguing that Canario and Saintiche "physically assisted Lemos in performing the digital rectal examination by forcefully pinning the Plaintiff to the hospital bed while he was handcuffed to it").) According to his account, Lemos then "came over, pulled [his] pants down and penetrated [his] rectum without any lubrication for about [five] seconds," which "consist[ed] of her twirling [two] fingers around in a circular motion as far up as she could go." (SAC ¶¶ 93–94.) The Court will consider the claim against Canario and Saintiche separately from the claim against Lemos.

#### i. Unreasonable Search Claim
#### Against Canario and Saintiche

Officers Canario and Saintiche have both affirmed that they took Plaintiff to St. Luke's for his second visit after learning that a judge had issued a search warrant to inspect Plaintiff's anal cavity for additional narcotics. (*See* Canario Aff. ¶ 26; Saintiche Aff. ¶ 19.) Apart from his meritless claim that the manual body cavity search actually took place during the first and only visit to St. Luke's, which the Court has already rejected, *see supra* Section II.B.7.a, Plaintiff has offered no credible basis to question Canario and Saintiche's good faith reliance on the search warrant. Accordingly, for the reasons just discussed, Canario and Saintiche are entitled to qualified immunity with respect to Plaintiff's unreasonable search claim in Count 15.

Having concluded that Canario and Saintiche are shielded by qualified immunity, the Court need only consider whether they exceeded the scope of the authorized search or carried out the search in an unreasonable manner. *See Walter v. United States*, 447 U.S. 649, 656 (1980) (plurality opinion) ("When an official search is properly authorized—whether by consent or by the issuance of a valid warrant—the scope of the search is limited by the terms of its authorization."); *United States v. Shi Yan Liu*, 239 F.3d 138, 141 (2d Cir. 2000) ("[A] search that greatly exceeds the bounds of a warrant and is not conducted in good faith is essentially indistinguishable from a general search."); *Vaher*, 916 F. Supp. 2d at 426 ("[E]ven when a search is conducted pursuant to a valid search warrant, police officers must still execute the warrant in good faith and within the confines of the limitations contained in the search warrant."); *Bolden*, 344 F. Supp. 2d at 416 ("No search warrant shields a police officer from carrying out a search in an unreasonable manner or from employing excessive force during a search.").

**\*49** Insofar as Count 15 is predicated on the manual body cavity search, Canario and Saintiche neither exceeded the scope of the authorized search nor conducted the search in an unreasonable manner. The only allegation that could remotely suggest improper behavior is Plaintiff's contention that Canario and Saintiche forcefully pinned him to the hospital bed. (*See* SAC ¶ 92.) But even if the Court accepts Plaintiff's allegations as true, Canario and Saintiche's actions do not constitute an unreasonable or excessive use of force under the circumstances. "Physical force is often necessary when effectuating arrests or executing search warrants and, thus, 'not every push or shove' is unconstitutionally excessive, 'even if it may later seem unnecessary in the peace of a judge's chambers.' " *Genovese v. Town of Southampton*, 921 F. Supp. 2d 8, 20–21 (E.D.N.Y. 2013) (quoting *Maxwell*, 380 F.3d at 108). Here, quite apart from the valid law enforcement interest in locating and seizing the supposed narcotics, (*see generally* Search Warrant & Supporting Aff.), the evidence shows there was also an urgent medical interest in performing the search, (*see* Durbin-French Aff. ¶ 24 (explaining that a "foreign object, whether swallowed or inserted into the rectum[,] could cause an obstruction which could be a surgical emergency")). Under these circumstances, it would have been reasonable for Canario and Saintiche to restrain Plaintiff in order to allow medical staff to perform the search. *Cf. J.L. v. E. Suffolk Boces*, No. 14-CV-4565, 2018 WL 1882847, at \*10–11 (E.D.N.Y. Apr. 19, 2018) (concluding on summary judgment that, in the context of a Fourth Amendment seizure, the defendant's use of force—tackling the plaintiff and holding his arms—was objectively reasonable in light of a "fast-moving and potentially dangerous situation"); *see also Spencer v. Roche*, 755 F. Supp. 2d 250, 257, 260–61, 268 (D. Mass. 2010) (concluding on summary judgment that a manual body cavity search had been performed in a

reasonable manner where the arrestee—who was handcuffed to the gurney—had his arms and legs held down by police during the search), *aff'd*, 659 F.3d 142 (1st Cir. 2011).

Accordingly, Police Defendants' Motion is granted with respect to Count 15.

ii. Unreasonable Search Claim Against Medical Defendant

Although Plaintiff brings his unreasonable search claim against Nurse Lemos based on his discredited theory that there was only one trip to St. Luke's, (*see* SAC ¶ 132; Pl.'s Opp'n 21–22), his medical records establish that it was Nurse Practitioner Durbin-French who performed the manual body cavity search during the second visit to the hospital, (*see* ER Records 25; *see also* Durbin-French Aff. ¶¶ 6, 11–23). Accordingly, Medical Defendants argue that the Court should dismiss Counts 12 through 18 because Plaintiff has named the wrong Defendant. (*See* Med. Defs.' Mem. 17.) Although here it is questionable whether Plaintiff's mistake in naming the wrong party was the result of mistake rather than bad faith, *cf.* *Park B. Smith, Inc. v. CHF Indus. Inc.*, 811 F. Supp. 2d 766, 772 (S.D.N.Y. 2011), in light of the latitude afforded to pro se litigants, as well as federal courts' preference "to resolve disputes on their merits rather than based on technical deficiencies in the pleadings or motion papers," *Simon v. City of New York*, No. 09-CV-1302, 2011 WL 317975, at *3 (E.D.N.Y. Jan. 3, 2011), *report and recommendation adopted*, 2011 WL 344757 (E.D.N.Y. Feb. 1, 2011), the Court will exercise its discretion and allow a substitution of Defendant Durbin-French for Nurse Lemos in Counts 12 through 18.

To determine whether Plaintiff's claim survives summary judgment, the Court must first decide whether Durbin-French was functioning as a state actor. " Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (citation omitted). Thus, to prevail on a § 1983 claim, a plaintiff must establish (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (citation and quotation marks omitted). Although the first (i.e., "color-of-state-law") requirement is

often fulfilled by defendants who are government officials acting with state power, a plaintiff may also establish a § 1983 claim against a "private individual defendant" where that individual and a "state official were acting in concert." *Porter-McWilliams v. Anderson*, No. 07-CV-407, 2007 WL 4276801, at *2 (S.D.N.Y. Dec. 3, 2007); *see also* *Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) ("A private actor acts under the color of state law when the private actor is a willful participant in joint activity with the State or its agents." (quotation marks omitted) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970))). Three main tests have emerged to determine when a private entity functions as a state actor:

> **\*50** For the purposes of [§] 1983, the actions of a nominally private entity are attributable to the state ... (1) [when] the entity acts pursuant to the coercive power of the state or is controlled by the state ("the compulsion test"); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ("the joint action test" or "close nexus test"); or (3) when the entity has been delegated a public function by the state, ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (alterations and some quotation marks omitted).

As a general matter, "private hospitals do not act under the color of law for § 1983 purposes." *Sykes v. McPhillips*, 412 F. Supp. 2d 197, 200 (N.D.N.Y. 2006) (quotation marks omitted); *see also* *Kia P. v. McIntyre*, 235 F.3d 749, 755–57 (2d Cir. 2000) (holding that a private hospital was not a state or municipal facility and thus was not liable pursuant to § 1983, insofar as it was acting "as a private actor providing medical care"); *Goonewardena v. N. Shore Long Island Jewish Health Sys.*, No. 11-CV-2456, 2014 WL

1271197, at *11 n.14 (E.D.N.Y. Mar. 26, 2014) (finding that, because the defendant was a private hospital and the plaintiff failed to plead any facts suggesting that the hospital acted in concert with state actors, the hospital could not be a state actor under 🚩 § 1983). However, private medical providers may be held liable as state actors under certain circumstances; thus, when a private company provides medical care in prisons, it "performs a role traditionally within the exclusive prerogative of the state and therefore ... is the functional equivalent of the municipality." *Bess v. City of New York*, No. 11-CV-6704, 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013). But "courts have held that the provision of medical care by a private hospital to an individual in police custody on the same terms as the hospital would provide to the public at large does not satisfy the state action test." *Hollman v. County of Suffolk*, No. 06-CV-3589, 2011 WL 280927, at *5 (E.D.N.Y. Jan. 27, 2011); *see also* 🚩 *Kavazanjian v. Rice*, No. 03-CV-1923, 2008 WL 5340988, at *12 (E.D.N.Y. Dec. 22, 2008) ("Providing isolated emergency treatment to a prisoner on equal terms with the general public ... does not constitute state action."); *Morse v. City of New York*, No. 00-CV-2528, 2001 WL 968996, at *8 (S.D.N.Y. Aug. 24, 2001) ("The fact that [the plaintiff] was brought to the hospital from police custody and was released from the hospital into police custody is insufficient to transform this private hospital and its staff into state actors for [§] 1983 purposes.").

This case presents the less common scenario in which a private hospital employee did act as an instrumentality of the state. In performing the cavity search and x-ray, Durbin-French was helping the police locate and seize any illegal narcotics, and thus, she was primarily performing a law-enforcement function rather than a medical function. While there may also have been a compelling medical interest in identifying and removing any contraband secreted inside Plaintiff's body cavity, this interest was ancillary to the law-enforcement interest. It is unlikely, for example, that the search would have occurred without the search warrant signed by Judge Williams, and the purpose of the search warrant was to "search for and seize" illegal narcotics. (*See* Search Warrant & Supporting Aff. 2.) By searching Plaintiff's person at the compulsion of the police in order to locate and seize illegal narcotics, Durbin-French was "perform[ing] a role traditionally within the exclusive prerogative of the state." *Bess*, 2013 WL 1164919, at *2. This feature distinguishes the case from those in which hospitals and their staff act primarily to provide medical care, in which case they are held not to be state actors. *Cf., e.g.,* 🚩 *Kavazanjian*, 2008 WL 5340988,

at *2–3 (finding that a hospital's treatment of an arrestee —which included x-rays and CT scans to check for spinal fractures and other internal injuries, a rectal examination to check for blood or pelvic fractures, and insertion of a catheter to identify any blood coming from the kidneys or bladder— constituted "isolated emergency treatment [provided] ... on equal terms with the general public," and therefore did not constitute state action). Indeed, the Court has found guidance in the Second Circuit's *Kia P.* decision, which underscores the importance of examining the nature of a healthcare provider's actions on a case-by-case basis. There, for example, the court held that where a private hospital had tested and treated a newborn for suspected methadone withdrawal, it was acting "in its capacity as a private provider of medical care," and was not a state actor for purposes of 🚩 § 1983 liability. *See* 🚩 235 F.3d at 756. But the court also observed that insofar as the hospital delayed releasing the newborn due to the "specter of potential child abuse or neglect," the hospital was acting "in its social welfare role" and "as part of the reporting and enforcement machinery for" the government agency responsible for detecting and stopping child abuse, in which case the hospital *was* functioning as a state actor. *Id.* Although the court ultimately concluded that the hospital's "actions in its capacity as a state actor had no effect, and thus did not subject it to liability under 🚩 § 1983," 🚩 *id.* at 757, the court's analysis illustrates the subtle distinctions that are relevant when deciding whether a private healthcare provider functions as a state actor.

**\*51** The Court's conclusion that Durbin-French acted under color of law by performing the cavity search and x-ray finds support in another recent case from this Circuit. In *Turner v. Procopio*, No. 13-CV-693, 2020 WL 2220244 (W.D.N.Y. Mar. 27, 2020), *report and recommendation adopted*, 2020 WL 2219503 (W.D.N.Y. May 7, 2020), *appeal dismissed*, 2020 WL 7329107 (2d Cir. 2020), the police obtained a search warrant for a cavity search "of the vaginal and rectal area" of the plaintiff, who was suspected of smuggling drugs, 2020 WL 2220244, at *3. The search warrant also authorized an x-ray of the plaintiff's pelvic area. *Id.* The plaintiff was transported to the hospital, where a doctor performed an x-ray and then performed a manual body cavity search of the plaintiff's vaginal and rectal cavities. *Id.* The plaintiff brought a 🚩 § 1983 action against the doctor, as well as a nurse who was present during the search, alleging that she had been subjected to an unlawful search. *Id.* at *1. The court concluded that the doctor and nurse were both "entitled to qualified immunity as private individuals and medical personnel acting

pursuant to a facially valid search warrant," thereby assuming that these defendants were state actors for purposes of § 1983 liability. *See id.* at *13. In reaching this conclusion, the court relied in part on *Rodrigues v. Furtado*, 950 F.2d 805 (1st Cir. 1991), a case in which the First Circuit, under nearly identical facts, held that the doctor performing the cavity inspection functioned as a state actor, *id.* at 814. As the court in *Rodrigues* observed, "[t]he scope and motivation for the search were established solely by the state's investigatory goals and justified solely by the search warrant." *Id.* That rationale is equally apt here. Durbin-French's "role in the search was purely that of an auxiliary to normal police search procedures," and she "exercised the power of search traditionally reserved exclusively to the State because of the 'coercive power' and 'significant encouragement' represented by the search warrant." *See id.* (citation omitted). For these reasons, the Court finds that Durbin-French was functioning as a state actor and is subject to liability under § 1983.

The Court must also consider the possibility, however, that Durbin-French is entitled to qualified immunity. The question whether qualified immunity may extend to private individuals functioning as state actors "is a more complicated question than one might think." *P.P. v. City of New York*, No. 13-CV-5049, 2014 WL 4704800, at *16 (S.D.N.Y. Sept. 19, 2014). The Supreme Court's opinions in *Richardson v. McKnight*, 521 U.S. 399 (1997), and *Filarsky v. Delia*, 566 U.S. 377 (2012), provide the touchstone for this Court's analysis.

In *Richardson*, the Supreme Court held that two prison guards employed by a private, for-profit company that managed a correctional facility in Tennessee were not entitled to qualified immunity. *See* 521 U.S. at 412. In reaching this conclusion, the Court considered whether the rationale for qualified immunity justified extending the protection to private prison guards. *See id.* at 407–12. The Court concluded that "the most important special government immunity-producing concern—unwarranted timidity—is less likely present, or at least is not special, when a private company subject to competitive market pressures operates a prison." *Id.* at 409. The Court explained that when a private firm whose guards are too aggressive faces claims for damages, that will raise costs, "thereby threatening [the

firm's] replacement." *Id.* At the same time, however, a firm with overly timid guards will also face competitive pressures from other firms "that demonstrate their ability to do both a safer and more effective job." *Id.* Thus, the Court reasoned, "marketplace pressures provide the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance." *Id.* at 410. That was particularly true given several factors in *Richardson*, where (1) the defendants worked for "a large, multistate private prison management firm"; (2) that firm was "systematically organized to perform a major administrative task for profit"; (3) the firm "perform[ed] that task independently, with relatively less ongoing direct state supervision"; (4) the firm was required to buy insurance to compensate civil rights tort victims; and (5) the firm's contract expired after three years, meaning its performance was "disciplined, not only by state review," but also by general marketplace pressures. *Id.* at 409–10. The Supreme Court contrasted this system to that in which government employees operate, which "is often characterized by multidepartment civil service rules that, while providing employees security, may limit the incentives or the ability of individual departments or supervisors flexibly to reward, or to punish, individual employees." *Id.* at 410–11.

**\*52** In concluding that private prison guards were not entitled to qualified immunity, the *Richardson* Court underscored the narrow nature of its holding. That is, *Richardson* involved a context in which a private firm, "with limited direct supervision by the government," undertook a major administrative task for profit, and "in competition with other firms." *Id.* at 413. The Court explicitly noted that the case did "not involve a private individual briefly associated with a government body, serving as an adjunct to government on an essential government activity, or acting under close official supervision." *Id.*

The Supreme Court confronted this latter scenario 15 years later in *Filarsky*. In that case, the defendant was a private employment attorney hired on an ad hoc basis by the City of Rialto, California to interview a firefighter in connection with an administrative investigation. 566 U.S. at 381. The firefighter was suspected of using medical leave to conduct a home-improvement project. *Id.* at 380–81. As part of the interview, the attorney ordered the firefighter to produce certain building supplies he had been observed

purchasing. *Id.* at 381. After complying with the order, the firefighter brought a § 1983 action against the municipality and the lawyer, among others, arguing that the order to produce the materials violated his rights under the Fourth and Fourteenth Amendments. *Id.* at 382. The Ninth Circuit denied qualified immunity to the lawyer, reasoning that he was a private attorney, and not a City employee. *Id.* at 382–83. The Supreme Court unanimously reversed. "Affording immunity not only to public employees but also to others acting on behalf of the government," the Court said, "serves to ensure that talented candidates are not deterred by the threat of damages suits from entering public service." *Id.* at 390 (citation, quotation marks, and brackets omitted). The Court observed that the government often "must look outside its permanent work force to secure the services of private individuals," particularly where there is a need "for specialized knowledge or expertise." *Id.* Of particular relevance here, the Court noted that

> [s]ometimes ... private individuals will work in close coordination with public employees, and face threatened legal action for the same conduct ... Because government employees will often be protected from suit by some form of immunity, those working alongside them could be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity. Under such circumstances, any private individual with a choice might think twice before accepting a government assignment.

*Id.* at 391 (record citation omitted). Accordingly, the Court held that private individuals "engaged in public service on a temporary or occasional basis" are "entitled to seek the protection of qualified immunity." *Id.* at 388–89, 393–94.

To determine whether a private actor is entitled to seek the protection of qualified immunity, another court in this District has analyzed whether the private actor more resembles the private attorney in *Filarsky* or the private

prison guards in *Richardson*. In *P.P. v. City of New York*, the defendants included individual social and case workers employed by non-profit corporations that provided foster-care services pursuant to a contract with the City of New York. *See* 2014 WL 4704800, at *1–2. Then-Judge (now Chief Judge) McMahon explained that in contrast to private prison operators, whose profit motives "can be counted upon to draw the most talented candidates," private foster-care homes would have a harder time recruiting "talented candidates to be social workers (an already thankless job) if those employees were exposed to § 1983 liability without the safe harbor of qualified immunity." *Id.* at *19. Thus, the defendants in *P.P.* were more like the private lawyer in *Filarsky*, and therefore able to invoke the protections of qualified immunity. Another court in this District has extended the protections of qualified immunity to private actors, *see* *Sullivan v. City of New York*, No. 14-CV-1334, 2015 WL 5025296, at *8 (S.D.N.Y. Aug. 25, 2015) (extending qualified immunity to an employee of the New York City Criminal Justice Agency, which is a "not-for-profit entity under contract with the City of New York to aid the City's administration of the criminal justice system by, among other things, performing bail interviews"), and, as noted *supra*, another court in the Second Circuit has extended qualified immunity to private healthcare providers under circumstances virtually identical to those in this case, *see* *Turner*, 2020 WL 2220244, at *13.

**\*53** Here, the Court has no difficulty concluding that Durbin-French is entitled to qualified immunity. Police Defendants came to St. Luke's to conduct a highly invasive search that required "specialized knowledge or expertise" beyond its "permanent work force." *Filarsky*, 566 U.S. at 390. Like the lawyer in *Filarsky*, Durbin-French participated in this public service on a brief, limited basis, working "in close coordination with public employees." *Id.* at 391. Under these circumstances, it would make no sense for Durbin-French to "be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." *Id.* The Court therefore holds that Durbin-French is entitled to qualified immunity in connection with the visual body cavity search and x-ray performed on Plaintiff.

But even if Durbin-French has qualified immunity based on her good faith reliance on the search warrant, she—like Police Defendants—is only protected to the extent her search was conducted in a reasonable manner within the

scope of the warrant. *See* *Walter*, 447 U.S. at 656; *Shi Yan Liu*, 239 F.3d at 140–41; *Vaher*, 916 F. Supp. 2d at 426; *Bolden*, 344 F. Supp. 2d at 416. Here, Plaintiff alleges that the nurse did not use lubricant when probing his anal cavity. (*See* SAC ¶ 135; Pl.'s Opp'n 24.) [36] By contrast, Durbin-French maintains that whenever she performed a search of this nature, she "would don examination gloves and apply a liberal amount of lubricant" before penetrating the person's anal cavity. (Durbin-French Aff. ¶ 19.) Although the Court has not identified a case explicitly holding that lubricant is a requisite part of a reasonable manual body cavity search, the relevant case law suggests as much. *See*

*United States v. Fowlkes*, 804 F.3d 954, 964, 967 (9th Cir. 2015) (concluding that police officers performed an unreasonable search when they extracted contraband from an arrestee's anal cavity without the use of lubricant, medical personnel, or a sanitary setting); *Diggins v. Coe*, No. 16-CV-242, 2019 WL 2491909, at *1 (S.D. Ill. June 14, 2019) (noting that on summary judgment, the court had concluded "it was possible for a jury to find" that the "lack of lubrication rendered [a manual body cavity] search unreasonable"); *cf. Davenport v. Tanner*, No. 13-CV-505, 2015 WL 4635449, at *2 *7–9 (E.D. La. July 31, 2015) (manual body cavity search not performed in unreasonable manner where the examining physician used a "lubricated index finger" to perform the search); *Roche*, 659 F.3d at 257, 260–61 (concluding on summary judgment that a manual body cavity search had been reasonably performed where the doctor "lubricated his fingers" before the search). [37] Thus, whether the manual body cavity search was performed in a reasonable manner turns on a disputed issue of fact—namely, whether Durbin-French used lubricant. Because the Court is confronted with a "he said, she said" scenario, it may not resolve this issue on summary judgment. *See* *Fincher*, 604 F.3d at 726. The jury will have to decide for itself whose version of events to believe.

**\*54** Accordingly, Medical Defendants' Motion is denied with respect to Count 15.

#### d. X-Ray Examination (Count 16)

Plaintiff's unreasonable search claim in Count 16 is based on the x-ray that was performed in addition to the manual body cavity search. (*See* SAC ¶ 133; Pl.'s Opp'n 23.) Having found that Canario, Saintiche, and Durbin-French are entitled

to qualified immunity, the only question to resolve is whether the x-ray examination exceeded the scope of the search warrant. [38]

The Court notes at the outset that there is some inconsistency in the record as to who ordered the x-ray examination and for what purpose. Plaintiff alleges that Canario and Saintiche were responsible for suggesting that an x-ray examination be performed. (*See* Pl.'s Opp'n 23.) Durbin-French states that the x-ray was performed "not because a police officer requested it," but because "good medical practice requires that a KUB x-ray be done ... [when the patient has possibly] ingest[ed] a foreign object or plac[ed] objects in the rectum." (Durbin-French Aff. ¶¶ 24–25.) However, there is also a note in the medical records which states, "[p]er Sergeant, [x-ray] if needed may be completed as well," (ER Records 29), which suggests that the x-ray request may have come from the police.

But regardless of who decided to have the x-ray examination performed, the Court concludes that this search was still within the scope of the warrant. Another court in this District has observed in a slightly different context that "x-ray searches are less invasive than a strip search," and thus, "a prisoner's rights are not violated by x-ray searches conducted pursuant to a reasonable prison policy." *See* *Manley v. Ramos*, No. 13-CV-2662, 2014 WL 1496094, at *2 (S.D.N.Y. Apr. 16, 2014). Here too, the x-ray performed on Plaintiff was far less invasive than the manual body cavity search performed a few minutes earlier. And although the search warrant issued by Judge Williams did not explicitly provide for an x-ray examination, *cf. Turner*, 2020 WL 2220244, at *3 (involving a search warrant that authorized an x-ray of the plaintiff's pelvic and stomach area), the breadth of the search warrant's language still encompasses such a procedure. Specifically, the warrant provides that police and medical personnel were authorized not only "to search and inspect," but also to "*photograph* and/or record *in any way the person* of [Plaintiff,] including an inspection of the rectal area." (Search Warrant & Supporting Aff. 2 (emphasis added).) Two conclusions follow from this language. First, police and medical personnel were authorized to search Plaintiff's entire "person," not just his "rectal area." (*Id.*) Second, they were authorized to "photograph" Plaintiff "in any way." (*Id.*) To perform an x-ray examination is "to examine, treat, or photograph with X-rays," *see* Merriam-Webster, *x-ray*, Merriam-Webster.com/dictionary/x-ray (last visited Mar. 1, 2021), and thus, this procedure fell squarely within the scope of the warrant.

**\*55** In reaching this conclusion, the Court has found persuasive guidance in *Spencer v. Roche*, a case in which the plaintiff likewise argued that a KUB x-ray exceeded the scope of a search warrant authorizing a manual body cavity search of the plaintiff's anal cavity. *See* 659 F.3d at 144, 146, 148–49. Rejecting this argument, the First Circuit observed that a diagnostic x-ray "is a routine medical procedure that is brisk, painless, and generally regarded as safe," and there was no evidence the x-ray was performed in a dangerous or inappropriate manner, particularly given that it had been performed "by trained professionals in a hospital setting." *Id.* at 147. (*Cf.* Durbin-French Aff. ¶ 27 (noting that Plaintiff's KUB x-ray "was performed in the x-ray department, by a trained radiology technician[ ] in a hospital setting and with minimal intrusion upon the [P]laintiff").) Insofar as the x-ray had revealed areas of the plaintiff's body beyond the scope authorized in the warrant, such as his stomach, the court said that such viewing "was incidental to the valid anal cavity search and, thus, did not require an independent showing of probable cause." 659 F.3d at 148. The court also observed that based on the evidence in the record, a KUB x-ray "is the only type of x-ray that can capture the entire anal cavity." *Id.* (*Cf.* Durbin-French Aff. ¶ 24.) "It follows inexorably," the court said, "that the KUB x-ray was within the scope of the warrant." 659 F.3d at 148.

Although *Spencer*'s rationale is equally applicable to the facts of this case, the conclusion here is even more straightforward in light of the expansive authorizing language in the search warrant. The Court therefore concludes that the x-ray did not exceed the scope of the warrant, and Canario, Saintiche, and Durbin-French are each entitled to qualified immunity. Police Defendants and Medical Defendants' respective Motions are both granted with respect to Count 16.

#### e. Right to Privacy Claim (Count 17)

In Count 17, Plaintiff brings a cause of action for violation of his right to privacy. (*See* SAC ¶ 134.) This count is based on the fact that Durbin-French—a nurse of the opposite sex—performed the anal cavity search. (*See id.*)

The Second Circuit has recognized that a visual body cavity search—and, *a fortiori*, a manual body cavity search—is invasive "[r]egardless of who performs the search."

*Harris*, 818 F.3d at 58. But although "all forced observations or inspections of the naked body implicate a privacy concern, it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex." *Id.* at 59 (citation omitted). Accordingly, the Second Circuit has stated that in the prison context, "cross-gender strip searches of inmates conducted in the absence of an emergency or other exigent circumstances are generally frowned upon." *Id.* at 62.

In *Holland v. City of New York*, 197 F. Supp. 3d 529 (S.D.N.Y. 2016), another court in this District had occasion to apply these principles in the pretrial-detainee context. While being held as a pretrial detainee at Rikers Island, the plaintiff in *Holland* was subjected to an invasive visual body cavity search by a female corrections officer during an emergency lockdown inspection that arose in response to a stabbing in the plaintiff's housing unit. *Id.* at 536. The court dismissed the unreasonable search claim, holding that the corrections officer was entitled to qualified immunity. *See id.* at 542–45. As Judge Torres explained, "there appear to be no Supreme Court or Second Circuit decisions establishing that, in an emergency situation, inmates have a Fourth Amendment right to be free from strip searches—even body cavity searches—by officers of the opposite sex." *Id.* at 544. The court therefore found that, in the absence of allegations "that the search was unnecessarily prolonged or repeated," the cross-gender search was justified in light of the exigent circumstances. *Id.*

As in *Holland*, exigent circumstances justified the cross-gender search at issue here. Given the urgency in locating and removing any illegal contraband—not least for the sake of Plaintiff's safety—it was not unreasonable for Durbin-French to perform the search herself. As she explains in an affidavit, she and Dr. Madell "would alternate patients as they presented to the [Emergency Department] after 11 pm." (Durbin-French Aff. ¶ 12.) Thus, the fact that Durbin-French was assigned to Plaintiff indicates that Dr. Madell—a male nurse—was occupied with another patient. Given the pressing law-enforcement interest in locating any illegal contraband, as well as the medical interest in protecting Plaintiff's health and safety, it was reasonable for Durbin-French to proceed with the search herself. Accordingly, Medical Defendants' Motion is granted with respect to Count 17.

### 8. Sexual Harassment and Sexual Abuse Claims
### Based on Events at St. Luke's (Counts 12 and 13)

**\*56** In Count 12, Plaintiff asserts a claim for "sexual harassment" based on the manual body cavity search at St. Luke's. (*See* SAC ¶ 129.) Insofar as this claim is predicated on Defendants' "repeated orders to submit to [an] unlawful body cavity search," (*id.*), the Court has already established that the search was lawful, *see supra* Section II.B.7.a–b, and that any orders to comply were not unreasonable under the circumstances, *see supra* note 36. To the extent this claim is based on Canario and Saintiche's "using physical force," (SAC ¶ 129), the Court has already considered—and rejected—that theory of liability, *see supra* Section II.B.7.c.i. Finally, to the extent this claim is based on Durbin-French's "touching and grabbing [Plaintiff's] buttocks and penetrating [his] body cavity," (SAC ¶ 129), the claim is duplicative of the unreasonable search claim in Count 15 and must therefore be dismissed for the same reasons already discussed in Section II.B.4 *supra*.

In Count 13, Plaintiff asserts a claim for "sexual abuse," also based on the manual body cavity search at St. Luke's. (*See* SAC ¶ 130.) Insofar as this claim is predicated on Defendants' "using physical force to secure [Plaintiff's] body to [the] bed," (*id.*), the Court already rejected that argument, *see supra* Section II.B.7.c.i. To the extent it is predicated on Durbin-French's "touching and grabbing [Plaintiff's] buttocks and penetrating [his] body cavity," (SAC ¶ 130), the claim is duplicative of the unreasonable search claim in Count 15 and, like Count 12, must be dismissed for the same reasons already discussed in Section II.B.4 *supra*.

Accordingly, Police Defendants' Motion and Medical Defendants' Motion are both granted with respect to Counts 12 and 13.

### 9. Deliberate Indifference Claims Based
### on Events at St. Luke's (Counts 18 and 19)

Plaintiff brings a deliberate indifference claim in Count 18 and a supervisory liability claim in Count 19, both of which stem from his medical treatment at St. Luke's. (*See* SAC ¶¶ 135–36.) In his Opposition to Defendants' respective summary judgment motions, Plaintiff also purports to raise new state-law claims for medical malpractice. (*See* Pl.'s

Opp'n 37.) The Court will not consider these putative claims for the same reasons discussed in Section II.B.5.a *supra*. Plaintiff may not constructively amend his pleadings on summary judgment in order to assert claims that appear nowhere in the Second Amended Complaint.

#### a. Deliberate Indifference (Count 18)

Although the deliberate indifference claim in Count 18 is brought against Defendant Lemos, (*see* SAC ¶ 135), as with Counts 12 through 17, Plaintiff has named the wrong defendant. To the extent Count 18 is predicated on Medical Defendants' "failure to x-ray [Plaintiff's] back and neck, examine [his] body cavity for infection, ... [and] prescribe pain medications," as well as their "ignoring [his] complaints," (*id.*; *see also id.* ¶¶ 86, 116), these alleged failures all pertain to Plaintiff's first visit to St. Luke's. (*See generally* ER Records 2–21.) According to Plaintiff's medical records, the Medical Defendant who treated Plaintiff during this first visit was Dr. Madell. (*See id.* at 3–4, 14, 16–21.)

But even if Plaintiff had named the proper defendant, his deliberate indifference claim must be dismissed insofar as it is based on his first visit to St. Luke's. In contrast to Plaintiff's second visit to the hospital, when police and medical personnel executed a search warrant, the sole purpose of the first visit was to provide Plaintiff with appropriate medical care after the police had used a taser and pepper spray to subdue him at the police station. But as discussed in Section II.B.7.c.ii *supra*, "courts have held that the provision of medical care by a private hospital to an individual in police custody on the same terms as the hospital would provide to the public at large does not satisfy the state action test." *Hollman*, 2011 WL 280927, at \*5. Here, then, "[t]he fact that [Plaintiff] was brought to the hospital from police custody and was released from the hospital into police custody is insufficient to transform this private hospital and its staff into state actors for [§] 1983 purposes." *Morse*, 2001 WL 968996, at \*8. Thus, to the extent Plaintiff has plausible claims based on perceived medical failures during the first visit, those claims are not cognizable under 🔖 § 1983, for Dr. Madell and his colleagues were not functioning as state actors.

**\*57** To the extent that Count 18 is predicated on Durbin-French's failure to "use lubricant and anesthesia" during the manual body cavity search, (*see* SAC ¶ 135), that claim is duplicative of Plaintiff's unreasonable search claim in Count 15. Even if this allegation were considered on its

own as a deliberate indifference claim, Plaintiff has failed to show either that (1) the "deprivation of medical care [was] sufficiently serious," or that (2) the defendant "acted or failed to act with a sufficiently culpable state of mind." *Dumel v. Westchester County*, No. 19-CV-2161, 2021 WL 738365, at *8 (S.D.N.Y. Feb. 25, 2021) (alteration in original) (citation, alterations, and quotation marks omitted). For example, even accepting Plaintiff's allegation that Durbin-French failed to use lubricant when conducting the manual body cavity search, Plaintiff has failed to establish that such a failure rises above the level of mere negligence. *See id.* at *9 (explaining that the second element of a deliberate indifference claim under the Fourteenth Amendment "requires proof of a mens rea greater than mere negligence" (citation omitted)). Thus, to the extent Count 18 is based on the manual body cavity search, it cannot survive summary judgment.

For these reasons, Medical Defendants' Motion is granted with respect to Count 18.

### b. Supervisory Liability Based on X-Ray and Removal of Taser Barbs (Count 19)

In Count 19, Plaintiff brings a deliberate indifference claim against Dr. Madell and Durbin-French based on their alleged "failure to supervise Lemos in conducting [the] body cavity / x-ray examinations and [their] failure to supervise Lemos when treating / removing taser barbs out of [Plaintiff's] back," which, according to Plaintiff, "resulted in serious physical and emotional injuries and the deprivation of [his] Fourth and Fourteenth Amendment [rights]." (SAC ¶ 136.) As discussed, Lemos neither removed the taser barbs nor performed the manual body cavity search or x-ray examination. But as with Count 18, even if Plaintiff had named the proper defendants, this claim would still fail, for several reasons.

To the extent Count 19 is predicated on Dr. Madell's removal of the taser barbs, because he was providing ordinary medical treatment "to an individual in police custody on the same terms as the hospital would provide to the public at large," *Hollman*, 2011 WL 280927, at *5, neither he nor his supervisors were functioning as state actors, thus precluding § 1983 liability. Insofar as Count 19 is predicated on the manual body cavity search and x-ray examination, Plaintiff's claim runs into a different dead-end. As explained in Section II.B.5.b *supra*, after *Tangreti*, a plaintiff must establish that a defendant committed a constitutional tort through the defendant's "own conduct, not by reason of [his] supervision

of others who committed the violation." *Tangreti*, 983 F.3d at 619. Here, that means Plaintiff must show that Durbin-French's supervisor "recklessly fail[ed] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Maldonado*, 460 F. Supp. 3d at 395 (quoting *Darnell*, 849 F.3d at 35). Apart from his own conclusory assertions, Plaintiff has made no showing that Durbin-French's cavity search (or the x-ray) constituted an excessive risk to his health or safety, let alone that Durbin-French's supervisor knew about or should have known about that risk and failed to take appropriate action. Accordingly, the deliberate indifference claim in Count 19 cannot survive summary judgment and must be dismissed. Medical Defendants' Motion is therefore granted in this regard.

### 10. Conspiracy Claims (Counts 14 and 20)

In Count 14, Plaintiff alleges that Canario, Saintiche, and Lemos conspired to deprive him of his "rights to be free from unreasonable search and seizures." (SAC ¶ 131.) This claim stems from Plaintiff's baseless theory that there was only one visit to the hospital. He has alleged that the search warrant signed by Judge Williams was at some point

> **\*58** brought back to the hospital by Canario and Saintiche so that they could conspire with the medical staff ... to make them cover-up the fact that [he] was illegally body cavity searched and x-rayed earlier[,] and to record th[o]se events as if they [had] happened ... almost ... [four] hours later .... And they all came to an agreement that between 6:47 P.M. and 7:39 P.M.[,] ... [Plaintiff] was only treated for [his] back and eyes.

(*Id.* ¶ 111.) In Count 20, Plaintiff alleges that Pitt, Canario, Saintiche, Lemos, and Durbin-French all conspired to deprive Plaintiff of "medical care," and all "participated in falsifying medical records and police documents stating that [Plaintiff] was re-admitted at the hospital, [and] that [he] made no

complaints concerning pain and injuries"—all so that the co-conspirators could "cover-up their illegal activities." (*Id.* ¶ 137.)

"To prove a 🚩 § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Corsini v. Brodsky*, 731 F. App'x 15, 19 (2d Cir. 2018) (summary order) (same) (citing 🚩 *Ciambriello*, 292 F.3d at 324–25). "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." 🚩 *Pangburn*, 200 F.3d at 72 (quotation marks omitted). To state a conspiracy claim, Plaintiff "must provide some factual basis supporting a meeting of the minds." 🚩 *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (quotation marks omitted). "To survive a motion for summary judgment, [the] plaintiff's evidence of a [§] 1983 conspiracy must, at least, reasonably lead to the inference that the defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." 🚩 *House v. City of New York*, No. 18-CV-6693, 2020 WL 6891830, at *20 (S.D.N.Y. Nov. 24, 2020) (quoting *Stein v. Janos*, 269 F. Supp. 2d 256, 261–62 (S.D.N.Y. 2003)); *see also Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (observing that a plaintiff must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end" (citations and quotation marks omitted)).

Unsurprisingly, Plaintiff has produced no evidence to substantiate his fanciful tale that police and medical personnel orchestrated an elaborate scheme to fabricate and falsify records. Although his handwritten, single-spaced, 46-page Opposition brief is filled with conclusory allegations that such a conspiracy occurred, he offers only one remotely substantive argument in support. (*See* Pl.'s Opp'n 46.) Specifically, he argues that a timestamp in the upper left-hand corner of his medical records shows that the records can be tampered with. (*Id.*) The medical records are constructed such that each page contains a banner at the top of the page with Plaintiff's name, age, sex, account number, and unit number. (*See* ER Records 4–11, 23–28.) Below the banner, the

records contain a detailed digital trail of Plaintiff's respective visits, including his admission and discharge times, when he was seen (and by whom), and what treatment he received, among other data. (*See id.*) Above the banner, the medical records contain three additional fields—(1) "Run Date"; (2) "Run Time"; and (3) "Run User." (*See id.*) The data in these fields are identical on each page of the records pertaining to a particular visit. Thus, the records pertaining to Plaintiff's first visit all indicate a "Run Date" of May 10, 2015, a "Run Time" of "0102," and a "Run User" named "N. KDC." (*See id.* at 4–11.) The records pertaining to Plaintiff's second visit indicate a "Run Date" of May 12, 2015, a "Run Time" of "0022," and a "Run User" named "N. CCD." (*See id.* at 23–28.) In her supporting affidavit, the St. Luke's official charged with overseeing the hospital's electronic medical records system explains that, "[t]o make an entry in the [electronic medical record system], a staff member must log-in and use their [sic] own secure password. Anyone accessing the [system] or making an entry in the [system] automatically generates a date/time entry." (Berberich Aff. ¶ 8.) She goes on to explain that the date and time entries on Plaintiff's medical records—i.e., the information below the banner—corresponds with Defendants' version of events, (*see id.* ¶¶ 9–12), which is true. But Plaintiff argues that the data fields above the banner show that "once [a] user logs in[to] the [electronic medical record system], any date/time, notes, names[,] and signatures can be edited/entered into the audit trail." (Pl.'s Opp'n 46.)

**\*59** This argument has several problems. First, so far as Plaintiff purports to dispute Berberich's testimony regarding the functionality of the electronic medical records system, he has no personal knowledge of how the system actually operates. *See Myers v. County of Nassau*, 825 F. Supp. 2d 359, 366 (E.D.N.Y. 2011) (observing that affidavits or deposition testimony offered to defeat summary judgment "must be based upon the personal knowledge of the witness, ... and the speaker must be shown competent to testify [to facts admissible in evidence]"). Relatedly, Plaintiff's argument—that the data fields above the banner show that a user can enter the system after the fact to cook the books—is pure speculation. Moreover, even if Plaintiff's theory had some empirical grounding, it would mean that Defendants or some accomplice modified the hospital records for the first visit on May 10, 2015, and then waited another two days to falsify the records for the second visit. That is a terribly odd way to go about covering one's tracks. The more natural inference, of course, is that the data fields above the banner pertain to routine administrative processing, and do not constitute indicia of some sinister plot.

But the Court need not trouble itself with this issue further, for even if the records did betray some sign of tampering, that alone provides no evidence of an agreement "between a state actor and a private entity" to "act in concert to inflict an unconstitutional injury." *Pangburn*, 200 F.3d at 72. If a summary judgment motion "is supported by documentary evidence and sworn affidavits and 'demonstrates the absence of a genuine issue of material fact,' the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or 'rely on conclusory allegations or unsubstantiated speculation.' " *Estate of Ferrara v. United Pub. Serv. Emps. Union*, No. 18-CV-527, 2020 WL 7714542, at \*5 (D. Conn. Dec. 29, 2020) (quoting *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015)) (granting summary judgment for defendants where plaintiff had presented only "diffuse and expansive allegations" of conspiracy, and where the plaintiff's testimony "simply underscore[d] the [u]nion's alleged antipathy towards him," but did not establish an agreement between the union and police to act "in concert" (citations omitted)). Because Plaintiff has failed to raise a triable issue of fact regarding either of his two conspiracy claims, summary judgment is appropriate. *See Hardy v. Baird*, No. 13-CV-7402, 2016 WL 2745852, at \*13–14 (S.D.N.Y. May 10, 2016) (dismissing § 1983 conspiracy claim on summary judgment where the plaintiff failed to provide any evidence that the defendants had reached an agreement to fabricate evidence to secure a search warrant); *Cuellar v. Love*, No. 11-CV-3632, 2014 WL 1486458, at \*9 (S.D.N.Y. Apr. 11, 2014) (dismissing § 1983 conspiracy claim on summary judgment where the plaintiff had failed to "cite any evidence demonstrating an agreement between [the defendants] to use excessive force"); *Phoenix v. Reddish*, 175 F. Supp. 2d 215, 218–19 (D. Conn. 2001) (dismissing § 1983 conspiracy claim on summary judgment where the plaintiff had provided no evidence that the defendants "had an understanding, either tacit or explicit, to act in concert," and had only offered "rank speculation and conjecture"). Accordingly, Police Defendants and Medical Defendants' Motions are both granted with respect to Counts 14 and 20, which are dismissed.

### III. Conclusion

For the reasons stated above, Police Defendants' Motion is granted in part and denied in Part. The Motion is granted with respect to Counts 1, 3–4, 7–8, 12–16, and 20. With respect to Count Two, the Motion is granted as to Plaintiff's Handcuff Claim and Assault Claim, but denied as to Plaintiff's Search Claim. The Motion is denied with respect to Counts Five and 10.

Medical Defendants' Motion is granted in part and denied in part. The Motion is granted with respect to Counts 12–14 and 16–20. The Motion is denied with respect to Count 15.

Plaintiff's Motion is granted in part and denied in part. With respect to Count Six, the Motion is granted as to the visual body cavity search and denied as to the alleged manual body cavity search. The Motion is denied as to Counts One, Seven, and 10.

**\*60** Accordingly, Counts 1, 3–4, 7–8, 12–14, and 16–20 are dismissed. The Handcuff Claim and Assault Claim within Count Two are also dismissed. Count 15 is dismissed as to Police Defendants only.

The Clerk of Court is respectfully directed to terminate the pending Motions, (Dkt. Nos. 159, 173), and mail a copy of this Opinion & Order to Plaintiff.

SO ORDERED.

### All Citations

Slip Copy, 2021 WL 1164185

---

## Footnotes

1    Police Defendants are Detective Michael Pitt ("Pitt" or "Detective Pitt"), Police Officer Carlos Canario ("Canario" or "Officer Canario"), Police Officer Andres Arestin ("Arestin" or "Officer Arestin"), Police Officer Jonathan Saintiche ("Saintiche" or "Officer Saintiche"), Patrol Sergeant William Anderson ("Anderson" or

"Sergeant Anderson"), Police Officer John Perez ("Perez" or "Officer Perez"), and Police Officer Carlos Mendez ("Mendez" or "Officer Mendez"). Medical Defendants are Doctor Alan Madell ("Madell" or "Dr. Madell"), Nurse Practitioner Hilary Durbin-French ("Durbin-French" or "Nurse Practitioner Durbin-French"), and Nurse Blanca Lemos ("Lemos" or "Nurse Lemos").

2    On July 6, 2020, the Court granted Medical Defendants' request to adopt the Local Civil Rule 56.1 Statement submitted by Police Defendants. (*See* Dkt. No. 182.)

3    Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). The nonmoving party must then submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." *Id.* at 56.1(b). "If the opposing party ... fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule." *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation and quotation marks omitted);

*see also* T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009) (same). "A pro se litigant is not excused from this rule." *Brandever v. Port Imperial Ferry Corp.*, No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (citation and italics omitted).

Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, the Court will not consider these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, as creating disputes of fact. *See Baity*, 51 F. Supp. 3d at 418 ("Many of [the] [p]laintiff's purported denials—and a number of his admissions—improperly interject arguments and/ or immaterial facts in response to facts asserted by [the] [d]efendants, often speaking past [the] [d]efendants' asserted facts without specifically controverting those same facts."); *id.* ("[A] number of [the] [p]laintiffs' purported denials quibble with [the] [d]efendants' phraseology, but do not address the factual substance asserted by [the] [d]efendants."); *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013) (explaining that the plaintiff's 56.1 statement violated the rule because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant, without specifically controverting those facts," and "[i]n other instances, ... neither admits nor denies a particular fact, but instead responds with equivocal statements"); *Goldstick v. The Hartford, Inc.*, No. 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (noting that the plaintiff's 56.1 statement "does not comply with the rule" because "it adds argumentative and often lengthy narrative in almost every case[,] the object of which is to 'spin' the impact of the admissions [the] plaintiff has been compelled to make").

Any party's failure to provide record support for its challenge to another party's factual statement could allow the Court to deem the challenged facts undisputed. *See* Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) (explaining that the court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the court's attention); *Baity*, 51 F. Supp. 3d at 418 (collecting cases holding that "responses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact." (alteration and quotation marks omitted)). Therefore, where the Court cites to only one of the Parties' Rule 56.1 Statements or Counterstatements, that fact is materially undisputed unless noted otherwise.

4    Plaintiff's Rule 56.1 Statement is located at ECF pages 5–7 of Dkt. No. 183.

5    Plaintiff's Counter 56.1 Statement is located at ECF pages 223–52 of Dkt. No. 204.

6    Quotations to Plaintiff's submissions occasionally reflect minor corrections in grammar, punctuation, and spelling.

7    In both his Second Amended Complaint and at his deposition, Plaintiff stated that Canario first approached the residence at 15 Lutheran Street and spoke to a resident on the porch before eventually walking toward Plaintiff. (*See* SAC ¶¶ 24–25; Pl.'s Dep. 33:13–16.)

8    Besides disputing Plaintiff's general characterization of the arrest, Police Defendants assert that Anderson, Pitt, and Saintiche were "not present at the scene of the arrest." (Defs.' 56.1 ¶ 27.) Although Arestin eventually arrived at the scene of the arrest, he allegedly did so after Plaintiff was in custody. (*Id.* ¶ 28.) Similarly, while Plaintiff asserts that it was Perez and Mendez who captured and forced him to the ground, (*see* SAC ¶¶ 28–30), Police Defendants maintain that Plaintiff was initially apprehended by Mendez and Canario, (*see* Aff. of Carlos Mendez in Supp. of Mot. ("Mendez Aff") ¶ 4 (Dkt. No. 163); Aff. of Carlos Canario in Supp. of Mot. ("Canario Aff.") ¶ 5 (Dkt. No. 165)), and that Perez arrived a few moments thereafter, (*see* Aff. of John Perez in Supp. of Mot. ("Perez Aff.") ¶¶ 3–4 (Dkt. No. 162)).

9    All videos discussed in this Opinion were transmitted by DVD as Exhibit C to the Posner Affidavit, and are on file with the Court. In this Opinion, each video is identified by the title of the camera angle as it appears on the DVD.

10   The Court notes at the outset that the terminology used to describe different types of invasive body searches is often imprecise and inconsistent. This observation applies to the relevant case law as well as to Defendants' various submissions. For example, although Defendants' 56.1 ¶¶ 36–37), Sergeant Anderson refers to the search alternatively as a "strip search," (*see* Aff. of William Anderson in Supp. of Mot. ("Anderson Aff") ¶¶ 2, 9 (Dkt. No. 161)), and as a "visual body cavity inspection," (*id.* ¶ 7), and the Newburgh Police Department's official strip search policy recognizes only two types of searches—a "strip search" and a "body cavity search," the latter of which must be performed "by a physician or ... other medically trained personnel at the physician's direction," (Posner Aff. Ex. G ("Strip Search Policy"), at 1–2, 3 (Dkt. No. 160-6)). Thus, although Defendants claim that Anderson authorized a "visual body cavity search," Plaintiff, relying on the Newburgh Strip Search Policy, maintains that Anderson authorized only a "strip search." (*See* Pl.'s Counter 56.1 ¶ 36.) Plaintiff has a valid point in this regard, for the department's strip search policy does not contain an explicit category labeled "visual body cavity search." In truth, however, the Parties appear to be talking past one another. Although Defendants refer to the search using different terms, it seems apparent that Anderson authorized a search that included an invasive look at Plaintiff's genitals and body cavity, but which did not include any touching. (*See* Anderson Aff. ¶¶ 7–8; Pl.'s Counter 56.1 ¶¶ 41–42.)

11   Plaintiff's Declaration is located at ECF pages 1–4 of Dkt. No. 183.

12   Citations to Plaintiff's medical records refer to the ECF stamp at the top of the page.

13   Citations to Police Defendants' Exhibit I refer to the ECF stamp at the top of the page.

14   As discussed in Section II.B.7.a *infra*, Nurse Lemos's timesheet for the evening of May 8, 2015 indicates that she did not clock in until 10:45 P.M., (*see* Lemos Aff. ¶ 5 & attached timesheet), posing something of a problem for Plaintiff's narrative that she performed his rectal examination during his first and only visit to the hospital.

15   As discussed in Section II.B.6 *infra*, the Court has construed Plaintiff's malicious abuse of process claim as a claim for denial of his right to a fair trial.

16    Plaintiff's Memorandum of Law in Support of his Motion for Partial Summary Judgment is located at ECF pages 8–17 of Dkt. No. 183. Citations to his Memorandum of Law refer to the ECF stamp at the top of the page.

17    By the time Officer Perez arrived on the scene, Plaintiff was already "in the custody of Officers Mendez and Canario." (Perez Aff. ¶ 4.)

18    In *Pagan*, the parties disputed whether, when officers arrived on the scene, the suspect "was still flailing about or was instead lying calmly on the floor." 2019 WL 8128482, at *6. As the court explained, "[t]here [could] be no question that the information officers received before arriving at the apartment would have established probable cause to arrest [the suspect], had he continued acting as described on the 911 calls." *Id.* "[V]iewing the evidence in the light most favorable to [the] [p]laintiff," however, the court found "it [was] a closer call whether probable cause was subsequently dissipated upon officers' arrival on the scene." *Id.*

    Ultimately, the *Pagan* court found it unnecessary to resolve this question. Because the court found that the officers had "arguable probable cause" to effectuate the arrest *even under the plaintiff's version of events*, it dismissed the false arrest claim on grounds of qualified immunity, without deciding whether there was *actual* probable cause for the arrest.

    In this respect, *Pagan* is distinguishable. Here, there is nothing in the record to suggest that Plaintiff's behavior minimized probable cause when the officers arrived on the scene. Quite the opposite. By deciding to run from police, Plaintiff's behavior further contributed to the existence of probable cause—a point discussed briefly *infra*.

19    Plaintiff's Declaration in Support of his Opposition to Summary Judgment is located at ECF pages 253–66 of Dkt. No. 204. Plaintiff's Memorandum of Law in Opposition to Summary Judgment is located at ECF pages 1–46 of Dkt. No. 204. Citations to the latter document refer to the ECF stamp at the top of the page.

20    Although the Court need not reach the qualified immunity analysis in light of its finding that the use of force itself was objectively reasonable, the Court has little doubt that Arestin would be entitled to qualified immunity under these circumstances. *See, e.g.*, *Sanders v. City of Dothan*, 409 F. App'x 285, 287 (11th Cir. 2011) (concluding that an officer was entitled to qualified immunity where he had "tasered [the plaintiff] in furtherance of the legitimate law-enforcement activity of searching for contraband in [the plaintiff's] mouth to prevent him from possibly destroying it by swallowing the contraband").

21    In the Second Amended Complaint, Plaintiff indicates that Count Six is based on Police Defendants' (1) "repeated orders to strip search"; (2) "using physical force to secure [Plaintiff's] arms and legs against wall"; (3) "touching and grabbing [Plaintiff's] buttocks"; (4) "punch[ing] [Plaintiff] in the face"; (5) "punching and kneeing [Plaintiff] in the ribs[,] causing noticeable injuries"; and (6) "penetrating [Plaintiff's] body cavity[,] causing physical and emotional injuries." (SAC ¶ 123.) The second, fourth, and fifth actions described by Plaintiff go toward his excessive force claim in Count Five, and the Court has therefore addressed these actions in a separate context *supra*. For purposes of analyzing Count Six, the Court will consider only the remaining actions described by Plaintiff, which are appropriately construed as supporting an unreasonable search claim.

22    New York courts and the Second Circuit share the same reasonable suspicion standard with respect to visual body cavity searches. Indeed, the rule adopted in *Sloley*—that officers must have "a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity"—was borrowed from a 2008 decision by New York's highest court. *See Sloley*, 945 F.3d at 41 & n.8

(discussing the New York Court of Appeals' decision in *Hall*, 886 N.E.2d 162, which interpreted the Fourth Amendment, rather than the New York state constitution).

23    Though the Second Circuit also observed that the plaintiff "had been arrested for nothing more serious than a B-misdemeanor[,]" *Hartline*, 546 F.3d at 101, the Second Circuit held in *Sloley* that whether an offense is a misdemeanor or felony makes no difference in the Fourth Amendment reasonable-suspicion analysis, *see Sloley*, 945 F.3d at 38–39 (noting that "it makes little sense in this context to draw Fourth Amendment lines that rest on the felony-misdemeanor distinction[,]" and "clarify[ing] ... that th[e] rule [that strip searches conducted incident to a misdemeanor arrest be supported by reasonable suspicion] applies equally to visual body cavity searches incident to all arrests").

24    Because Plaintiff was in police custody at the time of the alleged constitutional violation, he is treated as a pre-trial detainee for purposes of the deliberate-indifference analysis. *See Fredericks v. Doe*, No. 20-CV-11043, 2021 WL 308808, at *2, *4 (S.D.N.Y. Jan. 29, 2021) (treating a plaintiff who was allegedly assaulted by three detectives at a police precinct as a pretrial detainee for purposes of the deliberate-indifference analysis).

25    Plaintiff maintains he never made such a statement. (*See* SAC ¶ 108; Pl.'s Mem. 16–17.) But as noted in Section I.A.3 *supra*, Canario avers that "[a]t some point prior to [when Canario] [took] [Plaintiff] to the hospital at approximately 6:40 p.m.[,] [Plaintiff] told [Canario] he had more drugs inside his rectum but they were too far in and [the police] would not be able to get them." (Canario Aff. ¶ 25.) Canario "advised both Sergeant Anderson and Detective Pitt about these comments," which became part of the basis for the acquisition of the search warrant. (*See id.*) Pitt echoes Canario's account, explaining that at some point after he had helped remove the drugs from Plaintiff's mouth, he "learned that Officer Canario had reported [that] [Plaintiff] had told him he had additional drugs secreted in his body that had not been located[,] and [he] was directed to prepare an application for a search warrant based upon this information so that a digital rectal search could be performed at a local hospital." (Pitt. Aff. ¶ 14.) Thus, there is a factual dispute as to whether Plaintiff ever said he was concealing more drugs.

26    Plaintiff's Exhibit J is located at ECF pages 30–31 of Dkt. No. 183.

27    The second document also contains a disclaimer which states that "[a]lthough notice pursuant to [Criminal Procedure Law] § 710.30 has been gratuitously given, the People reserve their right to not introduce such statements in their case-in-chief against [Plaintiff] as not relevant to the charged criminal transaction." (Pl.'s Mem. Ex. J.)

28    Although Police Defendants dismiss the significance of the documents submitted by Plaintiff, the Court finds their arguments unpersuasive. Police Defendants note, for example, that the forms on which the District Attorney provided notice to Plaintiff "are those of the District Attorney, not the [Police] [D]efendants." (Police Defs.' Opp'n 9.) The relevance of this fact eludes the Court, for part of the inquiry is whether police forwarded fabricated evidence to the prosecution. *See, e.g.*, *Moroughan*, 2021 WL 298714, at *34; *Soomro*, 174 F. Supp. 3d at 815. That Plaintiff's alleged statements to the police subsequently showed up on the District Attorney's "forms" suggests that the police provided these statements to the prosecution. Police Defendants also point to various discrepancies between the two documents filed by the District Attorney and the evidence in the record, noting, for example, that while the District Attorney's first document indicates that Plaintiff made the relevant statement to Pitt, (*see* Pl.'s Mem. Ex. J), Pitt indicates that he heard the statement from someone else, (*see* Pitt. Aff. ¶ 14). (*See* Police Defs.' Opp'n 9.) But such discrepancies do not alter the Court's analysis: Whether the District Attorney accurately characterized the circumstantial details surrounding Plaintiff's alleged statements is not particularly relevant; what matters is that he had learned of these statements in the first place.

29    Although there is a 12-minute difference between the digital timestamps on page four and page 16 of these records, the Court finds this difference immaterial. The Court also notes that the time stamp on page 16 —"1927"—appears on a sheet of paper that was printed and then signed by Plaintiff and the caregiver. (*See* ER Records 16.) It makes intuitive sense that there is a short gap of time between when the sheet was printed (7:27 P.M.) and when, according to the hospital's time-keeping system, Plaintiff was formally discharged (7:39 P.M.). (*See* ER Records 4.) Moreover, although Laura Berberich, St. Luke's Director of Health Information Management, states that Plaintiff was discharged at "1938" (7:38 P.M.), (*see* Berberich Aff. ¶ 10), this disparity is also immaterial.

30    Plaintiff's argument that Ms. Berberich is an expert witness, (*see* Pl.'s Opp'n 15), is misguided. "To testify as an expert witness, an individual must be 'qualified as an expert by knowledge, skill, experience, training, or education.' " *SEC v. Lek Sec. Corp.*, No. 17-CV-1789, 2019 WL 1512713, at *3 (S.D.N.Y. Apr. 8, 2019) (quoting Fed. R. Evid. 702). An expert witness is one who "assists the jury in comprehending and deciding issues beyond the understanding of a layperson." *Lek*, 2019 WL 1512713, at *3 (citation and quotation marks omitted). That does not describe Ms. Berberich, who is serving as an ordinary fact witness.

31    Both assumptions are almost certainly true. Contrary to Police Defendants' argument, (*see* Police Defs.' Mem. 26), the case for probable cause would likely sustain a fatal blow if Plaintiff's alleged statement were omitted from the warrant application. Stated differently, Plaintiff's putative statement that he had more drugs in his anal cavity was almost certainly a material factor in Judge Williams' decision to issue the warrant. Indeed, without this statement, it is not clear what the basis for probable cause would be. Without evidence that drug dealers routinely store *multiple* bags of narcotics in their anal cavity, the fact that the officers had already discovered Plaintiff's contraband would arguably suggest there was no need for an additional search. Though the Court need not pursue this discussion in light of its finding that Plaintiff has failed to provide a sufficient offer of proof, it is safe to say that if Plaintiff *had* come forward with such proof, Police Defendants would not be entitled to qualified immunity based on the good faith exception.

32    Exhibit K to Plaintiff's Opposition submission is located at ECF page 295 of Dkt. No. 204.

33    Exhibit J to Plaintiff's Opposition submission is located at ECF page 294 of Dkt. No. 204.

34    The Second Circuit declined to decide whether the government's retention of the hard drives constituted a Fourth Amendment violation. *See* *Ganias*, 824 F.3d at 209.

35    Indeed, the description Pitt provided in the search warrant affidavit is arguably *more* incriminating to the officers than the account they have given elsewhere. As discussed in Section I.A.2 *supra*, the officers in the strip search room have affirmed that the bag of drugs *fell out* of Plaintiff's buttocks. But Judge Williams might easily have read the language in Pitt's affidavit to suggest that the officers had manually retrieved the drugs from Plaintiff's "rectum area." (Search Warrant & Supporting Aff. 4.) Thus, Pitt's imprecise use of language actually may have suggested that a more serious constitutional infraction took place—namely, a manual body cavity search. Pitt's description further suggests he was not trying to conceal the officers' underlying conduct.

36    Insofar as Plaintiff's claim against Durbin-French is also predicated on the allegation that she told him the police had "a search warrant and ... [could] use deadly force in order to get [him] to comply," (*see* SAC ¶ 88), the claim fails, for "[g]eneralized fear or intimidation alone is not enough to ... render [a] search unlawful," *Chambers v. Lombardi*, No. 17-CV-7557, 2020 WL 2097558, at *7 (S.D.N.Y. May 1, 2020).

37    To the extent Plaintiff also argues the search was unreasonable because it was performed without anesthesia or medical dilation, (*see* SAC ¶ 135; Pl.'s Opp'n 24), his claim is baseless. Plaintiff appears to rely on *Fowlkes, supra*, where several police officers retrieved contraband from an arrestee's anal cavity without "summon[ing] medical personnel, [without] mov[ing] [the arrestee] to a sanitary location, ... [and] without the assistance of

anesthesia, lubricant, or medical dilation." 🚩 804 F.3d at 959. Here, by contrast, the search was performed by a trained nurse in a hospital setting. Moreover, when the Ninth Circuit discussed why the search in *Fowlkes* was unreasonable, the court only mentioned the fact that it was performed (i) without lubrication, (ii) outside a sanitary setting, and (iii) without "the guidance or assistance of medical personnel." *See* 🚩 *id.* at 964, 967.

38    As with Count 15, Plaintiff's claim in Count 16 is based on the allegation that the search was performed "without [a] warrant, consent[,] or trained medical doctors." (SAC ¶ 133.) The Court has already concluded that the second visit to St. Luke's occurred after the police had obtained a search warrant, and thus, the police and medical staff did not need Plaintiff's consent to execute a search pursuant to the warrant, *see* 🚩⚠ *Michigan v. Tyler*, 436 U.S. 499, 506 (1978) ("[A] search of private property without proper consent is unreasonable unless it has been authorized by a valid search warrant" (citation and quotation marks omitted));

*see also* 🚩 *Bumper v. North Carolina*, 391 U.S. 543, 553 (1968) (Harlan, J., concurring) (observing that "if the officers had a valid search warrant, no consent was required to make the search lawful"). Plaintiff's claim that the medical personnel performing the manual body cavity search and x-ray lacked appropriate medical training is baseless and unsupported by the record.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Akanthos Capital Management, LLC v. CompuCredit Holdings Corp., N.D.Ga., March 7, 2014

2009 WL 5173787

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.

FARBERWARE LICENSING
COMPANY LLC, Plaintiff,

v.

MEYER MARKETING CO., LTD.,
Meyer Intellectual Properties, Ltd., and
Meyer Corporation, U.S., Defendants.

No. 09 Civ. 2570(HB).
|
Dec. 30, 2009.

**OPINION & ORDER**

Hon. HAROLD BAER, JR., District Judge.

**\*1** Plaintiff Farberware Licensing Company ("FLC") filed its Complaint against Defendants Meyer Marketing Co., Ltd. ("MMC"), Meyer Intellectual Properties, Ltd. ("MIP") and Meyer Corporation, U.S. ("MUS") (collectively, "Meyer") on March 20, 2009 alleging various claims that arose out of Meyer's use of FLC's FARBERWARE® trademark. FLC's Complaint alleged the following causes of action: (1) trademark infringement in violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) false designation of origin and false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) trademark dilution in violation of § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); (4) trademark dilution under New York State Law; (5) unfair competition under New York State common law; (6) deceptive acts and practices in violation of New York Gen. Bus. Law § 349; (7) breach of contract; and (8) breach of the implied covenant of good faith and fair dealing. Meyer filed its Answer and Counterclaims on June 2, 2009 in which it raised numerous affirmative defenses to FLC's claims and brought counterclaims against FLC for (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) unfair competition; (4) violation of section 17200 of the California Business and Professional Code; (5) declaratory judgment as to its right to use the FARBERWARE® marks in a variety of ways; and (6) equitable estoppel.

The jury trial of this action took place during the weeks of August 17 and August 24, 2009. After the jury returned its verdict on August 27, 2009, the Court entered judgment in accordance with the verdict as follows: (a) in favor of FLC on a non-material breach of contract in the amount of $1; (b) in favor of Meyer on its counterclaims for unfair competition in the amount of $195,000; and (c) in favor of Meyer on its counterclaim for breach of contract in the amount of $1. Among other things, the jury found that FLC had failed to prove its claims under the Lanham Act for trademark infringement, dilution and false designation of origin. Meyer now moves to recover attorneys' fees pursuant to Lanham Act § 35(a), 15 U.S.C. § 1117(a), and for costs as the prevailing party pursuant to 28 U.S.C. § 1920 and 15 U.S.C. § 1117. For the reasons set forth below, Meyer's motion for attorneys' fees is denied and its motion for costs is granted in part and denied in part.

**I. DISCUSSION**

**A. *Motion for Attorneys' Fees***

**1. *Legal Standard***

Section 35(a) of the Lanham Act provides a narrow exception to the American Rule that each party must bear its own attorneys' fees. Under the statute, a court may award attorneys' fees in "exceptional cases." 15 U.S.C. § 1117(a). The attorneys' fee provision "endeavors to afford protection to defendants against unfounded suits brought by trademark owners for harassment and the like." *IMAF, S.p.A. v. J.C. Penney Co., Inc.,* 810 F.Supp. 96, 98 (S.D.N.Y.1992). The Second Circuit has required that when a successful defendant applies for attorneys' fees under § 35(a) of the Lanham Act, the defendant must show the plaintiff's bad faith in bringing or prosecuting the suit. *See, e.g., Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 317 F.3d 209, 221 (2d

Cir.2003); Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 194-95 (2d Cir.1996). Bad faith has been found, for example, where the circumstances of a case have created "a substantial overtone ... to warrant an inference that [the] case was initiated as a competitive ploy." Mennen Co. v. Gillette Co., 565 F.Supp. 648, 657 (S.D.N.Y.1983); see also Multivideo Labs., Inc. v. Intel Corp., 99 Civ. 3908(DLC), 2000 WL 502866, at *1 (S.D.N.Y. Apr. 27, 2000) ("A finding of bad faith is warranted when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons.") (quoting Hirschfeld v. Bd. of Election, 984 F.2d 35, 40 (2d Cir.1992)); Universal City Studios, Inc. v. Nintendo Co., Ltd., 797 F.2d 70, 77 (2d Cir.1986) (bad faith shown where Lanham Act claim brought "merely to join in the [defendant's] profits").

**\*2** Bad faith might also be shown where a plaintiff's claim is completely without merit. See, e.g., Viola Sportswear, Inc. v. Mimun, 574 F.Supp. 619, 620-21 (E.D.N.Y.1983); see also IMAF, 810 F.Supp. at 100 (bad faith shown where plaintiff failed to produce survey evidence, or any other type of evidence, to show consumer confusion). While some courts have found bad faith based on the meritlessness of a plaintiff s claims, "[t]he circumstances were generally such in those cases, however, that a court could draw no inference other than that the actions had been brought for improper purposes." Multivideo, 2000 WL 502866 at *2. Thus, the mere fact that a plaintiff ultimately did not succeed in its Lanham Act claims does not dictate an inference of bad faith. E.g., Gordon & Breach Sci. Publishers S.A. v. American Inst. of Physics, 166 F.3d 438, 439 (2d Cir.1999) (per curium) ("The present litigation may not have been strong enough on the merits but raised enough nonfrivolous claims to preclude the awarding of fees."); Silberstein v. Fox Entm't Group, Inc., 536 F.Supp.2d 440, 445 (S.D.N.Y.2008); Textile Deliveries, Inc. v. Stagno, 90 Civ.2020, 1994 WL 202620, at *1 (S.D.N.Y. May 23, 1994). Moreover, while a finding of bad faith is required for fees to be imposed under § 35(a), a finding of bad faith in itself does not require the imposition of fees. See Nikon v. Ikon Corp., 803 F.Supp. 910, 928 (S.D.N.Y.1992). Whatever the circumstances, the decision of whether to impose attorneys' fees "falls well within the district court's discretion." Conopco, 95 F.3d at 194.

### 2. Application to Meyer

Here, Meyer contends that this is an "exceptional case" and that it is therefore entitled to attorneys' fees because FLC's Lanham Act claims were "baseless, capricious, unreasonable or otherwise pursued in bad faith." In support of this conclusion, Meyer argues that FLC's alleged bad faith is illustrated by the facts that (1) FLC had previously filed a virtually identical complaint against another licensee and succeeded in using that litigation to extract extra-contractual benefits from the licensee; (2) FLC accused Meyer of failing to submit goods for approval only later to admit that it had lost and then found the requested sample that had been timely submitted by Meyer; (3) FLC refused to dismiss claims that discovery showed lacked merit, including the dilution claims and any claims related to the stainless-steel tea kettles; (4) FLC abandoned the alternative dispute resolution process; and (5) FLC fought a motion to transfer venue knowing that all of Meyer's witnesses would be required to travel from California to New York. Meyer also places much emphasis on the jury's verdict in its favor on its counterclaims for unfair competition, arguing that this verdict in itself establishes the requisite "bad faith" for attorneys' fees, as bad faith is a required element of a claim for unfair competition. See, e.g., Empresa Cubana Del Tabaco v. Culbro Corp., 399 F.3d 462, 485 (2d Cir.2005) ("A plaintiff claiming unfair competition under New York law must show that the defendant acted in bad faith.") (citing Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 149 (2d Cir.1997)). Finally, Meyer contends that it is entitled to fees because FLC never produced any evidence to show it had a good faith basis to allege its claimed injuries, sustained any actual damage to reputation, suffered any dilution of its trademarks, or experienced any actual consumer confusion. In short, Meyer contends that FLC merely brought this case as a ploy to extract extra-contractual concessions from Meyer. FLC maintains that Meyer is not entitled to fees as it had a reasonable and good faith basis to bring and pursue its Lanham Act claims.

**\*3** Although both parties devoted much of their papers to a rehash of the factual and legal bases for their claims and defenses, I decline to retry this case on a post-trial motion for fees. Rather, it is sufficient here to say that, based on the evidence produced at trial and the arguments the parties put forth at that time, the Court finds that this is not an "exceptional case" that warrants an award of attorneys' fees under the Lanham Act. Although FLC ultimately was unsuccessful on its Lanham Act claims before the jury, there

is little evidence that the claims were brought, or that FLC continued to prosecute them, in bad faith or with the purpose to harass Meyer. The fact that the jury did not find that FLC had proven those claims by a preponderance of the evidence does not lead to the conclusion that they were necessarily brought in bad faith. Further, the jury's finding of bad faith on the unfair competition claims is irrelevant here, as the relevant inquiry is whether FLC's litigation tactics were premised on bad faith, and not whether its pre-Complaint conduct in preventing Meyer from using the FARBERWARE® marks in certain ways was done in bad faith. Accordingly, Meyer's motion for attorneys' fees pursuant to Lanham Act § 35(a) is denied. [1]

**B. *Motion for Costs***

*1. Legal Standard*

Meyer also requests an award of costs in the amount of $396,403.21 pursuant to 28 U.S.C. § 1920 and Lanham Act § 35(a). Courts generally award costs to prevailing parties in cases that involve claims brought under the Lanham Act. *See, e.g.,* ⚠️*Protection One Alarm Monitoring, Inc. v. Executive Protection One Security Serv ., LLC,* 553 F.Supp.2d 201, 210 (E.D.N.Y.2008) (citing 🚩*Tri-Star Pictures, Inc. v. Unger,* 42 F.Supp.2d 296, 306 (S.D.N.Y.1999)). Although both § 1920 and Local Rule 54.1 set forth certain categories of costs that may be awarded to a prevailing party, a party may ordinarily also tax "reasonable costs that are ordinarily charged to clients in the legal marketplace." 🚩*Shannon v. Fireman's Fund Ins. Co.,* 156 F.Supp.2d 279, (S.D.N.Y.2001) (quoting 🚩*Anderson v. City of N.Y.,* 132 F.Supp.2d 239, 245 (S.D .N.Y.2001)). Under the Lanham Act, "[o]ut of pocket litigation costs are generally recoverable if they are necessary for the representation of the client." 🚩*Tri-Star,* 42 F.Supp.2d at 306. Rule 54(d)(1) of the Federal Rules of Civil Procedure provides that costs are awardable to a prevailing party "as of course," and "the losing party has the burden to show that costs should not be imposed." 🚩*Whitfield v. Scully,* 241 F.3d 264, 270 (2d Cir.2001). Accordingly, "the district court may not deny costs to the prevailing party without explanation of adequate reasons." *Perks v. Town of Huntington,* 99-CV-4811 (JS), 2008 U.S. Dist. LEXIS 108845, at *5 (E.D.N.Y. Mar. 31, 2008), *aff'd,* 331 Fed. Appx. 796 (2d Cir.2009).

*2. Application to Meyer*

FLC does not dispute that Meyer may be considered a "prevailing party" in this case. Rather, FLC argues that Meyer is not entitled to costs for two principal reasons. First, FLC contends that the Court's judgment, entered October 13, 2009, decreed that any relief requested but not expressly granted in the judgment was denied; thus, because Meyer had requested costs in its counterclaims and the judgment did not provide for costs, FLC argues that the Court implicitly denied any such request. Second, FLC contends that costs should be denied because Meyer did not file a bill of costs as required under Federal Rule 54 and Local Rule 54.1. In the alternative, FLC contends that if the Court is to award costs, then certain deductions should be made for specific categories of Meyer's expenses.

**\*4** The Court can quickly dispense of FLC's two principal arguments in opposition to an award of costs. First, the judgment itself does not preclude an award of costs because it covered only the fees and costs that Meyer requested as part of their counterclaims, and not the costs to which they would be entitled as a prevailing party. Second, although Meyer did not file a bill of costs with the Clerk as required under Local Rule 54.1, it did attach a copy of certain bills and invoices to its papers in support of this motion, and has made this documentation available to FLC since the filing of their moving papers. Thus, except for the specific circumstances addressed in detail below, Meyer's failure to strictly adhere to the requirements of Local Rule 54.1 will not preclude them from recovering reasonable costs. For its part, Meyer contends that it should be awarded all of its claimed costs by virtue of being the prevailing party in a Lanham Act action. However, recovery is not quite so automatic as Meyer appears to contend, and because I agree with FLC that certain categories of costs for which Meyer seeks reimbursement were not "necessary for the representation of the client" in this case, *see* 🚩*Tri-Star,* 42 F.Supp.2d at 306, certain deductions to Meyer's costs must be made.

*(a) Daily Trial Transcripts*

Meyer seeks to tax costs in the amount of $13,000 for daily transcripts of the August 2009 trial. To determine whether daily transcripts are taxable costs, "[t]he relevant inquiry is whether the transcripts ... were necessary for defendant's use in the case." *Bucalo v. East Hampton Union Free Sch. Dist.,* 238 F.R.D. 126, 129 (E.D.N.Y.2006). Factors to consider in determining whether the transcripts were necessary include the length and complexity of the case, whether more than one attorney for the requesting party was present at the trial,

whether the transcript was a mere convenience and other extraordinary circumstances. *Id.* "Trial transcripts are rarely necessary for trials that are not particularly long or complex," *id.*; *Gabel v. Richards Spears Kibbe & Orbe LLP,* 07 Civ. 11031, 2009 U.S. Dist. LEXIS 108311, at *4-5 (S.D.N.Y. Nov. 17, 2009), and costs for daily trial transcripts are rarely granted where more than one attorney was present for each day of trial such that one attorney could have been taking notes, *see, e.g., Bucalo,* 238 F.R.D. at 129; *Malloy v. City of N.Y.,* No. 98-CV-5823, 2000 U.S. Dist. LEXIS 8673, at *2-3 (E.D.N.Y. June 23, 2000). Thus, cases where transcripts have been taxed as costs have generally involved "extraordinary circumstances," such as an exceedingly long and complex or confusing trial. *See, e.g., Perks,* 2008 U.S. Dist. LEXIS 108845 at * 10-13. These costs are routinely denied, however, where the prevailing party provides no reason why they were "necessary," as opposed to simply convenient. *E.g., Natural Organics, Inc. v. Nutraceutical Corp.,* 01 Civ. 0384(GBD) (RLE), 2009 U.S. Dist. LEXIS 71077, at *15 (S.D.N.Y. Aug. 6, 2009); *Mobasher v. Bronx Cmty. College of the City Univ. of N.Y.,* 01 Civ. 8636(WCC), 2008 U .S. Dist. LEXIS 57470, at *7-8 (S.D.N.Y. July 28, 2008).

**\*5** Here, Meyer has not shown why daily trial transcripts were necessary. Although daily transcripts were no doubt convenient, the trial in this case was not overly lengthy or complicated, and one of Meyer's team of attorneys (of which there were no fewer than five on any given trial day) could have been taking notes on the proceedings. Accordingly, I will deduct $13,000 from Meyer's award of costs.

#### (b) Deposition Transcripts

Pursuant to Local Rule 54.1, the cost of an original deposition transcript and one copy is taxable "if the deposition was used or received in evidence at the trial, whether or not it was read in its entirety." Local Civ. R. 54.1(c)(2). However, "[t]he plain language of [Local Rule 54.1's] first sentence, providing that depositions are taxable if 'used or received in evidence at the trial,' suggests that the word 'use' extends well beyond explicit reliance on the deposition as a basis for decision." *Whitfield v. Scully,* 241 F.3d 264, 271 (2d Cir.2001). Indeed, it is now well-established that a deponent's testimony at trial "alone is sufficient to end the inquiry as to whether their depositions were 'used' at the trial." *Perry v. Metropolitan Suburban Bus Auth.,* 236 F.R.D. 110, 112 (E.D.N.Y.2006).

Moreover, the costs of depositions not used at trial are still taxable under 28 U.S.C. § 1920(2) where they "appear to have been reasonably necessary to the litigation at the time they were taken." *Malloy,* 2000 U.S. Dist. LEXIS 8673 at *4 (quoting *Cush-Crawford v. Adchem Corp.,* 94 F.Supp.2d 294, 303 (E.D.N.Y.2000)); *see also United States Media Corp. v. Edde Entm't, Inc.,* 94 Civ. 4849(MHD), 1999 U.S. Dist. LEXIS 10605, at *29 (S.D.N.Y. July 14, 1999) ("It suffices that at the time the deposition was taken, it was reasonably expected that the transcript would be used for trial preparation."). Accordingly, "the proper inquiry is whether, at the time the deposition was taken, it appeared to be reasonably necessary." *Anderson,* 132 F.Supp.2d at 246. However, depositions taken "solely for discovery" or for the convenience of counsel are not taxable. *E.g., Natural Organics,* 2009 U.S. Dist. LEXIS 71077 at *17.

Even where the cost of a deposition transcript itself will be taxable under these standards, certain associated fees that are not necessary generally may not be taxed-for example, expedited service, [2] delivery costs, appearance fees, and rough diskettes and/or ASCII disks. *E.g, J.S. Nicol, Inc. v. Peking Handicraft, Inc.,* 03 Civ. 1548(GBD)(AJP), 2008 U.S. Dist. LEXIS 82085, at *69 (S.D.N.Y. Oct. 17, 2008) ("[A] 'rough disk'-a value-added, expedited transcript service-is rarely recoverable as a cost."); *Mobasher,* 2008 U.S. Dist. LEXIS 57470 at *10 (denying costs for overnight shipping because "not only is the cost unnecessary, but shipping fees are not provided for under Local Civil Rule 54.1"); *Yin v. Japan Society, Inc.,* 99 Civ. 4806(HB), 2000 U.S. Dist. LEXIS 8828. at *7-8 (S.D.N.Y. June 27, 2000) (deducting "appearance fee" and "delivery fee" from costs of deposition transcripts).

**\*6** In this case, Meyer seeks a total of $39,481.58 in costs associated with depositions: $39,050.04 for deposition transcripts and $431.54 for "depositions (miscellaneous)." This latter expense must be deducted, as any taxable costs related to depositions do not cover any "miscellaneous" expenses. *See* Local Civ. R. 54.1(c)(2) (providing for costs for transcript and one copy). As to the costs for the deposition transcripts themselves, Meyer seeks costs for 22 witnesses' depositions. It seems fair to find that at the time of each of these depositions, Meyer reasonably expected that the transcripts would be used at trial. *See Anderson,* 132 F.Supp.2d at 246. Indeed, 17 of the deposed witnesses actually testified at trial, either live or by deposition designation. *See Perry,* 236 F.R.D. at 112. Accordingly, these deposition costs

are taxable. However, in attempting to tax the full invoice value of their deposition costs, Meyer has included untaxable costs including RealTime service, delivery, appearance fees, rough disks and expedited service. Accordingly, the Court will deduct $7,753.50 to account for these unrecoverable deposition costs. Additionally, Meyer seeks to recover costs for the deposition of Suzanne Murphy for a total $302.00, but fails to submit an invoice to support that cost. [3] The cost of the Murphy deposition likewise will not be allowed. Thus, the total deposition costs for which Meyer will be permitted to recover from FLC is $30,994.54.

### *(c) Counsel's Travel Expenses and Local Counsel Fees*

Meyer seeks to recover $85,537.09 for travel and lodging for its counsel, who are located in Chicago. Although travel and lodging is not an enumerated category of taxable costs in § 1920 or Local Rule 54.1, there is authority that suggests that such costs are recoverable, especially in Lanham Act cases.

*See, e.g., Tri-Star,* 42 F.Supp.2d at 306; *see also Kuzma v. I.R.S.,* 821 F.2d 930, 933-34 (2d Cir.1987) (finding "[i]dentifiable, out-of-pocket disbursements for items such as ... travel" to be compensable). However, such costs are not automatically reimbursable, and numerous courts have denied travel and lodging costs when "it is not clear that out-of-state counsel's attendance was necessary at the proceedings." *Motorola, Inc. v. Abeckaser,* 07-cv-3963 (CPS), 2009 U.S. Dist. LEXIS 87803, at *20 (E.D.N.Y Aug. 5, 2009); *see also Simmons v. New York City Transit Auth,* CV-02-1575, 2008 U.S. Dist. LEXIS 16949, at *22 (E.D.N.Y. Mar. 5, 2008) (denying award of out-of-state counsel's travel expenses, noting that "[w]hile the Court recognizes [a party's] right to retain counsel of her choice, she has failed to explain the need for out-of-state counsel when presumably, a local attorney with similar trial experience could be located"), *vacated on other grounds,* 575 F.3d 170 (2d Cir.2009); *Cartier Int'l B.V. v. Gorski,* Civ. No. 3:01CV 01948(PCD), 2003 U.S. Dist. LEXIS 27709, at *15 (D.Conn. Apr. 30, 2003) (denying award of travel expenses because "Plaintiffs choice of non-local counsel does not warrant the consequent additional expense being charged to Defendants"). I am persuaded by this latter line of authority and find that Meyer's costs for its Chicago counsel's travel and lodging in New York City were not strictly necessary and thus not recoverable as costs. Accordingly, I will deduct $85,537.09 from Meyer's costs.

**\*7** Meyer's request for "costs" in the amount of $78,311.37 for its local counsel's fees warrants only brief address. It

is beyond peradventure that where a prevailing party is not otherwise entitled to attorneys' fees, it cannot then seek to collect its local counsel's fees as a taxable cost. Meyer has cited no cases to the contrary, and this Court's research has revealed none. Thus, I will deduct $78,311.37 from Meyer's costs.

### *(d) Expert Witness Fees*

Meyer seeks to recover a staggering $91,176.54 that it paid to its expert witnesses. While the work of these experts was undoubtedly important in mounting Meyer's defense to FLC's Lanham Act claim, "[u]nder well established principles of law, however, these expenses are not recoverable, except to the extent of the $40 per day statutory fee and travel expenses for witnesses in general." *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.,* 137 F.Supp.2d 351, 360 (S.D.N.Y.2001) (citing 28 U.S.C. § 1821(b)). As the Supreme Court has found, a prevailing party may not recover expert witness fees unless a statute or contract between the parties explicitly provides for the recovery of such fees.

*See West Virginia Univ. Hosps., Inc. v. Casey,* 499 U.S. 83, 86-87 (1991); *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 441 (1987); *see also United States ex rel. Evergreen Pipeline Const. Co., Inc. v. Merritt Meridian Constr. Corp.,* 95 F .3d 153, 173 (2d Cir.1996) ( "We are at a loss to see how Evergreen could seek [expert witness fees] in light of *Crawford* and [*Casey* ]"); Local Civ. R. 54.1(c)(3) ("Fees for expert witnesses are taxable only to the extent of fees for ordinary witnesses unless prior court approval was obtained."). There is no statutory provision in the Lanham Act that explicitly provides for the recovery of expert witness fees.

Here, Meyer's expert Nicholas Didow was deposed for two days but did not testify at trial; Didow's fees will be limited to $80. Meyer's expert Gary Ford was deposed for one day and testified at trial for one day; Ford's fees will be limited to $80. Likewise, Meyer's expert Bobby Calder was deposed for one day and testified at trial for one day; Calder's fees will be limited to $80. Although travel and lodging expenses for expert witnesses likely are within the ambit of taxable costs, *see Harbor Software, Inc. v. Applied Sys., Inc.,* 92 Civ. 8097(HB), 1997 U.S. Dist. LEXIS 4860, at *9 (S .D.N.Y. Apr, 15, 1997), Meyer provided no information as to its witnesses' travel expenses and did not indicate whether they were forced to stay away from home to be able to attend the depositions or trial, and I will therefore make no award for subsistence or travel for these expert witnesses, *see United*

*States Media Corp.,* 1999 U.S. Dist. LEXIS 10605 at *26. Likewise, because Meyer has not indicated whether any of its experts was present at trial on days when they did not testify, the Court cannot award a *per diem* cost based on any additional days. *See id.* Accordingly, Meyer's reimbursable expert witness fees will be limited to $240.00.

### *(e) Trial Consultants, IT Specialists and Trial Equipment*

 **\*8** Finally, Meyer seeks to recover its costs for its trial consultants ($26,439.50), IT trial specialists ($27,279.00) and trial equipment rental ($3,840.00). As to the IT specialists' fees, while it may well be that the specialists performed important work, Meyer has not submitted any invoices or descriptions of the work that its specialists performed. Without an understanding of what work was done or how important it might have been to the trial, I must deny Meyer's requests for costs for its trial consultants in the amount of the full $27,279.00. With respect to the trial graphics equipment and trial consultants, who, based on Meyer's invoices, prepared at least the lion's share of the trial graphics presented at trial, I am inclined to agree with Judge Chin's recent pronouncement that "the use of technology to improve the presentation of information to the jury and/or to the bench should be supported" and that "[c]omputers, computer graphics, digitized documents and other technological advancements have become important tools to the modern-day trial lawyer." *DiBella v. Hopkins,* 407 F.Supp.2d 537, 540 (S.D.N.Y.2005) (Chin, J.). Thus, "[a]s long as the cost is reasonable and the devices aid in the efficient and effective presentation of evidence, a prevailing party should be allowed to recover their expense." *Id.* Here, the documentary exhibits were voluminous and the various visual aids that were presented at trial were helpful to the jury and the Court in focusing attention on the salient documents and concepts. Accordingly, Meyer is entitled to recover its reasonable costs for equipment and technological graphics. In part because the remaining trial graphics costs, which amount to $30,279.50, are supported by invoices that Meyer paid, and in part because without the graphics the jury would have had a much more difficult time finding the facts in this matter, I will allow $25,000 as a reimbursable cost.

### II. CONCLUSION

For the foregoing reasons, Meyer's motion for attorneys' fees is DENIED. Meyer's motion for costs is GRANTED to the extent discussed in this opinion. Accordingly, the Clerk of this Court is instructed to assess costs in favor of Meyer in the amount of $87,572.67. The Clerk of this Court is instructed to close this motion (Docket No. 175) and, judgment having been entered in this case on October 13, 2009, the Clerk is further instructed to close this case and remove it from my docket.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 5173787

---

### Footnotes

1    Meyer also contends that this is an "exceptional case" because the relief that FLC sought far outweighed the alleged wrongful conduct of which FLC complained. However, courts in this district have found that fees are not warranted where a plaintiff brings a non-frivolous claim coupled with an overly exaggerated damage claim.

      *See* 🚩 *Yeshiva Univ. v. New Eng. Educ. Inst.,* 631 F.Supp. 146, 149 (S.D.N.Y.1986). Thus this argument, too, is insufficient to warrant an award of attorneys' fees.

2    An exception to this rule has been found where the deadlines of the case and/or timing of the depositions illustrated that expedited service was reasonably necessary. *See, e.g., Forest Labs., Inc. v. Abbot Labs.,* 96-CV-159S, 2006 U.S. Dist. LEXIS 33743, at *6 (W.D.N.Y. May 16, 2006) (allowing costs for expedited service when depositions taken just before or during trial).

3    The Murphy deposition cost was itemized on Meyer's spreadsheet of total costs submitted in support of its instant motion. The transcript for the deposition was prepared by a different reporting service than the remainder of the depositions, and the invoice for that charge was not attached, as were the invoices for the remaining depositions.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

**Green v. Venettozzi, Not Reported in Fed. Supp. (2019)**

2019 WL 4508927

2019 WL 4508927
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shawn GREEN, Plaintiff,

v.

D. VENETTOZZI, et al., Defendants.

9:14-CV-1215 (BKS/CFH)
|
Signed 09/19/2019

**Attorneys and Law Firms**

SHAWN GREEN, 97-A-0801, Plaintiff, pro se, Upstate
Correctional Facility, P.O. Box 2001, Malone, New York
12953.

HON. LETITIA JAMES, New York State Attorney General
- Albany, DENISE P. BUCKLEY, ESQ., Ass't Attorney
General, The Capitol, Albany, NY 12224, Attorney for
Defendants.

### DECISION AND ORDER

BRENDA K. SANNES, United States District Judge

### I. INTRODUCTION

 **\*1** In a Decision and Order filed on February 14, 2019
(the "February Order"), the Report-Recommendation of
Magistrate Judge Hummel was accepted and adopted in
its entirety; the motion for summary judgment filed on
behalf of Defendants was granted and Plaintiff's claims were
dismissed with prejudice. Dkt. No. 143. Judgment in favor of
Defendants was duly entered by the Clerk of the Court. [1] Dkt.
No. 144

Presently before the Court for consideration is Defendants'
motion for a Bill of Costs pursuant to Rule 54(d) of the
Federal Rules of Civil Procedure. Dkt. No. 145. On July 22,
2019 and August 5, 2019, Plaintiff, who is currently confined
at Upstate Correctional Facility ("Upstate C.F."), filed letters
advising the Court that he could not submit opposition to
the motion because his property was confiscated. Dkt. Nos.
153 and 154. Plaintiff also requested a "Court Order" and a
complete copy of the "Court's Docket". *Id.*

### II. BILL OF COSTS

In accordance with Rule 54(d), prevailing parties may recover
certain allowable, reasonable, and necessary costs. The
Supreme Court has construed the term "cost" in this context
to include only the specific items enumerated in 28 U.S.C. §
1920. *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S.
437, 441 (1987). The six categories of expenses which may
be taxed as costs are:

(1) Fees of the clerk and marshal;

(2) Fees for printed or electronically recorded transcripts
necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and the costs of making copies
of any materials where the copies are necessarily obtained
for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts,
compensation of interpreters, and salaries, fees, expenses,
and costs of special interpretation services under section
1828 of this title.

28 U.S.C. § 1920. On a proper showing by the losing party,
otherwise allowable costs may be denied by the district
court because of misconduct by the prevailing party, the
public importance of the case, the difficulty of the issues, or
the losing party's limited financial resources. *Whitfield v.
Scully*, 241 F.3d 264, 270 (2d Cir. 2001). The decision to
award costs to a prevailing party under Rule 54(d)(1) rests
within the sound discretion of the district court. *Id.* at 269.

The Bill of Costs submitted by Defendants seeks to recover
a total of $1,198.48 which includes the costs of Plaintiff's
deposition and the fees for exemplification and copies of
papers necessarily obtained for use in the case. Dkt. No. 145.

Generally speaking, the reasonable costs of transcribing
depositions are properly taxed in favor of the prevailing
party. *See Whitfield*, 241 F.3d at 270. "When a deposition
transcript is used or received in evidence at trial, or is
submitted to the court for consideration of a motion for
summary judgment, costs are properly allowed, without
regard to whether the deposition is specifically relied on
as a basis for the decision." *McEachin v. Goord*, No. 9:01-

Green v. Venettozzi, Not Reported in Fed. Supp. (2019)

2019 WL 4508927

CV-0259 (GJD), 2007 WL 1571981, at *1 (N.D.N.Y. May 25, 2007).

**\*2** In this case, Defendants elicited Plaintiff's testimony during the discovery period and annexed the transcript as an exhibit to the motion for summary judgment. Dkt. No. 121-8. The Court finds that the deposition was necessarily obtained for use in the case and is properly allowed as a cost recoverable by Defendants.

Defendants also seek to recover the cost of "one (1) copy of discovery (one hard copy produced to plaintiff totaling 1,404 pages) and one (1) copy of Plaintiff's deposition transcript totaling 169 pages." Dkt. No. 145 at 3. The items are identified as a Hearing Packet, Certified Transcript of Hearing, grievance records, requests for special accommodations, correspondence with Health Services, and medical records. *Id.* at 10-11. "Courts interpret [28 U.S.C. § 1920(4)] to include photocopying charges for discovery." *Phillips v. Allen*, No. 07 C 666, 2011 WL 1884558, at *2 (N.D. Ill. May 6, 2011) (citing *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000)). Here, counsel "provided sufficient information regarding the purpose of the copies" and the Court finds that the copies were "necessary [as it] relate[s] to the 'initial disclosure requirements.' " *See U.S. ex rel. Cullins v. Astra, Inc.*, No. 09-60696-CIV, 2010 WL 3008833, at *5 (S.D. Fla. July 28, 2010)

Defendants' counsel has provided the Court with exhibits to the bill of costs and provided detail as to the quantity and cost per page of the items copied at twenty-five cents per page – a rate which the court finds to be reasonable.

In accordance with the above, the Court directs the Clerk to tax the following costs in connection with the Judgment entered in this action: Fees for Deposition ($805.23) and Fees for Copies ($393.25) for a total of $1,198.48.

**III. Remaining Requests for Relief**

Plaintiff seeks an "urgent Court Order" directing Donald G. Uhler, the Superintendent at Upstate C.F., to provide Plaintiff with access to "all" of his property. Dkt. No. 153. Plaintiff's issues related to access to his property at Upstate C.F., *see* Dkt. Nos. 153 and 154, has no apparent relationship to this action, and seeks no relief available from this Court herein. Plaintiff is advised that this action is closed; further submissions in this case are not authorized. Insofar as Plaintiff may be requesting that this Court construe his letter as a Complaint

and commence a new action on his behalf, that request is denied. Nevertheless, the Clerk of the Court is directed to send Plaintiff a copy of his letters (Dkt. Nos. 153 and 154), a form complaint available for use in Section 1983 actions, and an application to proceed in forma pauperis.

In his correspondence, Plaintiff also requests an "estimate as to [the] number of pages each District Court's Docket consist[s] of as well as cost for a complete copy thereof." [2] Dkt. No. 154.

28 U.S.C. § 1915, which governs in forma pauperis proceedings, does not state that indigent parties are entitled to complimentary copies of the materials contained in a court's files or any other file. "[T]he granting of in forma pauperis status does not shift the entire financial burden of litigation either to the Court or to the opposing parties ... a party is required to pay the costs of discovery, including the costs of obtaining copies of requested documents, despite the fact that he has been found to be indigent." *Orraca v. Lee*, No. 9:04-CV-1249 (DNH/DRH), 2007 WL 81921, at *1 (N.D.N.Y. Jan. 9, 2007); *Madison v. Hoey*, 2006 WL 2265016, at *3 (N.D.N.Y. Aug. 4, 2006) (indigent status does not entitle a party to free copies but instead must bear his or her own costs of litigation). Local Rule 5.4(a) is clear that in forma pauperis status does not relieve a party of the obligation to pay all other fees for which that party is responsible regarding the action, including but not limited to copying and/or witness fees. Therefore, Plaintiff's request for free copies of documents is denied. If Plaintiff wishes to obtain copies of filings from the Court, the Clerk will compute the amount Plaintiff must prepay, at a cost of $0.50 per page, in order to obtain such copies. The Court directs the Clerk to provide a courtesy copy of the docket sheet for this action to Plaintiff together with a "Photocopy Request Form".

**IV. CONCLUSION**
**\*3** WHEREFORE, it is hereby

**ORDERED** that Defendants' motion for a Bill of Costs is **GRANTED**; and it is further

**ORDERED** that the Bill of Costs submitted by Defendants (Dkt. No. 145) is approved in its entirety and Defendants shall recover a total of $1,198.48; and it is further

**ORDERED** that Plaintiff's letter motion (Dkt. No. 153) is **DENIED**; and it is further

**Green v. Venettozzi, Not Reported in Fed. Supp. (2019)**

2019 WL 4508927

**ORDERED** that the Clerk of the Court shall send Plaintiff a copy of his letters (Dkt. Nos. 153 and 154), a form complaint available for use in Section 1983 actions, an application to proceed in forma pauperis, a copy of the Docket Sheet for this action, and a Photocopy Request form; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4508927

# Footnotes

1    Plaintiff's appeal from that Judgment was stayed by the Second Circuit pending the resolution of motions. Dkt. No. 149.

2    Plaintiff refers to himself as "Plaintiff/Petitioner" in "three cases currently pending" in this Court. Dkt. No. 154 at 1.

---

                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                                              3

2023 WL 3159571
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Daniel HAMPTON, Plaintiff,

v.

Denis MCDONOUGH, in his Official
Capacity as Secretary of the United States
Department of Veterans Affairs, Defendant.

17-CV-5711 (JMW)
|
Signed April 28, 2023

**Attorneys and Law Firms**

Daniel Hampton, 25 Belford Avenue, Bayshore, NY 11706,
Pro Se Plaintiff.

Megan Jeanette Freismuth, Esq., Thomas Russell Price,
Esq., Vincent Lipari, Esq., Assistant United States Attorneys,
United States Attorney's Office, Eastern District of New York,
610 Federal Plaza, Central Islip, New York 11722, Attorney
for Defendant.

**MEMORANDUM AND ORDER**

WICKS, Magistrate Judge:

*1 Plaintiff Daniel Hampton is a former employee of the
Veteran Affairs Medical Center in Northport ("VAMC"), New
York. Plaintiff commenced this case against Defendant Denis
McDonough, [1] in his official capacity as the Secretary of
the United States Department of Veterans Affairs, alleging
*quid pro quo* sexual harassment, hostile work environment,
atmosphere of adverse actions, and retaliation in violation
of Title VII of the Civil Rights Act of 1964, as amended
by the Civil Rights Act of 1991 ("Title VII"). (DE
1.) Following summary judgment motion practice, only
Plaintiff's retaliation claim remained in the case to be tried.
(DE 51.) As relevant to that claim, Plaintiff alleged that the
VAMC retaliated against him for filing an Equal Employment
Opportunity ("EEO") complaint against his supervisor on
November 16, 2015 by terminating his employment on April
16, 2016.

The undersigned presided over a three-day jury trial
addressing the sole remaining claim this case, namely,

retaliation from January 31, 2023 to February 1, 2023.
(DE 74; DE 77.) Plaintiff was represented by counsel all
throughout the trial. The issues of fact for trial were whether
the VAMC took an adverse action against Plaintiff after he
filed an EEO complaint, and if so, whether Plaintiff's filing
of the EEO complaint was the "but-for" cause of the adverse
action. (*See* DE 81.) The parties each presented witnesses
and documentary evidence at trial. (*See* DE 78; DE 80.)
The jury eventually returned a unanimous verdict in favor
of Defendant, finding that Plaintiff had not proven by a
preponderance of evidence that Defendant took an adverse
action against him. (DE 77; DE 81.) A final judgment was
entered accordingly. (DE 82.) Plaintiff appealed the final
judgment, and that appeal has been stayed pending resolution
of Plaintiff's post-trial motions. (DE 89.) Plaintiff filed an
appeal *pro se*. (DE 89.)

On February 6, 2023, Plaintiff initiated a series of *pro se*
filings purporting to seek relief under various state and
federal laws. (DE 83-87.) On March 7, 2023, Plaintiff filed
an amended motion that supplanted and superseded his
prior filings, rendering them moot. (DE 88.) This filing is
liberally construed by the Court as moving for relief from
final judgment under 🚩 Fed. R. Civ. P. 60(b)(3) and, in the
alternative, a new trial under Fed. R. Civ P. 59(a)(1)(A). [2]
(Electronic Order dated Mar. 8, 2023.) Plaintiffs' counsels'
motion to withdraw was filed on April 14, 2023, and that
application was granted. (*See* DE 102.)

*2 Defendant was directed to, and did, file an opposition to
Plaintiff's motions. (DE 91.) Plaintiff filed a reply. (DE 94.)
Plaintiff also filed a letter requesting that the Court allow him
to submit four flash drives containing audio and video files in
support of his motions -- a request Defendant also opposes. [3]
(DE 92; DE 93.)

For the reasons stated herein, Plaintiff's motions (DE 88; DE
92) are hereby **DENIED**.

**I. DISCUSSION**

**A. Consideration of New Evidence**
The Court declines the invitation to consider any new material
submitted by Plaintiff in support of his filings including,
*inter alia*, deposition excerpts, emails between Plaintiff and
his counsel, various online documents, and four flash drives
containing audio and video files that Plaintiff seeks to submit

to the Court. (*See* DE 88 at 5-15; DE 92; DE 94 at 10-30.) As Defendant argues, Plaintiff does not offer any evidence that was not available to him or his counsel before trial. (DE 96 at 1-2.) Though Plaintiff does not expressly explain what the four flash drives contain (*see* DE 92), Plaintiff's other filings reference a recording of a pretrial preparation session with his trial counsel, and "2 videos of calls made to 2 different VA hospitals in 2018" by Plaintiff regarding the process of converting an employee from temporary to permanent. (DE 88 at 2.)

First, Plaintiff's pre-trial conversations with trial counsel are of no moment for the reasons discussed below. *See infra* § I.C.i. Second, the evidence offered by Plaintiff either existed before trial, was disclosed during discovery, or could have been disclosed during discovery by Plaintiff before discovery closed on February 28, 2019. (*Id.*) For example, putting aside the typical evidentiary concerns such as authenticity, admissibility, relevance, as to the recordings of calls Plaintiff made in 2018, despite the availability of those recordings, Plaintiff did not attempt to present them at trial. Nor did Plaintiff present the deposition transcript excerpts or various other documents Plaintiff now relies on. Thus, this evidence does not provide a basis for relief from final judgment under Rule 60(b) and is not properly before the Court. *See State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 176 (2d Cir. 2004) ("Where a movant admits that a letter that the other party supposedly concealed was already present in the movant's files, it cannot claim that it was prevented from fully presenting its case." (internal quotation marks omitted)); *see also Patel v. Lutheran Med. Ctr., Inc.*, 775 F. Supp. 592, 596 (E.D.N.Y. 1991) ("Under Rules 59(e) and 60(b)(2) evidence which was in the possession of the party before the judgment was rendered ... is not newly discovered and does not entitle him to relief." (internal quotation marks omitted)).

## B. Rule 60(b)(3) Motion

Rule 60(b) generally provides that "[o]n motion and just terms" a party may be relieved from, *inter alia,* a final judgment for mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, or fraud. Fed. R. Civ. P. 60(b). Rule 60(b)(3) specifically allows the Court to relieve a party from final judgment for "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or

misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3). Rule 60(b), however, is considered "a mechanism for extraordinary judicial relief invoked only if the moving party demonstrates exceptional circumstances." *Juliao v. Charles Rutenberg Realty, Inc.*, No. 14-CV-808 (JMA) (AYS), 2020 WL 2513443, at * 2 (E.D.N.Y. May 15, 2020) (internal quotation and citation omitted).

**\*3** Relief under Rule 60(b)(3) "is only available if the moving party establishes by clear and convincing evidence that the opposing party engaged in fraud or other misconduct." *Tyson v. City of N.Y.*, 81 F. App'x 398, 400 (2d Cir. 2003) (summary order). Rule 60(b) is not a procedural vehicle to obtain a second bite at the apple, a request for relief "cannot serve as an attempt to relitigate the merits." *Id.* "To obtain relief, the movant must have been prevented from fully and fairly presenting his case." *Breslow v. Schlesinger*, 284 F.R.D. 78, 82 (E.D.N.Y. 2012). "The burden of proof on a Rule 60(b) motion is on the party seeking relief from the earlier judgment or order." *Obra Pia Ltd. v. Seagrape Invs. LLC*, No. 19-CV-7840 (RA), 2021 WL 1978545, at *2 (S.D.N.Y. May 18, 2021).

### i. Application

Plaintiff fails to establish any form of fraud or misconduct by Defendant. Plaintiff simply concludes that: "This is exactly what the defendant did [when] they allowed their witnesses to go up on the stand and misrepresent themselves and others that were within the VA health system. They allowed their witnesses to commit fraud." (DE 88 at 3.) Reading Plaintiff's filings in the most liberal light, Plaintiff makes the following arguments that appear to relate to his request for Rule 60(b)(3) relief: (1) Defendant failed to provide a complete copy of Plaintiff's electronic personnel file, (2) Defendant's case was built on false witness testimony given by conspiring witnesses, and (3) Plaintiff received ineffective assistance of counsel. (DE 88 at 1-2.)

First, neither Plaintiff nor his counsel raised to the Court that Defendant failed to produce any requested discovery that was necessary for trial, let alone the personnel file that Plaintiff now asserts was incomplete. Defendant also represents that a complete copy of Plaintiff's personnel file was produced during discovery, and Defendant never received a deficiency

letter regarding missing records. (DE 91 at 11-12.) More importantly, Plaintiff's argument does not support a finding of any type of fraud or misconduct.

Second, Plaintiff attempts to re-litigate his case using trial testimony, unintroduced deposition testimony, and other documents in order to connect dots to support his assertion that even though certain documents should have been in his personnel file, they were not. (DE 88 at 1-2.) Plaintiff concludes that Defendant's witnesses "conspired" against him. (DE 88 at 1-2; DE 94.) Plaintiff does not point to any actual evidence of a conspiracy against him or any evidence that anyone at the VAMC actually tampered with his personnel file. Plaintiff instead points to a slew of evidence, such as online websites, deposition testimony not presented at trial, trial testimony of Defendant's witnesses, and more, to show inconsistences, which Plaintiff believes disprove the testimony of Defendant's witnesses. (*See* DE 94.) However, the jury was presented with the parties' desired evidence and witnesses, and it was their province to make credibility determinations accordingly. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) ("[T]he assessment of a witness's credibility is a function reserved for the jury."). That the jury perhaps found a theory Plaintiff never advanced at trial unpersuasive is unsurprising to say the least. However, Plaintiff had every opportunity to present his evidence, cross-examine the witnesses, and make his credibility contentions to the jury.

Third, Plaintiff avers that he received ineffective assistance of counsel. Plaintiff states that despite his insistence, his trial counsel did not involve him in all aspects of the case including which witnesses to call, and with respect to certain agreements made with Defendant. (DE 88 at 2.) Chief among Plaintiff's grievances is that, without his knowledge, trial counsel stipulated with Defendant's counsel that the parties would not mention, or present evidence related to, *inter alia*, Plaintiff's already dismissed sexual harassment and hostile work environment claims. (*Id.*; *see* DE 63 (stipulation).)

**\*4** Plaintiff does not provide any evidence to support a finding that his trial counsel acted fraudulently. Instead, Plaintiff seems to disagree with his trial counsels' handling of certain matters. Those grievances, regardless of how meritorious, do not provide a basis for relief under Rule 60(b)(3) or, even reading Plaintiff's motion liberally, under Rule 60(b)(1). "Relief from counsel's error is usually sought pursuant to Rule 60(b)(1) on the theory that such

error constitutes mistake, inadvertence or excusable neglect." *Webb v. City of New York*, No. 08-CV-5145 (CBA) (JO), 2010 WL 3394537, at \*3 (E.D.N.Y. Aug. 23, 2010) (internal quotation marks and citations omitted). However, attorney negligence is not sufficient grounds for relief and "a person who selects counsel cannot thereafter avoid the consequences of the agent's acts or omissions." *See Nemaizer v. Baker*, 793 F.2d 58, 62 (2d Cir. 1986) ("Mere dissatisfaction in hindsight with choices deliberately made by counsel is not grounds for finding the mistake, inadvertence, surprise or excusable neglect necessary to justify Rule 60(b)(1) relief.").

Plaintiff's ineffective assistance of counsel argument is misplaced since "a lawyer's purported shortcomings present no cognizable ground for relief in a civil matter, where the Sixth Amendment right to counsel does not apply." *Singh v. Home Depot U.S.A., Inc.*, 580 F. App'x 24, 25 (2d Cir. 2014) (summary order). Moreover, as Plaintiff admits, he became aware of the subject stipulation the first day of trial when it was mentioned by the undersigned. (DE 88 at 2.) Ultimately, he decided not to raise the issue with the Court because his trial counsel supposedly advised him that mentioning sexual harassment would cause the case to be thrown out. (DE 88 at 2.) Nonetheless, Plaintiff had the opportunity to raise the issue with the Court then, or to press the issue further with his trial counsel but elected not to do so.

Plaintiff has not carried his burden for Rule 60(b)(3) relief, which requires clear and convincing evidence of fraud or misconduct. *See Castro v. Bank of New York Mellon*, 852 F. App'x 25, 30 (2d Cir. 2021) (summary order) ("[U]nsubstantiated assertion[s] do[ ] not satisfy the clear-and-convincing standard required to show fraud."). Plaintiff has not shown any fraud or misconduct by Defendant, let alone that he lacked the opportunity to present his case fully and fairly. The choices of Plaintiff and his trial counsel notwithstanding, Plaintiff had every opportunity to present witnesses, cross-examine Defendant's witnesses regarding any alleged inconsistences, and to introduce evidence to support his case. (*See* DE 91 at 6-9.) Accordingly, Plaintiff's request for relief from the final judgment is denied.

## C. **Rule 59(a)(1)(A)** Motion

Pursuant to Rule 59(a)(1)(A) "the court may, on motion, grant a new trial on all or some of the issues—and to any party ... after a jury trial, for any reason for which a new trial has

heretofore been granted in an action at law in federal court." Fed R. Civ P. 59 (a)(1)(A). "The decision whether to grant a new trial under Rule 59 'is committed to the sound discretion of the trial judge.' " 🚩*Crews v. Cty. of Nassau*, 149 F. Supp. 3d 287, 292 (E.D.N.Y. 2015) (quoting *Stoma v. Miller Marine Servs., Inc.*, 271 F. Supp. 2d 429, 431 (E.D.N.Y. 2003)). "Grounds for granting a new trial include verdicts that are against the weight of the evidence, substantial errors in the admission or rejection of evidence, and non-harmless errors in jury instructions, and verdict sheets." *Sass v. MTA Bus Co.*, 6 F. Supp. 3d 229, 233 (E.D.N.Y.), *adhered to on reconsideration*, 6 F. Supp. 3d 238 (E.D.N.Y. 2014) (internal citations omitted).

"A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Id.* (quoting *Snyder v. N.Y.S. Educ. Dep't*, 486 Fed. Appx. 176, 177 (2d Cir. 2012)); *see also* 🚩*Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003) (same). The Court may grant a new trial "even if there is substantial evidence supporting the jury's verdict," however, as the Second Circuit has made clear, the Court "should only grant such a motion when the jury's verdict is '*egregious*.' " 🚩*DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998) (emphasis added).

### i. Application

**\*5** In pursuit of a new trial, Plaintiff asserts that the witnesses and arguments presented by Defendant prejudiced the jury such that "the jury was unable to fairly review the credible evidence presented at the trial and render a fair verdict." (DE 88 at 3.) Plaintiff argues that Defendant implied at trial that Plaintiff's harassment complaint was related to Plaintiff taking time off work rather than sexual harassment. (DE 88 at 3.) In Plaintiff's view, Defendant should have informed the jury that Plaintiff's supervisor was made aware that Plaintiff made a complaint about being sexually harassed. (DE 88 at 3.) Plaintiff continues: "It is obvious since the overwhelming evidence, in this case, proved that Plaintiff was left in a hostile work environment and retaliated against and then wrongfully terminated due to the negligence of Defendant, that the defense did not allow the jury to fairly view the evidence and return a fair and just verdict." (DE 88 at 3.)

Plaintiff's arguments not only reflect a misunderstanding of legal process and the law, but they also represent an impermissible attempt to relitigate the merits of the case. First, Plaintiff fails to point to any evidence showing that Defendant created an implication that Plaintiff filed an EEO complaint because Plaintiff was being harassed for his time and leave practices. As Defendant states, evidence related to Plaintiff's time and leave was permissible to establish how an almost nine-day absence shortly before Defendant started to review Plaintiff's file explains why Defendant's employees were looking into Plaintiff around the time Plaintiff had filed an EEO complaint. (DE 91 at 7.) Plaintiff's trial counsel cross-examined all of the witnesses that testified regarding Plaintiff's time and leave and argued to the jury that Defendant's explanation was not credible. (DE 91 at 7.) Plaintiff also did not object to any testimony regarding time and leave. Thus, Plaintiff's dissatisfaction with that aspect of his employment being presented at trial, is not a basis for claiming prejudice, nor does it warrant a new trial.

Second, Plaintiff's core issue appears to be with his inability to make mention of his already dismissed sexual harassment and hostile work environment claims. Those claims were clearly dismissed on summary judgment. (DE 51.) The parties stipulated that details related to those claims would not be mentioned. (DE 63.) Additionally, the exact type of harassment Plaintiff complained of was not materially relevant to the two disputed elements of a Title VII retaliation claim in this case -- whether Plaintiff suffered an adverse action, and whether his EEO complaint was the but-for cause of that action. (*See* DE 71 at 1 (Joint pretrial order detailing claims and defenses that remain to be tried).)

Plaintiff cannot fabricate prejudice resulting from the strategic decision of his own trial counsel, which stipulated that certain matters would not be raised during trial. The effect on the mechanics of trial by a stipulation between the parties and of the dismissal of Plaintiff's prior claims may not be apparent to Plaintiff. Nonetheless, a misunderstanding of legal process does not equate to a miscarriage of justice. At bottom, Plaintiff has failed to put forth evidence that shows that the jury's verdict was egregious or that the verdict was a miscarriage of justice. (*See* DE 91 at 6-9.) Accordingly, Plaintiff's request for a new trial is denied.

### II. CONCLUSION

For the foregoing reasons, Plaintiff's motions (DE 88; 92) are **DENIED** and Defendant is directed to serve a copy of this Memorandum and Order upon Plaintiff, and file proof of service of the same on ECF on or before **May 1, 2023.**

**All Citations**

Slip Copy, 2023 WL 3159571

### Footnotes

1    Denis McDonough was automatically substituted for Robert Wilkie as a Defendant in accordance with Fed. R. Civ. P. 25(d). (Electronic Order dated Jan. 26, 2023.)

2    Plaintiff's motion also includes language referring to a judgment notwithstanding the verdict, presumably under Rule 50(b). (DE 88 at 1.) However, "[a] post-trial Rule 50(b) motion for judgment as a matter of law is properly made only if a Rule 50(a) motion for judgment as a matter of law has been made before submission of the case to the jury." *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004). Since Plaintiff did not make a Rule 50(a) motion before the case was submitted to the jury, the Court does not address this request. *See id.*

3    On February 27, 2023, Plaintiff attempted to deliver a flash drive to the Court, which the Court declined to accept, and the item was returned to Plaintiff without docketing or consideration. (*See* DE 87.)

2020 WL 4877186
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Chris HANSEN, Plaintiff,

v.

WARREN COUNTY and Peyton Ogden, Defendants.

1:17-cv-1134 (TWD)
|
Signed 08/20/2020

**Attorneys and Law Firms**

OF COUNSEL: MARTIN J. MCGUINNESS, ESQ., OFFICE OF MARTIN J. MCGUINNESS, Attorneys for Plaintiff.

OF COUNSEL: GREGG T. JOHNSON, ESQ., APRIL J. LAWS, ESQ., JOHNSON & LAWS, LLC, Attorneys for Defendants.

**DECISION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**I. INTRODUCTION**

**\*1** Plaintiff Chris Hansen ("Plaintiff" or "Hansen") commenced this action pursuant to 📄 42 U.S.C. § 1983 and New York state law against Defendants Warren County and Sheriff's Deputies Peyton Ogden ("Ogden") and Daniel Habshi ("Habshi"). (Dkt. No. 2.) After motion practice, only Plaintiff's Fourth Amendment excessive force claim against Ogden and state law battery claims against Ogden and Warren County remained for trial. (Dkt. Nos. 30, 52.) On November 18, 2019, following a four-day trial, including approximately eight-hours of deliberations, the jury rendered a verdict in favor of Defendants. (Dkt. No. 79.) Judgment was entered in favor of Defendants on November 19, 2019. (Dkt. No. 84.)

Currently pending before the Court are: (1) Plaintiff's motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure ("Rule 59") and Defendants' motion for a bill of costs pursuant to Rule 54 of the Federal Rules of Civil Procedure ("Rule 54"). (Dkt. Nos. 86, 89.) The motions are fully briefed. (Dkt. Nos. 90, 95, 97.) For the reasons that follow, Plaintiff's motion for a new trial is denied and

Defendants' motion for a bill of costs is granted in part and denied in part.

**II. BACKGROUND**

Familiarity with the procedural and factual background of this case is presumed, and portions of the background are recited only where necessary to decide the pending motions.

**III. PLAINTIFF'S RULE 59 MOTION**

Plaintiff argues a new trial is warranted because (1) he was precluded from offering expert testimony on the central issue of the case while Defendants were allowed to present heavily biased fact and expert testimony from Habshi; (2) the verdict was against the weight of the evidence; and (3) defense counsel made improper comments during opening and closing statements which unfairly influenced the jury's verdict. (Dkt. No. 89-2.) Defendants oppose the motion, and Plaintiff has replied. (Dkt. Nos. 95-5, 97.)

**A. Legal Standard**

Rule 59 provides that, after a jury trial, a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Generally, a district court should grant a motion for a new trial where, in its opinion, the jury has reached a "seriously erroneous result" or the verdict is a "miscarriage of justice." 📄 *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (quoting 📄 *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992)). Grounds for a new trial include that (1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of jury instructions; and (4) excessive damages. *Utica Mut. Ins. Co. v. Century Indem. Co.*, 419 F. Supp. 3d 449, 466-67 (N.D.N.Y. 2019) (citation omitted).

A new trial is also warranted where "opposing counsel's conduct causes prejudice to that party ... thereby unfairly influencing its verdict." 📄 *Tesser v. Bd. of Educ. of the City Sch. Dist. of New York*, 370 F.3d 314, 321 (2d Cir. 2004) (citations omitted). The totality of the circumstances must be considered, "including the nature of the comments, their frequency, their possible relevance to the real issue before the jury, [and] the manner in which the parties and the court

treated the comments." *Hopson v. Riverbay Corp.*, 190 F.R.D. 114, 122 (S.D.N.Y. 1999) (internal quotation marks omitted).

**\*2** "[I]n addressing a Rule 59 motion, the court may independently weigh the evidence presented at trial to determine whether the jury's verdict is seriously erroneous or resulted in a miscarriage of justice." *Edwards v. Schrader-Bridgeport Int'l., Inc.*, 205 F. Supp. 2d 3, 8 (N.D.N.Y. 2002) (quotation marks and citation omitted). "In doing so, the court 'is afforded considerable discretion.' " *Id.*; *see also Dotson v. City of Syracuse*, No. 5:04-CV-1388 (NAM/GJD), 2011 WL 817499, at *11 (N.D.N.Y. Mar. 2, 2011) ("The standard for granting such a motion is high and rulings on motions under Rule 59(a) are committed to the sound discretion of the district court.") (quotation marks and citation omitted).

A trial court has considerable discretion in determining whether or not evidence is admissible. *See Barrett v. Orange Cty. Human Rights Comm'n*, 194 F.3d 341, 346 (2d Cir. 1999). A new trial on the basis of improper evidentiary rulings will be granted only where the improper rulings "affect[ ] a substantial right of the moving party." *Mem'l Drive Consultants, Inc. v. ONY, Inc.*, 29 F. App'x 56, 61 (2d Cir. 2002) (summary order) (citing *Malek v. Fed. Ins. Co.*, 994 F.2d 49, 55 (2d Cir. 1993)). Whether an evidentiary error implicates a substantial right depends on "the likelihood that the error affected the outcome of the case." *Malek*, 994 F.2d at 55. Additionally, "[i]t is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998) (citations omitted).

**B. Analysis**

After carefully considering the matter, the Court denies Plaintiff's Rule 59 motion. Initially, and as pointed out by Defendants, for the bulk of Plaintiff's arguments, he fails to cite to any transcript or record from the trial to support them. (*See generally* Dkt. No. 89-2.) These "unsupported contentions ... are insufficient to justify the grant of a new trial." *AMW Materials Testing, Inc. v. Town of Babylon*, No. 01 CV 4245 (ADS) (ETB), 2008 WL 11449231, at *18 (E.D.N.Y. Mar. 13, 2008); *see also Robinson v. Ballard*, 9:13-CV-01213 (TWD), 2019 WL 4686355, at *3 (N.D.N.Y. Sept. 26, 2019). Nevertheless, the Court has considered each of

Plaintiff's arguments and will address them in the same order as presented by Plaintiff.

**1. Expert Testimony**

Plaintiff first argues a new trial is warranted because (1) this Court, in a pretrial motion *in limine* ruling, precluded Plaintiff from calling Ken Cooper ("Cooper") as an expert and allowed Habshi to testify both as an expert and fact witness; and (2) Habshi's strong partiality toward Defendants and advocacy for Ogden, combined with the lack of a curative or limiting instruction regarding his dual role as witness, may have improperly influenced and/or confused the jury. (Dkt. No. 89-2 at 13-16.) Plaintiff also contends Habshi was evasive and non-responsive during cross examination. *Id.*; *see also* Dkt. No. 97. Defendants respond that (1) the Court's pretrial *in limine* rulings were adequately supported and well within the Court's discretion to decide evidentiary matters; and (2) neither the fact that Habshi was an interested witness nor the absence of a limiting instruction—to which Plaintiff did not propose or raise an objection—is grounds for a new trial. (Dkt. No. 95-5 at 10-15.)

First, the Court finds the preclusion of Plaintiff's proposed expert testimony by Cooper does not warrant a new trial. A district court has "broad discretion" to carry out the *Daubert* gatekeeping function and ensure expert testimony is reliable and relevant. *See In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016). While Plaintiff faults the Court's pretrial ruling for relying on the fact that Cooper has never been a police officer or arrested anyone (Dkt. No. 89-2 at 15), the Court thoroughly considered all of Cooper's training and experience in determining he was not qualified to testify as an expert about the use of non-lethal force by a police officer to effectuate a lawful arrest at the scene of a domestic dispute (*see* Dkt. No. 74). Plaintiff makes no showing that the exclusion of Cooper's testimony affected a substantial right by likely affecting the outcome of the case. *See Malek*, 994 F.2d at 55; *see also* Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence ... is ground for granting a new trial."). Moreover, Plaintiff does not raise any new legal arguments or authority to support his contention that Cooper's testimony should have been allowed. As noted above, it is well-settled that Rule 59 "is not a vehicle for relitigating old issues ... or otherwise taking a second bite at the apple." *Sequa Corp.*, 156 F.3d at 144.

**\*3** Second, the Court finds Plaintiff has not shown Habshi's "dual role" as a fact and expert witness resulted in the jury reaching a seriously erroneous result or a miscarriage of justice. Initially, Plaintiff's complaints that Habshi and Ogden are friends and therefore Habshi was an "interested" witness are not grounds for a new trial. As Plaintiff notes, the evidence at trial indicated that Habshi and Ogden were colleagues, socialized together, and traveled to the trial together. (*See* Dkt. No. 89-2 at 14.) The jury was free to take into account the relationship between Habshi and Ogden when assessing Habshi's credibility and the weight to which his testimony was entitled. In considering a Rule 59 motion for a new trial, moreover, a court should "rarely disturb a jury's evaluation of a witness's credibility." *DLC Mgmt. Corp.*, 163 F.3d at 134 (citations omitted).

Plaintiff also argues a curative or limiting instruction should have been given to help the jury differentiate between Habshi's expert and fact testimony. (Dkt. No. 89-2 at 15.) As Defendants note, however, Plaintiff failed to include a curative instruction in his proposed jury instructions, stated he had no issues with the jury charges during the charge conference, and otherwise failed to object to the absence of an instruction regarding Habshi's dual role as expert and fact witness. (*See* Dkt. No. 95-5 at 14-15.) Moreover, to the extent a motion for a new trial is premised on an objection to a jury instruction, Rule 51 of the Federal Rules of Civil Procedure ("Rule 51") requires the movant to have raised that objection before the jury retires to preserve the objection.

*See* Brenner v. World Boxing Council, 675 F.2d 445, 456 (2d Cir. 1982), *cert. denied*, 459 U.S. 835 (1982). As noted, Plaintiff made no such objection.

However, Rule 51 provides, in pertinent part, that "[a] court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights." Fed. R. Civ. P. 51(c), (d). As such, "to establish plain error, [the movant] must show there was (1) error (2) that is plain and (3) that affects substantial rights." *U.S. v. Cossey*, 632 F.3d 82, 86-87 (2d Cir. 2011) (citations omitted). The error should be corrected only if it "seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 87 (citations and punctuation omitted). "The plain error doctrine should only be invoked with extreme caution in the civil context." *Feeley v. City of New York*, 362 F. Supp. 3d 153, 160 (S.D.N.Y. 2019) (citation and quotation marks omitted). "To constitute plain error, a court's action must contravene an established rule of law and

the substantial right affected must go to the very essence of the case." *Id.* (citations and internal punctuation omitted).

Here, there is no such error. A jury instruction is erroneous, and a new trial warranted, only if it misleads a jury as to the correct legal standard or does not adequately inform the jury on the law. *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994). Moreover, an omission in jury instructions is less likely to be prejudicial than a misstatement of the law. *Lore v. City of Syracuse*, 670 F.3d 127, 156 (2d Cir. 2012). Plaintiff has not shown the jury instructions were legally incorrect, led to any jury confusion, or caused any prejudice. Therefore, Plaintiff has failed to show that the absence of a curative instruction regarding Habshi's dual role resulted in a seriously erroneous result or a miscarriage of justice. *See DLC Mgmt. Corp.*, 163 F.3d at 133.

Based on the foregoing, the Court finds no error in the preclusion of Cooper's testimony, Habshi's testimony as both a fact and expert witness, and/or the absence of a jury instruction regarding Habshi's "dual role" as a fact and expert witness. Therefore, a new trial is not warranted on these grounds.

### 2. Weight of the Evidence

**\*4** Plaintiff next argues a new trial is warranted because the verdict was against the weight of the evidence. (Dkt. No. 89-2 at 16-18.) Generally, Plaintiff argues the testimony and evidence at trial disproved the notion that Plaintiff was choking Gina Canale ("Canale") at the time Ogden entered the residence and he attempts to cast doubt on Defendants' evidence. *See id.* Defendants respond that the verdict was consistent with the evidence and argue Plaintiff's motion is based on post-trial subjective credibility assessments. (Dkt. No. 95-5 at 15-19.)

Here, the Court finds Plaintiff has not come forth with evidence which shows the jury reached a seriously erroneous result or the verdict was a miscarriage of justice. Plaintiff largely argues his evidence was more credible than Defendants' evidence. However, as noted above, a court should "rarely disturb a jury's evaluation of a witness's credibility." *DLC Mgmt. Corp.*, 163 F.3d at 134 (citations omitted); *see also* Mugavero v. Arms Acres, Inc., 680 F. Supp. 2d 544, 558-59 (S.D.N.Y. 2010) ("In weighing the

evidence, however, the Court should not ordinarily ignore the jury's role in resolving factual disputes and assessing witness credibility.") (internal quotation marks and citation omitted). Accordingly, the Court declines to disturb the jury's findings on this basis.

Moreover, to the extent Plaintiff argues the verdict goes against the weight of the evidence because the evidence disproved the notion that he was choking Canale, this argument is unavailing. As pointed out by Defendants, the ultimate question of the reasonableness of the force used by Ogden does not turn on whether or not Plaintiff was in fact choking Canale nor the precise placement of Plaintiff's hand or hands around her neck. (Dkt. No. 95-5 at 16-18.) The Court has thoroughly reviewed Plaintiff's arguments and exhibits in this regard and finds that Plaintiff has not come forward with any evidence to show that the jury reached a seriously erroneous result or that the verdict was a miscarriage of justice. *See* Manley v. AmBase Corp., 337 F.3d 237, 244 (2d Cir. 2003). In fact, in other submissions to the Court, Plaintiff submits the litigated "issues were close." (*See* Dkt. No. 90 at 1.)

Accordingly, Plaintiff has not demonstrated the verdict goes against the weight of the evidence and the Court declines to disturb the jury's findings on this basis and order a new trial.

### 3. Statements Made by Defense Counsel

Plaintiff contends statement made by defense counsel during his opening and closing statements were prejudicial and require a new trial. (Dkt. No. 89-2 at 19-21.) Specifically, Plaintiff complains that (1) during opening statements, defense counsel stated the Court had already determined Hansen's arrest was "constitutional and legitimate" and (2) during closing statements, defense counsel stated Ogden had worked his way up the ranks and implied that an adverse verdict would harm his career and also asked the jury to consider what "message" their verdict would send to law enforcement personnel more generally. *See id.* Plaintiff argues defense counsel's reference to his "constitutional and *legitimate*" arrest was not relevant to any of the issues in the case, was substantially prejudicial because of the "risk" the jury would place undue emphasis on the Court's order, and was "misleading" because it implied that there was "nothing wrong with the arrest." *Id.* at 20 (emphasis in original). Plaintiff further contends the comment was "misplaced" because no evidence relating to the dismissal

of the false arrest claim was ever introduced into evidence. *Id.* As to the challenged remarks during defense counsel's summation, Plaintiff contends the comments at issue were "naked attempts to appeal to the passion of the jurors and were designed to generate sympathy for Ogden." *Id.* at 21.

**\*5** A court may order a new trial on the basis of attorney misconduct when, *inter alia*, "the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict." Pappas v. Middle Earth Condo. Ass'n, 963 F.2d 534, 540 (2d Cir. 1992). "[I]n evaluating a motion for a new trial based on counsel's alleged misconduct, the court must consider such a claim in the context of the trial as a whole, examining, among other things, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, and the manner in which the parties and the court treated the comments." Graham v. City of New York, 128 F. Supp. 3d 681, 698 (E.D.N.Y. 2015) (internal citations and quotation marks omitted). "Determining if counsel's conduct was so improper as to warrant a new trial is committed to the sound discretion of the trial judge." *Id.* As the Second Circuit has recognized, the trial court holds a "superior vantage point when evaluating the possible impact of the alleged prejudicial conduct" as "[a] printed record is unable to replicate in full all the circumstances–for example, tones of voices, demeanor of witnesses and jurors and the like–that occur in the course of an unfolding trial." Pappas, 963 F.2d at 540.

"The relevant inquiry in assessing undue prejudice is whether there is a 'reasonable probability' that the jury's verdict was influenced by the improper conduct of counsel." Claudio, 955 F. Supp. 2d at 156 (quoting Chang v. City of Albany, 150 F.R.D. 456, 459 (N.D.N.Y. 1993)). "[R]arely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal." Marcic v. Reinauer Transp. Companies, 397 F.3d 120, 124 (2d Cir. 2005) (internal quotation marks omitted).

Taking into consideration the totality of the circumstances, the Court finds a new trial is not warranted based on defense counsel's statements. At the beginning of the trial, the jury was instructed that "statements, arguments, and questions by the lawyers are not evidence." (Dkt. No. 95-2 at 4.) As to the challenged remarks made during defense's counsel opening statement, that "[t]his Court has already determined that that arrest was constitutional and legitimate," to which

Plaintiff's counsel did not object, the Court finds the statement was not unduly prejudicial or confusing, and thus does not provide a basis for a new trial. As pointed out by Defendants, inasmuch as Plaintiff's counsel attempted to "justify and legitimize" his October 23, 2016, conduct, by devoting most of his opening statement describing the history of events leading up to Hansen's arrest, it was critically important that the jury understand that the issues of whether Plaintiff was lawfully arrested was not an issue before them. (Dkt. No. 95-5 at 21.) Additionally, during his summation, Plaintiff's counsel explained that "what's not at issue in this case is whether the arrest was lawful. You're not deciding that." (Dkt. No. 95-4 at 77.)

As to the challenged statements made during defense's counsel summation, concerning "messages" the jury's verdict would "send" to Ogden and police officers generally, and any impact a verdict may have on Ogden's career and legacy, Plaintiff's counsel objected, and the objections were sustained. (Dkt. No. 95-4 at 61, 62.) No additional statements of this type were made by defense counsel. On the other hand, Plaintiff's counsel began his summation as follows:

> Ladies and gentlemen of the jury, let me tell you what this case is not about. This case is not about Peyton Ogden's police career and whether he's been successful or whether he's moved on to become a state trooper and the tarnish this lawsuit might put on his career. This has nothing to do with that. This case doesn't have anything to do with sending messages to police in general, and Mr. Hansen isn't suing police in general. He's not suing the law enforcement of the United States of America. He's not putting police departments on trial. He's not asking you to send a message to anyone except Peyton Ogden for bashing him up. ...

> This case is about what happened on October 23 of 2016, and it's about that and the six months after that when Mr. Hansen had to endure the injuries, the bruising, the inability to sleep in his own bed, because that man right there sitting at that table, all 245 pounds of him, decided to get on top of him and beat him while he's unconscious. That's what this case is about. It's not about his police career.

**\*6** *Id.* at 62-63.

In addition to sustaining the above-noted objections during defense counsel's summation, at the conclusion of the trial, the jury was instructed that the closing statements of counsel were not evidence. (Dkt. No. 95-4 at 81.) The jury was also instructed that "in deciding the facts of this case,

you must not be swayed by feelings of bias, prejudice, or sympathy towards any party[.]" *Id.* at 80. The jury was instructed that "every person has the constitutional right not to be subjected to excessive force while being arrested, even where the arrest is otherwise lawful." (Dkt. No. 95-4 at 93.) Here, there is no indication the jury was unable to follow these instructions. *See C.C. by and through Camarata v. Polaris Industries, Inc.*, No. 14-CV-0975 (GTS/TWD), 2018 WL 3031848, at *3 (N.D.N.Y. June 19, 2018) ("A jury is presumed to follow the instructions given by the Court and Plaintiff has not shown any evidence to suggest that the jury failed to properly follow these instructions when considering Plaintiff's claims."). Thus, even assuming *arguendo* that defense counsel's remarks were improper, the Court finds any potential prejudice was cured by the jury instructions. *See Pappas*, 963 F.2d at 540 ("Some misconduct is *de minimis* in the context of the entire trial, and some is promptly dealt with by the trial court's rulings and curative instructions."); *see also Claudio*, 955 F. Supp. 2d at 149 (noting that a warning to counsel, a sustained objection, and/or a curative instruction may sufficiently counteract any risk of prejudice posed by attorney misconduct).

Accordingly, given the totality of the circumstances, a new trial is not warranted based on defense counsel's statements.

For all the foregoing reasons, the Court denies Plaintiff's Rule 59 motion for a new trial.

## IV. DEFENDANTS' MOTION FOR A BILL OF COSTS

As the prevailing party in this action, Defendants seek costs in the total amount of $1720.98. (Dkt. No. 86.) Plaintiff opposes the motion. (Dkt. No. 90.)

### A. Legal Standard

Rule 54 allows the Court to award the prevailing party its costs. Fed. R. Civ. P. 54(d)(1); *see also* N.D.N.Y. L.R. 54.1(a). The term "costs" as used in Rule 54 includes the specific items enumerated in 28 U.S.C. § 1920. *Whitfield v. Scully*, 241 F.3d 264, 269 (2d Cir. 2001) (citations omitted). As a threshold matter, the prevailing party must establish to the court's satisfaction that the taxation of costs is justified. *Dedjoe v. Esper*, No. 1:15-CV-1170 (TJM), 2019 WL 697824, at *6 (N.D.N.Y. Feb. 19, 2019) (citing *John and Kathryn G. v. Board of Ed. of Mt. Vernon Public Schools*, 891 F. Supp. 122, 123 (S.D.N.Y. 1995)). "After the prevailing party demonstrates the amount of its costs and that they fall within

an allowable category of taxable costs, that party enjoys a presumption that its costs will be awarded." *Id.* (quoting

🚩 *Natural Organics, Inc. v. Nutraceutical Corp.*, 2009 WL 2424188, at *2 (S.D.N.Y. Aug. 6, 2009) (quotation marks and citations omitted)).

"[B]ecause Rule 54(d) allows costs 'as of course,' such an award against the losing party is the normal rule obtaining in civil litigation, not an exception. For this reason, the losing party has the burden to show that costs should not be imposed; for example, costs may be denied because of misconduct by the prevailing party, the public importance of the case, the difficulty of the issues, or the losing party's limited financial resources." 🚩 *Whitfield*, 241 F.3d at 270 (citations omitted). A district court has authority to review, adjust, or deny an award of costs, and that decision "is committed to the sound discretion of the district court." 🚩 *Cosgrove v. Sears, Roebuck, & Co.*, 191 F.3d 98, 102 (2d Cir. 1999) (quotation marks and citation omitted).

### B. Analysis

**\*7** As noted, Defendants seek costs in the amount of $1720.98, which is the combination of $400.00 for fees of the Clerk, $170.00 for service of summons and subpoena, $1049.50 for printed or electronically recorded transcripts, and $101.48 for witness fees. (Dkt. No. 86.) Each is a specific item enumerated in 28 U.S.C. § 1920 and Defendants have provided documentation supporting their sought-after costs. *Id.* Thus, Defendants are presumptively entitled to these costs under Rule 54. *See Dizak v. Hawks*, No. 9:15-CV-1171 (TJM), 2020 WL 204297, at *7 (N.D.N.Y. Jan. 13, 2020) (citing

🚩 *Natural Organics*, 2009 WL 2424188, at *2) ("After the prevailing party demonstrates the amount of its costs and that they fall within an allowable category of taxable costs, that party enjoys a presumption that its costs will be awarded."). Despite this presumption, the Court can deny taxation of costs if Plaintiff meets his burden of demonstrating that some or all the costs should not be taxed. *See id.*

Generally, Plaintiff argues the costs sought by the Defendants should be rejected because, *inter alia*, Plaintiff litigated the matter in "good faith" and the "issues were close." (Dkt. No. 90 at 1.[1]) Plaintiff asserts the taxable costs would cause financial hardship,[2] and notes Ogden likely has no responsibility for any incurred costs and that Warren County,

a taxing municipal entity with significant resources, was likely responsible for all costs. *Id.*

Regardless, as to the removal fee, Plaintiff submits he already paid $210.00 to commence this action in Supreme Court, Warren County, and argues he should not have to pay an additional $400.00 "to reimburse the Defendants for their discretionary choice of forum decision." *Id.* at 2. As to the depositions, Plaintiff states he already paid $150.00 for the January 24, 2018, deposition of John LaBombard ("LaBombard"), and has submitted evidence of same, and asserts he should not have to pay twice for the deposition transcript.[3] Relative to the pre-commencement 50h hearing, held June 1, 2017, Plaintiff argues, upon information and belief, there is no law providing that a state law notice of claim examination is a taxable cost in a federal action. *Id.* As to Hansen's post-commencement examination, held April 10, 2018, Plaintiff argues he paid his share of the deposition in the amount of $209.00, and has submitted evidence of same, and asserts Defendants are seeking a "windfall." *Id.*

Here, as to the imposition of costs generally, the Court finds Plaintiff has not met his burden to establish he is entitled to an exception to the normal rule of taxation. While Plaintiff believes the litigated "issues were close" and the jury reached the wrong conclusion, "a party's resolute stance in his position, even after a contrary jury conclusion, does not make the case so close that costs should not be taxed. Otherwise, every case brought in good faith would avoid taxation of costs, making Rule 54 meaningless." *Dedjoe v. Esper*, 2019 WL 697821, at *8; *see also Dash v. Montas*, 17-CV-515 (PKC/RER), 2020 WL 2198175, *1 (E.D.N.Y. May 6, 2020) ("The filing of an action in good faith does not, by itself, compel the denial of costs.") (citing, *inter alia*, *Castro v. City of New York*, No. 10-CV-4898 (NG/VVP), 2014 WL 4659293, at *3 (E.D.N.Y. Sept. 17, 2014)).

**\*8** "Moreover, even if the Court were to assume that the amount sought by Defendants would represent some degree of financial difficulty for Plaintiff, the Court is not obliged to deny costs on this basis alone." *Kane v. City of Ithaca*, No. 3:18-CV-0074 (ML), 2020 WL 372747, at *3 (N.D.N.Y. Jan. 22, 2020) (citations omitted); *see also Burchette v. Abercrombie & Fitch Stores, Inc.*, 08-CV-8786,

🚩 2010 WL 3720834, at *5 (S.D.N.Y. Sept. 22, 2010) (notwithstanding its acceptance of the plaintiff's "modest financial circumstances," the court refused to deny the defendants' recovery of more than $2,000 in costs); *see also Zulu v. Barnhart*, No. 9:16-CV-1408 (MAD/ML), 2019

WL 4544420, at *1 (N.D.N.Y. Sept. 19, 2019) ("Although a court may deny costs because of the losing party's indigency, indigency *per se* does not automatically preclude an award of costs.").

Turning to Plaintiff's specific objections, among the items listed in 28 U.S.C. § 1920(1) as taxable costs are "fees of the clerk," which the Local Guidelines describes as including the "[f]iling fee for a complaint, removal, or habeas corpus petition filed in federal court[.]" Local Guidelines II.B.a. Thus, the Court finds Defendants are entitled to the $400.00 removal fee. *See Kane*, 2020 WL 32747, at *5 (granting the defendants' motion for costs and taxing the plaintiff the $400.00 removal fee).

As to "fees for printed or electronically recorded transcripts necessarily obtained for in use in the case," considering Plaintiff's specific objections and the equitable considerations discussed above, the Court exercises its discretion and reduces the costs from $1049.50 to $430.00. The Court arrives at this amount by starting with Defendants' requested amount $1049.50, and subtracts from it $410.50 (Plaintiff's June 1, 2017, pre-commencement 50(h) hearing) and $209.00 (the amount of Plaintiff's share of the April 10, 2018, deposition that Plaintiff already paid). As to the deposition of LaBombard, a non-party, the Court finds the transcript fee

in the amount of $139.75 to be reasonable. Plaintiff does not specifically challenge the requested fees to secure Canale's testimony at trial, which the Court also finds reasonable.

Accordingly, Defendants' motion for a bill of costs is granted in part and denied in part. The amount of costs owed to Defendants by Plaintiff is reduced from $1720.98 to $1101.48.

**V. CONCLUSION**

Accordingly, for the reasons discussed above, it is hereby

**ORDERED** that Plaintiff's motion for a new trial (Dkt. No. 89) is **DENIED**; and it is further

**ORDERED** that Defendants' motion for a bill of costs (Dkt. No. 86) is **GRANTED IN PART AND DENIED IN PART** such that costs are awarded to Defendants from Plaintiff in the amount of $1101.48.

**SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 4877186

---

### Footnotes

1    The Court notes Plaintiff also references his pending motion for a new trial. (Dkt. No. 90 at 1.) However, for reasons explained above, that motion is denied. *See* Part III., *supra*. Additionally, in this District, an appeal does not stay a motion for a bill of costs or the timeframe within which the prevailing party may seek costs. N.D.N.Y. L.R. 54.1(a). The Local Guidelines state, in relevant part, that "[u]nless otherwise ordered by the District Court, or the Circuit Court of Appeals pursuant to [Fed. R. App. P.] 8, the filing of an appeal shall not stay the taxation of costs, entry of judgment thereon, or the judgment." *See* Local Guidelines I.F.2.

2    Specifically, Plaintiff states that he lost his job as a corrections officer and several months of pay in part because of his arrest on charges which were dismissed and, therefore, should not have to reimburse Defendants any amount of money. (Dkt. No. 90 at 1.)

3    Specifically, Plaintiff suggests that if Defendants wanted a copy of LaBombard's deposition, they should have requested a free copy from Plaintiff, and he would have provided a copy of the deposition free of charge (as Plaintiff's counsel did with both Ogden's and Habshi's deposition transcripts). The Court notes, however, both Ogden and Habshi were named as parties to this action, whereas LaBombard was not.

---

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

784 Fed.Appx. 16
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Carol HILL, as Administratrix of the Estate
of Tyjuan Hill, deceased, Plaintiff-Appellant,

v.

Sgt. Patrick QUIGLEY, Sh. #5,

Defendant-Cross-Claimant-Appellee. [*]

No. 18-2909
|
September 5, 2019

**Synopsis**

**Background:** Mother of arrestee who was fatally shot by
New York City police officer during attempted arrest filed
§ 1983 against officer, alleging unlawful use of force.
Following jury trial, the United States District Court for the
Southern District of New York, Alvin K. Hellerstein, Senior
District Judge, entered final judgment in favor of police
officer, and denied mother's motion for new trial.

**Holdings:** The Court of Appeals held that:

[1] trial court's error in using permissive rather than restrictive
language in deadly force instruction was not plain error, and
thus did not warrant new trial;

[2] any error in trial court's instruction on intent was harmless,
and thus did not warrant new trial;

[3] probative value of emergency call did not outweigh
danger of undue prejudice, and thus emergency call was
inadmissible; and

[4] record did not support argument that district court's
exclusion of emergency call as unduly prejudicial was pretext
for improperly excluding evidence based on its hearsay
character.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for New Trial.

West Headnotes (5)

[1] **Federal Courts** ⬥ Instructions

Trial court's error in using permissive rather than
restrictive language in deadly force instruction
was not plain error, and thus did not warrant
new trial, in § 1983 action by mother of arrestee
who was fatally shot by police officer, alleging
unlawful use of force in violation of Fourth
Amendment; instruction, as a whole, correctly
conveyed to jury that officer's use of physical
force was reasonable only if officer had probable
cause to believe arrestee posed significant threat
of death or serious bodily injury. U.S. Const.
Amend. 4.

[2] **Federal Courts** ⬥ Instructions

Defendant failed to preserve his argument that
district court erred by failing to provide deadly
force instruction in restrictive terms, in §
1983 action by mother of arrestee who was
fatally shot by New York City police officer,
alleging unlawful use of force in violation
of Fourth Amendment, where defense counsel
never cited case upon which deadly force
instruction requirement was based, nor explained
why such instruction was required, and defense
counsel expressed satisfaction with excessive
force instruction actually given. U.S. Const.
Amend. 4; Fed. R. Civ. P. 51(c)(1).

**[3]**   **Federal Courts** 👉 Applicability to issues and evidence

Any error in trial court's instruction on intent was harmless, and thus did not warrant new trial, in § 1983 action by mother of arrestee who was fatally shot by New York City police officer, alleging unlawful use of force in violation of Fourth Amendment, where intent was not at issue in trial, and defense focused on theory that use of lethal force was justified. U.S. Const. Amend. 4.

2 Cases that cite this headnote

**[4]**   **Evidence** 👉 Searches, seizures, and arrests

Probative value of emergency call reporting struggle between police officer and arrestee, and fatal shooting of arrestee, did not outweigh danger of undue prejudice, and thus emergency call was inadmissible, in § 1983 action by mother of arrestee who was fatally shot by New York City police officer, alleging unlawful use of force in violation of Fourth Amendment, where emergency call covered same facts as caller's in-court testimony, and call was made in emotional state. U.S. Const. Amend. 4; Fed. R. Evid. 403.

**[5]**   **Evidence** 👉 Hearsay Issues

Record did not support argument of arrestee's mother, that district court's post hoc exclusion of emergency call as unduly prejudicial was pretext for improperly excluding evidence based on its hearsay character, in § 1983 action by mother of arrestee who was fatally shot by New York City police officer, alleging unlawful use of force in violation of Fourth Amendment, where record indicated that district court addressed issue of undue prejudice only after acknowledging applicability of hearsay exceptions invoked by mother's counsel. U.S. Const. Amend. 4; Fed. R. Evid. 403.

**\*17** Appeal from a judgment of the United States District Court for the Southern District of New York (Hellerstein, *J.*).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the District Court is **AFFIRMED**.

**Attorneys and Law Firms**

FOR APPELLANT: David B. Shanies, David B. Shanies Law Office, New York, NY.

FOR APPELLEE: Melanie T. West (Richard Dearing, Claude S. Platton, on the brief), for Zachary W. Carter, Corporation Counsel of the City of New York, New York, NY.

PRESENT: PETER W. HALL, DEBRA ANN LIVINGSTON, Circuit Judges, JANE A. RESTANI, Judge. **\*\***

**SUMMARY ORDER**

Appellant Carol Hill ("Hill") brought this action under 🗁 42 U.S.C. § 1983 following the fatal shooting of her son, Tyjuan Hill ("Tyjuan"), by Defendant-Appellee Patrick Quigley, a New York City police officer. Hill appeals from the final judgment of the United States District Court for the Southern District of New York (Hellerstein, *J.*), entered on April 27, 2018 **\*18** following the jury's defense verdict, and from the District Court's August 28, 2018 order denying, pursuant to Fed. R. Civ. P. 59, Hill's motion for a new trial. We assume the parties' familiarity with the facts, record of prior proceedings, and arguments on appeal, which we reference only as necessary to explain our decision to affirm.

**I.**

The following facts are undisputed unless otherwise noted. In September 2012, police officers attempted to arrest Tyjuan during a prostitution sting operation. Tyjuan fled on foot, chased by several officers. One eventually tackled him, and a struggle ensued. Quigley arrived last at the scene of the struggle and was able to handcuff one of Tyjuan's wrists but not the other. Then, according to Quigley but disputed by Hill, Tyjuan pulled a handgun from his waistband and pointed it backwards at the officers. Quigley shot Tyjuan in the back of the head while Tyjuan was pinned face down on the ground.

## II.

Hill challenges two jury instructions and one evidentiary ruling by the District Court.

### A. Jury Instructions

We generally review a district court's jury instructions *de novo*, granting a new trial if we find an error that is not harmless. 🚩 *Rasanen v. Doe*, 723 F.3d 325, 331 (2d Cir. 2013). "If, however, the challenging party failed to object to the charge at trial, we review for plain error." 🚩 *Id.* at 332. The plain error standard requires Hill to show that the error was "fatal to the integrity of the trial." 🚩 *Anderson v. Branen*, 17 F.3d 552, 558 (2d Cir. 1994).

[1] [2] First, Hill argues that the District Court plainly erred by failing to give the deadly force instruction in restrictive terms as required by 🚩 *Rasanen*, 723 F.3d 325, and 🚩 *Callahan v. Wilson*, 863 F.3d 144 (2d Cir. 2017). [1] 🚩 *Rasanen* and 🚩 *Callahan* hold that when a plaintiff alleges deadly force in violation of the Fourth Amendment, the court must instruct the jury that the use of deadly force is "*unreasonable unless* the officer had probable cause to believe that the suspect posed a significant threat of death or serious physical injury to the officer or to others," rather than stating that an officer "may" use deadly force "if" the officer has such probable cause. 🚩 *Callahan*, 863 F.3d at 151 (quoting 🚩 *Rasanen*, 723 F.3d at 334). Here, the District Court charged the jury using the permissive "may/if" language prohibited by 🚩 *Rasanen* and 🚩 *Callahan*. Considering the probable cause instruction "in light of the charge as a whole," however, we conclude that the District Court's permissive framing is not plain error. 🚩 *Id.* at 148.

This Court's concern regarding the permissive "may/if" language is that it does not by itself "convey that an officer's use of deadly physical force is reasonable, and therefore legally permissible, only in a specific circumstance." 🚩 *Callahan*, 863 F.3d at 151. In this case, the District Court's charge, as a whole, conveyed to the jury that Quigley's use of deadly physical force was reasonable only if Quigley had probable cause to believe Tyjuan posed a significant **\*19** threat of death or serious bodily injury. After instructing the

jury that it must decide whether Quigley's use of force was reasonable, the District Court went on to state that "[t]he question is whether the totality of circumstances provided probable cause for an officer to believe that he or others faced a significant threat of death or serious physical harm." J. App. 1031. The court then read the definition of probable cause, repeating it for emphasis. Finally, the District Court listed several factors irrelevant to the jury's reasonableness determination, and repeated, "If Patrick Quigley had probable cause to believe that he or others faced a serious threat of serious harm in arresting Tyjuan Hill, then Patrick Quigley's use of lethal force was reasonable." *Id.* at 1032. Given the absence of any instruction suggesting that the use of force could be found reasonable on some other basis and the District Court's emphasis on the requisite probable cause —including the repetition of the probable cause standard and the instruction that whether Quigley had probable cause was "the" question—the District Court's failure to frame the probable cause instruction in restrictive terms did not "deprive[ ] the jury of adequate legal guidance to reach a rational decision on [the] case's fundamental issue" or "undermine the very integrity of the trial." 🚩 *Rasanen*, 723 F.3d at 334–35 (internal quotation marks omitted).

Neither 🚩 *Rasanen* nor 🚩 *Callahan* mandates a contrary conclusion. We found plain error in the jury instructions in 🚩 *Rasanen*, but the district court's error in that case was more egregious. The trial court's instruction focused on objective reasonableness and failed to instruct the jury in any manner regarding the probable cause justification discussed above. 🚩 *Id.* at 334. 🚩 *Callahan* dealt with a permissive instruction substantively identical to the one in this case, but 🚩 *Callahan* is distinguishable in two important respects. First, the plaintiffs in 🚩 *Callahan* preserved their objection, such that the instruction at issue was reviewed *de novo* for any error that was not harmless. 🚩 *Callahan*, 863 F.3d at 150 n.7. Second, the error in the formulation of the deadly force instruction in 🚩 *Callahan* was compounded, rather than cured, by the rest of the excessive force instruction. 🚩 *Id.* at 150. The rest of the instruction was largely identical to the general excessive force instruction that applies in situations involving non-deadly force; the court in 🚩 *Callahan*, unlike the court in this case, did not instruct the jury that "[t]he question is whether the totality of circumstances provided probable cause for an officer to believe that he or others faced

a significant threat of death or serious physical harm." J. App. 1031. [2]

 [3]  Hill's second assertion of instructional error, properly raised in an objection below, is that the District Court's instruction on intent was inconsistent with 🔖*Dancy v. McGinley*, 843 F.3d 93 (2d Cir. 2016). 🔖*Dancy* involved an excessive force claim against a police officer who broke the plaintiff's jaw bone while bending the plaintiff over the hood of a patrol car. The jury found in favor of the officer. On appeal, the plaintiff argued he was entitled to a new trial because the jury charge erroneously implied that the plaintiff was required to prove that the officer intentionally broke the plaintiff's jaw. This Court  *20 agreed with the plaintiff, finding prejudicial error in the district court's instruction "that, to impose liability, [the jury] was required to find that Williams 'acted intentionally or recklessly' rather than 'merely negligent[ly]' in performing the acts alleged." 🔖*Dancy*, 843 F.3d at 116 (quoting jury charge). That instruction was confusing, we held, because a plaintiff alleging excessive force need not prove that the officer "intended the *results* of his actions or consciously disregarded their *consequences*." 🔖*Id.* at 118 (emphasis in original).

Here, the District Court's intent instruction bears some similarity to the erroneous instruction in 🔖*Dancy*. But even assuming the District Court's instruction is error under 🔖*Dancy*, it is harmless error. In 🔖*Dancy*, the instructional error was not harmless because the police officer's lawyer suggested at trial that the broken jaw was unintentional, placing intent at issue. 🔖*Id.* at 119. Here, intent was not at issue at trial. The defense theory was that the use of lethal force was justified—not that the shooting was accidental. Quigley described the shooting as an intentional act. Thus, to the extent the District Court failed clearly to convey that Quigley could be held liable even if he unintentionally caused Tyjuan's death, that error is harmless.

Hill contends that intent was at issue because "Hill made clear to the District Court that she wanted to argue that [Quigley] may have pulled the trigger *unintentionally*" and "[a]mple evidence supported" that theory. Appellant Br. 31. That argument is meritless. Hill's counsel did not actually argue to the jury that the shooting could have been accidental. On the contrary, Hill's counsel emphasized in summation that

the shooting was intentional. Nor does the record support Hill's assertion that ample evidence supported an accidental shooting theory. Hill identifies no reason to think the jury found in favor of Quigley because it believed the shooting to be unintentional.

**B. Evidentiary Ruling**

Hill sought to introduce evidence of 911 calls placed by three eyewitnesses. The District Court, pursuant to 🔖Fed. R. Evid. 403, conditionally excluded the 911 calls placed by Darious Smith and Suzette Smoot, ruling that this evidence would be admitted only if Smith or Smoot were impeached on cross-examination. Although Hill appears to be challenging the exclusion of both calls, Hill's brief on appeal focuses on the Smith call and advances no argument specific to the Smoot call.

"We review a district court's evidentiary rulings for abuse of discretion," and reverse only if an abuse of discretion affects a party's substantial rights. 🔖*Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 224 (2d Cir. 1999). We find no abuse of discretion in the District Court's determination that Smith's 911 call "did nothing more than restate Smith's in-court testimony," had "limited probative value," was "cumulative," and was "likely to create a danger of unfair prejudice to defendant" due to its "emotional, frantic nature." Sp. App. 19–20.

 [4]  Hill asserts that Smith's 911 call was probative and not cumulative because it "showed genuine emotion." Appellant Br. 40. That argument lacks merit. Whether evidence is cumulative turns on whether it is offered to prove the same facts that other evidence tends to prove. *See* 🔖*Old Chief v. United States*, 519 U.S. 172, 183, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) ("[A] judge applying 🔖Rule 403 could reasonably apply some discount to the probative value of an item of evidence when faced with less risky alternative proof going to the same point."). Smith's 911 call went to the same facts about the struggle and shooting that were covered in Smith's in-court testimony, namely, that Tyjuan was tackled by  *21 about half a dozen police officers and did not have a gun in his hand at any point during the struggle. That the call is emotional supports the District Court's determination that it is prejudicial. Here, unlike in 🔖*United States v. Scully*, 877 F.3d 464 (2d Cir. 2017), the recording of Smith's 911 call was not critical to the plaintiff's case, and it is not "difficult to identify what unfair prejudice that [recording] would have imposed" on Quigley. 🔖*Id.* at 474. [3]

**[5]** Finally, Hill contends that the District Court's "*post hoc*" Rule 403 reasoning was a pretext for improperly excluding evidence based on its hearsay character. Appellant Br. 39. That contention is unsupported by the record, which shows that the District Court ruled on the 911 call pursuant to Rule 403. The District Court addressed Rule 403 only after discussing the hearsay issue and acknowledging the applicability of the hearsay exceptions invoked by Hill's counsel.

**III.**

We have considered all of Hill's remaining arguments and have found in them no basis for reversal. Accordingly, we **AFFIRM** the judgment of the District Court.

**All Citations**

784 Fed.Appx. 16

## Footnotes

\*  The Clerk of Court is respectfully requested to amend the caption as stated above.

\*\*  Judge Jane A. Restani of the United States Court of International Trade, sitting by designation.

1  The plain error standard applies because, although Hill's counsel requested a restrictive instruction in addition to the permissive instruction, Hill's counsel "never so much as cited either" *Rasanen* or *Callahan*, "never explained why such an instruction was required," and "elsewhere expressed satisfaction with the excessive force instruction actually given." *Rasanen*, 723 F.3d at 332–33; *see* Fed. R. Civ. P. 51(c)(1); Sp. App. 6–7; J. App. 945 ("I think that correctly states the standard").

2  Hill contends that the District Court's *Rasanen*/*Callahan* error was compounded by the court's confusing summary of the defense case, in which the court noted Quigley's claims that Quigley was "acting within his immunity as a police officer," that he "shot in self-defense," and that "Hill was resisting arrest." J. App. 1027, 1029. We are unpersuaded by Hill's arguments regarding these remarks for the reasons ably stated by the District Court.

3  Contrary to Hill's claim, defense counsel did not improperly impeach Smith's credibility during closing arguments. Defense counsel argued that given Smith's vantage point, the jury should question Smith's certainty that there was no gun. That argument did not call Smith's credibility into question in any way that playing the 911 recording might have rehabilitated.

End of Document · © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 675703
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Elizabeth HOGAN and Mark Hogan, Plaintiffs,

v.

Frank ROSE and Wilbur L. Stanford, Jr., Defendants.

7:16-cv-1325 (BKS/ATB)
|
Signed 03/07/2022

**Attorneys and Law Firms**

For Plaintiffs: A.J. Bosman, Bosman Law, L.L.C., 3000
McConnellsville Road, Blossvale, NY 13308.

For Defendant Frank Rose: Stephanie M. Campbell, Melissa
O. Rothbart, Bond Schoeneck & King, PLLC, One Lincoln
Center, Syracuse, NY 13202.

For Defendant Wilbur L. Stanford, Jr.: Christopher A. Guetti,
Smith Dominelli & Guetti LLC, 1031 Watervliet Shaker
Road, Suite 201, Albany, NY 12205.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

 **\*1** Presently set for trial in this Section 1983 and diversity
action are Plaintiff Mark Hogan's negligence claim against
Defendant Frank Rose and Plaintiff's trespass and false arrest
claims against Defendant Wilbur Stanford, Jr. (*See* Dkt. Nos.
116, 120 (summary judgment orders)). In this decision the
Court considers: (1) the parties' letter briefing on whether
Plaintiff Elizabeth Hogan has a surviving loss of consortium
claim against Rose (Dkt. Nos. 128, 129) and (2) the parties'
motions in limine (Dkt. Nos. 138, 156, 168) and their
responses thereto (Dkt. Nos. 173, 174, 175). The Court heard
oral argument on the motions at the final pretrial conference
on March 4, 2022.

**II. LOSS OF CONSORTIUM CLAIM**

On January 10, 2022, at the Court's request, Plaintiffs Mark
and Elizabeth Hogan and Defendant Rose filed letter briefs on
whether Elizabeth Hogan has a surviving loss of consortium
claim against Rose. (Dkt. Nos. 128, 129). Plaintiffs argue that

the Court should allow the consortium claim to proceed to
trial "to prevent a manifest injustice" because Plaintiffs have
always alleged that the loss of consortium "was based, in part,
on Plaintiff Mark Hogan's physical injury" suffered as a result
of Rose's negligence. (Dkt. No. 128, at 4). Rose responds that
Judge Kahn's decision on the parties' motions for summary
judgment dismissed Elizabeth Hogan's loss of consortium
claim and that there is "no procedural or substantive basis" to
reverse that portion of Judge Kahn's decision or reinstate the
claim on the eve of trial. (Dkt. No. 129, at 1).

Plaintiffs' complaint alleged loss of consortium claims
against Rose and former defendant David Vandewater. (Dkt.
No. 1, at ¶¶ 83–86). The complaint alleges that Vandewater
and Rose's negligence resulted in Plaintiff Mark Hogan's
physical injury, which deprived Elizabeth Hogan "of her
husband's support, comfort and companionship." (*Id.*). In
September 2019, Vandewater and Rose separately moved
for summary judgment, seeking dismissal of all claims
against them, including the loss of consortium claims. (*See
generally* Dkt. Nos. 94, 95, 96; *see* Dkt. No. 95-1, at 14–
15; Dkt. No. 96-36, at 34). In opposition, Plaintiffs argued
that Elizabeth Hogan's loss of consortium claims should
survive because Mark Hogan "spent countless time away"
due to "constant[ ] traveling ... for criminal proceedings as a
result of Defendants' frivolous filing of criminal complaints"
and his time spent in police custody. (Dkt. No. 107-4,
at 17–18; Dkt. No. 113-26, at 17).[1] In his October 20,
2020 summary judgment decision, Judge Kahn relied upon
Plaintiffs' assertion that Elizabeth Hogan's loss of consortium
claim was "based on injuries that derive from Mark Hogan's
involvement in the criminal justice system consequent to
Rose and Vandewater's complaints to police." (Dkt. No.
120, at 34). Judge Kahn dismissed the loss of consortium
claims, concluding: "Summary judgment is granted as to
Elizabeth Hogan's claims for loss of consortium, because they
are premised solely on Mark Hogan's malicious prosecution
claims, which have been dismissed." (*Id.* at 35).

 **\*2** Plaintiffs now argue that the Court should "revise"
the summary judgment order under Federal Rule of Civil
Procedure 54(b) "to prevent a manifest injustice." (Dkt. No.
128, at 4).[2] Under Rule 54(b), a nonfinal, interlocutory order
"may be revised at any time before the entry of a judgment
adjudicating all the claims and all the parties' rights and
liabilities." Fed. R. Civ. P. 54(b). A court may *sua sponte*
reconsider its own interlocutory orders "where there is a need
to correct a clear error or prevent manifest injustice, there is
an intervening change in the applicable law, or new evidence

is available." *Esposito v. Suffolk Cty. Cmty. Coll.*, 517 F. Supp. 3d 126, 134 (E.D.N.Y. 2021) (quoting *Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 381 F. Supp. 3d 185, 209 n.36 (N.D.N.Y. 2019)). "Whether such revision is appropriate in any given case is within the sound discretion of the trial judge." *Acha v. Beame*, 570 F.2d 57, 63 (2d Cir. 1978).

The Court concludes that revision of the summary judgment decision to reinstate Elizabeth Hogan's loss of consortium claim against Rose is not necessary to correct a clear error or prevent manifest injustice.[3] First, the Court finds no clear error in Judge Kahn's decision to dismiss the loss of consortium claim based on the evidence and arguments presented at summary judgment. A loss of consortium claim is a "derivative claim," *Hogan v. Cty. of Lewis*, No. 11-cv-754, 2014 WL 118964, at *3, 2014 U.S. Dist. LEXIS 3027 (N.D.N.Y. Jan. 10, 2014) (citation omitted), and Plaintiffs' only arguments with regard to the loss of consortium claim at summary judgment related to the malicious prosecution claim against Rose. (Dkt. No. 107-4, at 17–18; Dkt. No. 113-26, at 17). Nor did Plaintiffs present any evidence to support a loss of consortium claim premised on Rose's alleged negligence and Mark Hogan's resulting physical injury. When considering a motion for summary judgment, "the District Court is not required 'to scour the record on its own in a search for evidence' when the plaintiffs fail to present it" in opposition to the motion. *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 125 (2d Cir. 2013) (citation omitted); *see also J.B. Sterling Co. v. Verhelle*, 470 F. Supp. 3d 298, 304 (W.D.N.Y. 2020) (finding that the court did not overlook evidence on summary judgment where the plaintiff did not submit evidence which was "not newly discovered" and "readily available" to it "in formulating its response to the motion for partial summary judgment").

Second, Plaintiffs will not suffer a manifest injustice. Plaintiffs provide no explanation for their failure to argue, at any point in the five years this litigation has been pending, that Elizabeth Hogan had a viable loss of consortium claim deriving from Rose's negligence or to present evidence which would support such a claim. *Cf. Tubo v. Orange Reg'l Med. Ctr.*, No. 13-cv-1495, 2016 WL 452158, at *2, 2016 U.S. Dist. LEXIS 13520 (S.D.N.Y. Feb. 3, 2016) (finding that counsel's "failure to better describe all the relevant facts in Plaintiff's summary judgment opposition" did not "support the notion that the interests of justice would be served through reopening the case" (internal quotation marks and brackets omitted)).

**\*3** Accordingly, the Court declines to revisit the summary judgment order dismissing Elizabeth Hogan's loss of consortium claim against Rose. The Clerk of the Court is respectfully directed to terminate Elizabeth Hogan as a Plaintiff on the docket.

## III. MOTIONS IN LIMINE—CLAIMS AGAINST STANFORD

### A. State Action

The parties' letter briefs also address whether Stanford was acting under color of state law when he carried out a citizen's arrest of Plaintiff for purposes of Plaintiff's Section 1983 false arrest claim. Plaintiff argues that Stanford was acting under color of state law because he acted jointly with troopers and acted at their encouragement and direction. (Dkt. No. 128, at 1–3). Stanford argues that it is well-established that a private citizen effectuating an arrest is not a state actor. (Dkt. No. 130, at 2–3).

It is well-settled that a plaintiff alleging a violation of his constitutional rights under Section 1983 must show state action. *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012). While private parties generally are not state actors, their conduct can be attributed to the state for Section 1983 purposes in certain circumstances. *See Hogan v. A.O. Fox Mem'l Hosp.*, 346 F. App'x 627, 629 (2d Cir. 2009) (summary order) (citing *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)). As relevant here, to act under color of state law, "it is enough that the private party is a willful participant in joint action with the State or its agents." *Forbes v. City of New York*, No. 05-cv-7331, 2008 WL 3539936, at *5, 2008 U.S. Dist. LEXIS 63021 (S.D.N.Y. Aug. 12, 2008) (quoting *Dennis v. Sparks*, 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980)) (brackets omitted). The "touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the police." *Id.*, 2008 WL 3539936, at *5, 2008 U.S. Dist. LEXIS 63021.

Here, the Court finds that there is sufficient evidence to create a question of fact as to whether Stanford engaged in joint action with state agents such that he acted under color of state law in effectuating a citizen's arrest of Plaintiff. At his deposition, for example, Stanford testified that two troopers told Stanford what to do and say when arresting Plaintiff, and that the troopers followed Stanford back to the scene where

Stanford followed their instructions and the troopers placed Plaintiff under arrest. (Dkt. No. 82-8, at 74; *see* Dkt. No. 116, at 4–5). This is sufficient for the issue to be decided by the jury. 🔖 *Anilao v. Spota*, 774 F. Supp. 2d 457, 498–99 (E.D.N.Y. 2011) (noting that private actor is a state actor when he "takes a more active role" and "jointly engages in action with state actors").

### B. Conviction for Harassment in the Second Degree

Plaintiff argues that the Court should preclude any mention of Plaintiff's conviction of harassment in the second degree because (1) the conviction is not entitled to collateral estoppel effect, (2) it was procured through fraud and concealment, (3) it would intrude on the jury's fact-finding function, and (3) it is not admissible for impeachment purposes under Federal Rule of Evidence 609. (Dkt. No. 168, at 2–5). Stanford, in turn, argues that the conviction should be given preclusive effect as proof that Plaintiff committed the offense for which he was arrested. (Dkt. No. 138, at 7–8). [4]

**\*4** The accusatory instrument charged Plaintiff with committing the violation of harassment in the second degree: "physical contact" in violation of 🔖 New York Penal Law § 240.26(1). (Dkt. No. 82-11, at 3). [5] The instrument states: "On [September 1, 2016] said defendant did intentionally strike WILBUR L. STANFORD in the hand with the handle end of a golf club causing him to drop his phone." (*Id.*). The Certificate of Disposition indicates that Plaintiff was convicted of the charge after a trial on July 25, 2017 in Watson Town Court. (Dkt. No. 82-12). Counsel for Plaintiff confirmed at the final pretrial conference that Plaintiff was represented by counsel at the bench trial.

Collateral estoppel "precludes a party from relitigating an issue which has previously been decided against [him] in a proceeding in which [he] had a fair opportunity to fully litigate the point." 🔖 *In re Dunn*, 24 N.Y.3d 699, 704, 27 N.E.3d 465 (2015) (citation and internal quotation marks omitted). The party seeking to invoke collateral estoppel has the burden of showing "the identity of the issues," while the party seeking to avoid application of the doctrine "must establish the lack of a full and fair opportunity to litigate" the issue. 🔖 *Id.* Collateral estoppel "is a flexible doctrine which can never be rigidly or mechanically applied." 🔖 *Gilberg v. Barbieri*, 53 N.Y.2d 285, 292, 441 N.Y.S.2d 49, 423 N.E.2d 807 (1981) (citation omitted). "Considering the facts of each

case, a court must examine 'the realities of litigation,' such as recognition that if the first proceeding involved trivial stakes, it may not have been litigated vigorously." *Simmons v. Trans Express Inc.*, 37 N.Y.3d 107, 112, 170 N.E.3d 733 (2021) (citations omitted).

Here, the parties agree that the identity-of-issue requirement is met, as Stanford seeks to preclude Plaintiff from relitigating the issue of whether Plaintiff engaged in harassment in the second degree. [6] It is therefore Plaintiff's burden to demonstrate that he did not have a full and fair opportunity to litigate that issue in the prior proceeding. The factors the Court considers include (1) the "nature of the forum and the importance of the claim in the prior litigation," (2) the incentive to litigate and the actual extent of litigation in the prior forum," and (3) the "foreseeability of future litigation." 🔖 *In re Sokol*, 113 F.3d 303, 307 (2d Cir. 1997) (citing 🔖 *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 494, 501, 478 N.Y.S.2d 823, 467 N.E.2d 487 (1984)). The Court may also consider "the use of initiative," the "competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, [and] differences in the applicable law." 🔖 *Gilberg*, 53 N.Y.2d at 292, 441 N.Y.S.2d 49, 423 N.E.2d 807.

**\*5** Considering these factors, the Court finds that Plaintiff has not met his burden of demonstrating that he did not have a full and fair opportunity to litigate the harassment charge. Plaintiff was represented by counsel at his trial. He had the right to appeal his conviction but did not do so. Moreover, Plaintiff commenced the present action on November 4, 2016, well before the trial on his harassment charge on July 25, 2017. Plaintiff therefore was aware of the significance of the outcome of his criminal proceeding and had "ample incentive to litigate it." *Cf. Martin v. Rosenzweig*, 70 A.D.3d 1112, 1114, 894 N.Y.S.2d 228 (3d Dep't 2010) (finding the plaintiff had a full and fair opportunity to litigate the criminal action in town court where the plaintiff was represented by "competent counsel" and plaintiff commenced the civil action "during the pendency of the criminal action").

Plaintiff cites 🔖 *Gilberg* to argue that a harassment conviction cannot be given collateral estoppel effect in a later civil action. (*See* Dkt. No. 168, at 2). However, the Court does not read 🔖 *Gilberg* as holding that a conviction for a violation can never be given preclusive effect. *See* 🔖 *Gilberg*,

53 N.Y.2d at 293–94, 441 N.Y.S.2d 49, 423 N.E.2d 807 (discussing factors including the significance of the charge, lack of incentive to litigate, and lack of awareness of a possible subsequent civil suit); *see also Maiello v. Kirchner*, 98 A.D.3d 481, 483, 949 N.Y.S.2d 200 (2d Dep't 2012) (concluding that defendant in a civil action for damages satisfied his burden of demonstrating the absence of a full and fair opportunity to contest a charge of harassment in the second degree charge because he did not have "the same incentive to contest" the harassment charge). Plaintiff further argues that the conviction was obtained by fraud. However, Judge Kahn carefully considered and rejected the same argument at summary judgment, (Dkt. No. 116, at 13–15), and Plaintiff raises no new arguments that would warrant disturbing that finding.[7]

Finally, the Court finds that precluding relitigation of the facts underlying Plaintiff's conviction best serves "what are often competing policy considerations" underlying the collateral estoppel doctrine, including "fairness to the parties, conservation of the resources of the court and the litigants, and the societal interests in consistent and accurate results." *Simmons*, 37 N.Y.3d at 112, 170 N.E.3d 733 (citations omitted). Accordingly, the Court grants Stanford's motion to accord collateral estoppel effect to Plaintiff's conviction for harassment in the second degree.

### C. Probable Cause Under N.Y. Criminal Procedure Law § 140.10 and Penal Law § 35.20

Stanford argues that Plaintiff should be precluded from "arguing or adducing testimony" regarding New York Criminal Procedure Law § 140.10 and whether Plaintiff's arrest "for a non criminal violation constituted an unreasonable seizure" under the Fourth Amendment irrespective of whether there was probable cause. (Dkt. No. 138, at 5–6). Plaintiff does not respond to this argument. Section 140.10, however, deals with a police officer's authority to arrest an individual in certain circumstances, and is, therefore, irrelevant to the issues in this case. *See* N.Y. Crim. Proc. Law § 140.10(1) ("[A] police officer may arrest a person for ..."). The Court therefore grants this portion of Stanford's motion in limine.

Stanford also argues that Plaintiff should be precluded from making arguments or presenting testimony regarding New York Penal Law § 35.20, under which a landowner's physical force against another may be justified "to terminate what he

or she reasonably believes to be the commission or attempted commission by such other person of a criminal trespass upon such premises." N.Y. Penal Law § 35.20(2). Stanford argues that Section 35.20 is "inapplicable" under the law of the case doctrine, as Judge Kahn found at summary judgment that "there [was] no indication that any of the aggravating factors" associated with criminal trespass was met during this incident. (Dkt. No. 138, at 6; *see* Dkt. No. 116, at 18–19). Plaintiff does not respond to this portion of Stanford's motion. However, the Court finds that Section 35.20 is not relevant to Plaintiff's false arrest claim against Stanford. Judge Kahn's discussion of Section 35.20 was in relation to Plaintiff's false arrest claim against Trooper Michael Fayle, to which the existence of probable cause to arrest was a defense. (*See* Dkt. No. 116, at 18–19). By contrast, with Plaintiff's claim against Stanford, the question is not whether Stanford had probable cause to arrest Plaintiff. Rather, because Stanford effectuated a citizen's arrest, Stanford must show that Plaintiff actually committed harassment in the second degree. *See, e.g.*, *Liranzo v. United States*, 690 F.3d 78, 96 (2d Cir. 2012) ("In New York, a private citizen who makes an arrest does so at his peril; if the person arrested did not in fact commit the crime for which he is arrested, the person who arrests him is liable [for false arrest] even if he acts in good faith or has probable cause to make an arrest." (quoting *White v. Albany Med. Ctr. Hosp.*, 151 A.D.2d 859, 860, 542 N.Y.S.2d 834 (3d Dep't 1989))). The Court therefore finds that Section 35.20 is not relevant and grants this portion of Stanford's motion in limine.

## IV. MOTIONS IN LIMINE—CLAIM AGAINST ROSE

### A. Negligence Claim Based on Premises Liability Theory

**\*6** Rose argues that Plaintiff should be precluded from introducing evidence of or submitting to the jury a negligence claim based on a premises liability theory. (Dkt. No. 156-1, at 17–22). Rose argues that Plaintiff did not plead a negligence claim grounded in premises liability against Rose in the complaint and that Plaintiff should not be allowed to amend his complaint at this late stage. (*Id.*). Plaintiff responds that the location of his fall "has never been in genuine dispute" and that Rose has been on notice of Plaintiff's negligence claim against him since the filing of the complaint and suffers no prejudice from the fact that the complaint alleged the property where Plaintiff fell was owned by Vandewater. (Dkt. No. 174, at 9–10).

Plaintiff claims that he fell and was injured on September 3, 2015, while walking on what he then regarded as his right of way over Vandewater's property. (*See* Dkt. No. 156-1, at 6–7; Dkt. No. 174, at 9). As determined by the Prior Federal Action in 2017, and as explained by Judge Kahn, the path that Plaintiff regarded as his right of way—and on which he allegedly fell—"was in fact on Rose's property." (Dkt. No. 120, at 27–28 ("Mark Hogan thus fell and was injured on property owned by Rose and not Vandewater.")). For this reason, Judge Kahn dismissed Plaintiff's negligence claim against Vandewater. (🚩 *Id.* at 27–29, 101 S.Ct. 183).

The Court finds that Plaintiff may assert a negligence claim based on a theory of premises liability against Rose and that amendment of the pleadings is not necessary. Plaintiff's complaint asserts a cause of action for "negligence" against Defendants Vandewater and Rose. (*See* Dkt. No. 1, at ¶¶ 73–78). Plaintiff alleged that he was injured while "walking on his right of way located on the property of Defendant Vandewater." (*Id.* ¶ 74). Plaintiff further alleged that Rose "also claims ownership of the property in question." (*Id.*).

As an initial matter, a claim premised on premises liability is a species of negligence claim, which Plaintiff did plainly assert against Rose. *See, e.g.*, *PB-36 Doe v. Niagara Falls City Sch. Dist.*, 152 N.Y.S.3d 243, 246 (Sup. Ct. Niagara Cty. 2021) (finding that the "premises liability cause of action" was "duplicative of the negligence causes of action"); *cf. Fay v. Troy City Sch. Dist.*, 197 A.D.3d 1423, 1424 (3d Dep't 2021) (finding the "premises liability and negligent infliction of emotional distress claims" duplicative of the "negligence, negligent supervision and negligent retention claims"). Furthermore, the complaint's allegations that Rose claimed ownership in the property where Plaintiff fell and that provide detail about the hazardous condition that allegedly caused Plaintiff's fall put Rose on notice as to the claim against him. Indeed, in his memorandum of law in support of his motion for summary judgment, Rose made arguments about and cited cases regarding the very issues that arise under a premises liability claim. (*See* Dkt. No. 96-36, at 27–32 (making arguments about a "landowner's negligence" and duty and whether the hazard at issue was "open and obvious")). Accordingly, Rose's motion to preclude Plaintiff from asserting a premises liability claim against him at trial is denied.

**B. Evidence Regarding Location of Plaintiff's September 2015 Injury**

Plaintiff seeks to preclude Rose from introducing evidence, including surveys or maps showing lot lines, "to argue or suggest" that Plaintiff's alleged accident in September 2015 "did not occur on Rose's property." (Dkt. No. 168, at 9–10). Rose responds that evidence regarding the property at issue "goes directly to the heart of the current matter," as the "precise location of Mr. Hogan's alleged fall is unknown." (Dkt. No. 175, at 20–21). Rose further points out that Plaintiff's exhibit and witness lists include the same evidence Plaintiff seeks to preclude Rose from offering, including maps, surveys, and surveyor testimony. (*Id.*).

**\*7** At this point, the Court denies Plaintiff's request to exclude all evidence regarding the relevant property boundaries. *Cf. Garcia v. Law Offices Howard Lee Schiff P.C.*, No. 16-cv-791, 2019 WL 2076736, at *2–3, 2019 U.S. Dist. LEXIS 78980 (D. Conn. May 10, 2019) (noting that evidence should be excluded on a motion in limine only if the evidence is "clearly inadmissible on all potential grounds"). The Court has, however, directed the parties to work together toward reaching a stipulation to frame the issues in order to avoid a confusing presentation of evidence regarding property boundaries that have been determined in judicial proceedings. At the final pretrial conference the parties agree that the path Plaintiff *regarded as his right of way* was on property owned by Rose; the Court expects the parties to provide a stipulation regarding Plaintiff's *legal right of way.*

In any event, where Plaintiff's alleged accident occurred is an essential part of his claim against Rose. Although Plaintiff argues that Rose should be collaterally estopped from arguing that the accident did not occur on Rose's property in light of Judge Kahn's summary judgment decision, the precise location of Plaintiff's accident, and on whose property it took place, will have to be established at trial.

*Cf.* 🚩 *Lovejoy-Wilson v. Noco Motor Fuels, Inc.*, 242 F. Supp. 2d 236, 249 (W.D.N.Y. 2003) ("[S]tatements made by a court in a prior ruling on summary judgment should be interpreted only in light of the limited purpose for which it was made, namely, to determine whether summary judgment was appropriate, and not for the purpose of finding facts or making legal conclusions on a full record disposing of the case on the merits.") (citation and internal quotation marks omitted). Accordingly, Plaintiff's motion to preclude Rose from offering evidence regarding the location of Plaintiff's alleged September 2015 accident is denied.

**C. The *West* Action**

Plaintiff was a defendant in a prior action commenced in state court by a neighbor. *West v. Hogan v. Vandewater*, No. 2006-535 (N.Y. Sup. Ct. Lewis Cty.) ("the *West* Action"). In that action, Plaintiff was alleged to have trespassed, and the jury trial resulted in a verdict against him. Plaintiff seeks to preclude any mention of the *West* Action and its outcome on the grounds that the lawsuit is not relevant to any issues in this case and that such evidence would be unduly prejudicial. (Dkt. No. 168, at 7–8). Rose responds that the *West* Action is relevant because it "explicitly deals with the location of th[e] right of way" Plaintiff has over Vandewater's property and therefore "provides a framework for why Mr. Hogan entered Mr. Rose's property." (Dkt. No. 175, at 17–18). Rose further argues that other evidence relating to the *West* Action, including the determinations that Plaintiff engaged in "intentional harassment" of the Wests and was assessed with punitive damages, is admissible as evidence of Plaintiff's "motive in bringing the current case." (Dkt. No. 175, at 18–19).

In the *West* Action, the Hogans and the Vandewaters reached a stipulation, which was memorialized by a court order, regarding the location of the Hogans' right of way to their Lots 19, 21, and 22. (Dkt. No. 120, at 3–4; *see* Dkt. No. 96-23, at 5–6 (April 7, 2010 *West* court order)). As relevant here, Plaintiff's right of way proceeded "along the back lot lines" of lots owned by Rose, extending "at a width of 12 feet" from those lines into property owned by Vandewater. (Dkt. No. 96-23, at 5–6). The parties would later dispute the exact location of the "back lot lines" of Rose's property, leading to the confusion regarding both where Plaintiff's legal right of way lies and who owns the property on which he fell. The *West* court order is relevant to the issues of ownership of property, the location of the right of way, and why Plaintiff was traversing certain portions of land; however, as noted above, the Court expects that the parties can stipulate as to the Plaintiff's legal right of way.

**\*8** The Court disagrees with Rose that any other evidence regarding the *West* Action is relevant to the claims remaining for trial. Rose argues that Plaintiff's "ongoing campaign of malicious conduct toward his neighbors, including the harassment, property damage, and destruction, as outlined in the West Action and other litigation, is admissible" under Federal Rule of Evidence 404(b) to prove Plaintiff's "motive in bringing the current case." (Dkt. No. 175, at 19). Rose cites Redd v. New York State Division of Parole, where the court found that certain aspects of the plaintiff's disciplinary history were admissible as evidence of her motive in filing

charges of sexual harassment. 923 F. Supp. 2d 393, 401 (E.D.N.Y. 2013). However, Rose has not explained how Plaintiff's motive in bringing the present lawsuit is relevant to the remaining claims, particularly since Rose was not a party to the *West* Action. The Court further finds that any probative value other aspects of the *West* Action may have is minimal and substantially outweighed by the dangers of confusing the issues and wasting time. Fed. R. Evid. 403. [8]

### D. Argument that Plaintiff Was a Trespasser

Plaintiff seeks to preclude Rose from arguing that Plaintiff was a trespasser on Rose's property, arguing that the "location of the back lot line of Mr. Rose's Lake Lot No. 23 was settled" between the time of the *West* Action court order in 2010 and 2016 and that it "was in 2017" that "the property lines were adjusted" in the Prior Federal Action. (Dkt. No. 168, at 5–6). Rose responds that the 2017 decision in the Prior Federal Action determined that the property Plaintiff had been using as his right of way "actually belonged to Mr. Rose," and this fact is "vital background information." (Dkt. No. 175, at 11–14). More specifically, Rose argues that he should be allowed to introduce evidence that he "took reasonable measures to attempt to keep trespassers—including Plaintiff—off of his property" and that such evidence is also relevant to Plaintiff's "assumption of the risk" of traversing the property. (*Id.*). Rose stated at the final pretrial conference that he does not intend to focus his argument on calling Plaintiff a trespasser.

In any event, the Court denies Plaintiff's request to preclude Rose from referring to Plaintiff as a trespasser. As stated, the precise location of Plaintiff's alleged accident and who owned the property is an essential part of his claim against Rose. Whether Plaintiff was traversing Rose's property, the measures taken by Rose in an effort to keep trespassers off his property, and Plaintiff's evasion of those measures are all relevant to the foreseeability of harm and the scope of Rose's duty.

### E. Opinion Testimony Regarding the Cause of Any Dangerous Condition

Rose seeks to preclude Plaintiff from presenting any lay witness opinion testimony "regarding the causation of any erosion, subsistence, or instability of the Property on which Plaintiff claims to have been injured," on the grounds that Plaintiff has not disclosed any expert witness and such testimony would go "beyond the scope" of what is permissible for lay witness opinion testimony. (Dkt. No.

156-1, at 10–17). Plaintiff responds that his testimony is admissible because it is not based upon "scientific, technical, or other specialized knowledge" and the issue of causation is within the jury's experience and common sense. (Dkt. No. 174, at 6–9).

Under Rule 701, a lay witness's testimony "in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *United States v. Yannotti*, 541 F.3d 112, 125 (2d Cir. 2008) (quoting Fed. R. Evid. 701). Lay opinion "must be the product of reasoning processes familiar to the average person in everyday life."

*United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) (quoting Fed. R. Evid. 701(c), Advisory Committee Notes to 2000 Amendments). By contrast, if the opinion of a witness "rests in any way upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702," which governs the admission of expert witness testimony. *United States v. Haynes*, 729 F.3d 178, 195 (2d Cir. 2013) (quoting *Garcia*, 413 F.3d at 215).

**\*9** Moreover, Rule 701(c) exists to " 'prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth' in Federal Rule of Civil Procedure 26." *DVL, Inc. v. Niagara Mohawk Power Corp.*, 490 F. App'x 378, 380–81 (2d Cir. 2012) (quoting *Garcia*, 413 F.3d at 215). It is undisputed that here, as in *DVL*, Plaintiff "never designated [himself] as an expert." *Id.* at 381. Thus, Plaintiff may not provide expert testimony. *Id.* at 381–82 (citation omitted).

The Court further concludes that Plaintiff may not offer a lay opinion regarding what caused the earth to give way or collapse because such an opinion is "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). Expert witnesses routinely testify regarding soils, earth movements, and related issues. *See, e.g.*, *Alamia v. Nationwide Mut. Fire Ins. Co.*, 495 F. Supp. 2d 362, 365 (S.D.N.Y. 2007) (expert opining that damage was caused by the "downward movement of the

house's foundation," which was associated with "soil that is prone to settlement and that [was] inadequately compacted at the time of" construction of the house); *Coney Island Auto Parts Unlimited, Inc. v. Charter Oak Fire Ins. Co.*, No. 13-cv-1570, 2014 WL 3958080, at \*9, 2014 U.S. Dist. LEXIS 112215 (E.D.N.Y. Aug. 13, 2014) (noting that the parties' experts "agree[d] that soil settled underneath the concrete slab"); *Brooklyn Waterfront Terminal Corp. v. Int'l Terminal Operating Co.*, 211 F. Supp. 702, 704 (S.D.N.Y. 1962) (recounting expert's opinion that certain earth, prior to its removal, had prevented "sliding or mass movement of soil"); *O'Neil v. Allstate Prop. & Cas. Ins. Co.*, No. 17-cv-70, 2018 WL 4001978, at \*1, 2018 U.S. Dist. LEXIS 238715 (S.D. Miss. June 25, 2018) (precluding lay opinion testimony regarding "the type of soil upon which the house was built, or as to the cause of the alleged damage to the foundation").

Plaintiff argues that "[c]ommon experience allows the jury to conclude that excavating underneath a right of way could cause the ground to give way when walked upon." (Dkt. No. 174, at 7). Plaintiff points to cases where expert testimony was not required "where the jury must draw only a common sense causal connection between a plaintiff's injury and one precipitating cause." *See, e.g.*, *Young v. Sw. Airlines Co.*, 409 F. Supp. 3d 110, 116 (E.D.N.Y. 2017) (no expert testimony required where jurors could "easily assess" allegations of "bruises and abrasions from hitting her head against the seat in front of her or falling at the bottom of the exit slide"); *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 89 (2d Cir. 2006) (holding that "causal link" between "hearing loss and repeated exposure to noise so loud that it causes physical pain or ear-ringing" is "widely known"). However, as discussed above, causation opinions involving earth movements are routinely provided by experts, and the Court concludes that such opinions are based on scientific or specialized knowledge and not "the product of reasoning processes familiar to the average person in everyday life." *Garcia*, 413 F.3d at 215. Furthermore, it is not clear that the jury here will need to consider only "one precipitating cause." *Cf.* *Young*, 409 F. Supp. 3d at 116. Rose argues that Plaintiff "performed substantial clearing work" on the relevant property, "including cutting down trees and clearing large amounts of foliage and brush from the area on multiple occasions" between 2010 and 2015. (Dkt. No. 156-1, at 13). An opinion proffered by Plaintiff that the alleged earth collapse was caused by excavation, and not by clearing work or some other cause, is based on "scientific, technical, or other

specialized knowledge" and therefore an impermissible lay witness opinion.

**\*10** The Court therefore grants Rose's motion to preclude Plaintiff from giving opinion testimony regarding the cause of the alleged earth collapse. To be clear, the Court's holding in this regard does not preclude Plaintiff from testifying, based on personal knowledge, regarding any excavation that took place on Rose's property.

# V. MOTIONS IN LIMINE—GENERAL CONSIDERATIONS

### A. Plaintiff's Other Lawsuits
Plaintiff seeks to preclude mention of "other State and Federal actions" he has initiated on the grounds that these other lawsuits are not relevant to the issues in this case and "more prejudicial than probative." (Dkt. No. 168, at 6–7). Stanford responds that the Plaintiff's prior lawsuits and "history" of "interfering with different sections of the right of way" were "the very reason why" Stanford pulled over to take a video of Plaintiff and that precluding mention of this background information would prejudice Stanford by allowing Plaintiff to suggest that Stanford started recording Plaintiff for no reason. (Dkt. No. 173, at 6–7). Rose similarly responds that the other lawsuits "set the stage under which the alleged incident occurred" and provide background information regarding the parties' relationships. (Dkt. No. 175, at 14–17). Rose also points out that Plaintiff's exhibit and witness lists suggest that Plaintiff will introduce certain evidence relating to other lawsuits, thereby opening the door to further such evidence. (*Id.*).

As an initial matter, the Court agrees with Plaintiff that evidence of his other lawsuits is not admissible merely to prove his litigiousness. *See Hickey v. Myers*, No. 09-cv-1307, 2013 WL 2418252, at \*4, 2013 U.S. Dist. LEXIS 77419 (N.D.N.Y. June 3, 2013) ("It is well settled that it is improper for a court to admit evidence of prior lawsuits for the purpose of demonstrating that a plaintiff is a 'chronic litigant.' ") (quoting *Outley v. City of New York*, 837 F.2d 587, 591–93 (2d Cir. 1998)); *TVT Records v. Island Def Jam Music Grp.*, 250 F. Supp. 2d 341, 345–46 (S.D.N.Y. 2003) ("Introduction of evidence for the specific purpose of portraying TVT as perpetually litigious will not be permitted, insofar as such evidence may be irrelevant, unduly prejudicial and not probative and distracting to the jury."). However, evidence of Plaintiff's other lawsuits may be admissible for

purposes other than to prove his litigiousness. *Hickey*, 2013 WL 2418252, at \*4, 2013 U.S. Dist. LEXIS 77419. Here, for example, evidence of Plaintiff's prior lawsuit which resulted in a court order directing the Hogans and the Stanfords to maintain the status quo of the right of way may be admissible for the purpose of providing necessary background information to the incident between Plaintiff and Stanford in September 2016.

Rose further suggests that evidence of Plaintiff's prior lawsuits may be admissible for the purpose of proving that Plaintiff "had a motive, plan or scheme to bring similar kinds of claims against those who crossed him" or had a "campaign of litigation against a number of his neighbors." (Dkt. No. 175, at 15–16 (citing *Hickey*, 2013 WL 2418252, at \*4–5, 2013 U.S. Dist. LEXIS 77419)). In *Hickey*, which involved retaliation claims, the Court allowed limited examination into the plaintiff's prior lawsuit to show that the plaintiff "publicized the prior lawsuit in an effort to intimidate those who disagreed with him, and to show Plaintiff's own acknowledgement that he was not adequately fulfilling his duties." 2013 WL 2418252, at \*4–5, 2013 U.S. Dist. LEXIS 77419. The evidence was therefore "intertwined with the merits of the case." *Id.* Here, however, Rose does not explain how any motive or campaign of litigation on Plaintiff's part is relevant to the substantive claim of negligence against him.

**\*11** The Court cannot, however, rule at this time because the Defendants have not provided the Court with the prior lawsuits that they seek to admit and the basis for admission. Defendants are therefore directed to provide a letter brief by March 10, 2022, with a proffer of prior lawsuits they seek to admit at trial, including the date of the prior lawsuit and its relevance. However, the parties may not introduce evidence of such lawsuits for the purpose of proving Plaintiff's litigiousness, and the parties will not be permitted to engage in mini trials of other actions.

### B. Plaintiff's Arrests and Criminal Charges
Plaintiff seeks to preclude mention of all "arrests/criminal charges" brought against him by his "neighbors in Lewis County." (Dkt. No. 168, at 8–9). Plaintiff argues that, other than Stanford's arrest of him on September 1, 2016, these arrests and criminal charges are not relevant to any issue in the lawsuit, may not be used to impeach him, and would

be "more prejudicial than probative." (*Id.*). Stanford argues that he should be able to introduce evidence of other arrests and criminal charges "to narrow the scope of the damages" Plaintiff suffered as a result of the alleged false arrest on September 1, 2016. (Dkt. No. 173, at 7). Rose does not respond to this portion of Plaintiff's motion in limine.

The Court agrees with Stanford that evidence of other arrests and criminal charges may be admissible for the limited purpose of establishing what, if any, damages Plaintiff suffered as a result of the incident on September 1, 2016. *See* 🚩 *Thomas v. Kelly*, 903 F. Supp. 2d 237, 262–63 (S.D.N.Y. 2012) ("An individual subjected to a false arrest is entitled to two types of compensatory damages: (1) for loss of liberty and (2) for physical and emotional distress." (citations omitted)); 🚩 *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995) (noting that damages for a false arrest claim "cover the time of detention up until issuance of process or arraignment, but not more"). The parties have not addressed what specific evidence might be admissible here; the Court will therefore rule on more specific objections properly made at trial.

### C. Plaintiff's Employment

Plaintiff requests that the parties refer to Plaintiff's former and current employment exclusively as "government services." (Dkt. No. 168, at 9). Plaintiff states that he is "precluded by law from discussing [his] employment" and argue that Defendants "seek to prejudice Plaintiffs by virtue of the nature of [his] current and past employment." (*Id.*). Defendants do not object to Plaintiff's request. The Court therefore grants this portion of Plaintiff's motion in limine.

## VI. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's request to reinstate Elizabeth Hogan's loss of consortium claim against Defendant Rose is **DENIED**; and it is further

**ORDERED** that the parties' motions in limine (Dkt. Nos. 138, 156, 168) are **GRANTED** in part and **DENIED** in part as set forth in this opinion; and it is further

**ORDERED** that the Defendants are directed to file, by March 10, 2022, a letter brief with a proffer of the prior lawsuits they seek to admit at trial, including the dates of the prior lawsuits and their relevance. Plaintiff may respond with a letter brief by March 11, 2022; and it is further

**ORDERED** that the parties are directed to file, by March 9, 2022: (1) a proposed stipulation describing the legal right of way that is at issue in Plaintiff's negligence claim, and (2) a proposed stipulation regarding Stanford's right to use the road at issue on September 1, 2016. To the extent the parties cannot agree, they must each file a letter brief with a proposed stipulation, explaining their position with citations to documents that are either in the record or attached to their letter brief.

**\*12  IT IS SO ORDERED.**

### All Citations

Slip Copy, 2022 WL 675703

## Footnotes

1    In their summary judgment reply memoranda, Vandewater and Rose both noted that Plaintiffs did not base the loss of consortium claims on Mark Hogan's physical injury, but rather on the alleged malicious prosecutions. (*See* Dkt. No. 112-1, at 12; Dkt. No. 115, at 14 (arguing that the loss of consortium claim failed as a matter of law "[b]ecause Plaintiffs concede that Ms. Hogan's alleged loss of consortium claim is related not to Mr. Hogan's alleged physical injury, but rather his prosecution")).

2    Plaintiffs never moved for reconsideration of the summary judgment order dismissing the loss of consortium claims. To the extent Plaintiffs' letter brief could be considered a motion for reconsideration of that ruling,

the fourteen-day period for such a motion has long passed, and the Court denies it as untimely. N.D.N.Y. L.R. 60.1.

3    Plaintiffs make no argument that there has been an intervening change in the applicable law or that new evidence is available.

4    Plaintiff and Stanford agree that the conviction may not be used to impeach Plaintiff under Federal Rule of Evidence 609. (Dkt. No. 168, at 5; Dkt. No. 173, at 6).

5    "A person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person: 1. He or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same." N.Y. Penal Law § 240.26(1).

6    Plaintiff's counsel agreed, at the final pretrial conference, that an identical issue was decided in the criminal case that is decisive of the present action. Shortly after the final pretrial conference, however, Plaintiff filed a letter brief asserting, without any discussion, that Stanford failed to meet his burden of establishing the identity-of-issue requirement. (Dkt. No. 176, at 4). Plaintiff also argued that collateral estoppel should be denied because the Town Justice who presided over the criminal trial resigned from office three years after the trial, following his guilty plea to criminal mischief in connection with "keying" a town official's vehicle. (*Id.*; *see* Dkt. No. 176-2, at 2–7). As a preliminary matter, the motions in limine were fully briefed and argued; the Court did not give Plaintiff permission to file a supplemental brief, and that submission is rejected. Even if the Court considered Plaintiff's supplemental brief, however, it would not change the result here. The accusatory instrument and the certificate of disposition regarding the September 1, 2016 incident at issue in this litigation, (Dkt. Nos. 82-11, 82-12), establish the identity-of-issue requirement. And Plaintiff has failed to show how the Town Justice's unrelated resignation in December 2020 demonstrates that Plaintiff lacked a full and fair opportunity to contest the harassment charge in 2017.

7    The Court notes that the record contains a video capturing the incident which led to Plaintiff's conviction. (Dkt. No. 82-10).

8    At the final pretrial conference Rose argued that evidence of the *West* Action should be admissible if Plaintiff opens the door by claiming that he was a good neighbor. The Court reserves for trial any decision regarding evidence that will be admissible based upon Plaintiff having opened the door.

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4133284
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Christopher JOHNSON, Plaintiff,

v.

The CITY OF NEW YORK, Officer Steven Poupos,
Officer Joseph Davin, and John Does 1-2, Defendants.

21-cv-5268 (PKC)
|
Signed September 12, 2022

**Attorneys and Law Firms**

[Cyrus Joubin, Cyrus Joubin, Esq.](), New York, NY, for
Plaintiff.

Andrea Osgood, New York City Law Department, New York,
NY, [Matthew William McQueen](), Office of New York City
Comptroller, New York, NY, for Defendants City of New
York, Police Officer Steven Poupos, Police Officer Joseph
Davin.

OPINION AND ORDER

[CASTEL](), United States District Judge

**\*1** Plaintiff Christopher Johnson brings section 1983 claims
against defendants Steven Poupos and Joseph Davin, officers
of the New York City Police Department ("NYPD") (the
"Individual Defendants"), and the City of New York.[1] ⚑[42
U.S.C. § 1983](). Johnson principally claims that he was
deprived of rights protected by the Constitution when he was
arrested and detained, rather than given a desk appearance
ticket, and given a visual body cavity search. Defendants
move to dismiss the Amended Complaint for failure to state
a claim under [Rule 12(b)(6), Fed. R. Civ. P](). For reasons that
will be explained, the motion will be granted.

BACKGROUND
For purposes of the motion, the Court accepts the Amended
Complaint's well-pleaded factual allegations as true, drawing
all reasonable inferences in favor of the non-movant, Johnson.

⚑[In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir.
2007)]().

The Amended Complaint alleges that in the early morning
of February 13, 2020, Johnson was driving with a friend in
that friend's car through Harlem. (First Am. Compl't ("FAC")
(Doc 14) ¶ 10.) At around 1 a.m., Johnson and his friend
were pulled over by NYPD officers Steven Poupos and
Joseph Davin for driving with excessively tinted windows.
(FAC ¶ 11.) The Amended Complaint alleges that Johnson
and his friend, the owner of the car, were ticketed for the
same infraction by different NYPD officers minutes before
being pulled over by Poupos and Davin. (Id. ¶ 12.) Johnson's
friend explained this situation to Poupos and Davin, but
they instructed Johnson and his friend to exit the vehicle
and arrested them both. (Id. ¶¶ 12-13.) Poupos and Davin
"claimed" to find a bag of marijuana and a knife upon
searching Johnson's friend's car.[2] (Id. ¶ 14.)

Poupos and Davin brought Johnson to the 32nd precinct
where he was processed, fingerprinted, photographed and
detained in a holding cell. (Id. ¶ 15.) The officers performed
a pat-down search on Johnson, felt something, and at that
point Johnson admitted to having three ecstasy pills hidden
inside his underwear and [Viagra]() pills in his pants pocket.
(Id. ¶¶ 16-17.) After performing the pat-down, the officers
asked Johnson whether he was hiding anything in his body
cavities, to which Johnson replied that he was not. (Id. ¶
18.) The Amended Complaint alleges that the Individual
Defendants then strip searched Johnson, cut off his underwear
and performed a visual body cavity search of his anus. (Id.
¶ 19.) This visual body cavity search yielded no contraband.
(Id. ¶ 20.)

**\*2** After Johnson was searched, he was transported to
Central Booking in lower Manhattan where he was detained
for several hours. (Id. ¶ 23.) Approximately twenty-four
hours after his arrest, Johnson was arraigned in New York
County Criminal Court, charged with criminal possession of
a weapon in the fourth degree under ⚑[New York Penal
Law section 265.01](), and released on his own recognizance.
(Id. ¶¶ 23, 30.) Johnson claims, among other things, that he
should have been released from the 32nd precinct with a desk
appearance ticket rather than detained until his arraignment.
(Id. ¶ 24.)

PROCEDURAL HISTORY
Johnson filed the present action on June 14, 2021. Johnson
was granted leave to amend his complaint to add a claim for
relief and re-plead certain issues in response to Defendants'
pre-motion letter to dismiss (Docs 9 & 10), and Johnson filed

his Amended Complaint on November 8, 2021 (Doc 14). Accordingly, the Court assumes that the Amended Complaint provides the best and strongest formulation of Johnson's claims.

DISCUSSION

Johnson brings four claims under 🚩 section 1983 against the defendants. He alleges that (i) he was strip searched in violation of the Fourth Amendment, (ii) the decision to detain him rather than grant him a desk appearance ticket denied him due process of law, (iii) the Individual Defendants failed to intervene to prevent the constitutional violations, and (iv) the City is liable for the constitutional violations. The Court will address each claim in turn and begins with a discussion of the legal standard on a motion to dismiss for failure to state a claim.

A. Legal Standard for a Motion to Dismiss under Rule 12(b)(6).

Defendants move to dismiss the Amended Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P. On a motion to dismiss, the Court accepts the complaint's well-pled factual allegations as true and draws all reasonable inferences in favor of the non-movant. 🚩 In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" 🚩 Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Nevertheless, legal conclusions and "[t]hreadbare recitals of the elements of a cause of action" are not entitled to the presumption of truth. 🚩 Iqbal, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "The plausibility standard ... asks for more than a sheer possibility that a defendant has acted unlawfully." Id. "Under Iqbal, factual allegations must be sufficient to support necessary legal conclusions." 🚩 Ruston v. Town Bd. For Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010).

In addition to the allegations contained in the complaint, a court may properly consider on a motion to dismiss "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, ... and documents possessed by or known to the plaintiff and

upon which it relied in bringing the suit." 🚩 ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

B. Defendants' Motion to Dismiss the Illegal Strip Search Claim will be Granted.

Johnson's first claim is brought under 🚩 section 1983 for a strip search in violation of his Fourth Amendment rights. In particular, Johnson complains of the visual body cavity search performed by the Individual Defendants while he was detained at the 32nd precinct. For the following reasons, Johnson's claim for unlawful strip search is dismissed.

**\*3** The Fourth Amendment protects individuals against searches of their person without a warrant. A search incident to an arrest, however, "constitutes an exception to the warrant requirement" imposed by the Fourth Amendment. 🚩 Riley v. California, 573 U.S. 373, 382 (2014). Nevertheless, there are limitations upon the scope of an appropriate search incident to an arrest. Indeed, whether a search incident to an arrest was lawful turns upon whether such search was "reasonable." See 🚩 Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652 (1995).

Visual body cavity searches in particular are "invasive and degrading" and a "serious invasion of privacy," even more intrusive than a typical strip search. [3] Sloley v. VanBramer, 945 F.3d 30, 38 (2d Cir. 2019). An arresting officer may only conduct a visual body cavity search if he "has reason to believe, based on 'specific and articulable facts ..., taken together with rational inferences from those facts,' ... that an arrestee is secreting contraband inside a body cavity[.]" Id. (citing 🚩 Terry v. Ohio, 392 U.S. 1, 21 (1968)). To justify a visual body cavity search "the question is whether the criminal conduct for which a person was arrested speaks to the likelihood that he or she secreted contraband inside a body cavity." Id. at 39. Indeed, a visual body cavity search "must be based on reasonable suspicion to believe that the arrestee is secreting evidence inside the body cavity to be searched." Id. To determine whether a visual body cavity search was reasonable under the circumstances, "courts also consider whether the individual's preceding arrest was for a misdemeanor or felony, whether it involved drugs, whether the individual would soon be surrounded by other inmates or arrestees or housed alone, whether the search occurred privately, and whether the search was performed pursuant to reasonable suspicion or because of a blanket policy."

Monroe v. Gould, 372 F.Supp.3d 197, 204 (S.D.N.Y. Mar. 14, 2019) (citing Gonzalez v. City of Schenectady, 728 F.3d 149, 162 (2d Cir. 2013)).

Defendants urge the Court to consider body-worn camera footage which purportedly shows video of the strip search of Johnson while he was detained. But the Court declines to do so on a motion to dismiss. The facts as pled in the Amended Complaint, however, establish that the visual body cavity search of Johnson was reasonable.

Johnson was arrested after Poupos and Davin "claimed" to find "a bag of marijuana and a knife" inside the vehicle in which Johnson was a passenger. (FAC ¶ 13.) Johnson does not plausibly allege that Poupos and Davin did not actually find the marijuana and knife in the vehicle, and does not otherwise challenge the lawfulness of his arrest or that Poupos and Davin had probable cause to arrest him. After transporting Johnson to the 32nd precinct, the Individual Defendants performed a pat-down of Johnson and felt an object or objects in his underwear, which Johnson then admitted were pills of ecstasy. (Id. ¶ 17.) Johnson denied concealing any contraband in his body cavities when asked by the Individual Defendants, but after finding the ecstasy pills concealed in Johnson's underwear the Individual Defendants performed a visual body cavity search of his anus. (Id. ¶¶ 18-19.)

**\*4** Because (1) the search was pursuant to a lawful arrest, (2) Poupos and Davin discovered a controlled substance, marijuana, and a knife during the arrest, (3) Poupos and Davin found ecstasy pills concealed in Johnson's underwear and Viagra pills in his pants pocket, and (4) the visual body cavity search occurred in a holding cell at the 32nd precinct police station and not in public, the Court concludes that it was not constitutionally unreasonable for the Individual Defendants to perform the visual body cavity search.

In arguing that the visual body cavity search was not reasonable, Johnson relies on Bobbit v. Marzan, 16-cv-2042, 2020 WL 5633000 (S.D.N.Y. Sept. 21, 2020). There, the body cavity search was held to be unreasonable because the officer found drugs concealed in the defendant's sock before performing a body cavity search of the defendant's anus. Bobbit, 2020 WL 5633000 at \*11 ("It is not reasonable to infer from the discovery of contraband in Plaintiff's sock that she was also concealing contraband on her body in locations where it could only be accessed by requiring her to fully disrobe, squat to expose her private parts, and use

the bathroom, all in view of an officer."). Here, however, it was reasonable to suspect that Johnson may be concealing contraband in his anus after finding drugs hidden inside his underwear, where the drugs were concealed in close proximity to his anus and the location of those drugs signaled his willingness to hide contraband in the region of his privates.

The Court concludes that Johnson has failed to plausibly allege that the visual body cavity search was unreasonable and unlawful under the totality of circumstances. Accordingly, the defendants' motion to dismiss the claim will be granted.

### C. Johnson's Denial of Due Process Claim will be Dismissed.

Johnson alleges that in violation of his right to due process of law, Poupos and Davin detained him until arraignment instead of issuing him a desk appearance ticket.[4] Notably, Johnson does not assert a claim for false arrest or unlawful seizure, and Johnson does not contend that Poupos and Davin did not have probable cause to arrest him or that his arrest was otherwise unlawful. (See generally FAC.) Rather, Johnson argues that he was denied his procedural due process rights because he had a state-created liberty interest in being released with a desk appearance ticket pursuant to New York Criminal Procedure Law section 150.20, and that he was deprived of that liberty interest without due process when the officers detained him until his arraignment. (See Pl.'s Opp. Mem. at 6.)

The Court will analyze the legal standard to be applied to Johnson's denial of procedural due process claim. "In evaluating plaintiff['s] procedural due process claim, we analyze '(1) whether plaintiffs possessed a protected liberty or property interest, and, if so, (2) what process plaintiffs were due before they could be deprived of that interest.' " Adams v. Suozzi, 517, F.3d 124, 127 (2d Cir. 2008) (quoting Sealed v. Sealed, 332 F.3d 51, 55 (2d Cir. 2003)). "Although some due process protections stem independently from the Fourteenth Amendment, state law may also create liberty or property interests entitled to due process protection." Sealed v. Sealed, 332 F.3d at 55.

At the outset, the Court notes that Johnson has cited to no cases which have held that New York Criminal Procedure Law section 150.20, as amended January 1, 2020, created a federally protected liberty interest in being released with a desk appearance ticket when arrested for a misdemeanor

or violation. The Court is also unaware of any cases, either within the Second Circuit or within the New York state courts, that have held that 🚩 section 150.20 created a protected liberty interest. Generally, a violation of a right protected by state law does not morph into a federal due process violation.[5] Nevertheless, assuming that 🚩 section 150.20 does create a federally protected liberty interest, the Individual Defendants had probable cause to arrest Johnson for a class D felony for which he was not entitled to a desk appearance ticket.

**\*5** The Court assumes that the first prong of the procedural due process analysis is met and considers now the second prong; that is, whether Johnson was afforded appropriate process pursuant to 🚩 section 150.20. This first requires a determination of the process afforded under 🚩 section 150.20. Under 🚩 section 150.20, "[w]henever a police officer is authorized pursuant to section 140.10 of this title to arrest a person without a warrant for an offense other than a class A, B, C or D felony ... he shall ... instead issue to and serve upon such person an appearance ticket" subject to certain exceptions, none of which are applicable to the present circumstances. See N.Y. Crim. P. L. § 150.20. Thus, whether Johnson was afforded adequate process under 🚩 section 150.20 depends upon whether Poupos and Davin were "authorized pursuant to 📁 [New York Criminal Procedure Law] section 140.10" to arrest Johnson for "a class A, B, C or D felony[.]" And whether Poupos and Davin were authorized to arrest Johnson for a felony pursuant to 🚩 section 140.10 depends upon whether Poupos and Davin had "reasonable cause to believe" that Johnson had committed a felony. See N.Y. Crim. P. L. § 140.20. This necessitates an analysis of probable cause.

"An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Kee v. City of New York, 12 F.4th 150, 158 (2d Cir. 2021) (citing 📁 Jaegly v. Couch, 439 F.3d 149, 151-52 (2d Cir. 2006)). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence ... have no place in the [probable-cause] decision." 📁 Florida v. Harris, 568 U.S. 237, 243-44 (2013) (internal quotations and

citations omitted). The probable cause test "is not reducible to precise definition or quantification" and instead turns on an evaluation of the "totality of the circumstances." Id. "To assess probable cause, a court considers only the facts 'available to the officer at the time of arrest and immediately before it.' " Ashley v. City of New York, 992 F.3d 128, 136 (2d Cir. 2021) (quoting 📁 Stansbury v. Wertman, 721 F.3d 84, 89 (2d Cir. 2013)). "Probable cause ... is not a high bar: It requires only the 'kind of fair probability on which reasonable and prudent [people,] not legal technicians, act.' " 📁 Kaley v. United States, 571 U.S. 320, 338 (2014) (internal citations omitted).

There is no allegation in the Amended Complaint that Johnson was arrested on February 13, 2020 by the Individual Defendants without probable cause.[6] Johnson's arrest report indicates that he was arrested for, among other charges, two class D felonies: criminal possession of a controlled substance in the fifth degree under 📁 New York Penal Law section 220.06, and criminal possession of a weapon in the third degree under 📁 New York Penal Law section 265.02. (Doc 19, Ex. B ("Arrest Report") at 1.) The Arrest Report is properly considered in deciding this motion to dismiss. The Arrest Report is a matter of public record and is considered only to determine the statements contained therein and not for the truth of the matters asserted. See 📁 Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007); see also 📁 Shmueli v. City of New York, 424 F.3d 231, 233 (2d Cir. 2005). Indeed, "[i]n considering a motion to dismiss, the Court may consider ... public records such as Plaintiff's arrest reports, indictments, and criminal disposition data." 📁 Corley v. Vance, 365 F.Supp.3d 407, 432 (S.D.N.Y. Mar. 27, 2019).

Johnson was ultimately arraigned on the charge of criminal possession of a weapon in the fourth degree, a class A misdemeanor under 🚩 New York Penal Law section 265.01, for allegedly possessing a knife and a Billy club recovered from the vehicle. (FAC ¶ 30.) Johnson contends that he was in fact only in violation of a different statute: "a [class A] misdemeanor under New York Penal [Law] Section 220.03," criminal possession of a controlled substance in the seventh degree. (Pl.'s Opp. Mem. at 4.) These points, however, are immaterial to the decision on the motion.

**\*6** 🚩 Section 150.20, on which Johnson's claim hinges, provides that a "police officer ... authorized ... to arrest a

person without a warrant for an offense other than a class A, B, C or D felony ... instead issue" a desk appearance ticket. Here, Johnson was arrested for a class D felony, and, thus, he had no right under ▢ section 150.20 to a desk appearance ticket. The subsequent decision by the prosecutor to charge him with a misdemeanor and not a felony has no impact on the probable cause determination by the Individual Defendants to arrest Johnson for a class D felony.

The Amended Complaint alleges that Poupos and Davin "claimed" to have found a bag of marijuana and a knife inside the vehicle in which Johnson was a passenger and discovered ecstasy and Viagra pills hidden on Johnson's person, including certain pills concealed in his underwear. Based on these circumstances, it was reasonable for Poupos and Davin to believe that Johnson "knowingly and unlawfully possesse[d] ... a controlled substance with intent to sell it" in violation of ▢ New York Penal Law section 220.06, a class D felony. The presence of the knife, bag of marijuana, Viagra pills and concealed ecstasy pills, taken together, established probable cause for Poupos and Davin to reasonably believe that Johnson had the requisite "intent to sell" a controlled substance as is required under ▢ section 220.06, a class D felony.

The Court concludes that Johnson has failed to plausibly allege that the failure to issue a desk appearance ticket upon his arrest for a class D felony deprived him of rights protected by the due process clause of the Fourteenth Amendment. For this reason, the motion to dismiss Johnson's claim for denial of due process will be granted.

D. Johnson's Claims for Failure to Intervene and Municipal Liability Cannot Stand Without an Underlying Constitutional Violation and Therefore are Dismissed.
Johnson's remaining claims are for failure to intervene and municipal liability. For the following reasons, both claims are dismissed.

Johnson's claim for failure to intervene fails because he has not plausibly alleged a constitutional violation. "A plaintiff cannot succeed on a claim for failure to intervene under [▢ section] 1983 when there is no underlying constitutional violation." Kayo v. Mertz, 531 F.Supp.3d 774, 799 (S.D.N.Y. Mar. 31, 2021) (citing Wieder v. City of New York, 569 Fed.App'x 28, 30 (2d Cir. 2014)). Because Johnson's claims for illegal strip search and denial of due process are dismissed, the claim for failure to intervene cannot proceed. The motion to dismiss Johnson's failure to intervene claim will be granted.

Generously construed, Johnson's claim for municipal liability under ▢ section 1983 is brought against the City of New York pursuant to ▢ Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978). As discussed above, Johnson's claims for the constitutional violations of unlawful strip search and denial of due process, which underlie Johnson's Monell claim, are dismissed. "It is well-settled that a Monell claim cannot succeed without an underlying constitutional violation, and here there is no constitutional violation." Mastromonaco v. Cty. Of Westchester, 779 F.App'x 49, 51 (2d Cir. 2019) (citing City of Los Angeles v. Heller, 475 U.S. 799 (1986)). Accordingly, the motion to dismiss Johnson's municipal liability claim will be granted.

CONCLUSION
The Court has considered all arguments presented by the parties, including those not explicitly addressed herein. Defendants' motion to dismiss the Amended Complaint is GRANTED.

 **\*7** SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 4133284

---

# Footnotes

1      Plaintiff also named two unidentified officers as John Doe defendants. Although Johnson sought and was granted leave to amend his Complaint, he did not identify the officers who are the John Doe defendants in

the Amended Complaint. The ninety-day period to serve defendants under Rule 4(m), Fed. R. Civ. P., has expired. The John Doe defendants will be dismissed from the action without prejudice.

2    On the date of Johnson's arrest in February 2020, marijuana was included as a schedule one controlled substance under ⚑ N.Y. Pub. Health L. § 3306.

3    Visual body cavity searches, however, are less intrusive than manual body cavity searches. See ⚑ Monroe v. Gould, 372 F.Supp.3d 197, 204 (S.D.N.Y. Mar. 14, 2019) (comparing strip searches, visual body cavity searches, and manual body cavity searches).

4    Although Johnson's pleading does not specify whether he is alleging a violation of procedural or substantive due process, his brief asserts a violation of procedural due process. (See Pl.'s Opp. Mem. at 4-7.)

5    See, e.g., Wharton v. City of New York, 08-cv-510, 2009 WL 700704, at *2 (E.D.N.Y. Mar. 13, 2009) ("Plaintiff's ⚑ § 1983 claims based on violations of only state law must also be dismissed as ⚑ § 1983 only applies to the deprivation of federal rights."); Daniels v. City of Binghamton, 947 F.Supp. 590, 596 (N.D.N.Y. Nov. 20, 1996) ("[I]t is well-established that ⚑ § 1983 does not provide a remedy for official conduct that violates only state law.")

6    Johnson only states in a conclusory fashion in his brief that the Arrest Report charges were "bogus" and that the officers were not "authorized" to arrest Johnson on the felony charges. (Pl.'s Opp. Mem. at 4.) The brief makes no claim of a lack of probable cause to arrest and cites to no authority that would support such a claim.

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2459656

Only the Westlaw citation is currently available.

United States District Court,

E.D. New York.

Carolyn LOVEJOY, Plaintiff,

v.

Elif GURE–PEREZ, Defendant.

No. 10–CV–5748.

|

Signed May 19, 2014.

|

Filed May 21, 2014.

**Attorneys and Law Firms**

Kenechukwu Chudi Okoli, K.C. Okoli, Attorney at Law, New York, NY, for Plaintiff.

Andre Leon Lindsay, John S. Schowengerdt, Leah S. Schmelzer, Isaac Klepfish, NYC Law Department Office of Corp Counsel, Zev Samuel Singer, Corporation Counsel of New York, New York, NY, for Defendant.

**ORDER ON POST–TRIAL MOTIONS**

JACK B. WEINSTEIN, Senior District Judge.

## Table of Contents

I. Introduction.................................................................................................... 2

II. Facts.......................................................................................................... 2

III. Law........................................................................................................... 4

A. Rule 59 Standard............................................................................................ 4

B. Rule 50 Standard............................................................................................ 5

C. Rule 37(b)(2) Standard...................................................................................... 5

IV. Defendant's Post–Trial Motions.............................................................................. 6

A. New Trial.................................................................................................... 6

1. E-mails..................................................................................................... 6

2. Elicitation of Improper Testimony........................................................................... 7

B. Judgment as a Matter of Law................................................................................. 8

1. Defendant's Argument........................................................................................ 8

2. Evidentiary Issues.......................................................................................... 8

3. Evidence of Hostile Work Environment........................................................................ 9

V. Plaintiffs Post–Trial Motions................................................................................ 11

A. New Trial.................................................................................................... 11

1. Timeliness.................................................................................................. 11

2. E-mails..................................................................................................... 12

3. Evidence of Hostile Work Environment........................................................................ 12

4. Mr. Dickerson's Testimony...........................................................................................13

B. Attorney's Fees and Sanctions....................................................................................13

VI. Conclusion...................................................................................................................14

## I. Introduction

**\*1** Defendant Elif Gure–Perez was found liable for a hostile work environment based on race. *See* 42 U.S.C. § 1981. She was found not liable for a hostile work environment based on age, discrimination based on race or age, and constructive discharge based on race or age. *See* 42 U.S.C. §§ 1981, 1983. A jury awarded plaintiff Carolyn Lovejoy $110,000 in compensatory damages and no punitive damages.

Defendant moves for a partial retrial or, in the alternative, judgment as a matter as law. Plaintiff moves for a new trial and sanctions. All motions are denied. An attentive jury consisting of a good racial, age, and sociological background cross-section of the community has intelligently examined conflicting evidence. After a hard-fought and fair trial, it came to a reasonable resolution of the case.

## II. Facts

Plaintiff, a former Parent Coordinator with the New York City Department of Education ("DOE"), worked at Public School 316 under the supervision of defendant, the former principal of the school. Plaintiff and two co-workers-Elizabeth Butler and Christina Villavicencio-sued the DOE and defendant in a single action for violations of the First Amendment, the Family Medical Leave Act, the New York City Human Rights, and the NewYork City Admin Code §§ 8–101 *et seq. See* Pl.'s Compl., ECF No. 1.

In January 2014 all claims by co-plaintiffs Butler and Christina were dismissed as improperly joined. Plaintiff Lovejoy's complaint was amended to allege race and age based discrimination, hostile work environment, and constructive discharge. *See* 42 U.S.C. §§ 1981 and 1983.

Trial commenced on March 3, 2014. During the trial, both plaintiff and defendant testified regarding e-mails from defendant to plaintiff in which defendant was critical of plaintiffs' work. These emails were initially mentioned by

defendant during questioning by her counsel. Tr. 242:17–243:14. Plaintiff's counsel then asked defendant if she had documented any problems with plaintiff's performance. Defendant responded that she had e-mailed plaintiff on multiple occasions. Tr. 268:5–20. These e-mails had not been asked for in discovery, produced for trial, or exchanged with all documents required to be marked at an *in limine* hearing. *See* Docket Entry, ECF No. 45.

Without knowledge of, or immediate access to, these e-mails, plaintiff's counsel attempted to impeach defendant's testimony by referring to defendant's deposition. At her deposition, defendant stated that she did not have e-mails documenting plaintiff's unsatisfactory performance. Tr. 277:18–22. Defendant's counsel pointed out that electronic discovery was not conducted, and he requested to have a portion of these e-mails entered into evidence. This request was denied. Tr. 281:20–21.

The court instructed plaintiff's counsel to refrain from arguing that no e-mails existed but permitted him to state that he was not aware of such e-mails. Tr. 281:4–282:16. In his closing statement, plaintiff's counsel repeatedly violated this ruling by arguing that no such documentation existed. Tr. 481:9–483:21.

**\*2** After closing arguments, defendant moved for judgment as a matter of law under Rule 50. Tr. 435:20–22. This motion was denied. Tr. 440:20.

A verdict was rendered on March 6, 2014. The jury found that defendant was liable only for a hostile work environment based on race. Plaintiff was awarded $110,000 in compensatory damages and no punitive damages. Following the jury's verdict, plaintiff made no motion. Tr. 594:10–11. Her motion was made late. *See infra,* Part V.A.1. Defendant timely moved for a new trial and to have the verdict set aside as against the weight of the evidence. Tr. 594:12–14; 598:5–13.

A hearing on post-trial motions was held on May 19, 2014.

## III. Law

## A. Rule 59 Standard

"[F]or a district court to order a new trial under Rule 59(a), it must conclude that 'the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice.'"

*Manley v. AmBase Corp.,* 337 F.3d 237, 245 (2d Cir.2003)

(quoting *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992)). A court may grant a motion for a new trial "even if there is substantial evidence supporting the jury's verdict."

*See DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 133 (2d Cir.1998). A jury's verdict "should rarely be disturbed." *Farrior v. Waterford Bd. of Educ.,* 277 F.3d 633, 635 (2d Cir.2002).

## B. Rule 50 Standard

A court may grant a motion for judgment as a matter of law under Rule 50 only if "the evidence, viewed in the light most favorable to the nonmoving party, is insufficient to permit a reasonable juror to find in his favor." *Arlio v. Lively,* 474 F.3d 46, 51 (2d Cir.2007) (citing *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 289 (2d Cir.1998)). When considering this motion, a court " 'cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.'"

*Black v. Finantra Capital, Inc.,* 418 F.3d 203, 209 (2d Cir.2005) (quoting *Tolbert v. Queens Coll.,* 242 F.3d 58, 70 (2d Cir.2001)).

## C. Rule 37(b)(2) Standard

"Even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 106–07 (2d Cir.2002). To determine if sanctions for failure to disclose are appropriate, courts weigh: "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Design Strategy, Inc.,* 469 F.3d at 138 (citing *Patterson v. Balsamico,* 440 F.3d 104 (2d Cir.2006) (brackets in original).

## IV. Defendant's Post–Trial Motions

## A. New Trial

Defendant moves for a new trial based on four grounds: (1) the court excluded emails regarding plaintiff's underperformance; (2) the e-mails concerned the parties' credibility; (3) plaintiff's counsel made improper remarks regarding these e-mails in his closing; and (4) plaintiff's counsel elicited improper testimony.

**\*3** The motion is denied.

### 1. E-mails

Discovery in this case closed on November 25, 2013 without a request for disclosure of emails. Defendant now argues that she is entitled to a new trial because certain e-mails were not permitted into evidence and plaintiff's counsel improperly denied their existence in his closing statement.

The court properly excluded the e-mails from evidence. Defendant could have produced these e-mails during discovery, and any discovery disputes should have been taken up with the magistrate judge. They were not referred to at the *in limine* hearing when all relevant documents to be introduced were ordered marked and exchanged. *See* Docket Entry, ECF No. 66. There is no reasonable probability that the part of the jury's verdict favorable to plaintiff would have been different had these e-mails been in evidence. The e-mails have little if any bearing on the charge of a hostile work environment. Liability on this issue did not depend on defendant's evaluation of plaintiff's work.

Insofar as the e-mails were pertinent to the trial, they would have bolstered defendant's case against the charges of individual discrimination. But defendant prevailed on those charges without relying on the e-mails.

The exclusion of e-mails was not prejudicial and cannot justify a new trial. *See Nimely v. City of New York,* 414 F.3d 381, 399 ("To order a new trial we must 'find that the [evidentiary ruling] was a clear abuse of discretion *and* was so clearly prejudicial to the outcome of the trial that we are convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'")

(quoting *Luciano v. Olsten Corp.,* 110 F.3d 210, 217 (2d Cir.1997)).

### 2. Elicitation of Improper Testimony

The court excluded testimony regarding incidents outside the presence of plaintiff because the probative value of the evidence was substantially outweighed by unfair prejudice and confusion. In violation of the court's ruling, plaintiff's counsel repeatedly questioned defendant on this excluded evidence. Tr. 168:21–173:25, 176:7–24, 177:22–178:18.

Defendant has not shown prejudice resulting from plaintiff's attempts to elicit improper testimony. *See In re Fosamax Prods. Liab. Litig.,* 742 F.Supp.2d 460, 477 (S.D.N.Y.2010) ("Only when the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict is a new trial warranted.") (quoting 🔖 *Pappas v. Middle Earth Condo. Ass'n,* 963 F.2d 534, 540 (2d Cir.1992)). There is no reasonable probability that the jury would have been influenced as a result of plaintiff's misconduct. Defendant's counsel regularly and appropriately objected when plaintiff's counsel asked improper questions, and the court sustained these objections or had testimony stricken. Tr. 168:21–173:25, 176:7–24, 177:22–178:18. It forcefully instructed the jury that questions and arguments of counsel were not evidence. *See* Tr. 466:22–23; Jury Instructions 4.

### B. Judgment as a Matter of Law

#### 1. Defendant's Argument

**\*4** Defendant argues that the evidence presented does not rise to the level of a hostile work environment based on race. She claims that there is only one item of evidence showing racial animus: plaintiff's testimony that defendant called her "nigger." According to defendant, there is no testimony that this comment was made in a physically threatening manner or in the presence of other staff.

Plaintiff has given inconsistent versions of this encounter. At trial, plaintiff testified that defendant yelled the word "nigger" at her loudly. Tr. 115:21–23. But in plaintiff's handwritten notes, she describes defendant saying "nigger under her breath." Tr. 117:1–7. And, when applying for workers' compensation with the New York State Department of Labor, plaintiff did not mention this incident when asked if she had any examples of discrimination based on age or race. Tr. 119:4–9.

#### 2. Evidentiary Issues

The critical evidence concerning a hostile work environment was testimony by plaintiff and the assistant principal, Martin Williams. Plaintiff testified that defendant: (1) said it was

"too dark in here," Tr. 42:3–9; (2) told plaintiff that she did not meet "the profile of her staff," Tr. 42:12–20; (3) spoke in a threatening tone when addressing staff who were black but not staff who were white, Tr. 44:3–10; (4) told plaintiff that "she wanted [her] black ass out of her school," Tr. 113:5–6 (defendant's attorney quoting plaintiff's deposition transcript); (5) and called her "nigger," Tr. 53:19.

The final incident was described in detail by plaintiff: "[Defendant] was angry and she was yelling and she was spitting on my shirt. And then she just said, 'Just get out, just take your flex time and just get out of my office, get out of my office, you nigger, get out.' " Tr. 53:15–19. Although plaintiff's handwritten notes indicate otherwise, she stated that this conversation was loud enough for others to have overheard it. Tr. 115:14–16. After giving this testimony, plaintiff broke down in tears in what was apparently a genuine emotional recollection of a demeaning situation. Tr. 55:1–4. Defendant denied that any of these incidents occurred. Tr. 198:23–199:2; 179:11–14; 232:16–22; 179:21–24; and 246:19–247:22.

Williams, who is African–American and an impressively credible witness, testified that defendant spoke to him and others in a tone that was "intimidating and aggressive." Tr. 309:23–24. This tone, he believed, was demonstrated under circumstances indicating it was motivated by racial animosity. Tr. 319:16–18. In support of this interpretation, he testified that defendant had used the phrases "black ass," Tr. 319:25, "cracking the whip," Tr. 321:11, and "I will wipe that incipient smile off of your face and have you taken out of here in handcuffs," Tr. 320:20–22. In defendant's testimony, all these allegations were denied. Tr. 232:16–22; 179:21–24; 169:6–10; 170:14–17.

#### 3. Evidence of Hostile Work Environment

**\*5** Reviewing this testimony, defendant argues that the only evidence of racial animus is impeached testimony by plaintiff that defendant called her a "nigger" on one occasion. *See* Def.'s Mem. 23, ECF No. 84. As an initial matter, defendant's attempt to impeach plaintiff was entirely appropriate, but the credibility of the witnesses was for the jury to decide. On a Rule 50 motion, the court "cannot asses the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury." 🔖 *Tolbert v. Queens College,* 242 F.3d 58, 70 (2d Cir.2001).

Defendant's presentation of the testimony fails to reveal the full extent and context of the evidence. This is not a case where there is evidence of only a single, isolated racial epitaph. Characterizing the evidence this way fails to reflect how defendant's actions could have been reasonably understood by some of the African–American staff members.

Conduct must be analyzed in both interpersonal and historical context. When defendant's counsel asked Williams what made him believe that defendant's actions were motivated by race, he described his experience: "I felt belittled, and as a black person and an astute student of history, it smacks of racism to me, and that's how I felt." Tr. 321:20–22. This subjective perspective is valid evidence for the jury's consideration in determining whether there was an objectively hostile environment. *See* Alfano v. Costella, 294 F.3d 365, 378 (2d Cir.2002) (explaining that facially neutral incidents are relevant if there is "some circumstantial or other basis for inferring that incidents [ ]neutral on their face were in fact discriminatory.").

Even if plaintiff established that being called "nigger" was the only incident of racial animus, this would suffice for a hostile work environment claim. Plaintiff testified that she was called "nigger" by her supervisor in an aggressive and intimating tone, with saliva falling onto her body, and loudly enough for others to hear it. Whether considered alone or with additional evidence, this is sufficient to create a hostile work environment. *See* Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 24 (2d Cir.2014) ("We emphasize that '[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.' ") ( Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 439 (2d Cir.1999)); Albert–Roberts v. GGG Const., LLC, 542 Fed. App'x 62 (2013) ("There may well exist circumstances where a single use of the word 'nigger' would rise to the level of a hostile work environment...."); Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 724 (2d Cir.2010) ("[A] hostile work environment can also be established through evidence of a single incident of harassment that is extraordinarily severe.") (internal quotation marks omitted).

**\*6** The motion for judgment as a matter of law is denied. In the particular circumstances of this case, the jury could reasonably find that the incidents testified to by witnesses it could have found credible, taken as a whole, constituted a hostile work environment.

## V. Plaintiff's Post–Trial Motions

### A. New Trial
Plaintiff moves for a new trial under Rule 59 due to non-production of e-mails during discovery, the exclusion from evidence of comments made outside the plaintiff's presence, and the exclusion of a witness from testifying.

#### 1. Timeliness
A motion for a new trial must be filed no later than 28 days after entry of judgment. Fed.R.Civ.P. 59(b). Judgment was entered on March 18, 2014; motions for new trial were due by April 15, 2014. Plaintiff filed her motion for new trial April 25, 2014, well past the deadline. There is no appropriate excuse for this delay.

Plaintiff's motion for a new trial is denied as untimely and without merit.

#### 2. E-mails
Plaintiff is not entitled to a new trial on the ground that e-mails-which were unfavorable to her case-were not produced during discovery. First, plaintiff fails to articulate any way in which the court, through the magistrate judge, erred in supervising discovery. *See* In re Fitch, Inc., 330 F.3 104, 108 (2d Cir.2003) ("A trial court enjoys wide discretion in its handling of pretrial discovery, and its rulings with regard to discovery are reversed only upon a clear showing of an abuse of discretion.") (quoting In re DG Acquisition Corp., 151 F.3d 75, 79 (2d Cir.1998)). Second, she fails to show that non-production of these e-mails prejudiced her case. They were excluded from evidence, and plaintiff's counsel was permitted to argue that they never came to his attention. The jury would not have found defendant liable on additional claims as a result of production of these e-mails.

#### 3. Evidence of Hostile Work Environment
Plaintiff argues that the court improperly excluded evidence of a hostile work environment by prohibiting testimony of nonparty witnesses that they too suffered discrimination by the defendant. Such "me-too" witnesses can be relevant to a hostile work environment claim. *See* Leibovitz v. New

*York City Transit Auth.,* 252 F.3d 179, 190 (2d Cir.2001); *Whibbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 71 (2d Cir.2000). In this case, at the *in limine* hearing on February 18, 2014, the court excluded certain witnesses as hearsay, conclusory, cumulative, vague, or requiring separate trials. *See* Fed.R.Evid. 403, 802; Fed.R.Civ.P. 21. During the trial, the court ruled that, in the special circumstances of this case, testimony regarding incidents out of the plaintiff's presence was inadmissible under Rule 403. Tr. 215:15–217:25.

Plaintiff makes no argument why the court erred in excluding these witnesses under Rule 403. Both plaintiff and Williams testified regarding the experiences of these individuals with respect to a hostile work environment. Tr. 44:11–45:15; 305:18–306:25. No prejudice has been shown in excluding this evidence. The probative value was outweighed by other considerations and additional witnesses testified to the pertinent issues. *See* Fed R. Evid. 403; Fed.R.Civ.P. 61 (stating the harmless error rule).

#### 4. Mr. Dickerson's Testimony

**\*7** Plaintiff argues that the court improperly excluded testimony from a union representative, Craig Dickerson. Mr. Dickerson would have testified that a meeting was held between himself, defendant, and plaintiff. There is no indication that this testimony would be relevant to the particular claims made by plaintiff. His information was not based on his own observations of the events in question. This witness was properly excluded; no error or prejudice has been shown.

### B. Attorney's Fees and Sanctions

A motion for an award of fees under section 1988 must be made no later than 14 days after the entry of judgment. Fed.R.Civ.P. 54(d)(2)(B)(i); E.D.N.Y. Local Rule 54.1(c)(7). Judgment was entered on March 18, 2014; requests for attorney's fees were due by April 1, 2014. Plaintiff filed her motion for attorney's fees on April 25, 2014, long past the deadline, with no excuse for the delay. In addition, plaintiff provides no documentation of hours or rates for the court to use in determining fees. *See Hens ley v.* Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1982).

Plaintiff also requests sanctions because defendant did not produce e-mails during discovery. But she has failed to show any misconduct by defendant or any other reason why sanctions are justified. *See* Fed.R.Civ.P. 37(b)(2), (c)(2), (f). Instead, she argues that attorney's fees, which are unavailable, should be awarded as a form of sanctions. This appears to be an attempt by plaintiff's counsel to circumvent the requirements for timely application for attorney's fees. Plaintiff's request for attorney's fees and sanctions is denied.

### VI. Conclusion

The jury's verdict did not constitute a miscarriage of justice or a seriously erroneous result. Both parties received a fair trial.

Defendant's and plaintiff's post-trial motions are denied.

SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 2459656

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 246698
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jean OLIVER, Plaintiff,

v.

NEW YORK STATE POLICE; Wayne
Olson, in his individual capacity; Martin
McKee, in his individual capacity; Paul
Kelly, in his individual capacity, Defendants.

1:15-cv-00444 (BKS/DJS)
|
Signed January 18, 2023

**Attorneys and Law Firms**

Plaintiff pro se: Jean Oliver, Elma, NY 14059.

For Defendants New York State Police, Olson, and Kelly:
Daniel J. Moore, Joshua D. Steele, Daniel J. Palermo, Harris
Beach PLLC, 99 Garnsey Road, Pittsford, NY 14534.

For Defendant McKee: Lisa F. Joslin, Gleason, Dunn, Walsh
& O'Shea, 40 Beaver Street, Albany, NY 12207.

## MEMORANDUM-DECISION AND ORDER

Brenda K. Sannes, Chief United States District Judge:

## I. INTRODUCTION

**\*1** Plaintiff pro se Jean Oliver brought this employment
discrimination and retaliation action against her former
employer, the New York State Police ("NYSP"), and three of
her former supervisors, Paul Kelly, Wayne Olson, and Martin
McKee. Following a nine-day trial, at which Plaintiff was
assisted by stand-by counsel, [1] the jury returned a verdict
finding that Plaintiff had failed to prove her claims by a
preponderance of the evidence. (Dkt. No. 459). The Court
entered judgment in accordance with that verdict. (Dkt. No.
460). Presently before the Court is: (1) Plaintiff's motion for
a new trial under Federal Rule of Civil Procedure 59(a), [2]
(Dkt. No. 462), which is fully briefed, (Dkt. Nos. 471, 472
(Defendants' oppositions); Dkt. Nos. 473, 474, 475, 476, 477
(Plaintiff's reply affirmation and exhibits)); (2) Defendants'
motion to strike Plaintiff's reply affirmation and exhibits,
(Dkt. No. 483), and Plaintiff's opposition, (Dkt. Nos. 484 to
495); and (3) Defendants' motion for a bill of costs, (Dkt. No.

478), and Plaintiff's opposition and cross-motion for a stay
pending appeal, (Dkt. No. 479). For the following reasons, the
Court denies Plaintiff's motion for a new trial and Defendants'
motion to strike and grants Defendants' motion for a bill of
costs.

## II. RULE 59 MOTION

### A. Standard of Review

Under Rule 59(a), a court may "grant a new trial ... for any
reason for which a new trial has heretofore been granted in
an action at law in federal court," Fed. R. Civ. P. 59(a)(1)
(A), "including if the verdict is against the weight of the
evidence." Raedle v. Credit Agricole Indosuez, 670 F.3d 411,
417 (2d Cir. 2012). The Second Circuit has explained that "a
decision is against the weight of the evidence ... if and only
if the verdict is [1] seriously erroneous or [2] a miscarriage
of justice." Farrior v. Waterford Bd. of Educ., 277 F.3d 633,
635 (2d Cir. 2002). On a Rule 59 motion for a new trial,
the court "is free to weigh the evidence ... and need not
view it in the light most favorable to the verdict winner."
DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124,
134 (2d Cir. 1998). "A court considering a Rule 59 motion
for a new trial must bear in mind, however, that the court
should only grant such a motion when the jury's verdict is
'egregious.' " Id. (quoting Dunlap-McCuller v. Riese
Org., 980 F.2d 153, 158 (2d Cir. 1992)). Although a court
"may weigh the evidence and the credibility of witnesses"
when considering a Rule 59 motion, "a judge should rarely
disturb a jury's evaluation of a witness's credibility and may
not freely substitute his or her assessment of the credibility
of witnesses for that of the jury simply because the judge
disagrees with the jury." Raedle, 670 F.3d at 418 (citation and
internal quotation marks omitted).

### B. Motion to Strike

**\*2** Before considering the merits of Plaintiff's motion for
a new trial, the Court must address Defendants' motion to
strike, (Dkt. No. 483), the reply Plaintiff filed in connection
with her motion for a new trial, (Dkt. No. 473). Defendants
assert that Plaintiff, by her own admission, mistakenly filed
these submissions with this Court, instead of with the Second
Circuit, where her appeal and motion to vacate this Court's
judgment are pending. (Dkt. No. 483-1, ¶ 8); *see Oliver v.
NYSP, et al.*, No. 22-979 (2d Cir.), ECF Nos. 1 (Notice of Civil
Appeal filed May 2, 2022), 10 (Motion to Vacate Judgment
filed May 5, 2022). Defendants further assert that Plaintiff's

fifty-three page reply affirmation and exhibits, which total more than 700 pages of documents, go "far beyond the scope of both Plaintiff's original, three-page motion, and the Defendants' response." (Dkt. No. 483-1, ¶ 11). Plaintiff opposes Defendants' motion to strike, and although she has filed more than 1,000 pages in support of her opposition, (Dkt. Nos. 484, 485, 486, 487, 488, 489, 490, 491, 492, 493, 494, 495), she has not responded to either of Defendants' arguments.

Defendants' first assertion—that Plaintiff did not intend her submissions to constitute her reply papers to her motion for a new trial, but to constitute her reply papers to the motion to vacate she filed in the Second Circuit—appears to be correct. Plaintiff represented as much to the Second Circuit Court of Appeals in a letter dated May 25, 2022, stating she "mistakenly filed [her] original Reply to the Defendants' Response [to her motion to vacate] on May 20, 2022, in the District Court, as [she] was unsure whether the Reply needed to be filed with the District Court or the Court of Appeals" and "sincerely apologiz[ing] for any confusion this may have caused." (Dkt. No. 483-1, at 6). Defendants' second assertion is also correct; the matters Plaintiff addressed in her reply papers impermissibly exceed the scope of the issues Plaintiff raised in her three-page motion for a new trial. *See* 🔖 *Morgan v. McElroy*, 981 F. Supp. 873, 876 n.3 (S.D.N.Y. 1997) ("It is well settled in the Second Circuit that a party may not raise an argument for the first time in [her] reply brief."). Indeed, Plaintiff's fifty-three-page affirmation recounts the "History of the Facts in this case," the discovery process and the issues that arose during that process, Plaintiff's motion for a preliminary injunction, the summary judgment stage, pre-trial conferences and motions, and trial, highlighting alleged errors at each stage of the litigation. (*See generally* Dkt. No. 473). Further, the exhibits Plaintiff filed in support of her reply include documents related to the expert she hired, the search of her residence, and discovery responses—none of which are relevant to the arguments Plaintiff made in her motion for a new trial. (*See generally* Dkt. Nos. 473-1 to 473-4). However, given her status as a pro se litigant—albeit one that is very adept at briefing and filing documents with the Court—the Court declines to strike Plaintiff's reply submissions in their entirety. Instead, the Court will limit its consideration of Plaintiff's reply submissions to those aspects that concern the arguments Plaintiff raised in her initial motion for a new trial. Accordingly, Defendants' motion to strike is denied and the Court turns to the merits of Plaintiff's motion for a new trial.

## C. Discussion

### 1. Exhibits

Plaintiff argues that she is entitled to a new trial because the Court erroneously "refused to allow [her] to present the evidence [she] needed in order to establish" her claims. (Dkt. No. 463, at 1). Plaintiff observes that the Court permitted "every exhibit the defendants submitted" to be "presented to the jury," but permitted her to present "only very select and very specific exhibits" to the jury. (*Id.*). Plaintiff does not identify any specific exhibit the Court found inadmissible, but points to the Court's treatment of Plaintiff's Exhibit 62-2 as an example of the Court's unfair treatment of her evidence. (*Id.*). Specifically, Plaintiff represents that during the April 15, 2022 pretrial conference, the "Court insisted" that Plaintiff's Exhibit 62-2 was "not on the thumb drive [Plaintiff] provided to the parties in this case." (Dkt. No. 462, at 1). However, in working with one of Defendants' attorneys "to confirm several" exhibits during trial, Plaintiff "discovered" that the attorney "did in fact have Exhibit P62-2 on her thumb drive." (*Id.*). Plaintiff asserts that if she "had not observed this exhibit on Ms. Joslin's computer and pointed out to here that the exhibit was right there on her computer, a portion of these exhibits would have also never been admitted into evidence by this Court." (*Id.*).

**\*3** The history of the difficulty the Court and the parties experienced in attempting to parse Plaintiff's exhibits and locate documents, and reconcile the documents Plaintiff provided on thumb drives—which often lacked individual exhibit labels, contained multiple documents within a single exhibit, and reflected different numbers than those on Plaintiff's exhibit lists—with Plaintiff's exhibit lists, is laid out in the Court's Memorandum-Decision and Order denying Defendants' motion for sanctions and is incorporated herein. (Dkt. No. 451). It is also reflected in the Court's extensive and time-consuming pretrial conferences during which the Court and the parties worked to review and determine the admissibility of Plaintiff's exhibits. (Text Minute Entry for first pretrial conference on February 25, 2022; Dkt. No. 464 (transcript of second pretrial conference on April 13, 2022); Dkt. No. 465 (transcript of third pretrial conference on April 14, 2022); Dkt. No. 466 (transcript of fourth pretrial conference on April 15, 2022)). Even after trial began, the Court permitted Plaintiff to continue to organize and label her exhibits, often directing the parties to meet and confer

over breaks and in the evenings to work toward an agreement concerning Plaintiff's exhibits.

As the following description of Plaintiff's Exhibit 62-2, illustrates, it was not so much a question of whether Plaintiff had provided the documents that comprised that exhibit, it was a question of *locating* the documents within the thumb drives, and *reconciling* the numbering provided on the thumb drives, which often differed from the numbering on Plaintiff's exhibit lists. Plaintiff's Exhibit List, filed April 8, 2022, (Dkt. No. 443, at 12–13), divided P62 into P62-1 ("The removal of Plaintiff's undercover duties – Plaintiff") and P62-2 ("The Defendants file false statements to remove Plaintiff's undercover duties"), (*id.*). P62-1 was further divided into eighteen sub-exhibits denoted by letters P62-1A through P62-1R, (Dkt. No. 443, at 12–13), and P62-2 was further divided down into thirty-seven sub-exhibits denoted as P62-2A through P62-2HH, (*id.* at 13). However, the exhibits contained on the thumb drive Plaintiff provided to the Court were labeled "P-62(A)" through "P-62(NN)" and while the exhibits appeared to contain some of the documents listed on Plaintiff's April 8 Exhibit List, the documents were mislabeled. For example, the "Martin McKee memorandum to Mark Koss dated May 23, 2014" was labeled as "P-62NN" in the thumb drive, but listed as "P62-2GG" on Plaintiff's April 8 Exhibit List. (Dkt. No. 443, at 13; *see also* Dkt. No. 466, at 5–22 (transcript of April 15, 2022 pretrial conference, including the lengthy discussion of P62 and P62-2 and the efforts made by all present to locate and reconcile them)). On day three of the trial, Plaintiff produced a hard copy of the exhibits comprising P62, including the P62-2 sub-exhibits. After the parties met and conferred, all but four of the thirty-seven exhibits within P62-2 were admitted into evidence, many on the stipulation of defense counsel. (Dkt. No. 454, at 65–74).[3] In all, more than 120 of Plaintiff's exhibits were admitted into evidence at trial. (Dkt. No. 454; Dkt. No. 454-1).

As further evidence of the Court's alleged unfairness and bias toward Plaintiff and her exhibits, Plaintiff cites the Court's admission of all of Defendants' proposed exhibits into evidence. (Dkt. No. 462, at 1). However, not only did Plaintiff fail to object to any of Defendants' exhibits, but Plaintiff *stipulated* to the admission into evidence of *all* of Defendants' thirty-nine exhibits. (Dkt. No. 455). Plaintiff's argument is therefore without merit.

The Court's handling of Plaintiff's exhibits and requirement that they be properly organized and labeled and that the copies

each party, the Court, and the jury possessed were identical, served to ensure the orderly presentation of the evidence to the jury. *See Anderson v. Great Lakes Dredge & Dock Co.*, 509 F.2d 1119, 1131 (2d Cir. 1974) (explaining that a trial judge must "set the tone of the proceedings and exercise sufficient control to insure that the trial will be an orderly one in which the jury will have the evidence clearly presented"). To be sure, a significant amount of trial time focused on Plaintiff's exhibits and presentation of evidence, while comparatively little time was spent on Defendants' exhibits and witnesses, which were fewer in number, properly labeled and organized, and stipulated to by all parties. However, because Plaintiff's exhibits were numerous, disorganized, and often mislabeled, such time was necessary to ensure all parties, including Plaintiff herself, a fair trial. Thus, "[w]hile a judge should strive to create an 'atmosphere of perfect impartiality,' the law assures litigants a fair trial, not a perfect one." *Luca v. Cnty. of Nassau*, 344 F. App'x 637, 639 (2d Cir. 2009) (first quoting *Shah v. Pan Am. World Servs., Inc.*, 148 F.3d 84, 98 (2d Cir. 1998); and then citing *Zinman v. Black & Decker (U.S.), Inc.*, 983 F.2d 431, 436 (2d Cir. 1993)). Accordingly, Plaintiff's motion for a new trial based on the Court's handling of her exhibits at trial is denied.

### 2. Witnesses

**\*4** Plaintiff seeks a new trial on the ground that she was not permitted to call Timothy Bour, Michael Davis, Michael Bruggman, or Theresa Temple to testify as witnesses at trial. (Dkt. No. 462, at 2). Defendants oppose Plaintiff's motion. (Dkt. Nos. 471, 472).

On January 19, 2022, after reviewing Plaintiff's first witness list, which included a request for "guidance on the process for obtaining" trial subpoenas for her witnesses, (Dkt. No. 383, at 1), the Court issued a Text Order advising Plaintiff that she "must provide sufficient details of each witness's proposed testimony to allow the Court to determine whether the testimony is relevant to the remaining claims; the Court will only issue subpoenas for witnesses who have relevant testimony." (Dkt. No. 386). In addition, the Court directed Plaintiff "to coordinate with defense counsel to determine the witnesses for whom Plaintiff does not need to have subpoenas issued," as there were likely witnesses whom both Plaintiff and Defendants intended to call at trial. (Dkt. No. 386). In an email dated January 28, 2022, defense counsel notified Plaintiff that Defendants intended to issue subpoenas for,

among others, Bour, Davis, Bruggman, and Temple, thereby "obviating the need for you to issue your own subpoenas for their testimony." [4] (Dkt. No. 462-1, at 1).

On the sixth day of trial, Defendants notified the Court that they were planning to eliminate Bour, Davis, Bruggman, and Temple from their witness list in order to meet the trial schedule and because they no longer needed them given how the case was going. Plaintiff responded that, based on Defendants' representation that they would subpoena those witnesses, she had not requested the issuance of subpoenas for those witnesses and indicated that she was concerned that Davis, in particular, would not be called as a witness. Defense counsel acknowledged that the parties had spoken about "Davis some time ago," but noted that Plaintiff's recent witness lists had not included Davis. The Court then asked Plaintiff: "What relevant information do you seek to elicit from Mr. Davis?" Plaintiff provided a convoluted and wide-ranging response [5] that is best deciphered as indicating that Davis's testimony was relevant to her retaliatory transfer claim, i.e., that in May 2014, Defendants NYSP and McKee retaliated against her for filing EEO complaints of harassment and retaliation by forcing her to transfer from CNET to CTIU. Specifically, Plaintiff asserted that she expected to elicit information about the May 13, 2014 operation that immediately preceded the allegedly retaliatory transfer in order to contradict Defendants' contentions that she was "rushing" and "wasn't planning out" the operation. Plaintiff further asserted that she intended to show that that the memos and documents Bruggman, who was working on the operation with Plaintiff, and Davis, who was Plaintiff's supervisor at the time, prepared regarding the May 13 operation were false. Plaintiff also explained that it was her "contention" that when Davis "testified under oath, he committed perjury." [6] After listening to Plaintiff's proffer, the Court, after weighing the evidence in accordance with Federal Rule of Evidence 403, [7] declined to permit Plaintiff to call Davis or Bruggman as witnesses:

> **\*5** I've tried to listen very carefully to your claims and I've tried to look at the documents that you've submitted to me very carefully, and I don't find that you've made a proffer of how the testimony of Mike Davis or Mr. Bruggman would be relevant and admissible at this point in the trial,

and that ... any relevant testimony they have would be outweighed by the confusion of issues, misleading the jury, and cumulative evidence because we already have a fair amount of evidence regarding these transactions.

Neither the parties nor the Court further addressed Defendants' decision not to call Bour and Temple as witnesses. As noted above, of the four witnesses at issue, only Davis appeared on Plaintiff's witness lists. However, given Plaintiff's pro se status and Defendants' representation that she need not seek subpoenas for these witnesses, the Court nonetheless considers whether the absence of these witnesses from trial warrants a new trial in this case.

### 3. Davis and Bruggman

**\*6** Neither at trial nor in her post-trial motion did Plaintiff provide a proffer calling into question the Court's conclusion that the danger of presenting cumulative evidence, confusing the issues, or misleading the jury substantially outweighed any minimal probative value of Davis's or Bruggman's testimony. Plaintiff, Defendant Kelly, Defendant McKee, Defendant Olson, Jacqueline Baldwin, June Bradley, and Francis Christensen provided extensive testimony regarding the events of May 13, 2014 and/or Plaintiff's transfer out of CNET. Bradley, whom Plaintiff called to tell she had found a memo Bruggman had drafted about her on the office share drive, testified that Plaintiff was "so upset" when she called that Bradley asked Investigator Scott Gilman in the NYSP's employee assistance unit to contact her. Christensen stated that he helped to orchestrate Plaintiff's transfer after receiving a call from Gilman, who was concerned not only about a personnel complaint against Plaintiff in connection with taking a file, but also about Plaintiff "not being in the best work environment for her." Plaintiff presented her version of these events at trial, including the planning for the May 13 operation, Bruggman's actions at the office that day, her discovery of Bruggman's memo, her belief that Bruggman's memo was "not accurate," her reporting of the memo to Bradley, her overhearing Defendant McKee "telling someone on the phone" that "she's stealing files," and the memo she received that night regarding her transfer.

Plaintiff has not identified any additional information that Davis or Bruggman could have provided and argues only

that she would have shown that both made false statements regarding the underlying May 13 undercover operation that led to Bruggman's memo. Thus, given the minimal probative value of any testimony by these witnesses, and the danger of presenting cumulative evidence and confusing the issues—the May 13 undercover operation was an underlying event, tangential to her transfer—the Court's denial of Plaintiff's request that Davis and Bruggman testify does not warrant a new trial. "Rule 403 determinations command especial deference because the district court is in 'the best position to do the balancing mandated by Rule 403.' " *United States v. Al Kassar*, 660 F.3d 108, 123 (2d Cir. 2011) (quoting *United States v. Stewart*, 590 F.3d 93, 133 (2d Cir. 2009)). The Second Circuit has explained that "[s]o long as the trial court 'conscientiously balanced the proffered evidence's probative value with the risk for prejudice,' " it "will reverse its conclusion 'only if it is arbitrary or irrational.' " *Id.* (quoting *United States v. Awadallah*, 436 F.3d 125, 131 (2d Cir. 2006)). "Even manifest error does not require reversal if the error was harmless," that is, if we can conclude with fair assurance that the evidence would not have substantially influenced the jury. *Id.* (citing *United States v. Miller*, 626 F.3d at 682, 687–88 (2d Cir. 2010)). Moreover, it is clear that the jury credited Defendants' version of events regarding the transfer, while discrediting Plaintiff's. The Court declines to disturb the jury's evaluation of the credibility of the trial witnesses. *Raedle*, 670 F.3d at 418 (noting that "a judge 'should rarely disturb a jury's evaluation of a witness's credibility' " (quoting *DLC Mgmt. Corp.*, 163 F.3d at 134)).

### 4. Temple and Bour

As to Temple and Bour, Plaintiff presented no argument at trial and made no specific objection to Defendants' announcement that they no longer intended to call Temple and Bour as witnesses. Further, Plaintiff makes no proffer as to the testimony either might have provided at trial; she asserts only that she had evidence that "would have contradicted the false statements contained in the memoranda these witnesses submitted to Martin McKee and Wayne Olson in support of my forced transfer" to CTIU.[8] (Dkt. No. 462, at 2). For all the reasons discussed above, the Court therefore finds Defendants' decision not to call Temple or Bour provides no basis on which to grant a new trial.

### D. Impeachment of Witnesses

Plaintiff argues that the Court prohibited her from impeaching Defendants McKee and Kelly with "the false statements they filed and the false sworn testimony defendant, Martin McKee, repeatedly offered in this case ... all of which would have certainly established my claims against these defendants beyond a preponderance of the evidence." (Dkt. No. 462, at 2). As Plaintiff does not identify the statements or testimony to which she refers in her post-trial motion and given the large number of exhibits discussed at trial, the Court has no basis on which to evaluate Plaintiff's argument. In addition, Plaintiff conducted an extensive cross-examination of both McKee and Kelly, during which she repeatedly questioned not only the procedures they used in collecting memoranda regarding Plaintiff's conduct and various events at issue in this case, but also the veracity of statements they made in the memoranda they issued. Indeed, Plaintiff cross-examined McKee regarding his prior deposition testimony in this case. Plaintiff is therefore not entitled to a new trial based on the Court's refusal to admit unidentified evidence.

**\*7** In sum, none of Plaintiff's arguments—whether taken singly or in combination—raises a possibility that the jury verdict in this case was "seriously erroneous" or a "miscarriage of justice." *Farrior*, 277 F.3d at 635. The Court therefore denies Plaintiff's motion for a new trial.

## III. BILL OF COSTS

### A. Applicable Standard

Federal Rule of Civil Procedure 54(d)(1) states in relevant part that, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs ... should be allowed to the prevailing party." "[T]he Supreme Court has held that the term 'costs' includes only the specific items enumerated in 28 U.S.C. § 1920." *Whitfield v. Scully*, 241 F.3d 264, 269 (2d Cir. 2001), *abrogated on other grounds by Bruce v. Samuels*, 577 U.S. 82, 136 S.Ct. 627, 193 L.Ed.2d 496 (2016). Section 1920 provides that the following costs are taxable: (1) fees of the clerk and marshal; (2) fees for transcripts "necessarily obtained for use in the case"; (3) fees for printing and witnesses; (4) fees for exemplification and copying costs "where the copies are necessarily obtained for use in the case"; (5) docketing fees under 28 U.S.C. § 1923; and (6) fees for court-appointed experts and interpreters. 28 U.S.C. § 1920. "The burden is on the prevailing party to establish to the court's satisfaction that the taxation of costs is justified."

*Cohen v. Bank of N.Y. Mellon Corp.*, No. 11-cv-456, 2014 WL 1652229, at *1, 2014 U.S. Dist. LEXIS 57829 (S.D.N.Y. Apr. 24, 2014) (quoting *John G. v. Bd. of Educ.*, 891 F. Supp. 122, 123 (S.D.N.Y. 1995)). "[B]ecause Rule 54(d) allows costs 'as of course,' such an award against the losing party is the normal rule obtaining in civil litigation, not an exception." ⚑ *Whitfield*, 241 F.3d at 270.

**B. Discussion**

Defendant NYSP, Paul Kelly, and Wayne Olson seek a total of $12,081.64 in costs associated with defending this action. (Dkt. No. 478). Plaintiff filed a response and cross-motion for a stay of Defendants' motion for costs pending appeal. (Dkt. No. 479). However, Plaintiff does not advance any argument otherwise opposing Defendants' motion for costs. Defendants seek $11,047.78 for transcripts and $1,033.86 for witness fees.

**1. Transcript Fees**

A prevailing party is "ordinarily ... permitted to recover costs for the original and one copy of [a] transcript[ ]." *C.C. ex rel. Camarata v. Polaris Indus., Inc.*, No. 14-cv-0975, 2018 WL 3031848, at *5, 2018 U.S. Dist. LEXIS 101785 (N.D.N.Y. June 19, 2018). Stenographer fees are generally recoverable, ⚑ *Hines v. City of Albany*, 862 F.3d 215, 219 n.2 (2d Cir. 2017), as are exhibit fees, because "exhibits are a necessary part of an original deposition transcript," *In re Omeprazole Patent Litig.*, No. 00-cv-6749, 2012 WL 5427849, at *4, 2012 U.S. Dist. LEXIS 160046 (S.D.N.Y. Nov. 7, 2012); *see* N.D.N.Y. *Guidelines for Bills of Costs*, II(D)(1)(h), (i) (listing "[c]ourt reporter fees for attendance and travel for depositions" and "copies of papers obtained as exhibits in the deposition" as taxable costs). [9]

Here, Defendants seek costs for an original and two copies of Plaintiff's deposition, for a total of $9,581.73. (Dkt. Nos. 478-1, at 5–8). It appears that one of the copies of Plaintiff's deposition was for Defendant McKee, who is separately represented and who has not made an application for costs. Therefore, as Defendants NYSP, Kelly, and Olson are only entitled to an original and one copy, the Court reduces Defendants' award by one-third, to $6,419.76. That amount is further reduced by $156, the amount charged for "postage and handling fees" in connection with Plaintiff's deposition transcript. Delivery fees are generally disallowed.

*See* *Sevenson Envtl. Servs., Inc. v. Shaw Envtl., Inc.*, 246 F.R.D. 154, 156 (W.D.N.Y. 2007); *Cutie v. Sheehan*, No. 11-cv-66, 2016 WL 3661395, at *5, 2016 U.S. Dist. LEXIS 86548 (N.D.N.Y. July 5, 2016); *see also* N.D.N.Y. *Guidelines for Bills of Costs*, II(D)(2)(d) (providing that "[c]ourt reporter postage or delivery charges for a transcript" are not taxable). Therefore, the total to which Defendants are entitled for Plaintiff's transcript is $6,283.82. Defendants' request for an award of costs for transcripts of several pretrial proceedings, which total $1,466.05, appears to be for a single copy, (*see* Dkt. No. 478-1, at 10–15), and is therefore warranted. Accordingly, Defendants are entitled to a total award of costs in the amount of $7,749.87 for transcript fees.

**2. Witness Fees**

**\*8** Defendants seek an award of costs in the amount of $240.00 for the attendance of six witnesses at trial, as well as $793.86 in mileage for those witnesses. (Dkt. No. 478-1, at 3). As the statutory attendance fee is $40.00 per witness, and the mileage for each of those witnesses has been calculated at the rate of $0.585, as prescribed under 28 U.S.C. § 1821(c)(2) and the United States General Services Administration Privately Owned Vehicle Mileage Rates, effective January 1, 2022, see https://www.gsa.gov/travel/plan-book/transportation-airfare-pov-etc/privately-owned-vehicle-mileage-rates/pov-mileage-rates-archived (last visited Jan. 17, 2023), Defendants' request for costs in the amount of $1,033.86 is granted. *See* N.D.N.Y. *Guidelines for Bills of Costs* II(F)(1)(a), (b) (providing that "[w]itnesses are entitled to $40.00 per day of testimony" and mileage at the rate "set by the General Services Administration").

**C. Stay Pending Appeal**

Plaintiff moves for a stay of Defendants' motion for costs "pending a decision by the U.S. Court of Appeals." (Dkt. No. 479, ¶ 3). Under this Court's Guidelines for Bills of Costs, "[u]less otherwise ordered by the District Court, or the Circuit Court of Appeals pursuant to Fed. R. App. P. 8, the filing of an appeal shall not stay the taxation of costs." N.D.N.Y. *Guidelines for Bills of Costs* I(F)(2). While Plaintiff does not identify the legal authority for such a stay, the Court notes that while Fed. R. Civ. P. 62, which governs stays of proceedings to enforce a judgment and "outlines the mechanism for how a stay may be obtained while an appeal is pending," does not appear applicable to a bill of costs. *Miller v. City of Ithaca*, No. 10-cv-597, 2017 WL 61947, at *4, 2017 U.S. Dist. LEXIS

1310 (N.D.N.Y. Jan. 5, 2017). However, because "Rule 62 it does not limit the district court's inherent power to issue a stay in a manner that does not fall within the scope of the Rule," *id.*; *accord Eddystone Rail Co., LLC v. Jamex Transfer Servs., LLC*, No. 17-cv-1266, 2019 WL 181308, at *4, 2019 U.S. Dist. LEXIS 5416 (S.D.N.Y. Jan. 11, 2019) ("It is well-settled that a district court has discretionary power to stay proceedings pursuant to its inherent power to control its docket." (citing 🚩 *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55, 57 S.Ct. 163, 81 L.Ed. 153 (1936))), the Court utilizes its framework for evaluating Plaintiff's request. The Court concludes that Plaintiff has failed to meet her burden of showing that a stay is warranted.

"The party requesting a stay bears the burden of showing that the circumstances justify an exercise of th[e court's] discretion." 🚩 *Nken v. Holder*, 556 U.S. 418, 433–34, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). In deciding whether to stay proceedings, courts consider four factors, the first two of which "are the most critical": "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." 🚩 *Id.* at 434, 129 S.Ct. 1749 (quoting 🚩 *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987)); *accord* 🚩 *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007).

Here, Plaintiff has not made any showing of a likelihood of success on the merits or irreparable injury absent a stay. Having considered the applicable factors, the Court finds that Plaintiff has failed to meet her burden of showing that the circumstances here warrant a stay, and her motion for a stay of taxation of costs pending appeal is therefore denied.

## IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for a new trial (Dkt. No. 462) is **DENIED**; and it is further

**ORDERED** that the motion to strike (Dkt. No. 483) by Defendants NYSP, Kelly, and Olson is **DENIED**; and it is further

**\*9 ORDERED** that the motion for costs (Dkt. No. 478) by Defendants NYSP, Kelly, and Olson is **GRANTED in part** to the extent that Defendants are awarded $8,783.73 in costs, but is otherwise **DENIED**; and it is further

**ORDERED** that Plaintiff's cross-motion for a stay of Defendants' motion for costs pending appeal (Dkt. No. 479) is **DENIED.**

**IT IS SO ORDERED.**

### All Citations

Slip Copy, 2023 WL 246698

---

## Footnotes

1     The Court appointed, as stand by counsel for Plaintiff, a partner from the labor and employment practice of a prominent Syracuse law firm, to assist Plaintiff with the orderly presentation of her case at trial. (Dkt. No. 440).

2     Plaintiff does not specify the legal basis on which she seeks relief. However, as her post-trial motion objects to the Court's "mishandling of the jury trial," (Dkt. No. 461, at 1), and Plaintiff made no motion at trial for judgment as a matter of law under Rule 50(a), a prerequisite to a post-trial motion under Rule 50(b), *see Holmes v. United States*, 85 F.3d 956, 962 (2d Cir. 1996) ("A Rule 50(b) motion can be made after the jury verdict, but only if a Rule 50(a) motion was made prior to the close of the evidence."), the Court, like Defendants, has construed Plaintiff's motion as one for a new trial under Rule 59(a), (*see* Dkt. No. 471-1, at 5 (noting in memorandum of law that "Plaintiff has not offered a legal basis for the relief she requests, but she appears to be seeking relief pursuant to FRCP Rule 59")).

3    P62-2B, P62-2Z, P62-AA, and P62-2BB were not admitted into evidence and Plaintiff does not challenge the exclusion of these exhibits here.

4    In all, Plaintiff filed seven witness lists. (Dkt. Nos. 383, 384 (filed January 10, 2022), Dkt. No. 398 (filed January 26, 2022), Dkt. No. 405 (filed February 16, 2022), Dkt. No. 408 (filed March 2, 2022); Dkt. No. 410 (filed March 7, 2022); Dkt. No. 420 (filed March 17, 2022); Dkt. No. 444 (filed April 8, 2022)). Plaintiff identified Davis as a witness on her first five witness lists, but not on her last two witness lists. Bour, Bruggman, and Temple never appeared on Plaintiff's witness lists.

5    Although Plaintiff argued at length in response to the Court's inquiries as to the relevance of Davis's testimony, she only briefly addressed the testimony Davis might provide; much of Plaintiff's argument concerned an alleged ongoing pattern of cover-ups and false statements by her supervisors and others in the NYSP as part of a joint and ongoing effort to retaliate against her:

> THE COURT: ... [Y]ou're talking a lot because you're talking about an undercover transaction that was supposed to take place May 13 ... 2014, so you have a lot of complaints with how they describe what happened, but even assuming you were right on those complaints, what's the relevance to your claim that you were forced to transfer?

> MS. OLIVER: Ma'am, the relevance is if you look at every single incident, there are memorandas, there's documents being put together at the direction of these defendants, they have been falsified, they are false statements, there's false sworn testimony, and in every single time, I am the one who faces the consequences of that. It is one retaliatory act after another. And to not allow those documents in, if you look at the letter that Wayne Olson sent to Frank Koehler in May of 2014, that is three months, it's actually four months after Jeremy Peterson sexual harassment complaint is founded. Wayne Olson never discloses to Frank Koehler that in fact Jeremy Peterson was found to have sexually harassed me, because he has no excuse for transferring me on to the same team as Jeremy Peterson. So he hides that fact.

> And if you look at the letter of censure from Kevin Gagan, it's hidden again. Why is nobody willing to indicate that Jeremy Peterson was founded, because they forced me to transfer. And when they did, your Honor, you're not going to participate in any unit investigations, you're not going to go do anything, you're going to sit there by yourself and we're going to isolate you and we're going to keep coming after you and we're going to keep building these documents.

> You saw it, your Honor, in the testimony that I presented, the documents that Martin McKee is streamlining, the memorandums of his individuals to go directly to Wayne Olson who sent that right up to division level. They didn't see those documents, there is no one in the Division of State Police that would ever send an undercover in a situation where the target had already threatened that informant with a gun, but he'll stand there under sworn, under sworn testimony and say that ... that he would.

6    Plaintiff did not identify the testimony to which she was referring.

7    Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

8    Plaintiff does not identify this evidence.

9    *Available at* https://www.nynd.uscourts.gov/sites/nynd/files/Guidelines_Bill_of_Costs_091021.pdf.

---

2010 WL 4366999
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Richard J. PICCIANO, Plaintiff,

v.

Stephan McLOUGHLIN, Defendant.

No. 5:07–CV–0781 (GTS/GJD).
|
Oct. 28, 2010.

**Attorneys and Law Firms**

Guttman & Wallace, Richard M. Wallace, Esq., Hilary E.
Ward, Esq., of Counsel, Ithaca, NY, for Plaintiff.

Town, Ryan & Partners, P.C., John F. Moore, Esq., Claudia
A. Ryan, Esq., of Counsel, Albany, NY, for Defendant.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this civil rights action filed
by Richard J. Picciano ("Plaintiff") against City of Auburn
Police Officer Stephan McLoughlin ("Defendant"), are six
pretrial motions *in limine* submitted by Defendant (Dkt. No.
31), and two pretrial motions *in limine* submitted by Plaintiff
(Dkt. No. 40). For the reasons set forth below, Defendant's
motions are granted in part and denied in part, and Plaintiff's
motions are granted in part and denied in part.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Motions *in Limine***

Plaintiff has filed the following two motions *in limine:* (1)
a motion to preclude the introduction of evidence related to
an incident that occurred on February 4, 2003, involving the
assault and injury of Auburn Police Officer Mark Pilipczak;
and (2) a motion to preclude the introduction of evidence
related to Plaintiff's seven prior criminal arrests and/or
convictions. (Dkt. No. 40.)

**B. Defendant's Motions *in Limine***

Defendant has filed the following six motions *in limine:*
(1) a motion to preclude the introduction of evidence
related to the "Metler Incident"; (2) a motion to permit
Defendant to introduce evidence of Plaintiff's 2009 drug
conviction for impeachment purposes; (3) a motion to permit
Defendant to introduce evidence of Plaintiff's entire criminal
history; (4) a motion to preclude Mary Lou Picciano from
offering hearsay and/or irrelevant testimony; (5) a motion
to (a) preclude Plaintiff from arguing that, pursuant to
the relevant Municipal Code, Defendant simply could have
seized Plaintiff's skateboard and issued him a ticket in lieu
of arresting him, and (b) instruct the jury that they are not
to consider the validity of Plaintiff's arrest; and (6) a motion
to compel Plaintiff to provide Defendant with releases for
disclosure of the trial, plea, district attorney, and department
of corrections records regarding Plaintiff's 2009 drug arrest,
conviction and imprisonment. (Dkt. No. 31.)

**II. ANALYSIS**

**A. Whether Defendant May Introduce Evidence
Related to Plaintiff's Prior Arrests and Convictions**

In his motion *in limine,* Plaintiff argues that Defendant should
be precluded from mentioning his prior criminal history for
impeachment purposes pursuant to Fed.R.Evid. 609 because
(1) his prior criminal history is not relevant to this civil
rights action, (2) his prior criminal history is not probative
of truthfulness and/or the prejudicial effect of introducing his
criminal history substantially outweighs the probative value,
and (3) only his prior alleged conviction for petit larceny
involves a crime of dishonesty. [1]

Conversely, Defendant argues in his motion *in limine* that
evidence of Plaintiff's 2009 conviction is admissible because
(1) the impeachment value of the crime is high, (2) the prior
conviction is not too remote in time, (3) the conduct at issue
and the conviction sought to be introduced as dissimilar,
and (4) Plaintiff's credibility is key to a jury decision. In
addition, Defendant argues that evidence of Plaintiff's entire
prior criminal history is admissible if Plaintiff testifies about
his emotional damages, and in particular his "fear" of police
officers that he allegedly suffers from as a result of the
incident that occurred on August 4, 2004, which is the subject
of this action.

**\*2** Rule 402 of the Federal Rules of Evidence provides, *inter
alia,* that "[e]vidence which is not relevant is not admissible."
Fed.R.Evid. 402. Plaintiff will inevitably testify at trial about,

among other things, his injuries. Therefore, evidence that calls into question his character for truthfulness is relevant.

However, even assuming that evidence of Plaintiff's prior arrests and 2009 conviction is relevant, the Court must still determine whether such evidence is admissible under Fed.R.Evid. 403, 404(b), 608(b), and 609.

**1. Plaintiff's Prior Arrests and the Stabbing Incident**

Rule 403 of the Federal Rules of Evidence provides as follows:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Rule 404(b) of the Federal Rules of Evidence provides as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Finally, Rule 608(b) of the Federal Rules of Evidence provides as follows:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

As an initial matter, only Plaintiff's arrest for petit larceny involves a crime of dishonesty. Moreover, the Supreme Court has held that an "[a]rrest without more does not ... impeach the integrity or impair the credibility of a witness." *Michelson v. United States,* 335 U.S. 469, 482 (1948) (holding that "[o]nly a conviction ... may be inquired about to undermine the trustworthiness of a witness"). As a result, to the extent Defendant seeks to admit evidence of Plaintiff's prior arrests (and/or the stabbing incident) for impeachment purposes, that request is denied.

Having said that, in the event that Plaintiff testifies at trial that he suffered a "fear" of police officers, and/or lost his desire to become a police officer, as a result of the incident of August 4, 2004, which is the subject of this litigation, the Court will permit Defendant to ask Plaintiff whether he has been arrested on more than one occasion since August 4, 2004. This is because his subsequent arrests are probative of Plaintiff's claim for emotional damages, and the probative value of the testimony is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *See Ramos v. County of Suffolk,* 707 F.Supp.2d 421, 424 (E.D.N.Y.2010) (permitting defendant to question plaintiff about whether she

had ever been arrested prior to and after the incident that was the subject of the litigation because the fact of the arrest "affected the plaintiff's claim for emotional distress damages," but precluding defendant from "go[ing] into what the reason for the arrest is").

**2. Plaintiff's Prior Conviction**

**\*3** Rule 609(a)(1) of the Federal Rules of Evidence provides as follows:

> For the purpose of attacking the character for truthfulness of a witness, ... evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused.

Rule 609(a)(2) of the Federal Rules of Evidence provides as follows:

> For the purpose of attacking the character for truthfulness of a witness, ... evidence that any witness has been convicted of a crime shall be admitted regardless of the punishment, if it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness.

Finally, Rule 609(b) of the Federal Rules of Evidence provides as follows:

> Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

Because Plaintiff was released from prison within the past ten years, the ten-year time limit set forth in Fed.R.Evid. 609(b) does not apply. Therefore, the Court must determine whether evidence of Plaintiff's conviction for unlawful sale of a controlled substance is admissible under Fed.R.Evid. 609(a).

Drug crimes are generally not crimes involving dishonesty or false statement. *See* Lewis v. Velez, 149 F.R.D. 474, 481–82 (S.D.N.Y.1993) ("Neither drug crimes nor assault involve dishonesty or false statement."); Daniels v. Loizzo, 986 F.Supp. 245, 250 (S.D.N.Y.1997) ("Drug crimes, however, do not automatically implicate the use of dishonesty or false statements."). When the crime falls within the "uncertain middle category neither clearly nor clearly excluded by ... [Rule 609(a)(2) ]," the proffering party must demonstrate "that [the] particular prior conviction rested on facts warranting the dishonesty or false statement description." United States v. Hayes, 553 F.2d 824, 827 (2d Cir.1977) (barring admission of narcotics importation conviction under Rule 609(a)(2) because government failed to present specific facts that crime involved dishonesty or

false statement); *see also United States v. Hastings,* 577 F.2d 38, 41 (8th Cir.1978) (finding narcotics conviction inadmissible under Rule 609(a)(2) absent showing that conviction rested on facts involving dishonesty or false statement). In this case, Defendant offers no evidence to suggest that Plaintiff's 2009 conviction involved dishonesty or false statement. Thus, the conviction is not automatically admissible under Rule 609(a)(2).

**\*4** Nonetheless, the conviction may be admissible under Fed.R.Evid. 609(a)(1) because it was punishable by "imprisonment in excess of one year."[2] This conviction is therefore subject to the Fed.R.Evid. 403 balancing test imposed by Fed.R.Evid. 609(a)(1).

With regard to Fed.R.Evid. 609(a)(1), because Plaintiff was convicted of a crime punishable by more than one year, and because Plaintiff is not "an accused," evidence of Plaintiff's drug conviction may be admitted unless the Court determines that the "probative value [of the conviction] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. "Courts have often identified four factors that should be considered in balancing probative against prejudicial effect: (1) the impeachment value of the prior crime, (2) the remoteness of the prior conviction, (3) the similarity between the past crime and the conduct at issue, and (4) the importance of the credibility of the witness."

🚩 *Brundidge v. City of Buffalo,* 79 F.Supp.2d 219, 226 (W.D.N.Y.1999) (citations omitted).

With regard to the first factor, although unlawful sale of a controlled substance is not a crime involving dishonesty,[3] some court have found the impeachment value of this crime to be high. *See* 🚩 *Brundidge,* 79 F.Supp.2d at 226 (collecting cases). With regard to the second factor, the prior conviction is not remote in time; rather, it occurred within the past year. As such, it is "not so remote as to diminish the probative value." *Id.* With regard to the third factor, Plaintiff's conviction is drug-related, and the conduct at issue involves a civil rights claim. As a result, "the jury will not determine whether [P]laintiff ... committed additional crimes or harbor criminal tendencies." *Id.* (noting that "[c]ourts have allowed witnesses to be cross-examined on past crimes where the conviction at issue bears no resemblance to the current action"). Finally, with regard to the fourth factor, Plaintiff's credibility is of great importance in this case because his characterization

of the events leading up to and after his arrest is markedly different from Defendant's characterization of these events. As a result, "this case will rest on which side the jury finds most credible." *Id.* (noting that, because "the jury's main task will be to determine who is telling the truth.... Plaintiff's credibility on the stand and the credibility of her witnesses' are ... matters of great importance and outweigh any prejudice that may result").

For these reasons, Defendant may question Plaintiff regarding the nature of his 2009 conviction (i.e. what Plaintiff was convicted of). However, Defendant may not inquire into the substance of the conviction given, among other things, the potential for confusion.

## B. Whether Plaintiff May Introduce Evidence of the "Metler Incident"

**\*5** As stated in Part I.B. of this Decision and Order, Defendant seeks to preclude Plaintiff from introducing evidence about the "Metler Incident," i.e., an incident that occurred on or about July 30, 2004, in which Defendant grabbed Paul Metler, a juvenile, by the "nape of the neck" during his arrest.

In response, Plaintiff argues that evidence pertaining to the Metler Incident should be treated the same way as evidence concerning a teenager's assault of Officer Pilipczak, a City of Auburn police officer (hereinafter the "Pilipczak Incident").

The "Pilipczak Incident" involved a City of Auburn Police Officer who was assaulted by a sixteen-year-old juvenile roughly one and a half years prior to August 4, 2004. As discussed more fully below in Part II.F. of this Decision and Order, Defendant seeks to introduce evidence that, at the time he arrested Plaintiff, he was aware that another Officer Pilipczak had previously been assaulted by a sixteen-year-old boy. Defendant argues that such evidence is admissible because Plaintiff is seeking punitive damages, and therefore his state of mind (i.e., his thoughts leading up to and during his arrest of Plaintiff) is relevant.

The Court agrees that Defendant's state of mind is relevant because it will aid the jury in deciding whether he was acting with evil motive or intent when he arrested Plaintiff. However, to the extent that evidence of Defendant's good faith belief that sixteen-year-old boys may be dangerous is relevant to the issue of Defendant's lack of evil motive (i.e. his state of mind), evidence that Defendant used force to arrest a juvenile less than one week before he arrested Plaintiff is

relevant to rebut such an inference (i.e., demonstrating that he had a distaste for juveniles). As a result, for the same reasons that the Court will permit Defendant to introduce evidence of the Pilipczak Incident, discussed more fully below in Part II.F. of this Decision and Order, the Court will permit Plaintiff to introduce evidence of the Metler Incident. Accordingly, Defendant's motion to preclude Plaintiff from introducing evidence of the Metler Incident is denied.

### C. Whether Mary Lou Picciano May Proffer Hearsay and/or Irrelevant Testimony

As stated above in Part I.B. of this Decision and Order, Defendant seeks to preclude Plaintiff's mother, Mary Lou Picciano, from offering inadmissible testimony, i.e., testimony about conversations she had with various City of Auburn employees.

In response, Plaintiff argues that he does not expect to introduce hearsay or irrelevant testimony by any witness. Plaintiff further argues that, whether a witness's testimony is admissible should be determined on a question-by-question basis.

The Court is unwilling to speculate, pretrial, as to what statements any witness will or will not make during trial. As a result, the Court denies Defendant's motion as premature. Throughout the course of trial, Defendant's counsel may object to statements and/or evidence that he or she believes is inadmissible, and the Court will issue a ruling at that time.

### D. Whether Plaintiff Should Be Precluded from Presenting Evidence that Plaintiff's Arrest Was Improper, and Whether the Court Should Instruct the Jury Not to Consider the Validity of Plaintiff's Arrest

**\*6** As stated above in Part I.B of this Decision and Order, Defendant seeks to preclude Plaintiff from introducing evidence regarding the propriety of Plaintiff's arrest. Defendant argues that this evidence is irrelevant to Plaintiff's excessive force claim, and highly prejudicial. In addition, Defendant argues that the Court should instruct the jury that they should not consider the validity of Plaintiff's arrest in deciding whether Plaintiff was subjected to excessive force.

In response, Plaintiff argues that (1) an instruction to the jury that they are not to consider the validity of Plaintiff's arrest would be improper, and (2) because the jury should consider the severity of the crime in weighing the necessity of the force

used, evidence regarding the propriety of Plaintiff's arrest is relevant.

As an initial matter, the Court agrees with Defendant that the lawfulness of Plaintiff's arrest is not an element of Plaintiff's excessive force claim. Moreover, the ultimate disposition of Plaintiff's arrest is irrelevant to the issue of whether Plaintiff was subjected to excessive force, and is likely to confuse the jury. However, the Court also agrees with Plaintiff that the severity of the crime is a relevant factor for the jury to consider in determining whether the amount of force used was reasonable under the circumstances. *See Carvajal v. Mihalek,* 07–CV–0170, 2009 WL 4729929, at \*2 (S.D.N.Y. Dec. 10, 2009) (quoting, *inter alia,* 🚩 *Saucier v. Katz,* 533 U.S. 194, 205 [2001] ) ("Factors relevant to Fourth Amendment excessive force claims include, 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' ").

As a result, the Court will permit Plaintiff to introduce evidence of the name of the municipal ordinance that Plaintiff was arrested for violating, as well as evidence of the type of crime that Plaintiff was arrested for committing (i.e., a violation, misdemeanor, or felony). However, Plaintiff will not be permitted to introduce evidence challenging the propriety of Plaintiff's arrest. *See* 📁 *Salahuddin v. Coughlin,* 781 F.2d 24, 27 n. 4 (2d Cir.1986) (noting that a violation of a state law "is not necessarily a denial of [a] constitutional right"). In addition, in order to focus the jury on the relevant inquiry, i.e., whether Plaintiff was subjected to excessive force by Defendant, the Court will also issue the following instruction:

> You have not heard about the disposition of Plaintiff's arrest, and I hereby instruct you that you are not to speculate on what that outcome may have been. This is because the ultimate disposition of the criminal charges against Plaintiff has nothing to do with the merits of Plaintiff's excessive force claim.

**E. Whether Plaintiff Should Be Compelled to Provide Defendant with Releases for Disclosure of the Trial, Plea, District Attorney, and Department of Corrections Records Regarding Plaintiff's 2009 Drug Arrest, Conviction and Imprisonment**

**\*7** As stated above in Part I.B of this Decision and Order, Defendant seeks an order compelling Plaintiff to provide him with releases for disclosure of the trial, plea, district attorney, and department of corrections records regarding Plaintiff's 2009 drug arrest, conviction and imprisonment.

In response, Plaintiff argues that the records that Defendant seeks would have no tendency to disprove injuries that Plaintiff suffered in 2004, and, even if relevant, the probative value of these materials is substantially outweighed by the potential for prejudice.

As an initial matter, the Court finds that Defendant's request is procedurally improper. At the very latest, Defendant became aware that Plaintiff was incarcerated as a result of his felony drug conviction on August 24, 2010, when Defendant's counsel filed a status report with the Court regarding settlement discussions. (Dkt. No. 29.) Nonetheless, Defendant waited almost two months to file a motion to compel. As a result, the request is denied as untimely. *See* 8a Wright, Miller & Marcus, *Federal Practice and Procedure: Civil 2d* § (1994 & Supp.1999) (noting that, "[i]f the moving party has unduly delayed, [a] court may conclude that the motion is untimely").

In addition, and more importantly, the Court has already ruled that Defendant may question Plaintiff regarding the nature of his 2009 conviction, but he may not inquire into the substance of the conviction. Clearly, Defendant does not need records related to Plaintiff's 2009 drug arrest and conviction in order to ask him whether he was convicted of unlawfully selling a controlled substance, a Class B felony, in 2009. In other words, Defendant has failed to identify a need for this information separate and apart from the need to question Plaintiff about the substance of his conviction, which the Court has already determined is impermissible.

As a result, Defendant's request to have the Court compel Plaintiff to provide releases for records related to his 2009 arrest, conviction and imprisonment is denied.

**F. Whether Defendant Should Be Precluded from Introducing Evidence About a Teenager's Assault of a**

**City of Auburn Police Officer Around the Same Time as the Incident Giving Rise to this Litigation**

As stated above in Part I.A. of this Decision and Order, Plaintiff seeks to preclude Defendant from introducing evidence related to the "Pilipczak Incident" (described above in Part II.B. of this Decision and Order). Plaintiff argues that this evidence is irrelevant, and, even if relevant, its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and by considerations of undue delay and waste of time.

In response, Defendant argues that evidence of the Pilipczak Incident is relevant, and its probative value substantially outweighs the potential for prejudice, because (1) Plaintiff is seeking punitive damages, and (2) evidence of Defendant's state of mind is relevant to the issue of whether his use of force was based on an evil motive or intent.

**\*8** As stated in Part II.B. of this Decision and Order, evidence of the Pilipczak Incident is both relevant and probative of Defendant's state of mind at the time he used force to arrest Plaintiff. As a result, Plaintiff's motion is denied.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to preclude the introduction of evidence related to his prior criminal arrests and convictions (Dkt. No. 40) is *GRANTED* **in part** and *DENIED* **in part** as set forth in Part II.A. of this Decision and Order; and it is further

**ORDERED** that Defendant's motion to permit Defendant to introduce evidence of Plaintiff's 2009 drug conviction for impeachment purposes (Dkt. No. 31) is *GRANTED;* and it is further

**ORDERED** that Defendant's motion to permit Defendant to introduce evidence of Plaintiff's entire criminal history is *GRANTED* **in part** and *DENIED* **in part** as set forth in Part II.A.1. of this Decision and Order; and it is further

**ORDERED** that Defendant's motion to preclude the introduction of evidence related to the "Metler Incident" (Dkt. No. 31) is *DENIED;* and it is further

**ORDERED** that Defendant's motion to preclude Mary Lou Picciano from offering hearsay and/or irrelevant testimony

(Dkt. No. 31) is ***DENIED*** without prejudice as premature; and it is further

**ORDERED** that Defendant's motion to preclude Plaintiff from arguing that, pursuant to the relevant Municipal Code, Defendant simply could have seized Plaintiff's skateboard and issued him a ticket in lieu of arresting him (Dkt. No. 31) is ***GRANTED* in part** and ***DENIED* in part** as set forth above in Part II.D. of this Decision and Order; and it is further

**ORDERED** that Defendant's motion to instruct the jury that they are not to consider the validity of Plaintiff's arrest (Dkt. No. 31) is ***GRANTED;*** and it is further

**ORDERED** that Defendant's motion that the Court compel Plaintiff to provide Defendant with releases for disclosure of the trial, plea, district attorney, and department of corrections records regarding Plaintiff's 2009 drug arrest, conviction and imprisonment (Dkt. No. 31) is ***DENIED;*** and it is further

**ORDERED** that Plaintiff's motion to preclude the introduction of evidence related to the Pilipczak Incident (Dkt. No. 40) is ***DENIED.***

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 4366999

## Footnotes

1    The record evidence indicates that Plaintiff was arrested for the following crimes on the following dates: (1) trespassing on November 11, 2004; (2) disorderly conduct on March 15, 2005; (3) harassment and unlawful possession of alcohol on August 13, 2006; (4) petit larceny on March 8, 2008; and (5) unlawful sale of a controlled substance in 2009. The record evidence further indicates as follows: (1) on May 16, 2006, Plaintiff was involved in an incident in which he was stabbed by William Blake; (2) on November 1, 2006, Plaintiff was at a residence where there was a noise complaint involving underage drinking; and (3) sometime in 2009, Plaintiff was convicted of unlawful sale of a controlled substance in the third degree, a Class B felony.

2    Although it appears from the record that Plaintiff's imprisonment sentence was less than one year, a conviction for unlawful sale of a controlled substance in the third degree is punishable by at least one year imprisonment.

     *See* N.Y. Penal Law § 70.70(2)(a)(i).

3    *See* *Lewis,* 149 F.R.D. at 481–82; *Daniels,* 986 F.Supp. at 250.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

PPC Broadband, Inc. v. Corning Optical Communications..., Not Reported in Fed....

2017 WL 473910

2017 WL 473910
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

PPC BROADBAND, INC., Plaintiff,

v.

CORNING OPTICAL
COMMUNICATIONS RF, LLC, Defendant.

5:11-cv-761 (GLS/DEP)
|
Signed 02/03/2017

**Attorneys and Law Firms**

FOR THE PLAINTIFF: Barclay Damon LLP, One International Place, 14th Floor, OF COUNSEL: JOHN T. GUTKOSKI, ESQ., Boston, MA 02110, 80 State Street, OF COUNSEL: BELLA S. SATRA, ESQ., Albany, NY 12207, Barclay Damon Tower, 125 East Jefferson Street, OF COUNSEL: DOUGLAS J. NASH, ESQ., GABRIEL M. NUGENT, ESQ., JOHN D. COOK, ESQ., KATHRYN DALEY CORNISH, ESQ., MARK E. GALVEZ, ESQ., Syracuse, NY 13202.

FOR THE DEFENDANT: Orrick, Herrington Law Firm, 51 West 52nd Street, OF COUNSEL: ANDREW D. SILVERMAN, ESQ., DANIEL A. RUBENS, ESQ., New York, NY 10019, 1152 15th Street NW, OF COUNSEL: MARK S. DAVIES, ESQ., Washington, DC 2005-1706, DLA Piper LLP, 500 Eighth Street NW, OF COUNSEL: KATHRYN R. GRASSO, ESQ., STEPHEN J. GOMBITA, ESQ., JOSEPH P. LAVELLE, ESQ., ANDREW N. STEIN, ESQ., Washington, DC 20004, 401 B Street, Suite 1700, OF COUNSEL: SUSAN N. ACQUISTA, ESQ., San Diego, CA 92101-4297, Harter, Secrest Law Firm, 1600 Bausch & Lomb Place, OF COUNSEL: JERAULD E. BRYDGES, ESQ., ERIKA N.D. STANAT, ESQ., Rochester, NY 14604-2711.

## MEMORANDUM-DECISION AND ORDER

Gary L. Sharpe, Senior District Judge

### I. Introduction

**\*1** Plaintiff PPC Broadband, Inc. commenced this patent infringement action against defendant Corning Optical Communications RF, LLC. (Compl., Dkt. No. 1.) After a four-day trial, the jury found in favor of PPC. (Dkt. No. 358.) Subsequently, the court held a two-day bench trial on Corning's equitable defenses and found that Corning had not proven either defense. (Dkt. Nos. 513-14, 526.) The court also awarded PPC enhanced damages, supplemental damages, and pre-judgment interest. (Dkt. No. 526.) Judgment was entered against Corning in the amount of $61,339,316. (Dkt. No. 529.) PPC then filed a bill of costs seeking $121,020.36. (Dkt. No. 538.) Pending are Corning's objections to the bill of costs. (Dkt. No. 539.) For the reasons that follow, the Clerk is directed to tax $90,741.55 as costs.

### II. Standard of Review

Fed. R. Civ. P. 54(d)(1) authorizes the recovery of costs by a prevailing party "[u]nless a federal statute, [the Federal Rules of Civil Procedure], or a court order provides otherwise." Recoverable costs are limited to those enumerated in 28 U.S.C. § 1920, which sets out the following taxable costs:

(1) Fees of the clerk and marshal;

(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

*See* Whitfield v. Scully, 241 F.3d 264, 269-70 (2d Cir. 2001) (citing Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 441 (1987)), *abrogated on other grounds by Bruce v. Samuels*, 136 S. Ct. 627 (2016). "[B]ecause Rule 54(d) allows costs 'as of course,' such an award against the losing party is the normal rule obtaining in civil litigation," thereby placing on the losing party the "burden to show that costs should not be imposed." *Id.* at 270 (quoting Mercy v. Cty. of Suffolk, 748 F.2d 52, 54 (2d Cir. 1984)). Where a bill of costs is challenged, the reviewing district court exercises

PPC Broadband, Inc. v. Corning Optical Communications..., Not Reported in Fed....

2017 WL 473910

discretion and "decide[s] the cost question [it]self." 🚩 *Id.* at 269 (internal quotation marks and citation omitted).

## III. Discussion

PPC seeks a total of $121,020.36, consisting of the following itemized costs:

| Costs/Fees | Amount |
| --- | --- |
| Clerk Fees | $350.00 |
| Deposition Transcripts | $42,417.81 |
| Pre-Trial Transcripts | $932.52 |
| Trial Transcripts | $4,562.40 |
| Witness Fees | $4,630.00 |
| Copying Costs | $35,379.27 |
| Animation-Courtroom Pixels | $31,978.13 |
| Trial Boards | $770.23 |
| **Total** | **$121,020.36** |

(Dkt. No. 538; Dkt. No. 538, Attach. 2.)

Corning first objects to PPC's bill of costs for the global reason that "the [c]ourt has broad discretion to deny costs to the prevailing party and order both sides to bear their own costs." (Dkt. No. 539 at 2 (citing 🚩 *Manildra Mill Corp. v. Henkel Corp.*, 76 F.3d 1178, 1183 (Fed. Cir. 1996)).) The court declines Corning's invitation. In addition, Corning specifically objects to certain categories of costs it claims are not taxable under the statute or are not supported as reasonably necessary to the case. (*Id.*) The court will address these arguments in turn.

## A. Fees for Printing Transcripts Necessarily Obtained For Use in the Case

### 1. Deposition Transcripts

**\*2** Corning contends that value-added deposition services including rough ASCII copies of transcripts, expedited service, realtime streaming services, and fees for video synchronization and digitization are not recoverable. (Dkt. No. 539 at 3.) Consequently, Corning claims the court should disallow $15,884.36. (*Id.*; Dkt. No. 539, Attach. 1 ¶ 3.) With the exception of some fine points, *see infra* p. 7 & n.1, the court agrees.

District courts in this circuit have disallowed "certain associated fees" from deposition costs including "expedited service, delivery costs, appearance fees, and rough diskettes and/or ASC II disks." 🚩 *Farberware Licensing Co. LLC v. Meyer Mktg. Co., Ltd.*, No. 09 Civ. 2570, 2009 WL 5173787, at \*5 (S.D.N.Y. Dec. 30, 2009); *see Cutie v. Sheehan*, No. 1:11-CV-66, 2016 WL 3661395, at \*4 (N.D.N.Y. July 5, 2016) (disallowing costs for ASCII transcripts and expedited copies of transcripts). Although expedited service may be taxable if "quick delivery [is] necessary," *McGuigan v. CAE Link Corp.*, 155 F.R.D. 31, 35 (N.D.N.Y. 1994), PPC has not made this showing, *see Woodard v. CSX Transp., Inc.*, No. 1:10-cv-753, 2013 WL 6190843, at \*3 (N.D.N.Y. Nov. 26, 2013) ("[T]he burden of establishing the reasonableness of each charge [for costs] rests with the prevailing party."). Even assuming without deciding that the associated fees for deposition services are recoverable, PPC has likewise failed to demonstrate their necessity. *See id.* Therefore, these value-added services are not taxable, [1] and the court will reduce PPC's costs for deposition transcripts by $15,675.36. (Dkt. No. 539, Attach. 1 ¶ 3.)

Corning also argues that video depositions of PPC's own witnesses are not necessary and should not be taxable. (Dkt.

No. 539 at 8.) The court disagrees. Video depositions are a recoverable cost. *See* 28 U.S.C. § 1920(2); *see also In re Ricoh, Ltd. Patent Litig.*, 661 F.3d 1361, 1370 (Fed Cir. 2011) (finding "the correct interpretation of section 1920" includes "taxing both the written transcript and the video of the depositions"). Moreover, a party to a civil case cannot necessarily anticipate a deponent's availability for trial, which may be beyond the court's subpoena power, and the party should be able to preserve their witness's testimony through video for trial. *See* Fed. R. Civ. P. 45(c)(1); *see also McGuigan*, 155 F.R.D. at 35. Accordingly, PPC's costs for the video depositions of their own witnesses are taxable.

### 2. Pre-Trial & Trial Transcripts

**\*3** Corning argues that PPC has not shown that expedited delivery of pre-trial transcripts were necessary and suggests that PPC should recover only the costs for the one pre-trial transcript it ordered at the ordinary delivery rate. (Dkt. No. 539 at 5.)

As with deposition transcripts, there may be a reason for expedited service of pre-trial transcripts, but the party seeking costs must demonstrate that necessity. *See McGuigan*, 155 F.R.D. at 35. Indeed PPC has established that pre-trial transcripts were necessary to oppose Corning's partial summary judgment motion and for trial preparation, however, it has not shown that "quick delivery [was] necessary." *Id.* The court rejects Corning's contention that PPC should recover only for the pretrial transcript ordered at the ordinary rate and instead includes as taxable all pre-trial transcripts at the ordinary delivery rate determined by this district. *See* N.D.N.Y. General Order 3 (setting the transcript rate for ordinary delivery at $3.65 per page). Therefore, the court includes $784.75 as taxable costs. [2]

Corning also objects to PPC's request for daily trial transcript costs because they were only for counsel's convenience. (Dkt. No. 539 at 5-6.) PPC explained that, among other things, the transcripts "were utilized to prepare for future trial work." (Dkt. No. 538, Attach. 1 at 7.)

"Trial transcripts are undoubtedly useful in preparing for cross-examination, evidentiary disputes, summation, and the jury charge." *Cohen v. Bank of N.Y. Mellon Corp.*, No. 11 Civ. 0456, 2014 WL 1652229, at *2 (S.D.N.Y. Apr. 24, 2014). To award the "premium cost of daily transcripts" courts must find a necessity "beyond the mere convenience

of counsel." *Galella v. Onassis*, 487 F.2d 986, 999 (2d Cir. 1973). That said, "[t]he question of whether the expense of a daily transcript is to be taxed ... is a matter resting largely in the discretion of the trial court." *Syracuse Broad. Corp. v. Newhouse*, 319 F.2d 683 (2d Cir. 1963). Where courts have taxed costs for expedited transcript delivery, they have evaluated factors such as "the amount of representation, the length of the trial, and the complexity of the issues in the case." *Hogan v. Novartis Pharm. Corp.*, No. 06-260, 2012 WL 5898473, at *2 (E.D.N.Y. Nov. 20, 2012) (internal quotation marks and citation omitted), *aff'd* 546 Fed.Appx. 672 (2013); *see, e.g., Perks v. Town of Huntington*, 331 Fed.Appx. 769 (2d Cir. 2009) (upholding costs of daily transcripts where parties relied on transcripts during trial to impeach a crucial witness, determine admission of documentary evidence, resolve disputes over a party's legal theory and prepare the jury charge); *Forest Labs., Inc. v. Abbott Labs.*, No. 96-CV-159S, 2006 WL 7077571, at *1 (W.D.N.Y. May 17, 2006) (taxing costs for daily transcripts in lengthy and complex patent infringement trial).

While PPC's explanation for the necessity of daily transcripts could have been more detailed, the circumstances of this case warrant taxing these costs. The issues presented were undoubtedly complex and involved an explanation of multiple patents, technical components of coaxial cable connectors, and past litigation between the parties. (*See generally* Dkt. Nos. 359-62, 513-14.) The trial schedule further accentuated the complexity of the case. The trial was conducted in two parts—a jury trial on patent infringement and a bench trial on equitable defenses—and the evidence presented was largely relevant to both trials. Furthermore, daily transcripts were used by both parties to prepare and impeach witnesses and in their respective summations. That said, the court recognizes that "[u]se of the transcript during trial does not per se establish that they were necessary." *Hogan*, 2012 WL 5898473, at *2 (internal quotation marks and citation omitted). Nevertheless, the court finds based on the totality of the circumstances that fees for daily transcripts were necessary.

**\*4** In light of the foregoing, the court taxes $32,089.60 for printing transcripts necessarily obtained for use in the case, which reflects a reduction of $15,675.36 for value-added deposition transcript services and $147.77 for expedited pre-trial transcript delivery. (Dkt. No. 538, Attach. 3; Dkt. No. 538, Attach. 4 at 2-7; Dkt. No. 539, Attach. 1 ¶ 3.)

*PPC Broadband, Inc. v. Corning Optical Communications...*, Not Reported in Fed....

2017 WL 473910

## B. Fees for Exemplification and the Costs of Making Copies where the Copies are Necessarily Obtained For Use in the Case

PPC has requested $68,127.63, reflecting a fifty percent reduction from vendor invoices for the copying and exemplification costs. (Dkt. No. 538; Dkt. No. 538, Attach. 1 ¶ 18; Dkt. No. 538, Attach 2 at 4-6; Dkt. No. 538, Attachs. 9-10.) Regarding copying costs, PPC explains that while they "relate almost entirely to trial exhibits ... admittedly, a small percentage of the copies were made for convenience of counsel, and it would be onerous effort to delineate this amount." (Dkt. No. 538, Attach. 1 ¶ 18.) As for exemplification costs, PPC opted to reduce its costs because the animations were used to further illustrate the evidence and explain the technology at issue. (*Id.*)

In response, Corning argues that PPC includes non-recoverable or unsupported costs in each category that a blanket fifty percent reduction will not cure. (Dkt. No. 539 at 6.) Specifically, Corning first objects to the significant number of copies that were never used as trial exhibits, unsupported charges for color copies, non-recoverable charges for binders, tabs, Bates labeling, and "technical time," and a duplicative invoice. (*Id.* at 6-8.)

Costs for copying materials necessarily obtained for use in the case are recoverable. *See* 28 U.S.C. § 1920(4). Courts have the discretion to determine the award amount for authorized costs. *See* ⚑ *United States ex rel. Evergreen Pipeline Constr. Co., Inc. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 171 (2d Cir. 1996). "[S]ection 1920(4) does not demand page-by-page precision,[however,] a bill of costs must represent a calculation that is reasonably accurate under the circumstances." ⚑ *Summit Tech., Inc. v. Nidek Co., Ltd.*, 435 F.3d 1371, 1380 (Fed. Cir. 2006). A prevailing party may recover reasonable costs for photocopying even where the document was not admitted at trial. *See* ⚑ *Evergreen*, 95 F.3d at 173. In *Summit Tech.*, the prevailing party in a complex patent litigation submitted a bill of costs for fifty percent of its total copying costs to account for copies that were either unnecessary or duplicative. *See* ⚑ *See* 435 F.3d at 1378. The court upheld this calculation method while acknowledging it to be "somewhat crude," but nevertheless permissible, "in complex patent litigation involving hundreds of thousands of documents and copies." *Id.* The court reasoned that under the circumstances of the case "parties cannot be expected to track

the identity of each photocopied page along with a record of its relevance to the litigation." *Id.*

The same reasoning applies here where the number of copies reached over one hundred thousand and, as discussed above, the case was complex. (Dkt. No. 539, Attach. 1 ¶ 5); *see supra* Part.III.A.2. Accordingly, the court finds that PPC's proposed reduction reasonably estimates its necessary photocopying costs and addresses most of Corning's objections.

The court, however, disallows costs for items identified by Corning as office supplies or extra services, which amount to general overhead costs. (Dkt. No. 539, Attach. 1 ¶ 7); *see, e.g.*, Yong Fang Lin v. Tsuru of Bernards, LLC, No. 10-2400, 2011 WL 2680577, at *4 (D.N.J. July 8, 2011). At the same time, the court recognizes that bates-stamping is necessary to identify documents and may be taxable in a future case. *See* Split Pivot, Inc. v. Trek Bicycle Corp., 154 F. Supp. 3d 769, 781 n.10 (W.D. Wisc. 2015) (taxing costs for bates-stamping because it "has often been a part of paper copying costs to insure an orderly and controlled production of documents"). Nonetheless, the bates-stamping costs here have not been separated from other disallowed billings and the court will not endeavor to do this on its own. Additionally, while the court recognizes that PPC has not had an opportunity to respond to Corning's objections and correct any oversights in billing, it also disallows costs for a duplicate invoice in the amount of $11,050.64. (Dkt. No. 538, Attach. 9 at 7-8; Dkt. No. 539 at 6-7.)

**\*5** In addition, Corning objects to PPC's exemplification costs for animations as unnecessary and to certain billings from Courtroom Pixels, a company that creates trial graphics. (Dkt. No. 539 at 9-10.)

Section 1920(4) allows for recovery of "exemplification ... necessarily obtained for use in the case." District courts in this circuit have found that demonstrative aids are recoverable under this subsection. *See, e.g.,* 🚩 *Romag Fastners, Inc. v. Fossil, Inc.*, No. 3:10cv1827, 2015 WL 5787019, at *13 (D. Conn. Sept. 30, 2015); *DiBella v. Hopkins*, 407 F. Supp. 2d 537, 540 (S.D.N.Y. 2005). Courts have taxed costs for demonstratives found to aid the fact finder which "efficient[ly] and effective[ly]" present the evidence. ⚑ *In re Omeprazole Patent Litig.*, Nos. M-21-81, 00 Civ. 4541, 03 Civ. 8719, 2012 WL 5427791, at *7 (S.D.N.Y. Nov. 7, 2012); *see Settlement Funding, LLC v. AXA Equitable Life Ins. Co.,*

*PPC Broadband, Inc. v. Corning Optical Communications...*, Not Reported in Fed....

2017 WL 473910

No. 09 CV 8685, 2011 WL 2848644, at *1 (S.D.N.Y. July 18, 2011).

PPC requests half of the costs from its vendor invoices for exemplification. (Dkt. No. 538, Attach. 1 ¶ 18.) The court finds that PPC's animation and other visual aids were helpful to both the jury and the court to explain the coaxial cable technology and to present and highlight the evidence at trial. Included in these costs is time spent by Courtroom Pixels graphic designers to consult with the lawyers in the case, which the court finds was necessary to create the demonstratives. *See* 🚩 *Romag Fastners, Inc.*, 2015 WL 5787019, at *13 (taxing IT specialist fees to develop visual exhibits). Consequently, the court taxes PPC's requested costs as a reasonable estimate of exemplification costs necessary for use at trial. The court, however, disallows any airfare expenses not already excluded by PPC in the amount of $1,250.00. (Dkt. No. 539 at 10 n.1; Dkt. No. 538, Attach. 10 at 12-13.)

In sum, the court taxes $53,671.95 for copying and exemplification costs, which reflects a reduction of $1,384.81 for general overhead costs, $11,050.64 for a duplicate copying invoice, and $1,250.00 for unaccounted for airfare expenses. (Dkt. No. 538, Attach. 9 at 7-8; Dkt. No. 538, Attach, 10 at 12-13; Dkt. No. 539, Attach. 1 ¶¶ 7,8.)

## IV. **Conclusion**

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that PPC is awarded costs in the amount of $90,741.55, which represents $350 as fees of the Clerk; $32,089.60 as fees for printed or electronically recorded transcripts necessarily obtained for use in the case; $4,630.00 as fees for witnesses; $53,671.95 as fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 473910

## Footnotes

1    The court rejects Corning's argument on one ground. (Dkt. No. 539, Attach. 1 ¶ 3.) Corning contends that the transcript from the "Judge's Ruling" during Noah Montena's deposition should be excluded from costs. (*Id.*; Dkt. No. 538, Attach. 3 at 18.) It is clear from the record that counsel called Magistrate Judge Peebles during Montena's deposition to rule on an objection. (Minute Entry of May 21, 2013.) It is apparent that Judge Peebles' ruling was memorialized in Montena's deposition transcript and is, thus, taxable. (Dkt. No. 538, Attach. 3 at 18.) In the same entry, Corning lists "Exhibits" as a non-taxable value-added service. (Dkt. No. 539, Attach. 1 ¶ 3.) This appears to be an oversight as the invoice clearly indicates that the exhibits were used at Montena's deposition and are thus taxable. *See Internet Law Library, Inc. v. Southridge Capital Mgmt.*, Nos. 01 Civ. 6600, 01 Civ. 0877, 02 Civ. 0138, 2010 WL 3290965, at *8 (S.D.N.Y. Aug. 11, 2010). Accordingly, $209.00 is excluded. (Dkt. No. 539, Attach. 1 ¶ 3.)

2    This amount is the product of the $3.65 page rate for ordinary delivery and the number of pages in the pre-trial transcripts found in PPC's submitted invoices. (Dkt. No. 538, Attach. 4 at 2-7.)

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Reeder v. Bishop, Not Reported in Fed. Supp. (2019)

2019 WL 3732050, 110 Fed. R. Evid. Serv. 116

2019 WL 3732050
United States District Court, N.D. New York.

Raszell REEDER, Plaintiff,

v.

Captain Reginald BISHOP, Upstate Correctional
Facility; Sergeant Randal Smith, Upstate Correctional
Facility; Officer Brad Reif, Upstate Correctional
Facility; Officer Timothy Ramsdell, Upstate
Correctional Facility; Lieutenant Thomas Quinn,
Upstate Correctional Facility; and Lieutenant Steven
Salls, Upstate Correctional Facility, Defendants.

9:15-CV-1078 (MAD/TWD)
|
Signed 08/08/2019

**Attorneys and Law Firms**

OF COUNSEL: ETHAN ROMAN, ESQ., RICHARD S.
HARTUNIAN, ESQ., KENNETH D. FRIEDMAN, ESQ.,
MANATT, PHELPS & PHILLIPS, LLP, 7 Times Square
Plaza, New York, New York 10036, Attorneys for Plaintiff.

OF COUNSEL: KYLE W. STURGESS, AAG, MICHAEL G.
MCCARTIN, AAG, OFFICE OF THE NEW YORK STATE
ATTORNEY GENERAL, The Capitol, Albany, New York
12224, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge:

**I. INTRODUCTION**

 **\*1** Plaintiff, an inmate in the custody of the New York
State Department of Corrections and Community Supervision
("DOCCS"), commenced this Section 1983 action against
Defendants, who were DOCCS employees at Upstate
Correctional Facility during the relevant time period. *See* Dkt.
No. 168 at 6. In his Complaint, Plaintiff alleges claims of
excessive force and failure to intervene against Defendants
Bishop, Ramsdell, Reif, Salls, and Smith based on an incident
that occurred on April 8, 2015, and conditions of confinement
claims against Defendants Quinn and Smith based on his
living conditions after that incident. *See id.* The parties have

moved *in limine* for the Court to decide certain evidentiary
issues before trial. *See* Dkt. Nos. 173, 180.

**II. DISCUSSION**

**A. Legal Standard**

The purpose of a motion *in limine* is to allow the trial
court to rule in advance of trial on the admissibility of
certain forecasted evidence. *See* ⚑*Luce v. United States*,
469 U.S. 38, 40 n.2 (1984); *see also* ⚠*Palmieri v. Defaria*,
88 F.3d 136, 141 (2d Cir. 1996). A court should exclude
evidence on a motion *in limine* only when the evidence
is clearly inadmissible on all potential grounds. *See Baxter
Diagnostics, Inc. v. Novatek Med., Inc.*, No. 94-CV-5220,
1998 WL 665138, \*3 (S.D.N.Y. Sept. 25, 1998). The court
considering a motion *in limine* may reserve decision until trial
so that the motion is placed in the appropriate factual context.

*See* ⚑*Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Grp.*,
937 F. Supp. 276, 287 (S.D.N.Y. 1996). Alternatively, the
court is "free, in the exercise of sound judicial discretion, to
alter a previous *in limine* ruling" at trial as "the case unfolds,
particularly if the actual testimony differs from what was
contained in the [movant's] proffer." ⚑*Luce*, 469 U.S. at
41-42.

**B. Plaintiff's Prior Convictions**

Plaintiff first asks the Court to preclude Defendants from
introducing evidence about his criminal convictions under
Federal Rule of Evidence 609. *See* Dkt. No. 173-1 at 2.
Defendants oppose that request, arguing that the details about
Plaintiff's prior convictions are necessary to enable the jury to
resolve issues of credibility. *See* Dkt. No. 180 at 7-8.

In 1994, Plaintiff was convicted of Criminal Possession of a
Weapon in the 2nd Degree, a class C felony, and Reckless
Endangerment in the 1st Degree, a class D felony. *See* Dkt.
No. 185 at 1. While incarcerated, Plaintiff has been convicted
of several other offenses, and is now serving an indeterminate
term in prison for an aggregate minimum sentence of twenty
years and six months, and aggregate maximum sentence of
forty six years. [1] *See id.*; Dkt. No. 180 at 7-8.

Federal Rule of Evidence 609(a)(1) provides that, for the
purpose of attacking the credibility of a witness, evidence
that the witness has been convicted of a crime "punishable by

death or by imprisonment for more than one year ... must be admitted, subject to Rule 403, in a civil case." Fed. R. Evid. 609(a)(1). In other words, the court must admit the "name of a conviction, its date, and the sentence imposed unless the district court determines that the probative value of that evidence 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' " *United States v. Estrada*, 430 F.3d 606, 620-21 (2d Cir. 2005) (citing Fed. R. Evid. 403).

**\*2** Where over 10 years have passed since the witness's past felony conviction or release from confinement for it, Rule 609(b) provides that the conviction is admissible only if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and ... the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." Fed. R. Evid. 609(b)(1)-(2). Thus, by its terms, Rule 609(b) provides that evidence of a crime is not excludable if the witness is still incarcerated for that crime. *See Blake v. Coughlin*, 205 F.3d 1321, 2000 WL 233550, *1 (2d Cir. 2000) (summary order).

As the Court previously stated in *Somerville v. Saunders*, No. 11-CV-556, 2014 WL 272415 (N.D.N.Y. Jan. 24, 2014), this Court follows the principle that "confinement for one conviction has no effect on calculating the ten years applicable to another conviction" for Rule 609 purposes. *Id.* at *5 (quoting *United States v. Pettiford*, 238 F.R.D. 33, 40 (D.D.C. 2006)). In so holding, the Court followed *Pettiford*, which concluded that since Rule 609 contemplates the "release of the witness from the confinement imposed for *that conviction*," it would be improper to use a later conviction, for which the witness served more time, as the starting point for Rule 609(b)'s time-period calculation. *See Pettiford*, 238 F.R.D. at 40 (emphasis in original). Moreover, where the plaintiff is serving concurrent sentences for various crimes and the parties have not informed the court which sentence corresponds to each crime, the court must consider the maximum sentence possible under state law. *See Somerville*, 2014 WL 272415, at *6.

In balancing probative value against prejudicial effect under Rule 609, courts examine: "(1) the impeachment value of the prior crime, (2) the remoteness of the prior conviction, (3) the similarity between the past crime and the conduct at issue, and (4) the importance of the credibility of the witness." *Daniels v. Loizzo*, 986 F. Supp. 245, 250 (S.D.N.Y. 1997) (citations omitted). "Although all of these factors are relevant, 'prime among them is the first factor, *i.e.*, whether the crime, by its nature, is probative of a lack of *veracity*.' " *United States v. Brown*, 606 F. Supp. 2d 306, 312 (E.D.N.Y. 2009) (quoting *United States v. Ortiz*, 553 F.2d 782, 784 (2d Cir. 1977)) (alterations omitted). The district court has "wide discretion to impose limitations on the cross-examination of witnesses," *see United States v. Flaharty*, 295 F.3d 182, 191 (2d Cir. 2002), which includes the discretion to "exclude the nature or statutory name of the offense, ... [or] the length of the sentence when its probative value is outweighed by its prejudicial effect," *see Brown*, 606 F. Supp. 2d at 312.

"Rule 609(a)(1) presumes that all felonies are at least somewhat probative of a witness's propensity to testify truthfully," although "all Rule 609(a)(1) felonies are not equally probative of credibility." *Estrada*, 430 F.3d at 618. Violent crimes such as murder, conspiracy, robbery, and weapons possession are generally not particularly probative as to honesty or veracity. *See id.* at 617-18 (noting that convictions for violent or assaultive crimes generally do not relate to credibility). However, "crimes requiring planning or preparation bear more strongly on veracity than violence alone suggests because planning indicates deliberate and injurious violations of basic standards rather than impulse or anger, and usually it involves some element of deceiving the victim." *Id.* at 618 (internal quotation omitted).

### 1. 1994 Conviction

**\*3** As noted above, Plaintiff's current period of incarceration began in 1994 after he was convicted of Criminal Possession of a Weapon in the 2nd Degree, a class C felony, and Reckless Endangerment in the 1st Degree, a class D felony. *See* Dkt. No. 185 at 1. Since the parties have not informed the Court what sentence Plaintiff originally received for that conviction and Plaintiff is serving an aggregate sentence, the Court must consider the maximum sentence for each count under state law. *See Somerville*, 2014 WL 272415 at *6. According to New York Penal Law § 70.00, the maximum term of an indeterminate sentence of imprisonment for a class C felony is fifteen years, and the maximum term for a class D felony is seven years. N.Y. Penal Law § 70.00(2). Thus,

**Reeder v. Bishop, Not Reported in Fed. Supp. (2019)**

2019 WL 3732050, 110 Fed. R. Evid. Serv. 116

Plaintiff faced a maximum term of imprisonment of twenty-two years for the 1994 conviction, so his incarceration for that conviction would have ended in 2016. Accordingly, Rule 609(a) applies, and the statutory name of 1994 conviction, its date, and the sentence imposed are admissible unless "the probative value of that evidence 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' " *See* 🚩 *Estrada*, 430 F.3d at 620-21 (quoting Fed. R. Evid. 403).

As an initial matter, although violent crimes bear marginally on the issue of truthfulness or veracity, "Rule 609(a)(1) presumes that all felonies are at least somewhat probative of a witness's propensity to testify truthfully." 🚩 *Id.* at 617. Plaintiff's credibility is central to this case, where "substantial components of the Plaintiff's claims ... can be anticipated to be resolved on the parties' conflicting versions of the same events: in other words, by credibility-dependent assessments, made from different descriptions of the same events." *See* Dkt. No. 186 at 5-6; *see also United States v. Thomas*, 214 F. Supp. 3d 187, 196 (E.D.N.Y. 2016) (stating that "if [d]efendant testifies, his testimony would likely contradict the testimony of the Government's witnesses; in such a circumstance, evidence of [d]efendant's prior convictions would be highly probative for the jury to determine his veracity and credibility"). On the other hand, the 1994 conviction is somewhat prejudicial because knowledge that Plaintiff was convicted of Reckless Endangerment and Criminal Possession of a Weapon could cause the jurors "to evaluate his worth as a witness based on his status as a convicted felon regardless of the actual relevance of the [c]onviction." *United States v. Agostini*, 280 F. Supp. 2d 260, 262 (S.D.N.Y. 2003). Still, that prejudice is diminished by the fact that the conviction is twenty-five years old and does not involve conduct similar to the conduct at issue in this civil case. *See* 🚩 *Old Chief v. United States*, 519 U.S. 172, 185 (1997) (noting that "where a prior conviction was for ... one similar to other charges in a pending case the risk of unfair prejudice would be especially obvious"). Finally, the prejudicial effect of such information can be lessened by a limiting instruction from the Court.

Accordingly, the Court finds that the probative value of the conviction is not substantially outweighed by its prejudicial effect. Therefore, Defendants may question Plaintiff about

the statutory name of the 1994 conviction, the date, and the sentence imposed.

### 2. Convictions while Incarcerated

Since his incarceration began, Plaintiff has accumulated eight convictions for Aggravated Harassment of an Employee by an Inmate, a class E felony with a maximum indeterminate sentence of four years, and one conviction for Assault on a Peace Officer, a class C felony with a maximum indeterminate sentence of fifteen years. *See* Dkt. No. 185 at 1; 🚩 N.Y. Penal Law § 70.00(2). Based on those maximum prison sentences, the 2000, 2002, 2003 and 2004 Aggravated Harassment convictions (hereinafter, the "Older Harassment Convictions") should be analyzed under Rule 609(b), while the 2007, 2010, 2011 and 2012 Aggravated Harassment convictions (hereinafter, the "Recent Harassment Convictions") and the 2004 Assault conviction must be assessed under Rule 609(a). *See* 🚩 *Somerville*, 2014 WL 272415 at *6.

### a. 2007, 2010, 2011 and 2012 Aggravated Harassment Convictions

**\*4** First, the Recent Harassment Convictions must be admitted unless "the probative value of that evidence 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' " 🚩 *Estrada*, 430 F.3d at 620-21 (quoting Fed. R. Evid. 403). As noted above, the presumption underlying Rule 609(a)(1) is that all felonies are at least somewhat probative of a witness's propensity to testify truthfully, *see* 🚩 *id.* at 617, and Plaintiff's credibility is central to this case, *see Thomas*, 214 F. Supp. 3d at 196. Moreover, although the Recent Harassment Convictions involve conduct similar to the conduct at issue in this case, making them somewhat prejudicial, that prejudice is lessened if the Court admits only the "name of a conviction, its date, and the sentence imposed," while excluding the underlying details. *See* 🚩 *Estrada*, 430 F.3d at 616 (noting that "while it may be proper to limit, under Rule 609(a)(1), evidence of the underlying facts or details of a crime of which a witness was convicted, inquiry into the 'essential facts' of the conviction, including the nature or statutory name of each offense, its date, and the sentence imposed is presumptively

**Reeder v. Bishop, Not Reported in Fed. Supp. (2019)**

2019 WL 3732050, 110 Fed. R. Evid. Serv. 116

required by the Rule, subject to balancing under Rule 403"). Additionally, since "the jury will be informed that plaintiff has been convicted of a crime by the very nature of the case ... [a]dmission of his prior conviction[s] thus will cause minimal added prejudice." *Young v. Calhoun*, No. 85-CV-7584, 1995 WL 169020, *4 (S.D.N.Y. Apr. 10, 1995); *see also* 🚩*Lewis v. Velez*, 149 F.R.D. 474, 482 (S.D.N.Y. 1993) (stating that "where the jury knows that a witness is a convicted felon, admission of prior crimes may cause relatively little additional prejudice").

Thus, the Court finds that the probative value of each of the Recent Harassment Convictions is not substantially outweighed by the danger of unfair prejudice to Plaintiff. Accordingly, Defendants may introduce evidence about the "essential facts" - *i.e.*, the name, date, and the sentence imposed - for each of the Recent Harassment Convictions.

**b. 2000, 2002, 2003 and 2004 Harassment Convictions**

Unlike the Recent Harassment Convictions, the Older Harassment Convictions are inadmissible unless the "probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and ... the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." *See* Fed. R. Evid. 609(b)(1)-(2). Here, since Defendants will be permitted to introduce the more recent convictions, the Older Harassment Convictions have very little additional probative value. *See United States v. Washington*, 746 F.2d 104, 107 (2d Cir. 1984) (Newman, J., *concurring*) ("Once credibility is impeached by a prior felony conviction, the incremental probative force of a second conviction is minimal"). Their probative value is further diminished by the fact that each occurred at least fifteen years ago. *See* 🚩*Twitty v. Ashcroft*, No. 3:04-CV-410, 2010 WL 1677757, *2 (D. Conn. Apr. 23, 2010) (noting that "the 'probative value of a conviction decreases as its age increases' ") (quoting 4 Weinstein's Federal Evidence, § 609.05[3][d] at 609-41 (2d ed. 2010)). Finally, these convictions are prejudicial to Plaintiff, since they suggests a propensity to engage in violent behavior, *see* 🚩*Somerville*, 2014 WL 272415, at *9, and may lead the jury to conclude that, as someone who had repeatedly harassed corrections officers, Plaintiff "deserved to be assaulted by [Defendants]," *see Agostini*, 280 F. Supp. 2d at 262.

Accordingly, the Court finds that the probative value of the Older Harassment Convictions is not substantially outweighed by their prejudicial effect. As such, Defendants are precluded from introducing evidence about the 2000, 2002, 2003 and 2004 Harassment Convictions.

**c. Assault on a Peace Officer**

Plaintiff also asks the Court to preclude Defendants from introducing evidence about a 2004 conviction for Assault on a Peace Officer. *See* Dkt. No. 185 at 2. Because the statutory maximum indeterminate sentence for that felony is fifteen years, Rule 609(a) applies. *See* N.Y. Penal Law § 70.00. As a violent crime, the assault bears marginally on Plaintiff's honesty or veracity. *See* 🚩*Estrada*, 430 F.3d at 617. Although the felony is similar to the conduct at issue here, increasing its potential for prejudice, the Court has already allowed Defendants to introduce the statutory names, dates, and sentences for five other felony convictions. Thus, this additional conviction will have little additional prejudicial effect against Plaintiff. *See* 🚩*Lewis*, 149 F.R.D. at 482 (noting that "where the jury knows that a witness is a convicted felon, admission of prior crimes may cause relatively little additional prejudice"). Finally, any potential for prejudice is lessened if the Court does not admit the underlying details about the conviction, *see* 🚩*Estrada*, 430 F.3d at 616, and issues an appropriate limiting instruction to the jury. Accordingly, the Court will allow Defendants to admit the name of the Assault on a Peace Officer conviction, its date, and the sentence imposed for that conviction.

**C. Plaintiff's Disciplinary History**

**\*5** Next, Plaintiff asks the Court to exclude his disciplinary history, including the "throwing incident" that took place prior to the events of April 8, 2015. *See* Dkt. No. 173-1 at 2-3. Defendants respond that they should be permitted to introduce evidence of the April 8, 2015 incident because it is "the crucial background story to the events of April 8, 2015 and thereafter." *See* Dkt. No. 186 at 4.

*1. April 8, 2015 incident*

Federal Rule of Evidence 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

Reeder v. Bishop, Not Reported in Fed. Supp. (2019)

2019 WL 3732050, 110 Fed. R. Evid. Serv. 116

Fed. R. Evid. 404(b)(1). However, evidence of a prior criminal conviction may be admissible for other permissible purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," subject to a Rule 403 analysis. Fed. R. Evid. 404(b)(2). Thus, "[c]ourts may admit evidence of prior bad acts if the evidence is relevant to an issue at trial other than the [person's] character, and if the probative value of the evidence is not substantially outweighed by the risk of unfair prejudice." United States v. Barret, 677 Fed. Appx. 21, 23 (2d Cir. 2017), cert. denied sub nom. Scarlett v. United States, 137 S. Ct. 2280 (2017) (quotation omitted).

"The Second Circuit evaluates Rule 404(b) evidence under an 'inclusionary approach' and allows evidence 'for any purpose other than to show a defendant's criminal propensity.' " United States v. Garcia, 291 F.3d 127, 136 (2d Cir. 2002) (quoting United States v. Pitre, 960 F.2d 1112, 1118 (2d Cir. 1992)). The Supreme Court and Second Circuit have created a four-part test to determine admissibility under Rule 404(b): (1) whether the prior act evidence was offered for a proper purpose; (2) whether the evidence was relevant to a disputed issue; (3) whether the probative value of the prior act evidence is substantially outweighed by its potential for unfair prejudice; and (4) whether the district court administered an appropriate limiting instruction. Id. (citing Huddleston v. United States, 485 U.S. 681, 691-92 (1988)).

Defendants argue that the disciplinary incident that took place on the morning of April 8, 2015, "is both highly relevant and probative of the events occurring thereafter which give rise to the Plaintiff's causes of action, including why the Plaintiff was extracted from his cell on April 8; why he was thereafter placed on a 'loaf' diet instead of a standard food tray; why his running water access was restricted; and why he was deprived of certain items - viz., cups and liquid containers." See Dkt. No. 180 at 10; see also Dkt. No. 186 at 4. The Court agrees that such evidence "is at the core of the evidence that is essential for the Defendants to get a fair trial." See Dkt. No. 186 at 5. The evidence explains "why the extraction team went into the Plaintiff's cell in the first instance," and "exactly why the Plaintiff was deprived of those items that he was deprived of - the very things that he asserts in this lawsuit were denied to him in an unconstitutional manner." See Dkt. No. 180 at 13-14 (emphasis omitted). Thus, the April 8, 2015 disciplinary incident is relevant to this case and highly probative of several issues related to Defendants' defense. Finally, that probative value is not substantially outweighed

by the evidence's potential for prejudicing Plaintiff. Fed. R. Evid. 403. Although evidence of Plaintiff's misbehavior in prison could distract the jury from his constitutional claim, see Agostini, 280 F. Supp. 2d at 262, that risk can be mitigated by a limiting instruction, see Garcia, 291 F.3d at 136. Accordingly, Defendants may introduce evidence about the April 8, 2015 disciplinary incident at trial.

### 2. Other Disciplinary History

**\*6** Plaintiff has also asked the Court for an order preventing Defendants from introducing evidence about his other disciplinary history. See Dkt. No. 173-1 at 2. Plaintiff's disciplinary record includes over fourteen pages of incidents dating back to 1994, see Dkt. No. 163-1, and Defendants have not specified which infractions they seek to introduce. Therefore, the Court will reserve decision on each infraction's admissibility until it is placed in the appropriate factual context at trial. See Nat'l Union Fire Ins. Co., 937 F. Supp. at 287.

### D. Plaintiff's Deposition Testimony

Plaintiff requests a ruling from the Court precluding Defendants from introducing his deposition testimony, claiming that the testimony "would be far more prejudicial than probative pursuant to FRE 403." See Dkt. No. 173-1 at 3. Plaintiff has not designated any specific portions of the deposition that he believes are prejudicial or irrelevant, and has not offered any reason why the deposition should be excluded beyond that he was pro se when it was taken. Cf. Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas, No. 04-CV-10014, 2009 WL 3111766, *13 (S.D.N.Y. Sept. 28, 2009) (precluding portions of testimony where the movant specified the parts that it sought to be precluded and provided reasons for the preclusion); Flores v. Wall, No. CA 11-69 M, 2012 WL 4471106, *3 (D.R.I. Sept. 6, 2012), report and recommendation adopted in part, No. CA 11-69-M, 2012 WL 4470998 (D.R.I. Sept. 25, 2012) (excluding a pro se prisoner's deposition where the prisoner received less than twenty-hours notice). Absent some indication that the deposition was unfair or unreasonable, the Court will not wholly exclude such testimony. See Taylor-Merideth v. Metro. Gov't of Nashville & Davidson Cty., No. 3:16-0612, 2017 WL 5618093, *3 (M.D. Tenn. Oct. 27, 2017) (holding that a plaintiff's pro se status "does not prevent [the d]efendant from taking her deposition," because the defendant was "entitled to take [the] deposition to explore the basis for [the p]laintiff's claims").

**Reeder v. Bishop, Not Reported in Fed. Supp. (2019)**

2019 WL 3732050, 110 Fed. R. Evid. Serv. 116

Here, there is nothing to indicate that the deposition was unreasonable, or that Plaintiff did not understand the deposition process and the importance of his testimony. Accordingly, this request is denied.

### E. Unrelated Litigation and Grievances

Plaintiff asks that Defendants be precluded from referencing any other litigation or grievances that Plaintiff has filed concerning "unrelated incidents." *See* Dkt. No. 173-1 at 3-4. Defendants respond that the evidence should be admitted for another purposes, such as where " 'factual similarities between the past and present cases show[ ] more than just a generic pattern of litigiousness,' meeting the 'other purposes' provision of FRE 404(b)(2)." *See* Dkt. No. 186 at 7.

As a preliminary matter, the Court doubts that lawsuits and grievances about "unrelated incidents" are relevant to this trial. *See* Fed. R. Evid. 402. Moreover, as Plaintiff points out, "[l]itigiousness is the sort of character trait with which Rule 404(b) is concerned," and although it "may have some slight probative value," that value is likely "outweighed by the substantial danger of jury bias against the chronic litigant."

*See* ⚑ *Outley v. City of N.Y.*, 837 F.2d 587, 592 (2d Cir. 1988);

*see also* ⚑ *Seals v. Mitchell*, No. 04-CV-3764, 2011 WL 1399245, *5 (N.D. Cal. Apr. 13, 2011) (finding that although evidence of a plaintiff's other lawsuits and grievances "has some relevance to whether [the p]laintiff was biased against law enforcement, the probative value of this evidence is substantially outweighed by the danger of unfair prejudice").

 *7  Still, Plaintiff has not provided the Court with details about the lawsuits or grievances that he seeks to have precluded, so the Court will reserve decision on this issue until trial.

### F. Testimony Implying that Plaintiff's Lawsuit is Frivolous

Additionally, Plaintiff has moved to exclude "any argument or implication by Defendants that Plaintiff filed his lawsuit for frivolous reasons, or simply because anyone has access to the courts." *See* Dkt. No. 173-1 at 4. Granting that request "would unduly restrict counsel from arguing that the Plaintiff's claim is without merit based on what he argues to be the facts." *Trinidad v. Moore*, No. 15-CV-323, 2016 WL 5402683, *4 (M.D. Ala. Sept. 26, 2016); *see also Mitchell v. City of Tukwila*, No. C12-238, 2013 WL 6631791, *1 (W.D. Wash. Dec. 17, 2013) (denying motion where the plaintiff's

"motivation for filing th[e] lawsuit are relevant and probative of the issues remaining for trial"). Still, the decision whether to restrict such language is highly dependant on the context in which the statement is made. Therefore, the Court will reserve on the issue until trial.

### G. Defendants' Commendations and Awards

Plaintiff seeks an order excluding testimony concerning commendations or awards earned by Defendants. *See* Dkt. No. 173-1 at 4. Defendants respond that while good character evidence is contemplated by Rule 404, "district courts have recognized that matters involving good performance and promotion - when confined to introductory background testimony - are routine and admissible." *See* Dkt. No. 186 at 8-9.

The Second Circuit has stated that it is "well established ... that absent an attack on the veracity of a witness, no evidence to bolster his credibility is admissible." *See United States v. Arroyo-Angulo*, 580 F.2d 1137, 1146 (2d Cir. 1978). "Character evidence encompasses evidence of a defendant's prior commendations and awards ... because the only purpose for offering such information would be to portray a defendant in a positive light by demonstrating recognition of certain character traits or actions that demonstrate such character traits." *United States v. Brown*, 503 F. Supp. 2d 239, 242 (D.D.C. 2007). Thus, "as a general matter, character evidence in civil cases is inadmissible unless it falls within one of the stated exceptions [of Rule 404(a)]." *S.E.C. v. Drescher*, No. 99-CV-1418, 2001 WL 1602978, *2 (S.D.N.Y. Dec. 13, 2001).

Here, Defendants' character is not at issue in this case, either as an essential element of a claim or defense.

*See* ⚑ *Zubulake v. UBS Warburg LLC*, 382 F. Supp. 2d 536, 541 (S.D.N.Y. 2005) (excluding character evidence of performance evaluations and commendation letters in an employment discrimination case); *see also Bey v. Iaquinto*, No. 12-CV-5875, 2015 WL 5786487, *4 (S.D.N.Y. Sept. 30, 2015) (holding that certificates of completion of online courses were inadmissible to bolster a plaintiff's credibility). Accordingly, Plaintiff's request to exclude testimony concerning commendations or awards earned by Defendants is granted. [2]

### H. Demonstrative Aids

**Reeder v. Bishop, Not Reported in Fed. Supp. (2019)**

2019 WL 3732050, 110 Fed. R. Evid. Serv. 116

**\*8** Finally, Plaintiff has requested permission to use demonstrative aids in his opening statement. *See* Dkt. No. 173-1 at 4-5. As the Court informed the parties during the July 31, 2019 pre-trial conference, the Court does not allow the use of demonstrative aids during opening statements unless the parties have stipulated to their use. Therefore, Plaintiff's request is denied at this time. Should the parties agree on the use of demonstrative aids, they must file a stipulation with the Court indicating their accord.

### III. CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Plaintiff's motion *in limine* (Dkt. No. 173-1) is **GRANTED in part** and **DENIED in part**; and the Court further

**ORDERS** that Defendants' motion *in limine* (Dkt. No. 180) is **GRANTED in part** and **DENIED in part**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3732050, 110 Fed. R. Evid. Serv. 116

## Footnotes

1    Plaintiff also has several pre-1994 convictions, but Defendants have informed the Court that they will not mention those convictions at trial. *See* Dkt. No. 186 at 5 n.2.

2    To the extent Defendants may seek to introduce such evidence to combat impeachment of their witnesses, the Court will address that issue at trial. *See Arroyo-Angulo*, 580 F.2d at 1146.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 2836952
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Barry SEPULVEDA, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

15-CV-5187 (RRM) (CLP)
|
Signed 05/29/2020

**Attorneys and Law Firms**

Philip O. Ohene, Duane C. Felton, Staten Island, NY, for
Plaintiff.

Matthew W. McQueen, NYC Law Department, New York,
NY, for Defendants.

## MEMORANDUM AND ORDER

ROSLYNN R. MAUSKOPF, Chief United States District
Judge.

 **\*1** Plaintiff Barry Sepulveda brings this § 1983 action
against the City of New York, New York City Police
Department ("NYPD") Officers Ricky Alexander, Danny
Golat, and Sean Haggerty, and NYPD Sergeant Michael
DiCecco, alleging that defendants violated his rights under the
Fourth Amendment to the Constitution by subjecting him to
a visual body cavity search and hospitalizing him for six days
following a traffic stop. Defendants now move for summary
judgment. For the reasons set forth below, defendants' motion
for summary judgment is granted.

## BACKGROUND

**I. Background Facts**
Unless otherwise noted, the following facts are undisputed
and are drawn from the parties' Local Rule 56.1 statements
or from deposition testimony submitted by the parties.

On the evening of March 26, 2014, plaintiff Barry Sepulveda
was getting a ride home in his friend's Nissan Murano, having
just left a Best Buy store in Staten Island. (Defendants'
Statement of Undisputed Facts ("Defs.' Rule 56.1 Stmt.")

(Doc. No. 64) ¶ 6; Plaintiff's Statement of Material Disputed
Facts ("Pl.'s Rule 56.1 Stmt.") (Doc. No. 67) ¶ 6; Stein Decl.,
Ex. A and Ohene Decl., Ex. 1 ("Sepulveda Dep.") (Doc.
Nos. 65, 68-1) at 39, 42.) Sepulveda and his friend were
headed toward Sepulveda's home at 68 Targee Street, also
in Staten Island. (Defs.' Rule 56.1 Stmt. ¶¶ 5–6; Pl.'s Rule
56.1 Stmt. ¶¶ 5–6.) Before they reached Sepulveda's home,
Sepulveda and his friend were pulled over by NYPD officers.
(Defs.' Rule 56.1 Stmt. ¶ 7; Pl.'s Rule 56.1 Stmt. ¶ 7.) Officer
Alexander testified that he was in the car along with Sergeant
DiCecco, Officer Golat, and Officer Haggerty. (Stein Decl.,
Ex. B ("Alexander Dep.") (Doc. No. 65-2) at 12; *see also*
Sepulveda Dep. at 45, 51 (testifying that there were four
officers in the patrol car)).

According to Alexander, one of the officers signaled to
Sepulveda's friend to pull over by turning on the lights.
(Alexander Dep. at 23.) The car did not immediately pull
over, but instead drove "one to two blocks" before stopping.
(*Id.*) Alexander testified that after Sepulveda's friend pulled
over, the officers stopped in front of Sepulveda's friend's car
and all four officers got out. (*Id.* at 23.) Alexander testified
that he approached the front passenger window of the car,
where Sepulveda was sitting, and saw Sepulveda with a "clear
plastic bag with a white substance in it." (*Id.* at 27, 36.)
Alexander "asked [Sepulveda] to step out of the vehicle," but
Sepulveda refused. (*Id.* at 36.) Alexander repeatedly ordered
Sepulveda to step out of the car and pulled the handle of
the car door, but it would not open. (*Id.*) Watching through
the car window, Alexander "observed [Sepulveda] shove [the
plastic bag] into his butt." (*Id.* at 37; *see also* Defs.' Rule
56.1 Stmt. ¶¶ 9–11.) According to Alexander, he watched
through the car window as Sepulveda "leaned forward" and
with his right hand reached "[i]nto his butt area down his
pants" with the plastic bag in his hand. (Alexander Dep. at 38.)
Alexander testified that, at the time, he "didn't know" whether
Sepulveda was reaching for a weapon. (*Id.* at 39.) According
to Alexander's testimony, the car door eventually opened and
he pulled Sepulveda from the car. (*Id.* at 36–37.) Alexander
testified that he did not ask the other officers if they had seen
the clear plastic bag. (*Id.* at 62.)

 **\*2** Sepulveda describes a very different traffic stop.
According to Sepulveda, the traffic stop was initiated when
an unmarked car cut off the car he was riding in – and that no
lights or siren were used. (Sepulveda Dep. at 43.) Sepulveda
testified that, after being pulled over, all four "officers got out
[of the car] with their guns drawn." (*Id.*) "[T]wo Caucasian
officers approached [Sepulveda's] side of the vehicle" with

guns drawn, pulled him from the car, and beat him. (Pl.'s Rule 56.1 Stmt. ¶¶ 7–10.) Sepulveda testified that his windows were rolled up and the doors were unlocked. (Sepulveda Dep. at 45.) According to Sepulveda, the officers were not in uniform. (*Id.*)

Sepulveda "denies that he had any drugs in his hands when the police approached his vehicle and opened his door." (Pl.'s Rule 56.1 Stmt. ¶ 10.) According to Sepulveda, "his hands were in front of him" when officers approached the car. (*Id.* ¶ 11; Sepulveda Dep. at 46–47.) He denies inserting a plastic bag into his rectum. (*Id.* ¶ 12; Sepulveda Dep. at 47.) With respect to the driver of the vehicle, Sepulveda alleges in his amended complaint that Officer Golat "forcibly pulled the driver out of the vehicle" and Officer Haggerty assisted Officer Golat in doing so. (Am. Compl. (Doc. No. 33) ¶ 17.)

Officers searched the vehicle and recovered a gravity knife. (Defs.' Rule 56.1 Stmt. ¶ 13.) Sepulveda testified that he knew a knife was found in the car and that the knife was the basis for his arrest, but that he had "never seen the knife." (Sepulveda Dep. at 47.) Sepulveda was arrested and eventually charged with illegal possession of a gravity knife. (Alexander Dep. at 105.)

Sepulveda was transported back to the NYPD's 121st Precinct. (Defs.' Rule 56.1 Stmt. ¶ 14; Pl.'s Rule 56.1 Stmt. ¶ 14.) Sergeant DiCecco was the supervisor while Sepulveda was at the precinct. (Defs.' Rule 56.1 Stmt. ¶ 17; Pl.'s Rule 56.1 Stmt. ¶ 17.) Officer Alexander testified that, while in the "cell area" of the precinct, either he or another officer "asked [Sepulveda] if he wanted to remove" the plastic bag from his rectum "for his safety," but that Sepulveda "wouldn't do it." (Alexander Dep. at 62–63; Defs.' Rule 56.1 Stmt. ¶ 15.) Sergeant DiCecco testified, "I observed [Sepulveda] place an already existing object further up into his rectum in the Arrest Processing Room." (Stein Decl., Ex. E ("DiCecco Dep.") (Doc. No. 65-5) at 38–39.) Sepulveda denies both that he was given the opportunity to remove any drugs from his rectum and that he responded by pushing them further into his rectum. (Pl.'s Rule 56.1 Stmt. ¶ 15.)

The parties agree that Sepulveda was strip searched at the precinct. (Defs.' Rule 56.1 Stmt. ¶ 14; Pl.'s Rule 56.1 Stmt. ¶ 14.) Specifically, Sepulveda testifies that he was subjected to a visual body cavity search – he was asked to take off his clothes, squat, and bend over while police officers "look[ed] for something." (Sepulveda Dep. at 54–55.)

Defendants maintain that they decided to send Sepulveda to the hospital for his safety. (Defs.' Rule 56.1 Stmt. ¶ 16.) Officer Alexander testified that the officers were concerned the bag of drugs might rupture inside Sepulveda and kill him, but did not recall who specifically called for the ambulance. (Alexander Dep. at 76.)

Sepulveda denies that he was taken to the hospital for his safety. (Pl.'s Rule 56.1 Stmt. ¶ 16.) He emphasizes that defendants first took him to the precinct and searched him instead of immediately transporting him to the hospital. (*Id.*) Sepulveda maintains he had no idea why defendants were calling the ambulance while he was at the precinct. (*Id.* ¶ 19.)

An ambulance took Sepulveda to Richmond University Medical Center. (Defs.' Rule 56.1 Stmt. ¶ 16; Pl.'s Rule 56.1 Stmt. ¶ 16; Stein Decl., Ex. D ("Medical Records") (Doc. No. 65-4).) Defendants maintain that Sepulveda told ambulance staff "that he 'shoved a quarter sized bag of cocaine up his rectum.' " (Defs.' Rule 56.1 Stmt. ¶ 18.) The Prehospital Care Report Summary completed by the Fire Department reads, "[Sepulveda] stated to crew and officer that he shoved a quarter sized bag of cocaine up his rectum." (Prehospital Care Report Summary (Doc. No. 65-3) at 3.) [1] Sepulveda denies speaking with ambulance staff. (Pl.'s Rule 56.1 Stmt. ¶ 18.)

**\*3** Sepulveda's hospital records state that Sepulveda told hospital staff that "he put 5-8 bags [of cocaine] in his rectum." (Medical Records at 2; Defs.' Rule 56.1 Stmt. ¶ 10.) Sepulveda denies making this statement and responds that "he has no idea why the records say that." (Pl.'s Rule 56.1 Stmt. ¶¶ 20–21.) The hospital records also reflect that an abdominal x-ray revealed "[f]oreign bodies in [Sepulveda's] rectum surrounded by air bubble [sic]." (Defs.' Rule 56.1 Stmt. ¶ 23; Medical Records at 7.) Sepulveda says he "can neither admit nor controvert the allegation." (Pl.'s Rule 56.1 Stmt. ¶ 23.) Dr. Gisel Cubero completed a Physician Notes document on March 26, 2014, reading, "Based upon my evaluation of the patient, I feel inpatient admission is required; as the patient is a 27 year-old-M with no past medical history. Admission is necessary for drug packet ingestion per rectum, as rupture of packets leading to life threatening condition including fatal arrhythmia, myocardial infarction, CVA, is possible without further evaluation." (Defs.' Rule 56.1 Stmt. ¶ 22; Medical Records at 4.)

According to defendants, hospital staff told Sepulveda about the dangers of keeping cocaine in his rectum, but Sepulveda refused to drink laxatives, be touched, or have hospital staff

attempt to remove anything from his rectum. (Defs.' Rule 56.1 Stmt. ¶¶ 23–25.) Sepulveda confirms that he was told about the dangers of having cocaine in his rectum, but denies that he refused to drink laxative – he says he "did drink some" – and also denies that he refused to be touched or to have hospital staff remove anything from his rectum. (Pl.'s Rule 56.1 Stmt. ¶¶ 24–25; Sepulveda Dep. at 72.)

Sepulveda testifies that, while he was in an "observation room" at the hospital, one of the officers entered the hospital room and told Sepulveda that if he had "something on [him] to give it to them because if [he didn't] give it to them [he was] going to be charged with tampering which is a felony." (Sepulveda Dep. at 69.) Sepulveda told the officer he did not "have anything to give" him. (*Id.*) According to Sepulveda, a doctor at the hospital said he would let Sepulveda leave "if it was up to him," as Sepulveda "was wasting space in the hospital," but "the officers [were] holding [Sepulveda] there." (*Id.* at 80.) Sepulveda testifies the officers told him they were holding him at the hospital. (*Id.*) Defendants maintain that it was the hospital's decision to admit Sepulveda "and there is no evidence that any member of the NYPD ordered a search of any kind." (Defs.' Rule 56.1 Stmt. ¶ 27.) Officer Alexander testified that if drugs had been found in Sepulveda's rectum during his time in the hospital, he "would have charged [Sepulveda] with possession." (Alexander Dep. at 108.) Sepulveda says he cannot admit or controvert this allegation, but does maintain that defendants "orchestrate[d] the search of his body cavity conducted by the hospital." (Pl.'s Rule 56.1 Stmt. ¶ 27.)

The parties agree that cocaine was never recovered from Sepulveda. According to defendants, Sepulveda eventually had a bowel movement which produced no bags of cocaine. (Defs.' Rule 56.1 Stmt. ¶ 26; Pl.'s Rule 56.1 Stmt. ¶ 26.) Afterward, his abdominal x-ray showed no foreign body. (Defs.' Rule 56.1 Stmt. ¶ 26; Pl.'s Rule 56.1 Stmt. ¶ 26.) Sepulveda was discharged on March 31, 2014 – five days after entering the hospital. (Defs.' Rule 56.1 Stmt. ¶ 26; Pl.'s Rule 56.1 Stmt. ¶ 26.) After leaving the hospital, Sepulveda was taken to a different police precinct, fingerprinted and photographed, and then taken to court to be arraigned. (Defs.' Rule 56.1 Stmt. ¶ 29; Pl.'s Rule 56.1 Stmt. ¶ 29; Sepulveda Dep. at 87–88.)

## II. Complaint

Sepulveda filed his original complaint in this action on September 8, 2015. (Compl. (Doc. No. 1).) The complaint brought § 1983 claims against the City of New York and Officer Alexander alleging that Sepulveda was unlawfully searched at the 121ˢᵗ Precinct on May 26, 2014, and later unlawfully searched at the Richmond University Medical Center, in violation of his rights under the Fourth Amendment to the Constitution. (Compl. ¶¶ 11–27.) Sepulveda was subsequently granted permission to file an amended complaint. (Doc. No. 36.) That pleading added Officer Golat, Officer Haggerty, and Sergeant DiCecco as defendants and is now the operative pleading in this action. [2] (Am. Compl.)

**\*4** Sepulveda first brings a § 1983 claim alleging he was subjected to an unlawful search at the 121ˢᵗ Precinct. Specifically, Sepulveda alleges that the defendant police officers conducted a visual body cavity search without probable cause, in violation of Sepulveda's rights under the Fourth Amendment to the Constitution. (Am. Compl. ¶¶ 17–27.) Second, Sepulveda brings a § 1983 claim based on his detention at the hospital, alleging that he was subjected to an unlawful search by the hospital at the direction of the officers. (Am. Compl. ¶¶ 28–39.)

Sepulveda's amended complaint is somewhat unclear as to whether he challenges his treatment as unlawful pretrial punishment under the Fourteenth Amendment or as unlawful search and seizure without probable cause under the Fourth Amendment. He writes, "That the act of detaining Plaintiff, Barry Sepulveda, at the hospital for six (6) days, for a body cavity search without a search warrant from a judge or magistrate, constitutes cruel and inhuman treatment." (Am. Compl. ¶ 35.) However, Sepulveda clarifies in his opposition brief that he brings this claim under the Fourth Amendment, alleging an unlawful search: "Plaintiff Barry Sepulveda brings this action alleging a violation of his Fourth Amendment rights in that he was forced to stay at Richmond University Medical Center for six (6) days with police officers stationed at the entrance of his hospital room so that a manual body cavity search including x-rays could be performed on him, without his consent and without a search warrant." (Pl.'s Memorandum in Opposition to Motion for Summary Judgment ("Opp. Mot.") (Doc. No. 66) at 1.)

## III. Motion for Summary Judgment

Defendants filed their motion for summary judgment on July 26, 2019. (Notice of Motion (Doc. No. 62).) First, defendants argue that the Court must find that Sepulveda in fact inserted drugs into his rectum. (Defs.' Memorandum of Law in Support of Motion for Summary Judgment ("Mot.")

(Doc. No. 63) at 7–10.) According to defendants, in light of the objective medical evidence supporting the conclusion that Sepulveda had drugs in his rectum, and Sepulveda's reliance on his own testimony to dispute this fact, the Court must find that no reasonable juror could conclude that he did not insert drugs into his rectum. (*Id.*)

Most of defendants' subsequent arguments are predicated on a finding that no reasonable juror could credit Sepulveda's denial that he inserted drugs into his rectum. First, defendants argue that the Court's finding of fact with respect to Sepulveda's conduct would support summary judgment on Sepulveda's challenge to the search at the precinct. So long as the Court finds that Sepulveda was observed inserting a bag of suspected drugs into his rectum, defendants maintain, the Court can conclude there was reasonable suspicion supporting Sepulveda being subjected to a search at the precinct. (*Id.* at 10–11.)

Recognizing the ambiguity as to whether Sepulveda brought his second cause of action under the Fourth or Fourteenth Amendment, defendants first argue that involuntary hospitalization claims are cognizable only under the Fourth Amendment, and that Sepulveda's Fourteenth Amendment Due Process claim based on his hospitalization must be dismissed as duplicative. (*Id.* at 11–12.) Then, advancing the same argument used to oppose Sepulveda's first cause of action, defendants argue that Sepulveda's involuntary hospitalization was supported by probable cause given the fact that "he inserted cocaine into his anus." (*Id.* at 12.) Alternatively, defendants argue that Sepulveda's hospitalization was supported by probable cause under 🔖 Section 9.41 of the New York Mental Hygiene Law because Sepulveda was at risk of seriously harming himself by inserting cocaine into his rectum. (*Id.* at 13.) Defendants also argue that medical records demonstrate that it was the decision of hospital medical personnel, not defendant police officers, to admit Sepulveda to the hospital, hold him there, and seek to obtain the drugs inside Sepulveda. (*Id.* at 12–13.)

**\*5** Finally, defendants argue that claims against Officers Golat and Haggerty must be dismissed because Sepulveda fails to plead facts establishing their personal involvement in the alleged events. (*Id.* at 14.)

In response, Sepulveda disputes that any of the defendant officers observed him inserting a bag of drugs into his rectum, describing defendants' account of the event as "patently unreasonable and physically impossible" based on the unlikelihood that officers would watch this occurring "without drawing their guns" and the physical difficulty of inserting drugs into one's own rectum "while seated." (Opp. Mot. at 5.) Sepulveda next argues that defendants' decision to transport Sepulveda to the hospital constituted an unconstitutional search because the defendant police officers "cause[d] the removal of an object from an arrestee's body without first obtaining a search warrant." (*Id.*) Sepulveda maintains that the search at the precinct was unlawful because there could not have been a "clear indication" that evidence would be found, as Sepulveda argues is required under the Fourth Amendment to the Constitution. (*Id.* at 5–6.)

In reply, defendants reiterate that the Court should find that Sepulveda inserted drugs into his rectum, as no reasonable jury could conclude to the contrary based on the evidence presented. (Defs.' Reply Memorandum in Support of Motion for Summary Judgment ("Reply") (Doc. No. 69) at 6– 9.) Next, defendants argue that transporting Sepulveda to the hospital was not a violation of Sepulveda's Fourth Amendment rights because the defendant officers sent Sepulveda to the hospital out of a legitimate concern for Sepulveda's safety. (Reply at 9–11.) Finally, defendants note that Sepulveda did not oppose defendants' argument that the search of Sepulveda before transporting him to the hospital was constitutional or defendants' argument that Officers Golat and Haggerty are entitled to summary judgment because Sepulveda presents no facts tying them to the events at issue. (Reply at 8–9.)

### STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); 🔖 *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." 🔖 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party. 🔖 *Id.* at 255 (citing 🔖 *Adickes v. S.H. Kress & Co.*, 398 U.S.

144, 158–59 (1970)); *see also* *Brosseau v. Haugen*, 543 U.S. 194, 195 n.1 (2004).

Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "A defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

## DISCUSSION

### I. Applicable Law

#### A. Fourth Amendment Protections Against Unreasonable Searches and Seizures

**\*6** The Fourth Amendment to the Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A search occurs when the Government acquires information by either 'physically intruding on persons, houses, papers, or effects,' or otherwise invading an area in which the individual has a reasonable expectation of privacy." *United States v. Ganias*, 755 F.3d 125, 133 (2d Cir. 2014), *on reh'g en banc*, 824 F.3d 199 (2d Cir. 2016) (quoting *Florida v. Jardines*, 569 U.S. 1, 5 (2013)). "A 'seizure' occurs where, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Kia P. v. McIntyre*, 235 F.3d 749, 762 (2d Cir. 2000) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). It is "well-established" that Fourth Amendment protections

"extend to prisoners and pretrial detainees." *Holland v. City of New York*, 197 F. Supp. 3d 529, 542 (S.D.N.Y. 2016).

"[W]arrantless searches are *per se* unreasonable, subject only to a few specifically delineated and well-recognized exceptions." *New Jersey v. T.L.O.*, 469 U.S. 325, 354 (1985) (Brennan, J., concurring). Where law enforcement conducts a warrantless search based on an emergency circumstance and "[a]bsent th[e] established justification" provided by a warrant, "the fact-specific nature of the reasonableness inquiry demands that [courts] evaluate each case of alleged exigency based on its own facts and circumstances." *Missouri v. McNeely*, 569 U.S. 141, 150 (2013) (internal citations and quotation marks omitted).

The term "strip search" is often used to describe a number of distinct searches:

> (1) a "strip search" occurs when a suspect is required to remove his clothes; (2) a "visual body cavity search" is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); (3) a "manual body cavity search" occurs when the police put anything into a suspect's body cavity, or take anything out.

*Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2013).

Even following an arrest of a person for a felony offense, police must have "a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity" in order to conduct a visual body cavity search. *Sloley v. VanBramer*, 945 F.3d 30, 38 (2d Cir. 2019) (quoting *People v. Hall*, 10 N.Y.3d 303, 311 (2008)). When "an arresting officer has reason to believe, based on specific and articulable facts, taken together with rational inferences from those facts, that an arrestee is secreting contraband inside a body cavity, then the officer is permitted to conduct a visual body cavity search." *Id.* (internal citations and quotation marks omitted).

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation and internal quotation marks omitted). "Personal involvement can be shown by evidence that the defendant 'participated directly in the alleged constitutional violation'; or that the defendant acted in a supervisory capacity by creating a policy or custom under which violations occurred, by negligently supervising subordinates, or by failing to act or remedy wrongs after being aware of them." *Anderson v. City of New York*, 817 F. Supp. 2d 77, 93 (E.D.N.Y. 2011) (quoting *Colon*, 58 F.3d at 873).

Finally, "[t]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Frith v. City of New York*, 203 F. Supp. 3d 386, 391 (S.D.N.Y. 2016) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)) (internal quotation marks omitted).

### B. Factual Disputes at the Summary Judgment Stage

**\*7** At the summary judgment stage, plaintiffs often rely on their sworn testimony to establish a material issue of fact. Because a court at the summary judgment stage must draw all "reasonable" and "justifiable" inferences in favor of the non-moving party, a plaintiff's testimony is often sufficient to establish a material issue of fact precluding summary judgment. *See Anderson*, 477 U.S. at 255. Where, however, a court finds that "nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony," a court may conclude that no reasonable juror would believe the plaintiff's testimony. *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005). So, while district courts are not to "engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment," they may, "in certain extraordinary cases, where 'the facts alleged are so contradictory that doubt is cast up on their plausibility,' " grant summary judgment despite the fact that doing so requires finding contrary to the plaintiff's sworn testimony. *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (quoting *Jeffreys*, 426 F.3d at 555). At the same time, as the Second Circuit recently explained in *Bellamy v. City of New York*, where a non-movant's

testimony is "consistent and uncomplicated," is not "wholly improbable," and is supported by the record, self-serving testimony should not be disregarded on summary judgment. 914 F.3d 727, 746 (2d Cir. 2019).

### II. Factual Dispute Regarding Whether Sepulveda Inserted Drugs into His Rectum

Given the substantial evidence contradicting Sepulveda's testimony, no reasonable jury could conclude that Sepulveda did not insert drugs – or something that appeared to be a plastic bag containing drugs – into his rectum on March 26, 2014. In arguing that the Court must reject Sepulveda's account of events, defendants analogize this case to *Jeffreys*, in which the district court's grant of summary judgment was affirmed after it disregarded plaintiff's sworn testimony that he had not jumped out of a window and was instead thrown out by police. *Jeffreys*, 426 F.3d at 551–53. (Mot. at 8–9.) Plaintiff Jeffreys's sworn testimony was substantially contradicted by admissions he had apparently made to medical staff, doctors' reports of his injuries, and police officers' accounts of the incident. *Id.*

As in *Jeffreys*, here defendants point to a variety of evidence that contradicts Sepulveda's testimony. Defendants provide sworn testimony from Officer Alexander stating that he observed Sepulveda insert a plastic bag into his rectum. (Alexander Dep. at 36–38.) They also provide testimony from Sergeant DiCecco, who separately testifies that he observed Sepulveda "place an already existing object further up into his rectum in the Arrest Processing Room." (DiCecco Dep. at 38– 39; Alexander Dep. at 62–63.) Beyond the testimony of these officers, defendants present medical evidence that Sepulveda told ambulance staff and hospital staff that he had cocaine in his rectum, (Prehospital Care Report Summary at 3; Medical Records at 2), that Sepulveda's x-ray upon arriving at the hospital showed a foreign body inside Sepulveda's rectum, (Medical Records at 7), and that Dr. Cubero concluded that Sepulveda had to be admitted to the hospital due to the existence of drugs in his rectum, (Medical Records at 4).[3]

**\*8** Sepulveda presents nothing beyond his own testimony to dispute this evidence. He denies speaking with ambulance staff, (Pl.'s Rule 56.1 Stmt. ¶ 18), says he "has no idea why the records say" that he told hospital staff he had inserted drugs into his rectum, (Pl.'s Rule 56.1 Stmt. ¶¶ 20–21), and that he "can neither admit nor controvert the allegation" that an x-ray showed a foreign body in his rectum, (Pl.'s

Rule 56.1 Stmt. ¶ 23). To credit Sepulveda's alternative account of events, a juror would have to discredit not only the officers' testimony, but also the independent statements made by emergency personnel who transported Sepulveda to the hospital, the statements and conclusions of hospital staff, and the findings of an x-ray taken when Sepulveda was admitted. Sepulveda thus presents no account – much less a "consistent and uncomplicated" one – to account for the overwhelming evidence against him, 🚩 *Bellamy*, 914 F.3d at 746, despite the fact that Sepulveda has had "ample opportunity to explain or reconcile" his contradictory statements to medical staff and the medical evidence against him, 🚩 *Rojas*, 660 F.3d at 106.

Summary adjudication is appropriate here because Sepulveda's account of events is also not supported by facts in the record beyond Sepulveda's testimony. While the fact that the drugs were never recovered from Sepulveda might appear to support his account of events, it in fact only further complicates his testimony. The foreign object previously shown inside Sepulveda's rectum had disappeared by the time of Sepulveda's second x-ray, yet Sepulveda provides no account for how this happened, what non-drug foreign object was previously observed inside his body, or why it was no longer visible at the time he was discharged. Because the Court finds "nothing in the record to support [Sepulveda's] allegations other than [Sepulveda's] own contradictory and incomplete testimony," 🚩 *Jeffreys*, 426 F.3d at 555, the Court finds that Sepulveda in fact inserted a plastic bag with drugs – or something that appeared to be a plastic bag with drugs – into his rectum during the March 26, 2014, traffic stop.

### III. Fourth Amendment Claims Against Officers Based on Visual Cavity Search

The defendant officers are entitled to summary judgment on Sepulveda's § 1983 claims that the search at the 121st Precinct violated his Fourth Amendment rights. Because the Court finds that Sepulveda inserted drugs, or something that appeared to be drugs, into his rectum during the traffic stop, the arresting officers had "reason to believe, based on specific and articulable facts, taken together with rational inferences from those facts, that [Sepulveda was] secreting contraband inside a body cavity," and were thus "permitted to conduct a visual body cavity search." *Sloley*, 945 F.3d at 38.

### IV. Fourth Amendment Claims Against Officers Based on Hospitalization

Sepulveda also brings a § 1983 claim based on the allegation that the defendant officers arranged for his transport and admission to the hospital in order to conduct a warrantless search for the drugs they believed to be inside Sepulveda's rectum. Defendants are entitled to summary judgment on this claim as well because Sepulveda fails to present evidence to establish defendants' personal involvement in the alleged search.

In his opposition brief, Sepulveda argues that taking him to the hospital "for the purpose of performing a digital body cavity search" was a violation of his Fourth Amendment right to be free from unreasonable searches. (Opp. Mot. at 7.) As an initial matter, Sepulveda presents no evidence to support this pretextual motive for sending him to the hospital. Once they had reason to believe Sepulveda had hidden drugs in his rectum, defendants were justified in arranging for Sepulveda to be transported to a hospital. In arguing that defendants did not arrange for him to be transported to the hospital out of a concern for his safety, Sepulveda points only to the fact that officers brought him to the precinct instead of directly to the hospital. (Defs.' Rule 56.1 Stmt. ¶ 16; Pl.'s Rule 56.1 Stmt. ¶ 16.) Yet, given the officers' testimony that Sepulveda was given an opportunity to remove the drugs at the precinct, (Defs.' Rule 56.1 Stmt. ¶ 15), the stop at the precinct is not inconsistent with officers' sending Sepulveda to the hospital for his safety.

**\*9** More significant, however, is the fact that Sepulveda presents no evidence to dispute defendants' claim that it was hospital staff, not the defendant officers, who made the decision to admit Sepulveda to the hospital. The evidence filed with the parties' motions shows that it was Dr. Cubero who determined that "inpatient admission" was required based on the determination that Sepulveda had ingested drugs. (Medical Records at 4.) This decision was supported by the x-ray conducted by hospital staff, as well as Sepulveda's statements to emergency personnel and hospital staff. (Medical Records at 2, 7; Prehospital Care Report Summary at 3.)

The only evidence Sepulveda might point to in order to argue that defendants played a role in his hospitalization and any subsequent search is his own testimony that an unidentified doctor and an unidentified officer told him that officers were holding him at the hospital. (Sepulveda Dep. at 80.) However, these statements provide no basis for concluding that the defendant officers played any role in an alleged search at the hospital. [4] These statements are consistent with the fact that

Sepulveda was still under arrest and would have to return to the precinct once discharged from hospital. [5] Similarly, Officer Alexander's testimony that Sepulveda would have been charged with possession if he had been found with drugs inside his body does not provide a basis for concluding that officers played any role in any alleged search of Sepulveda at the hospital. (Alexander Dep. at 108.) Ultimately, Sepulveda concedes that he "can neither admit nor controvert the allegation that the decision to admit plaintiff to the hospital and treat him for inserting drugs into his rectum was made by hospital personnel." [6] (Pl.'s Rule 56.1 Stmt. ¶ 27.)

Defendants have offered "concrete evidence" to support the conclusion that Sepulveda's admission to the hospital was a decision made by hospital staff for Sepulveda's safety, and not with the intention of conducting a search of Sepulveda. *Anderson,* 477 U.S. at 256. Sepulveda fails to put forth any evidence to establish that the officers had him hospitalized for the purpose of a search, played a role in admitting Sepulveda to the hospital, or in his treatment while at the hospital. Sepulveda relies only on "conclusory allegations" and "unsubstantiated speculation" to create a genuine issue of fact for trial. *Scotto,* 143 F.3d at 114. Because Sepulveda fails to plead facts to establish that the officers either "participated directly in the alleged constitutional violation" or "fail[ed] to act or remedy wrongs after being aware of them," defendants are entitled to summary judgment on Sepulveda's § 1983 claim arising out of his hospitalization.

**V. Fourth Amendment Claims Against City of New York**

*10 Finally, to the extent Sepulveda brings a *Monell* claim seeking to hold the City of New York liable for the misconduct alleged, the City is entitled to summary judgment on those claims. Sepulveda presents no evidence of "an official policy or custom" related to the misconduct he alleges to support *Monell* liability against the City. *Frith,* 203 F. Supp. 3d at 391. Accordingly, the City of New York is entitled to summary judgment.

**CONCLUSION**

For the reasons set forth above, defendants' motion for summary judgment is granted. The Clerk of Court is respectfully directed to enter judgment for defendants and to close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 2836952

---

**Footnotes**

1    Except for citations to depositions, page numbers correspond to pagination from the Court's Electronic Case Filing System.

2    Although the amended complaint identifies Sergeant DiCecco as Sergeant "Diceco," the Court adopts the spelling used in plaintiff's and defendants' filings. (*See, e.g.,* Pl.'s Rule 56.1 Stmt. ¶ 17; DiCecco Dep.)

3    Courts in the Second Circuit regularly admit medical records as evidence pursuant to Federal Rule of Evidence 803(6), the business records exception to the hearsay rule. *See Duchnowski v. Cty. of Nassau,* 416 F. Supp. 3d 179, 182 (E.D.N.Y. 2018). This would include Sepulveda's medical records completed at the hospital and Sepulveda's Prehospital Care Report, completed by the emergency personnel who transported Sepulveda to the hospital. *See Ortiz v. City of New York,* No. 15-CV-2206 (DLC), 2017 WL 5613735, at *9 (S.D.N.Y. Nov. 21, 2017) (admitting prehospital care report and hospital medical records pursuant to Federal Rule of Evidence 803(6)). Although Sepulveda's statements to medical staff contained within these records would be hearsay, at least some of the statements would likely be admissible as evidence against him because they fall within the exception to the hearsay rule for statements made for the purpose of medical diagnosis or treatment, codified in Federal Rule of Evidence 803(4). *See Turner v. White,* 443 F. Supp. 2d

288, 297 (E.D.N.Y. 2005) ("The Second Circuit has held that where the statements are made to the physician about the patient's condition and the physician relies on the statement in formulating his opinion and treatment plan, then such statements are generally admissible."); *see also* Ortiz, 2017 WL 5613735, at *9.

4   It is also the case that the statement of the unidentified doctor, and possibly the officer as well, would constitute inadmissible hearsay. *See* Fed. R. Evid. 802.

5   Sepulveda acknowledges he was in fact transported to the precinct by other officers (not defendants) to be fingerprinted and later arraigned after he was discharged from the hospital. (Sepulveda Dep. at 87–88.)

6   The Court also notes that even if Sepulveda had evidence to establish the officers' role in his admission and treatment in the hospital, it is far from clear that Sepulveda could make out Fourth Amendment search claim based on the evidence presented. Sepulveda points to no evidence that the search he claims officers wanted the hospital to conduct was ever conducted. In his motion, Sepulveda argues that officers violated his Fourth Amendment rights by sending him to the hospital "for the purpose of performing a digital body cavity search." (Opp. Mot. at 7.) Yet, on the prior page, Sepulveda notes that the hospital merely "gave him a laxative and then took a stomach x-ray." (*Id.* at 6.)

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Sloley v. VanBramer, Not Reported in Fed. Supp. (2016)

2016 WL 6603211

KeyCite Red Flag - Severe Negative Treatment

Affirmed in Part, Vacated in Part, Remanded by Sloley v. VanBramer, 2nd
Cir.(N.Y.), December 12, 2019

2016 WL 6603211
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Maxmillian SLOLEY, Plaintiff,

v.

Eric VANBRAMER et al., Defendants.

1:14-cv-339 (GLS/CFH)
|
Signed 11/08/2016

**Attorneys and Law Firms**

Maxmillian Sloley, 18 Knollwood Ave., Elmsford, NY
10523, Pro Se.

FOR THE DEFENDANT: HON. ERIC T.
SCHNEIDERMAN, New York State Attorney General,
Litigation Bureau, The Capitol, OF COUNSEL: STEPHEN
M. KERWIN, Assistant Attorney General, Albany, NY
12224.

## <u>MEMORANDUM-DECISION AND ORDER</u>

Gary L. Sharpe, Senior District Judge

### I. <u>Introduction</u>

**\*1** Plaintiff *pro se* Maxmillian Sloley commenced this action
pursuant to 42 U.S.C. § 1983 against defendants Eric
VanBramer and Brian VanBramer alleging violations of his
Fourth Amendment rights. (Compl., Dkt. No. 1.) Pending is
defendants' motion for summary judgment. (Dkt. No. 41.) For
the reasons that follow, the motion is granted.

### II. <u>Background</u> [1]

On April 1, 2013, State Trooper Bryan VanBramer responded
to a 911 call concerning a domestic dispute at the home of
Daphne Rollins. (Defs.' Statement of Material Facts (SMF)
¶¶ 5, 11-13.) Rollins reported that Sloley, who apparently

was her boyfriend at the time, had struck her, smashed the
windshield of her car with a baseball bat, and took her
cell phone. (*Id.* ¶¶ 14-15; Dkt. No. 41, Attach. 2 at 36-37.)
Before police arrived, Sloley fled the scene in a white Nissan
Maxima. (Defs.' SMF ¶¶ 12, 16.) According to defendants,
Rollins also informed B. VanBramer that Sloley may have
drugs on him. (*Id.* ¶ 17.) Sloley disputes this. [2] (Dkt. No. 46
at 6.)

Shortly after, Sloley was pulled over by local police who
escorted him in their patrol vehicle to Rollins' home for
questioning by B. VanBramer. (Defs.' SMF ¶¶ 20-21; Dkt.
No. 41, Attach. 2 at 43-44.) At some point, B. VanBramer
directed State Trooper Eric VanBramer, a member of the
canine unit, to Sloley's vehicle and notified him that Sloley
had been stopped while fleeing from a crime and may have
been in possession of illegal drugs. (Defs.' SMF ¶¶ 29-31.) E.
VanBramer recognized Sloley's name as a well known drug
dealer in the area and had previously been informed by others
of the same. (*Id.* ¶ 31.)

E. VanBramer arrived at Sloley's car and approached it
with a police trained canine who positively alerted at the
various locations on the vehicle. (*Id.* ¶¶ 32-33.) E. VanBramer
observed a small quantity of a loose, chunky substance
appearing to be crack cocaine in the crease of the driver's seat.
(*Id.* ¶ 34.) A field test revealed that the substance was indeed
cocaine. (*Id.* ¶ 36.) Based on his experience, E. VanBramer
reasoned that some of the drugs had fallen out while Sloley
quickly tried to hide them when he was pulled over. (*Id.* ¶ 35.)
E. VanBramer informed B. VanBramer that drugs were found
in Sloley's car. (Dkt. No. 41, Attach. 4 ¶ 7.)

**\*2** After being questioned at Rollins' home, Sloley was
transported to the police station. (Defs.' SMF ¶ 37.) The
parties do not dispute that Sloley was arrested at this point.
(*Id.*; Compl. ¶¶ 11-12; Dkt. No. 41, Attach. 2 at 60-62.)
B. VanBramer processed Sloley and reviewed his criminal
history, which revealed that he was on federal supervised
release and was previously convicted of multiple felonies as
well as crimes for drug possession and sales. (Defs.' SMF ¶
38.)

E. VanBramer then returned to the station, told Sloley that
drugs were found in his car, and escorted him to a private
office for a visual strip search. (*Id.* ¶¶ 39-43.) E. VanBramer,
who was the only officer present, directed Sloley to remove
his clothing and to lift his genitals, squat, and spread his
buttocks. (*Id.* ¶¶ 41-42, 44-45, 47.) Sloley was not touched

Sloley v. VanBramer, Not Reported in Fed. Supp. (2016)

2016 WL 6603211

by E. VanBramer during this search and ultimately no drugs or contraband were found. (*Id.* ¶ 43; Dkt. No. 41, Attach. 2 at 72.)

Sloley was then charged and later arraigned on two felony counts of criminal mischief in the third degree, one misdemeanor count of criminal possession of a controlled substance in the seventh degree, and one count of harassment in the second degree, a violation. (Defs.'s SMF ¶¶ 48-49.) He was remanded because of his prior felony convictions and later pleaded guilty to harassment in the second degree in satisfaction of all charges. (*Id.* ¶¶ 50, 52.)

Sloley commenced this civil rights action alleging that the strip search violated his Fourth Amendment rights. (Compl.) Defendants subsequently filed the now-pending motion for summary judgment. (Dkt. No. 41.)

### III. Standard of Review

The standard of review pursuant to Fed. R. Civ. P. 56 is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 Fed.Appx. 500 (2d Cir. 2012).

### IV. Discussion

#### A. Personal Involvement

Defendants argue that State Trooper B. VanBramer should be dismissed from the lawsuit because he took no part in the strip search. (Dkt. No. 41, Attach. 7 at 9.) To be liable for a ⚑ section 1983 claim, "a plaintiff must establish a given defendant's personal involvement in the claimed violation." ⚑ *Patterson v. Cty. of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004). Here, where Sloley only alleges a constitutional violation based on the defendants' direct involvement and it is undisputed that B. VanBramer was not present for nor ordered the strip search, he lacks personal involvement sufficient for liability. *See* 🚩 *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Accordingly, he is entitled to summary judgment.

#### B. Strip Search

Defendants note that Sloley only contests the constitutionality of the strip search and argue that the search passes constitutional muster. (Dkt. No. 41, Attach. 7 at 10-15.) Specifically, defendants assert that the strip search was supported by reasonable suspicion that Sloley was secreting drugs on his person. [3] (*Id.*)

**\*3** The Fourth Amendment protects individuals from unreasonable searches by the government. *See* U.S. Const. amend IV. A search of a person is presumptively unreasonable if conducted without a warrant. *See* *Katz v. United States*, 389 U.S. 347, 357 (1967). Warrantless searches are constitutionally justified, however, if they fall under an exception to the warrant requirement. *See id.*

The leading Second Circuit case on warrantless strip searches of arrestees at police stations analyzed those searches under the incident to arrest exception. *See* ⚑ *Hartline v. Gallo*, 546 F.3d 95, 101 (2d Cir. 2008). Indeed, here, defendants appear to only contend that E. VanBramer searched Sloley to discover evidence and, thus, other exceptions to the warrant requirement, such as a special needs exception, do not apply. *Cf.* ⚑ *Reinhart v. City of Schenectady Police Dep't*, 599 F. Supp. 2d 323, 333-35 (N.D.N.Y. 2009). To pass constitutional muster, a warrantless strip search must be supported by individualized "reasonable suspicion that [a misdemeanor] arrestee is concealing weapons or other contraband based on the crime charge, the particular characteristics of the arrestee, and/or the circumstances of the arrest." [4] ⚑ *Hartline*, 546 F.3d at 100 (internal quotation marks and citation omitted); *see* ⚑🅰 *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986). Courts evaluate reasonable suspicion under the totality of the circumstances and allow officers "to draw on their own experience and specialized training to mark inferences from and deductions about the cumulative information available to them that might well elude an untrained person." ⚑ *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks and citation omitted). "A reasonable suspicion is more than a hunch, but less than probable cause, and considerably less than a preponderance of the evidence." ⚑ *United States v. DeLouya*, No. 1:04CR588, 2005 WL 3244173, at \*14 (N.D.N.Y. Nov. 30, 2005) (citing ⚑ *Arvizu*, 534 U.S. at 274).

The facts here support a finding of reasonable suspicion even discounting Rollins' statement to the police, which as noted above, *see* Part II *supra*, is in dispute. Before the search, the

Sloley v. VanBramer, Not Reported in Fed. Supp. (2016)

2016 WL 6603211

police recovered drugs from the driver's seat of Sloley's car. (Defs.' SMF ¶ 36.) E. VanBramer inferred from the manner that the drugs were found that Sloley hurriedly attempted to hide them on his body as he was pulled over by the police. (*Id.* ¶ 35.) The police were also aware that Sloley was a drug dealer. (*Id.* ¶ 31.) Finally, the police knew that Sloley had past convictions for possession and sale of drugs. (*Id.* ¶ 38.) In total, these facts support the conclusion that there was reasonable suspicion that Sloley was concealing contraband on his person.

**\*4** Additionally, the manner that the search was performed was reasonable. Sloley was escorted to a private room in the station with one other officer. (*Id.* ¶¶ 40, 44-45, 47.) He removed his own clothing and the officer did not touch or reach inside his body cavities. (*Id.* ¶¶ 41, 43.) Accordingly, based on these facts, the search was constitutional.

## C. Qualified Immunity

Defendants also contend that even if E. VanBramer violated Sloley's Fourth Amendment rights, he is entitled to qualified immunity. (Dkt. No. 41, Attach. 7 at 15-18.) The court agrees.

Officers are entitled to qualified immunity if their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). More specifically, an officer receives qualified immunity if it was "objectively reasonable" for him to believe that his conduct was constitutional. *See Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007). An officer is objectively reasonable if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The court finds that even if Sloley's Fourth Amendment rights were violated, E. VanBramer is entitled to qualified immunity. As detailed above, the court cannot say that the facts of this case demonstrate that "it is clearly established that no

'reasonable suspicion' justified a strip-search." *Wachtler v. Cty. of Herkimer*, 35 F.3d 77, 81 (2d Cir. 1994). Indeed, here, Sloley exhibited some factors that *Hartline* deemed relevant to determine the reasonableness of the search including "computerized information showing pertinent criminal propensities" and "discovery of incriminating matter during routine searches." *Hartline*, 546 F.3d at 101 (citing *United States v. Asbury*, 586 F.2d 973, 976-77 (2d Cir. 1978)); *see Easton v. City of New York*, No. 05-CV-1873, 2009 WL 1767725, at \*4 (E.D.N.Y. June 23, 2009). Accordingly, because "[t]here are so many permutations of fact that bear upon the constitutional issues of a search," *Gonzalez*, 728 F.3d at 162, it cannot be said that no reasonable officer in E. VanBramer's position would have determined there was no reasonable suspicion for the strip search.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 41) is **GRANTED**; and it is further

**ORDERED** that the Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED**

November 8, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6603211

---

## Footnotes

1  In response to defendants' statement of material facts, (Dkt. No. 46), Sloley failed to comply with this District's Local Rules. Local Rule 7.1(a)(3) provides that, in a response to a statement of material facts, "[t]he non-

Sloley v. VanBramer, Not Reported in Fed. Supp. (2016)

2016 WL 6603211

movant's response shall mirror the movant's [s]tatement of [m]aterial [f]acts by admitting and/or denying each of the movant's assertions .... Each denial shall set forth a specific citation to the record where the factual issue arises." Pursuant to Local Rule 7.1(a)(3), the court deems admitted defendants' statement of material facts, which are properly supported. However, in an abundance of caution and considering Sloley's *pro se* status, the court also admits properly supported facts raised in Sloley's response.

2    Defendants asks this court to strike the supporting affidavit of Daphne Rollins attached to Sloley's response. (Dkt. No. 46 at 6.) Defendants fail to supply any legal authority supporting their request and, thus, their request is denied.

3    The Supreme Court in ⚑*Florence v. Board of Chosen Freeholders of County of Burlington*, 132 S. Ct. 1510, 1520-21 (2012), held that corrections officers may perform visual body cavity searches on new detainees, regardless of the level of the offense charged, admitted to the general prison population without reasonable suspicion. Defendants acknowledge, but do not advocate, that some district courts in this circuit have extended *Florence*'s holding to strip searches in police stations. (Dkt. No. 41, Attach. 7 at 11 n. 4); *see*

⚑*Paulin v. Figlia*, 916 F. Supp. 2d 524, 533 (S.D.N.Y. 2013); *but see* Fate v. Charles, 24 F. Supp. 3d 337, 344-52 (S.D.N.Y. 2014). Absent direction from the Second Circuit, the court assumes without deciding that *Florence* does not apply to this case.

4    Defendants do not assert that a less demanding standard should apply because Sloley was also arrested for a felony. In an abundance of caution, however, the court applies the same standard to Sloley's felony arrest. *See, e.g.*, *Sarnicola v. Cty. of Westchester*, 229 F. Supp. 2d 259, 270 (S.D.N.Y. 2002) (noting that the Second Circuit has not directly spoken to the test for strip searches of felony arrestees but held that the same particularized reasonable suspicion standard should apply); *see also* ⚑*Gonzalez v. City of Schenectady*, 728 F.3d 149, 161-62, 164 (2d Cir. 2013) (holding that qualified immunity applied to an officer who strip searched a felony arrestee without reasonable suspicion because the law was not clearly established); ⚑*People v. Hall*, 10 N.Y.3d 303 (2008).

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 744037
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Michael TAYLOR, Plaintiff,

v.

CITY OF NEW YORK, Richard Alvarez,
Anthony Chow, Fernando Bonilla,
and Thomas Fabrizi, Defendants.

19 Civ. 6754 (KPF)
|
Signed 03/11/2022

**Attorneys and Law Firms**

Samuel Christopher DePaola, Michael Kevin Pinkard, Sameer Nath, Sim & DePaola, LLP, Bayside, NY, John K. Kouroupas, Greenberg & Stein, PC, New York, NY, for Plaintiff.

John L. Garcia, Laura Adanma Iheanachor, Richard Bahrenburg, New York City Law Department, New York, NY, for Defendants.

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

 **\*1** On August 31, 2016, Plaintiff Michael Taylor was arrested and charged with selling narcotics on a Manhattan street corner. Since then, Plaintiff has consistently maintained that his arrest and subsequent prosecution for narcotics offenses were predicated on false allegations concocted by the New York City Police Department (the "NYPD") officers who arrested him. A jury apparently agreed, acquitting Plaintiff at trial. Following his acquittal, Plaintiff filed this civil rights action against the NYPD officers involved in his arrest — Detective Richard Alvarez, Detective Anthony Chow, Detective Fernando Bonilla, and Lieutenant Thomas Fabrizi (the "Officers") — as well as the City of New York (the "City," and together with the Officers, "Defendants"), asserting claims for false arrest, malicious prosecution, illegal search, malicious abuse of process, and failure to intervene under 🚩42 U.S.C. § 1983, along with related state law claims. Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to all of Plaintiff's claims. For the reasons that follow, Defendants' motion is granted in part and denied in part.

**BACKGROUND** [1]

**A. Factual Background** [2]

 **\*2** On August 31, 2016, at approximately 7:45 p.m., Plaintiff Michael Taylor was arrested in the vicinity of West 103rd Street between Broadway and Amsterdam Avenue in Manhattan, New York, for the suspected sale of a controlled substance to a woman named Deborah Gasparro. (Def. 56.1 ¶¶ 1-2; Garcia Decl., Ex. B ("Arrest Report")). Thereafter, Plaintiff was charged with two narcotics felonies: (i) criminal sale of a controlled substance in the third degree and (ii) criminally using drug paraphernalia in the second degree. (Garcia Decl., Ex. K ("Criminal Complaint")).

While the parties agree that the precipitating event for Plaintiff's arrest was a brief interaction between Plaintiff and Gasparro, they sharply contest what occurred during the interaction. (*Compare* Def. 56.1 ¶ 2, *with* Garcia Decl., Ex. A ("Pl. Dep.") at 44:8-19). On Defendants' view, Detective Richard Alvarez witnessed Plaintiff engage in a narcotics transaction with Gasparro. (Garcia Decl., Ex. C ("Alvarez Dep.") at 52:5-11). Plaintiff, by contrast, contends that he did not possess any controlled substances and that he was arrested so soon after Gasparro approached him that Alvarez could not possibly have observed an exchange, let alone a narcotics transaction. (Pl. Dep. 44:16-19). This dispute lies at the heart of this case and, to a considerable degree, dictates the Court's resolution of this motion.

**1. The Circumstances of Plaintiff's Arrest**

On the day of Plaintiff's arrest, Alvarez was on patrol in plainclothes with Lieutenant Thomas Fabrizi, Detective Anthony Chow, and Detective Fernando Bonilla in the vicinity of Manhattan's 24th Precinct. (DePaola Decl., Ex. 1 ("Suppression Hr'g Tr.") at 7:3-24, 10:14-17). Alvarez described the area as "drug prone" and testified that he had made prior drug-related arrests in the neighborhood. (*Id.* at 9:23-10:4). In fact, one of Alvarez's prior arrests in this area had occurred but a half-hour before Plaintiff's, and involved an individual who was apprehended for possession of crack cocaine upon exiting the building at 868 Amsterdam Avenue — the same address that would lead Alvarez to Gasparro. (*Id.* at 10:18-11:16, 22:9-15).

Shortly after Alvarez arrested this unrelated individual, Bonilla radioed Alvarez to return to the area near 868 Amsterdam Avenue because a female, who was later identified as Gasparro, was trying to enter this address. (Suppression Hr'g Tr. 11:17-24). Upon arriving at the location, Alvarez saw Gasparro exiting the building with Juan Santana, whom Alvarez recognized from previous arrests as a known drug dealer in the community. (*Id.* at 13:11-16, 22:19-23:9). Chow, also in plainclothes, joined Alvarez, and the two officers followed Gasparro and Santana for several blocks. (*Id.* at 33:4-7, 48:13-17). When Gasparro and Santana eventually separated, the officers continued to track Gasparro. (*Id.* at 34:16-35:3, 48:14-25).

Alvarez claims that at some point thereafter, he witnessed Gasparro approach Plaintiff and engage in a narcotics transaction. (Def. 56.1 ¶ 4). More specifically, Alvarez claims that he was standing approximately 10 feet away from Plaintiff on the sidewalk when he observed Gasparro hand Plaintiff money in exchange for a small item that Alvarez believed to be crack cocaine. (Alvarez Dep. 46:7-21, 68:13-20). [3] Immediately following the perceived exchange, Alvarez apprehended Gasparro, who had tucked into her bra a small, clear Ziploc bag filled with a substance that later field-tested positive for crack cocaine. (Def. 56.1 ¶¶ 6-7, 9-10; Alvarez Dep. 62:12-23). Alvarez recovered the Ziploc bag from Gasparro and proceeded to arrest her. (Def. 56.1 ¶¶ 8, 11).

**\*3** Meanwhile, approximately two-and-a-half car lengths away from where Alvarez confronted Gasparro, Chow detained and searched Plaintiff. (Garcia Decl., Ex. D ("Chow Dep.") at 38:3-39:3). After finding Gasparro's Ziploc bag, Alvarez looked toward Chow and nodded, which Chow understood to mean that Alvarez had recovered drugs. (*Id.* at 35:14-23). Chow then handcuffed and arrested Plaintiff. (*Id.* at 39:15-20). At the time of his arrest, Plaintiff was holding cash in his hand and had 14 empty, small, yellow-tinted Ziploc bags in his right pants pocket. (Def. 56.1 ¶¶ 15-16; Garcia Decl., Ex. H).

Plaintiff provides a very different account of his interaction with Gasparro. He contends that, rather than asking him for narcotics, Gasparro was in fact approaching him to beg for money. (Pl. 56.1 ¶ 2; Pl. Dep. 34:24-35:2). In a charitable gesture, Plaintiff reached into his right pants pocket to pull out some cash, counted off a dollar, but was arrested before he could hand her the money. (Pl. 56.1 ¶¶ 3-4; Pl. Dep. 36:1-10). Plaintiff estimates that approximately one minute elapsed

between when Gasparro approached him and when he was arrested. (Pl. Dep. 44:14-19). Plaintiff maintains that he never possessed crack cocaine or any other controlled substance. (*Id.* at 38:15-20). The only items in Plaintiff's pockets at the time of his arrest were the yellow-tinted Ziploc bags, which differed from the clear bag recovered from Gasparro. (Def. 56.1 ¶ 16; Pl. Dep. 39:4-7). Plaintiff also had eight one-dollar bills in his hand and three twenty-dollar bills in his wallet. (Garcia Decl., Ex. G; Pl. Dep. 36:11-22).

Following their arrests, Plaintiff and Gasparro were placed in the rear of a prisoner transport van and taken to the 24th Precinct for processing. (Def. 56.1 ¶¶ 17-18). Upon arriving at the precinct, Plaintiff was subjected to an invasive search, which Plaintiff claims entailed removing his clothing, bending over, squatting, and coughing. (Pl. Dep. 51:24-52:5). Plaintiff recalls that Alvarez was present during this search. (*Id.* at 52:15-16).

### 2. Plaintiff's and Gasparro's Criminal Prosecutions
Both Plaintiff and Gasparro were charged with narcotics offenses stemming from their August 31, 2016 arrests. On September 1, 2016, Alvarez signed a criminal complaint charging Plaintiff with two felony narcotics counts: (i) criminal sale of a controlled substance in the third degree and (ii) criminally using drug paraphernalia in the second degree. (Criminal Complaint). Later that evening, Plaintiff was arraigned on these charges and then released from custody on his own recognizance. (Garcia Decl., Ex. L ("Pl. Arraignment Form")). On November 1, 2016, a grand jury sitting in Manhattan indicted Plaintiff on both narcotics offenses. (*Id.*, Ex. O ("Indictment")). Plaintiff's criminal case went to trial, which resulted in Plaintiff's acquittal on May 15, 2018. (*Id.*, Ex. P ("Pl. Certificate of Disposition")).

Separately, on October 5, 2016, Alvarez signed a criminal complaint charging Gasparro with criminal possession of a controlled substance in the seventh degree. (Garcia Decl., Ex. M ("Gasparro Criminal Complaint")). On October 25, 2016, Gasparro pleaded guilty to this offense and received a sentence of time served. (*Id.*, Ex. N ("Gasparro Certificate of Disposition")).

### B. Procedural Background
Prior to initiating the instant suit, on July 27, 2018, Plaintiff filed a Notice of Claim with the New York City Comptroller's Office. (Garcia Decl., Ex. Q ("Notice of Claim")). The Notice of Claim alleges, among other violations, that Plaintiff was

falsely arrested, falsely imprisoned, illegally searched and seized, and maliciously prosecuted by NYPD officers on August 31, 2016. (*Id.* at 3). Plaintiff testified to the allegations contained in this Notice of Claim at a hearing pursuant to [New York General Municipal Law 50-h](#) on October 15, 2018. (Garcia Decl., Ex. R ("50-h Hearing Tr.")).

**\*4** Plaintiff filed the Complaint in this case on July 19, 2019. (Dkt. #1 (the "Complaint" or "Compl.")). Defendants Alvarez, Chow, and the City of New York filed their Answer to the Complaint on November 8, 2019. (Dkt. #11). Fabrizi and Bonilla answered the Complaint on November 22, 2019. (Dkt. #13). Following the parties' unsuccessful mediation (Dkt. #14), on March 5, 2020, the Court entered a case management plan setting the discovery deadlines in this case (Dkt. #17). Due to the difficulties posed by the COVID-19 pandemic, the Court entered a revised case management plan on June 1, 2020. (Dkt. #23).

This case has been plagued by discovery disputes, nearly all of which were occasioned by Plaintiff's failure to timely comply with his discovery requests and Court-ordered deadlines. The first issue arose on July 29, 2020, when Defendants filed a letter seeking to compel Plaintiff to respond to their discovery requests. (Dkt. #24). On August 7, 2020, Plaintiff explained that he had responded to the outstanding discovery requests (Dkt. #25), which prompted the Court, on August 10, 2020, to dismiss Defendants' motion to compel as moot (Dkt. #26).

On October 5, 2020, just three days before the fact discovery cutoff set by the then-operative case management plan, Defendants filed a second letter motion requesting a conference to address Plaintiff's continued failure to comply with his discovery obligations. (Dkt. #27). Plaintiff opposed Defendants' application on October 9, 2020, mounting several objections to Defendants' requested discovery. (Dkt. #29). On October 13, 2020, the Court issued an endorsement extending the fact discovery deadline and compelling Plaintiff to supplement his discovery responses and provide the additional information requested by Defendants. (Dkt. #30).

On October 21, 2020, Plaintiff moved for reconsideration of the Court's order to compel, arguing that the Court's reasoning rested on a misapprehension of the extent to which Plaintiff had waived his right to object to Defendants' discovery requests going forward. (Dkt. #31). Defendants opposed Plaintiffs' motion for reconsideration on October 27, 2020. (Dkt. #35). After performing an individualized review of Plaintiff's objections, by Order dated November 9, 2020, the

Court granted in part and denied in part Plaintiff's motion for reconsideration, thereby clarifying the information that Plaintiff was obligated to produce in response to Defendants' October 5, 2020 motion to compel. (Dkt. #36). On December 7, 2020, Defendants submitted yet another letter motion, seeking to compel Plaintiff's compliance with the Court's November 9, 2020 Order. (Dkt. #37). Without receiving a response from Plaintiff, the Court granted Defendants' motion to compel on December 11, 2020. (Dkt. #38).

On January 21, 2021, Defendants filed their first letter motion seeking dismissal of the case for failure to prosecute. (Dkt. #41). Noting Plaintiff's history of repeatedly failing to respond to Defendants' efforts to contact him, on January 22, 2021, the Court directed Plaintiff to comply with the Court's outstanding discovery orders within the week or face dismissal. (Dkt. #42). By letter motion dated February 1, 2021, Defendants renewed their request to dismiss the case for failure to prosecute. (Dkt. #43). The following day, Plaintiff opposed Defendants' motion, claiming that his persistent failures to comply with the Court's discovery orders were "due to several extenuating circumstances beyond the control" of counsel. (Dkt. #44). In response, the Court ordered Plaintiff to file an *ex parte* letter under seal to substantiate this rationale for noncompliance. (Dkt. #45). The Court received Plaintiff's *ex parte* submission on February 10, 2021 (Dkt. #46), and denied Defendants' second motion to dismiss for failure to prosecute that same day (Dkt. #47).

**\*5** On February 17, 2021, Defendants notified the Court that Plaintiff's decision to withdraw certain of his claims for lost income, physical injuries, and psychological damages obviated the need for a number of documents that Plaintiff had been ordered to produce pursuant to the Court's November 9, 2020 Order. (Dkt. #48). Withdrawal of these claims did not, however, absolve Plaintiff of all outstanding production obligations, and so the Court directed Plaintiff on February 17, 2021, to complete his remaining discovery obligations within one week. (Dkt. #49).

Fact discovery closed on April 8, 2021 (Dkt. # 56, 57), after which the Court held a conference with the parties on May 4, 2021 (*see* Minute Entry of May 4, 2021). On June 3, 2021, Defendants submitted a status update, informing the Court that the parties' efforts to settle had failed and proposing a briefing schedule for summary judgment practice. (Dkt. #59). The following day, the Court issued an endorsement adopting Defendants' proposed briefing schedule. (Dkt. #60). On August 26, 2021, Defendants filed their motion for

summary judgment and supporting papers. (Dkt. #67-71). On November 9, 2021, Plaintiff filed his opposition papers. (Dkt. #74-76). [4] On January 6, 2022, Defendants submitted their reply brief. (Dkt. #85). As such, Defendants' motion for summary judgment is fully briefed and ripe for review.

## DISCUSSION

Plaintiff asserts both federal and state law claims arising out of the circumstances of his arrest and subsequent prosecution.

He brings the following claims pursuant to 42 U.S.C. § 1983 against the Officers: (i) false arrest; (ii) malicious prosecution; (iii) illegal stop and search; (iv) abuse of process; and (v) failure to intervene. Plaintiff also brings related claims under New York state law against all Defendants for (i) false arrest; (ii) assault and battery; (iii) malicious prosecution; (iv) malicious abuse of process; and (v) failure to intervene.

Plaintiff brings an additional Section 1983 claim against the City of New York for allegedly maintaining a policy, custom, or practice of violating people's rights to be free from illegal searches and seizures. [5]

**\*6** To preview, the Court will first address the applicable standard for motions for summary judgment under Federal Rule of Civil Procedure 56. It will then discuss Plaintiff's federal civil rights claims against the Officers, before turning to Plaintiff's federal claim for municipal liability. In the remainder of the Opinion, the Court will resolve Plaintiff's state law claims.

### A. Motions for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also* *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986). [6] A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted). A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986); *accord* *Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

On a motion for summary judgment, the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322; *see also* *Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the nonmoving party failed to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets its initial burden, the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial" using affidavits or other evidence in the record, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248; *accord* *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

**\*7** "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citation omitted). However, in considering "what may reasonably be inferred" from witness testimony, the court should not accord the nonmoving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (citing *Cnty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).

## B. Plaintiff's 🚩 Section 1983 Claims Against the Officers

Plaintiff asserts five 🚩 Section 1983 claims against the Officers, each alleging violations of his constitutional rights stemming from his August 31, 2016 arrest and ensuing prosecution. The Court begins by outlining the general principles for establishing a federal civil rights claim under 🚩 Section 1983, along with the doctrine of qualified immunity, before analyzing each of Plaintiff's claims.

### 1. Civil Rights Actions Under 🚩 42 U.S.C. § 1983 and Qualified Immunity

Plaintiff raises claims of false arrest, malicious prosecution, illegal search, malicious abuse of process, and failure to intervene, all under 🚩 42 U.S.C. § 1983. "[🚩 Section 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Oklahoma City* v. *Tuttle,* 471 U.S. 808, 816 (1985). There are two essential elements to any claim raised under 🚩 Section 1983: "[i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis* v. *Cnty. of Westchester,* 136 F.3d 239, 245 (2d Cir. 1998). Furthermore, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [🚩 Section] 1983." *Victory* v. *Pataki,* 814 F.3d 47, 67 (2d Cir. 2016) (quoting 🚩⚠️*Farrell* v. *Burke,* 449 F.3d 470, 484 (2d Cir. 2006)). The Second Circuit has defined "personal involvement" to mean direct participation, such as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts," despite knowing the actions were illegal. 🚩*Provost* v. *City of Newburgh,* 262 F.3d 146, 155 (2d Cir. 2001); *see also Patterson* v. *City of New York,* No. 14 Civ. 5330 (PKC), 2015 WL 8362702, at *2 (S.D.N.Y. Dec. 8, 2015) ("Personal involvement may arise through direct participation in the claimed conduct, a failure to intervene, or the creation of an unconstitutional policy or practice.").

A valid qualified immunity defense can foreclose liability under 🚩 Section 1983. "Qualified immunity is an affirmative defense that shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 🚩⚠️*Stephenson* v. *Doe,* 332 F.3d 68, 76 (2d Cir. 2003) (internal quotation marks and citation omitted). A right is clearly established if "existing law ... placed the constitutionality of the officer's conduct 'beyond debate.' " *District of Columbia* v. *Wesby,* 138 S. Ct. 577, 589 (2018) (quoting 🚩*Ashcroft* v. *al-Kidd,* 563 U.S. 731, 741 (2011)). "In determining whether a right was so clearly established, the Supreme Court has emphasized that the 'dispositive inquiry ... is whether it would be clear to a *reasonable officer* that his conduct was unlawful *in the situation he confronted.*' " *Barboza* v. *D'Agata,* 676 F. App'x 9, 12 (2d Cir. 2017) (summary order) (emphases in original) (quoting 🚩*Saucier* v. *Katz,* 533 U.S. 194, 202 (2001)). Qualified immunity protects officers when "their decision was reasonable, even if mistaken"; indeed, it "protect[s] all but the plainly incompetent or those who knowingly violate the law." 🚩*Johnson* v. *Perry,* 859 F.3d 156, 170 (2d Cir. 2017) (quoting 🚩*Hunter* v. *Bryant,* 502 U.S. 224, 229 (1991)).

### 2. False Arrest

**\*8** Plaintiff claims that he was falsely arrested on August 31, 2016. As discussed below, there are disputed issues of fact concerning the existence of probable cause for his arrest that foreclose summary judgment as to all of the Officers.

#### a. Applicable Law

A federal false arrest claim raised under 🚩 Section 1983 is "substantially the same as a claim for false arrest under New York law." 🚩*Weyant* v. *Okst,* 101 F.3d 845, 852 (2d Cir. 1996). The elements of false arrest under New York law are: "[i] the defendant intended to confine [plaintiff], [ii] the plaintiff was conscious of the confinement, [iii] the plaintiff did not consent to the confinement[,] and [iv] the confinement was not otherwise privileged." *Ackerson* v. *City of White Plains,* 702 F.3d 15, 19 (2d Cir. 2012) (internal quotation marks and citation omitted). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest." 🚩*Weyant,* 101 F.3d at 852 (internal quotation marks omitted); *accord Ackerson,* 702 F.3d at 19.

Officers have probable cause to arrest when they have "reasonably trustworthy information as to facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Ackerson*, 702 F.3d at 19 (internal quotation marks and alterations omitted). The central inquiry is thus "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Id.* (citation omitted). There need not have been probable cause for the charge stated at the time of arrest; what matters is whether there was probable cause to arrest for any offense. *See id.* at 20.

"In the context of [ Section] 1983 actions predicated on allegations of false arrest, ... an arresting officer is entitled to qualified immunity so long as 'arguable probable cause' was present when the arrest was made." *Figueroa* v. *Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (quoting *Zalaski* v. *City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013)). Arguable probable cause is an objective standard that "exists if either [i] it was objectively reasonable for the officer to believe that probable cause existed, or [ii] officers of reasonable competence could disagree on whether the probable cause test was met." *Garcia* v. *Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Zalaski*, 723 F.3d at 390). "[W]hether an officer's conduct was objectively reasonable" depends on "the information possessed by the officer at the time of the arrest," not "the subjective intent, motives, or beliefs of the officer." *Id.* (quoting *Amore* v. *Novarro*, 624 F.3d 522, 536 (2d Cir. 2010)). "Put another way, an arresting officer will find protection under the defense of qualified immunity unless 'no reasonably competent officer' could have concluded, based on the facts known at the time of arrest, that probable cause existed." *Figueroa*, 825 F.3d at 100 (citing *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986)). "Therefore, in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity." *Caldarola* v. *Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (citation omitted).

**b. The Court Denies Summary Judgment as to Plaintiff's False Arrest Claim**

**\*9** Defendants argue that summary judgment should be granted as to Plaintiff's claim of false arrest because the arrest was supported by probable cause — or at least arguable probable cause — based on Alvarez's observation of a furtive exchange between Plaintiff and Gasparro, combined with Alvarez's ensuing recovery of narcotics from Gasparro. (Def. Br. 6-8). Defendants also contend that Plaintiff's false arrest claim cannot survive with respect to Fabrizi and Bonilla for the additional reason that they were not at the scene of Plaintiff's arrest, or otherwise personally involved. (*Id.* at 4-5). In opposition, Plaintiff disputes Defendants' articulated basis for probable cause, claiming that Alvarez could not possibly have observed an exchange of any kind with Gasparro because Plaintiff was arrested so quickly after she approached him. (Pl. Opp. 18-21). Plaintiff also argues that the record supports Fabrizi's and Bonilla's personal involvement in his arrest. (*Id.* at 15).

As the Court will explain, there is a genuine dispute as to the existence of probable cause to arrest Plaintiff. Furthermore, triable issues of fact exist as to whether Bonilla and Fabrizi were sufficiently personally involved in Plaintiff's arrest to give rise to liability on this claim. Accordingly, none of the Officers is entitled to summary judgment on Plaintiff's false arrest claim.

**i. Probable Cause**

"Probable cause is a mixed question of law and fact." *Dufort* v. *City of New York*, 874 F.3d 338, 348 (2d Cir. 2017) (citation omitted). Generally speaking, "[q]uestions of historical fact regarding the officers' knowledge at the time of arrest are to be resolved by the jury." *Id.* (citation omitted). "However, 'where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court.' " *Id.* (quoting *Walczyk* v. *Rio*, 496 F.3d 139, 157 (2d Cir. 2007)).

Here, the parties present materially different versions of the key interaction between Plaintiff and Gasparro that allegedly gave the Officers probable cause to arrest Plaintiff. Defendants argue that there was probable cause to arrest Plaintiff because Alvarez saw Plaintiff reach into his pants pocket and engage in a hand-to-hand transaction with Gasparro, who was later found to possess crack cocaine. (Def. Br. 6-7). Yet, whether any exchange, at all, took place between Plaintiff and Gasparro is in genuine dispute. In

contrast with Defendants' account of the events, Plaintiff testified in his deposition that he interacted with Gasparro for "maybe a minute" before he was arrested and that he never handed her any money or even touched her hands. (Pl. Dep. 43:4-8, 44:16-19). Aside from Alvarez, no other officer recalls observing any exchange between Plaintiff and Gasparro, including Chow, the only other officer at the scene of the arrest. (*See* Chow Dep. 26:15-17 (Q: "Did you observe that exchange [between Plaintiff and Gasparro] yourself?" A: "No.")).

At this stage of the proceedings, the Court must construe the facts in the light most favorable to the nonmoving party. Thus, adopting Plaintiff's version of events, he could not have engaged in an exchange with Gasparro at the time of his arrest. (*See* Pl. Dep. 43:4-8). Without the exchange, the only evidence supporting probable cause for Plaintiff's arrest were the Ziploc bags and $68 of cash that were recovered from his person, and the fact that Gasparro was later found to possess crack cocaine. These facts are insufficient to establish probable cause to arrest Plaintiff, especially considering the circumstances suggesting that the Officers had reason to believe that Gasparro had acquired the drugs from someone other than Plaintiff. Notably, moments before interacting with Plaintiff, the Officers observed Gasparro in the presence of a known drug dealer after exiting an address where someone had been arrested by the Officers with crack cocaine earlier that evening. (Pl. Opp. 20). Furthermore, the Ziploc bags found in Plaintiff's pants pocket were empty and yellow-tinted, whereas the Ziploc bag containing crack cocaine that was recovered from Gasparro was clear. (*See id.* at 20-21). This leaves Defendants with little more than the mere fact that Plaintiff had a seconds-long interaction with someone who possessed drugs, which is plainly insufficient to establish probable cause to arrest. See 🚩 *Perez* v. *Duran*, 962 F. Supp. 2d 533, 538 (S.D.N.Y. 2013) ("Physical proximity to criminal behavior without more is insufficient to establish probable cause."); *see also* 🚩 *Virgil* v. *City of New York*, No. 17 Civ. 5100 (PKC) (SMG), 2019 WL 4736982, at *4 (E.D.N.Y. Sept. 27, 2019) ("[M]ere proximity to 'others independently suspected of criminal activity, does not, without more, give rise to probable cause' ") (quoting 🚩 *Burgess* v. *City of New York*, No. 15 Civ. 5525 (RRM) (VMS), 2018 WL 1581971, at *3 (E.D.N.Y. Mar. 29, 2018)).

**\*10** Plaintiff cites two analogous cases that support the Court's finding that the existence of probable cause cannot be established as a matter of law on this record. (Pl. Opp. 21).

In *Perez* v. *Duran*, Judge Koeltl denied summary judgment on a false arrest claim, where an officer's purported probable cause was based on his alleged observation of an exchange of money and a small object between the plaintiff and his father, who was found to be in possession of crack cocaine. 🚩 962 F. Supp. 2d at 536-37. Following the arrest of both the plaintiff and his father, the officers recovered $444 dollars in cash from the plaintiff, but no drugs. 🚩 *Id.* at 536. The plaintiff disputed that he had exchanged anything with his father during their interaction and contended that he had merely shaken his father's hand. *Id.* Finding there to be disputed issues of material fact as to the circumstances of the plaintiff's arrest, the court drew factual inferences in the plaintiff's favor and concluded that there was insufficient evidence to establish probable cause as a matter of law. 🚩 *Id.* at 539-40. In so holding, Judge Koeltl noted that "defendant cite[d] no case that suggests that probable cause to arrest a suspected drug seller exists based on the recovery of drugs from a suspected buyer without evidence of any exchange between a suspected seller and a suspected buyer found to possess drugs." 🚩 *Id.* at 539.

Similarly, in *Burgess* v. *City of New York*, Judge Mauskopf denied summary judgment on a false arrest claim, where a plaintiff's version of the facts cast doubt on the credibility of the officer's basis for probable cause. 🚩 2018 WL 1581971, at *3. In *Burgess*, the officers claimed that they saw the plaintiff engage in an exchange with someone who was later found to possess crack cocaine, which led to the arrest of both individuals. 🚩 *Id.* at *1. By contrast, the plaintiff admitted to greeting the other individual with a handshake, but denied touching his hand again or exchanging anything with him at any point. 🚩 *Id.* at *2. The plaintiff argued that the officers could not possibly have observed the handshake because they arrived five minutes after the plaintiff greeted the other individual. *Id.* On these facts, Judge Mauskopf found that critical facts were in dispute, which were not appropriately resolved on summary judgment. 🚩 *Id.* at *3-4.

A similar conclusion is warranted in this case, where a "jury crediting [Plaintiff's] version of events would be left without critical information going to probable cause." 🚩 *Burgess*, 2018 WL 1581971, at *4; *see also Virgil*, 2019 WL 4736982, at *3-5 (denying summary judgment on false arrest claim where, on plaintiff's version of events, officer "merely

witnessed Plaintiff shake hands with [another] in a drug-prone area"). The jury could credit Plaintiff's claim that he interacted with Gasparro for a matter of seconds and never touched her hand before he was arrested. And even if Alvarez did see their hands touch, the jury could nevertheless credit Plaintiff's contention that Gasparro approached him begging for money and that he never handed her a small object. If the jury were to make either finding, it could also find that the Officers lacked probable cause to arrest Plaintiff. These factual disputes concerning the circumstances of Plaintiff's arrest preclude summary judgment on his false arrest claim.

### ii. Individual Participation in Plaintiff's Arrest

Defendants argue that Fabrizi and Bonilla are entitled to summary judgment on Plaintiff's false arrest claim for the additional reason that they were not personally involved in Plaintiff's arrest. (Def. Br. 4-5). Plaintiff disagrees and claims that both Fabrizi and Bonilla were sufficiently involved in his arrest in ways other than directly seizing or arresting him so as to give rise to liability. (Pl. Opp. 15). The Court finds there to be triable issues of fact as to both Bonilla's and Fabrizi's personal involvement.

It is undisputed that Fabrizi and Bonilla were not at the scene when Plaintiff was seized (Def. 56.1 ¶¶ 19, 20),[7] but were members of the field team patrolling for narcotics offenses in the area where Plaintiff was arrested on August 31, 2016 (Alvarez Dep. 29:5-10). These officers' mere affiliation with the field unit that arrested Plaintiff does not, by itself, constitute their direct participation in his arrest. 🚩*Rodriguez* v. *City of New York*, 291 F. Supp. 3d 396, 410 (S.D.N.Y. 2018) ("Courts have rejected the notion that every member of a team of officers is, by default, personally involved in every arrest effected by the team." (collecting cases)). As such, the Court must discern whether Fabrizi's and Bonilla's precise actions vis-à-vis Plaintiff were sufficient to render them personally involved in Plaintiff's arrest.

**\*11** Bonilla was a detective assigned to the unit performing surveillance operations for narcotics offenses in the area where Plaintiff was arrested. (Bonilla Dep. 10:4-21, 11:4-12:17). According to Alvarez, Bonilla was the officer who radioed him to return to 868 Amsterdam because he saw Gasparro attempting to enter the building. (Suppression Hr'g Tr. 11:19-12:9). Bonilla testified that he was not a witness to Plaintiff's arrest because he was stationed around

the corner at 868 Amsterdam Avenue at the time. (Bonilla Dep. 16:3-13). Upon learning that Plaintiff had been taken into custody, Bonilla headed to the scene of the arrest and assisted Alvarez by placing property that was recovered from the arrestees in an envelope and waiting for the prisoner van to arrive. (*Id.* at 26:22-27:9). Bonilla also testified that he entered the information into Plaintiff's arrest report and vouchered the crack cocaine recovered from Gasparro, as well as administered the field test report of these same drugs. (*Id.* at 65:12-66:19; Garcia Decl., Ex. E (Gasparro Property Invoice); *id.*, Ex. F (Field Test Report)).

These facts concerning Bonilla's involvement raise triable issues of fact as to whether Bonilla directly participated in Plaintiff's arrest. As the Second Circuit has explained, "ordering or helping others to do the unlawful acts, rather than doing them [oneself]," can constitute "direct participation." 🚩*Provost*, 262 F.3d at 155. Particularly relevant to Bonilla, courts in this District have found that filling out arrest paperwork can suffice to demonstrate direct participation in an arrest. *See, e.g.*, 🚩*Shaheed* v. *City of New York*, 287 F. Supp. 3d 438, 449 n.6 (S.D.N.Y. 2018); 🚩*Arbuckle* v. *City of New York*, No. 14 Civ. 10248 (ER), 2016 WL 5793741, at \*13 (S.D.N.Y. Sept. 30, 2016); 🚩*Marom* v. *City of New York*, No. 15 Civ. 2017 (PKC), 2016 WL 916424, at \*16 (S.D.N.Y. Mar. 7, 2016). More than just completing paperwork, Bonilla helped corral Plaintiff's personal property following his arrest and admitted that he "definitely assisted" in the arrest of Plaintiff, even though he could not recall the specifics. (Bonilla Dep. 63:22-64:2). Additionally, Bonilla conceivably had reason to know that Gasparro might have acquired narcotics from someone other than Plaintiff, as he was the officer who radioed Alvarez to return to the vicinity of 868 Amsterdam Avenue after seeing Gasparro attempt to enter the building. (Suppression Hr'g Tr. 11:19-12:9). The Court thus cannot determine Bonilla's personal involvement in Plaintiff's arrest as a matter of law and denies summary judgment as to Bonilla on this claim.

Fabrizi was the lieutenant with supervisory responsibility over the field team that arrested Plaintiff. (Fabrizi Dep. 116:6-8). "[A] defendant in a [🚩Section] 1983 action may not be held liable for damages for constitutional violations merely because he [or she] held a high position of authority." 🚩*Black* v. *Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also* 🚩*Grullon* v. *City of New Haven*, 720 F.3d 133, 138-39 (2d

Cir. 2013). As the Second Circuit has recently confirmed, "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020)* (quoting *Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)*). A supervisor's "mere knowledge" of a subordinate's unconstitutional behavior is insufficient "because that knowledge does not amount to the supervisor's violating the Constitution." *Id. at 616-17* (internal quotation marks and alterations omitted) (quoting *Iqbal, 556 U.S. at 677*). "The violation must be established against the supervisory official directly." *Id. at 618.*

On this standard, Plaintiff must show that Fabrizi's own conduct violated Plaintiff's constitutional rights, not merely that he supervised others who committed a violation. Here, the record contains evidence suggesting that Fabrizi affirmatively approved Plaintiff's arrest, thereby personally sanctioning the conduct that allegedly violated Plaintiff's constitutional rights. *First*, Fabrizi was listed as the approving officer of Plaintiff's arrest paperwork. (Arrest Report 3). *Second*, although Fabrizi does not have an independent recollection of Plaintiff's arrest, he testified that it was his general practice to make himself present at an arrest scene and approve arrests that were made by his unit. (Fabrizi Dep. 106:19-23). Typically, upon arriving at a scene, Fabrizi would approve arrests based on the information he received from the arresting officer. (*Id.* at 106:24-107:9). *Third*, Plaintiff's testimony provides some support that Fabrizi followed this general practice, as he recounted that at some point after he was placed in handcuffs, Fabrizi arrived at the scene of the arrest in the van that later transported him to the 24th Precinct. (Pl. Dep. 45:2-5, 74:9-12).

**\*12** At the summary judgment stage, when all reasonable inferences must be drawn in favor of the nonmoving party, the Court cannot conclude on the present record that Fabrizi was not personally involved in Plaintiff's arrest. There is a triable issue of fact as to whether Fabrizi arrived at the scene of the arrest and affirmatively approved Plaintiff's arrest. If proven true, courts have found such conduct to constitute direct involvement in an arrest. *See Vett v. City of New York, No. 20 Civ. 2945 (CM), 2022 WL 47231, at \*10 (S.D.N.Y. Jan. 5, 2022)* ("That [the supervising officer] approved Plaintiff's arrest but was not present at the scene to physically execute Plaintiff's arrest does not negate his participation in the arrest

or that he intended to cause Plaintiff to be confined."); *see also Harris v. City of New York, No. 15 Civ. 8456 (CM), 2017 WL 6501912, at \*4 (S.D.N.Y. Dec. 15, 2017)* (finding an officer who "verified" an arrest — that is, concluded that the officers had probable cause to effectuate an arrest — to be a direct participant in an arrest). The Court acknowledges that a supervising officer's mere signature on arrest paperwork, in isolation, is likely to be insufficient to create a genuine dispute of material fact as to that officer's personal involvement in an arrest. *See Drayton v. City of New York, No. 17 Civ. 7091 (RRM) (RLM), 2020 WL 2615930, at \*5 (E.D.N.Y. May 20, 2020)* (granting summary judgment to officer on false arrest claim where the only evidence of personal involvement was his signature on arrest documentation); *Rodriguez v. City of New York, No. 08 Civ. 4173 (RRM) (RLM), 2012 WL 1059415, at \*9 (E.D.N.Y. Mar. 28, 2012)* (same). But here, the disputed facts regarding Fabrizi's personal involvement in Plaintiff's arrest go beyond the mere appearance of his name on the arrest report to include his actual decision to approve Plaintiff's arrest. Given the evidence permitting the inference that Fabrizi personally signed off on Plaintiff's arrest soon after he had been detained, the Court cannot conclude as a matter of law that Fabrizi was not personally involved in Plaintiff's arrest or that Plaintiff seeks to hold him liable merely for his role as a supervisor. Accordingly, summary judgment is denied as to Fabrizi on Plaintiff's false arrest claim. [8]

### iii. Qualified Immunity

Defendants additionally argue that the Officers are entitled to qualified immunity because they had at least arguable probable cause to arrest Plaintiff based on Alvarez's observations. (Def. Br. 7-8). It is up to a jury to resolve disputed issues of fact regarding the circumstances of Plaintiff's arrest in order to determine whether qualified immunity applies. *See McClellan v. Smith, 439 F.3d 137, 149 (2d Cir. 2006)* ("[R]esolution of genuine factual issues is inappropriate on motions for summary judgment based on qualified immunity."). Defendants' qualified immunity argument relies on the proposition that Alvarez witnessed an exchange of some object for money. As this central contention is disputed, the Court cannot conclude that probable cause existed or, by extension, grant the Officers qualified immunity on Plaintiff's false arrest claim.

### 3. Malicious Prosecution

**\*13** Plaintiff next claims that the Officers maliciously prosecuted him for crimes he did not commit. As detailed in the remainder of this section, this claim survives against the subset of Officers who can be said to have initiated Plaintiff's prosecution.

### a. Applicable Law

To prevail on a 🚩 Section 1983 claim for malicious prosecution, a plaintiff must demonstrate both (i) a Fourth Amendment violation and (ii) the common-law elements of the tort of malicious prosecution. *See* 🚩 *Mitchell v. City of New York*, 841 F.3d 72, 79 (2d Cir. 2016). New York law requires a plaintiff to demonstrate that "[i] the defendant initiated a prosecution against plaintiff, [ii] without probable cause to believe the proceeding can succeed, [iii] the proceeding was begun with malice, and [iv] the matter terminated in plaintiff's favor." *Rentas* v. *Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016) (internal quotation marks and alterations omitted). A claim for malicious prosecution under 🚩 Section 1983 requires the additional element of "[v] a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." 🚩 *Rohman* v. *N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).

The existence of probable cause is a defense to a claim of malicious prosecution. *See* 🚩 *Savino* v. *City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). Of note, "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." 🚩 *Stansbury* v. *Wertman*, 721 F.3d 84, 95 (2d Cir. 2013) (citation omitted). "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." 🚩 *Boyd* v. *City of New York*, 336 F.3d 72, 76 (2d Cir. 2003); *see also* 🚩 *Posr* v. *Ct. Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999) ("The defendants seem to conflate probable cause to arrest with probable cause to believe that [the charged individual] could be successfully prosecuted. Only the latter kind of probable cause is at issue with respect to the malicious prosecution claim[.]").

"Once a suspect has been indicted ... the law holds that the Grand Jury action creates a presumption of probable cause." 🚩 *Rothstein* v. *Carriere*, 373 F.3d 275, 282-83 (2d Cir. 2004) (quoting *Colon* v. *City of New York*, 60 N.Y.2d 78, 82 (1983)). "The presumption may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." 🚩 *Id.* at 283 (quoting *Colon*, 60 N.Y.2d at 82-83). "Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have lied in order to secure an indictment, and a jury could reasonably find that indictment was secured through bad faith or perjury, the presumption of probable cause created by the indictment may be overcome." 🚩 *Manganiello* v. *City of New York*, 612 F.3d 149, 162 (2d Cir. 2010) (internal quotation marks and citation omitted). "Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process." *Id.* (internal quotation marks and citation omitted).

**\*14** "[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment," 🚩 *Savino*, 331 F.3d at 73, and the law requires the plaintiff "to establish what occurred in the grand jury, and ... that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially,' " 🚩 *Rothstein*, 373 F.3d at 284 (quoting *Colon*, 60 N.Y.2d at 82). *See also Thorpe* v. *Duve*, No. 20-3679, 2022 WL 332804, at \*1 (2d Cir. Feb. 4, 2022) (summary order) ("[W]here a plaintiff was indicted by a grand jury, summary judgment in the defendants' favor is appropriate if the plaintiff fails to provide evidence from which a reasonable jury could infer that the defendants committed fraud or perjury, suppressed evidence, or otherwise acted in bad faith to procure the plaintiff's indictment by a preponderance of the evidence[.]"). Plaintiff cannot satisfy this burden "with mere 'conjecture' and 'surmise' that [the] indictment was procured as a result of conduct undertaken by the defendants in bad faith." 🚩 *Savino*, 331 F.3d at 73 (quoting *Bryant* v. *Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)); *see also* 🚩 *Brandon* v. *City of New York*, 705 F. Supp. 2d 261, 273 (S.D.N.Y. 2010) (collecting cases for the same proposition). "Because

'accusers must be allowed room for benign misjudgments,' the New York Court of Appeals has held that the law 'places a heavy burden on malicious prosecution plaintiffs.' " *Rothstein*, 373 F.3d at 282 (quoting *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000)).

### b. The Court Denies Summary Judgment as to Plaintiff's Malicious Prosecution Claim Against Alvarez and Bonilla, But Grants as to Chow and Fabrizi

Here, it is undisputed that a criminal proceeding was initiated against Plaintiff, that it terminated in Plaintiff's favor, and that he suffered a liberty restraint. In seeking to rebut the presumption of probable cause arising from his indictment, Plaintiff's central contention is that the grand jury proceedings were tainted by Alvarez's fabricated observation of a narcotics exchange. (Pl. Opp. 22-24). The Court concludes that Plaintiff has rebutted the presumption of probable cause arising from his Indictment, but that only Alvarez and Bonilla can be deemed to have "initiated" Plaintiff's malicious prosecution.

### i. Probable Cause

In asserting the existence of probable cause to prosecute Plaintiff, Defendants point to the same facts that supposedly underpin their probable cause to arrest him. (Def. Br. 7). Defendants' attempt to stretch their alleged probable cause to arrest into probable cause to prosecute necessarily fails, as the Court has already decided that there are issues of fact which, if resolved in Plaintiff's favor, indicate that the Officers lacked probable cause to arrest Plaintiff in the first instance. *See supra* Section B.2.b.i. If the jury credits Plaintiff's version of events, it follows *a fortiori* that Defendants lacked probable cause to prosecute Plaintiff. *See Coleman v. City of New York*, 585 F. App'x 787, 789 (2d Cir. 2014) (summary order) ("Where the question of whether an arresting officer had probable cause is predominantly factual in nature, as where there is a dispute as to the pertinent events, the existence *vel non* of probable cause is to be decided by the jury." (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997))).

Defendants also argue that Plaintiff has failed to rebut the presumption of probable cause that flows from Plaintiff's Indictment. (Def. Br. 9-10; Def. Reply 6-7). Plaintiff rejoins that the Indictment was procured by perjury, as evidenced by inconsistencies in Alvarez's sworn recollections of the events of Plaintiff's arrest. (Pl. Opp. 23-24). Namely, Alvarez attested in the Criminal Complaint to his observation that "Gasparro hand[ed] [Plaintiff] a ziploc[ ] style bag in exchange for a sum of U.S. currency." (Criminal Complaint 1). Alvarez directly contradicts this account in subsequent testimony, when he recounted that it was Plaintiff who handed a small item to Ms. Gasparro in exchange for money (Alvarez Dep. 45:15-21, 52:7-11), and that he was unable to discern the characteristics of the item that was exchanged (*id.* at 68:13-69:9). Plaintiff extrapolates from Alvarez's inconsistent recollection that the Indictment must have been predicated on false and misleading information. (Pl. Opp. 24).

**\*15** Although it is a close call, the Court finds that Alvarez's testimonial inconsistency, in conjunction with Plaintiff's testimony undercutting Alvarez's version of events, rebuts the presumption of probable cause arising from the Indictment. Defendants contend that Plaintiff has proffered no evidence, whatsoever, going to what occurred in the grand jury. (Def. Reply 6). The Court disagrees, as Plaintiff has argued that Alvarez lied to the District Attorney by including fabricated information in the Criminal Complaint, which was used to charge Plaintiff. *See Colon*, 60 N.Y.2d at 82-83 ("The presumption [of probable cause arising from an indictment] may be overcome ... by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney[.]"). It is true that "where a plaintiff's only evidence to rebut the presumption of the indictment is his version of events, courts will find such evidence to be nothing more than 'mere conjecture and surmise that [the plaintiff's] indictment was procured as a result of conduct undertaken by the defendants in bad faith,' which is insufficient to rebut the presumption of probable cause." *Brandon*, 705 F. Supp. 2d at 273 (citation omitted); *see also id.* (explaining that the Second Circuit has set forth a "competing testimony plus" standard to assess whether a plaintiff has rebutted the presumption of probable cause (citing *Boyd*, 336 F.3d 72)). Significantly, however, Plaintiff's attempt to rebut the Indictment's presumption is not limited to his testimony, as Plaintiff's version of events is supplemented by Alvarez's flatly contradictory recollections of the circumstances of Plaintiff's arrest. A reasonable jury could credit Plaintiff's version of events and conclude from Alvarez's inconsistent sworn statements that he lied about observing a narcotics exchange between Plaintiff and Gasparro. This would constitute precisely the type of bad-faith action sufficient to taint the grand jury proceedings and rebut the presumption of probable cause that

resulted therefrom. *See Minott* v. *Duffy*, No. 11 Civ. 1217 (KPF), 2014 WL 1386583, at *17-19 (S.D.N.Y. Apr. 8, 2014) (denying summary judgment on malicious prosecution claim where plaintiff alleged that officer included false evidence in criminal complaint); *cf.* Scotto v. *Almenas*, 143 F.3d 105, 113 (2d Cir. 1998) ("[I]t would be objectively unreasonable for [an officer] to believe he had probable cause to arrest [plaintiff] if [the officer] himself fabricated the grounds for arrest.").

### ii. Malice

Defendants' arguments in favor of summary judgment on Plaintiff's malicious prosecution claims go exclusively to the issue of probable cause. As such, neither side specifically addresses the malice element. Regardless, the Court need not belabor the analysis, as it is clear there exists a triable issue of fact on Defendants' malicious intent.

"Under New York law, malice does not have to be actual spite or hatred, but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.' " Lowth v. *Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (quoting *Nardelli* v. *Stamberg*, 44 N.Y.2d 500, 502-03 (1978)). "[A] lack of probable cause generally creates an inference of malice." Manganiello, 612 F.3d at 163; *see also* Ricciuti v. *N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997) ("[L]ack of probable cause generally raises an inference of malice sufficient to withstand summary judgment."). Here, malice may be inferred in light of the evidence suggesting that the probable cause to arrest and prosecute Plaintiff rested on Alvarez's fabricated allegations.

### iii. Commencement of Criminal Proceedings

Defendants also do not argue that summary judgment should be granted as to those Officers who did not "initiate" Plaintiff's prosecution. Despite the lack of argument on this point, the record establishes that only Alvarez and Bonilla can be considered to have initiated Plaintiff's criminal proceedings.

To initiate or continue a criminal proceeding, "a defendant must do more than report the crime or give testimony. He must 'play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " Manganiello, 612 F.3d at 163 (alteration omitted) (quoting Rohman, 215 F.3d at 217). A jury may permissibly find that a defendant initiated a prosecution where he "filed the charges" or "prepared an alleged false confession and forwarded it to prosecutors." Manganiello, 612 F.3d at 163 (alterations omitted) (quoting Ricciuti, 124 F.3d at 130). Where the defendant in a malicious prosecution action is a police officer, "courts have found a triable issue of fact as to the initiation element where the defendant-officer brought formal charges and had the person arraigned, filled out complaining and corroborating affidavits, swore to and signed a felony complaint, or created false information and forwarded it to prosecutors." Espada v. *Schneider*, 522 F. Supp. 2d 544, 553 (S.D.N.Y. 2007); *accord* Llerando-Phipps v. *City of New York*, 390 F. Supp. 2d 372, 382-83 (S.D.N.Y. 2005). "Additionally, a defendant initiates a prosecution by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor." Israel v. *City of New York*, No. 16 Civ. 6809 (PGG), 2018 WL 11219076, at *5 (quoting Aguirre v. *City of New York*, No. 15 Civ. 6043 (PKC), 2017 WL 4236552, at *9 (E.D.N.Y. Sept. 22, 2017)).

**\*16** Here, there is no evidence to support that either Fabrizi or Chow engaged in the types of actions that could constitute initiation of criminal proceedings. Fabrizi was the supervising lieutenant of the field unit that arrested Plaintiff and was the officer who signed off on the property invoices incident to Plaintiff's and Gasparro's arrests. (Arrest Report; Gasparro Property Invoice; Garcia Decl., Ex. G-H). Chow detained Plaintiff at the scene of the arrest and was the invoicing officer for the property recovered from Plaintiff. (Chow Dep. 39:15-20; Garcia Decl., Ex. G-H). Beyond these facts, there is no indication that Fabrizi or Chow played an active role in Plaintiff's prosecution or had a hand in passing along fabricated information to the District Attorney. *See* Israel, 2018 WL 11219076, at *7 ("[A]pproving reports and vouchers is not the type of 'active role' that courts have typically relied on for this element of a malicious prosecution claim.").

The Court reaches the opposite conclusion with respect to Alvarez and Bonilla. Alvarez was the officer who signed the Criminal Complaint (Criminal Complaint), while Bonilla was the officer who entered the information into the arrest form (Arrest Report; Bonilla Dep. 65:12-66:19). Both of these documents relay that Plaintiff engaged in an exchange with Gasparro, a fact Plaintiff contends was false. (Arrest Report; Criminal Complaint). If a jury were to credit Plaintiff's version of events, a reasonably corollary would be that both officers knowingly input false information into documents that contributed to the District Attorney's decision to charge Plaintiff. *See* *Aguirre*, 2017 WL 4236552, at \*9 (denying summary judgment against officer who "entered data into the NYPD online arrest report form" that was later provided to the District Attorney's Office); *see also* *Llerando-Phipps*, 390 F. Supp. 2d at 383 ("[A]n arresting officer may be held liable for malicious prosecution when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors." (internal quotation marks omitted)). Because the record contains evidence suggesting that Alvarez and Bonilla played a role in swearing out Plaintiff's criminal complaint and in creating false information that was passed onto prosecutors, there are triable issues of fact as to whether they initiated Plaintiff's prosecution.

#### iv. Qualified Immunity

Defendants argue that qualified immunity should preclude Plaintiff's malicious prosecution claims against the Officers. (Def. Br. 7-8). But, as discussed *supra*, the parties dispute whether his prosecution was underpinned by probable cause. "[W]here, as here, there is a question of fact as to whether defendants acted with malice in initiating a prosecution against plaintiffs, summary judgment on qualified immunity would be inappropriate." *Davis* v. *City of New York*, 373 F. Supp. 2d 322, 338 (S.D.N.Y. 2005); *see also* *Manganiello*, 612 F.3d at 165 (finding qualified immunity unavailable when an officer-defendant "misrepresented the evidence to the prosecutors"). As such, the Court declines to find that Alvarez and Bonilla are entitled to qualified immunity on Plaintiff's malicious prosecution claims.

#### 4. Unlawful Search

Next, Plaintiff claims that he was subjected to an unlawful strip-search and attendant cavity inspection upon arriving at the 24th Precinct following his arrest. (Pl. Opp. 24-25). Summary judgment is inappropriate on this claim as to the Officers who were personally involved in this search.

#### a. Applicable Law

The Second Circuit has defined several terms that are relevant to Plaintiff's unlawful search claim: "[i] a 'strip search' occurs when a suspect is required to remove his clothes; [ii] a 'visual body cavity search' is one in which the police observe the suspect's body cavities without touching them (as by having the suspect ... bend over, or squat and cough, while naked); [and] [iii] a 'manual body cavity search' occurs when the police put anything into a suspect's body cavity, or take anything out." *Gonzalez* v. *City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013) (citing *People* v. *Hall*, 10 N.Y.3d 303, 306-07 (2008)); *accord* *Sloley* v. *VanBramer*, 945 F.3d 30, 36-37 (2d Cir. 2019).

**\*17** The Fourth Amendment to the Constitution of the United States provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. "As the text makes clear, 'the ultimate touchstone of the Fourth Amendment is reasonableness.' " *Riley* v. *California*, 573 U.S. 373, 381-82 (2014) (quoting *Brigham City* v. *Stuart*, 547 U.S. 398, 403 (2006)).

Defendants justify any search that was conducted on Plaintiff as a search performed incident to a lawful arrest. (Def. Br. 9). Typically, a search requires a warrant in order to be reasonable under the Fourth Amendment; however, the search-incident-to-arrest doctrine is an exception to the Fourth Amendment's warrant requirement. *See* *United States* v. *Diaz*, 854 F.3d 197, 205 (2d Cir. 2017). Under this doctrine, the lawful arrest itself establishes the legality of the search, which means that an unlawful search claim turns on the existence of probable cause. *See* *United States* v. *Robinson*, 414 U.S. 218, 235 (1973); *accord* *Corley* v. *Vance*, 365 F. Supp. 3d 407, 443 (S.D.N.Y. 2019).

To determine whether a particular search incident to a lawful arrest may be excepted from the Fourth Amendment's warrant requirement, courts "examine the degree to which

[the search] intrud[es] upon an individual's privacy and the degree to which [it is] needed for the promotion of legitimate governmental interests." *Sloley*, 945 F.3d at 37 (citation omitted). Employing this analysis, the Second Circuit has held that the "Fourth Amendment requires an individualized 'reasonable suspicion that a misdemeanor arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest' before she may be lawfully subjected to a strip search." *Hartline* v. *Gallo*, 546 F.3d 95, 100 (2d Cir. 2008) (internal alterations omitted) (quoting *Weber* v. *Dell*, 804 F.2d 796, 802 (2d Cir. 1986)). Although *Hartline* concerned arrests for misdemeanor offenses, "[t]his court agrees with other courts in the circuit which have concluded that the same standard applies to felony arrestees." *Cannon* v. *Port Auth. of N.Y. & N.J.*, No. 15 Civ. 4579 (RA), 2020 WL 6290665, at *4 (S.D.N.Y. Oct. 27, 2020) (quoting *Jackson* v. *Waterbury Police Dep't*, No. 11 Civ. 642 (GWC), 2015 WL 5251533, at *9 (D. Conn. Sept. 8, 2015)); *see also, e.g.*, *Sarnicola* v. *Cnty. of Westchester*, 229 F. Supp. 2d 259, 270 (S.D.N.Y. 2002).

The Second Circuit has also applied the "reasonable suspicion" standard to visual body cavity searches, which are "even more intrusive" than strip searches and "require an arrestee not only to strip naked in front of a stranger, but also to expose the most private areas of her body to others." *Sloley*, 945 F.3d at 38. As such, "a visual body cavity search conducted as an incident to a lawful arrest for any offense must be supported by a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity." *Id.* (internal quotation marks omitted).

**b. The Court Denies Summary Judgment as to Plaintiff's Claim of Unlawful Strip Search and Cavity Inspection Against Alvarez and Fabrizi, But Grants as to Bonilla and Chow**

Plaintiff testified at his deposition that when he arrived at the 24th Precinct, he was "tak[en] to a separate cell and ... was told to strip, turn around, bend over, squat and cough." (Pl. Dep. 52:3-5).[9] Contrary to Defendants' argument that Plaintiff's "own cited testimony ... never mentions a cavity inspection whatsoever" (Def. Reply 5), Plaintiff clearly describes a strip search and visual cavity

inspection, as those terms have been defined in this Circuit. *See Gonzalez*, 728 F.3d at 158.

**\*18** Plaintiff alleges that both facets of the search that was performed on him at the precinct were unlawful. (Pl. Opp. 24-25). The Court finds there to be triable issues of fact as to the reasonableness of both the strip search and visual cavity inspection. However, Plaintiff's claim survives only as to Alvarez and Fabrizi, who are the only officers for whom the record contains evidence that could support personal involvement in the search.

**i. Reasonableness of the Search**

Because there are triable issues of fact as to whether probable cause existed to arrest Plaintiff, there are necessarily questions of material fact as to the reasonableness of the strip search and visual cavity inspection that were performed on Plaintiff incident to this arrest. If a jury determines that Alvarez fabricated the exchange that purportedly justified Plaintiff's arrest, the record contains scant additional evidence giving the Officers any basis to search Plaintiff, let alone strip search him or perform a visual cavity inspection.

Even assuming the Officers had probable cause to arrest Plaintiff, there are genuine disputes of material fact regarding whether they had reasonable suspicion to believe that Plaintiff was concealing contraband. "A 'reasonable suspicion' of wrongdoing is something stronger than a mere 'hunch,' but something weaker than probable cause." *Varrone* v. *Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997) (citation omitted). Whether a particular strip search is constitutional "turns on an objective assessment of the ... facts and circumstances confronting [the searching officer] at the time, and not on the officer's actual state of mind at the time" of the search. *Maryland* v. *Macon*, 472 U.S. 463, 470 (1985). "[B]eing arrested for a narcotics offense does not *automatically* give rise to a reasonable suspicion to justify a strip search and visual cavity inspection." *Carlos Quiles & Carlos Rodriguez* v. *City of New York*, No. 15 Civ. 1055 (CM), 2016 WL 6084078, at *11 (S.D.N.Y. Oct. 12, 2016).

Defendants do not present any argument that the strip search and inspection of Plaintiff was motivated by the Officers' reasonable suspicion that he was secreting contraband. Rather, Defendants rest their summary judgment argument on the contention that the search was performed incident to

a lawful arrest (Def. Br. 9), and that the record does not establish that Plaintiff was subjected to a cavity inspection (Def. Reply 5). As already discussed, these arguments do not warrant granting summary judgment in favor of Defendants. Additionally, the Court is unable to discern any evidence in the record that could establish, as a matter of law, that Plaintiff's strip search and cavity inspection were justified by reasonable suspicion. Fabrizi testified in the abstract during his deposition that based on his training and experience, Plaintiff's arrest was the type that would warrant a strip search because it occurred in "a drug prone location" and because the Officers "were not able to recover any additional narcotics on the prisoner's person" despite "the fact that [Alvarez] said he saw the hand to hand [transaction]." (Fabrizi Dep. 108:2-13). Even if Defendants attempted to rest the reasonableness of the search and inspection on Fabrizi's testimony — which they have not — it would not suffice to show that the Officers possessed "*individualized* suspicion, specifically directed to the person who is targeted for the strip [or visual body cavity] search." 🚩 *Hartline*, 546 F.3d at 100 (emphasis added); *see also Sloley*, 945 F.3d at 46 (noting that officers may have reasonable suspicion where the arrestee is fidgeting or making other suspicious movements; reaching or attempting to reach his hands down his pants; or known to have previously secreted drugs).

### ii. Personal Involvement

 **\*19** Having shown there to be a dispute of material fact over the reasonableness of the strip search and cavity inspection, Petitioner must establish that each Officer was personally involved in the search for his unlawful search claim to survive. *See* 🚩 *Victory*, 814 F.3d at 67. Plaintiff has adduced no evidence suggesting Bonilla's or Chow's personal involvement in the search. However, questions remain as to the personal involvement of Alvarez and Fabrizi.

Plaintiff asserts that "upon arrival at the 24th Precinct, [he] was subjected to a strip-search with an attendant cavity inspection by Det. Alvarez at the direction of Lt. Fabrizi." (Pl. Opp. 24). As support for the personal involvement of these individuals, Plaintiff cites to his own deposition testimony, recalling that Alvarez was likely present during his strip search. (Pl. Dep. 51:24-52:16), as well as Fabrizi's testimony, explaining that the arresting officer typically performs a strip search and that the search would have been performed at his direction (Fabrizi Dep. 108:14-24). The Court finds this

testimony to create a triable issue of fact as to Alvarez's and Fabrizi's personal involvement in the allegedly unlawful search of Plaintiff at the police precinct. [10]

Defendants argue that Plaintiff's unreasonable search claim is based on evidence suggesting that Plaintiff was "likely" (as opposed to actually) strip-searched based on speculation from the nature and circumstances of his arrest. (Def. Reply 5). Although neither Alvarez nor Fabrizi specifically recalled the strip search and cavity inspection, Plaintiff does, and the officers' corresponding "lack of memory does not create a genuine issue of fact." *Edwards* v. *Macy's Inc.*, No. 14 Civ. 8616 (CM) (JLC), 2015 WL 4104718, at *6 (S.D.N.Y. June 30, 2015) (citing 🚩 *F.D.I.C.* v. *Nat'l Union Fire Ins. Co. of Pittsburgh*, 205 F.3d 66, 75 (2d Cir. 2000)). In the absence of any other evidence suggesting that Alvarez and Fabrizi were not involved in the search, Defendants' have failed to demonstrate the lack of a genuine dispute of material fact as to their personal involvement in this alleged constitutional violation.

Accordingly, Plaintiff's unlawful search claim may proceed as against Alvarez and Fabrizi.

### iii. Qualified Immunity

What is more, Alvarez and Fabrizi are not entitled to qualified immunity on Plaintiff's unlawful search claim. Where, as here, "the Fourth Amendment requires an officer to have reasonable suspicion before undertaking a search, an officer is entitled to qualified immunity unless we can say on the somewhat unique facts before us that it is clearly established that no 'reasonable suspicion' justified a visual body cavity search." *Sloley*, 945 F.3d at 43 (internal quotation marks omitted). "Stated differently, qualified immunity is unavailable if 'no reasonable officer could have believed that there was reasonable suspicion.' " *Id.* (quoting 🚩 *Dancy* v. *McGinley*, 843 F.3d 93, 108 (2d Cir. 2016)).

 **\*20** As there is a genuine dispute over whether Alvarez fabricated the foundation of the probable cause supporting Plaintiff's arrest, the Court cannot conclude that Alvarez and Fabrizi are entitled to qualified immunity on Plaintiff's unlawful search claim. No reasonable officer would believe it to be reasonable to perform a strip search and visual cavity inspection on an individual who had been arrested on false pretenses. *See, e.g.*, 🚩 *Falls* v. *(Police Officer) Detective*

*Michael Pitt*, No. 16 Civ. 8863 (KMK), 2021 WL 1164185, at *28 (S.D.N.Y. Mar. 26, 2021) (denying qualified immunity to officers "in the absence of any evidence that has been held to support reasonable suspicion" in the context of a visual body cavity search).

Accordingly, Alvarez and Fabrizi are not entitled to qualified immunity on Plaintiff's unlawful search claim.

**5. Abuse of Process**

Plaintiff next brings an abuse of process claim, on the grounds that the Officers maliciously employed criminal process against him in violation of his right to due process. (Pl. Opp. 30). Defendants are entitled to summary judgment on this claim.

**a. Applicable Law**

The elements of a Section 1983 cause of action for malicious abuse of process are supplied by state law. *See Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). In New York, a malicious abuse of process claim may proceed when a defendant "[i] employed regularly issued legal process to compel performance or forbearance of some act, [ii] with the intent to do harm without excuse or justification, and [iii] in order to obtain a collateral objective that is outside the legitimate ends of the process." *Arrington v. City of New York*, 628 F. App'x 46, 49 (2d Cir. 2015) (summary order) (internal alterations omitted) (quoting *Savino*, 331 F.3d at 76). " '[L]egal process means that a court issued the process, and the plaintiff will be penalized if he violates it,' such as an arraignment." *Sforza v. City of New York*, No. 07 Civ. 6122 (DLC), 2009 WL 857496, at *16 (S.D.N.Y. Mar. 31, 2009) (quoting *Cook*, 41 F.3d at 80). By itself, a "warrantless arrest[ ] does not involve legal process." *Id.* at *17.

The third element — a collateral objective — is "[t]he crux of a malicious abuse of process claim[.]" *Marshall v. Port Auth. of N.Y. & N.J.*, No. 19 Civ. 2168 (WHP), 2020 WL 5633155, at *8 (S.D.N.Y. Sept. 21, 2020) (quoting *Douglas v. City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009)). "To meet this element, a plaintiff must prove not that [the] defendant acted with an improper *motive*, but rather an improper *purpose* — that is, 'he must claim that [the defendant] aimed to achieve a collateral purpose beyond or in

addition to his criminal prosecution." *Douglas*, 595 F. Supp. 2d at 344 (emphases added) (quoting *Savino*, 331 F.3d at 77). The torts of abuse of process and malicious prosecution are closely related, although there is a key distinction: "[w]hile [the latter], concerns the improper issuance of process, the gist of abuse of process is the improper use of process after it is regularly issued." *Cook*, 41 F.3d at 80 (internal quotation marks and alterations omitted). As such, "[t]he pursuit of a collateral objective must occur after the process is issued; the mere act of issuing process does not give rise to a claim." *Feliz v. City of New York*, No. 19 Civ. 6305 (AJN), 2022 WL 446043, at *8 (S.D.N.Y. Feb. 14, 2022) (citation omitted).

**b. The Court Grants Summary Judgment as to Plaintiff's Malicious Abuse of Process Claim**

Defendants challenge the "collateral objective" element of Plaintiff's abuse of process claim. (Def. Br. 12-13). On this point, Defendants contend that even if the Officers had some collateral objective in arresting Plaintiff, there is no evidence that any Defendant took any action in furtherance of that ancillary objective *after* initiating Plaintiff's prosecution. (*Id.*). The Court agrees with Defendants, and thus grants summary judgment as to Plaintiff's claim for abuse of process.

**\*21** Plaintiff contends that the Officers arrested and prosecuted him in pursuit of their "collateral objective ... to seize and search Ms. Gasparro." (Pl. Opp. 30). As support for this collateral objective, Plaintiff points to Defendants' willful failure to inquire into the source of Gasparro's drugs, when they had reason to know she did not acquire them from Plaintiff. (*Id.*). This does not suffice to make out a cognizable collateral objective that could sustain Plaintiff's malicious abuse of process claim. Plaintiff makes no effort to explain how Defendants' employment of criminal process could possibly have been geared toward this collateral objective, when Defendants had already seized and searched Gasparro by the time criminal process was issued. In essence, Plaintiff impermissibly seeks to recycle his theory of false arrest to sustain a malicious abuse of process claim. Plaintiff has pointed to no action taken by any Defendant subsequent to the initiation of legal process that evinces a collateral purpose beyond or in addition to his criminal prosecution. To the extent Plaintiff's argument may be construed as seeking to hold Defendants liable for employing legal process with the

true aim of falsely prosecuting Gasparro, this contention finds no support in the record.

Accordingly, summary judgment is granted on Plaintiff's malicious abuse of process claim.

#### 6. Failure to Intervene

Plaintiff brings a Section 1983 claim against the Officers for their failure to intervene to prevent the alleged violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution. (Compl. ¶¶ 133-136). Defendants have not addressed Plaintiff's failure to intervene claim in their motion for summary judgment, and have thus proffered little going toward their burden of demonstrating "the absence of a genuine issue of material fact" as to these claims. Celotex, 477 U.S. at 323. Nevertheless, the Court's review of the record and consideration of the parties' arguments with respect to Plaintiff's false arrest, unlawful search, and malicious prosecution claims leads the Court to deny summary judgment on Plaintiff's failure to intervene claims as to all of the Officers.

#### a. Applicable Law

Law enforcement officers have an affirmative duty to intervene to prevent their fellow officers from infringing on a citizen's constitutional rights. Rodriguez, 291 F. Supp. 3d at 417 (citing Guerrero v. City of New York, No. 16 Civ. 516 (JPO), 2017 WL 2271467, at *3 (S.D.N.Y. May 23, 2017)); see also Sloley, 945 F.3d at 46-47. An officer can be liable under Section 1983 where "[i] the officer had a realistic opportunity to intervene and prevent the harm; [ii] a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and [iii] the officer does not take reasonable steps to intervene." Guerrero, 2017 WL 2271467, at *3.

"Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.' " Terebesi v. Torreso, 764 F.3d 217, 244 (2d Cir. 2014) (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)). "Liability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator'

in the illegality." Figueroa, 825 F.3d at 106 (quoting O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988)). "In each case, the question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." Id. at 107. "Failure-to-intervene claims can arise out of a limitless variety of factual scenarios." Id.

It is well established that a plaintiff may not state a claim for failure to intervene against an officer who directly participated in the allegedly unlawful conduct. See Case v. City of New York, 233 F. Supp. 3d 372, 402 (S.D.N.Y. 2017) ("[A] defendant 'cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop [himself] from committing that violation.' " (quoting Marom, 2016 WL 916424, at *19)); accord Sanabria v. Detective Shawn Tezlof, No. 11 Civ. 6578 (NSR), 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016).

#### b. The Court Denies Summary Judgment as to Plaintiff's Failure to Intervene Claim

**\*22** As previously discussed, Plaintiff has established genuine disputes of material fact with respect to his claims of false arrest, malicious prosecution, and unlawful search. The record demonstrates that each of the Officers played different roles (and sometimes no role at all) in these alleged violations of Plaintiff's constitutional rights. Notwithstanding the parties' failure to provide briefing on Plaintiff's failure to intervene claims, the Court independently assesses the record to determine whether there are triable issues of fact as to whether any of the Officers failed to intervene to prevent the infringement of Plaintiff's rights. As the ensuing analysis reveals, there are factual disputes as to each of the Officers on at least some of Plaintiff's alleged violations. [11]

#### i. Alvarez

The record suggests that Alvarez played a central role in the events giving rise to Plaintiff's surviving Section 1983 claims. Alvarez was the only officer who allegedly witnessed the critical exchange between Plaintiff and Gasparro (Alvarez Dep. 46:7-21, 68:13-20), and was the officer who signed

the criminal complaint charging Plaintiff with narcotics offenses (Criminal Complaint). These undisputed facts permit the Court to determine, as a matter of law, that Alvarez was sufficiently directly involved in Plaintiff's alleged false arrest and malicious prosecution so as to foreclose liability for Alvarez's failure to intervene in these same violations.

*See* ⚑ *Anderson,* 17 F.3d at 557 ("[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by *other* law enforcement officers in their presence." (emphasis added)).

Plaintiff also testified that Alvarez was likely present during Plaintiff's strip search and visual cavity inspection. (Pl. Dep. 51:24-52:16). It remains unclear, however, whether Alvarez was the officer who performed the allegedly unlawful search, or whether he was merely a bystander who declined to intervene while another officer impermissibly searched Plaintiff. Therefore, a triable question of fact exists concerning the extent of Alvarez's direct participation in Plaintiff's strip search and visual cavity inspection. *See* ⚑ *Aguirre,* 2017 WL 4236552, at *13 ("Because there are genuine issues of material fact as to the extent of each officer's participation in the alleged misconduct, Defendants are not entitled to summary judgment on Plaintiff's failure to intervene claim on this basis.").

Accordingly, Alvarez is not entitled to summary judgment on Plaintiff's failure to intervene claim, to the extent this claim is related to his search and inspection.

### ii. Bonilla

The record suggests that, compared to Alvarez, Bonilla played a less active role in Plaintiff's arrest, search, and prosecution. Bonilla was a member of the field unit that arrested Plaintiff, but he did not observe Plaintiff interact with Gasparro, and he only arrived at the scene of the arrest after Plaintiff was taken into custody. (Bonilla Dep. 16:3-13, 26:22-27:9). Bonilla claims that he was the officer who filled out Plaintiff's arrest report and invoiced the property voucher for the narcotics recovered from Gasparro. (*Id.* at 65:12-66:19; Gasparro Property Invoice)). There is no evidence in the record suggesting that Bonilla was involved in, or even knew about, Plaintiff's strip search or cavity inspection.

**\*23** The Court relied on this record evidence in determining that triable issues of fact existed as to whether Bonilla directly participated in Plaintiff's false arrest and malicious prosecution. On this record, a reasonable jury crediting Plaintiff's version of events could find Bonilla liable for the support functions he played in facilitating Plaintiff's arrest, as well as for documenting a false narcotics exchange in the arrest report that was likely sent to the District Attorney's office. While liability for failure to intervene in Plaintiff's arrest or prosecution may not coexist with Bonilla's liability for these same violations on a theory of direct participation, at this stage in the proceedings, the undisputed facts do not allow the Court to conclude, as a matter of law, that Bonilla was a direct participant in Plaintiff's false arrest and malicious prosecution. *See* ⚑ *Aguirre,* 2017 WL 4236552, at *13.

Because a reasonable jury could find that Bonilla failed to intervene, as opposed to directly instigated, Plaintiff's false arrest and malicious prosecution, the Court denies summary judgment on Plaintiff's failure to intervene claim as to Bonilla on these grounds. At the same time, the record does not contain any evidence suggesting that Bonilla was ever in a position to intervene in Plaintiff's strip search and cavity inspection. Thus, to the extent Plaintiff's failure to intervene claim against Bonilla rests on his failure to intervene in the search and inspection, it cannot survive.

### iii. Chow

Chow was the officer who detained and handcuffed Plaintiff at the scene of the arrest. (Chow Dep. 32:12-17). This constitutes direct participation in Plaintiff's arrest, and thus Chow cannot be held liable for failing to intervene in an arrest that he effectuated. As to Plaintiff's search, there is no record evidence suggesting that Chow was ever in a position to intervene in the alleged search and inspection. Chow testified that he recalls Plaintiff's being searched at the precinct, which search was limited to a pat-down of his pockets and person. (*Id.* at 75:15-24). Chow specifically denies that Plaintiff was strip-searched upon arriving at the precinct. (*Id.* at 75:25-76:12). Consequently, the Court grants summary judgment on Plaintiff's false arrest claim as to Chow to the extent it is predicated on Chow's failure to intervene in Plaintiff's unlawful search and inspection.

By contrast, the Court declines to grant summary judgment to the extent Plaintiff's claim is predicated on Chow's failure to intervene in Plaintiff's prosecution. Unaided by argument

from Defendants, the Court believes that a reasonable jury could infer from the record evidence suggesting that Chow provided information to the District Attorney about Plaintiff's arrest and testified in proceedings in Plaintiff's criminal case, including before the grand jury, that he failed to take advantage of a reasonable opportunity to intervene in Plaintiff's malicious prosecution. (Chow Dep. 69:18-20, 70:23-71:20; Pl. Dep. 67:8-68:20).

#### iv. Fabrizi

Lastly, the Court finds there to be a genuine dispute of material fact as to whether Fabrizi failed to act in the face of a duty to intervene in Plaintiff's arrest, search, and prosecution.

As previously mentioned, Fabrizi was the supervising lieutenant who possessed oversight responsibility for the field unit that arrested Plaintiff. (Fabrizi Dep. 116:6-9). Documents associated with Plaintiff's arrest reflects that Fabrizi approved Plaintiff's arrest and verified the property that was recovered from both Plaintiff and Gasparro. (Arrest Report; Gasparro Property Invoice; Garcia Decl., Ex. G-H). Fabrizi does not recall being at the scene of the arrest when Plaintiff was detained, but he testified that it was customary for him appear at an arrest scene to approve the arrests effectuated by his unit. (Fabrizi Dep. 106:19-23). In the absence of any argument to the contrary, the Court finds Fabrizi's testimony regarding his usual practice of approving arrests to create a triable issue of fact as to whether Fabrizi forwent an opportunity to inhibit the violation of Plaintiff's constitutional rights when the unit he supervised arrested Plaintiff.

**\*24** The Court also concludes that triable issues of fact exist as to whether Fabrizi failed to intervene in Plaintiff's unlawful search and malicious prosecution. Fabrizi testified that if Plaintiff was, in fact, strip-searched, it would have been done at his direction. (Fabrizi Dep. 108:21-24). At the same time, Fabrizi does not specifically recall ordering a strip search and cavity inspection of Plaintiff, which prevents the Court from discerning whether Fabrizi's degree of personal involvement in the search was sufficient to foreclose liability on a failure to intervene theory. In addition, although Fabrizi did not initiate Plaintiff's prosecution, the record suggests that he participated in subsequent stages of Plaintiff's criminal case, including by providing testimony (Pl. Dep. 67:8-68:20), and may have been able to deter Plaintiff's allegedly fraudulent prosecution. Without the benefit of argument from Defendants, the Court

concludes that a reasonable jury could find that Fabrizi failed to intervene in Plaintiff's malicious prosecution.

As such, Fabrizi is not entitled to summary judgment on Plaintiff's failure to intervene claim with respect to any of Plaintiff's surviving constitutional violations.

### C. Plaintiff's 🚩 Section 1983 Claim for Municipal Liability

Separately, Plaintiff seeks to hold the City responsible for the alleged violation of his Fourth Amendment rights stemming from his strip search and cavity inspection. (Pl. Opp. 30-31). The Court grants summary judgment on this claim, as Plaintiff has failed to adduce any evidence suggesting that the municipality maintained a policy or practice of performing unconstitutional searches.

#### 1. Applicable Law

"To hold a [municipality] liable under [🚩 Section] 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: [i] an official policy or custom that [ii] causes the plaintiff to be subjected to [iii] a denial of a constitutional right." 🚩 *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (citation omitted); *see also* 🚩 *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). "[A] municipality cannot be made liable [under 🚩 Section 1983] by application of the doctrine of *respondeat superior*," 🚩 *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986), but rather the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury," 🚩 *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (citation omitted).

Under *Monell*, "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." 🚩 *Connick v. Thompson*, 563 U.S. 51, 61 (2011). In order to establish *Monell* liability based upon a "persistent and widespread" practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be "so manifest as to imply the

constructive acquiescence of senior policy-making officials." *Lucente*, 980 F.3d at 297-98 (quoting *Sorlucco* v. *N.Y.C. Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992)). "[A] custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [government]." *Bowen* v. *Cnty. of Westchester*, 706 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (quoting *Newton* v. *City of New York*, 566 F. Supp. 2d 256, 270-71 (S.D.N.Y. 2008)); *see also* *Tuttle*, 471 U.S. at 823-24 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.").

### 2. The Court Grants Summary Judgment as to Plaintiff's *Monell* Claim

Plaintiff submits that he was subjected to an unlawful strip search and cavity inspection "due to an overarching official or unofficial policy espoused or at least tacitly approved or condoned by the policymakers or high-ranking officials of the City of New York or its police department[.]" (Pl. Opp. 31). Defendants attest that Plaintiff's only support for an unconstitutional municipal policy is his own allegedly unlawful search. (Def. Br. 18). Defendants further argue that Plaintiff's theory of municipal liability invites the Court to fill in virtually all of its crucial details (*e.g.*, whether the policy is official or unofficial; actually or tacitly implemented; or condoned by policymakers or other officials) and is thus fatally imprecise. (Def. Reply 8). The Court agrees with Defendants that Plaintiff's *Monell* claim fails as a matter of law.

**\*25** Plaintiff argues that, in addition to his own allegedly unlawful search and cavity inspection, the testimony of Fabrizi and Alvarez lends additional support to the existence of an unconstitutional policy within the NYPD of performing unreasonable searches and inspections. (Pl. Opp. 31). Plaintiff overstates the import of both officers' testimony. For his part, Fabrizi explained that certain aspects of Plaintiff's arrest led him to believe that a strip search was appropriate, including that the arrest was made in a drug-prone area and that an officer claimed to have seen a narcotics exchange, but was unable to recover any drugs. (Fabrizi Dep. 108:7-13). And Alvarez merely testified that he perceived Plaintiff's arrest to be one that "most likely" would entail a strip search because

"[u]sually a drug dealer who sells narcotics hide[s] narcotics in the private parts area." (Alvarez Dep. 164:19-165:4). These bits of testimony come nowhere close to describing a municipality-wide policy of unconstitutional searches or a practice of unconstitutional conduct that was so persistent and widespread as to practically have the force of law. Even assuming Alvarez testified to an overbroad conception of the types of searches that are permissible incident to drug arrests, there is no evidence to suggest that he derived his misunderstanding from any municipal policy, whether explicit or implicit. Indeed, Fabrizi's testimony describes precisely the kind of considerations that are appropriate for law enforcement officers to assess when determining the reasonableness of a search.

Whether it was reasonable for Plaintiff to be strip-searched and inspected on the circumstances of this case is a distinct question that this Court has already determined is appropriately resolved by a jury. At the same time, this record does not create any genuine dispute as to whether Plaintiff's allegedly unconstitutional search was performed pursuant to a municipal policy or practice. Accordingly, summary judgment is granted as to Plaintiff's claim for municipal liability pursuant to Section 1983.

### D. Plaintiff's State Law Claims

In addition to his claims brought under Section 1983, Plaintiff asserts state law causes of action against all Defendants for false arrest, assault and battery, malicious prosecution, malicious abuse of process, and failure to intervene. [12] Defendants argue that most of Plaintiff's state law claims are procedurally barred for failure to comply with the requirements of New York General Municipal Law Sections 50-e and 50-i. (Def. Br. 20). The Court concludes that summary judgment is appropriate to all of Plaintiff's state law claims, except those related to his malicious prosecution and failure to intervene in his criminal proceeding.

### 1. Plaintiff's State Law Claims for False Arrest, Assault and Battery, and Abuse of Process Are Untimely

"Under New York law, a plaintiff asserting tort claims against the City or its employees must file a notice of claim within ninety days after the incident giving rise to the claim and commence the action within a year and ninety days from the date of the incident." *Brown* v. *City of New York*, No.

18 Civ. 3287 (JPO), 2020 WL 1819880, at *7 (S.D.N.Y. Apr. 9, 2020) (citing N.Y. Gen. Mun. Law §§ 50-e(1)(a), 50-i(1)). New York law provides that a "notice of claim is a statutory precondition to filing suit against the City or its employees." *Harris* v. *Bowden*, No. 03 Civ. 1617 (LAP), 2006 WL 738110, at *6 (S.D.N.Y. Mar. 23, 2006); *see also Hardy* v. *N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999) (explaining that in federal court, state notice-of-claim statutes apply to state law claims). A plaintiff's "failure to comply with the mandatory New York statutory notice-of-claim requirements generally results in dismissal of his claims." *Warner* v. *Vill. of Goshen Police Dep't*, 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003); *see also Matthews* v. *City of New York*, 889 F. Supp. 2d 418, 448 (E.D.N.Y. 2012) ("New York state courts strictly construe Notice of Claim requirements").

Plaintiff filed a notice of claim on July 27, 2018 (Notice of Claim), and commenced this action on July 19, 2019 (Complaint). As discussed below, both Plaintiff's notice of claim and his initiation of this suit were untimely as to Plaintiff's state law claims for false arrest, assault and battery, and abuse of process under New York General Municipal Law Sections 50-e and 50-i. As such, Defendants are entitled to summary judgment on these state law claims. [13]

#### i. False Arrest

**\*26** Defendants claim that Plaintiff's cause of action for false arrest accrued at the time of his arrest (Def. Br. 20); however, New York law provides that "a cause of action for the tort of false imprisonment accrues ... on the date of the prisoner's release from confinement." *Lynch* v. *Suffolk Cnty. Police Dep't, Inc.*, 348 F. App'x 672, 676 (2d Cir. 2009) (summary order) (internal quotation marks omitted) (quoting *Jackson* v. *Police Dep't of the City of N.Y.*, 500 N.Y.S.2d 553, 554 (2d Dep't 1986)); *see also Mitchell* v. *Home*, 377 F. Supp. 2d 361, 378 (S.D.N.Y. 2005) (holding that a cause of action for false arrest "accrues when a plaintiff is released from pre-arraignment custody"). According to Plaintiff's arraignment form, Plaintiff was released on bail on September 1, 2016 (Pl. Arraignment Form), meaning his deadline to file a notice of claim was November 30, 2016, and his deadline to file a lawsuit was November 30, 2017. Because Plaintiff met

neither of these deadlines, Defendants are entitled to summary judgment on Plaintiff's state law claim for false arrest.

#### ii. Assault and Battery

Plaintiff's state law claims for assault and battery accrued on August 31, 2016, the date Defendants are alleged to have unlawfully taken him into custody. *See, e.g.*, *Rateau* v. *City of New York*, No. 06 Civ. 4751 (KAM) (CLP), 2009 WL 3148765, at *14 (E.D.N.Y. Sept. 29, 2009) ("[C]auses of action for assault and battery [under New York law] accrue immediately upon the occurrence of the tortious act[.]"). Thus, Plaintiff's deadline to file a notice of claim for this claim was November 29, 2016, and his deadline to file suit was November 29, 2017. Plaintiff failed to satisfy either of these deadlines. As such, Defendants are entitled to summary judgment on Plaintiff's state law claim for assault and battery.

#### iii. Abuse of Process

Plaintiff's state law abuse of process claim is also untimely. This claim accrued when the criminal process was set in motion. *See Wright* v. *City of New York*, No. 18 Civ. 10769 (DLC), 2019 WL 2869066, at *3 (S.D.N.Y. July 2, 2019) ("A claim for abuse of process accrues at such time as the criminal process is set in motion, unless the plaintiff is unaware of facts supporting the claim.") (citing *Cunningham* v. *State of New York*, 53 N.Y.2d 851, 853 (1981)); *accord Pinter* v. *City of New York*, 976 F. Supp. 2d 539, 570 (S.D.N.Y. 2013). As discussed above, Plaintiff's malicious abuse of process claim is rooted in Defendants' alleged collateral objective of seizing and searching Gasparro. (Pl. Opp. 30.) This collateral objective was accomplished contemporaneously with Plaintiff's arrest, and thus accrued at that time, on August 31, 2016. As such, Plaintiff's deadline to file a notice of claim for this claim was November 29, 2016, and his deadline to file suit was November 29, 2017.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's state law abuse of process claim.

#### 2. The Court Denies Summary Judgment as to Plaintiff's State Law Malicious Prosecution Claim

Defendants do not contest that Plaintiff's state law malicious prosecution claim was timely filed (Def. Br. 20), as it accrued on May 15, 2018 (Pl. Certification of Disposition), the day his criminal charges were dismissed, *see* 🚩 *Breton v. City of New York*, 404 F. Supp. 3d 799, 809 (S.D.N.Y. 2019) (explaining that for purposes of evaluating the timeliness of a notice of claim filed pursuant to 🚩 General Municipal Law Section 50-e, a "claim for malicious prosecution [does] not accrue until the charges against the plaintiff [are] dismissed").

The Court has already found there to be genuine disputes of material fact as to Plaintiff's malicious prosecution claim brought under 🚩 Section 1983. Although claims for malicious prosecution under federal and state law are not coextensive, *see* 🚩 *Lanning v. City of Glen Falls*, 908 F.3d 19, 24-29 (2d Cir. 2018) (clarifying that "federal law defines the elements of a [🚩 Section] 1983 malicious prosecution claim, and that a State's tort law serves only as a source of persuasive authority rather than binding precedent in defining these elements"), the Court is aware of no authority — state or federal — that would yield divergent conclusions on Plaintiff's state and federal malicious prosecution claims. Just as in the 🚩 Section 1983 context, there are triable issues of fact as to whether Alvarez and Bonilla initiated Plaintiff's prosecution based on a fabricated narcotics exchange. Moreover, there is a genuine dispute as to whether Bonilla, Chow, or Fabrizi had a reasonable opportunity to intervene in Plaintiff's allegedly malicious prosecution.

**\*27** Accordingly, for substantially the same reasons as discussed in the 🚩 Section 1983 context, the Court denies summary judgment on Plaintiff's state law malicious prosecution claim as to Alvarez and Bonilla. Similarly, the Court denies summary judgment on Plaintiff's state law failure to intervene claim as to Bonilla, Chow, and Fabrizi, albeit only on the theory that they failed to intervene in Plaintiff's prosecution. Summary judgment is denied to the City of New York on both claims under a theory of *respondeat superior*.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

The claims that remain for trial are as follows:

- False Arrest (🚩 Section 1983): against Alvarez, Bonilla, Chow, and Fabrizi;

- Malicious Prosecution (🚩 Section 1983): against Alvarez and Bonilla;

- Malicious Prosecution (New York State Law): against Alvarez and Bonilla, along with a *respondeat superior* claim against the City;

- Unlawful Search (🚩 Section 1983): against Alvarez and Fabrizi;

- Failure to Intervene (🚩 Section 1983): against Alvarez regarding the search; against Bonilla regarding the arrest and prosecution; against Chow regarding the prosecution; and against Fabrizi regarding the arrest, search, and prosecution; and

- Failure to Intervene (New York State Law): identical to federal claim, along with a *respondeat superior* claim against the City.

The Clerk of Court is directed to terminate the pending motion at docket entry 67. The parties are directed to submit a joint status letter regarding proposed next steps on or before **April 11, 2022**.

SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 744037

**Footnotes**

1    The facts set forth in this Opinion are drawn from the parties' submissions in connection with Defendants' motion for summary judgment, including Defendants' statement of undisputed material facts pursuant to S.D.N.Y. Local Civil Rule 56.1 ("Def. 56.1" (Dkt. #70)), and Plaintiff's Rule 56.1 counterstatement ("Pl. 56.1" (Dkt. #76)). The Court also draws from the declarations submitted by the parties and the exhibits attached thereto, which declarations are cited using the convention "[Name] Decl."

      Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true. *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."). Additionally, to the extent that Plaintiff purports to dispute facts in Defendants' Rule 56.1 Statement with inadmissible evidence or with evidence that does not support the proposition for which it is advanced, the Court finds such facts to be true. *See id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

      For ease of reference, the Court refers to Defendants' memorandum of law as "Def. Br." (Dkt. #68); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #74); and Defendants' reply brief as "Def. Reply" (Dkt. #85).

2    At the threshold, Plaintiff urges the Court to deny Defendants' motion for summary judgment on the grounds that Defendants support their arguments with citations to their Rule 56.1 statement, rather than with citations to the record. (Pl. Opp. 14-15). Plaintiff's suggestion has no merit. Defendants' Rule 56.1 statement accords with Local Rule 56.1(d), which provides that each assertion of fact made by a party in such a statement "must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." Plaintiff presents no argument that Defendants rely on inadmissible evidence in support of their motion. Thus, the Court declines to disregard Defendants' permissible citations to their Rule 56.1 statement.

3    Alvarez characterized Plaintiff's interaction with Gasparro differently in the criminal complaint charging Plaintiff with narcotics offenses. There, while recounting the factual basis for the charges against Plaintiff, Alvarez had claimed that he observed Gasparro "hand [Plaintiff] a ziploc[ ] style bag in exchange for a sum of U.S. currency." (Criminal Complaint 1).

4    On October 8, 2021, the Court granted Plaintiff's first request for a *nunc pro tunc* extension of time to file his opposition brief. (Dkt. #73). Even with this extension, Plaintiff filed his opposition papers four days past the revised deadline, and submitted along with his briefing a second request for a *nunc pro tunc* extension of this filing deadline. (Dkt. #77). The Court accepted Plaintiff's late filing, while noting that it perceived this incident to be a continuation of his pattern of inattention to Court-ordered deadlines. (Dkt. #78).

5    Plaintiff has affirmatively withdrawn his state law claim for intentional or negligent infliction of emotional distress. (Pl. Opp. 14). Moreover, the Court deems Plaintiff to have abandoned his federal excessive force claim (Compl. ¶¶ 90-93) and his state law claim for negligent hiring, retention, and supervision against the City (*id.* at ¶¶ 137-143).

      Defendants addressed both Plaintiff's excessive force claim and his negligent hiring, retention, and supervision claim in their briefing. As to the former claim, Defendants argue that the record contains no evidence suggesting that Plaintiff was subjected to force by any of the Officers. (Def. Br. 10-11). With respect to the latter claim, Defendants argue that the record does not establish that the City was on notice of the need to more closely supervise, re-train, or terminate any of the Officers for the actions about which Plaintiff complains. (*Id.* at 19). Plaintiff's opposing papers fail to engage with either of these arguments, and

appear to wholly ignore the fact that Plaintiff even pleaded these claims. On this basis, the Court deems Plaintiff's claims for excessive force and negligent hiring, retention, and supervision to be abandoned. *See* [Jackson v. Fed. Express, 766 F.3d 189, 198 (2d Cir. 2014)](#) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").

6    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* [Fed. R. Civ. P. 56](#), advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

7    Plaintiff purports to dispute these paragraphs of Defendants' Rule 56.1 statement; however, the record evidence he cites to substantiate his objections does not suggest that Fabrizi or Bonilla was physically present at the scene when Plaintiff was arrested. (*See* Pl. 56.1 ¶¶ 19-20). Plaintiff cites to his arrest report, which lists Fabrizi as the approving supervisor and Bonilla as the officer who entered the report information, but neither designation implies that these officers were, in fact, present at the scene of Plaintiff's arrest. (Arrest Report). To suggest that Fabrizi was present at the scene of Plaintiff's arrest, Plaintiff cites an excerpt of Fabrizi's testimony discussing his typical practice for approving an arrest *when he wasn't initially present at the scene.* (Garcia Decl., Ex. J ("Fabrizi Dep.") at 106:16-23). For his part, Bonilla testified that he was across the street from 868 Amsterdam Avenue at the time of Plaintiff's arrest. (*Id.*, Ex. I ("Bonilla Dep.") at 14:8-14). The portion of Bonilla's testimony cited by Plaintiff establishes that Bonilla arrived at the scene of Plaintiff's arrest *after* Alvarez and Chow had taken Plaintiff into custody. (*Id.* at 26:22-27:9). Indeed, Detective Chow testified that no other members of his team were within a 50-foot radius when he arrested Plaintiff. (Chow Dep. 30:8-10). As such, the Court deems it undisputed that neither Fabrizi nor Bonilla was present at the scene when Plaintiff was arrested. As the Court will discuss, however, both officers are alleged to have arrived at the scene after Plaintiff was detained.

8    The Court acknowledges the line of cases establishing the "fellow officer rule," which embodies the principle that an officer may be shielded "from liability for false arrest if the officer relies on a fellow officer who vouches for probable cause." [Cruz v. City of New York, 232 F. Supp. 3d 438, 458 (S.D.N.Y. 2017)](#) (quoting [Golphin v. City of New York, No. 09 Civ. 1015 (BSJ), 2011 WL 4375679, at *2 (S.D.N.Y. Sept. 19, 2011)](#)); *see also* [United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001)](#) ("[A]n arresting officer might not be aware of all the underlying facts that provided probable cause or reasonable suspicion, but may nonetheless act reasonably in relying on information received by other law enforcement officials."). The Court perceives two issues with applying the fellow officer rule to Fabrizi on this motion, even though the record suggests he may have relied on Alvarez's recitation of probable cause in approving Plaintiff's arrest. *First*, Defendants do not advocate for the application of this principle, and instead rely principally on the fact that Fabrizi was not at the scene of the arrest when Plaintiff was detained. (*See* Def. Br. 4-5). As already discussed, the Court does not find this fact to be dispositive of Fabrizi's personal involvement. *Second,* during his deposition, Fabrizi could not recall the events of August 31, 2016, or the contents of any conversation he might have had with any officer prior to approving Plaintiff's arrest. (Fabrizi Dep. 52:9-18; 131:5-12). Left only to speculate as to the information that Fabrizi might have received from a fellow officer regarding Plaintiff's conduct prior to his arrest, the Court declines to presume that Fabrizi reasonably (or unreasonably) approved Plaintiff's arrest in reliance on information he received from an officer at the scene. Instead, this will be a matter for trial.

9    The version of Plaintiff's arrest report contained in the record does not reflect that he was subjected to a strip search. (Arrest Report). However, Fabrizi testified in his deposition that there existed documentation reflecting that a strip search had been conducted on Plaintiff. (Fabrizi Dep. 107:13-23). To the extent Defendants

challenge that Plaintiff was strip-searched (*see* Def. Reply 5), the record evidence creates a triable issue of fact as to whether such a search occurred that precludes summary judgment on this issue.

10    The Court reiterates that "there is no special rule for supervisory liability" under 🏷 Section 1983 and that in order to hold a supervisor liable for an alleged constitutional violation under this provision, a plaintiff must show that the "Government-official defendant, through the official's own individual actions, has violated the Constitution." 🏷 *Tangreti* v. *Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (citation omitted). In contrast to Plaintiff's false arrest claim, where there is no evidence suggesting that Fabrizi played an active role in effectuating Plaintiff's arrest, Fabrizi's own testimony suggests that he likely personally directed Plaintiff to be strip-searched at the precinct. (Fabrizi Dep. 108:14-24). This evidence is sufficient to suggest Fabrizi's personal involvement in the allegedly unlawful search and inspection.

11    Because Defendants do not address Plaintiff's failure to intervene claims, the Court declines to consider whether the Officers are entitled to qualified immunity for their failure to intervene. *See Ariz. Premium Fin. Co.* v. *Employers Ins. of Wausau*, 586 F. App'x 713, 716 (2d Cir. 2014) (summary order) ("While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out." (quoting 🏷 *Monahan* v. *N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000))).

12    "Unlike cases brought under [🏷 Section] 1983, municipalities may be liable for the common law torts, like false arrest and malicious prosecution, committed by their employees under the doctrine of *respondeat superior*." 🏷 *Biswas* v. *City of New York*, 973 F. Supp. 2d 504, 539 (S.D.N.Y. 2013) (quoting ⚠ *L.B.* v. *Town of Chester*, 232 F. Supp. 2d 227, 239 (S.D.N.Y. 2002)).

13    Plaintiff does not address Defendants' argument regarding his failure to comply with New York's notice of claim requirement and the applicable statute of limitations. Nor is there any indication that Plaintiff ever sought leave to file a late notice of claim. *See* 🏷 N.Y. Gen. Mun. Law § 50-e(7) (providing that an application for leave to serve a late notice of claim shall be made to "the supreme court or to the county court"). Therefore, the Court must dismiss Plaintiff's untimely state law tort claims. *See Gibson* v. *Comm'r of Mental Health*, No. 04 Civ. 4350 (SAS), 2006 WL 1234971, at *5 (S.D.N.Y. May 8, 2006) ("Federal courts do not have jurisdiction to hear complaints from plaintiffs who have failed to comply with the notice of claim requirement, or to grant permission to file a late notice.").

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1617490
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

UNITED STATES of America

v.

Ismael BIMBOW, Defendant.

21-CR-48 (JPO)

|

Signed 05/23/2022

**Attorneys and Law Firms**

Michael Ross Herman, Assistant US Attorney, David Robles, DOJ-USAO, New York, NY, Frank James Balsamello, U.S. Attorney's Office-SDNY, New York, NY, for United States of America.

Andrew Christian Olesnycky, The Law Offices of Robert G. Stahl, Westfield, NJ, Kevin Gregory Roe, Kevin G. Roe, Esq., Hackensack, NJ, for Defendant.

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

**\*1** Defendant Ismael Bimbow was charged with conspiring to distribute and possess with intent to distribute 400 grams and more of mixtures and substances containing a detectable amount of fentanyl and mixtures and substances containing a detectable amount of heroin in violation of 21 U.S.C. §§ 841(b)(1)(A), 841(b)(1)(C), and 846, and with using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

Following a jury trial in April 2022, Bimbow was convicted on both counts. Bimbow has now moved for judgment of acquittal or, in the alternative, for a new trial. For the reasons that follow, Bimbows motion is denied.

**I. Background**

The Court assumes familiarity with the factual background in this case as set forth in its previous opinions. (*See* Dkt. Nos. 30, 59.)

Trial against Bimbow began on April 4, 2022. On April 12, 2022, the jury found Bimbow guilty on both counts — conspiring to distribute fentanyl and heroin and using and carrying a firearm during and in relation to, or possessing a firearm in furtherance of, the narcotics conspiracy. (*See* Dkt. No. 74.)

On April 22, 2022, Bimbow moved for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Alternatively, Bimbow moved for a new trial pursuant to Rule 33. (*See* Dkt. No. 89.)

**II. Rule 29 Motion**

A motion for judgment of acquittal under Rule 29 may be granted only if "no rational trier of fact could find guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317 (1979). When considering such a motion, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (internal quotation marks omitted). A defendant challenging a jury's guilty verdict "bears a heavy burden." *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (internal quotation marks omitted).

Bimbow argues that the evidence at trial was insufficient to support the jury's guilty verdict as to both the narcotics conspiracy count and the firearm count. He also argues that the government failed to establish by a preponderance of the evidence that venue was proper in the Southern District of New York. (*See* Dkt. No. 89.) Each argument is addressed in turn.

**A. Narcotics Conspiracy Count**

Bimbow contends that the evidence presented by the government was insufficient to convict him of the narcotics conspiracy charged in Count I. (Dkt. No. 89 at 2–6.) He primarily argues that the jury should not have credited the testimony of Staff Coordinator Todd Riley or Special Agent James Lowndes, who both testified to conducting surveillance of Bimbow, including on the evening of November 23, 2020, when they observed him come out of a house in New Jersey with a black bag and handed the bag to two individuals, who then placed the bag in a vehicle and left. (Dkt. Nos. 77 at 111:7–115:6; at 344:1, 81 at 712:17–717:25.). Bimbow

similarly argues that the jury should not have credited the testimony of Cooperating Witness 1 ("CW-1"), because it was uncorroborated and inconsistent. (Dkt. No. 89 at 5–7.)

**\*2** It is well established that, when considering a Rule 29 motion, the Court is not entitled to determine the credibility of a witness, which is the province of the jury. *See* 🚩 *United States v. Cunningham*, 723 F.2d 217, 232 (2d Cir. 1983) ("[A] trial judge [is] not entitled to set [a] guilty verdict simply because he would have reached a different result if he had been the fact-finder."). The appropriate "place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury." *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989) (internal quotation marks omitted). Indeed, both law enforcement officers were cross-examined extensively about the November 23 surveillance, and CW-1 was cross-examined about his possible biases and motivations for testifying. (*See, e.g.*, Dkt. Nos. 77 at 268:6–274:13; 79 at 325:16–333:19; 81 at 724:5–728:3; 79 at 499:4–519:22.) The jury is responsible for deciding how these arguments bear on "the weight [it] should accord to the evidence." 🚩 *United States v. Truman*, 688 F.3d 129, 140 (2d Cir. 2012); *see also* 🚩 *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999) ("Any lack of corroboration of an accomplice's or co-conspirator's testimony goes merely to the weight of the evidence, not to its sufficiency.").

Bimbow also contends that much of the evidence introduced regarding the conspiracy was outside of the alleged time period charged in the indictment — "at least in or about November 2020, through in or about December 2020" (Dkt. No. 7 at 1) — and is therefore irrelevant to proving the existence of the conspiracy (Dkt. No. 89 at 6). But the critical language in the indictment is "in or about." (*See* Dkt. No. 7.) Where this type of language is used, "the government is not required to prove the exact date, if a date reasonably near is established .... This is especially true where, as here, the exact time when an offense was committed is not an essential element of the offense charged." 🚩 *United States v. Nersesian*, 824 F.2d 1294, 1323 (2d Cir. 1987) (internal quotation marks omitted). And as the Court instructed the jury, "it does not matter if the indictment charges that a specific act occurred on or about a certain date and the evidence indicates that in fact it was another date. The law only requires a substantial similarity between the date or date ranges alleged in the indictment, and the date or date ranges established by the testimony or exhibits." (Dkt. No. 80 at 1207:1–7.) Thus, it is of no consequence that the

testimony of CW-1 about certain events and communications that the government introduced to establish the existence of a narcotics conspiracy occurred a month or a couple months before the time period alleged in the indictment.

Furthermore, as the government notes, there was ample evidence of the existence of the narcotics conspiracy. This includes the large quantities of narcotics that Bimbow admittedly trafficked, the testimony of CW-1, in which he claimed to have worked with Bimbow and in which he related that Bimbow told him that he had two women to help him "bag up," and the evidence of other co-conspirators, who helped secure residences for Bimbow's business. (*See* Dkt. No. 90 at 13–15.)

**B. Firearms Count**

Bimbow briefly argues that there was insufficient evidence to convict him on the firearms count. (*See* Dkt. No. 89 at 6–7.) Specifically, he asserts that the evidence showed mere possession of the firearms and that there was no evidence connecting the firearms to the narcotics conspiracy, nor was there any evidence that the firearms had ever been used. (*Id.*)

The "requirement ... that the gun be possessed in furtherance of a drug crime may be satisfied by a showing of some nexus between the firearm and the drug selling operation." 🚩 *United States v. Lewter*, 402 F.3d 319, 322 (2d Cir. 2005) (internal quotation marks omitted). "That nexus is established where the firearm afforded some advantage (actual or potential, real or contingent) to the drug trafficking." *United States v. Willis*, 14 F. 4th 170, 184 (2d Cir. 2021) (internal quotation marks omitted). Under established Second Circuit case law, 🚩 Section 924(c) "applies where the charged weapon is readily accessible to protect drugs, drug proceeds, or the dealer himself." *Willis*, 14 F. 4th at 184. The *Willis* court, for example, held that there was a sufficient nexus to uphold a 924(c) conviction where the guns were found near drugs and tools of the drug trade. *Id.* at 184–85.

**\*3** The evidence at trial established that a firearm was found along with drugs and money in Bimbow's Black Honda. (*See* GX 202A.) Several other firearms were found in one of Bimbow's residences, including a firearm found under the passenger door of one of Bimbow's cars in his garage (Dkt. No. 77 at 172:5–18; GX 201G) and another on top a pile of items in Bimbow's garage (Dkt. No. 77 at 175:8–23; GX 201A). The evidence also established that there were drugs and drug paraphernalia in that apartment, and that these all

belonged to Bimbow, as he admitted on the stand. (*See* Dkt. Nos. 77 at 148:10–152:14; 83 at 896:3–5.)

Here, several guns were found in the garage of Bimbow's apartment where he admittedly possessed drugs (*see* Dkt. No. 83 at 895:25–896:5) and where the evidence established that he was cutting and packaging drugs (Dkt. No. 77 at 148:10–152:14). Furthermore, a gun was found in a hidden compartment in his car, along with 117 glassines and currency. (Dkt. No. 83 at 919:5–9; GX 202A). While Bimbow testified that he possessed the firearms for other purposes (Dkt. No. 83 at 908:11–909:13), the jury was entitled to disbelieve any part of Bimbow's testimony, *see United States v. Flores*, 945 F.3d 687, 711 (2d Cir. 2019). "[T]aking into account the totality of these circumstances, a jury could find beyond a reasonable doubt that the firearms were possessed" in furtherance of the drug trafficking crime. *United States v. Johnson*, 452 F. Supp. 3d 36 at 76 (S.D.N.Y. 2019). The Court therefore concludes that the evidence established at trial is sufficient to sustain Bimbow's conviction on the Section 924(c) count. Bimbow's motion for a judgment of acquittal on Count Two is denied.

It is also irrelevant that there is no evidence that the gun was ever used by Bimbow or was operable at the time of the crime. The Court properly instructed the jury that "[i]n considering the specific element of whether the defendant used or carried or possessed a firearm, it does not matter that the firearm was loaded or operable at the time of the crime." (Dkt. No. 87 at 1223:6–9.) The Court also properly instructed the jury that the government had to prove beyond a reasonable doubt not that Bimbow used the firearm, but that he possessed the firearm, meaning that he "either had physical possession of a firearm on his person or that he had dominion and control over the place where a firearm was located and had the power and intention to exercise control over a firearm." (Dkt. No. 87 at 1224:23–1225:1.)

### C. Venue

Finally, Bimbow argues that the evidence presented by the government at trial failed to establish that venue was proper in this District, contending that the evidence is "pure speculation." (Dkt. No. 89 at 8.) Viewing the evidence in the light most favorable to the government and drawing all permissible inferences in its favor, as required, the Court disagrees.

Venue for a conspiracy charge lies in any district in which an act in furtherance of the charged conspiracy took place, as long as it was "reasonably foreseeable" to the defendant that the act would take place in that district. *See United States v. Kirk Tang Yuk*, 885 F.3d 57, 68–70 (2d Cir. 2018). "Because venue is not an element of the crime, the government must prove its propriety only by a preponderance of the evidence." *Id.* at 71.

At trial, the government introduced evidence from which a rational jury could find that venue was established in this District. First, CW-1 testified that he bought drug paraphernalia, including glassines, and other ingredients for his "cut" of heroin from a smoke shop on West 8th Street in lower Manhattan. (Dkt. No. 79 at 416:4–14.) The government also introduced evidence that in November 2020, Bimbow performed multiple searches for a smoke shop on West 8th Street (*see* GX 334) and around that time, he was in the vicinity of West 8th Street (GX 407, Dkt. No. 81 at 624:7–24). Bimbow counters that CW-1's information was uncorroborated and that there was no evidence that law enforcement investigated this shop, undermining the credibility of CW-1. (Dkt. No. 89 at 7.) However, at this stage, "the evidence [must] be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). This means that courts must accord "a high degree of deference ... to the jury's evaluation of witness credibility." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012). That CW-1's testimony was uncorroborated by other evidence, including an investigation by law enforcement, did not require that the jury disbelieve his testimony.

**\*4** Second, CW-1 testified that while he was talking to Bimbow at a club in New Jersey, Bimbow told him that "he had a guy on the table across the water, some girls bagging for him. Across the water, meaning New York." (Dkt. No. 79 at 477:18–478:7.) Again, that CW-1 was a cooperating witness and his testimony was uncorroborated does not mean that the jury was required to discredit his testimony. Indeed, the Court's jury instructions explained both that "the testimony of a cooperating witness may be sufficient evidence for a conviction if the jury believes that the testimony establishes guilt beyond a reasonable doubt," *and* that "[i]t is also the case that cooperating witness is of such a nature that it must be scrutinized with great care." (Dkt. No. 87 at 1199:18–22.)

The case law in this Circuit is unclear as to whether courts may consider rebuttal evidence in deciding a Rule 29 motion. In *United States v. Aulicino*, the Second Circuit held that when a defendant testifies, he loses "his right to have sufficiency assessed on the basis of the government's presentation alone" for purposes of a Rule 29 motion. 44 F.3d 1102, 1114 (2d Cir. 1995). The court explained that "[t]he defendant's testimony may thus add weight to the government's case." *Id.* The situation here, however, is different because the evidence that most strongly supports venue is from the government's *rebuttal* case, not from Bimbow's testimony. The government introduced rebuttal evidence that contradicted Bimbow's testimony about whether Bimbow had ever been to Manhattan in connection with his drug trafficking. Specifically, it introduced evidence that in 2020, Bimbow entered Manhattan, texted someone saved as "W 8th" explaining that he would "be there" in thirty minutes, and ordered via text message "shirt logos" with names such as "Hot Sauce" and "Gorilla Pimp." (*See* GX 608, 331L). A DEA chemist then testified that those names were found stamped on the 50,000 glassines recovered from Bimbow's residence, suggesting that Bimbow had gone to the West 8th Street shop to purchase items for his drug business. (GX 515; Dkt. No. 85 at 1032:22–1033:16.) Though this evidence is also sufficient to establish venue, the Court need not rely on it in deciding the Rule 29 motion, given the lack of clarity in Second Circuit precedent. Based on the evidence established in the government's case-in-chief, the Court concludes that a rational trier of fact could have found that the government proved that venue was proper in this District by a preponderance of the evidence. Bimbow's motion for judgment of acquittal based on venue is therefore denied.

### III. Rule 33 Motion

Federal Rule of Criminal Procedure 33 provides: "Upon a defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "[B]efore ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted). "The test is whether it would be a manifest injustice to let the guilty verdict stand." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (internal quotation marks omitted).

Bimbow again argues that the testimony of Riley, Lowndes, and CW-1 should be discounted in their entirety because they were entirely incredible. (Dkt. No. 89 at 9.) Rule 33 does permit this Court to "weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *United States v. Carpenter*, No. 18 Crim. 362, 2019 WL 3216619, at *3 (E.D.N.Y. Jul. 17, 2019) (internal quotation marks omitted). However, a motion for a new trial should be granted only where "testimony is patently incredible or defies physical realities." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).

**\*5** Here, there is no basis to conclude that any of the three witnesses' testimony was so incredible that the jury's credibility determination must be disturbed. To the contrary, the testimony of Riley and Lowndes was corroborated by one another's testimony, the recovery of a large quantity of narcotics, several firearms, U.S. currency, and drug paraphernalia, as well as by the testimony of Bimbow himself, who admitted that the drugs, firearms, and residences belonged to him. (*See, e.g.*, Dkt. Nos. 77 at 148:10–152:14; 83 at 896:3–5, 919:5–9). And CW-1's testimony was corroborated by the evidence found during the execution of the warrants (including a gas mask that CW-1 said he gave to Bimbow) and text messages between the two individuals. (*See, e.g.*, Dkt. No. 79 at 455:4–456:9; GX 331F-1.) Bimbow has therefore failed to articulate any reasonable basis for finding that the testimony of these three witnesses, taken as a whole, was patently incredible.

Bimbow also contends that his motion for a new trial should be granted because he was prohibited from eliciting testimony from the only two agents, Special Agents Stephanie Ramirez and Drew Greeley, who prepared reports in this case. (Dkt. No. 89 at 9.) Prior to trial, the Court explained to Bimbow that relitigating the motion to suppress the evidence recovered from the execution of the warrants and attacking the investigation's methods were improper bases for calling these agents. (*See, e.g.*, Dkt. No. 75 at 5:13–22, 6:23–7:4.) The government conceded that if he planned to "call [them] for the truth of what [they] saw to impeach someone else who testified, that could be proper" (Dkt. No. 75 at 8:14–15), and the Court then reserved decision on whether to allow the defense to call these witnesses (Dkt. No. 75 at 17:3–6). Days into the trial, the Court repeated that no "proper basis" for calling Greeley and Ramirez had yet been provided, but again gave Bimbow another opportunity to articulate such a basis. (*See* Dkt. No. 81 at 746:4–7 ("So I still haven't heard a valid basis. So I need a letter or representation tomorrow morning

at 9:30 with a proper basis for Ramirez and Greeley or else I'm not going to permit it.").) But Bimbow did not submit such a letter or otherwise articulate a basis for calling the agents. The Court denied his request to call these witnesses "based on the lack of any proper basis for calling [them]." (Dkt. No. 83 at 835:6–14.) Bimbow still has not provided a proper basis for seeking testimony from these witnesses.

Bimbow's Rule 33 motion is therefore denied.

**IV. Conclusion**

For the foregoing reasons, Bimbow's motion for acquittal under Rule 29, or, in the alternative, for a new trial under Rule 33, is denied.

The Clerk of Court is directed to close the motion at Docket Number 89.

SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 1617490

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

860 Fed.Appx. 773
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

UNITED STATES of America, Appellee,

v.

Thamud ELDRIDGE, Kevin
Allen, Defendants-Appellants,

Kashika Speed, Galen Rose, Defendants. [1]

18-3294-cr (L), 19-92-cr (Con)
|
June 22, 2021

**Synopsis**
**Background:** Defendants were convicted by jury in the
United States District Court for the Western District of New
York, Richard J. Arcara, Senior District Judge, of narcotics
and firearms offenses, and violations of Racketeer Influenced
and Corrupt Organizations Act (RICO), and sentenced to 240
months. Defendants appealed.

**Holdings:** The Court of Appeals held that:

[1] partial closure of courtroom did not violate defendants'
right to public trial;

[2] district court acted within its discretion in questioning
the entire panel of jurors at once, rather than conducting
individual inquiries;

[3] alleged prosecutorial misconduct was not so severe and
significant as to result in denial of defendants' right to fair
trial;

[4] nearly six-year interval between defendant's indictment
and commencement of trial did not violate his right to a
speedy trial;

[5] district court properly declined to count defendant's state
court forgery conviction as relevant conduct, as opposed to
criminal history, when sentencing; and

[6] ample evidence supported district court's determination of
the drug quantity attributable to defendant.

Affirmed.

**Procedural Posture(s):** On Appeal; Pre-Trial Hearing
Motion; Jury Selection Challenge or Motion; Trial or Guilt
Phase Motion or Objection; Sentencing or Penalty Phase
Motion or Objection.

West Headnotes (15)

**[1]** **Criminal Law** 🔑 Narrow tailoring
requirement

**Criminal Law** 🔑 Management of courtroom;
security, order, and decorum

Partial closure of courtroom during defendants'
trial for narcotics and firearms offenses, and
violations of Racketeer Influenced and Corrupt
Organizations Act (RICO), did not violate their
right to a public trial; law enforcement had
requested that courtroom spectators produce
identification in response to reasonable security
concerns, and the partial closure of the courtroom
was no broader than necessary to protect that
interest. U.S. Const. Amend. 6.

**[2]** **Criminal Law** 🔑 Objections and disposition
thereof

District court acted within its discretion in
questioning the entire panel of jurors at
once about potential fears over their security,
rather than conducting individual inquiries,
in prosecution for narcotics, firearms, and

racketeering offenses; once court learned that one juror had voiced concerns to the courtroom deputy about the defendants' access to the jurors' personal information, it conducted a thorough inquiry of the jury to determine whether there was a risk of prejudice before issuing a cautionary instruction to the entire jury on its obligation to be fair and impartial.

**[3]** **Criminal Law** 👉 What constitutes perjured testimony

**Criminal Law** 👉 Evidence excluded

Alleged prosecutorial misconduct was not so severe and significant as to result in denial of defendants' right to fair trial in prosecution for narcotics, firearms, and racketeering offenses; although defendant claimed that prosecutor knew that testimony about when a witness met defendant was false, but then left it uncorrected for jury, mere differences in recollection did not constitute perjury, and although prosecutor's opening statement concerned evidence that was ultimately inadmissible at trial, at the time of the statement, prosecutor had a good faith basis to believe it could be admitted pursuant to a hearsay exception. U.S. Const. Amend. 6.

**[4]** **Criminal Law** 👉 Multiple charges or defendants

**Criminal Law** 👉 Delay caused by accused

**Criminal Law** 👉 Prejudice or absence of prejudice

Nearly six-year interval between defendant's indictment and commencement of trial for narcotics, firearms, and racketeering offenses did not violate defendant's right to a speedy trial, given the causes for the delay and lack of prejudice to defendant; at least ten months could be traced to defendant's motion to recuse the entire United States Attorney's Office, several of the Government's motions for extensions of time were responses to co-defendants' motions to bifurcate the proceedings, and the Government's motions regarding spoliation of evidence were pending at the same time as various defense motions, and since defendant was already

serving the remainder of another sentence during the first three years and three months following his indictment, he suffered little prejudice by the delay. U.S. Const. Amend. 6.

**[5]** **Racketeer Influenced and Corrupt Organizations** 👉 Particular enterprises

Evidence was sufficient for jury to find an association-in-fact racketeering enterprise, as required to support conviction for violation of Racketeer Influenced and Corrupt Organizations Act (RICO); evidence included testimony that co-defendants met frequently to plan and commit robberies of other drug dealers, that they traveled together to acquire drugs and guns after the robberies, and that they were affiliated with two other gangs that were split generationally. 🚩18 U.S.C.A. § 1961 et seq.

**[6]** **Racketeer Influenced and Corrupt Organizations** 👉 Continuity or relatedness; ongoing activity

Evidence was sufficient for jury to find a pattern of racketeering activity, as required to support conviction for violation of Racketeer Influenced and Corrupt Organizations Act (RICO); evidence included testimony that defendants' robbery of a drug dealer concluded with defendants splitting up the stolen cocaine for distribution and that defendants repeatedly robbed drug dealers because it was a way to obtain drugs "wholesale" for defendants to then distribute. 🚩18 U.S.C.A. § 1961 et seq.

**[7]** **Racketeer Influenced and Corrupt Organizations** 👉 Conspiracies

Evidence was sufficient for jury to find a narcotics conspiracy, as required to support conviction for violation of Racketeer Influenced and Corrupt Organizations Act (RICO); evidence included testimony that co-defendants not only planned to rob drug dealers with the intent of acquiring drugs "wholesale" for redistribution, but that they actually did so when robbing drug

dealers and divvying up the proceeds. 🚩 18 U.S.C.A. § 1961 et seq.

**[8]** **Robbery** 🔑 Attempts

**Robbery** 🔑 Identity of accused

Evidence was sufficient to support jury's finding that defendant was present at house during robbery, as required to support conviction for attempted robbery; evidence included cigar butt with defendant's DNA on it that had been found in the house, and homeowner's testimony that he did not know defendant, had never given him permission to enter the house, and that assailants that entered house were armed and had tied up victims at the house.

**[9]** **Weapons** 🔑 Furtherance; nexus

Evidence was sufficient to support defendant's conviction for possessing a firearm in furtherance of a drug trafficking crime; evidence included testimony that defendant was armed while obtaining or dealing drugs, that he carried a gun every time, every day, all day, including when being dropped off to sell drugs, and that defendant and his co-defendant had traveled together to Atlanta to acquire drugs and guns. 🚩 18 U.S.C.A. § 924(c).

**[10]** **Criminal Law** 🔑 Elements of offense and defenses

Even though district court's instruction to jury on charge of aiding and abetting firearm violation was insufficient because court did not include any language concerning "advance knowledge" of the presence of a firearm, defendant was not prejudiced by error, as would support reversal of jury verdict on plain error review, given the ample evidence that he possessed a firearm in connection with a drug trafficking charge. 🚩 18 U.S.C.A. § 924(c).

**[11]** **Criminal Law** 🔑 Elements of offense and defenses

It was not plain error for district court to fail to specifically instruct jury that defendant could not be convicted of two counts of possession of a firearm based on the same underlying conduct, given that jury had substantial evidence that defendant possessed a firearm while engaging in a number of drug trafficking activities, which provided it an ample basis to convict him of two separate counts. 🚩 18 U.S.C.A. § 924(c).

**[12]** **Sentencing and Punishment** 🔑 Relevant Conduct

District court properly declined to count defendant's state court forgery conviction as relevant conduct, as opposed to criminal history, in sentencing defendant to 240 months upon convictions for narcotics and firearms offenses, and violations of Racketeer Influenced and Corrupt Organizations Act (RICO) where the conviction could not serve as a racketeering predicate, and defendant did not offer any facts that would connect the forgery conviction to present crimes. 🚩 18 U.S.C.A. § 924(c).

**[13]** **Criminal Law** 🔑 Sentencing and Punishment

Even if district court erred in excluding defendant's earlier state court forgery conviction as relevant conduct, as opposed to criminal history, in sentencing defendant to 240 months upon convictions for narcotics and firearms offenses, and violations of Racketeer Influenced and Corrupt Organizations Act (RICO), any procedural error on individual counts did not prejudice defendant under plain error review, since the correct aggregate sentence would thus have been a prison term identical to the 240 months' sentence that was in fact imposed. 🚩 18 U.S.C.A. § 924(c).

**[14]** **Sentencing and Punishment** 🔑 Quantity of drugs and drug-related matter

Ample evidence supported district court's determination of the drug quantity attributable to defendant for purposes of calculating his base offense level upon narcotics conviction, including testimony of co-conspirator as to defendant's gang's weekly sales quantity and details of the intertwined drug-selling activities of defendant's gang and another gang.

[15] Criminal Law ⬅ Examination and cross-examination of witnesses

District court did not improperly take on role of prosecutor during cross-examination of witness in prosecution for narcotics, firearms, and racketeering offenses, as would result in denial of defendants' right to fair trial; after a colloquy in which the court sustained several of the prosecution's objections, defense counsel persisted on the same line of questioning, and it was only then that the judge asked the prosecution if it was objecting, at which point the judge again sustained the objection, and court's later statement that defense counsel's questioning would be limited based on whether witness's recollection was refreshed was not leading the witness, but rather an evidentiary ruling. U.S. Const. Amend. 6.

**\*776** Appeal from judgments of the United States District Court for the Western District of New York (Richard J. Arcara, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgments of conviction and sentences are **AFFIRMED**.

**Attorneys and Law Firms**

For Defendant-Appellant Thamud Eldridge: Devin McLaughlin, Langrock Sperry & Wool, LLP, Middlebury, VT

For Defendant-Appellant Kevin Allen: Cheryl M. Buth, Meyers Buth Law Group, Orchard Park, NY

For Appellee: Katherine A. Gregory, Assistant United States Attorney, for James P. Kennedy, Jr., United States Attorney for the Western District of New York, Buffalo, NY

Present: Denny Chin, Richard J. Sullivan, William J. Nardini, Circuit Judges.

**\*777 SUMMARY ORDER**

Defendants-Appellants Thamud Eldridge and Kevin Allen appeal from their convictions and sentences for narcotics and firearms offenses, as well as for violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act. In a concurrently filed opinion, we (1) reject the defendants' claim that they were denied a fair trial due to a curtain around the defense table; (2) find no plain error in the court's instructional error on Count Seven against Eldridge for possessing and brandishing a gun in furtherance of a crime of violence, in violation of 🚩 18 U.S.C. § 924(c); and (3) hold that Section 403(a) of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5221–22, does not apply to Eldridge. In this summary order, we conclude that none of the defendants' remaining challenges warrants reversal. We assume the reader's familiarity with the record.

**I. Fair Trial Claims**

**A. Partial closure of the courtroom**

The defendants claim that they were denied their right to a public trial when law enforcement officers in the courtroom asked for identification from the defendants' family members on one afternoon during trial. The district court denied the defendants' motion for a mistrial based in part on these actions, concluding that the Government's reason for the officers' actions—that some witnesses had reported receiving threats following opening statements—justified the narrow closure.

We find no error in the district court's ruling. The Supreme Court has acknowledged that the Sixth Amendment right to a public trial is not absolute and that circumstances may require closing the courtroom to protect other interests. *See* 🚩 *Waller v. Georgia*, 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). To justify a courtroom closure, the law requires that: (1) "the party seeking to close the hearing must advance

an overriding interest that is likely to be prejudiced," (2) "the closure must be no broader than necessary to protect that interest," (3) "the trial court must consider reasonable alternatives to closing the proceeding," and (4) "it must make findings adequate to support the closure." *Id.* at 48, 104 S.Ct. 2210. Where the courtroom is only partially closed, the first requirement is relaxed, requiring a "substantial reason" rather than "overriding interest" supporting the closure. *See United States v. Smith*, 426 F.3d 567, 571 (2d Cir. 2005) (internal quotation marks omitted).

**[1]** We have previously applied *Waller* to hold that law enforcement's request for courtroom spectators' identification in response to reasonable security concerns effected a partial closure of the courtroom, but one that did not violate the defendants' rights to a public trial. *See id.* at 572–73. We conclude the same here. The closure was narrow in scope and time, occurring on only one afternoon of trial and purportedly keeping only one spectator from attending the trial that day. Moreover, as the district court found, there was a "positive correlation" between the partial closure and the substantial interest at stake. Allen App'x at 149 (district court's decision, quoting *Smith*, 426 F.3d at 573). The court's inference that courtroom spectators could have been the source of threats made to witnesses—witnesses who had been named for the first time that morning during trial—was entirely reasonable, and the partial closure reasonably advanced the public interest in preventing further tampering by deterring such conduct or **\*778** aiding in a subsequent investigation. Thus, this short-lived partial closure was justified.

### B. Questioning the jury

**[2]** The defendants challenge the district court's decision to question the entire panel of jurors at once about potential fears over their security, rather than conducting individual inquiries. We review a district court's findings concerning jury impartiality for abuse of discretion, with the court having "broad flexibility in such matters, especially when the alleged prejudice results from statements by the jurors themselves." *United States v. Haynes*, 729 F.3d 178, 192 (2d Cir. 2013) (quoting *United States v. Thai*, 29 F.3d 785, 803 (2d Cir. 1994)). We find no abuse of discretion here. After learning that one juror had voiced concerns to the courtroom deputy about the defendants' access to the jurors' personal

information, the district court conducted a thorough inquiry of the jury to determine whether there was a risk of prejudice before issuing a cautionary instruction to the jury on its obligation to be fair and impartial. The defendants do not offer any reason beyond speculation to suspect that the procedure used by the district court here was inadequate to ensure an impartial jury.

### C. Prosecutorial misconduct

Eldridge alone alleges that prosecutorial misconduct infringed his right to a fair trial; however, Eldridge did not raise this challenge before the district court, and so we review his claim for plain error. *See Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (holding reversal appropriate only if there was "(1) error, (2) that is plain, and (3) that affects substantial rights," and only when "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings" (internal quotation marks and alterations omitted)).

To warrant a new trial, the alleged prosecutorial misconduct "must be so severe and significant as to result in the denial of [the defendant's] right to a fair trial." *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012) (quoting *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993)). Eldridge asserts that three instances of alleged misconduct meet this standard: first, that the prosecutor knew that testimony about when a witness named Jackson met Eldridge was false yet left it uncorrected; second, that the prosecutor's opening statement misled the jury as to evidence it would hear linking a cigar butt found at the scene of a charged armed robbery to the gunman; and third, that the prosecutor improperly solicited statements from a witness regarding Eldridge having previously been shot. We disagree, seeing no basis to conclude that Eldridge's right to a fair trial was violated.

**[3]** With respect to the purportedly false and uncorrected testimony, Eldridge has not demonstrated that the false statement was intentional, as opposed to the result of mistaken memory. *See United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009) (stating that "[d]ifferences in recollection do not constitute perjury"). Even assuming the false statement was intentional (and that the prosecutor was aware of the statement's falsity), the record does not support a finding that the falsehood was material to the jury's verdict. *See id.*

Eldridge does not suggest that the year he met Jackson was material to guilt; he only asserts that had the misstatement been made known to the jury, "Jackson's credibility would have been shot." Eldridge Br. at 47. But the discrepancy—if there was one—presumably would have been known to the defense, too, and yet Eldridge declined to cross-examine **\*779** Jackson on it, leaving Jackson's credibility undisturbed. Eldridge therefore has not demonstrated that the prosecution's failure to correct Jackson's testimony is now grounds for reversal.

Next, there was no misconduct in the prosecution's opening statement concerning the cigar-butt evidence because, at the time of the statement, the prosecution had a good faith basis to believe that the evidence linking the cigar butt to the gunman could be admitted pursuant to a hearsay exception. After the prosecution failed to adduce the requisite foundation for the testimony, it did not revisit the statement in summation. Moreover, any error would have been harmless because the defense summation highlighted the prosecution's failure to produce a witness to testify that the gunman had a cigar, and the district court issued limiting instructions to the jury concerning statements made during opening and closing statements. *Cf.* *United States v. Millar*, 79 F.3d 338, 343 (2d Cir. 1996) (unintentionality of prosecutor's misstatement is factor to be considered in evaluating misconduct); *United States v. Caracappa*, 614 F.3d 30, 41 (2d Cir. 2010) (efforts made to cure the misconduct considered when determining whether misconduct amounts to prejudicial error).

Last, Eldridge claims that it was misconduct for the prosecution to solicit testimony that Eldridge had previously been shot because the testimony violated the district court's pre-trial order excluding such evidence under Federal Rule of Evidence 403. We need not reach this question since any hypothetical error was harmless in light of the overwhelming evidence that Eldridge was a member of a gang, carried a gun, sold drugs, and committed robberies and other violent acts. *See* *United States v. McCarthy*, 54 F.3d 51, 55 (2d Cir. 1995) ("When prosecutorial misconduct is alleged, a new trial is only warranted if the misconduct is of sufficient significance to result in the denial of the defendant's right to a fair trial." (internal quotation marks omitted)).

## II. Eldridge's Speedy Trial Claim

Eldridge claims that he was denied a speedy trial under the Sixth Amendment, arguing that the approximately six-year interval between his indictment in September 2009 and the commencement of trial in January 2016 was presumptively prejudicial, that the prosecution caused the delay, and that the destruction of some trial evidence during the delay prejudiced his case. We consider four factors when considering claims of a constitutional speedy trial violation—the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant," *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)—none of which has "talismanic qualities," *id.* at 533, 92 S.Ct. 2182. Here, the Government concedes that a six-year delay is presumptively prejudicial, while Eldridge acknowledges that he did not expressly invoke his speedy trial rights before the district court. Since a presumptively prejudicial delay "cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria," *Doggett v. United States*, 505 U.S. 647, 656, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), Eldridge's claim turns primarily on the causes of the delay and the extent to which the delay in fact prejudiced Eldridge.

[4] The delay here did not violate Eldridge's right to a speedy trial. A significant portion, if not a substantial majority, of the delay was attributable to the defendants. For example, at least ten months can be traced to Eldridge's motion to recuse the entire U.S. Attorney's Office. Several of the Government's motions for extensions of time were responses to the **\*780** defendants' motions to bifurcate the proceedings. And the Government's motions regarding the spoliation of evidence were pending at the same time as various defense motions. Moreover, we see nothing problematic in the "neutral" reason for delay, namely the use of a magistrate judge for certain proceedings.

Furthermore, the delay did not prejudice Eldridge in any meaningful way. When evaluating prejudice, we look to "the interests of defendants which the speedy trial right was designed to protect," namely "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility the defense will be impaired." *Barker*, 407 U.S. at 532, 92 S.Ct. 2182. Here, Eldridge was already serving the remainder of another sentence during the first three years and three months following his indictment, and he did not argue that he suffered any particular anxiety. Nor was his defense impaired. Although he lost one of his original attorneys, that was because his lawyer was not eligible to practice in the Western District of New York and had nothing to do with the passage of time. The loss of evidence during the delay almost certainly redounded to Eldridge's benefit: the witness who had linked

the gunman at 87 Girard to the cigar butt with Eldridge's DNA on it died prior to trial, leaving the prosecution unable to directly connect Eldridge to that offense. On balance, Eldridge did not suffer a violation of his speedy trial rights.

### III. Sufficiency of Evidence

The defendants challenge the sufficiency of the evidence as to: (1) the existence of a racketeering enterprise; (2) a pattern of racketeering activity; and (3) a narcotics conspiracy (Racketeering Act One and Count Three). Eldridge additionally challenges the sufficiency of the evidence for: (4) the attempted robbery of 87 Girard (Racketeering Act Two); (5) the RICO conspiracy (Count Two); and (6) the possession of a firearm in furtherance of a drug trafficking crime (Count Four). Allen challenges the sufficiency of the evidence for (7) his participation in a conspiracy to rob Woodie Johnson (Count Six).

In reviewing the sufficiency of the evidence supporting a jury's verdict, "the reviewing court is required to draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury verdict." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). Direct testimony to a fact is sufficient to support a finding on that fact, and where there was such testimony, we will assume the jury credited it. *See United States v. Jespersen*, 65 F.3d 993, 998 (2d Cir. 1995). In light of this standard, we conclude that the Government adduced sufficient evidence on each of the challenged points.

 [5]  First, there was sufficient evidence of an "association-in-fact" racketeering enterprise, which "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). The Government's evidence showed that: Allen, Eldridge, and co-defendant Kashika Speed met frequently to plan and commit robberies of other drug dealers; Allen and Eldridge traveled together to Atlanta to acquire drugs and guns after the robberies; and the three were closely linked to, if not formally affiliated with, the Montana Bridge and Newburg crews, which were themselves essentially one gang split generationally. A jury could reasonably have concluded that the defendants constituted an ongoing enterprise **\*781** during the charged

period of criminal activity, with a shared purpose of selling drugs and committing robberies to enrich the group.

 [6]  Second, evidence of the two robberies clearly showed a pattern of racketeering activity and supported the narcotics conspiracy: the robbery of Woodie Johnson concluded with the defendants splitting up the stolen cocaine for distribution, while the attempted robbery of 87 Girard targeted a known drug house. The jury also heard testimony that the defendants robbed drug dealers because it was a way to obtain drugs "wholesale" for the defendants to then distribute. Because there was ample evidence that the defendants committed these predicate crimes, and that the crimes were sufficiently related, Allen's related challenge to the pattern is meritless.

 [7]  Third, with respect to the narcotics conspiracy charged in Racketeering Act One and Count Three, the defendants argue that the Government proved only instances of individual dealing. This claim is undermined by substantial evidence introduced at trial, including that the defendants not only planned to rob drug dealers with the intent of acquiring drugs "wholesale" for distribution, but actually did so when robbing Woodie Johnson and divvying up the proceeds.

 [8]  Fourth, we reject Eldridge's challenge to his conviction for the attempted robbery of 87 Girard Street charged in Racketeering Act Two. Eldridge argues that the Government failed to show that he was present at the robbery or that any robbery was actually attempted, but the jury could reasonably have inferred that Eldridge was present in the house during the robbery based on (1) the recovered cigar butt with Eldridge's DNA on it and (2) the homeowner's testimony that he did not know Eldridge and had never given him permission to enter the house. Similarly, the jury could have inferred that the assailants were attempting a robbery based on the evidence, which showed that the house was owned by a known drug dealer, the assailants were armed, and they tied up victims at the house. These facts support an inference of the requisite intent to take property sufficient to support a conviction.

Fifth, Eldridge challenges the sufficiency of the evidence underlying his conviction for the RICO conspiracy charged in Count Two; however, his argument is based entirely on the arguments rejected above concerning the lack of evidence of a racketeering enterprise or pattern of racketeering activity. Because we disagree with Eldridge that the Government failed to adduce sufficient evidence on either of those elements, we likewise reject his challenge to his conviction for RICO conspiracy.

**[9]** Sixth, we reject Eldridge's challenge to the sufficiency of the evidence supporting his conviction on Count Four for possessing a firearm in furtherance of a drug trafficking crime. Eldridge himself admits that there is "marginal" evidence that he possessed a firearm, but he nonetheless argues that the Government failed to prove the requisite nexus between that firearm possession and any drug trafficking crime. However, the jury heard ample testimony indicating that Eldridge was armed while obtaining or dealing drugs. For example, Renfro testified that Eldridge carried a gun "[e]very time, every day, all the day," including when Renfro "would drop him off and [Eldridge] would sell drugs." Tr. at 682–83. Moreover, as noted above, the jury heard testimony that Eldridge and Allen together went to Atlanta to acquire drugs and guns. Thus, the **\*782** evidence was sufficient to support the jury's conviction on Count Four.

Finally, Allen's challenge to the sufficiency of the evidence supporting his conviction for conspiracy to rob Woodie Johnson is meritless. A witness testified that he had attended a meeting where Allen, Eldridge, and Speed planned the robbery. Allen points to inconsistencies between that witness's testimony and that of other witnesses, but the jury was entitled to resolve those inconsistencies in favor of crediting the former.

## IV. Jury Instructions

Eldridge raises two challenges to the jury instructions on his 🚩 § 924(c) convictions. He first argues that the court's instruction as to aiding and abetting was insufficient because the court did not include any language concerning "advance knowledge" of the presence of a firearm, as required under 🚩 *Rosemond v. United States*, 572 U.S. 65, 134 S.Ct. 1240, 188 L.Ed.2d 248 (2014). *See* 🚩 *United States v. Prado*, 815 F.3d 93, 100–02 (2d Cir. 2016). Second, Eldridge challenges the district court's failure to specifically "instruct the jury that they were not to find liability on the multiple [§] 924(c) counts for the same predicate conduct." Eldridge Br. at 42. "We review challenges to jury instructions *de novo* but will reverse only where the charge, viewed as a whole, demonstrates prejudicial error. A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." 🚩 *Prado*, 815 F.3d at 100 (internal quotation marks and citation omitted). Because Eldridge did not object to the instructions below, we review for plain error.

**[10]** On Eldridge's first claim, we agree—and the Government does not dispute—that the district court failed to instruct the jury that advance knowledge of the firearm was necessary to sustain a conviction for secondary liability as required under 🚩 *Rosemond*. However, Eldridge fails to demonstrate, as he must under plain error review, that he was prejudiced by this error. There was ample evidence that Eldridge himself possessed a firearm in connection with the charged drug trafficking. Eldridge provides no reason to conclude that the jury's verdict turned on a finding that he acted as an accessory in Counts Four and Seven, much less a showing that the specific failure to instruct the jury on advance knowledge prejudiced him.

**[11]** We also reject Eldridge's claim that it was plain error for the district court to fail to specifically instruct the jury that Eldridge could not be convicted of both 🚩 § 924(c) counts based on the same underlying conduct. Even assuming that the district court did err—and the Government does not argue otherwise—Eldridge cannot show that he was prejudiced by the lack of such an instruction. Eldridge may be correct that the jury conceivably could have treated the Johnson robbery specified in Count Seven as part of the drug trafficking activities stated in Count Four and thus convicted him of both counts based on a single incident—the Johnson robbery. But conceivably is not enough; he bears the burden of showing that there was a "reasonable probability" that, if the court had provided the requested instruction, the jury would not have convicted him on both Counts Four and Seven. 🚩 *Prado*, 815 F.3d at 103. Here, the jury had substantial evidence that Eldridge possessed a firearm while engaging in a number of drug trafficking activities other than the Johnson incident; there is no reason to think that a more detailed instruction on the separate 🚩 § 924(c) counts would have changed the verdict. *See* 🚩 *United States v. Arline*, 835 F.3d 277, 282–83 (2d Cir. 2016) **\*783** (finding no plain error where district court did not instruct the jury that two 🚩 § 924(c) counts could not be predicated on the same conduct, in light of ample evidence showing that the defendant "possessed multiple firearms on separate occasions").

## V. Sentencing Challenges

Next, we address Eldridge's three challenges to his sentence, which together, he claims, amount to procedural error. First, he argues that the district court erred when calculating his

criminal history under the Sentencing Guidelines; second, he claims the court erred in failing to apply an adjustment pursuant to § 5G1.3(b) of the Guidelines; and third, he argues that the record did not support the drug quantity attributed to him.

A sentencing court commits procedural error if it, *inter alia*, "is mistaken in the Guidelines calculation ... [or] makes clearly erroneous factual findings." *United States v. Johnson*, 567 F.3d 40, 51 (2d Cir. 2009). "However, where we identify procedural error in a sentence, but the record indicates clearly that the district court would have imposed the same sentence in any event, the error may be deemed harmless, avoiding the need to vacate the sentence and to remand the case for resentencing." *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015) (internal quotation marks and alteration omitted). We review the application of the Guidelines *de novo* and the factual determinations underlying the calculation of the Guidelines range for clear error. *See* 🚩*United States v. Rowland*, 826 F.3d 100, 116 (2d Cir. 2016).

 **[12]**  **[13]** We see no reason to disturb Eldridge's sentence. First, we find no grounds to remand for resentencing with respect to the district court's calculation of the Guidelines. The court properly declined to count Eldridge's state forgery conviction as relevant conduct (as opposed to criminal history), since the conviction could not serve as a racketeering predicate, and Eldridge did not offer any facts that would connect the forgery conviction to Eldridge's crimes in this case. And, even if the court should have excluded Eldridge's 2009 federal convictions from his criminal-history calculation, any procedural error was harmless. Eldridge's dispute is basically over a five-month difference in the low end of the Guidelines range for Counts One, Two, and Six. Under his view, the court should have considered a range of 235–240 months, rather than a fixed "range" where both the minimum and maximum were 240 months. But the record is clear that the district court—having considered the § 3553(a) factors, the competing Guidelines ranges offered by the Government and Eldridge, and the length of the aggregate sentence it was going to impose—decided to impose a non-Guidelines sentence on Count Five. The court was free to choose any sentence from zero to life on this count, and it chose a sentence of 240 months. Because Eldridge's sentence for Count Five runs concurrently with and for the same length of time as the counts that Eldridge claims were subject to procedural error (Counts One, Two, and Six), any mistake the district court might have made when calculating the Guidelines with respect to those disputed counts could not

have had any effect on the total length of Eldridge's sentence. Thus, any error was harmless. *See* 🚩*United States v. Blount*, 291 F.3d 201, 214 (2d Cir. 2002) (finding sentencing error on individual counts did not prejudice the defendant under plain error review, where "[t]he correct aggregate sentence would thus have been a prison term identical to the sentence that was in fact imposed").

Next, we disagree with Eldridge's argument that he was entitled to an adjustment pursuant to 🚩U.S.S.G. § 5G1.3(b) based on **\*784** his characterization of the above-described 2009 convictions and his state forgery conviction. 🚩Section 5G1.3(b), by its plain language, applies only to "undischarged term[s] of imprisonment." Eldridge completed his sentence for these convictions in 2012—well before his sentence in this case was imposed—so his prior term of imprisonment was not "undischarged." Eldridge was not eligible for this adjustment.

 **[14]** Finally, we find that the district court did not clearly err in its determination of the drug quantity attributable to Eldridge for purposes of calculating his base offense level. There was ample testimony supporting the district court's implicit finding that the Montana Bridge and Newburgh gangs were intertwined, and thus the district court could rightly attribute their sales to Eldridge. The record likewise contains sufficient evidence, including the testimony of Jermone Laster, to support the calculated weekly sales quantity. In any event, the record is replete with evidence on which the district court could have based its calculated quantity of between 3,000 and 10,000 kilograms of marijuana even excluding the weekly sales of the Montana Bridge gang. For these reasons, we conclude that the district court did not clearly err in its calculation of the drug quantity.

### VI. Eldridge's *Pro Se* Claim

 **[15]** Eldridge, acting *pro se*, separately challenges his conviction by arguing that he was deprived of a fair trial because the district court judge took on the role of the prosecutor and denied defense counsel the opportunity to impeach a witness. In reviewing such a challenge, this Court will reverse only where "the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, tr[ia]l." *United States v. Amiel*, 95 F.3d 135, 146 (2d Cir. 1996) (citation omitted). "The test is whether the jury was so impressed with the judge's partiality to the prosecution that it became a factor in determining the defendant's guilt, or whether it appeared clear to the jury that the court believed

the accused is guilty." *Id.* (internal quotation marks and alteration omitted). Based on the record before us, the district court did not take on the role of the prosecutor during the cross-examination of the witness in question, Cuyler. Contrary to Eldridge's characterization, the district court did not object on the prosecutor's behalf. The record reflects that after a colloquy in which the court sustained several of the prosecution's objections, defense counsel persisted on the same line of questioning; it was only then that the judge asked the prosecution if it was objecting, at which point the judge again sustained the objection. There was nothing improper with this exchange. *See* United States v. Pisani, 773 F.2d 397, 403–04 (2d Cir. 1985) (finding no violation of a defendant's fair trial right where the judge questioned defense witnesses and made comments to defense counsel, at least some of which "were provoked by counsel's continuing to do things that the court had specifically cautioned" against). Further, the district court's statement that defense counsel's questioning would be limited based on whether Cuyler's recollection was refreshed was not "leading" Cuyler, but

rather an evidentiary ruling. In any event, Eldridge has failed to show how the district court's actions prejudiced him. Eldridge does not explain why Cuyler's testimony was critical to the jury's verdict, nor does he link Cuyler's testimony to any specific count or critical piece of evidence. He merely points to a single incident during a weeks-long trial, which cannot support his claim. Eldridge has thus failed to show that the judge's actions deprived him of a fair trial.

\* \* \*

**\*785** We have considered the defendants' remaining arguments and find them to be without merit. Accordingly, for the foregoing reasons as well as those in the accompanying opinion, we **AFFIRM** the defendants' convictions and sentences.

### All Citations

860 Fed.Appx. 773

## Footnotes

1    The Clerk of Court is directed to amend the caption as set forth above.

End of Document    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 336975
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

UNITED STATES of America,
v.
Nicholas JOSEPH, Defendant.

20-cr-603 (PKC)
|
Signed 02/04/2022

**Attorneys and Law Firms**

Andrew Ken-Wei Chan, Pro Hac Vice, Justin Victor Rodriguez, Assistant US Attorney, United States Attorney's Office, New York, NY, for United States of America.

OPINION AND ORDER

CASTEL, U.S.D.J.

**\*1** Defendant Nicholas Joseph moves for a partial judgment of acquittal and a new trial pursuant to Rules 29 and 33, Fed. R. Crim. P. For the reasons that will be explained, the motion is denied.

A five-count S2 indictment charged Joseph with participating in a racketeering conspiracy in violation of 18 U.S.C. § 1962(d); attempted murder and assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. § 1959; using and carrying a firearm, which was discharged, in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c); and two counts of being a felon in possession of firearms and ammunition, in violation of 18 U.S.C. §§ 922(g). (Docket # 33.)

Joseph's trial commenced on September 13, 2021. At trial, the government endeavored to prove that Joseph was a member of the Castle Hill Crew, a criminal enterprise based in the Soundview neighborhood of the Bronx, and that on April 28, 2017, Joseph discharged a firearm at the neighborhood's Story Playground, causing a 12-year-old boy to be shot in the hip. The government argued to the jury that the April 28 shooting was an act of retaliation for an unsuccessful attempt to attack Joseph that occurred on the day prior.

On September 22, 2021, the jury returned a verdict of guilty on all five counts. (Docket # 69.) Joseph now moves under Rule 29 for a judgment of acquittal as to Count Two and Count Three. In the alternative, he moves for a new trial pursuant to Rule 33.

**I. Joseph's Rule 29 Motion for Judgment of Acquittal Will Be Denied.**

Rule 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." In reviewing a Rule 29 motion, the court "must view the evidence in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government." United States v. Anderson, 747 F.3d 51, 60 (2d Cir. 2014) (internal quotation marks omitted). "The jury may reach its verdict based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation." United States v. Pugh, 945 F.3d 9, 19 (2d Cir. 2019) (quotation marks omitted). A court must "defer[ ] to the jury's evaluation of the credibility of witnesses, its choices between permissible inferences, and its assessment of the weight of the evidence." United States v. Jones, 482 F.3d 60, 68 (2d Cir. 2006); United States v. Florez, 447 F.3d 145, 156 (2d Cir. 2006) ("We will not attempt to second-guess a jury's credibility determination on a sufficiency challenge."). The motion must be denied if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Aguilar, 585 F.3d 652, 656 (2d Cir. 2009) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see also United States v. Cuti, 720 F.3d 453, 461 (2d Cir. 2013) (a verdict should be disturbed only where "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.").

**\*2** Count Two of the S2 Indictment charged Joseph with a violent crime in aid of racketeering, 18 U.S.C. § 1959(a). "To convict the defendant of a violent crime in aid of racketeering, the government was obliged to prove five elements: '(1) that the Organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed

the alleged crime of violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise.' " United States v. White, 7 F.4th 90, 101 (2d Cir. 2021) (quoting ⚠️United States v. Concepcion, 983 F.2d 369, 381 (2d Cir. 1992)). The fifth element is satisfied "if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership. The government need not prove that maintaining or increasing the defendant's position in the RICO enterprise was his sole or principal motive." Id. (quotation marks and citations omitted); see also United States v. Farmer, 583 F.3d 131, 143-44 (2d Cir. 2009) ("The government was not required to prove that Farmer's sole or principal motive was maintaining or increasing his position, so long as it proved that enhancement of status was among his purposes.") (quotation marks and citation omitted).

At trial, the government adduced evidence about the existence of a criminal organization referred to as the "Castle Hill Crew." Witness testimony and trial exhibits described the Castle Hill Crew as a gang based in and around the Castle Hill Houses in the Soundview neighborhood of the Bronx, whose criminal purpose included drug sales and bank-fraud schemes. (See, e.g., Tr. 307-08, 375-76, 546, 548, 559, 589-91, 599-600, 656, 548-49, 656.) The government introduced into evidence multiple photographs and videos that showed Joseph alongside members of the Castle Hill Crew, as well as social media posts touting his membership in the Castle Hill Crew and photos of Joseph's crew-related tattoos. (See, e.g., GX 308A, 308B, 309A, 309B, 309F, 310-13, 315, 315A, 317F, 503-3, 503-26, 730C, 503-4, 503-39, 705.)

Witness testimony described a violent rivalry between the Castle Hill Crew and the "Monroe Crew," which was based out of the nearby James Monroe Houses. (See, e.g., Trial Tr. 245-46, 554-55.) Angel Arroyo, a cooperating witness formerly affiliated with the Monroe Crew, testified that members of the Castle Hill Crew and the Monroe Crew were expected to commit acts of violence when they encountered one another – an expectation colloquially known as "putting in work, "spinning," and "earning your stripes." (Tr. 247-48.) Arroyo testified that examples of "putting in work" including "[s]tabbings, shootings, smashing." (Tr. 247.) Christopher Cruz of the Castle Hill Crew testified that putting in work "could mean anywhere from selling drugs to hurting

somebody.... The more work you put in the higher up you are.... Meaning like, statuswise, you could just control what you need to control." (Tr. 553.) Cruz testified that if a rival gang committed violence against the Castle Hill Crew, "Whatever they did, you want to do ten times worse," and that if a member of the Monroe Crew attacked someone from Castle Hill Crew, the expectation was to "[g]o back and shoot." (Tr. 554.)

The crimes charged in Count Two and Count Three relate to the discharge of a firearm that resulted in a bullet striking a twelve-year-old boy at the Story Playground in the Soundview neighborhood of the Bronx. Count Two charged Joseph with violent crime in aid of racketeering for the purpose of maintaining and increasing his position in the Castle Hill Crew. (S2 Indictment ¶ 10.) Count Three charged Joseph with carrying, possessing, brandishing and discharging a firearm in connection with the violent crime charged in Count Two. (S2 Indictment ¶ 11.)

At trial, Arroyo testified about an incident of April 27, 2017 in which a member of the Monroe Crew attempted to shoot Joseph and another member of the Castle Hill Crew using a .32 revolver. [1] (Tr. 335-37, 346-50.) Arroyo testified that on that date, he was selling drugs outside of the Monroe Houses when he handed a gun to a fellow Monroe Crew member named "Willy." (Tr. 335-37, 343.) Arroyo then observed a conversation between Willy, Joseph and others from the two rival crews. (Tr. 346-48.) Following the interaction, a person named "Nasir" expressed anger toward Willy because Willy failed to shoot the Castle Hill Crew members. (Tr. 347.) Nasir then took the gun and went toward the area where Joseph and another Castle Hill Crew member were believed to be, after which Arroyo heard a gunshot. (Tr. 348.) Arroyo did not observe the gun being discharged, but he then saw Joseph and another Castle Hill Crew member run in one direction and Nasir run in the other. (Tr. 348-49.)

**\*3** Arroyo testified that the next day, on April 28, 2017, Arroyo was again outside the Monroe Houses when he observed fellow Monroe Crew members Nasir and "Latief" walking toward the nearby Story Playground. (Tr. 350-51.) Nasir and Latief told Arroyo that they were going to sell drugs to a buyer in a private apartment complex where Joseph happened to live. (Tr. 153, 167, 217, 351.) A few minutes later, Arroyo heard three or four gunshots from the direction of the apartment complex. (Tr. 351-52.) Latief and Nasir ran toward Arroyo and told him that Joseph had shot at them in the Story Playground basketball courts. (Tr. 352-55.)

ShotSpotter, which is a system of sensors used to geolocate gunfire, detected three shots fired at or near 820 Thierot Avenue, the address of the apartment building where Joseph resided, on April 28, 2017 between 5:09:31 p.m. and 5:09:40 p.m. (GX 1000; Tr. 167.) Surveillance video from the lobby of 820 Thierot Avenue showed an individual who appeared to be Joseph lingering in and around the lobby with two other individuals at approximately 5:07 p.m. (GX 301.) A video taken from the building exterior appeared to show Joseph walking toward the Story Playground, then returning at a sprint, at which point he retrieved from an accomplice an object that appeared to be a gun. (GX 302.) The video showed Joseph running from the front door of 820 Thierot toward Story Playground at 5:09:21 p.m., with the apparent gun in hand, and disappearing from view at 5:09:26. (GX 302.) During this timeframe, a 12-year-old boy in the Story Playground was shot in the hip. (Tr. 143; GX 602.) The surveillance video showed Joseph's associates returning to the lobby, but not Joseph. (GX 301.)

Cruz testified that members of the Castle Hill Crew later discussed that Joseph had "put in work" for Castle Hill at a park in 2017. (Tr. 611-12.) Cruz testified that Joseph then "became somebody" and "had more status than most of the people that was in the gang." (Tr. 612.) The government adduced evidence of the search history from Joseph's cellphone from December 2020, including searches for news stories about the Story Playground shooting and the victim's name. (Tr. 845-51; GX 507, 508.)

Joseph urges that his motion for a judgment of acquittal should be granted because no eye witness testified that they observed him discharge the firearm at the playground shooting of April 28, 2017. However, there was direct and circumstantial evidence that Joseph was the playground shooter, including the lobby surveillance video taken from Joseph's apartment building at 820 Thierot Avenue. Further, Arroyo testified that his fellow Monroe Crew members Nasir and Latief ran from the Story Playground and told him that Joseph had shot at them. (Tr. 353-54.) Those statements were admitted as excited utterances and present-sense impression exceptions to the hearsay rule. Fed. R. Evid. 803(1), (2). ShotSpotter evidence also indicated that three shots were fired from the area near 820 Thierot Avenue and the Story Playground at a point in time that coincided with the lobby surveillance footage. (Tr. 194-95; GX 1000.) A rational trier of fact weighing this evidence could conclude that the surveillance video depicted Joseph

leaving for Story Playground while carrying a firearm and credit the ShotSpotter evidence that three shots were fired at or around the same time, and conclude that Joseph was the person who discharged the firearm at the Story Playground. See Cuti, 720 F.3d at 461. A rational trier of fact also could credit Arroyo's testimony about the statements of Nasir and Latief. See id. That no eye witness testified that he or she observed Joseph discharge the firearm does not warrant Rule 29 relief.

**\*4** Joseph's remaining arguments go toward whether there was sufficient evidence that the shooting was carried out in aid of the Castle Hill Crew racketeering conspiracy. As noted, one element under 18 U.S.C. § 1959(a) is proof that the defendant committed a crime of violence and "that his general purpose in so doing was to maintain or increase his position in the enterprise." White, 7 F.4th at 101; see also Farmer, 583 F.3d at 143-44.

Joseph urges that the government did not sufficiently prove that he was involved in an altercation on April 27, thereby defeating any evidence that the April 28 playground shooting was motivated by retaliation. Joseph notes that the parties stipulated that the ShotSpotter array at the Monroe Houses did not pick up any shot fired on April 27, 2017. (DX Z.) He also notes that no witness other than Arroyo testified about observing an April 27 shooting at the Monroe Houses. Thus, Joseph urges, a rational trier of fact could not conclude that the shooting of April 28 was carried out in retaliation for the incident of April 27.

At trial, the government called as a witness Walter Collier III, who was qualified as an expert in the forensic analysis of ShotSpotter data. (Tr. 190.) Collier testified that ShotSpotter detects approximately 90% of outdoor gunfire. (Tr. 205.) He testified that "many" factors can prevent gunfire detection, including when a weapon is fired downward. (Tr. 189.) A rational trier of fact could weigh the absence of ShotSpotter data alongside the testimony of Arroyo, and credit Arroyo's testimony that he observed Nasir pursue Joseph with a gun and then heard the gun's discharge. See Jones, 482 F.3d at 68 (a court must "defer[ ] to the jury's evaluation of the credibility of witnesses, its choices between permissible inferences, and its assessment of the weight of the evidence.").

In addition to Arroyo's testimony about the events of April 27, the jury also was entitled to weigh and credit evidence of

the ongoing acts of violence and retribution between members of the Monroe Crew and Castle Hill Crew, as described in the testimony of Arroyo and Cruz and shown in trial exhibits. (Tr. 316-37; 554-55; GX 311.) A rational trier of fact could conclude that Joseph discharged the firearm at the Story Playground in order to increase or maintain his status in the Castle Hill Crew, even if it was not in direct retribution for an incident on April 27.

Lastly, Joseph urges that Rule 29 relief is warranted because the mother of the 12-year-old victim testified at trial that she had heard that the April 28 shooting was motivated by a personal dispute over a girlfriend. (Tr. 147.) At trial, defense counsel asked, "And do you recall whether or not you said at one of those meetings -- at both of those meetings -- that the reason for the shooting was about a girlfriend?" (Tr. 147.) The government objected to the question on hearsay grounds. (Tr. 147.) Before the Court ruled on the objection, the witness stated, "I said it was a rumor, because neighborhood talk, so that's what I heard." (Tr. 147.) The government restated its objection, and the Court stated, "Yes. I understand. It's not admitted for the truth of its contents, but the fact that it was said." (Tr. 147.) When defense counsel later referred to this testimony in closing summations, the Court again instructed the jury that the statement was not to be considered for the truth of its contents. (Tr. 891-92.) [2] Defense counsel confirmed that he was referencing the testimony "for a limited purpose" and not for its truth. (Tr. 892.) In view of the overwhelming evidence that "putting in work" was a means of advancing within the Castle Hill Crew, the statement in the course of interviews that the shooting was motivated by a personal dispute involving a girlfriend does not warrant a judgment of acquittal under Rule 29.

**\*5** Joseph's motion for a judgment of acquittal as to Counts Two and Three under Rule 29 will therefore be denied.

## II. Defendant's Rule 33 Motion for a New Trial Will Be Denied.

### A. Legal Standard.

In the alternative, Joseph moves for a new trial under Rule 33(a), which provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." " 'Although a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant

to Fed. R. Crim. P. 29, where the truth of the prosecution's evidence must be assumed, that discretion should be exercised sparingly' and only in the most extraordinary circumstances." United States v. Landesman, 17 F.4th 298, 330 (2d Cir. 2021) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)). " 'In evaluating a Rule 33 motion, the court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation, keeping in mind that the ultimate test for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.' " Id. (quoting United States v. Alston, 899 F.3d 135, 146 (2d Cir. 2018)). While a court may weigh evidence and witness credibility, it must not usurp the jury's role. Id. Rule 33 relief may be appropriate where the evidence weighs so heavily against the verdict " 'that it would be manifest injustice to let the verdict stand.' " Id. (quoting United States v. Archer, 977 F.3d 181, 188 (2d Cir. 2020)).

### B. Jury Notes.

Joseph urges that he is entitled to a new trial because the Court's handling of juror notes did not comply with the four-part procedure described in United States v. Collins, 665 F.3d 454, 459-60 (2d Cir. 2012). A criminal defendant's right to be present at trial is based on the Fifth Amendment's due process clause and the Sixth Amendment's confrontation clause, and Rule 43(a)(2) provides that a defendant has the right to be present at "every stage of trial." Collins, 665 F.3d at 459. This right applies to a court's review and response to juror notes. Id. The Second Circuit has articulated the "proper practice" for handling jury notes: " '(1) the jury inquiry should be in writing; (2) the note should be marked as the court's exhibit and read into the record with counsel and defendant present; (3) counsel should have an opportunity to suggest a response, and the judge should inform counsel of the response to be given; and (4) on the recall of the jury, the trial judge should read the note into the record, allowing an opportunity to the jury to correct the inquiry or to elaborate upon it.' " Id. at 460 (quoting United States v. Mejia, 356 F.3d 470, 475 (2d Cir. 2004)). This process "reduces the risk that the trial court will respond in a way that prejudices one side" and avoids ex parte communications between the judge and any juror that "may unintentionally 'drift' into a supplemental instruction" outside the presence of the defendant. Id. [3] In Collins, the trial judge held an ex

parte interview with a juror without first sharing the contents of the juror's note or seeking counsel's input. 🚩 Id. at 458-59.

 **\*6** In one juror note, which was marked as Court Exhibit 7, a juror requested permission to retrieve a work-related item from a colleague during a lunch break, stating in part, "I request permission to either step out to pick up this item or to have my teammate step in to the courthouse to hand it over to me." Joseph observes that the Court did not raise the contents of the note with counsel or allow them the opportunity to comment on a proposed response. However, on the record and in the presence of counsel and the defendant, the Court stated, "I know Juror 3 has a request about picking up a package on Saturday -- on Monday during the lunch break. We'll make that happen. You can step out and pick up the package. You'll work with [the deputy clerk] and the CSOs. You can step out and you can bring it back into the courthouse. If there's a problem, I'll be around." (Tr. 620.) The jury then left the courtroom, at which point the Court heard from counsel on an evidentiary dispute. (Tr. 622-25.) Counsel had the opportunity to propose an immediate correction or clarification of the Court's response if they thought one was warranted. Joseph's Rule 33 motion does not now claim prejudice or unfairness in the Court's response or its failure to follow the four-step Collins process, nor does it explain why the Court's response would entitle him to a new trial under Rule 33(a).

Another note, which was marked as Court Exhibit 12, was sent by the jury at the conclusion of deliberations but before the verdict was taken, and was contained in an envelope marked "question." The Court discussed the note on the record at a sidebar with counsel:

But I did open the one that [reads] "question". And it's dated 12:35 today and it says:

"Some of us are concerned for our safety after the verdict is announced. Are there any protocols that would ensure our safety or can that be addressed?"

Just want you to know that that note came in and that what I'm doing is I don't plan to orally say anything but I've called down to see if we could get some extra CSOs who would be able to escort our jurors out. Everybody's entitled to know. So, you know what I know.

Thank you.

(Tr. 988.) While the note was shown to counsel for each side and marked as Court Exhibit 12, Joseph points out that it was not read aloud in open court. The assertion is true so far as it goes. But the sidebar was in the courtroom and the Court never barred defendant from attendance at sidebars or requesting such attendance. He also claims that the issue was not "directly addressed by the trial court." (Def. Mem. at 11.) The Court addressed the note by advising counsel that it did not plan to say anything to the jury but would arrange additional security upon the return of the verdict. Joseph does not identify any prejudice related to the Court's handling of Court Exhibit 12. Counsel had the opportunity to object to the Court's proposed handling of the note and did not do so. Joseph does not explain why the response to this note entitles him to a new trial under Rule 33(a).

Lastly, Joseph observes that the jury did not explicitly state in a note that it had reached a verdict. (Def. Mem. at 11.) Instead, the jury submitted an envelope labeled "verdict," which contained a completed verdict form. (See Tr. 988.) Joseph does not cite to any authority or offer a rationale as to why a jury note is required to announce that a verdict has been reached, nor does he explained how he was prejudiced by the absence of such a note.

Joseph's motion for a new trial based on the Court's responses to the jury notes will be denied.

### C. Questioning about Unconscious or Implicit Bias During Voir Dire.

Joseph urges that a new trial is warranted because during voir dire, the Court did not question or instruct jurors about their unconscious or implicit racial bias, in violation of Joseph's right to a fair trial under the Sixth Amendment. Joseph notes that the risks of implicit bias were heightened in his case because he is an African American and the purported members of the Castle Hill Crew were all either African American or Latino. Joseph also notes that there were no African Americans on the jury.

The Fifth and Sixth Amendments guarantee a criminal defendant the right to be tried before an impartial jury, which includes a jury free of bias. See, e.g., 🚩 United States v. Parse, 789 F.3d 83, 111 (2d Cir. 2015). There is no per

se constitutional rule that requires an inquiry about racial prejudice during voir dire, although a court must inquire if there are "substantial indications" of likely racial or ethnic prejudice affecting jurors in a particular case. ⚑ United States v. Diaz, 854 Fed. App'x 386, 388 (2d Cir. 2021) (summary order) (citing ⚑ Rosales-Lopez v. United States, 451 U.S. 182, 190 (1981)).

 **\*7** Prior to trial, Joseph proposed a preliminary instruction that would have defined an unconscious or implicit bias as "stereotypes, attitudes, or preferences that we express without conscious awareness, control, or intention. Like conscious bias, unconscious/implicit bias, too, can affect how we evaluate information and make decisions." (Docket # 48.) The Court's closing charge included an instruction about unconscious or implicit bias: "You must resist jumping to any conclusions in favor or against a witness or party based upon unconscious or implicit bias. Unconscious or implicit biases are stereotypes, attitudes, or preferences that we have that can affect how we evaluate information and make decisions. Your verdict must be based on the evidence or lack of evidence and the Court's instructions on the law." (Tr. 925.) The jury was required to follow all of the Court's instructions and Joseph does not explain how he was prejudiced by its inclusion in the final instructions rather than the preliminary instructions.

Joseph also complains that questions to jurors in voir dire did not raise the issue of implicit bias. Prior to voir dire, the Court distributed copies of its proposed questions to jurors and Joseph made no objection. [4] (Court Exhibits 1, 2; 9/8/21 Tr. at 3; 9/10/21 Tr. at 14.)

While its questions to jurors did not expressly refer to implicit or unconscious bias, the Court questioned potential jurors about the issue of prejudice, and asked whether there was any reason a potential juror "would be unable to sit as a fair and impartial juror in this case and render a true and just verdict without fear, favor, sympathy, or prejudice in accordance with the law...." (Court Exhibit 2 ¶ 31.) One potential juror claimed an inability to be impartial due to prejudice. (Voir Dire Tr. 150.)

Rule 33(a) relief is not warranted based on the absence of any question about implicit or unconscious bias during voir dire. The Court questioned potential jurors about the issue of prejudice. Moreover, the Court's closing charge cautioned jurors about the potential risk of unconscious or implicit biases in deliberations and instructed them that their verdict

must be based on the evidence and the Court's instructions. (Tr. 925.)

Joseph's motion for a new trial directed toward the questioning of jurors about unconscious bias will be denied.

## D. Witness Identification of "Marvin" in the Courtroom Gallery.

Lastly, Joseph notes that during trial, the government elicited testimony from Arroyo that a purported member of the Castle Hill Crew was seated in the gallery of the courtroom. (Tr. 250.) The government asked Arroyo if he recognized anyone in the courtroom, and Arroyo pointed out a member of the public in the gallery who he identified as "Marvin from Castle Hill." (Tr. 250.) Arroyo also identified Joseph. (Tr. 251.) Joseph urges that the identification of Marvin was "gratuitous and unnecessary" and "highly prejudicial." (Def. Mem. 12.) Marvin's image appeared in several government exhibits, and Arroyo later testified that Marvin and Joseph had once chased him down and stabbed him. (Tr. 324-27.) Joseph asserts that Arroyo's identification of Marvin caused the jurors to fear for their safety after the verdict, and that Marvin was present merely as a good-faith attempt to show support for his friend Joseph. (Def. Mem. 12-13.) Joseph urges that Arroyo's identification of Marvin underscores the need to include a question to jurors about implicit bias.

Joseph has not demonstrated unfair prejudice based on Arroyo's identification of Marvin, nor has he plausibly explained how the identification placed racial bias at issue. Arroyo identified Marvin in response to questions that appeared to have been intended to elicit Arroyo's identification of Joseph. Several images depicting Marvin with Joseph were received into evidence and Arroyo also testified about Marvin's participation in a violent attack against him. Joseph has not persuasively explained how Arroyo's identification of Marvin affected his right to a fair trial or otherwise touched on the issue of implicit or unconscious bias.

 **\*8** Joseph's motion for a new trial directed toward Arroyo's identification of Marvin will be denied.

CONCLUSION.

For the reasons explained, Joseph's motion for relief under Rules 29 and 33 is DENIED. (Docket # 90.)

SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 336975

## Footnotes

1   Though the Court will refer to the defendant by his given name, witnesses throughout the trial referred to Joseph by the nickname "Gotti."

2   No objection was made by the defense at the time of the witness's testimony or in summation to the Court's limiting instruction. No claim is made in the post-verdict motion as to the limitation on the jury's consideration of the witness's affirmative response.

3   There is a distinction between the holding of <u>Collins</u> and other cases involving a defendant's right to be present during the handling of jury notes and the Circuit's helpful guidance, originating in its decision in ⚑<u>United States v. Ronder</u>, 639 F.2d 931, 933 (2d Cir. 1981). Judicial practice has evolved since 1981, such that in responding to a jury note a formal "recall of the jury" into the courtroom is neither sought by either side nor required under the circumstances. For example, there are occasions after reading and marking a jury note where the Court will confer with counsel in the presence of the defendant and arrive at a response that is typed, marked as a Court exhibit and delivered to the jury room. Similarly, a jury request for a read-back is often dealt with in consultation with both sides by the preparation of an edited transcript (redacted to eliminate sidebars and other extraneous matter) that is then delivered to the jury room. Respectfully, the Court does not consider these practices to run afoul of any holding from the Circuit.

4   Both the government and defense counsel proposed revisions to the list of places and persons expected to be at issue in the trial but they raised no objection to the questions to jurors. (9/8/21 Tr. at 51-52; Tr. 69-70.)

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States v. Mendlowitz, Not Reported in Fed. Rptr. (2023)

2023 WL 2317172

2023 WL 2317172
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

UNITED STATES of America, Appellee,

v.

Michael MENDLOWITZ, also known as

Moshe Mendlowitz, Defendant-Appellant. [*]

No. 21-2049
|
March 2, 2023

Appeal from a judgment of the United States District Court for the Southern District of New York (Broderick, J.).

Upon due consideration, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

For Appellee: Jilan J. Kamal, Assistant United States Attorney (David Abramowicz, Dina McLeod, Won S. Shin, Assistant United States Attorneys, on the brief), for Damian Williams, United States Attorney for the Southern District of New York, New York, NY.

For Defendant-Appellant: Alexandra A.E. Shapiro, Shapiro Arato Bach LLP (Theodore Sampsell-Jones, Alice Buttrick, Shapiro Arato Bach LLP, Patrick J. Smith, Brian Burns, Smith Villazor LLP, on the brief), New York, NY.

PRESENT: Amalya L. Kearse, Rosemary S. Pooler, Steven J. Menashi, Circuit Judges.

**SUMMARY ORDER**

*1 Michael "Moshe" Mendlowitz was the President and Chief Executive Officer of a payment processing company called Commerce Payment Systems ("CPS"). While at CPS, Mendlowitz oversaw a sales operation by which CPS agents guaranteed certain fees and rates to merchants, then raised those fees and rates later on, often without advance notice. Mendlowitz's conduct ranged from approving misleading sales scripts to sales agents to withholding Terms and Conditions sheets in contracts with merchants. After an audit from CPS's parent company, EVO Payments, Inc. ("EVO"), Mendlowitz implemented a system that would auto-initial

the rest of the Terms and Conditions sheets for merchants after they had signed the first page of an agreement without needing to review the additional pages.

Mendlowitz was convicted of wire fraud in violation of 18 U.S.C. §§ 1343 and 2 and conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. He challenges his conviction on four grounds. First, he argues that the district court erred when it did not ask specifically about potential antisemitic bias at jury selection. Second, he claims that the district court erred in excluding his proffered expert witness from testifying. Third, he argues that the district court erred in excluding a recording of Mendlowitz from being played at trial. Fourth, Mendlowitz contends that the district court's cumulative evidentiary errors warrant a new trial. We conclude that the district court did not err in conducting voir dire. We also conclude that even if the district court erred in excluding the expert witness's testimony and the recording, those errors were harmless individually and cumulatively. We assume the parties' familiarity with the underlying facts and procedural history.

**I**

Mendlowitz is an Orthodox Jew who wears a yarmulke. In discussions with the district court in advance of voir dire, defense counsel introduced the issue by stating, "my client is Jewish, ... he's Orthodox, he wears a yarmulke in court, and he's going to wear it in trial. And that raises the unfortunate specter of bias of prospective jurors." Defense counsel feared that the nature of the charges in this case—an Orthodox Jewish credit-card company executive defrauding small businesses by overcharging them while charging the honest rates to his Jewish friends and family—could inflame antisemitic prejudices. Mendlowitz sought to have the district court ask the following two questions to potential jurors during voir dire:

> [1.] The defendant is Jewish-American. Do you have any personal views towards Jewish people that would cause you to doubt in any way your ability to be a fair and impartial juror in a financial case? ... [2.] Do you have any views on Jewish people in business or related to finance—either positive or negative—that would affect

**United States v. Mendlowitz, Not Reported in Fed. Rptr. (2023)**

2023 WL 2317172

your ability to be a fair and impartial juror?

App'x 111.

The government objected to the questions on the grounds that the questions were not relevant to the allegations or to any defense and that the questions also might suggest the prosecution itself was motivated by antisemitism. The district court instead asked the following question: "Would anything about the physical appearance of Mr. Mendlowitz influence you in this case and/or cause you to doubt in any way your ability to be a fair and impartial juror ... in a financial case?" App'x 139. Mendlowitz argues that the replacement of his questions with the district court's question about physical appearance deprived him of his right to a fair and impartial jury. We disagree.

**\*2** "[J]ury selection falls 'particularly within the province of the trial judge,'" and "[a] trial court's broad discretion in this area includes deciding what questions to ask prospective jurors." 🚩 *United States v. Tsarnaev*, 142 S. Ct. 1024, 1034 (2022) (quoting 🚩 *Skilling v. United States*, 561 U.S. 358, 386 (2010)). "Only when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion." 🚩 *Rosales-Lopez v. United States*, 451 U.S. 182, 190 (1981) (plurality opinion). Even then, "federal trial judges are not required to ask every question that counsel ... believes is appropriate." 🚩 *United States v. Lawes*, 292 F.3d 123, 128 (2d Cir. 2002). When the defense requests a certain question, "trial judge[s are] not required to put the question in any particular form, or to ask any particular number of questions on the subject, simply because requested to do so by" the defense. 🚩 *Ham v. South Carolina*, 409 U.S. 524, 527 (1973). The district court was not required to ask about antisemitic prejudices in the exact way that Mendlowitz requested. The district court needed only to "cover the subject." 🚩 *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991) (quoting 🚩 *Aldridge v. United States*, 283 U.S. 308, 311 (1931)).

In *United States v. Nieves*, we reversed a conviction and remanded for a new trial because "the district court abused its discretion by failing to take any of several possible steps that could have effectively screened prospective jurors for [gang-related] bias, or to take other steps to counter any bias that may in fact have existed among the venire." 58 F.4th 623, 626 (2d Cir. 2023). In *Nieves*, "[t]he government's case-in-chief centered largely" on evidence of the defendant's participation in a gang. *Id.* at 627. The defendants had requested that the district court ask certain questions about gang-related bias, and "[t]he parties also suggested that the district court question jurors about a suite of other topics." *Id.* at 628. Yet "[t]he district court instead opted for a far swifter approach than either side had advocated." *Id.* The district court "did not ask—overtly or otherwise—about gang-related bias, notwithstanding that the government's central theory of the case was that the assault was motivated by gang rules, and its evidence in support of that theory consisted of gang-member testimony and gang-related expert testimony." *Id.* at 640. The district court even "deliberately declined to mention that the case concerned gangs at all, or at least to caution the jurors that any feelings they might have about gangs or gang members must be set aside in service of their duty to decide, based on the evidence presented, whether the government established all elements of the charged crimes beyond a reasonable doubt." *Id.* Moreover, the court did not, "as a last resort," even "attempt to counterbalance any of this by asking additional biographical or attitudinal questions that might have circumstantially unearthed inferable bias among potential jurors, permitting either the court to dismiss them for cause, or [the defendant] to exercise his peremptory challenges to the same effect." *Id.*

Because the district court did not "provide *some* opportunity for prospective jurors to be meaningfully screened for biases relevant to [the] particular defendant or the charges against [the] defendant," we held in *Nieves* that the district court "exceeded the bounds of its discretion." *Id.* at 638-40.

In this case, the district court declined to ask Mendlowitz's proposed questions. Instead, the district court asked a question that aimed to achieve the same purpose of probing any potential bias a juror may have. We recognize that a question about a defendant's physical appearance cannot always be used as an adequate substitute to ferret out religious bias. However, here, the district court's question was a reasonable substitute for Mendlowitz's proposed questions. In fact, the question had the desired effect, as evidenced by one juror who responded to the question by stating: "The physical

United States v. Mendlowitz, Not Reported in Fed. Rptr. (2023)

2023 WL 2317172

appearance of the defendant, yes, he's wearing a yarmulke and he's supposed to be a student of the Torah. He's not supposed to steal. That is my initial impression." App'x 130. That juror was removed for cause.

**\*3** *Nieves* concerned the rare case in which a district court failed to take *any* steps to identify a potential bias that was implicated by the government's case. This case does not resemble that one. Mendlowitz has not shown that the district court's decision to substitute its question in place of his proposed questions was an abuse of the trial court's broad discretion in jury selection. We therefore decline to reverse Mendlowitz's conviction on this ground.

### II

Mendlowitz also challenges two of the district court's evidentiary rulings: the district court's exclusion of Mendlowitz's proffered expert witness and the district court's exclusion of a recorded conversation between Mendlowitz and a cooperating government witness who was wearing a wire at the time. Mendlowitz additionally contends that even if neither of these purported errors is itself enough to warrant reversal, the errors taken together cumulatively prejudiced him. Though the district court may have erred in its evidentiary rulings, we conclude that the errors were harmless. The evidence against Mendlowitz was strong enough that, even if the district court had allowed the expert to testify and had admitted the recording, it is exceedingly unlikely that the result would have been different.

### A

Mendlowitz first challenges the district court's exclusion of his proffered expert witness, Patrick Moran, an expert on the practices of the payment-processing industry. Moran planned to testify about the relationship between companies such as CPS and its parent company EVO as well as about the standard practices surrounding pricing, fees, and disclosures in the industry. Mendlowitz argues that the district court's exclusion of Moran's testimony was erroneous.

The district court excluded Moran's testimony for four reasons. First, the district court concluded that Moran's testimony "was not relevant." Special App'x 11. Second, the district court determined that Moran would not provide the jury with "information that was outside of the jury's

knowledge." *Id.* Third, the district court took the view that Moran's testimony "was not relevant or connected to Mendlowitz's state of mind." *Id.* Fourth, the district court held that "even if Moran's testimony were relevant and admissible, its relevancy is outweighed by the likelihood of juror confusion." *Id.*

"Evidence is relevant" if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401; *see also* *United States v. Litvak*, 889 F.3d 56, 68 (2d Cir. 2018) ("Relevancy is a very low standard.") (internal quotation marks omitted). In general, "[r]elevant evidence is admissible" while "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. Yet "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. When a party seeks to introduce expert testimony, the Federal Rules of Evidence provide that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" the following four criteria are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

**\*4** Fed. R. Evid. 702.

Mendlowitz's good faith defense was that he "could have reasonably *believed* CPS was not defrauding anyone simply by following standard industry practices." Appellant's Br. 36. Moran's testimony would have established those standard industry practices. The district court opined that "[t]he mere fact that Mendlowitz was an owner and executive of CPS

United States v. Mendlowitz, Not Reported in Fed. Rptr. (2023)

2023 WL 2317172

is insufficient to establish an inference that Mendlowitz was aware of industry practices during the relevant time period." Special App'x 17. However, Mendlowitz notes that his position as a credit card processing company executive would in fact raise a fair inference that he was aware of the standard practices of his own industry.

The district court noted that jurors generally have knowledge about credit cards from participating in the marketplace. Mendlowitz contends that jurors would not necessarily know about the relationships between credit-card processing companies and their subsidiaries as well as standard industry practices with respect to communications between credit-card processing companies and merchants.

The district court observed "that CPS and EVO witnesses—many of whom had either prior experience working for credit card processors or, in the case of [two] EVO employees ..., worked with independent sales organizations ... like CPS—testified about certain practices in the credit card processing industry." *Id.* at 13-14. For that reason, "there was no need for expert testimony related to industry practice." *Id.* at 15-16. But scattered testimony from government witnesses who happened to work at other companies was not necessarily a substitute for an expert's testimony about standard industry practices.

The district court was concerned that "Moran had no personal knowledge related to CPS, EVO or Mendlowitz's conduct, thus making his proposed testimony attenuated from what actually occurred at CPS." *Id.* at 17. The district court remarked that "there was a likelihood of jury confusion that the standard against which Mendlowitz's conduct was to be measured was industry practice rather than whether his conduct violated the wire fraud statute." *Id.* Mendlowitz's defense, however, turned on whether he could have believed his conduct was consistent with industry practice.

**B**

Mendlowitz also challenges the district court's exclusion of a recording—made by cooperating witness David Devers—of a conversation between Mendlowitz and Devers. While Devers was wearing a wire, he had a conversation with Mendlowitz about the auto-initialing feature that Mendlowitz implemented for agreements with CPS. The feature would auto-populate a customer's initials on the third through fifth pages of the agreement with CPS after the customer signed

the first page. Mendlowitz argues that the district court's exclusion of this recording from the evidence at trial was erroneous.

Mendlowitz and Devers had the following exchange about the auto-initialing feature:

> MENDLOWITZ: Well they are—the thing is when they initial the first page.
>
> **\*5** DEVERS: Yeah.
>
> MENDLOWITZ: It initials everything. Automatically.
>
> DEVERS: But we can't make it go one by one?
>
> MENDLOWITZ: We could. You know, it would be a little bit more intrusive.

App'x 622. Mendlowitz wanted to admit the recording as evidence that his intent with the auto-initialing program was not to *conceal* the Terms and Conditions pages from the customers but rather to make the signing process easier for them (that is, less "intrusive"). [1]

The district court declined to admit the evidence, explaining that it would not be allowed "with this witness," referring to Devers. App'x 343. In a post-trial opinion and order denying Mendlowitz's motion for a new trial under Rule 33, the district court elaborated on its reasoning for excluding the recording. The district court explained that Mendlowitz's statement—that making customers initial every page of the Terms and Conditions "would be a little bit more intrusive"—was "offered for the truth" because Mendlowitz was arguing that the program was implemented for convenience and not to defraud merchants. Special App'x 20-21. Furthermore, the district court noted, "even assuming the statement is admissible, Mendlowitz's argument that his statement demonstrates his state of mind with regard to the terms and conditions is of limited relevance and probative value." *Id.* at 21.

At oral argument on appeal, the government conceded that the recording was not hearsay. *See* Oral Argument Audio Recording at 29:21. The statement in the recording was not offered to prove the truth of the matter asserted—that it would be intrusive to make customers sign every page. Instead, the fact that Mendlowitz would make such a statement was suggestive of his state of mind.

United States v. Mendlowitz, Not Reported in Fed. Rptr. (2023)

2023 WL 2317172

The Federal Rules of Evidence provide that relevant evidence—even evidence of limited relevance—"is admissible." Fed. R. Evid. 402. While the district court may "exclude relevant evidence if its probative value is substantially outweighed" by one of the Rule 403 factors, the district court here made no finding that the recording presented "a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence"—let alone such a finding that would substantially outweigh the recording's probative value. Fed. R. Evid. 403.

### C

Yet "[e]ven if a district court errs, a defendant ordinarily is not entitled to a new trial if those errors were harmless—i.e., unimportant in relation to everything else the jury considered on the issue in question." *United States v. Zhong*, 26 F.4th 536, 558 (2d Cir. 2022) (internal quotation marks and alteration omitted). Here, we conclude that even if the district court erred, its errors were harmless given the significant evidence against Mendlowitz.

**\*6** The evidence against Mendlowitz was overwhelming. Mendlowitz approved sales scripts that gave false information to customers. For six years, he also withheld key Terms and Conditions pages from merchant agreements with CPS customers. Those pages related to material aspects of the merchant-customer's agreement, and the terms were often in direct contradiction to the representations that CPS's sales representatives made to potential customers during the sales process. *See* Special App'x 27-28; App'x 183-84, 464-65. The jury heard evidence that when asked about this practice, Mendlowitz told CPS employees that he was worried that providing the omitted Terms and Conditions pages "would kill the deal." App'x 277.

EVO audited CPS, and after the audit found that Mendlowitz was withholding the Terms and Conditions pages, EVO required that CPS include the pages going forward. Even then, Mendlowitz did not simply include the Terms and Conditions pages in the customer agreements. Instead, he implemented a feature for the signing of the agreements that auto-populated customers' initials on the third through fifth pages of the agreement after customers signed the first page. Throughout this time, CPS kept a list of "platinum" merchants—"usually [Mendlowitz's] friends and family"—who would not be charged the additional fees. App'x 279.

Moran's testimony would not have changed the fact that the evidence demonstrated Mendlowitz's intent to defraud CPS customers. Regardless of the standard industry practices, the evidence indicated that Mendlowitz concealed the Terms and Conditions pages because revealing the terms "would kill the deal." App'x 277. This comment was not the only basis for the conclusion that Mendlowitz acted with fraudulent intent. Testimony indicated that Mendlowitz wanted to "[s]queeze [customers] for as much as possible" during the time between customers signing up with CPS and canceling their accounts, which was not an infrequent occurrence. Supp. App'x 55-56. In addition, CPS incentivized sales agents to mislead customers because the agents could keep sales commissions even if the customers canceled after CPS started charging fees that were undisclosed in the sales process.

The recording of Mendlowitz and Devers also would not have undermined the jury's finding of Mendlowitz's fraudulent intent. The May 2015 recording came months after Mendlowitz implemented the auto-initialing feature in January 2015 and years after he started withholding the Terms and Conditions pages from customers in 2009. The recording does not establish that Mendlowitz's intent was benign. In the recording, Mendlowitz does not indicate that the intrusiveness of signing multiple pages was his actual or only reason for the auto-initialing feature, especially in light of his six years of withholding the Terms and Conditions from CPS customers.

### D

Mendlowitz argues that the district court's evidentiary errors, taken together, cumulatively prejudiced him. We disagree.

In *United States v. Certified Environmental Services*, we found that "evidentiary errors and prosecutorial misconduct[ ] infected every stage of the trial" before the district court. 753 F.3d 72, 96 (2d Cir. 2014). However, we "hesitate[d] to vacate and remand [the] case for a new trial based on any one of the errors ... in isolation, or perhaps even any one category of those errors. But considering the record as a whole, we [were] compelled to conclude a new trial [was] warranted." *Id.* We decided that the various evidentiary errors, along with the prosecutorial misconduct, worked a "cumulative prejudice" on the defendants. *Id.* at 95. We vacated the defendants' convictions and remanded the case for a new trial. *See* *id.* at 97.

United States v. Mendlowitz, Not Reported in Fed. Rptr. (2023)

2023 WL 2317172

**\*7** The facts of *Certified Environmental Services* were particularly egregious, including references by the prosecutor to the potential consequences of the verdict. *See* *id.* at 95 ("[The defendant] instructed everybody to violate the law. She gathered them. She marshalled them. She still works for [Certified Environmental Services ('CES')]. CES is still in business. Your verdict is going to have consequences, ladies and gentlemen."). The lesson of *Certified Environmental Services* is that in certain cases, when several evidentiary errors combine with various examples of prosecutorial misconduct to render a trial unfair, a new trial is warranted. Here, Mendlowitz does not allege prosecutorial misconduct. The evidentiary errors here, even when taken together, did not cumulatively prejudice Mendlowitz in light of the significant amount of evidence of his guilt.

\* \* \*

We have considered Mendlowitz's remaining arguments, which we conclude are without merit. For the foregoing reasons, we **AFFIRM** the judgment of the district court.

**All Citations**

Not Reported in Fed. Rptr., 2023 WL 2317172

---

## Footnotes

\*      The Clerk of Court is directed to amend the caption as set forth above.

1      *See* App'x 342 (Mendlowitz's counsel stating "I think that the theory of the government's case ... is that throughout the indictment period the terms and conditions were withheld through January 2015 for the purpose of advancing the fraud scheme by keeping important information out of the hands of the merchants and that thereafter the terms and conditions were concealed through the auto-population feature. This is counter to that, Judge, a realtime expression of state of mind").

---

2022 WL 823932
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

UTICA MUTUAL INSURANCE COMPANY, Plaintiff,

v.

CLEARWATER INSURANCE COMPANY, Defendant.

6:13-cv-1178 (GLS/TWD)
|
Signed 03/18/2022

**Attorneys and Law Firms**

FOR THE PLAINTIFF: PHILIP G. STECK, ESQ., Cooper, Erving Law Firm, 39 North Pearl Street, 4th Floor, Albany, NY 12207, THOMAS D. CUNNINGHAM, ESQ., Sidley, Austin Law Firm, One South Dearborn Street ESQ., Chicago, IL 60603, ADRIANA ALEXIS PEREZ, ESQ., Hunton Andrews Kurth LLP, 333 SE 2nd Avenue, Suite 2400, Miami, FL 33131, SYED S. AHMAD, ESQ., 2200 Pennsylvania Avenue, NW, Washington, DC 20037-1701, DANIEL R. THEIS, ESQ., Webber & Theis PC, 202 Lincoln Square, P.O. Box 189, Urbana, IL 61803.

FOR THE DEFENDANT: JOHN F. FINNEGAN, ESQ., THOMAS J. McCORMACK, ESQ., VICTORIA CORDER, ESQ., Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, NY 10019.

**MEMORANDUM-DECISION AND ORDER**

Gary L. Sharpe, Senior District Judge

### I. Introduction

*1 Plaintiff Utica Mutual Insurance Company commenced this diversity action against defendant Clearwater Insurance Company, alleging breach of contract claims and seeking declaratory relief and damages. (*See generally* Dkt. No. 1.) Clearwater counterclaimed for breach of contract and sought to recoup a payment it already made to Utica. (Dkt. No. 17 ¶¶ 66-70.) Following trial, a jury rendered a verdict fully favorable to Utica, (Dkt. No. 251), and judgment was entered consistent with that verdict, (Dkt. No. 252). Pending are Utica's motion to correct or amend the judgment, (Dkt. No. 255), Clearwater's motion for judgment as a matter of law, for a new trial, or to alter or amend the judgment, (Dkt. No.

258), and Clearwater's motion to stay the judgment pending resolution of these post-trial motions, (Dkt. No. 259). For the reasons that follow, Utica's motion is denied, Clearwater's motion for judgment as a matter of law, for a new trial, or to alter or amend the judgment is granted in part and denied in part, and Clearwater's motion to stay is denied as moot.

### II. Background

### A. Facts

The court assumes the parties' familiarity with the factual background of this action, which will not be rehashed in full detail here. This is a dispute concerning reinsurance contracts. Utica issued various liability insurance policies to Goulds Pumps, Inc., some of which were reinsured by Clearwater. (Dkt. No. 106 at 2-3.) When Goulds was subjected to a multitude of asbestos bodily injury claims, a dispute between Goulds and Utica arose as to Utica's potential liability, given that many of the policies between Utica and Goulds did not state what the aggregate limits of those policies were. (*Id.* at 4-6.) Utica and Goulds eventually settled the matter, and Utica subsequently sought indemnification from Clearwater pursuant to the applicable reinsurance contracts. (*Id.* at 6, 8-9.) Clearwater made one payment to Utica, and then refused to make any further payments. (*Id.* at 9.) Utica brought suit seeking the outstanding indemnification payments owed by Clearwater, and Clearwater counterclaimed seeking return of the payment it made to Utica. (*See generally* Dkt. No. 1; Dkt. No. 17 ¶¶ 66-70.)

### B. Procedural History

Utica moved for summary judgment seeking judgment on both its claims and Clearwater's counterclaim. (Dkt. No. 64.) Clearwater also moved for partial summary judgment seeking a declaration that Clearwater was not liable for any of the costs that Utica incurred to defend Goulds' asbestos claims. (Dkt. No. 65.) By Memorandum-Decision and Order, the court granted Utica's motion and denied Clearwater's, concluding that Clearwater was obligated to indemnify Utica according to Utica's settlement with Goulds. (Dkt. No. 106.)

On appeal, the Memorandum-Decision and Order was vacated by the Second Circuit Court of Appeals, and the matter was remanded for further proceedings. (Dkt. No. 138.) The Second Circuit specifically noted that Clearwater was liable only for loss expenses insured under Utica's umbrella policies, which covered expenses "not covered by" primary

insurance. (*Id.* at 14-16.) The Second Circuit ultimately found that it was the district court's responsibility to determine the meaning of "not covered by." (*Id.* at 17-19.)

**\*2** On remand, supplemental briefing with respect to Clearwater's partial summary judgment motion, (Dkt. No. 65), was submitted, in which Clearwater argued that "the 'occurrence not covered by' language contained in [the relevant umbrella policies] is unambiguous, and, that these [u]mbrella [p]olicies do not require Utica to pay any asbestos defense costs incurred by Goulds following the exhaustion of Utica's underlying primary policies," (Dkt. No. 144 at 1, 6-7; Dkt. No. 157 at 1-4.) The court denied Clearwater's motion, finding that, "[u]ltimately, the 'not covered by' provision in the umbrella policies, taken in the context of the agreement as a whole and viewed in the light most favorable to Utica, is susceptible to more than one reasonable meaning." (Dkt. No. 158 at 10.) The action was thus deemed trial-ready. (*Id.* at 12.)

Consistent with the trial scheduling order, (Dkt. No 166), the parties filed a multitude of documents, including, proposed jury instructions by Clearwater, which focused in part on the duty of "utmost good faith," (Dkt. No. 189 at 5-6, 27, 37-40; Dkt. No. 230 at 2; Dkt. No. 242 at 10, 16, 26, 31; Dkt. No. 246.) Clearwater also submitted a proposed verdict form. (Dkt. No. 190; Dkt. No. 245). Finally, Clearwater submitted a memorandum regarding the applicability of common law indemnification to the action. (Dkt. No. 240.)

Clearwater objected to the court's jury instructions and verdict form. (Dkt. No. 250; Dkt. No. 270, Attach. 1 at 1689.) Ultimately, a verdict favorable to Utica was rendered, (Dkt. No. 251), and judgment was entered in Utica's favor, (Dkt. No. 252). Specifically, the jury found that Utica proved by a preponderance of the evidence that: Utica and Goulds intended for the primary polices at issue to contain aggregate limits, Utica had an obligation to defend Goulds under the umbrella policies at issue, and Utica's settlement with Goulds was negotiated in good faith. (Dkt. No. 250 at 2.) The jury also found that Clearwater did not prove by substantial evidence that Utica's settlement reflected bad faith, fraud, or factual or legal error, or by a preponderance of the evidence, that Utica breached either its implied duty of good faith or its duty of utmost good faith. (*Id.* at 2-3.) Finally, the jury awarded $10,901,005.03 in damages to Utica, and found that Utica suffered these damages on December 2, 2012. (*Id.* at 3.)

## III. Standards of Review

### A. Rule 50

Rule 50(b) of the Federal Rules of Civil Procedure governs post-trial motions for judgment as a matter of law. *See* Fed. R. Civ. P. 50(b). "In ruling on [a Rule 50(b)] motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Id.* In ruling on a Rule 50(b) motion the court "consider[s] the evidence in the light most favorable to the non-moving party and giv[es] that party the benefit of all reasonable inferences that the jury might have drawn in that party's favor from the evidence." *Triolo v. Nassau County*, 24 F.4th 98, 105 (2d Cir. 2022) (citation omitted). A Rule 50(b) motion should only be granted where, "there is such complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that [a] reasonable and fair minded [jury] could not arrive at a verdict against it." *Id.* (citation omitted). "The movant's burden is particularly heavy where ... the jury has deliberated in the case and actually returned its verdict." *Id.* (internal quotation marks and citation omitted).

### B. Rule 59

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A court may award a new trial under Rule 59(a) when: "(1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury; or (4) damages are excessive." *Moore v. Keller*, No. 5:16-CV-1230, 2021 WL 4066541, at *2 (N.D.N.Y. Sept. 7, 2021) (citation omitted); *see Dizak v. Hawks*, No. 9:15-CV-1171, 2020 WL 204297, at *2 (N.D.N.Y. Jan. 13, 2020); *Maureen Christensen v. County of Dutchess*, 548 F. App'x 651, 653 (2d Cir. 2013) (holding that, in granting a Rule 59(a) motion, a court "must conclude that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice, *i.e.,* it must view the jury's verdict as against the weight of the evidence" (citation omitted)). "Unlike judgment as a matter of law, a new trial may be granted [under Rule 59(a)] even if there is substantial evidence supporting the jury's verdict" and "a trial judge is free to weight the evidence himself, and need

not view it in the light most favorable to the verdict winner." *Moore*, 2021 WL 4066541, at *2.

**\*3** Under Rule 59(e) of the Federal Rules of Civil Procedure, a district court may "alter or amend a judgment" following a jury trial. *See* Fed. R. Civ. P. 59(e). Pursuant to Rule 59(e), "district courts may alter or amend judgment to correct a clear error of law or prevent manifest injustice." 🚩 *4 Pillar Dynasty LLC v. N.Y. & Co., Inc.*, 933 F.3d 202, 216 (2d Cir. 2019) (citation omitted). However, a motion pursuant to Rule 59(e) "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Id.* (quoting 🚩 *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008)).

**C. Rule 60**

Rule 60(a) of the Federal Rules of Civil Procedure allows a court to "correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." 🚩 Rule 60(a) allows the court to correct a mistake regarding a judgment "in order to implement the result intended by the court" with respect to that judgment. *Weiming Chen v. Ying-Jeou Ma*, 595 F. App'x 79, 80 (2d Cir. 2015) (internal quotation marks and citation omitted); *see Funches v. Walsh*, No. 05 Civ. 2839, 2019 WL 1368999, at *1 n.2 (S.D.N.Y. Mar. 26, 2019) (citations omitted). "However, a court acting pursuant to 🚩 Rule 60(a) may not make changes that alter the original meaning [of the judgment] to correct a legal or factual error." *Weiming*, 595 F. App'x at 80 (internal quotation marks and citation omitted).

As relevant here, Rule 60(b) of the Federal Rules of Civil Procedure authorizes a court to grant relief from a judgment because of "mistake, inadvertence, surprise, or excusable neglect; ... [or] any other reason that justifies relief." 🚩 Fed. R. Civ. P. 60(b)(1), (6). Granting relief under 🚩 Rule 60(b) requires a showing that "extraordinary circumstances warrant such relief." *Keepers, Inc. v. City of Milford*, 776 F. App'x 734, 735 (2d Cir. 2019) (internal quotation marks and citation omitted); *see Whitaker v. N.Y. Univ.*, 543 F. App'x 113, 114 (2d Cir. 2013) (citations omitted). Further, "a 🚩 Rule 60(b) motion is properly denied where it seeks only to relitigate issues already decided." *Whitaker*, 543 F. App'x at 114.

## IV. Discussion

Clearwater makes a host of arguments for why it is entitled to a new trial, judgment as a matter or law, and/or an amendment of the judgment. Clearwater asserts that it is not required to pay supplemental defense costs to Utica, and given that Utica billed these defense costs to Clearwater, that it is entitled to a new trial to determine if Utica violated their duty of "good faith and utmost good faith." (Dkt. No. 258, Attach. 1 at 4-10.) Further, Clearwater maintains that the evidence at trial did not support the jury's verdict that Utica had proven its contract claim under the Towers, Perrin, Forster & Crosby, Inc. (TPF&C) Memoranda, (*id.* at 10-13), that Utica was not entitled to portions of their billings, including, "orphan shares" and the "reset of the umbrella policy limits," (*id.* at 13-19), and that the policies at issue unambiguously lacked aggregate limits, (*id.* at 20-22). Clearwater also seeks a new trial due to alleged errors in the jury instructions and verdict form. (*Id.* at 22-36.) Finally, Clearwater contends that the court should vacate the award of prejudgment interest, or amend the date from which interest is calculated. (*Id.* at 36-40.) For the reasons that follow, Clearwater's motion is granted in part, and denied in part, as outlined below.

### A. Supplemental Defense Costs

**\*4** Clearwater argues that, while at trial the jury was left to determine whether the polices at issue entitled Utica to supplemental defense costs, it is now entitled to judgment as a matter of law on the issue, due to the post-verdict Second Circuit opinion rendered in *Utica Mutual Ins. Co. v. Munich Reinsurance Am., Inc.*, 7 F.4th 50 (2d Cir. 2021), which found the phrase "occurrence not covered by" to be unambiguous. (Dkt. No. 258, Attach. 1 at 4-10.) Utica disputes the binding nature of *Munich*, largely because that decision addressed different policies, with materially different language. (Dkt. No. 264 at 4-10.) Utica further contends, in the alternative, that the jury's findings with respect to the common law of contractual indemnification provide an alternate avenue for Utica to recover defense costs. (*Id.* at 10-11.)

*Munich*, addressed the question of whether Utica's 1973 umbrella policy [1] entitled Utica to supplemental defense costs. *See Munich*, 7 F.4th at 56-58. In making this determination, the Second Circuit noted that the umbrella policy at issue there provided "vertical and horizontal coverage." [2] *Id.* at 56. The Court further determined that the underlying primary policy at issue covered asbestos claims,

so once that primary coverage was exhausted, the excess coverage (or "vertical coverage") provided for defense costs. See *id.* at 56-58. The question then became, "whether defense costs eroded the umbrella policy limits, or were supplemental to them." *Id.* This is where Utica and Munich's interpretation of the policy diverged. Utica claimed that an "endorsement to the umbrella policy made defense supplemental for the vertical ... coverage as well [as the horizontal coverage]." *Id.* Munich maintained that defense was only supplemental for the horizontal coverage. See *id.* The Second Circuit rejected Utica's theory, noting that the endorsement stated:

> With respect to any *occurrence not covered by the underlying policy(ies) of insurance* ..., but covered by the terms and conditions of this policy ... [Utica] shall: (a) defend any suit against the insured ... [and] (c) pay all expenses incurred by the company.... and the amounts so incurred, except settlements of claims and suits, are payable by the company *in addition to* the applicable limit of liability of this policy.

*Id.* at 56-57 (emphasis added). The Second Circuit reasoned that "[t]he phrase 'occurrence not covered by' unambiguously referred to the policy's [horizontal coverage] of risks," but not the vertical coverage. *Id.* at 57.

"An insurance agreement is subject to principles of contract interpretation." ⚑ *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 25 N.Y.3d 675, 680 (2015). A contract must be read in light of its "precise terminology" and "specific context." *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 890 F.3d 74, 77 (2d Cir. 2018) (noting that a "district court should construe each reinsurance policy ... in light of its language and ... specific context" (internal quotation marks and citations omitted). Further, a contract must be read "as a whole," "placing words and phrases in their proper contexts." *N.Y. Univ. v. Factory Mut. Ins. Co.*, No. 20-1093-CV, 2021 WL 3136078, at *2 n.10 (2d Cir. July 26, 2021); see ⚑ *Weiss v. Weiss*, 52 N.Y.2d 170, 174 (1981) ("[A]n agreement, where possible, should be read as a whole so as to give each section meaning."). "An agreement is unambiguous when its words have a definite and precise meaning, unattended

by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Vintage, LLC v. Laws Const. Corp.*, 13 N.Y.3d 847, 849 (2009) (internal quotation marks and citation omitted).

**\*5** These principles of contract interpretation indicate why the Second Circuit's interpretation of different policies, with different language, does not bind the court here. *Munich* dealt with Utica's 1973 umbrella policy, which contained materially different language than the policies at issue in this case (Utica's 1978-81 umbrella policies). While Clearwater emphasizes the similarities between the umbrella policies, namely the presence of the phrase "occurrence not covered by," (Dkt. No. 258, Attach. 1 at 4-5), it has conceded in the past that the policies' language is "somewhat different," (Dkt. No. 157 at 2).

The umbrella policy at issue here states: "With respect to any occurrence *not covered by* [the primary policy], but covered by the terms and conditions of this policy (*including damages wholly or partly within the amount of the retained limit*), the company shall: [cover expenses in addition to the stated limit]." (Dkt. No. 258, Attach. 24 (emphasis added).) "Retained limit" was defined by these same umbrella policies "as to each occurrence with respect to which insurance is afforded under this policy: ... if any underlying policy otherwise *applicable is inapplicable by reason of exhaustion of an aggregate limit of liability*; all amounts payable under other insurance, if any." (*Id.* (emphasis added).) The presence of this definition in the policies at issue demonstrates a key difference from these policies and the one analyzed by the *Munich* court. In *Munich*, the Second Circuit found that " 'inapplicable'--although not defined in the contract-- plainly means there is no underlying primary insurance for the occurrence." *Munich*, 7 F. 4th at 57; see ⚑ *Utica Mutual Ins. Co. v. Munich Reinsurance Am., Inc.*, 381 F. Supp. 3d 185, 211-12 (N.D.N.Y. 2019) (underlying decision likening the phrase "not covered by" to the term "inapplicable"). But, here, the policy explicitly notes that primary insurance may be "inapplicable by reason of exhaustion of an aggregate limit of liability." (Dkt. No. 258, Attach. 24.)

Ultimately, the phrase "occurrence not covered by" read in the context of the entire umbrella policy, and specifically with the definition of "retained limit" in mind, is susceptible to more than one reasonable meaning. "Occurrence not covered by" could be read to mean coverage outside of the scope of the underlying primary policies' coverage, or, it could mean

where the underlying policy coverage has been exhausted – again, specifically given the presence of the definition of "retained limit." [3] *Munich's* holding with respect to materially different umbrella policies does not change this result. *See Utica Mut. Ins. Co. v. Munich Reins.* 🚩⚠️ *Am., Inc.,* 594 F. App'x 700, 704 (2d Cir. 2014) (distinguishing decisions that interpreted different policies than the specific policy at issue).

For these reasons, [4] there is no reason to set aside prior rulings regarding the ambiguity of the polices at issue, (Dkt. No. 106 at 23; Dkt. No. 158 at 10-11 ("[the policy] is susceptible to more than one reasonable meaning")), and the jury's verdict, finding that Utica was entitled to supplemental defense costs, (Dkt. No. 251).

**\*6** Given that Utica was entitled to supplemental defense costs from Clearwater by virtue of the jury's verdicts, it therefore follows that billing these cost to Clearwater could not be a violation of any duty owed by Utica, and thus, Clearwater's request for a new trial on this issue is also denied.

**B. TPF&C Memoranda**
Clearwater also argues that it is entitled to judgment as a matter of law with respect to Utica's claims for breach of the TPF&C Memoranda. (Dkt. No. 258, Attach. 1 at 11.) It asserts that Utica did not adduce proof at trial that it received consent from TPF&C or Clearwater, as required by the TPF&C Memoranda, to settle with Goulds, nor that it was excused from doing so. (Dkt. No. 258, Attach. 1 at 11.) Utica disagrees, claiming that Clearwater is ignoring a provision in the TPF&C Memoranda that states "[p]ayments of their proportion of loss and expense paid by [Utica] will be made by the Reinsurers to the Reassured promptly following receipt of proof of loss," and therefore, proof of consent was not necessary. (Dkt. No. 264 at 11-14.)

The court agrees with Utica. A reasonable jury could read the provision in the TPF&C Memoranda stating that "[p]ayments of their proportion of loss and expense paid by [Utica] will be made by the Reinsurers to the Reassured promptly following receipt of proof of loss," (Dkt. No. 258, Attach. 5 at 2; Dkt. 258, Attach. 6 at 2), to mean that when Utica makes a payment "of loss and expense" under the policies, and then Utica provides a proof of the loss to Clearwater, that it is then entitled to indemnification, and that therefore, consent from Clearwater or TPF&C is not required.

Were it the case that failure to receive consent from either Clearwater or TPF&C (or to demonstrate that this requirement was excused) would foreclose Utica from binding Clearwater on the settlement with Goulds under the TPF&C Memoranda, the Second Circuit in *Utica Mut. Ins. Co. v. Clearwater Ins. Co.* would have noted as much when ruling on the parties' prior cross-appeals. There, the Second Circuit noted that Utica had failed to receive consent or demonstrate that it was excused from doing so. *See* 🚩*Utica Mut. Ins. Co. v. Clearwater Ins. Co.,* 906 F.3d 12, 21-23 (2d Cir. 2018). It then explained that, because of this shortcoming "Utica [had] failed to show that Clearwater was obliged to *follow the settlement* under the TPF&C Memoranda" and "accordingly vacate[d] the district court's grant of summary judgment for Utica and remand[ed] for trial to determine Clearwater's actual liability to Utica *under both the TPF&C [M]emoranda* and the Clearwater certificates." 🚩*Id.* at 21-23, 25 (emphasis added). If recovery under the TPF&C Memoranda was completely barred by Utica's failure to receive consent or demonstrate that it was excused from doing so, the Second Circuit would have directed judgment on this issue and would not have "remand[ed] for trial to determine Clearwater's actual liability to Utica under ... *the TPF&C [M]emoranda.*" 🚩*Id.* at 25 (emphasis added).

For these reasons, [5] and given the evidence presented at trial, a rational jury could – and did – find that Utica proved its contract claims with respect to the TPF&C Memoranda. Therefore, Clearwater's motion is denied.

**C. Defense Expense, Orphan Shares, and Umbrella Limits**
**\*7** Clearwater next argues that it is entitled to judgment as a matter of law on the "portions of Utica's billings that Utica was not obligated to pay to Goulds under the ... umbrella policies, most notably defense expense, orphan shares, and the reset and additional umbrella limits," and that "[t]he common law of indemnification cannot be used by Utica to establish ... Clearwater's liability." (Dkt. No. 258, Attach. 1 at 13, 16.)

Utica argues that the evidence at trial demonstrated that Utica was entitled to the entirety of the billings under the umbrella policies, (Dkt. No. 264 at 14-19), none the less, the orphan shares did not affect the billings, (*id.* at 15), Clearwater waived these arguments by not making them in

their Rule 50(a) motion, (*id.* at 15, 17), and common law indemnification supports their position, (*id.* at 15-16).

With respect to orphan shares, Clearwater's argument is irrelevant, as the evidence presented at trial demonstrated that liability from these shares did not affect the billings to Clearwater. (Dkt. No. 269, Attach. 2 at 593-94; Dkt. No. 269, Attach. 3 at 1106-07 ("Q: ... In the absence of the $31 million that was billed across the umbrella policies for orphan share, how would the billings to Clearwater be affected? A[:] They wouldn't have. They would have been billed the same amount."); *id.* at 1107-12, 1151.) Therefore, even if Utica was not entitled to bill for orphan shares, the amount of damages awarded would not be adjusted.

Regarding Clearwater's argument concerning defense costs, it claims Utica's billings ran afoul of the *Munich* decision, (Dkt. No. 258, Attach. 1 at 15-16), which stated that a "cedent's billing to its reinsurers" must be "at least consistent with, and ... not contradict ... the settlement." *Munich*, 7 F.4th at 59. But again, a reasonable jury could have found the evidence presented at trial showed that Utica did comply with *Munich*,[6] and billed Clearwater in accordance with the Goulds settlement. (Dkt. No. 264, Attach 9 at 4, 18-19 (Ex. P-424 (showing that Utica's payments and reinsurance billings matched).)

Finally, with respect to Clearwater's remaining arguments pertaining to Utica's billings, there was evidence presented at trial that supports Utica's assertion that it was entitled to the entirety of their billing under the umbrella policies at issue. (*See, e.g.*, Dkt. No. 269, Attach. 2 at 596-97 (noting that the policies had a $25 million dollar limit for indemnity only, with expense paid in addition, for a total of $48 million, and that "Utica's billings" were "based on the terms of the umbrella policies").) Thus, a reasonable jury could have found, based on this evidence, that Utica was entitled to the entirety of their billings to Clearwater,[7] and, therefore, Clearwater's motion for judgment as a matter of law is denied.

### D. Aggregate Limits

Clearwater argues that it is entitled to judgment as a matter of law because the primary policies did not contain aggregate limits. (Dkt. No. 258, Attach. 1 at 21-22.) In support of this position, it contends that the Second Circuit has found that the policies at issue unambiguously did not contain aggregate limits. (*Id.* at 20-21.) Therefore, it asserts that, these policies

would never have been triggered, and Clearwater would not be subject to any liability. (*Id.* at 21-22.)

**\*8** Clearwater is mistaken. The Second Circuit did not rule that the policies at issue unambiguously contained no aggregate limits. *See generally* Utica Mutual Ins. Co. v. Clearwater Ins. Co., 906 F.3d 12 (2d Cir. 2018). The Second Circuit, in detailing the background of the case and the grounds for the dispute between Utica and Goulds stated that "[t]he primary policies Utica issued to Goulds from 1978 to 1981 had a glaring omission: they did not include aggregate limits of liability," and "[t]he [Utica-Goulds] settlement treated the primary policies as having aggregate limits." *Id.* at 16.

There is no reason to disturb the prior rulings that the primary policies were ambiguous with respect to aggregate limits, (*see, e.g.*, Dkt. No. 269 at 1086 ("The fundamental issue is the ambiguity in the underlying Goulds-Utica contracts.... In other words, those four contracts are ambiguous. It's up to the jury to decide whether or not there were aggregate limits intended ... between Goulds and Utica."), and the jury's verdict on the issue, (Dkt. No. 251 (responding yes to question one on the special verdict form which stated: "Did Utica prove by a preponderance of the evidence that Utica and Goulds intended for the 1978-81 *primary policies* to contain aggregate limits")).

### E. The Duty of Utmost Good Faith

Clearwater argues that it is entitled to a new trial because the court instructed the jury on "the duty of utmost good faith ... [in a] legally erroneous and prejudicial" manner. (Dkt. No. 258, Attach. 1 at 22-33.) It makes a host of arguments for why the court's instructions were improper, including that the instructions "failed to define the duty of utmost good faith," "erroneously advanced the position that Clearwater bore the burden of proof" with respect to violation of the duty, contained a negative presumption against finding that this duty was violated, incorrectly required proof of a level of awareness of this duty by Utica, contained errors with respect to Utica's requisite level of intent, required that Clearwater be prejudiced, allowed Utica to improperly "put its interests before Clearwater's," required Clearwater to make efforts to negate any non-disclosures by Utica, and, finally, included the concept of substantial performance with respect to the duty. (*Id.* at 23-32.) Clearwater contends that the instructions resulted in prejudice to it because the jury could have found the duty was violated by Utica

"failing to disclose and misrepresenting the nature of the fight with Goulds, improperly allocating extra-contractual amounts to Clearwater in its settlement with Goulds, and improperly billing Clearwater for orphan shares, reset and increased umbrella policy limits, and—most egregiously—defense costs and declaratory judgment expenses." (Dkt. No. 268 at 3-4.) Utica argues that while these instructions were appropriate, (Dkt. No. 264 at 29-36), even if they were not, Clearwater was not prejudiced by them, (*id.* at 27-29).

"A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 390 (2d Cir. 2006) (citation omitted). "A jury instruction that misinforms the jury on the law requires a new trial unless the error is harmless." *Munich*, 7 F.4th at 65 (citing *Fid. & Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp.*, 540 F.3d 133, 139 (2d Cir. 2008). "An error is ... harmless if ... the error did not influence the jury's verdict." *LNC Invs., Inc. v. First Fidelity Bank, N.A. N.J.*, 173 F.3d 454, 462 (2d Cir. 1999) (citation omitted); *see Continental Casualty Co. v. Boughton*, 695 F. App'x 596, 600-01 (2d Cir. 2017) (finding, where the jury instruction arguably improperly shifted the burden of proof, that the error was harmless because it did not affect the jury's verdict.

**\*9** Most of Clearwater's arguments with respect to the legal errors in the jury instructions have already been raised, and the court and parties have spent a vast amount of time advocating for and determining the proper jury instructions. (*See, e.g.*, Dkt. No. 246 at 2-10; Dkt. No. 250 at 1-2.) The court is no more persuaded now by Clearwater's contentions than when they were previously raised.

Clearwater makes one additional argument that was not raised in advance of charging the jury, regarding the Second Circuit's decision in *Munich*. It argues that there, the Second Circuit held that "Utica could be found to have breached the duty of good faith simply by billing its reinsurer for amounts that were not due," without requiring any additional requirements, and, thus, the instructions here, which did include some additional requirements were erroneous. (Dkt. No. 258, Attach. 1 at 33.) Assuming arguendo that the court erred, Clearwater can not demonstrate how it was prejudiced. While the Second Circuit in *Munich* found that Utica billing for defense costs it was not entitled to recoup could have been a violation of the duty of good faith, in reaching this conclusion the Court also noted Utica was not entitled

to supplemental defense costs under the umbrella policies at issue there, but "if [Utica was entitled to] defense in addition to limits ... then it w[ould be] natural for the jury to conclude that Utica's billing was proper and therefore in good faith." *Munich*, 7 F. 4th at 65. Here, the jury found that Utica was entitled to supplemental defense cost. (Dkt. No. 251.) Therefore, even if Clearwater's desired utmost good faith instructions were given, it would not have changed the outcome of the verdict. For these reasons, Clearwater's request for a new trial is denied. *See LNC Invs., Inc. v. First Fidelity Bank, N.A. N.J.*, 173 F.3d 454, 462 (2d Cir. 1999) ("An error is ... harmless if ... the error did not influence the jury's verdict." (citation omitted).)

## F. Jury Instructions and Verdict Sheet on Indemnification and Elements of the Claims

Clearwater argues that it is entitled to a new trial because the "verdict sheet on the common law of indemnification [erroneously] permitted the jury to find Utica was obligated to pay certain amounts to Goulds." (Dkt. No. 258, Attach. 1 at 33-34.) Further, it asserts that "[t]he jury instructions erroneously instructed the jury on Utica's ability to prove its liability under the common law of indemnification with proof of a good faith settlement with Goulds." (*Id.* at 34.) It goes on to contend that the jury instructions were improper in light of the post-verdict *Munich* decision, (*id.* at 35), and that the jury instructions and verdict sheet improperly "provided the jury a path to finding Clearwater liable without requiring Utica to prove all four essential elements of its contract claims by a preponderance of the evidence." (*Id.* at 35.)

Clearwater's position on the jury instructions and verdict sheet, especially with respect to the common law of indemnification, was clear before the jury was charged and presented with the verdict sheet. (Dkt. No. 242 (Clearwater's proposed jury instructions); Dkt. No. 245 (Clearwater's proposed verdict sheet); (Dkt. No. 240 (Clearwater's memorandum regarding the applicability of common law indemnification to the action).) The court is no more persuaded by Clearwater's arguments now than it was before, when it declined to adopt its proposed instructions and verdict sheet.

**\*10** With respect to the common law of indemnification, even if the instructions or verdict sheet, were legally flawed it would not affect the jury's verdict, as the jury found Clearwater liable under the umbrella policies. (Dkt. No. 251.) For these reason, Clearwater's motion for a new trial is denied.

**G. Damages** [8]

Clearwater argues that the court should vacate the award of prejudgment interest or amend the date from which Utica is entitled to begin calculating prejudgment interest. (Dkt. No. 258, Attach. 1 at 36-40.) In support of this position, Clearwater contends that calculating prejudgment interest beginning on the date selected by the jury, December 2, 2012 (thirty days after the date of the first reinsurance bill submitted to Clearwater that went unpaid), "runs afoul of New York law and results in an improper windfall to Utica" and "there is no support in the record for the jury to have awarded prejudgment interest beginning then." (*Id.* at 36-38.)

Utica argues that Clearwater waived this argument by not objecting to the jury instructions and verdict form that required the jury to select a date for the calculation of prejudgment interest, (Dkt. No. 264 at 37-41), and the date selected by the jury is supported by the evidence and law, (Dkt. No. 264 at 42-44), but that the judgment should be amended to include the specific amount, (Dkt. No. 255, Attach. 1 at 1-5).

"In a diversity case, state law governs the award of prejudgment interest." *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008). New York Law governs this action. (Dkt. No. 54 at 6 n.3.) N.Y. C.P.L.R. 5001(a) provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract. *See ABKCO Music & Records Inc. v. Chimeron LLC*, 517 F. App'x 3, 4 (2d Cir. Feb. 21, 2013) (internal quotation marks and citation omitted). "Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." N.Y. C.P.L.R. 5001(b).

As a preliminary matter, Clearwater did not waive their argument regarding prejudgment interest. (Dkt. No. 1692 (the court stating that Clearwater "was free to raise [this] issue with [it] by way of motion" after Clearwater objected to the jury's selection of the date to begin calculating prejudgment interest after being prohibited by the court from objecting beforehand); Dkt. No. 245 at 4 (Clearwater's proposed verdict form allowing for the selection of more than one date for the purposes of calculating prejudgment interest).) Failing to raise the issue in its Rule 50(a) motion does not waive the argument now because the jury instructions did not exist when Clearwater filed its rule 50(a) motion.

Turning to the substance of the argument, calculating prejudgment interest beginning on December 2, 2012, would result in a windfall to Utica, and no reasonable jury could have found that prejudgment interest should run for the total damages beginning on December 2, 2012. (Dkt. No. 261, Attach. 1 (Ex. P-329A (showing that only a fraction of the total damages awarded had accrued by December 2, 2012)); *see GE Funding Capital Mkt. Servs., Inc. v. Nebraska Inv. Fin. Auth.*, 767 F. App'x 110, 115 (2d Cir. 2019) ("New York courts accordingly have looked to the economic realities of a given case to avoid conferring windfalls in the form of prejudgment interest."); *see also Random Ventures, Inc. v. Advanced Armament Corp., LLC*, No. 12 Civ. 6792, 2014 WL 2082124, at *2 (S.D.N.Y. May 2, 2014) ("The Court agrees that no prejudgment interest should be imposed with respect to ... payments [that] had not yet become due at the time of the breach, an award of prejudgment interest would result in a windfall.") Therefore, the judgment must be amended.

**\*11** Clearwater and Utica both suggest "reasonable intermediate dates" from which to calculate prejudgment interest. Utica proposes September 20, 2013, the date this action was filed, or, December 16, 2013, the median date between thirty days after Utica's first bill on June 22, 2011, and thirty days after the final bill on May 3, 2016. (Dkt. No. 264 at 45.) Clearwater proposes September 2, 2015, as a reasonable intermediate date, because that "is in or around" the "midpoint for billings." (Dkt. No. 261 at 9.)

The court agrees with Clearwater that September 2, 2015 is a reasonable date to begin calculating prejudgment interest. [9] *See Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc.*, 577 F. App'x 58, 61 (2d Cir. 2014) ("District courts are afforded wide discretion in determining a reasonable intermediate date from which to calculate prejudgment interest." (internal quotation marks and citation omitted)); *see also Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 435 (S.D.N.Y. 2004) ("[W]here damages are incurred at various times after the cause of action accrues, [N.Y. C.P.L.R.] 5001 grants courts wide discretion in determining a reasonable date from which to award pre-judgment interest.") (quoting *Conway v. Icahn & Co.*, 16 F.3d 504, 512 (2d Cir. 1994)). Using September 2, 2015 to begin calculating prejudgment interest yields $5,741,397.12. [10] Clearwater's motion to amend is

granted in part, in so far as the judgment will be amended to reflect this, [11] and denied in all other respects. Utica's motion to amend the judgment is denied. [12]

### V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Utica's motion to correct or amend the judgment (Dkt. No. 255) is **DENIED**; and it is further

**ORDERED** that Clearwater's motion for judgment as a matter of law, for a new trial, or to alter or amend the judgment (Dkt. No. 258) is **GRANTED IN PART** and **DENIED IN PART** as follows:

> **GRANTED** to the extent that it sought the judgment be amended to include

$5,741,397.12 in prejudgment interest; and

**DENIED** in all other respects; and it is further

**ORDERED** that the Clerk is directed to amend the judgment (Dkt. No. 252) to include $5,741,397.12 in prejudgment interest in favor of Utica; and it is further

**\*12 ORDERED** that Clearwater's motion to stay the judgment (Dkt. No. 259) is **DENIED**; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 823932

---

### Footnotes

1    This policy is not at issue in this case. The relevant polices here are Utica's 1978-81 umbrella policies.

2    "Vertical coverage" is coverage that "rests on top of the ... primary policy," and essentially provides additional coverage for the categories of risks covered in the primary policy, which would only apply if the primary policy limits were exhausted. *Munich*, 7 F.4th at 56. "Horizontal coverage," also referred to as "drop down coverage," affords "coverage in the first instance for categories of risks not covered by the underlying primary policy," making exhaustion of primary limits irrelevant for this coverage (given that there is no "primary" coverage at all). *Id.*

3    "[A]s to each occurrence with respect to which insurance is afforded under this policy: ... if any underlying policy otherwise *applicable is inapplicable by reason of exhaustion of an aggregate limit of liability*; all amounts payable under other insurance, if any." (Dkt. No. 258, Attach. 24 (emphasis added).)

4    The court need not address Utica's argument, in the alternative, that the jury's findings with respect to the common law of contractual indemnification provide an alternate avenue for Utica to recover defense costs, (Dkt. No. 264 at 10-11), as defense cost were properly awarded by the jury under the umbrella policy.

5    Utica further argues that because Clearwater made one payment under the TPF&C Memoranda without TPF&C's consent, that this course of performance confirms that consent is not required under the TPF&C Memoranda. (Dkt. No. 264 at 14.) That argument is not persuasive because Clearwater made the payment under an express reservation of rights. (Dkt. No. 268 at 13.)

6    It is worth noting that the holding in *Munich* was specifically within the context of "when a reinsurance certificate contains a follow-the-settlements clause," 7 F. 4th at 59, which is not the case here as Clearwater's

obligations to Utica are not subject to the follow-the-settlements doctrine. *See* ⚑ *Utica Mutual Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 25 (2d Cir. 2018).

7    For this reason, the court need not address the parties' arguments pertaining to the common law of indemnification nor Utica's argument that Clearwater waived its ability to make this argument.

8    For the sake of clarity, Utica's motion to amend the judgment and associated briefing will be discussed contemporaneously with Clearwater's motion.

9    The court previously stated "a midpoint between ninety days after the oldest unpaid billing ... and ninety days after the most recent unpaid billing" would be an appropriate method to determine a reasonable midpoint. (Dkt. No. 130 at 4.) However, this determination was made almost six years ago and in connection with an order which was ultimately vacated by the Second Circuit. The court now believes that the midpoint for billings is a more fair way to calculate the reasonable intermediate date.

10    Nine percent (the statutory interest per annum) of the jury award of $10,901,005.03 yields a per deem rate of interest of $2,687.92. $2,687.92 times 2,136 (the number of days from September 2, 2015 to July 8, 2021) equals $5,741,397.12, the total prejudgment interest amount.

11    Clearwater contends that one day of post-verdict interest should also be awarded, pursuant to N.Y. C.P.L.R. 5002, because the final judgment was entered one day after the verdict. (Dkt. No. 261 at 10.) However, "post[-]judgment interest is governed by federal statute [in a diversity case]" and is "calculated from the date of the entry of the judgment" not entry of verdict. ⚑ *Schipani v. McLeod*, 541 F.3d 158, 164-65 (2d Cir. 2008).

12    Clearwater also moved for a stay pending resolution of the post-trial motions. (Dkt. No. 259, Attach. 1.) That motion is denied as moot.

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

853 Fed.Appx. 694
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Benny T. WARR, Nina M. Warr, Plaintiffs-Appellants,

v.

Anthony R. LIBERATORE, Joseph M. Ferrigno,
II, Mitchell R. Stewart, II, James M. Sheppard,
City of Rochester, Defendants-Appellees. [1]

20-1165-cv
|
March 29, 2021

**Synopsis**

**Background:** Arrestee brought action city, city's police
department, and individual officers, asserting claim of
excessive force, claim of false arrest, and other claims
pursuant to § 1983 and New York State law for injuries
arising from his arrest for disorderly conduct. Following
a jury verdict that was for arrestee but that awarded only
nominal damages, the United States District Court for the
Western District of New York, Marian W. Payson, United
States Magistrate Judge, 437 F.Supp.3d 259, denied arrestee's
motion to set aside the verdict and grant a new trial. Arrestee
appealed.

**Holdings:** The Court of Appeals held that:

[1] trial court did not abuse its discretion in admitting
arresting officers' knowledge of criminal activity on the
particular street;

[2] trial court acted within its discretion in concluding that
defense counsel's misconduct did not prejudice arrestee so as
to warrant a new trial; and

[3] jury's finding that police officer was liable for punitive
damages and jury's award of zero punitive damages were not
inconsistent.

Affirmed.

**Procedural Posture(s):** On Appeal; Judgment; Motion for
New Trial; Objection to Evidentiary Ruling.

West Headnotes (3)

[1] **Civil Rights** 🔑 Criminal law enforcement;
prisons

**Evidence** 🔑 Searches, seizures, and arrests

Trial court in arrestee's action concerning claim
of false arrest and other claims pursuant to §
1983 and New York State law for injuries arising
from arrest for disorderly conduct did not abuse
its discretion in admitting arresting officers'
knowledge of criminal activity on the particular
street, and thus admission of such evidence
did not warrant a new trial; disorderly-conduct
allegation was based on arrestee's alleged refusal
to comply with a lawful dispersal order under
New York law, officers' knowledge of criminal
activity on the street was probative as to whether
dispersal order was arbitrary, and trial court
offered to address concern of potential prejudice
by instructing jury regarding the limited purpose
for which the evidence was admitted and could
be considered. 🚩 42 U.S.C.A. § 1983; N.Y.
Penal Law § 240.20(6); Fed. R. Evid. 401, 402,
403.

2 Cases that cite this headnote

[2] **Federal Civil Procedure** 🔑 Misconduct of
parties, counsel or witnesses

Trial court acted within its discretion in
concluding that defense counsel's misconduct
did not prejudice arrestee so as to warrant a new
trial in arrestee's action concerning excessive-

force claim and other claims pursuant to § 1983 and New York State law for injuries arising from arrest for disorderly conduct; although defense counsel's misconduct included improper references to arrestee's prior incarcerations, it was unlikely that the jury saw one improper reference, given that it was in small print on a side column of an exhibit, trial court instructed jury to disregard defense counsel's questions to witnesses concerning arrestee's prior incarcerations and gave curative instructions to jury sua sponte as to other instances of misconduct, and none of the misconduct at issue appeared to relate specifically to evidence regarding damages awarded to arrestee, which was the only component of jury's verdict that arrestee was challenging on appeal. 🚩 42 U.S.C.A. § 1983.

**[3]** **Civil Rights** 🔑 Exemplary or Punitive Damages

Jury's finding that police officer was liable for punitive damages was consistent with its award of zero punitive damages to arrestee on arrestee's excessive-force claim pursuant to § 1983 and New York State law, and thus alleged inconsistency between the finding and the punitive-damages award was not a basis for granting arrestee a new trial; pursuant to jury instructions, jury found that officer could be liable for punitive damages by having maliciously or wantonly used excessive force against arrestee, but jury instructions also explicitly advised that an award of punitive damages was discretionary, and therefore jury could have found that officer acted wantonly or maliciously in using excessive force while also deciding that a finding of liability against officer was sufficient punishment and deterrence. 🚩 42 U.S.C.A. § 1983.

**\*695** Appeal from judgments of the United States District Court for the Western District of New York (Payson, *M.J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgments of the district court are **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFFS-APPELLANTS: Charles F. Burkwit, Burkwit Law Firm, PLLC, Rochester, NY.

FOR DEFENDANTS-APPELLEES: Spencer L. Ash, for Timothy R. Curtin, Corporation Counsel of the City of Rochester, Rochester, NY.

PRESENT: BARRINGTON D. PARKER, GERARD E. LYNCH, JOSEPH F. BIANCO, Circuit Judges.

## SUMMARY ORDER

Plaintiffs-Appellants Benny T. Warr ("Warr") and Nina M. Warr appeal from an amended order of the district court entered on March 30, 2020, denying their motion to set aside the verdict and for a new trial under Federal Rule of Civil Procedure 59, the judgment entered on February 6, 2019 (with respect to Defendants-Appellees Joseph M. Ferrigno, II, Mitchell **\*696** R. Stewart, II, and the City of Rochester),[2] and the judgment entered on April 16, 2020 (with respect to Defendant-Appellee Anthony R. Liberatore). Plaintiffs brought various claims against defendants under 🚩 42 U.S.C. § 1983 and New York State law for injuries Warr alleges he suffered as a result of his arrest for disorderly conduct, including claims for false arrest, excessive force, assault, and battery. Following an eleven-day jury trial conducted before Magistrate Judge Marian W. Payson, the jury found liability only as to one defendant, Liberatore, for excessive force in violation of the Fourth Amendment. The jury awarded plaintiffs one dollar in nominal damages, zero dollars in compensatory damages, and zero dollars in punitive damages.

Plaintiffs argue on appeal that the district court abused its discretion when it denied their motion to set aside the verdict and grant a new trial in three respects. First, plaintiffs argue that the district court abused its discretion in admitting evidence at trial of the officers' knowledge of criminal activity on Jefferson Avenue as that evidence was not relevant to Warr's arrest and its probative value was substantially outweighed by its prejudicial effect. Second, plaintiffs contend that the district court abused its discretion when it ruled that the trial misconduct of defendants'

counsel, Spencer L. Ash, did not warrant a new trial. Finally, plaintiffs assert that the district court abused its discretion in determining that the jury's verdict regarding punitive damages was not inconsistent. With respect to the requested relief, plaintiffs do not seek a new trial on liability as to any of the claims, but rather seek the following, more limited, relief (which was also sought below): (1) a new trial as to the amount of compensatory and punitive damages on the excessive force claim against Liberatore (as to which the jury found liability); (2) disqualification of defendants' counsel from any retrial; and (3) an award to plaintiffs of the costs of any retrial. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal, which we reference only as necessary to explain our decision to affirm.

We review the district court's evidentiary rulings for abuse of discretion and will reverse only if a ruling was arbitrary and irrational. *United States v. Abu-Jihaad*, 630 F.3d 102, 131 (2d Cir. 2010). In addition, "[t]he standard that we apply in reviewing a party's claim that errors of the district court entitle [him] to a new trial depends on whether that party objected contemporaneously to the purported errors." *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005). Where claimed error was contemporaneously objected to, "a party is entitled to a new trial if the district court committed errors that were a clear abuse of discretion that were clearly prejudicial to the outcome of the trial, where prejudice is measured by assessing the error in light of the record as a whole." *Marshall v. Randall*, 719 F.3d 113, 116 (2d Cir. 2013) (internal quotation marks omitted). "A district court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* (alteration and internal quotation marks omitted).

### I. **The Evidentiary Ruling**

[1] Federal Rules of Evidence 401 and 402, respectively, provide that only relevant evidence is admissible at trial and **\*697** "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Plaintiffs argue that the district court abused its discretion in admitting evidence of the arresting officers' knowledge of criminal activity on Jefferson Avenue because that evidence was not relevant to whether there was probable cause for Warr's arrest. The district court concluded

that the evidence was "relevant to the determination whether probable cause supported Warr's arrest for disorderly conduct, as well as to explain the officers' conduct on patrol in the neighborhood." Special App'x at 37–38. We find no abuse of discretion in the district court's decision.

Plaintiffs first contend that the arresting officers' knowledge of criminal activity on Jefferson Avenue was improperly admitted into evidence because, as a matter of law, what an arresting officer knows is irrelevant to probable cause. Plaintiffs, however, misconstrue the legal standard for probable cause. To be sure, it is well settled that an officer's subjective motivation for an arrest is irrelevant to the probable cause determination. *See Arkansas v. Sullivan*, 532 U.S. 769, 771–72, 121 S.Ct. 1876, 149 L.Ed.2d 994 (2001). However, "[t]he probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 139 (2d Cir. 2010) (alteration and internal quotation marks omitted). Therefore, although probable cause is an objective standard, this objective inquiry must look at the facts an arresting officer knew at the time of arrest. *See Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) ("[A]n arresting officer's state of mind (*except for facts that he knows*) is irrelevant to the existence of probable cause." (emphasis added)).

Applying that standard here, the arresting officers' knowledge of criminal activity on Jefferson Avenue was relevant to the charge of disorderly conduct. Warr was arrested for, among other things, refusing to comply with an arresting officer's lawful dispersal order. *See* N.Y. Penal Law § 240.20(6) ("A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof ... [h]e congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse."). Under New York law, a failure to comply with a dispersal order is justified "only where the circumstances show conclusively that the police officer's direction was purely arbitrary and was not calculated in any way to promote the public order." *People v. Galpern*, 259 N.Y. 279, 284–85, 181 N.E. 572 (1932). Thus, if an officer's knowledge of criminal activity in an area was one of the reasons that caused the officer to issue the dispersal order, then such knowledge would be probative on the issue of whether the officer's dispersal order was arbitrary.

Moreover, we are unpersuaded by plaintiffs' contention that the probative value of this evidence was substantially outweighed by its prejudicial effect. More specifically, plaintiffs argue that evidence of criminal activity on Jefferson Avenue should have been excluded at trial because it confused or misled the jury and "invited the jury to judge ... Warr by the reputation of his neighborhood." Appellant's Br. at 36–37; *see also* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). In other words, plaintiffs **\*698** argue that they were prejudiced in that the jury declined to award them compensatory and punitive damages because the jury drew unfair conclusions about Warr based on the reputation of the neighborhood. The district court offered to address that concern of potential prejudice by instructing the jury regarding the limited purpose for which this evidence was admitted and could be considered. Plaintiffs' counsel, however, declined such an instruction. In any event, the district court was well within its discretion in determining that the Rule 403 balancing did not support the exclusion of this evidence. Accordingly, we conclude that the admission of this evidence does not warrant a new trial on damages.

## II. **Attorney Trial Misconduct**

 **[2]**  Plaintiffs also argue that the district court abused its discretion in concluding that Ash's misconduct did not warrant a new trial and limiting the relief to monetary sanctions. *See* *Pappas v. Middle Earth Condo. Ass'n,* 963 F.2d 534, 540 (2d Cir. 1992) ("[W]hen the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict, a new trial should be granted."). We conclude that the district court did not abuse its discretion in finding that none of the instances of Ash's misconduct, either independently or in combination, unfairly influenced the jury's verdict.

The district court described counsel's misconduct as follows:

> Having presided over the eleven-day trial, including intervening where appropriate to manage the proceedings, admonish counsel, and deliver curative instructions, I have little trouble concluding—and indeed the transcript demonstrates—that Ash

> engaged in conduct that violated my *in limine* orders and resorted to rhetoric and argument that was inflammatory and inappropriate.

Special App'x at 36. With respect to the motion for a new trial, the district court correctly articulated the focus of the analysis—namely, "whether that misconduct, judged in the context of the trial as a whole, unduly prejudiced plaintiffs so as to deprive them of a fair trial." *Id.* at 31. Having carefully reviewed the thorough and comprehensive reasoning of the district court, we find no basis to disturb its conclusion that the misconduct did not deprive plaintiffs of a fair trial.

First, "[g]reat discretion is to be given the judge who was present throughout the trial and is best able to determine the effect of the conduct of counsel on the jury." *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1289 (2d Cir. 1990). For instance, Ash twice improperly published to the jury an unredacted exhibit that referenced Warr's prior incarcerations. Both times, plaintiffs objected, and the district court immediately had the exhibit removed from the jury's view. The district court noted that the improper reference was in small print on a side column of the exhibit, and that it was unlikely that the jury even saw it. The trial judge, who was present for these events, was in the best position to assess the likelihood of any prejudice.

Second, although any impermissible reference to prior imprisonment raises an obvious danger of unfair prejudice, the extent of any prejudice must be considered in the context of the evidence as a whole. For example, when Ash improperly referred to Warr's previous incarceration while questioning two of plaintiffs' witnesses, plaintiffs objected. The district court instructed the jury to disregard the questions, the witnesses did not answer the questions, and the district court offered to give the jury limiting instructions (which plaintiffs' counsel declined). Moreover, **\*699** pursuant to rulings of the district court that are unchallenged on appeal, the jury heard admissible evidence about Warr's criminal history, including that Warr had been convicted of a felony for driving with a suspended license, and had been arrested four or five times. In light of the admissible evidence regarding his criminal history, we find no error in the district court's finding that Ash's brief and stricken questions referencing Warr's past incarceration had minimal potential influence on the jury's verdict.

Third, some of counsel's other violations of the district court's rulings, though blatant, had no discernible risk of prejudicial effect on the verdict. For example, Ash showed portions of a video showing Warr's presence at Jefferson Avenue earlier in the day of the incident, prior to the arresting officers' arrival. Upon plaintiffs' objection, the district court instructed the jury to disregard the footage, and although the district court invited plaintiffs' counsel to request additional curative instructions to the jury, plaintiffs' counsel did not make that request. Plaintiffs do not contend that the inadmissible portions of the video showed Warr doing anything wrong or illegal, and plaintiffs have failed to articulate how this misconduct, although a sanctionable breach of the court's rulings, could have influenced the jury's verdict.

Fourth, it is clear from the record that the district court carefully and systematically evaluated the risk of prejudice from Ash's conduct and statements, sustained objections, gave limiting instructions where appropriate, and liberally offered curative instructions to mitigate any potential prejudice from Ash's misconduct (some of which plaintiffs' counsel declined). In fact, in several instances, the district court gave curative instructions to the jury *sua sponte*, even absent an objection, in an abundance of caution. Thus, there is a substantial basis in the record to support the district court's conclusion that its response to Ash's misconduct during the trial minimized any risk that such misconduct would deprive plaintiffs of a fair trial.

Finally, it is difficult to discern how any of counsel's misconduct influenced the only component of the jury's verdict that plaintiffs challenge on appeal—namely, the level of compensatory and punitive damages awarded to Warr on his excessive force claim. In other words, none of the misconduct at issue appears to have related specifically to the evidence regarding damages, and plaintiffs make no argument that it did. Instead, plaintiffs speculate that the same jury whose verdict was not influenced by Ash's misconduct in finding in plaintiff's favor on the excessive force claim somehow was negatively influenced by this misconduct in deciding to award Warr only nominal damages. The verdict was well supported by the weakness of the evidence that Warr suffered from any acute injuries following his arrest. [3] Moreover, there was little foundation in the record for the jury to conclude that *Liberatore's* alleged use of force caused any of Warr's claimed injuries, particularly in light of the significant force used by other officers involved in the arrest (as to whom the jury found no liability for excessive force). In short, the evidentiary record fully supports the jury's

damages verdict irrespective of Ash's misconduct, which further militates in favor of a finding that Ash's misconduct did not unduly influence the jury's verdict. See *Marcic,* 397 F.3d at 124–28 (declining to award a new trial **\*700** where there was substantial evidence in the record to support the jury's verdict).

Accordingly, we conclude that the district court did not abuse its discretion in determining that Ash's misconduct did not warrant a new trial.

### III. The Jury's Punitive Damages Award

[3] As noted above, the jury found liability only as to Liberatore for excessive force. The jury also found that Liberatore was liable to Warr for punitive damages for his use of excessive force but determined that the appropriate amount of those damages was zero dollars. Plaintiffs argue that a new trial is warranted on the quantum of damages because the jury's punitive damages award of zero dollars is inconsistent with its finding that Liberatore was liable for punitive damages. The district court, in denying plaintiffs' request for a new trial, found no inconsistency in the jury's verdict with respect to punitive damages and reasoned that the jury's verdict was consistent with its instruction at trial.

To the extent that there is an apparent inconsistency arising from the jury's simultaneous findings that plaintiffs were entitled to punitive damages but only in the amount of zero dollars, we believe there is a fair reading of the findings that can be harmonized in light of the trial evidence and jury instructions. *Cf. Auwood v. Harry Brandt Booking Office, Inc.,* 850 F.2d 884, 891 (2d Cir. 1988) ("It is the duty of the court to attempt to harmonize the [special verdict] answers, if it is possible under a fair reading of them." (internal quotation marks omitted)).

Pursuant to the district court's instructions, the jury found that Liberatore could be liable for punitive damages by having maliciously or wantonly used excessive force against Warr. See Record on Appeal ("ROA"), doc. 197 at 1496 (instructing the jury as follows: "You may award the plaintiff punitive damages if you find that the acts or omissions of any of the defendants were done maliciously or wantonly"). The jury instructions, however, also explicitly advised the jury that an award of punitive damages was discretionary, and in effect, did not require the jury to award any amount of punitive damages. Further, the district court correctly instructed the jury that it could consider several factors in exercising that

discretion. *See* ROA, doc. 197 at 1497–98 (instructing the jury that the appropriate amount of punitive damages should consider the degree to which a defendant should be punished for his wrongful conduct and the degree to which an award would serve a general or specific deterrent effect).

Thus, the jury could have found that Liberatore acted wantonly or maliciously in using excessive force but, under the particular circumstances of this case, that the finding of liability against Liberatore itself was sufficient punishment and deterrence. Moreover, viewing the verdict sheet as a whole, we find nothing in the general verdict or answers to special interrogatories that is inconsistent with the award amount or that would belie the jury's clear written indication that it meant to award plaintiffs zero dollars in punitive

damages. Accordingly, we conclude that the district court did not abuse its discretion in denying a new trial on damages based upon an inconsistency in the jury's punitive damages award.

\* \* \*

We have considered all of plaintiffs' remaining arguments and find them to be without merit. For the foregoing reasons, the judgments of the district court are **AFFIRMED**.

**All Citations**

853 Fed.Appx. 694

## Footnotes

1     The Clerk of Court is respectfully directed to amend the caption as above.

2     Plaintiffs' brief makes no argument challenging the February 6, 2019 judgment, and their counsel at oral argument explicitly acknowledged that they seek relief only against Liberatore. Accordingly, we treat their claims against the other defendants as abandoned.

3     As noted by the district court, the evidence supporting Warr's claim of acute injuries was based on the testimony of plaintiffs' expert witnesses whose findings were based almost entirely on Warr's own subjective reports of his symptoms. Warr also could not explain during his testimony why there was no photograph corroborating his alleged injuries.

**End of Document**                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

852 Fed.Appx. 589 (Mem)

This case was not selected for
publication in West's Federal Reporter.

RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.

United States Court of Appeals, Second Circuit.

Damon WHEELER, Plaintiff-Appellant,

v.

Det. Ahmed ARTOLA, P.O. Jonathan McHugh,

and L.T. Jeffry Thoelen, Defendants-Appellees. [*]

19-3445-pr
|
April 27, 2021

Appeal from the United States District Court for the Southern
District of New York (Smith, *M.J.*).

**UPON CONSIDERATION WHEREOF, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Damon Wheeler, pro se,
Danbury, Connecticut.

FOR DEFENDANTS-APPELLEES: Alex Smith,
Corporation Counsel, City of Middletown, Middletown, New
York.

PRESENT: JOHN M. WALKER, JR., PIERRE N. LEVAL,
DENNY CHIN, Circuit Judges.

**\*590  SUMMARY ORDER**

Plaintiff-appellant Damon Wheeler appeals the district
court's judgment, entered September 23, 2019, in favor
of defendants-appellees Ahmed Artola, Jonathan McHugh,
and Jeffry Thoelen (collectively, "defendants") following a
bench trial on his claims under 42 U.S.C. § 1983. [1] We
assume the parties' familiarity with the underlying facts, the
procedural history of the case, and the issues on appeal.

We review a district court's findings of fact after a bench
trial for clear error and its conclusions of law *de novo*.
*Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125,
141 (2d Cir. 2016). "[A] finding is clearly erroneous when
although there is evidence to support it, the reviewing court
on the entire evidence is left with the definite and firm
conviction that a mistake has been committed." *Anderson
v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84
L.Ed.2d 518 (1985) (internal quotation marks omitted). Given
the conflicting narratives presented at trial, the district court
was entitled to make credibility determinations in reaching
its decision, and the record contained adequate evidence
to sustain its factual conclusions. *See Krist v. Kolombos
Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012) ("It is within the
province of the district court as the trier of fact to decide
whose testimony should be credited."). Thus, the district
court committed no clear error by crediting defendants'
version of events over Wheeler's and, with one exception
discussed below, ruling in defendants' favor and holding that
Wheeler failed to meet his burden of proving his claims by a
preponderance of the evidence. *See Principal Nat'l Life Ins.
Co. v. Coassin*, 884 F.3d 130, 138 (2d Cir. 2018). We address
Wheeler's additional arguments on appeal as follows.

First, Wheeler argues that he was unlawfully stopped by
police while driving. This argument is unavailing, however,
because the district court concluded that Wheeler was stopped
(and ticketed) for "inadequate lights and an inadequate plate
lamp, which are violations of New York's Vehicle and Traffic
Law." Dist. Ct. Dkt. 270 at 17; *see also United States v.
Harrell*, 268 F.3d 141, 148 (2d Cir. 2001) ("As a general
matter, the decision to stop an automobile is reasonable
where the police have probable cause to believe that a
traffic violation has occurred." (internal quotation marks
omitted)). Wheeler's cell phone video, which begins after he
was stopped, does not offer sufficient reason to persuade us
that the district court clearly erred in crediting defendants'
justification for the stop.

Second, Wheeler argues that he was falsely arrested because "there was no obstruction of governmental administration on the part of [Wheeler] at the time of this traffic stop," and he was "placed under arrest immediately after being dragged from his car." Appellant's Br. at 10. A person is guilty of obstruction of governmental administration when he "intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation,

**\*591** physical force or interference." N.Y. Penal Law § 195.05. "[I]nappropriate or disruptive conduct at the scene of the performance of an official function" is sufficient to support a charge for obstruction of governmental administration, "even if there is no physical force involved." *Willinger v. City of New Rochelle*, 212 A.D.2d 526, 527, 622 N.Y.S.2d 321 (1995). Because Wheeler refused to follow the officers' orders to leave the car, the officers had probable cause to arrest him for obstruction of governmental administration.

Third, Wheeler argues that police used excessive force in arresting him. "Fourth Amendment jurisprudence has long recognized that the right to make an arrest ... necessarily carries with it the right to use *some degree* of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (emphasis added). It is also well established, however, that law enforcement officers violate the Fourth Amendment if the amount of force they use is not "objectively reasonable in light of the facts and circumstances confronting them." *Id.* at 397, 109 S.Ct. 1865 (internal quotation marks omitted). The application of this standard requires consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. 1865.

The district court credited Artola's testimony that he punched Wheeler after Wheeler started closing his car window on Artola's arm. The court did not credit Wheeler's testimony that he was punched in the head while on the ground and handcuffed or that he was assaulted during the strip search. The court found that Wheeler's injuries were "minor," Dist. Ct. Dkt. 270 at 27, and were consistent with the force necessary to remove him from the vehicle. While Artola putting his arm into Wheeler's car may have been ill-advised, the force did not rise to the level of being unconstitutionally excessive. *See Edrei v. Maguire*, 892 F.3d 525, 533-34 (2d Cir. 2018) (factors to consider include "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether the force was inflicted maliciously or sadistically") (internal quotation marks and alterations omitted). Accordingly, the district court did not clearly err in holding that defendants did not use excessive force.

Fourth, Wheeler alleged that his arrest was in retaliation for filming the police during the traffic stop. While probable cause "should generally defeat a retaliatory arrest claim," a narrow exception exists where, even though officers have probable cause to make arrests, they "typically exercise their discretion not to do so." *Nieves v. Bartlett*, ––– U.S. ––––, 139 S. Ct. 1715, 1727, 204 L.Ed.2d 1 (2019). A plaintiff can take advantage of this exception by presenting "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* Here, as the district court noted, the officers had probable cause to arrest Wheeler for obstruction of governmental administration, and Wheeler did not submit any evidence that other similarly situated persons had been treated differently. Accordingly, the district court did not clearly err in holding that the arrest was not retaliatory.

Fifth, Wheeler argues that defendants were not justified in searching his vehicle. Under the "automobile" exception, police may conduct a warrantless search of a vehicle if they have probable cause to believe it contains contraband or other evidence of a crime. **\*592** *United States v. Ross*, 456 U.S. 798, 820-21, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). Given that the district court credited Artola's testimony about Wheeler's known history as a drug dealer, Wheeler's delay in pulling his car over, his defiance of Artola's orders in refusing to get out of the car, and his shutting of the window on Artola's arm, it was not unreasonable for defendants to believe that Wheeler had contraband in his car. Accordingly, defendants had probable cause to search the vehicle. *See United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004) (probable cause in this context "does not demand certainty but only a 'fair probability' that contraband or evidence of a crime will be found" (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983))).

Finally, Wheeler argues that the officers lacked reasonable suspicion or probable cause to conduct a strip and visual cavity search and that it was unauthorized. The district court credited Artola's testimony that he had conducted the search "incident to ... arrest" on the criminal drug possession charge "as a result of the seizure of apparent contraband from Wheeler's car." Dist. Ct. Dkt. 270 at 28. The district court declined, however, to rule on whether defendants had reasonable suspicion to conduct the strip and visual cavity search, and instead held that defendants were entitled to qualified immunity because the reasonable suspicion required for an officer to conduct a strip or visual cavity search incident to an arrest for a felony drug crime was not settled in 2014, when this search was conducted.

This was error for the law was clearly established in 2014. In *Sloley v. VanBramer*, which we decided in 2019, after the district court's ruling in this case, we held that it was "sufficiently clear" by 2013 (the time of the search in *Sloley* and a year before Wheeler's search) that any visual body cavity search incident to a lawful arrest had to be "supported by a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity and must be conducted in a reasonable manner." 945 F.3d 30, 40 (2d Cir. 2019) (internal quotation marks omitted); *see also* Hartline v. Gallo, 546 F.3d 95, 100 (2d Cir. 2008) ("The Fourth Amendment requires an individualized 'reasonable suspicion that [a misdemeanor] arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest' before [he] may be lawfully subjected to a strip search." (first alteration in original) (quoting Weber v. Dell, 804 F.2d 796, 802 (2d Cir. 1986))).

Nonetheless, we affirm, for the record established that Artola had reasonable suspicion to conduct a strip or cavity search. Artola testified that his reasons for the strip search and body cavity search were Wheeler's delay in stopping his vehicle, his possession of crack cocaine in his vehicle, his status as a known drug dealer, and Artola's previous observations of Wheeler selling drugs. Thoelen testified that based on Artola's report (although he did not recall the night of Wheeler's arrest in particular), the strip search complied with the police department's strip search policy and he would have approved the search. The district court credited Artola's testimony, and on these facts, we conclude that Artola had reasonable suspicion to conduct the search. *See* Leon v. Murphy, 988 F.2d 303, 308 (2d Cir. 1993) ("We may affirm ... on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely."). Based on Artola's proffered reasons for the search, he and, by extension McHugh and Thoelen, were entitled to qualified immunity because reasonable officers in their positions could have concluded that reasonable suspicion existed that Wheeler was concealing contraband, based on the drug crime charged, Wheeler's **\*593** characteristics, and the circumstances of the arrest. *See* Hartline, 546 F.3d at 100.

We have considered Wheeler's remaining arguments and conclude they are without merit. Accordingly, we **AFFIRM** the judgment of the district court.

### All Citations

852 Fed.Appx. 589 (Mem)

---

## Footnotes

\*    The Clerk of Court is respectfully directed to amend the caption as set forth above.

1    The parties consented to proceed before a magistrate judge. Prior to the bench trial, the district court granted summary judgment in favor of defendants on some of Wheeler's claims, resulting in the dismissal of several defendants. Wheeler does not challenge that decision on appeal. Wheeler also withdrew his claims against Kevin Weymer. Accordingly, Artola, McHugh, and Thoelen are the only remaining defendants on appeal.

**Wheeler v. Artola, Not Reported in Fed. Supp. (2019)**

2019 WL 4593651

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Wheeler v. City of Middletown,   S.D.N.Y.,   June 1, 2021

2019 WL 4593651
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Damon WHEELER, Plaintiff,

v.

Det. Ahmed ARTOLA, et al., Defendants.

16CV7440 (LMS)
|
Signed 09/23/2019

**Attorneys and Law Firms**

Christopher Justin Coulson, Bunsow De Mory LLP, Scarsdale, NY, for Plaintiff.

Alex J. Smith, Middletown, NY, for Defendants.

## <u>DECISION AND ORDER</u>

LISA MARGARET SMITH, U.S.M.J. [1]

**\*1** Plaintiff Damon Wheeler ("Wheeler") brought this action against Defendants Det. Ahmed Artola, P.O. Jonathan McHugh, P.O. Richard Regino, P.O. Joseph Festa, P.O. Deborah Sommer, P.O. Kevin Weymer, Sgt. Joseph Tobin, Lt. Jeffry Thoelen, Lt. John Ewanciw, Hratch Kazanjian, Robert Magrill, Rose Anna Roantree, Matthew DePasquale, Jennifer Breitenfeld, Theresa Shapiro, Orange Regional Medical Center, and the City of Middletown, asserting claims for illegal traffic stop, excessive force, illegal search, false arrest, illegal cavity search, unlawful imprisonment, denial of medical treatment, abuse of local, state and/or government resources, destroying/deleting official court records and arrest records, and retaliation. Docket # 89 ("Sixth Amended Complaint"). [2] On September 26, 2018, the Court issued a Decision and Order on motions for summary judgment that had been filed by the various Defendants, which resulted in the dismissal of several claims (and therefore, several Defendants). Docket # 232 ("SJ D&O"). The only remaining claims in the case are claims under  42 U.S.C. § 1983 (1) against Defendants Artola and McHugh for (a) an unlawful

traffic stop, (b) a false arrest, and (c) an unlawful search of Wheeler's vehicle; (2) against Defendant Artola for the use of excessive force based on (a) punching Wheeler's face, both before Wheeler was removed from his vehicle and after he was placed in handcuffs, and (b) slamming Wheeler's head into a wall during the strip search; (3) against Defendant McHugh for failure to intervene to prevent the excessive use of force during the strip search [3]; and (4) against Defendants Artola, McHugh, and Thoelen for an unlawful strip search.

The Court conducted a three-day bench trial from July 8, 2019, to July 10, 2019. Two witnesses testified on Wheeler's behalf, and five witnesses testified on behalf of the remaining Defendants. [4] For the reasons that follow, the Court finds (1) that Wheeler has failed to prove, by a preponderance of the evidence, that Defendants Artola and McHugh are liable for his claims of an unlawful traffic stop, false arrest, an unlawful search of his vehicle, and excessive force (including McHugh's failure to intervene to prevent the use of excessive force), and (2) that Defendants Artola, McHugh, and Thoelen are entitled to qualified immunity on the claim of an unlawful strip search.

## <u>FINDINGS OF FACT</u>

**\*2** The Court makes the following findings of fact as required by Rule 52 of the Federal Rules of Civil Procedure.

### A. <u>The Stop of Wheeler's Vehicle and the Arrest</u>

On the night of April 5, 2014, Wheeler was working as a taxi driver, driving his own vehicle, not a marked taxi. Tr. 132. Wheeler had been working as a taxi driver since August, 2010. Tr. 132-33. Artola and McHugh, officers with the Middletown Police Department, were on patrol just after midnight on April 5, 2014. Tr. 172-73, 286. [5] Artola had been a patrol officer with the Middletown Police Department since November, 2008; he was promoted to his current position of detective in February, 2017. Tr. 171. Artola had previously worked for the Village of Pelham Police Department, from January, 2006, to November, 2008. Tr. 171-72. McHugh has been an officer with the Middletown Police Department for the past seven years; before that, he worked for two years as an officer with the Village of Greenwood Lake Police Department. Tr. 285.

Artola and McHugh were traveling eastbound on West Main Street in Middletown when they saw a vehicle traveling

*Wheeler v. Artola*, Not Reported in Fed. Supp. (2019)

2019 WL 4593651

westbound on West Main Street without its headlights on. Tr. 173, 176, 286-87, 329. Artola made a U-turn and pulled the patrol car behind the vehicle. Tr. 176, 287. Artola radioed dispatch and notified dispatch that he was going to conduct a traffic stop, providing the location and the license plate of the vehicle. Tr. 177. When Artola pulled his patrol car behind Wheeler's vehicle, he observed that the vehicle had no operable plate lamp. Tr. 181. Artola activated his emergency lights at about 200 West Main Street in order to conduct a traffic stop; the vehicle slowed down and rolled to a stop at 245 West Main Street, approximately 1/4 mile down the road. Tr. 177-79, 288.

Artola approached the vehicle and asked the person driving, who he recognized as Wheeler, [6] for a driver's license and registration. Tr. 180. Wheeler complied. Id. Then Wheeler asked Artola why he had been stopped, and Artola explained that it was because Wheeler's headlights were off and his license plate light was not working. Tr. 181; see Tr. 307-08 (McHugh testified that he heard Artola explain to Wheeler that he was being pulled over because the headlights on his vehicle were not illuminated). Wheeler began arguing with Artola about whether he had committed these traffic infractions, and Artola asked Wheeler to step out of the vehicle. Tr. 181. Artola wanted to talk further with Wheeler and show Wheeler that his license plate light was out. Tr. 181-82, 212. Wheeler refused to exit the vehicle and starting grabbing his phone, saying that he was going to make a phone call. Tr. 182. Artola told Wheeler not to call anybody and to step out of the vehicle. Id. Wheeler continued to refuse. Id. Artola then attempted to grab Wheeler's cellphone, because he did not want Wheeler calling anyone, but Wheeler pulled the cellphone back and began shutting the window with Artola's arm inside the vehicle. Id. Artola punched Wheeler in the face once "just to disorient him" and removed his arm from the window area. Tr. 183. Wheeler closed the window completely and then opened it a little bit and kept yelling at Artola, saying "you punched me" and that he was going to record Artola. Id. Artola just continued telling Wheeler to step out of the vehicle. Tr. 184. By that point, McHugh had come over to Artola's side of the vehicle. Id.

**\*3** McHugh testified that he got out of the patrol car at the same time as Artola and stopped at the back of the vehicle before approaching the passenger side. Tr. 288. While McHugh was behind the vehicle, he heard Artola ask the driver for his license and registration and for him to put his phone down. Tr. 289. When McHugh got to the passenger side of the vehicle, the conversation between the driver and

Artola "escalated," and McHugh heard Artola tell the driver to put the phone down and get off the phone, at which point McHugh went around to the driver side of the vehicle. Tr. 289-90. When McHugh got to the driver side of the vehicle, he observed Artola talking to the driver about hanging up the phone and asking the driver to step out of the car. Tr. 290. McHugh said that the driver was "argumentative, defiant." Id. McHugh stated that Artola reached into the car, and the driver began to roll the window up on Artola's arm. Tr. 290-91. According to McHugh, Artola at that point told the driver to put the phone down and stop, and Artola was able to pull his hand out of the window. Tr. 291. McHugh did not see Artola make any contact with the driver. Id.

Thereafter Wheeler opened the window enough for Artola to use his expandable baton to unlock Wheeler's car door. Tr. 184. Wheeler tried to grab the baton, Tr. 259, 312, but McHugh was able to open the door. Tr. 184, 312; see Tr. 291 (McHugh testified that Artola used his expandable baton to unlock the car door, and McHugh opened the driver side door and removed the driver from the vehicle by grabbing his upper torso and pulling him out of the car and onto the ground). After McHugh opened the car door, Artola put his baton away and removed Wheeler from the vehicle by grabbing Wheeler's arm and pulling him out. Tr. 185; but see Tr. 312-13 (McHugh testified that he was the one who dragged Wheeler to the ground after he was removed from the vehicle, not Artola, and that "[t]o the best of my recollection," Artola "had no part in dragging [Wheeler] to the ground and handcuffing him"). As Artola was pulling Wheeler out of the vehicle, Wheeler was resisting, pulling his arm away. Tr. 185. Artola was able to get Wheeler on the ground behind his vehicle. Id. Once Wheeler was on the ground, Wheeler continued to resist by refusing to put his hands behind his back when Artola ordered him to do so. Tr. 186-87; see Tr. 314 (McHugh testified that Wheeler resisted arrest by refusing to step out of his vehicle and placing his arms under his body after being told that he was under arrest). Artola had to lean his leg on Wheeler's back to keep Wheeler down on the ground and get Wheeler's arms out from under him, at which point, McHugh was able to handcuff Wheeler. Tr. 185-88. McHugh testified to placing Wheeler face-down on the ground and manipulating Wheeler's left arm into an "arm bar," i.e., "straightening his arm out and using his elbow and shoulder to manipulate his joints," to gain compliance so that he could handcuff Wheeler. Tr. 291-92, 317. McHugh said that Artola was still on the other side of the car door when McHugh was removing the driver from the vehicle, but when they were on the ground, Artola helped handcuff the driver. Tr. 291, 313.

**Wheeler v. Artola, Not Reported in Fed. Supp. (2019)**

2019 WL 4593651

Wheeler was then placed in a patrol car to be transported to the Middletown Police Department. Tr. 187. McHugh testified that Wheeler was placed in his and Artola's patrol car. Tr. 293, 318. [7] Artola denied that he punched, slapped, kneed, or kicked Wheeler after pulling him out of the vehicle and placing him on the ground, Tr. 187-88, and McHugh corroborated this testimony, stating that no one punched, slapped, or kicked Wheeler while he was on the ground. Tr. 292-93, 313, 317. According to McHugh, Wheeler did not have any facial or head injuries when he was placed under arrest or in the patrol car, or when they arrived at the police station. Tr. 296, 300, 314, 318 [8] ; see Tr. 334 & Pl.'s Ex. 20 at 1 (Sgt. Tobin's memo to Lt. Thoelen states that when Sgt. Tobin responded to the scene of the incident on West Main Street, he was advised by the officers present that "neither [Wheeler] nor any officers were injured"; the memo also notes that the "lighting was poor in the area of the arrest"). [9]

**\*4** Wheeler's testimony contradicted that of Artola and McHugh in all material respects.

He testified that he was driving his Toyota minivan with "all my lights on" and that "everything" on his minivan was in "working condition," including the plate lamp on the back of the vehicle. Tr. 43-44. Wheeler added that he got his vehicle inspected on a regular basis. Tr. 44. Wheeler disputed where he stopped his vehicle, testifying that as he drove past the Mobil gas station on West Main Street, he saw a group of police cars, and as soon as he passed the traffic light at the intersection, he noticed "flashing red lights ... in my rearview." Id. Wheeler stated that he pulled over a "little bit past the light.... it wasn't too far down the road." Tr. 44-45. He added, "I was a little bit past the intersection, because you can still see the streetlights. There's a big white building on that corner ... on my side on the corner. So, from the corner to the building, ... maybe goes maybe around a hundred — maybe a little bit more than a hundred feet...." Tr. 45. Wheeler continued to elaborate, "There is a liquor store on the corner of that ... intersection, but it was about maybe five or six houses down. Because after the intersection, there's a parking lot, and then maybe five or six houses down, I stopped and pulled over. There was nothing odd about the traffic stop." Tr. 45-46. [10]

Wheeler said that he pulled over and locked the door of his car because "Middletown Police have a habit of just pulling your door open and asking you to step out of the car.... [A]ll I did

was lock my door and pull my window down and activated my cellphone." Tr. 50. Wheeler testified that he then took a cellphone video of his interaction with Artola, following which he was "dragged out the car and thrown in the back of a police car." Tr. 53. More specifically, Wheeler stated,

> I stopped, pulled over safely, locked my window, locked my door, pulled my window down, activated the cellphone. When I turned around, he was there, and all he did was reach for my door handle. He didn't identify himself, he didn't tell me I was speeding, my lights was off. He didn't ask me for a license and registration, nothing. He pulled the door, and when the door wasn't opened, he punched me in my mouth.

**\*5** Tr. 54; see also Tr. 135 ("As soon as I stopped. I locked my door, opened my window, activated the cellphone, and, by that time, [Artola] was right there.... [The video was activated] [a]round the same time as the punch."). After getting punched in the mouth by Artola, Wheeler closed the window about two-thirds of the way. Tr. 54. Wheeler said that Artola did not ask him for a license or registration or tell Wheeler why he had pulled over the car. Tr. 55-56. Wheeler stated that after he took the cellphone video, he turned off his phone, put the cellphone down, unbuckled his seatbelt, and "just prepared myself for what was coming next." Tr. 57-58. Wheeler said that he unbuckled his seatbelt because he knew he was about to be dragged out of the car. Tr. 60. He "just braced myself for a beating." Id. According to Wheeler, after Artola opened the car door and dragged Wheeler out, he threw Wheeler to the ground, put his knee in Wheeler's back, put Wheeler in an arm bar, and threw Wheeler's hands behind his back. Tr. 61. Wheeler added that Artola handcuffed him and, after he was handcuffed, struck him with just one blow while Wheeler's face was on the ground. Tr. 61-63.

The Court credits the testimony of Artola and McHugh regarding the stop of Wheeler's vehicle as to both where and why it occurred. Although Wheeler disputes the location of the stop, testifying that where Artola activated his patrol lights and where Wheeler pulled over are not even shown on the aerial photograph of West Main Street introduced into evidence at trial (Pl.'s Ex. 32/32-A), circumstantial

**Wheeler v. Artola, Not Reported in Fed. Supp. (2019)**

2019 WL 4593651

evidence in the record corroborates the testimony of Artola and McHugh, establishing that other officers arrived on the scene in response to Artola's radio transmission in which, as Artola testified, he would have notified dispatch that he was going to conduct a traffic stop and provided the location and the license plate of the vehicle. See Pl.'s Exs. 17, 18, 19, 20, 36; Tr. 177, 333. In addition, evidence in the record demonstrates that Wheeler's criminal prosecution stemming from the events of April 5, 2014, included charges under New York's Vehicle and Traffic Law for inadequate lights and an inadequate plate lamp. See Pl.'s Exs. 16 (Artola's Case Report), 23 (Intra Agency Memo); see also Tr. 268 (Artola testified on cross-examination to issuing traffic tickets for inadequate plate lamp and inadequate headlights).

The cellphone video taken by Wheeler was shown to the Court at trial. Pl.'s Ex. 1. It is a 23-second clip taken by Wheeler from inside his vehicle, with the window closed, showing a flashlight being shone into the vehicle, presumably by Artola. In the video, Wheeler asks Artola why he just punched Wheeler in the mouth, and although it is hard to hear Artola's response, he says that Wheeler "can videotape me all you want," he just wants Wheeler to step out of the car and to talk to Wheeler. It is apparent that the cellphone was not activated from the outset of the interaction between Artola and Wheeler but rather, was activated at some point after the interaction had begun. See Tr. 308 (McHugh testified, "This video started well into the traffic stop.... Officer Artola provided the Plaintiff with the reason for the traffic stop upon approaching the vehicle."). It is also apparent from Wheeler's tone of voice in the video that his reaction to Artola was angry and antagonistic. The Court does not observe anything in the cellphone video which substantiates Wheeler's claim that Artola just walked up to Wheeler's car and suddenly punched Wheeler in the face for no reason, nor does it substantiate Wheeler's testimony that he activated his cellphone at the same time as the punch. Rather, the Court finds credible the testimony of Artola and McHugh that Wheeler was arguing with Artola and refusing to exit the vehicle [11]; that Wheeler then began videotaping Artola on his cellphone, causing Artola to reach into the vehicle to grab his phone; that Wheeler at that point began to close the window, causing Artola to punch Wheeler in the mouth in order to avoid having the window close on his arm; and that Artola thereafter used his baton to open the car door so that he could remove Wheeler from the vehicle.

**\*6** There is evidence in the record to substantiate the finding that in the aftermath of Wheeler's removal from his vehicle

and placement on the ground and in handcuffs, the application of force that was used in the process caused him to suffer minor injuries to the right side of his face and his left ear. Pl.'s Exs. 3 & 5 (photos), Pl.'s Ex. 6 (hospital records) at page 4 ("Contusion to right side of face. Contusion and hematoma to left pinna of the ear."). Although this same evidence also shows that Wheeler suffered an injury to the back of his head, Pl.'s Exs. 3 & 5 (photos), Pl.'s Ex. 6 (hospital records) at page 4 ("Contusion to occipital region of head."), there is insufficient basis for the Court to conclude that this injury was caused by that same use of force. The Court does not credit Wheeler's testimony that Artola punched him after he was handcuffed and with such force that "the lights went out." Tr. 62-63.

### B. The Search of the Vehicle

After removing Wheeler from the vehicle, Artola searched Wheeler's immediate grabbable area in the vehicle because of Wheeler's delay in bringing his vehicle to a stop, his defiance to the orders to exit the vehicle, and his status as a known drug dealer. Tr. 188-89; see Pl.'s Ex. 16 (Case Report). Artola testified that prior to the night in question, he knew of confidential informants who had purchased drugs from Wheeler, and Artola had witnessed Wheeler selling drugs to confidential informants. Tr. 189. The Court credits Artola's testimony regarding the basis for the search.

Artola and McHugh searched Wheeler's vehicle and recovered chunky white substances that field-tested positive for cocaine, as well as an open bottle of Hennessey, an alcoholic beverage. Tr. 190-92, 264-67, 319; Defs.' Ex. A (photographs of evidence bags and plastic bag found in Wheeler's vehicle); Pl.'s Ex. 15 (Police Record, including reports of narcotics field-tests). More specifically, McHugh testified that he saw a "clear plastic bag on the front passenger seat with an off-white substance in it," Tr. 294, as well as a bottle of Hennessey liquor in the backseat that "appeared to be somewhat consumed." Tr. 295. McHugh removed both of these items from the vehicle. Tr. 294-95. Artola told McHugh that he found more of what Artola thought was a controlled substance on the floor of the vehicle. Tr. 295.

### C. The Strip Search

After the search of Wheeler's vehicle, Artola and McHugh transported Wheeler to the police station. Tr. 295-96. Artola testified that following his arrival at the police station, he requested permission from Thoelen, the supervisor on duty, to strip search Wheeler. Tr. 192-93. [12] The grounds for the

Wheeler v. Artola, Not Reported in Fed. Supp. (2019)

2019 WL 4593651

strip search were Wheeler's possession of crack cocaine in his vehicle, Wheeler's delay in stopping his vehicle after Artola initiated a traffic stop, and Wheeler "being a known drug dealer," including Artola's previous observations of Wheeler selling cocaine. Tr. 193. Artola testified that after describing to Thoelen his reasons for wanting to conduct the strip search, he received permission from Thoelen to do so. Tr. 194, 270; see Tr. 296, 320 (McHugh testified that a supervisor, he believes Thoelen, authorized the strip search, but he himself did not speak to the supervisor). Thoelen testified that he was the shift supervisor the night of April 5, 2014, Tr. 349, and that as shift supervisor, officers would have to ask him for permission to conduct a strip search if they were processing a defendant they believed may be in possession of contraband. Tr. 350. Thoelen did not, however, have any specific recollection of giving permission for the strip search of Wheeler. Tr. 350-52, 368. [13]

**\*7** Artola stated that the strip search was conducted in a "little foyer area between the men's cells and the women's holding cells" that Middletown police use for strip searches. Tr. 194. He and McHugh were the only officers present. Tr. 194, 196, 297, 321. McHugh brought his Taser into the strip search area, which is standard procedure, for officer safety, since the subjects of strip searches sometimes "become irrational or combative and the [T]aser is just a mere physical visual deterrent of that." Tr. 297, 321; see also Tr. 274 (Artola testified on cross-examination that McHugh may have had his Taser out and the need for a Taser was "a safety issue and also to make sure that the defendant is not going to actively resist or try to swallow any drugs that we may find on him"). Artola commanded Wheeler to take off his articles of clothing one by one, and as each article of clothing was taken off, Artola searched it for contraband. Tr. 196, 298. The only thing Artola found was "like a napkin or tissues or something" in Wheeler's underwear which, according to Artola, "is normally used to conceal narcotics"; however, Artola did not find any narcotics inside the tissue. Tr. 196, 240, 298. After Wheeler had taken off all of his clothing, Artola told Wheeler to squat and spread his butt cheeks and cough, which Wheeler did. Tr. 197-98. Artola was right behind Wheeler when he did this, as was McHugh. Tr. 197; see Tr. 299 (McHugh testified that Artola examined Wheeler visually when all of Wheeler's clothes were off, from "within two to three feet" of Wheeler). Artola and McHugh made a visual observation to see if any narcotics could be seen in Wheeler's rectal area, and they did not see anything. Tr. 198. Artola testified that he did not touch Wheeler at any point during the strip search, nor did McHugh. Tr. 198; see

Tr. 299 (McHugh testified that he did not touch Wheeler at any time during the strip search). Artola denied putting any light near Wheeler's body. Tr. 198-99. Artola explained that McHugh might have had his Taser out for safety reasons, and the Taser light might have been on. Tr. 197-98. After Wheeler had squatted down, and Artola had made his visual inspection, which lasted about "a second or two," Wheeler was given his clothes back and told to get dressed. Tr. 199; see Tr. 299 (according to McHugh, the strip search took about five minutes, and Wheeler was without all of his clothes on for about a minute or two). According to Artola, "if there was an incident where somebody had something in their rectum and refused to take it out themselves, there would be transport to the hospital and the hospital would remove it." Tr. 199. Artola testified that nothing unusual happened during the strip search and that Wheeler did not make any complaints during the strip search. Tr. 200; see also 274-75 (Artola testified on cross-examination that Wheeler did not resist being strip searched; that no force had to be used against Wheeler during the strip search; and that Wheeler was not injured during the strip search), 278 (on cross-examination, Artola denied tackling Wheeler or forcing Wheeler's head into the wall during the strip search). Similarly, McHugh testified that nothing unusual happened during the strip search, and that Wheeler did not make any complaints and was neither struck nor tackled during the strip search. Tr. 297-98, 322-23.

Wheeler provided an entirely different version of events. Wheeler testified that Artola told him, after he had taken off all of his clothes, to turn around, bend over, and spread his butt cheeks, at which point he was tackled by Artola. Tr. 70-71. Wheeler further stated that Artola tackled him and threw him into the wall, banging Wheeler's head on the wall, at which point some other, unspecified officers, who were also in the strip-search room, tackled Wheeler as well. Tr. 71, [14] 83. Wheeler stated that he was then curled up in a fetal position and being pressed against the wall by the other officers, with his head pressed up against the wall, when he felt Artola penetrate his anus with his finger and use a flashlight to see inside his anus. Tr. 71-74. [15]

The Court credits the testimony of Artola and McHugh regarding the strip search. There is no evidence, other than Wheeler's vague testimony, to substantiate the presence of any other police officers in the room during the search, and the Court does not credit Wheeler's testimony that Artola tackled Wheeler and threw him into the wall head first, or that Artola in any way penetrated Wheeler.

Wheeler v. Artola, Not Reported in Fed. Supp. (2019)

2019 WL 4593651

## CONCLUSIONS OF LAW

### I. Unlawful Traffic Stop

As the Second Circuit has explained,

> The temporary detention of an individual during a traffic stop is subject to limitation under the Fourth Amendment as a "seizure" of the person. Wren v. United States, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 135 L. Ed.2d 89 (1996). The Fourth Amendment requires that an officer making such a stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity. Id. at 810, 116 S. Ct. 1769; United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed.2d 740 (2002). Whether probable cause or reasonable suspicion exists is an objective inquiry; the "actual motivations of the individual officers involved" in the stop "play no role" in the analysis. Wren, 517 U.S. at 813, 116 S. Ct. 1769.

Holeman v. City of New London, 425 F.3d 184, 189-90 (2d Cir. 2005). "An automobile is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." U.S. v. Harrell, 268 F.3d 141, 148 (2d Cir. 2001) (quoting Wren, 517 U.S. at 810) (internal quotation marks omitted).

**\*8** In this case, Wheeler disputes that he was stopped based on a traffic violation, claiming that his car was in working order, and that he was not traveling without either his headlights on or an operable plate lamp. Wheeler testified that Artola never told him that he had committed any traffic infraction. However, the Court finds the testimony of Artola and McHugh regarding the traffic violations which formed the basis for the stop, and the conduct of the stop itself, to be credible. Moreover, Artola's Case Report concerning Wheeler's arrest on April 5, 2014, notes that tickets were issued to Wheeler for inadequate lights and an inadequate plate lamp, which are violations of New York's Vehicle and Traffic Law. [16] See Pl.'s Ex. 16 at 2; see also Pl.'s Ex. 23 (Intra Agency Memo noting that "Wheeler was also issued summons [sic] for inadequate plate lamp, no headlights ..."). The cellphone video taken by Wheeler shows only a 23-second clip of what occurred at some point after Wheeler's vehicle had been stopped, and thus, it proves nothing about the lawfulness of the stop itself.

Accordingly, the Court concludes, based on the evidence presented at trial, that Wheeler has failed to prove, by a preponderance of the evidence, that the traffic stop was unlawful. [17]

### II. First Amendment Retaliation

> "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. Hartman v. Moore, 547 U.S. 250, 256, 126 S. Ct. 1695, 164 L. Ed.2d 441 (2006). If an official takes adverse action against someone based on that forbidden motive, and "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences," the injured person may generally seek relief by bringing a First Amendment claim.

Nieves v. Bartlett, 139 S. Ct. 1715, 1722 (2019) (citation omitted). "To prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.' " Id. (quoting Hartman, 547 U.S. at 259). The Supreme Court held that with respect to First Amendment retaliatory arrest claims, a plaintiff must plead and prove the absence of probable cause. Id. at 1723. "Absent such a showing, a retaliatory arrest claim fails. But if the plaintiff establishes the absence of probable cause, 'then the Mt. Healthy [18] test governs: The plaintiff must show that the retaliation was a substantial or motivating factor behind the [arrest], and, if that showing is made, the defendant can prevail only by showing that the [arrest] would have been initiated without respect to retaliation.' " Id. at 1725 (quoting Lozman v. Riviera Beach, 138 S. Ct. 1945, 1952-53 (2018) (citing Hartman, 547 U.S. at 265-66)).

**\*9** The Supreme Court held, however, that "[a]lthough probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." Id. at 1727. In other words, "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he [or she] was arrested when otherwise similarly situated

**Wheeler v. Artola, Not Reported in Fed. Supp. (2019)**

2019 WL 4593651

individuals not engaged in the same sort of protected speech had not been." Id.

In his pretrial memorandum of law, Wheeler argues that he "engaged in protected speech prior to being assaulted, arrested, and assaulted again [when he] complained to Defendant Artola and took video of him," and that he "was arrested for a minor traffic infraction of the sort that normally would not trigger an arrest, and where the officer did not identify a crime for which probable cause existed until *after* the arrest." Docket # 258 ("Pl.'s Pretrial Mem.") at 5 (emphasis in original) (footnotes omitted). However, Wheeler did not present any evidence at trial to support the conclusion that "otherwise similarly situated individuals not engaged in the same sort of protected speech" were not arrested for similar crimes, and therefore, he did not demonstrate that he fell within the exception to the requirement that he prove the absence of probable cause for his arrest. As explained above, the Court concludes that Artola had probable cause for the traffic stop based on Wheeler's commission of traffic violations and, "[u]nder New York State law, it is clear that a traffic offense can be a basis for an arrest." United States v. Scopo, 19 F.3d 777, 785 (2d Cir. 1994) (citations omitted) (finding that law enforcement officers had probable cause to stop and arrest plaintiffs based on failure to signal lane changes in violation of New York traffic laws); see N.Y. Crim. Proc. Law § 140.10(1)(a) ("[A] police officer may arrest a person for ... [a]ny offense when he or she has reasonable cause to believe that such person has committed such offense in his or her presence[.]"); N.Y. Veh. & Traf. Law § 155 ("For purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense."). " 'When an officer observes a traffic offense–however minor–he [or she] has probable cause to stop the driver of the vehicle' and effect a subsequent arrest for that offense." Kennedy v. City of New York, 570 F. App'x 83, 84 (2d Cir. 2014) [19] (quoting Scopo, 19 F.3d at 782).

Because Wheeler has failed to prove, by a preponderance of the evidence, that there was no probable cause for the traffic stop and, therefore, that there was no probable cause for his arrest based on the traffic violations that gave rise to the traffic stop, Wheeler has failed to prove, by a preponderance of the evidence, that he was subjected to a retaliatory arrest in violation of his First Amendment rights. [20]

## III. **False Arrest**

"The common law tort of false arrest is a species of false imprisonment, an action derived from the ancient common-law action of trespass [that] protects the personal interest of freedom from restraint of movement." Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995) (internal quotation marks and citation omitted). "Under New York law, a plaintiff claiming false arrest must show, inter alia, that the defendant intentionally confined him [or her] without his [or her] consent and without justification." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (citation omitted). A claim for false arrest under 42 U.S.C. § 1983 is substantially the same as a claim for false arrest arising under state law. Id. (citations omitted). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest whether that action is brought under state law or under § 1983." Id. (internal quotation marks and citations omitted).

**\*10** Probable cause to arrest exists "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Singer, 63 F.3d at 119 (internal quotation marks and citation omitted). "Whether or not an officer had probable cause to make an arrest is a question of what the officer knew at the time of the arrest and whether she or he was reasonable in relying on that knowledge." Coyle v. Coyle, 354 F. Supp. 2d 207, 211 (E.D.N.Y.) (internal quotation marks and citation omitted), aff'd, 153 F. App'x 10 (2d Cir. 2005) (unpublished opinion).

Probable cause need not be "predicated upon the offense invoked by the arresting officer, or even upon an offense 'closely related' to the offense invoked by the arresting officer," but only on whether probable cause existed for the arrest. Jaegly v. Couch, 439 F.3d 149, 153-54 (2d Cir. 2006). When reviewing the propriety of a false arrest claim, the Court must "focus on the validity of the arrest, and not the validity of each charge." Id. at 154 (emphasis in original); see also id. (A "plaintiff is not entitled to damages under § 1983 for false arrest so long as the arrest itself was supported by probable cause, regardless of whether probable cause supported any individual charge identified by the arresting

Wheeler v. Artola, Not Reported in Fed. Supp. (2019)

2019 WL 4593651

officer at the time of arrest."). "[T]he probable cause inquiry is objective rather than subjective." Id. (citation omitted).

Defendants contend that Artola and McHugh had probable cause to arrest Wheeler for both the traffic violations and obstruction of governmental administration based on his refusal to exit his vehicle when ordered to do so by Artola. Docket # 264 ("Defs.' Proposed Findings") at 10-12. As explained above, a traffic infraction can be the basis for an arrest under New York law, Scopo, 19 F.3d at 785, and the Court concludes Artola and McHugh had probable cause to stop and arrest Wheeler for the traffic violations he had committed. In addition, Wheeler conceded that he "refused" Artola's orders to exit his vehicle, Tr. 135-36, thereby giving rise to probable cause to arrest Wheeler for obstruction of governmental administration. Murray v. Ruderfer, 15 Civ. 913 (ER), 2017 WL 1194371, at *5 (S.D.N.Y. Mar. 31, 2017) ("An officer has probable cause to arrest for obstructing governmental administration where a person refuses to comply with an order from a police officer.") (internal quotation marks and citations omitted); see N.Y. Penal Law § 195.05 ("A person is guilty of obstructing governmental administration when he [or she] intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act...."); see also Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977) (per curiam) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."). [21]

**\*11** Accordingly, the Court concludes, based on the evidence presented at trial, that Wheeler has failed to prove, by a preponderance of the evidence, that he was falsely arrested by Artola and McHugh.

## IV. Unlawful Search of Vehicle

Defendants contend that the search of Wheeler's vehicle was lawful under the "automobile exception" to the Fourth Amendment. "The 'automobile exception' permits law enforcement officers to search without a warrant a readily mobile vehicle where there is probable cause to believe that the vehicle contains contraband." United States v. Babilonia,

854 F.3d 163, 178 (2d Cir. 2017) (internal quotation marks and citations omitted). "If the exception applies, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." Id. (internal quotation marks and citation omitted). "As the Supreme Court has repeatedly explained, 'probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts.' " United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). "[P]robable cause exists where the facts and circumstances within ... [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man [or woman] of reasonable caution in the belief that evidence of a crime will be found in the place to be searched." Id. (internal quotation marks and citations omitted). "The standard does not demand certainty but only a 'fair probability' that contraband or evidence of a crime will be found." Id. at 457 (quoting Gates, 462 U.S. at 238). "Further, courts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a [layperson] might not." Id. Courts employ a " 'totality-of-the-circumstances' approach to determine whether there is probable cause." United States v. Pughe, 441 F. App'x 776, 777 (2d Cir. 2011) (citing Gates, 462 U.S. at 230-31).

At trial, Artola testified that he searched Wheeler's vehicle on account of Wheeler's delay in bringing his vehicle to a stop, his defiance to the orders to exit the vehicle, and his status as a known drug dealer. Tr. 189. [22] Artola added that prior to the night in question, he knew confidential informants who had purchased drugs from Wheeler, and Artola had witnessed Wheeler selling drugs to confidential informants. Id. As stated above, the Court credits the testimony of Artola and McHugh that Wheeler pulled over his vehicle at 245 West Main Street which, as shown in the aerial view of West Main Street, Pl.'s Ex. 32/32-A, is at some distance from 200 West Main Street, the location at which Artola activated his patrol car emergency lights. Wheeler concedes that he refused to follow Artola's orders to exit the vehicle, and the cellphone video evidences Wheeler's resistance. Moreover, immediately preceding the recording of the cellphone video, Wheeler had attempted to close the car window while Artola's arm was still inside the vehicle. [23] There is also evidence in the record that Wheeler admitted to a history of being a drug dealer. Tr. 149-51. [24] Under the totality of the circumstances, the

Wheeler v. Artola, Not Reported in Fed. Supp. (2019)

2019 WL 4593651

Court finds that Artola's and McHugh's search of Wheeler's vehicle was lawful under the automobile exception. See United States v. White, 298 F. Supp. 3d 451, 460 (E.D.N.Y. 2018) (officers had probable cause to search vehicle where driver refused officers' commands to exit the vehicle and "also began moving around inside the car in a highly suspicious manner," including rolling up the window and locking the doors).

**\*12** Accordingly, the Court concludes, based on the evidence presented at trial, that Wheeler has failed to prove, by a preponderance of the evidence, that Artola and McHugh unlawfully searched his vehicle.

## V. Excessive Force

"Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.' " Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (internal quotation marks and citations omitted). In applying that balancing test, a court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight." Id. (citation omitted). Indeed, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97.

### A. During the course of the arrest

As stated above, the Court does not credit Wheeler's testimony regarding the initial punch by Artola. Rather, the Court credits Artola's testimony that he punched Wheeler when he reached into the car to grab Wheeler's cellphone, and Wheeler began to close the window with Artola's arm still inside the vehicle. Although Artola created the situation which necessitated his use of force, the use of force was not objectively unreasonable under the circumstances. Lieutenant, now Chief, John Ewanciw,[25] testified at trial as to the report he issued about the use of force involving Wheeler, and in that report, Ewanciw stated as follows:

> In regards to Wheeler utilizing his cell-phone during the stop, I do agree that it could be viewed as an Officer Safety issue, as the possibility does exist that Wheeler could have been making arraignments [sic][26] to endanger the Officers, and I agree that it could impede and/or interfere with the Officers['] further investigation efforts, however given the circumstances of the stop I do not believe that Officer Artola was justified in trying to prevent Wheeler from using his cell-phone. As indicated in Officer Artola's report Wheeler claimed he was calling his wife, which seems to be reasonable given the situation. Furthermore Officer Artola should know better than to reach into a vehicle, as the inherent risks could be deadly, and if he didn't reach into the vehicle in an attempt to grab Wheeler's cell-phone, he would not have placed himself in jeopardy of becoming injured, by the closing window and therefore would not have had to utilize force to protect himself.

**\*13** Pl.'s Ex. 23. This use of force, albeit preventable, does not rise to the level of being unconstitutionally excessive.

As to the use of force after Wheeler was removed from the vehicle and in handcuffs, the Court does not credit Wheeler's testimony that Artola punched him in the head while he was face-down on the ground and handcuffed. Rather, the evidence at trial establishes that Wheeler suffered minor injuries to the right side of his face and his left ear that are consistent with the use of force that was needed to remove Wheeler from his vehicle, place him on the ground, and place

Wheeler v. Artola, Not Reported in Fed. Supp. (2019)

2019 WL 4593651

him in handcuffs, all of which the Court already determined in its summary judgment decision did not constitute an excessive use of force. See SJ D&O at 30-31. Although, as noted above, there is evidence that Wheeler suffered a minor injury to the back of his head as well, Wheeler has not produced evidence sufficient to allow the Court to determine how this injury was sustained, let alone to determine that it was the result of an excessive use of force in the course of removing Wheeler from his car and placing him under arrest.

Accordingly, the Court concludes, based on the evidence presented at trial, that Wheeler has failed to prove, by a preponderance of the evidence, that excessive force was used during the course of his arrest.

**B. During the strip search**

Wheeler claims that Artola slammed his head into the wall during the strip search, causing the contusion to the back of his head. As noted above, however, the Court does not credit his testimony regarding the manner in which the strip search was conducted. Accordingly, the Court concludes, based on the evidence presented at trial, that Wheeler has failed to prove, by a preponderance of the evidence, that Artola used excessive force during the strip search.

Because Wheeler's claim against McHugh was based on the Officer's failure to intervene to prevent Artola's use of excessive force during the strip search, the Court consequently concludes that Wheeler has failed to prove, by a preponderance of the evidence, McHugh's liability on this claim.

**VI. Unlawful Strip Search**

Wheeler claims that he was subjected to an unlawful strip search, amounting to a manual body cavity search, while he was at the police station. As noted above, the Court credits Artola's and McHugh's testimony regarding the strip search. According to Artola, he had Wheeler take off his articles of clothing one by one, and as each article of clothing was taken off, Artola searched it for contraband. Although Artola found a tissue in Wheeler's underwear, which is typically used to conceal narcotics, Artola did not find any narcotics inside the tissue. After Wheeler had taken off all of his clothing, Artola told Wheeler to squat and spread his butt cheeks and cough, while Artola and McHugh, who were right behind Wheeler, made a visual observation to see if any narcotics could be seen in Wheeler's rectal area. They did not see anything.

*14 In this case, Artola conducted the strip search incident to Wheeler's arrest on the charge of criminal possession of a controlled substance in the third degree, which is a class B felony, as a result of the seizure of apparent contraband from Wheeler's car. See Pl.'s Ex. 16 (Case Report cites NY Penal Law § 220.16(1)). "At least with respect to misdemeanor offenses, the lawfulness of strip searches depends on: the reasonable suspicion that a misdemeanor arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest." Blue v. City of New York, 14-CV-7836 (VSB), 2018 WL 1136613, at *15 (S.D.N.Y. Mar. 1, 2018) (internal quotation marks, ellipsis, and citations omitted). "Whether a particular strip search is constitutional turns on an objective assessment of the facts and circumstances confronting the searching officer at the time, and not on the officer's actual state of mind at the time of the search." Id. (internal quotation marks and citation omitted). "[A]lthough the Supreme Court has found constitutional blanket policies mandating strip searches of detainees who enter the general population of a jail, see Florence v. Bd. of Chosen Freeholders, 566 U.S. 318, 339 (2012), suspicionless visual body cavity searches at a police station are still subject to the Hartline [v. Gallo, 546 F.3d 95 (2d Cir. 2008)] standard requiring individualized reasonable suspicion." Id. (internal quotation marks and citations omitted). Furthermore, "[a]lthough Hartline concerned misdemeanor offenses, other courts in this Circuit have applied the reasonable suspicion standard to arrests for drug-related felonies." Id. (citing cases). "This individualized 'reasonable suspicion' is the same level of suspicion first defined in Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968): the suspicion need not rise to the level of probable cause, but it must be more substantial than an inarticulate hunch." Fate v. Charles, 24 F. Supp. 3d 337, 346 (S.D.N.Y. June 5, 2014) (internal quotation marks, alterations, and citations omitted). "The officer must be able to justify the particular intrusion he [or she] makes—in other words, the fact that he [or she] chooses to conduct a strip or visual/manual body cavity search—based on specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. (internal quotation marks and citations omitted). Moreover, "officers are not permitted to search arrestees in any manner they please. All searches must be reasonable in scope and manner of execution." Id. at 345 (internal quotation marks and citation omitted). "[T]he scope of a search bears directly on its reasonableness." Id.

Wheeler v. Artola, Not Reported in Fed. Supp. (2019)

2019 WL 4593651

at 350 (citations omitted); see also Tyus v. Newton, No. 3:13-cv-01486 (SRU), 2016 WL 6090719, at *16 (D. Conn. Oct. 18, 2016) ("The Fourth Amendment requires that strip searches of inmates be reasonable. See 🚩 Bell v. Wolfish, 441 U.S. 520, 559 (1979). In determining whether a particular strip search is reasonable, a court 'must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.' 🚩 Id. at 559.").

Middletown Police Department policy states that a "supervisor's approval must be obtained prior to conducting a strip search," and that "[o]nly those prisoners intended to be placed in the lock up AND suspected of hiding drugs or weapons on their person will be strip-searched." Pl.'s Ex. 13 at 3. The Court finds that Artola acted in compliance with this policy insofar as the Court credits Artola's testimony that he received permission from Thoelen to conduct the strip search. Tr. 194; see also Tr. 413 (Ewanciw testified that to his knowledge, the strip search was authorized by a supervising officer). However, the Court need not determine whether Artola's request to conduct the strip search was supported by reasonable suspicion,[27] since the Court concludes that Artola, and by extension, Thoelen, are entitled to qualified immunity because the right to be free from suspicionless strip searches upon arrest for a drug-related felony was not clearly established at the time of the incident in question.

As the Second Circuit has noted,

> The doctrine of qualified immunity protects government officials from suit if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 🚩 Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed.2d 396 (1982). The issues on qualified immunity are: (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was "clearly established"; and (3) even if the right was "clearly established," whether it was "objectively reasonable" for the officer to believe the conduct at issue was lawful.
>
> 🚩 Taravella v. Town of Wolcott, 599 F.3d 129, 133-34 (2d Cir. 2010).

🚩 Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013).

In Gonzalez, the Second Circuit explained that there are different types of bodily searches:

> (1) a "strip search" occurs when a suspect is required to remove his [or her] clothes; (2) a "visual body cavity search" is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); and (3) a "manual body cavity search" occurs when the police put anything into a suspect's body cavity, or take anything out.

*15 Id. at 158 (citing 🚩 People v. Hall, 10 N.Y. 3d 303, 306-07 (2008)). The Circuit Court added, "The law governing these types of searches is far from settled; the rules alter with circumstances, and the circumstances are myriad. The key precedents turn kaleidoscopically on whether the arrest is for a felony or a misdemeanor, and whether the suspect is placed in the general prison population, among other considerations." Id. After discussing the various precedents, and whether the right at issue was "clearly established," meaning that the contours of the right are sufficiently clear that a reasonable officer would understand that what he [or she] is doing violates that right," id. at 160 (internal quotation marks, brackets, and citation omitted), the Second Circuit concluded that "a reasonable officer ... would not have understood that conducting an otherwise suspicionless visual body cavity search of a person arrested for a felony drug offense was unlawful," and that the defendants in Gonzalez were therefore entitled to qualified immunity. Id. at 162. Here, Artola conducted a visual body cavity search of Wheeler, who had been arrested for a felony drug offense, and although the court in Blue stated that "other courts in this Circuit have applied the reasonable suspicion standard to arrests for drug-related felonies," 2018 WL 1136613, at *15, the Second Circuit itself has not, nor has the Court been able to find any Supreme Court precedent that has. Blue did not involve an arrest on a drug-related felony charge, and thus, the court there noted,

> [A]lthough the Second Circuit held in 2013 that the law was not clearly

Wheeler v. Artola, Not Reported in Fed. Supp. (2019)

2019 WL 4593651

established with respect to felony drug crimes, *see* 🚩 *Gonzalez,* 728 F.3d at 161, the Second Circuit has never held, or even suggested, that searches incident to lawful felony arrests for non-drug related charges are presumptively lawful or otherwise would not be subject to the reasonable suspicion standard. Rather, the relevant precedents suggest the opposite conclusion. Indeed, even in *Gonzalez,* the Second Circuit repeatedly emphasized that **the heightened concerns that may or may not warrant strip searches appear when individuals are arrested for felony drug crimes, as these circumstances more easily give rise to a presumption that an individual possesses drugs or contraband**.

*Id.* (emphasis added).

Accordingly, the Court concludes that Artola, McHugh, and Thoelen are entitled to qualified immunity from liability on Wheeler's claim for an unlawful strip search. [28]

## VII. **Damages**

Because the Court does not find Defendants liable on any of Wheeler's claims, it does not reach the issue of damages.

## CONCLUSION

For the foregoing reasons, the Court finds that Wheeler **has failed to prove, by a preponderance of the evidence**, (1) that Defendants Artola and McHugh are liable on Wheeler's claims under 🚩 42 U.S.C. § 1983 for (a) an unlawful traffic stop, (b) a false arrest, and (c) an unlawful search of Wheeler's vehicle; (2) that Defendant Artola is liable on Wheeler's claim under 🚩 42 U.S.C. § 1983 for the use of excessive force based on (a) punching Wheeler's face, both before Wheeler was removed from his vehicle and after he was placed in handcuffs, and (b) slamming Wheeler's head into a wall during the strip search; and (3) that Defendant McHugh is liable on Wheeler's claim under 🚩 42 U.S.C. § 1983 for failure to intervene to prevent the excessive use of force during the strip search. The Court finds that Defendants Artola, McHugh, and Thoelen are entitled to qualified immunity on Wheeler's claim under 🚩 42 U.S.C. § 1983 for an unlawful strip search. Wheeler withdrew all of his claims against Defendant Weymer. Accordingly, the Clerk of the Court is directed to terminate Defendant Weymer from the action. The Clerk of the Court is also directed to terminate the motions at Docket ## 256, 257, 260, and 265.

Judgment shall be entered in favor of Defendants Artola, McHugh, and Thoelen.

This constitutes the Decision and Order of the Court.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4593651

---

## Footnotes

1      The parties have consented to my exercise of jurisdiction over this matter pursuant to 🚩 28 U.S.C. § 636(c). Docket ## 38, 55, 75, 76, 226, 228.

2      The action was commenced on September 23, 2016, but the Sixth Amended Complaint, filed on June 30, 2017, is the current operative pleading.

Wheeler v. Artola, Not Reported in Fed. Supp. (2019)

2019 WL 4593651

3   Although Wheeler had also asserted the claim for failure to intervene to prevent the excessive use of force during the strip search against Defendant Weymer, and had also asserted the claim for an unlawful strip search against Defendant Weymer based on either direct participation or a failure to intervene, during the trial, Wheeler withdrew all of his claims against Defendant Weymer. Trial Transcript ("Tr.") at 345-47.

4   Wheeler was initially represented by pro bono counsel for purposes of the trial, see Docket # 250 (Notice of Appearance of Pro Bono Counsel), but Wheeler terminated the representation on the second day of the trial. Tr. 220-24.

5   Virtually all of Artola's testimony concerning the events that transpired during the early morning hours of April 5, 2014, involving Wheeler is corroborated by Artola's Case Report, Pl.'s Ex. 16. McHugh's testimony is likewise corroborated by his Case Supplemental Narrative Report, Pl.'s Exs. 18, 36.

6   Wheeler likewise testified that he knew Artola prior to April 5, 2014. Tr. 164. McHugh testified that he did not know Wheeler, or know about Wheeler, before that night. Tr. 330.

7   McHugh testified that Wheeler was subjected to a search—a "pat down"—prior to being placed in the patrol car. Tr. 293, 317-18.

8   McHugh also did not notice any injuries on Wheeler when the strip search was conducted. Tr. 322; but see Tr. 194-95 (Artola testified that at the time of strip search, he noticed "a scrape or an abrasion in [Wheeler's] face"). McHugh testified that he noticed redness on Wheeler's cheek when Wheeler was being interviewed by the paramedics about a purported seizure he experienced while he was in the holding cell at the police station. Tr. 303-04. The purported seizure occurred around 2:38 am, over two hours after the traffic stop, which occurred around 12:16 am. See Pl.'s Ex. 20 (Intra Agency Memo). However, McHugh's testimony is in conflict with the Subject Resistance Report that he signed on April 5, 2014, in which McHugh noted that during the course of the arrest, Wheeler suffered injuries, which McHugh described as "facial redness on right side of face." Pl.'s Ex. 19; see also Pl.'s Ex. 17 (Artola's Subject Resistance Report that he signed on April 5, 2014, in which Artola noted that during the course of the arrest, Wheeler suffered injuries, which Artola described as "facial redness").

9   Sergeant, now Lieutenant, Joseph Tobin's memo was "a brief summary of an investigation conducted in regards to minor injuries sustained to defendant Damon Wheeler while in police custody" on April 5, 2014. Pl.'s Ex. 20 at 1. Tobin, who began his employment with the Middletown Police Department in June, 2001, was promoted several times, including promotions in 2008 to the rank of sergeant and 2018 to the rank of lieutenant. Tr. 331-32. On the night of April 5, 2014, he was serving as the patrol sergeant on the midnight shift. Tr. 332. As such, he was responsible for overseeing field operations and personnel. Id.

10  On cross-examination, Wheeler testified that the aerial photograph of West Main Street, Pl.'s Ex. 32/32-A, does not include the location where he stopped his vehicle because the gas station is not shown in the photograph, and he "was stopped a little bit before 200 [West Main Street]." Tr. 133-34; see also Tr. 48-49 (On direct examination, Wheeler testified, "I don't see the gas station [on Exhibit 32/32-A].... [Y]ou have to understand that the location of the gas station is important, because that's where they started, and the lights came on right after they pulled out of the gas station. I didn't stop too far past the gas station, so for them to say that I stopped way down at 245 West Main Street is wrong, it's incorrect, because we didn't go too far past the gas station.... [T]hat map doesn't seem appropriate to me because it should show the location of the gas station first. If it showed the location of the gas station, I could better describe to you where I actually stopped at."). Wheeler disputed that Artola activated his patrol car lights at 200 West Main Street as noted on the photograph. Tr. 134.

11  On cross-examination, Wheeler conceded that he "refused" Artola's orders to get out of the car. Tr. 135-36.

Wheeler v. Artola, Not Reported in Fed. Supp. (2019)

2019 WL 4593651

12  Lieutenant Jeffry Thoelen, who began his employment with the Middletown Police Department on August 22, 2005, was promoted to the rank of patrol sergeant in 2010 and to the rank of lieutenant, his current position, in 2014. Tr. 347-48. Thoelen was a lieutenant on the date of the incident in question. Tr. 348-49.

13  At trial, Thoelen said he had since reviewed Artola's paperwork concerning the strip search. When asked, "if the reasons [Artola] has given in his paperwork for the strip search were presented to you in that fashion, would you have approved it," he responded, "Yes." Tr. 351. However, Defendants' counsel was not referring to a specific trial exhibit when he asked that question, and none of Artola's paperwork that was admitted into evidence at trial includes a statement regarding Artola's reasons for wanting to conduct the strip search. The Court does not know what paperwork Thoelen reviewed that formed the basis for his answer to that question.

14  Wheeler testified that he was surrounded by five or six officers in the strip-search room, including Artola and McHugh. Tr. 68. Wheeler stated that Weymer was in the room as well. Id. As noted above, see footnote 3, during the trial, Wheeler decided to dismiss all claims against Weymer. Wheeler could not identify the other officers in the strip-search room. Tr. 68.

15  McHugh testified that his Taser had both a flashlight and a laser, but they were off during the strip search. Tr. 323.

16  See 🚩 N.Y. Veh. & Traf. Law §§ 375(2)(a)(1), (4) ("Every motor vehicle except a motorcycle, driven upon a public highway during the period from one-half hour after sunset to one-half hour before sunrise ... and at such other times as visibility for a distance of one thousand feet ahead of such motor vehicle is not clear, shall display: ... at least two lighted head lamps on the front, one on each side, having light sources of equal power; ... and ... if required to display a number plate on the rear, a white light which shall illuminate the numerals on such plate in such manner as to render such numerals legible for at least fifty feet from the rear.....").

17  Records from Orange Regional Medical Center related to Wheeler's admission on April 5, 2014, due to a possible seizure, state that Wheeler was found smoking crack. See Pl.'s Ex. 6 at 3 ("Pt was reportedly found smoking crack/cocaine by Middletown Police and so he swallowed the remaining drugs, as per Middletown Police."). Although Artola and McHugh both deny making such a statement to the hospital staff, Tr. 247-48 (Artola testified that Wheeler was not found smoking crack and that he did not witness Wheeler swallowing drugs, and he denied reporting to hospital staff that Wheeler was found smoking crack; Artola testified that part of this report was incorrect), 305-06 (McHugh testified that Wheeler was not found smoking crack, nor did he witness Wheeler swallowing any drugs; McHugh testified that this report to the hospital staff was false but that he did not know who made the report), this discrepancy in the record does not preclude the Court from finding that the officers had probable cause to stop Wheeler's vehicle based on traffic violations.

18  🚩 Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274 (1977).

19  Copies of all unpublished opinions are being sent to Wheeler with his copy of this Decision and Order.

20  In reaching its conclusion, the Court assumes arguendo that Wheeler was engaged in protected First Amendment activity when he argued with Artola and took the cellphone video.

21  With respect to the crime of obstructing governmental administration, "New York courts have further held that the official function being performed must be one that was 'authorized by law.' " Murray, 2017 WL 1194371, at *4 (citations omitted). Here, Artola had lawfully detained Wheeler's vehicle for traffic violations; therefore, under Mimms, Artola's order for Wheeler to exit the vehicle was lawful as well.

Wheeler v. Artola, Not Reported in Fed. Supp. (2019)

2019 WL 4593651

22   This echoes Artola's Case Report regarding Wheeler's arrest, which states,

> Once on the ground the defendant was placed under arrest and in handcuffs by PO McHugh. R[eporting]/O[fficer] then began searching the immediate grabbable area of the defendant within the vehicle. This is due to the defendant taking longer than normal to pull over, his active defiance in exiting the vehicle, and R/O's knowledge of the defendant to be a crack cocaine dealer.

Pl.'s Ex. 16 at 2.

23   Artola was reprimanded for reaching into the vehicle, <u>see</u> Pl.'s Ex. 22 ("Officer Artola was spoken to regarding these concerns and appears to have a better understanding of the risks associated with his conduct."), Pl.'s Ex. 23 (issues with Wheeler's arrest were addressed through counseling); <u>see</u> <u>also</u> Section V.A., <u>infra</u>, as such an action may have placed his safety at risk. This does not alter the basis for the arrest and subsequent search.

24   On cross-examination, Wheeler acknowledged his deposition testimony in which he had admitted to telling someone that he had been a drug dealer. Tr. 149-51. It was also elicited on cross-examination that Wheeler had been convicted in federal court of conspiracy to possess and distribute cocaine, and that the charges leading to the conviction involved actions taken by Wheeler in the Middletown area. Tr. 155-56.

25   Ewanciw, who became Chief of the Middletown Police Department in July, 2017, began his career with the Middletown Police in January, 2000. Tr. 383. He was promoted several times prior to becoming Chief: in early 2006 to the rank of Sergeant, and in February, 2010, to the rank of Lieutenant. <u>Id.</u>

26   Ewanciw testified at trial that he meant to use the word "arrangements." Tr. 389.

27   Artola testified that his reasons for wanting to conduct the strip search were Wheeler's possession of crack cocaine in his vehicle (a crime for which he was charged); Wheeler's delay in stopping his vehicle after Artola initiated a traffic stop; and Wheeler "being a known drug dealer," including Artola's previous observations of Wheeler selling cocaine. Tr. 193.

28   As the Court finds that McHugh did not participate in conducting the strip search itself, to the extent that Wheeler would seek to hold McHugh liable based on a claim of failure to intervene, the Court finds that McHugh is entitled to qualified immunity as well.

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 5848738
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Stoker Olukoton WILLIAMS, Plaintiff,

v.

Dr. Vincent GERACI and Officer
Robert "Bob" Koch, Defendants.

14-CV-5742 (SIL)
|
Signed 09/30/2020

**Attorneys and Law Firms**

Andrew T. Hambelton, Daria Morgan Barry, Rachel Lindsay Cohn, Blank Rome LLP, New York, NY, for Plaintiff.

Stoker Olukotun Williams, Wallkill, NY, pro se.

Brian C. Mitchell, Suffolk County Dept. of Law-County Attorney, Hauppauge, NY, for Defendants.

**MEMORANDUM AND ORDER**

STEVEN I. LOCKE, United States Magistrate Judge:

 **\*1** By way of Complaint filed on September 26, 2014, Plaintiff Stoker Olukotun Williams ("Plaintiff" or "Williams") commenced this action, *pro se*, asserting civil rights violations under 42 U.S.C. § 1983 (" Section 1983") against various individuals and entities for deliberate indifference to medical needs.[1] *See* Complaint ("Compl."), Docket Entry ("DE") [1]. On June 29, 2015, Williams filed an Amended Complaint, ("Am. Compl."), DE [44], and on June 28, 2016, he filed a Second Amended Complaint ("Sec. Am. Compl."), DE [123]. Following the Court's rulings on a partial motion to dismiss filed on June 29, 2016, *see* Memorandum & Order granting DE [122] Motion to Dismiss, dated January 10, 2017, DE [142], and a motion for summary judgment filed on August 26, 2016, *see* Memorandum and Order granting in part and denying in part DE [127] Motion for Summary Judgment, dated January 31, 2017, ("Summary Judgment Mem. & Order" or "Summary Judgment Memorandum and Order"), DE [145], Plaintiff's remaining claims are his Section 1983 cause of action against Defendant Dr. Vincent Geraci ("Geraci") for failing to provide medical

treatment between June 2014 and April 2016, and his state law claim against Officer Robert "Bob" Koch ("Koch") for intentional infliction of emotional distress. *See* Summary Judgment Mem. & Order, 26, 41.

Presently before the Court are the parties' motions *in limine*, filed on December 9, 2019, which include a Memorandum of Law in Support of Plaintiff's Motion *in Limine*, ("Pl. Mem.") DE [215-1], and a Memorandum of Law in Support of Plaintiff's Motion *in Limine* Requesting Adverse Inference ("Pl. Adverse Inference Mem."), DE [215-2], Defendants' December 9, 2019 Letter Motion *in Limine* ("Def. Ltr. Motion"), DE [214], and Defendants' August 5, 2020 Memorandum of Law in Opposition to Plaintiff's Motion *in Limine* ("Def. Opp."), DE [230].[2] At the outset, the Court notes that none of the motions *in limine* or the opposition includes any exhibits, and citations to specific parts of the record or elsewhere are sparse. In Williams's motion *in limine*, he seeks to bar Defendants from offering or eliciting evidence at the trial of: (i) his criminal history; (ii) his alleged use of prostitutes pre-incarceration; (iii) his entry into incarceration with a gunshot wound and bullet fragments in his arm; (iv) his prison disciplinary history, with the exception of events that are directly related to the claims in this action; (v) his mental health history; (vi) the reasons Plaintiff was housed in the observation bay at Riverhead Correctional Facility; and (vii) his other civil lawsuits and civilian complaints. Pl. Mem. at 1. In addition, Plaintiff requests: (viii) that he be allowed to appear in front of the jury unshackled and in regular clothes with a belt, and (ix) that Defendants be prohibited from appearing in front of the jury in uniform. *Id.* In his motion requesting an adverse inference, Williams requests that Defendants be precluded from offering into evidence or eliciting any testimony related to video footage from the Riverhead Correctional Facility, where he was housed during the relevant time period, and an adverse inference instruction regarding Defendants' spoliation of certain destroyed video footage. *See* Pl. Adverse Inference Mem. at 2.

 **\*2** In opposition, Defendants state that they do not object to Plaintiff's requests regarding: his alleged use of prostitutes pre-incarceration; grievance and disciplinary history not directly related to his claims; and that he was housed in the observation bay at Riverhead Correctional Facility due to gang affiliation. Def. Opp. at 2. Further, Defendants do not oppose Plaintiff's request to appear in plain clothes, and state that they take no position on the cuff and shackle request but defer to the guidance from the US Marshal on courtroom safety. *Id.* at 2-3. Finally, Defendants assert that they will

be appearing in traditional dress business clothing. *Id.* Thus, these portions of Plaintiff's motion are granted on consent with the understanding that any concerns expressed by the US Marshal will be dealt with if and when they are raised.

Accordingly, the Court will address the parties' motions as they relate to Plaintiff's: (i) criminal history; (ii) entry into incarceration with a gunshot wound and bullet fragments in his arm; (iii) mental health history; (iv) other civil lawsuits and civilian complaints; and (v) request for preclusion of video footage and an adverse inference. Finally, the Court will turn to Defendants' unopposed motion *in limine*, which seeks to preclude Plaintiff from introducing evidence regarding a prior 🚩 Section 1983 Civil Rights case against Geraci. *See generally* Def. Ltr. Motion.

For the reasons set forth herein, Plaintiff's motions are granted in part and denied in part, and Defendants' motion is granted.

## I. BACKGROUND

When Williams filed the original complaint, he was housed in Suffolk County Correctional Facility located in Riverhead, New York. [3] *See* Compl. at 5. Geraci is the Director of the Medical Unit at the Suffolk County Jail in Riverhead, *see* Affidavit, DE [127-14], Exhibit ("Ex.") H to First Motion for Summary Judgment, ¶1, and Koch is a Corrections Officer there, *see* Defendants' Rule 56.1 Statement ("Defs.' 56.1 Stmt."), DE [112-1], ¶35. Plaintiff is currently incarcerated in Shawangunk Correctional Facility in Wallkill, *see* Reply in Opposition to Plaintiff's Motion to Compel and Status of Production of Video Footage, DE [168], at 1, [4] where he is serving a sentence of life without parole plus 155 years for December 7, 2016 convictions for Murder in the First Degree, Robbery in the First Degree, Criminal Use of a Firearm in the First Degree, and Attempted Murder in the Second Degree. *See* Def. Opp. at 3.

### A. Plaintiff's Claims

The following description of Plaintiff's allegations concerning his remaining claims are taken from his Second Amended Complaint and from the Summary Judgment Memorandum and Order, and are provided for context purposes only.

Williams alleges that Geraci was deliberately indifferent to his medical needs while incarcerated by failing to provide medical treatment for back pain between June 20, 2014, and April 22, 2016. *See* Sec. Am. Compl. at 18-21, 29. In ruling on Defendants' summary judgment motion, the Court concluded that "Plaintiff's allegations of chronic pain combined with his positive diagnosis of spinal lipomatosis raises issues of fact as to whether he has suffered an objectively serious deprivation of adequate medical care," and "whether Dr. Geraci acted with a sufficiently culpable state of mind," based on, *inter alia*, Williams's allegations of filing numerous medical "chits" that were ignored and a note he wrote and grievance he filed related to these issues, such that a trial is appropriate. *See* Summary Judgment Mem. & Order at 22-26.

**\*3** Further, Plaintiff maintains a claim against Koch for intentional infliction of emotional distress based on various alleged statements and conduct, including that Koch told him that he wants to "execute [him] with his pistol," wrote down the addresses of Plaintiff's loved ones and told him "you can't protect them from here," Sec. Am. Compl. at 25, 34, and that between September 2013 and June 2014, Koch "berated [him] daily," telling him that (1) "he would love to volunteer for [Plaintiff's] firing squad," (2) "he [wa]s going to bring in his pistol and shoot [Plaintiff] in [his] head if his condition worsens," and (3) "in Texas, they would have executed [you] already." *Id.* at 34. Williams asserts that Koch was aware that gangs had a "hit" on his life and told him that "gang members [we]re going to have [Plaintiff] on [his] knees sucking dick all day ... [and] they [we]re going to make [Plaintiff] their bitch." *Id.* at 35. Further, Williams alleges that Koch told him that he "should hang [him]self after 3AM." *Id.* at 36. Plaintiff claims that he has suffered from nightmares and emotional distress as a result of Koch's alleged behavior. *Id.*

### B. Procedural History

Given that this case commenced six years ago, there is a lengthy procedural history. Below is an overview of the events that took place for context purposes.

#### i. Discovery, proposed exhibits and evidence

On May 22, 2015, the Honorable Arlene R. Lindsay, the Magistrate Judge originally assigned to this case, issued a scheduling order requiring that, prior to discovery, (1) Plaintiff prepare a written narrative statement of the facts he currently anticipates presenting at trial through the testimony

of witnesses or documentary evidence, and to file it and send it to Defendants by July 3, 2015 and (2) each defendant serve and file a written narrative of the facts they anticipate presenting at trial through the testimony of witnesses or documentary evidence, including a list of all exhibits they intend to offer, the names and addresses of all witnesses they intend to call, and a summary of each anticipated witness's testimony by August 14, 2015. *See* Scheduling Order, DE [34]. Next, the scheduling order required the parties to initiate discovery, which was to be completed by November 23, 2015. *Id.* Further, it required that by December 14, 2015, Williams was to submit a revised narrative statement, exhibit list, witness list, and summary of each witness's testimony. *Id.* The scheduling order stated that this was expected to be the final written presentation and "will accurately reflect the facts which plaintiff will establish at trial and accurately recite all exhibits plaintiff will introduce and all witnesses [he] will call, including the substance of each witness's testimony." *Id.* It further stated that "[a]ny evidence not fully and accurately disclosed in this final pretrial narrative statement and list of documents and witnesses will be excluded at the trial," and that there would only be an exception to prevent manifest injustice. *Id.* Finally, the order required Defendants to submit the pretrial order by January 18, 2016. *Id.*

On February 18, 2016, after Defendants requested and were granted an extension, *see* ORDER re DE [93], dated January 29, 2016, a proposed joint pretrial order was filed ("Proposed Pretrial Order"), *see* DE [101], along with an addendum on February 19, 2016. *See* DE [102]. On February 19, 2016, the Honorable Arlene R. Lindsay approved the Proposed Pretrial Order. *See* ORDER re DEs [101] [102], dated February 19, 2016.

In the Proposed Pretrial Order, Plaintiff's proposed list of exhibits include:

1. Medical records;

2. Minutes of writ court hearings;

3. Video footage;

4. Grievances;

5. Observation reports;

6. Paper work from County attorney;

7. Inmate handbook;

8. Cases related to Suffolk Jail; and

9. Newspaper article 12-5-15.

*See* Proposed Pretrial Order, 8.

Further, Defendants' proposed list of exhibits is comprised of:

a.) Plaintiff's Suffolk County Jail records;

b.) Plaintiff's Jail medical records;

c.) Jail Observation Reports of Plaintiff;

d.) Plaintiff's records from Peconic Bay Medical Center;

e.) Incident report relating to June 18, 2014 incident;

**\*4** f.) Minutes from Writ proceedings in State Supreme Court;

g.) Video footage of plaintiff; and

h.) Plaintiff's Suffolk County Jail Mental Health Records Summons "and complaint and amended complaint filed by plaintiff along with any other legal documents drafted by the plaintiff which pertain to the allegations he purportedly sets forth in this complaint."

*Id.* at 9.

The Court is unaware of any subsequent pretrial order, proposed or otherwise. The Proposed Pretrial Order was filed after Plaintiff's Amended Complaint, but before Plaintiff's Second Amended Complaint. *See* Am. Compl.; Sec. Am. Compl. It was also filed prior to the Summary Judgment Memorandum and Order. However, a claim against Geraci for deliberate indifference to medical needs was contained in all versions of the Complaint, *see* Compl.; Am. Compl; Sec. Am. Compl., and a claim against Koch for intentional infliction of emotional distress was set forth in both the Amended Complaint and the Second Amended Complaint. *See* Am. Compl; Sec. Am. Compl.

Further, Defendants filed the following exhibits with their motion for summary judgment:

1. Plaintiff's Suffolk County Jail Medical Records to June 23, 2015;

2. Deposition Excerpts of Stoker Williams;

3. Observation Reports for Stoker Williams;

4. Interrogatory responses of Dr. Vincent Geraci;

5. Suffolk Jail Grievance R-2015-043;

6. Suffolk Jail Grievance R-2015-151;

7. Plaintiff's Suffolk County Jail Medical Records July 2015 to Present;

8. Affidavit of Dr. Vincent Geraci dated August 26, 2016;

9. Affidavit of Deputy Sheriff Allen Shapiro dated August 19, 2016;

10. Affidavit of Deputy Sheriff Douglas Mehrman dated August 19, 2016;

11. Suffolk County Sheriff's Sergeant Assignment Sheet; and

12. Suffolk County Jail Inmate Handbook.

*See* Declaration in Support of the Defendants' Rule 56 Motion, DE [127-4].

Moreover, Williams included exhibits with his Rule 56.1 Counterstatement, ("Pl.'s 56.1 Counterstmt."), DE [112-2], as well as his Response to Motion Re: DE [127] First Motion for Summary Judgment, DE [131], which the Court construed as a Supplemental Rule 56.1 Counterstatement ("Pl.'s Suppl. 56.1 Counterstmt.") in response to Defendants' Supplemental Rule 56.1 Statement filed with their summary judgment motion. *See* Summary Judgment Mem. & Order, 2, n.1. Plaintiff included an exhibit list with his Supplemental Rule 56.1 Counterstatement, which contains, as Williams describes: (1) a response to a grievance he filed, (2) a grievance he filed about a trip to the hospital, (3) a court order forcing the jail to allow him to use a wheelchair, (4) a blank medical grievance, (5) a blank medical chit, (6) an article about the jail's medical unit, (7) a lawsuit filed against the jail's medical unit, (8) the court transcript from a Habeas Corpus hearing seeking medical care, (9) observation reports, (10) a record of medical forms he gave nurses, [5] (11) court transcripts from a Habeas Corpus hearing, (12) an answer to a grievance he put in about his 23-hour lockdown status, (13) an article about sciatica, herniated discs, and how to diagnose and treat spinal conditions, (14) pages from the inmate handbook about requesting medical care, (15) his medical records, (16) grievances, letters to

internal affairs seeking video footage, (17) a letter to the warden, (18) exhibits "related to video," (19) questions Nurse Webster answered, and (20) a chapter from a book called "A Jailhouse Lawyer's Manual." *See* DEs [131-2], [131-4], [131-5]. As set forth above, there were also various exhibits filed with Plaintiff's Rule 56.1 Counterstatement, many of which match those included with the Supplemental 56.1 Supplemental Counterstatement. The record does not indicate that additional discovery took place following the Proposed Pretrial Order, other than limited expert discovery discussed below.

**\*5** Further, throughout this litigation, Plaintiff made numerous attempts to obtain video footage for a time frame beginning in early 2014 from Defendants for his housing area in the jail, *see* DEs [17], [33], & [49], but was ultimately able to view video footage only from select dates in 2015. *See* ORDER re DE [49], dated September 8, 2015, DE [56].

### *ii. Pretrial Events*

On July 19, 2018, a pretrial conference was held, and a trial was set for December 17, 2018. *See* Minute Order for Pretrial Conference, DE [160].

Following a series of changes to the trial date, *see, e.g.*, DE [169], Electronic Order dated January 16, 2019, DE [183], Electronic Order dated February 19, 2019, Electronic Notice of Hearing (Date Change) dated May 31, 2019, the trial was scheduled for December 16, 2019.

At an October 25, 2019 status conference, the parties consented to the case being reassigned to this Court. *See* DE [195]. On November 4, 2019, Plaintiff was appointed counsel, who for reasons irrelevant to the present motion, no longer represents him. There were two more status conferences on November 6, 2019, DE [201], and November 20, 2019, DE [203]. At the November 20, 2019 conference, Plaintiff made an oral motion to take the deposition of a treating physician, which was granted. *Id.*

On December 6, 2019, Plaintiff requested an adjournment of the trial in order to conduct expert discovery. *See* DE [210].

On December 9, 2019, both parties filed proposed jury instructions, *see* DEs [211], [212], and Williams filed a proposed voir dire, *see* DE [213].

On December 10, 2019, Williams's motion to adjourn the trial date and conduct expert discovery was granted. *See*

Electronic ORDER granting DE [210] Motion to Continue. In the electronic order, the Court directed the parties to meet and confer for the purposes of drafting a proposed amended scheduling order for expert discovery with two sets of trial dates, to be filed on or before January 6, 2020. *Id.*

On December 23, 2019, the parties filed a joint letter with their proposed expert discovery schedule and requested to revisit trial dates in April 2020. DE [217]. No trial date was ultimately selected, and it's unclear from the record if expert discovery was conducted or completed.

## II. LEGAL STANDARDS

### A. Motion *in Limine*

"The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." *Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 536 (E.D.N.Y. 2011) (citing *Luce v. United States*, 469 U.S. 38, 40 n.2 105 S. Ct. 460, 463 n.2 (1984)). Evidence should only be excluded if it is inadmissible on all potential grounds. *See Porter v. Home Depot U.S.A., Inc.*, No. 12-cv-4595, 2015 WL 128017, at *2 (E.D.N.Y. Jan. 8, 2015); *United States v. Paredes*, 176 F. Supp. 2d 179, 181 (S.D.N.Y. 2001). Courts considering a motion *in limine* may reserve decision until trial in order to place the motion in the appropriate factual context. *Jean-Laurent*, 840 F. Supp. 2d at 536; *see Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 283 (S.D.N.Y. 1996). The court's ruling is also "subject to change when the case unfolds, particularly if the actual testimony differs from what was [expected]." *Luce*, 469 U.S. at 41, 105 S. Ct. at 463.

Evidence must be relevant in order to be admissible at trial. Fed. R. Evid. 402. Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. The standard is "very low." *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (quoting *United v. Al-Moavad*, 545 F.3d 139, 176 (2d Cir. 2008)). All relevant evidence is admissible unless the United States Constitution, a federal statute, the Federal Rules of Evidence, or rules prescribed by the Supreme Court provide otherwise. Fed. R. Evid. 402; *see White*, 692 F.3d at 246.

### B. Plaintiff's Claims

#### i. Deliberate Indifference to Medical Needs

**\*6** The Second Circuit has two requirements for Plaintiff to establish deliberate indifference to medical needs. The first requirement, which is objective, asks whether "the alleged deprivation of adequate medical care" is "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (internal quotations marks and citations omitted). This inquiry has two components: whether the Plaintiff was "actually deprived of adequate medical care," and "whether the inadequacy in medical care is sufficiently serious." *Id.* at 279-80 (internal quotations marks and citations omitted). The second requirement is subjective, and requires that the charged official "acted with a sufficiently culpable state of mind." *Id.* (internal citation omitted).

#### ii. Intentional Infliction of Emotional Distress

In New York State, a claim for intentional infliction of emotional distress "requires a showing of: '(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.' " *Rich v. Fox News Network, LLC*, 939 F.3d 112, 122 (2d Cir. 2019) (citing *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353 (1993)).

## III. DISCUSSION

### A. Plaintiff's Motions

#### i. Plaintiff's Criminal History

As part of his motions, which Defendants oppose, Williams seeks to preclude Defendants from eliciting or introducing any evidence or testimony regarding his criminal history, including the length of his sentence and the underlying circumstances surrounding his arrest and prosecution leading to his incarceration. Pl. Mem. at 2.

#### a. Rule 609(a)(1)

Defendants seek to admit Plaintiff's prior convictions for impeachment purposes under Rule 609(a)(1), *See* Def. Opp. at 3. Specifically, Defendants request to admit the nature of the charges, the level of convictions, and the ultimate sentence. *See id.* Plaintiff argues that the unduly prejudicial effect of this evidence outweighs the probative value under Rule 403, and therefore exclusion is appropriate. Pl. Mem. at 4-8.

##### 1. Legal Standards

Fed. R. Evid. 609(a) provides, for convictions less than ten years old, that when attacking a witness's character for truthfulness by evidence of a criminal conviction, "for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence ... must be admitted, subject to Rule 403, in a civil case ..." Fed. R. Evid. 609 (a)(1)(A). Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see United States v. Estrada,* 430 F.3d 606, 620-21 (2d Cir. 2005) (setting forth the standard). Further, "[i]n balancing the probative value against prejudicial effect under [Rule 609(a)(1)], courts examine the following factors: (1) the impeachment value of the prior crime, (2) the remoteness of the prior conviction, (3) the similarity between the past crime and the conduct at issue, and (4) the importance of the credibility of the witness." *Daniels v. Loizzo,* 986 F. Supp. 245, 250 (S.D.N.Y. 1997) (citing *United States. v. Hayes,* 553 F.2d 820, 828 (2d Cir. 1977)) (other citation omitted). "Although all of these factors are relevant, '[p]rime among them is [the first factor, i.e.,] whether the crime, by its nature, is probative of a lack of veracity.' " *United States v. Brown,* 606 F. Supp. 2d 306, 312 (E.D.N.Y. 2009) (quoting *United States v. Ortiz,* 553 F.2d 782, 784 (2d Cir. 1977)). " '[C]rimes of violence and assaultive behavior have limited probative value concerning a witness's credibility.' " *Dougherty v. Cty. of Suffolk,* No. 13-cv-6493, 2018 WL 1902336, at *4 (E.D.N.Y. Apr. 20, 2018) (quoting *Celestin v. Premo,* No. 12-CV-301, 2015 WL 5089687, at *2 (N.D.N.Y. Aug. 27, 2015)). In addition, "[t]he second factor, remoteness, is measured from the date of trial, and more recent convictions are deemed to be more probative than older convictions." *Jean-Laurent v. Hennessy,* 840 F. Supp. 2d 529, 544 (E.D.N.Y. 2011) (citing *Stephen v. Hanley,* No. 03-cv-6226, 2009 WL 1471180, at *4 (E.D.N.Y. May 21, 2009)). Further, the third factor "deals with the similarity of the charged crimes, or the incident at issue in the pending case, to the conviction. The less similar the pending case to the prior conviction, the less prejudicial its admission is." *Hanley,* 2009 WL 1471180 at *5 (citing *United States. v. Hayes,* 553 F.2d 820, 828 (2d Cir. 1977)). Last, "where the credibility of a given witness is particularly important because there is little other documentary or supporting evidence and 'success at trial probably hinges entirely on [the witness's] credibility with the jury,' the fourth factor weighs in favor of admission of the prior conviction." *Jean-Laurent,* 840 F. Supp. 2d at 544 (citing *Jones v. City of New York,* No. 98-cv-6493, 2002 WL 207008, at *3 (S.D.N.Y. Feb. 11, 2002)).

##### 2. Application

###### i. Impeachment Value of Prior Crimes

**\*7** For all four convictions, the first factor weighs against admission. As set forth above, crimes of violence, such as those at issue here, have limited probative value concerning credibility. *See United States v. Flaharty,* 295 F.3d 182, 191 (2d Cir. 2002) ("Murder generally is not a crime of dishonesty ..."); *Dougherty,* 2018 WL 1902336 at *4 (E.D.N.Y. Apr. 20, 2018) (finding that robberies are "crimes of violence with little if any bearing on credibility"); *Espinosa v. McCabe,* No. 10-cv-497, 2014 WL 988832, at *1, 4 (N.D.N.Y. Mar. 12, 2014) (finding that the impeachment value of prior convictions weighs against admission for a plaintiff's felony convictions, which included Attempted Murder in the Second Degree and Criminal Use of a Firearm in the First Degree).

###### ii. Remoteness

As set forth above, remoteness is calculated from the date of trial. Given that at trial date has not been set in this matter, the Court is unable to fully consider this factor. However, the Court notes that this factor will likely favor admission, as at this time, the conviction is not even four years old.

*See* 🔖 *Jean-Laurent*, 840 F. Supp. 2d at 544 (finding the remoteness factor favors admission where the conviction is six years old, "well within the ten-year limit imposed by Rule 609").

iii. Similarity Between the Past Crimes and Conduct at Issue

Plaintiff's claims of deliberate indifference to medical needs and intentional infliction of emotional distress bear no similarities to the convictions. Thus, the Court finds that this factor weighs in favor of admission.

iv. Importance of the Credibility of the Witness

The Court also finds that credibility of the witness weighs in favor of admission. Although Plaintiff does plan to point to documentary evidence in this matter, *see* Proposed Pretrial Order, for the intentional infliction of emotional distress claim in particular, which is supported by statements Koch allegedly made to Williams, the Court expects that Plaintiff's credibility will be a key factor in assessing this claim. [6]

3. Conclusion

Although the Court finds that the third and fourth factors, and potentially the second factor, favor admission, the probative value of the convictions is substantially outweighed by the unfair prejudice that Williams may face under Rule 403 by allowing admission of his convictions. *See, e.g.*, *Zulu v. Barnhart*, No. 16-cv-1408, 2019 WL 3239397, at *2 (N.D.N.Y. July 18, 2019) (citing *United States v. Agostini*, 280 F. Supp. 2d 260, 262 (S.D.N.Y. 2003)) (finding that a plaintiff's prior murder conviction is highly prejudicial and could cause the jurors to evaluate his worth as a witness based on that conviction, regardless of its irrelevance to his claim).

Thus, the Court will allow admission of the fact that Williams was convicted of four felonies, when he was convicted, and the fact that he is currently incarcerated and serving a sentence, but will not allow admission of which crimes Plaintiff was convicted of, the facts underlying the offenses, or the length of the sentence, other than to state that the felonies are punishable by a term of imprisonment of more than one year. *See* *Hines v. Huff*, No. 16-cv-503, 2019 WL 3574246, at *2 (N.D.N.Y. Aug. 6, 2019) (internal citations omitted) (allowing defendants to introduce that a plaintiff was convicted of felonies punishable by a term of imprisonment of more than one year, but not the sentence, stating that "[t]he length of a sentence may bear a relation to the gravity of an offense" and finding that admitting the length of the sentence "creat[es] a danger of unfair prejudice because the jury might infer from its length that Plaintiff committed a serious violent crime, and unfairly decide this case, involving a physical altercation with the officers, based on such an inference"); *see also* *Olutosin v. Gunsett*, No. 14-CV-00685, 2019 WL 5616889, at *10 (S.D.N.Y. Oct. 31, 2019) (allowing the defendants "to cross-examine the plaintiff about the fact that he is a convicted felon serving an indeterminate sentence greater than 25 years" but precluding defendants from "offer[ing] evidence regarding the specific offenses charged, the actual length of the sentence, or the underlying details of the offense").

**\*8** Accordingly, Plaintiff's motion to preclude which crimes Plaintiff was convicted of, the underlying details of the convictions, and the length of the sentence is granted.

**b. Rule 608(b)(1)**

In addition to seeking to admit Plaintiff's prior convictions under Rule 609, Defendants seek to cross-examine Williams about the events leading to his arrest and conviction, namely, that he was convicted for September 7, 2013 conduct where he robbed someone at gunpoint, murdered her by shooting her in the head, engaged in a shootout with the police during which he was shot in the arm, and ran from the scene and tried to evade capture by hiding in the woods, under Rule 608(b)(1). *See* Def. Opp. at 4. Defendants argue that the facts underlying Plaintiff's conviction should be admissible to impeach his credibility and show his lack of truthfulness because they contrast with statements he made elsewhere, specifically, invoking his Fifth Amendment privilege during his deposition, but at his criminal trial, telling the jury that he did not commit the crime, but it was one of his other personalities named Malik. *Id.* Defendants argue that Plaintiff claims that he suffers from schizophrenia and has been diagnosed with that condition, but that during the police interrogation, he did not mention any other personalities, including Malik. *Id.*

1. Legal Standard

Rule 608(b) provides in relevant part that: "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of ... the witness." Fed. R. Evid. 608(b)(1). The admissibility of evidence under Rule 608(b) "is subject to the probative-prejudice balancing test in Rule 403." ⚑ *Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 552 (citing ⚑ *United States v. Schwab*, 886 F.2d 509, 513 (2d Cir. 1989)).

### 2. Application

The Court concludes that Williams telling the jury in his criminal trial that he did not commit the crime, but then stating that another one of his personalities named Malik did, while failing to mention multiple personalities during the police interrogation following his arrest, is relevant to truthfulness, and thus may be explored on cross-examination. However, the Court finds that the probative value of the facts underlying Plaintiff's arrest, which point to his involvement in violent crimes, is outweighed by the potential to unduly prejudice the jury against Plaintiff.

### 3. Conclusion

Accordingly, the facts underlying Williams's conviction are inadmissible, but pursuant to Rule 608(b), on cross-examination, Plaintiff's statements at his criminal trial regarding multiple personalities, and the fact that he did not mention another personality in the police interrogation following his arrest, may be addressed.

In reaching this conclusion, the Court notes three arguments made by Defendants. Defendants assert that the facts underlying Plaintiff's arrest and conviction should be admissible to attack his credibility because the physical activity of running in the woods and evading capture belie his claim that he had a back condition requiring medical attention when he entered the jail. Def. Opp. at 4-5. Moreover, these events may have caused Plaintiff distress or emotional trauma and are thus probative on the issue of damages. *Id.* at 5. Finally, Defendants appear to argue that the events leading to the conviction, which include that he robbed his victim at

gunpoint and thereafter murdered her by shooting her in the head, followed by a shootout with the police in which he was shot in the arm, ran from the scene, and hid in the woods to avoid capture, should be admissible because these facts may have also caused him emotional distress. While the Court acknowledges that there is some relevance to this evidence for the reasons Defendants argue, ultimately, the probative value is outweighed by the unduly prejudicial impact it may have on the jury's deliberations. [7]

**\*9** Accordingly, Plaintiff's motion regarding his criminal history is granted. Defendants, however, may cross-examine Plaintiff regarding his comments about an alternate personality, and failing to mention this during a police interrogation.

### *ii. Plaintiff's Gunshot Wound*

Williams asserts that during his deposition, Defendants tried to elicit testimony from him about a gunshot wound he had at the time of his arrest. Pl. Mem. at 9. He argues that the fact that he entered the prison system with a gunshot wound, and that he currently has bullet fragments in his arm, should be precluded under Rules 401-404 as irrelevant, prejudicial, and improper character evidence. *Id.*

For the reasons set forth below, the Court deems the fact that the Plaintiff entered jail with a gunshot wound inadmissible. As a result, Plaintiff's motion is granted in this respect.

### a. **Legal Standards**

"[Fed. R. Evid. 402] requires that evidence be relevant to be admissible," which "is defined as evidence 'having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " ⚑ *Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 536 (E.D.N.Y. 2011) (quoting Fed. R. Evid. 401). Thus, "the court's determination of what constitutes 'relevant evidence' is guided by the nature of the claims and defenses in the cause of action." *Id.*

Further, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance

with the character." Fed. R. Evid. 404(b)(1). Nevertheless, "this evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

Finally, as set forth above, under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "In making a Rule 403 determination, courts should ask whether the evidence's proper value 'is more than matched by [the possibility] ... that it will divert the jury from the facts which should control their verdict.' " Jean-Laurent, 840 F. Supp. 2d at 537 (quoting Bensen v. Am. Ultramar, Ltd., No. 92-cv-4420, 1996 WL 422262, at *6 (S.D.N.Y. July 29, 1996)).

### b. Application

Based on Defendants' argument that the fact that Plaintiff entered jail with a gunshot wound "is probative on the issue of the extent of his purported continuing back injury," Def. Opp. at 6, the Court understands Defendants to be arguing that this fact is relevant to Williams's Section 1983 claim for deliberate indifference to his medical needs against Geraci. Thus, the Court considers this evidence pursuant to Rules 402 and 403.

In their opposition, Defendants assert that the gunshot wound is relevant because Williams alleges that he made repeated complaints about his back since he entered the jail, but that his medical records belie this claim. [8] *Id.* However, the Court finds that Plaintiff's gunshot wound to his arm when he entered in September 2013 is of limited relevance to his claim that between June 20, 2014 and April 22, 2016, Geraci was deliberately indifferent to his medical needs concerning chronic pain in his back.

**\*10** Further, to the extent the gunshot wound is relevant, this evidence would be unfairly prejudicial under Rule 403. It appears that the gunshot wound occurred during the events that led to Plaintiff's conviction. When Williams was admitted to jail, "he had a gunshot wound to his arm caused during the commission of the crime for which he was incarcerated." *See* Defs' 56.1 Statement, ¶1. Thus, this could lead the jury

to speculate that Plaintiff was convicted of violent crimes, a fact which, as set forth above, the Court deems to be unfairly prejudicial.

### c. Conclusion

Therefore, the Court concludes that evidence that Williams entered jail with a gunshot wound is inadmissible and Plaintiff's motion regarding the gunshot wound is granted.

### *iii. Plaintiff's Mental Health History*

Williams next seeks to exclude evidence of his mental health history, including his diagnosis of schizophrenia and his mental health treatment while incarcerated on the grounds that it is irrelevant, not probative of any fact of consequence in this litigation, unfairly prejudicial, confusing to the jury, a waste of judicial resources, and improper character evidence. Pl. Mem. at 10. Plaintiff's motion in this regard is denied.

### a. Legal Standards

A witness's psychological history may be admitted as evidence when it goes to credibility. United States v. Sasso, 59 F.3d 341, 347 (2d Cir. 1995) (citing Fed. R. Evid. 611(b)). Further, "[a] mere history of psychological illness, not probative of the witness's state of mind at the time of the events being recalled, should not be admitted and risks stereotyping people with mental illness as incapable of testifying to events." Hernandez v. Kelly, No. 09-cv-1576, 2011 WL 2117611, at *5 (E.D.N.Y. May 27, 2011) (citing Sasso, 59 F.3d at 348); *see also* Lewis v. Velez, 149 F.R.D. 474, 484 (S.D.N.Y. 1993) ("A holding that any and all aspects of a witness' psychiatric history are probative of credibility would embrace unwarranted stereotypes of persons who seek mental health treatment."). In assessing the probative value of the evidence, Courts consider: (1) "the nature of the psychological problem," (2) "the temporal recency or remoteness of the history," and (3) "whether the witness suffered from the problem at the time of the events to which she is to testify, so that it may have affected her ability to perceive or to recall events or to testify accurately." Sasso, 59 F.3d at 347-48 (internal quotation marks and citations omitted). Further, the Court "has discretion to limit

such evidence if it determines that the probative value of the evidence is outweighed by its potential for unfair prejudice, confusion of the issues, or waste of time." *Id.* at 348 (citing Fed. R. Evid. 403; *Chnapkova v. Koh*, 985 F.2d 79, 81 (2d Cir. 1993)).

### b. Application

Defendants assert that Plaintiff's mental health history is probative of his "credibility and ability to perceive or recall events or to testify truthfully." Def. Opp. at 6. In support of their assertions, Defendants state that there are mental health records, in addition to Williams's "admissions in submissions to the Court," which includes a subsequent lawsuit, "that he has, or at least claims to have, suffered from a mental disorder that causes him to experience delusions that grossly distort his reactions to events." *Id.* at 7. [9] Further, Defendants argue that Plaintiff's mental health history is admissible on the issue of damages in relation to his claim against Koch for intentional infliction of emotional distress. *Id.*

**\*11** Initially, for the nature of the psychological problem at issue, a diagnosis of schizophrenia weighs in favor of admission. Here, in Plaintiff's January 28, 2016 deposition transcript, a portion of which Defendants included with their summary judgment motion, Williams stated that he was diagnosed schizophrenia while incarcerated at Suffolk County Jail. *See* Deposition Excerpts of Stoker Williams, DE [127-7], Ex. B to First Motion for Summary Judgment, 12-13. Further, as Defendants assert in their opposition, at his criminal trial Plaintiff testified that another personality, Malik, committed his crimes. *See* Def. Opp. at 4. These facts are directly relevant to Williams's credibility at trial.

Next, Plaintiff's statement regarding schizophrenia he made during his January 28, 2016 deposition is sufficiently recent.

*See, e.g.*, *Hernandez v. Kelly*, 09-cv-1576, 2011 WL 2117611, at \*5 (E.D.N.Y. May 27, 2011) ("[P]laintiff's diagnosis in 2004 is close enough in time to the underlying event (less than ten years) to be probative, where one can reasonably conclude that plaintiff's condition may have been evident on the day of the incident.")

Finally, whether Plaintiff suffered from the issue during the events to which he will testify, given that his allegations span from September 2013, which is when he entered jail, through at least April 2016, if he was diagnosed with schizophrenia

while incarcerated, at least prior to his January 28, 2016 deposition, it was undoubtedly present during at least some of the events to which he will testify.

### c. Conclusion

Here, the fact that Plaintiff claims he was diagnosed with schizophrenia while in jail, which presumably was present during the time period spanning his allegations, coupled with his claim that an alternate personality named Malik committed his crimes, *see* Def. Opp. at 4, the Court finds that Plaintiff's mental health history is admissible on these two issues. *See, e.g.*, *Lewis v. Velez*, 149 F.R.D. 474, 484–85 (S.D.N.Y. 1993) (allowing admission of parts of psychiatric history that describe hallucinations and delusions). Accordingly, Plaintiff's motion to preclude evidence of his psychological history is denied.

### iv. Plaintiff's Other Civil Lawsuits or Civilian Complaints

In his motion, Plaintiff states that "he objects to Defendants introducing any evidence or testimony regarding other lawsuits filed by Plaintiff to show that he has a character trait or propensity for litigiousness and, therefore, lacks credibility." Pl. Mem. at 16. Plaintiff specifically references the lawsuits he commenced in 2015 and 2016 against Suffolk County Medical Examiner Odette Hall, Suffolk County District Attorney Thomas Spota, and Suffolk County. [10]

### a. Legal Standards

It is improper for a court to admit evidence of prior lawsuits for the purpose of demonstrating that a plaintiff is a "chronic litigant." *See* *Outley v. City of New York*, 837 F.2d 587, 591-92 (2d Cir. 1988); *Jean-Laurent v. Hennessy*, 840 F.Supp. 2d 529, 542 (E.D.N.Y. 2011). Further, Fed. R. Evid. 404(b) prohibits the admission of evidence of prior acts in order to prove action in conformity with character. Fed. R. Evid. 404(b); *see also* *Ragin v. Newburgh Enlarged City School Dist.*, 2011 WL 2183175, at \*2 (S.D.N.Y. June 3, 2011). Evidence of prior or subsequent lawsuits can, however, be admitted to "show a possible cause of ... injury unrelated to the acts of the defendant," *Brewer v. Jones*, 222 Fed. App'x 69, 70 (2d Cir. 2007), or if it is offered for a different purpose

under Rule 404(b). Fed. R. Evid. 404(b); *see* Outley, 837 F.2d at 592; *see also Napolitano v. Synthes, Inc.*, No. 09-cv-828, 2014 WL 12868859, at *2 (D. Conn. May 2, 2014). As set forth above, Rule 404(b) requires a two-step analysis: "first, consideration of whether the evidence fits within the exceptions listed in the rule and, second, balancing the probative value of the evidence against the likelihood of undue prejudice, equivalent to the analysis under Rule 403."

Outley, 837 F.2d at 592 (citing Fed. R. Evid. 404, Notes of Advisory Committee).

### b. Application

**\*12** Plaintiff's motion to bar introduction of this lawsuit is granted in part and denied in part. In their opposition, Defendants seek to introduce evidence of a subsequent lawsuit brought by Plaintiff to impeach his "credibility and ability to perceive, recall or testify accurately," and because it is probative on this issue of damages for the intentional infliction of emotional distress claim. *See* Def. Opp. at 7-8. Defendants argue that the lawsuit, *see Williams v. Hall et al.*, 16-cv-6830, Docket Sheet (E.D.N.Y.), confirms that Williams suffers from schizophrenia, references a psychotic episode and an alternate personality, and is probative on the issue of damages since in the lawsuit, Plaintiff sues, *inter alia*, the medical examiner from his trial for intentional infliction of emotional distress, claiming she lied when she said the victim was shot in the back of her head. *Id.* As a result, the lawsuit is not being introduced to show that he is a chronic litigant, rather, it is being introduced for another purpose, to impeach Williams's credibility and show inconsistency in his statements. The Court agrees that these portions of the lawsuit concerning Plaintiff's schizophrenia, a psychotic episode, and an alternate personality are admissible.

However, certain allegations made in this lawsuit are inadmissible under Rule 403 as unduly prejudicial. The complaint in the lawsuit references the fact that Plaintiff shot his victim. *See Williams v. Hall et al.*, 16-cv-6830, Docket Sheet (E.D.N.Y.), DE [1]. Thus, because certain statements made during the course of this lawsuit are relevant to Plaintiff's intentional infliction of emotional distress claim and his credibility, the Court finds that introducing portions of the lawsuit, in which Plaintiff references that he shot the victim of his crimes, would be inappropriate.

### c. Conclusion

Accordingly, Plaintiff's motion *in limine* is granted in part only to the extent that statements concerning his criminal history made in the context of this litigation may not be introduced.

### *v. Preclusion of Video Footage and Adverse Inference Instruction*

Williams next claims that Defendants destroyed surveillance footage from Riverhead Correctional Facility that likely contained information favorable to his claims. *See* Pl. Adverse Inference Mem., 2-3. Based on this conduct, Plaintiff argues that Defendants' spoliation of the video footage warrants an adverse inference instruction to the jury. *See id.* at 3, 7-9. For the reasons set forth below, Plaintiff's motion regarding spoliation and an adverse inference is denied.

### a. Legal Standards

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). It is widely accepted in the Second Circuit that parties should not benefit from spoliation, and a federal district may impose sanctions under Federal Rule of Civil Procedure 37(b) or pursuant to "its inherent power to manage its own affairs" when a party destroys evidence. *See*

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d at 99, 107 (2d Cir. 2002); *see also Zubalake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003).

A court will only order an adverse inference instruction if the requesting party can establish "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind;' and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Official Committee of Unsecured Creditors of Exeter Holdings, Ltd. v. Haltman et al.*, No. 13-cv-5475, 2015 WL 5027899, at *7 (E.D.N.Y. Aug. 25, 2015),

*report and recommendation adopted*, No. 13-CV-5475, 2016 WL 128154 (E.D.N.Y. Jan. 12, 2016) (citing *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

For the duty to preserve, parties are obliged to preserve evidence when the party has notice that the evidence is relevant to litigation. *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). This involves two related inquiries: "when does the duty to preserve attach, and what evidence must be preserved?" *Hernandez v. Hacienda Mexicana Corp.*, No. 17-5608, 2018 WL 6427639, at *4 (S.D.N.Y. Dec. 6, 2018) (citing *Zubulake*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003)). The obligation to preserve arises when "the party has notice that the evidence is relevant to litigation, and ... this obligation may arise prior to the filing of a suit if the litigation is reasonably anticipated." *Toussie v. Cnty of Suffolk*, No. 01-cv-6716, 2007 WL 4565160, at *6 (E.D.N.Y. Dec. 21, 2007). Further, "[o]nce the duty to preserve evidence attaches, a party must save any evidence that it 'reasonably know is relevant' to an anticipated action." *Taylor v. City of New York*, 293 F.R.D. 601, 611 (S.D.N.Y. 2013). A litigant is under no duty to retain every document in its possession, but it is "under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Haltman*, 2015 WL 5027899, at *7 (citing *Zubalake*, 220 F.R.D. at 217) (internal citations omitted). This covers documents or tangible things made by those who have discoverable information "that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A). It can also include documents prepared for those individuals, as well as any information relevant to the claims or defenses of any other party. *Id.*; *see also* Fed. R. Civ. P. 26(b)(1).

**\*13**  Moreover, even in instances where a party has breached its obligation to preserve, "sanctions will only be warranted if the party responsible for the loss had a sufficiently culpable state of mind." *In re WRT Energy Sec. Litig.*, 246 F.R.D. 185, 195 (S.D.N.Y. 2007); *see also* *Kronisch v. U.S.*, 150 F.3d 112, 127 (2d Cir. 1998) ("Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that

evidence."). A party is culpable if it can be shown that the evidence was destroyed "knowingly, even if without intent to breach a duty to preserve it, or negligently." *Residential Funding Corp.*, 306 F.3d at 108. "In the discovery context, negligence is a failure to conform to the standard of what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding." *In re Pfizer Secs. Litig.*, 288 F.R.D. 297, 314 (S.D.N.Y. 2013) (internal quotations omitted). "Once the duty to preserve attached, any destruction [of relevant evidence] is, at a minimum, negligent." *Taylor*, 293 F.R.D. at 612 (quoting *Slovin*, 2013 WL 840865, at *4).

Finally, "[r]elevance may be assumed where the breaching party acted in bad faith or with gross negligence." *Haltman*, 2015 WL 5027899, at *9 (citing *Neverson-Young v. Blackrock, Inc.*, 09-cv-6716, 2011 WL 3585961, at *2 (S.D.N.Y. Aug. 11, 2011)). However, where the Defendants were merely negligent, Plaintiff must demonstrate not just ordinary relevance, but that the spoliated evidence "would have been of some 'assistive relevance' and favorable to the moving party's claims or defenses." *Residential Funding*, 306 F.3d at 108-10. The burden is on Plaintiff to show, *via* some extrinsic evidence, that the destroyed surveillance footage would have been favorable to him. *Taylor*, 293 F.R.D. at 613 (quoting *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 122 (S.D.N.Y. 2008)). This burden is counterbalanced by the Court's recognition that too strict of a standard would "allow parties who have destroyed evidence to profit from that destruction." *In re Pfizer*, 288 F.R.D. at 315.

### b. Application

#### i. Duty to Preserve

Williams claims that the duty to preserve attached when the Complaint was filed on September 26, 2014. *See* Pl. Adverse Inference Mem. at 4; *see generally* Compl. Defendant argues that it was not served with the Complaint until February 6, 2015, so the obligation would not attach until that date. *See* Def. Opp. at 10. "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation—most commonly when suit has already been filed, providing the party responsible for the

destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). Here, Defendants were not served with the Complaint until February 6, 2015. Plaintiff has presented no facts demonstrating that Defendants were aware that the video footage was relevant to litigation prior to this date. Thus, the Court concludes that February 6, 2015 is the date on which Defendants' obligation to preserve the relevant evidence attached.

Moreover, video footage from the Suffolk County jail may be relevant to Plaintiff's claims. As an inmate of the jail at the time his claims allegedly occurred, footage could prove helpful in understanding the facts. Defendants argue that the video camera recording system has only a finite amount of space, and old files are overridden once the server becomes full. *See* Def. Opp. at 9. This is not an excuse for not preserving surveillance footage however; once the Complaint was served on February 6, 2015, Defendants should have gone into the server and preserved as much footage as was maintained on that date. *See, e.g.,* *Taylor v. City of New York*, 293 F.R.D. 601, 611-12 (S.D.N.Y. 2013) (holding that all three hours of surveillance footage of Plaintiff was relevant to the lawsuit, not just the cherry-picked segments that Defendant deemed relevant); *Slovin v. Target Corp.*, No. 12-cv-863, 2013 WL 840865, at *3 (S.D.N.Y. Mar. 7, 2013) (Defendant's duty to preserve required that it save "an unedited version of the footage"). According to Defendants, the servers maintain a minimum of thirty days of footage, and may maintain as much as ninety days of footage. *See* Def. Opp. at 9. Thus, as of February 6, 2015, it is possible that Defendants had the ability to potentially preserve footage for dates 90 days prior, which would include Plaintiff's request for footage from November 25, 2014 and December 24, 2014. Defendants were under an obligation to preserve all of this footage, provided it had not been wiped from the servers as of February 6, 2015. [11]

### ii. Culpable State of Mind

**\*14** Here, the duty to preserve surveillance footage for the dates above attached before it may have been destroyed. *See* III(v)(b)(i), *supra*. At a minimum, then, Defendants were negligent in allowing the servers to delete footage after February 6, 2015. *See Taylor*, 293 F.R.D. at 216. Despite

Plaintiff's claim, however, Defendants did not act with gross negligence. The Second Circuit has rejected any *per se* holdings of negligence based on the failure to institute a litigation hold, and there has been no evidence offered to suggest that Defendants willfully deleted any footage. *See* *Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012). Once Defendants received Plaintiff's March 19, 2015 request for video footage, they assert that they made all footage available to the Plaintiff and placed a litigation hold on a month of video footage for Plaintiff's housing area. *See* Def. Opp. at 10. This demonstrates that, while Defendant's preservation policies in general may be imperfect, and they should have put a litigation hold on the videos by February 6, 2015, the deletion of surveillance footage was simple negligence. *See* *Chin*, 685 F.3d at 162 (holding that the failure to instigate a litigation hold is only one factor in determining whether to issue sanctions); *Taylor*, 293 F.R.D. at 613 (finding that Defendants were only negligent despite their "troublingly *ad hoc* video retention and preservation policies"); *Zubulake*, 220 F.R.D. at 221 (finding that defendant had not been intentionally or grossly negligent).

### iii. Assistive Relevance

The Court has scoured the record for extrinsic evidence that would demonstrate "assistive relevance" of the deleted footage, as very little was supplied in the parties' moving papers. In a letter to the Court on October 28, 2015, Plaintiff explained that the footage was relevant because it showed that "nurses took [his] medical grievances [ ] but for some reason they are not on record." *See* Letter from Stoker O. Williams to Judge Lindsay dated 10/28/15 Re: Video footage, DE [76], at 1. In Plaintiff's Narrative Statement from December 10, 2015, Plaintiff summarized several incidents in the jail in which he requested treatment from nurses but was denied. *See generally* Plaintiffs [sic] Narrative Statement from Pro Se Plaintiff Stoker Olukotun Williams dated 12/5/2015, DE [85]. These incidents were likely captured on the jail's surveillance footage. Unfortunately however, the Court cannot assume the veracity of these claims in the absence of any corroborating evidence. There is no relevant sworn testimony, either from depositions or affidavits, and no other extrinsic evidence that the destroyed surveillance footage would have been favorable to Plaintiff. Accordingly, the Court finds that Plaintiff has not met his burden of demonstrating that the deleted footage

would have assisted his case at trial. *See, e.g.,* 📁 *Barnes v. Harling*, 368 F.Supp. 3d 573, 608-09 (W.D.N.Y. 2019) (finding that Plaintiff had failed to demonstrate that video footage would support his claim); *Slater v. Lacapruccia*, No. 13-cv-1079S, 2019 WL 1723515, at *5 (W.D.N.Y. Apr. 18, 2019) (holding that Plaintiff could not demonstrate that the destroyed audiotape contained information favorable to his case).

### c. Conclusion

For the reasons set forth above, Plaintiff's motion that Defendants be precluded from offering into evidence or eliciting any testimony related to video footage from Riverhead Correctional Facility, and that an adverse inference instruction be given, is denied.

## B. Defendants' Motion

In Defendants' unopposed letter motion, they seek to preclude Williams from introducing evidence regarding a prior 📁 Section 1983 civil rights suit against Geraci, which also addressed a constitutional claim based on denial of medical care, related to the provision of hormone medication to a transgender inmate. *See Sunderland v. Geraci, et al.*, 13-cv-4838, Docket Sheet (E.D.N.Y.) (the "*Sunderland* Case"); Def. Ltr. Motion at 1. Defendants assert that in that case, the claim was tried and a jury returned a verdict against Geraci in favor of the plaintiff, which he disagrees with, as he maintains that he did not violate the plaintiff's rights. *See id.*

Defendants argue that evidence of the prior lawsuit should be inadmissible pursuant to Rule 404(b) because it would constitute propensity evidence and would only serve to prejudice the jury. *Id.* at 2. Defendants further assert that under Rule 403, any probative value of the prior complaint would be substantially outweighed by the danger of unfair prejudice to Geraci. *Id.* Because evidence of this lawsuit is barred under Rule 403, the Court will not conduct a Rule 404(b) analysis.

### i. Legal Standards

**\*15** As set forth above, pursuant to Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading

the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. In examining prior lawsuits brought against defendants for relevance and analyzing them under the probative-prejudice balancing test, this question of admissibility "depends on the nature of the prior lawsuit, including whether the prior lawsuit is sufficiently related to the instant case, and the purpose for which such evidence will be used at trial." *Bermudez v. City of New York*, No. 15-cv-3240, 2019 WL 136633, at *7 (E.D.N.Y. Jan. 8, 2019). Further, "[u]nrelated prior lawsuits are unlikely to yield evidence sufficiently probative to overcome the risk of unfair prejudice to defendants or confusing the issues for the jury," *id.* (citing *Nibbs v. Goulart*, 822 F.Supp.2d 339, 341 (S.D.N.Y. 2011)), but "evidence of factually similar lawsuits introduced for a permissible purpose under Rule 404(b) may be admitted." *Id.* (citing *Bourguignon v. Lantz*, No. 05-CV-0245, 2008 WL 4183439, at *1 (D. Conn. Sept. 10, 2008)).

### ii. Application

At the outset, the Court notes that Defendants' letter motion does not point to any instance of Plaintiff seeking to admit evidence of the *Sunderland* Case. The Court observes, however, that the Proposed Pretrial Order, which was approved for filing by the Honorable Arlene R. Lindsay on February 19, 2016, includes, as a proposed exhibit for Plaintiff, "Cases related to Suffolk Jail." *See* Proposed Pretrial Order, 8. Further, in Plaintiff's 56.1 Counterstatement, Williams expresses his intention to cite to a federal lawsuit, and an attached newspaper article about the lawsuit, filed by a doctor named Patricia Dillon against Suffolk County concerning the practices of the medical unit at Suffolk County Jail. Pl.'s 56.1 Counterstmt., ¶ 41. Plaintiff, quoting from the article, asserts that the doctor "exposed practices that violate inmates' rights," that "serious injuries weren't treated," that inmates were "abused" and received "shoddy medical care," and that this is a common practice. *Id.* Plaintiff states that he plans to cite the federal lawsuit because in it Dillon says that the medical unit at Suffolk County Jail "has practiced deliberately indifferent actions and it is widespread." *Id.* In an exhibit to Plaintiff's Supplemental Rule 56.1 Counterstatement, DE [131-4], Williams includes a print-out of a ruling on a summary judgment motion which shows that Geraci was also a defendant in that matter. *See* DE [131-4], 7-16; 📁 *Dillon v. Suffolk Cty. Dep't of Health Servs.*, 917 F. Supp. 2d 196 (E.D.N.Y. 2013). In that case, the plaintiff asserted a First Amendment retaliation claim and a claim pursuant to the New York State whistleblower statute against

Defendants Suffolk County, Dr. Humayun Chaudhry, and Geraci based on, *inter alia*, her complaints about indifferent medical treatment to prisoners and possible prisoner abuse at Riverhead Correctional Facility in Suffolk County, New York.

*See* ⚑ *Dillon*, 917 F. Supp. 2d at 200. In relation to Geraci, she alleged that he told her patients were denied medical treatments and delayed in being started on medication when they arrived. *Id.* She also alleged other instances of inadequate treatment at the jail. *See* ⚑ *id.* at 200-201. The summary judgment motion was granted in part and denied in part. ⚑ *Id.* at 217.

Based on Plaintiff's description of the case, it appears that he is attempting to enter it into evidence to show that deliberate indifference to medical needs is a common occurrence at the jail. [12] Admitting this lawsuit into evidence would be unfairly prejudicial to Geraci, and thus, it will be excluded. *See Phillips v. City of New York*, 871 F. Supp. 2d 200, 203 n.2 (E.D.N.Y. 2012) (excluding, *inter alia*, federal civil rights lawsuits against the defendant officers in a § 1983 civil rights case to show evidence of "pattern and practice" conduct because the Court found "no 'unusual characteristics' or evidence of a 'unique scheme,' and concluded that "any probative value of the complaints would be substantially outweighed by the danger of unfair prejudice to the Defendant Officers because the lawsuits [were] mere allegations ...")

**\*16** Further, as set forth above, Plaintiff makes no reference to the *Sunderland* Case against Geraci, and the Court sees no instances on the record of Williams expressing an intention to offer *Sunderland* into evidence for any articulated permissible purpose. Thus, the Court assumes that were Plaintiff to attempt to offer this suit into evidence, it would be to show that Geraci has a propensity for deliberate indifference to medical needs. Moreover, even if Plaintiff attempted to enter this lawsuit into evidence for an otherwise permissible purpose, any probative value would be outweighed by the potential for prejudice against Geraci in showing a recent claim brought against him for a similar violation. *See, e.g., Iverson v. Surber*, 800 F. App'x 50, 52 (2d Cir. 2020) (in an excessive force case, finding it was not an abuse of discretion to exclude evidence that a defendant was previously sued for excessive force).

### *iii. Conclusion*

Accordingly, Defendants' motion to preclude evidence of the *Sunderland* Case is granted. Plaintiff is also barred from

admitting the Memorandum and Order for ⚑ *Dillon v. Suffolk Cty. Dep't of Health Servs.*, 917 F. Supp. 2d 196 (E.D.N.Y. 2013) and related newspaper article.

## IV. CONCLUSION

For the reasons set forth herein, Plaintiff's motions are granted in part and denied in part, and Defendants' motion is granted.

Plaintiff's motion that Defendants be precluded from offering into evidence or eliciting any testimony related to video footage from Riverhead Correctional Facility, and that an adverse inference instruction be given, is denied. Further, Plaintiff's request to appear at trial in plain clothes and unshackled is granted, with the understanding that any concerns expressed by the US Marshal will be dealt with if and when they are raised. Finally, Plaintiff's motion requesting that Defendants appear in traditional dress business clothing is granted.

The following evidence is barred at trial: (1) the crimes Plaintiff was convicted of, the facts underlying the offenses, and the length of the sentence; (2) the fact that Williams entered jail with a gunshot wound; (3) Plaintiff's subsequent civil lawsuit to the extent it includes statements concerning his criminal history, *see Williams v. Hall et al.*, 16-cv-6830; (4) the *Sunderland* Case, and the Memorandum and Order for ⚑ *Dillon v. Suffolk Cty. Dep't of Health Servs.*, 917 F. Supp. 2d 196 (E.D.N.Y. 2013) and related newspaper article; (5) Plaintiff's alleged use of prostitutes pre-incarceration; (6) Plaintiff's grievance and disciplinary history not directly related to his claims; and (7) that he was housed in the observation bay at Riverhead Correctional Facility due to gang affiliation.

The following evidence will be admitted at trial: (1) the fact that Williams was convicted of four felonies, when he was convicted, the fact that he is currently incarcerated and serving a sentence for felonies punishable by a term of imprisonment of more than one year; (2) on cross-examination, Plaintiff's statements that another personality named Malik committed his crimes, and the fact that he did not mention another personality in the police interrogation following his arrest; and (3) Williams' mental health history regarding his schizophrenia diagnosis and statements regarding multiple personalities during the time period relevant to this litigation.

**All Citations**

Slip Copy, 2020 WL 5848738

## Footnotes

1       This action is proceeding before this Court for all purposes pursuant to the parties' consent. *See* DE [206]; 🚩 28 U.S.C. § 636.

2       Plaintiff was represented when he filed his motions *in limine*, but no longer has counsel. *See* Electronic ORDER granting DE [219] Motion to Withdraw as Attorney, dated June 11, 2020.

3       Plaintiff refers to the facility as "Riverhead Correctional Facility" in his moving papers, whereas Defendants refer to it as "Suffolk County Jail." *See generally* Pl. Mem; Def. Opp.

4       Many of the documents referenced in this opinion do not contain their own consistent pagination. Citations to these documents are to the page numbers as the appear on the Court's electronic filing system.

5       This appears to be a list written by Williams of dates, times, and the contents of medical grievances and chits. It is not clear when this list was made.

6       The Court observes that Plaintiff does appear to have filed a written grievance related to his interactions with Koch. *See* Suffolk Jail Grievance R-2015-151, DE [127-12], Ex. F to First Motion for Summary Judgment.

7       Regarding the back injury, Defendants have put forth that they have other evidence relating to Plaintiff's physical activity while incarcerated, including that he played basketball two to three times a week since entry into jail in September 2013, *see* Defs.' 56.1 Stmt., ¶5, which Williams does not dispute, *see* Pl.'s 56.1 Counterstmt., ¶5, and is not addressed in the parties' motions.

8       Here, Plaintiff's motion does not appear to seek preclusion of any particular records—just the fact that he entered jail with the wound. Further, Defendants have not presented the Court with the specific records they are seeking to include, although the Court notes that there are references to Williams's gunshot wound in various medical records submitted with Defendants' summary judgment motion. *See generally* DEs [127-6], [127-13], Exs. A, G to First Motion for Summary Judgment. The Court declines to rule on the admissibility of any records at this time, and its ruling is limited to whether the fact that Plaintiff came to jail with a gunshot wound is admissible.

9       This reference appears to be to a lawsuit filed by Plaintiff on December 6, 2016, *see Williams v. Hall et al.*, 16-cv-6830, Docket Sheet (E.D.N.Y.), wherein Plaintiff alleges in a complaint that he's been diagnosed with schizophrenia and a personality disorder, and has another personality. *See Williams v. Hall et al.*, 16-cv-6830, Docket Sheet (E.D.N.Y.), DE [1].

10      In Defendants' motion, they only seek to introduce a lawsuit filed by Plaintiff in 2016. *See* Def. Opp. at 8. Thus, the court will only address this lawsuit.

11      In their opposition, Defendants fail to provide the date on which the videos were wiped from the servers.

12      In the Summary Judgment Memorandum and Order, the Court analyzed Plaintiff's submission of this case in the context of the issue of municipal liability, finding that the lawsuit "does not establish a municipal custom

or policy." Summary Judgment Mem. & Order, 33. In its analysis, the Court notes that the allegations were disputed and predate Plaintiff's admission to the jail. *Id.* at 33-34.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 827671
United States District Court, S.D. New York.

Vicki YIN, Plaintiff,
v.
JAPAN SOCIETY, INC., Defendant.

No. 99 CIV. 4806(HB).
|
June 27, 2000.

OPINION & ORDER

[BAER](), District J.

I. BACKGROUND

**\*1** On April 5, 2000, at the conclusion of a two-day trial in this employment discrimination case, the jury rendered a verdict in favor of the defendant Japan Society, Inc. ("Japan Society"). Thereafter, Japan Society submitted a Bill of Costs seeking $3,312.25, which is summarized as follows: $1,912.15 for an expedited trial transcript; and $1400.10 for the costs associated with deposing plaintiff Vicki Yin. On May 15, 2000, the Judgment Clerk for the Southern District of New York awarded costs to Japan Society in the amount of $3,312.25. By notice filed on May 15, 2000, plaintiff objects to the taxation of costs in its entirety. Plaintiff's application of May 15, 2000 will be viewed as a motion to review the taxation of costs determined by the Clerk of the Court pursuant to [Rule 54(d)(1) of the Federal Rules of Civil Procedure](). For the reasons stated below, plaintiff's motion is GRANTED in part and DENIED in part.

II. DISCUSSION

As a preliminary issue, I note that the decision on taxation of costs is left solely to the discretion of the trial judge.

🚩 *[LoSacco v. City of Middletown,]() 71 F.3d 88, 92 (2d Cir.1995)* (citing 🚩*[Farmer v. Arabian Oil Co.,]() 379 U.S. 227, 232-233 (1964)*). "The burden is on the prevailing party to establish to the court's satisfaction that the taxation of costs is justified." *[John and Kathryn G v. Board of Ed. of Mt. Vernon Public Schools,]() 891 F.Supp. 122, 123 (S.D.N.Y.1995)*.

*A. TRIAL TRANSCRIPT*

Local Rule 54.1(c)(1) reads in relevant part: "The cost of any part of the original trial transcript that was necessarily obtained for use in this court or on appeal is taxable." The defendant, by the affidavit of Richard J. Reibstein in support of its request to tax costs, states that "The costs claimed in the ... Bill of Costs are allowable by law, are correctly stated and were necessarily incurred." (Reibstein Affidavit at ¶ 2.) The defendant provides no further argument or explanation as to why taxation of costs is appropriate in this case.

The plaintiff argues briefly that the defendant decided to order a daily (rush) copy of the trial transcript at the end of the first day of testimony in order to prepare its motion in opposition to an evidentiary ruling by this Court, and that such costs should not be taxed because such expense was unnecessary. On the first day of trial, the plaintiff called Patricia McNamara, a defense witness employed by the defendant as an accounting manager. Defendant stated that it intended to recall Ms. McNamara as part of its case and intended to defer questioning until then. The Court instructed defendant to question Ms. McNamara fully as part of its cross-examination "for efficiency's sake." (Tr. 17.) At the end of the first day of trial, defendant stated that it wished to recall Ms. McNamara. The Court reminded the defendant that it had already decided that Ms. McNamara would not be recalled. The defendant responded that it misunderstood the Court and stated that it need to question the witness further. The Court stated that it would consider the defendant's request and proceedings were adjourned for the day. The defendant ordered an expedited transcript in order to oppose the Court's decision. After reviewing defendant's motion this Court concluded that defendant should be granted an opportunity to recall the witness in the "interests of justice." (Tr. 78.) However, the Court stated that the transcript passages cited by defendant showed that this Court was clear in its ruling the previous day that defendant had "one shot" to question the witness. Indeed, the cited passages of the transcript served only to reconfirm that this Court had made it crystal clear to the defendant that it should fully question Ms. McNamara during the first day of trial. On these facts, this Court finds that the cost of the expedited transcript cannot be characterized as "necessary."

**\*2** In deciding whether trial transcripts should be taxed as costs, I note that courts in this district have observed that "[d]aily transcripts of trial testimony are not customary." *[John and Kathryn G,]() 891 F.Supp. at 123 (S.D.N.Y.1995)* (quoting *[Zapata Gulf Marine Co. v. Puerto Rico Maritime]()*

*Shipping Auth.,* 133 F.R.D. 481, 484 (E.D.La.1990)). Several courts in this district have denied costs for trial transcripts where, as in this case, the trial was short. *See Walther v. Maricopa Int'l Investment Corp.,* No. 97 Civ. 4816, 1999 WL 816176 (S.D.N.Y. Oct. 13, 1999) (trial lasted three days); *Morales v. Smith,* 1998 WL 352595, at 2 (S.D.N.Y. June 26, 1998) ("trial was not particularly long or complex"). Given that the trial lasted only two days and the "relatively uncomplicated nature of the issues at stake," I am persuaded that daily expedited trial transcripts were not justified in this instance. *Walther,* 1999 WL 816176, at *1 (citing *Dehoust v. Baxter Healthcare Corporation,* No. 98 Civ. 0774, 1999 WL 280423, *3 (S.D.N.Y. May 4, 1999) (denying costs for trial transcripts where trial lasted less than two weeks and did not involve "complexities" sufficient to justify daily expedited transcripts); *Morales v. Smith,* No. 94 Civ. 4865, 1998 WL 352595, *2 (S.D.N.Y. June 26, 1998) (denying costs for expedited daily transcripts "given that the trial was not particularly long or complex")). I note that Japan Society was represented by two attorneys, one who could have taken notes sufficient to contest this Court's evidentiary rulings. *See Morales,* 1998 WL 352595 at *2 (denying costs for expedited trial transcripts since, *inter alia,* "two defense counsel were present in the courtroom throughout the trial"). The defendant has not offered any explanation as to why the trial transcript was "necessary," and thus defendant's request to tax the costs of the trial transcript is DENIED.

### B. DEPOSITION TRANSCRIPTS

Local Rule 54.1(c)(2) reads in relevant part:

> Unless otherwise ordered by the court, the original transcript of a deposition, plus one copy, is taxable if the deposition was used or received in evidence at the trial, whether or not it was read in its entirety. Costs for depositions are also taxable if they were used by the court in ruling on a motion for summary judgment or other dispositive substantive motion.

On November 30, 1999, the defendant deposed the plaintiff. The trial transcript in this case indicates that the deposition transcript was referred to extensively at trial by the defendant in cross-examining the plaintiff. Thus, the deposition transcript was "used" within the meaning of Local Rule 54.1(c)(2) and are therefore taxable against the plaintiff under Local Rule 54.1(c)(2).

The plaintiff does not offer any argument as to why the costs of the deposition transcript should not be taxed. However, I note that the Local Rule 54.1(c)(2) limits recoverable costs to "the original transcript of a deposition, plus one copy[.]" *See Sim v. New York Mailers' Union Number 6,* No. 97 Civ. 2929, 1999 WL 674447, *2 (S.D .N.Y. Aug. 30, 1999)* (limiting deposition costs to the "one transcript and one copy rule" and excluding "reporter's fees and delivery charges"). Therefore, the "Appearance Fee" of $85.00, and the "Delivery Fee" of $15.00 must be subtracted from the costs of the deposition transcript. Additionally, the defendant is not entitled to duplicative costs invoiced as "ASCII Conversion" or "Condensed Transcript" for the deposition transcripts.

*3 The invoice for the deposition transcript indicates that the transcript was produced on an "expedited" basis. "Expedited transcripts are considered 'necessary' only if an impending deadline for such a motion necessitates such expedition." *Gottlieb v. Simon,* No. 97 Civ. 1019, 1999 WL 993700, (S.D.N.Y. Nov. 2, 1999). The Pre-Trial Scheduling Order entered on August 27, 1999 provides the following deadlines: "All discovery shall be commenced in time to be completed by 12/23/99. No party may make a dispositive motion returnable after 01/24/00." In light of the deadlines in this case, it is apparent that the defendant had no need of "expedited" deposition transcripts. Accordingly, the costs of expediting the deposition transcript must be deducted from the costs Japan Society is entitled to receive for deposition transcripts.

### III. CONCLUSION

For the foregoing reasons, the plaintiff's motion is GRANTED in part and DENIED in part. The defendant is instructed to submit a proposed amended judgment for the Court's review within 10 days of the date of this Opinion and Order.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 827671, 83 Fair Empl.Prac.Cas. (BNA) 792

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.