**EXHIBIT E**

# 22-2182-cv

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

MAXMILLIAN SLOLEY,

*Plaintiff-Appellant*,

*v.*

ERIC VANBRAMER, INDIVIDUAL AND OFFICIAL CAPACITY,

*Defendant-Appellee*,

STATE OF NEW YORK, BRIAN VANBRAMER, INDIVIDUAL AND OFFICIAL CAPACITY,

*Defendants*.

On Appeal from the United States District Court
for the Northern District of New York, No. 1:14-CV-339
Before the Honorable Christian F. Hummel

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFF-APPELLANT MAXMILLIAN SLOLEY

RYAN CHABOT
ALAN SCHOENFELD
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

*Counsel for Plaintiff-Appellant*

May 8, 2024

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION .............................................................................................. 1

JURISDICTIONAL STATEMENT ................................................................... 4

STATEMENT OF THE ISSUES ........................................................................ 4

STATEMENT OF FACTS .................................................................................. 4

    A.    Factual Background ............................................................................ 4

    B.    Pretrial Procedural History .............................................................. 6

    C.    Trial .................................................................................................. 10

    D.    Post-Trial Motions And Notice Of Appeal ...................................... 16

SUMMARY OF ARGUMENT ........................................................................... 19

ARGUMENT ...................................................................................................... 21

I.    THIS COURT CAN AND SHOULD CONSIDER THE DISTRICT
COURT'S DENIAL OF SLOLEY'S POST-TRIAL MOTIONS ................................. 21

    A.    The Court Has Jurisdiction To Consider The Post-Trial
Motions .............................................................................................. 21

    B.    The Court Should Consider The Post-Trial Motions ........................ 25

    C.    Even If The Court Did Not Consider The Denial Of The
Post-Trial Motions, It Would Reach The Substance Of
The Appeal ........................................................................................ 28

II.    THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN ITS
JURY INSTRUCTIONS ............................................................................. 29

    A.    The District Court Prejudicially Erred In Its Fourth
Amendment Instruction .................................................................... 31

B. The District Court Prejudicially Erred By Giving A Negligence Instruction ...................................................................... 38

CONCLUSION .................................................................................................. 41

CERTIFICATE OF COMPLIANCE

SPECIAL APPENDIX

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Bowles v. Russell*,
    551 U.S. 205 (2007)................................................................................23

*Canedy v. Boardman*,
    16 F.3d 183 (7th Cir. 1994) ...................................................................32

*Cobb v. Pozzi*,
    363 F.3d 89 (2d Cir. 2003) ....................................................................35

*Conway v. Village of Mount Kisco*,
    750 F.2d 205 (2d Cir. 1984) ............................................................26, 27

*Davis v. Goord*,
    320 F.3d 346 (2d Cir. 2003) ..................................................................28

*Elliott v. City of Hartford*,
    823 F.3d 170 (2d Cir. 2016) ............................................................26, 28

*Fate v. Charles*,
    24 F. Supp. 3d 337 (S.D.N.Y. 2014) ....................................................32

*Foman v. Davis*,
    371 U.S. 178 (1962)................................................................................26

*Gordon v. New York City Board of Education*,
    232 F.3d 111 (2d Cir. 2000) ......................................................30, 33, 37

*Grune v. Coughlin*,
    913 F.2d 41 (2d Cir. 1990) ....................................................................26

*Hamer v. Neighborhood Housing Services of Chicago*,
    583 U.S. 17 (2017)............................................................................24, 25

*Hathaway v. Coughlin*,
    99 F.3d 550 (2d Cir. 1996) ..............................................................30, 31

*Henderson ex rel. Henderson v. Shinseki*,
    562 U.S. 428 (2011)................................................................................23

*Holzapfel v. Town of Newburgh*,
    145 F.3d 516 (2d Cir. 1998) ...................................................................30, 33

*Houston v. Lack*,
    487 U.S. 266 (1988)..................................................................................28

*Hudson v. New York*,
    271 F.3d 62 (2d. Cir. 2001) ......................................................................36

*LNC Investments, Inc. v. First Fidelity Bank, N.A.*,
    173 F.3d 454 (2d Cir. 1999) ...........................................................30, 40, 41

*Marrero Pichardo v. Ashcroft*,
    374 F.3d 46 (2d Cir. 2004) .................................................................26, 27

*People v. Hall*,
    886 N.E.2d 162 (N.Y. 2008) ....................................................................32

*Rasanen v. Doe*,
    723 F.3d 325 (2d Cir. 2013) .....................................................................31

*Restivo v. Hessemann*,
    846 F.3d 547 (2d Cir. 2017) .....................................................................30

*Sloley v. VanBramer*,
    945 F.3d 30 (2d Cir. 2019) ...............................................................*passim*

*Swain v. Spinney*,
    117 F.3d 1 (1st Cir. 1997)....................................................................8, 31

*Terry v. Ohio*,
    392 U.S. 1 (1968)....................................................................................38

*Tracy v. Freshwater*,
    623 F.3d 90 (2d Cir. 2010) .................................................................26, 28

*Union Pacific Railroad Co. v. Brotherhood of Locomotive Engineers*,
    558 U.S. 67 (2009)..................................................................................23

*United States v. Asbury*,
    586 F.2d 973 (2d Cir. 1978) .....................................................................34

*United States v. Barnes*,
    506 F.3d 58 (1st Cir. 2007)....................................................................................32

*United States v. Bayless*,
    201 F.3d 116 (2d Cir. 2000) ...............................................................................38

*United States v. Brown*,
    2021 WL 3194794 (W.D.N.Y. Apr. 14, 2021)..................................................38

*United States v. Delfin-Colina*,
    464 F.3d 392 (3d Cir. 2006) ...............................................................................38

*United States v. Freeman*,
    735 F.3d 92 (2d Cir. 2013) .................................................................................38

*United States v. Jenkins*,
    452 F.3d 207 (2d Cir. 2006) ...............................................................................38

*United States v. Kopstein*,
    759 F.3d 168 (2d Cir. 2014) ...............................................................................36

*United States v. Muhammad*,
    463 F.3d 115 (2d Cir. 2006) ...............................................................................10

*United States v. Saladino*,
    7 F.4th 120 (2d Cir. 2021) ..................................................................................23

*United States v. Stewart*,
    604 F. Supp. 2d 676 (S.D.N.Y. 2009) ...............................................................38

*United States v. Stewart*,
    551 F.3d 187 (2d Cir. 2009) ...............................................................................38

*United States v. Weaver*,
    9 F.4th 129 (2d Cir. 2021) ..................................................................................38

*United States ex rel. Anti-Discriminatin Center of Metro New York,*
    *Inc. v. Westchester County*, 712 F.3d 761 (2d Cir. 2013) ..............................21

*Uzoukwu v. City of New York*,
    805 F.3d 409 (2d Cir. 2015) ...............................................................................30

*Woods v. START Treatment & Recovery Centers, Inc.*,
    864 F.3d 158 (2d Cir. 2017) ...............................................................33

## STATUTES AND RULES

28 U.S.C.
    § 1291 ............................................................................................4
    § 1331 ............................................................................................4
    § 2107 .......................................................................................23, 24

42 U.S.C. § 1983 ...................................................................1, 4, 6, 30, 39

Fed. R. App. P.
    Rule 3 .......................................................................................21, 22
    Rule 4 .............................................................................................*passim*

Fed. R. Civ. P.
    Rule 59 .....................................................................................17, 28
    Rule 60 .....................................................................................17, 28

## OTHER AUTHORITIES

16A Wright, Charles A. & Arthur R. Miller, *Federal Practice and
    Procedure* § 3950.1 (5th ed. 2023 update) .....................................25

**INTRODUCTION**

This case involves an invasive, humiliating, and unjustified visual body cavity search. In 2013, Maxmillian Sloley was pulled over by local police and taken into custody after his then-girlfriend called the police on him after a domestic dispute. While he was in custody, State Trooper Eric VanBramer conducted a search with his police dog of the car that Sloley had been driving. VanBramer claims that his dog alerted for drugs at parts of the car and that he found a small amount of a chunky substance on the driver's seat, which he claims was illegal drugs. VanBramer returned to the state police barracks, where Sloley was in custody, and searched Sloley to determine whether he had illegal drugs on his person. Sloley fully cooperated. He did not have any drugs on him.

With no facts suggesting Sloley was hiding drugs *inside* his person, VanBramer proceeded to perform a visual body cavity search. Having directed Sloley to remove his articles of clothing one by one—and finding no drugs on them—VanBramer then directed Sloley to bend over, spread his buttocks, and expose his anus to VanBramer for visual inspection. VanBramer found nothing.

Sloley sued VanBramer under § 1983, alleging that this search violated his Fourth Amendment rights. Sloley alleged that VanBramer did not have the reasonable suspicion required to conduct a visual body cavity search. After discovery in which Sloley proceeded pro se, the district court granted summary

judgment to VanBramer.  This Court reversed.  It held "that the Fourth

Amendment requires visual body cavity searches conducted incident to any lawful

arrest to be supported by 'a specific, articulable factual basis supporting a

reasonable suspicion to believe the arrestee secreted evidence *inside a body

cavity*.'"  *Sloley v. VanBramer*, 945 F.3d 30, 41 (2d Cir. 2019) (emphasis added).

With that guidance, this Court sent the case back down to the district court for trial.

Trial took place in August 2022.  No evidence or testimony showed that

Sloley's actions suggested that he was concealing drugs inside his anal cavity.  No

evidence was introduced showing that Sloley *had* drugs in his anal cavity at the

time of his arrest.  The district court, however, instructed the jury:  "In short, the

relevant question is do the circumstances of plaintiff's arrest support a reasonable

suspicion that he was hiding contraband in *or on* his person?"  JA615 (emphasis

added).  As the court later acknowledged, this "jury instruction … is a

misstatement of the law"—one that "could have permitted the jury to make an

impermissible conclusion" that reasonable suspicion of drugs *on* someone's person

is sufficient to search *in* his person.  SPA37.

Immediately after that erroneous instruction, the court continued, "Now if

you determine that the defendant was merely negligent, or in other words, acted in

a way that reflected a lack of due care for the plaintiff, but he did not in anyway

violate the plaintiff's Fourth Amendment rights, as described above, then you must

find in favor of the defendant." JA615-616. This instruction compounded the Fourth Amendment error. From it, the jury could have inferred that if VanBramer was negligent in suspecting that Sloley was hiding drugs in his anus, they must find in VanBramer's favor. As the district court acknowledged, the negligence instruction's "presence might have been confusing to the jury." SPA45.

Under these instructions, the jury returned a verdict for VanBramer. Proceeding pro se, Sloley filed a notice of appeal. With its designation of the appeal of the judgment, the notice of appeal stated, "Also submitted to the Court is a post-verdict motion by the Plaintiff. If the Court denies that motion, let this motion stand as a Notice of Appeal to appeal the denial of that Motion, and also to appeal the jury's adverse decision against the Plaintiff." JA648. Sloley then filed two post-trial motions, which the district court denied. JA650-657; JA658-659; JA715.

This Court appointed pro bono undersigned counsel to brief the issues whether the Court has jurisdiction over the denial of Sloley's post-trial motions and whether the district court's admittedly erroneous Fourth Amendment jury instruction was prejudicial, warranting a new trial. For the reasons that follow, this Court should vacate and remand for a new trial.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 over Sloley's claim pursuant to 42 U.S.C. § 1983 for a violation of the Fourth Amendment of the U.S. Constitution. On September 26, 2022, Sloley filed a timely notice of appeal of the August 31, 2022 judgment of the district court. *See* JA648. This Court has jurisdiction to review final decisions of the district court under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether this Court has jurisdiction over the denial of Sloley's post-judgment motions, where his pro se notice of appeal from the judgment requested that, if the district court later denied the post-judgment motions, the notice of appeal be considered to encompass that denial.

2. Whether the district court's admittedly erroneous jury instruction that the Fourth Amendment permits a visual body cavity search based on reasonable suspicion that someone is hiding drugs in *or on* his person was a prejudicial error.

3. Whether the district court's admittedly confusing jury instruction on negligence was a prejudicial error.

## STATEMENT OF FACTS

### A. Factual Background

On April 1, 2013, Maxmillian Sloley got into a fight with his then-girlfriend Daphne Rollins. As it escalated, Rollins smashed the windshield of Sloley's car with a bat, and Sloley responded by smashing Rollins's windshield and driving off.

Rollins called 9-1-1, giving the description of Sloley's car, and local police pulled him over and took him into custody. JA329. New York State Trooper Bryan VanBramer responded to the 9-1-1 call and would later claim that Rollins told him that she believed that Sloley had drugs and was involved in drug activity. JA426; JA428. Rollins, however, would deny saying that Sloley had or was involved with drugs. JA464. The local police brought Sloley back to Rollins's house and transferred him to Bryan VanBramer, who brought him to the New York State Police barracks for booking. JA396. Neither local police nor Bryan VanBramer asked Sloley about drugs or searched him for drugs.

Bryan VanBramer called State Trooper Eric VanBramer, a K-9 officer (and Bryan's brother), to go to Sloley's vehicle. JA428. When Eric VanBramer arrived at the vehicle, the arresting officer and Sloley were gone. Alone, VanBramer searched the vehicle with his police dog. JA488. VanBramer claims that the dog alerted to the presence of drugs on the driver's side, the passenger's side, the hood, and the center console of the car. JA353; JA355. He claims that he then searched the car himself and saw a "white chunky substance" on the driver's seat, JA489, although he admitted that his police dog did not alert to the driver's seat or even access the driver's seat at all. JA356. VanBramer claimed that he tested the substance on the driver's seat with a field test kit, and it was positive for cocaine. JA358. There were no witnesses to the test he allegedly performed.

- 5 -

VanBramer drove to the police barracks with his police dog.  JA396.  At the barracks, Sloley was handcuffed to a bench in a small room.  *Id*.  VanBramer walked past Sloley with the police dog, no more than four feet away.  The dog did not alert to drugs.  *Id*.  VanBramer took Sloley into a private room and instructed Sloley to remove his clothing, one article at a time.  JA330.  Each time that Sloley removed an article of clothing, VanBramer would search it for drugs.  He found no evidence of drugs on Sloley's clothes.  JA369.

Once Sloley was completely naked, VanBramer directed him to lift his testicles so VanBramer could inspect whether he was hiding anything underneath. JA397.  Finding nothing, VanBramer then directed Sloley to bend over and spread his buttocks and, with Sloley in that position, VanBramer performed a visual body cavity search of Sloley's anus for drugs.  Again he found nothing.  JA330.

## B.     Pretrial Procedural History

On March 27, 2014, Sloley filed a pro se complaint bringing claims for violations of his Fourth Amendment rights pursuant to 28 U.S.C. § 1983 against Eric VanBramer, Bryan VanBramer, and the State of New York.  *See* JA17-20. Sloley claimed that VanBramer's search was not based on reasonable suspicion including because "no contraband was found," because VanBramer's "drug-sniffing K-9 dog … totally ignored" Sloley when close to him, because VanBramer asked Sloley "if he is concealing any drugs within his anus, which arrestee

answered 'no,'" and because it was "false … that [VanBramer] found narcotics in the vehicle which arrestee was driving."   JA18-19 (¶¶ 13-15, 18).  The district court dismissed Sloley's claims against the State, while the claims against Eric and Bryan VanBramer proceeded to discovery.  JA3-4.

After discovery, both Eric and Bryan VanBramer moved for summary judgment.  The district court (Sharpe, J.) granted their motion.  *See* JA37.  The court held that the undisputed facts showed that "the police recovered drugs from the driver's seat of Sloley's car," that Eric VanBramer was "aware that Sloley was a drug dealer," and that VanBramer "knew Sloley had past convictions for possession and sale of drugs."  JA34-35.  From these facts, the court held as a matter of law that the search—which the court deemed merely a "strip search"— was based on "reasonable suspicion that Sloley was concealing contraband on his person."  JA30-35.  The court held in the alternative that Eric and Bryan VanBramer both were entitled to qualified immunity and that Bryan VanBramer was entitled to summary judgment for lack of personal involvement.  JA31-32; JA35-36.  Sloley appealed.

This Court vacated and remanded in relevant part.  *Sloley v. VanBramer*, 945 F.3d 30, 47 (2d Cir. 2019).[1]  In a precedential decision, this Court held as a matter

---

[1] The Court affirmed summary judgment to Bryan for lack of personal involvement.

- 7 -

of first impression that "visual body cavity searches must be justified by specific,

articulable facts supporting reasonable suspicion that an arrestee is secreting

contraband inside the body cavity to be searched." *Id.* at 33. The Court explained

that the ultimate test of the constitutionality of warrantless searches incident to

arrests is reasonableness, measured by balancing the intrusiveness of the search

against the government's interest in conducting it. *See id.* at 34, 37-39. "Visual

body cavity searches," the Court explained, "are invasive and degrading,

occasioning a serious invasion of privacy and working a significant harm to a

person's bodily integrity." *Id.* at 38. While strip searches "are themselves

'uniquely intrusive,'" "visual body cavity searches are even more intrusive." *Id.*

"They 'require an arrestee not only to strip naked in front of a stranger, but also to

expose the most private areas of her body to others. This is often, as here, done

while the person arrested is required to assume degrading and humiliating

positions.'" *Id.* (quoting *Swain v. Spinney*, 117 F.3d 1, 6 (1st Cir. 1997)). Thus,

this Court held that if and only if an officer has a reasonable suspicion "that an

arrestee is secreting contraband inside a body cavity, then the officer is permitted

to conduct a visual body cavity search." *Id.* "We … hold that such searches must

be based on reasonable suspicion to believe that the arrestee is secreting evidence

inside the body cavity to be searched." *Id.* at 39.

- 8 -

Before this Court, VanBramer argued that he nonetheless had sufficient reasonable suspicion because he "was aware of Sloley's criminal history, which included a drug-crime conviction, he had heard that Sloley was involved with drug dealing, he knew that Sloley was fleeing a crime scene, and Sloley stated that it was not possible that Eric had recovered drugs from his car." *Sloley*, 945 F.3d at 43-44. He also argued that his dog had "alerted to several areas of Sloley's car, including places from which Eric did not recover any drugs, leading him to conclude that Sloley had recently removed whatever had caused [the dog] to alert, and that Eric recovered crack cocaine from the driver's seat of Sloley's car, which Eric regarded as consistent with Sloley spilling cocaine as he secreted it." *Id.* at 44.

