UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

**************************************************

MAXMILLIAN SLOLEY,

                              Plaintiff,

                    -v-    14-cv-339

ERIC VANBRAMER,

                              Defendant.

**************************************************


                  TRANSCRIPT OF JURY TRIAL
         BEFORE THE HONORABLE PAUL J. EVANGELISTA
                     April 7, 2026
            445 Broadway, Albany, New York


FOR THE PLAINTIFF:

COHEN & GREEN, PLLC.
BY:  Remy Green, Esq.
     Regina Yu, Esq.
     Carlin Brito, Practitioner
1639 Centre Street
Ridgewood, New York 11385


FOR THE DEFENDANT:

OFFICE OF NEW YORK STATE ATTORNEY GENERAL
BY:  Mark Mitchell, AAG
     Rachael Ouimet, AAG
The Capitol
Albany, New York 12224

(Following jury selection.)

(Following lunch recess.)

COURT CLERK:  We're on the record.

THE COURT:  All right.  Welcome back.  Thank you all for being on time.  So, first thing I want to address is the elements portion of the precharge that I provided to counsel prior to our lunch break.

Is there -- Attorney Green, have you had a chance to go through that, and do you note any concerns or questions about it?

ATTORNEY GREEN:  I don't have any concerns as such.  For the second element, we would suggest adding some language to the effect of the question is, one, whether such a search happened and, two, whether there was probable cause to suspect evidence was specifically hidden in a body cavity, just consistent with the first instruction narrowing the jury's attention on what's actually at issue.  But we will obviously say the same thing in our opening if not.

THE COURT:  All right.

ATTORNEY MITCHELL:  I think for just the introductory instructions, maybe it's something what you have is better, just get started.

THE COURT:  Let me just tell you.  My -- some of the judges add this paragraph in precharge, some do

not.  My thought was to keep it pretty general just to give the jury a little bit of an idea on basically what's important in the case or what potentially is important without telling them that, which is --

ATTORNEY GREEN:  Yep.

THE COURT:  -- just letting them know a little bit of the elements and not -- not the specifics.  So I agree with Mr. Mitchell.  At this point, I think this is the charge I'm going to provide.  Of course, you have your opening and of course we have the final jury instruction as well, which we will have a conference on when that's appropriate.

All right.  So, now, is there anything else before we call the jury in?

ATTORNEY GREEN:  I think we would just -- in terms of the two plaintiff's exhibits, Plaintiff's 1 and 2, those are -- I just want to be clear what we intend to use them for.  Those are affidavits, so they're -- they wouldn't come in directly.  They're impeachment material and we will still want to -- you know, depending on what the testimony is and what objections get sustained, redact or not redact parts of them.  Just wanted to be clear on that.

THE COURT:  All right.  And those have been -- 1 and 2 have been -- P-1 and 2 have been stipulated into

evidence by --

ATTORNEY GREEN:  Or stipulated by that they're admissible I think is --

MR. MITCHELL:  No, Your Honor, they're in evidence.  That was my understanding.  We can use them if we want.

ATTORNEY GREEN:  I -- I don't know that we agree.  That's certainly not our understanding.  There are exhibits.  I -- we -- we are entitled to put on our case.  They can't force us to put something into evidence.

THE COURT:  One and two -- I received a -- a stipulation from the parties that I thought indicated that P-1 and 2 were stipulated into evidence.  You're telling me that there's not going to be an objection to the authentication of these or the foundation but we don't stipulate that these --

ATTORNEY GREEN:  Well, I -- my understanding of the stipulation was that each party would be able to offer them without any objection, not foundation, not anything in their case if they needed them.

THE COURT:  Well, they're not -- okay.  So we won't move them into evidence.  If you decide to move them into evidence --

ATTORNEY GREEN:  -- right.

THE COURT:  They're stipulated to --

(Court reporter admonishment.)

THE COURT:  Mr. Mitchell, I agree with the plaintiff that their agreement that -- your agreement that they're admissible doesn't mean that she need -- that the plaintiff needs to admit them.  So I don't agree with your statement that they are admitted.  So --

ATTORNEY MITCHELL:  Okay.

THE COURT:  We will -- are there other defendant exhibits that are -- that you would like me to move into evidence at this point?

ATTORNEY MITCHELL:  So, Your Honor, this was the -- the Document 205.  D-3, D-12, D-13, and D-20 are stipulated into evidence, and then D-19 is the image of the dog, and I think Your Honor ruled that would be coming in.  So we would like that accepted as well.

THE COURT:  All right.  So I have D-3 you're offering into evidence without objection.  D-12, D-13.  What was the next one?

ATTORNEY MITCHELL:  D-19 is the image of the dog, I think.  D --

THE COURT:  Hold on a second.  D-19 for the limited purpose that I -- I indicated in the limine motion.

ATTORNEY MITCHELL:  Right.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

ATTORNEY GREEN:  I suppose we will talk later about whether what is in evidence, whether something being in evidence means it goes to the jury, so on.  But I understood that would not go to the jury.

THE COURT:  Okay.

ATTORNEY MITCHELL:  Well, Your Honor, then, I'm going to move that to accept -- pull into evidence of the jury can see it.  I mean, if they're going to see it in here in the courtroom, why we can't they take it to the back?  That doesn't make sense.

ATTORNEY GREEN:  That's literally the ruling.

THE COURT:  So, I mean -- I can go back and look at the ruling.  My intention is not to have it go back into the jury room.  You can use it during the trial as evidence, during trial as a demonstrative aid, I suppose.  But I think the Court's ruling was really prefaced on the length of the time that the jury would look at a dog really, the dog is not -- the picture of the dog is not really that relevant other than to give the jury a better picture.  They don't need to bring that into the jury room.

ATTORNEY MITCHELL:  And then D-20 has been stipulated in.

THE COURT:  All right.  So I will move in D-3, D-12, D-13, D-19 to the extent we just discussed and

D-20 into evidence at this time.

Is there anything further before we bring the jury in?

ATTORNEY GREEN:  No, Your Honor.

THE COURT:  All right.  So we can go ahead and get the jury in.

(Jury present, 1:40 p.m.)

THE COURT:  Please be seated, everyone. Welcome back, everyone.  All right.  Now that you've all been sworn in, I want to give you a preliminary instruction to guide you in the participation in the trial and then we'll start with opening statements.

At the end of the trial, I'll give you a more detailed guidance on how you are to go about reaching your decision.  For now, I will explain how the trial will proceed and give you an overview of the claim. It's important that I give this right so I'm reading the precharge to you so don't be disrespected by the lack of eye contact.

All right.  So, it will be your duty to find from the evidence what the facts are.  You and you alone will be the judges of the fact.  You will then have to apply the law as I give it to you to those facts.  You must follow the law whether you agree with it or not. Nothing that I may say or do during the course of the

trial is intended to indicate or should be taken by you as an indication of what your verdict should be.

The evidence from which you will find the facts will consist of the testimony of witnesses, documents, and other things received into the record as exhibits and any facts that the lawyers agree to or stipulate to or that the Court may instruct you to find.

Certain things are not evidence and must not be considered by you.  I will list them for you now.

One, statements, arguments and questions by lawyers are not evidence.  The objections to questions are not evidence.  Lawyers have an obligation to their clients to make objections when they believe evidence being offered is improper under the rules of evidence.

You should not be influenced by the objection or by the Court's ruling on it.  If the objection is sustained, ignore the question.  If it is overruled, treat the answer like any other answer.  If you are instructed that some evidence -- some item of evidence is received for a limited purpose only, you must follow that instruction.

Three, testimony that the Court has excluded or told you to disregard is not evidence and must not be considered.  Four, anything you may have seen or heard outside the courtroom is not evidence and must be

disregarded.  You are to decide the case solely on the evidence presented here in the courtroom.

There are two kind of evidence:  direct and circumstantial.  Direct evidence is direct proof of a fact, such as testimony of an eyewitness.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.

I will give you further instructions on these, as well as other matters, at the end of the case.  But keep in mind that you may consider both kinds of evidence.  It will be up to you to decide which witness to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject.

I will give you some guidance -- some guidelines for determining the credibility of witness at the end of the case as well.

This is a civil case brought by Plaintiff, Maxmillian Sloley, against Defendant, Eric VanBramer.  The plaintiff has the burden of proving his case by what is called a preponderance of the evidence.  That means that the plaintiff has to produce evidence which, considered in light of all of the facts, leads you to believe that what the plaintiff claimed is more likely true than not.

To put it differently, if you were to put --

if you were to put the plaintiff's and the defendant's evidence on opposite sides of the scale, the plaintiff would have to make the scale tip somewhat on his side. If the plaintiff fails to meet this burden, the verdict must be for the defendant.

Those of you who have sat on criminal cases will have heard of proof beyond a reasonable doubt. That requirement does not apply to a civil case. Therefore, you should put it out of your mind.

In order to help you follow the evidence, I will now give you a brief summary of the plaintiff's allegations and the elements that the plaintiff must prove to make his case. I will give you detailed instructions on the law at the end of the case and those instructions will control your deliberations and decision. It is the law I give you at the end of the case that you must rely on in reaching your verdict and not this preliminary statement of the law.

The plaintiff, Maxmillian Sloley, alleges that on April 1st, 2013, while being booked at the New York State Police barracks in Greene County, New York, the defendant, Eric VanBramer, deprived him of his Fourth Amendment right which protects against unreasonable searches. The defendant denies the allegations against him.

Plaintiff has brought this claim pursuant to 42 United States Code, Section 1983.  That statute, which I'll refer to simply as Section 1983, generally speaking provides a remedy for people who have been deprived of their constitutional rights and other federally protected rights by officials acting under color of state law.

Specifically, Section 1983 provides every person who, under color of any statute, ordinance, regulation, custom or usage of any state, subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the constitution and laws shall be liable to the parties injured.

To establish this Section 1983 claim, the plaintiff's -- plaintiff must show by a preponderance of the evidence each of the following three elements: First, that the acts complained of were committed by the defendant while he was acting under color of state law. In other words, the acts complained of must have occurred while Defendant was acting or purporting to act in the performance of his official duties.

In this case, the parties, the plaintiff and the defendant, have agreed that the defendant acted

under color of state law at all relevant times. Therefore, you do not need to consider this element; it has been met.

Second, the plaintiff must demonstrate that the defendant's conduct deprived the plaintiff of a right secured by the Constitution of the United States or federal law.  Here, as part of the second element of this Section 1983 claim, the plaintiff acknowledges that the defendant, by conducting a visual body cavity search, deprived him of his right under the Fourth Amendment to the Constitution -- to the United States Constitution which protects individuals from unreasonable searches.

Here, an unreasonable search would mean a search that occurred without reasonable suspicion to believe that the plaintiff had evidence concealed inside of a body cavity.

Third, the plaintiff must demonstrate that the defendant's acts were the proximate cause of any injuries and damages the plaintiff sustained.

That's a brief summary of the claim and the elements.  I'll explain the elements of this claim in greater detail at the close of evidence when I instruct you on the law.  And as I'm repeating it again, it's very important, it is the law that I give you at the end

of the case that you must rely on in deliberating and in reaching your verdict and not this preliminary instruction.

I also want to let you know that the case which is about to be tried before you has been tried before, meaning there was an earlier trial. In the course of this trial, there may be mention from time to time of the previous trial. The fact that there was a previous trial and the legal reasons for why the case is being tried again have nothing to do with your decision of the issues which will be presented to you.

I mention the fact now so that you will understand any reference that may be made to the previous trial. But at the same time, I tell you that you are not to speculate concerning the earlier trial nor consider it at all except to the extent that evidence concerning the earlier trial is admitted into this trial.

All right. Our laws require jurors to follow certain instructions to help ensure a just and fair trial. I will now give you those instructions, and these apply throughout the whole trial, so please keep that in mind.

One: Do not converse either amongst yourselves or with anyone else about anything related to

the case.  You may tell people with whom you live and your employer that you are a juror and give them information about when you will be required to be in court, but you may not talk with them or anyone else about anything related to the case.

Two:  In this age of instant electronic communications and research, I want to emphasize that in addition to not conversing face to face with anyone about the case, you must not communicate with anyone about the case by any other means, including by telephone, text messages, email, social media websites or applications such as Facebook, Instagram or Twitter, now known as X, or anywhere else on the internet.

Three:  Do not visit or view the premises or places described in this case.  Do not use internet maps or Goggle Earth or any other program or device to search for and view any locations discussed in the testimony.

Four:  Do not read or view or listen to any accounts or discussions of the case reported by newspapers, television, radio, the internet or other news outlets.

Five:  Do not attempt to research any fact, issue or law relating to this case, whether by discussion with others, by researching a library or the internet or any other means or source.

Six:  You must not provide any information about the case to anyone by any means whatsoever.  That includes the posting of information about the case or what you're doing in the case or on any device or internet site, including blogs, chat rooms, social media websites, or any other means.

You must also not Google or otherwise search for information about the case or the law which applies to the case or the people involved in the case, including the plaintiff, the defendant, the witnesses, the lawyers, or the judge.  That was seven.

Eight:  Also a brief note about your phones. You may take them with you into the jury room but you must leave them in the jury room whenever you return to the courtroom.  When it's time to deliberate, I will ask you to leave your phones with the court security officer and they will remain outside the jury room until you finish your deliberations.

Nine:  Do not at any time during the trial request, accept, agree to accept or discuss with any person the receipt or acceptance of any payment or benefit in return for supplying any information concerning the trial.

Number ten:  You must promptly report directly to me any incident within your knowledge involving an

attempt by any person improperly to influence you or any member of the jury.

Eleven:  You must avoid speaking with any of the parties or their attorneys during the course of this trial, whether inside or outside of the courtroom. While this may present some awkwardness, the attorneys have been similarly instructed so please don't be offended if when you encounter them outside of the courtroom they avoid speaking to you.

Ladies and gentlemen, I want you to understand why these rules are so important.  Our law does not permit jurors to converse with anyone else about the case or to permit anyone to talk to them about the case because only jurors are authorized to render a verdict. Only you have been found to be fair and only you have promised to be fair.  No one else has been so qualified.

Two:  Our law does not permit jurors to converse amongst themselves about the case until the Court tells them to begin deliberations because premature discussions can lead to premature final decisions.

Number three:  Our law also does not permit you to visit a place discussed in the testimony.  First, you cannot always be sure that the place is the same condition as it was on the day in question.  Second,

even if it were in the same condition, once you go to the place discussed in the testimony to evaluate the evidence in light of what you see, you become a witness, not a juror.  As a witness, you may now have an erroneous view of the scene that may not be subject to correction by either party.  That would not be fair.

Finally, our laws require that you do not read or listen to any news accounts of the case and that you not attempt to research any fact, issue, or law related to the case.  Your decision must be based solely on the testimony and other evidence presented in this courtroom.  It would not be fair to the parties for you to base your decision on some reporter's view or opinion or on information you acquire outside the courtroom.

These rules are designed to help guarantee a fair trial, and our law accordingly sets forth serious consequences if the rules are not followed.  I trust you understand and appreciate the importance of the following -- of following these rules and in accord with your oath and promise, I know you will do so.

Finally, do not form any opinion until all the evidence is in.  Keep an open mind until you start your deliberations at the end of the case.

If you wish to take notes, you may take notes but if you do, please leave them in the jury room when

you leave at night and remember that they are for your own personal use.  They are not to be given or read to anyone else.  If you do take notes, please do not let note-taking distract you so that you do not hear other answers by witnesses.

