UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

**************************************************

MAXMILLIAN SLOLEY,

                              Plaintiff,

                    -v-    14-cv-339

ERIC VANBRAMER,

                              Defendant.

**************************************************


                    TRANSCRIPT OF JURY TRIAL
           BEFORE THE HONORABLE PAUL J. EVANGELISTA
                       April 8, 2026
              445 Broadway, Albany, New York


FOR THE PLAINTIFF:

COHEN & GREEN, PLLC.
BY:  Remy Green, Esq.
     Regina Yu, Esq.
     Carlin Brito, Practitioner
1639 Centre Street
Ridgewood, New York 11385


FOR THE DEFENDANT:

OFFICE OF NEW YORK STATE ATTORNEY GENERAL
BY:  Mark Mitchell, AAG
     Rachael Ouimet, AAG
The Capitol
Albany, New York 12224

(Held out of presence of the jury.)

COURT CLERK:  We're on the record.  Today is Wednesday, April 8, 2026.  The case is Maxmillian Sloley versus Eric VanBramer, Docket Number 14-cv-339.

Appearances for the record today.

ATTORNEY GREEN:  Good morning.  This is Remy Green, from Cohen & Green, PLLC, on behalf of plaintiff, joined, as yesterday, by Mx. Brito and Ms. Yu.

THE COURT:  Good morning.

ATTORNEY MITCHELL:  Mark Mitchell from the A.G.'s office, representing the defendant.

THE COURT:  Good morning, Mr. Mitchell.  And I know Ms. Ouimet will be here momentarily, but we have a few housekeeping matters to take care of.  So we're prepared to go forward.

Let me hear from the plaintiff as to where we're at with the outstanding issues.  One, the subpoena response, if any, and, two, the status of Miss Rollins.

ATTORNEY GREEN:  So we got an email last night attaching an unsworn letter from the Division of State Police saying that -- objecting that discovery is not open, which is a little strange, and then saying that they have searched their records, they didn't say about whether it was diligent, and saying they don't have any responsive materials.  I can hand that letter

up.

We also responded pretty quickly, saying that doesn't really make sense.  Right?  Like, we have this record, which we attached to our email of, you know -- there was a complaint, there was an investigation, it was closed as unsubstantiated.  So it doesn't make sense they don't have any records unless they have a document-retention policy that would result in the deletion of documents.

We said that we still expected them to show up this morning to discuss this because they didn't comply with the subpoena.  At a minimum, we would need a sworn statement that records didn't exist and a diligent search was conducted, and that's not what we got and, instead, we didn't get any response and it appears they're not here.

THE COURT:  All right.

Mr. Mitchell, do you have any information on this --

ATTORNEY MITCHELL:  Your Honor, I have the response right here.  April 7th they responded to the subpoena.  The thing about a diligent search, I think the plaintiff thinks this is a FOIL request.  It isn't.  This fully complies.  So I don't see what the issue is.  They're just unhappy that there are no records that are

responsive to the demand.

THE COURT:  Can you have that marked as a court exhibit and I'll take a look at it.

ATTORNEY GREEN:  Do you have the court exhibit stickers?

THE COURT:  Yes, we'll take care of it.

ATTORNEY GREEN:  Should I hand up our response too?

THE COURT:  We can do that as well.  Does Mr. Mitchell have a copy of that?

ATTORNEY GREEN:  He has it in his email but we also have a printed copy that we can hand over.

THE COURT:  Thank you.

ATTORNEY GREEN:  Let me just -- yeah.  Here's the response.  There you go.  This is -- this is the affidavit of service.

COURT CLERK:  Thank you.  Here.

THE COURT:  Just so the record is clear, I've marked Court Exhibit Number 1 as the letter response received by email last night.  The letter is signed by Jason D. Hughes, assistant counsel, I assume to the New York State Police.

The letter indicates, as already been noted on the record, that there are no documents.  The state police did not locate any responsive materials to

the subpoena.  As exhibit -- Court Exhibit Number 2 was Attorney Green's response.  Looks like an email to Mr. Hughes thanking him for their response but indicating her concerns with whether or not it's sufficient or deficient.  She set those on the record as well.

All right.  Attorney Green, let me ask you. What were you anticipating receiving?

ATTORNEY GREEN:  The initial complaint and the closing report.  I mean, this is standard in police investigations.  Some -- when somebody files a complaint, there is a complaint, whether it's through a web portal or a form at the office about -- when people make a complaint about a police officer, there is a document and then, you know, whatever investigation they do, there is some document that comes out of it that says that either we're substantiating this, we're not substantiating this, we're finding it unfounded or exonerating.

It might not be long but there is -- right? -- there is some document that -- that closes it because what we have -- what we have already is just a computer printout, kind of, from their database that just says here's the status of the report, here's the incident. But it does confirm that a complaint existed and it was

closed.

THE COURT:  Let's just put us in the -- in the hypothetical place where you received both of those things.  And now what are you asking the Court to do with them?

ATTORNEY GREEN:  I mean, it does depend on the content.  But, for example, one of the things that might show is Trooper VanBramer testified that he's never done a strip search in public.  This was a strip search in public that he might have been involved in.

We know that it -- that at least Bryan VanBramer, but -- but possibly Trooper VanBramer were involved, and if they were -- he was involved, that's significant impeachment material.  I guess that's one of the things.  But we just don't know what is in this complaint and what -- why it was unfounded, and without that, you know, I think there are inferences we can draw, but I'm not comfortable saying this is what we think's in it because we just don't know.

THE COURT:  Right.  I asked the question just to get the answer you provided, which was, you think it might contain some impeachment material.

ATTORNEY GREEN:  Yes.

THE COURT:  And you don't know whether it does or not because the state police is indicating that they

don't have the materials responsive to your subpoena.

ATTORNEY GREEN:  Right.

THE COURT:  And your subpoena was very specific as to what you were looking for, as I recall.

ATTORNEY GREEN:  Yes.

THE COURT:  Do you have any -- any reason to tell the Court as to why you -- other than what you have already stated, that a report would generally be generated if there was such a complaint, any reason why I should not take what the Assistant Counsel Hughes indicates as true, that there is no responsive materials to your subpoena?

ATTORNEY GREEN:  What about the complaint itself?  Right?  We just know for a fact there was a complaint.

THE COURT:  How do we know that?

ATTORNEY GREEN:  Because that's -- that's what the -- the document we already have.

Regina, do you have a copy of that?

ATTORNEY YU:  The actual -- the little printout thing?

ATTORNEY GREEN:  Yeah.

ATTORNEY YU:  It just says that there is a complainant, so there has to have been a complaint.  In order for the complaint to have been investigated, the

complaint would have had to have been lodged.  So it must exist.

THE COURT:  Okay.  Mr. Mitchell, do you have something to add?  Or just standing up?

ATTORNEY MITCHELL:  Yeah, Your Honor.  The -- the printout they're talking about actually was only from Bryan VanBramer's records, the non-party, and you've already precluded all disciplinary records against him.  We -- four years ago we -- we responded and there were no records about Eric VanBramer.

THE COURT:  All right.  So I'm going to -- I'm going to have to accept Assistant Counsel Hughes' letter over, I know, the objection of the plaintiff.  But I'm -- I'm satisfied that as a result of the response received last night that there were no responsive materials located, and you certainly have your objection to that determination.

All right.  Let's move on to the next issue.

ATTORNEY GREEN:  Okay.

THE COURT:  The affidavit of -- or the presence or not of Ms. Rollins.  What's going on?

ATTORNEY GREEN:  So we haven't heard from her. We have served a subpoena.  I think we're basically in the same situation we were in the last trial where, you know, the options are the marshal hauls her in or we

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

deal with it through the affidavit.  I think hauling her in is going to end up dragging the trial out at least another day, which no one wants to do.

We, as you requested, proposed, kind of, on the assumption of that you were going to do the same -- basically the same thing as Judge Hummel and we should just discuss specific redactions appropriate for this trial.  We sent suggestions.  Mr. Mitchell this morning said your suggests are rejected.  That's pretty tight paraphrase or quote and has not engaged with us.

THE COURT:  All right.  So, what's -- what's your position, Mr. Mitchell?

ATTORNEY MITCHELL:  So, Your Honor, we -- they wanted to put in this affidavit that the plaintiff submitted, summary judgment motion.  I think it's very questionable that it was under the improper influence of the plaintiff.  We litigated this I think four years ago.  These -- this was at Docket Numbers 122 and 123.

The plaintiff argued that the affidavit should come in under the residual exception.  We oppose that, provided case law that refutes their position.  The judge did allow it in but he -- he allowed in, I think it was the -- a very small portion of the affidavit, which is set forth in the trial transcript, I think starting at page 265.  And then we were allowed to put

in -- I think it's Exhibit D1 and D8 with certain reactions.

So I guess our position is if Your Honor is going to apply the residual exception, I think it should be done exactly as it was done in the first trial.  But I understand now the plaintiffs are unwilling to let in our exhibits, and they want to put in a lot more of the affidavit which Judge Hummel previously found was improper.

ATTORNEY GREEN:  Your Honor, that's just not true.  We specifically sent Mr. Mitchell proposed redactions for his exhibits and said we would stipulate to both.  I don't know why he's -- thinks this is wrong.  I don't know why he's -- doesn't understand what's going on.

ATTORNEY MITCHELL:  Because they want to take out additional information which last time came in to the trial in the exhibits that were accepted into evidence.

THE COURT:  Well, let me see the -- I have Judge Hummel's ruling here.  I haven't heard anything during the trial or now that would lead me to deviate from his prior decision.

It looks to me like a very limited portion of what -- in that case was P -- Plaintiff's 6, I think it

was --

ATTORNEY GREEN:  That sounds right.

THE COURT:  -- was read to the jury and admitted.  And then portions of -- almost, as the parties indicated last time, serving as almost a cross-examination or at least having the appearance of such, Attorney Ouimet was authorized and the Court admitted portions of Exhibit D1 --

ATTORNEY GREEN:  And D8.

THE COURT:  -- D8 and it looked like D9.  Is that not accurate?

ATTORNEY MITCHELL:  I thought -- I think D -- D9, I thought, was the 9-1-1 records.  Let me check here.

THE COURT:  I'm on page --

ATTORNEY MITCHELL:  So, D8 was the other one. It's the domestic violence report, and then Rachel Ouimet read -- I think it was the victim's statement, which was the second page of D8, but then D8 also was -- was admitted into evidence and went back with the jury. But the -- the main differences for D1, which is the incident report, and D8 are the -- it took out all the criminal charges.

THE COURT:  So what -- what I'm going to allow to have read to the jury is just what Judge Hummel

allowed to have read to the jury.  That's on page 265, 266 of the trial transcript, docket -- maybe 144.  But it's the second day of the trial transcript.

Do you want me to read what it is you're allowed to read or do you have that available to you?

ATTORNEY GREEN:  I think I have it available. If I may, almost all of what we changed was adding the header, just so that it's clear what the document is when it goes back with the jury, which I don't think should be objectionable.  I think, frankly, the jury seemed a little confused by it last time and that's why we wanted to just, you know, have the top where it says to the United States District Court of New York from Daphne Rollins.  This is in regard to my involvement in the court case.

THE COURT:  From my transcript, you read that the last time.

ATTORNEY GREEN:  Did I?  Okay.  Then I don't -- then I don't really know why we're fighting about it.  Then the other thing, because of the focus on restraining orders, she does testify here about restraining orders, and so that's -- I think that's the other material that we want in.  Where she says someone's -- and I think we can blank out Mr. Mitchell's name, said that I have numerous restraining orders

against Mr. Sloley, that is -- that is another lie, that never happened, nor did I make such statements.

I think because they have opened the door there, what we want in is different.

THE COURT: Go ahead.

ATTORNEY MITCHELL: Your Honor, the plaintiff already admitted that there was an order of protection. So I think that's already been introduced.

THE COURT: I thought -- all right. I'll allow that portion to be read as well.

ATTORNEY GREEN: Okay.

THE COURT: Is there any other portions of D1 or 8 that then would be appropriately read in response to that?

ATTORNEY GREEN: Your Honor, it may be easier to talk about the redaction proposing because they're very limited. But ....

THE COURT: You can go ahead.

ATTORNEY GREEN: Okay. So, all we're asking to redact from this is the names of the charges, which some of those the Court that's already excluded.

THE COURT: Which document are you speaking of?

ATTORNEY GREEN: This is -- sorry. This is D8. I can also forward with red boxes around everything

to the Court if that just make discussion easier.

THE COURT:  It would.

ATTORNEY GREENE:  What email address should I use?

(Discussion held off the record.)

COURT CLERK:  Did you send it?

ATTORNEY GREEN:  Yes, sorry.

COURT CLERK:  That's all right.

ATTORNEY GREEN:  I'm a little quicker than I ....

ATTORNEY MITCHELL:  Are we talking about D1 or D8?

ATTORNEY GREEN:  We can talk about them in order but I have D8 up and I'm happy to talk about either of them in any order.  I could also plug in and put it up on the screen, if that is helpful.

COURT CLERK:  I sent that too.

THE COURT:  That's probably easiest.

(Discussion held off the record.)

ATTORNEY GREEN:  Let's start with D8.  So here's essentially what we are proposing.  First, just this list of offenses.  Right?  This is coming in essentially as her testimony because her testimony is on the next page.  I don't think that the list of offenses or the offenses involved appropriately come in.  And

then the only other redaction on this one is suspect, colon, drug/alcohol history, which when they tried to ask about it the last trial, Judge Hummel kept out.

THE COURT:  Right.

ATTORNEY MITCHELL:  So, Your Honor, the -- the offenses were -- were omitted from the version that went to the jury last time, and as far as the offenses, the misdemeanor thing, I mean, that's already coming out. But the part up here about the drug/alcohol, I think that that needs to come in because that -- at the previous trial, the plaintiff was questioning witnesses, saying there was no reference in this document to Daphne's statement about the plaintiff being in possession of drugs or being involved in drugs.

So I think that opens the door.  I mean, it actually is referenced on the form here.

THE COURT:  So for the same reasons Judge Hummel didn't allow that in the last time, I'm going to make the same ruling.  That -- that suspect drug/alcohol with a checked box doesn't -- doesn't -- it's not probative to the Court as to relevant issues in the case.  So I'm not going to allow that portion to come in.  What else do we have?

ATTORNEY GREEN:  D1 is very similar.  The only redactions we're -- we have redactions I think on both

pages.  So on the first page, it's very similar.  Just the list of offenses, and I think we just all missed this last time.  But it's a Social Security number.  I don't know if it actually is an objection to that because we haven't talked but --

THE COURT:  We won't include the Social Security number.

ATTORNEY MITCHELL:  All right.  Yeah, I'm fine.  The charges were -- were omitted from the previous one that went to the jury.  Social Security number, I don't care, as long as he admits this is him.  What was on the second?

ATTORNEY GREEN:  So on the second page or -- I'm sorry -- yes, on the second page, we want to redact physical injury and criminal mischief and due to prior felony convictions.

ATTORNEY MITCHELL:  The second one about the prior felony convictions, that was redacted on the exhibit that went to the jury last time.  As far as the physical injury and criminal mischief, those are not -- I mean, maybe criminal mischief, but these are not technically physical -- or charges.  These are just a characterization of what the 9-1-1 said, and I think it's already come into evidence that there was domestic abuse and damage to property.  So I think that's already

part of the case.

THE COURT:  I agree with you, Mr. Mitchell. We're going to leave that portion in.

ATTORNEY GREEN:  So we're going to redact -- and criminal mischief or not -- none of the above?

THE COURT:  I think you should strike criminal mischief because it is a charge.  But physical injury is not necessarily a charge.

ATTORNEY GREEN:  That's fine.  Okay.  I can -- I can put together a redacted versions and we'll either -- I guess we should probably email them to Tara because we don't have a printer.

THE COURT:  That's fine.  And, Ms. Ouimet, I think the process we'll follow is we'll admit those outside the presence of the jury, I suppose, or during -- when they're present and then, Mx. Green, you can read those of P6, whichever the number is for this particular trial.  Is it the same?

ATTORNEY GREEN:  I think we haven't put any exhibits in.  So it will either be -- because we have P1 and 2 for identification, it will be P3.

THE COURT:  P3 will be allowed to read the portion that you have indicated won't be redacted and -- and then, Ms. Ouimet or Mr. Mitchell, you can read from D1 and D8 other than the redacted information, whatever

you like.  All right.

ATTORNEY GREEN:  And I'll email redacted versions to Tara.

(Discussion held off the record.)

THE COURT:  Just make sure you give them to Mr. Mitchell and Miss Ouimet.

ATTORNEY GREEN:  I will forward to everybody.

ATTORNEY MITCHELL:  Would I also be able to use Exhibit D1 as evidence?  Because I think we're going to use it with Bryan VanBramer's testimony because he -- he created this document.

THE COURT:  With the same redactions, I don't see why not.

ATTORNEY MITCHELL:  Thank you.

ATTORNEY GREEN:  No objection from us on that.

THE COURT:  Are we ready to go?

ATTORNEY GREEN:  Yes.

THE COURT:  What's on tap for this morning, Attorney Green?

ATTORNEY GREEN:  I think we are going to close once we do the read-in.

THE COURT:  Okay.

ATTORNEY GREEN:  Since we're past where we thought we would be, I think we should probably just get going and do the read-in and they can do the close of

evidence motion at the relevant time.  But we're going to rest as soon as we are -- we have done the read in.

THE COURT:  All right.  So the plan would be for me to -- I'll accept into evidence P3, D1, D8 as redacted and we can then go ahead and read.  Okay?  So just move to have it introduced when.

ATTORNEY GREEN:  Of course.  Ready.  Thank you, Tara.

(Jury present, 9:45 a.m.)

THE COURT:  Please be seated.

Good morning, ladies and gentlemen.  Welcome back.  As I warned you we would likely be doing some legal matters before you were called in, so I appreciate all being here on time and I apologize, it's 9:45.  But thanks.  Things went a little longer than expected.  But we are ready to go.

So with that, Attorney Green.

ATTORNEY GREEN:  Let me just make sure we have a copy of the document.  I'm sorry, everyone.  While we're awaiting that, Your Honor, I'd like to move P3 for identification purposes into evidence.

THE COURT:  All right.

Mr. Mitchell, I know you have already stated your objections if any.  So I will -- I will accept --

ATTORNEY GREEN:  I'm so sorry.  Let me -- how

do I not have this up?

COURT CLERK:  I have all the monitors.

ATTORNEY GREEN:  Okay.  It's only my monitor.

COURT CLERK:  It's only yours.

THE COURT:  With the redactions that we can discuss I will go ahead and accept P3 into evidence as Plaintiff's 3.

(Plaintiff's Exhibit 3, received.)

ATTORNEY GREEN:  I will.

THE COURT:  Ladies and gentlemen, let me just tell you at this point that, you know, you are going to see some documents with redactions.  You're not going to consider and it should play no part in your thought process why there are redactions.  There could be many, many reasons why something is redacted.  So you're not to consider why anything is redacted.  Okay?  All right.

ATTORNEY GREEN:  Okay.  Putting this on the screen, and then I'm going to ask for permission to publish for the jury.

THE COURT:  You may.

ATTORNEY GREEN:  Okay.  Tara, if you would be so kind.

COURT CLERK:  Yes.  I think I can just put it on.

ATTORNEY GREEN:  Okay.  Members of the jury,

you are looking at a document that was written by Daphne Rollins.  I am going to read it to you.  It is the sworn testimony of Daphne Rollins.

ATTORNEY MITCHELL:  I object to that characterization.  Counsel is testifying.

THE COURT:  All right.  So noted.  Move on.

ATTORNEY GREEN:  Re:  Sloley versus VanBramer. To:  The United States Court of the Northern District of New York.  From:  Daphne Rollins.  This is in regard to my involvement in the civil case currently pending, parentheses, Sloley versus VanBramer, 14-cv-339.

"First and foremost, the state police blatantly lied and said that I told them that Mr. Sloley possessed or possibly possessed or was in any way connected to drug activity.  I never said any of those things or anything remotely close to those things on that night of our incident that took place on April 1st, 2013.

Someone -- and the name is redacted -- "said that I have numerous restraining orders against Mr. Sloley.  That is also another lie.  That never happened nor did I say such statements.  Thank you for your time.  Daphne Rollins."

Let me just try to read this.  I believe it says sworn before me personally -- no, I -- I can't

quite read the jurat, but that -- what -- Your Honor, may I described what a jurat is?

THE COURT:  No, they will -- it speaks for itself.

ATTORNEY GREEN:  Okay.

THE COURT:  All right.  Anything else?

ATTORNEY GREEN:  No.  And that's the close of plaintiff.  So we will rest.

THE COURT:  Plaintiff rests?

ATTORNEY GREEN:  Yes.

THE COURT:  No further witness at this time?

ATTORNEY GREEN:  I'm sorry.  You are correct. That is my mistake.

THE COURT:  Before you -- before we consider case closed, Attorney Green, let's allow Ms. Ouimet to address -- I think it's Defendant's Exhibits 1 and 8; is that right?

PRACTITIONER BRITO:  Yes, but I'm only going to be introducing 8.

THE COURT:  All right.  So you are moving for 8 into evidence.  So other than what's previously been stated, anything further, Attorney Green?

ATTORNEY GREEN:  No.

THE COURT:  All right.  So 8 Defendant's 8 is accepted into evidence as D8.  Please proceed.

(Defendant's Exhibit 8, received.)

ATTORNEY GREEN:  I'm sorry.  That is other than the -- if there is any portion that they don't read.

THE COURT:  I understand.

ATTORNEY GREEN:  Yeah.

ATTORNEY OUIMET:  Do you want me to just --

ATTORNEY GREEN:  Not at all.  More than happy, just -- please.  Please don't minimize and --

COURT CLERK:  I can print it.  I have it.  Would you rather me do it?

ATTORNEY OUIMET:  It doesn't -- whichever.

ATTORNEY GREEN:  Why don't we do it this way and you can print one and we will be ready with the next one.  Okay.

THE COURT:  Sometimes technology makes things easier, sometimes it doesn't.  It's harder.  But thank you for your patience.

ATTORNEY OUIMET:  Thank you.

ATTORNEY GREEN:  That is 8, right?  Just look at the top left.

ATTORNEY OUIMET:  Yes.

ATTORNEY GREEN:  Great.

ATTORNEY OUIMET:  We can -- it's been admitted --

(Simultaneous speaking.)

THE COURT:  D8 is in evidence.  You can publish it for the jury.

ATTORNEY OUIMET:  This is the domestic incident report that was taken on April 1st, 2013, from Daphne Rollins.  I'll be reading a portion from the statement of allegations with the supporting deposition.

"I, Daphne Rollins, state that on April 1st, 2013, at 4:30 a.m., in the village of Athens of the State of New York, the following did occur:  I was at my house in the living room talking to Max Sloley about our relationship when I told him I can't be with him.  He stood up off the couch, pushed me onto the floor, then sat on me, grabbed my phone and went outside.

"I followed Max outside, told him I would call the cops if I didn't get my phone back.  Then he grabbed my arm and dragged me up the stairs through the front door and threw me into the radiator.  Then he pushed me several times on my back and shoulders.  Then he grabbed the aluminum bat from the door in the hallway, went outside, and proceeded to hit my car with the bat.

"After I watched him swing the bat, I came into the house again and called the cops.  I told him I was calling the cops.  At that point he left.  I would like him arrested for this."

And then she -- this is -- false statements

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

made herein are punishable as a Class A misdemeanor, pursuant to Section 210.45 of the Penal Law, and she signed here and it's dated 4/1/13, and it was witnessed by an officer.

THE COURT:  All right.  Thank you, Miss Ouimet.

Anything further from the plaintiff at this point?

ATTORNEY GREEN:  No, Your Honor.

THE COURT:  All right.  So plaintiff rests?

ATTORNEY GREEN:  Plaintiff rests.

THE COURT:  All right.

Ladies and gentlemen of the jury, that's -- plaintiff has now rested.  So the case has been completed for the time being.  I have to hear from counsel regarding certain issues.  I'm going to send you back to the jury room again.  It won't be for more than 15 minutes, and we'll call you back out and then you'll likely hear witnesses, if they have any, from the defense.  So -- all right.  Thank you very much.

(Jurors excused, 9:55 a.m.)

The COURT:  Let's wait for Tara to get back.

All right.  Mr. Mitchell, do you have any motions?