This Court rejected these arguments. The Court concluded that "none of the undisputed facts remotely suggest that Sloley was secreting drugs inside his anal cavity." *Sloley*, 945 F.3d at 46. "For example, there is no evidence that Sloley was fidgeting or moved about suspiciously, that he reached or attempted to reach his hands down his pants, that anyone observed Sloley putting drugs down his pants or retrieving drugs (or anything else) from inside his pants, or that Sloley himself was previously known to secret[] drugs inside his anal cavity." *Id.* (citations omitted). It held that there was a genuine dispute of fact over whether VanBramer actually recovered any crack cocaine from Sloley's car. *See id.* And "once the disputed

- 9 -

fact that Eric recovered crack cocaine from Sloley's car is disregarded, the evidence available to Eric supports no more than a mere hunch that Sloley was secreting drugs inside his anal cavity." *Id.* at 46. "Such a 'hunch of criminal activity is insufficient' to establish reasonable suspicion." *Id.* at 46 (quoting *United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006)).

The Court therefore vacated the grant of summary judgment to Eric VanBramer on Sloley's Fourth Amendment claim (including on qualified immunity) and remanded the case to proceed to trial. *Sloley*, 945 F.3d at 47.

## C. Trial

Trial took place on August 29-30, 2022, with Sloley represented by appointed pro bono counsel. It proceeded in a manner that substantially prejudiced Sloley's case. During voir dire, the jurors were not asked any questions related to racial bias to test whether they would be prejudiced against Sloley, a black man, in his claims against a white police officer. There was only one juror of color in the jury selection pool. JA310. The field test kit that VanBramer used on the substance on Sloley's driver's seat was destroyed before trial, along with the alleged evidence it contained. JA477. Despite a subpoena, Daphne Rollins failed to show up to court to testify consistent with her pretrial affidavit that she had *not* told Bryan VanBramer that Sloley was in possession of drugs. JA459-463.

- 10 -

The district court committed several errors. For example, although the court granted Sloley's motion in limine to exclude evidence of certain prior convictions, the jury nonetheless heard such evidence. During direct examination of Eric VanBramer, Sloley's counsel asked him about his reasons for suspecting Sloley had drugs hidden inside his body. When counsel asked, "Am I missing anything?" VanBramer replied, "several felony convictions involving drug possession." JA377. The court sustained Sloley's objection but provided no curative instruction, permitting the jury to retain the impression that it was likely Sloley did have drugs, and VanBramer's suspicion was reasonable, because of past convictions that the court had excluded.

Further, during direct examination of Bryan VanBramer, Sloley's attorney sought to introduce impeachment material related to Bryan's disciplinary record that the district court improperly excluded. JA449-450. Bryan's credibility was a key issue, since only his claim that Rollins told him Sloley had drugs—which Rollins denied—supported Eric VanBramer's search of Sloley's car that, Eric claimed, resulted in his finding drugs and thus performing the visual body cavity search. Yet the court nonetheless denied Sloley's request to confront Bryan with impeachment material. JA453-454.

The district court also allowed Eric VanBramer to give irrelevant and prejudicial testimony during the defense's direct examination. For instance,

- 11 -

VanBramer expounded at length about a completely irrelevant time he had embarked on a rescue mission to save two children buried in a snowbank. JA481-482. Sloley's attorney objected, and the court sustained the objection, but the jury had been allowed to hear the irrelevant heroic anecdote. JA482. And VanBramer's counsel emphasized it to idolize VanBramer in closing: "When the police are searching for a body, trying to locate a person or bring comfort to a desperate family, Eric VanBramer is out there with his police K9 combing the terrain, trying to find that person." JA593. Similarly, the defense elicited testimony from VanBramer about his love of animals and his love of the K-9 unit because "you're able to take that dog home with you at the end of the day, [it] becomes a part of your family, [and his] children play with the dog." JA482-484. While VanBramer testified, the defense presented a banner of his police dog to the jury. JA483-484.

On the actual critical issue of VanBramer's reasonable suspicion, the trial evidence "support[ed] no more than a mere hunch that Sloley was secreting drugs inside his anal cavity," just as this Court determined on the summary judgment record. *Sloley*, 945 F.3d at 46. The defense case was very thin. For instance, when asked how his dog alerted at Sloley's car, VanBramer answered that "we're talking about nine plus years," which was "just too long for [him] to remember." JA355. When asked how the dog was able to alert at the center console without

- 12 -

being near enough to alert at the driver's seat, VanBramer again could only say that it was a "long time ago" so he would have to "speculate." JA357. Although the field test was VanBramer's entire basis for thinking that the "less than half a gram" of substance that he supposedly found on the driver's seat was crack cocaine, JA441, VanBramer had no idea how accurate such field tests are—indeed, no defense witness knew. JA359.

As for the supposed crack cocaine itself, VanBramer testified that he had "formulate[d] an idea in [his] head of how it got there." JA361. Supposedly he thought that during the time Sloley was driving his car, then being pulled over, then engaged in a live traffic stop with a police office, Sloley had also decided to smoke crack cocaine—although there was no testimony that any device for smoking crack cocaine was found, of course. JA361; JA490. VanBramer further speculated that when this mid-drive, pipeless crack smoking session was interrupted by the police lights, Sloley had the time and ability to stuff drugs into his anus before pulling over "right away." JA362-363; JA394. In sum, VanBramer allegedly believed "[t]hat while Mr. Sloley was fleeing, he was potentially using, had the cocaine in plain sight, saw the emergency lights behind him as he was getting pulled over and was in a hurry to conceal them," and so "stuffed [the drugs] down his pants," "between the butt cheeks." JA361-363.

- 13 -

VanBramer, of course, had not observed anything like that himself. The officer who arrested Sloley never corroborated this speculation, because VanBramer never spoke to him. JA361-362. He had not heard from other officers, or observed himself, that Sloley made any suspicious movements on arrest to suggest that his theory was correct. JA361. There were no reports that Sloley fidgeted while inside his vehicle or otherwise made any movements suggesting that he had just urgently hidden drugs in his anus. In fact, at the time that VanBramer formed the idea that Sloley had hidden drugs in his anus, VanBramer had not interacted with Sloley at all. VanBramer did not find any other potential evidence of drugs anywhere in Sloley's vehicle other than the bit of "chunky substance" on the driver's seat. JA356; JA368.

Instead, the facts on which VanBramer stated he based his suspicion were the same ones this Court already determined support no more than a mere hunch. His suspicion was not based on specific and articulable facts that Sloley himself was hiding drugs in his anus. Rather, VanBramer testified that he suspected that Sloley had hidden drugs in his anus because VanBramer previously had "made numerous arrests where the subject I'm arresting has been concealing narcotics in their buttocks area." JA363. This is "where I've typically found things," he testified, or "other troopers that I've worked with have typically found things." JA502. He had seen "publications" and "bulletins" about such hiding places:

- 14 -

"we're constantly getting these alerts … [about] the places that these individuals are concealing drugs," "and it was so prevalent and occurring so often."  JA500. Based on this, VanBramer testified that he knew that this was a "[w]ell-known method of concealing narcotics at this time *so immediately that's what I was thinking*."  JA363-364 (emphasis added).  No particular, articulable facts—just, "Immediately, that's what you start thinking."  JA502.

When it came time to charge the jury, the district court had this Court's express holding of what the Fourth Amendment required:  "reasonable suspicion to believe that the arrestee is secreting evidence inside the body cavity to be searched."  *Sloley*, 945 F.3d at 39.  Yet the district court proposed to charge:  "In short, the relevant question is do the circumstances of the plaintiff's arrest support a reasonable suspicion that he was secreting contraband in *or on* his person?"  JA572 (emphasis added).  Sloley's counsel rightly objected:  "the question in this case is not on his person, the question in this case is in the cavity to be searched."  *Id*.  Counsel explained that VanBramer "may have had a suspicion that he had drugs on his person, but that's not the same as a suspicion that it was in the relevant cavity."  *Id*.  The proposed charge, Sloley's counsel argued, "invites [the jury] to say, if there was a reasonable suspicion that something was on his person, we lose," even though "that's specifically what the Second Circuit modified in this case."  JA573.  Nevertheless, the court held, "Over your objection, I'm going to

- 15 -

charge it reading, he was hiding contraband in or on his person ….” *Id*. And the court did so. JA615; JA642.

Immediately after charging that, “In short, the relevant question is do the circumstances of the plaintiff’s arrest support a reasonable suspicion that he was hiding contraband in or on his person?,” the court continued, “Now if you determine that the defendant was merely negligent or, in other words, acted in a way that reflected a lack of due care for the plaintiff, but he did not in any way violate the plaintiff’s Fourth Amendment rights, as described above, then you must find in favor of the defendant.” JA615. Sloley’s counsel had objected to this charge as well, explaining, “I don’t think that there’s a negligence question in this case” since “[t]here’s no question that the testimony was that the act was intentional”: “the only purpose this construction could be used for by the jury is to commit error.” JA576. Again, over objection, the court gave this charge.

With incorrect and confusing instructions, the jury deliberated for 33 minutes before returning a verdict for VanBramer. JA625.

### D. Post-Trial Motions And Notice Of Appeal

On September 26, 2022, Sloley, now again proceeding pro se, filed a motion with the district court to “overturn[] the jury’s verdict in its entirety, which would allow an award of damages, or grant the Plaintiff a new trial.” JA657. The same day, Sloley filed a “Motion for Notice of Appeal.” JA648. Sloley wrote: “I am

- 16 -

submitting this Notice of Appeal to the Court. Also submitted to the Court is a post-verdict Motion by the Plaintiff. If the Court denies that Motion, let this Motion stand as a Notice of Appeal to appeal the denial of that Motion, and Also to Appeal the jury's adverse decision." *Id.* On October 14, 2022, Sloley filed a "Motion to amend and supplement prior post-trial motion that was previously submitted." JA658.

The district court construed Sloley's pro se motions as motions pursuant to Federal Rules of Civil Procedure 59 and 60. Among the grounds raised by the post-trial motions were the erroneous jury instruction on the Fourth Amendment standard for a visual body cavity search and the confusing jury instruction on negligence. SPA32-33.

The district court denied both post-trial motions. SPA48. On the Fourth Amendment instruction, the court admitted error. It acknowledged, "The Second Circuit … set forth the appropriate standard for reasonable suspicion in the context of a visual body cavity search" earlier in the case. SPA36. That standard requires "reasonable suspicion to believe that the arrestee is secreting evidence *inside* the body cavity to be searched." *Id.* (quoting *Sloley*, 945 F.3d at 39) (district court's added emphasis). "Thus," the court wrote, "the Court's jury instruction, asking whether the circumstances supported a reasonable suspicion that plaintiff was hiding contraband 'in *or on* his person' is a misstatement of law." *Id.* The court

- 17 -

acknowledged that this "one misstatement could have permitted the jury to make an impermissible conclusion—that if Eric had reasonable suspicion to believe that plaintiff was hiding contraband *on* his body, he could conduct the visual body cavity search." SPA37.

The court further recognized that "there was not 'ample evidence' that plaintiff was hiding contraband inside of his body." SPA38. On the contrary, the court wrote that it was "not aware of a case in which a defendant has been successful on reasonable suspicion grounds supporting a visual body cavity search on such minimal evidence as was presented here." *Id.* The court explained:

> Plaintiff cooperated with the police at every stage; he was not acting suspicious or in any way that made him seem uncomfortable while in his vehicle; the canine did not alert to the driver's seat; no drugs or contraband were found on plaintiff during the strip search; and the only evidence supporting a search was the testimony about a white substance that was field tested positive for cocaine, and the incident report because the test kit had been destroyed before trial.

SPA39-40 (citations omitted). "No court has concluded that such minimal evidence amounts to reasonable suspicion to warrant a visual body cavity search." SPA40. Despite all this, the court concluded that "[t]he trial turned on plaintiff's credibility versus the VanBramer's credibility," and "[t]he decision of whose testimony to credit was for the jury to decide." SPA12. Although the court had to be convinced that its admitted error *did not* affect the verdict to deny the motion, it denied it for the lesser reason that it was not convinced the verdict *had* affected it.

- 18 -

*See* SPA41 (acknowledging that the standard is whether "'the court is convinced that the error did not influence the jury's verdict,'" but denying motion merely because it was "not convinced that had the one line of the jury instruction been correct, the jury would have come to a different conclusion").

As for the negligence instruction, the court again acknowledged the merits of Sloley's argument: that the instruction's "presence might have been confusing to the jury." SPA37; SPA45. But the court denied the motion because "the Court cannot say that the negligence instruction was so confusing that it undermined the very integrity of the trial." *Id.* (cleaned up).

Sloley now appeals the judgment and the district court's ruling on his post-trial motions.

## SUMMARY OF ARGUMENT

I.      This Court has jurisdiction over the denial of Sloley's post-trial motions. Although Sloley's notice of appeal is arguably technically deficient because he did not file a new or amended notice after the denial of his post-judgment motions, as required by Federal Rule of Appellate Procedure 4(a)(4)(B)(ii), that rule is not jurisdictional. Sloley did make his intent to appeal both the judgment and any denial of his post-trial motions clear and so provided sufficient notice to appellee VanBramer. Especially given the special solicitude

- 19 -

afforded to pro se litigants, this Court should exercise its discretion to overlook the notice of appeal's technical defect and consider the appeal of his post-trial motions.

II.     The district court made two prejudicial errors in its jury instructions.

A.     The district court committed reversible error when it instructed the jury that reasonable suspicion to perform a visual body cavity search existed if the circumstances of the arrest indicated that Sloley had drugs *on* his person.  This is not the correct standard.  As this Court held in this case, and as the district court acknowledged, such a search is justified under the Fourth Amendment only when there is reasonable suspicion that the arrestee is concealing drugs *inside* his body cavity.  Considering the lack of evidence that Sloley was hiding drugs in his anal cavity, this error was prejudicial.  Accordingly, a new trial is warranted.

B.     The district court's instruction on negligence was misleading and prejudicial.  Negligence was not relevant to the case, and its inclusion in the jury instruction could have led the jury to disregard the objective Fourth Amendment standard.  Given that VanBramer was ultimately mistaken in suspecting Sloley of hiding drugs in his anal cavity, the jury may well have thought that if they found VanBramer had made a mistake in his suspicions, they should find for him, and did.  This error was prejudicial and warrants a new trial.

- 20 -

## ARGUMENT

### I. THIS COURT CAN AND SHOULD CONSIDER THE DISTRICT COURT'S DENIAL OF SLOLEY'S POST-TRIAL MOTIONS

This Court has jurisdiction over the denial of Sloley's post-trial motions. Although the failure to file an amended notice of appeal after the denial of the post-trial motions amounts to technical noncompliance with Rule 4(a)(4)(B)(ii), that is not a limit on this Court's jurisdiction. The Court therefore may excuse the technical noncompliance and consider the denial of the post-trial motions. And the Court should do so, both because there was no prejudice to appellee VanBramer—who had clear notice of all issues being appealed—and because the Court gives leeway to pro se litigants, as Sloley was. The Court reviews this question of its appellate jurisdiction de novo. *See, e.g.*, *United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty.*, 712 F.3d 761, 767 (2d Cir. 2013) ("[W]e review jurisdictional questions de novo.").

### A. The Court Has Jurisdiction To Consider The Post-Trial Motions

Notices of appeal are governed by Federal Rules of Appellate Procedure 3 and 4. Rule 3(a)(1) provides, "An appeal permitted by law as of right from a district court to a court of appeals may be taken only by filing a notice of appeal with the district clerk within the time allowed by Rule 4." Rule 3(c)(1) requires that "[t]he notice of appeal must (A) specify the party or parties taking the appeal

- 21 -

… ; (B) designate the judgment—or the appealable order—from which the appeal

is taken; and (C) name the court to which the appeal is taken."

Federal Rule of Appellate Procedure 4(a), governing an "Appeal in a Civil

Case," establishes among other things the "Effect of a Motion on a Notice of

Appeal." Fed. R. App. P. 4(a)(4). Rule 4(a)(4)(B)(i) provides:

> If a party files a notice of appeal after the court announces or enters a
> judgment—but before it disposes of any motion listed in Rule
> 4(a)(4)(A)—the notice becomes effective to appeal a judgment or
> order, in whole or in part, when the order disposing of the last such
> remaining motion is entered.

However, Rule 4(a)(4)(B)(ii) then requires that:

> A party intending to challenge an order disposing of any motion listed
> in Rule 4(a)(4)(A), or a judgment's alteration or amendment upon
> such a motion, must file a notice of appeal, or an amended notice of
> appeal—in compliance with Rule 3(c)—within the time prescribed by
> this Rule measured from the entry of the order disposing of the last
> such remaining motion.

Although Sloley's notice of appeal specified the parties and designated the

judgment and appealable order from which the appeal was taken as required under

Rule 3, he did not file a new or amended notice of appeal after the district court

denied his post-judgment motion. *See* Fed. R. App. P. 3(c)(1)(A)-(B); *id.*

4(a)(4)(B)(ii). By failing to file a new or amended notice of appeal, Sloley, who

was proceeding pro se at that time, arguably did not comply with a strict reading of

Rule 4(a)(4)(B)(ii). But this technical defect does not foreclose this Court's

- 22 -

jurisdiction because Rule 4(a)(4)(B)(ii) is not a jurisdictional rule, but a claim-processing rule that does not inhibit this Court's adjudicatory authority.

Claim-processing rules "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). These rules do "not reduce the adjudicatory domain of a tribunal." *Union Pacific R.R. Co. v. Brotherhood Locomotive Eng'rs*, 558 U.S. 67, 81-82 (2009). In contrast, a "rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction." *Henderson*, 562 U.S. at 435. The distinction between jurisdictional and claim-processing rules is "not merely semantic but one of considerable practical importance." *Id.* at 434.