Notes are not entitled to any greater weight than the memory or impressions of each juror as to what the testimony may have been.  Whether you take notes or not, each of you must form and express your own opinion as to the facts of the case.  If you do not take notes, you should rely upon your own memory of what was said and not be overly influenced by the notes of other jurors.

As I've told you, we are going to be in trial from 9:30 to 5 p.m.  We will take an hour for lunch and roughly a 10- to 15-minute break in the morning and the afternoon.

There may be days and times when you are waiting to return to the courtroom.  Please know that during any such delays, the Court and the parties are working.  There may be issues that I need to address outside the presence of the jury or legal issues I need to resolve before the trial can proceed.

The trial will begin now.  First, each side is going to make an opening statement.  An opening

statement is neither evidence nor argument.  It is an outline of what the party intends to prove, offered to help you follow the evidence.

Next, the plaintiff will start by presenting witnesses and the defendants may cross-examine the witnesses.  Then the defendants may present witnesses and the plaintiff may cross-examine them.  In theory, the plaintiff's case goes first and then the defendant's case goes next.  Sometimes for reasons of convenience of witnesses we may take witnesses out of order.

At the end of the day, you're going to consider all of the evidence and decide the case, so don't worry too much about the order of the witnesses.

After all the evidence is in, the attorneys will present their closing arguments to summarize and interpret the evidence for you.  It's then that I will instruct you on the law.  After that, you will retire to deliberate on your verdict.

All right.  Are the parties ready to proceed to opening statements?

ATTORNEY GREEN:  Yes, Your Honor.

THE COURT:  At this time, I recognize the plaintiff for an opening statement.

Attorney Green?  Attorney Yu?

Before you start, we are just going to grab

notebooks for the jurors in case you want to take notes as instructed.

(Pause in proceeding.)

THE COURT:  Attorney Yu, you're ready?

ATTORNEY YU:  Good afternoon.  Your Honor, opposing counsel, members of the jury.  As I think we all know by now, I'm Regina Yu, and I'm here to represent Maxmillian Sloley.  He's the plaintiff in this trial.  And I'm representing him with my co-counsel over there, Remy Green, and sitting behind them is our law student/paralegal of our office, Carlin Brito.

Start by just thanking you all for being here today.  As the judge explained, and I'm sure all of the people in this room would agree, you as the jury have the most important role here and you're here to consider the evidence and decide the facts before coming together to reach a verdict.  We appreciate all the time and the care that you are going to put into hearing all of us for the next couple of days.

Sometimes police are allowed to stop you. Sometimes police are allowed to arrest you.  Sometimes police are allowed to search you.  But this case is about an officer who took it too far.  The story begins in Athens, New York, during the predawn hours of April 1st, 2013.  This was many years ago, so I'll just

tell you that April 1st was a Monday, and you'll hear it was the day after Easter that year.

Max was coming back Upstate after going to church with his mom and his kids.  He was driving his mom's car.  After dropping his kids off for the night, Max, as you will hear, went to go see somebody named Daphne Rollins, who you will hear was his girlfriend at the time, and went to her house.

And at that time, Max and Daphne Rollins' relationship was on the rocks and you will hear that they had an argument.  That argument ended after Daphne used a baseball bat to break the window, the windshield of Max's car, and then he took that bat and did the same to her car, and now, realizing both -- the time to cool off, you'll hear that Max got into his car and drove away.  His mom's car, rather.

And he didn't get too far before an officer from the Greene County Sheriff's Office pulled him over. You'll hear that after Max is handcuffed, the sheriff's office handed him over to a New York State trooper whose name was Bryan VanBramer, the defendant's brother.

You will hear that Bryan VanBramer drove Max to the Catskill police barracks, and that is where Max first met the defendant, Eric VanBramer, and his K9 partner, who was a drug-sniffing dog, and the dog's name

is Ryder, just in case you're curious.

So, the defendant and Ryder had just come from searching Max's car, which -- Max's mom car which had been left on the side of the road when he was arrested.

Now, the defendant will likely tell you about the search that he and his K9 partner did on the car, and I expect you'll hear that the K9 went around the car and alerted multiple places, and I expect that the defendant will explain how he did a field test on something that he found in the crease of the driver's seat, and he will say that it tested positive for cocaine.

Now, you won't get to see the actual field test kit that the defendant used or a photo of the inside of the car or a photo of what he said he found in the car.  Now, I anticipate that the defendant will say that whatever he says he found in the seat of the car was such a small amount that he actually put the whole sample inside the test kit, which was eventually destroyed.  So that's why you won't get to see the actual field test kit, although they might try to show you a sample or something similar so you can see, and that's why you won't see a photo.

So at the police barracks, when the defendant came in, he told Max about the drug test and that it was

positive results.  You will hear that Max was in complete disbelief and that he demanded to actually see what the defendant found.  He asked the defendant to show him either the drugs, the drug test, something. You will hear that the defendant refused to show him what he found and instead took Max into a separate room.

Essentially, members of the jury, once inside that room, the defendant told Max to take off every individual piece of clothing that he was wearing, shake it out, and hand it over until Max was standing there in just his undergarments.

The defendant didn't find anything but went further anyway.  He had Max completely naked.  The defendant still didn't find anything but went further anyway.  He ordered Max to lift up his testicles so he could inspect underneath, and you will hear that the defendant didn't find anything but continued on.

You will hear that he told Max to turn around, bend over, and spread his cheeks apart with his hands while the defendant put -- so the defendant could look directly at his anus to check and inspect for evidence of any contraband concealed inside.

Now, the evidence will show that no drugs were found anywhere on Max.  Not in his pockets, not stuffed inside his clothes or his shoes, not in or around his

genitals, and apart from what the defendant alleges he found on the seat of Max's mom's car, there was nothing found in the car, either.

Now, at this point, it's clear that you might hear about some things that maybe feel awkward but I ask you to think about that, even just hearing some of these saying the word "anus" in public is uncomfortable, consider how Max felt physically being in that situation himself.

Now, when Max takes the stand, you will hear that he felt scared and humiliated while alone in that room with the defendant. He will explain that although he protested verbally and didn't want to be searched like this, he felt like he had no choice but to comply.

You will hear that this moment lasted probably only a handful of seconds. But to Max, the person actually naked and bent over in that degrading position, it felt like further.

Now, since Max is the plaintiff in this case, which means he's the one bringing the lawsuit, he's suing, we have the burden of proof in this trial. And Judge Evangelista told you that we have to meet our burden by something called a preponderance of the evidence, which just means it's our job to convince you that it's more likely than not that the defendant

violated Max's constitutional rights.

And we will do this by proving three things. First, that the defendant conducted a visual body cavity search on Max. Now, with respect to this first element, whether a visual body cavity search actually occurred, we don't think this is in dispute.

The second element is that the defendant conducted this search without a reasonable, particularized suspicion that he would find drugs inside Max's anus. This is the issue I think you'll spend the most time on.

And the third element is -- is causation. So the visual body cavity search has to have been the proximate cause of the injury that Max suffered. So the injury that we're talking about here is called - it's emotional damages, psychological, emotional harm, and something called garden variety, which just means that Max has to prove that he had the damages that you would expect anybody in his situation to have suffered from being wrongfully searched.

And proximate cause or causation is just legalese for basic reasonably foreseeable that as a result of what the defendant did, is Max harmed in the way that you would expect.

And you may hear testimony that Max has been

in other situations that have caused emotional distress in other ways, but pay attention to the differences. Pay attention to how those other situations are different than the one here and how a wrongful search can cause a unique harm.

I want to talk a little more about this second element, the reasonable suspicion.  The judge will instruct you much more after the close of argument, before you begin to deliberate, but essentially the Fourth Amendment of the Constitution protects us from unreasonable searches by law enforcement.

I expect that over the course of this trial you will learn that there are different types of searches that police can do, which you might know, and they get more and more serious in terms of invasiveness. So think of it -- different searches like tiers.  Like, for example, stopping you and asking you a question, not touching your body at all, and then stopping you and patting you down.  It's a little bit more.  And maybe patting you down is less invasive than a strip search. But then a strip search is even less -- more or less invasive than visual body cavity search, what we're saying happened here.

There are other kinds of searches that could be even more invasive, like, if there's -- something

called a manual body cavity, somebody puts something inside and took something out.  Here, we're talking about the visual body cavity search.

So to get to each level, certain criteria have to be met.  And when you're listening to the defendant's answers, think about each step he took in this search and did he have enough to reach that next higher tier, and I expect you will hear that being patted down for things like drugs and weapons can be a routine part of an arrest.

But what happened here was not routine, members of the jury.  Can't stress enough, and I'm sure you'll hear this, that a visual body cavity search is not a normal, routine, everyday part of just being arrested.

You'll learn that it is not done with every arrest.  It is not done with every arrest where drugs are suspected.  It's not even done with every arrest where drugs are actually found.  It's supposed to be rare because of how intrusive it is.

The Constitution protects us against searches that cross.

(Court reporter admonition.)

MS. YU:  It balances a need for law and order, which each person's personal dignity and the ultimate

determining factor is reasonableness.  Did the police officer have the -- have a -- a reasonable belief to think that this person had drugs inside of them?  It's not enough to think that the person on drugs on their -- in their -- something like that in the car.

The defendant needed a reason to believe with specific facts that he can explain why he thought Max had the drugs inside his body.  But, members of the jury, here's what I don't think you're going to hear.  I don't think you're going to hear any clear evidence that Max was hiding drugs or was intoxicated any way when he was stopped by police.  You won't hear about a bulge seen in his pants or his waistband.  You won't hear about any direct observation of Max stashing drugs away. You won't hear about any indirect observation of this.

You won't hear that the police had Max take a drug test.  You won't hear facts about drugs being inside any of Max's body cavities.  You won't hear the concrete facts you need to justify taking this next step into this level of a search.

Now, I suspect that you may hear evidence or testimony or questions that conflate a strip search with a visual body cavity search, and I don't want you to be confused as you listen because they are different. They're different types of searches, they have different

levels of invasiveness.

You will learn that visual body cavity searches have a higher standard of suspicion than they require than a basic strip search because of the basic strip search a person is being asked to -- to fully undress, but they don't have to do anything more, like bend over, spread open, be able to let somebody inspect their body cavities.

So, you might come to think that the defendant had an opportunity regular --

(Court reporter clarification.)

MS. YU:  Enough to do a regular strip search but you won't hear that he had enough particularized suspicion to do the type of search that this escalated to, but he still went there.

You're going to have a chance to hear -- to hear from Max today.  I've had the benefit of getting to know him, you know, as I prepared for this trial.  You will just have a limited amount of time to listen to his -- I'll be upfront with you.  He doesn't beat around the bush, he tells it how it is, and he is very upset about this.

Next year marks 13 years since this happened.  And you'll hear how deeply that this still continues to haunt him.  This case actually isn't even about Max

specifically.  It's about the Fourth Amendment and how it protects every single one of us the same way.  This case is not about a fight with his ex-girlfriend, about his -- a strip search generally.  It's about whether the defendant had reasonable suspicion to justify what he did.  It's about where we draw the line between law and order and our right to be free from the government looking into our most private parts.

You'll hear that there are limits to what police officers can do in the name of public safety.  Police are entrusted with this job because they go through extensive training.  They learn the rules and they are supposed to understand when they are allowed to go further.  They're supposed to know how to strike this balance.

The choice to do a body -- a visual body cavity search was not a quick-split second decision that was made on street in a danger situation.  You'll learn that the defendant had a lot of time to think about his next steps while Max was in custody waiting at the precinct.  You will hear about several points in time where the defendant could have stopped.  But instead, he went further.

That's why, at the close of all the evidence, we will ask you to return the only verdict consistent

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

with the facts that justice demands.  A verdict of liable.  Thank you.

THE COURT:  All right.  Thank you, Attorney Yu.

Mr. Mitchell, does the defense wish to make an opening statement?

ATTORNEY OUIMET:  Yes.

THE COURT:  All right.  Proceed when you're ready, Ms. Ouimet.

ATTORNEY OUIMET:  May it please the Court, members of the jury.  My name is Rachel Ouimet, and I'm assistant attorney general in the office of the New York State Attorney General.  I'm joined by my co-counsel, Mark Mitchell, and together we represent the defendant, Eric VanBramer.  Thank you for giving us your time and your attention.

Now, the truth is simple.  And like the truth, the facts of this case are also simple.

The plaintiff says our client did something. Our client denies this.  Plaintiff will try to convince you that on April 1st, 2013, Trooper VanBramer violated his constitutional rights.

But there are two sides to this story.  One side is supported by the credible evidence and the other is not.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

You just heard plaintiff's counsel tell you a story.  A story that on April 1st, 2013, while plaintiff was being booked at Catskill state trooper barracks, Trooper VanBramer performed a search that was unconstitutional, and that official records recorded contemporaneously were false, that a report stating that cocaine was found in plaintiff's car was simply made up.  But facts, all it is.  A story.  A story that cannot be supported by any credible evidence presented at this trial.

After plaintiff tells you his story, you will hear from Trooper VanBramer, and you will hear his credible account of what actually happened.

In April of 2013, Trooper VanBramer was working as a New York State trooper in the K9 unit.  He worked with a highly trained K9 named Ryder.  Ryder was trained to identify by scent the presence of illegal substances, including cocaine.

You will learn that in the early morning hours of April 1st, 2013, Plaintiff traveled to Athens, New York, to the residence of Daphne Rollins.  Miss Rollins was Plaintiff's girlfriend.  At some point, Miss Rollins called 9-1-1 after a domestic violence incident which was perpetrated by plaintiff.  Simultaneously, Plaintiff fled the scene in his vehicle.

Miss Rollins provided a 9-1-1 dispatcher with Plaintiff's name and description, as well as a description of plaintiff's car.  Ms. Rollins also provided the 9-1-1 dispatcher with an account of the domestic violence incident which had just occurred at her home.  All of this information prompted local and state police to be on the lookout for a person and/or vehicle matching Plaintiff's.

After Ms. Rollins' 9-1-1 call, Bryan VanBramer, the defendant's brother and also a New York State trooper, responded to Ms. Rollins' residence. Shortly thereafter, plaintiff's vehicle was stopped by a Greene County sheriff deputy near the Rip VanWinkle Bridge in Hudson, New York.

After receiving a call from his brother, Bryan VanBramer, our client, Trooper Eric VanBramer, drove to the location of Plaintiff's vehicle. Suspecting the presence of illegal substances in the vehicle, Trooper VanBramer brought his partner, K9 Ryder, near Plaintiff's car.

Ryder had a positive alert on each side of the vehicle, the hood, and the center console inside of the vehicle.  You will hear Trooper VanBramer explain to you what Ryder's positive alerts looked like, what a positive alert means, and what caused him to believe the

presence of illegal drugs were in Plaintiff's vehicle. Not only did Ryder positively alert as to the presence of illegal substances, but Trooper VanBramer also observed a small amount of loose white chunky substance located in the crease of Plaintiff's driver's seat.

In accordance with his training, Trooper VanBramer performed a field test.  You will learn that a field test is a narcotic screen test developed to rapidly screen and presumptively identify substances suspected of being illegal drugs.

Trooper VanBramer's field test on the substance found in Plaintiff's -- or on Plaintiff's driver's seat was positive for cocaine.  Plaintiff was transported to the state police barracks for processing.

The evidence will show that based on Ryder's positive alert for the presence of narcotics in Plaintiff's vehicle, the field test's positive cocaine results, and other information that Trooper Eric VanBramer will tell you about during his testimony, Trooper VanBramer performed a strip search on Plaintiff.