ATTORNEY MITCHELL:  Your Honor, I'd like to make a Rule 50 motion to dismiss at this point.  The

plaintiff has not put in sufficient evidence to justify the case going any further.  I think the -- the elements were that the plaintiff had to prove that the defendant performed a visual body cavity search and that it was done without reasonable suspicion.  The plaintiff was concealing contraband within the cavity that was searched.

The evidence here shows there was no visual body cavity search.  The search was just of the outer skin of the plaintiff.  There was no inspection inside the anus.

And in terms of reasonable suspicion, there's been ample evidence that's come in so far.  I think it's the -- the statement of the victim, the fact that the plaintiff was fleeing from the crime scene, the K9 alert by Ryder of the vehicle, the fact that there was substance that appeared to be cocaine located on the driver's seat.  There was a field test performed which found that positive for cocaine.

Based on the way it was situated, it appeared -- reasonably appeared to the officer that the fact that the plaintiff was fleeing, it appeared that the plaintiff had been trying to quickly hide the contraband but he was unsuccessful and some of it fell onto the seat.

I also think there's been no -- not sufficient evidence that there was any injury caused.  The plaintiff has had -- has undergone searches like this numerous time.  This was a routine for him.  So I think that the case should be dismissed now with no need for us to put on a defense.

THE COURT:  All right.  Thank you, Mr. Mitchell.

Mx. Green, any response?

ATTORNEY GREEN:  Yeah.  So, I think -- let me just start with what I expect is going to be an issue for the rest of the case, which is, it kind of seems like the defendant's side of the V does not understand what the Second Circuit has said is a visual body cavity search.  I'm quoting from Sloley I here.  A visual body search is one in which the police observed a suspect's body cavity without touching them as by having the suspect bend over or squat and cough while naked.

That's exactly what he described.  Frankly, anatomically, I have no idea what -- what Eric VanBramer was talking about when he's saying he needs to look into the -- like, the anal tunnel.  I don't -- frankly, I don't know how that could physically work without it being a manual body cavity search where you're essentially doing a -- a colonoscopy.

He -- he testified specifically that he looked at the anus.  That's a visual body cavity search.  I don't know how -- how this mistake can happen.  Otherwise, again, we're -- just like the last trial, just like Sloley I, just like Sloley II, what -- what has been put in testimony is exactly what was on summary judgment.  We are right -- they -- they want you to accept their testimony as completely true and take several major inferential leaps from there when the jury could have just as easily not accept it.  On that, it's credibility.

And as far as injury, even if they were right, and I don't think they are, Mr. Sloley testified specifically that he has never had this kind of search before because this is not a routine strip search.  Even if you accept that, nominal damages are available.

If -- if the -- the Section 1983 itself does not say anything about damages.  It says that -- that someone shall be liable upon a violation.  Now, what they are liable for is a different question.  But they shall be liable.  So, unless you want to hear more, I don't -- let's get the jury back in here.

THE COURT:  All right.  Thank you, Attorney Green.  All right.

Mr. Mitchell, I'm going to deny your motion

under Rule 50.  I agree with basically everything that has been said by the plaintiff's counsel in the case. From what the Court observed during all witnesses that have testified, the definition of visual body cavity search that was read by plaintiff's counsel, which I was going to read during my decision, a visual body cavity search is one in which the police observed the suspect's body cavities without touching them as by having the suspect bend over or squat and cough while naked.

I believe that a prima facie case has been established to support that definition of a visual body cavity search, if not more.  And with regard to reasonable suspicion that was necessary, I think there is certainly a prima facie case that the necessary level of reasonable suspicion to believe that the plaintiff was secreting drugs inside of his body has been established.

So, further, with regard to the damages, I agree with the plaintiff.  Mr. Sloley's testimony, as well as the act itself in this case that's been testified to I think is a sufficient prima facie case to establish that damages were a proximate cause -- proximately related to what happened here.  So -- according to the testimony.

So for those reasons, I've denied your Rule 50

motion.

Are we ready to begin with your first witness?

ATTORNEY MITCHELL:  I have to go out and get him.

THE COURT:  All right.  So we can do that.  So I'll -- I'll have the jury brought back in and you can simultaneously grab the first witness.  Who is it going to be?

ATTORNEY MITCHELL:  Bryan VanBramer.

THE COURT:  Thank you, sir.

ATTORNEY GREEN:  Do you mind -- do you mind if I run to the restroom?

THE COURT:  No.  Go ahead.  We won't get the jury until Mx. Green gets back.

(Pause in proceeding.)

THE COURT:  We can get the jury now.

(Jury present, 10:05 a.m.)

THE COURT:  All right.  Mr. Mitchell, does the defense wish to present any witnesses?

ATTORNEY MITCHELL:  Your Honor, the defense calls Bryan VanBramer.

THE COURT:  All right.  Mr. VanBramer, please approach.  Ms. Burtt is going to swear you in, and there's water at the stand for you if you need.

COURT CLERK:  Please raise your right hand.

B. VANBRAMER - DIRECT - MITCHELL

B Y R A N   V A N B R A M E R ,  having been duly sworn, was examined and testified as follows:

THE COURT:  When you're ready, Mr. Mitchell. Thank you.

DIRECT EXAMINATION

BY ATTORNEY MITCHELL:

Q    Sir, could you please introduce yourself to the jury.

A    Good morning.  My name is Investigator Bryan VanBramer.

Q    Where were you born?

A    Niskayuna, New York.

Q    Where did you go to high school?

A    Cohoes High School, Albany County.

Q    Do you presently work for the New York State Police?

A    I do.

Q    For about how many years have you worked for the state police?

A    Over 19 years.

Q    What is your current title?

A    Investigator.

Q    Could you please tell me about your training.

A    I attended a 26-week academy, Albany.  New York State Police Academy in Albany, New York.  Also attended

B. VANBRAMER - DIRECT - MITCHELL

a New York State Police undercover school, undercover certified.  I've also attended several training courses through state and federal law enforcement agencies.

Q     Did that include any training in narcotics?

A     Yes, sir.

Q     What was that?

A     I completed a narcotics detection in the academy and also as an investigator with the Narcotics Unit, I received several training courses involving narcotics.

Q     Back in April of 2013, what was your position with the state police?

A     I held a rank of trooper.

Q     What were your responsibilities at that time?

A     I was assigned as a uniform trooper.  I was currently stationed at Coxsackie in Greene County, New York, S.P. Coxsackie barracks in Greene County.

Q     What was your shift back then?

A     It would have been 7 p.m. to 7 a.m.

Q     I want to direct your attention to the early morning hours of April 1st, 2013.

      What were you doing at that time?

A     I was routine patrol.

Q     Did something occur that you responded to?

A     Yes, sir.

Q     What was that?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

B. VANBRAMER - DIRECT - MITCHELL

A      I responded to a 9-1-1 call, Greene County, indicating that there was a physical domestic in the town of Athens.

Q      At approximately what time did you receive that 9-1-1 call?

A      I believe it was between the hours of 4 a.m. and 4:30.  Excuse me.  4 a.m. and 4:30 a.m.

Q      At some point did you arrive at the location?

A      Yes, sir.

Q      What happened when you got there?

A      I was advised there was a physical domestic at that location.  Male party had left the scene.  I was then approached by a distraught female at that time.

Q      What was the name of the female?

A      Female's name was Daphne Rollins.

Q      What did Daphne Rollins say to you about what happened?

A      She indicated that she got into a argument with her boyfriend, Max.  She indicated that she had attempted to call 9-1-1.  He became physical with her.  At that time she indicated that -- during the course of the conversation she indicated that she didn't want to be with her boyfriend, Max, anymore.  He became combative, started damaging personal property, then attempted to drag her back into the residence before fleeing.

B. VANBRAMER - DIRECT - MITCHELL

Q    What was Daphne Rollins's demeanor at that time?

A    She was emotional and she was upset.

Q    Did you observe any injuries to Daphne Rollins?

A    I did, sir.

Q    What were they?

A    Abrasions to I believe her arms, legs, which appeared consistent with being in a physical struggle.

Q    Did you observe any damage to her property?

A    Yes, sir.

Q    What was that?

A    I observed a shattered windshield on her personal vehicle and shattered cellular telephone.

Q    Did Daphne Rollins say anything about activities Maxmillian Sloley might be involved in?

A    Yes, sir.

PRACTITIONER BRITO:  Objection.

THE COURT:  Grounds?

PRACTITIONER BRITO:  To the extent it's offered for the truth of the matter asserted.

THE COURT:  All right.  I will sustain the objection.  I'll instruct the jury.

Ladies and gentlemen, hearsay you're not to consider -- when I allow something in hearsay, you are not to consider it for the truth of what's asserted, but only for certain other reasons.  So I will allow the

B. VANBRAMER - DIRECT - MITCHELL

answer.

A     Can you repeat it, please.

BY ATTORNEY MITCHELL:

Q     Did Daphne Rollins say anything about activities that Maxmillian Sloley might be involved in?

A     Yes, sir.

Q     What?

A     She indicated previous to leaving the residence that they were consuming alcohol together, that he may be in possession of drugs.

Q     At some point did you get any news about Maxmillian Sloley's whereabouts?

A     Yes, sir, I did.

Q     What did you find out?

A     I received information while I was on scene that he was -- he was stopped in the area of the Rip VanWinkle Bridge in Catskill.

Q     What did you do at that point?

A     At that point, I believe I relayed a message to Trooper VanBramer, who is a K9 unit, to go and report to the location of the vehicle and traffic stop.

Q     Why did you contact Eric VanBramer in particular?

A     Trooper VanBramer was a -- specialized in narcotics with the state police K9.

Q     What did you tell Eric VanBramer?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

B. VANBRAMER - DIRECT - MITCHELL

A    I relayed the message that I was on scene with the physical domestic, I was interviewing the female party. I did relay the message that the individual that was stopped -- Mr. Sloley -- could possibly be in possession of a controlled substance.

Q    At some point did Eric VanBramer communicate with you about his search of Maxmillian Sloley's vehicle?

PRACTITIONER BRITO:  Objection.  Hearsay.

THE COURT:  Overruled.

A    Yes, sir.

BY ATTORNEY MITCHELL:

Q    At some point did you go to the police station S.P. Catskill?

A    Yes, I did.

Q    Were you there with the suspect, Maxmillian Sloley?

A    I was.

Q    What happened when you got to S.P. Catskill?

A    Mr. Sloley was then in a room with Trooper VanBramer.

Q    Did you look up any information about Maxmillian Sloley's background?

A    Yes, sir, I did.  Conducted a -- a criminal history.

PRACTITIONER BRITO:  Objection.

THE COURT:  The question was, Did you look up any information about Mr. Sloley's background?  So

B. VANBRAMER - DIRECT - MITCHELL

that's a yes/no question.  So you can answer that question.

A    Yes, sir, I did.

BY ATTORNEY MITCHELL:

Q    When you're booking a suspect at the police station, are there certain things about the suspect's background that you are supposed to look into?

A    Yes, sir.

Q    Without getting into the specifics about Maxmillian Sloley, what are the things --

PRACTITIONER BRITO:  Objection.

Q    -- about a background that you are supposed to look into?

THE COURT:  Grounds?

PRACTITIONER BRITO:  Hearsay.

THE COURT:  Overruled on that ground.

A    Yes, sir.  I would have to look up a criminal history of the person that I'm going to be processing for criminal charges.

BY ATTORNEY MITCHELL:

Q    Did you do that in this case?

A    Yes, sir, I did.

Q    At some point did Eric VanBramer enter the police station?

A    Yes, sir.

B. VANBRAMER - DIRECT - MITCHELL

Q    Did he give you some evidence?

A    Yes, sir, he did.

Q    What did he give you?

A    He gave me a narco field test kit that was positive for cocaine which was retrieved from Mr. Sloley's vehicle.

ATTORNEY MITCHELL:  All right.  So, Your Honor, I'd like to show the witness and also the jury Exhibit D13, which was admitted into evidence by stipulation.

THE COURT:  Any objection?

ATTORNEY GREEN:  I'm sorry.  It's admitted by stipulation.  I was just finding it.

THE COURT:  Okay.  So, no -- no -- you agree it's admitted by stipulation?  All right.  It's admitted and accepted into evidence as D13.

(Defendant's Exhibit 13, received.)

ATTORNEY MITCHELL:  Can this be shown to everyone?

COURT CLERK:  Not just the witness?

ATTORNEY MITCHELL:  Right.

COURT CLERK:  Yes.

BY ATTORNEY MITCHELL:

Q    So I'm showing you Exhibit D13.  Can you see that?

A    Yes, sir.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

B. VANBRAMER - DIRECT - MITCHELL

Q    Do you recognize this document?

A    I do.

Q    What is it?

A    It's a New York State Police General 2 form.  It's a -- a document that shows a transfer of evidence.

Q    Did you fill out some of the information on this document?

A    Yes, sir.

Q    Do you see your name on it?

A    I do.

Q    Can you read the part that's under Description.

A    Item Number 1 being 904 for cocaine, salt and base containing cocaine, cocaine residue, which tested positive for cocaine.

Q    And then on the section below this called Transfer Record, do you see that?

A    I do, sir.

Q    What is a Transfer Record?

A    Transfer Record is indicating that that item -- the above item was from the defendant, went to Trooper Eric VanBramer.  Then the transfer goes from Trooper VanBramer to myself, for myself, that item is then secured in the -- in the station uniform evidence locker.

          THE COURT:  Can everyone hear the witness?  I

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

B. VANBRAMER - DIRECT - MITCHELL

know there's some external noise happening here.  It sounds like they're moving someone into the guest room. All right.  If you can't hear an answer, please signal to me.  Okay?

          Please continue, Mr. Mitchell.

BY ATTORNEY MITCHELL:

Q    Okay.  Can you tell us the parts that you are referenced on here, what these mean.

A    Yes.  The first line indicates that the above item came from the defendant, Mr. Sloley, into Trooper Eric VanBramer's custody at approximately 5:45 a.m.  At 6:25 a.m., Trooper Eric VanBramer then transferred that item over to myself, where then signed for it.  Then at approximately 6:30 a.m., I took the above item and I secured it in a uniform evidence locker, and at a later date it would have been picked up by the evidence custodian.

Q    Why did you put the evidence in the evidence locker?

A    It was a secure -- it's a secure location.  It's locked up.  Then this item would have been gone over by a supervisor just to make sure that it is correct.

          ATTORNEY MITCHELL:  So, Your Honor, I'd like to show the witness Exhibit D1.  This is one of the exhibits that was accepted into evidence to do with

B. VANBRAMER - DIRECT - MITCHELL

certain redactions?

THE COURT:  Yes, you may proceed.

COURT CLERK:  Would it be for everybody or just the witness?

ATTORNEY MITCHELL:  It's in evidence, so it would be for everybody.

BY ATTORNEY MITCHELL:

Q    I'm showing you first the first page.  Can you identify this document?

A    Yes.  This is a New York State Police History Report.

Q    And is that -- is this the incident report about the incident from April 1st, 2013, that we've been discussing?

A    Yes, sir.

Q    So now I'm showing you the second page.

Do you see a section called Narrative?

A    Yes, sir.

Q    Do you see your name on there?

A    I do.

Q    Did you fill out the information in this box?

A    Yes, I did.

Q    I'll give them a chance to read it and then I'll ask you some questions about this.

A    Thank you.  Okay, sir.  Thank you.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

B. VANBRAMER - DIRECT - MITCHELL

Q    Okay.  Did you draft this information here?

A    I composed this report, yes.

Q    Is this a narrative accurate?

A    Yes, sir.

Q    I'd like to ask you about, in particular -- am I correct that there's a section on here where it says "Rollins had confirmed during interview that Sloley may be associated with illegal drug activity"?

     Did I read that correctly?

A    You did, sir.

Q    Did you ever fabricate evidence of Maxmillian Sloley?

          PRACTITIONER BRITO:  Objection.  Leading.

          THE COURT:  Overruled.

BY ATTORNEY MITCHELL:

Q    Did you ever fabricate evidence against Maxmillian Sloley?

A    Never.

Q    Did you have any issues with him prior to this incident?

A    None.

          ATTORNEY MITCHELL:  I have no further questions.

          THE WITNESS:  Thank you.

          THE COURT:  All right.  Is there any

                Lisa L. Tennyson, CSR, RMR, FCRR
              UNITED STATES DISTRICT COURT - NDNY

B. VANBRAMER - CROSS - PRACTITIONER BRITO

cross-examination?

PRACTITIONER BRITO:  Yes.

THE COURT:  Practicer Brito, when you're ready.

CROSS-EXAMINATION

BY PRACTITIONER BRITO:

Q    Hello, Mr. VanBramer.

A    Good morning.

Q    You personally know the defendant in this case; is that right?

A    I do now, correct.

Q    The defendant's last name is the same as yours, right?

A    Yes.

Q    And that's not a coincidence?

A    No.

Q    Because the two of you are brothers?

A    That's correct.

Q    Right?  You just testified earlier about the early morning hours of April 1st, 2013, so I'd like to direct your attention back to that date.

A    Sure.

Q    You were on duty that day, right?

A    Correct.

Q    And your brother, the defendant, was also on duty?

B. VANBRAMER - CROSS - PRACTITIONER BRITO

A    He was.

Q    You know he was on duty because at some point that morning you spoke to him while he was on duty with his K9?

A    Yes.

Q    And you spoke to him about having to come do a search on a car; is that correct?

A    Yes.

Q    And you spoke to him over the phone, right?

A    I presume it would have been communication over a cellular phone.

Q    Yesterday your brother told the jury on April 1st, 2013, that you told him that Mr. Sloley "may have been in possession of drugs."

    Was your brother's testimony accurate?

A    Yes.

        PRACTITIONER BRITO:  Your Honor, permission to approach the witness with what is already in evidence as D8?

        THE COURT:  Granted.

        PRACTITIONER BRITO:  Thank you.

        THE COURT:  And the record should reflect that the witness has been handed D-8.

        PRACTITIONER BRITO:  Permission to publish to the jury?

        Lisa L. Tennyson, CSR, RMR, FCRR
        UNITED STATES DISTRICT COURT - NDNY

B. VANBRAMER - CROSS - PRACTITIONER BRITO

THE COURT:  You may.

BY PRACTITIONER BRITO:

Q    So I'd like to direct your attention to the second page of the document in your hands.  This is an affidavit signed by Daphne Rollins; is that right?

A    Correct.

Q    And you know that because her signature is on the bottom of the page along with that of a witness or officer; is that right?

A    Yes.

Q    And this document was signed on April 1st, 2013, right?

A    Yes.

Q    And this document was physically written by Miss Rollins; is that right?

A    The --

Q    The content?  The statement portion of it?

A    No.  This is her description of events being narrated to Trooper Quinn, who then wrote her statement, and she then confirms that the information above, that is true and accurate.

Q    Thank you.  Is it correct that nowhere in Daphne Rollins' affidavit from that day did she say anything about drugs?

A    Can I review it?  May I review it?

B. VANBRAMER - CROSS - PRACTITIONER BRITO

Q    From the second page of the document?

A    Yes.  Yes.

THE COURT:  You can look at it.  It's in evidence, ladies and gentlemen.

A    In her statement to Trooper Quinn, she didn't indicate anything about drugs in her statement.

PRACTITIONER BRITO:  Thank you.  We can take it off the screen.

Q    Investigator VanBramer, you mentioned in your testimony earlier that on April 1st, 2013, you encountered Maxmillian Sloley; is that right?

A    Yes.

Q    And you transported Mr. Sloley to the police barracks, right?

A    I don't recall who transported him.  I believe he was relayed to me and then from there, I would have transported him.  I don't recall exactly who transported him or what unit transported.

Q    Fair enough.  Is it true that you prepared an incident report on this date?

A    Yes.  It was submitted to evidence, correct.

Q    Is it true that when preparing an incident report, you make note of a suspect's apparent condition?

A    In an incident report?  I would have to review it.

PRACTITIONER BRITO:  Sure.  Your Honor,

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

B. VANBRAMER - CROSS - PRACTITIONER BRITO

permission to approach the witness what is stipulated into evidence as D1.

THE COURT:  Approved.

A     Thank you.  Yes.

COURT CLERK:  You want it published to everybody, right?

Q     Apologies.  I told you to look at the second page. I'm going to take that back and ask you to look at the first, please.

PRACTITIONER BRITO:  Permission to publish to the jury?

THE COURT:  You may.

BY PRACTITIONER BRITO:

Q     Mr. VanBramer, I'd like to direct your attention to Box 37 on this document.

A     Yes.

Q     Is it right that on April 1st, 2013, you documented here Mr. Sloley's condition as apparently normal?

A     Yes, I did.

Q     Thank you.

A     Do you need this back as evidence?

Q     Uh-huh.  Thank you.

Something you mentioned earlier is that you -- you were at the police barracks after Mr. Sloley was arrested?

B. VANBRAMER - CROSS - PRACTITIONER BRITO

A    Correct.

Q    And Defendant VanBramer was also there, right?

A    Yes.

Q    And he gave you a field test kit; is that correct?

A    Yes.

Q    And your understanding was that he had just used that kit to test a substance that was found -- found in the car that you had asked him to search; is that right?

A    Yes.  Location where the defendant was taken into custody, correct.

Q    You have no idea how accurate those tests are; is that right?

A    Are you looking for a statistical data?  Because I have none.

Q    You would agree that a lab test would be significantly more accurate than one of these field tests?

A    It would be more accurate.

Q    The sample found in this case was not sent to a lab, right?

A    I don't know if it went to a lab or not.

Q    And the sample and the test kit, to your knowledge, were eventually destroyed; is that correct?

A    Eventually, correct.

          PRACTITIONER BRITO:  Your Honor, no further

          Lisa L. Tennyson, CSR, RMR, FCRR
          UNITED STATES DISTRICT COURT - NDNY

questions.

THE COURT:  All right.  Thank you.

ATTORNEY MITCHELL:  Your Honor, could I ask for a sidebar about Exhibit D8?

THE COURT:  Sure.  We are going to take a brief sidebar, ladies and gentlemen.  Are you done with Mr. VanBramer?  Does Mr. VanBramer still required to be on the stand?

ATTORNEY MITCHELL:  Depending on what we decide, I might have more questions.

THE COURT:  Sit tight, Mr. VanBramer.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Thank you.

(Discussion held at sidebar.)

ATTORNEY MITCHELL:  So, Your Honor, I just -- with Exhibit D8, the plaintiff has opened the door to this one redaction coming back in.  The question about drugs.  I mean, so that was taken out and now they are trying to elicit testimony there's no reference in here to drugs.  And so I think that should be restored, the redaction taken out.

THE COURT:  All right.  I'm going to deny the request, deny the objection, however we frame it, and we can move forward.

(Held in open court.)

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

ATTORNEY MITCHELL:  I have no further questions, Your Honor.

THE COURT:  All right.  Thank you.

Mr. VanBramer, you can step down.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

THE COURT:  Mr. Mitchell, you can call your next witness.

ATTORNEY MITCHELL:  I'm calling --

THE COURT:  Ladies and gentlemen, before you do that, let's take a ten-minute break.  I promised you a 10- or 15-minute.  It seems like the right time to do it.  So ten minutes.  We will come back at 10:46.  All right.  Thank you very much.  Remember not to talk to yourselves about this case while we're on this little break.  Okay?

(Jurors excused, 10:36 a.m.)

THE COURT:  Are we ready to call the jury back in?

Mr. Mitchell, are you ready to go?

ATTORNEY MITCHELL:  We are, Your Honor.

THE COURT:  All right.  Why don't we go ahead and get the jury.

(Jury present, 10:50 a.m.)

THE COURT:  Mr. Mitchell, go ahead and call

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

your next witness if you have any.

ATTORNEY MITCHELL:  I call Eric VanBramer to the stand.

THE COURT:  All right.  Mr. VanBramer, we will put you under oath again.

COURT CLERK:  Please raise your right hand.

E R I C   V A N B R A M E R ,  having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MITCHELL:

Q    Could you please introduce yourself to the jury.

A    Trooper Eric VanBramer.

Q    Where were you born?

A    Niskayuna, New York.

Q    Where did you go to high school?

A    Cohoes High School.

Q    Do you presently work for the New York State Police?

A    Yes.

Q    For how long?

A    Approximately 19 years.

Q    What are your responsibilities?

A    Currently, the troop K9 coordinator for Troop G.  I oversee all the K9s in our troop.  Goes from dog training, certifications, setting up details.  Currently

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

on the Bomb Disposal Unit. Essentially what that is, is I respond to complaints for explosive devices or hazardous devices.