As this Court has recognized, a rule is jurisdictional "[i]f the Legislature clearly states that a prescription counts as jurisdictional." *United States v. Saladino*, 7 F.4th 120, 123 (2d Cir. 2021). Likewise, "'when Congress does not rank a prescription as jurisdictional, courts should treat the restriction as nonjurisdictional in character.'" *Id.* For example, in *Bowles v. Russell*, 551 U.S. 205 (2007), the Supreme Court held that the Sixth Circuit lacked jurisdiction over a notice of appeal that had been filed outside the period allowed by Rule 4(a)(6). *Id.* at 213-214. The Court reasoned that Rule 4(a)(6) was jurisdictional because Congress enacted its time limits in 28 U.S.C. § 2107(c). *Id.*

- 23 -

In *Hamer v. Neighborhood Housing Services of Chicago*, 583 U.S. 17 (2017), the Court clarified its holding in *Bowles* and reemphasized Congress's exclusive authority to define the jurisdiction of lower federal courts.  In *Hamer*, the plaintiff filed her notice of appeal within a two-month extension granted by the district court, but outside the thirty-day limit on such extensions set by Rule 4(a)(5)(C).  *Id.* at 21-22.  The Seventh Circuit dismissed the appeal, relying on *Bowles* to conclude that Rule 4(a)(5)(C)'s time limit was jurisdictional.  *Id.*  Even though Rule 4(a)(5)(C)'s time limit was not codified in statute, the Seventh Circuit nevertheless analogized it to Rule 4(a)(6) in *Bowles* and described it as the "vehicle by which § 2107(c) is employed."  *Id.* at 26.

The *Hamer* Court rejected this reasoning and held that Rule 4(a)(5)(C)'s time limit was a nonjurisdictional claim-processing rule because it had not been enacted into statute.  583 U.S. at 17.  The Court articulated "a rule of decision that is both clear and easy to apply:  If a time prescription governing the transfer of adjudicatory authority from one Article III court to another appears in statute, the limitation is jurisdictional; otherwise, the time specification fits within the claim-processing category."  *Id.* at 18.  The Court emphasized, "'Only Congress may determine a lower federal court's subject-matter jurisdiction."  *Id.* at 19. "Accordingly, a provision governing the time to appeal in a civil action qualifies as jurisdictional only if Congress sets the time."  *Id.*  The Court did not limit its

- 24 -

reasoning to the "timebound transfer of adjudicatory authority." *Id.* at 25 n.9. It held broadly that a "rule is jurisdictional '[i]f the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional.'" *Id. Hamer* therefore clarified that only those provisions of Rule 4 that have been set by statute are jurisdictional. *See* 16A Wright & Miller, *Federal Practice and Procedure* § 3950.1 (5th ed. 2023 update).

Here, Sloley's notice of appeal is arguably deficient because he failed to file a new or amended complaint as required by Rule 4(a)(4)(B)(ii). But Congress has not enacted Rule 4(a)(4)(B)(ii) into statute. Under *Hamer*'s "clear and easy" rule, Rule 4(a)(4)(B)(ii) is not a jurisdictional limit but a claim-processing rule, and this Court may exercise jurisdiction over the denial of Sloley's post-trial motions.

## B.     The Court Should Consider The Post-Trial Motions

Because Rule 4(a)(4)(B)(ii) is not jurisdictional, this Court can and should exercise its discretion to overlook the technical defects of Sloley's pro se notice of appeal, which clearly articulated his intent to appeal a potential adverse decision on his post-judgment motions and provided adequate notice to appellee VanBramer.

This Court routinely liberally interprets and overlooks technical defects in notices of appeal, an approach that is all the more appropriate when the appellant initiates the appeal pro se. While a notice of appeal must designate the judgment or order being appealed, "it is well settled that courts should apply a liberal

- 25 -

interpretation to that requirement." *Conway v. Village of Mount Kisco*, 750 F.2d 205, 211 (2d Cir. 1984). And courts are "ordinarily obligated to afford a special solicitude to *pro se* litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). "A notice of appeal filed by a *pro se* litigant must be viewed liberally, and not every technical defect in a notice of appeal constitutes a jurisdictional defect" for that reason. *Grune v. Coughlin*, 913 F.2d 41, 43 (2d Cir. 1990) (citations omitted). This Court has described its task as interpreting "the notice of appeal so as to remain faithful to the intent of the appellant, fair to the appellee, and consistent with the jurisdictional authority of this court." *Conway*, 750 F.2d at 211; *see also Foman v. Davis*, 371 U.S. 178, 181 (1962) (holding that a defective notice of appeal "did not mislead or prejudice the respondent" because "petitioner's intention to seek review of" both orders was "manifest"). "As long as the *pro se* party's notice of appeal evinces an intent to appeal an order or judgment of the district court and the appellee has not been prejudiced or misled by the notice, the notice's technical deficiencies will not bar appellate jurisdiction." *Elliott v. City of Hartford*, 823 F.3d 170, 172-173 (2d Cir. 2016) (per curiam).

*Marrero Pichardo v. Ashcroft*, 374 F.3d 46 (2d Cir. 2004), provides an instructive example. In that case, the district court denied a habeas petition and the petitioner filed a notice of appeal, but then also filed a motion to reconsider that raised a new legal argument and that the court then denied. *See id.* at 50. Without

filing a new or amended notice of appeal, the petitioner premised his appeal on claims raised in the motion for reconsideration. *Id.* at 54. When considering the permissible scope of the appeal under the circumstances, this Court explained that it had "previously excused defects in an appellant's notice of appeal by holding that the notice requirement should be liberally construed." *Id.* (citing *Conway*, 750 F.2d at 211). It found that the petitioner's intent to appeal the issue first raised in his motion to reconsider was clear and that there was no prejudice or surprise from the notice's technical defects. *Id.* As such, the Court permitted the appeal to proceed and reviewed the denial of the motion for reconsideration, even though that order had not been mentioned in the notice of appeal.

This case presents even stronger grounds for the Court's leeway. Like in *Marrero Pichardo*, Sloley seeks appellate review of an order that came after his notice of appeal. But unlike in *Marrero Pichardo*, Sloley proactively designated his post-judgment motions in his notice of appeal and clearly articulated his intent to appeal their potential denial. There is no risk that the appellee VanBramer will be surprised or prejudiced. The Court in *Marrero Pichardo* also noted that the petitioner had been the victim of "poor lawyering" when filing his notice. 374 F.3d at 55. Here, Sloley had no lawyer at all when filing his notice, entitling him to the "special solicitude" shown pro se litigants—indeed, courts "should be particularly solicitous of *pro se* litigants who assert civil rights claims" and "who

- 27 -

are incarcerated." *Tracy*, 623 F.3d at 102 (citing *Davis v. Goord*, 320 F.3d 346, 350 (2d Cir. 2003); *Houston v. Lack*, 487 U.S. 266, 270-272 (1988)).  In short, this case is an easy candidate for the Court's leniency in the strict notice-of-appeal requirements.  *See, e.g.*, *Elliott*, 823 F.3d at 171 (exercising jurisdiction over later order not identified in notice of appeal by pro se civil rights plaintiff).

### C.  Even If The Court Did Not Consider The Denial Of The Post-Trial Motions, It Would Reach The Substance Of The Appeal

Although the Court has jurisdiction over the post-trial motions and should consider them, it will reach the substance of the appeal even if it concludes otherwise.  All the grounds that Sloley raises on appeal are available even if the Court does not consider the post-trial motions because he designated the judgment in his timely-filed notice of appeal.  JA648 ("After a jury trial, the jury rendered a verdict against I, Plaintiff Sloley, and in favor of the defendant, Eric Vanbramer.  And so I am submitting this Notice of Appeal to the Court.").

Under Rule 4(a)(4)(B)(i), "If a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered."  Here, Sloley filed his notice of appeal after the court had entered its judgment but before it had disposed of his post-trial motion.  The court reviewed Sloley's post-trial motion under Federal Rules of Civil Procedure 59 and 60, both

- 28 -

of which are listed in Rule 4(a)(4)(A). SPA8-9. Under Rule 4(a)(4)(B)(i), Sloley's

appeal of the underlying judgment became effective when the court disposed of his

post-trial motion on May 25, 2023. SPA48. As described in more detail below,

Sloley appeals the court's erroneous jury instructions on the reasonable suspicion

standard and on negligence. Both issues were preserved for appeal and are

properly before the Court in an appeal of the post-trial judgment alone.

Accordingly, even if the Court declines to consider the post-trial motions, his

substantive grounds for appeal are available.

## II. THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN ITS JURY INSTRUCTIONS

A new trial is warranted because of the district court's erroneous jury

instructions. The court gave two instructions requiring a new trial. The first was

an admitted misstatement of the key question of liability under the Fourth

Amendment, indeed the very question this Court answered in this case's first

appeal: Is it enough for a visual body cavity search to reasonably suspect that an

arrestee has drugs *on* his person? This Court answered no. On remand, the district

court told the jury the answer was yes. That error alone warrants a new trial.

The second error compounded the first one. Right after wrongly instructing

the jury on the reasonable suspicion standard, the district court misleadingly and

irrelevantly instructed the jury that they must find for VanBramer if he was

"merely negligent." But reasonable suspicion is an objective standard. This

- 29 -

instruction—appropriate when a state official's *conduct* might be unintentional, like a § 1983 action after a car crash—was misleading here, where VanBramer's intent to conduct the visual body cavity search was undisputed. The only thing that VanBramer could have been "negligent" about was his suspicion that Sloley was hiding drugs, and where—a fact entirely irrelevant to his liability.

"A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Restivo v. Hessemann*, 846 F.3d 547, 569 (2d Cir. 2017). An erroneous instruction requires a new trial if the error is not harmless. *Uzoukwu v. City of N.Y.*, 805 F.3d 409, 418 (2d Cir. 2015). "An error is harmless only if the court is convinced that the error did not influence the jury's verdict." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000). Put another way, a new trial is warranted if the court finds that "[t]he jury might well have reached a different result had appropriate instructions been given." *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 525 (2d Cir. 1998). "Where jury instructions create an erroneous impression regarding the standard of liability, it is not harmless error because it goes directly to the plaintiff's claim, and a new trial is warranted." *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 173 F.3d 454, 463 (2d Cir. 1999) (Sotomayor, J.) (citing *Hathaway v. Coughlin*, 99 F.3d 550, 554-555 (2d Cir. 1996)).

- 30 -

This Court "review[s] challenges to jury instructions in civil cases *de novo*." *Rasanen v. Doe*, 723 F.3d 325, 331 (2d Cir. 2013).

## A. The District Court Prejudicially Erred In Its Fourth Amendment Instruction

The district court's central Fourth Amendment instruction was admittedly, and prejudicially, incorrect. This prejudicial error warrants a new trial.

There is no question that the district court's instruction that suspicion Sloley had drugs *on* his person sufficed to visually search for drugs *in* his person was an error. *See, e.g.*, *Hathaway*, 99 F.3d at 552 ("A jury charge is erroneous if it misleads the jury as to the correct legal standard …."). In its post-trial order, the district court admitted that "asking whether the circumstances supported a reasonable suspicion that plaintiff was hiding contraband 'in or on his person' is a misstatement of the law." SPA36.

Indeed, it is a misstatement of the very law established by this Court in this case. As the Court emphasized in the first appeal, visual body cavity searches compromise privacy and bodily integrity. "They 'require an arrestee not only to strip naked in front of a stranger, but also to expose the most private areas of her body to others. This is often done, as here, while the person arrested is required to assume degrading and humiliating positions.'" *Sloley*, 945 F.3d at 38 (quoting *Swain v. Spinney*, 117 F.3d 1, 6 (1st Cir. 1997)). "The freedom from such 'degrading body inspections … is basic to the concept of privacy.'" *Id.* (quoting

*Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994)). "In contrast to that strong privacy interest, the government's interest in conducting suspicionless visual body cavity searches incident to an arrest is slight." *Id.*; *United States v. Barnes*, 506 F.3d 58, 62 (1st Cir. 2007) (requiring a more particularized suspicion that contraband is concealed before upholding a visual body cavity search). For this reason, the Fourth Amendment provides significant protections in the context of a visual body cavity search.

Specifically, "a visual body cavity search conducted as an incident to a lawful arrest must be supported by 'a specific articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity.'" *Sloley*, 945 F.3d at 38 (quoting *People v. Hall*, 886 N.E.2d 162, 168 (N.Y. 2008)). An officer "must be able to justify the particular intrusion" that he makes in examining a body cavity and must have reasonable suspicion, based on the particularized circumstances, that the arrestee was concealing contraband where the officer searched. *Fate v. Charles*, 24 F. Supp. 3d 337, 346 (S.D.N.Y. 2014). A general suspicion that an arrestee possessed contraband somewhere on his body or clothes is not enough to support a visual body cavity search. It is the law in this Circuit that "such searches must be based on reasonable suspicion to believe that the arrestee is secreting evidence *inside the body cavity to be searched*." *Sloley*, 945 F.3d at 39 (emphasis added).

- 32 -

Yet on remand, the district court distilled its Fourth Amendment instruction to: "In short, the relevant question is do the circumstances of plaintiff's arrest support a reasonable suspicion that he was hiding contraband in *or on* his person?" JA615 (emphasis added). That is an undisputed error.

The only question, then, is whether the error was prejudicial, warranting a new trial. A new trial is called for by erroneous jury instructions where "[t]he jury might well have reached a different result had appropriate instructions been given." *Holzapfel*, 145 F.3d at 525. The Court need not be convinced that the verdict *would* have been different to grant a new trial. *See Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 170 (2d Cir. 2017) (holding that although the evidence could convince a reasonable juror to reach the same verdict without the erroneous instruction, the evidence was not so overwhelming as to render to the error harmless). "An error is harmless *only if* the court is convinced that the error *did not* influence the jury's verdict." *Gordon*, 232 F.3d at 116 (emphases added).

The Court cannot be convinced that this error was harmless. There was minimal evidence at trial to support a reasonable suspicion that Sloley was hiding drugs in his anal cavity. VanBramer went to the car because Bryan told him that Rollins said Sloley might possess drugs, but Rollins denied saying so. No one claims Rollins said anything about Sloley hiding drugs in a body cavity. VanBramer claims his dog alerted for drugs in several spots around the car, but not

- 33 -

that the dog alerted at the small substance on the driver's seat, nor that the dog alerted to Sloley's person back at the barracks. Even accepting that the dog alerted at the car, and even accepting that the trace of substance was crack cocaine—a fact supported only by a destroyed test kit of unknown reliability and VanBramer's say so—finding drugs in a car does not mean that there are drugs in the driver. Back at the barracks, before the search, Sloley did not squirm, fidget, reach into his pants, act uncooperatively, or resist a strip search. He adamantly denied having drugs with him or in his car.[2] With his cooperation, every piece of his clothing was removed, searched, and found to have no drugs or even traces of drugs in them. At that point, no particularized, articulable fact supported VanBramer's decision to continue to a visual body cavity search. He had simply developed a hunch—"Immediately"—and wanted to see it through.

Both this Court and the district court have already recognized how thin the evidence was that Sloley had hidden drugs in his anus. This Court wrote that "once the disputed fact that Eric recovered crack cocaine from Sloley's car is disregarded, the evidence available to Eric supports no more than a mere hunch that Sloley was secreting drugs inside his anal cavity." *Sloley*, 945 F.3d at 46. That fact remained vigorously disputed at trial, with little evidence that crack was

---

[2] *See United States v. Asbury*, 586 F.2d 973, 976-977 (2d Cir. 1978) (listing factors contributing to the reasonableness of a strip search including "[e]xcessive nervousness," "[u]nusual conduct," and "[e]vasive or contradictory answers").

found—but even if it was, there was nearly no evidence suggesting that Sloley had not merely possessed drugs, but hidden drugs in his body. After trial, the district court agreed that "there was not 'ample evidence' that plaintiff was hiding contraband inside of his body" and, indeed, that the court was "not aware of a case … supporting a visual body cavity search on such minimal evidence as was presented here": "No court has concluded that such minimal evidence amounts to reasonable suspicion to warrant a visual body cavity search." SPA38; SPA40.

On this record, this Court cannot be convinced that the erroneous jury instruction did not have an effect on the jury's verdict. *See Cobb v. Pozzi*, 363 F.3d 89, 118 (2d Cir. 2003) (erroneous instruction not harmless when "th[e] evidence could [also] support a jury's reaching the opposite conclusion").

In denying Sloley's post-trial motions, the district court held that its admitted error was harmless because the law was stated correctly elsewhere in the jury instructions, by counsel, and on the verdict form. *See* SPA40-41. At bottom, this conclusion misapprehends the nature of the court's error. The jury's hearing elsewhere that they should find for VanBramer if he had reasonable suspicion that Sloley had drugs *inside* his person does nothing to defuse the error of the court's telling them to find for VanBramer if Sloley had drugs in *or on* his person. Altogether, the jury was simply presented with alternatives—two ways to find for VanBramer, reasonable suspicion of drugs *in* or of drugs *on* Sloley. But if I tell

- 35 -

you that you may eat an apple or an orange for a snack, the fact that I earlier told you that you may eat an apple is no reason to conclude that you may not eat an orange. So the court's reliance on other places where the law was stated correctly, but not in a way that cured or diminished its later error, is unavailing.

In any event, this Court cannot be convinced that the jury minded those instances rather than the court's distilling "in short" for them what they had to find. For one, the court instructed the jury repeatedly, and rightly, that it must follow the law as the court instructed. *See* JA601 ("You must base your decision on what I now tell you ...."); JA602 ("The law that you must apply is the law I now instruct you."). The court's error cannot be cured by statements of counsel or on the verdict form when, by its own command, the court's instructions control. And it is also well established that a court's incorrect statements are not necessarily cured if the charge contains the correct standard elsewhere. *See Hudson v. New York*, 271 F.3d 62, 70 (2d. Cir. 2001); *United States v. Kopstein*, 759 F.3d 168, 182 (2d Cir. 2014). This is true even more so when the court fails to issue a curative instruction and the jury has no way of knowing whether the latter instruction was incorrect compared to the earlier instruction. The framing of the faulty charge here makes it even less likely the jury relied on the correct instruction. Starting the erroneous instruction with "in short" indicates that the district court was summing up and simplifying the Fourth Amendment standard for the jury, to help it apply the law to

- 36 -

the facts.  As a result, there was a significant likelihood that the jury would rely on the simplified instruction containing the error during deliberations.  Merely stating the correct standard before the error does not negate the risk that the error influenced the jury's deliberations.