To ensure that Plaintiff did not possess any other illegal drugs or contraband, you will learn that a strip search is searching a person for weapons or other contraband, like illegal substances, hidden on their body or inside their clothes.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

Trooper VanBramer will tell you that the strip search occurred in a private room and that throughout the duration of the search, he never touched Plaintiff, and that all his actions were appropriate and consistent with his training.  But perhaps the most important thing Trooper VanBramer will tell you is the truth.  He will tell you he did not do what Plaintiff is claiming.

By the time Plaintiff and Defendant have rested their cases, you will have heard two different stories.  You will hear Plaintiff's version of the facts.  It's very different than that shown by the credible evidence presented by Trooper VanBramer. It will only take your common sense to determine which story is true, Defendant's story, and which story is not, Plaintiff's.

At the end of this trial, Mr. Mitchell will come before you and highlight the evidence in this case which will show that Trooper VanBramer did not violate Plaintiff's constitutional rights by performing a strip search on April 1st, 2013, and he will ask you to return the only verdict that is supported by the credible evidence, a verdict in favor of our client, Trooper Eric VanBramer, dismissing the lawsuit against him.

Thank you.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - DIRECT - YU

THE COURT:  All right.  Thank you, Ms. Ouimet.

Is the plaintiff ready to call their first witness?

ATTORNEY YU:  Yes, Your Honor.  At this time, Plaintiff calls Maxmillian Sloley to the stand.  So do we --

THE COURT:  Let's take a -- just before we start that, let's take a brief break.  I need to use the bathroom already.  So, folks, we are just going to take a five-minute break and we will reconvene in five minutes.  So Tara will take you to the jury room.  Thank you.

(Jurors excused.)

THE COURT:  Why don't we get Mr. Sloley to the stand and then we can resume.

(Following recess; jurors present, 2:30 p.m.)

THE COURT:  All right, Tara, would you swear in the witness, please.

COURT CLERK:  Yes.

Mr. Sloley, just raise your right hand.

M A X M I L L I A N   S L O L E Y ,  having been duly sworn, was examined and testified as follows:

THE COURT:  All right.  Mr. Sloley, you have water if you need it.  Just make sure keep your voice up so we can all hear you.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - DIRECT - YU

And when you're ready, Attorney Yu, please proceed.

DIRECT EXAMINATION

BY MS. YU:

Q    Good afternoon.  Can you please just introduce yourself to the jury.

A    Me?

Q    Yes.

A    Maxmillian Sloley.

Q    How old are you?

A    49.

Q    Where did you grow up?

A    Bronx, New York.

Q    And what county do you live in now?

A    Sullivan.

Q    Okay.  So I want to direct your attention now to the very early morning hours of April 1st, 2013.  Do you remember that day?

A    Yes.

Q    Where were you living at that time?

A    Westchester County.

Q    Say that again?

A    Westchester County.

Q    And were you working at that time?

A    Per diem.  I was mostly going to school, taking

SLOLEY - DIRECT - YU

classes.

Q    At some point in those early morning hours of April 1st, did you encounter the police?

A    Yes.

Q    Can you explain what led up to that encounter.

A    Me and Daphne Rollins was having a conversation/argument and she ended up calling the police.

Q    So, I want to ask you.  Who is Daphne Rollins to you at that time?  What was your relationship?

A    Girlfriend.

Q    And where were you coming from?

A    Catskill.  I dropped my kids off with their -- with their cousin and their aunt in Catskill.  Before that, me, my kids and my mom, we all went to church for Easter.

Q    And so were you -- you were driving?

A    Yes.

Q    Was that your car?

A    No.

Q    Who owned that car?

A    My mom.

Q    Did you own a car at that time yourself?

A    No.

Q    So can you just explain a little bit more about --

SLOLEY - DIRECT - YU

about this argument that you say you had.

A    It ended with -- I grabbed the phone and she chased behind me with a bat.  She fell down.  I went in my car and I started it.  She thought I had her phone but her phone's already on the ground broken but she didn't know; she thought I still had it.  So she smashed my windshield.  My mother's windshield, excuse me.  It wasn't my car.

And I got out of the car, I pushed her down and pushed the bat out of her hand.  I smashed the windshield, then I got in the car and left.

Q    So was that the end of your interaction with Ms. Rollins?

A    Yes, that was it.

Q    So, what happened after you drove away?

A    A few minutes after that, I seen sirens behind me. The sheriffs pulled me over.  Once I stopped, the sheriffs took me out of the car.  We was having a conversation about the incident.  They asked me about the windshield.  I was explaining to them.  They said they are going to have to take me back to Ms. Rollins' residence.

So I said do I have to get cuffed?  Because at the time I wasn't under arrest.  They said I can't get in their car unless I'm cuffed.  So the sheriffs took me

-SLOLEY - DIRECT - YU-

back to Ms. Rollins' residence.  That's when they switched me over to the troopers.

Q    Got it.  So I want to break that down a little bit.  You said that at that time you weren't under arrest?

A    No.

Q    Did somebody tell you that?

A    Yeah.  The sheriff.

Q    Okay.  They still handcuffed you?

A    Yes.

Q    Where were you at this time?

A    They put me in the back of their cruiser.  The sheriff's cruiser.

Q    Where were you, just generally -- people understand where you were, when you got pulled over?

A    I was about five minutes from her residence.

Q    Were you near a bridge, by any chance?

A    Yes.  There's a bridge that separates Greene County and Columbia County.  Hudson River.

Q    Okay.  So you said that they drove you -- where did they drive you?

A    When they took me out my vehicle, they put me in the sheriff's car and I sat there for a while.  I was talking to one of the officers.  The other officer, he was searching the vehicle.  After he finished searching

-SLOLEY - DIRECT - YU-

the vehicle, he got into the cruiser, and they took us to Daphne's residence.  Daphne Rollins' residence.

Q    Was this one of the Greene County sheriff's officers that you saw searching your car or your mom's car?

A    Yeah.

Q    What did you see that person doing?

A    He just had a flashlight searching the vehicle.

Q    How good of a view did you have?

A    I would have to -- I -- I couldn't see, really.  I couldn't see because it was nighttime.  I seen that he was searching, regular routine search.  Front, backseat.  Whatever.

Q    You saw a flashlight, right?

A    Yes.  It was nighttime, yeah.

Q    Once you were in the sheriff's car, did any of the sheriff's officers ask you anything about drugs?

A    No.

        ATTORNEY MITCHELL:  Objection to the hearsay.

        THE COURT:  Overruled.

BY MS. YU:

Q    Did any of the sheriff officers ask you about drugs when you were in their care?

A    No.  They just kept the conversation about the incident with me and Rollins and the windshield.

SLOLEY - DIRECT - YU

Q    Did you have any drugs with you in the car?

A    No.

Q    Did you have any drugs on your person?

A    No.

Q    Did you have any drugs inside you?

A    No.

Q    So once you got to Daphne's, what happened?

A    They switched me to troopers.  Bryan VanBramer and another -- another troop -- I don't know his name. There was two of them.

Q    And you said Bryan VanBramer was somebody you got switched over to, right?

A    Yes.

Q    Okay.  So, what happened next?  What did they do with you?

A    They took the bat as evidence and they was going to take her cell phone but he ended up just taking a picture of it and giving it back to her and they drove it to the barracks.

Q    Okay.  What is the barracks?

A    That's the police station for the state police.

Q    So at this point, did somebody tell you you were under arrest?

A    Yes.  Bryan VanBramer.

Q    So you eventually arrived at the barracks, right?

SLOLEY - DIRECT - YU

A     Yes.

Q     And what did the officers do with you there?

A     They cuffed me to the bench in their office where the officers were at.  There's, like, a bench by the walls when you come in and their desk is, like, on the other side of the room.

Q     And was this bench -- is it, like -- is it right when you walk into the barracks or --

A     Starts -- as soon as you walk, it starts to your right by -- it's against the wall, like, to your right. It's -- I'm sitting there on the bench, cuffed to the bench.

Q     So do you recall maybe how long you might have been waiting there?

A     It was a little while because, you know, it was -- it was -- it was awhile they had me there.

Q     Can you give any kind of estimate?

A     You mean before -- how long they had me there before the incident?

Q     Yes.

A     About an hour, I would assume.

Q     All right.  So at some point while you were waiting there cuffed to the bench, did you encounter somebody named Eric VanBramer at the barracks?

A     Yes.

SLOLEY - DIRECT - YU

Q    Do you see Eric VanBramer in this courtroom today?

A    Yes.

Q    Can you please identify him by location and an article of clothing.

A    He's to the right of Miss Ouimet, has a dark suit and dark tie.

ATTORNEY YU:  Let the record reflect that the witness has accurately identified the defendant.

BY ATTORNEY YU:

Q    And was Defendant VanBramer by himself when you saw him?

A    No.  He was with his K9.

Q    That's a police dog, basically?

A    Yes, yes.

Q    All right.  So, where was the defendant and his K9 in relation to where you were cuffed on the bench?

A    When I was cuffed to the bench, they entered the room and they walked right by me.  Him and his K9 walked by me.  The K9 was between me and him.

Q    So do you recall maybe how close they came to you?

A    The K9 was about four feet away from me.

Q    Do you recall noticing anything unusual about how the K9 was -- was acting?

A    K9 walked past me like I wasn't even there.

Q    Did you and the defendant speak while you were in

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - DIRECT - YU

that area handcuffed to the bench?

A    Yes.

Q    What did he say to you?

A    He told me he found drugs in the car.  I said where?  Because it's impossible.  He said he found it in the driver's seat.  I said nobody drives that car but me and my mom, and my mom don't do drugs and neither do I. Asked him, if you found drugs, let me see it, a picture of it, something.  To this day, I haven't seen nothing.

Q    So when you asked to see a picture or the drugs or the, you know, test --

A    Anything.  Yeah.

Q    Sorry?

A    Yeah.

Q    When you asked to see these items, did he actually tell you no or did he not respond?

A    He responded.  He told me the drugs was -- it was too little to show me or to see.  Something to that nature.  Something that didn't make sense.

Q    So what happened next?

A    He told me he found drugs so he had the right to strip search me.

Q    And is that all he said at the time?  That because he found drugs, he had the right to strip search you?

A    Yeah.

SLOLEY - DIRECT - YU

Q     Okay.  So before we get into more specifics about the actual search, can you tell us what you were wearing that day.

A     I had -- I was wearing tan shoes, jeans, a white button-up, like, a tan cardigan sweater.

Q     So when you were in this room, can you -- can you take us through what happened.

A     After he said he had to strip search me, he took me to the room, he asked me to pass all my clothes one by one, taking them off.  I complied.  I did everything.  Eventually I was completely naked.  And then he told me to, you know, lift -- lift my testicles and penis, whatever, and he told me turn around and bend over and spread.

Q     Did you comply with each of those orders?

A     Yes, I did.

Q     What did he do with all of the pieces of clothing as you handed them to him?

A     He searched through them.

Q     Do you recall whether you are aware of him finding anything?

A     No, he didn't find anything.

Q     Okay.  So when -- did you say you were turned around and bent over?

A     Yes.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - DIRECT - YU

Q    Do you have a memory of how far away he was from you when you were in that position?

A    About where she's at.  Right here in front of me. That would be about five, six feet.  Something like that.

Q    Okay.  And was there anybody else in the room with you while this was happening?

A    No.

Q    Just you and -- and the defendant, right?

A    Yes.

Q    If you can remember, did this room have a door?

A    The entrance door, that's it.

Q    While the search was happening, where were you in relation to that entrance door?

A    I was facing the door.  He -- he had his back turned to the entrance.  He had his back turned to the entrance door and he was facing each other until he told me to turn around.

Q    Could you see if the door to this room was open or closed while the search was happening?

A    I can't remember.

Q    Do you remember if there were other officers outside the room that you could hear?

A    Yes.

Q    And if the door was open and if an officer had

SLOLEY - DIRECT - YU

looked inside the room while the search was happening --

ATTORNEY MITCHELL:  Objection.  Not relevant.

THE COURT:  Let her finish the question first and I'll respond.

BY ATTORNEY YU:

Q    Were you positioned in a way that they would have been able to see you?

ATTORNEY MITCHELL:  Objection.  Not relevant. Speculation.

THE COURT:  I agree.  It calls for speculation.  I'll sustain the objection.

BY ATTORNEY YU:

Q    So while the search was happening, were you -- did you say anything?

A    No.

Q    Did he say anything to you besides telling you each step to do?

A    No.  That was it.

Q    Did you consent to the search?

A    No.  Verbally, no.

Q    Did you -- did the defendant explain any more while the search was happening why he was doing this?

A    No.

Q    And as far as you're aware, was anything at found during the search?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - DIRECT - YU

A    No.

Q    So what happened after the defendant -- well, at some point did the defendant complete his search?

A    Yes.

Q    And so what happened?

A    I got dressed.

Q    Can you tell the jury how this experience felt?

A    I don't even like talking about it right now.  It's embarrassing.  It's -- I don't know.  It shouldn't happen.

Q    I know it might be hard but you have to -- just tell the jury how it impacted you emotionally, psychologically.

A    It's an assault on my manhood.  My -- my personhood.  It's just humiliating, embarrassing, and what made it worse was I couldn't refuse because it could have been worse.  So I had to comply.  It would have been more -- maybe I could stomach it more if it was a reasonable circumstance, but just because the officer felt like doing it, it kind of dehumanizes you.

Q    Do you still feel the impact of this today?

A    Yeah.  I feel like this until the day I die.

ATTORNEY YU:  I have no further questions at this time.

THE COURT:  All right.  Thank you, Attorney Yu.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - CROSS - MITCHELL

Any cross-examination?

ATTORNEY MITCHELL: Yes, Your Honor.

THE COURT: All right, Mr. Mitchell, when you're ready.

ATTORNEY MITCHELL: Your Honor, do you have the trial binder up there that we provided?

THE COURT: I do. Thank you.

ATTORNEY MITCHELL: Okay. Because -- if I end up referring to some of it, I'll give you the page and exhibit.

THE COURT: All right. And I assume counsel has copies as well?

ATTORNEY MITCHELL: Yes.

ATTORNEY YU: Yes.

THE COURT: Thank you, Ms. Yu.

CROSS-EXAMINATION

BY ATTORNEY MITCHELL:

Q   Mr. Sloley, am I correct that you were convicted of criminal possession of a weapon in the second degree?

A   Yes.

Q   Am I correct that conviction was in 2017?

A   You are correct.

Q   Am I correct that in 2017 you were also convicted of unlawful fleeing from a police officer in a motor vehicle in the third degree?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - CROSS - MITCHELL

A    Correct.

Q    Am I correct that you were convicted of criminal impersonation?

A    Correct.

Q    I'd like to ask you about some of your other identities.

Have you also used the name Ronnie Perry?

A    Yes.

Q    Have you also gone by the name of Kevin Madison?

A    Yes.

Q    Have you also used the identity of Jerry Ebanks?

A    Yes.

Q    Am I correct that those were all false names that you have given to the police when they arrested you?

A    Yes.

Q    Am I correct that in 2018 you filed a case against the Greene County sheriff and various individuals who worked at the Greene County sheriff?

A    Yes.

Q    Or at the Green County jail?

A    Yeah.  Yeah.  The one that's -- they closed it. It's condemned now.  Yes, that one.

Q    Am I correct that you claimed you were subjected to cruel and unusual punishment as a pretrial detainee at the Greene County jail?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - CROSS - MITCHELL

A    Yes, I was.