I'm on the Contaminated Crime Scene Emergency Response Team, which deals with hazmat situations, and currently work part-time. I was selected out of all the dogs on the eastern part of --

ATTORNEY GREEN: Objection.

THE COURT: Grounds?

ATTORNEY GREEN: Can we approach at sidebar?

THE COURT: Yes. Okay. Just a minute.

(Discussion held at sidebar.)

ATTORNEY GREEN: Obviously don't know exactly where he's going with this but it sounds like he's about to testify to an award, have been -- he's been selected for having, you know, for excellence and blah, blah, blah, blah. I think that that's directly addressed by the in limine rulings, keeping awards, honors, et cetera, out.

ATTORNEY MITCHELL: There was no such ruling in this case.

ATTORNEY GREEN: Yes, there was.

ATTORNEY MITCHELL: That -- you did not raise that --

ATTORNEY GREEN: I did.

E. VANBRAMER - DIRECT - MITCHELL

ATTORNEY MITCHELL:  -- in your motion in limine.

ATTORNEY GREEN:  It's in the old motion in limine, which were adopted.

ATTORNEY MITCHELL:  Well, I don't think the Court got into it.

THE COURT:  Your objection is to the relevance of that in this case.  I will rule on it now.  I don't think that awards is received for the dog handling is relevant.  So we can just -- you can certainly get into what his responsibilities are, but I don't want this to become a battle of matters that are not relevant to the case.  So --

ATTORNEY MITCHELL:  Or he -- he was just describing, I think, his work with the special operations team.

THE COURT:  I didn't have any objection to what was -- the question that was asked but I don't want to get into awards and accolades that he received.

ATTORNEY MITCHELL:  Okay.

ATTORNEY GREEN:  Selected of all the dogs.

THE COURT:  Haven't allowed the plaintiffs to get into kind of complaint or anything of that -- I don't think this should be about those issues.  So it's -- he's aware of my limiting ruling, right?  The

E. VANBRAMER - DIRECT - MITCHELL

witness is?  You've discussed that with him?

ATTORNEY MITCHELL:  I didn't -- the Court didn't address that.  The way Judge Hummel addressed is he said the awards would not come in in the first instance; however, if there was a challenge to the officer's qualifications, then they would come in.

THE COURT:  That's fine.  We're not at that point yet and I don't think there's going to be a challenge to his qualifications.  If we get there, we will reconsider it.  Make your arguments.

(Held in open court.)

ATTORNEY GREEN:  Just move to strike the last sentence of his testimony.

THE COURT:  I don't recall an answer but I'll go ahead and strike if there was an answer and we can just re-ask the question.

BY ATTORNEY MITCHELL:

Q    All right.  Sir, can you discuss your responsibilities.

A    My responsibilities, as I just previously addressed, again, I was chosen out of all --

ATTORNEY GREEN:  Objection.

THE COURT:  Overruled.

A    I was chosen out of all the K9s on the eastern part of the state to assist the Special Operations Response

E. VANBRAMER - DIRECT - MITCHELL

Team with -- essentially a SWAT team in their K9 capacity and they chose the K9 handler based on --

ATTORNEY GREEN:  Objection.

THE COURT:  Mr. Mitchell, let's move -- let's move him along.  Sustained.

ATTORNEY GREEN:  Move to strike the entirety --

THE COURT:  I'm not striking at this point.  You can -- you can ask your next question.

ATTORNEY MITCHELL:  Just to clarify, because there's been so many objections.

ATTORNEY GREEN:  Objection.  Move to strike.

THE COURT:  All right, Counsel.  We will strike Counsel's quip from the record and just -- you don't need the comments.  Thank you.

BY ATTORNEY MITCHELL:

Q    So there was troop K9 coordinator/supervisor Troop G; is that right?

A    Yes.

Q    And then bomb disposal?

A    Yes.

Q    And the Emergency Response Team?

A    Yeah.  The C-CERT emergency -- Contaminated Crime Scene Emergency Response Team, which dealt with hazmat situations.

Q    Was there also the -- you're involved with the

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

Special Operations Response Team?

A     Yes.  I'm also certified for drone operations as well.

Q     In what geographic area do you work?

A     The Capital Region.

Q     So in your work as the K9 coordinator supervisor, approximately how many dogs do you supervise?

A     It includes approximately 16 K9s, both within the New York State Police and I also coordinate outside agencies as well.

Q     Could you please tell me about your training.

A     Yes.  So prior to becoming a New York State trooper, I was a police officer in Arlington, Virginia. I attended an approximately six-month academy at the Northern Virginia Criminal Justice Training Academy in Northern Virginia.  I worked in Virginia for a few years, and then I got hired with the state police.  I attended their academy, which is approximately six-month residential training academy at the New York State Police Academy in Albany.

     I also attended a five-week FBI hazardous device school down at the Redstone Arsenal in Hudson, Alabama. Also deputized in the Commonwealth of Pennsylvania.

Q     Do you have training in drug detection?

A     Yes.

E. VANBRAMER - DIRECT - MITCHELL

Q    Can you tell us about that.

A    I received training in the academy on the detection of drugs and eventually once getting a drug dog, I found myself in many drug investigations.  So there's a lot of instructions on narcotics, trends, and things of that such.

Q    Can you tell me a little bit about your training and working with police K9s.

A    Yes.  So, part of the process of getting a police K9 is you have to agree to do a -- it's an approximately five-month residential training academy at the New York State Police K9 facility in Cooperstown, New York.

You show up on a Monday with your K9 partner and you live there until Friday afternoon with your partner. And from there, you are trained daily in drug detection, tracking, handler protection, building searches, article searches, and some instances you may have to certify a cadaver as well.

Q    How did you get interested in working with K9s?

A    I've always --

ATTORNEY GREEN:  Objection.

THE COURT:  Sustained.

BY ATTORNEY MITCHELL:

Q    Can you tell us a little bit about your thought process of going into this field of working with K9s?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

ATTORNEY GREEN:  Objection.

THE COURT:  On the grounds?

ATTORNEY GREEN:  It's the same thing.

THE COURT:  What were the grounds?

ATTORNEY GREEN:  The grounds were irrelevant. It's --

THE COURT:  Agree.  Sustained.

ATTORNEY GREEN:  Yeah.

BY ATTORNEY MITCHELL:

Q    Do you know what a cadaver dog is?

ATTORNEY GREEN:  Objection.

THE COURT:  You can answer if you know.

A    Yes.

BY ATTORNEY MITCHELL:

Q    Have you also worked with K9 as cadaver dogs?

ATTORNEY GREEN:  Objection.  May we be heard at sidebar?

THE COURT:  No.  Mr. Mitchell, what's the relevance of this question?

ATTORNEY MITCHELL:  This has to do with his success of working with dogs.

ATTORNEY GREEN:  Objection.  Can we do this at sidebar?

THE COURT:  No, I'm going to -- I'm going to sustain the objection.  Move on.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

BY ATTORNEY MITCHELL:

Q    So back in April of 2013, what was your position with the state police?

A    I was a trooper assigned to the K9 unit.

Q    What troop was that in?

A    That was in Troop F.

Q    In what geographic area did you work?

A    It encompassed Greene County and Ulster County.

Q    What were your responsibilities at that time?

A    From that time, I was on routine patrol, and you responded to patrol or a place in the area, vehicle and traffic enforcement, and having the K9, you'd just be available in case anybody within that region or surrounding region needed a K9 response.

Q    Back in April of 2013, did you work with a particular K9?

A    Yes.

Q    Who was that?

A    It was K9 Ryder.

        ATTORNEY MITCHELL:  So, Your Honor, we're going to show the jury Exhibit D19, which was accepted into evidence.

        THE COURT:  All right.  You can -- you can show the jury.  You can show it to him.

BY ATTORNEY MITCHELL:


                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

Q    Sir, do you recognize the animal shown in D19?

A    Yes.

Q    Who is that?

A    That was my partner, Ryder.

Q    Is Ryder still alive?

A    No.

Q    What kind of dog was Ryder?

A    She was a female German shepherd trained in odor recognition of narcotics.  She also tracked --

THE COURT:  Ms. Ouimet, I think we have had enough of the picture.  You can go ahead.

A    Building searches, handler protection, article searches, and cadaver.

Q    Were you involved in Ryder's training?

A    Yes.

Q    Can you give us more -- a little more specifics about what that training was for Ryder.

A    As I discussed earlier, a five-month academy.  It's a residential -- we get our dogs, we want them to be green, which means that they really don't have any prior training.  We, as a unit, like to imprint our own types of procedures or practices into the K9s.  So, again, we work with the dogs in odor recognition.  We have to certified odor recognition, tracking.  We have to certify at the end of the K9 academy on tracking, the

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

same with building searches, article searches, and handler protection.

We have a series of tests that we have to perform before we're release from the academy to show we're proficient in all those disciplines.

Q    Did Ryder's training include drug detection?

A    Yes.

Q    Can you tell the jury a little bit more specifically about what that training was, any tests the dog had to go through.

A    Yes.  So there's a -- a four-part series that's conducted just for narcotics.  One of the tests is where we bring in 24 cans and in the top of the can there's a small, little opening.  We have certain drugs that the dogs has to test on.  So some of those cans is going to be the odor of a narcotic.  In all the rest of the cans we put distraction odors, such as peanut butter, dog treats, anything to distract the dog, and the dog has to go through all -- all 24 of those cans and properly identify, working through those distracting odors, that they can find the narcotic.

There's a second part which involves searching vehicles.  There's a number of vehicles.  Some are blank, which means there's no drugs sitting on the vehicle.  Some contained narcotics, either on the

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

exterior or interior.  The dog has to search the vehicles and it has to show that they can effectively find the narcotic.

There's a third part to the test, it's called the package test, which is approximately 16 packages that they place in a room, just utilizing just a couple of odors, not all of them in this situation.  Your dog has to successfully find the narcotics in the packages.

And the fourth test is a room search.  Again, just utilizing two odors, not all the odors.  Your dog has to successfully find two odors that are hidden.  It can be in any -- any of the rooms.

So based on all those tests, your dog has to show that they successfully find, and in a timely manner, the narcotics that they're searching for.

Q    Did Ryder's training include detection of cocaine?

A    Yes.

Q    Did Ryder meet the standards with respect to detection of cocaine?

A    Yes.

Q    Can you give me an example of Ryder successfully locating drugs?

ATTORNEY GREEN:  Objection.

THE COURT:  I will allow it.

A    Yes.  So I was trooper of the year based on my --

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

ATTORNEY GREEN:  Objection.

THE COURT:  Sustained.  Move to strike?

ATTORNEY GREEN:  Move to strike.

THE COURT:  Strike that portion of the answer.

ATTORNEY GREEN:  I ask for an admonition to the witness.

THE COURT:  Yes.  I will just say, Trooper VanBramer, just try to answer the questions that are asked without adding additional information that wasn't part of the question.  Thank you.

THE WITNESS:  Yes, Your Honor.

BY ATTORNEY MITCHELL:

Q    Can you give an example of Ryder successfully locating drugs.

A    Yeah.  There was a time -- it was a pretty significant -- it was one of my significant -- most significant cases with Ryder where I was contacted by investigators to do a vehicle search.  Upon arriving, I was told that they had unloaded a vehicle that was on a car transport trailer and they suspected that there was possibly drugs inside the vehicle.

At that point, they asked me to do a search around the vehicle.  My dog had a positive alert on that vehicle.  So based on the positive alert, they did get a warrant on -- not just the alert but other

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

circumstances, and it was transferred to the DEA headquarters in Albany.

Back at the DEA headquarters, they conducted a search of the vehicle. They did not locate anything. So I did a secondary search and, again, my -- my partner --

ATTORNEY GREEN: Objection at this point.

THE COURT: Overruled.

A    My partner continued to search and exhibited the same type of alerts that she did, and she was sourcing on the driver side and the passenger side exterior. Upon some further investigation, it was determined that this type of vehicle had a frame which should have been a U. So once we got out of the vehicle, we noticed that the actual frame was enclosed. So you couldn't see inside the frame.

Further investigation revealed, once they cut into the frame along both sides, there was cocaine, kilos of cocaine stuffed from the front to the back in the rails of the -- of the frame.

BY ATTORNEY MITCHELL:

Q    I'd like to direct --

ATTORNEY GREEN: Your Honor, could we be heard briefly at sidebar?

THE COURT: I'm not -- I'm not going to have a

E. VANBRAMER - DIRECT - MITCHELL

sidebar on the issue right now.

BY ATTORNEY MITCHELL:

Q    Sir, I'd like to direct your attention to the early morning hours of April 1st, 2013.

What were you doing?

A    I was on routine patrol.

Q    Did you have your K9, Ryder, with you?

A    Yes.

Q    What was your shift?

A    It was called the 2 shift.  It was from 7 p.m. to 7 a.m.

Q    Did something attract your attention?

A    Yes.

Q    What was it?

A    9-1-1 had pulled all available cars for a physical domestic in the village of Athens.

ATTORNEY MITCHELL:  Your Honor, can I approach the witness?

THE COURT:  You may.

ATTORNEY MITCHELL:  So I'm showing him Exhibit D-9, which is not in evidence.  I think you should have it in your binder, Your Honor.

THE COURT:  Do you have -- Counsel, do you have D9 as well?

ATTORNEY GREEN:  I should.  Give me a moment.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

Yes.  Okay.  Here we go.

ATTORNEY MITCHELL:  So, Your Honor, I would like to move D9 into evidence as a business record.  It has a business record certification on the first page, which should be sufficient.

ATTORNEY GREEN:  Business record certification is not -- is still hearsay.  The -- the -- the custodian is not here.  There's also hearsay within the document even -- if, you know, part of the record came in as kept in the ordinary course of business, I think the only use of this document would be for truth and there -- you know, he can testify to what he can testify to, but what somebody else certifies is a business record and we don't have that witness.  That can't come in.

THE COURT:  Mr. Mitchell, do you want to respond?

ATTORNEY MITCHELL:  Business record is an exception to the hearsay rule.  So Counsel's wrong about that.  This certification meets all the standards and this is relevant because it's the 9-1-1 call that the officers were responding to about the incident with Daphne Rollins.

ATTORNEY GREEN:  Your Honor, may I --

THE COURT:  I don't need any further argument. I think that what I'm looking at in -- in D9 may in part

E. VANBRAMER - DIRECT - MITCHELL

be a business record, but there's a number of narratives in here that, in the Court's opinion, wouldn't qualify under the business record exception.  So I'm going to sustain the objection.

BY ATTORNEY MITCHELL:

Q    Do you know approximately what time that 9-1-1 call was?

A    Looks like there was a 9-1-1 --

THE COURT:  Counsel --

Q    Without look at it --

ATTORNEY GREEN:  Can we --

THE COURT:  Why don't we have the -- you can pass the exhibit up to your counsel.  You can certainly refresh his recollection of it, Mr. Mitchell, if necessary.  But please proceed.

BY ATTORNEY MITCHELL:

Q    Approximately what time was the 9-1-1 call?

A    I believe the -- received initially 9-1-1 hang-up around 4:20.  Approximately 4:20 a.m.

Q    Do you recall the name of the caller?

A    Miss Daphne Rollins.

Q    Do you recall the general nature of what the call was about?

ATTORNEY GREEN:  Object to foundation. Personal knowledge.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

THE COURT:  Let me take a look at the question.  You can answer if you have any knowledge about what was asked.  Overruled.

A    Yes, it would have been broadcast over the air.

BY ATTORNEY MITCHELL:

Q    Did you say it was a 9-1-1 domestic incident?

A    Yes.

Q    After you heard the 9-1-1 call, how did you react?

A    Upon hearing it was a physical domestic, these are the most dangerous calls for law enforcement.  There's been several troopers --

ATTORNEY GREEN:  Objection.

THE COURT:  Overruled.

A    There's been several troopers that have been killed responding to these types of calls.  The fact this wasn't just verbal, the fact that it was physical makes it a little bit more serious.  So not being in the general area, we didn't have a lot of people working that night.  I decided to kind of start making my way there just in case something happened.

BY ATTORNEY MITCHELL:

Q    At some point did you receive a call from Bryan VanBramer?

A    Yes.

Q    And who is that?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

A    It's my brother.

Q    Is he also a state trooper?

A    Yes.

Q    What did he tell you?

A    He advised that he had spoke to the victim, Miss Rollins, and she advised that the suspect was fleeing and possibly possession of narcotics.

Q    Did he tell you anything about a vehicle stopped?

A    Yes.

Q    Can you tell us about that.

A    Yeah.  He advised the suspect was stopped and pulled over by the Greene County sheriffs in the area of the Rip VanWinkle Bridge.

Q    Did Bryan VanBramer request that you go somewhere?

A    Yes.  He had asked, since I was the only K9 working that night, that -- if I could patrol to the location of the vehicle.

Q    What did you do?

A    I patrolled to the vehicle.

Q    Upon arriving at that location near the bridge, what did you see?

A    I saw the suspect's vehicle on the side of the road and, again, was in the town of Catskill.

Q    What did you do next?

A    I got my K9 partner and I conducted a search of the

E. VANBRAMER - DIRECT - MITCHELL

vehicle.

Q   Can you tell us how Ryder reacted to the vehicle, if at all.

A   Ryder had a positive K9 alert to the vehicle for the odor of narcotics, which I instructed her to search for.

Q   And I know you testified about that at length yesterday.  So there was a positive alert.  And do you recall the areas of the vehicle?

A   Yes.  So I was working Ryder around the vehicle. She was alerting in the area of the driver's side, passenger side, the area of the hood exterior.  And once I introduced her into the vehicle, she was alerting.  I could tell she was in the odor of the area of the center console.

Q   Did you find anything in the vehicle?

A   Yes.

Q   What was it?

A   It was a -- a white chunky substance.  Again, based on my training and experience, I believe it to be cocaine.

Q   Can you describe more how it looked in terms of being on the seat?

A   When you find the -- you know, narcotics or drugs or marijuana on the seat, it's typically indication that

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

there's usually more in the vehicle being used.  They're coming out of the container or packaging, whatever they're in.  So, to me, it was very suspicious.  Why would there be a small amount on the seat?  And there must be a larger amount somewhere else in order for that small amount to be spilled on the seat.  It must be in some type of packaging.

Q    Did what you see on the seat raise any suspicion for you about what the driver may have been doing right before he was arrested?

ATTORNEY GREEN:  Objection.  Speculation.

THE COURT:  I'll allow it.  Overruled.

A    Yes.

BY ATTORNEY MITCHELL:

Q    What was your suspicion?

A    It was my belief when anybody is fleeing from a crime scene, it's usually because they don't want to get caught for something that they're doing.  So I had made the determination that while he was fleeing, he knew Miss Rollins had called the police, he knew that the police response was going to be coming, and so in a very hurriedly manner or a -- a quickly manner, as he was fleeing, I believe that he was trying to conceal the drugs, or hide them.

Q    Did you do anything with the evidence?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

A     Yes.

Q     What did you do?

A     I field tested it.

Q     What is the name of the test that you used?

A     We call it a NIK test.  It's, again, a -- a rapid field screen test.  It's a 904 reagent for cocaine, salts and bases.

ATTORNEY MITCHELL:  So, Your Honor, I'd like to show you or show the witness Exhibit D20 in which I understand was stipulated into evidence.

THE COURT:  Counsel?

ATTORNEY GREEN:  I want to make sure we did. I don't think we stipulated that into evidence.  Did we? Okay.  Never mind.

THE COURT:  Received without objection.

(Defendant's Exhibit D20, received.)

ATTORNEY MITCHELL:  Your Honor, can I approach the witness?

THE COURT:  You may.

BY ATTORNEY MITCHELL:

Q     Sir, can you tell us what Exhibit D-20 is.

A     This is a replica of the field test kit that I used that night when I field tested the cocaine that I found inside Mr. Sloley's vehicle.

Q     Is Exhibit D20 a fair and accurate representation

E. VANBRAMER - DIRECT - MITCHELL

of the field test that you used on April 1st, 2013?

A    Yes.

Q    Prior to that day, had you had any training in how to perform this field test?

A    Yes.

Q    Can you tell me about that training.

A    Yes.  So, the good thing about being in the state police is they do a really good job of training and providing resources to their members.  So at this -- New York State Police Academy, they did instruct us, extensive training on how to use the drug test kit.

Q    How is the test performed?

A    So once you have a -- a suspected narcotic, and based on our training and experience, sometimes we get these narcotics and we can easily identify them.  So once we identify them as the narcotic that we think it is, we proceed to the test kit that's going to test for that narcotic.

What that entails is there's a -- a little plastic strip on the top of this pouch.  You remove it and then you open up the pouch.  There's an area that you deliver the suspected narcotics, which drops into the bottom of the field test kit, and there's instructions on the front on how to proceed with the sample.

So that night, I put a small amount in the bottom

E. VANBRAMER - DIRECT - MITCHELL

of the test kit.  There's three ampoules in here that contain a chemical solution.  What you're supposed to do is you're supposed to crush the first ampoule.  There's a liquid that falls into the bottom of the pouch reacting with the suspected substance.  You slightly agitate it, and if it is indeed cocaine, it will turn blue.

Once I receive that blue color that night, I proceeded to step number two.  Step number two is the same fashion.  You crush that little ampoule, releasing the chemical into the bottom of the pouch reacting with the suspected narcotics, do a slight agitation, and you should receive a color pink.  On that night I did receive the color pink, so I proceeded to step number three.

Step number three, same fashion.  You break the third ampoule, chemical falls down, reacts with the suspected narcotic.  Do a slight agitation and in this case you are going to get a color suspension and that just means that there's a color pink that's suspended over the color blue, and that means that you have a -- a field test kit that tested positive for cocaine.

And based on my training and experience and my instructions at the New York State Police Academy, that's how I conducted the test that night.

E. VANBRAMER - DIRECT - MITCHELL

Q    So the test you performed on April 1st, 2013, on that substance that came out of the plaintiff's car, what was the result?

A    It tested positive for cocaine.

Q    Approximately how many of those field tests have you performed in your career?

A    Hundreds.

Q    After you performed the test, what did you do with the evidence?

A    I secured it as evidence.

Q    How did you secure it?

A    I took it back to the trooper barracks, S.P. Catskill, and I turned it over to Trooper Bryan VanBramer.

Q    I'll ask you more about that later but for that --
where did you go next?

A    I went back to the trooper barracks at S.P. Catskill.

Q    Was Maxmillian Sloley at the station?

A    Yes.

Q    Were you the officer who arrested Maxmillian Sloley?

A    No.

Q    Without getting into the details when you arrived at the station, were you told anything about Maxmillian Sloley's background?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

A    I was.

Q    On April 1st, 2013, did you perform any searches of Maxmillian Sloley?

A    Yes.

Q    How did you perform the search?

A    Again, as I discussed yesterday, there's kind of a standardized way that I perform the search.  I have the subject who's being searched go into a private room.  I advise them to stand with their hands against the wall facing away from me and not to do anything until they're instructed to, at which point I advise them that I'm going to be asking them to hand back an article of clothing, and I'll search that article of clothing, and then we will continue until there is no more clothing.

Q    Did you find any contraband in his clothing?

A    No.

Q    So what happened next?

A    So based on my training and experience, there is certain areas of our body that just can't be seen unless there's some type of manipulation.  Our fingers, if they're closed, I'm going to have to tell you to open them so I can see the exterior of our skin.  Our toes -- if our toes -- we may have to spread them apart so I can see the inside of the toes.  When our hands are down at our side like this, there's an area where -- the armpit.

E. VANBRAMER - DIRECT - MITCHELL

And this case, we got done with the searches after I checked in between his fingers, his toes, underneath his arms.

There comes a time where -- there's an area where the butt cheeks are squeezed together; this area is very moist.  So if you had a plastic packing material, anything that's plastic, we all know by experience that if you were to put it into that area, based on the sweat and everything else, just because you're bending over does not mean that that's going to fall out.  It's going to stay secreted in between the butt cheeks based on that moisture and the type of material that's in there.

So I still could not see all the exterior of the skin at this point.  So I asked Mr. Sloley if he could just separate the area so I could see all the remaining skin.

Q    Did you look inside of Maxmillian Sloley's body?

A    No.

Q    How long did the search of his buttocks last?

A    A second.

Q    Did you touch him?

A    No.

Q    Did you reach into his body cavity?

A    No.

Q    Did you put anything in his body cavity?

E. VANBRAMER - DIRECT - MITCHELL

A     No.

Q     How far away were you from Maxmillian Sloley when the search of his buttocks occurred?