In the end, the Court cannot be convinced that the error was harmless.  The evidence presented could have much more easily supported reasonable suspicion that Sloley had narcotics *on* his person than concealed *in* his person, making the error consequential.  VanBramer's testimony about finding a chunky white substance in the driver's seat, allegedly confirmed to be crack cocaine, may very well justify a less intrusive search on Sloley's person, like a pat-down.  But imagine a juror leaning toward a verdict for Sloley, thinking VanBramer lacked reasonable suspicion that Sloley had drugs in his person.  During deliberations, however, another juror steps in to say that the court made clear—"in short"—that such suspicion was not required, rather reasonable suspicion of drugs *in or on his person* was enough.  The first juror, persuaded by the court's error, agrees that makes it an easy case, and 33 minutes later, the jury has a verdict for VanBramer.  On this record, this Court cannot be "convinced that the error did not influence the jury's verdict," *Gordon*, 232 F.3d at 116, and a new trial is warranted.

- 37 -

## B.      The District Court Prejudicially Erred By Giving A Negligence Instruction

The Fourth Amendment's reasonableness requirement is an objective test. In justifying an invasive intrusion such as a visual body cavity search, "the fact that an officer truly believed that he saw a violation does not necessarily make it reasonable for him to suspect that the violation occurred. Good faith alone does not make suspicion reasonable." *United States v. Stewart*, 604 F. Supp. 2d 676, 682-683 (S.D.N.Y. 2009) (citing *Terry v. Ohio*, 392 U.S. 1, 22 (1968)); *see also United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) ("[A] district court must not merely defer to the police officer's judgment."). Instead, there must be a particularized and *objective* basis for suspecting wrongdoing. *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013). Whether the officer was negligent in suspecting wrongdoing is not a relevant inquiry. There is no mental state requirement. Indeed, searched parties often argue that law enforcement officers were mistaken or malicious in their suspicions, and courts reject those arguments as irrelevant to the objective Fourth Amendment inquiry. *See, e.g., United States v. Weaver*, 9 F.4th 129, 145 (2d Cir. 2021); *United States v. Stewart*, 551 F.3d 187, 191-193 (2d Cir. 2009); *United States v. Jenkins*, 452 F.3d 207, 212 (2d Cir. 2006); *United States v. Brown*, 2021 WL 3194794, at *6 n.7 (W.D.N.Y. Apr. 14, 2021); *see also United States v. Delfin-Colina*, 464 F.3d 392, 399 (3d Cir. 2006).

- 38 -

Nonetheless, the district court gave the following instruction:

> In short, the relevant question is do the circumstances of plaintiff's arrest support a reasonable suspicion that he was hiding contraband in or on his person? Now if you determine that the Defendant was merely negligent or, in other words, acted in a way that reflected a lack of due care for the Plaintiff, but he did not in any way violate the Plaintiff's Fourth Amendment rights, as described above, then you must find in favor of the defendant.

JA615-616.

This instruction misled and likely confused the jury. This case is distinct from § 1983 actions involving excessive force, for example, where harm can result from an officer's negligence rather than from his specific intent. It is distinct from someone suing under § 1983 after a federal agent's car crash. Here, negligence was not at issue. A visual search of an arrestee's anal cavity does not happen by accident. If there were any question of VanBramer's intent—and it is hard to imagine how there would be—his trial testimony dispenses with it: He testified that he took Sloley to a private room with the full intention of strip searching him. JA364 ("I brought Mr. Sloley into a private room where I advised him that I was going to be doing a strip search, asked him if he had anything on his person that I should know about before the search.").

But since VanBramer's intent was not at issue, under what circumstances could the jury "determine that the Defendant was merely negligent or, in other words, acted in a way that reflected a lack of due care for the Plaintiff" such that

- 39 -

they "must find in favor the defendant"?  The only understanding that a jury could take from that instruction is that VanBramer could be excusably negligent in his suspicion that Sloley was hiding drugs in his anal cavity.  This instruction could have caused the jury to ignore the objective circumstances of the search and find in VanBramer's favor if they determined that he made an error in judgment about reasonable suspicion.  This inference is contrary to established Fourth Amendment law.  Thus, as the district court acknowledged, the negligence instruction's "presence might have been confusing to the jury."  SPA45.

In light of the evidence at trial, it is "far from certain that the [error] was harmless."  *LNC Invs.*, 173 F.3d at 462.  As explained, the jury's verdict for VanBramer was nowhere near inevitable based on the evidence presented.  Both this Court and the district court after trial recognized how thin the case for reasonable suspicion was—the district court could find *no case ever* finding reasonable suspicion for a visual body cavity search on so little.  This Court cannot confidently conclude that, without the misleading negligence instruction, the jury would have found for VanBramer.

Again, imagine a juror who enters deliberations thinking that VanBramer lacked reasonable suspicion that there were drugs in Sloley's anal cavity.  She voices her opinion to her fellow jurors.  But, one corrects her, the judge told us that if we determine that VanBramer was "merely negligent," then we have to find for

- 40 -

him—and I don't think VanBramer intentionally or recklessly committed an unconstitutional search, even if he was careless with Sloley's rights. The first juror agrees that VanBramer was at most merely negligent, making this is an easy case and—33 minutes later—the jury emerges with a verdict for VanBramer. The district court's negligence instruction, immediately following its erroneous pronouncement of the Fourth Amendment standard, may have "'create[d] an erroneous impression regarding the standard of liability.'" *LNC Invs.*, 173 F.3d at 463. This confusing instruction was not harmless, and a new trial is warranted.

## CONCLUSION

For these reasons, the Court should reverse the district court's denial of Sloley's post-trial motions, vacate the judgment in favor of VanBramer, and remand the case for a new trial.

Respectfully submitted.

/s/ Ryan Chabot
RYAN CHABOT
ALAN SCHOENFELD
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

*Counsel for Plaintiff-Appellant*

May 8, 2024

- 41 -

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as modified by Local Rule 32.1(a)(4).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 10,009 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font and complies with the requirements of Fed. R. App. P. 32(a)(5)-(6).  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Ryan Chabot
RYAN CHABOT

May 8, 2024

# SPECIAL APPENDIX

# SPECIAL APPENDIX
## TABLE OF CONTENTS

Page

District Court Judgment, Dkt. 126 (August 31, 2022) ....................................... SPA1

District Court Memorandum and Order Denying Plaintiff's Post-Trial
Motions and Granting Defendant's Bill of Cost,
Dkt. 147 (May 25, 2023) ........................................................................ SPA3

U.S. Constitution Amendment IV .................................................................. SPA50

42 U.S.C. § 1983 ........................................................................................ SPA50

Fed. R. App. P. 4 ......................................................................................... SPA51

UNITED STATES DISTRICT COURT – N.D. OF N.Y.

**FILED**

**Aug 31 - 2022**

John M. Domurad, Clerk

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

## <u>JUDGMENT IN A CIVIL CASE</u>

**Maxmillian Sloley**
> Plaintiff(s)

> vs.                                  **CASE NUMBER: 14-CV-339**

**Eric VanBramer**
> Defendant(s)


> **Jury Verdict.**  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

IT IS ORDERED AND ADJUDGED  that in the above entitled action, after the completion of a Jury Trial before Magistrate Judge Christian F. Hummel on August 30, 2022, the Jury finds in favor of the Defendant with a verdict of no cause. Accordingly, the action is DISMISSED in it's ENTIRETY, and Judgment is entered in favor of Defendant, Eric VanBramer.


DATED: August 31, 2022

Clerk of Court

s/_____
Tara Burtt
Deputy Clerk


**SPA1**

# Federal Rules of Appellate Procedure
## Rule 4. Appeal as of Right

### (a) Appeal in a Civil Case.

1. (1) *Time for Filing a Notice of Appeal.*

(A) In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from.

(B) The notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from if one of the parties is:

(i) the United States;
(ii) a United States agency;
(iii) a United States officer or employee sued in an official capacity; or
(iv) a current or former United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf — including all instances in which the United States represents that person when the judgment or order is entered or files the appeal for that person.

(C) An appeal from an order granting or denying an application for a writ of error *coram nobis* is an appeal in a civil case for purposes of Rule 4(a).

(2) *Filing Before Entry of Judgment.* A notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry.

(3) *Multiple Appeals.* If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later.

(4) *Effect of a Motion on a Notice of Appeal.*

(A) If a party timely files in the district court any of the following motions under the Federal Rules of Civil Procedure, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:

(i) for judgment under Rule 50(b);

(ii) to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;

(iii) for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;

(iv) to alter or amend the judgment under Rule 59;

(v) for a new trial under Rule 59; or

(vi) for relief under Rule 60 if the motion is filed no later than 28 days after the judgment is entered.

(B)(i) If a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

(ii) A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice

of appeal—in compliance with Rule 3(c)—within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.

(5) *Motion for Extension of Time.*

(A) The district court may extend the time to file a notice of appeal if:

(i) a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and

(ii) regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause.

(B) A motion filed before the expiration of the time prescribed in Rule 4(a)(1) or (3) may be ex parte unless the court requires otherwise. If the motion is filed after the expiration of the prescribed time, notice must be given to the other parties in accordance with local rules.

(C) No extension under this Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later.

(6) *Reopening the Time to File an Appeal.* The district court may reopen the time to file an appeal for a period of 14 days after the date when its order to reopen is entered, but only if all the following conditions are satisfied:

(A) the court finds that the moving party did not receive notice under Federal Rule of Civil Procedure 77 (d) of the entry of the judgment or order sought to be appealed within 21 days after entry;

(B) the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice under Federal Rule of Civil Procedure 77 (d) of the entry, whichever is earlier; and

(C) the court finds that no party would be prejudiced.

(7) *Entry Defined.*

(A) A judgment or order is entered for purposes of this Rule 4(a):

(i) if Federal Rule of Civil Procedure 58 (a) does not require a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79 (a); or

(ii) if Federal Rule of Civil Procedure 58 (a) requires a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a) and when the earlier of these events occurs:

• the judgment or order is set forth on a separate document, or

• 150 days have run from entry of the judgment or order in the civil docket under Federal Rule of Civil Procedure 79 (a).

(B) A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58 (a) does not affect the validity of an appeal from that judgment or order.

**SPA2**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

MAXMILLIAN SLOLEY,

                              Plaintiff,

          v.

ERIC VANBRAMER,                              No. 1:14-CV-339
                                             (CFH)

                              Defendant.


_____

APPEARANCES:                              OF COUNSEL:

Maxmillian Sloley
17-A-0421
Eastern New York Correctional Facility
Box 338
Napanoch, New York 12458
Plaintiff pro se

Attorney General for the                  MARK G. MITCHELL, ESQ.
State of New York                         RACHAEL OUIMET, ESQ.
The Capitol                               Assistant Attorneys General
Albany, New York 12224
Attorneys for defendant(s)

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### MEMORANDUM-DECISION AND ORDER[1]

Pro se plaintiff Maxmillian Sloley ("plaintiff"), presently an inmate at Eastern New

York Correctional Facility, commenced this action pursuant to 42 U.S.C. § 1983

claiming that his Fourth Amendment rights were violated. See Dkt. No. 1. The case

proceeded to a jury trial on August 29, 2022, against defendant Eric VanBramer

---

[1] The parties consented to Magistrate Judge Hummel's jurisdiction. See Dkt. No. 85.

**SPA3**

("defendant" or "Eric").  See Text Minute Entry 08/29/22.  The trial concluded on August 30, 2022, and the jury returned a no cause verdict.  See Text Minute Entry 08/30/22; see also Dkt. No. 124.  Presently before the Court is plaintiff's pro se post-trial motion "to reverse the erroneous verdict by the jury[]" and for a new trial.  Dkt. No. 134; see also Dkt. No. 140.  Defendant responded in opposition.  See Dkt. No. 143.  Defendant also filed a bill of costs.  See Dkt. No. 135.  For the following reasons, plaintiff's motion is denied, and defendant's bill of costs is granted to the extent set forth in this Memorandum-Decision and Order.

## I.  Background

In his complaint, plaintiff alleged that New York State Police Officers and brothers, Eric, and Bryan VanBramer ("Bryan"), violated his Fourth Amendment rights by conducting a visual body cavity search subsequent to an arrest without proper justification.  See generally Dkt. No. 1.  The VanBramers moved for summary judgment, see Dkt. No. 41, which Senior District Judge Gary L. Sharpe granted.  See Sloley v. VanBramer, No. 1:14-CV-339 (GLS/CFH), 2016 WL 6603211, at *4 (N.D.N.Y. Nov. 8, 2016),[2] aff'd in part, vacated in part, remanded, 945 F.3d 30 (2d Cir. 2019); see also Dkt. No. 49.  The Court granted summary judgment as to Bryan for lack of personal involvement, and as to Eric because the search was constitutional and "even if Sloley's Fourth Amendment rights were violated, [Eric was] entitled to qualified immunity." Sloley, 2016 WL 6603211, at *4.  Plaintiff appealed, and the Second Circuit affirmed this

---

[2] All unpublished decisions cited in this Memorandum-Decision and Order, unless otherwise noted, have been provided to plaintiff.

2

**SPA4**

Court's dismissal of the complaint against Bryan but vacated and remanded the case as to Eric. See Dkt. No. 64; see also Sloley v. VanBramer, 945 F.3d 30, 47 (2d Cir. 2019). The Second Circuit concluded that Eric was not entitled to qualified immunity because

> every reasonable officer in the VanBramers' position as New York State Troopers would have known that visual body cavity searches conducted incident to any arrest must additionally be supported by "a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity" and must be conducted in a reasonable manner.

Sloley, 945 F.3d at 40 (quoting People v. Hall, 10 N.Y.3d 303, 311 (Ct. App. 2008); People v. Mothersell, 14 N.Y.3d 358, 366-67 (Ct. App. 2010)). The Court stated that "once the disputed fact that Eric recovered crack cocaine from Sloley's car is disregarded, the evidence available to Eric supports no more than a mere hunch that Sloley was secreting drugs inside his anal cavity. Such a 'hunch of criminal activity is insufficient' to establish reasonable suspicion." Id. at 46 (quoting United States v. Muhammad, 463 F.3d 115, 121 (2d Cir. 2006)). Thus, the Second Circuit ordered the case to proceed to trial against Eric. See id. at 47.

The case proceeded to a two-day jury trial where plaintiff was represented by pro bono counsel, Remy Green, Esq. See Dkt. Nos. 80, 144, 145; see also Text Minute Entry 08/29/22; Text Minute Entry 08/30/22. During trial, the jury heard testimony from plaintiff, Eric, Bryan, and Senior Investigator Theodore LaRuffa. See generally Dkt. Nos. 144, 145. In sum, following a domestic dispute phone call to 9-1-1, Bryan arrived at the home of Daphne Rollins. See Dkt. No. 144 at 221.[3] Ms. Rollins advised Bryan that she and plaintiff, her boyfriend at the time, had gotten into an argument and plaintiff had driven away. See id. at 221-22. Bryan testified that Ms. Rollins told him that

---

[3] Citations to the record are to the pagination generated by CM/ECF in the header of each page.

3

**SPA5**

plaintiff "may potentially be in possession of drugs and that he had been drinking . . . ." Id. at 223. Ms. Rollins' affidavit, which was read to the jury, stated that she became "fully aware of false accusations and false statements that were made by Eric VanBramer and Bryan VanBramer" and that she "ha[d] no knowledge of Mr. Sloley being involved with drugs[.]" Dkt. No. 145 at 16. Bryan was later informed that plaintiff had been pulled over by another officer. See Dkt. No. 144 at 223. Bryan contacted Eric, who was working at a different location, and who was a canine handler of a drug dog. See id.

Eric went to the location where plaintiff had been pulled over and had his drug dog "conduct a[n] open air sniff" of the vehicle. Dkt. No. 144 at 148. The canine alerted to the presence of narcotics on "the driver's side, the passenger's side, the hood, and inside the vehicle, the center console area around where the driver and passenger's seat is." Id. at 150. Eric then observed "a white chunky substance that resembled, [from his] training and experience, cocaine[]" on the driver's seat. Id. at 151. The canine did not alert to the driver's seat. See id. Eric explained that this was "[b]ecause if [he] introduce[d] [his] dog to the driver's seat, part of detection is biting and, you know, K9 handlers, we are fully aware that, the hazards that comes with search a vehicle[.]" Id. He "saw the narcotics and [he] decided at that point if [his] dog were to go into that area, she would consume it and die." Id. The canine did alert to the driver's console, and Eric explained that when he introduced the canine to the vehicle, "it's not really up to [him] kind of where the dog goes." Id. at 152. When he "saw the cocaine on the seat[,]" he "backed [the canine] out[.]" Id. Eric field tested the substance which revealed a positive result for cocaine. See id. at 153.

4

**SPA6**

While Eric was testing the substance, he "formulate[d] an idea in [his] head of how it got there." Dkt. No. 144 at 156. Eric believed "[t]hat while Mr. Sloley was fleeing, he was potentially using, had the cocaine in plain sight, saw the emergency lights behind him as he was getting pulled over and was in a hurry to conceal them." Id. He thought that plaintiff "stuffed [the drugs] down his pants[,]" "between the butt cheeks." Id. at 157-58. He affirmed that he thought plaintiff was actively using cocaine while driving. See id. at 161-62. Eric did not find drugs anywhere else in the car. See id. at 163.

Plaintiff was taken to the trooper barracks where Eric conducted a search of plaintiff, requiring plaintiff to take one article of clothing off at a time and hand it to Eric. See Dkt. No. 144 at 159, 164. Eric did not find any drugs or drug residue in plaintiff's clothing. See id. at 164. After Eric instructed plaintiff to slide his underwear down to his ankles, Eric instructed plaintiff to bend over and separate his butt cheeks so that Eric could look into the "void[.]" Id. at 165-66. Eric did not find any drugs. See id. at 166. Plaintiff was instructed to get dressed and was arrested. See id.