Q    Isn't it true that you claimed the sheriff and the jail caused you mental and emotional injuries?

A    Every day.

Q    And am I correct that you claim that they caused you injuries including "tremendous harmful psychological effects, such as stress, depression, fear and anxiety and also a lack of sleep which also worsened blood pressure"?

A    Yes.

Q    Am I correct that you filed a case in 2012 against the City of Hudson and various City of Hudson officers?

A    Yes.

Q    Am I correct that you claimed in that case that you were strip searched in connection with an arrest?

A    I'm not sure.  My lawyer filed that case; I didn't file it.  The attorney's name is Laboe.  Attorney James Laboe.  He filed that.  I didn't really have no input.

        ATTORNEY MITCHELL:  Your Honor, could I approach the witness?

        THE COURT:  You may.

BY ATTORNEY MITCHELL:

Q    Sir, could you -- can you identify this document?

A    It's a complaint.

Q    Can you look at paragraph 21.

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

SLOLEY - CROSS - MITCHELL

THE COURT: Mr. Mitchell, is it marked for identification?

ATTORNEY MITCHELL: No, I was just using it to refresh his memory. I can mark it if you'd like.

THE COURT: Why don't we mark it just so that we have a record of it.

ATTORNEY MITCHELL: Okay.

ATTORNEY YU: We just don't have this document.

THE COURT: We don't know what it is yet but -- would a copy be provided to counsel as well, Mr. Mitchell?

ATTORNEY MITCHELL: Yes.

THE COURT: Thank you.

ATTORNEY MITCHELL: I'll mark this, then. I guess it would be D-26.

BY ATTORNEY MITCHELL:

Q    Can you take a look at paragraph 21.

A    Yes.

Q    All right. And does this refresh your recollection about what you alleged in that case?

A    Information and belief, plaintiff was held in a cell for --

THE COURT: Mr. Sloley, don't -- don't read from the document. Just try to answer the question

SLOLEY - CROSS - MITCHELL

that's asked regarding the document.

ATTORNEY YU: Your Honor, I object to lack of personal knowledge. He said he didn't have anything to do with writing this document.

THE COURT: I'm going to overrule the objection. I'll let Mr. Mitchell continue with his attempt.

BY ATTORNEY MITCHELL:

Q    So, if you could put that document aside. Am I correct that in this case, you alleged that you were strip searched?

A    Yes.

Q    Isn't it true that you claim that the Hudson police caused you mental and emotional injuries?

A    I didn't -- I didn't file this complaint. I can't tell you verbatim what my lawyer did.

Q    Isn't it true that you claimed that they caused you to suffer, quote, great mental anguish, emotional distress and public humiliation, further caused you to experience fear of physical harm and violence?

ATTORNEY YU: Objection, Your Honor. Same grounds.

THE COURT: Overruled.

A    I don't know. All I know is that the Hudson Police Department arrested me. They held me in jail for almost

SLOLEY - CROSS - MITCHELL

two years and dropped the charges because they had me locked up for no reason, and that's when my lawyer filed this complaint.

ATTORNEY MITCHELL:  Your Honor, I'd like to approach the witness.

THE COURT:  You may.

BY ATTORNEY MITCHELL:

Q    If you could open up to D-25 and page 198. Actually, it's pages 197 and 198.

Am I correct that I asked you, and more specifically, am I correct you claimed that they caused you to suffer, quote, great mental anguish, emotional distress and public humiliation and was further caused to experience fear of physical harm and violence; is that right?

A    Yes.

Q    Question mark?  And then you answered yes, that's correct?

A    Yes.

Q    Am I correct that you filed a case in 2023 against the New York State Department of Corrections and Community Supervision --

ATTORNEY YU:  Objection.  Your Honor.  I believe this violates the in limine rulings.

ATTORNEY MITCHELL:  It doesn't.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - CROSS - MITCHELL

THE COURT:  Let's have a sidebar on this.  We are going to take a quick sidebar.  The rulings made before trial, that's in limine rulings.  We are going to talk about that.  Just have a few minutes.  Music please.

(Discussion held at sidebar.)

THE COURT:  All right.  What have we got?

ATTORNEY YU:  I think this was addressed in the in limine, more specifically --

ATTORNEY MITCHELL:  Page 10.  I can ask about three cases.  This is one of them.

ATTORNEY GREEN:  I don't know that that -- like, I -- so -- present general information -- okay.  I -- then I was confused by -- we were --

THE COURT:  Just general information though.  All right?

ATTORNEY GREEN:  Okay.

ATTORNEY OUIMET:  What's that mean?

THE COURT:  Give me a proffer on a -- what you expect -- what do you --

ATTORNEY MITCHELL:  Just the same thing.  Who were the defendants, the year filed, and that he claimed mental emotional harm, and I was going to read a quote of the injuries he explained.

ATTORNEY GREEN:  We're talking about an

SLOLEY - CROSS - MITCHELL

incident from ten years later, 2023 versus 2013 incident.  The idea that somehow there's some overlap because he claims garden-variety emotional distress in two different cases, it's extremely prejudicial and it's completely irrelevant.  It has nothing -- right?  Like, this is generic garden-variety language.  It's overlapping.

THE COURT:  I think there's been a -- gotten into the other cases you've described that's happened.  That's on the record.  I think if you want to just generally say was there another case from 2023 in which you claimed emotional damages, he can answer that and then nothing further.  Okay?

ATTORNEY MITCHELL:  Okay.

(Held in open court.)

THE COURT:  When you're ready, Mr. Mitchell.  Thank you.  Why don't you re-ask the question.

BY ATTORNEY MITCHELL:

Q    Mr. Sloley, am I correct that you filed a case in 2023 as well?

A    Yeah.  The medical department discontinued my medication for no reason.

Q    Am I correct that in that case you claimed that the defendant -- the -- the department and various medical people caused you mental and emotional injuries?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - CROSS - MITCHELL

A     Yes.

Q     Am I correct that in the present case, you also claim that Eric VanBramer caused you mental and emotional injuries?

A     Yes.

Q     Am I correct that you -- you allege that Eric VanBramer caused you "fear, paranoia, anxiety, humiliation, and fear and loss of trust for law enforcement"?

A     Absolutely.

Q     Were you treated by a provider named Dr. Kessler?

ATTORNEY YU:  Objection.

THE COURT:  You can answer the question.

ATTORNEY GREEN:  Your Honor, can we speak at sidebar?

THE COURT:  I don't need to.  The question is were you treated by a doctor named Kessler?

A     Answer like is this is going to have to take -- it's not a yes-or-no answer.  I would have to explain.

THE COURT:  All right.  Well, I think --

A     I wasn't -- due to the -- to the situation --

THE COURT:  Don't -- I don't want you to speak any more.  If you're not being able to answer the question in a yes-or-no format, the yes-or-no answer would be unobjectionable.  Otherwise, I'm going to

SLOLEY - CROSS - MITCHELL

sustain the objection.  I don't want anything beyond yes or no.  He's not able to answer that.  So let's move to a next question.

BY ATTORNEY MITCHELL:

Q    Am I correct that as of April 1st, 2013, you were serving a term of supervised release?

A    Yes.

Q    Am I correct you were being supervised by the United States District Court, Southern District of New York Probation Office?

A    Yes.

Q    Did you obtain permission from your probation officer to leave the Southern District and go to Greene County on April 1st, 2013?

A    No.

Q    So you gave some testimony about your interaction with Daphne Rollins.  I'd like to ask you about that.

     Am I correct that you talked to Daphne Rollins about drugs?

A    I spoke to her --

          ATTORNEY YU:  Objection.

A    -- about drugs, no.

          THE COURT:  Overruled.  Go ahead.  You can answer.

A    No.

SLOLEY - CROSS - MITCHELL

BY ATTORNEY MITCHELL:

Q    Don't you claim Daphne Rollins asked you to give her Percocet?

ATTORNEY YU:  Objection.

THE COURT:  What Mr. Mitchell said isn't evidence, and I think the question can be answered by the witness.  So I'm going to overrule the objection.

A    Yeah.  She asked me if I had any Percocet and I told her I didn't have any.  That was it.  That was the only drug conversation that came up.

BY ATTORNEY MITCHELL:

Q    Am I correct that Percocet is a prescription opioid pain medication?

A    Yes.

Q    Isn't it true that Daphne Rollins accused you of cheating on her?

ATTORNEY YU:  Objection.

THE COURT:  Again, I'll overrule the objection.

A    Yes.

BY ATTORNEY MITCHELL:

Q    Am I correct that Daphne Rollins said that she was breaking up with you?

A    No.  It was the other way around.

Q    Am I correct that you pushed her onto the floor?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - CROSS - MITCHELL

A    Yes.  When I retrieved the bat from her, I said -- I pushed her down the floor and took the bat out of her hand.  That's the only time I pushed her down.

Q    Did you drag her up the stairs?

A    We never went upstairs.  Everything happened on the first floor in the front of the house.

Q    Did you throw her into a radiator?

A    No.

Q    Did you push her onto her back and shoulders?

A    When I retrieved the bat from her hand, yes.  I pushed her down on the ground.

Q    Isn't it true that you took Daphne Rollins' iPhone and threw it in the street?

A    Yes.

Q    Am I correct that the cell phone display was broken?

A    Yes, it was.

Q    Isn't it true that you smashed her car windshield with a baseball bat?

A    That's true.

Q    Am I correct that you took her iPhone so that she wouldn't be able to call for help?

A    No.

Q    Then am I correct you got in your car and left the scene?

SLOLEY - CROSS - MITCHELL

A    Yes.  I left eventually, yeah.

Q    Were you stopped near the Rip VanWinkle Bridge by a Greene County sheriff?

A    Yes.

Q    And am I correct the sheriff brought you back to Daphne Rollins' residence?

A    Yes.

Q    Isn't it true that you told the police that Daphne Rollins smashed her own windshield?

A    At first that's what I told them.

Q    So you lied to the police?

A    Yes.

Q    So you testified about a search that Eric VanBramer did at the police station of you.  Do you remember that?

A    Yes.

Q    Am I correct the search was done in a private room?

A    I don't know if it's a room -- I don't know if the room was private.  It was in the police station.  I don't know.

Q    Were any other troopers present in that room for the search?

A    Inside the room it was just me and Mr. VanBramer.

Q    Did anyone touch you while you were being searched in that room?

A    No.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - CROSS - MITCHELL

Q    Did anyone reach into your body cavity?

A    No.

Q    Did anyone put an object, such as a probe, into your body cavity?

A    No.

Q    Were you crying during the strip search?

A    No.

Q    How about the rest of the search?  Were you crying?

A    No.

Q    Were you shaking during the search?

A    A little bit.

Q    Were you having a panic attack?

A    No, I wouldn't say that.

Q    Mr. Sloley, could you look at -- in the binder -- Exhibit 21, D-21.

     Do you recall testifying at a deposition in this case?

A    Yes.

Q    Is that on May 18, 2015?

A    I think so.

Q    Did you testify under oath?

A    Yes.

Q    Did you swear to tell the truth in that deposition?

A    Yes.

Q    So if you look at page 72, lines 6 to 8.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

SLOLEY - CROSS - MITCHELL

Am I correct it says I asked a question "Were you shaking or having a panic attack or anything like that?"

"ANSWER:  No."

Did I read that correctly?

A    Page what?

Q    Page 72.

A    It says no.  But you mean a part that says -- were you in fear?  At the top?

Q    That's not responsive to my question.  Thank you.

Am I correct that you have been strip searched on other occasions?

A    Yes.

Q    Was it more than five times?

A    I -- I don't know.  I can't recall.

Q    Was it more than ten times?

A    I can't recall.

Q    If you could look at the deposition again, Exhibit 21 at page 22, starts at line 12.  So am I correct that the -- there was a question here:

"Before April of 2013, approximately how many times have you been strip searched?

"ANSWER:  I'm not sure.

"QUESTION:  Was it more than ten times?

"ANSWER:  Possibly.

"QUESTION:  Was it more than five times?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - CROSS - MITCHELL

"ANSWER:  Yes."

Did I read that correctly?

A    Yes.

Q    Am I correct in other strip searches that you have been subjected to, they involved taking off your clothes, squatting and opening your butt cheeks while the officer looked at you?

A    They tell you to squat and cough.  That's the standard procedure I have ever experienced.

Q    Now, when you were at the police station after you were taken away from Daphne Rollins' residence, did you overhear officers on the phone talking to the DA about your criminal history?

A    I don't know.  If I heard the officers talking to the District Attorney on the telephone?  Maybe I did.  I don't -- I don't -- we're talking about back in 2013?  I can't remember.

Q    After you left the police station, were you taken to Athens Town Court?

A    Yes.

Q    Am I correct that after that you went to Columbia County Jail?

A    No.  This happened in Greene County.  I went to Greene County Jail.

Q    Am I correct that Daphne Rollins obtained an order

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - CROSS - MITCHELL

of protection against you?

ATTORNEY YU:  Objection.

THE COURT:  Grounds?

ATTORNEY YU:  This is 403, that it's not -- sorry.  401, that it's not relevant and 403, that it's substantially more prejudicial than it is probative.

THE COURT:  Mr. Mitchell, do you want to be heard?

ATTORNEY MITCHELL:  Your Honor, these are part of the circumstances, and this is a potential witness who might be testifying.  So I think this is appropriate question to ask him.

THE COURT:  I will allow it.

BY ATTORNEY MITCHELL:

Q    Am I correct that Daphne Rollins obtained an order of protection against you?

A    You're not correct.  Because after the incident, I spoke to Daphne about this on numerous occasions, and she told me that standard procedure is that the judge has to put an order of protection automatically, whether she wants to or not.  This is what Daphne told me after she -- before she went and got the order of protection dropped.

BY ATTORNEY MITCHELL:

Q    So if you could look at your deposition transcript,

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - CROSS - MITCHELL

Exhibit 21, page 83.  I'll start at line 7.

THE COURT:  Mr. Mitchell, before you read from 83, are you -- are you impeaching or are you refreshing recollection?

ATTORNEY MITCHELL:  This is a prior inconsistent statement.

THE COURT:  All right.  Proceed.

BY ATTORNEY MITCHELL:

Q   So this is page 83, starting on line 7.  I'll skip the first sentence there.  This was your answer.  Quote -- all right.  I'll just -- I think the -- well, I'll say I think the order of protection was put on.  I'll skip the rest of that part, okay?  Right?  And then --

"QUESTION:  Was that to protect Daphne Rollins?

"ANSWER:  Yes.

A   Why would you skip the -- skip a certain part?  That's very important.

THE COURT:  Hold on.

A   Very prejudicial.

THE COURT:  Mr. Sloley, you don't ask the questions, okay?  Just answer them.  And there's legal reasons why counsel is doing that.  So just answer the questions that are put to you, and your counsel will be able to redirect you if they so choose.  But at this

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - CROSS - MITCHELL

point, please answer Mr. Mitchell's questions.

So, Mr. Mitchell, your question was -- can you ask the question.

Thank you, Mr. Sloley.

BY ATTORNEY MITCHELL:

Q    I said did I read that correctly?

A    Yes.  You have -- you have to ask me again.

Q    Okay.  So starting on that line 7 again, skipping the first sentence, and you said, "I think the order of protection was actually put on."  I'm not going to read the rest of that for certain reasons and --

"QUESTION:  And was that to protect Daphne Rollins?

"ANSWER:  Yes."

A    Yes.