A     Approximately four to five feet.

Q     Did you find any contraband on his body?

A     I did not.

Q     Prior to conducting the search, did you suspect that Maxmillian Sloley was concealing contraband on his person, including in that area between his butt cheeks?

          ATTORNEY GREEN:  Objection.

          THE COURT:  I'm just going to read the question.  Overruled.

A     Can you repeat the question?

BY ATTORNEY MITCHELL:

Q     Prior to conducting the search, did you suspect that Maxmillian Sloley was concealing contraband on his person, including in that area between his butt cheeks?

          ATTORNEY GREEN:  Same objection.  It's the word "on," which is --

          THE COURT:  I understand.  I'll -- with that clarification, I will sustain the objection.

BY ATTORNEY MITCHELL:

Q     Prior to conducting the search, did you suspect that Maxmillian Sloley was concealing contraband in the area between his butt cheeks?

E. VANBRAMER - DIRECT - MITCHELL

A    I absolutely suspected.  That's the only reason why I conducted the search, is with a hundred percent certainty I believe that he did possess something.

ATTORNEY GREEN:  Same objection and move to strike.  It's still not the right question.

THE COURT:  Overruled.  You can cross-examine on the issue.

BY ATTORNEY MITCHELL:

Q    Without getting into any information you might have known about Maxmillian Sloley's background, what facts was your suspicion based on?

A    So, again, like we talked about yesterday, me as a trooper, again, I hold myself to a high standard.

THE COURT:  Let me just interrupt you.  The question was what -- I'll just read it because I don't want the -- the extraneous comments.

Without getting into any information you might have known about Maxmillian Sloley's background, what facts was your suspicion based on?

A    So, my suspicion was based on a number of facts.  I compile all these facts and I put it together.  So based on the fact that we responded to a physical domestic where the victim had advised that the suspect was in possession of narcotics, I took that into account.

I took into account that Mr. Sloley was fleeing.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

Why would somebody flee from the scene prior to the police responding unless they were trying to hide something.  I took --

ATTORNEY GREEN:  Objection.  Can we be heard on sidebar?

THE COURT:  Okay.  We can have a quick sidebar.

(Discussion held at sidebar.)

ATTORNEY GREEN:  I think we have kind of a -- sorry.  I will wait --

COURT CLERK:  The music hasn't started yet.

ATTORNEY GREEN:  The Fourth Amendment rule is the suspicion can't come from purely fleeing the police. I -- I don't think that, right, in testifying that fleeing is a factor that creates a reasonable suspicion that there is a substance in a body cavity without explaining that in depth to the jury is going to be fair.

THE COURT:  I think you can cross-examine him on how fleeing creates a suspicion that someone's secreted into their body.

ATTORNEY GREEN:  But I think -- I'm happy to do that if we are going to instruct the jury that the Fourth Amendment rule is that fleeing does not create a reasonable suspicion, that the problem is confusing the

E. VANBRAMER - DIRECT - MITCHELL

jury.

ATTORNEY MITCHELL:  No, it's the totality of the circumstances is one of many facts that's relevant. It's not the only one.

ATTORNEY GREEN:  Objection.

ATTORNEY MITCHELL:  That instruction will be --

THE COURT:  Well, I'm going to overrule the objection.

(Held in open court.)

THE COURT:  The objection is overruled.  You can proceed with your question.

BY ATTORNEY MITCHELL:

Q    So you're talking about the fleeing from the scene. Can you continue your answer, sir.

A    Yes.  So I just like to tell the jury, like, none of this was done in a hunch --

ATTORNEY GREEN:  Objection.  Move to strike.

THE COURT:  Overruled.

A    There was a number of things that me, as a police officer investigating that night, that I was taking into account.  I discussed the victim, her statements, the fact that he was fleeing.  I took into account that my dog, who is certified in the odor of narcotics, had a positive alert on the vehicle.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

I took into account the fact that I found cocaine inside of Mr. Sloley's vehicle.  I took into account that that suspected narcotics field tested positive for cocaine.  I also took into account the manner in which I found these drugs.  As I discussed, there's only one way that crumbs or, in this case, the small particles of narcotics are going to get onto the seat.  It's because it's coming from another source.  It's in a container.  It's in a big plastic bag.  Nobody's just going to sprinkle a little bit on that.

So me, in the manner in which I found the drugs leads me to believe that he was concealing them.  I also took into account his criminal history.

BY ATTORNEY MITCHELL:

Q    You can't get into that.  So -- okay.

THE COURT:  I'll strike that last portion of the answer as violating my in limine ruling.  This is the last warning.

ATTORNEY MITCHELL:  All right.  Just the last sentence?

THE COURT:  The last portion.

ATTORNEY MITCHELL:  Okay.

BY ATTORNEY MITCHELL:

Q    In your experience, do suspects sometimes conceal drugs in that area between their buttocks?

E. VANBRAMER - DIRECT - MITCHELL

A    Yes.

Q    On other occasions, have you found drugs in that area when you search a suspect?

A    Yes.

Q    So I'd like to show you Exhibit D13 that's in evidence.

ATTORNEY MITCHELL:  Can we show this to the jury?

THE COURT:  You may.

BY ATTORNEY MITCHELL:

Q    So this is Exhibit D13 that one of the other witnesses talked about.

Do you recognize this document?

A    It's not on my screen.  It's on now.

Q    Do you recognize this document?

A    Yes.

Q    What is it?

A    It is a New York State Police General 2 Evidence form.

Q    Did you fill out some of the information on this document?

A    Yes.

Q    Is this document about the drugs that you recovered from Maxmillian Sloley's vehicle?

A    Yes.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

Q    So you see the section called Description?

A    Yes.

Q    Is that an accurate description of what you recovered?

A    Yes.

Q    And it says 904 reagent for cocaine salt and base. Is that the kind of test that we -- that you talked about, Exhibit D20?

A    Yes.

Q    And does this record reflect what you did with the evidence?

A    Yes.

Q    Can you tell us.

A    It's just showing that I transferred the evidence from the defendant at 5:45 a.m. on April 1st, 2013.  I took that from the defendant, then I gave that evidence to Trooper Bryan VanBramer at 6:25 a.m. on April 1st, 2013.

Q    So is that notation accurate?

A    Yes.

Q    So discussing that drug evidence, did you have any further -- any further responsibility for it after you transferred it to Bryan VanBramer?

A    No.

Q    Did you have any say about where the drug evidence

E. VANBRAMER - DIRECT - MITCHELL

would be kept?

ATTORNEY GREEN:  Objection.

THE COURT:  Grounds?

ATTORNEY GREEN:  Relevance.  I think it may
also be opening the door to other things on special
relationship that --

THE COURT:  All right.  I'll -- I'll sustain
the objection.

BY ATTORNEY MITCHELL:

Q    Were you involved in an evidence custodian possibly
moving the drugs?

ATTORNEY GREEN:  Objection.  Same objection.

THE COURT:  Different question.  I'll allow
it.

A    No.

Q    Did you decide how long the drug evidence would be
kept?

ATTORNEY GREEN:  Same objection.

A    No.

ATTORNEY GREEN:  I --

THE COURT:  I'm going to allow it.  Overruled.

BY ATTORNEY MITCHELL:

Q    Did you decide how long the drug evidence would be
kept?

A    No.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

ATTORNEY MITCHELL:  So I'd like to publish and show the witness Exhibit D3.  This was stipulated into evidence.

THE COURT:  My records show D3 was stipulated; is that accurate?

ATTORNEY GREEN:  Yes.

THE COURT:  D3 is -- it's admitted into evidence as Defendant's 3.

ATTORNEY MITCHELL:  I'm showing it right now.

ATTORNEY GREEN:  No objection.

BY ATTORNEY MITCHELL:

Q    Do you recognize Exhibit D3?

A    Yes.

Q    Who made this document?

A    I did.

Q    I'd like to take you to the section called Narrative.  Was this drafted by you?

A    Yes.

Q    Can you read that section to the jury.

A    On April 1st, 2013, utilized K9 Ryder for a vehicle search on State Route 23 in the village of Catskill.  I was requested by Trooper VanBramer to search a vehicle that was utilized in a crime in the village of Athens. Ryder did have a positive alert on each side and front hood exterior.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - DIRECT - MITCHELL

Inside the vehicle, Ryder alerted on the center console area.  A small amount of cocaine was located on the driver's seat near the alert area.  Closed.  See SJS 5034984.

Q     In terms of that SJS number, what does that mean?

A     It's just a cross-reference to Trooper Bryan VanBramer's incident report.

Q     Is this narrative accurate?

A     Yes.

Q     What's the date that it was written?

A     April 1st, 2013.

Q     Did you ever fabricate evidence against Maxmillian Sloley?

A     No.

Q     Did you have any personal issues with Maxmillian Sloley --

A     No.

Q     -- before this incident?

ATTORNEY MITCHELL:  I have no further questions.

THE COURT:  All right.  Cross-examination.

ATTORNEY GREEN:  Yes.  I don't know if we want to give the jury a break or not, but I'm happy to get going.

THE COURT:  Let's get going.  They just had a

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - CROSS - GREEN

break and we're nearing the lunch hour.  So you can proceed.

ATTORNEY GREEN:  That's very fair.  Let me just --

CROSS-EXAMINATION

BY ATTORNEY GREEN:

Q    Morning or afternoon?

A    Good morning.

Q    Good morning.  So, you testified about a few things.  I -- I'm going to do my best to kind of do it in a similar order but I'm sorry if I go out of order.

First, do you recall earlier talking about an incident in which you found drugs in a car, right?  In, like, the secret place in the car?

A    Yes.

Q    Okay.  And in order to get into that part of the car, what did you do?  Or what did you or your colleagues do?

A    Again, I was called for, like, K9 support.  It was an investigation -- a pretty large-scale investigation that was being conducted.  So I was there simply as a K9 support.  I had nothing to do with anything regarding --

Q    Okay.  But somebody at the police department or the sheriff's office -- or the troop -- what is the correct term for the office?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - CROSS - GREEN

A     I believe it was a DEA task force.

Q     Okay.  Somebody in the DEA task force cut open part of the car or something like that; is that correct?

A     That's correct.

Q     No one did that to the car here, right?

A     No.

Q     No one searched the car even for -- any further after, you know, you found this trace amount, did they?

A     You're wrong.

Q     Okay.  Somebody searched the car further?

A     I did.

Q     Okay.  You searched the car further but you didn't search, kind of, secret areas or things like in that other case, did you?

A     There was no need to.  Because at this point, I had located the drugs inside the vehicle, and this case I'm talking about, there was no drugs present.  So we had assumed that the drugs were coming from somewhere.

Q     Well, but you just testified, did you not, that you did think there were other drugs, that you were searching for bulk product, right?

A     Correct.

Q     That was your testimony?

A     That was my testimony.

Q     But you didn't search the car for it in -- in the

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - CROSS - GREEN

secret places, in the places you know it could be?

A    Well, that's because we had Mr. Sloley back at the station.

Q    Right.  But you just testified that -- that one of the places these things could be is in the car.  Why didn't you suspect it was in the car?

A    We just hadn't gotten to that point yet.

Q    And but -- okay.  Then let me another question. You searched Mr. Sloley and didn't find anything.  Why didn't you search the car after that?

A    Because it wasn't my arrest.  It wasn't my investigation.

Q    Okay.  But -- but no one searched the car after that, right?

A    That's correct.

Q    So you didn't find anything.  You didn't find any bulk product.  You say you thought there was bulk product but no one bothered to search the car?

ATTORNEY MITCHELL:  I object.  That misstates the testimony.  He found drugs in the car.

THE COURT:  Overruled.  You can answer.

A    Yes.  So there are certain inconsistencies like --

ATTORNEY GREEN:  Objection.  Move to strike.

Q    Yes or no, please.

A    I'm trying to explain my answer.

E. VANBRAMER - CROSS - GREEN

THE COURT:  Let me reread the question.  So you didn't find anything, you didn't find any bulk product.  You said you thought there was bulk product but no one bothered to search the car.  The answer and then the next question -- was there another question?

ATTORNEY GREEN:  It's just a yes-or-no question.

A     There's a reason why we searched that vehicle I was talking about.

ATTORNEY GREEN:  Objection.  Move to strike.

THE COURT:  So you can answer the question that was posed to you, if you can.  If you can't for some reason --

THE WITNESS:  Can you repeat?  I'm sorry.

BY ATTORNEY GREEN:

Q     Okay.  So you searched Mr. Sloley.  You found this trace amount of drugs.  You didn't find any drugs on Mr. Sloley's body.  You thought you were searching for bulk product But no one bothered to search the car deeply; is that correct?

A     There's a reason why.  So, no.

Q     So -- so the answer is yes.  If there's a reason why, then it happened.  Then --

ATTORNEY MITCHELL:  This is argumentative.  They're cutting off the witness.  This is improper.

E. VANBRAMER - CROSS - GREEN

THE COURT: All right. Let's move on to the next question or rephrase the question.

BY ATTORNEY GREEN:

Q   Okay. So, you testified, kind of, about your suspicions while you described to Mr. Sloley as fleeing. Let's get into that a little bit.

When you say "fleeing," you don't mean directly fleeing from the police like the police are chasing him. You mean he left when he heard the police had been called at all, correct?

A   Yeah. He knew the police were on their way. So, yes, he was fleeing.

Q   But we're not talking about, like, a movie car chase or the OJ Simpson car chase or anything like that, right?

A   No.

ATTORNEY MITCHELL: Objection to the relevance.

THE COURT: Overruled.

BY ATTORNEY GREEN:

Q   So, at some point he gets pulled over on a bridge, correct? Or near a bridge?

A   Correct.

Q   About how far from the bridge did you -- or -- let me figure out. At some point before he gets pulled

E. VANBRAMER - CROSS - GREEN

over, he sees the police car for the first time, correct?

A     Yeah.  He would have to, yes.

Q     About how far from the bridge would that have been?

ATTORNEY MITCHELL:  Objection.  Calls for speculation.

THE COURT:  If you know, you can answer.

A     How far from the actual bridge?

BY ATTORNEY GREEN:

Q     Or how far from where he stopped, is really what I want to know.

A     How far -- repeat the question.

Q     Let me -- let me try to ask it better.

There was a place at which he pulled over when -- when the police car showed up, correct?

A     Yes.

Q     Did he pull over immediately when you put on your lights or what have you?

A     I didn't -- I did not pull him over.

Q     Do you know how quickly he pulled over?

A     The -- the Greene County sheriffs who pulled him over were already gone from the scene upon my arrival.

Q     It could have been as soon as he saw the Greene County sheriffs he pulled over immediately, correct?

A     Or it could have been several seconds.  I -- I

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - CROSS - GREEN

don't know.

Q    Either way, we're talking about seconds, not minutes.  Not a long chase, correct?

A    Correct.  Yeah, there was no -- there was no chase.

Q    Okay.  So, you said you think when people are fleeing the police, they are likely to hide drugs, they are likely to try to dispose of or hide drugs, correct?

A    Correct.

Q    But you didn't search the seat.  You didn't have Ryder, kind of, go in the area where he would have driven up to stopping, did you?

A    No.  I conducted a search around the vehicle.

Q    Right.  But just around the vehicle.  You didn't go back to where he had driven up, you didn't check on the side of the road, did you?

A    We're talking about several miles.  We're not going to go back several miles and search the road and conduct a -- a -- a grid search.  That's something that we just do in our course of business.

Q    I'm not talking about several miles.  You just testified that it was probably several seconds before he took to pull over.  There wasn't a long chase.  But you didn't go cover those seconds seconds [sic] -- several seconds from where he would have seen the siren to where he ultimately pulled over, did you?

E. VANBRAMER - CROSS - GREEN

A    I did not, no.

Q    And you testified that that is a place where you think, based on your training, it's pretty likely someone would have thrown drugs, right?

ATTORNEY MITCHELL:  Objection. Mischaracterizes.

THE COURT:  You can answer it if you know the answer.

A    Repeat the question.

BY ATTORNEY GREEN:

Q    Let me rephrase.  Based on your training, when somebody sees the police and it is fleeing, in your words, they are likely to try to dispose of drugs by, for example, throwing them out the window, correct?

A    I mean, these drugs are a profit.  Their first method is --

ATTORNEY GREEN:  Objection.  Move to strike.

THE COURT:  Again, try to answer the question.

ATTORNEY MITCHELL:  Your Honor, he did -- well, never mind.

Q    It's a yes-or-no question.  Based on your training, when somebody sees the police and they have drugs, you think they -- one of the things they are likely to do is throw them out the window to dispose of them, correct?

A    There are several ways.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - CROSS - GREEN

Q    Right.  But that's one of them, correct?

A    That is one way, yes.

Q    Okay.  And -- but you didn't conduct a search for what would have happened if that had happened, did you?

A    Again, it wasn't my arrest.  I was there --

ATTORNEY GREEN:  Objection.  Move to strike.

Q    Please answer yes or no.

ATTORNEY MITCHELL:  Objection.  This was asked and answered.

THE COURT:  I'm going to allow you to answer that question.

A    Did I search the area?

ATTORNEY GREEN:  Can we read back the question, please?  I'm sorry.

THE COURT:  The question was:  You didn't conduct a search for what would have happened if that had happened, did you?  The answer, again, it wasn't my arrest.  I was there.

ATTORNEY GREEN:  Perhaps I should rephrase.

THE COURT:  Why don't you rephrase.

BY ATTORNEY GREEN:

Q    You did not search for where you would have found drugs if somebody was fleeing and threw them out the window, correct?

ATTORNEY MITCHELL:  Objection.  Asked and

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - CROSS - GREEN

answered.  Not relevant.

THE COURT:  Overruled.  I'm not sure we got an answer to that.

A    I checked the surrounding area around the vehicle.

Q    Right.  But your testimony was that you didn't check beyond just the immediate area, correct?

A    I don't recall that night --

Q    Okay.

A    -- how far away from the vehicle I checked.  I really don't.  I'm sorry.

Q    Okay.  So do you remember when Mr. Mitchell was asking you questions about -- I think it was Defendant's 20, that was the sample test kit?

A    The NIK test kit?

Q    Yes.

A    Yes.

Q    When you -- when you have one of those in the field, it has a set of instructions, correct?

A    On the front of the package, yes.

Q    We don't have that set of instructions with us here today?

A    It's in front of me right now.

Q    I'm sorry.

ATTORNEY GREEN:  May I approach the witness and take a look at this?

E. VANBRAMER - CROSS - GREEN

THE COURT:  You may.

ATTORNEY GREEN:  Okay.

A    Instruction one, instruction two, and instruction three.

Q    I see, yep.  Let me rephrase the question.

There are some instructions on the package, and I -- but the -- the test kit itself comes with a written set of instructions, correct?

A    Yes.

Q    And we don't have that with us here today, do we?

A    No.

Q    Okay.  And those written instructions are very important for understanding how to use the test kit, et cetera, correct?

A    No.

Q    The written instructions are not important?

A    I told everybody, I was instructed at the New York State Police Academy.  It's very simple.

ATTORNEY GREEN:  Objection.  Move to strike.

THE COURT:  Overruled.  You can answer the question.

A    So this test is so simple that you could -- you could show a child how to use it and you would never have to show them again.  It's like starting your vehicle.  You may have to show somebody how to turn the

E. VANBRAMER - CROSS - GREEN

ignition once.  Once you learn how to do the ignition, you don't need a set of instructions to operate that -- the starter in your vehicle.  So, I was instructed --

THE COURT:  That's sufficient.  Move on.

BY ATTORNEY GREEN:

Q    But the instructions don't just say how to mechanically use the test, do they?  They include some cautions how to use the substance of the results, correct?

A    Yes.

Q    And you're saying that's not important?

A    I was trained on all of this.

Q    Right.  The instructions are also important, correct?

A    The instructions are important for somebody who does not know how to use it, yes.

Q    Well, the company has updated the kit since you were trained; isn't that correct?

A    I don't know.

Q    You don't know?

ATTORNEY MITCHELL:  Objection.  This is not relevant.  We should stick with the time period of this case.

THE COURT:  Overrule the objection but let's -- let move forward.  I think the point's been

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - CROSS - GREEN

made.

ATTORNEY GREEN:  Okay.

BY ATTORNEY GREEN:

Q    So you testified that you conduct a -- your searches of this kind in a standardized way.  Do you recall that?

A    Yes.

Q    You said you have people stand with their hands against the wall, correct?

A    Correct.

Q    That you search an article of clothing and you will continue until there's no more clothing, correct?

A    Correct.

Q    And then there are certain areas where you can't see anything without manipulation; is that correct?

A    Correct.

Q    You -- you said some things that were confusing to me, so I want to clear them up.

ATTORNEY MITCHELL:  Objection to counsel testifying.

THE COURT:  Counsel, same --

ATTORNEY GREEN:  Understood --

THE COURT:  Please keep the quips --

(Court reporter admonition.)

BY ATTORNEY GREEN:

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

SLOLEY v VANBRAMER - 14-cv-339

101

E. VANBRAMER - CROSS - GREEN

Q    You were talking about what you could see being exterior skin.  Isn't all skin exterior?

A    All skin exterior?

Q    Yeah.

A    Yes.

Q    Okay.  So, there's no distinction between interior skin and exterior skin, correct?

A    Kind of confused on what you're asking.

Q    Well, your testimony was that -- that -- I'll apologize.  This is a tight paraphrase instead an exact quote, but your testimony was all that you looked at was the exterior skin.  I'm trying to understand whether there is something other than an exterior skin.  Some other kind of skin.

A    Yes.

Q    There is another kind of skin?

A    That would be inside your body.

Q    That -- that's not skin, is it?

A    I mean, I don't know what you would call it but -- I was referring to just the skin on the exterior of the body.

Q    Okay.  I believe you gave some testimony about whether or not you have some responsibility for maintaining evidence.  Do you remember that?

A    Me maintaining evidence?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - CROSS - GREEN

Q    Whether or not -- and I think your testimony was that you do not have that responsibility.  Is that more or less correct?

A    Until the time I put the evidence into the evidence locker, I do have to cause custody of that, of that evidence.  But, yeah, once I put it into the evidence locker, I have no control over what happens to it.

Q    Understood.  But you are -- let me just -- you are employed by the same entity that is responsible for maintaining the evidence locker, correct?

A    Yes.

Q    You were trained by the same entity that is responsible for maintaining the evidence locker, correct?

A    Correct.

Q    You are represented by attorneys from the same entity --

        ATTORNEY MITCHELL:  Objection.  Not relevant.

        ATTORNEY GREEN:  Do we want to discuss this at sidebar or --

        ATTORNEY MITCHELL:  The -- the witness's representation --

        THE COURT:  Let me -- let me -- let me take a sidebar here and hear -- hear the arguments.

        (Discussion held at sidebar.)


Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - CROSS - GREEN

ATTORNEY GREEN:  This is what I've said earlier about they testified that he doesn't have responsibility.  This goes to whether there's a special relationship.  These are just straight -- straight up the factors of special relationship from the test.  Now, whether I'm going to ask factors 5 and 6 is something I want to talk about sidebar whether they will stipulate out of the presence of jury to indemnification and settlement subject to approval.  But the first four factors I think are completely fair game because they try to tell the jury he has no responsibility.

ATTORNEY MITCHELL:  Your Honor, you already precluded this in the --

THE COURT:  I think I did.

ATTORNEY GREEN:  They opened the door.

THE COURT:  I don't think so.  We stopped them from doing most of those questions.

ATTORNEY GREEN:  All right.

THE COURT:  I'm going to -- I'm going to sustain the objection, and we're going to not be talking about the test.

ATTORNEY GREEN:  Okay.

THE COURT:  Thank you.

(Held in open court.)

BY ATTORNEY GREEN:

E. VANBRAMER - CROSS - GREEN

Q    So a moment ago, or when you were speaking to Mr. Mitchell, you were also testifying specifically about your history with Ryder and other searches she's conducted.  Do you recall that?

A    Yes.

Q    Is it fair to say that Ryder occasionally gets things wrong or got things wrong?

A    I don't know.  It's complicated.

Q    Is it fair to say that Ryder has alerted in situations where you did not ultimately find drugs?

A    Again, that requires some explanation.

Q    Why don't you give me a yes-or-no question [sic] and your counsel on redirect can ask you to explain it or not.

A    There has been times where Ryder has alerted and there has not been anything located.

Q    Okay.  So I think the last thing I'd like to ask you about is basically your understanding of what it would mean to be hiding drugs inside somebody's body.

So, I've got a pen in my hand.  Is it fair to say that this is, now that it's in my pocket, on my body?