Investigator LaRuffa was given the field test kit that was used to test the substance found in the driver's seat. See Dkt. No. 145 at 78. The narrative on an incident report stated that "[l]ess than 1 gram of cocaine was seized from the crease of the driver's seat and secured as evidence[.]" Id. The only drugs Investigator LaRuffa was given were those contained inside the test kit. See id. at 95. The test kit was not produced at trial because it had been destroyed after being kept in an evidence vault for six months. See id. at 79-80.

5

**SPA7**

## II. Legal Standards

Plaintiff does not identify the Federal Rule of Civil Procedure ("Fed. R. Civ. P.") under which he seeks to bring his motion to "reverse the erroneous verdict by the jury[]" and for "a new trial[.]" Dkt. No. 134 at 1; Dkt. No. 140 at 1. Post-trial motions can be brought under Rules 50, 59, and/or 60. See FED. R. CIV. P. 50 (Judgement as a Matter of Law; Related Motion for New Trial; Conditional Ruling); FED. R. CIV. P. 59 (New Trial; Altering or Amending a Judgment); FED. R. CIV. P. 60 (Relief from a Judgment or Order). As plaintiff did not make a Rule 50(a) motion during trial, his present motion cannot be construed as a Rule 50(b) motion. See Holmes v. United States, 85 F.3d 956, 962 (2d Cir. 1996) ("A Rule 50(b) motion can be made after the jury verdict, but only if a Rule 50(a) motion was made prior to the close of the evidence."). As plaintiff cannot bring a Rule 50(b) motion, and out of deference to his pro se status and because Eric addresses both Rules 59 and 60 in his response, the Court will review plaintiff's motion under Rules 59 and 60. See generally Dkt. No. 143; see also Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010) (citations omitted) ("It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants. The rationale underlying this rule is that a *pro se* litigant generally lacks both legal training and experience and, accordingly, is likely to forfeit important rights through inadvertence if he is not afforded some degree of protection.").

### A. Rule 59

Under Rule 59(a), "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" FED. R. CIV. P. 59(a)(1)(a). "[F]or a district

6

**SPA8**

court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence." Manley v. AmBase Corp., 337 F.3d 237, 245 (2d Cir. 2003) (internal quotation marks omitted) (quoting DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1998)). A new trial may be warranted "when: '(1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury; or (4) damages are excessive.'" Utica Mut. Ins. Co. v. Clearwater Ins. Co., No. 6:13-CV-1178 (GLS/TWD), 2022 WL 823932, at *2 (N.D.N.Y. Mar. 18, 2022) (citation omitted). Additionally, "[u]nder Rule 59(e), 'district courts may alter or amend judgment to correct a clear error of law or prevent manifest injustice.'" 4 Pillar Dynasty LLC v. N.Y. & Co., Inc., 933 F.3d 202, 216 (2d Cir. 2019) (citation omitted). "A Rule 59(e) motion 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" Id. (citation omitted).

## B. Rule 60

Rule 60(b) states,

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

7

**SPA9**

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

FED. R. CIV. P. 60(b). "In deciding a Rule 60(b) motion, a court must balance the policy in favor of hearing a litigant's claims on the merits against the policy in favor of finality." Kotlicky v. United States Fid. & Guar. Co., 817 F.2d 6, 9 (2d Cir. 1987) (citation omitted). "Rule 60(b) motions are left to the sound discretion of the district judge." Stewart Park & Rsrv. Coal. Inc. (SPARC) v. Slater, 374 F. Supp. 2d 243, 253 (N.D.N.Y. 2005) (citing Nat'l Petrochemical Co. of Iran v. The M/T Stolt Sheaf, 930 F.2d 240, 244 (2d Cir. 1991)). "[C]ourts require the party seeking to avail itself of [] Rule [60(b)(6)] to demonstrate that 'extraordinary circumstances' warrant relief." Stevens v. Miller, 676 F.3d 62, 67 (2d Cir. 2012) (citation omitted).

### III. Analysis

### A. Credibility of Witnesses

Plaintiff argues that Eric and Bryan "committed intentional perjury under oath." Dkt. No. 134 at 2. Plaintiff contends that their testimony that drugs were found in the driver's seat of the car is "outrageous," "unbelievable," and "suspicious" because no one else saw the drugs and "[a] test kit alone without any drugs shows that the credibility of these officers and their story is fabricated." Id. Plaintiff asserts that the VanBramers' testimony and an incident report are insufficient to prove that plaintiff possessed drugs,

8

**SPA10**

and that a visual body cavity search was warranted.  See id. at 3-4.  Eric argues that plaintiff is challenging the jury's credibility determination, and that there is no persuasive evidence to second guess that determination.  See Dkt. No. 143 at 4-5.

"On new trial motions, the trial judge may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner."  Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012) (citation omitted).  "However, . . . trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge 'should rarely disturb a jury's evaluation of a witness's credibility[.]'"  Id. (quoting DLC Mgmt. Corp., 163 F.3d at 134).  The Court also "may not 'freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury[.]'"  Id. (quoting United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998)).  "[W]here the jury resolved conflicting versions of events in favor of one party, a new trial is appropriate only where one conflicting account is so inherently implausible as to tax credulity, or there is independent evidence in the trial record" which indicates "that finding for one party, instead of another, would lead to a miscarriage of justice."  Edwards v. Schrader-Bridgeport Int'l, Inc., 205 F. Supp. 2d 3, 8 (N.D.N.Y. 2002) (quotation marks omitted) (quoting Finn-Verburg v. N.Y. State Dep't of Labor, 165 F. Supp. 2d 223, 228 (N.D.N.Y. 2001)).  "A court should grant a new trial only where the court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  Id. (citation and quotation marks omitted).

Plaintiff's argument that the VanBramers lied under oath because their testimony is implausible is insufficient to warrant a new trial.  See Dkt. No. 134 at 3-5.  As plaintiff

9

**SPA11**

points out, there was extremely minimal physical evidence presented at trial—only an incident report which mentioned the positive drug test kit. See id. at 3-4. The trial turned on plaintiff's credibility versus the VanBramers' credibility. The decision of whose testimony to credit was for the jury to decide, and plaintiff has not presented independent evidence that calls the VanBramers' testimony into question. See Hampton v. McDonough, No. 17-CV-5711 (JMW), 2023 WL 3159571, at *3 (E.D.N.Y. Apr. 28, 2023) ("[T]he jury was presented with the parties' desired evidence and witnesses, and it was their province to make credibility determinations accordingly. . . . [The p]laintiff had every opportunity to present his evidence, cross-examine the witnesses, and make his credibility contentions to the jury."); United States v. Bimbow, No. 21-CR-48 (JPO), 2022 WL 1617490, at *5 (S.D.N.Y. May 23, 2022) ("[T]here is no basis to conclude that any of the three witnesses' testimony was so incredible that the jury's credibility determination must be disturbed. To the contrary, the testimony of [agents who assisted in the investigation] was corroborated by one another's testimony, the recovery of a large quantity of narcotics, several firearms, U.S. currency, and drug paraphernalia, as well as by the testimony of [the defendant] himself, who admitted that the drugs, firearms, and residences belonged to him.").

Eric's testimony was corroborated by Bryan's testimony, Investigator LaRuffa's testimony, and the incident report. Although no drugs, aside from those inside the test kit, were recovered from the vehicle or plaintiff, that does not establish that Eric and Bryan's testimony was perjured. As plaintiff has not presented evidence to contradict the VanBramers' testimony, the Court cannot disturb the jury's credibility determination. See Encarnacion v. Spinner, No. 9:15-CV-1411 (BKS/ML), 2023 WL 2785745, at *4

10

**SPA12**

(N.D.N.Y. Apr. 5, 2023) (citation omitted) (denying motion for new trial where the "[p]laintiff's request that the Court now find that [certain] testimony was false amounts to a request that the Court 'ignore the jury's role in resolving factual disputes and assessing witness credibility.'"); Daniel v. T&M Prot. Res., LLC, 844 F. App'x 433, 436 (2d Cir. 2021) (summary order) (affirming district court's denial of Rule 60(b) motion because the plaintiff "did not offer any evidence that [the defendant's] witnesses or attorneys perjured themselves. [The plaintiff] asserts that various [defense] witnesses lied. But the fact that their testimony contradicted [the plaintiff's] personal account is not sufficient to show perjury."). Thus, a new trial is not warranted on this ground.

## B. Evidentiary Rulings

"A new trial may be warranted 'if substantial errors were made in admitting or excluding evidence.'" Stampf v. Long Island R. Co., 761 F.3d 192, 202 (2d Cir. 2014) (quoting Sharkey v. Lasmo (AUL Ltd.), 55 F. Supp. 2d 279, 289 (S.D.N.Y. 1999)). "A trial court has considerable discretion in determining whether or not evidence is admissible." Hansen v. Warren County, No. 1:17-CV-1134 (TWD), 2020 WL 4877186, at *2 (N.D.N.Y. Aug. 20, 2020) (citing Barrett v. Orange Cnty. Human Rights Comm'n, 194 F.3d 341, 346 (2d Cir. 1999)). "A new trial on the basis of improper evidentiary rulings will be granted only where the improper rulings 'affect[ ] a substantial right of the moving party.'" Id. (alteration in original) (citation omitted). "Whether an evidentiary error implicates a substantial right depends on 'the likelihood that the error affected the outcome of the case.'" Id. (quoting Malek v. Fed. Ins. Co., 994 F.2d 49, 55 (2d Cir. 1993)); see also FED. R. CIV. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence . . . is ground for granting a new trial.").

11

**SPA13**

Plaintiff argues that the trial was unfair because Eric discussed information that was irrelevant and prejudicial, including that plaintiff "tried to br[eak] Ms. Rollins' back during a dispute[,]" had several felony convictions, filed other civil lawsuits, had a restraining order against him from a different female; and that Eric found two missing children with the help of his canine and was awarded Trooper of the Year. Dkt. No. 134 at 1-2, 4. Plaintiff states that "[t]here were issues that the Magistrate forbid [defense counsel] from presenting that the [attorney] chose to present anyway just to cause prejudice and bias and deny [p]laintiff a fair trial." Id. at 2. Eric argues that "the Court properly permitted defense counsel to cross-examine [p]laintiff about other instances in which he alleged injuries nearly identical to those he alleges in the present action, and he claimed a cause of those injuries that is unrelated to [d]efendant." Dkt. No. 143 at 5. Eric also contends that questions about plaintiff's prior convictions were appropriate. See id. at 6.

Plaintiff's arguments have previously been considered by the Court and do not warrant a new trial as the Court's evidentiary rulings did not affect a substantial right. See Dkt. No. 144 at 210; see also Dkt. No. 146 at 9-23, 27, 38, 44-45. Insofar as plaintiff challenges defense counsel's reference to a restraining order, at trial, Eric's counsel, Mark Mitchell, Esq., asked, "Am I correct that subsequently your other girlfriend Carrie Anderson also obtained an order of protection against you?" Dkt. No. 144 at 210; see also Dkt. No. 134 at 2. Plaintiff's counsel, Mx.[4] Green, objected, and the Court sustained the objection and instructed the jury "to disregard that question and any potential answer." Dkt. No. 144 at 210.

---

[4] Attorney Green's honorific is "Mx." Dkt. No. 104-1 at 31.

12

**SPA14**

Courts often deny a motion for a new trial when the court sustained an objection to improper questioning and instructed the jury to disregard the inappropriate question and/or answer. See Graham v. City of New York, 128 F. Supp. 3d 681, 703 (E.D.N.Y. 2015) (citing Lovejoy v. Gure-Perez, No. 10-CV-5748, 2014 WL 2459656, at *3 (E.D.N.Y. May 21, 2014); Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 370 (2d Cir. 1988)) (concluding that "[t]here is no suggestion that these two questions, asked in the course of a three-day trial, had any impact on the jury's verdict, and the [c]ourt does not find that this single, isolated incident of improper questioning warrants a new trial."); see also Warr v. Liberatore, 437 F. Supp. 3d 259, 278 (W.D.N.Y. 2020) (concluding that there was no undue prejudice requiring a new trial because "[t]he Court promptly provided a curative instruction after the footage was displayed, directing the jury to disregard it, and in its instructions to the jury, the Court advised the jury that counsel's statements were not evidence."), as amended (Mar. 30, 2020), aff'd, 853 F. App'x 694 (2d Cir. 2021) (summary order). Here, too, as Mx. Green immediately objected and the Court instructed the jury to disregard Mr. Mitchell's question concerning a restraining order, there was no undue prejudice.[5] A new trial is not warranted on this ground.

Next, prior to trial, plaintiff moved to have his prior convictions excluded from evidence. See Dkt. No. 104-1 at 10-15; see also Dkt. No. 117 at 11. During the Court's

---

[5] The Court is cognizant of the difficulty that arises when considering whether a jury actually disregarded information it had already heard. See David Alan Sklansky, Evidentiary Instructions and the Jury As Other, 65 STAN. L. REV. 407, 412 (2013) (footnotes omitted) ("[I]t has long seemed obvious that jurors cannot forget or ignore evidence once they have been exposed to it. There is no end to the metaphors judges have used to express this concept: 'one cannot unring a bell'; '[a] drop of ink cannot be removed from a glass of milk'; 'after the thrust of the saber it is difficult to say forget the wound'; 'if you throw a skunk into the jury box, you can't instruct the jury not to smell it.' The idea is always the same: jurors cannot forget evidence they have seen or heard, and neither can they 'fractionate evidence into competent and incompetent segments, using only the former in [their] decision making process.'"). However, because the standard for a new trial is so high and plaintiff has not established that he was unduly prejudiced by Mr. Mitchell's one question, the Court must deny the motion on this issue.

13

**SPA15**

hearing on the parties' motions in limine, the Court concluded that defense counsel could ask plaintiff about the date and charge of his 1996 criminal impersonation conviction and a 2017 criminal possession of a weapon conviction and fleeing the police charge. See Dkt. No. 146 at 9-23. During trial, Mr. Mitchell asked plaintiff about only those crimes. See Dkt. No. 144 at 195.

The Court did not err in permitting defense counsel to question plaintiff about a limited portion of his criminal history. Plaintiff's present arguments are an attempt to relitigate the issue. First, plaintiff's convictions were admissible under Federal Rules of Evidence ("Fed. R. Evid.") 608 and 609. See FED. R. EVID. 608(b); FED. R. EVID. 609(a)(1)-(2); see also United States v. Estrada, 430 F.3d 606, 615, 617 (2d Cir. 2005) ("[E]vidence of convictions for crimes involving 'dishonesty or false statement,' whether felonies or misdemeanors, *must* be admitted under Rule 609(a)(2) as being *per se* probative of credibility[.] . . . In conformity with Rule 403, unless the risk of unfair prejudice, confusion, or delay substantially outweighs the probative value of a felony conviction, it is the jury's function to assess the probative value of a witness's specific conviction or convictions as part of its overall evaluation of the witness's credibility. . . . [F]elonies not involving dishonesty or false statement such as to fall within the scope of Rule 609(a)(2) nonetheless bear on credibility to varying degrees.").

Second, plaintiff has not shown that the Court's evidentiary ruling was so clearly prejudicial that it impacted the outcome of the trial. Insofar as plaintiff argues that the testimony concerning his convictions painted him in a bad light to the jury, the Court previously weighed this argument concerning the probative and prejudicial values of his convictions and ruled that certain convictions could be discussed to a limited extent.

14

**SPA16**

See Dkt. No. 146 at 9-23.  To be sure, the trial turned almost exclusively on credibility and a criminal conviction could negatively impact one's credibility.  Yet that does not alone warrant exclusion of plaintiff's convictions.  Plaintiff's attempt to rehash this argument without showing substantial prejudice or an error in the Court's ruling does not warrant a new trial.  See Encarnacion, 2023 WL 2785745, at *5 (citations and quotation marks omitted) (denying motion for new trial because the "[p]laintiff's disputes of the Court's disposition of the evidentiary issues are attempts at relitigating old issues . . . or otherwise taking a 'second bite at the apple[]'" and the "[p]laintiff has not shown that these rulings were clearly prejudicial to the outcome of the trial, taking into account 'the record as a whole.").

As to the testimony concerning plaintiff's other civil lawsuits, Eric argues that "the Court properly permitted" the testimony because it was "relevant to the issues of causation and damages."  Dkt. No. 143 at 5.  Plaintiff asserts that Eric used plaintiff's prior lawsuits "to paint a picture to the jury that [he] has a tendency to file frivolous lawsuits looking for a financial handout."  Dkt. No. 134 at 1.

Prior to trial, plaintiff sought to have evidence of his other lawsuits excluded, arguing that they were irrelevant and had no impact on plaintiff's request for garden variety damages.  See Dkt. No. 104-1 at 15-17; see also 117 at 6-9.  During the pre-trial conference, the Court ruled that defense counsel could ask plaintiff about two of his three other civil lawsuits.  See Dkt. No. 146 at 27.  The Court instructed defense counsel that, with respect to the two lawsuits, defense counsel could only "inquire whether or not [plaintiff] had filed a claim, and in the course of that claim[,] [whether plaintiff] allege[d] he suffered emotional damages[.]"  Id.

15

**SPA17**

During trial, Mr. Mitchell asked plaintiff whether he had filed claims in 2012 against the City of Hudson and various Hudson police officers and in 2018 against the Greene County Sheriff and individuals working at Greene County jail. See Dkt. No. 144 at 197. Mr. Mitchell inquired whether, in relation to both claims, plaintiff alleged mental and emotional injuries. See id. Plaintiff answered affirmatively to all questions. See id. Mx. Green objected to the questioning, asserting that "the court's in limine rulings on that require that to be linked up to the damages in this case if it was going to come in. There was no linkage and so I'd ask to strike all of that testimony." Id. at 198. The Court responded that defense counsel was still questioning the witness. See id. Mr. Mitchell then asked plaintiff whether he was claiming that Eric caused him mental and emotional injuries in the present case, to which plaintiff answered affirmatively. See id.