Q    At some point did you receive your mother's car back?

A    Yes.

Q    And when you obtained it again, were there muddy footprints from a dog inside the car?

A    All over the front seats and backseats was covered in muddy paw prints.

ATTORNEY MITCHELL:  I have no further questions.

THE COURT:  All right.  Thank you, Mr. Mitchell.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY - REDIRECT - YU

Any redirect?

ATTORNEY YU:  Yes, Your Honor.

THE COURT:  When you're ready.

REDIRECT EXAMINATION

BY ATTORNEY YU:

Q    Mr. Sloley, do you remember Mr. Mitchell asking you questions about other times you've been searched?

A    Yes.

Q    Do you remember agreeing with him that there's been other times that you were actually strip searched?

A    Yes.

Q    Can you explain how this was different or not from those situations.

A    Those situations I wasn't told to bend over and spread my cheeks open.  The furthest it went was the clothing exchange or squat and cough.

Q    Is this the only time that someone has searched you in this manner as -- as Defendant VanBramer did?

A    Yes, it is.

ATTORNEY YU:  I have no further questions.  I just ask that -- to take a short break.

THE COURT:  Let me just see if there's recross.

ATTORNEY MITCHELL:  No recross, Your Honor.

THE COURT:  All right.  So, we can take a

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

ten-minute break, ladies and gentlemen.  Is that okay with you?  All right.

So let's take a ten-minute break.  We'll be back in court at 3:27.  And thank you.  Thank you for listening attentively.  Don't discuss the case amongst yourselves or while you're out there.  All right.

(Jurors excused, 3:18 p.m.)

THE COURT:  Anything before I leave for a few minutes?

ATTORNEY GREEN:  No.

THE COURT:  Thank you, all.

(Following recess.)

THE COURT:  Are we ready to bring the jury back in?

ATTORNEY GREEN:  Before we jump back in, I just -- we have received a subpoena on the state police, I forget the exact name of the agency, for certain disciplinary records it was due this morning.  They have not appeared and they have not produced.  I think at some point we should enter an order to enforce of some sort.  Otherwise, I don't know how we address it but, you know, there is something that is effectively an order -- well, actually you "so ordered" it.

It wasn't even an attorney's subpoena.  You ordered it, they did not comply.  So I don't know how we

want to handle that but I think I -- if it -- if you're willing to do it, I will make an oral motion to enforce, happy to put something on the docket this evening.

THE COURT:  Yeah, we can -- we can do it I think at the close of this session today, just -- I'll give you overnight to submit a motion, brief motion and I'll let the -- Mr. Mitchell respond and we'll look into it.

ATTORNEY GREEN:  I just -- if they are not complying with the court order, I want them to -- here as soon as possible, that we need it by 9 a.m. tomorrow.

THE COURT:  All right.  Well, they are -- you served the state police?

ATTORNEY GREEN:  Yes.

THE COURT:  They are aware of it, so I won't have a problem requiring them to be here first thing in the morning if we do that --

ATTORNEY GREEN:  Okay.

THE COURT:  -- at 5:00.

ATTORNEY GREEN:  Thank you, Your Honor.

THE COURT:  All right.

ATTORNEY MITCHELL:  I just -- I have not seen any proof of service.  Nothing was provided to me.

ATTORNEY GREEN:  It's on the docket.

ATTORNEY MITCHELL:  Well, I think that the

state police have to actually be served. I don't accept service on their behalf because I don't represent the commissioner.

ATTORNEY GREEN: The proof of service is on the docket.

ATTORNEY MITCHELL: Okay.

THE COURT: All right. So, like I said, we'll address it. I don't want to keep the jury waiting. So we'll --

ATTORNEY GREEN: No --

THE COURT: -- at the close of the day, maybe we will finish up, depending on where it breaks at -- a few minutes early. All right? All right.

Ready, Tara?

(Jurors present, 3:30 p.m.)

THE COURT: Everyone, be seated, thank you.

Are we ready with our next witness, Attorney Green? Attorney Yu?

ATTORNEY YU: Me again. Yes. At this time, we call Eric VanBramer to the stand.

THE COURT: All right.

Mr. VanBramer, would you approach to be sworn in.

THE WITNESS: Sure, Your Honor.

COURT CLERK: Please raise your right hand.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

E R I C   V A N B R A M E R ,  having been duly sworn, was examined and testified as follows:

THE COURT:  All right, Ms. Yu.  When you're ready.

DIRECT EXAMINATION

BY ATTORNEY YU:

Q    Good afternoon.  Is your current title trooper or how should I --

A    Trooper.

Q    Okay.  All right.  So, Trooper VanBramer, you currently work for the New York State Police, right?

A    Yes.

Q    And back in April of 2013, you were also working for the New York State Police?

A    Yes.

Q    You were a -- you were also a New York State trooper at that time?

A    Yes.

Q    You were part of the K9 unit?

A    Correct.

Q    So, you were assigned a K9 as a partner, right?

A    Yes.

Q    And so your K9 was a German shepherd?

A    Yes.

Q    You were on duty on April 1st, 2013, in the early

E. VANBRAMER - DIRECT - YU

morning hours, right?

A    Yes.

Q    I want to ask you some questions about your training.  As a police officer, one of your responsibilities is to enforce the law, right?

A    Yes.

Q    You're also responsible for something like managing public safety?

A    Yes.

Q    As a police officer, part of the job is knowing what the law says, right?

A    Yes.

Q    And one of the reasons it's important is because there are limitations on what police can do, right?

A    Absolutely.

Q    You said "absolutely."  So I take it you think this is very serious and important?

A    It is very serious and important, yes.

Q    And part of your job is balancing, you know, your goal of maintaining law and order against individual people's privacy rights, right?

         ATTORNEY MITCHELL:  Objection to the relevance.

         THE COURT:  Overruled.

A    Yes.

E. VANBRAMER - DIRECT - YU

BY ATTORNEY YU:

Q    This balance, understanding the balance is something that is part of your training, right?

A    Yeah, also part of your moral obligation.

Q    Your training, would you agree that it emphasizes minimizing an unnecessary intrusion on a private person?

A    Yes.

Q    You have received training on how to do different kind of searches, right?

A    Yes.

Q    Can you tell me if you know whether there are different kinds of strip searches?

A    There's one strip search.

Q    Is it your testimony that having somebody get fully naked and that's it, is the same thing as having somebody get fully naked and bend over and have to spread their butt cheeks?

ATTORNEY MITCHELL:  Objection.  Misstates the testimony.

THE COURT:  I will allow it.  Answer the question.

A    As long as I am viewing the exterior of the skin and looking -- not looking inside of the individual, that is a strip search.

BY ATTORNEY YU:

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

Q    So do you know what a visual body cavity search is?

A    Yes.

Q    Is that a type of strip search?

A    No.

Q    Can you explain?

A    So a visual body cavity search is when somebody would instruct somebody to physically open up their anus so you can see -- again, I apologize for being so descriptive, but -- so you can actually see inside of the person.

Q    So you can see inside of their anal cavity?

A    Yes.

Q    So you disagree that having somebody bend over and use their hands to spread open their butt cheeks is not a visual body cavity search?

A    Well, are you asking me what I did that night?

Q    I'm asking in general.

A    So, again, a strip search is when you view the exterior of the skin.  As well aware, there comes a time where you may be bending over and there's still contact of the exterior of your butt cheeks where you just can't physically see inside.  So if you're telling the person to spread their butt cheeks so you can see the -- all the exterior of the skin without viewing inside them, that is a strip search.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

Q   So, using your description of what a visual body cavity strip search is, which is having -- if I'm understanding correctly -- having the person spread open their cheeks wide enough so you can see inside their anal cavity.  Is that what you're saying?

A   That is a visual body cavity search.

Q   And so would you agree that you did not have probable cause to do a visual body cavity search as you're describing it on Mr. Sloley that night?

ATTORNEY MITCHELL:  Objection.  That's argumentative and that is also not the legal standard, probable cause.

THE COURT:  I will sustain the objection.

BY ATTORNEY YU:

Q   Have you ever done a strip search on somebody where you didn't have them bend over?

A   No.

Q   Every single time you have done a search of somebody you have them bend over and expose their anus to you in the way that you did here?

A   Let me correct myself.  So, if there comes a point where you -- again, you do have that person bend over and you are able to see all the exterior of the skin, then that would not require asking them to spread their butt cheeks so you can view it.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

Q    What are the procedures you follow when you're conducting a strip search?

A    You're asking me how I go through the entire process?

Q    Yes.

A    When I conduct a strip search, I advise the suspect why the search is being performed.  I'll bring them into a private setting where nobody has access to or nobody has view of what is being done.  Have that individual stand with their hands against the wall, not facing me. I'll instruct them not to do anything until they're being told to do so.  At which point, I will have them remove an article of clothing, I will have them pass it back, I'll check that article of clothing, until there is no more articles of clothing to check.

Q    And so what happens if you don't find any kind of contraband if you're doing a search and get to this point?

A    Once I have checked all clothes, I have checked all the exterior of the suspect's skin, I advise them to get dressed.

Q    So when someone is -- so say when someone is arrested, when you arrest somebody, do you automatically have a right to search them regardless of the circumstances of the arrest?

E. VANBRAMER - DIRECT - YU

A    I have the right to search them for weapons, contraband in their -- in their immediate area, for my safety.

Q    And what is, like, the first level of a search you do?  Is that a pat down or something else?

A    Yeah, you're doing --

ATTORNEY MITCHELL:  Objection to the relevance.

THE COURT:  Overruled.

A    Yeah, you're essential doing a pat down.

BY ATTORNEY YU:

Q    And so, at what point do you move on further to do a next type of search?

A    What are you referring to, the next type of search?  Can you please be more specific?

Q    So, maybe looking inside their pockets.  How about that?  What would -- what would be required for you to, you know, instead of a pat down outside the clothes to -- to reach into someone's pockets?

ATTORNEY MITCHELL:  Objection, Your Honor.  It's not relevant to our case.

THE COURT:  Just -- not too many more questions on other search type.  So why don't we move forward.  I'll overrule the objection on this question and allow you to answer, sir.  But let's move forward on

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

that.

BY ATTORNEY YU:

Q    Yeah.  So at what point do you, you know, take the next step from a pat down to checking someone's pockets?

A    So the state police mandates us in our rules and regulations that anybody under arrest has to be searched for weapons and includes in their pockets, any areas they might be able to conceal a weapon.

Q    So if you get this far and don't find anything, when did you strip search?

A    When you have reasonable suspicion.

Q    What would that look like?

        ATTORNEY MITCHELL:  Objection.  I think that's too general, Your Honor.

        THE COURT:  I think you should ask not for legal conclusions as to what probable cause is to do a strip search but just ask him what he did or what his training says he should do, et cetera.

        ATTORNEY YU:  Sure.

        THE COURT:  I will sustain the objection.

        ATTORNEY YU:  Understood.

BY ATTORNEY YU:

Q    So with respect to the procedures you learned in your training, what types of things would you need to have in order to do a strip search?

E. VANBRAMER - DIRECT - YU

A     The things you would need is nature of the crime, the circumstances regarding the arrest, and the scope of the intrusion.

Q     Can you say more about the scope of the intrusion? What do you mean by that?

A     The type of search that you are going to be conducting.

Q     So you would agree that different types of searches would have varying levels of intrusiveness?

A     Yeah.  I think we already discussed those.

Q     So you would -- the answer is yes, right?

A     Different levels of intrusion.

Q     You are going to do a visual body cavity search, would you agree that that would require, based on what you learned in your training as a state trooper, that that would require more suspicion than a regular strip search would?

        ATTORNEY MITCHELL:  Objection.  I think that's vague.

        THE COURT:  Overruled.  If you understand the question, you can answer it, sir.

A     Our rules and regulations of the state police advise that you need reasonable suspicion for both a strip search and a visual body cavity search.

Q     So I think you said you can't perform a visual body

E. VANBRAMER - DIRECT - YU

camera search based on a hunch?

A    Correct.

Q    You can't perform a visual body cavity search based on speculation that you might find something?

A    You need reasonable suspicion.

Q    Reasonable suspicion of what?

A    So based on the strip search that I conducted, again, I was talking about nature of the crime.  Suspect was arrested for drug possession.  The circumstances regarding the arrest, we responded to a -- a violent physical domestic where the suspect had fled.

ATTORNEY YU:  Objection, Your Honor.

THE COURT:  I'm going to overrule.  You did ask the question.

A    The suspect was fleeing from the police prior to our arrival, which led us to believe that he was trying to flee possibly because he possessed something.  We had the victim's statement that she said that the suspect was in possession --

ATTORNEY YU:  Objection, Your Honor.  Can we come to sidebar?

THE COURT:  It's become a little bit narrative.  Why don't we hold the answer there.  Ask your next question.  We can move forward.

ATTORNEY YU:  Okay.  I want to move to strike

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

the part of the testimony about him -- about fleeing from a crime, the -- being arrested for having a drug possession.

ATTORNEY MITCHELL:  Your Honor, you overruled the objection, so I think that came in appropriately. They asked the question.

ATTORNEY GREEN:  Can we approach?

THE COURT:  Yes, give us a few minutes, ladies and gentlemen.

(Discussion held at sidebar.)

THE COURT:  Go ahead.

ATTORNEY YU:  Yes, just -- I was moving to strike because the answer was non-responsive, went beyond the scope of what I was asking.

THE COURT:  You want to strike particularly the -- that he was responding to a violent crime incident and then --

ATTORNEY GREEN:  Any of that, Your Honor.  The question was, what does he need reasonable suspicion of to do a body cavity search.  It wasn't about this case, it was about his training and his --

THE COURT:  I think the question was a little more vague than that and the answer involved what he considers reasonable suspicion to be and one of those was the nature of the crime for which he was called to

E. VANBRAMER - DIRECT - YU

respond to.  I think that's what the testimony was.

ATTORNEY GREEN:  I would ask for a readback on the question.

THE COURT:  But I don't think that's the question was.  Do we have the question?  Based on the first strip search, I was talking about the nature of the crime, suspect was arrested for drug possession, circumstances of the arrest, regarding the offenses, physical domestic, and suspect fled.

ATTORNEY GREEN:  Answer is -- includes things that were excluded by in limine rulings.  The question was not -- the question was not what did you suspect in this case?  The question was, right? -- in the context it was -- you can't perform visual body cavity based on speculation, right?  Yes.  So, what do you need reasonable suspicion of?

This was a general question.  Not a question about the individual factual circumstances.  We would be much narrower we wouldn't ask an open-ended question about the facts sirs of this case in this way.  Right?  The -- this is -- the answer went way beyond what the question was and -- was both completely non-responsive and violated the in limine rulings.

THE COURT:  Do you want me to --

ATTORNEY MITCHELL:  I just think that -- you

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

no I thought Your Honor directed them to start getting into the incident and he -- I think reasonably interpreted that he was supposed to go through the facts and he was talking about the search, which I thought was what the case was about.  And then Your Honor did eventually tell him to stop the narrative and move on.  But I think the rest of that answer was appropriate and should stay.

THE COURT:  Do you want me to say you are not to consider -- and then the specific answer?  I mean, bring attention to it again?

ATTORNEY GREEN:  I think we will be -- you should say is keep -- you know, he did not answer the question, I might ask you to disregard the question and, you know, disregard what he said because it -- it went -- it included things I have ordered him not to speak about.

THE COURT:  I'm going to overrule the request to strike that portion of the answer from the language.  I think the question was vague.  I don't think the witness intentionally violated the limine order and the question was asked and by the Court's -- in my opinion, the question was answered in a way that that was appropriate.