ATTORNEY MITCHELL:  Objection.  I don't see the relevance.

THE COURT:  Overruled.

A    It's on your person.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - CROSS - GREEN

BY ATTORNEY GREEN:

Q    Okay.  And let's say I put it in my pocket here. Is that now -- is it fair to say this is now on my body or on my person?

A    On your person.

Q    Is it also fair to say that I would get in a lot of trouble if I tried to put this pen in my body in front of the Court?

ATTORNEY MITCHELL:  Objection.  Not relevant.

THE COURT:  I mean, that particular question probably isn't relevant whether you would get in trouble or not with the Court for inserting a pen into your ear. But you can rephrase the question.

BY ATTORNEY GREEN:

Q    Okay.  I would have to do something very different to put this pen in my body, correct?

A    In terms of what?

Q    Well, you testified that you had a suspicion that -- that Mr. Sloley was hiding drugs inside his body.  Correct?

A    No, I never said that he was hiding drugs inside of his body.  I never said --

ATTORNEY GREEN:  Then no further questions.

THE COURT:  Let him finish the answer.

A    I said Mr. Sloley I believed was hiding drugs on

E. VANBRAMER - CROSS - GREEN

the exterior of his skin in the area where the butt cheeks, you can't physically see, was a part of his body that just needed to be manipulated so I could see the exterior of the skin.  I never said anything about him having drugs inside of his person.

Q    Okay.  So your testimony is that you did not have a reasonable suspicion that he had drugs in his body?

ATTORNEY MITCHELL:  Objection.  That was not the testimony.

THE COURT:  It was a question, so I will overrule the objection.

A    I had reasonable suspicion to believe that he had drugs on his person.

Q    Please answer the question I asked, Trooper VanBramer.  You --

A    Yes.

Q    You did not -- you did not -- yes?  You did not have reasonable suspicion that he had drugs in his body?

A    You just rephrased the question.  Can you ask it again so I can answer correctly?

Q    You did not have a reasonable suspicion that Mr. Sloley had drugs in his body?

A    I didn't think that he had drugs in his body.

ATTORNEY GREEN:  No further questions.

THE COURT:  All right.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - REDIRECT - MITCHELL

Mr. Mitchell, any redirect?

ATTORNEY MITCHELL:  Okay.

REDIRECT EXAMINATION

BY ATTORNEY MITCHELL:

Q    Okay.  So in terms of the part of his body where you -- you had the reasonable suspicion that he was hiding contraband, what was that area where you suspected he was hiding it?

A    The exterior of his skin between his butt cheeks.

Q    You said that it was -- it required further explanation to answer the question about Ryder sometimes getting it wrong.  Can you explain that to us.

A    Yes.  So I'd just like to instruct the jury, like, how powerful a K9's nose is.

ATTORNEY GREEN:  Objection.

THE COURT:  Just -- the witness doesn't instruct you.  I instruct you.  But with regard to the answer to that question, it's redirect.  I'll allow him to answer the question.

ATTORNEY GREEN:  That was the objection.

THE COURT:  Sustained.  Rest of the question is permissible.  Go ahead.  You can answer.

THE WITNESS:  I'm sorry about that.

THE COURT:  It's all right.

A    So the K9's nose is a very powerful tool, and the

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

E. VANBRAMER - REDIRECT - MITCHELL

way I like to describe it to people who really don't understand a dog's nose is that I'll use, like, a cookie analogy, right?  Let's just say that your mother is making chocolate chip cookies and you go into the house and those cookies are no longer there.  She already gave them away but the house still smells like cookies.

So a dog, where you were to have a quantity of narcotic inside of a vehicle -- let's just say that there's a significant amount of drugs in a trunk or on the passenger seat of a vehicle and those drugs were just removed, that dog is doing like a chocolate chip analogy.  It's still smelling the odor of that narcotic inside the vehicle after that's been taken away.

So, to answer that question appropriately, can I say definitively that when my dog alerted and did not find anything in the vehicle that my dog really wasn't smelling something?  Because there could have been something there.  I just didn't know about it.  So I can't truly say whether or not Ryder had alerted and not found anything.

It just wouldn't be fair to my partner, Ryder, because she may have found it or she may have smelled it but it just wasn't in the car.  So -- and that's how a dog's nose works.  So I can't comfortably say that I was wrong or my dog was wrong, if that makes sense.

E. VANBRAMER - RECROSS - GREEN

BY ATTORNEY MITCHELL:

Q    Approximately how long was the lead on Ryder that day?

A    It was a six-foot lead.

Q    Just to clarify, you testified that your search of Maxmillian Sloley was of the skin.  You did not look inside the body; is that correct?

A    It was of the skin only.  I did look inside of his body.

          ATTORNEY MITCHELL:  Thank you.

          THE COURT:  Any further questions?

          ATTORNEY GREEN:  Very briefly.

RECROSS EXAMINATION

BY ATTORNEY GREEN:

Q    I'd like to ask you about your cookie analogy.  So, if you go into a house in this metaphor and you smell cookies, you don't necessarily have a specific suspicion that say cookies are in the dishwasher just because you smell cookies in the kitchen.  Right?

A    It's possible they can be in the dishwasher.

Q    It's possible.  But you don't have a specific, particularized suspicion the cookies are there, correct?

A    No.  You just smell the cookies.

          ATTORNEY GREEN:  Nothing further.

          THE COURT:  All right.  Mr. Mitchell?

SLOLEY v VANBRAMER - 14-cv-339

110

LARUFFA - DIRECT - OUIMET

ATTORNEY MITCHELL:  No further questions.

THE COURT:  All right.  Thank you, Trooper VanBramer.  You may step down.

THE WITNESS:  I still have the --

THE COURT:  You can just leave it on the counter.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Thank you, sir.

(Witness excused.)

THE COURT:  Mr. Mitchell, would you retrieve the NIK test from the witness box and then call your next witness.

ATTORNEY OUIMET:  Defense calls Ted LaRuffa. I'll just go get him.

THE COURT:  Thank you, Attorney Ouimet.

COURT CLERK:  Mr. LaRuffa, I'm going to swear you in.

T H E O D O R E   L A R U F F A, having been duly sworn, was examined and testified as follows:

THE COURT:  Is there water up there?

THE WITNESS:  Yes, sir, there is.  Thank you.

THE COURT:  Please speak into the microphone and try not to talk over each other.  Okay?

DIRECT EXAMINATION

BY ATTORNEY OUIMET:

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

LARUFFA - DIRECT - OUIMET

Q    Good afternoon.

A    Good afternoon.

Q    Could you please introduce yourself to the jury.

A    My name is Theodore A. LaRuffa.  I'm an investigator with the Orange County Sheriff's Office in New York.

Q    Prior to working for the Orange County Sheriff's Office, where were you employed?

A    Worked for the New York State Police, retired after 29 years, and began employment with Orange County.

Q    At the time of your retirement, what was your rank?

A    Senior investigator.

Q    And were you in a particular unit?

A    I supervised the Gaming Unit in Monticello, New York.  Sullivan County.

Q    And as a senior investigator for the Gaming Unit, what were your -- what were some of your responsibilities?

A    I oversaw a unit of investigators.  We conducted background investigations and investigations as needed within the casino.

Q    Did you go to the New York State Police Academy?

A    I did.  I entered the state police academy in September of 1993.  I took the six-month basic training, graduated in spring of '94.  I was then assigned to

LARUFFA - DIRECT - OUIMET

Troop F where I partook in a 12-week basic -- I'm sorry -- field training under the supervision of two senior troopers, and upon successful completion of that, I was permanently assigned to Troop F.

Q   And at the academy, did you receive training with respect to evidence?

A   I did.  It was part of the advanced training. Learned evidence recovery procedures, evidence handling and preservation.

Q   In 2013, what was your rank within the New York State Police?

A   I was an investigator.

Q   In -- were you with a particular troop?

A   I was in the -- assigned to Troop F headquarters. I was part of the Forensic Identification Unit.  I had done approximately nine years as a crime scene investigator, and then I became the Troop F evidence custodian, where I oversaw all the evidence within Troop F.

Q   As the evidence custodian for Troop F, what were your responsibilities?

A   I was in charge of the security preservation of the evidence that was typically collected in the field by troopers and investigators.  They would initially secure the evidence at their local station, and then I would go

LARUFFA - DIRECT - OUIMET

round, pick up the evidence, bring it back to Troop F
headquarters, where it was assigned, secured in the
evidence vault.

Q    Are you familiar with the plaintiff, Max Sloley?

A    Only by name.  From this case.

Q    Were you involved in plaintiff's arrest on
April 1st, 2013?

A    I was not.

Q    Okay.  I'm going to show you what's been admitted
into evidence as D1.

        ATTORNEY OUIMET:  We can show it to everyone.

Q    Mr. LaRuffa, do you recognize this document?

A    I do.

Q    What is it?

A    It's a New York State Incident Report.  It's a
report that's filled out subsequent to an investigation
or an arrest, and it's kept in the normal course of
business of the state police.

Q    Is there a suspect named in this incident report?

A    There is.

        ATTORNEY GREEN:  Objection.  I think we have
gone over this document, and I don't see what this
witness has to say about it.

        THE COURT:  It's in evidence.  The document
does speak for itself.  Is there something the witness

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

LARUFFA - DIRECT - OUIMET

needs to add?  You can get to that, otherwise, just reading a document I think is cumulative at this point.

ATTORNEY OUIMET:  Okay.

Q    Does this incident report pertain to a particular incident number?

A    Yes, it does.

Q    What's the number?

A    5034984.

Q    Is an incident number the number the same as a case number?

A    Yes, it is.

Q    Okay.  As you look at this incident report, was there any physical evidence collected?

A    I believe it would be on the second page.  Yes, there was.

Q    Okay.  What was it?

A    It's described as less than one gram of cocaine and, in particular, crack cocaine.

Q    Are you -- where are you looking on this document?

A    On the top of the page.

Q    Right here?

A    Yes.

Q    And going down to the bottom where it says Narrative, do you see that?

A    I do.

LARUFFA - DIRECT - OUIMET

Q    Is there a second entry for the Narrative portion of this incident report?

A    Yes, there is.

ATTORNEY GREEN:  Objection.  We're just reading the document.

ATTORNEY MITCHELL:  I'm --

THE COURT:  You can answer the question. Overruled.  He hasn't started reading the document.

BY ATTORNEY OUIMET:

Q    Okay.  I'm sorry.  What was your question [sic]?

A    Yes, there is an entry in the narrative as it pertains to the evidence seized.

Q    And what's the date?

A    The date of action and the date written was April 3rd of 2013.

Q    And I'm talking specifically about the second entry.

A    The one dated October 31st of 2013?

Q    Yes.

A    Yes, that's -- date of action and the date written were the same day.

Q    And what does the second entry -- what does that second entry mean to you?

A    So that's an entry made by the supervisor, in this case, a sergeant, and he has been advised that the case

LARUFFA - DIRECT - OUIMET

has been adjudicated and the evidence can be destroyed.

Q    And approximately how many months was the second entry made after the evidence was initially collected?

A    Six months.

Q    Okay.  How does the police department become aware that a case has been dismissed?

A    Typically, the court that the case is being prosecuted in, when there is an adjudication, they will reach out to the station where the evidence was collected from and advise the supervisor, usually a sergeant.

Q    Who makes the determination for evidence to be destroyed?

A    Once there is a -- a -- the supervisor's advised by the court, the supervisor makes that determination.

Q    Is it common practice that, once a case is dismissed, for the evidence to be destroyed?

A    Yes.

Q    And why is it destroyed?

A    The evidence is collected for a criminal prosecution.  When that criminal case is done, it is no longer needed.  And in the regular course of business, we destroy that evidence because we have a constant flow of evidence coming in.

Q    What's the General 2 form?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

LARUFFA - DIRECT - OUIMET

A     That's the evidence record for each individual item that's collected.

Q     Did there come a time that you made an entry on a General 2 form --

A     Yes.

Q     -- for this case?

A     Yes.

          ATTORNEY OUIMET:  I'm going to show and publish to the jury what has been marked as D13 and has been admitted into evidence.

Q     Again, do you recognize this document?

A     I do.

Q     What it is it?

A     It's the General 2 evidence record that pertains to the case I spoke of on the incident report. Specifically, the case number of 5034984, and the defendant is listed as Maxmillian Sloley.

Q     Do you see your name or your handwriting on this document?

A     I do.

Q     Where?

A     It is the last entry in the transfer record, about three-quarters of the way down.

Q     Right there?

A     Yes, that is it.  That's my signature you're

LARUFFA - DIRECT - OUIMET

pointing to, and it's dated May 22nd of 2013.

Q    And next to your name, what does it say?

A    It indicates that I picked up Item Number 1 and brought it from the evidence locker, which was at S.P. Catskill, to the evidence vault at Troop F headquarters.

Q    What does "evidence vault" mean?

A    That's where all the evidence is stored when it's taken from the station.

Q    Based on this document, what was the evidence collected?

A    Item 1 is listed as 904 reagent for cocaine salts and base containing cocaine residue which tested positive for cocaine.

Q    Is there any indication as to how Item 1 came to be in evidence?

A    Yes, that's listed in the transfer record.

Q    And what does that say?

A    So the first entry is when it was secured.  That's on April 1st of 2013 at 5:45 a.m.  It was taken from the defendant and secured by Trooper Eric VanBramer.

     The next entry shows that same item going from Trooper Eric VanBramer to Trooper Bryan VanBramer on April 1st, 2013, at 6:25 a.m.  And then from Trooper Bryan VanBramer to the evidence locker at S.P. Catskill, and that's on the same date at 6:30 a.m.

LARUFFA - DIRECT - OUIMET

Q    And what does 21.9G mean?

A    That's a weight that would have been written on the General 2 at the time of destruction.  It's part of the destruction process.  It indicates the entire weight of Item 1 inclusive of its packaging.  That would be weighed at the Forensic Investigation Center in Albany after I bring it up there for destruction.

Q    Why would evidence be initially brought to the vault?

A    That's where it's secured until it's needed for prosecution.  If it's not needed for prosecution, it stays there until the evidence is destroyed.

Q    From the time that it's placed in the vault to the case's final disposition, what happens to the evidence in the vault?

A    It just stays in a locked room.  The vault is divided into different sections.  One section holds the drug evidence; another, biological evidence; another, for guns.  And then this case, it would stay in a drug room until it's taken for destruction or prosecution.

Q    So in this case the evidence was kept in the vault for approximately six months?

A    Yes.

Q    Are you the evidence custodian in this case?

A    Yes, I am.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

LARUFFA - DIRECT - OUIMET

Q    Did you receive instruction as the evidence custodian in this case?

A    I did.

Q    What was that instruction?

A    To forward it for destruction because the case had been adjudicated.

Q    Okay.  And now looking back at D13, could you explain what the information in the Final Disposition of Evidence section means.

A    That's a stamp I would use when I'm preparing it for destruction.  So this item was prepared for destruction on November 18th of 2013.  I placed my initials on it and the Item Number 1 is next to my initials.

Q    Okay.  At the time of preparing the evidence to be sent to the lab, are you required to fill out a form?

A    I am.

Q    For this case, was a form prepared?

A    Yes, it was.

Q    And what is the name of that document?

A    That's a Drug Destruction Memo.  It lists all the evidence on that page that is being brought up for destruction.  It holds -- it has 17 lines.  So there would be 17 different cases for each drug destruction memo, and then every item of evidence that pertains to

LARUFFA - DIRECT - OUIMET

that case would be listed on that line.

Q    Okay.  And then I'm going to show you what has been marked as D12, which I believe has been admitted into evidence.

Do you recognize this document?

A    I do.

Q    And is this the document that you were just talking about?

A    Yes, it is.

Q    And what's the purpose of this document?

A    This is to show which items are being presented to the lab for destruction.  Once I complete it, it is signed off by a captain, and then I'll bring the items up to the lab in Albany.  The lab technicians there will examine the Drug Destruction Memo, they will compare the items that are listed on it to the items on the evidence record.

Q    Can you determine what if any evidence is articulated in this destruction log for the case we're talking about here today?

A    Yes.

Q    And what is that?

A    On the left-hand column, number 14, which just signifies that's the 14th case for this Drug Destruction Memo.  Next to it says Coxsackie, which is a station

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

LARUFFA - DIRECT - OUIMET

where it originated from, 5034984 is the case number that I spoke of that's on both the evidence record and the incident report.  The suspected drug is cocaine. It's further indicated that it's a test kit.

The weight, total weight of 21.9 grams is the same number that was listed on the General 2.  Next to that are the initials of the lab technician who weighed that evidence.

Q    Can you tell the jury what happened to that evidence.

A    Once I give the item to the lab, the lab technician verify its contents.  They hold it there until all the drugs that are collected from the state for that month are brought to an incinerator to be burned and destroyed.

ATTORNEY OUIMET:  Thank you.  I have no other questions.

THE COURT:  All right.  Thank you, Attorney Ouimet.  Any questions?

ATTORNEY GREEN:  We have no questions for this witness.

THE COURT:  No questions?  Okay.  Sir, you're excused.  Thank you.

THE WITNESS:  Thank you.

(Witness excused.)

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THE COURT:  Mr. Mitchell, you can call your next witness.

ATTORNEY MITCHELL:  We have no further witnesses but I would like to try to make sure we have all of our exhibits ready before we close.

THE COURT:  We will certainly do that.  We don't need the jury for that.

Attorney Green, do you have any rebuttal witnesses?

ATTORNEY GREEN:  We do not.

THE COURT:  All right.  So the -- let me ask Attorney Mitchell.  Does the defense rest?

ATTORNEY MITCHELL:  I just wanted to make sure we have all of the exhibits in before I rest.  So that's the only thing left.

THE COURT:  Plaintiff rests?

ATTORNEY GREEN:  We rest and we have no objection to even if they're not -- if they are resting, fixing up the exhibits, that's fine.

THE COURT:  We can -- we can look through the exhibits, make sure everything is there.  We will go back on the record when the jury comes back and I can have Mr. Mitchell rest at that point.  That's fine.

Ladies and gentlemen of the jury, I think at this point we have some significant legal work to do

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

before we move to the next phase of the case.  So I'm going to -- I know you stayed a little extra for us to get through the witnesses, and I appreciate your patience there.

I'm going to give you a little bit longer of a break today for lunch.  So I think our plan is to do some stuff with the charge, the instructions that I'll give you at the end of the case.  So we have to go through that with the parties, and then we have a few other housekeeping tasks to take care of.  So I think if we brought you back here at 2:00, I think that would be a good amount of time for us, and hopefully enjoy a little extra time for your lunch.  Do you have any objection to leaving until 2:00 today?

All right.  So let me just remind you again that you are not to talk amongst yourselves about this case until the case is actually given to you for your deliberations and all the evidence is in.  So we're not quite sure if we're there yet, so don't discuss the case amongst yourselves yet.  All the other admonishments still hold.

So enjoy your lunch and we will see you back here at 2:00.

(Jury excused, 12:21 p.m.)

THE COURT:  So let me let you guys have lunch.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

We are going to get you a copy of our preliminary -- a proposed charge here in a few minutes.  Do you want to say something?

ATTORNEY GREEN:  Yes, Your Honor.  I think we want to make a 50(a) motion.

THE COURT:  I'm going to give you an opportunity to a make a motion in a second.  So, just the -- schedule-wise, we will get you a copy of that.  We'll reconvene at, like, 1:15 to have our charge conference.  Okay?  And we can -- we can do that -- we will come into the courtroom and then we can go to chambers or we can do it in here, depending on what's most convenient for everyone.  So let me hear any motions at this point.

ATTORNEY GREEN:  Yes, Your Honor.  This is an odd one because I feel like most 50(a) motions are made with the expectation that they be denied.  I just think that there is factually a dispute left in the case.

Trooper VanBramer specifically testified that he did not have a suspicion that he would find drugs inside the body cavity.  I'm -- I'm reading from Sloley II here.  If a -- if an --

THE COURT:  Before you continue with that line, was it inside the body cavity or inside the body?

ATTORNEY GREEN:  Inside the body cavity.

That's the language from the case.

THE COURT:  That was the testimony?

ATTORNEY GREEN:  I -- I think the testimony was inside the body cavity, although I'm not sure I see a difference.

THE COURT:  So -- all right.  Well, you can continue.

ATTORNEY GREEN:  If an arresting officer has reason to believe based on specific and articulable facts taken together with rational inferences from those facts that an arrestee is secreting contraband, and this is emphasizing the case, inside a body cavity, ending emphasis, then the officer is permitted to conduct a visual body cavity search.

I think whether it's his direct testimony that he did not have a suspicion that anything was inside the body cavities or his testimony about the dishwasher and cookie metaphor that -- right?  Of course he wouldn't have a reasonable suspicion based on particularized facts that something just based on the smell was in the dishwasher as opposed to somewhere else in the kitchen, I think that there's kind of no question left in the case other than damages.

Second, I think even to the extent that where you're inclined to deny that motion, I think we're

entitled to partial judgment on the question of whether there was a visual body cavity search.  His testimony as you said in denying defendant's 50(a) motion matches exactly what the Second Circuit has said in both cases is what a visual body cavity search is.

Right?  The example they gave is exactly what he did.  I don't think there's a serious question here, and I think it's very prejudicial to confuse the jury with argument that it didn't happen because that will invite them to make the exact same mistake that was made last time around, which is confusing a visual cavity search to just a strip search.

THE COURT:  All right.  Anything further?

ATTORNEY GREEN:  No, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Mitchell?

ATTORNEY MITCHELL:  I'm going to oppose that. I'm also going to move for Rule 50 to dismiss the case.

So the officer testified about the area that he searched, that he had the plaintiff open his butt cheeks just to look in that area between the butt cheeks, and he testified that he had reasonable suspicion to search that area.  And what he said was that he did not search any further inside the anus.

So, and, you know, there was similar testimony

at the first trial.  I know Your Honor said that we preserved that issue and that remains an issue here.  I know on the first trial Judge Hummel found that there were issues of fact and sent it to the jury.  There's never been a finding as a matter of law that a body cavity search occurred.  He -- the officer described it in his own words what he did and why he had appropriate reasonable suspicion to search that area.

So I think at this point there's -- you know, we have presented overwhelming evidence that was reasonable for him to search there.  It was the -- the tip from the victim, there was fleeing the scene, there was the K9 alert, there was -- the officer saw drugs on the seat in a way that seemed to indicate that the plaintiff was in a hurry to hide them but then spilled some of them on the seat.

There was the positive drug test, and there was also the officer's experience that he's -- and similar circumstances he's found contraband in that area between the buttocks that he searched.

And there's been -- I also think there's -- there's no viable claim here that there was any proximate cause of injury.  So I think on those grounds, the plaintiff's Rule 50 should be denied, the defendant's Rule 50 should be granted, and also that

there remains a specific issue of fact of what search was, and then also further issue if it was a visual body cavity search, was it supported by reasonable suspicion.

ATTORNEY GREEN:  Since they cross moved, may I respond?

THE COURT:  You may.

ATTORNEY GREEN:  So, I think one of the pieces of confusion here is that the Second Circuit is articulating two -- in both cases articulating two different things.  Right?  A visual body cavity search, as they described it, is looking at the -- right?  You don't manipulate anything.  There's no speculum.  There's no -- I'm pulling the anus open or anything like that.  That's -- that's something else entirely.

But you do have to -- to have somebody do more than, say, shake out outside of doing the visual inspection, you have to have suspicion that there is something inside.  That's what they said.  It's -- it's not just -- you can't have a suspicion that something is between the butt cheeks.  There's a way to search for that that is not this invasive.  That's what the Second Circuit said.

THE COURT:  The testimony that I look at in looking back at the question, and I'll just say the question "Did you have any reasonable suspicion that

Mr. Sloley had drugs in his body?"  The answer was "I didn't think that he had drugs in his body."

And so from your perspective, the -- the Circuit, when it talks about a visual body cavity search and reason to suspect that there was something inside the visual body cavity is the same as inside the body.

ATTORNEY GREEN:  I think that has to be right because I would not describe the area between the butt cheeks as a cavity.  I don't think that's medically correct.  A cavity is -- you know, there's the anal cavity, which is behind the anus.  There's -- there's -- I think that's what "cavity" means.  It's a means inside.

THE COURT:  All right.

Mr. Mitchell, do you have a position on that?