Courts often allow evidence of other injuries or claims into evidence when the cause of damages is at issue. See Brewer v. Jones, 222 F. App'x 69, 70 (2d Cir. 2007) (summary order) (determining that evidence of a previous lawsuit was admissible "because the evidence was relevant to show a possible cause of [the plaintiff's] injury unrelated to the acts of the defendant[.]"); Jean-Laurent v. Hennessy, 840 F. Supp. 2d 529, 543 (E.D.N.Y. 2011) ("To the extent that plaintiff testifies at trial that he suffered emotional damages as a result of the June 11, 2002 strip search, defendants may introduce limited deposition testimony given by plaintiff in [another] Action as a prior inconsistent statement as to causation . . . ."); Williams v. Geraci, No. 14-CV-5742 (SIL), 2020 WL 5848738, at *12 (E.D.N.Y. Sept. 30, 2020) ("[T]he lawsuit [in which the plaintiff sought emotional damages] is not being introduced to show that he is a chronic litigant, rather, it is being introduced for another purpose, to impeach Williams's credibility and

16

**SPA18**

show inconsistency in his statements."); Hogan v. Rose, No. 7:16-CV-1325 (BKS/ATB), 2022 WL 675703, at *10 (N.D.N.Y. Mar. 7, 2022) ("[E]vidence of [the p]laintiff's other lawsuits may be admissible for purposes other than to prove his litigiousness."); cf. Picciano v. McLoughlin, No. 5:07-CV-0781 (GTS/GJD), 2010 WL 4366999, at *2 (N.D.N.Y. Oct. 28, 2010) ("[I]n the event that [the p]laintiff testifies at trial that he suffered a 'fear' of police officers . . . as a result of the incident of August 4, 2014, which is the subject of this litigation, the Court will permit [the d]efendant to ask [the p]laintiff whether he has been arrested on more than one occasion since August 4, 2004. This is because his subsequent arrests are probative of [the p]laintiff's claim for emotional damages . . . .").

Here, plaintiff was claiming emotional damages from Eric's visual body cavity search, and the Court allowed defense counsel to cross examine plaintiff about his other claims for emotional damages stemming from unrelated incidents. See Dkt. No. 146 at 23-28. As the Court did not permit defense counsel to probe the underlying facts of plaintiff's other lawsuits or present them to show that plaintiff was litigious, the Court sees no error in its prior ruling. See Hogan, 2022 WL 675703, at *10. As plaintiff has not shown that the testimony caused substantial prejudice, a new trial is not warranted on this ground.

Plaintiff next argues that the jury was prejudiced by Eric's testimony "about him and his K-9 finding two children in a snow bank." Dkt. No. 134 at 4. Eric does not respond to this argument. See generally Dkt. No. 143. In his motion in limine, plaintiff sought to have Eric precluded from testifying about any awards or commendations that Eric received as a police officer. See Dkt. No. 104-1 at 26-27. Eric argued that such

17

**SPA19**

testimony should be admitted "for other appropriate purposes, including to show [d]efendant's experience working with police canines." Dkt. No. 116 at 15. The Court determined that any testimony concerning Eric receiving an award for working with a canine would not be "allow[ed] [] in the first instance," but if plaintiff's counsel attacked Eric's "credibility regarding his competence with respect to use of canine dogs," the evidence would be permitted. Dkt. No. 146 at 38.

During trial, plaintiff's counsel, Mx. Green, asked Eric, "[s]o in your mind what happened here, and this is what gave rise to your decision to search him, is he opens a bag of drugs, uses some of it, spills some of it on the driver's seat and then puts the rest in his anus?" Dkt. No. 144 at 162. Eric responded,

> [s]o that's the difficult part when it comes to being a police officer. The bad guy is never going to tell us, hey, Trooper, this is what I was doing. It's based on us, our training, experience, to determine what was going on at that point. I've been involved in numerous of these cases, you know, trooper of the year, so I was -- I was pretty effective and pretty good at what I was doing so you asked me, you know, why I thought that.

Id. (emphasis added). Later, Mr. Mitchell asked Eric, "[a]nd one of the things, since there's been quite a lot of questioning about your proficiency with K9s . . . have you received any awards related to your work with police K9s?" Dkt. No. 144 at 176. Mx. Green objected, and the Court stated, "[w]e addressed this during the motions in limine so we're not going to go down that road." Id. Mr. Mitchell moved on to other questions. See id. Eric was asked to provide an example of a time he worked with a canine, and he explained that several years earlier, he worked with a canine to search for two missing children. See Dkt. No. 145 at 25. Mx. Green objected on relevance grounds, and the Court gave Mr. Mitchell "a little leeway" but instructed him to "then move on to

18

**SPA20**

something else[.]" Id. Eric explained that his canine alerted to a snowbank under which he located two missing children. See id. at 25-26.

"The Second Circuit has stated that it is 'well established . . . that absent an attack on the veracity of a witness, no evidence to bolster his credibility is admissible.'" Reeder v. Bishop, No. 9:15-CV-1078 (MAD/TWD), 2019 WL 3732050, at *7 (N.D.N.Y. Aug. 8, 2019) (quoting United States v. Arroyo-Angulo, 580 F.2d 1137, 1146 (2d Cir. 1978)). "Character evidence encompasses evidence of a defendant's prior commendations and awards . . . because the only purpose for offering such information would be to portray a defendant in a positive light by demonstrating recognition of certain character traits or actions that demonstrate such character traits." Id. (quoting United States v. Brown, 503 F. Supp. 2d 239, 242 (D.D.C. 2007)).

The Court did not permit Eric to speak about the award he achieved for handling his canine. See Dkt. No. 146 at 38. Additionally, plaintiff's counsel did not object to Eric's testimony that he had won Trooper of the Year. See Dkt. No. 144 at 162. Plaintiff's counsel did object to the relevance of Eric's testimony concerning his use of a canine to track two missing children, but relevance is a low bar. See Dkt. No. 145 at 25; see also United States v. White, 692 F.3d 235, 246 (2d Cir. 2012) (quoting FED. R. EVID. 401) (explaining that "[e]vidence is relevant when 'it has any tendency to make a fact more or less probable than it would be without the evidence,' and that this is a "very low standard"), as amended (Sept. 28, 2012). The Court permitted the testimony as an example of Eric's use and success working with a canine in conducting a search. See Dkt. No. 145 at 25. Although searching for two children is not the same as searching for drugs, Eric's prior success working with a canine makes it more probable that Eric was

19

**SPA21**

successful in working with a canine in the case at hand. As the relevance bar is so low, the Court sees no error in its prior rulings. Further, plaintiff has not established that the testimony caused any prejudice. A new trial is not warranted on this ground.

Finally, plaintiff states that "[t]here was a document that presented evidence that Bryan and Eric Vanbramer illegally strip searched an elderly black man . . . ." Dkt. No. 134 at 4. Plaintiff contends that if the evidence had been presented, the jury would have been informed about the "propensity of both brothers to be dishonest and conduct unconstitutional strip searches." Id. at 5. Eric does not respond to this argument. See generally Dkt. No. 143.

In his motion in limine, Eric sought to exclude evidence concerning other individuals that the VanBramers strip searched. See Dkt. No. 107-1 at 9-11. During the pretrial conference, plaintiff's counsel stated that they[6] intended to ask questions about whether Eric had conducted other visual body cavity searches but not about who was searched or what plaintiff may have heard about other strip searches. See Dkt. No. 146 at 44-45. The Court permitted counsel for both sides to ask Eric about "any prior anal cavity searches which he conducted and whether or not drugs were found, but no one is going to inquire regarding any hearsay testimony about what was done or not done by either of the VanBramers." Id. at 46.

The Court did not err in excluding evidence of other individuals who had been stripped searched by the VanBramers. Plaintiff has not explained what the document is that he wanted to offer, plaintiff's counsel never tried to enter any such document into evidence, and plaintiff has not explained how the document would have been

---

[6] Attorney Green's pronouns are "they" and "them." Dkt. No. 104-1 at 31-32.

20

**SPA22**

admissible. See generally Dkt. Nos. 134, 140. To the extent plaintiff states that the document would have shown a propensity for conducting unconstitutional strip searches, in general, evidence of prior conduct is not admissible to show that because an individual acted one way in the past, they must have acted that same way in the current circumstances. See FED. R. EVID. 404(b)(1) ("Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."). Plaintiff did not raise the issue of the document during the pretrial conference or at trial. Plaintiff also does not argue that trial counsel was ineffective for failing to try to enter this document into evidence. See generally Dkt. Nos. 134, 140. The Court sees no error in its prior ruling on this issue and plaintiff has not established that he was substantially prejudiced as a result. Thus, his motion is denied on this ground.

In sum, the Court's evidentiary rulings do not warrant reversal of the jury's verdict or a new trial.

### C. Make Up of The Jury

Plaintiff argues that his trial was unfair because the jury was comprised of all white individuals. See Dkt. No. 134 at 2-3, 5. Plaintiff states that during voir dire, the Court asked about potential bias concerning members of the LGBTQ community but did not ask any questions concerning racial bias. See id. at 5. He also states that one female juror "was added" after voir dire but was never questioned. Id. Plaintiff argues that "one of the (male) jurors stated that he would not credit the testimony of someone with numerous/multiple convictions," and "the opposition capitalized off of this and made a prejudicial comment that [p]laintiff has several felonies for drugs." Id. Defendant

21

**SPA23**

contends that "[p]laintiff's allegation of racial bias in the jury pool and trial jury is without merit[]" because plaintiff has not provided evidence to prove that minority jurors were impermissibly excluded.  Dkt. No. 143 at 6.

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." Berghuis v. Smith, 559 U.S. 314, 319 (2010).  This right has been codified for all federal litigants in the Jury Selection and Service Act ("JSSA") which provides that "all litigants in Federal courts entitled to trial by jury shall have the right to . . . juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."  28 U.S.C. § 1861.   "Under the JSSA, a district court's jury selection plan must ensure jurors are selected 'from a *fair cross section of the community* in the district or division wherein the court convenes.'"  Askew v. Lindsay, No. 21-799, 2022 WL 17748623, at *4 (2d Cir. Aug. 1, 2022) (summary order) (quoting 28 U.S.C. §§ 1861, 1863(a)).  The JSSA contains procedural requirements: "a civil litigant must 'move to stay the proceedings on the ground of substantial failure to comply with the [JSSA]' and file it 'before the voir dire examination begins, or within seven days after the [litigant] discovered or could have discovered, by the exercise of diligence, the grounds . . . .'"  Id. (quoting 28 U.S.C. § 1867(c)).  Additionally, "[t]he motion must contain a 'sworn statement of facts which, if true, would constitute [such] a substantial failure.'"  Id. (quoting 28 U.S.C. § 1867(d)).

During a side bar conversation in which counsel for both parties and the Court were discussing challenges to the jury venire, Mx. Green stated, "[w]hile we are here, one issue I don't know when to raise, it does concern me that the entire pool we just

22

**SPA24**

looked at was white." Dkt. No. 144 at 105. The Court noted that "there is one juror of color in the pool[.]" Id. Mx. Green explained,

> I'm not sure exactly what the remedy would be, but it does concern me that it appears that the jury pool that we pulled in for these first 16 jurors is not representative of the community, it appears to be all white. There is not a single juror of color in the group that we just looked at, and the amount of peremptory strikes we have does not necessarily let us get to the point where there's even a single juror of color in the group. It appears to me, and this is just based on how people present, that they're, in this entire group there is a single juror of color, and I don't think that's representative of the community. And I am – I'd have to do some research to find out what the appropriate remedy is but I'd ask the court let me brief that I suppose on what the appropriate remedy is.

Id. at 105-106. The Court responded, "I'm not sure what you'd like me to do, Counsel, we brought in jurors in accordance with the policies here in the Northern District of New York but I've noted your position." Id. at 106. Mr. Mitchell stated, "I think the jury selection has been handled here the way it has in all the other trials I've had, I don't think the court can control who shows up and happens to be in the jury pool." Id. Mx. Green said, "[o]kay." Id.

Plaintiff did not meet the procedural requirement of the JSSA, and his motion on this issue must fail. See Askew, 2022 WL 17748623, at *4; see also Barclay v. New York, 602 F. App'x 7, 12-13 (2d Cir. 2015) (summary order) ("Because [the appellant] failed to comply with these procedures, his challenge to the jury pool must fail."). Further, plaintiff has not presented any evidence that the jury selection process impermissibly excluded minorities. As he has not pointed to anything about the jury selection process that caused the alleged unfairness, plaintiff's motion on this ground must be denied. See Dedjoe v. Esper, No. 1:15-CV-1170, 2019 WL 697821, at *5 (N.D.N.Y. Feb. 19, 2019) ("[The [p]laintiff fails to provide sufficient evidence indicating

23

**SPA25**

that the jury venire impermissibly excluded African-Americans, or did not represent a fair cross section of the community. Without this evidence, the motion for a new trial on the ground that the trial was unfair because of the racial composition of the jury pool or trial jury must be denied."); Dolberry v. Jakob, No. 9:11-CV-1018 (DNH/DEP), 2019 WL 1396975, at *2 (N.D.N.Y. Mar. 28, 2019) (quoting Williams v. City of Newburgh, 830 F. Supp. 770, 772 (S.D.N.Y. 1990)) ("[The p]laintiff is 'obligated to point to something - i.e. the manner in which the jury panel was assembled or the peremptory challenges were exercised - suggesting racial bias in the jury selection process.'"); Encarnacion, 2023 WL 2785745, at *2 (citations omitted) ("Merely pointing to the composition of the jury as proof of its unfairness is insufficient to warrant a new trial. Similarly, a plaintiff must 'make some kind of basic, threshold showing of impropriety beyond mere generalized speculation' to demonstrate unfairness of the trial arising from the behavior of the jury.").

Plaintiff also argues that a juror remained on the panel, and should not have, after the juror "stated that he would not credit the testimony of someone with multiple and/or numerous convictions." Dkt. No. 134 at 5. During voir dire, juror 139 was asked whether they had "opinions about people who have prior criminal histories[.]" Dkt. No. 144 at 79. The juror responded that "[i]t would depend on what the criminal history is, I mean what -- what the offense is, so I mean that's to me kind of a broad – there's a variance of the offense." Id. Mx. Green asked whether people with criminal histories are more or less trustworthy than other people and juror 139 said, "[n]o, they can be just as trustworthy as other people, just because they have, you know, done things in the past, it's not necessarily their character." Id. at 80. When asked whether knowing that plaintiff had at least one prior conviction would affect her neutrality, the juror explained,

24

**SPA26**

"I would have to know what that conviction was. I mean, I think that that's -- that would be really important, depends on the severity of it." Id. Juror 139 stated that "[i]f it was a serious crime, I believe so. I . . . I mean, I consider a serious crime murder, arson, being a pedophiler [sic], you know, those are pretty serious crimes." Id. Mx. Green then asked whether a conviction for something like tax fraud or theft would impact neutrality and juror 139 said, "it would not." Id. at 80-81. Neither counsel for the parties challenged juror 139 and she was added to the jury. See id. at 100-104.

After the jury had been selected and counsel for both sides presented their opening statements, juror 139 approached the Court and asked whether there would be evidence concerning domestic violence presented during the trial. See Dkt. No. 144 at 135. Mr. Mitchell explained that the defense would likely be presenting evidence of a dispute between plaintiff and Ms. Rollins that included pushing, dragging, and breaking property. See id. at 136. The Court explained, "[w]e may have a problem then with one of the jurors because the juror indicated to me that they do not feel comfortable if that in fact is going to be the testimony." Id. The Court asked if the parties were agreeable to proceeding with a seven-person jury. See id. The attorneys for both sides, plaintiff, and defendant consented to continuing with a seven-person jury. See id. at 136-38. The Court then excused juror 139. See id. at 140-41.

During voir dire, other potential jurors expressed that they would find it difficult to be impartial because of interactions or relations to police officers, or because they believed that people with criminal histories are less trustworthy. See Dkt. No. 144 at 64, 66-67, 81-82, 84-85. Each of those jurors were excused for cause or through a peremptory challenge and were not added to the jury. See id. at 67-68, 98-105. Based

25

SPA27

on the Court's review of the record, there was no juror who remained on the jury that stated they could not perform their duties fairly and impartially. Rather, the Court promptly informed the parties when a juror expressed discomfort about her ability to be impartial and all other jurors who stated a bias were excused. See United States v. Greer, 285 F.3d 158, 169 (2d Cir. 2002) (citations and quotation marks omitted) ("The process of empaneling a jury is firmly entrusted to the sound discretion of the trial judge . . . . To be sure, a judge who receives important information from a juror should promptly convey that information to the parties and counsel."). Therefore, plaintiff has not established that his trial was unfair in this regard and a new trial is not warranted on this ground.

Next, insofar as plaintiff states that a juror was added at the end of the voir dire but never questioned, see Dkt. No. 134 at 5, that is plainly inaccurate. After the attorneys challenged the jury venire and the Court ruled on their challenges, there was one spot that needed to be filled. See Dkt. No. 144 at 105. A new potential juror was added, and the Court stated, "I know you were present this morning when I asked the jurors a series of questions, the attorneys asked them a series of questions. Based upon those questions, anything you'd like to tell me in the first instance?" Id. at 108. The juror gestured negatively, and the Court asked whether there was any reason they could not be fair in the case. See id. The juror said, "[n]o." Id. The Court then proceeded to ask the juror about their job, spouse, children, home, connection to police officers, where they get their news, what they like to do in their spare time, and their ability to be impartial in the case—all questions that the Court asked of every other potential juror. See id. at 108-113. Counsel for both parties questioned the potential

26

**SPA28**

juror. See id. at 113-15. As the Court and counsel for both sides asked the juror a series of questions concerning their ability to be a juror, just as the Court and attorneys asked every other juror, the Court finds no error on this issue and denies plaintiff's motion.

Plaintiff argues that the Court erred by failing to ask the potential jurors "about any possible biases towards [plaintiff] being Black." Dkt. No. 134 at 5. During voir dire, the Court asked each prospective juror whether they agreed that someone being a member of the LGBTQ community had no bearing on the outcome of the trial. See Dkt. No. 144 at 14-15, 19, 24, 28, 30, 36, 40-41, 44, 49-50, 52-53, 58, 62, 72, 75, 112. The Court did not ask a similar question related to race.