So I'm going to overrule the objection.  I

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

won't allow him to ask any more questions.  No more questions about what he thinks probable cause is or reasonable suspicion is.  I mean, I think you're asking him some legal conclusions, not facts.  So it's kind of getting into a dangerous area.

ATTORNEY YU:  I -- I -- I understand what you're saying, Your Honor.  I do think, however, that I'm trying to ask the question in a way that helps the jury understand what he understands or his training he learned in his training as part of it.

THE COURT:  But whether he thinks what he did is a visual body cavity search or not I don't think is relevant.  I'm going to instruct the jury on what the law is and what he's required to -- what -- what is a visual body cavity search potentially, if that's an issue that I have to instruct them on, and then what reasonable suspicion is required to get there.  I mean, if you give what he did, then that's where he should go.

What -- are you trying to say that he -- that he -- he's going to -- are you trying to admit that he didn't have reasonable suspicion to do a visual body cavity?

ATTORNEY YU:  I'm trying to understand what he thinks he -- was needed to happen, found, no, what his training is on this.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

THE COURT:  So you can ask him what is training is but, I mean --

ATTORNEY YU:  I did, but it was just -- it wasn't really, -I tried a different way and --

THE COURT:  You can follow up with additional questions but, again, if you ask him what constitutes reasonable suspicion to you, he's going to be answering the nature of the -- the crime, okay?  All right.  So I'm not striking anything from the answer.

ATTORNEY MITCHELL:  Your Honor --

THE COURT:  Move forward.

ATTORNEY MITCHELL:  In general, I think these questions are -- are intruding on the Court's role of instructing the jury.  I think it's more like he should testify about the facts and then Your Honor will tell them what the law is.

THE COURT:  I think in his training, as counsel has kind of pivoted to, after I did a speaking of an objection, it's kind of pivoted to what I think is relevant.  I do agree it's not relevant to ask this witness what the law is.  So --

ATTORNEY YU:  We're really not what I'm trying to do.

THE COURT:  I know, but that's what it sounds like so -- I know you know what not to do.  That's fine.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

ATTORNEY YU:  I asked him his training and I wanted to do a different way.

THE COURT:  That's -- let's just move forward. All right.  Thank you.

(Held in open court.)

THE COURT:  All right.  Please proceed.

ATTORNEY YU:  Okay.

BY ATTORNEY YU:

Q    Okay.  Just going to direct your attention now to the morning of April 1st, 2013, okay?

That morning, somewhere around -- maybe, I guess somewhere, you know, after midnight but before 5 a.m. you got a phone call from your brother, right?

A    Yes.

Q    Your brother is Bryan VanBramer, right?

A    Yes.

Q    And Bryan VanBramer at the time was also a New York State trooper, right?

A    Yes.

Q    He still a New York State trooper?

A    He's still employed with the state.  He's an investigator.

Q    Got it.  Your brother asked you to respond to the scene, right?

A    I was already heading in that direction.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

Q    But because of his phone call, you went to the scene?

A    Yes.

ATTORNEY MITCHELL:  Object to the scene. You're not being specific enough.

THE COURT:  Overruled.

BY ATTORNEY YU:

Q    You had your K9 partner with you, right?

A    Yes.

Q    So when you got to -- where exactly did you drive to when -- after your brother called you?

A    So where the suspect was taken into custody.

Q    So when you got there -- and this was on the side of the road, right?

A    Yes.

Q    Near the Rip VanWinkle Bridge?

A    Yes.

Q    When you got there, you saw a car, right?

A    Yes.

Q    It wasn't a police car, it was a regular -- sedan, I guess, right?

A    Yes.

Q    So you brought your K9 partner over closer to the car, right?

A    At a given point I did.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

Q    Sorry.  I didn't catch that.

A    At some point I did.

Q    And at some point you learned that that car belonged to Max Sloley's mom?

A    I don't believe I did, no.

Q    So when you brought your K9 closer to the car, you had her do an open-air sniff, right?

A    Yes.

Q    And an open-air sniff is when the dog smells around the car, right?  Or walks around and sniffs?

A    Yes.  We have to give specific instructions on what they're searching for.

Q    Okay.  What -- you give the specific instructions?

A    Yes.

Q    Okay.  How do you do that?

A    I tell them to search for drugs.

Q    You tell the -- the dog to search for drugs?

A    Yes.

Q    Verbally?

A    Yes.

Q    So your dog did the search right as you instructed?

A    Yes.

Q    And you would say that she alerted, right?

A    She did alert.

Q    Okay.  And an alert would signal to you that she

E. VANBRAMER - DIRECT - YU

had found something?

A     That she was in the odor of narcotics.

Q     Okay.  So if she alerts that she smells an odor, you would call that a positive alert, right?

A     Yes.

Q     She alerted at this time, you say, to the front hood and the sides of the car?

A     Yes.  She had a positive K9 alert on the driver side, passenger side, and in the area of the hood of the exterior of the vehicle.

Q     And your K9 had multiple different ways that she would alert, right?

A     Yes.

Q     One of those ways could be barking?

A     Yes.

Q     Another way could be scratching at, you know, the area where she smells something?

A     No, that would be a final response of sourcing.

Q     Okay.  What other types of alerts would she give if she smelled something?

A     The K9 is going to give you a change of behavior, and that's when you know as a handler that your dog is coming into odor and to really start paying attention.

Q     So specifically, what did you observe about her change of behavior here in this instance?

E. VANBRAMER - DIRECT - YU

A     So unfortunately, that night was such a long time ago, I just documented that she had a positive K9 alert. I have done thousands of searches since then.  I can't specifically recall the way Ryder alerted that night, whether or not -- what type of change of behavior she produced.  I just put in my notes that she did have a positive K9 alert.

Q     Okay.  So you let her go inside the car?

A     Yes.

Q     And she alerted to the center console of the car, right?

A     I believe I put -- she was in an odor in the area of the center console of the vehicle.

Q     And you can't remember what the alert looked like here either, right?

A     No.

Q     When she alerted, you actually pulled her back right away, right?

A     I don't recall if it was right away.

Q     Well, weren't you scared that she was going to eat whatever it was that she found?

A     There came a point where I did observe cocaine or a -- a white chunky substance on the seat, which I suspected to be narcotics.  If your dog ingests these drugs, we have had dogs that have -- some of have passed

E. VANBRAMER - DIRECT - YU

away, others became extremely ill.  So as soon as I saw the drugs that were out in the open, I pulled my -- my dog out of the vehicle.

Q    As part of your training with Ryder, don't you train Ryder not to eat narcotics if she finds them?

A     Absolutely not.  It -- we're talking about a dog. The dog is going to do whatever they do.  Dogs -- you can't tell a dog not to eat something.  Most dogs are curious in nature and tend to actually put things in their mouth.

Q    Okay.  So she's not trained on not eating narcotics if she finds them, right?

A     We do not train our dog to have a final response by putting them in their mouth.

Q    Okay.  After Ryder gave what appeared to be a positive alert, you pulled her out, right?

A     Yes.

Q    Of the car?  And then you looked inside the car yourself?

A     Yes.  Well, prior to -- prior to -- when you're searching with the K9 -- I've searched numerous cars. You know, I was one of the K9 handlers in the area.  So if somebody had a vehicle pulled over, it was a drug arrest, they would often call a K9 because it's a little bit easier.  It's a little bit quicker to conduct some

E. VANBRAMER - DIRECT - YU

of these searches.  And some of these vehicles, they're not the cleanest of the vehicles.

ATTORNEY YU:  Your Honor --

A    Hypodermic needles --

ATTORNEY YU:  -- Objection.

THE COURT:  Hold on.  What's the objection?

ATTORNEY YU:  Non-responsive.  Question was just --

THE COURT:  What was the question?

ATTORNEY YU:  You looked and saw something on the driver's seat?

THE COURT:  Do you have an answer to that question?

THE WITNESS:  Yes.

THE COURT:  Move forward.

BY ATTORNEY YU:

Q    All right.  So you looked and you saw something in the driver's seat, right?

A    Yes.

Q    And this substance, you said what you would say looked like a white chunky substance?

A    Yes.

Q    Was it a -- like, one big chunk or multiple small chunks?  Can you tell me more?

A    It was one small one.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

Q    Okay.  You hadn't seen it before Ryder alerted to you, right?

A    Correct.

Q    It was in the crease of the driver's seat?

A    I believe that's what I put in my notes, yes.

Q    Do you recall what color the -- the seats in the car were?

A    No.

Q    And you said you noticed the substance in the driver's seat, right?  But Ryder didn't alert in the driver seat, did she?

A    I told you she was in odor in the area of the center console.  So she just hadn't made her way to that -- that area yet.

Q    Okay.  But she didn't specifically, you know, alert on the substance on the driver's seat?

A    No.  That night, the only thing my K9 did was give me a change of behavior.  Just an alert.  She never gave me a final response, which would be sourcing the actual narcotics.  So when a dog gives a final response, you're going to -- they're going to paw, they're going to bite, they're going to bark at a specific location, and they're telling the handler, hey, look here because I have kind of narrowed that scent down and, you know, I think you should check here as opposed to just being an

E. VANBRAMER - DIRECT - YU

odor and trying to work it out.

Q    The substance that you saw in the driver's seat, you said it was small, right?

A    Yes.

Q    To you, it looked like less than a gram's worth based on, I guess, your experience as a state trooper?

A    Yes.

Q    It looked like less than half a gram's worth, right?

A    I would say less than a gram, yes.  So I would say probably about a half gram, maybe less, yeah.

Q    So before you brought Ryder to do the open-air sniff, did you look inside the car yourself?

A    I don't recall if I did that night.

Q    So maybe, maybe not?

A    Maybe, maybe not.  Correct.  I can't recall.

Q    Apart from finding, you know, this -- this -- the substance on driver's seat, did you notice anything else unusual about the car?

A    Not that I remember.

Q    You didn't take a picture of the inside of the car, right?

A    No.

Q    You didn't take a picture of whatever the substance was that you found?

E. VANBRAMER - DIRECT - YU

A    No.

Q    Why not?

A    It's not common practice.  In my thousand drug arrests, I have never taken a picture of the inside of the vehicle.  I take detailed notes so I can go back and explain what I saw, what I found.

Q    So once you saw the substance, you decided to run a test on it, right?

A    Yes.

Q    You wanted to basically know if you could figure out what it was?

A    Yes.

Q    You had what I guess you would call a field test kit with you?

A    Yes.

Q    A field test kit is a test that can -- it can test for the presence of narcotics?

A    Yes.

Q    It's like a rapid test though as -- in comparison to sending it to a lab that would take longer?

A    Yes, sir.

Q    How quickly does this test give you a result?

A    Very quickly.  That's why we use it in the field.

Q    A few seconds?  Minute?

A    I would say within under a minute you have a -- a

E. VANBRAMER - DIRECT - YU

result.

Q    You don't know the accuracy of these kind of field tests, right?

A    I do believe it's pretty accurate.

Q    You can't tell me how, like, the percentage or anything like that, right?

A    Unfortunately, not.

Q    And a more accurate read would be to send the substance to a lab for testing, right?

A    Yes.

Q    And that's something you've done in other situations?

A    Really depends on the situation itself.

Q    But the answer is yes, that other situations where you have found what you, you know, would suspect to be drugs, you have sent the test results to a lab?

A    At the request of another person.  Like me, personally, I'm not sending drugs to the lab.  If a district attorney -- you have an arrest, the district attorney advised you that they want a sample that those drugs can go to the lab, at that point you will send them.  It's never my responsibility as a trooper who makes an arrest to determine if those drugs are going to go to the lab or not.

Q    And here they didn't?

E. VANBRAMER - DIRECT - YU

A    They did not.

Q    So, you picked up the substance from the seat, right, with your hands?

A    Yes.

Q    And you put the entire amount into the test kit?

A    Correct.

Q    Do you always put half gram's worth of a substance that you find into a test kit to test it?

A    The substance I found that night was a pretty ample size in relation to what you're supposed to put into the test kit.  So once doing the search, I located this before I conducted any other searches.  I saw the suspected narcotic and decided to use that and place it into the test kit to sample that.

Q    My question was, do you always put -- like, when you find a half gram of a drug, do you always put that whole amount into the test kit?

A    In this case, it was the right amount to sample with, so I did use it.

Q    But I'm asking about in other situations where you have used a field test kit and you find this amount of drugs.  Do you put that amount into the -- into the test kit to be tested?

A    So if you're asking me if you find a pound of cocaine, are you putting a pound of cocaine into test

E. VANBRAMER - DIRECT - YU

kit?  No, you're putting about the size that I did that night.  Usually pretty standard.  That's why I did issue or put into the -- to the test kit that size sample because it meet the criteria.

Q    In a situation where you maybe found less than half a gram and you put it in the test kit, would that be enough for the test kit to read the -- to read the results?

A    So I think for the test -- I don't know.  I -- I just know from training and experience that whenever I conduct a test, I usually use a sample around the size that I used that night.

Q    And when you've used smaller samples in the past, have you gotten positive results?

A    Yeah.

Q    Okay.  So you did the test, right?

A    Yes.

Q    And the results, you would say they came back positive, right?

A    Yeah, they came back positive for cocaine.

Q    Okay.  And you said you can't speak to the accuracy of this, right?

A    Again, they're pretty accurate.

Q    But you can't specifically speak to that?

ATTORNEY MITCHELL:  Objection.  That's been

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY v VANBRAMER - 14-cv-339

101

E. VANBRAMER - DIRECT - YU

answered.

THE COURT:  Yes.  Let's move on.  Sustained.

BY ATTORNEY YU:

Q   So after you ran this test kit, you continued to search, I guess, the rest of the car, right?

A   I'm sure I did.  It was such a long time ago, I don't know what kind of -- what order I conducted but, yeah, I would assume that I did at some point do a further search, yes.

Q   Okay.  But you didn't find anything anywhere else?

A   No.

Q   So at some point you left the scene on the side of the road, right?

A   Yes.

Q   And did you go right to the police barracks from there?

A   I believe I did, yes.

Q   Did Ryder come with you?

A   Yes.

Q   Does Ryder always come with you when you go into the station?

A   No.

Q   When would she not?

A   When there's a defendant in the station.

Q   When there's a defendant anywhere in the police

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

station, Ryder can't come in?

A    That's correct.

Q    Where do you put her?

A    There's a kennel in my patrol vehicle.

Q    So she stays in the car while you go inside?

A    Correct.

Q    Did you say you don't recall whether you brought her in with you or you didn't?

A    Whenever there is -- I know there's a subject under arrest at our station, I will strictly avoid bringing my dog in.  There's been instances in other troops or other handlers who have brought their dogs into a situation while there's somebody in there and their dog unfortunately bit that person and they got kicked off the unit.  So I would never put myself in a situation where -- bringing my dog into a station where there's a defendant, I'll put my dog in that situation.  So, no, I would never bring my dog in knowing there is a defendant there.

Q    Do you specifically not remember not bringing her that night?  Are you saying generally, you know, you -- you think you didn't because that's your normal practice?

A    It's a rule that I have.  So, I knew Mr. Sloley was at the station.  She would not come into the station.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

Q    So when you went into the station, you encountered Mr. Sloley, right?

A    Yes.

Q    He was -- you were there to -- to meet with him, right?

A    No.

Q    Why were you there?