ATTORNEY MITCHELL:  Well, it's just -- okay. Now the plaintiff, I guess, is saying that the search between the buttocks, they would admit is not a cavity search.  So I guess if -- if the jury does agree that that was the search that was performed as it was described by my client, then the plaintiff would admit that this case should be dismissed.  I mean, the -- the the -- the defendant was describing in his own terms what he looked at, and he described that area between the buttocks.  That's what he looked at.  That's where

he thought the -- the plaintiff had concealed contraband.  Didn't go further inside the anus.

THE COURT:  Was the testimony, as I recall it -- and I'm asking you if this is consistent with your view, was the testimony from the defendant that in order to see the cavity that he visually inspected that Mr. Sloley was required to manipulate his ass cheeks?

ATTORNEY MITCHELL:  I think he said that he had them spread it because you can't see -- remember how he's describing how they fold together, like finger -- fingers, where you have to spread them?  That's what he had the guy do.

THE COURT:  So --

ATTORNEY MITCHELL:  The defendant was about five feet away.

THE COURT:  So he did ask him to manipulate his butt cheeks.

ATTORNEY MITCHELL:  Right.  Just to spread them a little bit because of that area of skin that was covered.  Right.

THE COURT:  All right.  And it's your position, then, that the cavity between the butt cheeks that was required to be -- required him to spread so he could peer into that cavity, that is not the body cavity that the Circuit is talking about.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

ATTORNEY MITCHELL:  Yeah.  So our position is that was not a cavity search but that, in any event, whatever you want to call it, he had reasonable suspicion to look in the areas that he looked.  So it's -- those are our positions.

THE COURT:  Anything further?

ATTORNEY GREEN:  Yes, I think the -- the crux of this is there are two different things.  There's what they described as a visual body cavity search, which there are more invasive searches, right?  There's a manual body cavity search, you can do an x-ray body cavity search.  You can do all kinds of things.  But a visual body cavity search is looking at the outside of the body cavity visually.

THE COURT:  Mr. Mitchell compared it to spreading your fingers or lifting up your arm.  Would those constitute visual body cavity searches in your definition?

ATTORNEY GREEN:  I don't think so.  And I don't think that's what the Circuit would say, either.

THE COURT:  Would the Circuit attribute in your reading of its decision a level of intrusion greater if you ask someone to spread their body -- spread their fingers?  Is that the same level of intrusion as they have described for what in this case

was -- they described as a visual body cavity search of the anal cavity?

ATTORNEY GREEN:  Absolutely not.  I'm doing -- not to use the same example again, but I can do this in the courtroom.

THE COURT:  Did the level of intrusiveness that the Circuit found correspond to the level of suspicion needed?

ATTORNEY GREEN:  Yes.

THE COURT:  Mr. Mitchell, do you have an answer to that question?

ATTORNEY MITCHELL:  Well, he -- he had reasonable suspicion that there was going to be contraband in that area between the butt cheeks that he searched for all the reasons --

THE COURT:  So let me ask you.  What do we call the search?  If it's not just -- if it's not a strip search, which is not an issue in this case, but if -- if lifting up your arms is not a mere strip search, if that's an additional requirement placed on the suspect, what do we call that search?  Is that a visual body cavity search?

ATTORNEY MITCHELL:  Of a -- looking at the --

THE COURT:  Armpit.

ATTORNEY MITCHELL:  Well, you're not looking

inside the body.  I think the -- the reason -- when they're talking about a visual body cavity search, when it's the anus -- and I cited in my trial brief to a couple cases here.  This is point one, *Fate v Charles* and *Unites States v Gonzalez*.

So, the first case there it says a visual body cavity search is one that requires a subject to hold his buttocks open to allow officers to visually inspect the anus.  Likewise, a female subject may be required to squat or hold her labia open to allow officers to visually inspect her vagina.

So that's what they mean.  It's more invasive than what was done here.  And I also cited a case called *United States v Gonzales*.  This was a situation, officer had the suspect remove his clothing, open his legs, squat, so as to lead contraband to fall out from between his buttocks.  The court found that was less intrusive than a visual body cavity search.

ATTORNEY GREEN:  All of those cases are pre-Sloley I.

THE COURT:  Okay.  So with regard to the defendant's renewed motion or new motion under Rule 50, for the same reasons I denied it the first time, I'm going to deny it the second time.  I'm going to reserve on both components of the plaintiff's motion at this

point and I'll -- I think we have to render a decision at least on one of those issues before the jury charge, and I'll do that before we have the charge conference.

ATTORNEY GREEN:  I think we have no issue with charging the jury and deciding to treat it as advisory or not, depending on your decision.

THE COURT:  I understand.  All right. Anything further for this portion of the motion?

ATTORNEY GREEN:  Just getting a copy of the instructions.

THE COURT:  We're going to print those out in a few minutes and get them to you before you leave. While you're packing up, we'll get those to you.  We will be back here -- what did I say -- 1:10?

ATTORNEY GREEN:  Yes, Your Honor.  You said 1:15.

THE COURT:  1:15, then, it is.  All right.

Anything further?

ATTORNEY GREEN:  No, Your Honor.

ATTORNEY MITCHELL:  Just we're going to get the exhibits.

THE COURT:  Yes.  Why don't you guys make sure we have all exhibits and we will -- and when we come back on, we are going to make sure to remind me to have you close, Mr. Mitchell.  Thank you.  I mean, have you

rest.

(Recess taken.)

(Discussion held in chambers.)

THE COURT:  We are at the charge conference; all the parties are here.  The parties are not here, all the attorneys are here.  So I know we got the charge to you a little bit later than we had hoped because of the technical difficulties.  So we can go through it instruction by instruction.  You can have as much time as you need to reread it.

Was there any -- with regard to the introduction, wasn't quite sure where to put, as I told you at the start of this case, it's been tried before. I'm not opposed to putting it somewhere else in the instruction.  Is that the first thing we tell them, but I don't really -- do you have any objection to leaving it there or --

ATTORNEY GREEN:  Nothing from us.

THE COURT:  Or anything else about that paragraph are you concerned about?  I'm not going to read the caption, I don't believe.

ATTORNEY MITCHELL:  I think that's fine.

THE COURT:  All right.  And then the paragraph labeled "Role of the Jurors and Role of the Court." Anything with the Role of the Jurors, Role of the Court?

ATTORNEY GREEN:  Not from us.

ATTORNEY MITCHELL:  No issues here.

THE COURT:  All right.  How about bias, prejudice, sympathy?

ATTORNEY GREEN:  Makes perfect sense.

ATTORNEY MITCHELL:  No objection.

THE COURT:  Starting with the easy ones.  Role of the attorneys?

ATTORNEY GREEN:  No issues.

ATTORNEY MITCHELL:  No objection.

THE COURT:  Objections, stricken testimony, sidebars.  All of those occurred.

ATTORNEY GREEN:  I think there is a typo in the third-from-the-last paragraph where it says "which means I have allowed the question," and I think what you mean is which means I have not allowed the question.

THE COURT:  When the Court sustained an objection which means I have -- yeah, not allowed the question.

ATTORNEY GREEN:  But no objection to the substance.

THE COURT:  All right.  Evidence, generally?

ATTORNEY GREEN:  No issues from us.

ATTORNEY MITCHELL:  I think that's fine.

THE COURT:  I don't think I said the word

"inference," did I?  Maybe in the original charge.  Is there any -- any objection to Section B, "Inferences to Be Drawn From the Evidence"?

ATTORNEY GREEN:  None from us.

ATTORNEY MITCHELL:  No objection.

LAW CLERK:  Judge, is it okay for me to speak?

THE COURT:  Of course.

LAW CLERK:  Would you like me -- you may have heard me, since you're not certain, of your use, the term "inference"?

THE COURT:  Yes, sure.  Probably said it in the preliminary charge but -- either way.  Do you guys know Nicole?  She's my career clerk.

(Discussion off the record.)

THE COURT:  So evaluation of evidence, burden of proof, preponderance of the evidence.

ATTORNEY GREEN:  So, the last paragraph, I think it just might be clearer if you take -- fourth line from the bottom, the word "nearly" and replace it with "closely."  For whatever reason, the word "nearly" is seeming --

THE COURT:  Any objection to that?

ATTORNEY MITCHELL:  I would keep nearly because I think that's what they always have in these instructions.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THE COURT:  In order for the plaintiff to prevail on an issue for which he has the burden of proof, evidence that supports the claim on the issue must appear to you as nearly representing -- yeah, I think it's fine.

ATTORNEY GREEN:  Okay.

THE COURT:  It is kind of standard.  I don't want to start messing with the standards.

ATTORNEY GREEN:  That's fine.

THE COURT:  Credibility of witnesses.

ATTORNEY GREEN:  So, I think the penultimate paragraph here is duplicative of the falsus in uno charge.  I think we should just have it in one place.

THE COURT:  Yeah.  Okay.  Let's -- let's just -- you want to --

ATTORNEY GREEN:  I don't care.

THE COURT:  Where do you want to leave it?

ATTORNEY GREEN:  Maybe leave it in the credibility section because it --

THE COURT:  We're just going to go ahead and delete -- just see -- again, I'm not going to read the headings anyway.  So we will just take that paragraph right out.

ATTORNEY GREEN:  Sure.

THE COURT:  Did you have that, Nicole?

LAW CLERK:  Yes.

THE COURT:  Did you -- did you -- did you have more time than anyone else to go through this?

ATTORNEY GREEN:  No, I just read really fast, as my best friend knows.

THE COURT:  So we are at prior felony convictions, employment as officer.

ATTORNEY GREEN:  No issues from us, unless you guys thought of something.

ATTORNEY MITCHELL:  I think it should say you have heard evidence plaintiff has been convicted of a felony because I think -- I think the fleeing of the police and impersonation might have been misdemeanors but they involve credibility.

THE COURT:  That's a good pickup.

ATTORNEY MITCHELL:  I know that's not helping.

THE COURT:  The Circuit had a problem with an S in the last decision too, I think.

Thank you, Mr. Mitchell.  Anything else with that paragraph that you can pick up on?

ATTORNEY GREEN:  Just going to take a closer look now.

THE COURT:  Of course.

ATTORNEY GREEN:  I think this is good.

ATTORNEY MITCHELL:  The rest is fine.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THE COURT:  Interest in the outcome.

ATTORNEY GREEN:  I think that's fine.

ATTORNEY MITCHELL:  Yes, it's fine.

THE COURT:  Inconsistent statements.

ATTORNEY GREEN:  That is fine to us.

ATTORNEY MITCHELL:  Yeah.  No objection here.

THE COURT:  All right.  All witnesses or evidence need not be produced.  Short paragraph, G.

ATTORNEY GREEN:  That's fine.

ATTORNEY MITCHELL:  No objection there.

THE COURT:  The state is not a defendant.

ATTORNEY GREEN:  So I think this is I think our first substantive issue, not a surprise, but I think without the context of indemnity, this I think kind of starts to suggest that Eric VanBramer would never pay a judgment in this case, which is just not the case.  Right?  You are only to consider Eric VanBramer's potential liability.  You must understand that the state is not a defendant.

I feel like it's cleaner to just not say anything, but if we say anything, I think that you are also not to consider whether the state would -- whether or not the state would indemnify him so that he at least have a hint of the full picture.

THE COURT:  Mr. Mitchell?

ATTORNEY MITCHELL:  I disagree with that. This should be kept in as it is, and the reason is because this is the nature of 1983 and sovereign immunity.  In our case, the plaintiff's claim was dismissed against the -- New York State.  So he's being sued as an in his individual capacity only, and that's the nature of the claim.  It's only against him.

And so that -- that is spelled out correctly here, that they're not supposed to think the police or the state are the defendants, and there's nothing in here about who would pay the judgment.  So that was not the reason.

THE COURT:  Do you want to be heard?

ATTORNEY GREEN:  Yes.  I think that this is very similar to what the Circuit commented on about including a negligence charge.  Mr. Mitchell's obviously right.  The state is not a defendant.  That's correct. But I think including this information suggests to the jury this is something that they have to think about, and much like a negligence charge, they're going to think this is here for a reason and it's doing something and it's not because no one's suggested at any point the state is a party.

ATTORNEY MITCHELL:  Can I respond?

THE COURT:  Yes.  What is your concern

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

about them thinking -- do you think it's a realistic potential that they're thinking New York State is a defendant in the case?  What's the concern?

ATTORNEY MITCHELL:  Another issue is this charge was in Judge Hummel's charge in the first trial, and this was not something that the Second Circuit found to be erroneous.  This is just talking about the nature of the claim, that's an individual claim, and that he can't be liable for things that maybe his employer did because it's a person acting under color of state law. It's not their -- their agency.

ATTORNEY GREEN:  I mean, we won the appeal.

THE COURT:  Yeah, I think there's potential. We have heard things about New York State as an agency and what they did in this case with regard to the preservation or not of evidence.  I just think that I'm going to keep it in, in part because I think it's -- it's important for the jury to understand it was in a prior jury instruction.

I'll agree with Mr. Mitchell on that one.

We're at substantive charges.  Take a look at that one.  Take your time on this one.

ATTORNEY GREEN:  Yeah.  So, I'll go -- just going to go with what I have.  I think after second, and after what's there, you should just -- to echo the

first, where you say this element is not disputed, I think the second should have it is not disputed whether there is a right to be free of unreasonable body cavity searches. It is disputed whether the -- and depending on rulings on -- on the 50(a), it is disputed even -- either whether a body cavity search happened and whether it was -- was based on reasonable suspicion or whether it was based on reasonable suspicion. But I think we should clarify that the jury is not deciding whether there is a right.

ATTORNEY MITCHELL: I oppose all that. Second element is one of the elements that the plaintiff has to prove, and it is being challenged, and we are saying that there was no visual body cavity search. So that's one of the issues of fact the jury has to sort out.

ATTORNEY GREEN: Right. But, like -- I don't think that addresses the point, which is that the jury is not deciding whether what was -- whether there is a right secured by the Constitution or laws of the United States.

ATTORNEY MITCHELL: It doesn't -- it says you must establish that the defendant's conduct deprived him of a right secured. That's --

ATTORNEY GREEN: Right.

ATTORNEY MITCHELL: So this should stay as it

is.

ATTORNEY GREEN:  I'm -- okay.  I -- I think that we can do language that is more clear.  I mean, it could even be deprived him of his right to be free of unreasonable body cavity searches which I will instruct you on momentarily.

THE COURT:  I think at this point in the -- in the instructions, I'm going to agree with Mr. Mitchell, and we're going to keep it as is.

ATTORNEY GREEN:  Okay.  And in the final paragraph, I think rather than all three, you should -- we should say the disputed, because the first element is not disputed.

THE COURT:  Okay.  What do you think, Mr. Mitchell?  You must prove all disputed elements by a preponderance of the credible evidence?

ATTORNEY MITCHELL:  Okay.

THE COURT:  All right.  Make that change.

ATTORNEY GREEN:  And then does not prove one or more of the disputed elements, just so that it -- like, I'm not going to make an argument about state law and I don't want the jury to be confused.

THE COURT:  If we call them disputed elements in the first portion of that sentence, these then refer only to the disputed elements?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

ATTORNEY GREEN:  I'm not sure.  I think maybe it -- probably it does but I think -- we could argue be more clear but --

THE COURT:  We can add any one more of these disputed elements.

ATTORNEY GREEN:  Yeah.  That's what I was suggesting.

THE COURT:  I don't know if it adds anything but I don't think it -- substantive.  Do you have any concern?

ATTORNEY MITCHELL:  Well, no, they have to prove all of them.

ATTORNEY GREEN:  You don't have to prove the first element, that was part of the defendant's case.

ATTORNEY MITCHELL:  I would just keep it the way it is.  It's just getting more and more confusing.  You already said that he was acting in the course of his duties.

ATTORNEY GREEN:  We have already had a problem with the later instruction contradicting an earlier one and having to retry the case over it.

ATTORNEY MITCHELL:  What you're saying is making it even more confusing.  We don't know what we're talking about, saying they only have to prove one of the elements, that's not correct, they have to prove all.

ATTORNEY GREEN:  We need to prove two.

MR. EURBGS:  Right, but what you said is proving one or more.

ATTORNEY GREEN:  One or more of these disputed elements.

THE COURT:  In the first paragraph, we indicate that the first element, this element is not disputed.  You are not to assess this and should presume that the defendant is acting in the color of state law.  With regard to the third, I am going to say to succeed, the plaintiff must prove all of the disputed elements by a preponderance of the credible evidence.  If the plaintiff does not prove one or more of these disputed elements by a preponderance of the evidence, you are to return a verdict for the defendant.

ATTORNEY MITCHELL:  Great.  Thanks.

ATTORNEY GREEN:  That's all we were asking.

THE COURT:  Let's skip -- let's save B for the end.

ATTORNEY GREEN:  Yeah.

THE COURT:  Let's go to state law.  Any issue with that?

ATTORNEY GREEN:  I think that this risks confusing the jury.  We haven't talked about state law at all.  No one's mentioned state law.  I think this --

especially coming so close after the real substantive charge, I just -- I don't know what this is doing here. Like, there are obviously -- this is where it's important but --

THE COURT:  I mean, I think there might be a concern that there were police rules, regulations, policies, procedures, directives mentioned throughout. I mean, I don't want them to hold Mr. VanBramer responsible for a potential violation of any of those matters.  I agree that maybe there hasn't been a state law that's been addressed but --

ATTORNEY GREEN:  So maybe --

THE COURT:  The captions -- again, it says state law.  I'm not going to read that.  You must bear in mind that the case against the defendant concerns whether there was a violation of plaintiff's federal constitutional rights.  In this regard whether or not a --

ATTORNEY GREEN:  If we say a violation of police rules there, we have no issue with it.

ATTORNEY MITCHELL:  I think we should keep it as it is because a 1983 claim can only be a violation of federal rights, not state rights.  So this is just a basic statement the law of 1983.  So I think it should include it as it is.

ATTORNEY GREEN:  And the Circuit has been clear that you don't state every piece of the law, the instruction was improper because it instructed on negligence last time.

ATTORNEY YU:  I think we want it to be clear that --

MR. MITCHELL:  It is clear as written.  So I support this instruction.

THE COURT:  All right.  Let me -- let me see how we can word this.  Maybe if we -- separating out state procedural violation, we kind of group it together with the other -- other types of violations.  Like, in this regard, whether or not a state procedural violation, police rule, regulation, policy, procedure or directive occurred is completely irrelevant to your --

ATTORNEY YU:  I wonder if we could just take out that second sentence.  So instead, it would say you must bear in mind that the case against the defendant concerns whether there was a violation, the plaintiff's federal constitutional rights; therefore, if you find merely that the defendant failed to follow a state law or police -- maybe just take out that second sentence. Just go right to the third.

THE COURT:  That's fine.

ATTORNEY GREEN:  That seems fine.

THE COURT:  What do you think?

ATTORNEY MITCHELL:  I oppose it.  It should stay in because this is the correct statement of the law.

ATTORNEY GREEN:  Shocker.

THE COURT:  We do not need that.  Mr. Mitchell's been on his best behavior.  You have not.  Can we strike that?

I think we can go ahead and take that one sentence out.  Just to avoid any confusion.  I mean, Attorney Green does reference the prior decision from the Circuit which suggested that gratuitous or unnecessary instruction could be confusing to the jury and I agree.

So that particular portion we will take out. I think the paragraph is accomplished by leaving what we have in and -- so I will go ahead and clear that and modify that as directed.  You guys have that one?

LAW CLERK:  Should I read it?

THE COURT:  Yes, why don't you do that.

LAW CLERK:  You must bear in mind that the case against the defendant concerns whether there was a violation of the plaintiff's federal constitutional rights.  Therefore, if you find merely that the defendant failed to follow state law or police rule,

regulation, policy, procedural, directive, this would not be sufficient to establish a violation of the plaintiff's federal constitutional rights.

THE COURT:  All right.  And I know, Mr. Mitchell, you're objecting to the modification and it's so noted.  All right.

How about damages generally?

ATTORNEY GREEN:  Generally looks fine to us.

ATTORNEY MITCHELL:  I have no objection to that.

THE COURT:  How about compensatory damages?

ATTORNEY GREEN:  No issue there.  But kind of between the sections we have a thought.

THE COURT:  All right.  What's your thought?

ATTORNEY GREEN:  We think that there should be a garden variety damages charge.

THE COURT:  Mr. Mitchell?

ATTORNEY MITCHELL:  I oppose that.  That's not in the instruction I have ever seen in a Northern District trial.  I've done many.

ATTORNEY GREEN:  Mr. Mitchell has repeatedly implied that there needs to be medical evidence.  He's asked about treatment.  I think he's open the door.  He did clarify to the jury what garden variety damages are, because Mr. Mitchell will again argue to the jury that,

you know, there is no such thing.  So they need to not be confused and not receive the wrong state of the law.

I think he's won on a number of objections where the jury has required to be instructed about the correct state of the law, and if they're not instructed about what garden variety damages are, they're not instructed on the correct state of the law.

ATTORNEY MITCHELL:  That's not a standard instruction that's given in the Northern District trials.  So I oppose pose that.

THE COURT:  All right.  Well, standard or not, I think that the instruction of compensatory damages incorporates the concern that Attorney Green is raising. It's specifically the word defines compensatory damages. That is, to compensate for any damage he may have suffered.  So I'll stay with the --

ATTORNEY GREEN:  May I suggest at the end of that paragraph, just including those damages that one would reasonably expect from this type of conduct or this kind of violation or whatever, whatever the -- right now at the end is but --

THE COURT:  I understand your request.  I'm going to deny it.  I think that the language there is sufficient and enough to advise the jury but not confuse them.

How about nominal damages?

ATTORNEY MITCHELL:  Can I just ask something about the end of compensatory damages?

THE COURT:  You can.

ATTORNEY MITCHELL:  Can we include what we had in our instruction, that they should also consider any pre-existing conditions and that the jury should not give -- engage in speculation, guess or conjecture, must not award damages based on punishment or sympathy?

ATTORNEY GREEN:  I think at least certainly the first part is essentially right, trying to confuse them more about the garden variety issue.  There's no -- garden variety doesn't have prior existing conditions. That's -- it's -- I mean, it's incoherent here.

As far as the second, I think that's essentially already in here, especially in the punitive damages instruction that's to come.

THE COURT:  I think for the same reason, I'm going to deny that request.  I agree.  Let's get to the nominal damages.

ATTORNEY GREEN:  We would consent to that if we got the garden variety charge.

THE COURT:  You are not talking about the nominal damages?

ATTORNEY GREEN:  No, no.  We would consent to

what they were asking for if we also had a section on garden variety.

THE COURT:  I don't think either of those requests from were necessary from either side.  So we are going to keep it as is.

ATTORNEY GREEN:  Okay.

ATTORNEY MITCHELL:  I'm not opposing the nominal but I oppose as I did the other part the plaintiff was asking for.

THE COURT:  All right.

ATTORNEY GREEN:  You heard argument on this. I do think it's potentially a reversible issue.  Our briefing the Circuit has reversed essentially on this issue albeit in an unpublished order.  That said, you made your decision.  So no need to waste more time.

THE COURT:  All right.  Punitive damages.

ATTORNEY GREEN:  No issue from us.

ATTORNEY MITCHELL:  I have no objection to that.

THE COURT:  All right.  Any objection to the conclusion paragraph?

ATTORNEY GREEN:  Do you see anything there?  I think we're good.

THE COURT:  Let's go back, then, to -- what do we want to say about Fourth Amendment protections from

being subjected to an unreasonable search or being detained after an arrest, et cetera, B, body cavity search?

ATTORNEY GREEN:  I'm not sure the connection to the preponderance standard is necessary here, but let's deal with the substantive charge first, which we don't have an issue with.

ATTORNEY MITCHELL:  Which part are we talking about?

THE COURT:  Just the entire B, visual body cavity.

ATTORNEY GREEN:  I have some concerns about the third paragraph but I think -- let's deal with the substantive charge before that piece.

ATTORNEY YU:  The first paragraph?

ATTORNEY GREEN:  First and second.

ATTORNEY MITCHELL:  Yes.  Also, I have some objections to this, Your Honor.

THE COURT:  Go ahead.

ATTORNEY MITCHELL:  I guess it's the, kind of, like near the middle of the page.  Visual body cavity search is not considered a routine search of an arrestee's person because it's uniquely intrusive and it's degrading.  I would subtract that whole sentence. Degrading implies that it was morally wrong to do it,

but he has to prove his claim.  If he was properly searched with reasonable suspicion, it is not degrading, it was lawful.

ATTORNEY GREEN:  Still degrading, and that's I think a verbatim quote from the Second Circuit opinion.