The Second Circuit has "never reversed a conviction for the failure to ask a particular question of prospective jurors." United States v. Nieves, 58 F.4th 623, 626 (2d Cir. 2023) (citation omitted). "[D]istrict judges are afforded broad discretion in conducting voir dire[,]" but the "discretion [] is not boundless." Id. "The standard set by the [Supreme] Court, which remains the standard today, is that the trial court's discretion must be exercised consistent with 'the essential demands of fairness.'" Id. at 632 (alteration in original) (quoting United States v. Barnes, 604 F.2d 121, 137-38 (2d Cir. 1979)). It is a "basic principle that '[t]here must be sufficient information elicited on *voir dire* to permit a defendant to intelligently exercise' both for-cause and peremptory challenges." Id. at 633 (alteration in original) (quoting United States v. Colombo, 869 F.2d 149, 151 (2d Cir. 1989)). "In other words, there must be sufficient factfinding at voir dire to allow for facts probative of any of these forms of bias to reveal themselves.

27

**SPA29**

Otherwise, [f]undamental unfairness arises if voir dire is not adequate . . . to identify unqualified jurors." Id. (citations and quotation marks omitted) (alteration in original).

The Second Circuit has outlined three general ways in which voir dire could "fall short":

> (i) a voir dire so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about a potential juror's general outlook, experience, communication skills, intelligence, or life-style;

> (ii) a failure to inquire about, or warn against, a systematic or pervasive bias, including one that may be short-lived but existent at the time of trial, in the community that would have been cured by asking a question posed by a party; or

> (iii) a record viewed in its entirety suggesting a substantial possibility that a jury misunderstood its duty to weigh certain evidence fairly that would have been clarified by asking a requested voir dire question.

Nieves, 58 F.4th at 633 (quoting United States v. Lawes, 292 F.3d 123, 129 (2d Cir. 2002)). In Nieves, the Court reiterated "the unremarkable but critical proposition that the district court must provide some opportunity for prospective jurors to be meaningfully screened for biases relevant to a particular defendant or the charges against that defendant." Id. at 638. Put another way, "a district court's decision not to ask certain questions probative of bias will not be grounds for reversal so long as *voir dire* otherwise covers the subjects that may arise in the case to ensure that jurors will be impartial." Id. (quotation marks omitted) (quoting United States v. Rahman, 189 F.3d 88, 121 (2d Cir. 1999) (per curiam)). The Court explained that a trial court could, "inquire directly about relevant biases. But we have never reversed for failure to take that specific path, and again refrain from doing so today." Id. (citation omitted).

28

**SPA30**

The <u>Nieves</u> Court overturned a conviction because the trial court "did not ask – overtly or otherwise – about gang-related bias, notwithstanding that the government's central theory of the case was that the assault was motivated by gang rules, and its evidence in support of that theory consisted of gang-member testimony and gang-related expert testimony."  58 F.4th at 640.  "Nor, as a last resort, did the district court attempt to counterbalance any of this by asking additional biographical or attitudinal questions that might have circumstantially unearthed inferable bias among potential jurors . . . ."  <u>Id.</u>  This was the case despite both parties asking for such questions in their proposed jury instructions.  <u>See</u> <u>id.</u> at 635.

"*Nieves* concerned the rare case in which a district court failed to take *any* steps to identify a potential bias that was implicated by the government's case."  <u>United States v. Mendlowitz</u>, No. 21-2049, 2023 WL 2317172, at *3 (2d Cir. Mar. 2, 2023) (summary order).  Here, the Court did not err by failing to ask whether the prospective jurors had any racial biases.  <u>See</u> <u>United States v. Joseph</u>, No. 20-CR-603 (PKC), 2022 WL 336975, at *6 (S.D.N.Y. Feb. 4, 2022) (citation omitted) ("There is no <u>per</u> <u>se</u> constitutional rule that requires an inquiry about racial prejudice during voir dire, although a court must inquire if there are 'substantial indications' of likely racial or ethnic prejudice affecting jurors in a particular case.").  First, neither party requested such a question in their proposed <u>voir</u> <u>dire</u>.  <u>See</u> Dkt. Nos. 92, 98.  Second, the Court inquired where each prospective juror received their news—the answer to which may have revealed potential political and racial biases.  <u>See, e.g.</u>, Dkt. No. 144 at 13, 18, 39, 58.[7]

---

[7] "Liberals mainly continue to rely on, and to place greatest trust in, legacy media outlets such as CNN, NPR, and the New York Times[.] . . .  Survey data show that a large plurality of conservatives, to an extent that has no parallel on the left, orient themselves around a single news source: Fox News."

29

**SPA31**

The Court and the attorneys also questioned prospective jurors about potential biases for, or against, police officers and individuals with criminal histories. See, e.g., Dkt. No. 144 at 18, 74, 76, 81-82, 87, 90, 93, 96. These questions are sufficient to ensure that the prospective jurors were "meaningfully screened" for potential racial biases without directly asking them whether they were biased. Nieves, 58 F.4th at 638. Accordingly, the Court finds no error, and plaintiff's motion is denied on this ground.

### D. Jury Instructions

Plaintiff argues that the Court gave erroneous jury instructions that warrant a new trial. See Dkt. No. 140 at 1. Specifically, plaintiff asserts that the Court erred in instructing the jury on negligence and misstated the law concerning reasonable suspicion to conduct a visual body cavity search. See id. at 1-2. Eric argues that the Court did not err as to the negligence instruction because "[i]t is well settled that negligence is not cognizable under § 1983." Dkt. No. 143 at 6 (citation and quotation marks omitted). As to the visual body cavity search instruction, Eric restates a different portion of the Court's instructions than what plaintiff relies on, and argues that "[p]laintiff fails to identify an error in the Court's instruction[.]" Id. at 7.

The Court's jury instructions, in relevant part, read as follows:

### B. Visual Body Cavity Search

Here, Plaintiff claims that Defendant Eric VanBramer violated his Fourth Amendment rights on April 1, 2013, while plaintiff was being booked at a New York State Police Barracks in Greene County, New York. Specifically, Plaintiff alleges that defendant Eric VanBramer violated his Fourth Amendment rights when he conducted a strip search and a visual body cavity search of plaintiff at the police barracks. A strip search occurs when a suspect is asked to remove his clothes. A visual cavity search is

---

Joseph Fishkin & David E. Pozen, Asymmetric Constitutional Hardball, 118 COLUM. L. REV. 915, 957 (2018) (footnotes omitted).

30

**SPA32**

one in which the police observe the suspect's body cavities without touching them.

The Fourth Amendment protects persons from being subjected to an unreasonable search while being arrested or while being detained after an arrest.

A visual cavity search occurring in connection with an arrest must be based on a reasonable suspicion that the arrestee is hiding evidence inside the body cavity to be searched. Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than is necessary for probable cause.

The officer's reasonable suspicion must be based on specific and articulable facts, along with rational inference taken from those facts.

To assess whether a search is reasonable or unreasonable under the Fourth Amendment, you are to assess the "totality of the circumstances." In other words, you are to consider all of the factors surrounding the arrest and the search to assess whether the officer had a particularized and objective basis for suspecting legal wrongdoing. In short, the relevant question is do the circumstances of the plaintiff's arrest support a reasonable suspicion that he was hiding contraband in or on his person?

### C. Negligence is not a Basis for Liability

If you determine that the Defendant was merely negligent or, in other words, acted in a way that reflected a lack of due care for the Plaintiff, but that he did not in a way that violated the Plaintiff's Fourth Amendment rights, as described above, then you must find in favor of the defendant."

Dkt. No. 125 at 8-9.

During the jury charge conference, Mx. Green objected to both instructions. See Dkt. No. 145 at 111-12, 116-17, 120-21. They first argued that the last line of the visual body cavity search instruction "undermines some of the rest of the instruction." Id. at 111. They argued that "the relevant question is not whether it supports a reasonable suspicion that they were secreting contraband on their person, it's in the specific cavity searched." Id. at 111-12. Mx. Green stated, "I think the problem is that it is, and I think what we're going to argue in closing is, he may have had a suspicion that he had drugs on his person, but that's not the same as a suspicion that it was in the relevant cavity."

31

**SPA33**

Id. at 116. Mr. Mitchell responded, "I think I would keep this quote from the case because this is what the law actually is[.]" Id. at 117. The Court asked, "[s]o if I were to say, do the circumstances of the plaintiff's arrest support a reasonable suspicion that he was secreting -- excuse me, that he was hiding contraband in or on his person, in or on his person, would that address your concern?" Id. Mx. Green responded, "[n]o, because it still invites them to say, if there was a reasonable suspicion that something was on his person, we lose. That's -- that is, I mean I feel like that's specifically what the Second Circuit modified in this case." Id. Over plaintiff's objection, the Court kept the instruction as it was written. See id.

As to the negligence instruction, Mx. Green objected, stating,

I don't think that there's a negligence question in this case. There's no question that the testimony was that the act was intentional. I think the authority the court is referring to is that police can't be liable under 1983 for negligent acts but that's not negligence as to the law which is the only question here. It's negligence as to the acts, you can't sue under 1983 for a car accident. But the testimony from the defendant specifically was that he intended to conduct a search. The act was intentional, I think this is, this -- the only purpose this instruction could be used for by the jury is to commit error.

Dkt. No. 145 at 120. Mr. Mitchell responded, "I think this instruction's correct just because that's the nature of 1983, and that otherwise a jury might think negligence is good enough to support 1983 but it's not." Id. The Court stated, "I agree with [defense counsel,] I'm going to charge this over your objection, Attorney Green. It's just a mere statement of the law, negligence is not a basis for liability under 1983, but again, I'll note your objection." Id. at 120-21.

Plaintiff's counsel further inquired, stating, "I don't understand what would be negligent in this case that would be not good enough, right, what would, what -- what, I

32

**SPA34**

guess what act was committed, would the jury even be able to find was committed negligently?" Dkt. No. 145 at 121. The Court said, "I don't know, but it's a pretty clear statement of the law. You'd agree that negligence is not a basis for liability under 1983?" Id. Plaintiff's counsel answered, "[n]o, of course not, but I mean, we don't read the entire law to the jury, period, and there was no testimony here that anything was negligent." Id. The Court then concluded that the jury would be instructed as written over plaintiff's objection. See id. The Court delivered the jury instructions as written to the jury. See id. at 157-60. The Court provided the jury with a copy of the instructions. See id. at 167-68. The jury deliberated for approximately thirty minutes and did not ask any questions. See id. at 169. The jury returned a verdict in Eric's favor. See id. at 169-70.

"When evaluating the effect of an allegedly erroneous jury instruction, the jury charge must be read as a whole." United States v. Botti, 711 F.3d 299, 310-11 (2d Cir. 2013). "[A] jury instruction [is] erroneous 'if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law.'" United States v. Silver, 864 F.3d 102, 118 (2d Cir. 2017) (quoting United States v. Finazzo, 850 F.3d 94, 105 (2d Cir. 2017)). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Lore v. City of Syracuse, 670 F.3d 127, 156 (2d Cir. 2012) (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)). "An erroneous instruction requires a new trial unless the error is harmless and an error is harmless only if the court is convinced that the error did not influence the jury's verdict." Murray v. UBS Sec., LLC, 43 F.4th 254, 262 (2d Cir. 2022) (quoting Warren v. Pataki, 823 F.3d 125, 137 (2d Cir. 2016)).

33

**SPA35**

## 1. Visual Body Cavity Search Instruction

The Second Circuit, in reviewing this Court's 2016 grant of summary judgment, set forth the appropriate standard for reasonable suspicion in the context of a visual body cavity search: "visual body cavity searches incident to all arrests . . . must be based on reasonable suspicion to believe that the arrestee is secreting evidence <u>inside</u> the body cavity to be searched." <u>Sloley</u>, 945 F.3d at 39 (emphasis added). Thus, the Court's jury instruction, asking whether the circumstances supported a reasonable suspicion that plaintiff was hiding contraband "in <u>or on</u> his person" is a misstatement of the law. Dkt. No. 125 at 8 (emphasis added).[8] The question is whether the error is harmless.

A few lines above the Court's misstatement, the Court correctly stated the law: "[a] visual cavity search occurring in connection with an arrest must be based on a reasonable suspicion that the arrestee is hiding evidence <u>inside</u> the body cavity to be searched." Dkt. No. 125 at 8 (emphasis added). Similarly, in the Court's jury verdict form, the correct standard was stated, asking, "Has plaintiff, Maxmillian Sloley, proven by a preponderance of the credible evidence that on April 1, 2013, defendant Eric

---

[8] The parties noted that the Court's instruction was derived from <u>Hartline v. Gallo</u>, 546 F.3d 95, 102 (2d Cir. 2008). <u>See</u> Dkt. No. 145 at 111, 117. In <u>Hartline</u>, the Second Circuit concluded "that Hartline's Fourth Amendment rights were violated, because she was subjected to a <u>strip</u> <u>search</u> by the Southampton Police in the absence of reasonable suspicion that she was secreting contraband <u>on</u> her person." <u>Hartline</u>, 546 F.3d at 102 (emphasis added). Eleven years later, in <u>Sloley v. VanBramer</u>, the Second Circuit made the "necessary" decision to "define several terms essential" to the case, including "strip search" and "visual body cavity search." 945 F.3d at 36. The Second Circuit explained the difference between the different types of searches and stated that visual body cavity searches are "even more intrusive" than a strip search. <u>Id.</u> at 38. Thus, the Court held that a visual body cavity search subsequent to an arrest must be supported by a "reasonable suspicion reasonable suspicion to believe that the arrestee is secreting evidence <u>inside</u> the body cavity to be searched." <u>Id.</u> at 39 (emphasis added). At issue in this trial was not plaintiff's strip search, but solely the visual body cavity search. <u>See</u> <u>id.</u> at 37, 45. Thus, although <u>Hartline</u> remains the standard for strip searches, <u>Sloley</u> set forth a heightened standard for reasonable suspicion concerning the "more intrusive" visual body cavity search. <u>Id.</u> at 38.

34

**SPA36**

VanBramer subjected him to a visual body cavity search without reasonable suspicion to believe that Mr. Sloley had hidden evidence <u>inside</u> of his body cavity, in violation of the Fourth Amendment?" Dkt. No. 124 at 1 (emphasis added).

The Court's one misstatement could have permitted the jury to make an impermissible conclusion—that if Eric had reasonable suspicion to believe that plaintiff was hiding contraband <u>on</u> his body, he could conduct the visual body cavity search. Dkt. No. 125 at 8. However, the Court is convinced "that the error did not influence the jury's verdict." <u>Murray</u>, 43 F.4th at 262.

First, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." <u>Lore</u>, 670 F.3d at 156. The Court did not omit an instruction but misstated the law in one of its three references to a visual body cavity search. Second, when determining whether an error in jury instructions is harmless, courts often look to whether there was "ample evidence" presented during trial that supports the jury's conclusion. <u>See</u> <u>United States v. Sheehan</u>, 838 F.3d 109, 127 (2d Cir. 2016) (citing <u>United States v. Tomkins</u>, 782 F.3d 338, 347 (7th Cir. 2015) ("[A]ny error with the jury instructions' definition of 'destructive device' was harmless because there was ample evidence to prove beyond a reasonable doubt that the devices were destructive devices.")); <u>United States v. Post</u>, 950 F. Supp. 2d 519, 535 (S.D.N.Y. 2013) (citing <u>United States v. Wright</u>, 665 F.3d 560, 570-72 (3d Cir. 2012) (honest services counts of conviction vacated where there was "ample evidence" that allowed the jury to convict on the basis of an honest services theory that "required nondisclosure of a financial interest that could conflict with a public official's duty to provide honest services" instead of a "bribery theory")); <u>United States v. Gatto</u>, 986 F.3d 104, 122 (2d

35

SPA37

Cir.) ("[T]he jury heard ample evidence demonstrating" that the government met its burden.), cert. denied, 142 S. Ct. 710 (2021); United States v. Kozeny, 667 F.3d 122, 133 (2d Cir. 2011) ("While the government's primary theory at trial was that he had actual knowledge of the bribery scheme, there is ample evidence to support a conviction based on the alternate theory of conscious avoidance."); United States v. Diaz, 176 F.3d 52, 98 (2d Cir. 1999) ("[T]he government presented ample evidence" that supported the conviction); United States v. Eldridge, 860 F. App'x 773, 782 (2d Cir. 2021) (summary order) ("There was ample evidence that [the defendant] himself possessed a firearm in connection with the charged drug trafficking.").[9]

Here, there was not "ample evidence" that plaintiff was hiding contraband inside of his body. The undersigned is not aware of a case in which a defendant has been successful on reasonable suspicion grounds supporting a visual body cavity search on such minimal evidence as was presented here. See Sepulveda v. City of New York, No. 15-CV-5187 (RRM/CLP), 2020 WL 2836952, at *8 (E.D.N.Y. May 29, 2020) ("Because the Court finds that [the plaintiff] inserted drugs, or something that appeared to be drugs, into his rectum during the traffic stop, the arresting officers had "reason to believe, based on specific and articulable facts, taken together with rational inferences from those facts, that [the plaintiff was] secreting contraband inside a body cavity," and were thus "permitted to conduct a visual body cavity search.""); Taylor v. City of New York, No. 19-CV-6754 (KPF), 2022 WL 744037, at *18 (S.D.N.Y. Mar. 11, 2022) ("[T]he

---

[9] The cases discussing "ample evidence" concern criminal convictions which require a jury to reach a verdict beyond a reasonable doubt. See Gatto, 986 F.3d at 122; Kozeny, 667 F.3d at 133; Diaz, 176 F.3d at 98-99; see also Jackson v. Virginia, 443 U.S. 307, 309 (1979) ("The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt."). That standard is higher than the preponderance of the evidence standard which was applied in this case. See Dkt. No. 125 at 4.