A    I had nothing else to do.  It was kind of getting towards the end of my shift.  It's off -- it wasn't my arrest; it was Trooper Bryan VanBramer's arrest.  I did have evidence that I needed to turn over to Trooper VanBramer, so I patrolled back to the station so I could give him that evidence and see if there's anything else that he needed assistance with.

Q    Got it.  So you didn't go thinking that you were going to search Mr. Sloley?

A    No.

Q    No one told you to search Mr. Sloley?

A    I mean, for all I know, he could have already been searched at that point.

Q    Okay.  Do you remember what he was wearing?

A    I don't.

Q    Do you remember where he was in the -- in the precinct or the barracks when you got in there?

A    Yes.  So, as you enter my station, there's a large

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

vestibule area.  Once you go through these set of doors, there's a long hallway with some bathrooms.  At the end of that hall, there's a T intersection with another long hallway then a hallway along hallway to the left, where our communications is.

And then past the communications area is our patrol room.  That's where Mr. Sloley was seated, in that patrol room.  Down two hallways, out in the back, handcuffed to a bench.

Q    Was he alone, do you remember?

A    There was other troopers that were -- maybe had an arrest.  We had a lot of paperwork.  There was a domestic.  There was a lot of moving parts, things like that.  It required a lot of paperwork.  So everybody was kind of chipping in, helping out.

Q    Got it.  Did you have to do any paperwork?

A    I believe I helped with the General 2, which is a New York State Police Evidence Form, and I completed a K9 search as part of my reports.

Q    So, when you encountered Mr. Sloley, did you have a conversation?

A    I don't recall saying anything to him.

Q    Okay.  But would you have had to speak to him in order to get him to go into another room to do a search?

A    Yeah.  If -- at the point where I decided I was the

E. VANBRAMER - DIRECT - YU

one who was going to be doing the search, I would have spoken to him.  Yes.

Q    How did it come to be that you were doing the search?

A    I mean, like I said, we all kind of try to chip in. It was getting toward the end of our shift.  It was a long night, so we were trying to wrap up as much paperwork and process evidence, process Mr. Sloley, search him, do the domestic incident report.  So it's very common that we all kind of take a -- we all help out.  And this instance that night, it was me who conducted the search.

Q    Right.  But how did it come to you that you specifically were the one who did the search?  Did you volunteer?  Did someone tell you to do it?

A    I don't know if Trooper Bryan VanBramer asked me to or if I told him, hey, let me help you out.  I -- I don't.

Q    Based on your training, when you are going to do a strip search, can a trooper decide to do it on their own, or do they need some other authority to do the strip search, like a supervisor?

A    No.  At that point, you -- as long as you had that reasonable suspicion, you're allowed to complete the search.

SLOLEY v VANBRAMER - 14-cv-339

106

E. VANBRAMER - DIRECT - YU

Q    Do you recall anything unusual about Mr. Sloley's appearance when you saw him or spoke to him?

A    No.

Q    Nothing that made you think he was intoxicated?

A    No.

Q    You didn't have him do a drug test, right?

A    No.

Q    So you said that everyone was sort of pitching in at the station, right?

A    Yes.

Q    And you said that there is a bunch of paperwork that people complete, right?

A    There's a bunch of paperwork that needs to be completed.

Q    Sure.  Based on your experience, would any of paperwork have indicated whether Mr. Sloley had already undergone a search with respect to this arrest?

A    Well, I'm assuming that night that he has or he hadn't, that's why I was conducting the search.

Q    But would there have been any paperwork that would specifically indicate whether he had been searched or not at that point?

A    At the point I walked into the station from returning from the vehicle search?

Q    Yeah.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

A    No.  We don't keep, like, a -- a log of -- if he's been searched or not.

Q    So when someone's arrested, you don't keep a log or any -- you don't keep track of whether they have been searched?

A    Yes.  We keep track of if they have been searched, yes.

Q    That's what I'm trying to ask about.  Was there something that you could have looked at to see whether or not he had already been searched before you searched him?

A    I didn't need to look at anything.

        MR. MITCHELL:  Objection, Your Honor.  I don't think this is relevant.

        THE COURT:  I'm going to allow it, but let's -- let's try to keep going.

BY ATTORNEY YU:

Q    Would there have been anything you could have looked at to know if he had been searched before you did yours?

A    There would be no reason to.  The arresting officer was in the room where I was at.

Q    I just want to know if, like, this document exists, like, would it exist?

A    We don't have a search document, no.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY v VANBRAMER - 14-cv-339

108

E. VANBRAMER - DIRECT - YU

Q    Okay.  And you didn't ask Mr. Sloley if he had already been searched, right?

A    I don't remember asking him that, no.

Q    All right.  So at some point you decided he would be searched, right?

A    Yes.

Q    And you, I guess -- you decided you would be the one to search him?

A    I -- I don't recall if it was Trooper VanBramer asking me if I wouldn't mind helping him out and doing a strip search or if I said, Trooper VanBramer, let me help you out, I'll conduct a search.

Q    So you took him from the bench where he was handcuffed, right?

A    Yes.

Q    Brought him into, like, a different room?

A    Correct.

Q    And in this room, it was just the two of you?

A    Yes.

Q    You gave him instructions, right?

A    Yes.

Q    The instructions were to remove all of his articles of clothing one by one, right?

A    Yes.

Q    And then shake them out and hand them to you or was

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

there something else?

A     No, I don't instruct them to shake them out.  I just instruct them to hand me the article of clothing so I can search it.

Q     When you're searching, you are just kind of feeling around it and looking, right?

A     Yes.  I'm not holding it right in front of my face, but I'm looking for both product.  I'm looking for something significant, not, like, something that I found in the seat.  So holding it away, I'm feeling it.  A lot of times I found things, like a coat, where they have sewed drugs into the seam of it.  So you're kind of feeling those areas where, in the past or based on training and experience, you have found drugs in clothing in the past.

Q     Okay.  But you didn't find any here?

A     No.

Q     So you didn't find anything but you decided that you would continue instructing him along this search, right?

A     Yes.

Q     So you told him to lift up his testicles, right?

A     I don't recall asking him that.

Q     Is that part of what do you when you strip search someone?

SLOLEY v VANBRAMER - 14-cv-339

110

E. VANBRAMER - DIRECT - YU

A    I -- again, we're going into, like, the -- the strip search definition where as long as you can see the exterior of the skin without having somebody lift up their testicles, so, again, I can't remember if I asked him that.

Q    Okay.  So you don't remember if you asked him to lift up his testicles so you can look underneath or anything?

A    Correct.

Q    So you might have?

A    It's possible.

Q    And you didn't see anything, right?  You don't remember seeing anything if you did this?

A    No.

Q    And so then you had him turn around, right?

A    Again, I don't know if I ever had him turn towards me, so I don't know if, like, if he turned around or not.

Q    But isn't something you do, as part of the process, have the person turn around and put their hands on the wall?

A    Yes.

Q    So would you expect that you would have told him to do that here?

A    In the very beginning I would have, yes.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

Q    Okay.  So then -- let's say he's facing the wall and then at this point you instructed him to bend over, right?

A    Yes.

Q    And he did that?

A    Yes.

Q    And you didn't see anything?

A    No.

Q    Okay.  And you told him to take his hands and use them to spread his butt cheeks apart, right?

A    Something along those lines.

Q    So that you could see the outside of his anus?

A    No, not his anus.  I need to see the exterior of the skin.  So, when you're telling somebody to spread their butt cheeks, it's because you can't fully see the exterior of the skin at that point.  There's, like -- there's compression, right?  So you -- there's still an area that's pushing against each other, the exterior of their body.  So simply asking them to move it apart so I can see the exterior of the skin.

Q    But when someone pulls their butt cheeks apart, isn't their anus exposed, the outside of it?

A    Yeah.

Q    Okay.  So you could see that?

A    Well, I just want to make sure we're tracking the

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

definition of anus.  Making sure your definition isn't different than mine.

Q   Okay.  What is your definition?

A   The exterior of the bubble.

Q   Okay.  Right.  I'm not talking about the anal cavity, which would be inside the body.  I'm talking about the exterior of the anus which you can see when you're spreading somebody's butt cheeks apart.

Do you -- do you see the difference?

ATTORNEY MITCHELL:  Objection.  I think the question is compound.

THE COURT:  Why don't you rephrase the question.

ATTORNEY YU:  Sure.

BY ATTORNEY YU:

Q   So when you asked Mr. Sloley to use his hands to spread his cheeks apart, what part of his body were you looking at?

A   His butt cheeks.

Q   And the space between them, right?

A   Correct.

Q   The space that opened up when he used his hands to spread his cheeks apart?

A   Again, I wasn't looking inside of his cavity.  I never told him to spread it so I can see inside of his

E. VANBRAMER - DIRECT - YU

cavity.  I saw the exterior of the skin and the exterior of what we're calling the anus.

Q    Okay.  I'm not asking any questions about looking inside the anal cavity.  So when he -- when he -- when he's spread -- when he spreads his cheeks apart, you did a visual inspection, right?

A    Correct.

Q    How far away were you standing, if you remember?

A    Probably four or five feet.

Q    But you -- you did have to look directly at him, right?

A    That's why I asked him to do it, yes.

Q    And then you were inspecting to see if you would find something, right?

A    Yes.  Based on my training and experience, it's very common to find things in that spot.  So that is why I had him spread his butt cheeks, so I could see the exterior of the skin.

Q    And in other situations where you're saying that you -- you found stuff, when the person used their hands to spread their cheeks, could you see something?

A    There's been occasions, yes.

Q    But here you did not?

A    Here, I did not.

Q    You didn't see any residue or anything that looked

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

like the substance that you saw in the car on his body
anywhere, right?

A    If I were to go back that night, I wish I was a
little bit thorough, a little more thorough in checking
his clothing.  Again, I wasn't looking for residue.  So
it's possible there was residue on his boxers.  I was
looking for bulk product.  So, no, I did not find any
more residue like I found in the vehicle.

Q    And you -- you said you looked at all of his
clothing, right, when he handed it to you?

A    Yes.

Q    You don't recall seeing anything falling out?

A    No.

Q    You don't recall seeing a white substance, you
know, stuck on the seat of his pants, for example?

A    No, I don't think I was paying that close of
attention but, no, I did not.

Q    But you were looking for drugs, right?

A    Again, I was looking for -- for bulk drugs.  I
wasn't looking for residue drugs.

Q    Sure.  But would you agree that finding a residue
would indicate to you that there might be drugs inside
of him?

A    Yes.

Q    But you didn't have that here?

E. VANBRAMER - DIRECT - YU

A    No, I did not find anything.  No.

Q    Okay.  So I want to talk about sort of the specific reasons that led you to do the search in this manner.

One of the reasons was the K9 alert at the car, right?  Outside and inside.

A    There was a number of reasons.  But, yes, that was one of them.

Q    So -- and another reason was the substance that you -- you saw in the crease of the driver's seat, right.

A    Yes.

Q    Another reason was that was because when your brother told you -- right? -- what Daphne said to him?

A    It was what the victim said.

Q    We're talking about Daphne Rollins, right?

A    Yes.  She said that he was in possession of drugs.

Q    And that was her belief, right?  That's what your brother told you?

A    I don't know how he phrased it.  But, yes, he said the victim said that Mr. Sloley may be in possession of narcotics.

Q    And nobody mentioned that he may be in possession of narcotics inside his body, right?

A    No.

Q    And so are these specific facts that you observed

E. VANBRAMER - DIRECT - YU

on this night that formed your belief that Mr. Sloley

had drugs inside his body cavity?

A    No, there's -- there's more than just what you

mentioned.

Q    Is the more we're talking about specific facts that

you observed that night?

A    I can list the facts if you'd like.

ATTORNEY YU:  Can I just have one second?

THE COURT:  Sure.  Do you guys need a break?

Are you good?  Anybody want a break?  All right.

BY ATTORNEY YU:

Q    Sorry about that.

So, apart from the K9 alert of the car, the

substance you observed in the crease of the driver's

seat that you ran the test kit on, the positive test

kit, and what your brother told you about what Daphne

Rollins told him about the nature of -- or about what

her belief was, what other specific facts did you

personally observe that led you to believe Mr. Sloley

was concealing contraband of some kind inside his body

cavity?

A    I personally observed his criminal history of where

he was --

ATTORNEY YU:  Objection.

A    -- arrested for --

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

THE COURT:  Let's -- let's have a sidebar.

(Discussion held at sidebar.)

THE COURT:  You're going to ask him what he thinks reasonable speculation is and he's going to say he observed his criminal history to have drug offenses on it.  I mean, I don't know if you want to ask that question unless you want to but -- I mean, if he's going to give an answer that's -- that's not -- it's going to be opening the door for him to talk about those things and --

ATTORNEY YU:  But the issue is that -- I'm asking the question is what he observed specifically that night.  Just that night.

ATTORNEY OUIMET:  He saw the depository record.

THE COURT:  He may well testify that that night he -- he saw the NCIS, NCIC record of prior history.  I mean, I'm starting to think I should have allowed that to come in because it's reasonable suspicion that he's relied on, then maybe it is more probative than prejudicial.  I mean, you seem to be coming back to it a lot.  He keeps wanting to answer it in that way.

Is there anything -- what am I missing?  If he's -- he's going to say look at the criminal history

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

and wants to talk about that, as observing that in to answer your question, I'm going to overrule on the objection you have to -- violating a in limine order. But I'm not going to tell you what to do, but that's what I will do if he answers in that way which given his pretty good indication that he is.

ATTORNEY GREEN:  Your Honor, I think this is the analysis that Judge Hummel did on the record, right? And I think the bottom line is, that is not what he found, that's not actually probative, that's not provide any kind of reasonable suspicion knowing that.  So what they're trying to do is set out, like, what did he have that had a -- that thinks gave him reasonable suspicion and have an in limine ruling.  So this isn't part of that.

THE COURT:  But I can't -- you're asking to him what was probative, what was reasonable suspicion. I have said that we can't bring it up.  If you want to bring it up, if that was relevant to him, I can't say to him, listen, if -- if, you know, you can't -- don't talk about things that were relevant to your reasonable suspicion.  I don't want to say that.

ATTORNEY GREEN:  The Court has already ruled that's not relevant but maybe the way to do it is to say to add to the list of things not to answer anything you

E. VANBRAMER - DIRECT - YU

saw on NCIS.

ATTORNEY MITCHELL:  Your Honor, this is just -- they're using your ruling as a sword to try to claim that there weren't enough reasons and not letting him answer.  If you're opening the door, he should be able to give all of the reasons.

ATTORNEY GREEN:  But the ruling is that is a impermissible reason, that's --

ATTORNEY MITCHELL:  There was no such ruling.

THE COURT:  No, I don't agree.  I don't think the ruling was it wasn't coming in because he was probe -- its prejudicial outweighs its probative value.  That's what I understood the ruling to be.  That's what my ruling is.

ATTORNEY GREEN:  That's what they argued in front of Judge Hummel.  Judge Hummel -- that's exactly what they argued.  They argued that he knew this.  That -- that we can go to the briefs but argument was not just this comes in because standard criminal history.  Their argument was specifically this is what he's going to testify to.  In order to -- and form this part of his suspicion.  The argument we made that wasn't be part of what forms his suspicion.  It's not -- that's not legally part of what should be considered and therefore stays out.  That's the argument that we made.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

The in limine rulings, that's fine.  That's what Judge Hummel analyzed and the result we researched.

ATTORNEY MITCHELL:  There was no such result. You opened the door.

ATTORNEY GREEN:  We did not open the door.