THE COURT:  It is.  What else?  I'm going to leave that portion in.

ATTORNEY YU:  The next sentence that starts "because of this," we should add the word "body" to -- to visual body cavity search.  It says body cavity search.

THE COURT:  Yes.

ATTORNEY GREEN:  Good catch.

LAW CLERK:  I didn't catch where that is.

THE COURT:  It's -- sentence starting "because of this."

ATTORNEY OUIMET:  Visual body cavity search.

LAW CLERK:  Thank you.

THE COURT:  Take your time, Mr. Mitchell.

ATTORNEY MITCHELL:  I think we should add the material I had.  It's page 20 of our jury instruction, the bottom paragraph.  In evaluating whether reasonable suspicion under the totality of the circumstances exist, officers are allowed to draw on their own experience, specialized training to make inferences from and

deduction that cumulative information available to them that might well elude an untrained person.

While the crime of arrest is not a determinate factor, it's one officer may take into account in your consideration of the totality of the circumstances surrounding the search.  That's language taken from the U.S. Supreme Court about what reasonable suspicion is, and then the -- the crime of arrest and so forth, that was right out of the *Sloley* decision.

THE COURT:  Can you -- can I see that part of it?  Thanks.

ATTORNEY GREEN:  I also don't have a copy of that on me.

(Discussion held off the record.)

ATTORNEY GREEN:  What was the docket number?

THE COURT:  I can pull it up.  You can have his copy.  I will --

ATTORNEY MITCHELL:  It was 192.

ATTORNEY GREEN:  We didn't have anything like this in the last trial instruction, right?

ATTORNEY MITCHELL:  The one that was erroneous?

ATTORNEY GREEN:  Well, it wasn't as you are -- you have said many times, it wasn't erroneous on everything and it was -- we have copied the instructions

from the last trial many times at your urging over this conference. So I'm asking you. I'm happy to pull it up and look but as a courtesy, was this in the last?

THE COURT: What page was that?

ATTORNEY MITCHELL: This was on page 20 and going to 21.

THE COURT: Can you find the charge from the last trial.

LAW CLERK: Yes.

THE COURT: You're asking -- so we have in there reasonable suspicion is less demanding standard than probable cause, and so on. And then picks up, you wanted to us to add, in evaluating whether reasonable suspicion nor under the totality of the circumstances exist, officers are allowed to draw on their own experience and specialized training to make inferences from deductions about accumulative information available to them that might well elude an untrained person. That's --

ATTORNEY MITCHELL: Right, that's --

THE COURT: -- that's portion that you wanted add?

ATTORNEY MITCHELL: Yes, and I also said while the crime of arrest is not a determinative factor, one officers may take into account total of the

circumstances surrounding the search.

THE COURT:  You want to respond?

ATTORNEY GREEN:  Yeah, I mean, I don't --

THE COURT:  We are going to grab the other --

ATTORNEY GREEN:  Yeah.

THE COURT:  The original.

ATTORNEY GREEN:  Is there -- is there a case where this instruction has been given?

ATTORNEY MITCHELL:  Well, it's from right out of United States versus Arvizu -- A-R-V-I-Z-U -- 534 U.S. 266, page 273.

ATTORNEY GREEN:  Right.  So that's a Supreme Court decision with reasoning.  Is there a case where this has been given as an instruction?

ATTORNEY MITCHELL:  Well, that's the -- that's the definition.  That's part of the definition of what reasonable suspicion is that the Supreme Court has said is appropriate.  So that's why --

ATTORNEY GREEN:  No one has -- it sounds like no one has ever said this is appropriate on to instruct the jury on.  Many of our proposals have been rejected that Mr. Mitchell is urging because they have never been given in the Northern District.  I don't -- it sounds like we -- this -- this was not given in the last trial. This has never been given as an instruction, as far as

it sounds like here, ever.

I think it risks almost disrupting and undermining the you cannot give law enforcement witness more credibility.  They have testified about what their -- what they knew insofar as in limine allowed them.  They have testified about their training and the jury can consider it.  Nothing tells them they can't, but emphasizing that, especially at this place in the charge, based on no authority at all that is an appropriate jury instruction I think is risky at best.

ATTORNEY MITCHELL:  It's the U.S. Supreme Court authority on what reasonable suspicion is.

ATTORNEY GREEN:  The U.S. Supreme Court has also spoken on garden variety damages.

ATTORNEY MITCHELL:  I think it's right on point.

THE COURT:  I've heard -- I think I've heard enough of the argument on that issue.  I'm looking at the charge from the last trial on the totality of the circumstances issue.  It doesn't -- it doesn't particularly address that section that Mr. Mitchell has asked me to include in this charge.  It says what we have already included on the totality of the circumstances.

So I'm going to leave it as is and I'll -- I

will not grant your request to supplement that portion.

ATTORNEY GREEN:  And I can read the tea leaves and suggestions to change anything else.

THE COURT:  You can make your arguments.

ATTORNEY GREEN:  I think that for the reasons you are rejecting this, it makes sense that you would reject any -- maybe just deleting the word "considerably" from less than proof of wrongdoing. Considerably less than proof of wrongdoing by a preponderance.  To me, that just seems like it's a mixing up two kinds of evidentiary issues, is my concern.

ATTORNEY MITCHELL:  That's language from right out of the Second Circuit.

ATTORNEY GREEN:  I -- I -- I -- I understand that.

THE COURT:  Yeah, I think that's fairly --

ATTORNEY GREEN:  Right.

THE COURT:  -- clear and straightforward.

ATTORNEY GREEN:  Okay.

THE COURT:  I will leave it in there.

Is there anything else with the charge at this point?

ATTORNEY GREEN:  No, Your Honor.

ATTORNEY MITCHELL:  I would like a missing

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

witness charge for Daphne Rollins.

ATTORNEY GREEN:  We have no objection but we think it should run against Defendant.

ATTORNEY MITCHELL:  Plaintiff had Daphne Rollins on their exhibit list as someone they will call, not that they may, and they didn't produce Daphne Rollins.

ATTORNEY GREEN:  She disobeyed a subpoena and part of the reason we don't have her testimony is because Mr. Mitchell failed to take -- to ask any questions at a deposition where he had her.

THE COURT:  All right.  So I understand the argument.  I think we have addressed it with allowing the affidavit to come in and allowing other information to come in.  So basically cross-examining the affidavit on documents.  So I don't think I'm going to give the missing witness charge in this case under all the circumstances.

What else, Mr. Mitchell?

ATTORNEY MITCHELL:  I think that was it for us.  Do you have any --

ATTORNEY OUIMET:  No.

THE COURT:  Anything else, Attorney Green?

ATTORNEY GREEN:  No.  Just the verdict form next.

THE COURT:  Yes, verdict form.

ATTORNEY GREEN:  So on question one, depending on the resolution of the 50(a) motion, we are wondering whether it makes sense to split one into two questions, which is whether a body cavity search happened and whether there was reasonable suspicion.

THE COURT:  All right.  Do you -- if I was to decide that there was not a question of fact that's been -- that's been presented at the trial that a visual body cavity search occurred, this is the charge that you would want me to keep?

ATTORNEY GREEN:  I -- yes, I think there would have to be some fact instruction to the jury that there is no more question that happened.

THE COURT:  My thought would be if I was to rule that way, I would put it at the end of the --

ATTORNEY GREEN:  Yes.

THE COURT:  -- visual body cavity search section and just include a statement that says as a matter of law, I'm telling you that the visual body cavity search --

ATTORNEY GREEN:  In that event, yes, this is appropriate, reserving whether we want to, before the jury is dismissed, ask for special interrogatories on the defense verdict.

THE COURT:  If I was to -- if I was to reserve

and not make that decision before we gave the case to the jury, what would you like the verdict form to say?

ATTORNEY GREEN:  I think we would like it to basically be identical, except the first question has plaintiff, et cetera, et cetera, et cetera, proven that Defendant, Eric VanBramer, subjected him to a visual body search?  Yes or no?  And then has plaintiff proven by a preponderance of evidence that Eric VanBramer did such a search without reasonable suspicion or what --

THE COURT:  That's basically your verdict form.

ATTORNEY MITCHELL:  First of all, I object to having a jury instruction that says that there was a visual body camera search.  We put in extensive evidence that calls that into question.

THE COURT:  Okay.

ATTORNEY MITCHELL:  I think the better way to do it is the way I had it, where it splits it up because -- in the first trial they were, you know, basically merged into one question.  So we don't know which one the jury said no to.

THE COURT:  I understand.

ATTORNEY MITCHELL:  I would have the first question the way I had it.  But if they answered no, then they have to sign the verdict sheet and it's done.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

ATTORNEY GREEN:  I mean, that of course -- yeah.  At least that part of it, that is correct.

THE COURT:  So with regard to -- so I think what I'm going to do, and I'm going to reserve on the motion.  So I think I'd like to get both issues in front of the jury.  I think to do that we will use this verdict form.  I mean, I will say --

ATTORNEY GREEN:  Can I see their verdict form?  Because I think we had other issues with it.

THE COURT:  So for the part concerning -- for the part concerning the first two questions, you were right.  I think you were about to say what you were going to say is that's fine for those two portions.  The remainder of the verdict form -- we will start with on the verdict form I provided to you has the plaintiff, Maxmillian Sloley, proved by a preponderance of the credible evidence that Eric VanBramer's conduct proximately caused Plaintiff's injury.

Do you have any objection to that --

ATTORNEY GREEN:  No.

THE COURT:  -- statement?  It's Number 2 on the proposed form.

ATTORNEY OUIMET:  Right at the top.

ATTORNEY MITCHELL:  Oh.  No.  Yeah, I want that in.

THE COURT: Okay. And then --

ATTORNEY GREEN: Let me just be clear. I think if I understood the instructions correctly, if they say yes to one or one and two or call it 1-A, 1-B, if they say 1-A and 1-B and no to 2, that's what the instruction say they will write a dollar for, right?

THE COURT: Well, they will -- I think we are going to -- let me get to that portion.

ATTORNEY GREEN: I'm --

THE COURT: So if they say yes, it was proximate cause, then we get to what sum of money.

ATTORNEY GREEN: Right. But if they say --

(Court reporter admonition.)

THE COURT: If they say no, it was not -- if they say it did not cause Plaintiff's injuries, what's your position on that?

ATTORNEY GREEN: Then that's nominal damages. Right?

THE COURT: No.

ATTORNEY GREEN: If the unconstitutional search is inherently an injury.

THE COURT: I understand what you're saying.

ATTORNEY GREEN: If -- if they find that -- and so to that end, that's how I understood this form, and so we didn't have an objection to it. But I think,

right? -- that if we're doing it some other way then we are asking the same question twice, and which is encouraging an inconsistent verdict.

ATTORNEY MITCHELL:  I don't agree with that. Proximate cause is a well-understood element of a 1983 claim.  So if they say no, then the case is over. If they say yes and that there was an injury caused but that it just has no monetary value, then it would be one dollar.  If they says no proximate cause, then that should be dismissed.

ATTORNEY GREEN:  The entire doctrine of nominal damages is that a -- a -- a violation of the Constitutional inherently causes an injury.  That's the entire purpose of it.  That's the reason it's plaintiff's right to demand the instruction, not defendant's.

THE COURT:  So I understand what you're saying.  If they find that there was a violation of a Constitutional right by answering yes to both of the first two questions, then there could be nothing other than some damage, whether that's nominal --

ATTORNEY GREEN:  Correct.

THE COURT:  -- if they don't put a money value down or compensatory --

ATTORNEY GREEN:  Correct.  And that's inherent

Constitutional injuries as opposed to tort injuries.

THE COURT:  I'm going to think about that because -- I appreciate the argument and I think that I have everyone's position on that.

Mr. Mitchell, you're basically opposed to it. You stated your reason.

ATTORNEY MITCHELL:  Right.

THE COURT:  But, I mean, I'll -- is that something you'll need before closing?

ATTORNEY GREEN:  I'm not sure in that I think that part of the reason we don't -- we don't -- you know, part of the reason I don't think that we need a nominal damage instruction to begin with is that the -- that's a legal issue.

THE COURT:  Right.

ATTORNEY GREEN:  So I almost -- I almost think we can cross out question two on this form in that they write -- if they write zero here, you change it to one, and that's kind of the entire -- right?  And if they write zero, that means that they're doing the same -- they are not finding that it caused Plaintiff injury.  The jury is worth nothing.

THE COURT:  I'm not sure I'm following.

ATTORNEY GREEN:  If they were to -- if we skip this and they write zero --

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THE COURT:  Right.

ATTORNEY GREEN:  I don't see the difference between that and a no to this question.

THE COURT:  Would I be able to distinguish that whatever injury be proven that they haven't determined was because of some other event or some other issue that happened to him?

ATTORNEY GREEN:  I mean, if they are writing zero, then I don't know if that even comes in.

THE COURT:  Do they necessarily get to the proximate cause issue?

ATTORNEY GREEN:  I mean, I think --

THE COURT:  I understand your argument.  Let me just think about it.  I'm not going to give you a decision on it right now.

ATTORNEY GREEN:  Understood.

THE COURT:  But I do understand.  All right. And then -- so that kind of --

ATTORNEY GREEN:  I think you know our thoughts.  So however you want to rewrite the form.

LAW CLERK:  I want to make sure I'm on the same page, Judge.  Am I correct that we're breaking up what was one into now one and two?

THE COURT:  Yes.  We are going to use the form -- we're going to use, in essence, Mr. Mitchell's

verdict form as it pertains to his question one and two. Breaking up whether or not a visual body cavity search occurred, and then if it did, whether or not there was reasonable suspicion to believe that Mr. Sloley had something secreted in his body.

And then we're going to get to damages question.  The question is whether or not we then -- if they find one and two --

ATTORNEY GREEN:  Yeah.

THE COURT:  -- do we ask them whether or not it is proven by a preponderance of credible evidence that the defendant Eric VanBramer's conduct proximately caused Plaintiff's injury.  So that -- that's a question.  You don't want us to ask that question of the jury?  Because you think it's unnecessary --

ATTORNEY GREEN:  I think it's unnecessary --

THE COURT:  -- for a --

ATTORNEY GREEN:  I think it's unnecessary but if the instructions moot it out anyway saying if you answer no to this, you still answer the next question, we don't have an issue with it being there.

THE COURT:  Right.  Okay.

ATTORNEY GREEN:  I just --

ATTORNEY MITCHELL:  I think this says if they answer no to two, then --

ATTORNEY GREEN:  Proceed to one.

ATTORNEY MITCHELL:  -- they just hand in the verdict sheet.  Case over.  They haven't proven one of the elements of 1983 proximate cause.

ATTORNEY GREEN:  Right.  And we're putting that to the side to discuss just the pure mechanics.

THE COURT:  If we wind up leaving it in there as is, if they answer no, case over.  If they answer yes, we go on to what sum of money, if any, that you find that Plaintiff, Maxmillian Sloley, has proven by a fair and preponderance of the credible evidence, et cetera.  Is there any objection to that --

ATTORNEY GREEN:  No.

THE COURT:  -- language?

ATTORNEY GREEN:  There's -- there's no -- no objection, but I do -- I do think, right? -- if -- this instruction but plaintiff did not sustain any actual punitive or compensatory damages as a result of this violation is the same meaning as Defendant Eric VanBramer's conduct proximately caused Plaintiff injury.  Right?  Those -- those are purely synonymous.

THE COURT:  It looks like the explanatory language to three does tell them that -- first of all, it sets up as a different question than two, but it does tell them that if they found that there was a violation,

they have to award nominal damages.

ATTORNEY GREEN:  Right.

THE COURT:  Which is your point with two.  If there was a violation, then they have to award nominal damages.  So you're saying they don't get to proximate cause, it's unnecessary because nominal damages has to be awarded.

ATTORNEY GREEN:  Exactly.

THE COURT:  And you miss -- proximate cause is required, as far as you're concerned as an element.

ATTORNEY MITCHELL:  Yeah, I think actually these -- this is pretty similar to what Judge Hummel had.  He had the separate proximate cause and then he had a very similar question about this with damages and the Court didn't find anything wrong with it.

THE COURT:  I mean, I -- I know I relied on Judge Hummel's prior decisions.  I think, independently though, I'm -- I'm confident that the way it's written, it incorporates the necessary elements, and I'm going to keep it as is.

ATTORNEY GREEN:  Keep it as is?

THE COURT:  Keep it as is, as this is -- this is as far as I want the jury to determine whether or not there was a preponderance of credible evidence that Eric VanBramer's conduct proximately caused the injury, and

then I guess the only question is --

ATTORNEY GREEN:  This is the problem.

THE COURT:  I know.  I keep going in circles. All right.  Let me do a little research on it and then I will decide it before you guys have to close.  Because I want to be able to talk about it.

ATTORNEY GREEN:  For what it's worth, with Judge Hummel, part of the issue was we had objected to nominal damages at all and part of the theory there was you can't really have nominal damages or plaintiff's objection on a -- on a case where it's more than, like, a momentary violation of a First Amendment right or something like that.

Right?  The nominal damages doctrine comes out of kind of real token violations, not serious searches that are inherently degrading.

ATTORNEY MITCHELL:  No, that's not correct. There have been all kinds of jury verdicts involving strip searches.  For example, in prison where the jury just writes one dollar.

ATTORNEY GREEN:  I didn't say it's never happened.  I said it comes out of cases.

THE COURT:  So we have gotten through almost everything.  I'll get you a determination on the ultimate verdict sheet.  I've heard your objections and

I understand where you're coming from.  We will certainly run it by you before closings.

ATTORNEY GREEN:  There was one thing.  I think -- I think this may just be where you land in the version of question two.  In Defendant's proposal they say evidence and this instruction says contraband.  I think contraband is the better word given the facts of the case.

THE COURT:  All right.

ATTORNEY GREEN:  It -- hidden evidence --

THE COURT:  You're talking about what we -- we have use contraband in our proposed language.

ATTORNEY GREEN:  Yeah.  Yeah.

THE COURT:  Instead of evidence.

ATTORNEY GREEN:  Instead of evidence.

THE COURT:  Hidden contraband instead of evidence.

ATTORNEY GREEN:  Yeah.

THE COURT:  I agree with that.  I mean, Mr. Mitchell can note your objection if you have it.

ATTORNEY MITCHELL:  I think either one would work.

THE COURT:  Okay.

ATTORNEY MITCHELL:  I assume the jury understands what contraband means, and so --

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

ATTORNEY GREEN:  Agreed.

THE COURT:  If you are concerned that they won't, tell them in your closings.  All right.  We'll be out probably -- what time?  We told them 2, didn't we?

ATTORNEY GREEN:  Yes.

ATTORNEY MITCHELL:  Can I mention number four?

THE COURT:  Yes.

ATTORNEY MITCHELL:  I don't have a problem with the question, but I think the jury needs to be informed that if they say yes to this, there will end up being a further hearing on a different day.  I just think they ought to -- out of respect to them, their time, their lives, they should be informed about that.

THE COURT:  Right.  And I think I -- in the instruction I think we say there would be another hearing about it.  I don't want to --

ATTORNEY GREEN:  We didn't object to -- you know.

THE COURT:  I think it is unnecessarily prejudicial to say you'll have to come back again to determine that issue.  While they will, I don't want to tell them that because, frankly, if I was a juror, I would probably click no, because I don't want to come back, and that's something that I would be concerned that they would do.  So, I don't want to include that.

But I understand your request and note it.

ATTORNEY GREEN:  For the record, we are not closing on punitive damages and one go over our objection.

THE COURT:  What's what?

ATTORNEY GREEN:  We believe that just everything should be submitted to the jury at once.

THE COURT:  Okay.

MR. MITCHELL:  I oppose that.

THE COURT:  I mean, we're not --

ATTORNEY GREEN:  I understand where we are just --

THE COURT:  So we will be out in probably ten minutes.  Thanks, everyone.

(Held in open court.)

THE COURT:  All right.  We're back on the record.

We have adjusted the jury verdict form.  Has each had an opportunity to take a look at it?

ATTORNEY GREEN:  Yes, Your Honor.

THE COURT:  I think that should conform more closely to what you were speaking about, Attorney Green?

ATTORNEY GREEN:  Exactly, Your Honor.

THE COURT:  Mr. Mitchell, do you have an objection to that particular form?

ATTORNEY MITCHELL:  Yeah, I -- I think that, as we discussed in the back, I agree with having one of two separate but then -- and with -- and having three as well, but then I think that instructions about nominal damages ought to go with Number 4 and that for Number 3, if they say no, I think then -- then the case should be dismissed.

THE COURT:  All right.  So I did -- I do think there was some internal inconsistencies with the original jury instructions form that we provided.  I do agree with the plaintiff that if -- if a violation of constitutional rights is established, then that would be so if they get to questions one and two, then nominal damages are required.

So, I'll note your objection, and we're going to go ahead and proceed with this particular form.

All right.  So, I've also provided the jury instructions.  We've incorporated all the changes that I think we have discussed.  If you have an opportunity before we actually give those instructions, we can address them after closing if there's anything.

Have you looked through them already?

ATTORNEY GREEN:  I have had a little opportunity, and I think that that conforms, and we already talked about everything.  So --

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THE COURT:  All right.  Mr. Mitchell, have you had a chance to look through them?

ATTORNEY MITCHELL:  We looked through them a bit.  I mean, if there is a little more time later, we might want to.  But it appeared that it's all issues we already argued.

THE COURT:  Did you -- do you have any idea on how long your closings might be?

ATTORNEY GREEN:  Mine is going to depend in part on Mr. Mitchell's, but I think the affirmative material I have is probably 20 minutes.

THE COURT:  Mr. Mitchell, what do you think?

ATTORNEY MITCHELL:  Mine will be ten.  I'm not long-winded.

THE COURT:  Okay.  I just wanted guidelines on that.  I'm not going to hold you to any particular timeline.  You're both seasoned attorneys.  So I think you know the drill.  So -- but I just wanted -- for scheduling purposes, I think we will then have time to quickly address anything you note in the new revamped instructions, not including the objections you've already made.  And then we will bring them in, I can charge them, and so on.

So, Mr. Mitchell, though, we left and -- we were going to go through the exhibits.  Are those in

order, sir?

ATTORNEY MITCHELL:  Yes.  So -- and I have them right here.  I just wanted to confirm.  So the defense exhibits that are in evidence are D1, D3, D8, D12, D13, D20, which is the test kit, and then D19 was admitted to be able to show to the jury, but I understand it's not going to be sent to the back.

THE COURT:  That was the dog poster?

ATTORNEY MITCHELL:  Right.

THE COURT:  Yes.  Correct.

ATTORNEY GREEN:  That's correct.

THE COURT:  What about --

ATTORNEY GREEN:  I'm sorry.  And then P3 is the one we offered.

THE COURT:  All right.

ATTORNEY GREEN:  Miss Rollins' affidavit.

THE COURT:  Ms. Burtt, that conforms with what we have?

COURT CLERK:  Yes.

THE COURT:  So, Mr. Mitchell, the defense closing?  Or resting?

ATTORNEY MITCHELL:  Yes, I can do it in front of the jury, if that's what you wondered.

THE COURT:  That's what we want to do.  We can go ahead and get them.

ATTORNEY GREEN:  Briefly, because we printed out and we didn't have a copy of the redacted, is there a second copy of Miss Rollins' affidavit that I can use during closing?

COURT CLERK:  Yes.  Well, I will print out another one where I can give you the one that's marked. I'll just need it back.

ATTORNEY GREEN:  I appreciate it.

COURT CLERK:  No problem.

ATTORNEY GREEN:  Thank you so much.

(Jurors present, 2:52 p.m.)

THE COURT:  Please be seated.

Ladies and gentlemen, thank you for your patience.  I know I was very poor at estimating the amount of time it was going to take us to do what we had to do.  Rest assured that no one had lunch and we have been working since we left here.  So I appreciate that.

And with that, I think, Mr. Mitchell, I think the exhibits are now in order for the Court.

Do you have any further witnesses to present?

ATTORNEY MITCHELL:  Your Honor, the defense rests.

THE COURT:  All right.  And just so the record is neat, Plaintiff, no rebuttal witnesses?

ATTORNEY GREEN:  No, rebuttal witnesses.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

Thank you, Your Honor.

THE COURT:  You rest as well?

ATTORNEY GREEN:  We rest.

THE COURT:  So, ladies and gentlemen, that ends the proof of the case.  The next portion is going to be to hear from each of the sides with the closing argument.  So I'm ready to proceed right to closing argument, as I think the parties are.  So we can proceed.

When you're ready, Counsel.

ATTORNEY MITCHELL:  So, on behalf of my client, Eric VanBramer, and my co-counsel, Rachel Ouimet, I want to thank you for your service as jurors. We appreciate that you listened to the evidence and the testimony, and I hope it was also interesting for you.

What is the claim in this case, really? Basically, the plaintiff is claiming that someone looked at his behind for approximately one second.  That's it. And he claims that this was a violation of his constitutional rights.

So it's up to you to decide whether, on the basis of the evidence you have heard at this trial, Eric VanBramer should be found to be a person who violated the Constitution of the United States.

Just think about what a serious allegation

that is to make against any American, but particularly against this man who spent approximately 19 years working for the state police.

ATTORNEY GREEN:  Your Honor, I'm so sorry. I'm so sorry.  This is -- I think this goes to the in limine ruling.  I don't want to interrupt but I think this is exactly what the Court said could not happen.

THE COURT:  All right.  I know what you're saying.  I'll ask Mr. Mitchell to just make sure he's in compliance with the in limine rulings going forward. And please continue.

ATTORNEY MITCHELL:  As the judge discussed at the beginning of this case, the plaintiff, Maxmillian Sloley, has the burden of proof.  He must prove his claim by a preponderance of the evidence.  The defendant, that's our side, doesn't have to prove anything.

I'd like you to ask yourself, based on the evidence at this trial, is the plaintiff, Maxmillian Sloley, someone who --

ATTORNEY GREEN:  Your Honor.  Objection.

THE COURT:  I'm going to overrule that.

ATTORNEY GREEN:  Okay.

ATTORNEY MITCHELL:  Starting over.  I'd like to ask you, is the plaintiff, Maxmillian Sloley, someone

who would tell falsehoods and smear another person to benefit himself?  Would he make up false, self-serving allegations in an attempt to persuade you, the jury, to put money into his pocket in this case?  I suggest that that's exactly what the plaintiff is doing at this trial.

You heard testimony about the plaintiff's criminal history.  Criminal possession of a weapon in the second degree, unlawful fleeing from a police officer in a motor vehicle in the third degree, criminal impersonation.  At the time of this incident, he was on supervised release.

We also talked about the plaintiff's numerous aliases:  Ronnie Perry, Kevin Madison, Jerry Ebanks.  All false identities that he's given to the police when they arrested him.

Do you think that Maxmillian Sloley was being honest with you about what happened on April 1st, 2013, at Daphne Rollins' home?  Do you recall his testimony about how Daphne Rollins supposedly was the aggressor?  That she just fell?  That it was all just a misunderstanding?  Is that consistent with the physical evidence you heard about, including physical injuries to Daphne Rollins, the windshield of her car smashed with a baseball bat, her iPhone in the street with a cracked

screen?

And do you remember the plaintiff admitted to you that he lied to the police about the incident.  He told them that Daphne smashed her own windshield.  And after all that -- the beating, the property damage, his infidelity -- the plaintiff thinks actually he was the victim in that whole episode.

So not only was Plaintiff not telling you the truth about that incident, but he takes no responsibility for his actions.  The plaintiff claims that as a result of the search on April 1st, 2013, he supposedly suffered mental and emotional injuries.  He described them as fear, paranoia, anxiety, humiliation, and fear and loss of trust for law enforcement.

But when the plaintiff was on the stand, you had a chance to observe his demeanor.  Did he seem emotionally traumatized?  Did he seem overcome with fear and anxiety?  Or was it more like he was just going through the motions, saying what he thinks he's supposed to say to convince you, the jury, to give him money in this case?

Also you heard that the plaintiff has three other cases where he claimed mental and emotional injuries.  One was against the Greene County sheriff and the Greene County Jail, he had another case against the

City of Hudson Police, and then there was a third case filed in 2023 against various medical providers.  He's claiming the same mental and emotional injuries that he's claiming in our case.  However, in those other ones, he said those injuries were caused by other people, in other places, at other times.

And also Plaintiff admitted that he's been subjected to many other strip searches, including where an officer directed him to squat while naked and the officer looked at him.

The plaintiff is basically asking you to believe that this was all some sort of huge plot against him, I guess he's claiming there was no positive alert by Ryder.  He's claiming there was no white chunky substance in the driver seat of the car.  He's saying there's no field test.

Apparently he's even claiming that the evidence custodian was making false entries in the record, that people were holding evidence in a vault that did not even exist.  But did he present any credible evidence to support that outlandish theory? And what was the officer's motive for concocting this plot to frame the plaintiff?

The officers -- Bryan VanBramer and Eric VanBramer -- had never had an issue with the plaintiff

before that date.  The plaintiff did not even live in the county.  They had no way of knowing he would sneak into Greene County on a random Monday morning at 2 a.m.

Actually, the proof at trial showed what really happened.  There was a 9-1-1 domestic violence call that Bryan VanBramer responded to.  The victim, Daphne Rollins, told him, among other things, that Maxmillian Sloley might be in possession of drugs.

The plaintiff was fleeing from the scene, was stopped by the Greene County sheriff and arrested.  Eric VanBramer, that's the defendant, proceeded to the vehicle with Ryder, his highly trained police K9.  Ryder had a positive alert on a few different parts of the car, and Eric VanBramer explained how that works, how the dog's nose is extremely sensitive, and he explained what an alert is and how the dog alerted to different parts of the car.

That point, Eric VanBramer spotted a small amount of a loose, chunky substance in the driver's seat that looked like cocaine.  It appeared to him that the driver had been in a hurry to conceal contraband but some of it fell onto the seat, and in accordance with his training, Eric VanBramer performed a field test on the substance; it was positive for cocaine.

So I expect the Court will instruct you that

Eric VanBramer's search of the suspect had to be supported by reasonable suspicion.  It has to be based on specific facts and you're supposed to look at all the circumstances.  And I think the Court will talk to you about how it has to be based on more than a mere hunch but it doesn't have to rise to the level of probable cause.  Probable cause is the standard for arrest.

And the evidence in this case overwhelmingly met this burden of showing reasonable suspicion.  There was the victim's statement that the plaintiff might be in possession of drugs.  There was the fact that Plaintiff was fleeing from the scene in his vehicle at the time.  There was the positive alert by the K9, Ryder, and most significantly, Eric VanBramer found cocaine in the driver's seat.  And Eric VanBramer was entitled to rely on his own experience dealing with different drug arrests to form a suspicion about what might have happened in that car.

So I want to address a few issues I think the plaintiff might try to confuse you about in this case. The plaintiff claims that Eric VanBramer carried out a visual body cavity search.  But if you recall, actually the testimony proved that wasn't true.

The evidence showed Eric VanBramer performed a strip search that included the plaintiff squatting and

opening his own buttocks.  But Eric VanBramer was only looking at the outer skin.  He did not look inside the body.  In fact, Eric VanBramer was standing several feet away from the plaintiff during the search.

And during the search, Eric VanBramer never touched the plaintiff, never put anything into the plaintiff's body.  He didn't stick a probe into the plaintiff.  He didn't touch him at all.

Another thing I think the plaintiff wants you to think that just because Eric VanBramer did not find drugs during the search of the plaintiff's body, that that means there couldn't be reasonable suspicion. That's false.  Whether or not ultimately drugs were found as a result of the search is irrelevant.

What matters is what were the facts available to Eric VanBramer before the search that made it reasonable for him to think that the plaintiff was hiding drugs in the areas of -- of plaintiff's body that Eric VanBramer searched.

There was also testimony about the field test that Eric VanBramer used, that was the test to test the cocaine recovered from the plaintiff's vehicle.  Seems like the plaintiff thinks that maybe it isn't a very good test, maybe that occasionally it gets the wrong result.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

However, Eric VanBramer's working in the field. He was trained by the state police and provided with this test, so that's what they give him to work with. He doesn't decide what tests the state police is going to order and provide to its troopers. If the plaintiff thinks that the field test should not be provided to officers in the field, that's an issue they can take up with the management of the state police, not Eric VanBramer, who's working the streets as an officer.

So to conclude, the plaintiff, Maxmillian Sloley, presented no credible evidence whatsoever to support his outrageous claim in this case. Fortunately, Eric VanBramer had the opportunity in this trial to come to court, to face his accuser, and to defend himself before a jury of his peers. And I think the trial showed you that Eric VanBramer is not the villain the plaintiff would have you to believe.

What you learned at this trial is that Eric VanBramer's been working for the state police for 19 years. He's the troop K9 coordinator supervisor responsible for 16 dogs. When a 9-1-1 domestic violence call goes out at 2 a.m., as happened in this case, he's one of the people that responds.

When there's an emergency response issued that requires hazmat involvement, he's part of the team that

responds to that.  When there's a bomb that needs to be disposed of, Eric VanBramer is one of the ones that goes to the scene to dispose of the bomb.

So I respectfully submit to you the only verdict that evidence supports in this case is a verdict that Eric VanBramer did not violate the plaintiff's constitutional rights.  With that verdict, Eric VanBramer can leave this courthouse with his head held high, and justice will have been done in this case. Thank you.

THE COURT:  All right.  Thank you, Mr. Mitchell.

Is there a closing statement for the plaintiff?

ATTORNEY GREEN:  Yes, Your Honor.

THE COURT:  Please proceed, Attorney Green, when you're ready.

ATTORNEY GREEN:  Okay.  If you will excuse me. It will just take a moment to get set.  Excuse me for being a little further away.  So if I can -- okay.  If I can have that on the screen, I would appreciate it. Okay.  Let me also just -- okay.

Members of the jury, thank you all so much for listening closely, for spending your time, for spending your valuable energy on this case.  I know Mr. Sloley

appreciates it, I appreciate it.  And I think the one thing that all of the counsel have -- here agree on thoroughly is that what you were doing is of vital civic service.  Mr. Mitchell thanked you all thoroughly, and I know you've been paying careful attention.  So I'm not going to belabor the point more than saying I join all of the sentiments he expressed to you.

Getting into it.  You probably notice that we stopped asking questions at a certain point today.  That's because after so long in this case, since 2013, we finally got an admission, an agreement on what happened.  You heard it, I heard it, and there was no ambiguity.

Trooper VanBramer admitted that he had -- and this is I think a verbatim quote -- quote, or that -- that he -- and I think this a verbatim quote -- quote, didn't have reasonable suspicion to think that Mr. Sloley had drugs in his body.

That's the standard.  That's what Judge Hummel [sic] is about to instruct you.  You need to think he had in order to return a verdict of not liable.  Instead of addressing that, all you've heard from the defense side of the table is distraction, obfuscation, talking about touching.  A visual body cavity search doesn't have touching.  Probes, conspiracy

theories.  That's not what we're arguing.  Criminal background.  Their witnesses, at least when we asked them questions, don't answer questions directly, and so on and so on.

In fact, the last thing that Mr. Mitchell talked to you about wasn't anything about this case.  He was talking to you about bombs.  There are no bombs in this case; this is a case about a search.  If they were confident, if they were sure that they were in the right, why were they trying to bolster Trooper VanBramer's testimony by taking about what he does other than this search?

To find for us, you don't need to see a conspiracy.  You don't need to find, as they suggested, a manual body cavity search.  And ultimately, I think we can actually harmonize all the testimony.  No one has to be lying.  You don't need to see a plot.  I'm sorry.  I said that.

At the start of this trial, no -- well, I got ahead of myself there.  We will get there too in a moment.  Let's just --

Defense counsel, at the start of this trial, promised that you would hear two competing narratives.  Two things that could not both be true at the same time.  I don't think that was what you heard.  That was not

what I heard.  The evidence was, if anything, shockingly consistent.

So let's talk about the core of the story and let's talk about cookies and dishwashers.

Trooper VanBramer used, I think, a powerful analogy when he talked about what a dog does.  A dog generally smells things.  A dog goes in and looks for the general smell.  Sometimes a dog can go further.  It can paw at something and give a final alert.  It can do all sorts of things.  But all we have here is a dog, in his words, smelling cookies in the house.

He admitted when I asked him, there would be no reason with the smell of cookies to think the cookies were in the dishwasher.  I'm using dishwasher, again, because what we're talking about here is extremely awkward.  I'm not comfortable talking about it.  You heard, you know, the joke that Judge Evangelista and I shared when he said, you know, I am not sure what you're allowed to do with a pen or I don't think the witness was sure.

What happened here?  The narrative? Mr. Sloley was involved in something that was very bad. He did -- he was not in the right in the house.  What he did with Daphne Rollins was not good.  But as you saw from Daphne Rollins' affidavit, and we will talk about

that more in a moment, she does not agree that -- that -- with what happened to him.

The police here were not protecting a victim. The police here were going further. They were going too far. There was a fight. Both windshields were smashed. You did not hear any testimony that Daphne Rollins did not also smash Mr. Sloley's windshield. In fact, that's probably how they identify the car. He was pulled over. He pulled over promptly, you heard.

He was searched there, and then he was taken back to the barracks where Trooper VanBramer, his words, made him stand against the wall, place his hands on the wall, remove each item of clothing which Trooper VanBramer searched, could not find anything, and then he went further.

Then he made him bend over, spread his butt cheeks and stared into his anus. Not inside his body. He didn't use a speculum, he didn't make him tear it apart. But he did look into his anus. He -- he looked into his anus and the only way you can visually. That is a visual body cavity search. You will hear from Judge Evangelista that that's what it is.

ATTORNEY MITCHELL: I object. I think the Court should be able to give its own instructions.

THE COURT: Objection's overruled.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

Ladies and gentlemen, counsel can offer opinions on what they think I'll say.  What I say is -- will be what I say during the instructions and those are the instructions on the law that you should follow.

You can proceed, Counsel.

ATTORNEY GREEN:  Okay.  And as you heard from Ms. Yu at the start of the trial, what we're talking about here is not psychological damage, it's not post-traumatic stress disorder.  It's what's called garden variety emotional distress.  Distress that you would expect anybody to have when their rights are violated.  That might not be millions of dollars.  It need not be.

So, let's go in and talk about the details of what happened here.  The details of body cavity searches.  A visual body search is one in which a police officer searches a subject's body --

ATTORNEY MITCHELL:  I think this intrudes on the Court's instructions.

THE COURT:  Overruled.

ATTORNEY GREEN:  Without touching the subject, such as by having the subject bend over or squat and cough while naked.

Here's what Eric VanBramer said it was. Police observed the inside of somebody's body, not the

exterior of the skin, even the exterior of the anus, without touching them, and it does not include having the suspect bend over to allow observation.

Here's what Eric VanBramer said he did.  He had Max stand with his hands against the wall without touching him and had Max bend over and spread his butt cheeks to observe Max's anus.  That is a visual body cavity search.  It will line up exactly with the instructions you're going to hear from Judge Evangelista.  There's no question here that a visual body cavity search, such as Judge Evangelista will define for you, took place.

The problem is this.  As you will be able to infer from the jury instructions, Eric VanBramer's understanding of what a visual body cavity search is is wrong and that means he did not even evaluate the right standard for probable cause.

ATTORNEY MITCHELL:  I object.  This standard is not probable cause.

ATTORNEY GREEN:  I'm sorry.  I --

ATTORNEY MITCHELL:  I think this needs to be struck.

ATTORNEY GREEN:  We can strike this or we can replace it with reasonable suspicion.  That's fine.

THE COURT:  All right.  I'm going to ask

counsel to take a breath.  I appreciate the advocacy.  Closing argument.  I think that was a misuse of the word.  You can strike probable cause from the record.  You can address it, but let's try to move forward.

ATTORNEY GREEN:  Okay.  Trooper VanBramer admitted he, quote, didn't have reasonable suspicion to think Mr. Sloley had drugs in his body.  Remember, the dishwasher and the cookies.  Just because you smell cookies doesn't mean cookies are in the dishwasher.

We can confirm that he was wrong by looking at his reasoning.  Let's talk about the facts.  The K9 alert.  Would that be a suspicion to stop Max?  Yes.  Would it be suspicion to do a mere strip search?  Probably.  Would that be suspicion to think that there was something inside the anal area?  No.  Even if you believe it -- that the sniff happened, you don't have to resolve conflicting testimony.  The sniff could have happened.  The alert could have happened.  But that's only a belief that there were drugs in the car, not inside his anus.

Same thing with chunky residue.  Maybe suspicion to strip search, probably suspicion to stop, but even if you believe it happened, there was no residue on the clothing.  Trooper VanBramer admitted, as he went through each item of clothing, as -- as he, you

know, already had disposed of all of the physical evidence, he didn't find anything else and, frankly, I'm not sure it's completely credible for him to say he didn't care much about finding more drugs.

He was going as far as doing a visual body cavity search.  Of course he wanted to find more drugs and he admitted he did not find them on the clothing. If his theory of what happened were genuine, he would have found them on the clothing.

What about what his brother said?  I think we need to focus on what his brother actually said.  He -- he said that Mr. Sloley may be in possession of drugs. That is not saying that he has a reasonable suspicion based on particularized facts that there are drugs inside Mr. Sloley's body cavity.  It's far from it.

Moreover, the drugs he was talking about at the time were Percocet.  Right?  We heard that.  They emphasized it.  They were -- they were very strong in saying it was Percocet.  Nothing was mentioned about the anal area.

What about fleeing?  Again, this might not even be enough on its own for even suspicion to stop. And we know that this was not a sincere basis because Trooper VanBramer admitted he didn't have the dog search where, if somebody would have thrown drugs out of the

car, if the person was fleeing, he didn't bother having Ryder sniff there. That is not really what is really going on here.

Eric VanBramer even described his suspicion without discussing -- and this was just generally, he described his suspicion what was going on by saying Mr. Sloley may be in possession of drugs. That's not the suspicion that it's in a body cavity.

Here are some reasons that Eric VanBramer admitted were not in place here. No one was fidgeting. He testified that if he remembered it, it would have been in the paperwork. He was not driving erratically. No information about stuffing something into his pants, reaching into his pants. Anything of the sort. And no residue on Max anywhere in his clothing or anywhere besides in a crease in Max's mother's car.

There was no observation of anything else unusual in the car and they didn't -- if they really believed there were drugs, why didn't they seriously search the car like Trooper VanBramer testified he's done and did very well.

Again, the search itself. Nothing was found. Nothing at all caught his attention when Max was stripping. Nothing caught his attention when Max was naked, and nothing at all caught his attention when Max

was spreading his cheeks.

So to recap.  On one side of the scale we have the K9 alert, the chunky residue, what VanBramer's brother said.  And I -- I think I have missed an item here, which is going to be fleeing, and that will be the next slide.

On the other side we have no fidgeting, no driving erratically, no act or information suggested even hiding drugs, and nothing unusual on the car, no residue on Max and his clothing.

So, we can zoom in on each of these as we just did.  Fleeing.  They didn't search elsewhere.  But VanBramer's brother said he may be in possession of drugs.  Chunky residue.  There was no residue at elsewhere and, yes, we do think the drug test is problematic, especially because, as Trooper VanBramer said, he used more than enough.  He made sure to dispose of everything, and he didn't look for more to do the better test which they would have had had to do if they -- I'm sorry.  Strike that.

And the K9 alert.  You heard that the dogs are curious in nature such that they might even try to eat drugs on duty.  It was in the car only and all that Trooper VanBramer remembers is a -- is some minor change in behavior, not a final alert.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

So we're left with this.  But that, again, leaves off the most important piece of the scale. Trooper VanBramer admitted he did not have reasonable suspicion to think Maxmillian Sloley had drugs inside his body.  And we know any suspicion that there were drugs in Max's anal area was not grounded because everyone admits no drugs were found.  Everyone admits Trooper VanBramer did not have reasonable suspicion to think Mr. Sloley had drugs in his body.

So, let's say that's not enough.  I think it is.  Let's say it's not.  We do have another witness. We have Miss Rollins' affidavit.  Both the ones they submitted on their document cross-examination and the one we submitted.  So, let's take a look at those.

If we can publish this to the jury.  I will zoom out.

First, we have what she submitted to help us. First and foremost, the state police blatantly lied and said that I told them that Mr. Sloley possessed or possibly possessed or was in any way connected to any activity.  I never -- to any drug activity.  I never said any of those things or anything remotely close to those things that night, and I -- I have done a bad job of reading because I'm bad with her handwriting but you get the idea.

Now, I think that can be harmonized with the trooper's memory because I think when she's saying drugs here, she's talking about crack cocaine. When the troopers are talking about drugs and him being involved in drugs, they're talking about Percocet. Those are two very different things, and the search was certainly not based on suspicion that he had Percocet inside his body cavity.

Now, what about her other affidavit? The one that the police themselves got to hand write. You heard them. This was written by a police officer and dictated by Miss Rollins. It says nothing about drugs. If drugs were important, if they thought there were drugs, if Miss -- if Miss Rollins was saying something about drugs, she -- they would have put it in this report. They would have asked her to say it and sign it. She would not sign a statement that says there were drugs.

So, with that, let me talk about what we are going to do here. Or -- I'm sorry. What your next task is.

You're going to get a verdict sheet. It's going to have a number of questions for you. The first two questions are going to be about whether a cavity search existed, happened at all and whether it was with reasonable suspicion. We think that you should answer

that the search did happen and it was not with reasonable suspicion.

You're then going to be asked to assign a dollar value if you have answered those two questions in our favor.  That is a hundred percent up to you, but I do want to say a few words about damages.

As we told you in opening, the damages here are what are called garden variety damages.  Just the normal damages you would expect.  To that end, I think it's -- it's difficult to swallow what defense counsel argued here at the table.  Defense counsel essentially argued that once you had one injury of an emotional kind ever, you can never have another one.

If I have trouble sleeping because I have stress because of law school, I can't also have trouble sleeping because I have stress because of this trial.  It doesn't make sense.  If I have anxiety because of this trial, I can't have anxiety because I care a lot about what Judge Evangelista thinks of me.

Those two things can both be true.  I can lose sleep, I can have anxiety about both things.  It just doesn't make sense.  The idea that -- that saying that you have been emotionally harmed once means that you can never be emotionally harmed again, I don't think any of us thinks that makes sense.  It's not the same injury.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

Now, you do have one interesting option on the jury sheet and that's what are called nominal damages. Nominal damages exist because to vindicate certain important civil rights --

ATTORNEY MITCHELL:  I object.  I think this is going to the Court's instruction.

THE COURT:  Ladies and gentlemen, as I've already told you, I will instruct you on the law. Counsel is offering her take on that.  So I'll overrule the objection.

ATTORNEY GREEN:  If you think that a constitutional right has been violated but that you don't feel it's appropriate to award money, significant money for it, you can award one dollar.  That is a symbolic award that establish -- that says there was a right violated here but there were no real damages. There was no way to quantify it.  That is an option available to you.

What we would ask at the end of this is that you think very hard about what testimony you heard.  At the end of the day, the only thing you should be focused on is did a visual body cavity search, as Judge Evangelista will define it for you, happen and did Trooper VanBramer have a reasonable, articulable suspicion that he was going to find drugs inside a body

cavity?  He already testified that we win on both of those.  So I think you should return a verdict of liable.

Thank you so much for your time.  Thank you, Your Honor.  That's all I have to say.

THE COURT:  All right.  Thank you, Attorney Green.

Ladies and gentlemen, I have to ask counsel a few questions outside of your presence.  I can have you remain there and do it on the sidebar, or I can have you go back to the jury room for about ten minutes.  It's up to you.  Would you like --

JUROR:  Sidebar.

THE COURT:  Sidebar?  All right.  We are going to come over to the sidebar.  It may not be ten minutes, listen to the music.  We will be right back.

(Discussion held at sidebar.)

THE COURT:  All right.  So just -- just wanted to deal with the instructions.  I've provided the instructions with changes earmarked that we made.  Your objections to the instructions were previously noted. So I'm not looking for new objections.

Have you gone over the changes and -- this is what I'm going to read.  Is that acceptable to the plaintiff for now?

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

ATTORNEY GREEN:  Yes.

THE COURT:  All right.  Mr. Mitchell, not waiving any previous objections, this is what I'm going to read.

ATTORNEY MITCHELL:  This sets forth what you decided, yes.

THE COURT:  All right.  Very good.  That's all I need.  Thanks.

* * * * * * * * *

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

C E R T I F I C A T I O N


I, Lisa L. Tennyson, RMR, CSR, FCRR, Official Court Reporter, in and for the United States District Court for the Northern District of New York, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


                        /s/ Lisa L. Tennyson

                        Lisa L. Tennyson, RMR, RPR, FCRR