36

SPA38

Court is unable to discern any evidence in the record that could establish, as a matter of law, that [the p]laintiff's strip search and cavity inspection were justified by reasonable suspicion. [The defendant] testified in the abstract during his deposition that based on his training and experience, [the p]laintiff's arrest was the type that would warrant a strip search because it occurred in 'a drug prone location' and because the Officers 'were not able to recover any additional narcotics on the prisoner's person' despite 'the fact that [the defendant] said he saw the hand to hand [transaction].'"); Johnson v. City of New York, No. 21-CV-5268 (PKC), 2022 WL 4133284, at *4 (S.D.N.Y. Sept. 12, 2022) ("[T]hat it was not constitutionally unreasonable for the Individual Defendants to perform the visual body cavity search" in part because the defendants "discovered a controlled substance, marijuana, and a knife during the arrest [and the defendants] found ecstasy pills concealed in [the plaintiff's] underwear and Viagra pills in his pants pocket"); Wheeler v. Artola, No. 16-CV-7440 (LMS), 2019 WL 4593651, at *2, *14-15 (S.D.N.Y. Sept. 23, 2019) (concluding that a search was supported by reasonable suspicion where the plaintiff had a clear plastic bag with a white substance in his front passenger seat, he delayed in stopping his vehicle, he was a known drug dealer, and he had been observed selling cocaine), aff'd, 852 F. App'x 589 (2d Cir. 2021) (summary order).

Here, plaintiff cooperated with the police at every stage; he was not acting suspicious or in any way that made him seem uncomfortable while in his vehicle; the canine did not alert to the driver's seat; no drugs or contraband were found on plaintiff during the strip search; and the only evidence supporting a search was the testimony about a white substance that was field tested positive for cocaine, and the incident report because the test kit had been destroyed before trial. See Dkt. No. Dkt. No. 144

37

**SPA39**

at 150-51; see also Dkt. No. 145 at 78, 88. No court has concluded that such minimal evidence amounts to reasonable suspicion to warrant a visual body cavity search. See Falls v. (Police Officer) Detective Michael Pitt, No. 16-CV-8863 (KMK), 2021 WL 1164185, at *27-28 (S.D.N.Y. Mar. 26, 2021) (granting the plaintiff's motion for summary judgment on the body cavity search claim because "without some particular indicator that [the p]laintiff was secreting drugs inside his body, the fact that he was arrested for reportedly dealing drugs is insufficient to establish reasonable suspicion. . . . In the absence of any evidence that has been held to support reasonable suspicion in this context—such as fidgeting or moving suspiciously, reaching into one's pants, or having an individual reputation for concealing drugs inside one's body cavity—this Court must conclude, as did the Second Circuit in *Sloley*, that 'no reasonable officer could have believed . . . there was reasonable suspicion to conduct a visual body cavity search.'").

Nevertheless, the relevant inquiry here is not whether there was enough evidence to support the search as a matter of law, or whether the Court would have decided the case differently than the jury. Whether a jury instruction is harmless turns on whether "the court is convinced that the error did not influence the jury's verdict." Murray, 43 F.4th at 262. The Court is so convinced. During plaintiff's closing argument, Mx. Green repeatedly emphasized the lack of physical evidence presented at trial and reiterated that the relevant question for the jury was whether there was reasonable suspicion to believe that plaintiff was hiding contraband inside of his body cavity. See Dkt. No. 145 at 141-45. During Eric's testimony, Mr. Mitchell questioned him about why he believed plaintiff was hiding drugs "in the area between [plaintiff's] buttocks[.]" See Dkt. No. 145 at 43-46. Mx. Green asked similar questions, and Eric affirmed that he

38

**SPA40**

believed plaintiff might have been doing drugs while driving and frantically put the drugs down his pants while being pulled over. See Dkt. No. 144 at 157-161. This was despite plaintiff acting entirely normal, the canine not alerting to the driver's seat, and no drugs being found anywhere else in the car or in plaintiff's clothes—all information that was presented to the jury. See id. at 156, 162-65.

This trial, because of a lack of physical evidence, came down to who the jury believed: plaintiff or defendant. The jury chose to credit defendant Eric's testimony. The Court is not convinced that had the one line of the jury instruction been correct, the jury would have come to a different conclusion. See Dkt. No. 125 at 8. The proper standard was stated earlier in the instructions and in the jury verdict form which the jury answered in favor of Eric. See id.; see also Dkt. No. 124 at 1. The correct standard being the ultimate question that the jury had to answer leaves the Court unconvinced that its one misstatement was harmful. See Dkt. No. 125 at 8; see also Dkt. No. 124 at 1; cf. Jones v. United States, 527 U.S. 373, 393 (1999) (citation omitted) ("[W]e agree . . . that '[a]lthough the verdict forms standing alone could have persuaded a jury to conclude that unanimity was not required for the lesser sentence option, any confusion created by the verdict forms was clarified when considered in light of the entire jury instruction.'"); Tardif v. City of New York, 991 F.3d 394, 415 (2d Cir. 2021) (concluding that an error was harmful, in part, because "the jury was *never* provided with the correct instruction on those claims."). Accordingly, the Court denies plaintiff's motion on this ground.

**SPA41**

## 2. Negligence Instruction

It is well settled that negligence does not give rise to a constitutional violation pursuant to § 1983. See Hendricks v. Coughlin, 942 F.2d 109, 113 (2d Cir. 1991) ("Proof of mere negligence will not give rise to a constitutional violation."). "What mental state a § 1983 plaintiff is required to prove depends on the right at issue. Section 1983 'does not itself import an intent standard into an underlying constitutional deprivation that lacks such a requirement.'" Dancy v. McGinley, 843 F.3d 93, 117 (2d Cir. 2016) (quoting Hudson v. New York City, 271 F.3d 62, 68 (2d Cir. 2001)). "Plaintiffs 'need only demonstrate intent where the underlying constitutional deprivation, such as an equal protection violation under the Fourteenth Amendment, calls for it.'" Id. (citation omitted). "[U]nlike § 1983 claims under the Due Process Clause or Eighth Amendment, Fourth Amendment claims are tied to reasonableness, which is considerably less demanding." Id. at 117-18 (citing Graham v. Connor, 490 U.S. 386, 398 (1989) ("Differing standards under the Fourth and Eighth Amendments are hardly surprising: the terms 'cruel' and 'punishments' clearly suggest some inquiry into subjective state of mind, whereas the term 'unreasonable' does not.")). In Hudson, the Second Circuit "readily assum[ed] that all Fourth Amendment violations require intentional actions by officers, rather than the accidental effects of otherwise lawful government conduct." Id. (quoting Hudson, 271 F.3d at 68); see also Brower v. Cnty. of Inyo, 489 U.S. 593, 596 (1989) ("Violation of the Fourth Amendment requires an intentional acquisition of physical control."). Moreover, the reasonable suspicion inquiry turns on an objective analysis. See United States v. Weaver, 9 F.4th 129, 140, 145 (2d Cir. 2021) (footnotes omitted) ("The Supreme Court has 'consistently recognized that reasonable suspicion

40

**SPA42**

'need not rule out the possibility of innocent conduct.'. . . The Supreme Court has long rejected any attempt to inject subjectivity into the Fourth Amendment context. '[T]he Fourth Amendment's concern with "reasonableness" allows certain actions to be taken in certain circumstances, whatever the subjective intent [of the officer].'").

In Dancy v. McGinley, in relation to a Fourth Amendment excessive force claim, the district court instructed the jury that "[t]o establish a claim under Section 1983, a plaintiff must . . . show that a defendant acted intentionally or recklessly. If you have found that the defendant committed the act in question, you must then determine whether the defendant acted intentionally or recklessly. If so, you will go on to consider the third element of the plaintiff's second 1983 claim." Dancy, 843 F.3d at 118. The court proceeded, "[i]f, however, you find that the defendant's acts were merely negligent, then even if you find that the plaintiff was harmed as a result of those particular acts or omissions, you must find that the plaintiff has not established his claim under Section 1983. . . ." Id. The Second Circuit explained that "as long as an officer deliberately performed acts that constitute a seizure, the Fourth Amendment has been triggered, regardless of whether it was accomplished by the exact method intended." Id. at 116. The Court continued, "[i]ntent is not relevant, however, as to the officer's underlying motivation for his actions during the course of a seizure. In *Graham*, the Supreme Court made clear that the standard is one of objective reasonableness, meaning the officer's 'underlying intent or motivation' is not a factor." Id. (quoting Graham, 490 U.S. at 397). "Objectively unreasonable actions during the course of a seizure, even if based on a mistake, are unconstitutional." Id. at 117 (citations omitted). Thus, the Second Circuit concluded that the district court's negligence instruction was

41

**SPA43**

confusing in the context of excessive force liability.  Instructing that a plaintiff must show that "the defendant acted intentionally or recklessly" and that if "the defendant's acts were merely negligent . . . [the jury] must find that the plaintiff has not established his claim" could be understood to suggest incorrectly that an officer must have intended the results of his actions or consciously disregarded their consequences.  The district court's instruction thus may have led the jury to erroneously believe that it was required to find that [the defendant] intended to hit [the plaintiff's] face against the car and/or to injure him.

Id.

The same reasonableness and objective standards that the Dancy Court set forth for a Fourth Amendment seizure apply to a Fourth Amendment search.  See United States v. Weaver, 9 F.4th 129, 145 (2d Cir. 2021) (en banc) (footnotes omitted) ("[A] police officer's subjective intentions bear no weight in determining whether a search has occurred.  The Supreme Court has long rejected any attempt to inject subjectivity into the Fourth Amendment context."); Hartline v. Gallo, 546 F.3d 95, 100 (2d Cir. 2008) (citation omitted) ("Whether a particular strip search is constitutional 'turns on an objective assessment of the . . . facts and circumstances confronting [the searching officer] at the time, and not on the officer's actual state of mind at the time' of the search."); Taylor, 2022 WL 744037, at *18 (discussing relevant objective standard in the context of a visual body cavity search).

Although this Court's instruction is similar to the instruction in Dancy, they are not identical, and the differences warrant different outcomes.  See Dkt. No. 125 at 9; see also Dancy, 843 F.3d at 118.  First, in Dancy, the district court instructed the jury that the plaintiff had to prove that the defendant's conduct was intentional or reckless—an incorrect statement and one that this Court did not make.  See Dancy, 843 F.3d at 118; cf. Fisher v. City of Memphis, 234 F.3d 312, 317 (6th Cir. 2000) ("[T]he intent in

42

**SPA44**

question is the intent to commit the act, not the intent that a certain result be achieved. [The defendant's] act of firing the gun was intentional, even if the result was not one he sought to achieve. Instructing the jury that more than negligence was required would likely confuse the jury as to the intent question. The district court thus did not err in failing to instruct the jury that mere negligence is not actionable under § 1983.").

Second, in Dancy, the district court's instruction was contradictory with "the instruction that force is excessive if it is objectively unreasonable, i.e., beyond that which a reasonable and prudent officer would have applied." 843 F.3d at 119. Here, the Court's instruction did not contradict any other portion of its instructions. The Court did not, anywhere in the jury instructions, state that Eric had to have intended his actions in order to find him liable. See generally Dkt. No. 125. The Court did not include any state of mind instructions other than the negligence instruction. See id. at 9. Rather, the instructions stated that "the plaintiff must establish that the defendant's conduct deprived him of a right or rights secured by the Constitution or federal law[]" and that the defendant could not be held liable if "he did not [act] in a way that violated the Plaintiff's Fourth Amendment rights[.]" Id. at 8-9.

Although its presence might have been confusing to the jury, the Court cannot say that the negligence instruction was so confusing that it "undermine[d] 'the very integrity of the trial.'" Dancy, 843 F.3d at 116 (quoting SCS Commc'ns Inc. v. Herrick Co., 360 F.3d 329, 343 (2d Cir. 2004)). As the jury was not told that plaintiff had to prove that Eric's actions were intentional and intent to conduct the search was not an issue at trial, the Court did not err in giving the negligence instruction. However, even if the Court did err, any error is harmless. See Hill v. Quigley, 784 F. App'x 16, 19-20 (2d

43

**SPA45**

Cir. 2019) (summary order) (citing Dancy, 843 F.3d at 116) ("[I]ntent was not at issue

. . . . The defense theory was that the use of lethal force was justified—not that the

shooting was accidental. [The defendant] described the shooting as an intentional act.

Thus, to the extent the District Court failed clearly to convey that [the defendant] could

be held liable even if he unintentionally caused [the plaintiff's] death, that error is

harmless."). Thus, plaintiff's motion is denied on this ground.

### IV.  Bill of Costs

As a result of the favorable verdict, defendant seeks $589.10 in transcript costs,

$126.20 for witness fees and mileage, and $9.00 for copies, for a total of $724.30. See

Dkt. No. 135 at 1, 3-4. Plaintiff does not oppose the motion for costs.

Federal Rule of Civil Procedure 54(d)(1) states, "[u]nless a federal statute, these

rules, or a court order provides otherwise, costs . . . should be allowed to the prevailing

party." FED. R. CIV. P. 54(d)(1). "[T]he Supreme Court has held that the term 'costs'

includes only the specific items enumerated in 28 U.S.C. § 1920." Whitfield v. Scully,

241 F.3d 264, 269 (2d Cir. 2001) (citations omitted), abrogated on other grounds by

Bruce v. Samuels, 577 U.S. 82 (2016). As outlined in section 1920,

> "[a] judge or clerk of any court of the United States may tax as costs the
> following:
>
> (1) Fees of the clerk and marshal;
>
> (2) Fees for printed or electronically recorded transcripts necessarily
>     obtained for use in the case;
>
> (3) Fees and disbursements for printing and witnesses;

44

**SPA46**

(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title; [and]

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title."

28 U.S.C. § 1920. "A prevailing party is 'ordinarily . . . permitted to recover costs for the original and one copy of [a] transcript[ ].'" Oliver v. N.Y.S. Police, No. 1:15-CV-00444 (BKS/DJS), 2023 WL 246698, at *7 (N.D.N.Y. Jan. 18, 2023) (citation omitted). "Furthermore, '[c]ourts interpret [28 U.S.C. § 1920(4)] to include photocopying charges for discovery.'" Encarnacion, 2023 WL 2785745, at *7 (quoting Green v. Venettozzi, No. 14-CV-1215, 2019 WL 4508927, at *2 (N.D.N.Y. Sept. 19, 2019)). Finally, 28 U.S.C. § 1821 allows $40.00 per for witness fees, plus mileage. See, e.g., id. at *6. The United States General Services Administration Privately Owned Vehicle Mileage Rates sets mileage at $0.625 for automobiles and $0.22 for government-furnished automobiles. See POV Mileage Rates, U.S. Gen. Serv. Admin., https://www.gsa.gov/travel/plan-book/transportation-airfare-pov-etc/privately-owned-vehicle-mileage-rates/pov-mileage-rates-archived (last visited May 9, 2023).

Defendant has provided sufficient information indicating that he seeks costs for an original and one copy of plaintiff's deposition, $40.00 for two witnesses and mileage at a rate of $0.22, and copies of defendant's mandatory disclosures. See Dkt. No. 135 at 4-12. These costs are appropriate, and defendant's motion is granted as to these requests. See Encarnacion, 2023 WL 2785745, at *7 (citation and quotation marks omitted) ("[T]he Court finds that the copies were necessary [as they] relate to the 'initial disclosure requirements.").

45

SPA47

Insofar as defendant seeks $86.00 for an appearance fee for the court reporter from a deposition at which plaintiff failed to appear, such a fee is not listed as taxable under section 1920. See 28 U.S.C. § 1920; see also PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC, No. 5:11-CV-761 (GLS/DEP), 2017 WL 473910, at *2 (N.D.N.Y. Feb. 3, 2017) (quoting Farberware Licensing Co. LLC v. Meyer Mktg. Co., Ltd., No. 09-CV-2570, 2009 WL 5173787, at *5 (S.D.N.Y. Dec. 30, 2009)) ("District courts in this circuit have disallowed 'certain associated fees' from deposition costs including 'expedited service, delivery costs, appearance fees, and rough diskettes and/or ASC II disks.'"); C.C. by & through Camarata v. Polaris Indus., Inc., No. 6:14-CV-0975 (GTS/TWD), 2018 WL 3031848, at *5 (N.D.N.Y. June 19, 2018) (disallowing additional fees associated with depositions that were not received into evidence or used with motion for summary judgment), aff'd, 774 F. App'x 45 (2d Cir. 2019) (summary order); Yin v. Japan Soc., Inc., No. 99-CV-4806 (HB), 2000 WL 827671, at *2 (S.D.N.Y. June 27, 2000) ("[T]he 'Appearance Fee' of $85.00, and the 'Delivery Fee' of $15.00 must be subtracted from the costs of the deposition transcript."). Thus, the Court grants defendant's bill of costs, minus the $86.00 appearance fee, totaling $638.30.

### V. Conclusion

**WHEREFORE**, for the reasons set forth above, it is hereby:

**ORDERED**, that plaintiff's motion to reverse the jury's verdict and for a new trial (Dkt. Nos. 134, 140) is **DENIED;** and it is further

46

**SPA48**

**ORDERED**, that defendant's motion for bill of costs (Dkt. No. 135) is **GRANTED to the extent outlined in this Memorandum-Decision and Order**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Dated: May 25, 2023
       Albany, New York

_Christian F. Hummel_
Christian F. Hummel
U.S. Magistrate Judge

47

**SPA49**

# U.S. Constitution

## Amendment IV

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

## 42 U.S.C. § 1983

### § 1983. Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

## Federal Rule of Appellate Procedure 4

**Rule 4. Appeal as of Right--When Taken**

(a) Appeal in a Civil Case.

*   *   *

(4) Effect of a Motion on a Notice of Appeal.

(A) If a party files in the district court any of the following motions under the Federal Rules of Civil Procedure--and does so within the time allowed by those rules--the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:

(i) for judgment under Rule 50(b);

(ii) to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;

(iii) for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;

(iv) to alter or amend the judgment under Rule 59;

(v) for a new trial under Rule 59; or

(vi) for relief under Rule 60 if the motion is filed within the time allowed for filing a motion under Rule 59.

**SPA51**

(B)(i) If a party files a notice of appeal after the court announces or enters a judgment--but before it disposes of any motion listed in Rule 4(a)(4)(A)--the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

(ii) A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice of appeal--in compliance with Rule 3(c)--within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.

(iii) No additional fee is required to file an amended notice.

\* \* \*

SPA52