THE COURT:  Hold on.  All right.  So -- if you want to ask the question and limit it in some way, I'll allow you to do that.  You want to say to him not -- not talking about relevant criminal history --

ATTORNEY YU:  Yeah.  Yeah.

ATTORNEY GREEN:  -- just say NCI S.  I mean -- can we voir dire that outside the presence of the jury so we all make sure we understand that?

THE COURT:  I don't think we have to do that.

ATTORNEY YU:  Okay.

THE COURT:  All right.

(Held in open court.)

THE COURT:  As far as the last partial answer, we will strike that portion of the answer from the record.  You're certainly free to re-ask the question or -- again, another line of questioning.  We can proceed.

ATTORNEY YU:  Okay.

BY ATTORNEY YU:

Q    You didn't see Mr. Sloley on April 1st, 2013, until you met him at the police barracks, right?

E. VANBRAMER - DIRECT - YU

A    Correct.

Q    And so it's safe to say you didn't see him in the car at all before you did the search with your K9?

A    Correct.

Q    As far as you're aware, nobody you know told you Max is driving erratically or anything?

A    No.

Q    And no one said that they saw him stuffing something down his pants, as far as you're aware?

A    No.

Q    No one told you they saw him doing something that looked like he was reaching down in his pants?

A    No.

Q    There was no mention of anyone observing him doing anything unusual in the car?

A    No.

Q    If Max was doing any of those things that I just mentioned, would you have expected your brother to have relayed it to you?

        ATTORNEY MITCHELL:  Objection.  Speculation.

        THE COURT:  Overruled.  You can answer if you know.

A    I'm not sure I'm supposed to answer that.  My brother was not the -- behind him.

BY ATTORNEY YU:

                Lisa L. Tennyson, CSR, RMR, FCRR
            UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - YU

Q    But if Max was doing any of those things I just mentioned, you would expect it to be in any of the paperwork that you reviewed, right?

A    No.

Q    No, it wouldn't have been mentioned?

A    He was pulled over by the Greene County sheriffs.

Q    Okay.  And you didn't see any of their police paperwork?

A    I did not, and they were gone from the scene upon my arrival.

Q    Okay.  So when you were at the car doing your search with -- with the K9, at that point you didn't know you were going to search Mr. Sloley, right?

A    Correct.

Q    When you saw Max, you -- did he have a jacket, do you remember?

A    I don't remember what he was wearing that night.

Q    But you don't remember seeing a bulge or anything sewed into any of his clothing, right?

A    No.

Q    Nothing hidden in his socks?

A    No.

Q    Wasn't fidgeting from side to side?

A    I don't remember, no.

Q    If you did remember that, would you have put that

E. VANBRAMER - DIRECT - YU

in your paperwork?

A    Yeah, I believe I would have, yes.

Q    There was nothing at all that caught your attention while you had Mr. Sloley remove his clothing?

A    No.

Q    Nothing at all that caught your attention while Mr. Sloley was naked in that room with you?

A    No.

Q    Nothing that caught your attention when he bent over?

A    No.

Q    Nothing that caught your attention when he, you know, used his hands to spread his cheeks, right?

A    No.

ATTORNEY YU:  Just one second, Your Honor.  I have no further questions at this time.

THE COURT:  Thank you, Attorney Yu.

Mr. Mitchell, do you have any cross-examination?

ATTORNEY MITCHELL:  Your Honor, I'd like to do my questioning of the witness when we do our case in chief so I can do a direct of him.

THE COURT:  All right.  So, we will certainly allow you to do that.

ATTORNEY MITCHELL:  Thank you.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THE COURT:  All right.  So, Mr. VanBramer, you can step down.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

THE COURT:  Are you prepared to call another witness and, if so, how long would you anticipate the direct examination?

ATTORNEY GREEN:  Your Honor, our other witness would be Daphne Rollins, who we have the subpoena for for tomorrow morning.  We figured -- I guess we were about a half an hour off in how we timed things.

THE COURT:  Perfectly -- perfectly fine.

ATTORNEY GREEN:  I do think we have housekeeping to keep us busy but maybe we can let the jury go.

THE COURT:  All right.

Any objection, Mr. Mitchell?

ATTORNEY MITCHELL:  No objection.

THE COURT:  All right.  Ladies and gentlemen, do you object to being let go a little bit early today?  No?  All right.  So, let me just read you a little bit longer of an admonition.

Ladies and gentlemen, we're now going to be breaking for the day.  Before you leave, let me take a moment to reiterate some of the instructions I've

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

already given you.  As I've said previously, you're not to discuss this case with anyone until the trial is over.  This includes your fellow jurors, members of your family, friends, and anyone associated with the trial.

Additionally, you should not permit others to discuss the case with you.  Do not read or listen to any views of the reports of the trial.  I don't expect there will be any.  As I mentioned earlier, I have no particular reason to believe that there will be any, but if you do happen to see or hear any reports about the trial, please do not read or listen to them.  Do not discuss or post anything about this case in any way on social media.  Do not use the internet to search about the parties, the witnesses, the lawyers, the judge or anyone else involved in the case.

Also, do not attempt to do any of your own research about the issues being addressed at the trial. As I've instructed you previously, we may have heard some statements about the law and the witnesses. Ultimately, I'm going to give you what the law is in this case in that final jury instructions.  So you certainly don't need to look it up and, you know, while you've heard some testimony about it, I want to remind you at the end of this case I will be instructing you on what the law is.

The only information you're to consider in deciding the case is what you learn in the courtroom. Finally, please remember to keep an open mind about the case until you have heard all of the evidence when you will then be permitted to discuss the case with your fellow jurors.

All right.  Thank you very much for your attention today.  It was a long day.  I'm glad we can get you out of here a little bit early.

We are going to start at 9:30.  We will start a little bit earlier.  Please be ready to come into the courtroom at 9:30.  Okay?  I appreciate the efforts you put in today, as I know all the parties and counsel do.

So, with that, I think I will excuse the jury for the day.  Please stand.  Certainly leave stuff in the jury room if you'd like; it will be locked.

Please be seated.

JUROR:  I will take your order for Dunkin' Donuts.

(Jurors excused, 4:40 p.m.)

THE COURT:  Take a moment to gather your thoughts.  I'm going to wait for Tara to come back.  We will go ahead and discuss a few things.

All right.  So we're back on the record, and you heard the timing for tomorrow.  If you could get

here about 9:15 unless there's no issues to resolve but 9:15 we should be able to address anything that's out standing or even just tomorrow morning.

There's subpoenas to the New York State Police.

Attorney Green, why don't you tell me -- I have the proof of services here.  Why don't you tell me about how service was made and -- and what you would like to do.  We just checked with the clerk to see if anything was dropped off to the court, that's where it was made returnable.  I'm not sure we know the answer to that yet.

COURT CLERK:  Nothing came.

THE COURT:  Nothing came in.  So what would you like -- what's your request?

ATTORNEY GREEN:  I think, Your Honor, we would ask for an order enforcing this order.  I don't think we're at contempt yet but, you know, perhaps you have more experience with this particular police unit than I do.

THE COURT:  I can certainly make an order for them to respond to the subpoena that I already signed.  I think that will -- that will just kind of kick the can down the road a little bit.

Mr. Mitchell, I know this is your client but

you do have some better connection to the state police. I have the name from the proof of service that this was certainly -- that the subpoena was served upon who apparently accepted service as a -- as a member of the superintendent's office, it sounds like.

ATTORNEY YU:  The New York State troopers, when you're going to do a subpoena, they require you to serve it on the superintendent.  It's -- that's who you serve it on.

THE COURT:  So I looked at the New York State Police website to see who -- how service needs to be effectuated when you're seeking documents from the troopers, and it does look like the service that was effectuated complies with that request.

Do you have any information as to why the troopers would ignore a judicial subpoena?

ATTORNEY MITCHELL:  Your Honor, I can -- I can email someone over there.  You know, ultimately they have their own attorneys who work on these.  I don't respond to the subpoenas.

THE COURT:  All right.  So what I'd like you to do is -- is email someone over there and get in touch with -- I'm going to give you the gentleman's name, and I know this isn't your client, Mr. Mitchell, but I think it's in everyone's best interest to -- to recruit your

assistance here.  The proof of service suggests that Trooper Brian Gauthier was served -- G-A-U-T-H-I-E-R -- on Friday April 3rd of 2026 at 10:51.

Someone from the troopers' superintendent's office that would be able to answer my inquiries about the subpoena should be here at -- at 9:15 tomorrow morning.  That's the message I'd like to have presented to the troopers.  And if you have any way of getting in touch with Mr. -- Trooper Gauthier, you can pass along the same message.  They may show up and have a reason to quash the subpoena, but I think it's appropriate that someone shows up.

ATTORNEY MITCHELL:  If they were to, say, email it to the plaintiff, would that be good enough or --

THE COURT:  If a subpoena satisfied, I don't need to see anybody.  But if they're going to not answer it or not respond to the Court's signed subpoena, which seems to have been issued pursuant to their regulations on their website, the Court is not going to look kindly on that.  So someone should be here if they're not going to respond.  All right?

ATTORNEY GREEN:  Yes.  The other thing, you know, it is entirely possible that Ms. Rollins does not show up tomorrow.  I think -- you know, we have a

subpoena out.  She didn't do it last time.  I can say that it does appear that she is either genuinely very, very sick or dodging service.  But we served her.  We had somebody camp out and -- and basically throw the subpoena into the house when the door was answered.

To that end, I think in order to avoid, kind of, the trial spilling out at all, we would essentially, if she does not show up, make the same Rule 807 motion that we made in the last trial, that's Document Number 122, which is to admit a redacted version of the affidavit she submitted because she's unavailable and because Defendant had an opportunity to cross-examine, that is the deposition that they elected not to proceed with for reasons that were their own.

I think Judge Hummel's ruling on this was completely correct, which is that we meet the rare circumstances in which an 807 is appropriate subject to redactions for irrelevant material.

THE COURT:  All right.  I won't make that decision until we get to the point where I have to.  But I would request of the parties to consider that Judge Hummel has ruled on this and I'm likely to rule in the same manner and you should work on a redaction version on the affidavit in case authorize if Ms. Rollins doesn't show up.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

ATTORNEY GREEN:  Can we just adopt the brief, the letter brief from last time or do you want a separate briefing?

THE COURT:  I don't need any more briefing on this issue.  Just -- I want to make sure you're in agreement on the document that I -- I may need to introduce into the case is redacted sufficiently for both sides.

ATTORNEY GREEN:  All right.  We -- we will confer.  I -- I expect they will object to it happening at all, but you said what you want on that.

THE COURT:  So go ahead, Mr. Mitchell.

ATTORNEY MITCHELL:  Just one -- the agreement was I think they put in two sentences or something from her affidavit, but then they agreed to put in exhibit -- I think it was Exhibit A1 and A8, certain redactions, and they are now opposing that, saying they not stipulated those in.  So --

ATTORNEY GREEN:  I mean, I think the calculous I think on what's admissible is obviously different if this is coming in and there's no opportunity to cross-examine Miss Rollins, if that's not what's happening.  So of course, if the Court grants it and correspondingly -- we would correspondingly consent to essentially the same thing.  I want -- just make sure we

redact the relevant parts of that last time too.

But, in principle, we have no objection to looking at all three documents together and doing appropriate reactions to all three.

THE COURT:  Why don't you do that and we will address it first thing tomorrow at 9:15.

ATTORNEY GREEN:  Okay.

THE COURT:  If any additional briefing needs to be presented to that Court on any of those issues, you can do that preferably before, you know, 9:00 in the morning, but I'll take a look at it when I come in.

ATTORNEY GREEN:  Okay.  I don't think we would say anything different than last time.

THE COURT:  Okay.  Mr. Mitchell, anything further?

ATTORNEY MITCHELL:  So -- I just wonder are the -- would Daphne Rollins be the plaintiff's last witness?  Because we have witnesses coming --

ATTORNEY GREEN:  -- yes.

ATTORNEY MITCHELL:  -- and I'm wondering when to tell them to get here.

ATTORNEY GREEN:  Yes, that's a great question. Yes, she would be our last witness and her testimony would be brief if she does show up.

THE COURT:  All right.

And, Mr. Mitchell, you took -- you took my next inquiry.  How many witnesses do you intend to call?  I'm not going to hold you to it, but at this point do you anticipate being done at some point tomorrow?

ATTORNEY MITCHELL:  Yeah, we have -- we have Bryan VanBramer, Eric VanBramer, and Theodore LaRuffa, and that would be it for our witnesses.

THE COURT:  All right.  And, again, not necessarily holding you to it, but barring any unforeseen circumstance, do you have any idea on how long you expect that to go?

ATTORNEY MITCHELL:  I think -- Theodore LaRuffa, it was probably only about half an hour last time it.  It would be very similar for him.  He's the evidence custodian.  Eric VanBramer, I mean, I will do my direct but I won't try to -- I won't repeat all the stuff that was already discussed.  I will try to narrow it down.  And then Bryan VanBramer will even be shorter than that.

THE COURT:  All right.  So, I mean, if -- if you were to get to your side of the case after plaintiff rests and we hear some motions by -- you think 10:30?

ATTORNEY GREEN:  Yes.

THE COURT:  And then you will be able to be finished before lunch?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

ATTORNEY MITCHELL:  I think we can probably do all of our witnesses within two hours.

THE COURT:  All right.  So --

ATTORNEY MITCHELL:  -- something like that.

THE COURT:  -- so we will figure that we're going to do the charge conference sometime early afternoon tomorrow.  So be prepared to do that as well.  I know you have a lot of other things on your plate but be prepared to do the charge conference early tomorrow.

ATTORNEY GREEN:  Are we going to get a copy of the Court's proposed instructions before that?  Probably at lunch?

THE COURT:  Yeah, we will get you -- we will get you a copy of the proposed instructions right around -- before the lunch hour.

ATTORNEY GREEN:  Okay.  And may I suggest.  Assuming that Ms. Rollins doesn't turn up, that means we could argue close of evidence motions by defendant at, like, 9:15 or even 9, so that we don't keep the jury too long.

THE COURT:  Say that again.

ATTORNEY GREEN:  So, the only thing that we would be putting on would be a read-in from the Rollins affidavit which the Court is going to have read because it's going to be thinking about the motion.  So,

theoretically, we can get the Court -- close of -- close of discovery motions resolved at least contingent on whether she testifies before the jury even has to show up tomorrow.

THE COURT:  Yeah, that would be the plan.  So, we'd do that at 9:15, I think.

ATTORNEY GREEN:  Okay.

THE COURT:  The jury will show up at 9:30.

ATTORNEY GREEN:  All right.

THE COURT:  All right.  Anything further?

ATTORNEY GREEN:  No, Your Honor.

THE COURT:  All right.  Thank you, Attorney Green.

Mr. Mitchell.

ATTORNEY MITCHELL:  Should we be ready to do our closings tomorrow also?

THE COURT:  I would think so, yes.

ATTORNEY MITCHELL:  Great.  Thank you.

THE COURT:  All right.  We're adjourned.  Thank you both.

ATTORNEY GREEN:  Thank you, Your Honor.

(Proceeding adjourned until April 8, 2026.)

* * * * * * * * * *

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

C E R T I F I C A T I O N


I, Lisa L. Tennyson, RMR, CSR, FCRR, Official Court Reporter, in and for the United States District Court for the Northern District of New York, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


/s/ Lisa L. Tennyson

Lisa L. Tennyson, RMR, RPR, FCRR


Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY